# EXHIBIT 1

5H - 84092001 - 0    Page 1

| | **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>Grant Agreement | **GRANT NUMBER (FAIN):** 84092001<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5H | **DATE OF AWARD**<br>07/08/2024 |
|---|---|---|---|
| | | **TYPE OF ACTION**<br>New | **MAILING DATE**<br>07/11/2024 |
| | | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>90711 |

| **RECIPIENT TYPE:**<br>State | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| EXECUTIVE OFFICE OF STATE OF ARIZONA<br>1700 WEST WASHINGTON SUITE 500<br>PHOENIX, AZ 85007-2812<br>EIN:  86-6004791 | EXECUTIVE OFFICE OF STATE OF ARIZONA<br>1700 WEST WASHINGTON SUITE 500<br>PHOENIX, AZ 85007-2812 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Blaise Caudill<br>1700 W. Washington St Suite 500<br>Phonex, AZ 85007-2815<br>**Email:**  bcaudill@az.gov<br>**Phone:** 520-312-5854 | Rebecca Taylor<br>1200 Pennsylvania Ave, NW, 4410C<br>Washington , DC 20460<br>**Email:**  taylor.rebecca@epa.gov<br>**Phone:** 202-564-5211 | Jennifer Brooks<br>1200 Pennsylvania Ave, NW, 3903R<br>Washington , DC 20460<br>**Email:**  brooks.jennifer@epa.gov<br>**Phone:** 202-564-6374 |

**PROJECT TITLE AND DESCRIPTION**

Solar for All Arizonans: Enhancing Access to Solar Energy for Low-Income and Disadvantaged Communities in Arizona - "Note: A special payment condition applies to this award."

See Attachment 1 for project description.

| **BUDGET PERIOD**<br>05/01/2024 - 04/30/2029 | **PROJECT PERIOD**<br>05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 0.00 | **TOTAL PROJECT PERIOD COST**<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW<br>Washington , DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** Keva R. Lloyd - Acting Chief, Grants Management Branch | **DATE**<br>07/08/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I) Clean Air Act: Sec. 134(a)(1) 2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41039 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

5H - 84092001 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

- MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

- Payment requests (if applicable): EPA Project Officer

- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with

local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

> Progress towards objectives on key performance metrics over the entire period of performance,

> Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

> Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

> Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

> Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*<u>The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition</u>*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**_The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:_**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**_The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:_**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

D. Signage Required

1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

<u>2. Public or Media Events</u>

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

II. Additional Programmatic Terms and Conditions

A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

### J. Participant Support Costs

### 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

<u>2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs</u>

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

**K. Labor and Equitable Workforce Development Requirements**

<u>1. Davis-Bacon and Related Acts (DBRA)</u>

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the [EPA Build America, Buy America General Term and Condition](#), which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

<u>4. Indirect Cost Rate</u>

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

<u>5. Sufficient Progress</u>

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.
This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

### 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

### 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

**AA. Compliant URL Links**

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

**AB. Flow-Down Requirements**

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

#### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

#### 2. Governance Requirements

#### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| TOTAL CONTRACTUAL | $2,120,000 | $2,106,350 | $2,077,741 | $2,069,173 | $2,065,648 | $10,438,912 | |
| **OTHER** | | | | | | | |
| Subgrant to Financial Partner for Residential Program | | $26,625,000 | $26,625,000 | $26,625,000 | $26,625,000 | $106,500,000 | $106,500,000 |
| Subgrant for "Arizona Solar" Deployment Partner | $15,400,000 | $15,400,000 | $15,400,000 | $15,400,000 | $15,400,000 | $77,000,000 | $77,000,000 |
| Subgrant for "Solar + Storage" Pilot Program Partner | $4,440,000 | $4,440,000 | $4,440,000 | $4,440,000 | $4,440,000 | $22,200,000 | $22,200,000 |
| Subgrant for workforce development training program | $4,360,000 | $4,360,000 | $4,360,000 | $4,360,000 | $4,360,000 | $21,800,000 | |
| Subgrant for Solar for All Arizonans Program Evaluation (Program Evaluation) | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $2,000,000 | |
| Subgrant to support technial assistance administration for local nonprofit and municipal partners | $308,000 | $509,000 | $509,000 | $509,000 | $209,000 | $2,044,000 | |
| TOTAL OTHER | $24,908,000 | $51,734,000 | $51,734,000 | $51,734,000 | $51,434,000 | $231,544,000 | $205,700,000 |
| TOTAL DIRECT | $28,215,890 | $55,052,978 | $55,049,849 | $55,067,526 | $54,791,033 | $248,269,070 | |
| **Indirect Costs  Indirect Costs** | | | | | | | |
| 23.25% on direct costs | | | | | | | |
| Direct Costs | $276,184 | $281,936 | $287,860 | $293,962 | $300,247 | $1,440,189 | |
| Contractual (10) | $58,125 | $58,125 | $58,125 | $58,125 | $58,125 | $290,625 | |
| TOTAL INDIRECT | $334,309 | $340,061 | $345,985 | $352,087 | $358,372 | $1,730,814 | |
| **FUNDING** | $28,550,199 | $55,393,039 | $55,395,834 | $55,419,613 | $55,149,404 | $249,999,885 | |
| **funding by** | | | | | | $115 | 82% |

# EXHIBIT 2

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Solar for All Arizonans Work Plan**
Project Period:  5/1/2024 – 4/30/2029
Submittal Date:  5/23/2023

**Project Title:** Solar for All Arizonans
**Grant Number: 5H-84092001**
**Organization Name:** Executive Office of the State of Arizona
**Geography:** Entire state of Arizona

Introduction

# Section 1:  Project Description

### 1.1 Overview

Solar for All Arizonans is a transformational opportunity for the State of Arizona to bring the benefits of the state's abundant solar resources to the state's low-income and disadvantaged communities (LIDAC). Arizona is one of the sunniest states, with one of the nation's fastest growing solar markets. Yet, the benefits of solar markets are not currently distributed fairly across Arizona's diverse communities. This program will provide $156M in EPA investments to benefit low-income and disadvantaged communities through innovative solar deployments and long-term changes to solar markets. Solar for All Arizonans will create multiple innovative market mechanisms that accelerate LIDAC distributed solar deployment on rooftops, in neighborhood solar projects, and in solar-plus-storage systems.

The benefits of these programs will include more equitable and just long-term solar development in the state, bringing the benefits of solar energy to low and moderate income (LMI) and disadvantaged communities in urban, rural, and tribal areas. The program will provide significant immediate savings on electricity bills for recipients of solar energy benefits, as well as extensive reductions of greenhouse gas emissions from the state's electricity sector, with larger reductions per dollar of federal investment in solar than any other state. Finally, it will provide greater resilience to accelerating heat and climate risks that fall disproportionately on LMI and disadvantaged communities.

The project will use tools such as the Climate and Economic Justice Screening Tool (CEJST) to identify and prioritize overburdened and underserved households across Arizona. Census tracts and communities designated as LIDAC as defined by the EPA, including Tribal areas, and dispersed low-income households under 80% of AMI will be prioritized.

1

## 1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Environmental Results - Outputs and Outcomes:**
**All outcomes will be based on SFA-funded solar.**

### Table 1. Output and Outcome Metrics

| Number of households projected to benefit from the solar program | |
|---|---|
| Total number of households benefiting | 11,232 |
| Award funding requested per household | $13,927 |
| Average savings per household per year | $588 |
| **Megawatts of solar capacity deployed** | |
| Total megawatts deployed | 61.2 MW |
| Total megawatts residential solar | 21.5 MW |
| Total megawatts neighborhood solar | 39.94 MW |
| Total awarded dollars per MW deployed | $2.5 million / MW |
| **Megawatts of storage capacity deployed** | |
| Megawatt hours deployed | 4.2 MWh |
| Total awarded dollars per MWh of storage | $890,000 / MWh |
| **Annual tons of CO2 avoided** | |
| Total tons of CO2 avoided | 96,789 (annual) |
| Total awarded dollars per tons of CO2 avoided | $64 / ton |
| **Annual household savings** | |
| Program-wide household savings | $165.74 M (25 years) |
| Total awarded dollars per dollars of household savings | $0.95 |
| **Workforce development** | |
| Number of workforce development events supported (bootcamps, trainings, recruitment events) | 3 |

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - o   Objective 1.1: Reduce Emissions that Cause Climate Change

## Section 2:  Project Design Plan

### 2.1 Activities to be Conducted.

Due to the novelty of this undertaking, Arizona will utilize the one-year planning period to stand up its program. Specific action items for this planning period are included at the end of each section of this workplan.

## Meaningful Benefit Plan

*Solar for All Arizonans* will enable low-income and disadvantaged communities to deploy or benefit from solar by focusing on the five meaningful benefits outlined by the EPA: household savings, equitable access, resilience, community ownership, and workforce development.

### Household Savings
*Solar for All Arizonans* will implement three solar deployment strategies, each of which will ensure low-income households save a minimum of 20% on their monthly utility bill. The Program Impact Evaluator and Compliance Manager will help establish mechanisms for calculating the 20% savings through certifications and audits. This will be determined during the planning period.

- **Strategy 1** (Distributed Rooftop Solar) will provide loans and grants for distributed residential rooftop solar photovoltaic installations for homeowners located in geographically dispersed low-income households and LIDAC communities.
- **Strategy 2** (Neighborhood Solar) will build neighborhood solar projects, which are 1 to 5 MW distributed solar installations built with grant funding. Partnering utilities who choose to participate will provide bill discounts to low-income households (both owners and renters), meeting a minimum savings of 20% for participating households. This program will be offered through existing utility discount programs for low-income customers or equivalent programs designed for this grant.
- **Strategy 3** (Rural & Tribal Solar + Storage) implements a resilience pilot program for distributed residential solar plus battery storage that prioritizes services to rural and Tribal areas, as these areas are at high risk from effects of natural hazards and climate change and stand to benefit the most from projects that increase household resiliency.

### Equitable Access to Solar

With cost being one of the greatest barriers to solar adoption, this program will offer multiple forms of financial assistance on an income-based sliding scale to greatly increase the

3

access of low-income and disadvantaged households to solar. Potential costs to households for participating in the program will be determined during the planning period.

- Strategy 1 and 3 will rely on a mix of grants and low-interest loans. For households making below 80% AMI, financial assistance will be provided in the form of a grant, as requiring repayment would impose too high of a financial burden on households at this income level. Households earning between 80% to 150% AMI will receive low-interest loans for solar, targeting rates that are subprime and low enough to incentivize solar adoption. Multifamily units where the owner earns above 130% of area median income and provides subsidized rent to low-income renters through programs like Section 8 housing vouchers can also access the low-interest loans, but will be required in the loan agreement to pass along the subsequent decrease in monthly utility bills if the monthly rent includes utilities. At least 50% of electricity and 50% of benefits will be delivered to residents in the utility territory. Neighborhood Solar as we define it here differs from Community Solar in that it will be owned by the utilities rather than mechanisms allowing for more direct ownership by communities. This is due to restrictive solar policies in Arizona.
- Strategy 2 will deploy financial assistance in the form of **competitive grants** to build 1 to 5 MW distributed solar projects, in partnership with local utilities. Proposals for strategy 2 must provide bill credits to low-income and disadvantaged households within the utility service territory. This strategy will specifically serve Tribal Nations, as well as LIDAC communities with a high proportion of renters, to complement Strategies 1 and 3, that serve, primarily, homeowners. Individuals living in buildings with master metering would have access to savings benefits if the landlord enrolls in the program. The landlord would then distribute saving benefits from neighborhood solar projects to eligibile residents. Further details will be explored during the planning period.

## Community Ownership

*Solar for All Arizonans* will maximize household ownership of solar energy for low-income and disadvantaged households. **Strategy 1** (Distributed Rooftop Solar) and **Strategy 3** (Rural and Tribal Solar + Batteries) will deploy solar that is nearly entirely owned by households. These strategies comprise 51% of grant funds ($80.3M). **Strategy 2** (Neighborhood Solar, 31% of grant funds, $48.05M) will promote **ownership of solar by community-based non-profits, cities, or other organizations or other third parties on behalf of low-income and disadvantaged communities and deliver financial benefits from those projects to households within those communities through utility rate discounts.**

## Delivering energy resilience and grid benefits

*Solar for All Arizonans* will increase household energy resilience **through a resilience pilot strategy for distributed residential solar and battery storage for low-income households in rural and Tribal areas.** Arizona will prioritize census tracts identified as being at the highest risk of natural hazards and impacts of climate change.

The program will evaluate each home, gather data from the occupants and determine the best overall solar and battery combination for the property. We will also explore the option of extending this program to critical community facilities, such as community resilience hubs, cooling centers, etc., that might be included in the program.

*Solar for All Arizonans* will also deliver broader grid benefits by increasing the proportion of the state's solar electricity generation. The project's distributed residential solar installations will reduce electricity demand and ease stress on transmission systems, especially during summer months, which will decrease the likelihood of a power outage during peak demand times and ensure a sufficient supply of electricity for low-income and disadvantaged households.

**Workforce Development**

*Solar for All Arizonans* will make significant investments in jobs and businesses located in low- income and disadvantaged communities. It will develop extensive workforce pathways to train new workers and upskill existing workers to build out the state's solar workforce capacity to meet ambitious project deployment goals.

During planning in year 1, the project will develop a series of competitive requests for proposals (RFPs) to procure the following types of contractors:

- A Solar for All Arizonans Residential Implementer: The Program Development and Implementation contractor will be responsible for designing and executing a technician management and referral system that provides a seamless solution for vetting, training, and deploying solar technicians through the various SFA programming. This implementer shall assist the Office of Resiliency in developing Solar for All Arizonans programing, including, but not limited to, identifying lenders to oversee low-cost residential loans, nonprofits for community outreach and engagement, Housing Finance Authorities for the green mortgage program, solar contractors and community colleges, Tribal colleges, universities, labor unions, and other community-based training providers for workforce development. The implementer will work with workforce development providers to ensure that graduates from SFA workforce development program will have the opportunity to work on SFA funded projects. Workforce benefits will be available in LIDAC communities where solar panels are targeted to be deployed.

  RFP selection criteria will give preference points based on ownership characteristics and labor practices. Ownership preference will be given to companies: located in a LIDAC tract or HUBZone, prioritizing LIDAC-owned companies. The State will prioritize companies that are a member of one of Arizona's Registered Apprenticeship programs or who subcontracts with a member, and to companies with a demonstrated commitment to "high road" labor practices that include paying at least the prevailing wage (using federal Davis-Bacon standards), providing family-sustaining benefits, providing predictable work schedules, paid time- off, retirement contributions, and safe and healthy working conditions. *Solar for All Arizonans* has set a target that 50% of contracts will meet one of the above ownership or labor practices parameters to ensure significant investment in quality jobs in low-income and disadvantaged communities. *Solar for All Arizonans* will prioritize contracts that include project labor agreements to pay prevailing wages, as well as prioritize working with companies that employ a workforce that is at least 40% individuals who live in low-income or LIDAC communities, aligning with the federal Justice40 initiative. These measures demonstrate the commitment of *Solar for All Arizonans* to job quality and expanding opportunities for workers from underserved communities.

5

● Program Evaluation Expenses Contractor: The Compliance contractor will provide analysis, post-award services, and oversight to ensure compliance with OMB Uniform Guidance and grant-specific requirements and serve as a resource for staff of grant-funded programs for fiscal and programmatic compliance matters.

## Financial Assistance Strategy

### 1.A. Financial assistance strategy to maximize solar deployment.

**Financial Assistance Strategy 1.**

Solar Rooftop Grants and Loans will invest $66.4M in grant funds to create programs for rooftop solar deployment in low-income and disadvantaged communities, targeting three market segments with distinct financial mechanisms. The program implementer will be responsible for operations, maintenance, and recycling of the assets funded under the program for the lifetime of the assets. This will include conducting audits of assets to ensure operations and maintenance is performed. These plans will conform with EPA's General Terms and Conditions "Automated Standard Application Payments (ASAP) and Proper Payment Draw Down" terms and condition. The overall percentage of funding that will be used for financial assistance will be determined during the planning period.

Market 1: Green Mortgages will invest $33M of grant funds to integrate rooftop solar deployment into the purchase of a new home, easing financial assistance and combining programs to simultaneously address housing and energy inequalities.

We will develop a new "Pathway to Solar" program to mimic a successful "Pathway to Purchase" program that lenders and mortgage professionals already understand. Homebuyers in allowed LIDAC communities who make under 150% area median income will receive a home mortgage bundled with down payment assistance (on average $13,800 of private capital) and a solar grant (on average $15,000) for rooftop solar panels. The solar grant will be structured as a "silent second mortgage" so the homebuyer will have zero payments and zero interest. Should they move or refinance prior to 10 years (a federally standardized period in the Mortgage Credit Certificate Program), the amortized amount is paid back to the Arizona Resilience Fund (a solar revolving loan fund) as a source of evergreen solar loan capital for Arizona residents. We will address plans for customer retention during the planning period.

We expect to install solar on 2,250 homes through the "Pathway to Solar" program, mobilizing an additional $48.3M in private capital through mortgage originations and down payment assistance. This program is expected to generate $14.5M in returns over the first ten years that will help fund the Arizona Resilience Fund to support solar markets for low-income and disadvantaged communities on an ongoing basis after the grant finishes.

The program is expected to generate $2M in revenue for each participating Housing Finance Authority (HFA) that can also be used to subsidize low-income and disadvantaged community solar markets at the HFA level. To participate in

6

the program, lenders and loan officers must be registered, approved and trained with the local HFA. Mortgage-making financial institutions and others are familiar with using criteria such as LIDAC designation and low-income metrics as qualifying factors for program eligibility and will implement these definitions for this program, with review and oversight by the program administrator.

Market 2: Energy Equity Catalyst Grants will invest $16.5M in grant funds to help existing low-income homeowners to install rooftop solar. This market will target households that earn under 80% AMI and provide a fully subsidized solar installation. *Solar for All Arizonans* will conduct an annual competitive grant process for nonprofit organizations and/or qualifying municipal entities with a strong track record of service delivery to low-income, diverse communities. In addition to accounting for population-level balanced disbursement, organizations will be selected for funding that can demonstrate: a clear implementation plan for providing solar with 20% savings to low-income populations and reporting energy savings according to program standards; a strategy for leveraging existing statewide programs such as HOMES, HEEHRA, LIHEAP, and WAP; a track record of successful outreach and participation within the target communities, including embedded existing strong communities networks; and additional emphasis will be placed on leveraging public and private capital mobilization through matching capital or cost offsets. We estimate this program will generate an additional $5.6M in matching capital beyond grant funds.

The Energy Equity Catalyst partners will then identify and engage eligible homeowners to apply for an Energy Equity grant. *Solar for All Arizonans* will provide technical assistance and training to partners via the Solar Community of Practice to grow organizational capacity to provide or expand their existing services to low- income and disadvantaged communities and improve the quality of their engagement and service, as well as connect them to the statewide contractor referral program, developed for statewide projects. We expect to install grant-funded rooftop solar on 931 homes.

Market 3: Arizona Resilience Loan Fund will invest $16.7M in grant funds to drive market- making, public and private capital mobilization and long-term capacity building for capital providers through a low interest loan fund plus a technical assistance grant program for qualified, mission-driven, Arizona-based lenders. The program will conduct an annual competitive grant process for Arizona-based Community Development Financial Institutions (CDFIs), nonprofit lenders, credit unions, and lending coalitions. Competition requirements will be designed to support existing capital providers to scale up or add solar loan portfolios. The target service market is qualified moderate-income homeowners in low- income and disadvantaged communities (households earning between 80-150% AMI) or higher income owners of multi-family housing with affordability guarantees (e.g., Section 8 housing) and a commitment to pass on bill savings to low-income tenants.

Our program interest rate to lending institutions will parallel the widely utilized Small Business Administration Microloan whereby lending institutions will borrow the capital at a low interest rate, fully amortized up to 10 years to be returned to the Statewide Arizona Resilience Revolving Loan Fund. Loan sizes

will be capped, with the expectation of 10% matching capital mobilization or blended capital for borrowers. This loan funding approach will return an estimated $25M over the amortization period to the Arizona Resilience Fund. Capital partners will also be eligible to apply for a smaller technical assistance or capacity grant, which can be leveraged in multiple ways such as a Loan Loss Reserve or staff development, portfolio management and reporting, as well as participation in the Community of Practice.

Based on market conditions and financial portfolio they will propose a strategy to best meet the programmatic goals. Their solutions will be required to demonstrate: a clear implementation plan for providing solar with 20% savings to eligible borrowers and reporting energy savings according to program standards; a strategy for leveraging existing statewide programs such as HOMES, HEEHRA, LIHEAP, and WAP; a track record of successful outreach and participation within the target communities, including embedded existing strong communities networks; additional emphasis will be placed on leveraging public and private capital mobilization through matching capital or cost offsets. We estimate that the program will generate an additional $2M in capital match from participating lenders. Participating entities will be required to submit their Loan Policies, Risk Mitigation, and Capital Mobilization/Matching policies for reporting standardization and approval. We expect to install loan-funded rooftop solar on a minimum 650 homes through this approach.

**Financial Assistance Strategy 2.**

Arizona Neighborhood Solar will invest $48M in grant funds to build up to 39.94 MW of solar in the form of 1-5 MW distributed solar projects for low- income and disadvantaged neighborhoods. **$15M of this program will be prioritized for projects in Tribal communities.** The program will provide utility bill discounts to low-income households within the service territory of the project in LIDAC communities. *Solar for All Arizonans* will conduct a competitive grant process open to public, private (nonprofits and co-ops), and Tribal entities. Grants will fund the full cost of the development and installation of 1-5 MW solar projects, while the public/non-profit facility or Tribal entity would provide the location. The partnering utility will provide an additional bill credit to low-income households enrolled in the utility's existing limited-income bill assistance program, which has the benefit of targeting pre- qualified LMI households. Based on estimates of current prices for solar deployment in AZ, projects are estimated to cost $1.20 per W, allowing a total of 39.94 MW of solar deployed. Grant amounts will vary from $1.2M to $6M each depending on the size of the array and other factors. We anticipate that distributed solar deployed through this mechanism will provide bill discounts to approximately 7,383 households. Utilities will be responsible for operations, maintenance, and recycling of the assets funded under the program for the lifetime of the assets. This will include conducting audits of assets to ensure operations and maintenance is performed. These plans will conform with EPA's General Terms and Conditions "Automated Standard Application Payments (ASAP) and Proper Payment Draw Down" terms and condition.

At least 50% of electricity and 50% of benefits will be delivered to residents in the utility territory. Neighborhood Solar as we define it here differs from

Community Solar in that it will be owned by the utilities rather than mechanisms allowing for more direct ownership by communities. This is due to restrictive solar policies in Arizona.

The overall percentage of funding that will be used for financial assistance will be determined during the planning period.

**Financial Assistance Strategy 3.**

*Solar for All Arizonans* financial assistance will be in the form of a zero percent deferred forgivable loan with a recapture period of five years. Homeowners will sign a Deed of Trust and Promissory Note, to be filed with municipal Recorder's Offices, and liens will be for five years, with the balance in the form of a grant. If the property is not sold within the 5-year period, the lien will be released one month following the 5- year anniversary date of when installation was completed. The overall percentage of funding that will be used for financial assistance will be determined during the planning period.

Based on initial estimates, average home size in rural counties in Arizona range from 1,000 to 1,300 square feet. We anticipate financial assistance will average $37,000 per household to pay for 9.3 kW of solar panels, 10 to 13.5 kWh of battery storage, and installation. *Solar for All Arizonans* will also provide maintenance and repairs from natural causes to participating households, which is expected to be $1,000 per year and provided in the form of contracted services with a vendor the project will procure post-award. This service will include cleaning the solar panels up to twice per year, dependent on system evaluation and need. This will also include recycling of the assets funded under the program for the lifetime of the assets. This will include conducting audits of assets to ensure operations and maintenance is performed. These plans will conform with EPA's General Terms and Conditions "Automated Standard Application Payments (ASAP) and Proper Payment Draw Down" terms and conditions. We expect the resilience pilot will serve 321 rural, disadvantaged households.

## 1.B. Complementing existing sources of capital and financial assistance.

*Solar for All Arizonans* is designed to leverage and align with multiple sources of capital and financial assistance in order to maximize the impact of grant funds. At the same time, we are ensuring that federal funds will not duplicate any existing funding sources.

For **Strategy 1** and **Strategy 3** discussed above, which provide residential solar via low- interest loans, loan servicers will be instructed to work with each household to first identify existing programs for which they are eligible and assist with applying for these forms of financial assistance. These include state tax credits (25% of the cost of installation up to $1,000) and federal tax credits (30% of the installation cost). We expect that the lowest income households that qualify for *Solar for All Arizonans* grants will not have the resources to pay up front and wait for these tax credits, so servicers will only apply tax credits to loans.

*Solar for All Arizonans* will work with a network of nonprofit partners around the state to conduct outreach and education to sign up eligible households. Nonprofits will be

9

trained on how to help each household leverage related financial assistance, including new benefits funded by the Inflation Reduction Act. These include the Homeowner Managing Energy Savings (HOMES) program that provides performance-based rebates for whole-house energy saving retrofits, as well as the High-Efficiency Electric Home Rebate Program (HEEHRA) that provides point-of-sale rebates for qualified electrification projects such installing electric heat pumps or electric stoves. It will also include the long-running Weatherization Assistance Program (WAP) overseen by the Arizona Department of Housing that helps low-income households make their houses more energy efficient.

The *Solar for All Arizonans* Green Mortgage program will work with Housing Finance Authorities (HFA), which have bonding authority to support affordable housing programs and have a decades-long track record with housing finance programs for low-income families. The project will work with state and municipal HFAs to mobilize private capital through green bonds and access existing capital instruments like Single Family Mortgage Revenue Bonds and TBA Down Payment Assistance Programs. Homebuyers will then benefit from a low mortgage rate, down payment assistance, and a free or deeply subsidized solar installation.

The program will also establish partnerships with mission-based, existing capital providers (non-profit lenders, CDFIs, and credit unions) to implement low-interest and subsidized solar loan products. Grant funds will provide low-cost capital for loan capitalization, credit enhancements, rate-buy-downs, and other financial products to reduce the cost of solar for end users. *Solar for All Arizonans* will prioritize working with institutions that become part of the National Clean Investment Fund (NCIF) and the Clean Communities Investment Accelerator (CCIA) in order to better coordinate regional efforts under the Greenhouse Gas Reduction Fund.

The project will establish the Arizona Resilience Fund, an evergreen revolving loan fund for ongoing clean energy investments. During and after the grant period, percentage origination fees from Housing Finance Authorities and repayments of low-interest *Solar for All Arizonans* loans will build and replenish the AZ Resilience Fund.

### 1.C. Criteria for providing financial assistance for storage and enabling upgrades.

The third *Solar for All Arizonans* strategy, the resilience pilot in rural and Tribal areas, will provide financial assistance for solar plus associated battery storage for 321 households. The criteria for providing financial assistance for battery storage is that the household must be located in a rural or Tribal area; earn below 150% AMI; own either a single-family home or manufactured home; and also participate in the solar panel installation program.

*Solar for All Arizonans* will prioritize vulnerable populations for solar and battery storage, as these groups are demonstrated by research to be more at-risk for negative outcomes during an outage. The state selected rural areas and Tribal communities because these areas are more likely to experience longer outages than urban areas, primarily because the dispersed nature of their grid slows response times compared to urban settings with concentrated power lines. Coupled with the increase in extreme weather events, power outages can have serious health impacts, particularly outages that last longer than eight hours, the typical battery life for most medical devices.

Households that are not part of the resilience pilot but are installing rooftop solar through **Strategy 1** can opt to install battery storage by either paying for it themselves or applying to a financial institution for a storage loan.

Across **Strategy 1** and **Strategy 3**, *Solar for All Arizonans* qualified solar contractors will assess each home to identify whether and what type of enabling upgrades are required to install solar. We anticipate most upgrades will be related to roof work, tree trimming, and upgrading service panels. Service panel upgrades and electrical work will be covered using HOMES and/or HEEHRA funds, as allowable. The lowest-income homeowners receiving fully subsidized solar through Energy Equity grants can receive up to $5,000 in enabling upgrades if needed to install solar on their rooftop (grant funded). **For homeowners receiving SFA loans, the Solar for All Arizonans Residential Implementor will identify other sources of funding to cover enabling upgrades.**

### 1.D. **Long-term impacts of program financial assistance.**

*Solar for All Arizonans* will impact ~11,525 households with solar financial assistance that will immediately increase the affordability of housing by reducing monthly energy costs by at least 20% from what they currently pay.

The Green Mortgage program will integrate housing affordability into the solar program and mobilize significant additional private market capital, with financial tools that include rate- buy-downs, grants, revolving low-interest loans, bond funding, and tax credits, and layer grants and loans on top to further increase the affordability of Arizona's housing stock by reducing household energy costs. We anticipate the Green Mortgage program will provide low-rate mortgages, down payment assistance, and low or no cost solar panels, which together will make becoming a homeowner much more affordable in Arizona.

*Solar for All Arizonans* will use Greenlink Equity Map's spatial index for energy insecurity to target Green Mortgages to Census tracts that are both LIDAC and identified as having a high or severe energy burden in order to integrate housing affordability with *Solar for All Arizonans*.

The program will use components (PV panels, etc.) that have a minimum 20-year warranty for all components, as well as labor. RFPs will ask participating solar installers to indicate options for end-of-life re-use and/or re-cycling of panels. AZ recently opened one of the first solar panel recycling facilities in the nation, putting us on the leading edge of this critical long-term issue. The program will encourage its use and educate Arizonans about it that will help fund the Arizona Resilience Fund to support solar markets for low-income and disadvantaged communities on an ongoing basis after the grant finishes. In addition, the program is expected to generate $2M in revenue for each participating HFA that can also be used to subsidize low-income and disadvantaged community solar markets at the HFA level. To participate in the program, lenders and loan officers must be registered, approved and trained with the local HFA. Mortgage-making financial institutions and others are familiar with using criteria such as LIDAC designation and low-income metrics as qualifying factors for program eligibility and will implement these definitions for this program, with review and oversight by the program administrator.

**Market 2: Energy Equity Catalyst Grants** will invest in grant funds to help existing low-income homeowners to install rooftop solar. This market will target households that earn under 80% AMI and provide a fully subsidized solar installation. *Solar for All Arizonans* will conduct an annual competitive grant process for nonprofit organizations and/or qualifying municipal entities with a strong track record of service delivery to low-income, diverse communities. In addition to accounting for population-level balanced disbursement, organizations will be selected for funding that can demonstrate: a clear implementation plan for providing solar with 20% savings to low-income populations and reporting energy savings according to program standards; a strategy for leveraging existing statewide programs such as HOMES, HEEHRA, LIHEAP, and WAP; a track record of successful outreach and participation within the target communities, including embedded existing strong communities networks; and additional emphasis will be placed on leveraging public and private capital mobilization through matching capital or cost offsets. We estimate this program will generate an additional $5.6M in matching capital beyond grant funds. The Energy Equity Catalyst partners will then identify and engage eligible homeowners to apply for an Energy Equity grant. *Solar for All Arizonans* will provide technical assistance and training to partners via the Solar Community of Practice to grow organizational capacity to provide or expand their existing services to low- income and disadvantaged communities and improve the quality of their engagement and service, as well as connect them to the statewide contractor referral program, developed for statewide projects.

**Market 3: Arizona Resilience Loan Fund** will invest in grant funds to drive market-making, public and private capital mobilization and long-term capacity building for capital providers through a low interest loan fund plus a technical assistance grant program for qualified, mission-driven, Arizona-based lenders. The program will conduct an annual competitive grant process for Arizona-based CDFIs, nonprofit lenders, credit unions, and lending coalitions. Competition requirements will be designed to support existing capital providers to scale up or add solar loan portfolios. The target service market is qualified moderate-income homeowners in low- income and disadvantaged communities (households earning between 80-150% AMI) or higher income owners of multi-family housing with affordability guarantees (e.g., Section 8 housing) and a commitment to pass on bill savings to low-income tenants.

## Project-Deployment Technical Assistance Strategy

### Investing in a skilled workforce in low-income and disadvantaged communities.

*Solar for All Arizonans* will establish a robust workforce development program that expands participation of workers from low-income and disadvantaged communities and aligns with LIDAC-designated Census tracts targeted for support. SFA workforce programs will prioritize building workforce capacity in rural and Tribal areas of Arizona, as well as in outlying towns and cities, expanding geographically on the already well-developed solar workforce in the state's two main urban areas, Phoenix and Tucson, and ensuring that access to timely, professional, and skilled solar installations is available throughout the state.

12

The program will work through four-year institutions of higher education in the state that qualify as Minority Serving Institutions, two-year community college systems, and Tribal colleges to develop and deliver high quality solar workforce training that meets current technical and professional standards for the solar industry through non-degree training programs. The program will also work with partners in community-based organizations, labor unions, Tribal renewable energy workforce development initiatives, and other workforce development centers to implement training in low-income, disadvantaged, and Tribal communities throughout the state. The program will develop train-the-trainer programs and provide materials and resources to diverse organizations around the state who will, in turn, provide course, bootcamps, and certificate programs to serve diverse rural and Tribal communities around the state. Where appropriate, the program will supplement hands-on, in-person learning with hybrid online options and virtual classroom learning.

Training will explicitly include introductory energy and power topics, electrical safety and hazard analysis, system integration and commissioning, operation, and maintenance, troubleshooting methodologies, asset selection and sizing, and performance testing to name a few. As an initial stage of the training process, a needs assessment will be completed with the guidance and input of the community partners to determine the full breadth of content to be delivered. Training delivery formats will include self-paced virtual exercise and simulation of arc flash boundaries, self-paced recorded lecture of technical standards that can also be completed in person, and an in-person hands-on training for solar PV inverter and storage integration and commissioning tests. Together, these formats permit knowledge acquisition online for rapid scaling while enabling individuals to practice asset integration and troubleshooting in person before taking a practical examination to be certified.

A key goal will be to significantly expand awareness of training and career opportunities for residents of low-income and disadvantaged communities. This goal is embedded throughout training with highlights, guest speakers, and in-person and virtual engagements with solar industry representatives. Information regarding workforce development opportunities will be an important component of all outreach conducted for solar installation (for rooftop, neighborhood, and multi- solar services. This activity will make Arizona residents more broadly aware of existing and new training services for solar careers, leveraging the PipelineAZ career planning platform that features jobs like Solar PV Installer with information on training programs offered by community colleges and Tribal colleges. Information about workforce development training and services will be incorporated into the general advertising and outreach carried out by *Solar for All Arizonans* alongside informing households of their eligibility for participation in financial programs. Outreach will be supported by working with trusted messengers, for both low-income and Tribal communities and through the state Office of Tribal Relations team.

Workforce development will leverage already existing capabilities around the state. *Solar for All Arizonans* will work with Tribal colleges to leverage existing and develop new workforce training programs based on the North American Board of Certified Energy Practitioners (NABCEP) training and certification programs, which are considered the gold standard for the solar industry workforce. This training also includes existing solar installer training opportunities, as well as training at community colleges throughout the state, such as two-year solar energy technology/technician programs provided by multiple community colleges throughout the state, e.g., the solar installation and design program at East Valley Institute of Technology. The program will build on and, in some cases, update existing

13

training curricula for these training programs in solar careers. Special attention will be placed on updating training to current technical standards in the solar industry, evolving technologies, and skills needed specifically for bringing solar to low-income and disadvantaged communities.

The program will also leverage existing programs at state four-year universities, who offer solar, energy, sustainability, and technology policy degree and certificate programs that provide higher-level workforce development preparation for positions with state governments and local municipalities, Tribal governments, utilities, nonprofits, and private companies to grow the capabilities of solar business and policy in Arizona.

*Solar for All Arizonans* will coordinate its activities with existing Workforce Innovation Opportunity Act (WIOA) workforce development funding and services throughout the state that are provided via Arizona@Work, the statewide workforce development network.

*Solar for All Arizonans* will also work with existing apprenticeship programs throughout Arizona as a valuable resource for job seekers and employers. The program will establish partnerships with Registered Apprenticeship programs in relevant fields (including for electrical careers) throughout the state beginning in Year 1.

Lastly, *Solar for All Arizonans* will seek to work with the new federally funded American Climate Corps expected to train 12,840 individuals in clean energy and climate resilience jobs.

### 1.E. **Providing technical assistance to address interconnection and other challenges.**

During planning in year 1, *Solar for All Arizonans* will develop a procurement process to effectively vet the state's current solar installers and contract with the most professional companies that bring a strong track record of customer trust and timely installation. We will then work with the qualified solar developers to provide technical assistance to address the following challenges: lack of a streamlined review process leading to 24% of projects under 10 kW and 25% of projects 11-50 kW not meeting the state of Arizona's mandated timeline for interconnection and no dedicated consumer-contractor dispute resolution mechanism specific to interconnection issues.

*Solar for All Arizonans* will dedicate planning time in year 1 to identifying solutions to interconnection challenges and has developed the following initial plans for technical assistance for solar developers and communities adopting solar. The first will streamline the review process by co-creating with utility and industry partners "*Solar for All Arizonans*" templates to ensure that the information necessary for review is included in applications.

In addition, *Solar for All Arizonans* will help develop a wider understanding of city authorizations that are required to enable solar development. Additionally, *Solar for All Arizonans* will work with utilities during planning to explore how the project can help build interconnection capacity, if welcome and helpful, such as through grant funds to hire additional interconnection review staff.

To address the lack of consumer-contractor interconnection-specific dispute resolution mechanisms, *Solar for All Arizonans* will work with the State Attorney General's Conflict Resolution Program, which already provides free volunteer conflict resolution. *Solar for All*

*Arizonans* will work with our network of solar industry experts like the Arizona Solar Energy Industries Association, which has done extensive work on consumer-contractor interconnection issues, to identify and recruit potential volunteer mediators with solar industry expertise. They will be connected with the Attorney General's 40-hour mediation training and after completing training, will be able to offer consumer-contractor interconnection dispute resolution services.

*Solar for All Arizonans* does not anticipate being able to address interconnection challenges related to costs and for making modifications to distribution systems, as these are controlled by utilities.

### *1.F.* **Ensuring projects are efficiently deployed and resilient.**

*Solar for All Arizonans* is budgeting for technical assistance for organizations and groups that will represent diverse areas of solar planning and installation expertise. Grant-funded projects will meet current and broadly accepted consensus-based building codes and standards, ensure projects are resilient to climate hazards, and include robust pre-construction quality assurance plans and post-construction inspection and quality control processes. During the planning period, the compliance contractor will determine appropriate inspection methodologies and other quality control processes. We will encourage partnering municipalities to apply for a SolSmart designation to receive free technical assistance to help effectively expand solar deployment in their jurisdiction. SolSmart technical assistance includes assistance to further the goals of the federal Justice40 initiative to provide equitable opportunities for underserved communities, so it will be a valuable resource for municipalities participating in *Solar for All Arizonans*. Climate hazards, greenspace preservation, and land use planning and zoning codes that impact project siting will be considered during the planning period.

Technical assistance will be facilitated in multiple ways, including through the creation of a robust *Solar for All Arizonans* Community of Practice program. Participating solar companies, financial institutions, municipalities and counties, community-based organizations, utilities, and other professional organizations will all be required to participate actively in the Community of Practice. The goals of the Community of Practice program are to facilitated shared learning that:
(1) grows the capacity of participating organizations to provide the highest quality professional service and meet industry best practices; (2) enables organizations to work effectively with low- income and disadvantaged communities and meet their distinctive and diverse needs, contexts, and trust; (3) expands the number of organizations providing services to low-income and disadvantaged communities in the solar field (loans, installation, permitting); and (4) expands the familiarity of organizations, especially in rural and Tribal areas outside of Phoenix and Tucson, with and training in use of advanced tools and practices of solar installation, financing, interconnection, and permitting and encourages them to adopt them.

The Community of Practice will primarily be organized virtually, with working groups for each organizational domain that meet monthly and convene technical assistance workshops. The entire Community of Practice will come together annually in a statewide conference. In cases where technical assistance covers local information (e.g., particular county or municipal zoning and building codes), convenings will be in-person in the local jurisdiction. When technical assistance topics are applicable statewide, convenings will be virtual. We will also record all sessions and make recordings available to solar developers and

disadvantaged communities through a *Solar for All Arizonans* website. For complex topics, technical assistance may include handbooks or manuals. The Community of Practices will intentionally foster cross-industry learning for lenders, solar installers, municipalities, nonprofits, and utilities to share lessons and best practices from their industry.

Topics for technical assistance will include county and municipal permitting and inspection requirements, processes and solar industry quality control best practices, best practices for working with utilities on project siting, county and/or municipal land use planning and zoning codes that impact project siting (such as limits on the size of the array), identification of relevant local community benefits agreements and how they can be leveraged to support a new solar project, and incorporating climate hazards and climate protections into siting strategy.

For Tribal utilities and governments, topics will include, in addition to those listed above for solar: necessary information and procedures for participating in the rooftop and neighborhood solar programs of *Solar for All Arizonans*. For financial lenders, topics will include: effective and equitable non-traditional underwriting and servicing for LMI borrowers; cultural sensitivity to enhance Tribal participation; best practices in climate financing, including leveraging HOMES, HEEHR, LIHEAP, WAP and tax credits; implementing and adapting the *Promotores Model* for successful outreach and education among diverse low-income communities; financing strategies for building decarbonized affordable housing; effective data collection strategies to measure the impact of solar; and best practices for vetting and approving solar contractors. For all participants, topics will include: working effectively with low-income and disadvantaged communities to advance solar energy deployment; and understanding the requirements of the multiple *Solar for All Arizonans* programs. As part of its technical assistance activities, *Solar for All Arizonans* will also encourage counties and cities to adopt NREL's SolarAPP+ software that can help streamline permitting processes. It is free for jurisdictions to adopt and should any cities or counties use the software. Technical assistance will be provided on how to apply for a permit in the app for solar developers and for local governments in its effective use.

**Equitable Access and Meaningful Involvement Plan**

*1.A.* **Maximizing breadth and diversity of communities and prioritizing the most disadvantaged.**

Within each strategy, *Solar for All Arizonans* will procure and contract with nonprofits that are trusted messengers in relevant communities, particularly LIDAC communities, and limited English-speaking communities. The procurement process will prioritize nonprofits with demonstrated reach into these communities so that it reaches the most disadvantaged households across the state.

**Strategy 1** makes distributed rooftop solar available statewide in low-income and CEJST communities, which span urban, suburban, and rural areas, including Arizona's 22 federally recognized Tribal Nations. With linguistic inclusivity, Strategy 1 ensures that equity is considered in terms of commonly comprehendible semantics within the English language as well as in other commonly spoken languages in the state of Arizona. This statewide strategy will reach a diversity of communities, as demonstrated by Arizona's demographic profile below. SFA will provide multilingual outreach and services. **Strategy 1** will serve

multiple at-risk energy communities, including **Census tracts 9422.02, 9605, and 9633** that each have a coal-fired electric generating unit being retired; 14 Census tracts that directly adjoin a tract with qualifying coal closure; eight counties that meet both the fossil fuel employment threshold and the unemployment rate requirement; and many disadvantaged tracks facing high energy.

**Strategy 2** will fund 1 to 5 MW neighborhood solar energy projects across the state. This strategy specifically addresses the solar needs of the 34.2% of Arizonans who are renters, owners of manufactured homes, and homeowners whose rooftops are not conducive to solar. This strategy will also serve the five Tribal Nations that have formed Tribal utility authorities (TUAs) including Hualapai Tribal Utility Authority, Aha Macav Power Services, Navajo Tribal Utility Authority, Gila River Indian Community Utility Authority, and Tohono O'odham Utility Authority.

**Strategy 3** will pilot a program to provide low-income homeowners with resilience through solar plus storage. The project prioritizes residents of rural and Tribal land.

*1.B.* **Plan for participatory governance**

One of the first activities of the grant will be to host a series of kick-off meetings in low income and disadvantaged communities to obtain key input on program element designs that will best achieve the program's goals, including program requirements and processes, best practices for reaching communities, etc. These meetings will also continue the process of building trust and get the word out to communities about the opportunities that will be coming.

To build a foundation of trust and inclusivity, the structured itinerary of meetings/events should take into consideration ways to involve:
- Cultural components such as a blessing or performances
- Speakers who are respected in the community.
- Local food vendors
- Break out groups for building stronger networks.
- "Big Circle" discussions

The project will also establish an Advisory Council whose membership is at least 50% representatives from disadvantaged or historically marginalized communities. We will seek for this representation to be a mix of individuals such as nonprofit leaders from local communities, LMI residents, and Tribal representatives. The other 50% of the Advisory Council will be from key partners, including the solar industry, electric utilities, and financial institutions. The Advisory Council will advise a Leadership Team composed of staff from the **Office of Resiliency and the Solar for All Arizonans Residential Implementor (TBD)** that meets on a regular basis. Nominations for Advisory Council representatives will be solicited widely, with a focus on geographic and demographic coverage and representation from organizations with a demonstrated track record of community trust and effective engagement with disadvantaged communities, including specifically LIDAC  communities.

*Solar for All Arizonans* will also convene a Tribal Solar Strategy Working Group composed of Tribal energy and elected leaders from as many of Arizona's 22 federally recognized Tribes as possible to maximize participation. The Committee will be responsible for identifying ways to maximize the benefit of the funding allocations marked for Tribes.

The Advisory Council will meet monthly in Year 1 to advise on project design and then transition to quarterly meetings for project oversight, which includes reviewing data to monitor progress toward grant deliverables, uplifting best practices, and using lessons learned to course correct and make continuous improvements. The Council will also advise on the process for developing Requests for Proposals to procure project partners, including selection criteria, to ensure contracted partners have a strong track record working in and with disadvantaged communities. Any changes to financial assistance (e.g., amounts, interest rates, or criteria) must be reviewed and approved by the Advisory Council.

Participant support cost funding will be made available to local nonprofits and local government entities supporting program participants with applying for the program as committee. Funds will also be used to provide travel and participation stipends for members of the Advisory Council and associated working groups. Stipend amounts TBD.

We will procure experienced compliance specialists and evaluators to design and integrate summative and formative data collection strategies that can be fully integrated into the program's diverse strategies and processes to ensure that *Solar for All Arizonans* is continuously informed about its progress toward its goals (solar deployment in low-income and disadvantaged communities, GHG emissions reductions, bill savings, geographic and demographic coverage, etc.), problems that evolve and need to be addressed, and long-term benefits delivered. Evaluators will also design and implement additional qualitative and quantitative data collection and analysis to better understand the communities targeted by *Solar for All Arizonans* and their needs and contexts, as well as assess and learn lessons for future projects in Arizona and elsewhere about what works and doesn't work in communication, recruitment, deployment, and experiences of participants over time. This component will include conducting focus groups, surveys of participating homeowners, and interviews for a 360-degree view of the *Solar for All Arizonans* program impact.

### 1.C. Engaging with education, outreach, community, and other stakeholders.

The Arizona State Office of Resiliency will lead stakeholder outreach across the state for all *Solar for All Arizonans* services and will build on our experience across multiple departments in providing education and engagement working with trusted community based organizations, community leaders, and representatives. The program will work with agencies in low-income communities, using the map of CEJST Census tracts targeted to align services in regions across the state while contracting through an Request for Proposals (RFP) process in Year 1. An important outreach component will be the completion of a local community assessment and asset map by the contracted community agencies to better understand the need and opportunities for rooftop solar and community projects in each region. The community partner will conduct presentations, focus groups, local surveys and meetings with leaders from businesses, schools, and community organizations, to gain the participation of community members in planning for solar resources.

Once assessments are complete, partners will hold community meetings in each targeted area, well publicized, in convenient locations, like apartment complexes, schools, assisted living facilities and libraries. Program information will be disseminated in newspapers, on partner websites and through social media. Also included will be information about

opportunities for community involvement, e.g., grants and financial options through loans accessible to low-income residents, job training, etc. The project will provide regular communication and long term engagement via program newsletters detailing success stories and social media updates. **As discussed above, the program will seek community leaders to participate on our statewide Advisory Council.**

Support will be provided as needed for outreach and written materials. Community outreach partners may also use apps like *Google Translate* or *SayHi* for immediate translation needs in targeted languages at community meetings and information sessions.

Community engagement and outreach with the 22 federally recognized Tribal nations is crucial. The state Office of Tribal Relations (OTR) Team has four Tribal Liaisons and a Tribal Relations Manager who will support solar awareness and outreach. OTR serves as the single point of contact for Tribal issues and works to develop policies in consultation with Tribal leaders. *Solar for All Arizonans* will leverage this communication structure to establish needed Tribal connections essential for outreach, in addition to the Tribal working group discussed above

Program outreach will also leverage multiple existing state programs for low-income populations, providing informational meetings, flyers, and leveraging social media channels to publicize solar resources available. This outreach will include WIOA workforce development services discussed above, federal resources and additional need-based programs discussed below.

Regarding plans for financial subsidies, the program has already consulted with industry financial sector actors (ie Green Banks) within Arizona and will continue to consult with whichever financial partners are adopted.

### 1.D. Customer acquisition and management strategy.

*Solar for All Arizonans* will use state and municipal communication channels to build trust, emphasize the role of municipalities and the state in overseeing the quality of this program and procure and oversee trusted solar installers, incorporate creative and proven marketing strategies used in other solar projects for low- income and disadvantaged communities, and prominently feature the program on state and municipal websites that will include FAQs and contact information to ask questions.

*Solar for All Arizonans* will work with community-based organizations and municipal entities procured through RFPs after federal award. Contractors will be trusted messengers in low-income communities to conduct outreach and to acquire customers for solar infrastructure services. The program will target benefits to low and moderate income households throughout the state, defined as those with **documented income below 150% AMI or below the federal poverty rate.** Case Managers will assess households for income eligibility and automatically qualify households enrolled in need-based programs like SNAP or WIC, which already conduct rigorous income verification, which will minimize the qualification burden on households. Categorical need-based programs used by the state to qualify residents can include the Arizona Weatherization Assistance Program (WAP), which in 2023 has a household income limit for a family of four of $60,000, and the Arizona Nutrition Assistance program. It can include households enrolled in Arizona's Cash Assistance benefits, which has a typical eligibility limit for families below

100% of the federal poverty rate (below program limits). For the Lifeline program, this income eligibility is 135% of the federal poverty level for either phone or internet services. For the Low-Income Home Energy Assistance Program (LIHEAP), eligibility limits are monthly household income of
$4,303 for a family of four. For households not enrolled in need-based programs, Case Managers will qualify households through documentation of limited family income, such as with pay stubs, while avoiding self-attestation as much as feasible. The Green Mortgage component will also make information available to residents of low-income and disadvantaged households who apply for low-income mortgage assistance or other programs to support the purchase of new homes via lending institutions and HFAs.

The second program component will work with utilities to facilitate participation of low-income and disadvantaged neighborhoods who are eligible for support through utilities' existing
low-income discount programs or similar programs set up for this grant. 100% of customers acquired in this component will be low-income and disadvantaged and will include Native American communities and those with limited English proficiency. The program will work with utilities, community-based organizations, and other experts to identify specific communities who meet eligibility criteria and ensure impact among the most disadvantaged communities.

Additional tools to verify income for eligible customers in *Solar for All Arizonans* will include consideration of the forthcoming U.S. Department of Energy and Health and Human Services Community Solar Subscription Tool (the Low-Income Clean Energy Connector) when it becomes broadly available in states in 2025.

For customer management, the program will provide each homeowner with a single point of contact to help manage their installation across contractors and answer questions or concerns throughout the process and after installation. We will track individual project progress weekly to provide a high level of customer service, identify issues before they grow, and provide regular opportunities for customer feedback. SFA will build robust quality assurance checks for each installed system to ensure homeowner satisfaction and that every system will support at least a 20% reduction in the household utility bill. Lastly, the Solar for All Arizonans Residential Implementor will oversee any customer concerns or complaints and to address them in a timely manner.

## Section 2 Activities to be Completed in 1st Year (Planning Year)
Quarter 1 Objectives
- Hire grant program managers
- Draft and prepare for release a series of competitive requests for proposals (RFPs) to procure the Solar for All Arizonans Residential Implementor and the Program Evaluation Expenses Contractor.
- Conduct stakeholder outreach engagements, prioritizing outreach to LIDAC communities, in partnership with representative community-based organizations.
- Develop an equity outreach plan detailing how each of the three strategies will embed equity in their implementation and outlining how program managers will work with LIDAC CBOs.
- Conduct initial meetings with the governing entities who oversee rural cooperative utilities and Tribal utilities to explore their interest in participation in all three

strategies (Distributed Rooftop Solar, Neighborhood Solar, and Rural & Tribal Solar + Batteries).

- Refer to the National Community Solar Partnership meaningful benefits resources for guidance.

Quarter 2 Objectives

- Work with program contractors to determine if solar resulting from Strategy 2 (Neighborhood Solar) and Strategy 3 (Rural & Tribal Solar + Batteries) can be "islanded," and deployable in isolation from the grid, including during a grid outage or for Strategy 3 as "off-grid."
- Develop plan to ensure participating utilities in Strategy 2 (Neighborhood Solar) meet the required 20% minimum customer bill savings for participating customers. Identify how performance will be audited after the program starts.
- Determine how financial benefits will flow to participating customers (e.g.: bill credits based on generation or predetermined bill discount, flat amount or variable credits based on generation, etc.). Determine who will receive renewable energy credits.

Quarter 3 Objectives

- Meet with rural cooperative and tribal utility staff on program design for all three strategies. Determine how bill crediting will work to ensure financial benefits flow to low-income customers in Strategy 2 (Neighborhood Solar).
- Refine household savings calculation using the intersectional thinking approach.
- Finalize RFP language to solicit locations and preliminary site plans for neighborhood solar locations.
- Work with our contractor to finalize the design of the low interest loan package for Strategies 1 (Distributed Rooftop Solar) and 3 (Rural & Tribal Solar + Batteries).

Quarter 4 Objectives

- Finalize priority LIDAC communities for participation in Strategy 1 (Distributed Rooftop Solar).
- Finalize program participant acquisition plan for Strategies 1 (Distributed Rooftop Solar) and 3 (Rural & Tribal Solar + Batteries) to ensure underserved communities are the beneficiaries.
- Follow-up with surveying of constituent communities' experiences of distributed rooftop solar.
- Finalize how the program will ensure minimum 20% household savings will be delivered net of any costs the program beneficiary incurs, how recipients will calculate the household benefit, and how household savings will be monitored and audited in quarterly reports.

### Section 3:  Fiscal Stewardship Plan

The Executive Office of the State of Arizona, which includes the Governor's Office of Resiliency, operates as a passthrough for numerous Federal grant opportunities and has established policies and procedures to help ensure compliance with federal and state requirements. In addition to specific policies and procedures designed to comply with the provisions of the Uniform Administrative Requirements and Grant Guidance in Title 2 Code of Federal Regulations (CFR) Part 200, the Office is required to adhere to the State of Arizona Accounting Manual (SAAM). The SAAM includes the State's central accounting policies and control standards for ensuring federal and state monies are used for intended purposes, are protected against fraud, waste, and abuse, and that conflicts of interest are addressed.

The Office of Resiliency and Governor's Accounting Office staff will exercise fiscal stewardship in line with the requirements outlined in SAAM. Stewardship activities include, but are not limited to, reviewing performance and financial reporting from subrecipients and recipients of financial assistance; providing technical assistance; conducting site visits; identifying and addressing any noted deficiencies that develop during the project; and assuring compliance with terms and conditions. Additionally, the Governor's Office will ensure that processes are in place to prevent and detect waste, fraud, and abuse of funds, and to prevent and remediate any real or perceived conflicts of interest. Compliance and audit reports shall be annually reported to the Solar for All Arizonans Advisory Council and the Tribal Solar Strategy Working Group. During the planning period, the program will determine methods to limit risk to communities whenever ownership pathways are offered.

The Office uses an internal grant management system, called the Grant Information Management System (GIMS). This grant system includes supervisory review and approval controls and workflows, and is reconciled to the State's accounting system, Arizona Financial Information System (AFIS), on a monthly basis. All grant and subaward documentation, including reporting data, fiscal information, programmatic reports, and associated documents would be collected in this system for quick access.

In line with generally accepted accounting principles (GAAP), the Governor's Accounting Office will account for Solar for All award funds separately from all other funds during both the period of performance and under the EPA Closeout Agreement. Additionally, all recipient and subrecipient funding will be accounted for separately, and all program income, if applicable, will be accounted for separately from receipts/drawdowns of EPA award funds during the period of performance.

The Executive Office of the State of Arizona operates as a passthrough for numerous Federal grant awards and has established policies and procedures for subaward management. The subaward management process includes ensuring that all applicable federal "flow down" terms are included in contractor and subrecipient award agreements; collecting and reviewing supporting documentation prior to reimbursing expenses to ensure all expenses are allowable uses of grant funds; reviewing progress reports and monitoring award activity; conducting site visits and desk reviews; and monitoring compliance with federal and state requirements (e.g., DBRA, BABA).

### 1.A. Consumer protection.

To achieve the goals set forth by the *Solar for All Arizonans* proposal, the Office of Resiliency will maintain a process for receiving, monitoring, and resolving consumer feedback and complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency. To achieve these fiscal stewardship goals, the Office of Resiliency will hire a Solar Program Impact Evaluator and Compliance manager. Some of the objectives will include: design solar contractor performance indicators for continuous evaluation and adherence to program standards; ensure all communication with consumers is conducted in a culturally appropriate language that the consumer understands; serve as a central point of contact for homeowners and contractors.

The Solar Program Impact Evaluator and Compliance manager serves a crucial role in effective program deployment, guaranteeing that *Solar for All Arizonans* participants have access to essential information about the various programs and potential benefits therein, and assuring the benefits of solar are actually realized by participants. The Solar Program Impact Evaluator and Compliance manager shall provide all program language, including

information about leasing, purchasing, financing, and/or costs associated with program participation in clear and understandable language.

Team will review consumer protection laws in applicable jurisdictions during the planning period and devise further mechanisms to comply.

### 1.B. Ensuring household savings through audits.

Achieving an annual energy savings of at least 20% is fundamental to the *Solar for All Arizonans* mission. In coordination with solar industry partners, utility partners, the Advisory Council, and the Tribal Solar Strategy Working Group, the Office of Resiliency shall establish a certification process for households wishing to participate in the *Solar for All Arizonans* programming and identify the best participation pathway that achieves the 20% minimum savings goal and will complete home energy performance audits with participants to ensure benefits are being realized. The Program Impact Evaluator and Compliance Manager will work with the above actors to establish audit guidelines and processes necessary for ensuring participants achieve the 20% minimum savings goal.

**Section 3 Activities to be Completed in 1st Year (Planning Year)**

Quarter 1 Objectives
- Collect and document policies and best practices for the creation of Consumer Protection materials. (see Illinois IPA solar consumer protection handbook for example)
- Identify and document processes to prevent and detect waste, fraud, and abuse of funds, and to prevent and remediate any real or perceived conflicts of interest
- Draft policies for program oversight, confidential reporting (e.g., whistleblower protections), and managing conflicts of interest
- Design process for receiving, monitoring, and resolving consumer feedback and complaints

Quarter 2 Objectives
- Create content for the Consumer Protection materials to document policies, protocols, and best practices.
- Design criteria for reviewing performance and financial reporting from subrecipients and recipients of financial assistance
- Create plan for providing technical assistance
- Document protocols and expectations for conducting site visits
- Create plan for identifying and addressing any noted deficiencies that develop during the project
- Schedule creation of annual compliance and audit reports to be delivered to the Solar for All Arizonans Advisory Council and the Tribal Solar Strategy Working Group

Quarter 3 Objectives
- MILESTONE: Finalize process for receiving, monitoring, and resolving consumer feedback and complaints.
- Identify best practices for home energy performance audits as they relate to solar.

Quarter 4 Objectives1
- MILESTONE: Finalize solar consumer protection materials and schedule publication dates.

- Identify the best participation pathway that achieves the 20% minimum savings goal for households.
- Establish a certification process for households wishing to participate in the *Solar for All Arizonans* program.
- Document procedures for plans to implement home energy performance audits under SFA.

Section 4:  Timeline and Milestones

See separate document based on "EPA's Solar for All Program Timeline" attached for review. Arizona's timeline will be in the tab titled "Solar for All Arizonans Timeline- May Start".

Section 5:  Reporting Requirements

**Evaluation, publication, and reporting**
This proposal includes funding for a contractor *(Program Evaluation Expenses Contractor, referred to as **Program Evaluator**)* to collect program data and evaluate *Solar for All Arizonans* activities to ensure program success and desired outcomes. Evaluation activities will include both a process evaluation as well as an outcomes evaluation in order to monitor deployment of program capital as well as overall GHG reductions and financial benefits for participating customers. Evaluation data will support reporting, and continuous program improvements, and will engage community participants in data collection. Program Evaluators will support OOR staff, specifically the **Solar Program Impact Evaluator and Compliance Manager,** in data collection instrument and metric development as well as support data collection implementation. The Program Evaluator shall report, at a minimum, semi-annually to the Solar for All Arizonans Advisory Council, the Tribal Solar Strategy Working Group, and the Solar For All Arizonans Program staff.

In coordination with the Solar for All Arizonans Residential Implementor, the Solar Program Impact Evaluator and Compliance Manager will file federally required reports, including an annual federal financial report and the single audit report completed by the accounting contractor, also mentioned in the Budget Narrative. The Solar Program Impact Evaluator and Compliance Manager will be ultimately responsible for collecting all necessary information and submitting the necessary reports.

The Office of Resiliency will establish the activities and processes necessary to ensure compliance of all reporting requirements established for this award. As provided in the Terms and Conditions for the award, OOR agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. OOR also agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the OOR EPA-approved Solar for All Workplan under the federal award.

**1. Performance Reports**
Semi-Annual Report
With the collaboration of the Program Evaluator, OOR agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

**Final Report**

OOR also agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the OOR's implementation of the EPA-approved Solar for All Workplan, supported by qualitative discussions and quantitative metrics. Additionally, OOR will detail the program strategy and plans for performance reporting under the Closeout Agreement. In the final report, OOR will include the following broad, non-exhaustive elements:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

OOR agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.


## 2. Transaction-Level and Project-Level Data

OOR agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). OOR also agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.


### Section 5 Activities to be Completed in 1st Year (Planning Year)

Quarter 1 Objectives

- Create procurement plan for the Solar for All Arizonans Residential Implementor
- Create procurement plan for the Program Evaluation Expenses Compliance Contractor

Quarter 2 Objectives

- Review and approve selection of the Solar for All Arizonans Residential Implementor
- Review and approve selection of the Program Evaluation Expenses Compliance Contractor

Quarter 3 Objectives

- Establish communication channels with all entities involved in data collection and reporting

- Create processes and templates to be used for data collection during implementation

Quarter 4 Objectives

- Finalize processes and templates to be used for data collection during implementation

## Section 6:  Budget Narrative

### 6.1 Project Budget

**Table 2. Budget Table**

| Object Class Categories | Amount |
|---|---|
| Personnel | $3,375,000 |
| Fringe Benefits | $1,113,750 |
| Travel | $66,450 |
| Equipment | $0 |
| Supplies | $87,500 |
| Contractual | $8,225,188 |
| Other | $142,037,800 |
| Indirect Charges | $1,214,312 |
| Grand Total | $156,120,000 |

| Use of Funds by Type | Amount |
|---|---|
| **Financial Assistance** | |
| Direct Residential Financial Assistance (Strategy 1) | $66,456,000 |
| Direct "Arizona Neighborhood Solar" Financial Assistance (Strategy 2) | $48,048,000 |
| Direct "Resiliency Pilot" Financial Assistance (Strategy 3) | $13,852,800 |
| **Financial Assistance Subtotal** | $128,356,800 |
| All other use | $27,763,200 |
| **Grand Total** | $156,120,000 |
| **Percent Financial Assistance** | 83% |

**Personnel**

**Budget Amount: $3,375,000**

**Position Title**

| | |
|---|---|
| Solar Access & Resilience Program Manager | Relation to grant proposal and program implementation: This position will be responsible for Strategies 2 (Neighborhood Solar) and 3 (Rural & Tribal Solar + Batteries)<br>Salary: $90-105,000<br>Fringe Benefits: $34,650<br>Total max cost for the budget period (5 years): $698,250 |
| Solar Fund Manager | Relation to grant proposal and program implementation: This position will be responsible for Strategy 1 (Distributed Rooftop Solar), Strategy 2 Neighborhood Solar, and Strategy 3 Rural & Tribal Solar + Batteries<br>Salary: $105-115,000<br>Fringe Benefits: $37,950<br>Total max cost for the budget period (5 years): $764,750 |
| Solar Residential Deployment & Regulatory Manager | Relation to grant proposal and program implementation: This position will be responsible for Strategy 1 (Distributed Rooftop Solar)<br>Salary: $90-105,000<br>Fringe Benefits: $34,650<br>Total max cost for the budget period (5 years): $698,250 |
| Solar Program Eval & Compliance | Relation to grant proposal and program implementation: This position shall provide support to all program deployment strategies and ensure program goals are met through key performance metric evaluation and reporting.<br>Salary: $85-95,000<br>Fringe Benefits: $31,350<br>Total max cost for the budget period (5 years): $631,750 |
| Solar Grants Coordinator 1 | Relation to grant proposal and program implementation: This position will provide administrative support for program deployment Strategies 1 and 3.<br>Salary: $75-85,000<br>Fringe Benefits: $28,050<br>Total max cost for the budget period (5 years): $565,250 |
| Solar Grants Coordinator 2 | Relation to grant proposal and program implementation: This position will provide administrative support for program deployment Strategies 2.<br>Salary: $75-85,000<br>Fringe Benefits: $28,050<br>Total max cost for the budget period (5 years): $565,250 |
| Solar Community Development/Engagement Educator | Salary: $75-85,000<br>Fringe Benefits: $28,050<br>Total max cost for the budget period (5 years): $565,250 |

Each of the positions listed above is considered 1 FTE, charged 100% to this grant funding. The PI for this project is Office of Resiliency Deputy Director Blaise Caudill. His personnel expenses are not charged to this grant.

Personnel expenses and fringe benefits are budgeted as a constant expense for each grant year. This is based on several assumptions, including that there will be vacancy savings;

that not all staff will elect all available medical/dental/life insurance benefits; and that any salary increases provided during the grant term will be based on available funding, not a standard "COLA" increase.

**Proposed Personnel Job Descriptions and Role in Implementation:**

**Solar Access & Resilience Program Manager:**
Total Budget Amount: $525,000
Essential Duties and Responsibilities:
- The Solar Access & Resilience Program Manager shall:
- Ensure all program objectives, timelines, evaluations, and reporting are achieved as they relate to the neighborhood solar program and the solar-plus-storage resilience pilot program.
- Work with Justice40 communities to develop neighborhood solar project Request for Proposals.
- Address and mitigate barriers to participation in neighborhood solar and solar+storage projects for low-income and disadvantaged communities.
- Identify and implement ways to leverage public and private capital to maximize the impact of the neighborhood solar program and the solar-plus-storage pilot program.
- Ensure program funds are stacked and braided with other potential incentives and smoothly integrated with broader program delivery systems.
- This position will report directly to the Arizona Governor's Office of Resiliency Director.


**Solar Fund Manager:**
Total Budget Amount: $575,000
Essential Duties and Responsibilities:
- Direct and oversee the development of innovative financial mechanisms to support solar energy by removing financial barriers and other constraints that prevent low-income and disadvantaged households from adopting solar.
- Mobilize additional private capital to supplement federal investments and establish an evergreen Solar Revolving Loan Fund that creates long-term solar markets serving low-income and disadvantaged communities beyond the 5-year project period.
- Help build a strong Solar Community of Practice that significantly enhances the knowledge and skills of professionals across multiple sectors, including the solar and financial industries, local governments, permitters, housing and real estate, utilities, and others. Activities will include providing technical assistance and sharing of best practices in effectively serving and benefitting low-income and disadvantaged communities.
- With other SFA AZ program managers and other relevant partners, help develop critically needed workforce development pathways to quality green jobs for residents of low-income, disadvantaged, rural, and Tribal communities.
- Manage and provide administrative support and state coordination on all grant funded projects from scoping to final completion, including working with State compliance and procurement staff;
- Work closely with relevant OOR staff and grant funded consultants and contractors to ensure grant funded deliverable completion;
- Serve as the primary contact for all state agencies and coordinating contractors for the purposes of Fund management.

28

- This position will report directly to the Arizona Governor's Office of Resiliency Director.

**Program and Financial Management:**
- Financial Oversight: Oversee all financial aspects of the program and its projects, ensuring robust financial health and sustainability.
- Budget Management: Manage budgets, forecast financial needs, and ensure efficient allocation and utilization of resources for the program.
- Financial Controls and Monitoring: Implement financial controls and monitoring mechanisms to ensure that program deliverables are achieved within budgetary constraints.
- Mentor SFA AZ Program Managers in the area of compliance and financial reporting best practices. Continuously monitor staff's compliance to standards.

**Solar Residential Deployment & Regulatory Manager:**
Total Budget Amount: $525,000
Essential Duties and Responsibilities:
- Ensure all program objectives, timelines, evaluations, and reporting are achieved on time as it relates to SFA AZ strategy.
- Responsible for the overall success of the SFA AZ residential rooftop solar program.
- Assist Solar Program Impact Evaluator in development of standards and processes to meet SFA AZ compliance and quality requirements.
- Manage SFA AZ procurement processes, subaward contracts, and routine monitoring of administrative compliance, in partnership with the Solar Program Impact Evaluator and the Governor's Office Procurement staff.
- Support management of the program's budgets to ensure optimal allocation of resources to achieve program goals without overspending.
- Work with the SFA AZ Solar Program Impact Evaluator to manage all SFA AZ compliance requirements, establish standards/best practices, and guide program teams on any changes/improvements.
- Coordinate with the Solar Community Development/Engagement Educator to facilitate Statewide stakeholder engagement.
- Actively monitor and assess policy relevant to the program's scope and objectives.
- With other SFA AZ program managers and other relevant partners, help develop critically needed workforce development pathways to quality green jobs for residents of low-income, disadvantaged, rural, and Tribal communities.
- This position will report directly to the Arizona Governor's Office of Resiliency Director.

**Solar Program Eval & Compliance:**
Total Budget Amount: $475,000
Essential Duties and Responsibilities:

- While the overall program will be evaluated by an outside independent evaluator, the Program Impact Evaluator will be responsible for program metric development and design for reporting across sub-awardees and contracting.
- Provide regular reporting to program stakeholders.
- Provide technical assistance to sub-awardees and grantees with implementation of data collection strategies across programs.

29

- Manage a comprehensive compliance risk and issue log for all program activities and proactively present these to senior management.

Operational and Program Oversight:
- Lead development of standards and processes to meet SFA AZ compliance and quality requirements; proactively communicate and train other staff and support their adherence.
- Ensure compliance with required reporting and SFA AZ procedures.
- Define processes and procedures for detailed metrics tracking across each project.
- Proactively aggregate and monitor to support improvements and increased meaningful benefits of the program.
- Define compliance processes and procedures for individual participant enrollment, certification/income qualifications, and lifecycle tracking. Work closely with the other SFA AZ staff in administering these processes.

Financial and Resource Management:
- Support the Solar Residential Deployment & Regulatory Manager to manage SFA AZ procurement processes, subaward contracts, and routine monitoring of administrative compliance, in partnership with the Governor's Office Procurement staff.
- Work closely with the Solar Fund Manager to ensure fiscal compliance.
- Define processes and procedures for adherence to and monitoring of all federal and state wage reporting requirements including Davis-Bacon and Related Acts.
- Provide consultation to contractors in support of their adherence to funding agency requirements and all federal, state, and local regulations. Continuously monitor compliance for all subcontractors.

Reporting and Compliance:
- Manage all SFA AZ compliance requirements, establish standards/best practices, and guide program teams on any changes/improvements.
- Develop programmatic compliance standards, tracking, and tools to ensure transparency and accountability in reporting to senior management and federal funding agencies.
- Serve as official SFA AZ Quality Assurance Manager. Develop and manage Quality Management Plan and Quality Assurance Project Plan and associated activities for environmental information as required by the EPA and that adhere to federal quality control standards.
- Working closely with the Solar Fund Manager, contribute to all SFA AZ financial performance reporting including adherence to the Financial Transparency Act and other federal regulations.
- Define and and administer document and data management processes, procedures, and tools.

**Solar Grant Coordinator 1 & 2:**
Total Budget Amount: $850,000
Essential Duties and Responsibilities:
- Provide administrative support and state coordination on all grant funded projects from scoping to final completion, including working with compliance and procurement staff within the Governor's Office for EPA reporting purposes;
- Provide administrative support to the Solar Access & Resilience Program Manager and/or the Solar Residential Deployment & Regulatory Manager, as assigned;

- Coordinate logistics for Advisory Council and associated working group meetings;
- Help facilitate Advisory Council and associated working group meetings;
- Perform other duties as assigned.

**Solar Community Development/Engagement Educator:**
Total Budget Amount: $425,000
Essential Duties and Responsibilities:

- Providing administrative support and state coordination on all grant funded projects;
- Coordinating with OOR staff and grant funded consultants and contractors to ensure deliverable completion;
- Assisting with identifying key stakeholder community-based organizations including (but not limited to) the following focus areas: labor representatives, disadvantaged and low income community advocacy groups, and environmental justice advocacy groups;
- Maintaining up to date contact information for all community-based and non-governmental partners on grant funded projects;
- Assisting and coordinating grant funded community engagement activities;
- Assisting to properly compile and maintain minutes/notes of all grant funded community engagement activities;
- Distributing minutes/notes from all grant funded community engagement activities, as requested;
- Centering low-income and disadvantaged community voices in all grant funded work;
- Coordinating with OOR staff to develop communication materials related to grant funded work;
- Providing administrative support for and attending grant related community engagement meetings;
- Ensuring Justice40 initiative goals are met in program deliverables;
- Supporting analysis of energy related priorities and actions;
- Contributing to the delivery of energy related statewide initiatives;
- Other duties as assigned by the Director of the Office of Resiliency (or their designee).

**Fringe Benefits**
Total Budget Amount: $1,113,750
The State of Arizona budgets Fringe Benefits costs at an estimated rate of 33% of the total salary/wages. Fringe or employee-related benefits offered by the State of Arizona include employee leave (annual leave, sick leave, military leave, bereavement leave, etc); all required taxes; retirement contributions; and elective Medical/Dental/Vision/Life Insurances, etc. Actual elected medical benefits paid depend on the employee's selections, but generally range between 11-15%. For purposes of this budget, we conservatively estimated 12.01%, for a total of 33% fringe benefits calculated.

**Travel**
Total Budget Amount: $66,450
Travel estimates included in the budget are based on historical employee travel information and allowable travel reimbursement maximum rates established by the State's General Accounting Office (GAO) policy in the State of Arizona Accounting Manual (SAAM).

31

Out-of-state travel requires supervisory review and approval. The State will only draw funds for actual travel expenses incurred.

The Office of Resiliency plans to participate in EPA technical assistance workshops and conferences, as available and planned by the EPA. These technical assistance and professional development opportunities help to ensure that program staff stay current on their understanding of key grant related issues and have the opportunity to network with colleagues from around the country in implementing Solar for All programs. Trip funding will be used for 2 grant funded staff to participate in those in-person meetings. The State has budgeted $31,800 during the grant period for conference travel expenses, including airfare, per diem, and lodging costs. The State has also budgeted $15,900 for technical assistance travel expenses, including airfare, per diem, and lodging, based on the State's travel policy rates.

Travel funds are also budgeted for grant-funded staff's in-state mileage reimbursement. Four grant program staff (Program Evaluator, Community Development Educator, and 2 Grants Coordinators), will be working with many partner agencies throughout the state, with particular focus on outreach to Native nations and communities. Mileage funding is estimated at $18,750 and will provide support for site visits, monitoring, and direct engagement with key partners. Mileage reimbursement rates are set in the State of Arizona Accounting Manual.

**Equipment**
Not applicable

**Supplies**

Total Budget Amount: $87,500

The Governor's Office budgets for grant-funded programming supplies based on the number of FTE assigned to the grant. The formula is FTE * $2,500 per year, which is based on historical averages. 7 staff are budgeted to this Solar for All grant funding, 7 * $2,500 = $17,500 per year. The supplies formula is intended to cover the costs of program staff-only expenses to perform grant-funded duties including general office supplies, site visit/monitoring equipment, technology (including desktops or laptops; keyboard/mouse combos; webcams; and software subscriptions including for Davis-Bacon and Related Acts required monitoring and reporting), and telecommunications costs. The Governor's Office is required to comply with the State of Arizona Accounting Manual and the State procurement code regulations in the acquisition of all supplies.

**Contractual**

Grand Total Budget Amount: $8,225,188

The Governor's Office is required to comply with the State of Arizona Accounting Manual and the State procurement code regulations in the acquisition of all professional services contracted to support and implement grant-funded activities. The Governor's Office also includes the State's standard, uniform terms and conditions in all contractual awards and

will include all required EPA flow-down terms and conditions to program participants, subrecipients, and subcontractors including but not limited to bankers, borrowers, and beneficiaries, as required. The State will develop written guidelines and expected contract duration for subawardees and provide them to our Project Officer for review and approval during the planning period. Once approved, these written guidelines will be provided to subawardees.

**Solar for All Arizonans Program Evaluation Expenses**

Total Budget amount: $3,200,188

The State will contract with a compliance contractor to provide analysis, post-award services, and oversight to ensure compliance with OMB Uniform Guidance and grant-specific requirements and serve as a resource for staff of grant-funded programs for fiscal and programmatic compliance matters. The contractor shall report as requested to Solar For All Arizonans Program staff. They shall also report annually to the Solar for All Arizonans Advisory Council and the Tribal Solar Strategy Working Group.  All anticipated costs for paying this contractor are classified as contractual.

**Solar for All Arizonans Solar for All Arizonans Residential Implementor (Program Development and Implementation)**
Total Budget amount: $5,025,000

The State will contract with a Program Development and Implementation contractor that will be responsible for designing and executing a technician management and referral system that provides a seamless solution for vetting, training, and deploying solar technicians through the various SFA programming. The contractor shall report as requested to the Solar For All Arizonans Program staff. They shall  also report annually to the Solar for All Arizonans Advisory Council and the Tribal Solar Strategy Working Group.  All anticipated costs for paying this contractor are classified as contractual.

## <u>Construction (if applicable)</u>
Not applicable

## <u>Other</u>
Grand Total Budget Amount: $142,037,800

**Subaward Residential Financial Assistance (Strategy 1)**

Total Budget Amount: $66,456,000

(Distributed Rooftop Solar) will provide loans and grants for distributed residential rooftop solar photovoltaic installations for homeowners located in geographically dispersed low-income households and LIDAC communities. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

Experience and Expertise Requirements: the State will follow state procurement statutes to contract for this subawardee. The State will be looking to procure an entity that provides, at a minimum, the following expertise and/or experience:
- Arizona-locally owned entity
- Experience in working with low-income and disadvantaged communities
- Greenbank and/or sustainable finance expertise
- Revolving loan fund expertise and experience

- Minimum staff capacity already employed
- Past solar deployment and/or solar financing experience
- Past experience with braiding and stacking available federal funds
- Experience with managing and reporting on federal grant funds

**Subaward "Arizona Neighborhood Solar" Financial Assistance (Strategy 2)**

Total Budget Amount: $48,048,000
(Neighborhood Solar) will build neighborhood solar projects, which are 1 to 5 MW distributed solar installations built with grant funding. Partnering utilities who choose to participate will provide bill discounts to low-income households (both owners and renters). This program will be offered through existing utility discount programs for low-income customers or equivalent programs designed for this grant. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

Experience and Expertise Requirements: the State will follow state procurement statutes to contract for this subawardee. The State will be looking to procure an entity that provides, at a minimum, the following expertise and/or experience:
- Arizona-based entity
- Experience in working with low-income and disadvantaged communities
- Demonstrated staff capacity to develop and deploy solar projects
- Past solar deployment experience
- Ability to provide on-bill discounts for participating low-income households

**Subaward "Rural or Tribal Solar + Battery" Financial Assistance (Strategy 3)**

Total Budget Amount: $13,852,800
(Rural & Tribal Solar + Batteries) implements a resilience pilot program for distributed residential solar plus battery storage that targets federally designated Community Disaster Resilience Zones, rural, and Tribal areas, as these areas are at highest risk from effects of natural hazards and climate change and stand to benefit the most from projects that increase household resiliency. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

Experience and Expertise Requirements: the State will follow state procurement statutes to contract for this subawardee. The State will be looking to procure an entity that provides, at a minimum, the following expertise and/or experience:
- Arizona-locally owned entity
- Experience in working with low-income and disadvantaged communities
- Greenbank and/or sustainable finance expertise
- Minimum staff capacity already employed
- Past solar deployment and/or solar financing experience
- Past experience with braiding and stacking available federal funds
- Experience with managing and reporting on federal grant funds

**Subaward Workforce Development Training Program**

Total Budget Amount: $11,000,000

This subgrantee shall develop workforce training programming and activities to expand participation of workers from LIDAC communities and align with CEJST-designated Census

tracts targeted for support. The developed workforce programs will prioritize building workforce capacity in rural and Tribal areas of Arizona, as well as in outlying towns and cities, expanding geographically on the already well-developed solar workforce in the state's two main urban areas, Phoenix and Tucson, and ensuring that access to timely, professional, and skilled solar installations is available throughout the state. The subgrantee shall report on a quarterly basis to the *Solar for All Arizonans* Advisory Council, the Tribal Solar Strategy Working Group, and Solar For All Arizonans Program staff. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

**Facilities Allocation**
Total Budget Amount: $315,000
Facilities costs are based on a formula: $9,000 per FTE per year. These costs include rent, utilities, janitorial services, and repair and maintenance. The formula is based on the amount charged to the Governor's Office by the State's central facilities and building management agency.   The State charges the Governor's Office based on square footage of rental space occupied. The Governor's Office then allocates facility costs based on each FTE's/internal agency division's funding source. Facilities costs are considered to be a direct expense and are not duplicated in the State's indirect cost pool

**Subaward Solar for All Arizonans Community of Practice Solar Benefits Summit**
Total Budget Amount: $375,000

Solar for All Arizonans will include the creation of a Community of Practice program that will invite solar companies, financial institutions, municipalities and counties, community organizations, utilities, and more. Its goals will be to facilitate shared learning that grows industry best practices including how to work effectively with disadvantaged communities and more. This will involve an in-person conference, technical assistance workshops, and additional Community of Practice meetings. Cost estimates based on past venue, A/V, seating, and event fee cost estimates.

The planning of our conference and workshop strategy and schedule will be undertaken in the initial planning year and finalized in the updated workplan.

**Participant Support Costs**
Total Budget Amount: $1,591,000

A majority of this funding will support local nonprofits and local government entities supporting program participants with applying for the program. Funds will also be used to provide travel and participation stipents for members of the Advisory Council and associated working groups. Stipend amounts TBD. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

**Additional Items**

**Indirect Charges**
Grand Total Budget Amount: $1,214,312

The Executive Office of the State of Arizona, including the Governor's Office of Resiliency, has a Federally Approved Indirect Cost Rate Agreement that is approved by the U.S.

Department of Justice. The approved indirect rate for the fiscal year period 7/1/2024 - 6/30/2025 is 20.52% of all direct costs with a cap of $25,000 for each subrecipient agreements and vendor contracts. For each year's indirect costs calculation, the direct costs include the total of Personnel, Fringe Benefits, Travel, Equipment, and Supplies * .2052. The Contractual costs estimate 10 agreements (which would include both subrecipient agreements, subawards, and vendor contracts) * 25,000 cap * .2052.

**Meals and Refreshments**

Not applicable. Program funds will not be used for any meals and refreshments.

**Program Income**

An estimated $24M will be generated in returns in the first 10 years as a part of the program's Solar Revolving Loan Fund. The development of this fund will be undertaken in the initial planning year.

**Section 6 Activities to be Completed in 1st Year (Planning Year)**

Quarter 1 Objectives

- Complete initial tranche of FTE hires.
- Move into office space, confirm final facilities cost.

Quarter 2 Objectives

- Develop the Workforce Development Training Program

Quarter 3 Objectives

- Design Solar Revolving Loan Fund
- Draft a supplementary budget narrative to justify the amounts entered for each category of the budget table in the SF-424A. Include in the narrative activities supported by the subawards, range of funding in subawards, subaward types (i.e., governmental, non-profit, for-profit), specify how the subawardees are eligible in accordance with EPA's Subaward Policy.

Quarter 4 Objectives

- Finalize schedule and program budget including for initial kick-off events, the workforce development program, Community of Practice technical assistance workshops, conference meeting schedule and event budgets.

Applicant Name: Arizona Governor's Office of Resiliency    Award Number:    84092001

## Budget Information - Non Construction Programs

OMB Approval No. 0348-0044

**Section A - Budget Summary**

| Grant Program Function or Activity (a) | Catalog of Federal Domestic Assistance Number (b) | Estimated Unobligated Funds | | New or Revised Budget | | |
|---|---|---|---|---|---|---|
| | | Federal (c ) | Non-Federal (d) | Federal (e) | Non-Federal (f) | Total (g) |
| 1. Solar for All | 66.959 | $0 | | $156,120,000 | | $156,120,000 |
| 2. | | | | | | $0 |
| 3. | | | | | | $0 |
| 4. | | | | | | $0 |
| 5.     Totals | | $0 | $0 | $156,120,000 | $0 | $156,120,000 |

**Section B - Budget Categories**

| 6. Object Class Categories | Grant Program, Function or Activity | | | | Total (5) |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | |
| a. Personnel | $3,375,000 | | | | $3,375,000 |
| b. Fringe Benefits | $1,113,750 | | | | $1,113,750 |
| c. Travel | $66,450 | | | | $66,450 |
| d. Equipment | $0 | | | | $0 |
| e. Supplies | $87,500 | | | | $87,500 |
| f. Contractual | $8,225,188 | | | | $8,225,188 |
| g. Construction | $0 | | | | $0 |
| h. Other | $142,037,800 | | | | $142,037,800 |
| i. Total Direct Charges (sum of 6a-6h) | $154,905,688 | $0 | $0 | $0 | $154,905,688 |
| j. Indirect Charges | $1,214,312 | | | | $1,214,312 |
| k. **Totals** (sum of 6i-6j) | $156,120,000 | $0 | $0 | $0 | $156,120,000 |
| | | | | | |
| 7.          Program Income | $24,000,000 | | | | $24,000,000 |

**SF-424A** (Rev. 4-92)

Previous Edition Usable                                                    Prescribed by OMB Circular A-102

**Updated Detailed Budget Table**

*An OPTIONAL template for applicants to fill in and submit in the Application Materials, Attachment E: Budget Table described in in Section 2.1 of the Program Narrative.*

| COST-TYPE | CATEGORY | YEAR 1 FFY2025 | YEAR 2 FFY2026 | YEAR 3 FFY2027 | YEAR 4 FFY2028 | YEAR 5 FFY2029 | TOTAL | Narrative | TOTAL BUDGET BY ACTIVITY BUCKET |
|---|---|---|---|---|---|---|---|---|---|
| Direct Costs | **Personnel** | | | | | | | | |
| | 1 FTE Solar Access + Resilience Manager starting at $105,000 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $525,000.00 | | |
| | 1 FTE Solar Fund Manager starting at $115,000 | $115,000.00 | $115,000.00 | $115,000.00 | $115,000.00 | $115,000.00 | $575,000.00 | | |
| | 1 FTE Solar Program Impact Evaluator and Compliance Manager starting at $95,000 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $475,000.00 | | |
| | 1 FTE Solar Residential Deployment + Regulatory Manager starting at $105,000 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $525,000.00 | | |
| | 2 FTE Grants Coordinators starting at $85,000 | $170,000.00 | $170,000.00 | $170,000.00 | $170,000.00 | $170,000.00 | $850,000.00 | | |
| | 1 FTE Solar Community Development/ Engagement Educator starting at $85,000 | $85,000.00 | $85,000.00 | $85,000.00 | $85,000.00 | $85,000.00 | $425,000.00 | | |
| | | | | | | | | | $2,097,066.17 |
| | | | | | | | | | $3,360,683 |
| | TOTAL PERSONNEL | $675,000.00 | $675,000.00 | $675,000.00 | $675,000.00 | $675,000.00 | $3,375,000.00 | | |
| | **Fringe Benefits** | | | | | | | The State of Arizona budgets Fringe Benefits costs at an estimated rate of 33% of the total salary/wages. Fringe or employee-related benefits offered by the State of Arizona include employee leave (annual leave, sick leave, military leave, bereavement leave, etc); all required taxes; retirement contributions; and elective Medical/Life Insurances, etc. Actual elected medical benefits paid depend on the employee's selections, but generally range between 11-15%. For purposes of this budget, we conservatively estimate 12.01%, for a total of 33% fringe benefits calculated. | |
| | 1 FTE Solar Access + Resilience Manager | $34,650.00 | $34,650.00 | $34,650.00 | $34,650.00 | $34,650.00 | $173,250.00 | | |
| | 1 FTE Solar Fund Manager | $37,950.00 | $37,950.00 | $37,950.00 | $37,950.00 | $37,950.00 | $189,750.00 | | |
| | 1 FTE Solar Program Impact Evaluator and Compliance Manager | $31,350.00 | $31,350.00 | $31,350.00 | $31,350.00 | $31,350.00 | $156,750.00 | | |
| | 1 FTE Solar Residential Deployment + Regulator Manager | $34,650.00 | $34,650.00 | $34,650.00 | $34,650.00 | $34,650.00 | $173,250.00 | | |
| | 2 FTE Grants Coordinators | $56,100.00 | $56,100.00 | $56,100.00 | $56,100.00 | $56,100.00 | $280,500.00 | | |
| | 1 FTE Solar Community Development/ Engagement Educator | $28,050.00 | $28,050.00 | $28,050.00 | $28,050.00 | $28,050.00 | $140,250.00 | | |
| | TOTAL FRINGE BENEFITS | $222,750.00 | $222,750.00 | $222,750.00 | $222,750.00 | $222,750.00 | $1,113,750.00 | | |
| | **Travel** | | | | | | | The Office of Resiliency plans to participate in EPA technical assistance workshops and conferences, as available and planned by the EPA. Travel funding will also be for mileage for engagement and monitoring. All travel is subject to State of Arizona Accounting Manual restrictions. | |
| | Workshops | | | | | | | | |
| | Airfare: 4 @ $600 round trip | $2,400.00 | $2,400.00 | $2,400.00 | $2,400.00 | $2,400.00 | $12,000.00 | | |
| | Per Diem: 16 days @ $60/day | $960.00 | $960.00 | $960.00 | $960.00 | $960.00 | $4,800.00 | | |
| | Hotel: 4 (2 opportunities* 2 staff attending) x 3 nights @ $250/night | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $15,000.00 | | |
| | Program Evaluator, 100 mi/mo @ $.625/mi x 12 mo | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $3,750.00 | | |
| | Community Development Educator, 200 mi/mo @ $.625/mi x 12 mo | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $7,500.00 | | |
| | 2 Solar Grants Coordinators 100 mi/mo @ $.625/mi x 12 mo | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $7,500.00 | | |
| | Airfare for TA workshops: 2 @ $600 R/T | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $6,000.00 | | |
| | TA travel Per Diem: 2 staff X 4 days @ $60/day | $480.00 | $480.00 | $480.00 | $480.00 | $480.00 | $2,400.00 | | |
| | Hotel: 2 staff X 3 nights @ $250/night | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $7,500.00 | | |
| | TOTAL TRAVEL | $13,290.00 | $13,290.00 | $13,290.00 | $13,290.00 | $13,290.00 | $66,450.00 | | $41,465.00 |
| | **Equipment** | | | | | | | | |
| | | | | | | | | $0.00 | | |
| | TOTAL EQUIPMENT | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | |
| | **Supplies** | | | | | | | | |
| | PC Laptops | $3,150.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3,150.00 | 3 units, estimated cost of $1,050/unit, purchased when position is filled | |
| | Macbook Laptops | $9,600.00 | $0.00 | $0.00 | $0.00 | $0.00 | $9,600.00 | 4 units, estimated cost of $2,400/unit, purchased when position is filled | |
| | Monitors | $2,240.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,240.00 | 14 units total (2 per FTE), estimated cost of $160/unit, purchased when position is filled | |
| | Docking Stations | $1,750.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,750.00 | 7 units, estimated cost of $250/unit, purchased purchased when position is filled | |
| | USB-C Power Adapters | $350.00 | $0.00 | $0.00 | $0.00 | $0.00 | $350.00 | 7 units, estimated cost of $50/unit, purchased purchased when position is filled | |
| | Display Port Cables | $210.00 | $0.00 | $0.00 | $0.00 | $0.00 | $210.00 | 14 units total (2 per FTE), estimated cost of $15/unit, purchased when position is filled | |
| | Keyboard and Mouse | $385.00 | $0.00 | $0.00 | $0.00 | $0.00 | $385.00 | 7 units, estimated cost of $55/unit, purchased when position is filled | |
| | Telecommunications/Mobile Phones | $5,880.00 | $5,880.00 | $5,880.00 | $5,880.00 | $5,880.00 | $29,400.00 | $840 annual per FTE, 7 FTEs total | |
| | Davis Bacon Compliance Software | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $5,000.00 | Only needed for one FTE, Solar Program Impact Evaluator and Compliance Manager | |
| | Asana - Project Management Software | $2,100.00 | $2,100.00 | $2,100.00 | $2,100.00 | $2,100.00 | $10,500.00 | $300 annual per FTE, 7 FTEs total | |
| | Adobe Acrobat | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $3,500.00 | $100 annual per FTE, 7 FTEs total | |
| | Office 365 | $1,848.00 | $1,848.00 | $1,848.00 | $1,848.00 | $1,848.00 | $9,240.00 | $264 annual per FTE, 7 FTEs total | |
| | VPN - Ventraq | $252.00 | $252.00 | $252.00 | $252.00 | $252.00 | $1,260.00 | $36 annual per FTE, 7 FTEs total | |
| | ARC GIS software | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $3,500.00 | Only needed for one FTE | |
| | State IT Office licensing and hosting fees | $945.00 | $945.00 | $945.00 | $945.00 | $945.00 | $4,725.00 | $135 annual per FTE, 7 FTEs total | |
| | Misc. pens, notebooks, business cards | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $2,500.00 | Flat amount estimated per year | |
| | Hard Hats | $44.00 | $0.00 | $44.00 | $0.00 | $44.00 | $132.00 | 2 units, replaced every 2 years, 6 units total | |
| | Safety Eyewear | $58.00 | $0.00 | $0.00 | $0.00 | $0.00 | $58.00 | One box, contains 24 units | |
| | TOTAL SUPPLIES | $31,712.00 | $13,925.00 | $13,969.00 | $13,925.00 | $13,969.00 | $87,500.00 | | |
| | **Contractual** | | | | | | | | |
| | Program Evaluation Expenses (Compliance Contractor) | $200,188.00 | $750,000.00 | $750,000.00 | $750,000.00 | $750,000.00 | $3,200,188.00 | compliance with OMB Uniform Guidance and grant-specific requirements and serve as a | |
| | Implementation(s) | $1,005,000.00 | $1,005,000.00 | $1,005,000.00 | $1,005,000.00 | $1,005,000.00 | $5,025,000.00 | and executing a technician management and referral system that provides a seamless solution | |
| | TOTAL CONTRACTUAL | $1,205,188.00 | $1,755,000.00 | $1,755,000.00 | $1,755,000.00 | $1,755,000.00 | $8,225,188.00 | | |
| | **OTHER** | | | | | | | | |
| | Subaward- Residential Financial Assistance (Strategy 1) | $2,000,000.00 | $16,614,000.00 | $16,614,000.00 | $16,614,000.00 | $16,614,000.00 | $66,456,000.00 | photovoltaic installations for homeowners located in geographically dispersed low-income | |
| | Subaward- "Arizona Neighborhood Solar" Financial Assistance (Strategy 2) | | $12,012,000.00 | $12,012,000.00 | $12,012,000.00 | $12,012,000.00 | $48,048,000.00 | solar installations built with grant funding and owned by nonprofits or public agencies. Subaward | |
| | Subaward- "Resiliency Pilot" Financial Assistance (Strategy 3) | | $3,463,200.00 | $3,463,200.00 | $3,463,200.00 | $3,463,200.00 | $13,852,800.00 | solar plus battery storage that targets federally designated Community Disaster Resilience Zones | |
| | Subaward- Workforce development training program | $1,000,000.00 | $3,750,000.00 | $2,750,000.00 | $1,750,000.00 | $1,750,000.00 | $11,000,000.00 | | |
| | costs | $116,000.00 | $600,000.00 | $600,000.00 | $500,000.00 | $150,000.00 | $1,966,000.00 | supporting program participants with applying for the program as committee. Funds will also | |
| | Facilities Allocation (the formula should be $9,000*FTE) | $63,000.00 | $63,000.00 | $63,000.00 | $63,000.00 | $63,000.00 | $315,000.00 | | |
| | EPA In-Kind | | | | | | $400,000.00 | | |
| | TOTAL OTHER | $3,179,000.00 | $34,502,200.00 | $35,502,200.00 | $34,402,200.00 | $34,052,200.00 | $142,037,800.00 | | |
| | TOTAL DIRECT | $5,326,940.00 | $37,182,165.00 | $38,182,209.00 | $37,082,165.00 | $36,732,209.00 | $154,905,688.00 | | |
| Indirect Costs | **Indirect Costs** | | | | | | | | |
| | 20.52% on direct costs | | | | | | | FY2025 | |
| | Direct Costs | $191,562.00 | $191,562.00 | $191,562.00 | $191,562.00 | $191,562.00 | $957,812.00 | | |
| | Contractual (20) | $51,300.00 | $51,300.00 | $51,300.00 | $51,300.00 | $51,300.00 | $256,500.00 | | |
| | TOTAL INDIRECT | $242,862.00 | $242,862.00 | $242,862.00 | $242,862.00 | $242,863.00 | $1,214,312.00 | | |
| **FUNDING** | | $5,569,802.00 | $37,425,027.00 | $38,425,071.00 | $37,325,028.00 | $36,975,072.00 | $156,120,000.00 | | |

**Detailed Budget Table**

*An OPTIONAL template for applicants to fill in and submit in the Application Materials, Attachment E: Budget Table described in in Section 2.1 of the Program Narrative*

| COST-TYPE | CATEGORY | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|---|
| **Direct Costs** | **Personnel** | | | | | | |
| | 1 FTE Solar Program Director starting at $110,000/yr with COL increases | $110,000 | $113,300 | $116,699 | $120,200 | $123,806 | $584,005 |
| | 1 FTE Solar Fund Manager starting at $105,000/yr with COL increases | $105,000 | $108,150 | $111,395 | $114,736 | $118,178 | $557,459 |
| | 1 FTE Solar Program Impact Evaluator and Data Analyst starting at $95,000/yr with COL increases | $95,000 | $97,850 | $100,786 | $103,809 | $106,923 | $504,368 |
| | 1 FTE Solar Program Communications Specialist starting at $85,000/yr with COL increases | $85,000 | $87,550 | $90,177 | $92,882 | $95,668 | $451,277 |
| | 2 FTE Grants Manager starting at $75,000/yr with COL increases | $150,000 | $154,500 | $159,135 | $163,909 | $168,826 | $796,370 |
| | 1 FTE Solar Community Development Educator starting at $75,000/yr with COL increases | $75,000 | $77,250 | $79,568 | $81,955 | $84,413 | $398,185 |
| | 1 FTE Energy Policy Advisor at $130,000/yr with COL increases | $13,000 | $13,390 | $13,792 | $14,205 | $14,632 | $69,019 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | **TOTAL PERSONNEL** | $620,000 | $638,600 | $657,758 | $677,491 | $697,815 | $3,360,683 |
| | **Fringe Benefits** | | | | | | |
| | Program Directors @ 33% of salary | $36,300 | $37,389 | $38,511 | $39,666 | $40,856 | $192,722 |
| | Fund Manager @ 33% of salary | $34,650 | $35,690 | $36,760 | $37,863 | $38,999 | $183,962 |
| | Program Impact Evaluator & Data Analyst @ 33% of salary | $31,350 | $32,291 | $33,259 | $34,257 | $35,285 | $166,441 |
| | Communications Specialist @ 33% of salary | $28,050 | $28,892 | $29,758 | $30,651 | $31,571 | $148,921 |
| | Grants Manager @ 33% of salary | $49,500 | $50,985 | $52,515 | $54,090 | $55,713 | $262,802 |
| | Solar Community Development Educators @ 33% of salary | $24,750 | $25,493 | $26,257 | $27,045 | $27,856 | $131,401 |
| | Energy Policy Advisor | $4,290 | $4,419 | $4,551 | $4,688 | $4,828 | $22,776 |
| | **TOTAL FRINGE BENEFITS** | $204,600 | $210,738 | $217,060 | $223,572 | $230,279 | $1,109,025 |
| | **Travel** | | | | | | |
| | 2 Conference Opportunity, 2 staff attending DoE Technical Assistance Workshops | | | | | | |
| | Airfare: 4 @ $600 round trip | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $12,000 |
| | Per Diem: 16 days @ $60/day | $960 | $960 | $960 | $960 | $960 | $4,800 |
| | Hotel: 4 (2 opportunities* 2 staff attending) x 3 nights @ $250/night | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $15,000 |
| | Program Evaluator, 100 mi/mo @ $.625/mi x 12 mo | $750 | $750 | $750 | $750 | $750 | $3,750 |
| | Community Development Educator, 200 mi/mo @ $.625/mi x 12 mo | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $7,500 |
| | 2 Data Analysts, 100 mi/mo @ $.625/mi x 12 mo | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $7,500 |
| | Airfare for TA workshops 2 @ $600 R/T | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $6,000 |
| | TA travel Per Diem: 2 staff X 4 days @ $60/day | $480 | $480 | $480 | $480 | $480 | $2,400 |
| | Hotel: 2 staff X 3 nights @ $250/night | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $7,500 |
| | | | | | | | $0 |
| | **TOTAL TRAVEL** | $13,290 | $13,290 | $13,290 | $13,290 | $13,290 | $66,450 |
| | **Equipment** | | | | | | |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | **TOTAL EQUIPMENT** | $0 | $0 | $0 | $0 | $0 | $0 |
| | **Supplies** | | | | | | |
| | Annual conference | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $1,250,000 |
| | Software and Technology related to data analysis, project tracking, etc | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $150,000 |
| | Outreach Educational Materials | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $100,000 |
| | Digital Marketing | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $250,000 |
| | | | | | | | $0 |
| | **TOTAL SUPPLIES** | $350,000 | $350,000 | $350,000 | $350,000 | $350,000 | $1,750,000 |
| | **Contractual** | | | | | | |
| | Legal services | $75,000 | $60,000 | $30,000 | $20,000 | $15,000 | $200,000 |
| | Accounting (Single Audit) | $45,000 | $46,350 | $47,741 | $49,173 | $50,648 | $238,912 |
| | Solar for All Compliance Contractor (Data validation) | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $5,000,000 |
| | Solar for All Technicians Management Contractor (Program Development and Implementation) | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $5,000,000 |

| TOTAL BUDGET BY ACTIVITY BUCKET |
|---|
| FINANCIAL ASSISTANCE |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| TOTAL CONTRACTUAL | $2,120,000 | $2,106,350 | $2,077,741 | $2,069,173 | $2,065,648 | $10,438,912 | |
| **OTHER** | | | | | | | |
| Subgrant to Financial Partner for Residential Program | | $26,625,000 | $26,625,000 | $26,625,000 | $26,625,000 | $106,500,000 | $106,500,000 |
| Subgrant for "Arizona Solar" Deployment Partner | $15,400,000 | $15,400,000 | $15,400,000 | $15,400,000 | $15,400,000 | $77,000,000 | $77,000,000 |
| Subgrant for "Solar + Storage" Pilot Program Partner | $4,440,000 | $4,440,000 | $4,440,000 | $4,440,000 | $4,440,000 | $22,200,000 | $22,200,000 |
| Subgrant for workforce development training program | $4,360,000 | $4,360,000 | $4,360,000 | $4,360,000 | $4,360,000 | $21,800,000 | |
| Subgrant for Solar for All Arizonans Program Evaluation (Program Evaluation) | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $2,000,000 | |
| Subgrant to support technial assistance administration for local nonprofit and municipal partners | $308,000 | $509,000 | $509,000 | $509,000 | $209,000 | $2,044,000 | |
| TOTAL OTHER | $24,908,000 | $51,734,000 | $51,734,000 | $51,734,000 | $51,434,000 | $231,544,000 | $205,700,000 |
| TOTAL DIRECT | $28,215,890 | $55,052,978 | $55,049,849 | $55,067,526 | $54,791,033 | $248,269,070 | |
| **Indirect Costs** | | | | | | | |
| 23.25% on direct costs | | | | | | | |
| Direct Costs | $276,184 | $281,936 | $287,860 | $293,962 | $300,247 | $1,440,189 | |
| Contractual (10) | $58,125 | $58,125 | $58,125 | $58,125 | $58,125 | $290,625 | |
| TOTAL INDIRECT | $334,309 | $340,061 | $345,985 | $352,087 | $358,372 | $1,730,814 | |
| **FUNDING** | $28,550,199 | $55,393,039 | $55,395,834 | $55,419,613 | $55,149,404 | $249,999,885 | |
| **funding by** | | | $115 | | | | 82% |

# EXHIBIT 3



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**   Termination of EPA Assistance Agreement 5H-84092001 under 2 CFR 200.340

**FROM:**   Devon Brown, EPA Award Official

**TO:**   Maren Mahoney, Director, Office of Resiliency
Executive Office Of State Of Arizona

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84092001 awarded to Executive Office Of State Of Arizona. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Jennifer Brooks, EPA Grant Specialist
    Melissa Hopkinson, EPA Project Officer
    Blaise Caudill, Grantee Program Manager

EXHIBIT 4



GOVERNOR'S
OFFICE OF
RESILIENCY

1700 W. Washington St., Ste 500
Phoenix, AZ 85007
(602) 542- 4331

**KATIE HOBBS**
GOVERNOR

**MAREN MAHONEY**
DIRECTOR

August 28, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue N.W.
Washington, D.C. 20460

RE:  Notice of Disagreement with Modification No. 2 to Grant Number (FAIN): 5H-84092001, dated August 8, 2025

Dear Mr. Brown:

On August 7, 2025, the Arizona Office of Resiliency received a memorandum from you that purported to terminate EPA Assistance Agreement 5H-84092001 under 2 CFR 200.340 ("Termination Letter"). The Termination Letter outlines a Dispute process pursuant to 2 CFR 1500.15 with a deadline of 30 days. The Termination Letter also states: "[t]he EPA Grants Management Office will issue an amendment to the agreement to document the termination."

The next day, on August 8, 2025, the Arizona Office of Resiliency received a document titled "Assistance Amendment." That document states that it is "Modification Number: 2" to Grant Number 5H-84092001. Under its "Explanation of Changes," the document states that it requires the Arizona Office of Resiliency to stop work, terminates the agreement, reduces performance period duration, curtails the scope of work, and adds administrative terms and conditions. In the "Notice of Award" section, the document states that if the recipient disagrees with the terms and conditions specified, it must furnish a notice of disagreement within 21 days.

Please accept this letter as the Arizona Office of Resiliency's notice of disagreement with Modification No. 2 dated August 8, 2025, issued under your signature as the EPA Award Official. The Arizona Office of Resiliency also disagrees with the suggestion in the Assistance Amendment that any attempt to draw down funds could function as a waiver of its dispute rights. This waiver language is contrary to the Termination Letter's specific statement that costs incurred prior to the termination date are allowable.

If the termination is not rescinded, the Arizona Office of Resiliency reserves the right to pursue all available remedies.

Please acknowledge receipt of this notice of disagreement and contact the Arizona Office of Resiliency via the below-signer to discuss resolution of this disagreement as soon as possible.

Sincerely,

Maren Mahoney,
Director of the Arizona Office of Resiliency

**Arizona Governor's Office of Resiliency | Resilient.AZ.gov**

# EXHIBIT 5



**GOVERNOR'S OFFICE OF RESILIENCY**

1700 W. Washington St., Ste 500
Phoenix, AZ 85007
(602) 542-4331

**KATIE HOBBS**
GOVERNOR

**MAREN MAHONEY**
DIRECTOR

September 5, 2025

Michael Molina, EPA Dispute Decision Official
U.S. Environmental Protection Agency
Office of Mission Support
1200 Pennsylvania Avenue N.W.
Washington, D.C. 20460
molina.michael@epa.gov

RE: Dispute of Termination of EPA Assistance Agreement 5H-84092001 dated August 7, 2025

Dear Mr. Molina:

Please accept this letter as the Arizona Office of Resiliency's dispute with the termination notice issued by the Environmental Protection Agency ("EPA") on August 7, 2025, purporting to terminate EPA Assistance Agreement 5H-84092001 under 2 CFR 200.340 ("Termination Letter").[1]  The next day, the Office of Resiliency received a document titled "Assistance Amendment" dated August 8, 2025,[2] which the Office of Resiliency previously responded to on August 28, 2025.  Now, the Office of Resiliency timely submits this letter in accordance with 2 C.F.R. § 1500.15 disputing the August 7, 2025, Termination Letter.

Pursuant to 2 CFR 1500.15, we write to notify you as the EPA Dispute Decision Official that the Office of Resiliency disagrees with the attempt to terminate the subject award.  The termination notice: (1) violates the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only unobligated balances and preserved funds already awarded to recipients; (2) violates the legally binding Assistance Agreement dated July 7, 2024; (3) provides no valid reason for termination pursuant to 2 C.F.R. § 200.341; (4) is arbitrary, capricious, and not supported by substantial evidence; (5) violates constitutional boundaries; and (6) causes irreparable harm to Arizonans.

The following is a more detailed statement of the specific legal and factual grounds for this Dispute:

## FACTUAL GROUNDS

On October 11, 2023, the Office of Resiliency submitted an application under EPA's Solar for All[3] Notice of Funding Opportunity EPA-R-HQ-SFA-23-01.  In developing its

---

[1] Ex. 1 (attached).
[2] Ex. 2 (attached).
[3]     *Greenhouse     Gas     Reduction     Fund,*     U.S.     EPA,
https://www.epa.gov/greenhouse-gas-reduction-fund;

application, the Arizona Office of Resiliency consulted a number of stakeholders, including local governments. On April 22, 2024, EPA announced that it had selected 60 applicants to receive Solar for All funding, including "states, territories, Tribal governments, municipalities, and nonprofits."[4] EPA announced that it obligated these funds as part of the larger Greenhouse Gas Reduction Fund.[5] As one of the recipients of the obligated funds, the Office of Resiliency received an Assistance Agreement for $155,720,000 million in July 2024.[6]

Relying on the Assistance Agreement, the Office of Resiliency negotiated its work plan and budget with EPA. On November 24, 2024, the Office of Resiliency submitted its final work plan ("Work Plan") and budget documents to EPA. The Work Plan outlined the Office of Resiliency's plan for planning, designing, and implementing its Solar for All program.[7]

The Office of Resiliency's Work Plan proposed deploying 61 megawatts of distributed solar, increasing the State's distributed solar generation from the current 7 megawatts. This would be accomplished using three strategies: (1) low and no-interest loans to homeowners for rooftop solar; (2) developing neighborhood scale solar in low income and Tribal communities and contracting with utility providers to issue monthly utility bill credits; and (3) a solar plus storage resilience pilot for homes that are not connected to the grid (for Tribal and rural communities).

Pursuant to its approved Work Plan, the Office of Resiliency elected to take a full Program Planning Year to design and ready for implementation its Solar for All program. Between December 2024 and August 2025, the Office of Resiliency did the following, for example:

    a. Developed EPA required documents, including Title VI compliance documents, a Quality Management Plan, and a Quality Assurance Project Plan ("QAPP"), in consultation with the Arizona Department of Environmental Quality.

    b. Began drafting a formal risk management strategy for the Solar for All program, including incorporating existing policies and procedures for preventing, identifying, and mitigating potential conflicts of interest and waste, fraud, and abuse.

    c. Began a hiring process for necessary staff to administer the Solar for All program. This activity included developing six job descriptions, posting the job descriptions on the State of Arizona Job Posting website,

---

https://www.epa.gov/system/files/documents/2023-04/GGRF%20Implementation%20Framewor k_730am.pdf at pp. 41-52.
[4]

https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-gra nts-deliver-residential.
[5]

https://www.epa.gov/newsreleases/epa-awards-27b-greenhouse-gas-reduction-fund-grants-accele rate-clean-energy-solutions.
[6] Ex. 3 (attached).
[7] Ex. 4 (attached).

reviewing an estimated 250 applications, completing preliminary and secondary interviews, and hiring and onboarding the Solar Access and Resilience Program Manager.

d. Launched the Solar for All Arizonans Advisory Council to provide input on various aspects of the Solar for All Arizona program design to ensure the program meets community needs.

e. Began developing the Consumer Protection Guide to serve as a comprehensive resource for Solar for All Arizona participants to understand and engage with the solar energy market.

f. Engaged with the Arizona Governor's Office on Tribal Relations to design and plan a Tribal Solar Strategy Working Group, intended to identify ways to ensure Solar for All Arizona benefits and programming were available and accessible to Tribal community members.

g. Developed informational documents and related materials for public dissemination.

The Office of Resiliency also used the Program Planning Year to further develop the three programs outlined in its application. For example, the Office of Resiliency did the following:

a. Drafted and compiled all required documents for a competitive request for funding application, previously scheduled to be made available to eligible applicants on August 7, 2025.

b. Drafted a request for information to gather facts on, and likely terms of, financial products for residential solar systems for households with low-income (less than 80% area median income) participating in the Solar for All program.

c. Began drafting a QAPP household savings appendix to demonstrate household savings calculation methodology, the data elements that Solar for All Arizona staff would be collecting for that calculation, and data collection methods.

d. Developed a framework for the residential rooftop solar and solar plus storage programs, from marketing and outreach to project completion. Established standard criteria for contracted vendors to set up financing mechanisms, support a contractor network, and contract with community advocacy organizations to engage Arizonans to participate in the program.

e. Began the procurement process, established scope of work, and contracted for grant writing technical assistance workshops to be held monthly during the fall of 2025.

The subject line of the Termination Letter states that the termination is under 2 C.F.R. § 200.340, and the Letter states that the Office of Resiliency should follow the closeout process outlined in 2 C.F.R. 200.344. The Termination Letter states that OBBBA "repeal[ed] the underlying authority for the Solar for All program" and "rescind[ed] unobligated amounts to carry out" the program. Per the Termination Letter, EPA's opinion is that OBBBA "effectively and completely terminated the statutory authority and all appropriations related to Solar for All"

3

and "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the Solar for All program. To be clear, OBBA did not eliminate EPA's entire administrative budget. To the contrary, on March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection Agency–Environmental Programs and Management" in fiscal year 2025.[8]

The Letter also notes that recipients could continue to request payment from the Automated Standard Application Payments ("ASAP") system for "allowable costs incurred up to the date of" the Termination Letter, in addition to "reasonable and necessary" closeout costs pursuant to 2 CFR 200.472.

Further, the Office of Resiliency has complied with all the agreement's terms and conditions and was achieving all the deliverables and activities within the Work Plan.

## LEGAL GROUNDS

1. **EPA's Termination of the Office of Resiliency's Solar for All Assistance Agreement Exceeds and Contradicts OBBBA's Language, Which Rescinded Unobligated Balances and Preserved Funds Already Awarded.**

EPA's Termination Letter states that the subject Assistance Agreement is terminated because it is required by OBBBA. Section 60002 of OBBBA provides:

Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

But the full amount of the Office of Resiliency's $155,720,000 funds were obligated many months before OBBBA and remain obligated. The Office of Resiliency's award was, therefore, unaffected by Section 60002 rescission.

Funds awarded to Solar for All recipients were obligated upon award and subject to a legally binding agreement whereby the EPA "promise[d] to spend the money, either immediately or in the future, as work under the obligation is completed."[9] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[10] The same principle applies to the Solar for All Assistance Agreement. Solar for All funds were obligated at the time OBBBA was passed, and OBBBA did not change this and could not have legally rescinded this obligated funding award.

---

[8] Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

[9] https://www.usaspending.gov/explorer?glossary=obligation.

[10] https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf.

Where the plain language of a statute is unambiguous, no further analysis is required.[11] Here, the plain language of OBBBA is clear that obligated funds are not affected by Section 60002. EPA's action in terminating the Office of Resiliency's Solar for All Assistance Agreement is therefore contrary to the plain language of OBBBA.

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.[12] Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. Congress did not direct or otherwise authorize EPA to terminate the Solar for All program. EPA is acting beyond its authority because it defies Congress's express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All appropriations are rescinded. EPA should therefore reinstate the Office of Resiliency's Solar for All Assistance Agreement.

## 2. EPA's Decision to Terminate the Office of Resiliency's Solar for All Assistance Agreement Lacks Any Legal Basis.

The Termination Letter does not give any reason for termination other than its alleged reliance on OBBBA. While the Letter cites 2 C.F.R. § 200.340, that regulation does not authorize EPA to terminate a federal award when EPA believes that it "no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring" of an award program. Nor does it authorize EPA to terminate a federal award when Congress rescinds EPA's "administrative cost appropriation," as the Termination Letter alleges. Indeed, EPA has not identified any provision of 2 C.F.R. § 200.340 which authorizes termination of the Office of Resiliency's Solar for All Assistance Agreement.[13]

Similarly, the terms and conditions of the Assistance Agreement do not allow for termination under the circumstances described in the Termination Letter.

EPA has identified no basis for unilateral termination of the Office of Resiliency's Solar for All Assistance Agreement. Termination for noncompliance is only possible when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."[14] Neither condition exists here. Indeed, EPA has not identified any noncompliance, has provided no evidence of waste, fraud, or abuse, nor has it requested that the Office of Resiliency take action to cure any deficiencies in its performance.

---

[11] *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end.").

[12] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).

[13] The uniform regulations at 2 C.F.R. 200.340(a) provide the circumstances under which the government may terminate an agreement, which are (1) failure to comply with the award terms and conditions; (2) with consent of the recipient; (3) by request of the recipient; or (4) otherwise pursuant to the terms and conditions of the agreement, to the extent authorized by law.

[14] Ex. 3 at p. 30.

5

EPA did not assert "agency priorities" as a basis for terminating Office of Resiliency's Assistance Agreement, but even if it had, 2 C.F.R. § 200.340(a)(4)'s language allowing termination "if an award no longer effectuates the program goals or agency priorities" would not apply anyway. When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget ("OMB") confirmed that the termination language relating to agency priorities did not allow agencies to implement arbitrary cancellations.[15] In 2024, OMB completed another round of revisions to this provision.[16] After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that may form a ground for termination, but only if "the language is included in the terms and conditions of the award."[17] The agency must "clearly and unambiguously" include (a)(4) in the agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4).[18]

Here, because the Assistance Agreement does not include the "agency priorities" provision of (a)(4) as a ground for potential termination in its terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the award.[19] To the extent agency priorities were a basis for the termination, EPA acted contrary to the governing regulations.[20]

The Office of Resiliency has not, and unequivocally does not, agree to any attempts to terminate this Assistance Agreement based on an erroneous, bad faith interpretation of OBBBA Section 60002. Congress intended for these funds to benefit the public by providing efficient and sustainable energy options to meet the country's growing energy needs. The Office of Resiliency complied with the Assistance Agreement's terms and conditions and does not consent to the Assistance Agreement being terminated. The Office of Resiliency's award must be immediately restored to its full amount.[21] The Office of Resiliency requests that the EPA follow the law and rescind this unlawful termination.

3. **EPA's Decision to Terminate the Office of Resiliency's Solar for All Assistance Agreement is Arbitrary and Capricious**.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

---

[15] Guidance for Grants and Agreements 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).

[16] Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024).

[17] *Id.* at 30,089.

[18] *Id.*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

[19] Even if this provision applied, this program effectuates the Trump administration's priorities by increasing energy independence and lowering energy costs.

[20] 2 C.F.R. § 200.340(b); see 89 Fed. Reg. at 30,089.

[21] 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.

agency expertise."[22]  In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[23]

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[24]  Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process."[25]  Agency action taken on pretextual grounds violates the requirement of reasoned agency decision-making.

EPA's decision to terminate the Office of Resiliency's Solar for All Assistance Agreement is arbitrary and capricious because the federal agency: (1) provided no reasoned basis for the termination, (2) failed to undertake any individual assessments of the Office of Resiliency's Solar for All award, and (3) ignored the Office of Resiliency's substantial reliance interests and the harmful impact of an abrupt and complete termination of the Solar for All program.

EPA's sole stated rationale for the Termination Letter—that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients"—is a contrived, irrational, and insufficient explanation and thus not a reasoned basis for that action.  EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that Congress appropriated to EPA in March to pay for "Environmental Programs and Management."

EPA likewise failed to engage in reasoned consideration of the Office of Resiliency's Solar for All award before categorically terminating the Solar for All program.  EPA has identified no other facts which would support the termination.  EPA's prior statements demonstrate that its stated rationale was pretextual.

Also arbitrary was EPA's failure to give notice to the Office of Resiliency so it could address any alleged failures.  2 C.F.R. 200.208 requires the agency to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to satisfy the conditions.  2 C.F.R. § 200.208(d)-(e).  It is only after an award recipient fails to meet the conditions imposed that the award can be terminated.  2 C.F.R. § 200.339(a) & (c) (authorizing a temporary hold on payments, suspension or termination unless or until the recipient takes corrective action).  EPA's actions are contrary to these procedures.  EPA terminated the Assistance Agreement without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure.  2 C.F.R. § 200.208.  Contrary to Section 200.208's notice-and-cure requirements, EPA operated in secret to withdraw access to the Office of Resiliency's accounts. The lack of notice was arbitrary, capricious, and deprived the Office of Resiliency of due process.

---

[22] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
[23] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).
[24] *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).
[25] *Id.*

4. **EPA's Termination of the Office of Resiliency's Duly Appropriated and Obligated Solar for All Assistance Agreement Violates the Constitution's Separation of Powers.**

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[26]  The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[27]  The Executive has no power "to enact, to amend or to repeal statutes."[28]  Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority.  And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

*Spending Clause*

The Constitution also "exclusively grants the power of the purse to Congress, not the President."[29]  U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[30]

The Termination Letter and EPA's subsequent implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[31]  For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of the Office of Resiliency's funding agreement.

*Take Care Clause*

The Constitution provides that the executive must "take Care that the laws be faithfully executed."[32]  The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[33]  Given these principles, where the Executive Branch

---

[26] U.S. Const. art. I, § 1.

[27] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

[28] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

[29] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

[30] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).

[31] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

[32] U.S. Const. art. II, § 3.

[33] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the

overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and the Office of Resiliency's individual award on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind the Office of Resiliency's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[34] EPA's Termination of the Office of Resiliency's Assistance Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to the Office of Resiliency prior to September 30, 2024. EPA violated constitutional separation-of-powers constraints because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[35] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[36] Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[37]

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[38] When Congress passed the Inflation Reduction Act, including the Clean Air Act, Section 134, through both Houses of Congress, it did so consistent with its legislative powers. Likewise, when Congress directed in § 60002 of OBBBA that only "unobligated balances of amounts made available to carry out [Clean Air Act Section 134] are rescinded," it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by adopting an interpretation of the OBBBA that is contrary to its plain language and relying upon that misinterpretation to

---

President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

[34] OBBBA at § 60002.

[35] U.S. Const. Art. I, § 9, cl. 7.

[36] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).

[37] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

[38] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

unilaterally terminate the Office of Resiliency's Solar for All Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[39] When actions by the federal government come in the form of "threats to terminate . . . significant independent" awards, the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[40] EPA's termination of the Office of Resiliency's Solar for All Assistance Agreement altered the terms upon which the award was obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the award. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Letter and subsequent termination of the Office of Resiliency's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind the Office of Resiliency's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

**5. The Termination of Arizona's Solar for All Assistance Agreement Will Cause Irreparable Harm to Arizonans.**

The EPA's termination of Arizona's Solar for All Assistance Agreement will cause irreparable harm to Arizonans. The Office of Resiliency expected to serve approximately 11,232 low-income households between the various programs it intended to offer using Solar for All funding, resulting in the reduction of electrical bills by approximately $165 million in the aggregate. With the loss of Solar for All funding, the Office of Resiliency will no longer be able to offer low and no-interest loans to single family households, offer funding to utility/nonprofit or municipality partnerships to develop neighborhood scale solar projects in low income and Tribal communities, or distribute resulting savings via monthly utility bill credits and funding for distributed solar plus storage to Tribal and rural homes that lack electricity access.

Indeed, Solar for All Arizonans was set to invest $33 million in green mortgages to integrate rooftop solar into the purchase of a new home, easing financial assistance and combining programs to simultaneously address energy burdens.

In addition, Solar for All Arizonans was planning to invest $16.7 million to drive market-making, public and private capital mobilization, and long-term capacity building for

---

[39] U.S. Const. amend. X.
[40] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

capital providers through a low interest loan fund. This would also include a technical assistance program for community development financial institutions and nonprofit lenders. This revolving loan fund would continue supporting energy stability and resilience beyond the initial Solar for All investment—with the potential to impact several future generations of Arizonans.

Solar for All Arizonans was also planning to use $11 million of funding to support workforce development programs to train the workforce necessary for program delivery. In total, it is estimated that thousands of new green jobs in Arizona's solar industry would have been stimulated by these investments and activities.

The loss of Solar for All funding will harm Arizonans, including Tribal members and governments. The Office of Resiliency collaborated with multiple Tribal governments to develop the proposal Solar for All programming. Based on these engagements, and as informed by community best practice, certain funds from each of the aforementioned programs were prioritized to benefit Tribal communities. It is estimated that 15,000 Tribal households in Arizona lack *any* access to electricity; and many Tribal communities that do have electricity access often experience outages due to aging infrastructure and lack of investment in these areas. Stripping Solar for All funding from the Office of Resiliency prohibits these funds from being able to benefit Tribal communities and undermines the work done to improve the relationship between the State and Tribal governments and communities. Terminating this program–especially for Tribal members without electricity–exacerbates economic and educational disparities, prevents homes from accessing running water, and aggravates negative health consequences associated with surviving Arizona summers without any relief from the heat from an already-vulnerable population.

The Office of Resiliency cannot backfill with state funds to keep its Solar for All offerings available. The vast majority of the state budget supports statutorily required, ongoing expenditures, and the federal cuts from H.R. 1 to essential government services, such as public safety and Medicaid, present new, significant impacts to the State's fiscal future. Arizona is also statutorily constrained in its ability to raise additional revenue.

The loss of Solar for All results in multiple other harms. The unexpected, premature end of Solar for All funding harms the Office of Resiliency. The Office of Resiliency had used Solar for All funding to hire a Solar Access and Resilience Program Manager and was in the process of interviewing candidates to hire five additional staff. Without this funding, the Office of Resiliency will have to identify an additional funding source to continue employing the staff member who had been recently hired for his expertise in distributed solar and specifically to develop Solar for All Arizona. And the Office of Resiliency has had to cancel its hiring of the five additional staff. The Office of Resiliency does not receive substantial state general fund dollars, meaning funding and staff time allocations must be rerouted from other programs not related to solar energy. Moreover, the Office of Resiliency expended at least many hundreds of employee hours on Solar for All programming. In doing so, the Office of Resiliency had to forgo other funding opportunities and other program and policy development opportunities.

11

The loss of Solar for All funding has also caused the loss of necessary technical assistance that would have provided critical insights into how to maximize household savings for low and moderate-income households taking advantage of distributed solar opportunities. This information is critical to households facing rising electric bills, particularly through Arizona's long, hot summers.

The termination of the Solar for All program will also result in a loss of improved air quality and increased health benefits for Arizonans across the State. With Solar for All, Arizona would have experienced an estimated reduction of 316,000 lbs of particulate matter 2.5 (PM 2.5), 1.8 million lbs of nitric oxide (NOx), and 939,000 lbs of sulfur dioxide (SO2). The program was also expected to avoid 2.4 million tons of carbon dioxide (CO2) emissions, representing an average drop of 42% in annual emissions avoided per participating household.

In addition, the loss of Solar for All Funding will pose a challenge to Arizona's ability to meet the projected 40% increase in load growth demand in the coming years, leading to a less reliable, resilient grid and higher electricity bills for households and businesses. It also will increase the challenge to Arizona's utilities as they work toward voluntary carbon-neutrality goals by 2050.

If EPA claims that it no longer possesses the requisite personnel or administrative funding required to oversee and administer the award, the Office of Resiliency respectfully proposes the appointment of an independent third party to administer and oversee the award, subject to EPA's reasonable oversight and supervision.

Until the Office of Resiliency's dispute with EPA has been resolved, it objects to any claims of noncompliance under 2 C.F.R. 200.344(i).

The specific remedy or relief sought here is rescission of the termination of this Assistance Agreement; reinstatement of the Assistance Agreement for the originally awarded amount, scope of work, and performance period; and reinstatement of the notice to proceed. In furtherance of this Dispute, please find attached:

- A copy of the disputed Agency Decision; and
- Copies of supporting documents.

The name and contact information, including email address, of the Office of Resiliency's designated point of contact for this Dispute is: Maren Mahoney, Director of the Arizona Office of Resiliency, mmahoney@az.gov.

Please acknowledge receipt of this Dispute and contact me to discuss resolution of this disagreement as soon as possible.

Very truly yours,

Maren Mahoney
Director of the Arizona Office of Resiliency

CC: Devon Brown, EPA Award Official *via email* (brown.devon@epa.gov)

Exhibits



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

<u>**MEMORANDUM**</u>

**SUBJECT:**     Termination of EPA Assistance Agreement 5H-84092001 under 2 CFR 200.340

**FROM:**          Devon Brown, EPA Award Official

**TO:**               Maren Mahoney, Director, Office of Resiliency
                           Executive Office Of State Of Arizona

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84092001 awarded to Executive Office Of State Of Arizona. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Jennifer Brooks, EPA Grant Specialist
    Melissa Hopkinson, EPA Project Officer
    Blaise Caudill, Grantee Program Manager

5H - 84092001 - 2    Page 1

| | | GRANT NUMBER (FAIN): 84092001 | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | | MODIFICATION NUMBER: 2 PROGRAM CODE: 5H | **DATE OF AWARD** 08/08/2025 |
| | | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 08/08/2025 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** 90711 |

| RECIPIENT TYPE: State | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| EXECUTIVE OFFICE OF STATE OF ARIZONA 1700 WEST WASHINGTON SUITE 500 PHOENIX, AZ 85007-2812 EIN:  86-6004791 | EXECUTIVE OFFICE OF STATE OF ARIZONA 1700 WEST WASHINGTON SUITE 500 PHOENIX, AZ 85007-2812 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Blaise Caudill 1700 W. Washington St Suite 500 Phonex, AZ 85007-2815 **Email:** bcaudill@az.gov **Phone:** 520-312-5854 | Melissa Hopkinson 1200 Pennsylvania Ave NW, 1101R Washington, DC 20460 **Email:** Hopkinson.Melissa@epa.gov **Phone:** 202-566-0810 | Jennifer Brooks 1200 Pennsylvania Ave, NW, 3903R Washington , DC 20460 **Email:**  brooks.jennifer@epa.gov **Phone:** 202-564-6374 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Solar for All Arizonans: Enhancing Access to Solar Energy for Low-Income and Disadvantaged Communities in Arizona

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements.  Administrative terms and conditions are added.

Per 2 CFR 200.340 (a)(4) and the administrative terms and conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD 05/01/2024 - 08/08/2025 | PROJECT PERIOD 05/01/2024 - 08/08/2025 | TOTAL BUDGET PERIOD COST $ 156,120,000.00 | TOTAL PROJECT PERIOD COST $ 156,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave, NW Washington , DC 20460 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature applied by EPA Award Official for Devon Brown - Branch Chief, GMB by LaShaun Phillips - Award Official Delegate | **DATE** 08/08/2025 |
|---|---|

5H - 84092001 - 2     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 155,720,000 | $ 0 | $ 155,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 3,375,000 |
| 2. Fringe Benefits | $ 1,113,750 |
| 3. Travel | $ 66,450 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 87,500 |
| 6. Contractual | $ 8,225,188 |
| 7. Construction | $ 0 |
| 8. Other | $ 142,037,800 |
| 9. Total Direct Charges | $ 154,905,688 |
| 10. Indirect Costs: 20.52 % Base MTDC | $ 1,214,312 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 24,000,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

    a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

    b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

    c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect.  The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

    a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

    b. Explanations on why established outputs/outcomes were not met; and

    c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

    a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

    b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

## Programmatic Conditions

All Programmatic Conditions Remain the Same.

5H - 84092001 - 0    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN): 84092001<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5H | DATE OF AWARD<br>07/08/2024 |
|---|---|---|---|
| | | TYPE OF ACTION<br>New | MAILING DATE<br>07/11/2024 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>90711 |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| EXECUTIVE OFFICE OF STATE OF ARIZONA<br>1700 WEST WASHINGTON SUITE 500<br>PHOENIX, AZ 85007-2812<br>EIN:  86-6004791 | EXECUTIVE OFFICE OF STATE OF ARIZONA<br>1700 WEST WASHINGTON SUITE 500<br>PHOENIX, AZ 85007-2812 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Blaise Caudill<br>1700 W. Washington St Suite 500<br>Phonex, AZ 85007-2815<br>**Email:** bcaudill@az.gov<br>**Phone:** 520-312-5854 | Rebecca Taylor<br>1200 Pennsylvania Ave, NW, 4410C<br>Washington , DC 20460<br>**Email:** taylor.rebecca@epa.gov<br>**Phone:** 202-564-5211 | Jennifer Brooks<br>1200 Pennsylvania Ave, NW, 3903R<br>Washington , DC 20460<br>**Email:** brooks.jennifer@epa.gov<br>**Phone:** 202-564-6374 |

**PROJECT TITLE AND DESCRIPTION**

Solar for All Arizonans: Enhancing Access to Solar Energy for Low-Income and Disadvantaged Communities in Arizona - "Note: A special payment condition applies to this award."

See Attachment 1 for project description.

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 0.00 | TOTAL PROJECT PERIOD COST<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW<br>Washington , DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Keva R. Lloyd - Acting Chief, Grants Management Branch | DATE<br>07/08/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41039 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

5H - 84092001 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00__ % Federal ___0.00__ %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

- MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

- Payment requests (if applicable): EPA Project Officer

- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with

local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed <u>prior</u> to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*<u>The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition</u>*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

_**The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:**_

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

_**The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:**_

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining its UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

K. Labor and Equitable Workforce Development Requirements

1. Davis-Bacon and Related Acts (DBRA)

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

<u>5. Disadvantaged Business Enterprises</u>

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the [EPA Build America, Buy America General Term and Condition](), which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

### 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

### 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

<u>3. Low-Income and Disadvantaged Communities Expenditure Requirements</u>

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

<u>4. Cash Management Requirements</u>

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

<u>5. Remedies for Non-Compliance</u>

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

<u>6. Suspension and Debarment</u>

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

**AA. Compliant URL Links**

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

**AB. Flow-Down Requirements**

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

#### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

#### 2. Governance Requirements

#### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Solar for All Arizonans Work Plan**
Project Period:  5/1/2024 – 4/30/2029
Submittal Date:  5/23/2023

**Project Title:** Solar for All Arizonans
**Grant Number: 5H-84092001**
**Organization Name:** Executive Office of the State of Arizona
**Geography:** Entire state of Arizona

Introduction

# Section 1:  Project Description

## 1.1 Overview

Solar for All Arizonans is a transformational opportunity for the State of Arizona to bring the benefits of the state's abundant solar resources to the state's low-income and disadvantaged communities (LIDAC). Arizona is one of the sunniest states, with one of the nation's fastest growing solar markets. Yet, the benefits of solar markets are not currently distributed fairly across Arizona's diverse communities. This program will provide $156M in EPA investments to benefit low-income and disadvantaged communities through innovative solar deployments and long-term changes to solar markets. Solar for All Arizonans will create multiple innovative market mechanisms that accelerate LIDAC distributed solar deployment on rooftops, in neighborhood solar projects, and in solar-plus-storage systems.

The benefits of these programs will include more equitable and just long-term solar development in the state, bringing the benefits of solar energy to low and moderate income (LMI) and disadvantaged communities in urban, rural, and tribal areas. The program will provide significant immediate savings on electricity bills for recipients of solar energy benefits, as well as extensive reductions of greenhouse gas emissions from the state's electricity sector, with larger reductions per dollar of federal investment in solar than any other state. Finally, it will provide greater resilience to accelerating heat and climate risks that fall disproportionately on LMI and disadvantaged communities.

The project will use tools such as the Climate and Economic Justice Screening Tool (CEJST) to identify and prioritize overburdened and underserved households across Arizona. Census tracts and communities designated as LIDAC as defined by the EPA, including Tribal areas, and dispersed low-income households under 80% of AMI will be prioritized.

1

## 1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Environmental Results - Outputs and Outcomes:**
**All outcomes will be based on SFA-funded solar.**

### Table 1. Output and Outcome Metrics

| Number of households projected to benefit from the solar program | |
|---|---|
| Total number of households benefiting | 11,232 |
| Award funding requested per household | $13,927 |
| Average savings per household per year | $588 |
| **Megawatts of solar capacity deployed** | |
| Total megawatts deployed | 61.2 MW |
| Total megawatts residential solar | 21.5 MW |
| Total megawatts neighborhood solar | 39.94 MW |
| Total awarded dollars per MW deployed | $2.5 million / MW |
| **Megawatts of storage capacity deployed** | |
| Megawatt hours deployed | 4.2 MWh |
| Total awarded dollars per MWh of storage | $890,000 / MWh |
| **Annual tons of $CO_2$ avoided** | |
| Total tons of $CO_2$ avoided | 96,789 (annual) |
| Total awarded dollars per tons of $CO_2$ avoided | $64 / ton |
| **Annual household savings** | |
| Program-wide household savings | $165.74 M (25 years) |
| Total awarded dollars per dollars of household savings | $0.95 |
| **Workforce development** | |
| Number of workforce development events supported (bootcamps, trainings, recruitment events) | 3 |

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

## Section 2:  Project Design Plan

### 2.1 Activities to be Conducted.

Due to the novelty of this undertaking, Arizona will utilize the one-year planning period to stand up its program. Specific action items for this planning period are included at the end of each section of this workplan.

## Meaningful Benefit Plan

*Solar for All Arizonans* will enable low-income and disadvantaged communities to deploy or benefit from solar by focusing on the five meaningful benefits outlined by the EPA: household savings, equitable access, resilience, community ownership, and workforce development.

### Household Savings
*Solar for All Arizonans* will implement three solar deployment strategies, each of which will ensure low-income households save a minimum of 20% on their monthly utility bill. The Program Impact Evaluator and Compliance Manager will help establish mechanisms for calculating the 20% savings through certifications and audits. This will be determined during the planning period.

- **Strategy 1** (Distributed Rooftop Solar) will provide loans and grants for distributed residential rooftop solar photovoltaic installations for homeowners located in geographically dispersed low-income households and LIDAC communities.
- **Strategy 2** (Neighborhood Solar) will build neighborhood solar projects, which are 1 to 5 MW distributed solar installations built with grant funding. Partnering utilities who choose to participate will provide bill discounts to low-income households (both owners and renters), meeting a minimum savings of 20% for participating households. This program will be offered through existing utility discount programs for low-income customers or equivalent programs designed for this grant.
- **Strategy 3** (Rural & Tribal Solar + Storage) implements a resilience pilot program for distributed residential solar plus battery storage that prioritizes services to rural and Tribal areas, as these areas are at high risk from effects of natural hazards and climate change and stand to benefit the most from projects that increase household resiliency.

### Equitable Access to Solar

With cost being one of the greatest barriers to solar adoption, this program will offer multiple forms of financial assistance on an income-based sliding scale to greatly increase the

3

access of low-income and disadvantaged households to solar. Potential costs to households for participating in the program will be determined during the planning period.

- Strategy 1 and 3 will rely on a mix of grants and low-interest loans. For households making below 80% AMI, financial assistance will be provided in the form of a grant, as requiring repayment would impose too high of a financial burden on households at this income level. Households earning between 80% to 150% AMI will receive low-interest loans for solar, targeting rates that are subprime and low enough to incentivize solar adoption. Multifamily units where the owner earns above 130% of area median income and provides subsidized rent to low-income renters through programs like Section 8 housing vouchers can also access the low-interest loans, but will be required in the loan agreement to pass along the subsequent decrease in monthly utility bills if the monthly rent includes utilities. At least 50% of electricity and 50% of benefits will be delivered to residents in the utility territory. Neighborhood Solar as we define it here differs from Community Solar in that it will be owned by the utilities rather than mechanisms allowing for more direct ownership by communities. This is due to restrictive solar policies in Arizona.
- Strategy 2 will deploy financial assistance in the form of **competitive grants** to build 1 to 5 MW distributed solar projects, in partnership with local utilities. Proposals for strategy 2 must provide bill credits to low-income and disadvantaged households within the utility service territory. This strategy will specifically serve Tribal Nations, as well as LIDAC communities with a high proportion of renters, to complement Strategies 1 and 3, that serve, primarily, homeowners. Individuals living in buildings with master metering would have access to savings benefits if the landlord enrolls in the program. The landlord would then distribute saving benefits from neighborhood solar projects to eligibile residents. Further details will be explored during the planning period.

## Community Ownership

*Solar for All Arizonans* will maximize household ownership of solar energy for low-income and disadvantaged households. **Strategy 1** (Distributed Rooftop Solar) and **Strategy 3** (Rural and Tribal Solar + Batteries) will deploy solar that is nearly entirely owned by households. These strategies comprise 51% of grant funds ($80.3M). **Strategy 2** (Neighborhood Solar, 31% of grant funds, $48.05M) will promote **ownership of solar by community-based non-profits, cities, or other organizations or other third parties on behalf of low-income and disadvantaged communities and deliver financial benefits from those projects to households within those communities through utility rate discounts.**

## Delivering energy resilience and grid benefits

*Solar for All Arizonans* will increase household energy resilience **through a resilience pilot strategy for distributed residential solar and battery storage for low-income households in rural and Tribal areas.** Arizona will prioritize census tracts identified as being at the highest risk of natural hazards and impacts of climate change.

The program will evaluate each home, gather data from the occupants and determine the best overall solar and battery combination for the property. We will also explore the option of extending this program to critical community facilities, such as community resilience hubs, cooling centers, etc., that might be included in the program.

4

*Solar for All Arizonans* will also deliver broader grid benefits by increasing the proportion of the state's solar electricity generation. The project's distributed residential solar installations will reduce electricity demand and ease stress on transmission systems, especially during summer months, which will decrease the likelihood of a power outage during peak demand times and ensure a sufficient supply of electricity for low-income and disadvantaged households.

**Workforce Development**

*Solar for All Arizonans* will make significant investments in jobs and businesses located in low- income and disadvantaged communities. It will develop extensive workforce pathways to train new workers and upskill existing workers to build out the state's solar workforce capacity to meet ambitious project deployment goals.

During planning in year 1, the project will develop a series of competitive requests for proposals (RFPs) to procure the following types of contractors:

- A Solar for All Arizonans Residential Implementer: The Program Development and Implementation contractor will be responsible for designing and executing a technician management and referral system that provides a seamless solution for vetting, training, and deploying solar technicians through the various SFA programming. This implementer shall assist the Office of Resiliency in developing Solar for All Arizonans programing, including, but not limited to, identifying lenders to oversee low-cost residential loans, nonprofits for community outreach and engagement, Housing Finance Authorities for the green mortgage program, solar contractors and community colleges, Tribal colleges, universities, labor unions, and other community-based training providers for workforce development. The implementer will work with workforce development providers to ensure that graduates from SFA workforce development program will have the opportunity to work on SFA funded projects. Workforce benefits will be available in LIDAC communities where solar panels are targeted to be deployed.

  RFP selection criteria will give preference points based on ownership characteristics and labor practices. Ownership preference will be given to companies: located in a LIDAC tract or HUBZone, prioritizing LIDAC-owned companies. The State will prioritize companies that are a member of one of Arizona's Registered Apprenticeship programs or who subcontracts with a member, and to companies with a demonstrated commitment to "high road" labor practices that include paying at least the prevailing wage (using federal Davis-Bacon standards), providing family-sustaining benefits, providing predictable work schedules, paid time- off, retirement contributions, and safe and healthy working conditions. *Solar for All Arizonans* has set a target that 50% of contracts will meet one of the above ownership or labor practices parameters to ensure significant investment in quality jobs in low-income and disadvantaged communities. *Solar for All Arizonans* will prioritize contracts that include project labor agreements to pay prevailing wages, as well as prioritize working with companies that employ a workforce that is at least 40% individuals who live in low-income or LIDAC communities, aligning with the federal Justice40 initiative. These measures demonstrate the commitment of *Solar for All Arizonans* to job quality and expanding opportunities for workers from underserved communities.

5

- Program Evaluation Expenses Contractor: The Compliance contractor will provide analysis, post-award services, and oversight to ensure compliance with OMB Uniform Guidance and grant-specific requirements and serve as a resource for staff of grant-funded programs for fiscal and programmatic compliance matters.

**Financial Assistance Strategy**

*1.A.* **Financial assistance strategy to maximize solar deployment.**

**Financial Assistance Strategy 1.**

Solar Rooftop Grants and Loans will invest $66.4M in grant funds to create programs for rooftop solar deployment in low-income and disadvantaged communities, targeting three market segments with distinct financial mechanisms. The program implementer will be responsible for operations, maintenance, and recycling of the assets funded under the program for the lifetime of the assets. This will include conducting audits of assets to ensure operations and maintenance is performed. These plans will conform with EPA's General Terms and Conditions "Automated Standard Application Payments (ASAP) and Proper Payment Draw Down" terms and condition. The overall percentage of funding that will be used for financial assistance will be determined during the planning period.

Market 1: Green Mortgages will invest $33M of grant funds to integrate rooftop solar deployment into the purchase of a new home, easing financial assistance and combining programs to simultaneously address housing and energy inequalities.

We will develop a new "Pathway to Solar" program to mimic a successful "Pathway to Purchase" program that lenders and mortgage professionals already understand. Homebuyers in allowed LIDAC communities who make under 150% area median income will receive a home mortgage bundled with down payment assistance (on average $13,800 of private capital) and a solar grant (on average $15,000) for rooftop solar panels. The solar grant will be structured as a "silent second mortgage" so the homebuyer will have zero payments and zero interest. Should they move or refinance prior to 10 years (a federally standardized period in the Mortgage Credit Certificate Program), the amortized amount is paid back to the Arizona Resilience Fund (a solar revolving loan fund) as a source of evergreen solar loan capital for Arizona residents. We will address plans for customer retention during the planning period.

We expect to install solar on 2,250 homes through the "Pathway to Solar" program, mobilizing an additional $48.3M in private capital through mortgage originations and down payment assistance. This program is expected to generate $14.5M in returns over the first ten years that will help fund the Arizona Resilience Fund to support solar markets for low-income and disadvantaged communities on an ongoing basis after the grant finishes.

The program is expected to generate $2M in revenue for each participating Housing Finance Authority (HFA) that can also be used to subsidize low-income and disadvantaged community solar markets at the HFA level. To participate in

6

the program, lenders and loan officers must be registered, approved and trained with the local HFA. Mortgage-making financial institutions and others are familiar with using criteria such as LIDAC designation and low-income metrics as qualifying factors for program eligibility and will implement these definitions for this program, with review and oversight by the program administrator.

Market 2: Energy Equity Catalyst Grants will invest $16.5M in grant funds to help existing low-income homeowners to install rooftop solar. This market will target households that earn under 80% AMI and provide a fully subsidized solar installation. *Solar for All Arizonans* will conduct an annual competitive grant process for nonprofit organizations and/or qualifying municipal entities with a strong track record of service delivery to low-income, diverse communities. In addition to accounting for population-level balanced disbursement, organizations will be selected for funding that can demonstrate: a clear implementation plan for providing solar with 20% savings to low-income populations and reporting energy savings according to program standards; a strategy for leveraging existing statewide programs such as HOMES, HEEHRA, LIHEAP, and WAP; a track record of successful outreach and participation within the target communities, including embedded existing strong communities networks; and additional emphasis will be placed on leveraging public and private capital mobilization through matching capital or cost offsets. We estimate this program will generate an additional $5.6M in matching capital beyond grant funds.

The Energy Equity Catalyst partners will then identify and engage eligible homeowners to apply for an Energy Equity grant. *Solar for All Arizonans* will provide technical assistance and training to partners via the Solar Community of Practice to grow organizational capacity to provide or expand their existing services to low- income and disadvantaged communities and improve the quality of their engagement and service, as well as connect them to the statewide contractor referral program, developed for statewide projects. We expect to install grant-funded rooftop solar on 931 homes.

Market 3: Arizona Resilience Loan Fund will invest $16.7M in grant funds to drive market- making, public and private capital mobilization and long-term capacity building for capital providers through a low interest loan fund plus a technical assistance grant program for qualified, mission-driven, Arizona-based lenders. The program will conduct an annual competitive grant process for Arizona-based Community Development Financial Institutions (CDFIs), nonprofit lenders, credit unions, and lending coalitions. Competition requirements will be designed to support existing capital providers to scale up or add solar loan portfolios. The target service market is qualified moderate-income homeowners in low- income and disadvantaged communities (households earning between 80-150% AMI) or higher income owners of multi-family housing with affordability guarantees (e.g., Section 8 housing) and a commitment to pass on bill savings to low-income tenants.

Our program interest rate to lending institutions will parallel the widely utilized Small Business Administration Microloan whereby lending institutions will borrow the capital at a low interest rate, fully amortized up to 10 years to be returned to the Statewide Arizona Resilience Revolving Loan Fund. Loan sizes

7

will be capped, with the expectation of 10% matching capital mobilization or blended capital for borrowers. This loan funding approach will return an estimated $25M over the amortization period to the Arizona Resilience Fund. Capital partners will also be eligible to apply for a smaller technical assistance or capacity grant, which can be leveraged in multiple ways such as a Loan Loss Reserve or staff development, portfolio management and reporting, as well as participation in the Community of Practice.

Based on market conditions and financial portfolio they will propose a strategy to best meet the programmatic goals. Their solutions will be required to demonstrate: a clear implementation plan for providing solar with 20% savings to eligible borrowers and reporting energy savings according to program standards; a strategy for leveraging existing statewide programs such as HOMES, HEEHRA, LIHEAP, and WAP; a track record of successful outreach and participation within the target communities, including embedded existing strong communities networks; additional emphasis will be placed on leveraging public and private capital mobilization through matching capital or cost offsets. We estimate that the program will generate an additional $2M in capital match from participating lenders. Participating entities will be required to submit their Loan Policies, Risk Mitigation, and Capital Mobilization/Matching policies for reporting standardization and approval. We expect to install loan-funded rooftop solar on a minimum 650 homes through this approach.

**Financial Assistance Strategy 2.**

Arizona Neighborhood Solar will invest $48M in grant funds to build up to 39.94 MW of solar in the form of 1-5 MW distributed solar projects for low- income and disadvantaged neighborhoods. **$15M of this program will be prioritized for projects in Tribal communities.** The program will provide utility bill discounts to low-income households within the service territory of the project in LIDAC communities. *Solar for All Arizonans* will conduct a competitive grant process open to public, private (nonprofits and co-ops), and Tribal entities. Grants will fund the full cost of the development and installation of 1-5 MW solar projects, while the public/non-profit facility or Tribal entity would provide the location. The partnering utility will provide an additional bill credit to low-income households enrolled in the utility's existing limited-income bill assistance program, which has the benefit of targeting pre- qualified LMI households. Based on estimates of current prices for solar deployment in AZ, projects are estimated to cost $1.20 per W, allowing a total of 39.94 MW of solar deployed. Grant amounts will vary from $1.2M to $6M each depending on the size of the array and other factors. We anticipate that distributed solar deployed through this mechanism will provide bill discounts to approximately 7,383 households. Utilities will be responsible for operations, maintenance, and recycling of the assets funded under the program for the lifetime of the assets. This will include conducting audits of assets to ensure operations and maintenance is performed. These plans will conform with EPA's General Terms and Conditions "Automated Standard Application Payments (ASAP) and Proper Payment Draw Down" terms and condition.

At least 50% of electricity and 50% of benefits will be delivered to residents in the utility territory. Neighborhood Solar as we define it here differs from

Community Solar in that it will be owned by the utilities rather than mechanisms allowing for more direct ownership by communities. This is due to restrictive solar policies in Arizona.

The overall percentage of funding that will be used for financial assistance will be determined during the planning period.

**Financial Assistance Strategy 3.**

*Solar for All Arizonans* financial assistance will be in the form of a zero percent deferred forgivable loan with a recapture period of five years. Homeowners will sign a Deed of Trust and Promissory Note, to be filed with municipal Recorder's Offices, and liens will be for five years, with the balance in the form of a grant. If the property is not sold within the 5-year period, the lien will be released one month following the 5- year anniversary date of when installation was completed. The overall percentage of funding that will be used for financial assistance will be determined during the planning period.

Based on initial estimates, average home size in rural counties in Arizona range from 1,000 to 1,300 square feet. We anticipate financial assistance will average $37,000 per household to pay for 9.3 kW of solar panels, 10 to 13.5 kWh of battery storage, and installation. *Solar for All Arizonans* will also provide maintenance and repairs from natural causes to participating households, which is expected to be $1,000 per year and provided in the form of contracted services with a vendor the project will procure post-award. This service will include cleaning the solar panels up to twice per year, dependent on system evaluation and need. This will also include recycling of the assets funded under the program for the lifetime of the assets. This will include conducting audits of assets to ensure operations and maintenance is performed. These plans will conform with EPA's General Terms and Conditions "Automated Standard Application Payments (ASAP) and Proper Payment Draw Down" terms and conditions. We expect the resilience pilot will serve 321 rural, disadvantaged households.

## 1.B. Complementing existing sources of capital and financial assistance.

*Solar for All Arizonans* is designed to leverage and align with multiple sources of capital and financial assistance in order to maximize the impact of grant funds. At the same time, we are ensuring that federal funds will not duplicate any existing funding sources.

For **Strategy 1** and **Strategy 3** discussed above, which provide residential solar via low- interest loans, loan servicers will be instructed to work with each household to first identify existing programs for which they are eligible and assist with applying for these forms of financial assistance. These include state tax credits (25% of the cost of installation up to $1,000) and federal tax credits (30% of the installation cost). We expect that the lowest income households that qualify for *Solar for All Arizonans* grants will not have the resources to pay up front and wait for these tax credits, so servicers will only apply tax credits to loans.

*Solar for All Arizonans* will work with a network of nonprofit partners around the state to conduct outreach and education to sign up eligible households. Nonprofits will be

9

trained on how to help each household leverage related financial assistance, including new benefits funded by the Inflation Reduction Act. These include the Homeowner Managing Energy Savings (HOMES) program that provides performance-based rebates for whole-house energy saving retrofits, as well as the High-Efficiency Electric Home Rebate Program (HEEHRA) that provides point-of-sale rebates for qualified electrification projects such installing electric heat pumps or electric stoves. It will also include the long-running Weatherization Assistance Program (WAP) overseen by the Arizona Department of Housing that helps low-income households make their houses more energy efficient.

The *Solar for All Arizonans* Green Mortgage program will work with Housing Finance Authorities (HFA), which have bonding authority to support affordable housing programs and have a decades-long track record with housing finance programs for low-income families. The project will work with state and municipal HFAs to mobilize private capital through green bonds and access existing capital instruments like Single Family Mortgage Revenue Bonds and TBA Down Payment Assistance Programs. Homebuyers will then benefit from a low mortgage rate, down payment assistance, and a free or deeply subsidized solar installation.

The program will also establish partnerships with mission-based, existing capital providers (non-profit lenders, CDFIs, and credit unions) to implement low-interest and subsidized solar loan products. Grant funds will provide low-cost capital for loan capitalization, credit enhancements, rate-buy-downs, and other financial products to reduce the cost of solar for end users. *Solar for All Arizonans* will prioritize working with institutions that become part of the National Clean Investment Fund (NCIF) and the Clean Communities Investment Accelerator (CCIA) in order to better coordinate regional efforts under the Greenhouse Gas Reduction Fund.

The project will establish the Arizona Resilience Fund, an evergreen revolving loan fund for ongoing clean energy investments. During and after the grant period, percentage origination fees from Housing Finance Authorities and repayments of low-interest *Solar for All Arizonans* loans will build and replenish the AZ Resilience Fund.

### 1.C. Criteria for providing financial assistance for storage and enabling upgrades.

The third *Solar for All Arizonans* strategy, the resilience pilot in rural and Tribal areas, will provide financial assistance for solar plus associated battery storage for 321 households. The criteria for providing financial assistance for battery storage is that the household must be located in a rural or Tribal area; earn below 150% AMI; own either a single-family home or manufactured home; and also participate in the solar panel installation program.

*Solar for All Arizonans* will prioritize vulnerable populations for solar and battery storage, as these groups are demonstrated by research to be more at-risk for negative outcomes during an outage. The state selected rural areas and Tribal communities because these areas are more likely to experience longer outages than urban areas, primarily because the dispersed nature of their grid slows response times compared to urban settings with concentrated power lines. Coupled with the increase in extreme weather events, power outages can have serious health impacts, particularly outages that last longer than eight hours, the typical battery life for most medical devices.

Households that are not part of the resilience pilot but are installing rooftop solar through **Strategy 1** can opt to install battery storage by either paying for it themselves or applying to a financial institution for a storage loan.

Across **Strategy 1** and **Strategy 3**, *Solar for All Arizonans* qualified solar contractors will assess each home to identify whether and what type of enabling upgrades are required to install solar. We anticipate most upgrades will be related to roof work, tree trimming, and upgrading service panels. Service panel upgrades and electrical work will be covered using HOMES and/or HEEHRA funds, as allowable. The lowest-income homeowners receiving fully subsidized solar through Energy Equity grants can receive up to $5,000 in enabling upgrades if needed to install solar on their rooftop (grant funded). **For homeowners receiving SFA loans, the Solar for All Arizonans Residential Implementor will identify other sources of funding to cover enabling upgrades.**

*1.D.* **Long-term impacts of program financial assistance.**

*Solar for All Arizonans* will impact ~11,525 households with solar financial assistance that will immediately increase the affordability of housing by reducing monthly energy costs by at least 20% from what they currently pay.

The Green Mortgage program will integrate housing affordability into the solar program and mobilize significant additional private market capital, with financial tools that include rate- buy-downs, grants, revolving low-interest loans, bond funding, and tax credits, and layer grants and loans on top to further increase the affordability of Arizona's housing stock by reducing household energy costs. We anticipate the Green Mortgage program will provide low-rate mortgages, down payment assistance, and low or no cost solar panels, which together will make becoming a homeowner much more affordable in Arizona.

*Solar for All Arizonans* will use Greenlink Equity Map's spatial index for energy insecurity to target Green Mortgages to Census tracts that are both LIDAC and identified as having a high or severe energy burden in order to integrate housing affordability with *Solar for All Arizonans*.

The program will use components (PV panels, etc.) that have a minimum 20-year warranty for all components, as well as labor. RFPs will ask participating solar installers to indicate options for end-of-life re-use and/or re-cycling of panels. AZ recently opened one of the first solar panel recycling facilities in the nation, putting us on the leading edge of this critical long-term issue. The program will encourage its use and educate Arizonans about it that will help fund the Arizona Resilience Fund to support solar markets for low-income and disadvantaged communities on an ongoing basis after the grant finishes. In addition, the program is expected to generate $2M in revenue for each participating HFA that can also be used to subsidize low-income and disadvantaged community solar markets at the HFA level. To participate in the program, lenders and loan officers must be registered, approved and trained with the local HFA. Mortgage-making financial institutions and others are familiar with using criteria such as LIDAC designation and low-income metrics as qualifying factors for program eligibility and will implement these definitions for this program, with review and oversight by the program administrator.

**Market 2: Energy Equity Catalyst Grants** will invest in grant funds to help existing low-income homeowners to install rooftop solar. This market will target households that earn under 80% AMI and provide a fully subsidized solar installation. *Solar for All Arizonans* will conduct an annual competitive grant process for nonprofit organizations and/or qualifying municipal entities with a strong track record of service delivery to low-income, diverse communities. In addition to accounting for population-level balanced disbursement, organizations will be selected for funding that can demonstrate: a clear implementation plan for providing solar with 20% savings to low-income populations and reporting energy savings according to program standards; a strategy for leveraging existing statewide programs such as HOMES, HEEHRA, LIHEAP, and WAP; a track record of successful outreach and participation within the target communities, including embedded existing strong communities networks; and additional emphasis will be placed on leveraging public and private capital mobilization through matching capital or cost offsets. We estimate this program will generate an additional $5.6M in matching capital beyond grant funds. The Energy Equity Catalyst partners will then identify and engage eligible homeowners to apply for an Energy Equity grant. *Solar for All Arizonans* will provide technical assistance and training to partners via the Solar Community of Practice to grow organizational capacity to provide or expand their existing services to low- income and disadvantaged communities and improve the quality of their engagement and service, as well as connect them to the statewide contractor referral program, developed for statewide projects.

**Market 3: Arizona Resilience Loan Fund** will invest in grant funds to drive market-making, public and private capital mobilization and long-term capacity building for capital providers through a low interest loan fund plus a technical assistance grant program for qualified, mission-driven, Arizona-based lenders. The program will conduct an annual competitive grant process for Arizona-based CDFIs, nonprofit lenders, credit unions, and lending coalitions. Competition requirements will be designed to support existing capital providers to scale up or add solar loan portfolios. The target service market is qualified moderate-income homeowners in low- income and disadvantaged communities (households earning between 80-150% AMI) or higher income owners of multi-family housing with affordability guarantees (e.g., Section 8 housing) and a commitment to pass on bill savings to low-income tenants.

## Project-Deployment Technical Assistance Strategy

### Investing in a skilled workforce in low-income and disadvantaged communities.

*Solar for All Arizonans* will establish a robust workforce development program that expands participation of workers from low-income and disadvantaged communities and aligns with LIDAC-designated Census tracts targeted for support. SFA workforce programs will prioritize building workforce capacity in rural and Tribal areas of Arizona, as well as in outlying towns and cities, expanding geographically on the already well-developed solar workforce in the state's two main urban areas, Phoenix and Tucson, and ensuring that access to timely, professional, and skilled solar installations is available throughout the state.

12

The program will work through four-year institutions of higher education in the state that qualify as Minority Serving Institutions, two-year community college systems, and Tribal colleges to develop and deliver high quality solar workforce training that meets current technical and professional standards for the solar industry through non-degree training programs. The program will also work with partners in community-based organizations, labor unions, Tribal renewable energy workforce development initiatives, and other workforce development centers to implement training in low-income, disadvantaged, and Tribal communities throughout the state. The program will develop train-the-trainer programs and provide materials and resources to diverse organizations around the state who will, in turn, provide course, bootcamps, and certificate programs to serve diverse rural and Tribal communities around the state. Where appropriate, the program will supplement hands-on, in-person learning with hybrid online options and virtual classroom learning.

Training will explicitly include introductory energy and power topics, electrical safety and hazard analysis, system integration and commissioning, operation, and maintenance, troubleshooting methodologies, asset selection and sizing, and performance testing to name a few. As an initial stage of the training process, a needs assessment will be completed with the guidance and input of the community partners to determine the full breadth of content to be delivered. Training delivery formats will include self-paced virtual exercise and simulation of arc flash boundaries, self-paced recorded lecture of technical standards that can also be completed in person, and an in-person hands-on training for solar PV inverter and storage integration and commissioning tests. Together, these formats permit knowledge acquisition online for rapid scaling while enabling individuals to practice asset integration and troubleshooting in person before taking a practical examination to be certified.

A key goal will be to significantly expand awareness of training and career opportunities for residents of low-income and disadvantaged communities. This goal is embedded throughout training with highlights, guest speakers, and in-person and virtual engagements with solar industry representatives. Information regarding workforce development opportunities will be an important component of all outreach conducted for solar installation (for rooftop, neighborhood, and multi- solar services. This activity will make Arizona residents more broadly aware of existing and new training services for solar careers, leveraging the PipelineAZ career planning platform that features jobs like Solar PV Installer with information on training programs offered by community colleges and Tribal colleges. Information about workforce development training and services will be incorporated into the general advertising and outreach carried out by *Solar for All Arizonans* alongside informing households of their eligibility for participation in financial programs. Outreach will be supported by working with trusted messengers, for both low-income and Tribal communities and through the state Office of Tribal Relations team.

Workforce development will leverage already existing capabilities around the state. *Solar for All Arizonans* will work with Tribal colleges to leverage existing and develop new workforce training programs based on the North American Board of Certified Energy Practitioners (NABCEP) training and certification programs, which are considered the gold standard for the solar industry workforce. This training also includes existing solar installer training opportunities, as well as training at community colleges throughout the state, such as two-year solar energy technology/technician programs provided by multiple community colleges throughout the state, e.g., the solar installation and design program at East Valley Institute of Technology. The program will build on and, in some cases, update existing

13

training curricula for these training programs in solar careers. Special attention will be placed on updating training to current technical standards in the solar industry, evolving technologies, and skills needed specifically for bringing solar to low-income and disadvantaged communities.

The program will also leverage existing programs at state four-year universities, who offer solar, energy, sustainability, and technology policy degree and certificate programs that provide higher-level workforce development preparation for positions with state governments and local municipalities, Tribal governments, utilities, nonprofits, and private companies to grow the capabilities of solar business and policy in Arizona.

*Solar for All Arizonans* will coordinate its activities with existing Workforce Innovation Opportunity Act (WIOA) workforce development funding and services throughout the state that are provided via Arizona@Work, the statewide workforce development network.

*Solar for All Arizonans* will also work with existing apprenticeship programs throughout Arizona as a valuable resource for job seekers and employers. The program will establish partnerships with Registered Apprenticeship programs in relevant fields (including for electrical careers) throughout the state beginning in Year 1.

Lastly, *Solar for All Arizonans* will seek to work with the new federally funded American Climate Corps expected to train 12,840 individuals in clean energy and climate resilience jobs.

### 1.E. Providing technical assistance to address interconnection and other challenges.

During planning in year 1, *Solar for All Arizonans* will develop a procurement process to effectively vet the state's current solar installers and contract with the most professional companies that bring a strong track record of customer trust and timely installation. We will then work with the qualified solar developers to provide technical assistance to address the following challenges: lack of a streamlined review process leading to 24% of projects under 10 kW and 25% of projects 11-50 kW not meeting the state of Arizona's mandated timeline for interconnection and no dedicated consumer-contractor dispute resolution mechanism specific to interconnection issues.

*Solar for All Arizonans* will dedicate planning time in year 1 to identifying solutions to interconnection challenges and has developed the following initial plans for technical assistance for solar developers and communities adopting solar. The first will streamline the review process by co-creating with utility and industry partners "*Solar for All Arizonans*" templates to ensure that the information necessary for review is included in applications.

In addition, *Solar for All Arizonans* will help develop a wider understanding of city authorizations that are required to enable solar development. Additionally, *Solar for All Arizonans* will work with utilities during planning to explore how the project can help build interconnection capacity, if welcome and helpful, such as through grant funds to hire additional interconnection review staff.

To address the lack of consumer-contractor interconnection-specific dispute resolution mechanisms, *Solar for All Arizonans* will work with the State Attorney General's Conflict Resolution Program, which already provides free volunteer conflict resolution. *Solar for All*

*Arizonans* will work with our network of solar industry experts like the Arizona Solar Energy Industries Association, which has done extensive work on consumer-contractor interconnection issues, to identify and recruit potential volunteer mediators with solar industry expertise. They will be connected with the Attorney General's 40-hour mediation training and after completing training, will be able to offer consumer-contractor interconnection dispute resolution services.

*Solar for All Arizonans* does not anticipate being able to address interconnection challenges related to costs and for making modifications to distribution systems, as these are controlled by utilities.

### *1.F.* **Ensuring projects are efficiently deployed and resilient.**

*Solar for All Arizonans* is budgeting for technical assistance for organizations and groups that will represent diverse areas of solar planning and installation expertise. Grant-funded projects will meet current and broadly accepted consensus-based building codes and standards, ensure projects are resilient to climate hazards, and include robust pre-construction quality assurance plans and post-construction inspection and quality control processes. During the planning period, the compliance contractor will determine appropriate inspection methodologies and other quality control processes. We will encourage partnering municipalities to apply for a SolSmart designation to receive free technical assistance to help effectively expand solar deployment in their jurisdiction. SolSmart technical assistance includes assistance to further the goals of the federal Justice40 initiative to provide equitable opportunities for underserved communities, so it will be a valuable resource for municipalities participating in *Solar for All Arizonans*. Climate hazards, greenspace preservation, and land use planning and zoning codes that impact project siting will be considered during the planning period.

Technical assistance will be facilitated in multiple ways, including through the creation of a robust *Solar for All Arizonans* Community of Practice program. Participating solar companies, financial institutions, municipalities and counties, community-based organizations, utilities, and other professional organizations will all be required to participate actively in the Community of Practice. The goals of the Community of Practice program are to facilitated shared learning that:
(1) grows the capacity of participating organizations to provide the highest quality professional service and meet industry best practices; (2) enables organizations to work effectively with low- income and disadvantaged communities and meet their distinctive and diverse needs, contexts, and trust; (3) expands the number of organizations providing services to low-income and disadvantaged communities in the solar field (loans, installation, permitting); and (4) expands the familiarity of organizations, especially in rural and Tribal areas outside of Phoenix and Tucson, with and training in use of advanced tools and practices of solar installation, financing, interconnection, and permitting and encourages them to adopt them.

The Community of Practice will primarily be organized virtually, with working groups for each organizational domain that meet monthly and convene technical assistance workshops. The entire Community of Practice will come together annually in a statewide conference. In cases where technical assistance covers local information (e.g., particular county or municipal zoning and building codes), convenings will be in-person in the local jurisdiction. When technical assistance topics are applicable statewide, convenings will be virtual. We will also record all sessions and make recordings available to solar developers and

15

disadvantaged communities through a *Solar for All Arizonans* website. For complex topics, technical assistance may include handbooks or manuals. The Community of Practices will intentionally foster cross-industry learning for lenders, solar installers, municipalities, nonprofits, and utilities to share lessons and best practices from their industry.

Topics for technical assistance will include county and municipal permitting and inspection requirements, processes and solar industry quality control best practices, best practices for working with utilities on project siting, county and/or municipal land use planning and zoning codes that impact project siting (such as limits on the size of the array), identification of relevant local community benefits agreements and how they can be leveraged to support a new solar project, and incorporating climate hazards and climate protections into siting strategy.

For Tribal utilities and governments, topics will include, in addition to those listed above for solar: necessary information and procedures for participating in the rooftop and neighborhood solar programs of *Solar for All Arizonans*. For financial lenders, topics will include: effective and equitable non-traditional underwriting and servicing for LMI borrowers; cultural sensitivity to enhance Tribal participation; best practices in climate financing, including leveraging HOMES, HEEHR, LIHEAP, WAP and tax credits; implementing and adapting the *Promotores Model* for successful outreach and education among diverse low-income communities; financing strategies for building decarbonized affordable housing; effective data collection strategies to measure the impact of solar; and best practices for vetting and approving solar contractors. For all participants, topics will include: working effectively with low-income and disadvantaged communities to advance solar energy deployment; and understanding the requirements of the multiple *Solar for All Arizonans* programs. As part of its technical assistance activities, *Solar for All Arizonans* will also encourage counties and cities to adopt NREL's SolarAPP+ software that can help streamline permitting processes. It is free for jurisdictions to adopt and should any cities or counties use the software. Technical assistance will be provided on how to apply for a permit in the app for solar developers and for local governments in its effective use.

## Equitable Access and Meaningful Involvement Plan

### *1.A.* **Maximizing breadth and diversity of communities and prioritizing the most disadvantaged.**

Within each strategy, *Solar for All Arizonans* will procure and contract with nonprofits that are trusted messengers in relevant communities, particularly LIDAC communities, and limited English-speaking communities. The procurement process will prioritize nonprofits with demonstrated reach into these communities so that it reaches the most disadvantaged households across the state.

**Strategy 1** makes distributed rooftop solar available statewide in low-income and CEJST communities, which span urban, suburban, and rural areas, including Arizona's 22 federally recognized Tribal Nations. With linguistic inclusivity, Strategy 1 ensures that equity is considered in terms of commonly comprehendible semantics within the English language as well as in other commonly spoken languages in the state of Arizona. This statewide strategy will reach a diversity of communities, as demonstrated by Arizona's demographic profile below. SFA will provide multilingual outreach and services. **Strategy 1** will serve

16

multiple at-risk energy communities, including **Census tracts 9422.02, 9605, and 9633** that each have a coal-fired electric generating unit being retired; 14 Census tracts that directly adjoin a tract with qualifying coal closure; eight counties that meet both the fossil fuel employment threshold and the unemployment rate requirement; and many disadvantaged tracks facing high energy.

**Strategy 2** will fund 1 to 5 MW neighborhood solar energy projects across the state. This strategy specifically addresses the solar needs of the 34.2% of Arizonans who are renters, owners of manufactured homes, and homeowners whose rooftops are not conducive to solar. This strategy will also serve the five Tribal Nations that have formed Tribal utility authorities (TUAs) including Hualapai Tribal Utility Authority, Aha Macav Power Services, Navajo Tribal Utility Authority, Gila River Indian Community Utility Authority, and Tohono O'odham Utility Authority.

**Strategy 3** will pilot a program to provide low-income homeowners with resilience through solar plus storage. The project prioritizes residents of rural and Tribal land.

### 1.B. Plan for participatory governance

One of the first activities of the grant will be to host a series of kick-off meetings in low income and disadvantaged communities to obtain key input on program element designs that will best achieve the program's goals, including program requirements and processes, best practices for reaching communities, etc. These meetings will also continue the process of building trust and get the word out to communities about the opportunities that will be coming.

To build a foundation of trust and inclusivity, the structured itinerary of meetings/events should take into consideration ways to involve:
- Cultural components such as a blessing or performances
- Speakers who are respected in the community.
- Local food vendors
- Break out groups for building stronger networks.
- "Big Circle" discussions

The project will also establish an Advisory Council whose membership is at least 50% representatives from disadvantaged or historically marginalized communities. We will seek for this representation to be a mix of individuals such as nonprofit leaders from local communities, LMI residents, and Tribal representatives. The other 50% of the Advisory Council will be from key partners, including the solar industry, electric utilities, and financial institutions. The Advisory Council will advise a Leadership Team composed of staff from the **Office of Resiliency and the Solar for All Arizonans Residential Implementor (TBD)** that meets on a regular basis. Nominations for Advisory Council representatives will be solicited widely, with a focus on geographic and demographic coverage and representation from organizations with a demonstrated track record of community trust and effective engagement with disadvantaged communities, including specifically LIDAC communities.

*Solar for All Arizonans* will also convene a Tribal Solar Strategy Working Group composed of Tribal energy and elected leaders from as many of Arizona's 22 federally recognized Tribes as possible to maximize participation. The Committee will be responsible for identifying ways to maximize the benefit of the funding allocations marked for Tribes.

17

The Advisory Council will meet monthly in Year 1 to advise on project design and then transition to quarterly meetings for project oversight, which includes reviewing data to monitor progress toward grant deliverables, uplifting best practices, and using lessons learned to course correct and make continuous improvements. The Council will also advise on the process for developing Requests for Proposals to procure project partners, including selection criteria, to ensure contracted partners have a strong track record working in and with disadvantaged communities. Any changes to financial assistance (e.g., amounts, interest rates, or criteria) must be reviewed and approved by the Advisory Council.

Participant support cost funding will be made available to local nonprofits and local government entities supporting program participants with applying for the program as committee. Funds will also be used to provide travel and participation stipends for members of the Advisory Council and associated working groups. Stipend amounts TBD.

We will procure experienced compliance specialists and evaluators to design and integrate summative and formative data collection strategies that can be fully integrated into the program's diverse strategies and processes to ensure that *Solar for All Arizonans* is continuously informed about its progress toward its goals (solar deployment in low-income and disadvantaged communities, GHG emissions reductions, bill savings, geographic and demographic coverage, etc.), problems that evolve and need to be addressed, and long-term benefits delivered. Evaluators will also design and implement additional qualitative and quantitative data collection and analysis to better understand the communities targeted by *Solar for All Arizonans* and their needs and contexts, as well as assess and learn lessons for future projects in Arizona and elsewhere about what works and doesn't work in communication, recruitment, deployment, and experiences of participants over time. This component will include conducting focus groups, surveys of participating homeowners, and interviews for a 360-degree view of the *Solar for All Arizonans* program impact.

### 1.C. Engaging with education, outreach, community, and other stakeholders.

The Arizona State Office of Resiliency will lead stakeholder outreach across the state for all *Solar for All Arizonans* services and will build on our experience across multiple departments in providing education and engagement working with trusted community based organizations, community leaders, and representatives. The program will work with agencies in low-income communities, using the map of CEJST Census tracts targeted to align services in regions across the state while contracting through an Request for Proposals (RFP) process in Year 1. An important outreach component will be the completion of a local community assessment and asset map by the contracted community agencies to better understand the need and opportunities for rooftop solar and community projects in each region. The community partner will conduct presentations, focus groups, local surveys and meetings with leaders from businesses, schools, and community organizations, to gain the participation of community members in planning for solar resources.

Once assessments are complete, partners will hold community meetings in each targeted area, well publicized, in convenient locations, like apartment complexes, schools, assisted living facilities and libraries. Program information will be disseminated in newspapers, on partner websites and through social media. Also included will be information about

opportunities for community involvement, e.g., grants and financial options through loans accessible to low-income residents, job training, etc. The project will provide regular communication and long term engagement via program newsletters detailing success stories and social media updates. **As discussed above, the program will seek community leaders to participate on our statewide Advisory Council.**

Support will be provided as needed for outreach and written materials. Community outreach partners may also use apps like *Google Translate* or *SayHi* for immediate translation needs in targeted languages at community meetings and information sessions.

Community engagement and outreach with the 22 federally recognized Tribal nations is crucial. The state Office of Tribal Relations (OTR) Team has four Tribal Liaisons and a Tribal Relations Manager who will support solar awareness and outreach. OTR serves as the single point of contact for Tribal issues and works to develop policies in consultation with Tribal leaders. *Solar for All Arizonans* will leverage this communication structure to establish needed Tribal connections essential for outreach, in addition to the Tribal working group discussed above

Program outreach will also leverage multiple existing state programs for low-income populations, providing informational meetings, flyers, and leveraging social media channels to publicize solar resources available. This outreach will include WIOA workforce development services discussed above, federal resources and additional need-based programs discussed below.

Regarding plans for financial subsidies, the program has already consulted with industry financial sector actors (ie Green Banks) within Arizona and will continue to consult with whichever financial partners are adopted.

*1.D.* **Customer acquisition and management strategy.**

*Solar for All Arizonans* will use state and municipal communication channels to build trust, emphasize the role of municipalities and the state in overseeing the quality of this program and procure and oversee trusted solar installers, incorporate creative and proven marketing strategies used in other solar projects for low- income and disadvantaged communities, and prominently feature the program on state and municipal websites that will include FAQs and contact information to ask questions.

*Solar for All Arizonans* will work with community-based organizations and municipal entities procured through RFPs after federal award. Contractors will be trusted messengers in low-income communities to conduct outreach and to acquire customers for solar infrastructure services. The program will target benefits to low and moderate income households throughout the state, defined as those with **documented income below 150% AMI or below the federal poverty rate.** Case Managers will assess households for income eligibility and automatically qualify households enrolled in need-based programs like SNAP or WIC, which already conduct rigorous income verification, which will minimize the qualification burden on households. Categorical need-based programs used by the state to qualify residents can include the Arizona Weatherization Assistance Program (WAP), which in 2023 has a household income limit for a family of four of $60,000, and the Arizona Nutrition Assistance program. It can include households enrolled in Arizona's Cash Assistance benefits, which has a typical eligibility limit for families below

19

100% of the federal poverty rate (below program limits). For the Lifeline program, this income eligibility is 135% of the federal poverty level for either phone or internet services. For the Low-Income Home Energy Assistance Program (LIHEAP), eligibility limits are monthly household income of
$4,303 for a family of four. For households not enrolled in need-based programs, Case Managers will qualify households through documentation of limited family income, such as with pay stubs, while avoiding self-attestation as much as feasible. The Green Mortgage component will also make information available to residents of low-income and disadvantaged households who apply for low-income mortgage assistance or other programs to support the purchase of new homes via lending institutions and HFAs.

The second program component will work with utilities to facilitate participation of low-income and disadvantaged neighborhoods who are eligible for support through utilities' existing
low-income discount programs or similar programs set up for this grant. 100% of customers acquired in this component will be low-income and disadvantaged and will include Native American communities and those with limited English proficiency. The program will work with utilities, community-based organizations, and other experts to identify specific communities who meet eligibility criteria and ensure impact among the most disadvantaged communities.

Additional tools to verify income for eligible customers in *Solar for All Arizonans* will include consideration of the forthcoming U.S. Department of Energy and Health and Human Services Community Solar Subscription Tool (the Low-Income Clean Energy Connector) when it becomes broadly available in states in 2025.

For customer management, the program will provide each homeowner with a single point of contact to help manage their installation across contractors and answer questions or concerns throughout the process and after installation. We will track individual project progress weekly to provide a high level of customer service, identify issues before they grow, and provide regular opportunities for customer feedback. SFA will build robust quality assurance checks for each installed system to ensure homeowner satisfaction and that every system will support at least a 20% reduction in the household utility bill. Lastly, the Solar for All Arizonans Residential Implementor will oversee any customer concerns or complaints and to address them in a timely manner.

## Section 2 Activities to be Completed in 1st Year (Planning Year)
Quarter 1 Objectives
- Hire grant program managers
- Draft and prepare for release a series of competitive requests for proposals (RFPs) to procure the Solar for All Arizonans Residential Implementor and the Program Evaluation Expenses Contractor.
- Conduct stakeholder outreach engagements, prioritizing outreach to LIDAC communities, in partnership with representative community-based organizations.
- Develop an equity outreach plan detailing how each of the three strategies will embed equity in their implementation and outlining how program managers will work with LIDAC CBOs.
- Conduct initial meetings with the governing entities who oversee rural cooperative utilities and Tribal utilities to explore their interest in participation in all three

strategies (Distributed Rooftop Solar, Neighborhood Solar, and Rural & Tribal Solar + Batteries).

- Refer to the National Community Solar Partnership meaningful benefits resources for guidance.

Quarter 2 Objectives

- Work with program contractors to determine if solar resulting from Strategy 2 (Neighborhood Solar) and Strategy 3 (Rural & Tribal Solar + Batteries) can be "islanded," and deployable in isolation from the grid, including during a grid outage or for Strategy 3 as "off-grid."
- Develop plan to ensure participating utilities in Strategy 2 (Neighborhood Solar) meet the required 20% minimum customer bill savings for participating customers. Identify how performance will be audited after the program starts.
- Determine how financial benefits will flow to participating customers (e.g.: bill credits based on generation or predetermined bill discount, flat amount or variable credits based on generation, etc.). Determine who will receive renewable energy credits.

Quarter 3 Objectives

- Meet with rural cooperative and tribal utility staff on program design for all three strategies. Determine how bill crediting will work to ensure financial benefits flow to low-income customers in Strategy 2 (Neighborhood Solar).
- Refine household savings calculation using the intersectional thinking approach.
- Finalize RFP language to solicit locations and preliminary site plans for neighborhood solar locations.
- Work with our contractor to finalize the design of the low interest loan package for Strategies 1 (Distributed Rooftop Solar) and 3 (Rural & Tribal Solar + Batteries).

Quarter 4 Objectives

- Finalize priority LIDAC communities for participation in Strategy 1 (Distributed Rooftop Solar).
- Finalize program participant acquisition plan for Strategies 1 (Distributed Rooftop Solar) and 3 (Rural & Tribal Solar + Batteries) to ensure underserved communities are the beneficiaries.
- Follow-up with surveying of constituent communities' experiences of distributed rooftop solar.
- Finalize how the program will ensure minimum 20% household savings will be delivered net of any costs the program beneficiary incurs, how recipients will calculate the household benefit, and how household savings will be monitored and audited in quarterly reports.

**Section 3: Fiscal Stewardship Plan**

The Executive Office of the State of Arizona, which includes the Governor's Office of Resiliency, operates as a passthrough for numerous Federal grant opportunities and has established policies and procedures to help ensure compliance with federal and state requirements. In addition to specific policies and procedures designed to comply with the provisions of the Uniform Administrative Requirements and Grant Guidance in Title 2 Code of Federal Regulations (CFR) Part 200, the Office is required to adhere to the State of Arizona Accounting Manual (SAAM). The SAAM includes the State's central accounting policies and control standards for ensuring federal and state monies are used for intended purposes, are protected against fraud, waste, and abuse, and that conflicts of interest are addressed.

21

The Office of Resiliency and Governor's Accounting Office staff will exercise fiscal stewardship in line with the requirements outlined in SAAM. Stewardship activities include, but are not limited to, reviewing performance and financial reporting from subrecipients and recipients of financial assistance; providing technical assistance; conducting site visits; identifying and addressing any noted deficiencies that develop during the project; and assuring compliance with terms and conditions. Additionally, the Governor's Office will ensure that processes are in place to prevent and detect waste, fraud, and abuse of funds, and to prevent and remediate any real or perceived conflicts of interest. Compliance and audit reports shall be annually reported to the Solar for All Arizonans Advisory Council and the Tribal Solar Strategy Working Group. During the planning period, the program will determine methods to limit risk to communities whenever ownership pathways are offered.

The Office uses an internal grant management system, called the Grant Information Management System (GIMS). This grant system includes supervisory review and approval controls and workflows, and is reconciled to the State's accounting system, Arizona Financial Information System (AFIS), on a monthly basis. All grant and subaward documentation, including reporting data, fiscal information, programmatic reports, and associated documents would be collected in this system for quick access.

In line with generally accepted accounting principles (GAAP), the Governor's Accounting Office will account for Solar for All award funds separately from all other funds during both the period of performance and under the EPA Closeout Agreement. Additionally, all recipient and subrecipient funding will be accounted for separately, and all program income, if applicable, will be accounted for separately from receipts/drawdowns of EPA award funds during the period of performance.

The Executive Office of the State of Arizona operates as a passthrough for numerous Federal grant awards and has established policies and procedures for subaward management. The subaward management process includes ensuring that all applicable federal "flow down" terms are included in contractor and subrecipient award agreements; collecting and reviewing supporting documentation prior to reimbursing expenses to ensure all expenses are allowable uses of grant funds; reviewing progress reports and monitoring award activity; conducting site visits and desk reviews; and monitoring compliance with federal and state requirements (e.g., DBRA, BABA).

### 1.A. Consumer protection.

To achieve the goals set forth by the *Solar for All Arizonans* proposal, the Office of Resiliency will maintain a process for receiving, monitoring, and resolving consumer feedback and complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency. To achieve these fiscal stewardship goals, the Office of Resiliency will hire a Solar Program Impact Evaluator and Compliance manager. Some of the objectives will include: design solar contractor performance indicators for continuous evaluation and adherence to program standards; ensure all communication with consumers is conducted in a culturally appropriate language that the consumer understands; serve as a central point of contact for homeowners and contractors.

The Solar Program Impact Evaluator and Compliance manager serves a crucial role in effective program deployment, guaranteeing that *Solar for All Arizonans* participants have access to essential information about the various programs and potential benefits therein, and assuring the benefits of solar are actually realized by participants. The Solar Program Impact Evaluator and Compliance manager shall provide all program language, including

22

information about leasing, purchasing, financing, and/or costs associated with program participation in clear and understandable language.

Team will review consumer protection laws in applicable jurisdictions during the planning period and devise further mechanisms to comply.

### 1.B. Ensuring household savings through audits.

Achieving an annual energy savings of at least 20% is fundamental to the *Solar for All Arizonans* mission. In coordination with solar industry partners, utility partners, the Advisory Council, and the Tribal Solar Strategy Working Group, the Office of Resiliency shall establish a certification process for households wishing to participate in the *Solar for All Arizonans* programming and identify the best participation pathway that achieves the 20% minimum savings goal and will complete home energy performance audits with participants to ensure benefits are being realized. The Program Impact Evaluator and Compliance Manager will work with the above actors to establish audit guidelines and processes necessary for ensuring participants achieve the 20% minimum savings goal.

### Section 3 Activities to be Completed in 1st Year (Planning Year)

Quarter 1 Objectives

- Collect and document policies and best practices for the creation of Consumer Protection materials. (see Illinois IPA solar consumer protection handbook for example)
- Identify and document processes to prevent and detect waste, fraud, and abuse of funds, and to prevent and remediate any real or perceived conflicts of interest
- Draft policies for program oversight, confidential reporting (e.g., whistleblower protections), and managing conflicts of interest
- Design process for receiving, monitoring, and resolving consumer feedback and complaints

Quarter 2 Objectives

- Create content for the Consumer Protection materials to document policies, protocols, and best practices.
- Design criteria for reviewing performance and financial reporting from subrecipients and recipients of financial assistance
- Create plan for providing technical assistance
- Document protocols and expectations for conducting site visits
- Create plan for identifying and addressing any noted deficiencies that develop during the project
- Schedule creation of annual compliance and audit reports to be delivered to the Solar for All Arizonans Advisory Council and the Tribal Solar Strategy Working Group

Quarter 3 Objectives

- MILESTONE: Finalize process for receiving, monitoring, and resolving consumer feedback and complaints.
- Identify best practices for home energy performance audits as they relate to solar.

Quarter 4 Objectives1

- MILESTONE: Finalize solar consumer protection materials and schedule publication dates.

- Identify the best participation pathway that achieves the 20% minimum savings goal for households.
- Establish a certification process for households wishing to participate in the *Solar for All Arizonans* program.
- Document procedures for plans to implement home energy performance audits under SFA.

Section 4:  Timeline and Milestones

See separate document based on "EPA's Solar for All Program Timeline" attached for review. Arizona's timeline will be in the tab titled "Solar for All Arizonans Timeline- May Start".

Section 5:  Reporting Requirements

**Evaluation, publication, and reporting**
This proposal includes funding for a contractor *(Program Evaluation Expenses Contractor, referred to as **Program Evaluator**)* to collect program data and evaluate *Solar for All Arizonans* activities to ensure program success and desired outcomes. Evaluation activities will include both a process evaluation as well as an outcomes evaluation in order to monitor deployment of program capital as well as overall GHG reductions and financial benefits for participating customers. Evaluation data will support reporting, and continuous program improvements, and will engage community participants in data collection. Program Evaluators will support OOR staff, specifically the **Solar Program Impact Evaluator and Compliance Manager,** in data collection instrument and metric development as well as support data collection implementation. The Program Evaluator shall report, at a minimum, semi-annually to the Solar for All Arizonans Advisory Council, the Tribal Solar Strategy Working Group, and the Solar For All Arizonans Program staff.

In coordination with the Solar for All Arizonans Residential Implementor, the Solar Program Impact Evaluator and Compliance Manager will file federally required reports, including an annual federal financial report and the single audit report completed by the accounting contractor, also mentioned in the Budget Narrative. The Solar Program Impact Evaluator and Compliance Manager will be ultimately responsible for collecting all necessary information and submitting the necessary reports.

The Office of Resiliency will establish the activities and processes necessary to ensure compliance of all reporting requirements established for this award. As provided in the Terms and Conditions for the award, OOR agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. OOR also agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the OOR EPA-approved Solar for All Workplan under the federal award.

**1. Performance Reports**
Semi-Annual Report
With the collaboration of the Program Evaluator, OOR agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

24

**Final Report**

OOR also agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the OOR's implementation of the EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, OOR will detail the program strategy and plans for performance reporting under the Closeout Agreement. In the final report, OOR will include the following broad, non-exhaustive elements:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

OOR agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.


## 2. Transaction-Level and Project-Level Data

OOR agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). OOR also agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

<u>Section 5 Activities to be Completed in 1st Year (Planning Year)</u>

Quarter 1 Objectives

- Create procurement plan for the Solar for All Arizonans Residential Implementor
- Create procurement plan for the Program Evaluation Expenses Compliance Contractor

Quarter 2 Objectives

- Review and approve selection of the Solar for All Arizonans Residential Implementor
- Review and approve selection of the Program Evaluation Expenses Compliance Contractor

Quarter 3 Objectives

- Establish communication channels with all entities involved in data collection and reporting

- Create processes and templates to be used for data collection during implementation

Quarter 4 Objectives

- Finalize processes and templates to be used for data collection during implementation

## Section 6:  Budget Narrative

### 6.1 Project Budget

**Table 2. Budget Table**

| Object Class Categories | Amount |
|---|---|
| Personnel | $3,375,000 |
| Fringe Benefits | $1,113,750 |
| Travel | $66,450 |
| Equipment | $0 |
| Supplies | $87,500 |
| Contractual | $8,225,188 |
| Other | $142,037,800 |
| Indirect Charges | $1,214,312 |
| Grand Total | $156,120,000 |

| Use of Funds by Type | Amount |
|---|---|
| **Financial Assistance** | |
| Direct Residential Financial Assistance (Strategy 1) | $66,456,000 |
| Direct "Arizona Neighborhood Solar" Financial Assistance (Strategy 2) | $48,048,000 |
| Direct "Resiliency Pilot" Financial Assistance (Strategy 3) | $13,852,800 |
| **Financial Assistance Subtotal** | $128,356,800 |
| All other use | $27,763,200 |
| **Grand Total** | $156,120,000 |
| **Percent Financial Assistance** | 83% |

26

**Personnel**

**Budget Amount: $3,375,000**

**Position Title**

| | |
|---|---|
| Solar Access & Resilience Program Manager | Relation to grant proposal and program implementation: This position will be responsible for Strategies 2 (Neighborhood Solar) and 3 (Rural & Tribal Solar + Batteries)<br>Salary: $90-105,000<br>Fringe Benefits: $34,650<br>Total max cost for the budget period (5 years): $698,250 |
| Solar Fund Manager | Relation to grant proposal and program implementation: This position will be responsible for Strategy 1 (Distributed Rooftop Solar), Strategy 2 Neighborhood Solar, and Strategy 3 Rural & Tribal Solar + Batteries<br>Salary: $105-115,000<br>Fringe Benefits: $37,950<br>Total max cost for the budget period (5 years): $764,750 |
| Solar Residential Deployment & Regulatory Manager | Relation to grant proposal and program implementation: This position will be responsible for Strategy 1 (Distributed Rooftop Solar)<br>Salary: $90-105,000<br>Fringe Benefits: $34,650<br>Total max cost for the budget period (5 years): $698,250 |
| Solar Program Eval & Compliance | Relation to grant proposal and program implementation: This position shall provide support to all program deployment strategies and ensure program goals are met through key performance metric evaluation and reporting.<br>Salary: $85-95,000<br>Fringe Benefits: $31,350<br>Total max cost for the budget period (5 years): $631,750 |
| Solar Grants Coordinator 1 | Relation to grant proposal and program implementation: This position will provide administrative support for program deployment Strategies 1 and 3.<br>Salary: $75-85,000<br>Fringe Benefits: $28,050<br>Total max cost for the budget period (5 years): $565,250 |
| Solar Grants Coordinator 2 | Relation to grant proposal and program implementation: This position will provide administrative support for program deployment Strategies 2.<br>Salary: $75-85,000<br>Fringe Benefits: $28,050<br>Total max cost for the budget period (5 years): $565,250 |
| Solar Community Development/Engagement Educator | Salary: $75-85,000<br>Fringe Benefits: $28,050<br>Total max cost for the budget period (5 years): $565,250 |

Each of the positions listed above is considered 1 FTE, charged 100% to this grant funding. The PI for this project is Office of Resiliency Deputy Director Blaise Caudill. His personnel expenses are not charged to this grant.

Personnel expenses and fringe benefits are budgeted as a constant expense for each grant year. This is based on several assumptions, including that there will be vacancy savings;

that not all staff will elect all available medical/dental/life insurance benefits; and that any salary increases provided during the grant term will be based on available funding, not a standard "COLA" increase.

**Proposed Personnel Job Descriptions and Role in Implementation:**

**Solar Access & Resilience Program Manager:**
Total Budget Amount: $525,000
Essential Duties and Responsibilities:
- The Solar Access & Resilience Program Manager shall:
- Ensure all program objectives, timelines, evaluations, and reporting are achieved as they relate to the neighborhood solar program and the solar-plus-storage resilience pilot program.
- Work with Justice40 communities to develop neighborhood solar project Request for Proposals.
- Address and mitigate barriers to participation in neighborhood solar and solar+storage projects for low-income and disadvantaged communities.
- Identify and implement ways to leverage public and private capital to maximize the impact of the neighborhood solar program and the solar-plus-storage pilot program.
- Ensure program funds are stacked and braided with other potential incentives and smoothly integrated with broader program delivery systems.
- This position will report directly to the Arizona Governor's Office of Resiliency Director.

**Solar Fund Manager:**
Total Budget Amount: $575,000
Essential Duties and Responsibilities:
- Direct and oversee the development of innovative financial mechanisms to support solar energy by removing financial barriers and other constraints that prevent low-income and disadvantaged households from adopting solar.
- Mobilize additional private capital to supplement federal investments and establish an evergreen Solar Revolving Loan Fund that creates long-term solar markets serving low-income and disadvantaged communities beyond the 5-year project period.
- Help build a strong Solar Community of Practice that significantly enhances the knowledge and skills of professionals across multiple sectors, including the solar and financial industries, local governments, permitters, housing and real estate, utilities, and others. Activities will include providing technical assistance and sharing of best practices in effectively serving and benefitting low-income and disadvantaged communities.
- With other SFA AZ program managers and other relevant partners, help develop critically needed workforce development pathways to quality green jobs for residents of low-income, disadvantaged, rural, and Tribal communities.
- Manage and provide administrative support and state coordination on all grant funded projects from scoping to final completion, including working with State compliance and procurement staff;
- Work closely with relevant OOR staff and grant funded consultants and contractors to ensure grant funded deliverable completion;
- Serve as the primary contact for all state agencies and coordinating contractors for the purposes of Fund management.

28

- This position will report directly to the Arizona Governor's Office of Resiliency Director.

**Program and Financial Management:**
- Financial Oversight: Oversee all financial aspects of the program and its projects, ensuring robust financial health and sustainability.
- Budget Management: Manage budgets, forecast financial needs, and ensure efficient allocation and utilization of resources for the program.
- Financial Controls and Monitoring: Implement financial controls and monitoring mechanisms to ensure that program deliverables are achieved within budgetary constraints.
- Mentor SFA AZ Program Managers in the area of compliance and financial reporting best practices. Continuously monitor staff's compliance to standards.

**Solar Residential Deployment & Regulatory Manager:**
Total Budget Amount: $525,000
Essential Duties and Responsibilities:
- Ensure all program objectives, timelines, evaluations, and reporting are achieved on time as it relates to SFA AZ strategy.
- Responsible for the overall success of the SFA AZ residential rooftop solar program.
- Assist Solar Program Impact Evaluator in development of standards and processes to meet SFA AZ compliance and quality requirements.
- Manage SFA AZ procurement processes, subaward contracts, and routine monitoring of administrative compliance, in partnership with the Solar Program Impact Evaluator and the Governor's Office Procurement staff.
- Support management of the program's budgets to ensure optimal allocation of resources to achieve program goals without overspending.
- Work with the SFA AZ Solar Program Impact Evaluator to manage all SFA AZ compliance requirements, establish standards/best practices, and guide program teams on any changes/improvements.
- Coordinate with the Solar Community Development/Engagement Educator to facilitate Statewide stakeholder engagement.
- Actively monitor and assess policy relevant to the program's scope and objectives.
- With other SFA AZ program managers and other relevant partners, help develop critically needed workforce development pathways to quality green jobs for residents of low-income, disadvantaged, rural, and Tribal communities.
- This position will report directly to the Arizona Governor's Office of Resiliency Director.

**Solar Program Eval & Compliance:**
Total Budget Amount: $475,000
Essential Duties and Responsibilities:

- While the overall program will be evaluated by an outside independent evaluator, the Program Impact Evaluator will be responsible for program metric development and design for reporting across sub-awardees and contracting.
- Provide regular reporting to program stakeholders.
- Provide technical assistance to sub-awardees and grantees with implementation of data collection strategies across programs.

29

- Manage a comprehensive compliance risk and issue log for all program activities and proactively present these to senior management.

Operational and Program Oversight:
- Lead development of standards and processes to meet SFA AZ compliance and quality requirements; proactively communicate and train other staff and support their adherence.
- Ensure compliance with required reporting and SFA AZ procedures.
- Define processes and procedures for detailed metrics tracking across each project.
- Proactively aggregate and monitor to support improvements and increased meaningful benefits of the program.
- Define compliance processes and procedures for individual participant enrollment, certification/income qualifications, and lifecycle tracking. Work closely with the other SFA AZ staff in administering these processes.

Financial and Resource Management:
- Support the Solar Residential Deployment & Regulatory Manager to manage SFA AZ procurement processes, subaward contracts, and routine monitoring of administrative compliance, in partnership with the Governor's Office Procurement staff.
- Work closely with the Solar Fund Manager to ensure fiscal compliance.
- Define processes and procedures for adherence to and monitoring of all federal and state wage reporting requirements including Davis-Bacon and Related Acts.
- Provide consultation to contractors in support of their adherence to funding agency requirements and all federal, state, and local regulations. Continuously monitor compliance for all subcontractors.

Reporting and Compliance:
- Manage all SFA AZ compliance requirements, establish standards/best practices, and guide program teams on any changes/improvements.
- Develop programmatic compliance standards, tracking, and tools to ensure transparency and accountability in reporting to senior management and federal funding agencies.
- Serve as official SFA AZ Quality Assurance Manager. Develop and manage Quality Management Plan and Quality Assurance Project Plan and associated activities for environmental information as required by the EPA and that adhere to federal quality control standards.
- Working closely with the Solar Fund Manager, contribute to all SFA AZ financial performance reporting including adherence to the Financial Transparency Act and other federal regulations.
- Define and and administer document and data management processes, procedures, and tools.

**Solar Grant Coordinator 1 & 2:**
Total Budget Amount: $850,000
Essential Duties and Responsibilities:
- Provide administrative support and state coordination on all grant funded projects from scoping to final completion, including working with compliance and procurement staff within the Governor's Office for EPA reporting purposes;
- Provide administrative support to the Solar Access & Resilience Program Manager and/or the Solar Residential Deployment & Regulatory Manager, as assigned;

- Coordinate logistics for Advisory Council and associated working group meetings;
- Help facilitate Advisory Council and associated working group meetings;
- Perform other duties as assigned.

**Solar Community Development/Engagement Educator:**
Total Budget Amount: $425,000
Essential Duties and Responsibilities:
- Providing administrative support and state coordination on all grant funded projects;
- Coordinating with OOR staff and grant funded consultants and contractors to ensure deliverable completion;
- Assisting with identifying key stakeholder community-based organizations including (but not limited to) the following focus areas: labor representatives, disadvantaged and low income community advocacy groups, and environmental justice advocacy groups;
- Maintaining up to date contact information for all community-based and non-governmental partners on grant funded projects;
- Assisting and coordinating grant funded community engagement activities;
- Assisting to properly compile and maintain minutes/notes of all grant funded community engagement activities;
- Distributing minutes/notes from all grant funded community engagement activities, as requested;
- Centering low-income and disadvantaged community voices in all grant funded work;
- Coordinating with OOR staff to develop communication materials related to grant funded work;
- Providing administrative support for and attending grant related community engagement meetings;
- Ensuring Justice40 initiative goals are met in program deliverables;
- Supporting analysis of energy related priorities and actions;
- Contributing to the delivery of energy related statewide initiatives;
- Other duties as assigned by the Director of the Office of Resiliency (or their designee).

**Fringe Benefits**
Total Budget Amount: $1,113,750
The State of Arizona budgets Fringe Benefits costs at an estimated rate of 33% of the total salary/wages. Fringe or employee-related benefits offered by the State of Arizona include employee leave (annual leave, sick leave, military leave, bereavement leave, etc); all required taxes; retirement contributions; and elective Medical/Dental/Vision/Life Insurances, etc. Actual elected medical benefits paid depend on the employee's selections, but generally range between 11-15%. For purposes of this budget, we conservatively estimated 12.01%, for a total of 33% fringe benefits calculated.

**Travel**
Total Budget Amount: $66,450
Travel estimates included in the budget are based on historical employee travel information and allowable travel reimbursement maximum rates established by the State's General Accounting Office (GAO) policy in the State of Arizona Accounting Manual (SAAM).

31

Out-of-state travel requires supervisory review and approval. The State will only draw funds for actual travel expenses incurred.

The Office of Resiliency plans to participate in EPA technical assistance workshops and conferences, as available and planned by the EPA. These technical assistance and professional development opportunities help to ensure that program staff stay current on their understanding of key grant related issues and have the opportunity to network with colleagues from around the country in implementing Solar for All programs. Trip funding will be used for 2 grant funded staff to participate in those in-person meetings. The State has budgeted $31,800 during the grant period for conference travel expenses, including airfare, per diem, and lodging costs. The State has also budgeted $15,900 for technical assistance travel expenses, including airfare, per diem, and lodging, based on the State's travel policy rates.

Travel funds are also budgeted for grant-funded staff's in-state mileage reimbursement. Four grant program staff (Program Evaluator, Community Development Educator, and 2 Grants Coordinators), will be working with many partner agencies throughout the state, with particular focus on outreach to Native nations and communities. Mileage funding is estimated at $18,750 and will provide support for site visits, monitoring, and direct engagement with key partners. Mileage reimbursement rates are set in the State of Arizona Accounting Manual.

## Equipment
Not applicable

## Supplies

Total Budget Amount: $87,500

The Governor's Office budgets for grant-funded programming supplies based on the number of FTE assigned to the grant. The formula is FTE * $2,500 per year, which is based on historical averages. 7 staff are budgeted to this Solar for All grant funding, 7 * $2,500 = $17,500 per year. The supplies formula is intended to cover the costs of program staff-only expenses to perform grant-funded duties including general office supplies, site visit/monitoring equipment, technology (including desktops or laptops; keyboard/mouse combos; webcams; and software subscriptions including for Davis-Bacon and Related Acts required monitoring and reporting), and telecommunications costs. The Governor's Office is required to comply with the State of Arizona Accounting Manual and the State procurement code regulations in the acquisition of all supplies.

## Contractual
Grand Total Budget Amount: $8,225,188

The Governor's Office is required to comply with the State of Arizona Accounting Manual and the State procurement code regulations in the acquisition of all professional services contracted to support and implement grant-funded activities. The Governor's Office also includes the State's standard, uniform terms and conditions in all contractual awards and

will include all required EPA flow-down terms and conditions to program participants, subrecipients, and subcontractors including but not limited to bankers, borrowers, and beneficiaries, as required. The State will develop written guidelines and expected contract duration for subawardees and provide them to our Project Officer for review and approval during the planning period. Once approved, these written guidelines will be provided to subawardees.

**Solar for All Arizonans Program Evaluation Expenses**

Total Budget amount: $3,200,188

The State will contract with a compliance contractor to provide analysis, post-award services, and oversight to ensure compliance with OMB Uniform Guidance and grant-specific requirements and serve as a resource for staff of grant-funded programs for fiscal and programmatic compliance matters. The contractor shall report as requested to Solar For All Arizonans Program staff. They shall also report annually to the Solar for All Arizonans Advisory Council and the Tribal Solar Strategy Working Group.  All anticipated costs for paying this contractor are classified as contractual.

**Solar for All Arizonans Solar for All Arizonans Residential Implementor (Program Development and Implementation)**
Total Budget amount: $5,025,000

The State will contract with a Program Development and Implementation contractor that will be responsible for designing and executing a technician management and referral system that provides a seamless solution for vetting, training, and deploying solar technicians through the various SFA programming. The contractor shall report as requested to the Solar For All Arizonans Program staff. They shall  also report annually to the Solar for All Arizonans Advisory Council and the Tribal Solar Strategy Working Group.  All anticipated costs for paying this contractor are classified as contractual.

## Construction (if applicable)
Not applicable

## Other
Grand Total Budget Amount: $142,037,800

**Subaward Residential Financial Assistance (Strategy 1)**

Total Budget Amount: $66,456,000

(Distributed Rooftop Solar) will provide loans and grants for distributed residential rooftop solar photovoltaic installations for homeowners located in geographically dispersed low-income households and LIDAC communities. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

Experience and Expertise Requirements: the State will follow state procurement statutes to contract for this subawardee. The State will be looking to procure an entity that provides, at a minimum, the following expertise and/or experience:
- Arizona-locally owned entity
- Experience in working with low-income and disadvantaged communities
- Greenbank and/or sustainable finance expertise
- Revolving loan fund expertise and experience

33

- Minimum staff capacity already employed
- Past solar deployment and/or solar financing experience
- Past experience with braiding and stacking available federal funds
- Experience with managing and reporting on federal grant funds

**Subaward "Arizona Neighborhood Solar" Financial Assistance (Strategy 2)**

Total Budget Amount: $48,048,000
(Neighborhood Solar) will build neighborhood solar projects, which are 1 to 5 MW distributed solar installations built with grant funding. Partnering utilities who choose to participate will provide bill discounts to low-income households (both owners and renters). This program will be offered through existing utility discount programs for low-income customers or equivalent programs designed for this grant. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

Experience and Expertise Requirements: the State will follow state procurement statutes to contract for this subawardee. The State will be looking to procure an entity that provides, at a minimum, the following expertise and/or experience:

- Arizona-based entity
- Experience in working with low-income and disadvantaged communities
- Demonstrated staff capacity to develop and deploy solar projects
- Past solar deployment experience
- Ability to provide on-bill discounts for participating low-income households

**Subaward "Rural or Tribal Solar + Battery" Financial Assistance (Strategy 3)**

Total Budget Amount: $13,852,800
(Rural & Tribal Solar + Batteries) implements a resilience pilot program for distributed residential solar plus battery storage that targets federally designated Community Disaster Resilience Zones, rural, and Tribal areas, as these areas are at highest risk from effects of natural hazards and climate change and stand to benefit the most from projects that increase household resiliency. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

Experience and Expertise Requirements: the State will follow state procurement statutes to contract for this subawardee. The State will be looking to procure an entity that provides, at a minimum, the following expertise and/or experience:

- Arizona-locally owned entity
- Experience in working with low-income and disadvantaged communities
- Greenbank and/or sustainable finance expertise
- Minimum staff capacity already employed
- Past solar deployment and/or solar financing experience
- Past experience with braiding and stacking available federal funds
- Experience with managing and reporting on federal grant funds

**Subaward Workforce Development Training Program**

Total Budget Amount: $11,000,000

This subgrantee shall develop workforce training programming and activities to expand participation of workers from LIDAC communities and align with CEJST-designated Census

34

tracts targeted for support. The developed workforce programs will prioritize building workforce capacity in rural and Tribal areas of Arizona, as well as in outlying towns and cities, expanding geographically on the already well-developed solar workforce in the state's two main urban areas, Phoenix and Tucson, and ensuring that access to timely, professional, and skilled solar installations is available throughout the state. The subgrantee shall report on a quarterly basis to the *Solar for All Arizonans* Advisory Council, the Tribal Solar Strategy Working Group, and Solar For All Arizonans Program staff. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

**Facilities Allocation**
Total Budget Amount: $315,000
Facilities costs are based on a formula: $9,000 per FTE per year. These costs include rent, utilities, janitorial services, and repair and maintenance. The formula is based on the amount charged to the Governor's Office by the State's central facilities and building management agency.   The State charges the Governor's Office based on square footage of rental space occupied. The Governor's Office then allocates facility costs based on each FTE's/internal agency division's funding source. Facilities costs are considered to be a direct expense and are not duplicated in the State's indirect cost pool

**Subaward Solar for All Arizonans Community of Practice Solar Benefits Summit**
Total Budget Amount: $375,000

Solar for All Arizonans will include the creation of a Community of Practice program that will invite solar companies, financial institutions, municipalities and counties, community organizations, utilities, and more. Its goals will be to facilitate shared learning that grows industry best practices including how to work effectively with disadvantaged communities and more. This will involve an in-person conference, technical assistance workshops, and additional Community of Practice meetings. Cost estimates based on past venue, A/V, seating, and event fee cost estimates.

The planning of our conference and workshop strategy and schedule will be undertaken in the initial planning year and finalized in the updated workplan.

**Participant Support Costs**
Total Budget Amount: $1,591,000

A majority of this funding will support local nonprofits and local government entities supporting program participants with applying for the program. Funds will also be used to provide travel and participation stipents for members of the Advisory Council and associated working groups. Stipend amounts TBD. Subaward entities are TBD, but if subawardee is a for-profit entity, the State shall provide the required terms and conditions information to the subawardee.

**Additional Items**

**Indirect Charges**
Grand Total Budget Amount: $1,214,312

The Executive Office of the State of Arizona, including the Governor's Office of Resiliency, has a Federally Approved Indirect Cost Rate Agreement that is approved by the U.S.

35

Department of Justice. The approved indirect rate for the fiscal year period 7/1/2024 - 6/30/2025 is 20.52% of all direct costs with a cap of $25,000 for each subrecipient agreements and vendor contracts. For each year's indirect costs calculation, the direct costs include the total of Personnel, Fringe Benefits, Travel, Equipment, and Supplies * .2052. The Contractual costs estimate 10 agreements (which would include both subrecipient agreements, subawards, and vendor contracts) * 25,000 cap * .2052.

**Meals and Refreshments**
Not applicable. Program funds will not be used for any meals and refreshments.

**Program Income**
An estimated $24M will be generated in returns in the first 10 years as a part of the program's Solar Revolving Loan Fund. The development of this fund will be undertaken in the initial planning year.

**Section 6 Activities to be Completed in 1st Year (Planning Year)**
Quarter 1 Objectives
- Complete initial tranche of FTE hires.
- Move into office space, confirm final facilities cost.

Quarter 2 Objectives
- Develop the Workforce Development Training Program

Quarter 3 Objectives
- Design Solar Revolving Loan Fund
- Draft a supplementary budget narrative to justify the amounts entered for each category of the budget table in the SF-424A. Include in the narrative activities supported by the subawards, range of funding in subawards, subaward types (i.e., governmental, non-profit, for-profit), specify how the subawardees are eligible in accordance with EPA's Subaward Policy.

Quarter 4 Objectives
- Finalize schedule and program budget including for initial kick-off events, the workforce development program, Community of Practice technical assistance workshops, conference meeting schedule and event budgets.

Applicant Name: Arizona Governor's Office of Resiliency        Award Number:        84092001

## Budget Information - Non Construction Programs

OMB Approval No. 0348-0044

**Section A - Budget Summary**

| Grant Program Function or Activity (a) | Catalog of Federal Domestic Assistance Number (b) | Estimated Unobligated Funds | | New or Revised Budget | | |
|---|---|---|---|---|---|---|
| | | Federal (c ) | Non-Federal (d) | Federal (e) | Non-Federal (f) | Total (g) |
| 1. Solar for All | 66.959 | $0 | | $156,120,000 | | $156,120,000 |
| 2. | | | | | | $0 |
| 3. | | | | | | $0 |
| 4. | | | | | | $0 |
| 5.        Totals | | $0 | $0 | $156,120,000 | $0 | $156,120,000 |

**Section B - Budget Categories**

| 6. Object Class Categories | Grant Program, Function or Activity | | | | Total (5) |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | |
| a. Personnel | $3,375,000 | | | | $3,375,000 |
| b. Fringe Benefits | $1,113,750 | | | | $1,113,750 |
| c. Travel | $66,450 | | | | $66,450 |
| d. Equipment | $0 | | | | $0 |
| e. Supplies | $87,500 | | | | $87,500 |
| f. Contractual | $8,225,188 | | | | $8,225,188 |
| g. Construction | $0 | | | | $0 |
| h. Other | $142,037,800 | | | | $142,037,800 |
| i. Total Direct Charges (sum of 6a-6h) | $154,905,688 | $0 | $0 | $0 | $154,905,688 |
| j. Indirect Charges | $1,214,312 | | | | $1,214,312 |
| k. **Totals** (sum of 6i-6j) | $156,120,000 | $0 | $0 | $0 | $156,120,000 |
| | | | | | |
| 7.        Program Income | $24,000,000 | | | | $24,000,000 |

**SF-424A** (Rev. 4-92)

Previous Edition Usable                                                        Prescribed by OMB Circular A-102

**Updated Detailed Budget Table**

*An OPTIONAL template for applicants to fill and submit in the Application Materials, Attachment E: Budget Table described in in Section 2.1 of the Program Narrative*

| BUDGET BY YEAR | | | | | | | | | TOTAL BUDGET BY ACTIVITY BUCKET |
|---|---|---|---|---|---|---|---|---|---|
| COST-TYPE | CATEGORY | YEAR 1 FFY2025 | YEAR 2 FFY2026 | YEAR 3 FFY 2027 | YEAR 4 FFY2028 | YEAR 5 FFY2029 | TOTAL | Narrative | |
| Direct Costs | **Personnel** | | | | | | | | |
| | 1 FTE Solar Access + Resilience Manager starting at $105,000 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $525,000 | | |
| | 1 FTE Solar Fund Manager starting at $115,000 | $115,000.00 | $115,000.00 | $115,000.00 | $115,000.00 | $115,000.00 | $575,000 | | |
| | | | | | | | | | |
| | 1 FTE Solar Program Impact Evaluator and Compliance Manager starting at $95,000 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $475,000 | | |
| | 1 FTE Solar Residential Deployment + Regulatory Manager starting at $105,000 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $525,000 | | |
| | 2 FTE Grants Coordinators starting at $85,000 | $170,000.00 | $170,000.00 | $170,000.00 | $170,000.00 | $170,000.00 | $850,000 | | |
| | | | | | | | | | |
| | 1 FTE Solar Community Development/ Engagement Educator starting at $85,000 | $85,000.00 | $85,000.00 | $85,000.00 | $85,000.00 | $85,000.00 | $425,000 | | |
| | | | | | | | | | $2,097,066.17 |
| | | | | | | | | | $3,360,683 |
| | TOTAL PERSONNEL | $675,000.00 | $675,000.00 | $675,000.00 | $675,000.00 | $675,000.00 | $3,375,000 | | |
| | | | | | | | | The State of Arizona budgets Fringe Benefits costs at an estimated rate of 33% of the total salary/wages. Fringe or employee-related benefits offered by the State of Arizona include employee leave (annual leave, sick leave, military leave, bereavement leave, etc); all required taxes; retirement contributions; and elective Medical/Life Insurances, etc. Actual elected medical benefits paid depend on the employee's selections, but generally range between 11-15%. For purposes of this budget, we conservatively estimate 12.01%, for a total of 33% fringe benefits calculated. | |
| | **Fringe Benefits** | | | | | | | | |
| | 1 FTE Solar Access + Resilience Manager | $34,650.00 | $34,650.00 | $34,650.00 | $34,650.00 | $34,650.00 | $173,250.00 | | |
| | 1 FTE Solar Fund Manager | $37,950.00 | $37,950.00 | $37,950.00 | $37,950.00 | $37,950.00 | $189,750.00 | | |
| | 1 FTE Solar Program Impact Evaluator and Compliance Manager | $31,350.00 | $31,350.00 | $31,350.00 | $31,350.00 | $31,350.00 | $156,750.00 | | |
| | 1 FTE Solar Residential Deployment + Regulator Manager | $34,650.00 | $34,650.00 | $34,650.00 | $34,650.00 | $34,650.00 | $173,250.00 | | |
| | 2 FTE Grants Coordinators | $56,100.00 | $56,100.00 | $56,100.00 | $56,100.00 | $56,100.00 | $280,500.00 | | |
| | 1 FTE Solar Community Development/ Engagement Educator | $28,050.00 | $28,050.00 | $28,050.00 | $28,050.00 | $28,050.00 | $140,250.00 | | |
| | | | | | | | | | |
| | TOTAL FRINGE BENEFITS | $222,750.00 | $222,750.00 | $222,750.00 | $222,750.00 | $222,750.00 | $1,113,750.00 | | |
| | | | | | | | | The Office of Resiliency plans to participate in EPA technical assistance workshops and conferences, as available and planned by the EPA. Travel funding will also be for mileage for engagement and monitoring. All travel is subject to State of Arizona Accounting Manual restrictions. | |
| | **Travel** | | | | | | | | |
| | Workshops | | | | | | | | |
| | Airfare: 4 @ $600 round trip | $2,400.00 | $2,400.00 | $2,400.00 | $2,400.00 | $2,400.00 | $12,000.00 | | |
| | Per Diem: 16 days @ $60/day | $960.00 | $960.00 | $960.00 | $960.00 | $960.00 | $4,800.00 | | |
| | Hotel: 4 (2 opportunities* 2 staff attending) x 3 nights @ $250/night | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $15,000.00 | | |
| | Program Evaluator, 100 mi/mo @ $.625/mi x 12 mo | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $3,750.00 | | |
| | Community Development Educator, 200 mi/mo @ $.625/mi x 12 mo | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $7,500.00 | | |
| | 2 Solar Grants Coordinators 100 mi/mo @ $.625/mi x 12 mo | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $7,500.00 | | |
| | Airfare for TA workshops: 2 @ $600 R/T | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $6,000.00 | | |
| | TA travel Per Diem: 2 staff X 4 days @ $60/day | $480.00 | $480.00 | $480.00 | $480.00 | $480.00 | $2,400.00 | | |
| | Hotel: 2 staff X 3 nights @ $250/night | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $7,500.00 | | |
| | | | | | | | | | |
| | TOTAL TRAVEL | $13,290.00 | $13,290.00 | $13,290.00 | $13,290.00 | $13,290.00 | $66,450.00 | | $41,465.00 |
| | **Equipment** | | | | | | $0.00 | | |
| | | | | | | | | | |
| | TOTAL EQUIPMENT | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | |
| | **Supplies** | | | | | | | | |
| | PC Laptops | $3,150.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3,150.00 | 3 units, estimated cost of $1,050/unit, purchased when position is filled | |
| | Macbook Laptops | $9,600.00 | $0.00 | $0.00 | $0.00 | $0.00 | $9,600.00 | 4 units, estimated cost of $2,400/unit, purchased when position is filled | |
| | Monitors | $2,240.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,240.00 | 14 units total (2 per FTE), estimated cost of $160/unit, purchased when position is filled | |
| | Docking Stations | $1,750.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,750.00 | 7 units, estimated cost of $250/unit, purchased purchased when position is filled | |
| | USB-C Power Adapters | $350.00 | $0.00 | $0.00 | $0.00 | $0.00 | $350.00 | 7 units, estimated cost of $50/unit, purchased purchased when position is filled | |
| | Display Port Cables | $210.00 | $0.00 | $0.00 | $0.00 | $0.00 | $210.00 | 14 units total (2 per FTE), estimated cost of $15/unit, purchased when position is filled | |
| | Keyboard and Mouse | $385.00 | $0.00 | $0.00 | $0.00 | $0.00 | $385.00 | 7 units, estimated cost of $55/unit, purchased when position is filled | |
| | Telecommunications/Mobile Phones | $5,880.00 | $5,880.00 | $5,880.00 | $5,880.00 | $5,880.00 | $29,400.00 | $840 annual per FTE, 7 FTEs total | |
| | Davis Bacon Compliance Software | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $5,000.00 | Only needed for one FTE, Solar Program Impact Evaluator and Compliance Manager | |
| | Asana - Project Management Software | $2,100.00 | $2,100.00 | $2,100.00 | $2,100.00 | $2,100.00 | $10,500.00 | $300 annual per FTE, 7 FTEs total | |
| | Adobe Acrobat | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $3,500.00 | $100 annual per FTE, 7 FTEs total | |
| | Office 365 | $1,848.00 | $1,848.00 | $1,848.00 | $1,848.00 | $1,848.00 | $9,240.00 | $264 annual per FTE, 7 FTEs total | |
| | VPN - Ventraq | $252.00 | $252.00 | $252.00 | $252.00 | $252.00 | $1,260.00 | $36 annual per FTE, 7 FTEs total | |
| | ARC GIS software | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $3,500.00 | Only needed for one FTE | |
| | State IT Office licensing and hosting fees | $945.00 | $945.00 | $945.00 | $945.00 | $945.00 | $4,725.00 | $135 annual per FTE, 7 FTEs total | |
| | Misc. pens, notebooks, business cards | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $2,500.00 | Flat amount estimated per year | |
| | Hard Hats | $44.00 | $0.00 | $44.00 | $0.00 | $44.00 | $132.00 | 2 units, replaced every 2 years, 6 units total | |
| | Safety Eyewear | $58.00 | $0.00 | $0.00 | $0.00 | $0.00 | $58.00 | One box, contains 24 units | |
| | | | | | | | | | |
| | TOTAL SUPPLIES | $31,712.00 | $13,925.00 | $13,969.00 | $13,925.00 | $13,969.00 | $87,500.00 | | |
| | **Contractual** | | | | | | | | |
| | Program Evaluation Expenses (Compliance Contractor) | $200,188.00 | $750,000.00 | $750,000.00 | $750,000.00 | $750,000.00 | $3,200,188.00 | compliance with OMB Uniform Guidance and grant-specific requirements and serve as a | |
| | Implementation | $1,005,000.00 | $1,005,000.00 | $1,005,000.00 | $1,005,000.00 | $1,005,000.00 | $5,025,000.00 | and executing a technician management and referral system that provides a seamless solution | |
| | | | | | | | | | |
| | TOTAL CONTRACTUAL | $1,205,188.00 | $1,755,000.00 | $1,755,000.00 | $1,755,000.00 | $1,755,000.00 | $8,225,188.00 | | |
| | **OTHER** | | | | | | | | |
| | Subaward- Residential Financial Assistance (Strategy 1) | $2,000,000.00 | $16,614,000.00 | $16,614,000.00 | $16,614,000.00 | $16,614,000.00 | $66,456,000.00 | photovoltaic installations for homeowners located in geographically dispersed low-income | |
| | Subaward- "Arizona Neighborhood Solar" Financial Assistance (Strategy 2) | | $12,012,000.00 | $12,012,000.00 | $12,012,000.00 | $12,012,000.00 | $48,048,000.00 | solar installations built with grant funding and owned by nonprofits or public agencies. Subaward | |
| | Subaward- "Resiliency Pilot" Financial Assistance (Strategy 3) | | $3,463,200.00 | $3,463,200.00 | $3,463,200.00 | $3,463,200.00 | $13,852,800.00 | solar plus battery storage that targets federally designated Community Disaster Resilience Zones | |
| | Subaward- Workforce development training program | $1,000,000.00 | $1,750,000.00 | $2,750,000.00 | $1,750,000.00 | $1,750,000.00 | $11,000,000.00 | | $6,864,000 |
| | | | | | | | | | |
| | costs | $116,000.00 | $600,000.00 | $600,000.00 | $500,000.00 | $150,000.00 | $1,966,000.00 | supporting program participants with applying for the program as committee. Funds will also | |
| | Facilities Allocation (the formula should be $9,000*FTE) | $63,000.00 | $63,000.00 | $63,000.00 | $63,000.00 | $63,000.00 | $315,000.00 | | |
| | EPA In-Kind | | | | | | $400,000.00 | | |
| | TOTAL OTHER | $3,179,000.00 | $34,502,200.00 | $35,502,200.00 | $34,402,200.00 | $34,052,200.00 | $142,037,800.00 | | |
| | TOTAL DIRECT | $5,326,940.00 | $37,182,165.00 | $38,182,209.00 | $37,082,165.00 | $36,732,209.00 | $154,905,688.00 | | |
| Indirect Costs | **Indirect Costs** | | | | | | $0.00 | | |
| | 20.52% on direct costs | | | | | | | FY2025 | |
| | Direct Costs | $191,562.00 | $191,562.00 | $191,562.00 | $191,563.00 | $191,563.00 | $957,812.00 | | |
| | Contractual (10) | $51,300.00 | $51,300.00 | $51,300.00 | $51,300.00 | $51,300.00 | $256,500.00 | | |
| | TOTAL INDIRECT | $242,862.00 | $242,862.00 | $242,862.00 | $242,863.00 | $242,863.00 | $1,214,312.00 | | |
| **FUNDING** | | $5,569,802.00 | $37,425,027.00 | $38,425,071.00 | $37,325,028.00 | $36,975,072.00 | $156,120,000.00 | | |

**Detailed Budget Table**

*An OPTIONAL template for applicants to fill in and submit in the Application Materials, Attachment E: Budget Table described in in Section 2.1 of the Program Narrative*

| BUDGET BY YEAR | | | | | | | |
|---|---|---|---|---|---|---|---|
| **COST-TYPE** | **CATEGORY** | **YEAR 1** | **YEAR 2** | **YEAR 3** | **YEAR 4** | **YEAR 5** | **TOTAL** |
| **Direct Costs** | **Personnel** | | | | | | |
| | 1 FTE Solar Program Director starting at $110,000/yr with COL increases | $110,000 | $113,300 | $116,699 | $120,200 | $123,806 | $584,005 |
| | 1 FTE Solar Fund Manager starting at $105,000/yr with COL increases | $105,000 | $108,150 | $111,395 | $114,736 | $118,178 | $557,459 |
| | | | | | | | |
| | 1 FTE Solar Program Impact Evaluator and Data Analyst starting at $95,000/yr with COL increases | $95,000 | $97,850 | $100,786 | $103,809 | $106,923 | $504,368 |
| | 1 FTE Solar Program Communications Specialist starting at $85,000/yr with COL increases | $85,000 | $87,550 | $90,177 | $92,882 | $95,668 | $451,277 |
| | 2 FTE Grants Manager starting at $75,000/yr with COL increases | $150,000 | $154,500 | $159,135 | $163,909 | $168,826 | $796,370 |
| | 1 FTE Solar Community Development Educator starting at $75,000/yr with COL increases | $75,000 | $77,250 | $79,568 | $81,955 | $84,413 | $398,185 |
| | 1 FTE Energy Policy Advisor at $130,000/yr with COL increases | $13,000 | $13,390 | $13,792 | $14,205 | $14,632 | $69,019 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | **TOTAL PERSONNEL** | $620,000 | $638,600 | $657,758 | $677,491 | $697,815 | $3,360,683 |
| | **Fringe Benefits** | | | | | | |
| | Program Directors @ 33% of salary | $36,300 | $37,389 | $38,511 | $39,666 | $40,856 | $192,722 |
| | Fund Manager @ 33% of salary | $34,650 | $35,690 | $36,760 | $37,863 | $38,999 | $183,962 |
| | Program Impact Evaluator & Data Analyst @ 33% of salary | $31,350 | $32,291 | $33,259 | $34,257 | $35,285 | $166,441 |
| | Communications Specialist @ 33% of salary | $28,050 | $28,892 | $29,758 | $30,651 | $31,571 | $148,921 |
| | Grants Manager @ 33% of salary | $49,500 | $50,985 | $52,515 | $54,090 | $55,713 | $262,802 |
| | Solar Community Development Educators @ 33% of salary | $24,750 | $25,493 | $26,257 | $27,045 | $27,856 | $131,401 |
| | Energy Policy Advisor | $4,290 | $4,419 | $4,551 | $4,688 | $4,828 | $22,776 |
| | **TOTAL FRINGE BENEFITS** | $204,600 | $210,738 | $217,060 | $223,572 | $230,279 | $1,109,025 |
| | **Travel** | | | | | | |
| | 2 Conference Opportunity, 2 staff attending DoE Technical Assistance Workshops | | | | | | |
| | Airfare: 4 @ $600 round trip | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $12,000 |
| | Per Diem: 16 days @ $60/day | $960 | $960 | $960 | $960 | $960 | $4,800 |
| | Hotel: 4 (2 opportunities* 2 staff attending) x 3 nights @ $250/night | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $15,000 |
| | Program Evaluator, 100 mi/mo @ $.625/mi x 12 mo | $750 | $750 | $750 | $750 | $750 | $3,750 |
| | Community Development Educator, 200 mi/mo @ $.625/mi x 12 mo | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $7,500 |
| | 2 Data Analysts, 100 mi/mo @ $.625/mi x 12 mo | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $7,500 |
| | Airfare for TA workshops 2 @ $600 R/T | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $6,000 |
| | TA travel Per Diem: 2 staff X 4 days @ $60/day | $480 | $480 | $480 | $480 | $480 | $2,400 |
| | Hotel: 2 staff X 3 nights @ $250/night | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $7,500 |
| | | | | | | | $0 |
| | **TOTAL TRAVEL** | $13,290 | $13,290 | $13,290 | $13,290 | $13,290 | $66,450 |
| | **Equipment** | | | | | | |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | **TOTAL EQUIPMENT** | $0 | $0 | $0 | $0 | $0 | $0 |
| | **Supplies** | | | | | | |
| | Annual conference | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $1,250,000 |
| | Software and Technology related to data analysis, project tracking, etc | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $150,000 |
| | Outreach Educational Materials | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $100,000 |
| | Digital Marketing | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $250,000 |
| | | | | | | | $0 |
| | **TOTAL SUPPLIES** | $350,000 | $350,000 | $350,000 | $350,000 | $350,000 | $1,750,000 |
| | **Contractual** | | | | | | |
| | Legal services | $75,000 | $60,000 | $30,000 | $20,000 | $15,000 | $200,000 |
| | Accounting (Single Audit) | $45,000 | $46,350 | $47,741 | $49,173 | $50,648 | $238,912 |
| | Solar for All Compliance Contractor (Data validation) | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $5,000,000 |
| | Solar for All Technicians Management Contractor (Program Development and Implementation) | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $5,000,000 |

| TOTAL BUDGET BY ACTIVITY BUCKET | | |
|---|---|---|
| **FINANCIAL ASSISTANCE** | | |
| | | |

| | Y1 | Y2 | Y3 | Y4 | Y5 | Total |
|---|---|---|---|---|---|---|
| TOTAL CONTRACTUAL | $2,120,000 | $2,106,350 | $2,077,741 | $2,069,173 | $2,065,648 | $10,438,912 |
| **OTHER** | | | | | | |
| Subgrant to Financial Partner for Residential Program | | $26,625,000 | $26,625,000 | $26,625,000 | $26,625,000 | $106,500,000 |
| Subgrant for "Arizona Solar" Deployment Partner | $15,400,000 | $15,400,000 | $15,400,000 | $15,400,000 | $15,400,000 | $77,000,000 |
| Subgrant for "Solar + Storage" Pilot Program Partner | $4,440,000 | $4,440,000 | $4,440,000 | $4,440,000 | $4,440,000 | $22,200,000 |
| Subgrant for workforce development training program | $4,360,000 | $4,360,000 | $4,360,000 | $4,360,000 | $4,360,000 | $21,800,000 |
| Subgrant for Solar for All Arizonans Program Evaluation (Program Evaluation) | $400,000 | $400,000 | $400,000 | $400,000 | $400,000 | $2,000,000 |
| Subgrant to support technial assistance administration for local nonprofit and municipal partners | $308,000 | $509,000 | $509,000 | $509,000 | $209,000 | $2,044,000 |
| TOTAL OTHER | $24,908,000 | $51,734,000 | $51,734,000 | $51,734,000 | $51,434,000 | $231,544,000 |
| TOTAL DIRECT | $28,215,890 | $55,052,978 | $55,049,849 | $55,067,526 | $54,791,033 | $248,269,070 |
| **Indirect Costs** | | | | | | |
| 23.25% on direct costs | | | | | | |
| Direct Costs | $276,184 | $281,936 | $287,860 | $293,962 | $300,247 | $1,440,189 |
| Contractual (10) | $58,125 | $58,125 | $58,125 | $58,125 | $58,125 | $290,625 |
| TOTAL INDIRECT | $334,309 | $340,061 | $345,985 | $352,087 | $358,372 | $1,730,814 |
| **FUNDING** | $28,550,199 | $55,393,039 | $55,395,834 | $55,419,613 | $55,149,404 | $249,999,885 |
| **funding by** | | | | | $115 | 82% |

EXHIBIT 6



## Acknowledgement - RE: Dispute of Termination Notice of EPA Assistance Agreement 5H-84092001

**Schindel, Phillip** <Schindel.Phillip@epa.gov>                    Mon, Sep 22, 2025 at 5:00 AM
To: "mmahoney@az.gov" <mmahoney@az.gov>, "jbell@az.gov" <jbell@az.gov>, Blaise Caudill <bcaudill@az.gov>, Rosa Ellis <rellis@az.gov>
Cc: "Brown, Devon" <Brown.Devon@epa.gov>, "Nguyen, Tiana" <Nguyen.Tiana@epa.gov>, "Molina, Michael" <molina.michael@epa.gov>

Good morning Ms. Mahoney,


This email acknowledges the Arizona Governors Office of Resiliency's notice of disagreement and its formal dispute of the termination of its assistance agreement 5H-84092001 on behalf of the Agency and Michael Molina, Principal Deputy Assistant Administrator for the Office of Mission Support. No additional information or documentation is being requested from the organization at this time. Mr. Molina's staff will contact you to let you know if the agency requests any additional information or documentation from the organization that is needed to complete the dispute review.

In accordance with 2 CFR 1500.17, a decision will be issued regarding this dispute by February 24, 2026. If this timeline changes, Mr. Molina's staff will reach back out to inform you.

Sincerely,




Phillip Schindel

Acting Director

US EPA Grants Management and Business Operations Division

202-564-5293

# EXHIBIT 7

---------- Forwarded message ---------
From: **SFA** <SFA@epa.gov>
Date: Wed, Oct 1, 2025 at 1:21 PM
Subject: Solar for All Grant Closeout Instructions
To: SFA <SFA@epa.gov>

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

**Final Federal Financial Report (SF-425)**
**Submission Instructions**:
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.
  - If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close

out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance during the entire performance period (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - Progress towards objectives on program key performance metrics during the performance period.
  - Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All

reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 8



## OFFICE OF MISSION SUPPORT
### WASHINGTON, D.C. 20460

October 23, 2025

**MEMORANDUM**

**SUBJECT:**     Update on Dispute of EPA Assistance Agreement 5H-84092001 under 2 CFR 200.340

**FROM:**        Michael D. Molina, Principal Deputy Assistant Administrator
                 Grants Dispute Decision Official

**TO:**          Maren Mahoney, Director
                 Governors Office of Resiliency, AZ

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84092001. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.24
17:06:07 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# EXHIBIT 9

ATTORNEY WORK PRODUCT          DRAFT          PRIVILEGED & CONFIDENTIAL

To: Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC 20460

CC: Michael Molina

Date: November 7, 2025

Re:     Objection to Closeout of EPA Assistance Agreement 5H-84092001

Dear Mr. Brown:

On September 5, 2025, the Arizona Office of Resiliency ("Office of Resiliency") submitted to the U.S. Environmental Protection Agency ("EPA") a Dispute of Termination of EPA Assistance Agreement 5H-84092001 pursuant to 2 C.F.R. § 1500.15 ("Dispute of Termination"). Despite that timely dispute, on October 1, 2025, the Office of Resiliency received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that it complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." The Office of Resiliency has now received EPA's October 23, 2025, letter purporting to declare moot its "dispute regarding the termination of Assistance Agreement 5H-84092001." The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that the Office of Resiliency close out Assistance Agreement 5H-84092001.

As an initial matter, clarification is needed because EPA's October 23, 2025, letter references "your dispute . . . submitted on August 28, 2025." But the Office of Resiliency did not submit its Part 1500 dispute on August 28, 2028. Rather, August 28, 2025, is the date that the Office of Resiliency submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025, Assistance Amendment. Instead, as discussed, the Office of Resiliency submitted its Dispute of Termination to EPA's Dispute Decision Official on September 5, 2025. Thus, it is unclear what exactly "EPA has rendered" moot.

The Office of Resiliency disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending. EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation. We request that EPA reverse its mootness determination and allow the administrative dispute to proceed. At a minimum, EPA should stay the administrative dispute until the conclusion of Arizona's lawsuit challenging EPA's termination of the Solar for

ATTORNEY WORK PRODUCT                DRAFT                PRIVILEGED & CONFIDENTIAL

All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of the Office of Resiliency's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, Arizona has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS.  It would be inappropriate and prejudicial to require the Office of Resiliency to close out while litigation is pending that directly concerns EPA's termination of this grant.  *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed."  The Office of Resiliency has complied—and continues to comply—with the terms and conditions of the Solar for All program.  The Arizona Solar for All program was awarded $155,720,000 and the EPA unilaterally terminated this grant. As a result of EPA's unlawful actions, the Office of Resiliency has not been able to complete the work required under Assistance Agreement 5H-84092001.  Accordingly, EPA necessarily cannot "determine[] that all administrative actions and required work of the Federal award have been completed," as would be required to close out.

The Office of Resiliency does not agree to close out Assistance Agreement 5H-84092001 while litigation relating to this grant is pending.  We seek an extension for our close-out date until all litigation has been resolved, including any appeals.  Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00pm on November 12, 2025.

Sincerely,

*Maren Mahoney*
Maren Mahoney (Nov 7, 2025 17:07:10 MST)

Maren Mahoney
Director
Governor's Office of Resiliency
Executive Office of the State of Arizona