# EXHIBIT 1

5H - 84092301 - 0    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN): 84092301<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5H | DATE OF AWARD<br>07/08/2024 |
|---|---|---|---|
| | | TYPE OF ACTION<br>New | MAILING DATE<br>07/11/2024 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>90062 |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| RECIPIENT: | PAYEE: |
|---|---|
| STATE OF CALIFORNIA ENERGY COMMISSION<br>715 P Street<br>Sacramento, CA 95814-5504<br>EIN:  68-0364962 | STATE OF CALIFORNIA ENERGY COMMISSION<br>715 P Street<br>Sacramento, CA 95814-5504 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Elizabeth Giorgi<br>715 P Street<br>Sacramento, CA 95814-5504<br>**Email:** elizabeth.giorgi@energy.ca.gov<br>**Phone:** 916-639-0567 | Rebecca Taylor<br>1200 Pennsylvania Ave NW, 4410C<br>Washington, DC 20460<br>**Email:** taylor.rebecca@epa.gov<br>**Phone:** 202-564-5211 | Jennifer Brooks<br>1200 Pennsylvania Ave, NW, 3903R<br>Washington, DC 20460<br>**Email:** brooks.jennifer@epa.gov<br>**Phone:** 202-564-6374 |

**PROJECT TITLE AND DESCRIPTION**

California Solar for All Program - "Note: A special payment condition applies to this award."

See Attachment 1 for project description.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 05/01/2024 - 04/30/2029 | 05/01/2024 - 04/30/2029 | $ 0.00 | $ 0.00 |

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 249,800,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,800,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, The Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington , DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Keva R. Lloyd - Acting Chief, Grants Management Branch | DATE<br>07/08/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 249,400,000 | $ 249,400,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 249,800,000 | $ 249,800,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41038 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 249,400,000 |
| | | | | | | | | | $ 249,400,000 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 249,800,000 |
| 15. Total EPA Amount Awarded To Date | $ 249,800,000 |

# Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

- MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

- Payment requests (if applicable): EPA Project Officer

- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with

local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed <u>prior</u> to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

   Progress towards objectives on key performance metrics over the entire period of performance,

   Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

   Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

   Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

   Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*<u>The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition</u>*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

25

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

D. Signage Required

1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

<u>2. Public or Media Events</u>

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

<u>1. Leveraging</u>

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

<u>2. Fund Raising</u>

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

### Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

### K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

II. Additional Programmatic Terms and Conditions

A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

> Revised SF-424A, Budget Information for Non-Construction Programs
>
> Indirect Rate Proposal or Agreement, if applicable
>
> Revised Budget Narrative
>
> Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining its UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

K. Labor and Equitable Workforce Development Requirements

1. Davis-Bacon and Related Acts (DBRA)

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

> **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

> **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the [EPA Build America, Buy America General Term and Condition](), which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents is an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

<u>4. Indirect Cost Rate</u>

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

<u>5. Sufficient Progress</u>

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

### 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

### 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

### AA. Compliant URL Links

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

### AB. Flow-Down Requirements

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

5H - 84092301 - 1   Page 1

| | | GRANT NUMBER (FAIN):  84092301 | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | | MODIFICATION NUMBER:  1 | **DATE OF AWARD** 12/16/2024 |
| | | PROGRAM CODE:  5H | |
| | | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 12/16/2024 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** 90062 |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| California Public Utilities Commission 505 Van Ness San Francisco, CA 94102-3214 EIN:  94-3031353 | California Public Utilities Commission 505 Van Ness San Francisco, CA 94102-3214 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Tory Francisco 505 Van Ness San Francisco, CA 94102-3214 **Email:** tory.francisco@cpuc.ca.gov **Phone:** 415-703-2743 | Vineet Pandharpurkar 1200 Pennsylvania Ave NW, 4410C Washington, DC 20460 **Email:** pandharpurkar.vineet@epa.gov **Phone:** 202-564-5211 | Jennifer Brooks 1200 Pennsylvania Ave, NW, 3903R Washington, DC 20460 **Email:** brooks.jennifer@epa.gov **Phone:** 202-564-6374 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

California Solar for All Program

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 249,800,000.00 | **TOTAL PROJECT PERIOD COST** $ 249,800,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,800,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, The Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington , DC 20460 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| **Digital signature applied by EPA Award Official** Keva R. Lloyd - Associate Award Official | **DATE** 12/16/2024 |
|---|---|

5H - 84092301 - 1    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 249,400,000 | $ 0 | $ 249,400,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 249,800,000 | $ 0 | $ 249,800,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84092301 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 4,250,000 |
| 2. Fringe Benefits | $ 2,272,050 |
| 3. Travel | $ 48,000 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 2,629,950 |
| 7. Construction | $ 0 |
| 8. Other | $ 239,680,000 |
| 9. Total Direct Charges | $ 248,880,000 |
| 10. Indirect Costs: 10.00 % Base MTDC | $ 920,000 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 249,800,000 |
| 12. Total Approved Assistance Amount | $ 249,800,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 249,800,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

## Programmatic Conditions

**Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)**

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

  a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

  b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

  c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

  d. Being funded by public or charitable contributions; and

  e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa. gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program**

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

> 1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

> 2. Privately-owned commercial buildings when they meet the "public function" test;

> 3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

84

purposes of BABA applicability:

   1. Single family homes;

   2. Privately-owned, non-mixed-use, multi-family housing properties;

   3. Privately-owned residential portions of mixed-use properties;

   4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

   1. Low-Income Housing Tax Credit (LIHTC);

   2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

   3. Federal Housing Administration Insured Multifamily Mortgages;

   4. HUD Section 8 Funding;

   5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

   1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

   2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

### O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

### P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT 3

STATE OF CALIFORNIA • DEPARTMENT OF GENERAL SERVICES

# STANDARD AGREEMENT
STD 213 (Rev. 04/2020)

| AGREEMENT NUMBER | PURCHASING AUTHORITY NUMBER (If Applicable) |
|---|---|
| 24NS0854 | |

1. This Agreement is entered into between the Contracting Agency and the Contractor named below:

CONTRACTING AGENCY NAME

California Public Utilities Commission

CONTRACTOR NAME

California Energy Commission

2. The term of this Agreement is:

START DATE

December 16, 2024 or upon approval

THROUGH END DATE

April 29, 2029

3. The maximum amount of this Agreement is:

$ 30,200,000.00 – Thirty Million Two Hundred Thousand Dollars and Zero Cents

4. The parties agree to comply with the terms and conditions of the following exhibits, which are by this reference made a part of the Agreement.

| | Exhibits | Title | Pages |
|---|---|---|---|
| | Exhibit A | Scope of Work | 6 |
| | Exhibit A | Appendix A – EPA Grant Award/Solar For All (SFA) and Terms and Conditions (12/3/24) | 90 |
| | Exhibit A | Appendix B – EPA General Terms and Conditions (10/24) | 46 |
| + − | Exhibit A | Appendix C – Solar for All Work Plan | 80 |
| + − | Exhibit A | Appendix D – Solar for All Budget | 2 |
| + − | Exhibit A | Appendix E – Solar for All Timeline and Milestones | 5 |
| + − | Exhibit B | Budget Detail and Payment Provisions | 3 |
| + − | Exhibit C* | Interagency General Terms and Conditions (GIA 11/2022) | 0 |
| + − | Exhibit D | Special Terms and Conditions | 6 |

*Items shown with an asterisk (*), are hereby incorporated by reference and made part of this agreement as if attached hereto.*
*These documents can be viewed at https://www.dgs.ca.gov/OLS/Resources*
*IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN EXECUTED BY THE PARTIES HERETO.*

## CONTRACTOR

CONTRACTOR NAME (if other than an individual, state whether a corporation, partnership, etc.)

California Energy Commission

| CONTRACTOR BUSINESS ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 715 P Street | Sacramento | CA | 95814 |

| PRINTED NAME OF PERSON SIGNING | TITLE |
|---|---|
| Tatyana Yakshina | Contracts, Grants and Loans Office Manager |

| CONTRACTOR AUTHORIZED SIGNATURE | DATE SIGNED |
|---|---|
| *Tatyana Yakshina* | 6/27/2025 |

Page 1 of 2

SCO ID: 8660-24NS0854/3360-RMB50024004

STATE OF CALIFORNIA – DEPARTMENT OF GENERAL SERVICES
**STANDARD AGREEMENT**
STD 213 (Rev. 04/2020)

| AGREEMENT NUMBER | PURCHASING AUTHORITY NUMBER (If Applicable) |
|---|---|
| 24NS0854 | |

**STATE OF CALIFORNIA**

CONTRACTING AGENCY NAME
California Public Utilities Commission

| CONTRACTING AGENCY ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 505 Van Ness Ave. | San Francisco | CA | 94102 |

| PRINTED NAME OF PERSON SIGNING | TITLE |
|---|---|
| Ryan Dulin | Deputy Executive Director, Internal Operations |

CONTRACTING AGENCY AUTHORIZED SIGNATURE

Ryan O. Dulin   Digitally signed by Ryan O. Dulin
Date: 2025.07.02 10:14:59 -07'00'

DATE SIGNED
7/2/25

CALIFORNIA DEPARTMENT OF GENERAL SERVICES APPROVAL

EXEMPTION (If Applicable)
Exempt per SCM Vol. 1 Section 4.06

## EXHIBIT A - SCOPE OF WORK

1. **Background**

The California Public Utilities Commission (CPUC) regulates services and utilities, as well as projects related thereto, protects consumers, safeguards the environment, and assures Californians' access to safe and reliable utility infrastructure and services. The essential services regulated include, without limitation, electric, natural gas, telecommunications, water, railroad, rail transit, and passenger transportation companies.

The California Energy Commission (CEC) is the state's energy policy and planning agency. It has seven core responsibilities: advancing state energy policy, encouraging energy efficiency, certifying thermal power plants, investing in energy innovation, developing renewable energy, transforming transportation, and preparing for energy emergencies.

A coalition of California agencies – CPUC, CEC, and Employment Development Department (EDD) – was awarded a Solar For All (SFA or S4A) grant from EPA to advance equitable access to renewable energy. The final amended grant agreement is dated December 16, 2024. The award is for $249,800,000 and the budget period is May 1, 2024, to April 30, 2029; of which $400,000 is in-kind technical assistance from National Renewable Energy Laboratory (NREL), which may be allocated amongst the California agency partners pursuant to the budget caps.

The purpose of this Interagency Agreement is to facilitate funding to the CEC from CPUC for the CEC's portion of the SFA program activities, as detailed in the EPA approved California SFA Workplan and Budget. In summary, CEC's SFA work includes a plan to offer $25 million in financial assistance to programs serving Low-Income and Disadvantaged Customers (LIDAC) and Tribal residents in POU territories. CEC's program will be developed with public input, and to provide funding for community solar, multifamily rooftop solar, single-family rooftop solar, or solar with associated storage systems that will satisfy the minimum 20% electricity bill savings criteria.

This agreement corresponds to the information submitted and approved within the EPA California Workplan and Budget and other materials (see Appendices). The EPA approved California Budget includes a breakdown of the budget by coalition agency partner.

CPUC is the prime grant recipient, and the CEC and EDD are award subrecipients. CEC has responsibility for awareness and understanding of the SFA federal regulations and grant terms and conditions. As the prime grant recipient, CPUC may review activities for conformance to those regulations and grant terms and conditions, towards that end CPUC will:

1) Collect and process monthly invoices
2) Issue periodic requests for data collection or budget expenditures
3) May request documentation of activities or tasks
4) Delegate responsibilities or tasks to meet federal and grant rules

If an activity or expense is found to be non-conforming, it is not eligible for funding per EPA's SFA Grant Terms and Conditions.

While all EPA Grant Terms and Conditions are incorporated into this agreement in Appendices #s A and B; these are provided in duplicate as preferred by those terms and conditions. By accepting this interagency agreement and future grant funding, CEC formally acknowledges:

1) By accepting this award, the EPA Subrecipient (CEC) acknowledges and agrees to the terms and conditions provided in the Davis-Bacon and Related Acts (DBRA) Requirements for EPA Subrecipients.
2) By accepting this award, subrecipients (CEC) must comply with the requirements in 29 CFR 5.6.
3) By accepting this award, subrecipients (CEC) comply with the requirements in subsection E "Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries" of Exhibit #.
4) Adherence to these requirements, among others:
   a. Title VI of the Civil Rights Act and other Federal statutes and regulations prohibiting discrimination in Federal financial assistance programs, as applicable.
   b. Reporting Subawards and Executive Compensation under Federal Funding Accountability and Transparency Act (FFATA) set forth in General Condition of the pass-through entity's agreement with EPA entitled "Reporting Subawards and Executive Compensation."
   c. Limitations on individual consultant fees as set forth in General Condition 2 CFR 1500.9 and the General Condition of the pass-through entity's agreement with EPA entitled "Consultant Fee Cap."
   d. EPA's prohibition on paying management fees as set forth in General Condition of the pass-through entity's agreement with EPA entitled "Management Fees."
   e. The Procurement Standards in 2 CFR Part 200 including those requiring competition when the subrecipient acquires goods and services from contractors (including consultants).
   f. EPA provides general information on other statutes, regulations and Executive Orders on the Grants internet site at www.epa.gov/grants. Many Federal requirements are agreement or program specific and EPA encourages pass-through entities to review the terms of their assistance agreement carefully and consult with their EPA Project Officer for advice, if necessary.
5) The grant Workplan, Budget, and Timeline can be updated with the approval of the EPA Project Officer. Subawardees, CEC and EDD, must follow updated versions.

## 2. Tasks

Under this Agreement, CEC staff (staff) will implement SFA in accordance with the approved Workplan, Budget, and Timeline (Appendices B-D). CEC agrees to adhere to any updated, approved EPA SFA California Workplan, Budget, or Timeline (Appendices B-D) as provided by the CPUC and CEC shall implement any changes as required.

In summary, CEC will run one or more grant solicitations to which applicants within Publicly Owned Utilities (POUs) and Tribes can apply. Funds will be used for increasing access of low-income households to rooftop or community solar. Program development will include tasks like soliciting stakeholder feedback, hosting workshops, outreach, application selection criteria, and

developing eligibility and application selection criteria and program requirements. CEC staff will evaluate grant applications, develop agreement documents including applicable permits, and oversee grant management. CEC will support recipients of its SFA grants in expending funds prior to the close of the grant period.

CEC will coordinate with CPUC on public messaging and press inquiries. CEC will notify CPUC of inbound press requests regarding the SFA grant. CEC will support CPUC, if requested by the CPUC, on in-bound inquiries from Members of Congress, State officials, or Governors. In alignment with the approved Workplan, specific tasks include, but are not limited to, the following enumerated tasks:

**Program Planning Activities:**

Task 1: Stakeholder Outreach and Tribal Engagement
CEC staff will conduct and participate in scoping workshops and outreach meetings to gather input from POUs, community-based organizations, solar/storage project developers, other stakeholders, and tribal entities. Staff will initiate tribal consultations and engagement including outlining strategies to formalize partnerships and address barriers to participation for tribal communities.

Task 2: Solicitation Manual Development
CEC staff will develop a comprehensive solicitation manual outlining eligibility, funding criteria categories, application processes, project requirements, and criteria for scoring and selecting applications for funding, focused on eligible entities within POU territories. The manual will include considerations for master-metered and rental property eligibility, community ownership, and consumer protections. Staff will publish a draft for public comment and hold a public workshop to solicit stakeholder feedback.

Staff must incorporate SFA grant terms and conditions that flow down to recipients, including key outcome metrics. Prior to releasing the solicitation manual, staff will informally engage CPUC and EDD staff to receive feedback.

Task 3: Release Final Solicitation Manual
CEC staff will revise and finalize the solicitation manual to address stakeholder comments and ensure clarity and alignment with program goals. Staff will issue the Notice of Funding Availability (NOFA) and open the application window for POU grants and incentives. Depending on program structure and available funding, staff may release additional funding solicitation rounds as needed to award all funds as intended.

**Project Deployment Activities:**

Task 4: Application Management
Applicants will submit applications in accordance with solicitation requirements. CEC staff will manage the application process, screen applications for eligibility, evaluate eligible applications based on finalized criteria including financial and technical requirements, and issue a Notice of Proposed Award (NOPA).

Task 5: Agreement Development

CEC staff will work with proposed awardees to develop and execute grant agreements. Technical assistance will be provided to develop siting plans and requirements for procurement documentation. Staff will establish agreements with relevant POUs to share customer billing data to verify household bill savings. Staff will prepare CEQA documents for each agreement, as applicable, and collaborate with CEC legal counsel and the Contracts, Grants, and Loans (CGL) Office to prepare agreement documents. Staff will present the proposed awards at a CEC Business Meeting for final approval and will execute agreements.

**Grant Management Activities**

Task 6: Consultants

CEC staff will contract with consultants, as identified in the approved Workplan and Budget, for technical assistance and compliance management to support program activities. Technical assistance funding will be allocated for targeted application outreach and assistance. Annual compliance contracting services will require hiring contractor(s) with in-depth knowledge of federal regulations and familiarity with the energy sector.

Task 7: Quality Management, Reporting and Data

CEC staff will commence grant management activities, including collecting progress reports, conducting outreach and engagement with recipients and stakeholders, conducting site visits where feasible, managing payments for grant activities, and preparing grant amendments as needed. CEC staff will engage with CPUC and EDD to coordinate SFA program activities including collecting and reporting program data in accordance with all EPA reporting requirements practices for confidential data such as personally identifiable information (PII). The decision-making authority for data types and collection, for satisfying federal and EPA grant requirements, shall reside with the CPUC as the prime grantee.

Task 8: Alignment with Grant Terms and Conditions and Federal Regulations

CEC will ensure its agreement will adhere to Davis-Bacon Act and Build America, Buy America Act requirements, and all other required federal regulations, as applicable.

Task 9: Other

Other tasks as necessary for administration of the Solar for All POU program. These may include providing input on EPA Environmental Information Quality Policy documents such as the Quality Management Plan (QMP) and Quality Assurance Project Plan (QAPP). Staff will also ensure the coordination of agency policies as related to SFA in accordance with the Memorandum of Understanding (MOU) established between CEC and CPUC. CEC staff will engage in SFA EPA trainings or meetings at their own behest or as requested by CPUC. CEC, CPUC and EDD will co-host annual, public coordination meetings or other stakeholder meetings in adherence with the Workplan (Appendix C).

CEC must notify CPUC when its planning period tasks, noted in Appendix C Workplan, have ended. As the prime grantee, CPUC shall have the sole authority to request from EPA to amend or close the grant planning period.

CEC will develop and implement processes and protocols collecting any funds that are unspent at the end of the grant period. Unspent grant funds must be returned to CPUC in accordance with federal regulations and the grant terms and conditions, and this Interagency agreement.

**3. Location**

Services shall be performed at CEC offices.

**4. Period of Performance**

The term of this agreement will be December 16, 2024 through December 31, 2029. The term of the agreement follows the SFA grant award notice and its terms and conditions; should that agreement be cancelled, that will automatically apply to this performance period. The agreement extends beyond the grant term to allow for possible grant extensions, invoicing, or other required coordinating activities to close out the grant. CEC agrees to accept and adhere to any modifications of the grant terms and conditions as issued by EPA.

Grant implementation tasks may occur through April 30, 2029. Final reporting tasks go beyond the end of the grant period up to 90 days. Should the EPA adjust the SFA grant terms and conditions these dates may adjust, and this agreement will incorporate those changes without amendments.

**5. Contact Information**

The Contract Representatives during the term of this Agreement shall be:

| Public Utilities Commission | Energy Commission |
|---|---|
| Section/Unit: Energy Division | Section/Unit: Reliability, Renewable Energy & Decarbonization Incentives Division |
| Name: Tory Francisco | Name: Geoffrey Dodson |
| Phone: 415-703-2743 | Phone: 279-226-1100 |
| Email: tory.francisco@cpuc.ca.gov | Email: Geoffrey.Dodson@energy.ca.gov |

The Communications Representatives during the term of this Agreement shall be:

| Public Utilities Commission | Energy Commission |
|---|---|
| Section/Unit: External Affairs Division | Section/Unit: Media & Public Communications Office |
| Name: Terrie Prosper | Name: Elaine Kahan |
| Phone: 415-703-2160 | Phone: 916-891-8914 |
| Email: terrie.prosper@cpuc.ca.gov | Email: Elaine.Kahan@energy.ca.gov |

The CEC should notify the CPUC Contract Representative within five (5) working days of a change in CEC Contract Representative.

Table of Award Information:

| | |
|---|---|
| **CEC Unique Entity Identifier (UEI)** | VKM2SF7167N9 |
| **CPUC EPA Federal Award Grant Number** | 84092302 |
| **CPUC EPA Award Date** | 09/06/2024 - 04/30/2029 |
| **EPA Award Catalog of Federal Domestic Assistance (CFDA) Number and Name** | 66.959 - Greenhouse Gas Reduction Fund: Solar for All |
| **Subaward Period of Performance Start and End-Date** | December 16, 2024 to April 30, 2029 |
| **CEC's Approved Indirect Cost Rate and Approval Date** | 15% De Minimis Indirect Rate; Approved by EPA in CPUC Budget on 12/16/24 |

6. Appendices

Appendix A. EPA Grant Award December 16, 2024, with Solar For All (SFA) Terms and
   Conditions (12/3/23)
Appendix B. Solar For All Grant Terms and Conditions (10/2024)
Appendix C. Solar For All Workplan (11/15/24)
Appendix D. Solar For All Budget (11/15/24)
Appendix E. Solar For All Timeline and Milestones (11/15/24)

109

Appendix A

5H - 84092301 - 1    Page 1

| | | |
|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>Assistance Amendment | **GRANT NUMBER (FAIN):** 84092301<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5H | **DATE OF AWARD**<br>12/16/2024 |
| | **TYPE OF ACTION**<br>No Cost Amendment | **MAILING DATE**<br>12/16/2024 |
| | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>90062 |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| California Public Utilities Commission<br>505 Van Ness<br>San Francisco, CA 94102-3214<br>EIN:  94-3031353 | California Public Utilities Commission<br>505 Van Ness<br>San Francisco, CA 94102-3214 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Tory Francisco<br>505 Van Ness<br>San Francisco, CA 94102-3214<br>**Email:** tory.francisco@cpuc.ca.gov<br>**Phone:** 415-703-2743 | Vineet Pandharpurkar<br>1200 Pennsylvania Ave NW, 4410C<br>Washington, DC 20460<br>**Email:**  pandharpurkar.vineet@epa.gov<br>**Phone:** 202-564-5211 | Jennifer Brooks<br>1200 Pennsylvania Ave, NW, 3903R<br>Washington, DC 20460<br>**Email:**  brooks.jennifer@epa.gov<br>**Phone:** 202-564-6374 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

California Solar for All Program

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD**<br>05/01/2024 - 04/30/2029 | **PROJECT PERIOD**<br>05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 249,800,000.00 | **TOTAL PROJECT PERIOD COST**<br>$ 249,800,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,800,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, The Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington , DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** Keva R. Lloyd - Associate Award Official | **DATE**<br>12/16/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 249,400,000 | $ 0 | $ 249,400,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 249,800,000 | $ 0 | $ 249,800,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84092301 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 4,250,000 |
| 2. Fringe Benefits | $ 2,272,050 |
| 3. Travel | $ 48,000 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 2,629,950 |
| 7. Construction | $ 0 |
| 8. Other | $ 239,680,000 |
| 9. Total Direct Charges | $ 248,880,000 |
| 10. Indirect Costs: 10.00 % Base MTDC | $ 920,000 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 249,800,000 |
| 12. Total Approved Assistance Amount | $ 249,800,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 249,800,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A): Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's [Environmental Information Quality Policy](#). Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's [Environmental Information Quality Policy](#). Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well [SFA@epa.gov](#) such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States: Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

## 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

### For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

### Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

# III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

## Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

## Solar For All (SFA) Terms and Conditions (December 3, 2024)

**I. Definitions** ........................................................................................................................... 3

    Air Pollutant ........................................................................................................... 3

    Award Agreement .................................................................................................. 3

    Apprentice.............................................................................................................. 3

    Contracts for Delivery of Financial Assistance ...................................................... 3

    Eligible Recipient ................................................................................................... 3

    Eligible Zero-Emissions Technology ...................................................................... 4

    Environmental Information .................................................................................... 5

    Environmental Information Operations................................................................. 5

    EPA Project Officer ................................................................................................ 5

    EPA Award Official ................................................................................................. 5

    Financial Assistance .............................................................................................. 5

    Freely Associated States ....................................................................................... 5

    Greenhouse Gas..................................................................................................... 6

    Low-Income and Disadvantaged Communities ..................................................... 6

    Materially Impaired ............................................................................................... 7

    Participant Support Costs ...................................................................................... 7

    Period of Closeout................................................................................................. 7

    Period of Performance .......................................................................................... 7

    Post-Closeout Program Income ............................................................................ 8

    Program Administration Activities ........................................................................ 8

    Program Beneficiary.............................................................................................. 8

    Program Income..................................................................................................... 8

    Project-Deployment Technical Assistance ............................................................ 9

    Subaward ............................................................................................................... 9

    Subrecipient .......................................................................................................... 9

    Waste, Fraud, or Abuse......................................................................................... 9

**II. National Programmatic Terms and Conditions** ................................................................ 10

    A. Performance Reporting .................................................................................... 10

    B. Cybersecurity Condition................................................................................... 12

    C. Competency Policy........................................................................................... 14

    D. Public or Media Events .................................................................................... 15

    E. In-Kind Assistance ........................................................................................... 15

    F. Geospatial Data Standards .............................................................................. 15

    G. Leveraging and Fundraising ............................................................................ 15

    H. Quality Assurance ........................................................................................... 16

    I. Real Property.................................................................................................... 17

    J. Program Income .............................................................................................. 18

    K. Use of Logos.................................................................................................... 18

**III. Additional Programmatic Terms and Conditions** ........................................................... 19

    A. Solar for All Workplan...................................................................................... 19

    B. Allowable and Unallowable Activities............................................................... 19

    C. Foreign Entity of Concern ................................................................................ 20

    D. Low-Income and Disadvantaged Communities Expenditure Requirement ....... 20

    E. Revolving Loan Fund Characterization............................................................. 20

F. Subawards to For-Profit Entities ............................................................................................... 20

G. Subawards as Part of Revolving Loan Funds ........................................................................... 21

H. Participant Support Costs ........................................................................................................ 22

I. Contracts for Delivery of Financial Assistance ......................................................................... 22

J. Labor and Equitable Workforce Development Requirements ................................................. 23

K. Build America, Buy America Act............................................................................................... 26

L. Consumer Protection Requirements ....................................................................................... 27

M. Financial Risk Management Requirements ............................................................................. 28

N. Historic Preservation ............................................................................................................... 29

O. Uniform Relocation Assistance and Real Property Acquisition Policies Act ....................... 30

P. Remedies for Non-Compliance ................................................................................................ 30

Q. Clarifications to EPA General Terms and Conditions ............................................................ 31

R. Period of Performance............................................................................................................. 33

S. Closeout Agreement ................................................................................................................. 33

T. Accounting Principles ............................................................................................................... 37

U. Internal Controls....................................................................................................................... 37

V. Audits ........................................................................................................................................ 37

W. EPA Project Officer Oversight and Monitoring....................................................................... 38

X. Compliant URL Links ................................................................................................................ 39

Y. Flow-Down Requirements........................................................................................................ 39

Z. Financial Assistance in the Form of Credit Enhancements .................................................... 39

AA. Additional Requirements for Eligible Nonprofit Recipients ............................................... 40

AB. Amendments to Award Agreement ...................................................................................... 41

AC. Preservation of Guidance and Data...................................................................................... 41

**IV. Administrative Terms and Conditions**.................................................................................... 42

A. General Terms and Conditions ................................................................................................ 42

B. Correspondence Condition ...................................................................................................... 42

C. Intergovernmental Review Period .......................................................................................... 42

D. Pre-Award Costs ....................................................................................................................... 43

E. New Recipient Training Requirement ...................................................................................... 43

2

## I. Definitions

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

   a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;
   b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"
   c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);
   d. Being funded by public or charitable contributions; and
   e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

**Freely Associated States:** Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.3 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing

Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity. Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the

date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided

8

under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. National Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

**1. Progress Reports**

*Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

*Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

### 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

### B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to

contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

**C. Competency Policy**
In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

14

**D. Public or Media Events**

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

**E. In-Kind Assistance**

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

**F. Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**G. Leveraging and Fundraising**

**1. Leveraging**

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

**2. Fundraising**

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

**H. Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

**1. Quality Management Plan (QMP)**

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**
• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.
• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.
• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

**I. Real Property**
In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

**Disposition**
If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

**Recordation**

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

**K. Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must not be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

### III. Additional Programmatic Terms and Conditions

**A. Solar for All Workplan**
**1. EPA-approved Solar for All Workplan**
The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

**2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period**
The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

**B. Allowable and Unallowable Activities**
The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

**C. Foreign Entity of Concern**
As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

**D. Low-Income and Disadvantaged Communities Expenditure Requirement**
The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

**E. Revolving Loan Fund Characterization**
EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

**F. Subawards to For-Profit Entities**
The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;
2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

**G. Subawards as Part of Revolving Loan Funds**

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

21

**H. Participant Support Costs**

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

> A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

> B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

**I. Contracts for Delivery of Financial Assistance**
**2 CFR 200 Procurement Standards**
The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;

- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

**J. Labor and Equitable Workforce Development Requirements**

**1. Davis-Bacon and Related Acts (DBRA)**
**A.   Program Applicability**
As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B.  Davis-Bacon and Related Acts
Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C.  Recipient Responsibilities When Entering Into and Managing Contracts:

    a.  **Solicitation and Contract Requirements:**
        i.  **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
        ii.  **Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
    b.  **After Award of Contract:**

      i. **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

      ii. **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

D. **Recipient Responsibilities When Establishing and Managing Additional Subawards:**

    a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

    b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

    c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

E. **Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

    "[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

    a. **Solicitation and Contract Requirements:**
      i. **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

      ii. **Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

    b. **After Award of Contract:**
      i. **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

      ii. **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F.   DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

**1. Compliance with Federal Statutes and Regulations**
The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

**2. Free and Fair Choice to Join a Union**
In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

**K. Build America, Buy America Act**
The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

26

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;
2. Privately-owned commercial buildings when they meet the "public function" test;
3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Single family homes;
2. Privately-owned, non-mixed-use, multi-family housing properties;
3. Privately-owned residential portions of mixed-use properties;
4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);
2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;
3. Federal Housing Administration Insured Multifamily Mortgages;
4. HUD Section 8 Funding;
5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

**L. Consumer Protection Requirements**

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;
2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;
3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;
4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and
5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

**M. Financial Risk Management Requirements**

**1. Cash Management Requirements**
The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

## 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

**Archeological and Historic Preservation Act (AHPA)**
This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

**O. Uniform Relocation Assistance and Real Property Acquisition Policies Act**
The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

**P. Remedies for Non-Compliance**
The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

**Q. Clarifications to EPA General Terms and Conditions**
EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

**1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

**2. Establishing and Managing Subawards**
2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e.,

31

governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

**R. Period of Performance**
The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must **"**notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance.**"**

**S. Closeout Agreement**
As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

### 1. Allowable Activities
The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements
After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements
The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and

benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

### 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

### 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

### 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

**8. Record-Keeping**

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

**9. Other Federal Requirements**

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

**10. Amendments to the Closeout Agreement**

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

**11. Audit Requirements**

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify

36

the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

**12. Termination of the Closeout Agreement**

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

**13. Points of Contact**

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

**T. Accounting Principles**

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

**U. Internal Controls**

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

**V. Audits**

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

**W. EPA Project Officer Oversight and Monitoring**
Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.
2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;
3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;
4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;
5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;
6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;
7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;
8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial

Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9.  Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

### X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

### Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

### Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity

providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

**AA. Additional Requirements for Eligible Nonprofit Recipients**

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

**1. Incorporation and Control**
The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

**2. Governance Requirements**

**A. Board Size and Composition**
The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

**B. Board Independence**
The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

**C. Board Policies and Procedures**

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel
The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

### AB. Amendments to Award Agreement
The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

### AC. Preservation of Guidance and Data
Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

## IV. Administrative Terms and Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order

12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

**D. Pre-Award Costs**

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

**E. New Recipient Training Requirement**

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

Appendix B

Environmental Protection Agency

# General Terms and Conditions

*Effective October 1, 2024*

**Revision History:**

The Environmental Protection Agency's General Terms and Conditions ***are published and become effective October 1st at the start of the federal fiscal year.*** Any additions, revisions, or changes to the terms and conditions after October 1 will be summarized below.

| T&C Number | Effective Date | Description of Changes |
|---|---|---|
| #41 | 4/26/2025 | Added a new T&C on the procurement of synthetic nucleic acids and benchtop nucleic acid synthesis equipment. |
| #18 | 11/26/2024 | Added language on the de minimis rate for grants amended to incorporate the October 2024 Revisions to 2 CFR Part 200. |
| | | |

**Table of Contents**

Preface ...................................................................................................................................................2

Financial Information ............................................................................................................................3

Selected Items of Cost .........................................................................................................................5

Reporting and Additional Post-Award Requirements......................................................................11

Programmatic General Terms and Conditions.................................................................................26

Public Policy Requirements................................................................................................................35

**Preface**

1. **Introduction**
   (a) These terms and conditions are in addition to the assurances and certifications made as part of the award and terms, conditions, and restrictions reflected on the official assistance award document. Recipients **must** review their official award document for additional administrative and programmatic requirements. Failure to comply with the general terms and conditions outlined below and those directly reflected on the official assistance award document may result in enforcement actions as outlined in 2 CFR 200.339 and 2 CFR 200.340.
   (b) If the EPA General Terms and Conditions have been revised, EPA will update the terms and conditions when it provides additional funding (incremental or supplemental) prior to the end of the period of performance of this agreement. The recipient must comply with the revised terms and conditions after the effective date of the EPA action that leads to the revision. Revised terms and conditions do not apply to the recipient's expenditures of EPA funds or activities the recipient carries out prior to the effective date of the EPA action. EPA will inform the recipient of revised terms and conditions in the action adding additional funds.

2. **Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards**
   This award is subject to the requirements of the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 and 2 CFR Part 1500. 2 CFR 1500.2, Adoption of 2 CFR Part 200, states the EPA adopts the Office of Management and Budget (OMB) guidance Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards to Non-Federal Entities (subparts A through F of 2 CFR Part 200), as supplemented by 2 CFR Part 1500, as the EPA policies and procedures for financial assistance administration. 2 CFR Part 1500 satisfies the requirements of 2 CFR 200.110(a) and gives regulatory effect to the OMB guidance as supplemented by 2 CFR Part 1500. This award is also subject to applicable requirements contained in EPA programmatic regulations located in 40 CFR Chapter 1 Subchapter B.

3. **Termination**
   Consistent with 2 CFR 200.340, EPA may terminate this award in part or its entirety:
   (a) If a recipient or subrecipient fails to comply with the terms and conditions of the award, including statutory or regulatory requirements;
   (b) With the consent of the recipient when both the recipient and the EPA agree upon the termination conditions, which include the effective date and, in the case of partial termination, the portion to be terminated;

(c) If a recipient sends the EPA a written notification of the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated; however, if the EPA determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the EPA may terminate the award in its entirety; or

(d) Pursuant to the programmatic terms and conditions specified in the Federal award.

**Financial Information**

4. **Reimbursement Limitation**
EPA's financial obligations to the recipient are limited by the amount of federal funding awarded to date as reflected on the award document. If the recipient incurs costs in anticipation of receiving additional funds from EPA, it does so at its own risk. See 2 CFR 1500.9.

5. **Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**
**Electronic Payments.** Recipients must be enrolled or enroll in the Automated Standard Application for Payments (ASAP) system to receive payments under EPA financial assistance agreements unless:
   - EPA grants a recipient-specific exception;
   - The assistance program has received a waiver from this requirement;
   - The recipient is exempt from this requirement under 31 CFR 208.4; or,
   - The recipient is a fellowship recipient pursuant to 40 CFR Part 46.

EPA will not make payments to recipients until the ASAP enrollment is completed or if recipients fall under one of the above categories. EPA's Research Triangle Park Finance Center (RTPFC) will initiate the ASAP enrollment based on the key contact information on the grant application. The "payee" on the key contacts form will receive an email from ASAP indicating the steps required for completing the enrollment. Recipients may request exceptions using the procedures below.

Under this payment mechanism, the recipient initiates an electronic payment request online via ASAP, which is approved or rejected based on the amount of available funds authorized by EPA in the recipient's ASAP account. Approved payments are credited to the account at the financial institution of the recipient organization set up by the recipient during the ASAP enrollment process.

Additional information concerning ASAP and enrollment can be obtained by contacting the EPA RTPFC, at rtpfc-grants@epa.gov, or by visiting: https://www.fiscal.treasury.gov/asap/.

EPA will grant exceptions to the ASAP enrollment requirement only in situations in which the recipient demonstrates to EPA that receiving payment via ASAP places an undue administrative or financial management burden on the recipient or EPA determines that granting the waiver is in the public interest. Recipients may request an exception to the requirement by following the procedures specified in RAIN-2018-G06-R.

**Proper Payment Drawdown (for recipients other than states)**

**(a)** As required by 2 CFR 200.305(b), the recipient must draw funds from ASAP only for the minimum amounts needed for actual and immediate cash requirements to pay employees, contractors, subrecipients or to satisfy other obligations for allowable costs under this assistance agreement. The timing and amounts of the drawdowns must be as close as administratively feasible to actual disbursements of EPA funds. Disbursement within 5 business days of drawdown will comply with this requirement and the recipient agrees to meet this standard when performing this award.

**(b)** Recipients may not retain more than 5% of the amount drawn down, or $1,000 whichever is less, 5 business days after drawdown to materially comply with the standard. Any EPA funds subject to this paragraph that remain undisbursed after 5 business days must be fully disbursed within 15 business days of draw down or be returned to EPA.

**(c)** If the recipient draws down EPA funds in excess of that allowed by paragraph b., the recipient must contact rtpfc-grants@epa.gov for instructions on whether to return the funds to EPA. The recipient  must comply with the requirements at 2 CFR 200.305(b)(11)  regarding depositing advances of Federal funds in interest bearing accounts.

**(d)** Returning Funds: Pay.gov is the preferred mechanism to return funds. It is free, secure, paperless, expedient, and does not require the recipient//vendor to create an account. Contact RTPFC-Grants at rtpfc-grants@epa.gov to obtain complete instructions. Additional information is available at the Pay.gov website. Information on how to repay EPA via check is available at https://www.epa.gov/financial/makepayment. Instructions on how to return funds to EPA electronically via ASAP are available at https://www.fiscal.treasury.gov/asap/.

**(e)** Failure on the part of the recipient to materially comply with this condition may, in addition to EPA recovery of the un-disbursed portions of the drawn down funds, lead to changing the payment method from advance payment to a reimbursable basis. EPA may also take other remedies for noncompliance under 2 CFR 200.208 and/or 2 CFR 200.339.

**(f)** If the recipient believes that there are extraordinary circumstances that prevent it from complying with the 5-business day disbursement requirement throughout the performance period of this agreement, recipients  may request an exception to the requirement by following the procedures specified in RAIN-2018-G06-R. EPA will grant exceptions to the 5-business day disbursement requirement only if the recipient demonstrates that compliance places an undue administrative or financial management burden or EPA determines that granting the exception is in the public interest. EPA will grant exceptions to the 5-business day disbursement requirement only if the recipient demonstrates that compliance places an undue administrative or financial management burden or EPA determines that granting the exception is in the public interest.

**Proper Payment Drawdown for State Recipients**

In accordance with 2 CFR 200.305(a), payments are governed by Treasury-State Cash Management Improvement Act (CMIA) agreements and default procedures codified at 31 CFR Part 205, Subparts A and B and Treasury Financial Manual (TFM) 4A-2000, "Overall Disbursing Rules for All Federal Agencies" unless a program specific regulation (e.g. 40 CFR 35.3160 or 40 CFR 35.3560) provides otherwise. Pursuant to 31 CFR Part 205, Subpart A—*Rules Applicable to Federal Assistance Programs*

*Included in a Treasury-State Agreement,* States follow their Treasury-State CMIA Agreement for major Federal programs listed in the agreement. For those programs not listed as major in the Treasury-State agreement, the State follows the default procedures in 31 CFR Part 205, Subpart B— Rules Applicable to Federal Assistance Programs Not Included in a Treasury-State Agreement, which directs State recipients to draw-down and disburse Federal financial assistance funds in anticipation of immediate cash needs of the State for work under the award. States must comply with 2 CFR 200.302(a) in reconciling costs incurred and charged to EPA financial assistance agreements at time of close out unless a program specific regulation provides otherwise.

## Selected Items of Cost

6. **Prohibition on Certain Telecommunications and Video Surveillance Service Equipment or Services**
   Prohibition on covered telecommunications and video surveillance services or equipment is effective on all obligations and expenditures of EPA financial assistance funding as of August 13, 2020, including awards made before that date.

   As required by 2 CFR 200.216, EPA recipients and subrecipients, including borrowers under EPA-funded revolving loan fund programs, are prohibited from obligating or expending Federal loan or grant funds to procure or obtain covered telecommunications equipment or services; extend or renew a contract to procure or obtain covered telecommunications equipment or services; or enter into a contract (or extend or renew a contract) to procure or obtain covered telecommunications equipment or services. As described in section 889 of Public Law 115-232, "covered telecommunications equipment or services" means any of the following:
   1. Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities);
   2. For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities);
   3. Telecommunications or video surveillance services provided by such entities or using such equipment;
   4. Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

   Pursuant to 2 CFR 200.216(c), "covered telecommunications equipment or services" also include systems that use covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. Consistent with 2 CFR 200.471, costs incurred for telecommunications and video surveillance services or equipment such

as phones, internet, video surveillance, and cloud servers are allowable except for the following circumstances:

(a) Obligating or expending EPA funds for covered telecommunications and video surveillance services or equipment or services as described in 2 CFR 200.216 to:

    (1) Procure or obtain, extend or renew a contract to procure or obtain;

    (2) Enter into a contract (or extend or renew a contract) to procure; or

    (3) Obtain the equipment, services, or systems.

Certain prohibited equipment, systems, or services, including equipment, systems, or services produced or provided by entities identified in section 889 of Public Law 115-232, are recorded in the System for Award Management exclusion list.

## 7. Consultant Cap

EPA participation in the salary rate (excluding overhead) paid to individual consultants retained by recipients or by a recipient's contractors or subcontractors shall be limited to the maximum daily rate for a Level IV of the Executive Schedule, available at: https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/, to be adjusted annually. This limit applies to consultation services of designated individuals with specialized skills who are paid at a daily or hourly rate. This rate does not include transportation and subsistence costs for travel performed (the recipient will pay these in accordance with their normal travel reimbursement practices).

Information on how to calculate the maximum daily rate and the daily pay limitation is available at the Office Of Personnel Management's Fact Sheet: How to Compute Rates of Pay and Fact Sheet: Expert and Consultant Pay. Specifically, to determine the maximum daily rate, follow these steps:

    (1) Divide the Level IV salary by 2087 to determine the hourly rate. Rates must be rounded to the nearest cent, counting one-half cent and over as the next higher cent (e.g., round $18.845 to $18.85).

    (2) Multiply the hourly rate by 8 hours. The product is the maximum daily rate.

Contracts and subcontracts with firms for services that are awarded using the procurement requirements in Subpart D of 2 CFR Part 200 are not affected by this limitation unless the terms of the contract provide the recipient with responsibility for the selection, direction and control of the individuals who will be providing services under the contract at an hourly or daily rate of compensation. See 2 CFR 1500.10.

## 8. Establishing and Managing Subawards

If the recipient chooses to pass funds from this assistance agreement to other entities, the recipient must comply with applicable subaward provisions of 2 CFR Part 200 and the EPA Subaward Policy.

As a pass-through entity, the recipient agrees to:

    1. Select subrecipients and conduct subaward competitions, as appropriate, using a

system that properly differentiates between subrecipients and procurement contractors consistent with the differentiating characteristics explained in 2 CFR 200.331 and EPA's supplemental guidance in Appendix A of the EPA Subaward Policy.

2. Verify that the potential subrecipient is not excluded or disqualified in accordance with the verification methods provided in 2 CFR 180.300, such as confirming in SAM.gov that a potential subrecipient is not suspended, debarred, or otherwise excluded from receiving Federal funds.

3. Establish and follow a system that ensures all subaward agreements are in writing and contain all of the elements required by 2 CFR 200.332(b). EPA has developed a template for subaward agreements that is available in Appendix D of the EPA Subaward Policy.

4. Prior to making subawards, ensure that each subrecipient has a "Unique Entity Identifier" (UEI). The UEI is required by 2 CFR Part 25 and 2 CFR 200.332(b). Subrecipients are not required to complete full System for Award Management (SAM.gov) registration to obtain a UEI. Information regarding obtaining a UEI is available at the System for Award Management (SAM.gov) Internet site: http://www.sam.gov/SAM/and in the General Condition of the pass-through entity's agreement with EPA entitled **"System for Award Management and Universal Identifier Requirements"** T&C of the pass-through entity's agreement with the EPA.

5. Ensure that subrecipients are aware of the requirements that apply to the subaward, including those that flow down from the recipient, as required by 2 CFR 200.332(b) and monitor the activities of the subrecipient to ensure compliance with these requirements per 2 CFR 200.332(e). These requirements include, among others:

   a. Title VI of the Civil Rights Act and other Federal statutes and regulations prohibiting discrimination in Federal financial assistance programs, as applicable, including provisions protecting free speech, religious liberty, public welfare, and the environment per 2 CFR 200.300(a), as well as regulations, including 2 CFR 200.300(b) prohibiting discrimination based on sex, sexual orientation, or gender identity.

   b. Reporting Subawards and Executive Compensation under Federal Funding Accountability and Transparency Act (FFATA) set forth in the General Condition pass-through entity's agreement with EPA entitled **"Reporting Subawards and Executive Compensation."**

   c. Limitations on individual consultant fees as set forth in 2 CFR 1500.10 and the General Condition of the pass-through entity's agreement with EPA entitled **"Consultant Fee Cap."**

   d. EPA's prohibition on paying management fees as set forth in General Condition of the pass-through entity's agreement with EPA entitled "**Management Fees**."

   e. The Procurement Standards in 2 CFR Part 200 including those requiring competition when the subrecipient acquires goods and services from

contractors (including consultants) and Domestic preferences for procurements at 2 CFR 200.322.

f. Other statutes, regulations and Executive Orders that may apply to subawards are described at Information on Requirements that Pass-Through Entities must "Flow Down" to Subrecipients. Many Federal requirements are agreement- or program-specific, and EPA encourages pass-through entities to review the terms of their assistance agreement carefully and consult with their EPA Project Officer for advice if necessary.

6. Establish and follow a system for evaluating subrecipient fraud risk and risk of noncompliance with a subaward to determine the appropriate monitoring described at 2 CFR 200.332(c) and consider whether, based on the evaluation of risk, additional monitoring tools may be useful as described in 2 CFR 200.332(f). When evaluating a subrecipient's risk, a pass-through entity should consider:

a. The subrecipient's prior experience with same or similar subawards;

b. Results of previous audits, including considering whether the subrecipient receives a Single Audit, in accordance with 2 CFR Part 200, Subpart F and the extent to which the same or similar subawards have been audited as a major program;

c. Whether the subrecipient has new personnel or new or substantially change systems, and

d. The extent and results of any Federal agency monitoring (for example, if the subrecipient also receives Federal awards directly from the Federal agency).

7. Establish and follow a process for deciding whether to implement specific conditions in subawards based on risk factors, as described in 2 CFR 200.208, and notify EPA of the specific conditions as required by 2 CFR 200.332(d). Examples of specific conditions, per 2 CFR 200.208, may include:

a. Requiring payments as reimbursements rather than advance payments;

b. Withholding authority to proceed to the next phase until receipt of evidence of acceptable performance;

c. Requiring additional or more detailed financial reports;

d. Requiring additional or project monitoring;

e. Requiring the recipient or subrecipient to obtain technical or management assistance; or

f. Establishing additional prior approvals.

8. Establish and follow a system for monitoring subrecipient performance that includes the elements required at 2 CFR 200.332(e), such as reviewing financial and performance reports, and report the results of the monitoring in performance reports as provided in the reporting terms and conditions of this agreement.

9. Ensure that a subrecipient provides a plan for and takes corrective action on all significant developments that negatively affect the subaward. Per 2 CFR 200.332(e)(2), significant developments include Single Audit findings related to the subaward, other audit findings, site visits, and written notifications from a subrecipient of adverse conditions that will impact their ability to meet the

milestones or objectives of the subaward.

10. Establish and maintain an accounting system which ensures compliance with the $50,000 limitation at 2 CFR 200.1, *Modified Total Direct Costs*, if applicable, on including subaward costs in *Modified Total Direct Costs* for the purposes of distributing indirect costs. Recipients with Federally approved indirect cost rates that use a different basis for distributing indirect costs to subawards must comply with their Indirect Cost Rate Agreement.

11. Work with EPA's Project Officer to obtain the written consent of EPA's Office of International and Tribal Affairs (OITA) prior to awarding a subaward to a foreign or international organization or a subaward to be performed in a foreign country, even if that subaward is described in a proposed scope of work.

12. Obtain prior written approval from the EPA's Award Official for any subawards or subaward activities that are not described in the approved work plan in accordance with 2 CFR 200.308. As provided in 2 CFR 200.308(f)(6), recipients must obtain prior approval to change a named subrecipient from the EPA Award Official if the pass-through entity described the original subrecipient's qualifications and/or performance history in the competitive application. Recipients must contact their Project Officer to begin the prior approval process.

13. Obtain prior written approval from the EPA's Award Official before awarding a subaward to an individual if the EPA-approved scope of work does not include a description of subawards to individuals.

14. Establish and follow written procedures under 2 CFR 200.302(b)(7) for determining that subaward costs are allowable in accordance with 2 CFR Part 200, Subpart E and the terms and conditions of this award. These procedures may provide for allowability determinations on a pre-award basis, through ongoing monitoring of costs that subrecipients incur, or a combination of both approaches provided the pass-through entity documents its determinations.

15. Verify that the subrecipient is audited, as applicable, per 2 CFR part 200, Subpart F, and establish and maintain a system under 2 CFR 200.332(g) and 2 CFR 200.521 for issuing management decisions for audits of subrecipients that relate to the Federal award from the recipient. The recipient remains accountable to EPA for ensuring that unallowable subaward costs initially paid by EPA are either reimbursed or offset with allowable costs, regardless of whether the recipient recovers those costs from the subrecipient.

16. As provided in 2 CFR 200.333, pass-through entities must obtain EPA approval to make fixed amount subawards. Recipients should consult with their EPA Project Officer regarding how to obtain EPA approval.

By accepting this award, the recipient is certifying that it either has systems in place to comply

with the requirements described in Items 1 through 16 above or will refrain from making subawards until the systems are designed and implemented.

**Subawards to Federal Agencies – Clarity on Applicable EPA Terms and Conditions:** If the subrecipient is a Federal agency, the only provisions of the EPA General Terms and Conditions implementing 2 CFR Part 200 on subawards that apply are: (1) the requirement for the Federal agency to obtain a Unique Entity Identifier (UEI) in accordance with 2 CFR Part 25 as described in Item 4 above and (2) the requirement for the recipient to report on first-tier subawards as described in EPA General Term and Condition 15.1, "Reporting of first tier subawards."

As provided within 2 CFR 200.101(a)(2), all other provisions of 2 CFR Part 200, Subparts A through E, do not apply to subawards with federal agencies. Transactions between the recipient and the Federal agency subrecipient will be governed by the Federal agency subrecipient's cost reimbursement agreement with the recipient.

9. **Management Fees**
Management Fees or similar charges in excess of the direct costs and approved indirect rates are not allowable. The term "management fees or similar charges" refers to expenses added to the direct costs in order to accumulate and reserve funds for ongoing business expenses; unforeseen liabilities; or for other similar costs which are not allowable under this assistance agreement. Management fees or similar charges may not be used to improve or expand the project funded under this agreement, except to the extent authorized as a direct cost of carrying out the scope of work.

10. **Federal Employee Costs**
The recipient understands that none of the funds for this project (including funds contributed by the recipient as cost sharing) may be used to pay for the travel of Federal employees or for other costs associated with Federal participation in this project unless a Federal agency will be providing services to the recipient as authorized by a Federal statute.

11. **Foreign Travel**
**EPA policy requires that all foreign travel must be approved by its Office of International and Tribal Affairs.** The recipient agrees to obtain prior EPA approval before using funds available under this agreement for international travel unless the trip(s) are already described in the EPA approved budget for this agreement. Foreign travel includes trips to Mexico and Canada but does not include trips to Puerto Rico, the U.S. Territories or possessions. Recipients that request post-award approval to travel frequently to Mexico and Canada by motor vehicle (e.g., for sampling or meetings) may describe their proposed travel in general terms in their request for EPA approval. Requests for prior approval must be submitted to the Project Officer for this agreement.

12. **The Fly America Act and Foreign Travel**

The recipient understands that all foreign travel **funded under this assistance agreement** must comply with the Fly America Act. All travel must be on U.S. air carriers certified under 49 U.S.C. Section 40118, to the extent that service by such carriers is available even if foreign air carrier costs are less than the American air carrier.

**13. Union Organizing**

Grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

**Reporting and Additional Post-Award Requirements**

**14. System for Award Management and Universal Identifier Requirements**

14.1     **Requirement for System for Award Management (SAM)** Unless exempted from this requirement under 2 CFR 25.110, the recipient must maintain current and active registrationSAM.gov. The recipient's registration must always be current and active until it submits all final reports required under this Federal award or receive the final payment, whichever is later. The recipient must review and update its information in SAM.gov at least annually from the date of its initial registration or any subsequent updates to ensure it is current, accurate, and complete. If applicable, this includes identifying the recipient's immediate and highest-level owner and subsidiaries and providing information about the recipient's predecessors that have received a Federal award or contract within the last three years.

14.2     **Requirement for Unique Entity Identifier (UEI).** If the recipient is authorized to make subawards under this award, the recipient:

a.   Must notify potential subrecipients that no entity may receive a subaward unless the entity has provided its UEI to the recipient.

b.   Must not make a subaward to an entity unless the entity has provided its UEI. Subrecipients are not required to complete full registration in SAM.gov to obtain a UEI.

14.3     **Definitions.** For the Purpose of this award term:

a.   **System for Award Management (SAM.gov)** means the Federal repository into which an entity must provide the information required for the conduct of business as a recipient. Additional information about registration procedures may be found in SAM.gov (currently at: https://www.sam.gov).

b.   **Unique Entity Identifier** means the universal identifier assigned by SAM.gov to uniquely identify an entity.

c.   **Entity** is defined at 2 CFR 25.400 and includes all of the following types as defined in 2 CFR 200.1:

1)  Non-federal entity,

2)  Foreign organization;

3)  Foreign public entity;

    **4)**  Domestic for-profit organization; and
    **5)**  Federal agency.
  **d.**  **Subaward** has the meaning given in 2 CFR 200.1
  **e.**  **Subrecipient** has the meaning given in 2 CFR 200.1

## 15. Reporting Subawards and Executive Compensation

  **15.1**    **Reporting of first tier subawards.**

    **a.**  **Applicability**. Unless the recipient is exempt as provided in paragraph 15.4. of this award term, the recipient must report each action that obligates $30,000 or more in Federal funds for a subaward to an entity or Federal agency. The recipient must also report a subaward if a modification increases the Federal funding to an amount that equals or exceeds $30,000.

    **b.**  **Reporting Requirements.** (1) The entity or Federal agency must report each subaward described in paragraph 15.1.a of this award term to the Federal Funding Accountability and Transparency Act Subaward Reporting System (FSRS) at https://www.fsrs.gov. (2) For subaward information, report no later than the end of the month following the month in which the subaward was made. (For example, if the subaward was made on any date during the month of November of a given year, the obligation must be reported by no later than December 31 of that year.)

  **15.2**    **Reporting Total Compensation of Recipient Executives.**

    **a.**  **Applicability.** The recipient must report the total compensation for each of its five most highly compensated executives for the preceding completed fiscal year, if:

    **15.2.a.1.**  The total Federal funding authorized to date under this award is $30,000 or more;

    **15.2.a.2.**  In the preceding fiscal year, the recipient received: (i.) 80 percent or more of their annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards (and subawards) subject to the Transparency Act); (ii.) and $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards (and subawards) subject to the Transparency Act; and

    **15.2.a.3.**  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receiving this subaward. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at: http:// www.sec.gov/answers/execomp.htm.)

    **b.**  **Reporting Requirements.** The recipient must report executive total compensation described in paragraph 15.2.a of this award term: (i.) As part of the recipient's registration profile at https://www.sam.gov/SAM/ (ii.) No later than the end of the month following the month in which this award is made, and annually thereafter

(For example if this award was made on any date of November in a given year, the executive total compensation must be reported by no later than December 31 of that year.)

**15.3    Reporting Total Compensation of Subrecipient Executives.**

    **a.    Applicability**. Unless a first-tier subrecipient is exempt as provided in paragraph 15.4. of this award term, the recipient must report the executive total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

    **15.3.a.1.**  The total federal funding authorized to date under the subaward equals or exceeds $30,000; and

    **15.3.a.2.** In the subrecipient's preceding fiscal year, the subrecipient received: (i.) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal awards subject to the Transparency Act; and (ii.) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal awards (and subawards) subject to the Transparency Act; and

    **15.3.a.3.**  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receiving this subaward. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at: http:// www.sec.gov/answers/execomp.htm.)

    **b.    Reporting Requirements.** Subrecipients must report their executive total compensation described in paragraph 15.3.a. of this award term to the recipient. The recipient is required to submit this information to FSRS at http:///www.fsrs.gov no later than the end of the month following the month in which the subaward was made. (For example, if a subaward was made on any date during the month of October of a given year, the subaward must be reported no later than November 30 of that year).

**15.4    Exemptions**

    **a.**    If, in the previous tax year, the recipient had gross income, from all sources, under $300,000, the recipient is exempt from the requirements to report:

    **15.4.a.1.** (i) subawards, and (ii) the total compensation of the five most highly compensated executives of any subrecipient.

**15.5    Definitions.** For purposes of this award term:

    **a.    Entity:** includes:

    (1) whether for profit or nonprofit: (i) A corporation; (ii) An association; (iii) A partnership; (iv) A limited liability company; (v) A limited liability partnership; (vi) A sole proprietorship; (vii) Any other legal business entity; (viii) Another grantee or contractor that is not excluded by subparagraph (2); and (ix) Any State or locality.

(2) It does not include: (i) An individual recipient of Federal financial assistance; or (ii) A Federal employee.

    **b.** **Executive** means an officer, managing partner, or any other employee holding a management position.

    **c.** **Subaward:** has the meaning given in 2 CFR 200.1

    **d.** **Subrecipient** has the meaning given in 2 CFR 200.1.

    **e.** **Total compensation** means the cash and noncash dollar value an executive earns during the recipient's or subrecipient's preceding fiscal year. This includes all items of compensation as prescribed in 17 CFR 229.402(c)(2)).

**16. Recipient Integrity and Performance Matters – Reporting of Matters Related to Recipient Integrity and Performance**

    **16.1**     **General Reporting Requirement**

        If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to SAM.gov that is made available in the designated integrity and performance system (currently the responsibility/qualification information) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

    **16.2**     **Proceedings About Which You Must Report**

        Submit the information required about each proceeding that:

    **a.** Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

    **b.** Reached its final disposition during the most recent five-year period; and

    **c.** Is one of the following:

        **16.2.c.1.** A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

        **16.2.c.2.** A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

        **16.2.c.3.** An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

        **16.2.c.4.** Any other criminal, civil, or administrative proceeding if:

**16.2.c.4.1.** It could have led to an outcome described in paragraph 16.2.c.1, 16.2.c.2, or 16.2.c.3 of this award term and condition;

**16.2.c.4.2.** It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

**16.2.c.4.3.** The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

**16.3    Reporting Procedures**

Enter in SAM.gov Entity Management area the information that SAM.gov requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM.gov because you were required to do so under Federal procurement contracts that you were awarded.

**16.4    Reporting Frequency**

During any period of time when you are subject to the requirement in paragraph 16.1 of this award term and condition, you must report proceedings information through SAM.gov for the most recent five-year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

**16.5    Definitions**

For purposes of this award term and condition:

**a.** Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (*e.g.,* Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

**b.** Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

**c.** Total value of currently active grants, cooperative agreements, and procurement contracts includes –

**16.5.c.1.** Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

**16.5.c.2.** The value of all expected funding increments under a Federal award and options, even if not yet exercised.

**17. Federal Financial Reporting (FFR)**

Pursuant to 2 CFR 200.328 and 2 CFR 200.344, EPA recipients must submit the Federal Financial Report (SF-425) at least annually and no more frequently than quarterly. EPA's standard reporting frequency is annual unless an EPA Region has included an additional term and condition specifying greater reporting frequency within this award document in accordance with 2 CFR 200.208. EPA recipients must submit the SF-425 no later than 30 calendar days after the conclusion of each specified reporting period for quarterly and semi-annual reports and 90 calendar days for annual reports. Final reports are due no later than 120 calendar days after the conclusion of the period of performance of the award. Extension of reporting due dates may be approved by EPA when requested and justified by the recipient. The FFR form is available on the internet at: https://www.epa.gov/grants/sf-425-federal-financial-report. All FFRs must be submitted to the Research Triangle Park Finance Center (RTPFC) via email at rtpfc- grants@epa.gov or mail it to:

US Environmental Protection Agency
RTP-Finance Center (Mail Code AA216-01)
4930 Page Rd.
Durham, NC 27703

The RTPFC will make adjustments as necessary, to obligated funds after reviewing and accepting a final Federal Financial Report. Recipients will be notified and instructed by EPA if they must complete any additional forms for the closeout of the assistance agreement.

**18. Indirect Cost Rate Agreements**

This term and condition provides requirements for recipients using EPA funds for indirect costs and applies to all EPA assistance agreements unless there are statutory or regulatory limits on IDCs. See also EPA's Indirect Cost Policy for Recipients of EPA Assistance Agreements (IDC Policy).

In order for the assistance agreement recipient to use EPA funding for indirect costs, the IDC category of the recipient's assistance agreement award budget must include an amount for IDCs and at least one of the following must apply:

- With the exception of "exempt" agencies and Institutions of Higher Education as noted below, all recipients must have one of the following current (not expired) IDC rates, including IDC rates that have been extended by the cognizant agency:
  - Provisional
  - Final
  - Fixed rate with carry-forward
  - Predetermined

- – Grants awarded before October 1, 2024 - 10% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f)
- – Grants awarded on or after October 1, 2024 – up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f)
- – Grants amended to incorporate the October 2024 Revisions to 2 CFR 200 – up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f), effective as of the date of the amendment and going forward, cannot be applied retroactively
- – EPA-approved use of an expired fixed rate with carry-forward on an exception basis, as detailed in section 6.4.a. of the IDC Policy
- • "Exempt" state of local governmental departments or agencies are agencies that receive up to and including $35,000,000 in Federal funding per the department or agency's fiscal year and must have an IDC rate proposal developed in accordance with 2 CFR Part 200, Appendix VII, with documentation maintained and available for audit.
- • Institutions of Higher Education must use the IDC rate(s) on the approved rate agreement in place at the time of award during the life of the assistance agreement (unless the rate was provisional at time of award, in which case the rate will change once it becomes final). As provided by 2 CFR Part 200, Appendix III(C)(7), the term "life of the assistance agreement", means each competitive segment of the project. If negotiated rate agreements do not extend through the life of the Federal award at the time of the initial award, then the negotiated rate for the last year of the Federal award must be extended through the end of the award. Additional information is available in the regulation.

IDCs incurred during any period of the assistance agreement that are not covered by the provisions above are not allowable costs and must not be drawn down by the recipient. Recipients may budget for IDCs if they have submitted a proposed IDC rate to their cognizant Federal agency, or requested an exception from EPA under subsection 6.4 of the IDC Policy. However, recipients may not draw down IDCs until their rate is approved, if applicable, or EPA grants an exception. IDC drawdowns must comply with the indirect rate corresponding to the period during which the costs were incurred.  If the recipient's indirect cost rate has not been finalized within one year after the period of performance ends, the EPA Grants Management Officer is authorized to close the recipient's award using their most recently negotiated rate per 2 CFR 200.344(h).

This term and condition does not govern indirect rates for subrecipients or recipient procurement contractors under EPA assistance agreements. Pass-through entities are required to comply with 2 CFR 200.332(b)(4)(i) and (ii) when establishing indirect cost rates for subawards.

## 19. Audit Requirements

In accordance with 2 CFR 200.501(a), the recipient hereby agrees to obtain a single audit from an independent auditor, if their organization expends $1,000,000 or more in total Federal funds in their fiscal year for that year.

The recipient must submit a single audit report within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor. The single audit report MUST be submitted using the Federal Audit Clearinghouse available at: https://fac.gov/.

For complete information on how to accomplish the single audit submissions, the recipient will need to visit the Federal Audit Clearinghouse Web site: https://fac.gov/

**20. Closeout Requirements**

Reports required for closeout of the assistance agreement must be submitted in accordance with this agreement. Submission requirements and frequently asked questions can also be found at: https://www.epa.gov/grants/frequent-questions-about-closeouts

**21. Suspension and Debarment**

Recipient shall fully comply with Subpart C of 2 C.F.R. Part 180 entitled, "Responsibilities of Participants Regarding Transactions Doing Business With Other Persons," as implemented and supplemented by 2 C.F.R. Part 1532. Recipient is responsible for ensuring that any lower tier covered transaction, as described in Subpart B of 2 C.F.R. Part 180, entitled "Covered Transactions," and 2 C.F.R. § 1532.220, includes a term or condition requiring compliance with 2 C.F.R. Part 180, Subpart C. Recipient is responsible for further requiring the inclusion of a similar term and condition in any subsequent lower tier covered transactions. Recipient acknowledges that failing to disclose the information required under 2 C.F.R. § 180.335 to the EPA office that is entering into the transaction with the recipient may result in the delay or negation of this assistance agreement, or pursuance of administrative remedies, including suspension and debarment. Recipients may access the SAM.gov exclusion list at https://sam.gov/SAM/ to determine whether an entity or individual is presently excluded or disqualified.

**22. Representation by Corporations Regarding Delinquent Tax Liability or a Felony Conviction under any Federal Law**

This award is subject to the provisions contained in an appropriations act(s) which prohibits the Federal Government from entering into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to any corporation having a delinquent Federal tax liability or a felony conviction under any Federal law, unless the agency has considered suspension or debarment of the corporation and has made a determination that this further action is not necessary to protect the interests of the Government. A "corporation" is a legal entity that is separate and distinct from the entities that own, manage, or control it. It is organized and incorporated under the jurisdictional authority of a governmental body, such as a State or the District of Columbia. A corporation may be a for-profit or non-profit organization.

As required by the appropriations act(s) prohibitions, the Government will not enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee with any corporation that — (1) Has any unpaid Federal tax liability that has been

assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless an agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or (2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless an agency has considered suspension or debarment of the corporation and made a determination that this action is not necessary to protect the interests of the Government.

By accepting this award, the recipient represents that it is not a corporation that has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability; and it is not a corporation that was convicted of a felony criminal violation under a Federal law within the preceding 24 months.

Alternatively, by accepting this award, the recipient represents that it disclosed unpaid Federal tax liability information and/or Federal felony conviction information to the EPA. The recipient may accept this award if the EPA Suspension and Debarment Official has considered suspension or debarment of the corporation based on tax liabilities and/or Federal felony convictions and determined that suspension or debarment is not necessary to protect the Government's interests.

If the recipient fails to comply with this term and condition, EPA will annul this agreement and may recover any funds the recipient has expended in violation of the appropriations act(s) prohibition(s). The EPA may also pursue other administrative remedies as outlined in 2 CFR 200.339 and 2 CFR 200.340 and may also pursue suspension and debarment.

## 23. Disclosing Conflict of Interest

**23.1    For Awards to Recipients, Subrecipients, and Individuals (other than states and fellowship recipients under 40 CFR Part 46)**
As required by 2 CFR 200.112, EPA has established a policy (COI Policy) for disclosure of conflicts of interest (COI) that may affect EPA financial assistance awards. EPA's COI Policy is posted at https://www.epa.gov/grants/epas-financial-assistance-conflict-interest-policy. The posted version of EPA's COI Policy is applicable to new funding (initial awards, supplemental and incremental funding) awarded on or after October 1, 2015.

For competitive awards, recipients must disclose any competition related COI described in section 4.0(a) of the COI Policy that are discovered after award to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of discovery of the COI. The Grant Specialist will respond to any such disclosure within 30 calendar days.

EPA's COI Policy requires that recipients have systems in place to address, resolve and disclose to EPA COIs described in sections 4.0(b), (c) and/or (d) of the COI Policy that affect any contract or subaward regardless of amount funded under this award. The recipient's COI Point of Contact for the award must disclose any COI to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of the discovery of the potential COI and their approach for resolving the COI.

EPA's COI Policy requires that subrecipients have systems in place to address, resolve and disclose COI's described in section 4.0(b)(c) and (d) of the COI Policy regardless of the amount of the transaction. Recipients who are pass-through entities as defined at 2 CFR 200.1 must require that subrecipients being considered for or receiving subawards disclose COI to the pass-through entities in a manner that, at a minimum, is in accordance with sections 5.0(d) and 7.0(c) of EPA's COI Policy. Pass-through entities must disclose the subrecipient COI along with the approach for resolving the COI to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of receiving notification of the COI by the subrecipient.

EPA only requires that recipients and subrecipients disclose COI's that are discovered under their systems for addressing and resolving COI. If recipients or subrecipients do not discover a COI, they do not need to advise EPA or the pass-through entity of the absence of a COI.

Upon notice from the recipient of a potential COI and the approach for resolving it, the Agency will then make a determination regarding the effectiveness of these measures within 30 days of receipt of the recipient's notice unless a longer period is necessary due to the complexity of the matter. Recipients may not request payment from EPA for costs for transactions subject to the COI pending notification of EPA's determination. Failure to disclose a COI may result in cost disallowances.

Disclosure of potential COI will not necessarily result in EPA disallowing costs, with the exception of procurement contracts that the Agency determines violate 2 CFR 200.318(c)(1) or (2), provided the recipient notifies EPA of measures the recipient or subrecipient has taken to eliminate, neutralize or mitigate the conflict of interest when making the disclosure.

### 23.2    For Awards to States Including State Universities that are State Agencies or Instrumentalities

As required by 2 CFR 200.112, EPA has established a policy (COI Policy) for disclosure of conflicts of interest (COI) that may affect EPA financial assistance awards. EPA's COI Policy is posted at: https://www.epa.gov/grants/epas-financial-assistance-conflict-interest-policy. The posted version of EPA's COI Policy is applicable to new funding (initial awards, supplemental, incremental funding) awarded on or after October 1, 2015.

For competitive awards, recipients must disclose any competition related COI described in section 4.0(a) of the COI Policy that are discovered after award to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of discovery of the COI. The Grants Specialist will respond to any such disclosure within 30 calendar days.

States including state universities that are state agencies and instrumentalities receiving funding from EPA are only required to disclose subrecipient COI as a pass-through entity as defined by 2 CFR 200.1. Any other COI are subject to state laws, regulations, and policies. EPA's COI Policy requires that subrecipients have systems in place to address, resolve and disclose COIs described in section 4.0(b)(c) and (d) of the COI Policy that arise after EPA made the award regardless of the amount of the transaction. States who are pass-through entities as defined at 2 CFR 200.1 must require that subrecipients being considered for or receiving subawards disclose COI to the state in a manner that, as a minimum, in accordance with sections 5.0(d) and 7.0(c) of EPA's COI Policy. States must disclose the subrecipient COI along with the approach for resolving the COI to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of receiving notification of the COI by the subrecipient.

EPA only requires that subrecipients disclose COI's to state pass-through entities that are discovered under their systems for addressing, resolving, and disclosing COI. If subrecipients do not discover a COI, they do not need to advise state pass-through entities of the absence of a COI.

Upon receiving notice of a potential COI and the approach for resolving it, the Agency will make a determination regarding the effectiveness of these measures within 30 days of receipt of the state's notice of a subrecipient COI unless a longer period is necessary due to the complexity of the matter. States may not request payment from EPA for costs for transactions subject to the COI pending notification of EPA's determination. A subrecipient's failure to disclose a COI to the state and EPA may result in cost disallowances.

Disclosure of potential subrecipient COI will not necessarily result in EPA disallowing costs, with the exception of procurement contracts that the Agency determines violate 2 CFR 200.318(c)(1) or (2), provided the subrecipient has taken measures that EPA and the state agree eliminate, neutralize or mitigate the conflict of interest.

## 24. Transfer of Funds
### 24.1 Transfer of Funds
**Applicable to all assistance agreements other than Continuing Environmental Program Grants subject to 40 CFR 35.114 and 40 CFR 35.514 when EPA's share of the total award exceeds the**

**Simplified Acquisition Threshold. Simplified Acquisition Threshold is defined at 2 CFR 200.1 and is currently set at $250,000 but the amount is subject to adjustment.**

**(1)** As provided at 2 CFR 200.308(i), the recipient must obtain prior approval from EPA's Grants Management Officer if the cumulative amount of funding transfers among direct budget categories or programs, functions and activities exceeds 10% of the total budget, as last approved by EPA, including cost share. Recipients must submit requests for prior approval to the Grant Specialist and Grants Management Officer with a copy to the Project Officer for this agreement.

**(2)** Recipients must notify EPA's Grant Specialist and Project Officer of cumulative funding transfers among direct budget categories or programs, functions and activities that do not exceed 10% of the total budget for the agreement. Prior approval by EPA's Grants Management Officer is required if the transfer involves any of the items listed in 2 CFR 200.407 that EPA did not previously approve at time of award or in response to a previous post-award request by the recipient.

**24.2 Post-Award Changes for Continuing Environmental Program Grants**

**Applicable to Continuing Environmental Program Grants subject to 40 CFR 35.114 and 40 CFR 35.514 when EPA's share of the total project costs exceeds the Simplified Acquisition Threshold. Simplified Acquisition Threshold is defined at 2 CFR 200.1 and is currently set at $250,000 but the amount is subject to adjustment.**

To determine if a post-award change in work plan commitments is significant and requires prior written approval for the purposes of 40 CFR §35.114(a) or 40 CFR §35.514(a), the recipient agrees to consult the EPA Project Officer (PO) before making the change. The term work plan commitments is defined at 40 CFR §35.102. If the PO determines the change is significant, the recipient cannot make the change without prior written approval by the EPA Award Official or Grants Management Officer.

The recipient must obtain written approval from the EPA Award Official prior to transferring funds from one budget category to another if the EPA Award Official determines that such transfer significantly changes work plan commitment(s). All transfers must be reported in required performance reports. In addition, unless approved with the budget at the time of award, Continuing Environmental Program (CEP) recipients must also obtain prior written approval from the EPA Award Official or Grants Management Officer to use EPA funds for directly charging compensation for administrative and clerical personnel under 2 CFR 200.413(c) and the General Provisions for Selected Items of Cost allowability at 2 CFR 200.420 through 2 CFR 200.476 as supplemented by EPA's Guidance on Selected Items of Cost. The recipient is not required to obtain prior written approval from the EPA Award Official for other items requiring prior EPA approval listed in 2 CFR 200.407.

**25. Electronic/Digital Signatures on Financial Assistance Agreement Form(s)/Document(s)**

Throughout the life of this assistance agreement, the recipient agrees to ensure that any form(s)/document(s) required to be signed by the recipient and submitted to EPA through any

means including but not limited to hard copy via U.S. mail or express mail, hand delivery or through electronic means such as e-mail are: (1) signed by the individual identified on the form/document, and (2) the signer has the authority to sign the form/document for the recipient. Submission of any signed form(s)/document(s) is subject to any provisions of law on making false statements (e.g., 18 U.S.C. 1001).

**26. Extension of Project/Budget Period Expiration Date**

EPA has not exercised the waiver option to allow automatic one-time extensions for non-research grants under 2 CFR 200.308(g)(2). Therefore, if a no-cost time extension is necessary to extend the period of availability of funds, the recipient must submit a written request to the EPA at least 10 calendar days before the conclusion of the period of performance as required by 2 CFR 200.308(f)(10). **The written request must include:** a justification describing the need for additional time, an estimated date of completion, and a revised schedule for project completion including updated milestone target dates for the approved workplan activities. In addition, if there are overdue reports required by the general, administrative, and/or programmatic terms and conditions of this assistance agreement, the recipient must ensure that they are submitted along with or prior to submitting the no-cost time extension request.

**27. Utilization of Disadvantaged Business Enterprises**

**General Compliance, 40 CFR, Part 33**

The recipient agrees to comply with the requirements of EPA's Disadvantaged Business Enterprise (DBE) Program for procurement activities under assistance agreements, contained in 40 CFR, Part 33.

The following text provides updates to 40 CFR Part 33 based upon the associated class exception or highlights a requirement.

1) **EPA MBE/WBE CERTIFICATION, 40 CFR, Part 33, Subpart B**

   EPA no longer certifies entities as Minority-Owned Business Entities (MBEs) or Women-Owned Business Entities (WBEs) pursuant to a class exception issued in October 2019. The class exception was authorized pursuant to the authority in 2 CFR, Section 1500.4(b).

2) **SIX GOOD FAITH EFFORTS, 40 CFR, Part 33, Subpart C**

   Pursuant to 40 CFR Section 33.301, the recipient agrees to make good faith efforts whenever procuring construction, equipment, services and supplies under an EPA financial assistance agreement, and to require that sub-recipients, loan recipients, and prime contractors also comply. Records documenting compliance with the six good faith efforts shall be retained. The specific six good faith efforts can be found at: 40 CFR Section 33.301 (a)-(f).

   However, in EPA assistance agreements that are for the benefit of Native Americans, the recipient must solicit and recruit Native American organizations and Native American-owned economic enterprises and give them preference in the award process prior to undertaking

the six good faith efforts (40 CFR Section 33.304). If recruiting efforts are unsuccessful, the recipient must follow the six good faith efforts.

3) **CONTRACT ADMINISTRATION PROVISIONS, 40 CFR, Section 33.302**

The recipient agrees to comply with the contract administration provisions of 40 CFR Section 33.302 (a)-(d) and (i).

4) **BIDDERS LIST, 40 CFR Section 33.501(b) and (c)**

Recipients of a Continuing Environmental Program Grant or other annual reporting grant, agree to create and maintain a bidders list. Recipients of an EPA financial assistance agreement to capitalize a revolving loan fund also agree to require entities receiving identified loans to create and maintain a bidders list if the recipient of the loan is subject to, or chooses to follow, competitive bidding requirements. Please see 40 CFR Section 33.501 (b) and (c) for specific requirements and exemptions.

5) **FAIR SHARE OBJECTIVES, 40 CFR, Part 33, Subpart D**

Recipients must negotiate with the appropriate EPA Award Official, or their designee, fair share objectives/goals for MBE and WBE participation in procurement under financial assistance agreements. The recipient is exempted if this agreement meets one or more of the exemptions outlined in 40 CFR 33.411.

Applicability of Fair Share Objectives:
- If the total dollar amount of the agreement or all the recipient's EPA agreements in a fiscal year is $250,000 or more.
- The applicable MBE/WBE fair share objectives/goals are those negotiated with EPA for the State-lead environmental entity where the majority of the procurement activity will occur. This applies unless the recipient has been specially identified, to the year in which the procurement activity occurred.

The negotiated fair share objectives/goals are located at: https://www.epa.gov/grants/fair-share-objectives

By accepting this financial assistance agreement, the recipient is accepting the fair share objectives/goals negotiated with the State-lead environmental entity and attests to the fact that they are purchasing the same or similar construction, supplies, services, and equipment, in the same or similar relevant geographic buying market.

**Negotiating Fair Share Objectives/Goals, 40 CFR, Section 33.404**

The recipient has the option to negotiate their own MBE/WBE fair share objectives/goals. If the recipient elects to negotiate their own MBE/WBE fair share objectives/goals, the recipient agrees to submit the proposed MBE/WBE fair share objectives/goals with the supporting availability analysis or disparity study, of qualified MBEs and WBEs in their relevant geographic buying market for construction, services, supplies, and equipment, to the Regional MBE/WBE Coordinator within 120 days of their acceptance of the assistance agreement. EPA will respond to the proposed fair share objective/goals within 30 days of receiving the submission. Failure to respond within this time frame may be considered an

agreement by EPA to the fair share objectives/goals submitted by the recipient. MBE and WBE fair share objectives/goals must be agreed upon by the recipient and EPA before funds may be expended for procurement under the recipient's assistance agreement.

In accordance with 40 CFR, Part 33, Subpart D, established fair share objectives/goals remain in effect for three fiscal years unless there are significant changes to the data supporting the fair share objectives. The recipient is required to follow requirements as outlined in 40 CFR Part 33, Subpart D when renegotiating the fair share objectives/goals.

**Fair Share Objectives/Goals of Loan Recipients**
As a recipient of an EPA financial assistance agreement to capitalize revolving loan funds, the recipient agrees to either apply their fair share objectives/goals negotiated with EPA to identified loans using a substantially similar relevant geographic market or negotiate separate fair share objectives with their identified loan recipients. These separate fair share objectives/goals must be based on demonstrable evidence of the availability of MBEs and WBEs in accordance with 40 CFR, Part 33, Subpart D.
The recipient agrees that if procurements will occur over more than one year, the recipient may choose to apply the fair share objectives/goals in place either for the year in which the identified loan is awarded or for the year in which the procurement action occurs. The recipient must specify this choice in the financial assistance agreement or incorporate it by reference therein.

The recipient is not required to apply the fair share objectives requirements to an entity receiving an identified loan of $250,000 or less or to an entity receiving more than one identified loan with a combined total of $250,000 or less in any one fiscal year.

6) **MBE/WBE REPORTING, 40 CFR, Part 33, Subpart E**
When required, the recipient agrees to complete and submit a "MBE/WBE Utilization Under Federal Grants and Cooperative Agreements" report (EPA Form 5700-52A) on an annual basis. The current EPA Form 5700-52A can be found at the EPA Grantee Forms Page at https://www.epa.gov/system/files/documents/2021-08/epa_form_5700_52a.pdf .

Reporting is required for assistance agreements where funds are budgeted for procuring construction, equipment, services and supplies (including funds budgeted for direct procurement by the recipient or procurement under subawards or loans in the "Other" category) with a cumulative total that exceed the Simplified Acquisition Threshold (SAT) (currently, $250,000 however the threshold will be automatically revised whenever the SAT is adjusted; See 2 CFR Section 200.1), including amendments and/or modifications. When reporting is required, all procurement actions are reportable, not just the portion which exceeds the SAT.
**Annual reports are due by October 30th of each year. Final reports are due 120 days after the conclusion of the period of performance.**

This provision represents an approved exception from the MBE/WBE reporting requirements as described in 40 CFR Section 33.502.

7) **MBE/WBE RECORDKEEPING, 40 CFR, Part 33, Subpart E**
The recipient agrees to comply with all recordkeeping requirements as stipulated in 40 CFR Part 33, Subpart E including creating and maintain a bidders list, when required. Any document created as a record to demonstrate compliance with any requirements of 40 CFR Part 33 must be maintained pursuant to the requirements stated in this Subpart.


## Programmatic General Terms and Conditions

### 28. Sufficient Progress
EPA will measure sufficient progress by examining the performance required under the workplan in conjunction with the milestone schedule, the time remaining for performance within the project period and/or the availability of funds necessary to complete the project. EPA may terminate the assistance agreement for failure to ensure reasonable completion of the project within the project period.

### 29. Copyrighted Material and Data
In accordance with 2 CFR 200.315, EPA has the right to reproduce, publish, use and authorize others to reproduce, publish and use copyrighted works or other data developed under this assistance agreement for Federal purposes. This includes the right to require recipients and subrecipients to make such works available through agency-designated public access repositories.

Examples of a Federal purpose include but are not limited to: (1) Use by EPA and other Federal employees for official Government purposes; (2) Use by Federal contractors performing specific tasks for [i.e., authorized by] the Government; (3) Publication in EPA documents provided the document does not disclose trade secrets (e.g. software codes) and the work is properly attributed to the recipient through citation or otherwise; (4) Reproduction of documents for inclusion in Federal depositories; (5) Use by State, Tribal and local governments that carry out delegated Federal environmental programs as "co-regulators" or act as official partners with EPA to carry out a national environmental program within their jurisdiction and; (6) Limited use by other recipients to carry out Federal grants provided the use is consistent with the terms of EPA's authorization to the other recipient to use the copyrighted works or other data.
Under Item 6, the recipient acknowledges that EPA may authorize another recipient(s) to use the copyrighted works or other data developed under this grant as a result of:
- The selection of another recipient by EPA to perform a project that will involve the use of the copyrighted works or other data, or
- Termination or expiration of this agreement.

In addition, EPA may authorize another recipient to use copyrighted works or other data developed with Agency funds provided under this grant to perform another grant when such use promotes efficient and effective use of Federal grant funds.

## 30. Patents and Inventions

Rights to inventions made under this assistance agreement are subject to federal patent and licensing regulations, which are codified at Title 37 CFR Part 401 and Title 35 USC Sections 200-212.

Pursuant to the Bayh-Dole Act (set forth in 35 USC 200-212), EPA retains the right to a worldwide, nonexclusive, nontransferable, irrevocable, paid-up license to practice the invention owned by the assistance agreement holder, as defined in the Act. To streamline the invention reporting process and to facilitate compliance with the Bayh-Dole Act, the recipient must utilize the Interagency Edison extramural invention reporting system at https://www.nist.gov/iedison. Annual utilization reports must be submitted through the system. The recipient is required to notify the Project Officer identified on the award document when an invention report, patent report, or utilization report is filed at https://www.nist.gov/iedison. EPA elects not to require the recipient to provide a report prior to the close-out of a funding agreement listing all subject inventions or stating that there were none.

In accordance with Executive Order 12591, as amended, government owned and operated laboratories can enter into cooperative research and development agreements with other federal laboratories, state and local governments, universities, and the private sector, and license, assign, or waive rights to intellectual property "developed by the laboratory either under such cooperative research or development agreements and from within individual laboratories."

## 31. Acknowledgement Requirements for Non-ORD Assistance Agreements

The recipient agrees that any reports, documents, publications, or other materials developed for public distribution supported by this assistance agreement shall contain the following statement: "This project has been funded wholly or in part by the United States Environmental Protection Agency under assistance agreement (number) to (recipient). The contents of this document do not necessarily reflect the views and policies of the Environmental Protection Agency, nor does the Environmental Protection Agency endorse trade names or recommend the use of commercial products mentioned in this document, as well as any images, video, text, or other content created by generative artificial intelligence tools, nor does any such content necessarily reflect the views and policies of the Environmental Protection Agency."

Recipients of EPA Office of Research Development (ORD) research awards must follow the acknowledgement requirements outlined in the research T&Cs available at: https://www.nsf.gov/awards/managing/rtc.jsp. In accordance with the Research Terms and

Conditions Overlay to the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards (Uniform Guidance), 2 CFR §200, recipients of EPA ORD research must abide by the research T&Cs.

**32. Electronic and Information Technology Accessibility**

Recipients are subject to the program accessibility provisions of Section 504 of the Rehabilitation Act, codified in 40 CFR Part 7, which includes an obligation to provide individuals with disabilities reasonable accommodations and an equal and effective opportunity to benefit from or participate in a program, including those offered through electronic and information technology ("EIT"). In compliance with Section 504, EIT systems or products funded by this award must be designed to meet the diverse needs of users (e.g., U.S. public, recipient personnel) without barriers or diminished function or quality. Systems shall include usability features or functions that accommodate the needs of persons with disabilities, including those who use assistive technology. At this time, the EPA will consider a recipient's websites, interactive tools, and other EIT as being in compliance with Section 504 if such technologies meet standards established under Section 508 of the Rehabilitation Act, codified at 36 CFR Part 1194. While Section 508 does not apply directly to grant recipients, we encourage recipients to follow either the 508 guidelines or other comparable guidelines that concern accessibility to EIT for individuals with disabilities.

Recipients may wish to consult the latest Section 508 guidelines issued by the U.S. Access Board or W3C's Web Content Accessibility Guidelines (WCAG) 2.0 (see https://www.access-board.gov/about/policy/accessibility.html).

**33. Human Subjects**

Human subjects research is any activity that meets the regulatory definitions of both research AND human subject. Research is a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge. Human subject means a living individual about whom an investigator (whether professional or student) conducting research: (i) Obtains information or biospecimens through intervention or interaction with the individual, and uses, studies, or analyzes the information or biospecimens; or (ii) Obtains, uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens 40 CFR 26.102(e)(l).

No research involving human subjects shall be conducted under this agreement without prior written approval of the EPA Human Subject Research Review Official (HSRRO) to proceed with that research. If engaged in human subjects' research as part of this agreement, the recipient agrees to comply with all applicable provisions of EPA Regulation 40 CFR 26 (Protection of Human Subjects). This includes, at Subpart A, the Basic Federal Policy for the Protection of Human Research Subjects, also known as the Common Rule. It also includes, at Subparts B, C, and D, prohibitions and additional protections for children, nursing women, pregnant women, and fetuses in research conducted or supported by EPA.

The recipient further agrees to comply with EPA's procedures for oversight of the recipient's compliance with 40 CFR 26, as given in EPA Order 1000.17A (Policy and Procedures on Protection of Human Research Subjects in EPA Conducted or Supported Research). As per this order, no human subject may be involved in any research conducted under this assistance agreement, including recruitment, until the research has been approved or determined to be exempt by the EPA HSRRO after review of the approval or exemption determination of the Institutional Review Board(s) (IRB(s)) with jurisdiction over the research under 40 CFR 26.

For HSRRO approval, the recipient must forward to the Project Officer: (1) copies of all documents upon which the IRB(s) with jurisdiction based their approval(s) or exemption determination(s), (2) copies of the IRB approval or exemption determination letter(s), (3) copy of the IRB-approved consent forms and subject recruitment materials, if applicable, and (4) copies of all supplementary IRB correspondence.

Following the initial approvals indicated above, the recipient must, as part of the annual report(s), provide evidence of continuing review and approval of the research by the IRB(s) with jurisdiction, as required by 40 CFR 26.109(e). Materials submitted to the IRB(s) for their continuing review and approval are to be provided to the EPA HSRRO via the Project Officer upon IRB approval. During the course of the research, investigators must promptly report any unanticipated problems involving risk to subjects or others according to requirements set forth by the IRB. In addition, any event that is significant enough to result in the removal of the subject from the study should also be reported to the EPA HSRRO via the Project Officer, even if the event is not reportable to the IRB of record.

## 34. Animal Subjects

The recipient agrees to comply with the Animal Welfare Act of 1966 (P.L. 89-544), as amended, 7 USC 2131- 2156. Recipient also agrees to abide by the "U.S. Government Principles for the Utilization and Care of Vertebrate Animals used in Testing, Research, and Training." (Federal Register 50(97): 20864-20865. May 20,1985). The nine principles can be viewed at https://olaw.nih.gov/policies-laws/phs-policy.htm. For additional information about the Principles, the recipient should consult the *Guide for the Care and Use of Laboratory Animals,* prepared by the Institute of Laboratory Animal Resources, National Research Council.

## 35. Light Refreshments and/or Meals

(a) **APPLICABLE TO ALL AGREEMENTS EXCEPT STATE CONTINUING ENVIRONMENTAL PROGRAMS (AS DESCRIBED BELOW):**

Unless the event(s) and all of its components are described in the approved workplan, the recipient agrees to obtain prior approval from EPA for the use of grant funds for light refreshments and/or meals served at meetings, conferences, training workshops and outreach activities (events). The recipient must send requests for approval to the EPA Project Officer and include:

(1) An estimated budget and description for the light refreshments, meals, and/or beverages to be served at the event(s)

**(2)** A description of the purpose, agenda, location, length, and timing for the event, and

**(3)** An estimated number of participants in the event and a description of their roles

Costs for light refreshments and meals for recipient staff meetings and similar day-to-day activities are not allowable under EPA assistance agreements.

Recipients may address questions about whether costs for light refreshments, and meals for events may be allowable to the recipient's EPA Project Officer; however, the Agency Award Official or Grant Management Officer will make final determinations on allowability. Agency policy prohibits the use of EPA funds for receptions, banquets and similar activities that take place after normal business hours unless the recipient has provided a justification that has been expressly approved by EPA's Award Official or Grants Management Officer.

EPA funding for meals, light refreshments, and space rental may not be used for any discrete portion of an event or meeting, such as a reception, banquet, or another similar entertainment-oriented activity, where alcohol is served, purchased, or otherwise available as part of the discrete portion of the event or meeting, even if EPA funds are not used to purchase the alcohol. This restriction does not prohibit a recipient from using its own funds, private donations, or separate fees charged to the meeting attendees (that are not program income) for discrete portions of events or meetings, such as receptions, banquets, or another similar entertainment-oriented activity where alcohol is served.

Note: U.S. General Services Administration regulations define light refreshments for morning, afternoon, or evening breaks to include, but not be limited to, coffee, tea, milk, juice, soft drinks, donuts, bagels, fruit, pretzels, cookies, chips, or muffins. (41 CFR 301-74.7)

**(b) FOR STATE CONTINUING ENVIROMENTAL PROGRAM GRANT RECIPIENTS EXCLUDING STATE UNIVERSITIES:**

If the state maintains systems capable of complying with federal grant regulations at 2 CFR 200.432 and 2 CFR 200.438, EPA has waived the prior approval requirements for the use of EPA funds for light refreshments and/or meals served at meetings, conferences, and training, as described in paragraph (a) above. The state may follow its own procedures without requesting prior approval from EPA. However, notwithstanding state policies, EPA funds may not be used for (1) Meetings (e.g. routine staff meetings) that do not meet the definition of "Conference" in 2 CFR 200.432, (2) evening receptions, or (2) other evening events (with the exception of working meetings). Examples of working meetings include those evening events in which small groups discuss technical subjects on the basis of a structured agenda or there are presentations being conducted by experts. EPA funds for meals, light refreshments, and space rental may not be used for any portion of an event (including evening working meetings) where alcohol is served, purchased, or otherwise available as part of the event or meeting, even if EPA funds are not used to purchase the alcohol.

By accepting this award, the state is certifying that it has systems in place (including internal controls) to comply with the requirements described above.

## 36. Tangible Personal Property

### 36.1 Reporting

Pursuant to 2 CFR 200.312 and 2 CFR 200.314, property reports, if applicable, are required for Federally-owned property in the custody of a recipient or subrecipient upon completion of the Federal award or when the property is no longer needed. Additionally, upon termination or completion of the project, residual unused supplies with a total aggregate fair market value exceeding $10,000 not needed for any other Federally-funded programs or projects must be reported. For Superfund awards under Subpart O, refer to 40 CFR 35.6340 and 40 CFR 35.6660 for property reporting requirements. Recipients should utilize the Tangible Personal Property Report form series (SF-428) to report tangible personal property.

### 36.2 Disposition

**36.2.1. Most Recipients or Subrecipients.** Consistent with 2 CFR 200.313, unless instructed otherwise on the official award document, this award term, or at closeout, the recipient or subrecipient, including a subrecipient of a State or an Indian Tribe, may keep the equipment and continue to use it on the project originally funded through this assistance agreement or on other federally funded projects whether or not the project or program continues to be supported by Federal funds.

**36.2.2. State Agencies.** Per 2 CFR 200.313(b), recipients that are State agencies must manage and dispose of equipment acquired under this assistance agreement in accordance with state laws and procedures.

**36.2.3. Indian Tribes.** Per 2 CFR 200.313(b), recipients that are Indian Tribes must manage and dispose of equipment acquired under this assistance agreement in accordance with tribal laws and procedures. If such laws and procedures do not exist, Indian Tribes, unless instructed otherwise on the official award document or at closeout, may keep the equipment and continue to use it on the project originally funded through this assistance agreement or on other federally funded projects whether or not the project or program continues to be supported by Federal funds.

**36.2.4. Superfund Recipients.** Equipment purchased for Superfund projects under Subpart O is subject to specific disposal options in accordance with 40 CFR Part 35.6345.

## 37. Dual Use Research of Concern (DURC)

The recipient agrees to conduct all life science research[*] in compliance with *EPA's Order on the Policy and Procedures for Managing Dual Use Research of Concern* (EPA DURC Order) and *United States Government Policy for Institutional Oversight of Life Sciences Dual Use Research of Concern (iDURC Policy).* If the recipient is an institution within the United States that receives funding through this agreement, or from any other source, the recipient agrees to comply with the iDURC Policy if they conduct or sponsor research involving any of the agents or toxins identified in Section 6.2.1 of the iDURC Policy. If the institution is outside the United States and receives funding through

this agreement to conduct or sponsor research involving any of those same agents or toxins, the recipient agrees to comply with the iDURC Policy. The recipient agrees to provide any additional information that may be requested by EPA regarding DURC and iDURC. The recipient agrees to immediately notify the EPA Project Officer should the project use or introduce use of any of the agents or toxins identified in the iDURC Policy. The recipient's Institution/Organization must also comply with USG iDURC policy and EPA DURC Order and will inform the appropriate government agency if funded by such agency of research with the agents or toxins identified in Section 6.2.1 of the iDURC Policy. If privately funded the recipient agrees to notify the National Institutes of Health at DURC@od.nih.gov.

\* "*Life Sciences Research,*" for purposes of the EPA DURC Order, and based on the definition of research in 40 CFR §26.102(d), is a systematic investigation designed to develop or contribute to generalizable knowledge involving living organisms (e.g., microbes, human beings, animals, and plants) and their products. EPA does not consider the following activities to be research: routine product testing, quality control, mapping, collection of general-purpose statistics, routine monitoring and evaluation of an operational program, observational studies, and the training of scientific and technical personnel. [Note: This is consistent with Office of Management and Budget Circular A-11.]

## 38. Research Misconduct

In accordance with 2 CFR 200.329, the recipient and subrecipient agree to notify the EPA Project Officer in writing about research misconduct involving research activities that are supported in whole or in part with EPA funds under this project. EPA defines research misconduct as fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results [65 FR 76262. I], or ordering, advising or suggesting that subordinates engage in research misconduct. The recipient agrees to:

**(1)** Immediately notify the EPA Project Officer who will then inform the EPA Office of Inspector General (OIG) if, at any time, an allegation of research misconduct falls into one of the categories listed below:

   **A.** Public health of safety is at risk

   **B.** Agency resources or interests are threatened

   **C.** Circumstances where research activities should be suspended

   **D.** There is a reasonable indication of possible violations of civil or criminal law

   **E.** Federal action is required to protect the interests of those involved in the investigation

   **F.** The research entity believes that the inquiry or investigation may be made public prematurely so that appropriate steps can be taken to safeguard evidence and protect the rights of those involved

   **G.** Circumstances where the research community or public should be informed. [65 FR 76263.III]

**(2)** Report other allegations to the OIG when they have conducted an inquiry and determined that there is sufficient evidence to proceed with an investigation. [65 FR 76263. III]

### 39. Scientific Integrity Terms and Conditions

The recipient agrees to comply with EPA's Scientific Integrity Policy when conducting, supervising, and communicating science and when using or applying the results of science. For purposes of this award condition scientific activities include, but are not limited to, computer modelling, economic analysis, field sampling, laboratory experimentation, demonstrating new technology, statistical analysis, and writing a review article on a scientific issue. The recipient agrees to:

### 39.1 Scientific Products

**39.1.1.**  Produce scientific products of the highest quality, rigor, and objectivity, by adhering to applicable EPA information quality guidelines, quality policy, and peer review policy.

**39.1.2.**  Prohibit all recipient employees, contractors, and program participants, including scientists, managers, and other recipient leadership, from suppressing, altering, or otherwise impeding the timely release of scientific findings or conclusions.

**39.1.3.**  Adhere to EPA's Peer Review Handbook, 4th Edition, for the peer review of scientific and technical work products generated through EPA grants or cooperative agreements which, by definition, are not primarily for EPA's direct use or benefit.

### 39.2 Scientific Findings

**39.2.1.**  Require that reviews regarding the content of a scientific product that are conducted by the project manager and other recipient managers and the broader management chain be based only on scientific quality considerations, e.g., the methods used are clear and appropriate, the presentation of results and conclusions is impartial.

**39.2.2.**  Ensure scientific findings are generated and disseminated in a timely and transparent manner, including scientific research performed by employees, contractors, and program participants, who assist with developing or applying the results of scientific activities.

**39.2.3.**  Include, when communicating scientific findings, an explication of underlying assumptions, accurate contextualization of uncertainties, and a description of the probabilities associated with both optimistic and pessimistic projections, if applicable.

**39.2.4.**  Document the use of independent validation of scientific methods.

**39.2.5.**  Document any independent review of the recipient's scientific facilities and testing activities, as occurs with accreditation by a nationally or internationally recognized sanctioning body.

**39.2.6.**  Make scientific information available online in open formats in a timely manner, including access to data and non-proprietary models.

### 39.3 Scientific Misconduct

**39.3.1.**  Prohibit intimidation or coercion of scientists to alter scientific data, findings, or professional opinions or non-scientific influence of scientific advisory boards. In addition, recipient employees, contractors, and program participants, including scientists, managers, and other leadership, shall not knowingly misrepresent, exaggerate, or downplay areas of scientific uncertainty.

**39.3.2.**  Prohibit retaliation or other punitive actions toward recipient employees who uncover or report allegations of scientific and research misconduct, or who express a differing scientific

opinion. Employees who have allegedly engaged in scientific or research misconduct shall be afforded the due process protections provided by law, regulation, and applicable collective bargaining agreements, prior to any action. Recipients shall ensure that all employees and contractors of the recipient shall be familiar with these protections and avoid the appearance of retaliatory actions.

**39.3.3.** Require all recipient employees, contractors, and program participants to act honestly and refrain from acts of research misconduct, including publication or reporting, as described in EPA's Policy and Procedures for Addressing Research Misconduct, Section 9.C. Research misconduct does not include honest error or differences of opinion. While EPA retains the ultimate oversight authority for EPA-supported research, grant recipients conducting research bear primary responsibility for prevention and detection of research misconduct and for the inquiry, investigation, and adjudication of research misconduct alleged to have occurred in association with their own institution.

**39.3.4.** Take the actions required on the part of the recipient described in the EPA's Policy and Procedures for Addressing Research Misconduct, Sections 6 through 9, when research misconduct is suspected or found.

**39.4 Additional Resources**

For more information about the Scientific Integrity Policy, an introductory video can be accessed at: https://youtu.be/FQJCy8BXXq8. A training video is available at: https://youtu.be/Zc0T7fooot8.

## 40. Post-Award Disclosure of Current and Pending Support on Research Grants

The recipient is required to notify EPA if there has been a change in support for senior/key persons since submission of its application or the last reporting period in the performance report. If there has been a change, the recipient must report the change within 30 calendar days to the EPA Project Officer. The information should also be included in the next due performance report. If there has been a change, submit a revised current and pending support form (see 'EPA Current and Pending Support'). Senior/key persons must certify that the information contained in the updated current and pending support form is current, accurate, and complete. For additional details on what information needs to be disclosed, please see NSTC Pre-award and Post-award disclosures Relating to the Biographical Sketch and Current and Pending (Other) Support at NSTC Research Security Subcommittee NSPM-33 Implementation Guidance Disclosure Requirements & Standardization.

EPA may consult with the Lead/Contact PI and the Authorized Organization Representative (AOR), if necessary, to determine the impact of the new information on the EPA-funded research grant and, where necessary, take appropriate action.

If the recipient discovers that a senior/key person on an active EPA grant failed to disclose current and pending support information or provided inaccurate information as part of the proposal submission process, it must submit a revised current and pending support form (see 'EPA Current

and Pending Support') to the EPA Project Officer within 30 calendar days of the identification of the undisclosed or inaccurate current and pending information.

41. **Procurement of Synthetic Nucleic Acids and Benchtop Nucleic Acid Synthesis Equipment**
Beginning on April 26, 2025, the recipient must procure synthetic nucleic acids and benchtop nucleic acid synthesis equipment, as defined in the 2024 Office of Science and Technology Policy (OSTP) Framework for Nucleic Acid Synthesis Screening (Framework), from providers or manufacturers that attest to adhering to the Framework. The attestation may be posted on a public website or provided directly to the recipient upon request. The recipient must include this requirement in all lower tier agreements (for example subrecipients or subcontractors).

**Public Policy Requirements**

42. **Civil Rights Obligations**
This term and condition incorporates by reference the signed assurance provided by the recipient's authorized representative on: 1) EPA Form 4700-4, "Preaward Compliance Review Report for All Applicants and Recipients Requesting EPA Financial Assistance"; and 2) Certifications and Representations in SAM.gov or Standard Form 424D, as applicable.

These assurances and this term and condition obligate the recipient to comply fully with applicable civil rights statutes and implementing federal and EPA regulations.

(a) **Statutory Requirements**
  i. In carrying out this agreement, the recipient must comply with:
   1) Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, and national origin, by entities receiving Federal financial assistance.
   2) Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against persons with disabilities by entities receiving Federal financial assistance; and
   3) The Age Discrimination Act of 1975, which prohibits age discrimination by entities receiving Federal financial assistance.
  ii. If the recipient is an education program or activity (e.g., school, college, or university) or if the recipient is conducting an education program or activity under this agreement, it must also comply with:
   1) Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex in education programs and activities operated by entities receiving Federal financial assistance. For further information about your compliance obligations regarding Title IX, see https://www.justice.gov/crt/title-ix
  iii. If this agreement is funded with financial assistance under the Clean Water Act (CWA), the recipient must also comply with:
   1) Section 13 of the Federal Water Pollution Control Act Amendments of 1972, which prohibits discrimination on the basis of sex in CWA-funded programs or activities.
(b) **Regulatory Requirements**

i. The recipient agrees to comply with all applicable EPA civil rights regulations, including:

   1) For Title IX obligations, 40 C.F.R. Part 5; and

   2) For Title VI, Section 504, Age Discrimination Act, and Section 13 obligations, 40 C.F.R Part7.

      **Note that for financial assistance awarded to any entity, including any subrecipient, in the State of Louisiana,** pursuant to a permanent injunction issued by the U.S. District Court for the Western District of Louisiana, EPA will not impose any disparate-impact or cumulative-impact-analysis requirements under Title VI of the Civil Rights Act of 1964 in any pre-award assurances or terms and conditions accompanying the application for and receipt of this grant award.

   3) The statutory and national policy requirements at 2 CFR 200.300(a).

   4) For Federal awards that are subject to a Federal statute prohibiting discrimination based on sex, the Federal agency or pass-through entity must ensure that the award is administered in a way that does not unlawfully discriminate based on sexual orientation or gender identity consistent with the Supreme Court's reasoning in *Bostock v Clayton County*, 140 S. Ct. 1731 (2020), in accordance with 2 CFR 200.300.

   5) As noted on the EPA Form 4700-4 signed by the recipient's authorized representative, these regulations establish specific requirements as applicable, including, but not limited to collecting, maintaining, and providing upon request compliance information, establishing grievance procedures, designating a Civil Rights Coordinator, and providing notices of non-discrimination.

(c) **Title VI – Limited English Proficiency (LEP), Public Participation and Affirmative Compliance Obligation**

   i. As a recipient of EPA financial assistance, you are required by Title VI of the Civil Rights Act to take reasonable steps to provide meaningful access to LEP individuals. In implementing that requirement, the recipient may refer to the EPA document entitled "Guidance to Environmental Protection Agency Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons." The Guidance can be found at:
   https://www.federalregister.gov/documents/2004/06/25/04-14464/guidance-to-environmental-protection-agency-financial-assistance-recipients-regarding-title-vi.

   ii. If the recipient is administering permitting programs under this agreement, the recipient may refer to EPA's "Title VI Public Involvement Guidance for EPA Assistance Recipients Administering Environmental Permitting Programs." The Guidance can be found at:
   https://www.govinfo.gov/content/pkg/FR-2006-03-21/pdf/06-2691.pdf.

   iii. In accepting this assistance agreement, the recipient acknowledges it has an affirmative obligation to implement effective federal civil rights compliance programs, as required by EPA's nondiscrimination regulations at 40 C.F.R. Parts 5 and 7, and ensure that it does not discriminate in its programs and activities in violation of federal civil rights laws and regulations. The recipient must be prepared to demonstrate to EPA that such compliance programs exist and are being implemented, or to otherwise demonstrate how it is meeting

its federal civil rights obligations. For further assistance on civil rights compliance, the recipient may refer to the EPA document entitled, "Civil Rights Guidance on Procedural Safeguards: Requirements and Best Practices." The Guidance can be found at: www.epa.gov/system/files/documents/2024-08/civil-rights-guidance-on-procedural-safeguards-august-2024.pdf.

**43. Drug-Free Workplace**

The recipient organization of this EPA assistance agreement must make an ongoing, good faith effort to maintain a drug-free workplace pursuant to the specific requirements set forth in Title 2 CFR Part 1536 Subpart B. Additionally, in accordance with these regulations, the recipient organization must identify all known workplaces under its federal awards and keep this information on file during the performance of the award.

Those recipients who are individuals must comply with the drug-free provisions set forth in Title 2 CFR Part 1536 Subpart C.

The consequences for violating this condition are detailed under Title 2 CFR Part 1536 Subpart E. Recipients can access the Code of Federal Regulations (CFR) Title 2 Part 1536 at www.ecfr.gov/.

**44. Hotel-Motel Fire Safety**

Pursuant to U.S.C. 2225a, the recipient agrees to ensure that all space for conferences, meetings, conventions, or training seminars funded in whole or in part with federal funds complies with the protection and control guidelines of the Hotel and Motel Fire Safety Act (PL 101-391, as amended). Recipients may search the Hotel-Motel National Master List at https://apps.usfa.fema.gov/hotel/ to see if a property is in compliance, or to find other information about the Act.

**45. Lobbying Restrictions**

**a) This assistance agreement is subject to lobbying restrictions as described below. Applicable to all assistance agreements:**

    **i.** The chief executive officer of this recipient agency shall ensure that no grant funds awarded under this assistance agreement are used to engage in lobbying of the Federal Government or in litigation against the U.S. unless authorized under existing law. The recipient shall abide by the Cost Principles available at 2 CFR Part 200 which generally prohibits the use of federal grant funds for litigation against the U.S. or for lobbying or other political activities.

    **ii.** The recipient agrees to comply with Title 40 CFR Part 34, New Restrictions on Lobbying. The recipient shall include the language of this provision in award documents for all subawards exceeding $100,000 and require that subrecipients submit certification and disclosure forms accordingly.

    **iii.** In accordance with the Byrd Anti-Lobbying Amendment, any recipient who makes a prohibited expenditure under Title 40 CFR Part 34 or fails to file the required certification

or lobbying forms shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such expenditure.

iv. Contracts awarded by a recipient shall contain, when applicable, the anti-lobbying provision as stipulated in the contract provisions provided in  Appendix II to Part 200.

v. By accepting this award, the recipient affirms that it is not a nonprofit organization described in Section 501(c)(4) of the Internal Revenue Code of 1986 as required by Section 18 of the Lobbying Disclosure Act; or that it is a nonprofit organization described in Section 501(c)(4) of the Code but does not and will not engage in lobbying activities as defined in Section 3 of the Lobbying Disclosure Act. Nonprofit organizations exempt from taxation under section 501(c)(4) of the Internal Revenue Code that engage in lobbying activities are ineligible for EPA subawards.

b) **Applicable to assistance agreements when the amount of the award is over $100,000:**

i. By accepting this award, the recipient certifies, to the best of its knowledge and belief that:

1) No Federal appropriated funds have been or will be paid, by or on behalf of the recipient, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, or any employee of a Member of Congress in connection with this Federal grant or cooperative agreement, the recipient shall complete and submit the linked Standard Form -- LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3) The recipient shall require that the language of this certification be included in the award documents for all subawards exceeding $100,000 at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

ii. This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, Title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each failure.

**46. Recycled Paper**

When directed to provide paper documents, the recipient agrees to use recycled paper and double-sided printing for all reports which are prepared as a part of this agreement and delivered to EPA. This requirement does not apply to reports prepared on forms supplied by EPA.

**47. Resource Conservation and Recovery Act**

Consistent with goals of section 6002 of RCRA (42 U.S.C. 6962), State and local institutions of higher education, hospitals and non-profit organization recipients agree to give preference in procurement programs to the purchase of specific products containing recycled materials, as identified in 40 CFR Part 247.

a) Consistent with section 6002 of RCRA (42 U.S.C. 6962) and 2 CFR 200.323, the recipient or subrecipient that is a State agency or agency of a political subdivision of a State and its contractors are required to purchase certain items made from recycled materials, as identified in 40 CFR Part 247, when the purchase price exceeds $10,000 during the course of a fiscal year or where the quantity of such items acquired in the course of the preceding fiscal year was $10,000 or more. Pursuant to 40 CFR 247.2(d), the recipient or subrecipient may decide not to procure such items if they are not reasonably available in a reasonable period of time; fail to meet reasonable performance standards; or are only available at an unreasonable price.

b) The recipient or subrecipient should, to the greatest extent practicable and consistent with law, purchase, acquire, or use products and services that can be reused, refurbished, or recycled; contain recycled content, are biobased, or are energy and water efficient; and are sustainable. This may include purchasing compostable items and other products and services that reduce the use of single-use plastic products per Executive Order 14057, section 101, Policy.

**48. Trafficking in Persons**

a) **Provisions applicable to a recipient that is a private entity receiving funds under the award.**

  i. The recipient, the recipient's employees, subrecipients under this award, and subrecipients' employees may not engage in:

    1) Severe forms of trafficking in persons;

    2) The procurement of a commercial sex act during the period of time that this award or any subaward is in effect;

    3) The use forced labor in the performance of this award or any subaward; or

    4) Acts that directly support or advance trafficking in persons, including the following acts:

      i. Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents;

      ii. Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless:

        **A.** Exempted from the requirement to provide or pay for such return transportation by the Federal department or agency providing or entering into the grant or cooperative agreements; or

        **B.** The employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action;

    **iii.** Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment;

    **iv.** Charging recruited employees a placement or recruitment fee; or

    **v.** Providing or arranging housing that fails to meet the host country's housing and safety standards.

**ii.** EPA may unilaterally terminate this award or take any remedial actions authorized by 22 U.S.C. 7104b(c), without penalty, if any private entity under this award:

    **1)** Is determined to have violated a prohibition in paragraph 47.a.i. of this award term; or

    **2)** Has an employee that is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph 47.a.i. of this award term through conduct that is either:

        **i.** Associated with the performance under this award; or

        **ii.** Imputed to the recipient or subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR Part 180, ''OMB Guidelines to Agencies on Government-wide Debarment and Suspension (Non- procurement),'' as implemented by EPA at 2 CFR Part 1532.

**b)** **Provision applicable to a recipient other than a private entity.** EPA may unilaterally terminate this award or take any remedial actions authorized by 22 U.S.C. 7104b(c), without penalty, if a subrecipient that is a private entity under this award:

    **i.** Is determined to have violated an applicable prohibition in paragraph 47.a.i. of this award term; or

    **ii.** Has an employee that is determined to have violated a prohibition in paragraph 47.a.i. of this award term through conduct that is either:

        **1)** Associated with the performance under this award; or

        **2)** Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR Part 180, ''OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement),'' as implemented by EPA at 2 CFR Part 1532.

**c)** **Provisions applicable to any recipient**

    **i.** The recipient must inform the EPA and the EPA's Office of Inspector General immediately of any information received from any source alleging a violation of a prohibition in paragraph 47.a.i. of this award term.

    ii.   The EPA's right to terminate unilaterally that is described in paragraphs 47.a. and 47.b.:
- 1) Implements the requirements of 22 U.S.C. Chapter 78, and
- 2) Is in addition to all other remedies for noncompliance that are available to the EPA under this award.

    iii.   The recipient must include the requirements of paragraph 47.a.1. of this award term in any subaward made to a private entity.

    iv.   If applicable, the recipient must also comply with the compliance plan and certification requirements in 2 CFR 175.105(b).

**d) Definitions.** For purposes of this award term:

    i.   "Employee" means either:
- 1) An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or
- 2) Another person engaged in the performance of the project or program under this award and not compensated by the recipient including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing requirements.

    ii.   "Private Entity" means any entity, including for-profit organizations, nonprofit organizations, institutions of higher education, and hospitals. The term does not include foreign public entities, Indian Tribes, local governments, or states as defined in 2 CFR 200.1

    iii.   The terms "severe forms of trafficking in persons," ''commercial sex act,'' "sex trafficking," "Abuse or threatened abuse of law or legal process," ''coercion,'' "debt bondage," and involuntary servitude" have the meanings given at section 103 of the Trafficking Victims Protection Act of 2000, as amended (22 U.S.C. 7102).

**49. Build America, Buy America – Required Use of American Iron, Steel, Manufactured Products, and Construction Materials (effective October 23, 2023, and forward)**

***Buy America Preference.*** Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

**(1)** All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

**(2)** All manufactured products used in the project are produced in the United States— this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under

applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

**(3)** All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

***Incorporation into an infrastructure project.*** The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

***Categorization of articles, materials, and supplies.*** An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

***Application of the Buy America Preference by category.*** An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

***Determining the cost of components for manufactured products.*** In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

**(a)** For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

**(b)** For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

***Construction material standards.*** The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied to a single construction material.

**(1)** Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

**(2)** Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.

**(3)** Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

**(4)** Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

**(5)** Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

**(6)** Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.

**(7)** Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

**(8)** Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

***Waivers.*** When supported by rationale provided in IIJA §70914, the recipient may submit a waiver request in writing to EPA. Recipients should request guidance on the submission instructions of an EPA waiver request from the EPA Project Officer for this agreement. A list of approved EPA waivers (general applicability and project specific) is available on the [EPA Build America, Buy America website](#).

EPA may waive the application of the Buy America Preference when it has determined that one of the following exceptions applies:

**(1)** applying the Buy America Preference would be inconsistent with the public interest;

**(2)** the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

**(3)** the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

For questions regarding the Build America, Buy America Act requirements for this assistance agreement or to determine if there is an approved waiver in place, please contact the EPA Project Officer for this agreement.

***Definitions.*** For legal definitions and sourcing requirements, the recipient must consult the EPA Build America, Buy America website, 2 CFR Part 184, and the Office of Management and Budget's (OMB) Memorandum M-24-02 Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure.

## 50. Required Certifications and Consequences of Fraud

Per 2 CFR 200.415(a), financial reports must include a certification that must be signed by an official who is authorized to legally bind the recipient which reads as follows:

"By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. I am aware that any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (U.S. Code Title 18, Section 1001 and Title 31, Sections 3729-3730 and 3801-3812)."

As outlined in 2 CFR 200.415(b), subrecipients of all tiers under the Federal award must certify to the pass-through entity whenever applying for funds, requesting payment, and submitting financial reports as follows:

"I certify to the best of my knowledge and belief that the information provided herein is true, complete, and accurate. I am aware that the provision of false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil, or administrative consequences including, but not limited to violations of U.S. Code Title 18, Sections 2, 1001, 1343 and Title 31, Sections 3729-3730 and 3801-3812."

The certifications must be maintained in accordance with the record retention requirements at 2 CFR 200.334.

## 51. Reporting Waste, Fraud and Abuse

Consistent with 2 CFR 200.113, the recipient and any subrecipients of this award must promptly report in writing whenever there is credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. 3729-3733) to the EPA Project Officer, the pass-through entity (if applicable), and the EPA Office of Inspector General (OIG). The methods to contact the EPA OIG are (1) online submission via the EPA OIG Hotline Complaint Form; (2) email to OIG_Hotline@epa.gov; (3) phone 1-888-546-8740; or (4) mail directed to

Environmental Protection Agency, Office of Inspector General, 1200 Pennsylvania Avenue, N.W. (2410T), Washington, DC 20460.

To support awareness of the OIG hotline, recipients and/or subrecipients receiving an EPA award or subaward of $1,000,000 or more must display EPA OIG Hotline posters in facilities where the work is performed under the grant. EPA OIG Hotline posters may be downloaded or printed or may be obtained by contacting the OIG at 1- 888-546-8740. Recipients and subrecipients need not comply with this requirement if they have established a mechanism, such as a hotline, by which employees may report suspected instances of improper conduct and have provided instructions that encourage employees to make such reports.

Recipients and subrecipients are also required to report matters related to recipient integrity and performance in accordance with Appendix XII to 2 CFR Part 200.

**52. Whistleblower Protections**

This award is subject is to whistleblower protections, including the protections established at 41 U.S.C. 4712 and 2 CFR 200.217 providing that an employee of the recipient or subrecipient may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (a)(2) of 41 U.S.C. 4712 information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract, grant, or subaward, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract), grant. These covered persons or bodies include:

    **a.** A member of Congress or representative of a committee of Congress.

    **b.** An Inspector General.

    **c.** The Government Accountability Office.

    **d.** A Federal employee responsible for contract or grant oversight or management at the relevant agency.

    **e.** An authorized official of the Department of Justice or other law enforcement agency.

    **f.** A court of grand jury.

    **g.** A management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct.

Consistent with 41 U.S.C. 4712(d), the recipient and subrecipients must inform their employees in writing, in the predominant language of the workforce or organization, of employee whistleblower rights and protections under 41 U.S.C. 4712. Additional information about whistleblower protections, including protections for such employees may be found at the EPA Office of Inspector General's Whistleblower Protection page.

**53. Access to Records**

In accordance with 2 CFR 200.337, EPA, the pass-through entity, the EPA Office of Inspector General (OIG), and the Comptroller General of the United States have the right to access any records of the recipient and subrecipient pertinent to this award, to perform audits, execute site visits, or for any other official use. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview and discussion related to such documents or the Federal award in general. This right of access shall continue as long as the records are retained.

Appendix C

**Greenhouse Gas Reduction Fund**
**Solar for All**
**California Solar for All Program**
**Work Plan**
**Project Period: 5/1/24 – 4/30/29, Submitted 10/9/24, Revised 11/15/24 (11/19/24 Correction)**

**Project Title:** The State of California's Solar for All Program (**CA-S4A**)
**Grant Number:** #84092302
**Organization Name:** The California Public Utilities Commission, on behalf of the State of California
**Geography:** State of California

## Table of Contents

Definition of LIDAC: ................................................................................................................ 3

Section 1:  Project Description ................................................................................................. 4

   1.1 Overview ........................................................................................................................ 4

      1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals ................. 6

Section 2:  Project Design Plan ............................................................................................... 10

   2.1 Activities to be Conducted ............................................................................................. 10

      2.1.1 Meaningful Benefits Plan ........................................................................................ 10

      2.1.2 Planning Period Tasks ............................................................................................. 14

      2.1.3 Household Savings - Bill Benefit ............................................................................ 18

      2.1.4 Resiliency Benefits .................................................................................................. 20

      2.1.5 LIDAC Access ........................................................................................................ 20

      2.1.6 Household and Community Ownership .................................................................... 22

      2.1.7 Quality Jobs and Businesses ................................................................................... 22

   2.2 Financial Assistance Strategy ........................................................................................ 25

   2.3 Project-Deployment Technical Assistance Strategy ....................................................... 30

      2.3.1 Workforce Development .......................................................................................... 31

      2.3.2 Project Siting, Permitting. And Interconnection (to the grid) .................................. 33

      2.3.3 Equitable Access and Meaningful Involvement Plan .............................................. 38

      2.3.4 Summary Matrix of Customers with Barriers and CA S4A Tactics to Address Barriers ................................................................................................................................ 40

      2.3.5 Plan for Participatory Governance-Formalized Structures: .................................... 44

Section 3:  Fiscal Stewardship Plan ......................................................................................... 47

   3.1 Consumer Protections .................................................................................................... 49

Section 4: Timeline and Milestones ......................................................................................... 53

Section 5:  Reporting Requirements .................................................................... 60

  5.1 Performance Reports.................................................................................63

  5.2 Transaction-Level and Project-Level Data ...............................................64

Section 6:  Budget Narrative................................................................................ 65

  6.1 Overall Project Budget.............................................................................65

  6.2 Personnel..................................................................................................66

  6.3 Fringe Benefits.........................................................................................68

  6.5 Equipment ................................................................................................71

  6.6 Supplies....................................................................................................71

  6.7 Contractual...............................................................................................71

  6.8 Construction .............................................................................................75

  6.9 Other ........................................................................................................75

  6.10 Additional Items.....................................................................................77

  6.11 Additional Workplan and Budget Questions ..........................................79

## Definition of LIDAC:

California Solar for All (**CA-S4A**) intends to use criterion that align with the US Environmental Protection Agency (EPA) definition of low-income and disadvantaged communities (LIDAC) as defined in Section I.D: Competition Terminology of the Notice of Funding Opportunity was used to determine if a household is eligible for Solar for All assistance.

Meeting any of the following four categories qualifies as a low-income and disadvantaged community:

1. Located in a census tract within an identified disadvantaged community (DAC) according to the latest version of CalEnviroScreen, meaning those census tracts scoring in the highest 25% among the designated factors and land within the boundaries of Federally Recognized Tribes.
2. Any additional communities identified as disadvantaged by the Climate and Economic Justic Screening Tool (CEJST) or EJScreen mapping tool, which includes American Indian Reservations, American Indian Off-reservation Trust Lands.
3. Geographically dispersed low-income households:
   a. Metropolitan Areas: (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Guidelines (FPG), wherein the maximum of these two figures determines the income limit.
   b. Non-Metropolitan Areas: (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level, wherein the maximum of these three figures determines the income limit.
4. Properties providing affordable housing (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs:
   a. (1) Low-Income Housing Tax Credit;
   b. (2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program;
   c. (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or
   d. (4) a housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22))

# Section 1: Project Description

## 1.1 Overview

**CA-S4A** represents a coalition of state entities with deep programmatic expertise in regulatory design, capacity building, clean energy infrastructure development, and sophisticated grid management. Together, the coalition will leverage California's historical transformation of its solar energy markets to reach households and businesses statewide that are most in need of affordable, reliable clean energy. With this new infusion of highly flexible, equity-focused resources, California will build new programmatic designs, expand current efforts, address funding gaps, and add momentum to new strategies under development. California will continue its march to address changing market and real-world conditions as the state continues to advance its decarbonization goals. California has matured the solar energy landscape, at home and globally, in the last two decades. Through these new equity-focused partnerships, designed with an emphasis on a modernized and cost-effective grid, the **CA-S4A** program will continue to accelerate deployment of clean energy generation options for additional priority, communities.

In the 1990s, California's vertically integrated utilities, responsible for delivery, power generation, and transmission, were bifurcated into separate functions. **IOUs** (IOUs) run distribution grids and deliver power to customers while generation companies own power plants and sell into wholesale power markets. California's Independent System Operator (CAISO) runs the state's transmission system.

The California Public Utilities Commission (CPUC) regulates privately owned public utilities, including electric power. The California Energy Commission is the state energy office that oversees energy planning and the publicly-owned utilities (POUs). The California Labor and Workforce Development Agency (LWDA) is a cabinet-level agency that coordinates workforce programs across state departments including the Employment Development Department (EDD), which provides employment service programs along with its other core functions.

Since 2007, California ratepayers have dedicated over $1 billion in subsidies towards low-income and community renewable energy programs. The state's low-income rooftop solar, low-income multifamily solar, and community solar programs have resulted in over 13,365 approved projects and 430 MW of solar capacity online or in process. During this same time, two community solar programs were also launched for general market customers and for low-income renters in disadvantaged community census tracts.

California requires renewable energy facilities, typically rooftop solar, for most new construction projects, including residential, commercial and industrial facilities. These requirements are incorporated into the state building energy code (Title – 24 Building Energy Code) that the CEC develops and local jurisdictions, in charge of planning and permitting construction, implement.

In 2022, California approved a high roads job legislation that requires construction workers and apprentices of customer-owned renewable energy facilities be paid the prevailing wage rate. This

applies to workers on certain, mainly commercial, renewable energy projects in Pacific Gas & Electric, Southern California Edison, and San Diego Gas & Electric territories.[1]

The administering agencies of **CA-S4A** are the California Public Utilities Commission (CPUC), California Energy Commission (CEC), and the Labor and Workforce Development Agency with the Employee Development Department (EDD). The CPUC will implement programs serving LIDAC and Tribal customers in the investor-owned utility (IOU) territories. The CEC will focus on the same audiences in publicly-owned utilities (POU) territories. While many of the state's POUs are committed to the deployment of clean energy programs that benefit low-income and disadvantaged communities (LIDAC) in their service territories, not all have the technical ability, funding, and/or regulations in place to sufficiently deploy solar and storage projects to their LIDAC customers. EDD will offer labor training programs through the Resilient Workforce Program (RWP). Only a small part of the grant (7% of funds) will cover gaps in existing programs.

**IOU-S4A Community Solar (~$200 million):** A new program that will support new mid-scale capacity solar systems (about 5 MW each) that offer 20% monthly electricity bill discounts to participating households. Competitively selected solar PV power-producing facilities or solar energy purchasing program from a power-producing facility will dedicate nearly 100% of their generated power to low-income residential customers in the same utility territory. These plants may be community-owned or third-party owned.[2]

**IOU-S4A SOMAH (~$10 million):** Solar on Multifamily Affordable Housing (SOMAH) site readiness grants to affordable multifamily participants to improve structures and grid connections enabling upgrades to deploy residential rooftop solar and associated storage (including tribal customers). Expected bill benefits to tenants range from at least 20% but may be as high as 60% of monthly electricity bills. Since 2019, SOMAH has funded rooftop solar that offsets tenant electricity bills through tenant benefit agreements administered by the IOUs. This established bill crediting process is known as virtual net energy metering.[3]

**POU-S4A (~$25 million):** Establish new programs to deploy community solar, multifamily rooftop solar, and single-family rooftop solar or solar with associated storage systems (including tribal stakeholders) in multiple POU territories. **POU-S4A** will offer at least the minimum bill expected of 20% monthly electricity bill savings. The CEC will run two to three granting cycles to which POUs or Tribes will apply to start new programs and tariffs in their territories during the grant period to expand solar access to LIDAC customers.

**RWP-S4A (~$9 million):**  Establish and expand training programs to increase knowledge and competency of workers within the solar and storage sectors. Selected programs will include outreach to increase participants from identified LIDAC communities. EDD Workforce Services Branch (WSB) has managed funding programs that create pathways for job growth via training partnerships with California employers.  These programs include those authorized by the federal

---

[1] Assembly Bill 2143 (2022, Carrillo)
[2] Notice of Funding Opportunity, "Residential-Serving Community Solar" at page 9
[3] Notice of Funding Opportunity, "Enabling Upgrades" permits that 20% of total financial assistance deployed may go towards enabling upgrades. Only one-fifth of CA S4A financial assistance is allocated to IOU-S4A SOMAH.

Workforce Innovation and Opportunity Act (WIOA) and the Wagner-Peyser Act. EDD WSB delivers programs that prepare all job seekers, including dislocated workers, youth, veterans, people with disabilities, for the workforce. With this experience EDD WSB will work with local workforce development boards, community colleges, and other key training providers to establish or expand training programs for jobs in the solar market.  EDD tracks trainee information through the CalJOBS system which includes data on program completion, job placement, wage progression and career advancement.

Due to its downscaling efforts from a reduced EPA grant award, California has integrated work originally planned for the Strategic Growth Council (SGC-S4A) and the California Energy Commission (Tribal-S4A), and incorporated its audiences (low-income, single-family households, tribes) into its IOU and POU Community Solar programs. A community solar program removes financing and technical barriers to for these LIDAC recipients as it eliminates the need for up-front capital.

## 1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Environmental Results - Outputs and Outcomes:**

California anticipates that the grant will result in the following outputs (measurable over the grant period) and outcomes (over the lifecycle of new solar or solar with storage systems) to improve the environment and equity in the California solar market. California's tactics are focused on expanding community solar for LIDAC customers, leveraging an existing affordable multifamily program (for on-site, multi-tenant benefitting systems), and growing its solar and energy workforce development opportunities. California has diligently planned an approach to increase equity and avoid duplication of existing offerings. As an example, **IOU-S4A Community Solar** and **IOU-S4A SOMAH** will use non-interest bearing utility balancing accounts[4] and subaccounts to bifurcate and firewall CA-S4A funds from existing funding sources such as utility greenhouse gas auction proceeds, general state taxpayer funds, or funds sourced via Public Purpose Program funds collected in rates. Clearly separating these funds will simplify tracking outcomes and impacts of the grant. *At this time, the following outputs and outcomes are projected in alignment with the components of the Meaningful Benefits Plan*:

**Objective 1, reducing emissions of greenhouse gases and other air pollutants:**
- Estimated output of deploying ~**$233M** to promote up to **75MW** new solar and **37 MWh** new associated storage to the grid.[5]
  - These systems will generate 205,330 MWh annually and reduce key pollutants harming the atmosphere:
    - $CO_2$ 104,546 tons
    - $SO_2$ 6,603 lbs
    - $NOX$ 44,895 lbs
    - $PM2.5$ 30,211 lbs

---

[4] A utility balancing account is an account used to match the collection of actual revenues against actual costs after an adjustment for unanticipated changes in expenditures.
[5] This output estimate utilizes the low case scenario for IOU-S4A Community Solar, see table below for details on the case ranges.

- VOCs 4,642 lbs
- NH3 6,707 lbs
- A typical solar system lasts twenty years, the **CA-S4A** Coalition's estimated outcome is that this work can offset nearly 3 billion tons of CO2, equivalent to 566,182 homes' electricity use for one year.[6]

**Objective 2, deliver benefits of greenhouse gas and air pollution reducing projects to communities, particularly low-income and disadvantaged communities:**
- Encouraging installation of roughly 600 new renewable energy facilities in tribal and disadvantaged communities.
- Community Solar for nearly 29,000 LIDAC multifamily and single-family households, with a third of those directly owning their solar systems.
- Achieving up to 31% average annual bill savings per household. This will deliver over $151.3 million dollars in savings per year.
- Delivering the benefits of solar or solar + storage to over 29,000 low-income households.
- Ensuring equitable benefits for residents, regardless of whether they own their home.
- Promoting prevailing wage standards across **CA-S4A** funded projects.
- Providing high-road job training opportunities to make long-term career pathways to good jobs in priority communities. Creating an estimated 395 new solar and energy storage jobs of which 225 will be high-road jobs expected to achieve a 10.5% increase in wages.

**Objective 3, mobilizing financing and private capital to stimulate additional deployment of greenhouse gas and air pollution reducing projects:**
- Creating pathways for community-centered projects that provide climate resilience and economic opportunity.
- Leveraging over $1B in new and existing investor-owned utility ratepayer funded programs.
- Developing a free tool to prevent predatory sales tactics and support customers in determining simple payback.
- Incentivizing property owners and developers to co-fund new systems.
- Engage and support twelve community-based organizations for Solar For All services

Throughout the grant's period of performance, the California Solar for All program will be evaluated on its ability to deliver on meaningful benefits, strict accountability, and verified benefits to uphold the GGRF program objectives.

---

[6] Calculated using EPA's Greenhouse Gas Equivalencies Calculator

**Objectives 1, 2, and 3 Key Metrics from CA-S4A By Program:**
The following tables show the expected outputs during the grant period for each part of the **CA-S4A** Coalition.



For total amount of household bill savings, these amounts are cumulative; for example, the households with solar treated in Year 1 will have four years of bill savings, whereas households treated in Year 5 will have one year of bill savings during the grant period.

| CA-S4A-IOU Community Solar Program Estimated Outputs[7] | Financial Assistance: $190.2 Million |
|---|---|
| Solar Capacity Installed (MW) | 50-100 MW |
| Number of Projects Financed (#) | 10-20 Community Solar Sites |
| Clean Energy Generation (MWh) | 115,925-231,850 MWh |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) | 54,713-109,426 (tons CO2) |
| Number of Households Benefitting from Projects (#) | 15,000-30,000 households |
| Amount of Household Bill Savings Delivered Cumulative Total ($) (*in Year 5*) | $6,678,180-13,356,360 ($/average month) |
| Average Savings per Benefitting Household (%) | 20% |
| Private Sector Financing Mobilized (Developer Co-Pay) | TBD |
| Note: At this time, it is expected the program funding (from S4A and other public funding sources) will cover all project costs. The estimated output range is associated with two scenarios, the high output case is based on lower-cost, solar-only projects and the low output case is higher-cost, hybrid solar + storage projects. This will be updated as result of Planning Period activities. | |

[7] Since the proceeding that will determine the final CA-IOU Community Solar application of federal funding is still ongoing, this table shows an estimate only and will be updated in the final workplan at the end of the planning year.

| CA-S4A-IOU SOMAH Estimated Outputs | Financial Assistance: $9.69 Million |
|---|---|
| Solar Capacity Installed (Residential Solar) (MW) | 12.1 MW |
| Number of Projects Financed (#) | 85 projects |
| Storage Capacity Installed (MWh) | 24 MWh |
| Clean Energy Generation (MWh) | 37,643 MWh |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) | 18,129 CO2 |
| Number of Households Benefitting from Projects (#) | 6,446 households |
| Amount of Household Bill Savings Delivered Cumulative Total ($) (*in Year 5*) | $5,359,898 ($/average month) |
| Average Savings per Benefitting Household (%) | 39% |
| Private Sector Financing Mobilized (Property Owner Co-pay) | $22,185,000 |
| Note: These outputs are additive to the SOMAH program and are the expected increase from S4A funding. SOMAH's administrative costs and solar incentives are provided through its current budget. | |

| CA-S4A-POU Program Estimated Outputs | Financial Assistance: $25 Million |
|---|---|
| Solar Capacity Installed (Residential Solar) (MW) | 13.1 |
| Number of Projects Financed (#) | 512 |
| Storage Capacity Installed (MWh) | 13.1 |
| Clean Energy Generation (MWh) | 51,762 |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) | 31,705 |
| Number of Households Benefitting from Projects (#) | 7,956 |
| Amount of Household Bill Savings Delivered Cumulative Total ($) (*in Year 5*) | $7,764,750 ($/average month) |
| Average Savings per Benefitting Household (%) | 20% to 30.3% |
| Private Sector Financing Mobilized (POU Matching Funds and/or Owner Co-Pay) | $12,000,000 |
| Note: Private Sector Financing mobilized may be adjusted based on the outcomes of Planning Period tasks. Average Bill Savings per Benefiting Household estimate high case is based on previous programs analyses, and low case is based on minimum S4A requirements. | |

| CA-S4A RWP Estimated Outputs | Financial Assistance: $8 Million |
|---|---|
| Workers Trained by Workforce Development Programs | 225 |
| Projects Executed Using Tools to Project Good Jobs and Community Benefits | 17 |
| Average increased wages for individuals working in solar energy (%) | 10.5% |

California has ongoing and active programs for solar that the Solar For All programs will complement. Under the CPUC's jurisdiction are these other incentive programs: Disadvantaged Communities Solar Affordable Homes Program (DAC-SASH), Disadvantaged Communities Green Tariff (DAC-GT), Solar on Multifamily Affordable Housing (SOMAH), and the Self-Generation Incentive Program (SGIP) serving LIDAC customers.[8] Of these, only SOMAH is being expanded through S4A funding. The CPUC also oversees several customer generation export tariffs: net energy metering, net billing, fuel-cell net energy metering, and tariff variations to support customers with disaggregated sites (such as agricultural customers), multitenant properties, local governments, schools, and tribal governments.

This work will comply with Title VI of the Civil Rights Act and other Federal statutes (including Section 504 of the Rehabilitation Act of 1973 and The Age Discrimination Act of 1975) and regulations prohibiting discrimination in Federal financial assistance programs, as applicable. Participation in Solar For All programs will *not* be determined based on any personal factors such as race, color, gender, or national origin.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

# Section 2:  Project Design Plan

## 2.1 Activities to be Conducted

### 2.1.1 Meaningful Benefits Plan

Across all of the **CA-S4A** program's actions, California will deliver on the five US EPA Solar for All meaningful benefits, with a focus on targeting new distributed solar and storage projects to LIDAC customers: (1) delivering a minimum of 20% of household savings (Bill Benefits), (2) increasing LIDAC access to solar + storage through financing products and deployment options

---

[8] More information available at: https://www.cpuc.ca.gov/industries-and-topics/electrical-energy/demand-side-management

(Financing Products and Deployment), (3) increasing resiliency and grid benefits by creating capacity that can deliver energy to LIDACs during grid outages (Increase Resiliency and Grid Benefits), (4) maximizing household and community ownership models, and (5) investing in quality jobs and businesses (Quality Jobs and Businesses) per President's Executive Order on Investing in America and Investing in American Workers, the Administration's Good Jobs Principles and E.O. 14082. As indicated, California intends to take advantage of USEPA's provision for a twelve-month planning period before several of the **CA-S4A** programs begin committing funds. During this planning period, as policy decisions are made and program designs advance to reflect them, the state's ability to predict specific outcomes will necessarily improve.

California law already requires all workers and apprentices involved in the construction of net energy metering solar generating facilities supporting commercial, industrial, and large multifamily properties to be paid prevailing wage akin to public works projects.

California has simplified the application process. After the passage of SB 379, California Energy Commission oversaw the implementation of the California Automated Permit Processing Program (CalAPP) to expedite local jurisdiction permitting. Currently, a total of 242 counties and cities have automated platforms for issuing solar permits. Additionally, California's Title 24 Building Code sets minimum building energy efficiency standards, and as part of a regular update cycle that went into effect in 2020, virtually all new residential construction is required to incorporate rooftop solar or an alternative.

California also offers two community solar programs, one of which DAC-Green Tariff specifically designed for low-income renters living in disadvantaged communities. The program enables income-qualified, residential customers in DACs who may be unable to install solar on their roof to benefit from utility scale clean energy and receive a 20% monthly bill discount. The program is available to customers who meet the income eligibility requirements for the California Alternate Rates for Energy (CARE) and Family Electric Rate Assistance (FERA) programs (200% FPG).

California's Native population is one of the largest in America. Native American tribes located within POU territories are included as eligible participants in the portion of funding administered by the CEC, and the California Public Utilities Commission (CPUC) is the agency that will consider awarding funds to Tribes located in IOU territory.

Two barriers that impact the breadth and diversity of solar deployment are 1) the lack of programs focused on opportunities to advance solar and storage in partnership with California's Native American tribes, and 2) the lack of programs focused on improving California's aging housing and building stock to allow the buildings to accommodate solar and storage. To create and measure meaningful benefits, California S4A addresses these barriers and utilize an expert consultant contract to provide ongoing analytical work to quantitatively model program design options; recommend program design aspects; and measure impacts, realization rates, and bill savings.

The majority of the Solar For All grant is going to new programs (93% of grant funds) California has key elements already in place, which will be maintained through the grant period:

1. Tariffs
   a. **IOU-S4A SOMAH** utilizes a virtual net energy metering tariff to share generation credits amongst multiple benefitting accounts at a set-rate. Participating tenants must be on a time-of-use import rate and may also receive additional energy rate discounts through income qualified discount programs such as the California Alternate Rates for Energy (CARE) and the Family Electric Rate Assistance (FERA) program. Net export compensation (for solar added to the grid) funding comes from non-participating ratepayers.

2. Per-Watt Incentives
   a. **IOU-S4A SOMAH** offers a per-watt incentive for solar or solar with storage systems. The incentive is higher for capacity dedicated to tenants; and to reduce double compensation, it is lowered with the use of complimentary tax incentives. At most, the incentive is $3.50/watt for tenant capacity and $1.19/watt for common areas. This is funded by participating IOUs' greenhouse gas auction revenues.
   b. **IOU-S4A Community Solar** may offer a per-watt upfront incentive or per kilowatt hour performance incentive for new solar+storage projects in LIDACs. The incentive level will be determined through a stakeholder process during the period of performance. **IOU-S4A Community Solar** may also apply funding to the 20% low-income subscriber saving threshold.

3. Existing Programs
   a. **POU-S4A** will leverage existing POU programs in applicable territories to expand their impact and offer new funding opportunities for other POUs that lack sufficient resources.
   b. **POU-S4A** includes funding for tribes in POU territories to enhance tribal energy sovereignty through programs such as Long Duration Energy Storage (LDES) and microgrid funding through California's Electric Program Investment Charge (EPIC) Program. Funding can also expand tribal partnerships to support leveraging capital through the CEC's Energy Conservation Assistance Act loan program.
   c. **IOU-S4A SOMAH** expands the SOMAH program, which provides solar incentives to affordable multifamily property since 2019 and has a current budget over $700 million. The incentive is higher for the solar capacity supporting tenants ($3.50/watt) than common areas ($1.19/watt). To-date, the program has installed 23.25 MW at 162 sites with over 13,000 LIDAC renter households. The program has a significant amount of unspent incentive funds, $507.4 million, and eligible, but non-participating property owners need support covering additional site remediations to facilitate on-site solar.
      i. SOMAH workforce training requirements are a precursor to receiving incentives. Incentives (for the solar system) will not be disbursed if the contractor does not follow and document workforce training.
   d. **IOU-S4A** may leverage the CPUC's existing DAC-GT program which subsidizes the renewable energy premium or delta above low-customers' otherwise applicable rate and 20% average customer monthly bill discount for low-income

residential customers. To-date, the DAC-GT program has procured 74 MW and serves 24,000 LIDAC households. The program capacity was recently expanded and has approximately 140 MW available for new procurement.

4. Achieving a 20% Bill Discount
   a. **IOU-S4A Community Solar** and SOMAH calculate the 20% low-income customer bill discount on a monthly basis.
   b. **POU-S4A** will use the 12-month planning period to determine exact methodology for calculating 20% savings. It is expected that as a condition of receiving an award, POUs must agree to apply a minimum 20% subsidy/discount/bill credit to a recipient household's cost of electrical usage over a monthly or annual period.

5. Data Collection to Verify Bill Savings
   a. **IOU-S4A Community Solar** has mandated monthly bill savings, so the IOUs and CCAs will automatically apply a 20% average monthly bill discount for all participating low-income customers. The CPUC will periodically request customer billing data to verify the outcomes over the grant period, however the IOUs may be found to be out of compliance with CPUC directives should this outcome not be achieved.
   b. **IOU-S4A SOMAH** already requires that a majority of generating capacity (at least 51 percent) is dedicated to tenants for the life of the solar system (20 years). **IOU-S4A SOMAH** will update program agreements so Solar For All recipients will have to acknowledge the 20% minimum bill savings required. Applicants must submit system design characteristics and their credit allocation agreements in order to receive incentive payments. The current average bill reduction for a SOMAH participant far exceeds a 20 percent minimum. In 2022, SOMAH participants had an average savings of $39/month or a 60% percent average monthly reduction. The CPUC will periodically request customer billing data to verify outcomes over the grant period.
      i. When designing a SOMAH solar system, the applicant looks at the property's common area and tenants' electricity usage from the past year to determine the baseline needs and may add future electrical vehicle charging. The property also conducts an energy efficiency audit to determine if additional capacity adjustments should be made. After the entire system is designed, the property owner determines the split between tenants and the common areas. For tenant households, it is often set by the number of bedrooms in each tenant household.

6. No construction costs for participating LIDAC Households **IOU-S4A Community Solar** will disallow construction costs from being passed on to beneficiaries; there will be cost-sharing with beneficiaries.

7. **IOU-S4A SOMAH** prohibits landlord from passing on any costs to multifamily renters either directly or indirectly through raised rents. Property owners must sign an agreement which requires them to return their incentives if they do not abide by this term.

8. Throughout the grant, **CA S4A Coalition Agencies** will meet regularly to coordinate policies and implementation, including reporting and enforcement of the S4A terms and conditions.

## 2.1.2 Planning Period Tasks

In the 12-month planning period:

- **CA-S4A** coalition agencies will hire new personnel and vendors as specified in their budgets and timelines.
- At the onset, CPUC will host a virtual, public workshop to release CA's S4A approved workplan and preview the timeline and key milestones. There would be an opportunity for public feedback and to answer questions. This would be noticed on the CPUC website, social media, regulatory list serves, CPUC's daily calendar, as well as other agency communication lists, calendars, and websites. To expand our reach further, CPUC staff would directly reach out to provide notice to relevant community-based organizations that participate in statewide advisory groups or that participate in existing low-income programs.
- Engage in tasks (data, monitoring, reporting, etc.) in support of quality management plan and quality assurance.
- Create interagency agreements between prime grantee, CPUC, and each CA coalition agency to facilitate confidential information sharing, implementation, and funding.
- Coalition agency staff will coordinate regularly on planning period tasks, with CPUC staff as administrator lead. Coalition agency staff will also attend S4A EPA trainings, and inter-state meetings organized by Clean Energy States Alliance (CESA).

**IOU-S4A Community Solar** Planning Period Tasks

*Grant and Incentive Funding:*

1) Finalize community solar program implementation details with diverse group of stakeholders including but not limited to environmental justice groups, environmental and energy nonprofit groups, solar industry trade organizations, solar developers, subscription managers and subscribing organizations, ratepayer advocates, IOUs, and CCAs.
2) Identify budget per IOU territory and identify initial enrollment approaches including automatic enrollment for reaching households meeting income, tribal status, and geographic criteria to simplify household participation. Review utility balancing accounts and, if necessary, direct adjustments to comply with S4A terms and conditions.
3) Establish funding set-asides, if any, for technical assistance.
4) Outline criteria for proposals and selecting winning community solar development proposals, which include satisfaction of quality jobs and businesses criteria and Build America, Buy America Act standards and satisfying Davis-Bacon Act federal wage compliance. CPUC will permit third-party owned community solar to compete and operate residential-serving community solar. Ownership by third-parties such as experienced independent power producers will likely result in least-cost projects, with developers being able to take full advantage of government incentives and private financing measures. While this option may not necessarily result in direct community ownership, an indirect form of ownership under this model occurs when projects are owned by POUs or community choice aggregators, which are overseen by local governments.
5) Deploy incentive structures for capital mobilization and tax credit leveraging.
6) Implement automated processes for eligible customers to receive and maintain solar bill credits.

7) Finalize new program documentation to operationalize and implement all above noted steps through the ministerial review and approval process.

8) Hire consultant to provide concierge tribal outreach assistance, guided by comprehensive data consolidation, a deep familiarity with programmatic elements, cultural competence and expertise to connect Tribes with viable program offerings.

9) The CPUC has already directed mandatory customer savings threshold. However, in the planning period, the IOUs will establish tariffs that enshrine the 20% discount.

10) Workforce requirements will not be provided a separate budget or funding, as any workforce requirements that are adopted must be followed to receive incentives. Additionally, the CPUC will follow the best practice establishing and enforcing clawing back provisions for incentive funds if criteria, including workforce training obligations are not met.

*Tariffs*:

1) Proceeding to determine need for distinct community solar tariffs and if adopted, conduct a ministerial review process to finalize implementation. After which the IOUs will modify their billing systems to accommodate new rates.

**IOU-S4A SOMAH** Planning Period Tasks

*Grant and Incentive Funding:*

1) Determine whether program changes are needed to increase resiliency through incentivizing solar with storage at affordable multifamily sites. Assess whether existing SOMAH utility balancing accounts are S4A award-compliant and direct changes if needed.
2) Define eligible measures for rooftop remediation and site readiness.
3) Generate mapping showing overlay of LIDAC geographic criteria with current SOMAH LIDAC criteria.
4) Design incentive structures for capital mobilization, including advance payments to eliminate financial barriers for cash-strapped affordable housing operators.
5) Address incorporation of quality jobs and businesses criteria and Build America, Buy America Act standards, as well as, satisfying federal wage compliance standards with the Davis-Bacon Act and other rules.
6) **IOU-S4A SOMAH** will update program agreements so Solar For All SOMAH recipients will have to attest to the 20% minimum bill savings requirement. Property owners will adjust the capacity dedicated to tenants if needed to do so. However, in practice SOMAH properties already achieve this outcome with an average monthly discount of 39%. Finalize updated program documentation to operationalize and implement all above noted steps through the ministerial review and approval process.
7) Hire consultants to provide tribal outreach assistance (in conjunction with **IOU-S4A Community Solar**) and provide affordable housing finance and tax credit monetization support to increase system ownership benefits for affordable housing owners.
8) Senate Bill 355 (2023, Eggman) adjusted SOMAH's enacting public utility code to lessen the prohibition against master-metered properties' participation. The CPUC efforts to address outstanding issues from this legislation will coincide with the S4A planning period and may result in eligibility changes for affordable, master-metered properties or those that are individually metered, but tenants do not pay their electricity bills, like a short-term homeless shelter. In both instances there must be verifiable tenant benefit agreements in place to ensure that financial benefits accrue to the renters in an appropriate manner.
9) CPUC is currently considering expanding SOMAH funding to be used for solar with integrated storage through its regulatory processes. If adopted, the program would need to determine a rebate amount or rate for integrated storage. This would be funded through existing program funds, and not S4A.

**POU-S4A** Planning Period Tasks

*Grant and Incentive Funding*

1) Upfront project costs are a barrier for housing owners and operators in LIDAC as combined installation of battery storage brings the most benefit when utilizing this

program. **POU-S4A** plans to alleviate this barrier for program participants by directing solar and storage grant funds to benefit LIDAC households in POU territories (including tribal stakeholders).

- Conduct scoping Workshops, Stakeholder meetings, Tribal Co-development, Consultation, Engagement, and listening sessions.
- Develop Tribal Engagement and Inclusion Plan
- Draft Solicitation Manual, which will include satisfaction of quality jobs and businesses criteria and Build America, Buy America Act standards as well as satisfying Davis-Bacon Act federal wage compliance and all other Solar For All terms and conditions.
- Release draft solicitation; host public workshop and solicit public comment.
- Release final solicitation package; Notice of Funding Availability (NOFA); applications open.

2) CEC will engage in agreements with the POUs (as needed) to share customer billing data as condition of receiving funding to verify that savings are being realized. Some POUs may have existing agreements or may not participate.

3) CEC intends to incorporate the 20% minimum bill savings requirements into its granting criteria. As part of its regulatory process, with input from stakeholders, will determine whether the bill savings will be calculated monthly or over a 12-month period. It is possible that the CEC will take a mixed approach – with a 12-month period for single-family homeowners, and a monthly approach for multifamily residents. Single-family electricity bills tend to be much higher and less consistent than multifamily, so even with a smaller solar allocation, multifamily electricity bills are likely to have higher percentage decrease of their electricity bill than single-family customer.

4) CEC will determine if cost-sharing with the LIDAC household will be permissible or not during its planning period. If cost-sharing is permissible, it will be incorporated into the household benefit calculation to achieve the 20% minimum savings outcome required. CEC will also take care to avoid impacts to household income that could affect taxes or other income-based eligibility. CEC will consider applicant's capital mobilization as part of the grant criteria. There may be a minimum matching funds requirement, so the POU contributed funding as well.

5) CEC will consider adjustments for master-metered and/or rental properties as part of its stakeholder feedback within the regulatory process.

6) Community ownership risk mitigation will be a component of the granting criteria for selecting awardees. CEC will follow best practices for consumer protection available in existing programs, such as clear disclosures, consideration of ability to pay, and protections against overly burdensome debt, as well as protections against passing on community solar construction costs from property owners to renters either directly or indirectly unless the renters choose to participate in the program. The details on this component will be determined during the planning period.

7) Define essential quality control components to ensure that installed solar or solar + storage systems perform as expected and that contractors are held accountable for their workmanship. CEC will set minimum criteria following best practices on product and workmanship warranties and will give additional points for applications that go beyond the minimum required.

**RWP-S4A** Planning Period Tasks
*Workforce Training Development*
1) Planning processes to expand existing programs or establish new offerings in LIDAC areas and receive stakeholder input to refine plans. Review and confirm accounting practices do not result in the generation of profit (such as an interest-bearing banking account) and, if necessary, adjust to comply with Solar For All terms and conditions.
2) Assess current programs throughout the state, focused on existing partnerships with the state's 45 local workforce development boards and state high road training partnerships.
3) Confer with CPUC and CEC and S4A program administrator leads on training needs to identify workforce gaps – meet at least twice with one public convening. For any workforce gaps identified, work with training partners to adjust lessons as necessary/feasible.
4) If new training programs are needed, they will be developed during the planning period.
5) Establish grants within target areas with S4A projects to be awarded or underway. Competitive grant process to increase the number of skilled workers from LIDACs in high-quality jobs.
6) Require trainee data to be reported through CalJOBS including participant wages, and rates of completion.

S4A Coalition has included estimating timing and key milestones in the Timeline Section at the end of the Workplan. As planning period tasks are completed, the **CA-S4A** Coalition Workplan will be updated.

## 2.1.3 Household Savings - Bill Benefit

- **IOU-S4A Community Solar** adopted a policy to require that each participating low-income customer will receive a minimum 20% bill benefit. This will be included on customer electricity bills and will be incorporated into the customer's existing tariff. Eligible customers may also receive additional energy rate discounts through income qualified discount programs such as the California Alternate Rates for Energy (CARE) and the Family Electric Rate Assistance (FERA) program. The **IOU-S4A Community Solar** will leverage an expert consultant to provide ongoing analytical work, research and quantitative model program design review to measure impacts, realization rates, and bill savings.
- **IOU-S4A Solar on Multifamily Affordable Housing (SOMAH)** requires that at least 51% of the solar capacity is dedicated to tenants at the site and the customer generation tariff export compensation is equivalent to that benefitting customer's price of energy. The CPUC already has a tariff in place to facilitate transfer of solar credits to tenant's monthly electricity bills – via virtual net energy metering (VNEM) arrangements.
  - Property owners will work with their contractor or the SOMAH PA to determine the percentage of capacity for each tenant household; typically, this is determined by the number of bedrooms within an apartment (low-income household). Please see the overview above for more detail.

- **POU-S4A** is committed to achieving the minimum bill benefit expected and will use the planning period to develop its policies and guidelines. The POUs do not have uniform tariffs and some may need to adopt new policies in order to add the bill discount. In the planning period: 1) develop grant criteria, 2) customer billing data access requirements, 3) determine whether 20% bill benefit is calculated monthly or over 12 months, and 4) if cost-sharing is allowed, how to incorporate it into the overall bill benefit (see above for more detail).

- **POU-S4A** program will offer grant/incentive funding to install new solar and storage capacity for eligible applicants in POU territories. Applicants are also required to demonstrate how the proposal will deliver at least 20% household savings to program beneficiaries. Applicants will provide supporting evidence on how the applicant's chosen mechanism – whether it be subscriptions, utility bill subsidies, bill credit, etc. – will deliver household savings, while maintaining a cost-effective approach to delivering savings for the most significant number of recipients. Methodology for calculating 20% bill savings is expected to be based on a monthly/annual percentage of a customer's electrical usage. This could take into account local utility rates and related factors and will be further refined in the 12-month planning period.

- **IOU-S4A Community Solar, IOU-S4A SOMAH, and POU-S4A** have different approaches to master-metered and/or rental properties. For IOU customers, any resident of a master-metered multifamily building has a right to their qualified bill discounts, however they must claim them indirectly via their landlord. The CPUC does not have oversight of these pass-through arrangements and to adjust this would require legislative intervention. California prohibited the construction of new master-metered, multi-tenant buildings in 1982.

  - For **IOU-S4A Community Solar**, a landlord can apply on behalf of their tenant or tenant(s) and should have submetering in place such that they can pass on the bill benefits.

  - For **IOU-S4A SOMAH**, only rental properties with individually metered tenant apartments can participate, and properties cannot be master-metered at this time. This may be adjusted during the planning period in compliance with CPUC directives and guardrails.

  - For **POU-S4A**, the CEC will use the planning period to determine its approach to master-metered and/or rental properties. POUs have the same barriers as the CPUC as to insights on whether landlords correctly pass-through rate discounts to tenants. This, too, will be addressed within the granting criteria.

| **Savings Calculation Methods Overview** |
| --- |
| Community Solar, pre-determined discount rates: |
| • Utilities automatically apply a 20 percent discount for each participating low-income customer on their monthly bill. The discount reduces energy consumption charges. This follows current practices for other low-income discount programs. |
| • Community solar program administrator links Community Solar project generation and customer subscriptions to ensure that generated power is equivalent to the required bill benefit. |
| |
| Shared, on-site solar: |

- Program manager reviews the applicant's solar system design, property's past energy use, and solar allocation agreement to determine that the generation and estimated savings (of at least 20% monthly) can be met.
- Utility and property owner identify all customer accounts at a property. The utility and property owner (as the owner/operator of the on-site solar) identify the percent of the generation for each customer account. This is set by an allocation agreement or similar document for use by the utility's billing services.
- Utility uses the allocation agreement to distribute the solar system's monthly energy exports as energy offsets (kWh) and/or value ($/kWh exported) to reduce each benefiting customer's monthly energy bills.

Individual, on-site solar:
- Program manager reviews the applicant's solar system design, property's past energy use, and solar allocation agreement to determine that the generation and estimated savings (of at least 20% monthly) can be met.

If there is a co-pay required, the CA partners will use the planning period to determine how to incorporate this element in the 20% savings requirement. The most straightforward approach is to amortize any customer upfront costs over the lifetime of the solar system. Additionally, these savings methods may differ slightly between programs and are also dependent on the utility's interconnection and billing practices where the project is located.

## 2.1.4 Resiliency Benefits
- **POU-S4A** and **IOU-S4A SOMAH** will encourage solar + storage installations.
- **POU-S4A** will include resiliency as a criterion in determining its grant awards. Ultimately the outcome of this aspect is determined by the owners' willingness to install a battery. In the **POU-S4A** programs, they may encourage tariff adjustments like California's IOU net billing tariff where the highest value comes from shifting load to use solar to offset late afternoon or evening peak charges.
- **IOU-S4A SOMAH** will use the planning period to consider how to better encourage solar + storage. On September 30, 2024, the CPUC released a proposed decision to authorize existing program funding to go towards incentivize storage integrated with solar.

## 2.1.5 LIDAC Access
- **IOU-S4A Community Solar, POU-S4A**, and **RWP S4A** will use the planning period to determine their outreach best practices. The community solar programs will focus on making customer enrollment simple and automatic, preferably through existing utility billing portals that utilize utility data to determine (and enroll) those low-income customers most at risk of energy insecurity.

- **IOU-S4A and POU-S4A** will invest resources reaching Tribal communities. [9] Tribal sovereignty, complex land ownership arrangements, and matrices of multifamily property ownership models present challenges to tribes in accessing traditional third-party ownership loans or other forms of project financing. In 2022, there were 50 MW of solar and 40 MWh of storage installed in tribal lands.[10] Currently, some of California's funding programs include program design elements tailored to increasing access to solar energy and energy storage for tribes, providing an important starting point that will be leveraged in the **POU-S4A** and **IOU-S4A** programs as applicable. To elevate the needs of all tribes in California, and to ensure that their interests are both represented and likely to be funded in this Solar for All competition, the CEC and CPUC will work to formalize partnerships with tribes and tribal organizations through the development of Memorandums of Agreement and other mechanisms. For example, four tribes (Campo Band of Mission Indians, La Jolla Band of Luiseño Indians, Morongo Band of Mission Indians, Soboba Band of Luiseño Indians) have organized an informal consortium of tribal governments to develop a partnership with **CA-S4A**.
- **IOU-S4A SOMAH** issues an annual marketing, education, and outreach plan. Part of the program's administration includes subcontracting with community-based organizations to provide culturally sensitive and in-language outreach on program participation and job training. Also, **IOU-S4A SOMAH** works with local governments and tribes to educate them on program requirements, offerings, and benefits and to provide technical assistance. **IOU-S4A SOMAH** will expand technical assistance to provide the in-kind services of a financial advisor to improve project financing and tax credit monetization. After solar and storage projects are constructed and interconnected, property owners can allocate bill credits to tenant units without the need for individual approvals or paperwork. Generated solar credits are automatically applied to reduce tenants' monthly electricity bills.
- **POU-S4A** program will leverage the Strategic Reliability Reserve (SRR) to strengthen its reach to LIDAC households, grow DER resources, and fortify aggregate demand response measures. In 2022, California made an unprecedented investment in the SRR to support the state's electric grid reliability during extreme events. The CEC administers two programs under the SRR: 1) the Distributed Electricity Backup Assets program, which incents the construction of clean distributed assets, and 2) the Demand Side Grid Support Program, which compensates for load reduction during extreme events. Together, these programs provide support to grow California's virtual power plants.
- **POU-S4A** program is filling a gap of historically underinvested stakeholders in California. Investment varies across different POU's, and **POU-S4A** will provide opportunities in POU territories that will be flexible to address differences across regulatory regimes.

---

[9] CPUC, SOMAH "Tribal Pathways Requirements Guide". https://calsomah.org/resources/tribal-requirements-guide; California Environmental Protections Agency (EPA), Disadvantaged Communities Map Update (2022). https://calepa.ca.gov/wp-content/uploads/sites/6/2022/05/Updated-Disadvantaged-Communities-Designation-DAC-May-2022-Eng.a.hp_-1.pdf, May 2022.

[10] CEC, "Renewable Energy Market Data Report" (2022). https://www.energy.ca.gov/datareports/energy-almanac/data-renewable-energy-markets-and-resources.

- **RWP S4A** will leverage existing programs with local workforce development boards and partnerships to maximize funding while also identifying any gaps in program delivery within targeted regions where new programs may be needed.

## 2.1.6 Household and Community Ownership

- **IOU-S4A Community Solar** will build on the state's existing third-party ownership market structure in which IOUs and community choice aggregators (CCAs) hold competitive procurements and sign power purchase agreements for up to 20-year terms with selected bidders that meet least cost best fit requirements. This model will allow low-income customers to access economic benefits similar to rooftop asset ownership such as a 20% minimum monthly bill savings.
- **CA-S4A** will use the majority of its funding for **IOU-S4A Community Solar** which will not facilitate direct financial ownership as this would add additional barriers and complexity, increase risk and cost to ratepayers, and make it difficult to expend funding within the period of performance. The CPUC's experience running the now discontinued Enhanced Community Renewables (ECR) and Community Solar Green Tariff (CSGT) demonstrated that community interest requirements were a significant barrier to success and have not yielded successful enrollment or engagement by a community sponsor. Direct community ownership is also difficult as developing a successful community solar project requires significant financial and technical expertise. Additionally, subscribers must rely on their local utility to procure all other services needed to serve retail load – transmission, reliability services, ancillary services, distribution, and resource adequacy. Prior CPUC program and market evaluations have surveyed existing and potential community solar participants and found that monthly bill savings are ranked highest before any community ownership of assets.
- **POU-S4A Community Solar** bill discounts are linked with the customer even if they move to a new location (so long as it still in the service territory where the community solar project is located). Determining the process for maintaining this benefit will be a part of the planning period.
- **IOU-S4A SOMAH** does not allow property owners to shift their installation costs to tenants either directly or indirectly through increases in rent. Additionally, the solar benefit will last 20 years and stays with the rented apartment, so will pass to the next tenant if there is tenant turnover. **IOU-S4A SOMAH** provides meaningful bill benefits to low-income renters. **IOU-S4A SOMAH** funded financial advisor support will help owners maximize tax credit monetization or navigate complicated debt structures. This support will help raise the number of SOMAH incented host-owned systems, increasing the likelihood of expanded capacity, future storage additions, or bill benefits beyond the expected useful life of incentivized systems.
- **POU-S4A Community Solar** may also offer grants to homeowners to install on-site, rooftop systems or to a community to establish microgrids. This will be determined in the planning phase. Planning phase will include developing a strategy to avoid ownership risks.

## 2.1.7 Quality Jobs and Businesses

- **CA-S4A** has dedicated $9 million of its budget to **RWP-S4A** for direct workforce training, and the other programs will establish workforce criteria, like number of trainees,

as mandatory criteria for receiving incentives. This follows best practices for limiting overly complex and burdensome incentive program deigns or requirements.

- **IOU-S4A and POU-S4A Community Solar**, as well as **IOU-S4A SOMAH and RWP-S4A,** will use the planning period to determine how best to incorporate Administration's Good Jobs Principles and E.O. 14082. Plans include:
    1. Recruiting and hiring from underserved communities.
    2. Provide benefits for full or part-time workers
    3. Ensure Diversity, Equity, Inclusion and Accessibility to provide equal opportunities to a diverse range of program participants.
    4. Empower workforce representation, including the support of unionization.
    5. Establish job security and working conditions to ensure the highest standards.
    6. Profligate an organizational culture that ensures workers are valued and respected.
    7. Mandate that workers are paid a stable and predictable living wage.
    8. Provide skill and career advancement offerings for workers to have equitable opportunities and tools to progress towards future, good quality jobs.
    9. For **POU-S4A** and **IOU-S4A Community Solar**, program will follow California's programs' best practice of making workforce criteria part of the general, mandatory criteria for receiving incentives.
    10. Determine best approach on metrics collection to target and track impact to LIDAC participants. Given that LIDAC definitions heavily rely on geographic location, training participants should be able to self-disclose their home zip code or census tract for metrics without compromising privacy.

- **IOU-S4A SOMAH** program handbook already has requirements in place that overlap with the principles noted above, however the CPUC will use the planning period to confirm if any refinements are needed. Contractors for SOMAH projects must pass a SOMAH training course to be eligible for building SOMAH incented projects and pursuant to new state law, workers must be paid prevailing wages
    1. SOMAH requires each project to hire at least one trainee and meet a certain minimum number of training hours. Number of trainees and working hours escalates with the capacity size of a system. Trainees must be paid the prevailing wage rate or a living wage rate that is 1.4 times the city minimum wage, whichever is higher.
    2. SOMAH incentives (for the solar system) are dependent on the contractor satisfying workforce requirements.

- **POU-S4A** projects aims to support hands-on training for rural communities and tribal members to both foster a skilled workforce and to build rural and tribal staff capacity to operate and maintain energy assets over time. For example, program scoring criteria could include additional bonus points for applicants that leverage assistance with the RWF-S4A program. Each applicant will be asked how they will meet the workforce goals of a diverse workforce or provide training opportunities. Additionally, in the planning period, **POU-S4A** would intend to match the best practice from the SOMAH program to require at least one trainee per project and to pay that trainee the prevailing wage or 1.4xs the minimum wage for that city, whichever is higher. At a minimum each winning grant must satisfy the following in compliance with S4A funding requirements:

1.  Commitment to providing family-sustaining benefits and predictable work schedules to promote economic security and mobility.
2.  Pay a stable and predictable living wage.
3.  Provide safe and healthy working conditions, including the free and fair choice to join and/or form a union.
4.  Aims to expand workforce opportunity for underserved communities who face disproportionate barriers to training and employment.

- **RWP-S4A Resilient Workforce Program** will foster regional hubs that will design new and/or support the expansion of existing solar & storage installation training programs, including earn-and-learn models such as pre-apprenticeships and apprenticeships that cover both technical skills and job quality aspects, job readiness, personal development, and offer wraparound support services, such as childcare assistance and transportation options, to ensure barriers to participation are minimized. Under the umbrella of the Labor and Workforce Development Agency, California's workforce agencies – EDD WSB, Department of Industrial Relations Division of Apprenticeship Standards, California Workforce Development Board and the Employment Training Panel - deliver a range of services to job seekers, including job training for unemployed and incumbent workers, apprenticeships and pre-apprenticeships, supportive services, and establishing employer partnerships. Programs aim to build workers' skills and meet industry needs to support workers with entering career pathways where employment and earnings outcomes increase over time.  California has established programs to reach underserved communities such as programs that assist formerly incarcerated individuals with job training, placement and wrap around services as well as grants to increase participation of opportunity youth in pre-apprenticeship and apprenticeship programs. The state's high road training partnerships also have established pre-apprenticeship programs that link local building and construction trades councils to workforce boards, community colleges, and community-based organizations, creating structured pathways — with a standard core curriculum and critical supportive services — to state-certified apprenticeships in a variety of crafts.
  1.  EDD has significant experience overseeing workforce training grants that include worker outcomes such as wage progression, program graduation and job placement. Using this experience, EDD will use the planning time to work with local partners – including local workforce development boards, labor unions, and educational institutions to, build on existing programs or establish new programs as needed to increase LIDAC customer participation.
  2.  During the planning period EDD will work with state agencies to identify key regions where S4A projects will take place, and then determine where partnerships can be targeted to reach workers with a focus on programs with experience reaching underserved communities.

## 2.2 Financial Assistance Strategy

**CA-S4A** will allocate approximately $233M in financial assistance towards solar+storage planning and deployment in LIDACs, with special care to address prominent barriers to LIDAC participation in existing state programs. **POU-S4A** and **IOU-S4A** provide financial assistance mechanisms that are additive to existing resources for solar deployment in LIDACs and avoid duplication of services. IOU-S4A Community Solar and IOU-S4A SOMAH will use a non-interest bearing utility balancing accounts[11] and subaccounts to bifurcate and firewall CA-S4A funds from existing funding sources such as utility greenhouse gas auction proceeds, general state taxpayer funds, or funds sourced via Public Purpose Program funds collected in rates. Clearly separating these funds will simplify tracking outcomes and impacts of the grant. Importantly, California intends to solicit significant funding from both the National Clean Investment Fund (NCIF) and Clean Communities Investment Accelerator (CCIA) programs, which will enable further financial assistance beyond what S4A provides. **CA-S4A** components include (1) funding for TA and capacity- building, (2) expanding available financial assistance to municipal-owned utility, public-owned utility, and tribal utility customers, and (3) reducing project costs, including upfront costs, enabling upgrades (if necessary, cannot be more than 20% of financial assistance funds), payback periods, and costs associated with site remediation activities. None of the programs will provide direct funding to households.

The **CA-S4A** program funding allocations are summarized below.[12]
- **POU-S4A** (CEC): $30.2M Total, $25M financial assistance
- **IOU-S4A** (CPUC): $210.4M Total, ~$200M financial assistance
- **RWP-S4A** (EDD): $9.2M Total, $8M financial assistance
- **TOTAL**: $249.8M Total, ~$233M financial assistance

**POU-S4A** will award its $25 million in financial assistance towards solar and storage planning and deployment to eligible participants, with special care to address prominent barriers to LIDAC participation in existing state programs. **POU-S4A** will provide financial assistance mechanisms that are additive to existing resources for solar deployment in LIDAC and avoid duplication of services. **POU-S4A** will develop grants and incentives with specific program design informed by a robust stakeholder process during the first year and will leverage existing state and utility programs.

CEC staff will work with each POU to identify whether its low-income electric rate tier falls within the boundaries of EPA LIDAC guidelines. If a POU does not have a low-income electric rate tier within the boundaries of EPA LIDAC guidelines, prospective applicants in an individual household must demonstrate an income that is at or below the greater of the definition for #3 Geographically Dispersed Low-Income Households. The process the program will use for income verification will be determined during the program planning year.

---

[11] A utility balancing account is an account used to match the collection of actual revenues against actual costs after an adjustment for unanticipated changes in expenditures.

[12] In alignment with the SFA Terms and Conditions (National Programmatic Terms and Conditions, D. Signage Required), if financial assistance exceeds $250,000 to a single site, the participating benefiter will be asked to place a sign displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act."

California's POUs serve diverse communities across California with unique characteristics, such as customer base, geographic location, and size. The POUs are committed to supporting California's greenhouse gas emission reduction goals and to advancing a range of resource solutions, including solar and energy storage, while providing support to their LIDAC. **POU-S4A** will provide grants and incentives to stakeholders (including Tribes) in POU territory to augment their existing and future community solar, rooftop solar, and energy storage installation programs.

The **POU-S4A** program will utilize the 12-month planning period to determine exact eligibility among LIDAC residents, however staff intend to allow for the largest pool of potential applicants as feasible and intend to enable both single-family housing and multifamily housing residents. **POU-S4A** does not envision offering grants or incentives to non-residential customers.

Additionally, **POU-S4A** will use the 12-month planning period to determine how funding will be disbursed. All applicants to **POU-S4A** will be required to demonstrate basic eligibility criteria including income verification if income is used to meet LIDAC criteria. However, the CEC plans to make every effort to avoid changes to household income eligibility requirements of existing POU programs. For this reason, it may be best for a POU to apply for funding on behalf of specific eligible households in their territory, with the household receiving benefits through bill discounts and other mechanisms such as inclusion on community solar installation.

Some POUs may already have existing utility rates that are income restricted. If applicable, the CEC may work with a POU during the 12-month planning period to identify whether its income-restricted rate falls within EPA's LIDAC parameters, and in that case can use an applicant's participation in applicable POU programs as an alternative means of demonstrating income verification.

As existing resources vary widely across the 47 different POUs, we will use the 12-month planning period to design a program that maximizes flexibility to offer grants or incentives that meet the needs of each stakeholder without duplicating resources. For example, the biggest POU (LADWP) has existing residential solar+storage incentive programs that would enable **POU-S4A** funding to expand existing programs. Other smaller POU territories may have limited existing resources and **POU-S4A** grants or incentives may constitute a new funding opportunity in these territories.

All community solar funded under **POU-S4A** will conform to the definition of residential serving community solar. Specifically, they will have a nameplate capacity of 5 $MW_{AC}$ or less, 2) deliver at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and 3) verify that at least 50% of the benefits and/or credits of the power generated from a community solar system be delivered to residential customers in the same service territory.

**POU-S4A** subrecipients will be updated during the planning period.

**IOU-S4A Community Solar and SOMAH** ($9.69M in financial assistance for rooftop remediation and site suitability (SOMAH) and $190.19M in financial assistance for Community Solar projects) will support on-site ("rooftop") residential solar or solar with associated storage as well as community solar and storage developments. The **IOU-S4A Community Solar** funding leverages $33 million in additional California taxpayer funding. **IOU-S4A SOMAH** leverages its $730 million in current funding, which is expected to reach a final amount of $940 million by June 2026.

All community solar funded under **IOU-S4A Community Solar** will conform to the definition of residential serving community solar. Specifically, they will have a nameplate capacity of 5 $MW_{AC}$ or less, 2) deliver through bill credits at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and 3) verify that at least 50% of the benefits and/or credits of the power generated from a community solar system be delivered to residential customers in the same service territory.

Under **IOU-S4A SOMAH,** participants will have renewable energy facilities installed on their property and can make use of the system for resiliency. The **IOU-S4A SOMAH** rooftop remediation and site readiness funds will be dedicated to the Solar on Multifamily Affordable Housing (SOMAH) program participants. **IOU-S4A SOMAH** will cover the costs of a building's solar readiness, equivalent up to 20% of the total solar or solar + storage incentive. This approach leverages an existing statewide program, solves a participation hurdle, and targets funding to priority communities. SOMAH eligibility aligns most closely with the LIDAC definition of affordable multifamily properties. **IOU-S4A SOMAH** will reduce upfront project costs by, for example, upgrading or replacing transformers, replacing or adding meters, fire safety measures (when storage is being added), or structural repairs to roofs (to accept weight of solar panels and racking). Roof repairs in particular have been a longstanding hurdle to increasing solar installations. Should roof-readiness costs be too high, eligible properties may forgo the installation of a PV system altogether. If SOMAH participants are unable to complete necessary remediations such as roof repairs without incentives, they may instead select alternative sites like a solar shading system over a parking lot, which, though eligible to receive SOMAH funding, could increase total project costs compared to roof-mounted options. Additionally, it is reasonable to anticipate that total project costs could be lower with a roof-mounted option than with a carport-mounted option as carport-mounted solar requires significantly more labor, materiel, and planning.

Once in place, these renewable energy systems will last for two decades or more, ensuring that this financial assistance will generate benefits well past the initial incentive. This financial assistance is neutral as to the solar ownership type, however, lowered upfront costs will better enable customers to choose between financing options (leasing or owning their systems). The planning period will be used to consider advance payments and capital mobilization for affordable housing owners and community solar developers. For example, when two or more LIDAC criteria are met (affordable housing and being in a CESJT community) or if a property owner is willing to match the S4A grant, a 1:1 advance payment could be automatically issued by the program.

Should readiness costs add an additional 20% to the overall project costs, the influx of funds for site preparation under **IOU-S4A SOMAH** can facilitate approximately 12 MW of solar and 85 MWh of storage at 85 multifamily properties and impact 6,450 LIDAC multifamily renter households. CPUC expects the average site abatement award to range between $100,000 to $115,000 per multifamily property. This funding will only go towards affordable properties that house low-income renters, including properties owned by California Native Tribes. Participating properties must have at least five units or more to be eligible. The final incentive or grant amount per property is dependent on the size of its renewable energy facility and its total costs; the amounts here are illustrative and are based on averages from recent application data. **IOU-SFA SOMAH** creates capital mobilization by requiring an owner co-pay, and reducing the (ratepayer paid) solar incentive based on use of federal or state tax credits. This capital mobilization metric will be tracked as part of the grant outputs.[13] As part of the down scoping effort, CPUC will focus **IOU-S4A** resources on affordable multifamily properties. An award at a multifamily property is a more efficient investment even though there will be fewer sites treated, the number of benefitting households will be higher. With a focus on affordable multifamily properties, more low-income households per grant dollar will be reached than with a focus on low-income single-family households.

As part of a May 5th 2023 ruling the CPUC asked stakeholders how to improve financing access for SOMAH participants, including expanding partnerships with financial service providers. It is expected that the CPUC will make a determination on this feedback during the planning phase and could expand the program's ability to leverage external financing partnerships. Further, the SOMAH program has an existing program implementation plan (laying out its high-level goals and key tactics) and a more detailed program handbook which will be updated through the CPUC's ministerial review process to operationalize any necessary changes. This effort is expected to be completed early in the planning period.

**IOU-S4A SOMAH** is available to deed-restricted affordable multifamily property owners, as such these property owners have complicated financing and debt holdings. CPUC will contract a financial expert, as part of its administrative budget, to provide in-kind advisory services to interested property owners.  The advisor will support property owners interested in pursuing host-owned systems. Providing additional support can increase ownership rates of SOMAH incented systems. When a system is owned, instead of leased, it is more likely that the owner will make continuous improvements like expanding capacity, future storage additions, or realizing bill benefits beyond the expected useful life of the system. Further, capitalizing on recent tax credit monetization schemas may enable participating properties to install larger systems and drive down upfront costs. CPUC will contract a financial consultant to provide in-kind customer services to **IOU-S4A SOMAH** non-profit properties. Such advice and expertise are necessary to support property owners to make use of recent changes to tax laws (by the Inflation Reduction Act) and create an economical debt structure. Financial support services can reduce barriers to participation and complements existing tax credit options.

---

[13] SOMAH applications already must disclose their total project costs including use of tax credits, so it can be easily determined by an evaluator as to the final capital mobilization amounts in dollars, per project, and per capacity (kW).

The **IOU-S4A Community Solar** will maximize customer participation in IOU territories by providing meaningful bill savings to residential customers in LIDACs that subscribe to community solar projects, with final design details determined during the planning phase of the grant. On May 30, 2024 the CPUC adopted a decision that improves existing community solar programs and authorizes a new community solar program that meets the legislative requirements established in AB 2316. On June 5, 2024, the CPUC issued a ruling directing parties to file comments to questions regarding the implementation of the Decision including aspects of its new Community Renewable Energy Program including revenue share, bill credits, and method for disbursing federal and state incentives among other topics. Party comments were filed in July and are currently under review. **CA-S4A** will take advantage of the available twelve-month planning period to resolve these programmatic issues before expending funds.

The federal funding for community solar is expected to deliver an equivalent of 40 MW of solar serving 15,000-30,000 LIDAC customer households. **IOU-S4A** anticipates that these funds will likely be used to support projects that leverage external private capital and innovative financing structures available to developers, potentially including leveraging tax credits and public revolving loan programs, by providing a predictable source of funding for offsetting customer bills and enhancing participation in the program. Critically, the funding can help developers finance storage, in addition to solar, which is an essential technology for allowing these projects to shift their exports to the evening hours, when they provide maximum value to California's electric grid needs.

In the one-year planning period, the CPUC will finalize the Community Solar program design through its existing regulatory proceeding. The proceeding will establish policies or rules affecting regulated entities as to how they must implement the Community Solar program in accordance with state policy and in alignment with the grant's parameters. After the proceeding concludes, the IOUs and CCAs may be instructed to file compliance documentation before the program can be fully implemented. Industry stakeholders are parties to CPUC proceedings and can provide input on the final financial subsidy via established public processes.

**IOU-S4A SOMAH** Subrecipients include: SOMAH Program Administrator organizations (led by Center for Sustainable Energy), Pacific Gas & Electric Company, San Diego Gas & Electric Company, Southern California Edison, PacifiCorp or Liberty Utilities. Southern California Edison holds the contract with the SOMAH Program Administrator organizations.

**IOU-S4A Community Solar** Subrecipients include: CCAs which may include but are not limited to Ava Community Energy, Clean Energy Alliance, Clean Power Alliance, CleanPowerSF, Desert Community Energy, Lancaster Energy, Marin Clean Energy, Peninsula Clean Energy, Pico Rivera Innovative Municipal Energy, San Jacinto Power, San Diego Community Power, San Jose Clean Energy, Silicon Valley Clean Energy, and IOUs including Pacific Gas & Electric, San Diego Gas & Electric, and Southern California Edison.  Grant funds will be distributed and tracked in IOU balancing accounts (each IOU will distribute and track funds on behalf of respective CCAs in each IOU service territory as the CPUC does not have direct jurisdiction over CCAs).

**RWP-S4A** ($9.2M Total, $8M in grants) will foster four regional hubs that will design new and/or support the expansion of existing solar and storage installation training programs, including earn-and-learn models such as pre-apprenticeships and apprenticeships that cover both technical skills and job quality aspects, job readiness, and personal development, and offer wraparound support services, such as childcare assistance and transportation options, to ensure barriers to participation are minimized.

**RWP-S4A** subrecipients will be determined during the planning period.

*For all C4A Coalition partners, subawards to for-profit entities*, will meet the 'subawards to for-profit entities' term and condition. If they do not meet these requirements, they are not an eligible subaward. CPUC agrees to require that any subaward to a for-profit entity will abide by these terms and conditions, where applicable, these may be updated during the planning period as awards are finalized.

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;
2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;
3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and
5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports. As an alternative, recipient may demonstrate it has the capacity and capability already to comply with 2 CFR 200.509 criteria.

## 2.3 Project-Deployment Technical Assistance Strategy

LIDACs face numerous barriers to accessing solar energy and its economic benefits. High upfront costs, site barriers, and other challenges present challenges. California is addressing these barriers by providing technical assistance (TA) to communities and solar market stakeholders that will allow for the development of a robust project pipeline, increased solar deployment, and wealth-building spurred by the clean energy transition in LIDACs.

Efforts include robust plans to (1) invest in a skilled workforce needed to deploy solar and storage, (2) provide solar developers and communities with TA to address interconnection challenges, and (3) ensure projects funded under the program are efficiently deployed and resilient by providing solar developers and communities with TA for project siting, land-use, permitting, building codes, inspection, and quality control. California has also already adopted best-in-class policies and directed funding to overcome building and safety permit barriers by creating online platforms to expedite and streamline local permitting.

### 2.3.1 Workforce Development

All of California's S4A program components **invest in a skilled workforce** through direct financial assistance and program design. California has a statewide training network in place, which allows S4A to leverage its existing resources and expertise. This includes pre-existing energy related multi-sector partnerships and relationships with CBOs. RWP-S4A will increase training and close access gaps for LIDAC customers, the outputs of the new projects from IOU-S4A and POU-S4A will be on-the-job learning opportunities. The estimated new job opportunities from IOU-SFA and POU-SFA will be updated as part of the Planning Period activities. As a baseline, this grant is estimated to have these workforce outputs:

| CA-S4A RWP Estimated Outputs | |
|---|---|
| Workers Trained by Workforce Development Programs (#) | 225 |
| Number of Solar Jobs Created (#) | 225 |
| Average increased wages for individuals working in solar energy  (%) | 10.5% |

| IOU-S4A SOMAH Estimated Outputs | |
|---|---|
| Workers Trained by SOMAH Projects | 170 |
| Number of Solar Jobs Created (#) | 51 |
| Average increased wages for individuals working in solar energy  (%) | TBD |

**RWP-S4A**'s technical assistance includes support for application development, inclusive recruitment and coalition building, curriculum development and training deployment, and job standards development. Standing up new training programs is time intensive, so using S4A funds to expand in LIDAC geographic areas is more efficient. During the planning period, if **RWP-S4A** identifies any workforce gaps, it may adjust curriculum or add new learning modules (developed over the same period).

How workforce training opportunities are provided: In addition to direct outreach, California maintains a database of Eligible Training Providers on its CalJobs website. CalJobs is also available in Spanish. Programs are available statewide and often accept new entrants on a rolling basis; certificate programs may require on-the-job training for energy related career training.

Engagement Strategy: California's Employment Development Department (EDD) staff have decades of program management experience as well as dedicated field specialists, an evaluation team, and access to University of California Labor Centers that can provide additional support efforts. As EDD aims to foster regional support through the planning and development of workforce training curriculum and the implementation of training programs, EDD will work with applicants and local workforce boards and regional coalitions to build a cohort model that allows for consistent curriculum and opportunities. Additionally, EDD will review potential partnerships with the California Community College system to support the development of clear career pathways that outlines the progression from entry-level solar installation roles to advanced positions, such as battery storage installation, project management or system design.

**POU-S4A** applicants will be encouraged to consider Workforce Development, Education, and Training in their proposal, anchored by the **RWP-S4A**. Workforce development and training programs will train participants for transferable jobs and skills, resulting in high-quality jobs that reflect **CA-S4A** goals and priorities.

How workforce training opportunities are provided: Trainees will come to **POU-S4A** projects already having received basic skills training, from **RWP-S4A** or similar.**POU-S4A** will offer job site training under a qualified contractor. Additionally, grantees may propose other job-training readiness webinars like soft skills (behavior, time management, etc.) or in-depth training like solar engineering and design to earn additional points in the competitive grant delivery.

Engagement Strategy: The CEC will leverage **POU-S4A** program grant funds in the following way: (a) developing program requirements in partnership with Tribes for greatest impact; (b) offering funds for the deployment of Tribal led solar and storage projects (including microgrids), filling the gap of existing state and utility programs; (c) coordinating with coalition agencies to support the development of clean energy transition plans, energy feasibility studies, and other predevelopment activities to support solar and storage deployment projects and coordinating with CPUC grantees by providing job training and economic development opportunities, such as leveraging tribal apprenticeship programs and supporting tribal energy enterprises; and (d) leveraging capital to advance decarbonization.

**IOU-S4A SOMAH** has existing workforce measures that will be leveraged to support S4A goals. SOMAH assists contractors in hiring trainees that are local or targeted hires from participating properties and disadvantaged communities. The program requires that trainees are paid at least 1.4x the minimum wage of the city where the project is located to ensure fair, stable wages. To expand the pool of active contractors, Program Administrators have begun to connect eligible contractors as subcontractors on larger projects to help provide them with more experience. The program is also expected to leverage a consultant to provide concierge tribal outreach assistance, guided by market data, familiarity with the SOMAH program elements and cultural competence to assist potential SOMAH Tribal projects.

How workforce training opportunities are provided: Trainees will come to **IOU-S4A SOMAH** projects already having received basic skills training, from SOMAH's online training partner (Heatspring), **RWP-S4A** or a similar training organization. **IOU-S4A** offers job site training under a qualified contractor. Trainees can work in installation, design/engineering, or in

operations. SOMAH periodically offers webinars on job readiness application and interview skills.

Engagement Strategy: The program utilizes a Solar Career Center and Job Board where resumes, openings, and applications can be posted and connections between job seekers and participating contractors can be made. SOMAH hosts open, public webinars to support trainees with job-readiness skills, and the Jobs Trainings Organization Task Force engages with the training community (community colleges, apprenticeship programs, etc.) to discuss benefits, challenges, and opportunities for solar trainees. The program requires that trainees are paid at least 1.4x the minimum wage of the city where the project is located to ensure fair, stable wages. To expand the pool of active contractors, Program Administrators have begun to connect eligible contractors as subcontractors on larger projects to help provide them with more experience.

**IOU-S4A Community Solar** will use the planning period to assess the feasibility of encouraging or formally adopting workforce training opportunities. A May 2024 Decision laid out the following frameworks and plan for determining final implementation rules and guidelines:

The Decision expands the current DAC-GT program by 60 megawatts (MWs), bringing the program total to 144 MWs. This program provides subsidies to participants that reduce their monthly electricity bills by 20 percent. California's three largest IOUs and 10 CCAs currently administer this program across the state to reach wide range of vulnerable customers.

The Decision also authorizes an additional community solar program that will be available to customers of all income levels, as well as commercial customers. The new program will directly benefit low-income customers as 51 percent of the subscribers must be low-income and receive a guaranteed 20% electricity bill credit. The program will allow California to take advantage of federal and state funding opportunities for low-income customers by creating a mechanism to capture available funding for community solar. A ruling has been issued in this proceeding to collect stakeholder feedback on program details, including the method for dispersing state and federal funding to the projects and participating customers, and tribal outreach. The CPUC will also hire a consultant to provide concierge tribal outreach assistance, informed by market data, solar suitability mapping, and cultural competency to inform Tribes of potential community solar project options.

### 2.3.2 Project Siting, Permitting. And Interconnection (to the grid)

While IOUs and POUs in California continue to implement and improve processes for **interconnecting renewable energy facilities**, there are several opportunities to help foster development of more transparent, equitable, and efficient processes across all the state's electric distribution utilities. A critical component of **CA-S4A** in this regard will be to help improve sharing of information and best practices between different utilities, developers, and customers with an emphasis on rural, low-income, and tribal communities. Specifically, as part of this proposal **IOU-S4A Community Solar** and **POU-S4A** will consider in the planning phase:

- Provide direct technical and/or financial assistance to project sites applying for interconnection through this program, including funding for interconnection fees and potential utility-side upgrades or mitigations required for safe interconnection.

- o Confirm that enabling upgrades for grid capacity upgrades conform to the following three requirements:
  - ▪ 1) That capital upgrades are necessary for the Solar For All program and
  - ▪ 2) That grid upgrades will only be funded where non-wire alternatives are not a feasible solution
  - ▪ 3) The proposed costs for grid upgrades if available (anticipated cost per solar capacity for NREL to review)
- o The share of financial assistance expended on enabling upgrades cannot exceed 20% of the financial assistance (not total budget) over the lifetime of the program.
- o CPUC will hire a modelling support contractor to assess siting proposals and capabilities of selected projects to meet subscriber bill savings minimums.
- o CPUC will hire a tribal outreach consultant to leverage data sources and coupled with a cultural awareness of Tribal governance structures and needs to connect interested Tribes to **IOU-S4A Community Solar** options.
- Host annual convenings of all electric distribution utilities and load serving entities in California focused on sharing knowledge and examples of successful programs and strategies to improve customer interconnection experiences.
- Develop and administer targeted outreach and assistance programs for the state's small POUs, cooperative, and Tribal utilities that help disseminate best practices and increase consistency in interconnection processes and requirements.
- When solar is added on-site to an existing multifamily property or single-family home, there is no way to practically add requirements around greenspaces, climate resiliency or agrivoltaics. For multifamily properties, sometimes a solar photovoltaic mounting system doubles as a carport, adding shading over an existing parking lot. Adding shading over darker, lower albedo surfaces can help limit local warming (heat islands). For siting on greenspaces, residential properties have space at a premium in California. It is unlikely that a previously open greenspace is an option for a residential system. Similarly, undergrounding conduit through trenching to connect a system behind the meter is expensive Instead, placing the solar system as near to the electricity loads as possible reduces construction costs and this cost burden naturally disincentivizes using greenspaces on residential sites for a solar installation. The more requirements put upon a site design the fewer applicants there are that can comply, so it would undercut program participation to have climate resiliency or greenspace requirements on siting residential systems. Additionally, as these projects are expected to involve existing residential parcels, we expect all projects will be CEQA/NEPA exempt. Details will be developed during the program year and follow applicable CEQA/NEPA review processes.
- **POU-S4A**: In cases where a POU applies for funding involving a community solar project, the applicant will be required to submit supporting documentation indicating CEQA Exemption or otherwise demonstrate that the project complies with all siting requirements. Exact documentation and procedures will be outlined during the program planning phase.

The program will require documentation verifying completion of applicable CEQA review, permitting, and safety requirements, including California Senate Bill 38 (Laird, Chapter 377, Statutes of 2023) requirements for energy storage systems. Also, during the program planning year, the program will consider opportunities to leverage California's Residential Solar Permit

Program (Senate Bill 379, Wiener, 2022) requirements for local governments to implement online solar permitting platforms that verify code compliance.

Building on existing programs, such as the California Automated Permit Processing Program (CalAPP), California IOUs and POUs will seek to support solar developers and communities with **TA for project siting, land-use, permitting, building codes, inspection, and quality control**.

Both **IOU-S4A Community Solar** and **POU-S4A** will consider how and to what extent to offer these services during the planning phase period. Offering some level of TA will be critical to ensuring that there is a diverse group of bidders for community solar projects. The administering agencies will also consider whether to offer post-award TA to selected community solar projects to open the door to newer market entrants. Such an approach will increase representation and expand equitable access to community solar development contracts.

For **quality control of assets regarding safety and engineering standards**, there is nothing different or unique about S4A projects that necessitate the hiring of new engineers to conduct initial or ongoing inspections. In other words, inspection to meet federal laws and state mandates is being absorbed by existing agency departments, utilities, and local jurisdictions already tasked with that work. For **quality control regarding solar output performance**, **IOU-S4A Community Solar** and **POU-S4A** will determine their approach in the performance period.[14] The CEC will use the 12-month planning period to develop a plan on long-term operation and maintenance costs. Although details will be developed during the planning period, the program will require contractors to provide at least a 10-year workmanship warranty to provide for no-cost repair or replacement of the system, as well as a performance monitoring and reporting service to alert customers if maintenance is needed. Programs anticipate following these best practices:

1. Community solar plants (5 MW or less): developer must maintain operational logs, insurance and permit financial audits. These details are typically outlined in competitive solicitation documents and power purchase agreement contract between the utility or CCA and the third-party developer.
2. On-site residential systems: As a baseline, current requirements include an equipment warranty, a workmanship warranty, and a performance monitoring and reporting service. Systems must have a performance warranty of not less than 10 years to protect against defects and undue degradation of electrical generation output. Contractors must provide at least a 10-year workmanship warranty to provide for no-cost repair or replacement of the system. A performance monitoring and reporting service will alert customers if maintenance is needed, preferably required for the life of the system. Other elements could include longer warranty periods from those described above or additional warranties such as protecting the customer against meter breaks (or damage).
3. The **CA-S4A** program will require funded projects to meet California Contractors State License Board (CSLB) requirements for the installation of solar and battery energy storage systems.

---

[14] CPUC Public Utilities Code 387.5(d)(4) requires that all solar energy systems that receive an incentive (from a program subject to the Public Utilities Code) must have a warranty of not less than 10 years to protect against defects and undue degradation of electrical generation output.

**IOU-S4A SOMAH** already has quality control requirements in place with expansive warranty requirements, required performance monitoring and reporting services for customers, and the program administrator intakes all performance data into its own fleeting monitoring system. The fleet monitoring system is a new innovation to account for affordable multifamily building owner management staff constraints to consistently monitor their systems independently. The SOMAH program administrator will contact the host customer and contractor if the system is underperforming. SOMAH's expanded warranty requirements include: equipment warranty for a minimum 20 years, contractors providing a minimum 20-year warranty to protect the customer against more than 10% degradation of electrical performance, and a one-year warranty for meters to protect against defective workmanship, degradation, or breaks. Warranty requirements are captured in the program handbook and the property owner must provide an affidavit attesting to these requirements. **IOU-S4A SOMAH** and **POU-S4A** will review report recommendations and consider how to incorporate improvements.

**IOU-S4A Community Solar** implementers will conduct bidder workshops and the CPUC will consider additional pre- and post-bidding TA support during the planning phase. Predevelopment support could include energy feasibility studies, coordinating with job training or apprenticeship programs, and supporting tribal enterprises. CPUC will hire an expert consultant to liaise with Tribes and advise them on solar options, including community solar projects or **IOU-S4A SOMAH**.

**POU-S4A** will conduct targeted outreach and engage in dialogue with the state's small POUs and associated tribal stakeholders within **CA-S4A**-POU responsibility to help disseminate best practices and increase consistency in interconnection processes and requirements.

**IOU-S4A SOMAH** currently offers upfront TA services for property owners and building managers to evaluate solar and associated storage potential and feasibility, including whether the system should be expanded to support resiliency, electrification of end-uses and electric vehicle charging stations. TA also includes providing financial modeling and a cost/savings analysis; as noted above this service will be expanded to include tax credit monetization **IOU-S4A SOMAH** does offer online resources, such as a project bidding tool, which supports interested property owners in requesting and receiving bids from multiple, eligible contractors. This pool of services will be expanded to include rooftop remediation and site readiness measures that can be funded with S4A grants.

Prior to an application, SOMAH offers a pre-review of an interested property owner's affordability status to ensure that it meets LIDAC criteria. This proactive offering helps avoid unnecessary application rejections or additional burden on property owners who ultimately do not qualify and gives increased confidence to others who learn that they are indeed eligible.

Towards this end, SOMAH will make and offer these resources over the course of the grant period:
1. Adjust and expand online resources to list common remedies for known site barriers
2. Promote and share ancillary benefits from rooftop and site remediation
3. Develop 1 to 2 case studies showcasing successful **IOU-S4A SOMAH** projects

4. Incorporate new informational materials into property owner, contractor, and stakeholder outreach (workshops, webinars, 1-1 support calls, etc.).

### 2.3.3 Equitable Access and Meaningful Involvement Plan

**CA-S4A** will maximize access to the program for low-income disadvantaged communities and California Native American Tribes by addressing the elements outlined in the Meaningful Benefits Plan and Distributed Solar Market Strategy, including maximizing the breadth and diversity of households and communities served, building participatory governance-formalized structures, meaningfully engaging with stakeholders, and strategizing for customer acquisition and management.

During the planning year, the S4A program will further develop pathways to achieve these elements, such as processes to encourage the use of community benefits agreements.[15]

All administering agencies will promote outreach and technical assistance that benefit community-centered engagement across all relevant geographies. When possible, programs will recruit and serve Project Area residents and aim to reduce barriers to participation through project elements such as the training program design and recruitment strategy.

Each administering agency will use their existing websites and public distribution lists to announce the new S4A funding and program development or expansion. This is more effective than California's previous proposal to invest time and resources in building a new site. Additionally, California has an open data initiative – data.ca.gov – where agencies can share public datasets and the CPUC publicly tracks customer-owned solar and solar with storage projects at DGStats (CaliforniaDGStats). The CPUC plans to expand DGStats to include community solar project information. DGStats data is updated monthly and is part of the public domain.

The CPUC and CEC are able to support customers as a meaningful point of entry and coordination to efficiently access S4A opportunities and other state and federal funding opportunities.

As permitted in the notice for funding, all **CA-S4A** programs will offer applicants flexibility as to their LIDAC status, they must only satisfy one of the LIDAC definitions.[16] The income related status must be supported by appropriate documentation (pay stubs, bank statements, annuity letter, etc.) or enrollment (and award letter) in a program with income requirement equivalency.

As stated in the Overview section, California has long history of investment in the solar industry and current solar programs and initiatives, some of which are also targeted or exclusive to low-income customers. California is directing 93% of its S4A grant to stand up new programs to increase equitable access. Further, California is reserving $19M of its **IOU-S4A Community Solar** budget to encourage the development of projects on tribal lands. Should these funds not be fully allocated after three years, funds will return to the general allocation of **IOU-S4A Community Solar** funds.

---

[15] The following fact sheet provides a helpful summary of community benefits agreements in relation to community development projects: "Strategies to Minimize Displacement: Community Benefits Agreements." https://www.epa.gov/system/files/documents/2023-04/Brownfields_CBA_FINAL.pdf.

[16]

*Maximizing Breadth and Diversity:* Each **CA-S4A** program will have a framework for creating a continuum of engagement where some elements are only open to California's LIDAC communities and others are tailored to ensure equitable access by the state's LIDAC stakeholders. For example, existing CPUC programs to be integrated into **IOU-S4A** have specific eligibility criteria to increase participation in under-served communities and contribute to increasing the diversity of solar owners in California overall. To ensure equitable access, the programs will utilize trusted messengers, incorporate community leadership, and seek to work with disadvantaged business enterprises and LIDAC-based workforce trainees. **POU-S4A** will ensure solar reaches various parts of the state, including rural or tribal areas often unreached by programs, and often with the least energy reliability. This program will incorporate various POUs not currently engaged by state supported programs.

*Community Based Organization Engagement:* Each **CA-S4A** program will either continue or seek to work with community-based organizations (CBOs) over the grant period. **IOU-S4A Community Solar** will use the planning period to consider how CBOs can be involved in the development and siting of community solar plants. **POU-S4A** Community Solar will consider structuring the granting criteria to favor applicants who seek to work with CBOs, especially for treating single-family households in the same geographic areas. The extent of **POU-S4A** incorporation of CBOs will be finalized in the planning period. **IOU-S4A SOMAH** already directly contracts with eight CBOs on marketing and outreach efforts. In 2024, SOMAH budgeted $800k for CBOs with a budget for oversight ($229k) and contracts ($524k). RWP S4A will use the planning period to build connections with CBOs familiar with workforce outreach. The CPUC will host an annual convening of the agencies to discuss S4A grant work and opportunities for leveraging, part of this effort will explicitly include a focus on growing relationships with CBOs.

**2.3.4 Summary Matrix of Customers with Barriers and CA S4A Tactics to Address Barriers**

| Customers with Barriers | CA-S4A Ameliorate or Remove Barriers |
|---|---|
| Rural Communities and Tribal Communities | • **POU-S4A** and IOU S4A will offer technical assistance.<br>• **IOU-S4A SOMAH** offers in-depth technical assistance to design projects and run a bidding process.<br>• **IOU-S4A SOMAH** (pre-dating S4A) has tribal representation on its Advisory Council and is looking to find an aligned tribal CBO.<br>• **IOU-S4A Community Solar** will be available anywhere in a given utility territory, including rural areas.<br>• In **IOU-S4A** and **POU-S4A**, tribal communities can collaborate with third-party developers to propose community solar projects.<br>• **RWP-S4A** will use the planning period to assess coverage in rural communities and seek to increase job training opportunities where there are gaps. |
| Language, other than English | • All programs will offer materials in languages other than English. The primary non-English language in California is Spanish.<br>• Pre-existing resources are offered in multiple languages, including the California Solar Consumer Protection Guide and CalJobs online portal website. |
| Renters | • **IOU-S4A Community Solar** beneficiaries are only qualified by their LIDAC status, so renters are able to opt-in to this program and continue it even if they move within the same utility territory.<br>• **IOU-S4A SOMAH** permits owners to receive a lesser incentive for solar for common areas, so they also receive a program benefit, which reduces their split incentives.<br>• **POU-S4A** will consider benefits to renters as part of the granting criteria. |
| Mobile home or Modular Communities | • **IOU-S4A Community Solar** is not limited by housing type, so mobile home or modular community households can participate.<br>• **IOU-S4A SOMAH** is available to deed-restricted, mobile home parks or modular communities. Even if the mobile home is owned by the resident, and they only rent the land underneath.<br>• **POU-S4A** will allow applicants to propose to treat mobile home or modular communities via community solar or rooftop solar. |

More specifically, **IOU-S4A SOMAH** will:

- Continue to subcontract with CBOs to do outreach to property owners, public housing authorities, and workforce training entities such as apprenticeship programs and community colleges.
- Work towards a voluntary benchmark to raise participation from properties located in disadvantaged communities to 40% of all participants.
- Liaise with tribal organizations and governments to increase tribal participation.
- Ease participation for tribes and likely implement new policies based on feedback from stakeholders during the planning phase.
- Update its annual marketing and outreach plan tactics to 1) ensure sufficient job trainee and preparation for job training opportunities and 2) educate eligible tenants to maximize their benefits.
- Continue to encourage disadvantaged business enterprises to become SOMAH eligible. Expand online web resources (SOMAH | Solar on Multifamily Affordable Housing (calsomah.org) to include new information related to S4A funding opportunities.
- Every three years the SOMAH program must be evaluated, so in July 2026, there will be recommendations from an independent evaluator to further refine meaningful community involvement.
- Income Verification: SOMAH is only eligible for deed-restricted, low-income affordable housing that have at least five rental units. Properties must be funded by low-income housing tax credits, tax-exempt mortgage revenue bonds, general obligation bonds, or have received a local, state or federal loan or grant. The deed agreement must be independently enforceable, and verifiable. There must be at least 10 years remaining on the affordability restriction. Additionally, the site must at least one of the other criteria:
  - At least 66% of property residents must have incomes at our below 80% of the Area Median Income; or
  - Property is located in a Disadvantaged Community as defined by CalEPA, which is the top 25 percent of the census tracts statewide in the CalEnviroScreen tool; or
  - Property is owned by a California Native American Tribe; or
  - Property is owned by a Public Housing Authority or Public Housing Agency.
  - SOMAH does not independently verify individual tenant income data as this would be intrusive to tenants, time consuming for the property owner, developer, and the program administrator, and duplicative of the deed agreements already in place.
  - In the planning period, SOMAH will overlay the geographic LIDAC criteria with SOMAH LIDAC geographic eligibility criteria and issue guidance to applicants if there are discrepancies. **IOU-S4A SOMAH** is providing relief to solve a gap in the program's offerings, and this will be limited to properties that meet both SOMAH and **IOU-S4A SOMAH** eligibility requirements. **IOU-S4A SOMAH** is expected to treat 85 properties with over 6,400 renter households.
- Continue successful program designs and efforts to ensure housing affordability. As noted above, SOMAH is only available to multifamily properties with at least 10 years remaining on their affordability restrictions.  By reducing operating and tenant electric bills, SOMAH also protects mission-driven program participants' commitments to maintain the affordability of their properties. Under current rules, participating property owners must submit an affidavit that ensures that 100% of the program's tenant economic

benefit is retained by tenants. SOMAH is designed, in part, to relieve tenants' energy cost burden through on-bill credits. The property owner must demonstrate that the portion of the solar energy system allocated to offsetting tenant load will result in the tenants receiving 100% of the economic benefit of the generation allocated to their unit and meter on a monthly basis for the life of the system or 20 years, whichever is less. Tenants may not bear any portion of the cost of the solar energy system nor be subject to the recapture or diminishment of SOMAH's required tenant economic benefits. Property owners will be required to exclude solar credits from utility allowance calculations, may not assume control of tenant utility accounts, nor increase rents in relation to the SOMAH-funded PV installation. The property owner will also certify that it will not use the California Utility Allowance Calculator to recapture and/or diminish tenant economic benefits from solar.

- Customer Acquisition: Most of the program's applications are contractor-led, meaning that a contractor is marketing the SOMAH program to a property owner or building manager. The SOMAH program administrator and its CBO networks also actively recruit property owners. SOMAH offers technical assistance to design a solar system and find a contractor to help ease entry into the program. SOMAH also generates an annual marketing, education, and outreach plan detailing its key tactics.[17] This approach will not shift as a result of new S4A funds, however it will provide a new benefit to communicate with property owners. SOMAH tracks reasons for not participating from warm leads or those who have had cancelled applications. SOMAH will review this list to see if site readiness was a barrier and will re-engage with previously interested applicants to see if their projects can be revived.

**IOU-S4A Community Solar** will:
- In the planning phase, the CPUC will encourage project developers and subscriber organizations to invest directly in communities through workforce development efforts that benefit residents beyond the projects themselves.
- Continue to build on successful elements of projects which achieved commercial operation under the DAC-GT program requiring workforce development and work with a community sponsor to enroll customers.
- In the planning phase, the CPUC will seek to align outcomes with our Environmental Social Justice Action Plan to explore opportunities for program modifications, such as stacking diverse incentives, implementing auto-enrollment of eligible customers, and improved outreach to best reach ESJ communities. These efforts also include targeting tribal customers. California expects to set aside $19M of its **IOU-S4A Community Solar** budget to preferentially encourage the development of projects on tribal lands. Should these funds not be fully allocated after three years, funds will return to the general allocation of **IOU-S4A Community Solar** funds.
- CPUC has received feedback from parties to ease participation for tribes and is considering new policies based on that feedback during the planning phase.
- Encourage utilities and community choice aggregators to include in their marketing, education and outreach plans commitments to developing diverse and culturally

---

[17] SOMAH Annual Marketing, Education, and Outreach Plan 2024 retrieved at 2024_SOMAH_MEO_Plan (ca.gov)

appropriate communication strategies to ensure that stakeholders can participate in decisions and actions that impact their communities.
- Leverage a consultant to provide concierge tribal outreach assistance, informed by market data, solar suitability mapping, and cultural competency to inform Tribes of potential community solar project options.
- Income Verification: Subscribing customers must be eligible for either the California Alternative Rates for Energy (CARE) or Family Electric Rate Assistance (FERA) program. Customers apply online through their utility's website to verify that their household income is 200% or less of FPG or someone in the household is enrolled in a public assistance program such as:
  - Bureau of Indian Affairs General Assistance
  - CalFresh/SNAP (Food Stamps)
  - CalWORKs (TANF) or Tribal TANF
  - Head Start Income Eligible (Tribal Only)
  - Low Income Home Energy Assistance Program (LIHEAP)
  - Medicaid/Medi-Cal
  - Medi-Cal for Families (Healthy Families A&B)
  - National School Lunch Program (NSLP)
  - Supplemental Security Income (SSI)
  - Women, Infants, and Children (WIC)
- Customer Acquisition: Program administrators will automatically enroll eligible low-income customers, with priority given to customers who meet the Arrearage Management Program criteria (meaning that they are in debt to the utility), followed by all other low-income customers to be automatically enrolled until subscriptions are full. Customers may opt-out if requested.[18]

The **POU-S4A** program will ensure solar reaches various parts of the state, including rural areas often unreached by programs, and often with the least energy reliability. These programs will incorporate various utilities not currently engaged by state supported programs.
- Income Verification: For grant applicants using criteria #3 to meet LIDAC eligibility, the CEC will require supporting documentation demonstrating appropriate eligibility. Exact procedures and requirements will be determined during the 12-month planning period. To the extent possible, CEC will work with each POU to determine of existing income-restricted utility rate programs fall within the parameters of **CA-S4A** LIDAC income requirements. In these cases, applicants can use their participation in their POU's income-restricted rate plan to meet this requirement. Otherwise, CEC will identify appropriate documentation to confirm eligibility (such as a W-2 combined with location-based information).
- Customer Acquisition: Grant applicants will be scored higher if they have a more robust outreach strategy or connections to the utility or a community group that can support direct outreach. Depending on the targeted audience, the CEC will be evaluating for certain best practices:
  - Single-Family Customers; Partnerships with CBOs in the same area.

---

[18] D.24-05-065 at 118-119

- o Multifamily Customers; Partnerships with Utilities that can identify the contact information for the property owner and facilitate an introduction.
- o Tribal Areas: Partnerships with the Tribe(s) of the tribal lands
- o The details of the customer acquisition strategy will be determined in the planning period.

**RWP-S4A** – EDD will build on the state's existing workforce development program that create pathways for job growth via partnerships with employers, local workforce boards, community organizations and educational entities. With the state's high road training partnerships - focus on quality job principles such as worksite safety, stable family-sustaining wages and worker voice – as a model, the RWP will target programs that directly increase the number of skilled workers from LIDACs. One example is the state's partnership with Joint Apprenticeship and Training Committees that has trained over 2,800 pre-apprentices with a stated goal of reaching underserved workers. **RWP-S4A** set aside funding to increase targeted outreach to LIDACs and ensure grantees continue that outreach for recruitment of trainees. During the planning period, EDD will set a process for how to track income verification or other criteria for self-identification of a trainee's LIDAC status. For similar programs EDD receives monthly or quarterly updates from grantees regarding activities centered around outreach events aimed at increasing training participation in the programs.

## 2.3.5 Plan for Participatory Governance-Formalized Structures:

**POU-S4A** and **IOU-S4A** will develop program guidelines with substantial engagement from utility and community stakeholders. Both **POU-S4A** and **IOU-S4A** will provide TA.

For **IOU-S4A**, in the planning phase the CPUC's regulatory proceedings are open to the public and advertised on social media to promote engagement. **IOU-S4A Community Solar** will explore the possibilities of incorporating continuous engagement via advisory boards, annual developer forums, or surveys. These tools are currently used in the CPUC's Green Tariff and DAC-GT programs. The CPUC S4A administrative budget for the CPUC includes funding for an evaluation consultant who will also be able to conduct primary data collection and surveys of targeted communities. Their findings will generate recommendations to improve **IOU-S4A** roll out. This overlaps with the 'Meaningful Engagement with Stakeholders' section below. An evaluation consultant will be brought on as soon as possible for the duration of the grant period.

**POU-S4A** awards for tribal projects will be tribally led, -owned, and -initiated, with other program components in a supporting role to tribal leadership's project direction. Tribes or tribal organizations will be eligible applicants, with anyone submitting on the tribe's behalf, also submitting a letter from Tribal Council to ensure the project is tribally driven and lead to significant benefits for tribal communities. **POU-S4A** will develop solicitation requirements with substantial engagement from utility and community stakeholders.

**Meaningful Engagement with Stakeholders: IOU-S4A** will leverage existing multicultural outreach approaches. Through owned and earned media, these efforts create a pipeline of timely, relevant and culturally connected content to introduce program offerings and raise awareness about program benefits to specific audiences.

The **IOU-S4A SOMAH** program details these approaches in its annual Marketing, Education, and Outreach plan, which is also distributed to the CPUC's Low-Income Oversight Board and Disadvantaged Community Advisory Group for feedback. Guides are produced for specific audiences, both property owners and eligible trainees. For example, SOMAH program staff created the guide: "Application Resources for Tribal Groups: Documentation of Multifamily Low-Income Housing Eligibility" to educate Tribes on how to document deed restriction. Program staff also work with CBOs and local governments to conduct marketing and outreach to reach eligible participants. There are two program features, an Advisory Council and a Job Training Taskforce, that incorporate community engagement the program's day-to-day administration. Both groups meet regularly and provide feedback to the administrator. Advisory Council and Job Training Taskforce members receive honorariums to remove any economic barriers to participation in meetings. Properties that receive **IOU-S4A** funding will provide culturally sensitive and in-language education on how to understand net energy metering tariffs, distributed generation monthly bill impacts, and ways to conserve energy.

For the **IOU-S4A Community Solar** program during the planning phase the CPUC will review adding these best practices. There are basic requirements for inclusion and meaningful engagement such as culturally sensitive and in-language marketing, education, and outreach when recruiting households to sign up for subscriptions. Throughout the planning period, program design will benefit from input from a range of stakeholders, such as IOUs, CBOs, and labor organizations who participate in the CPUC's proceeding processes. Program Administrators will develop customer-facing websites, conduct informational webinars, and hold developer-community matchmaking exercises.

**Tribal Engagement:** Under the direction of the State of California Office of the Tribal Advisor, the **CA-S4A** coordinating agencies engage with 109 federally recognized tribes within California. The State of California has a robust system of Tribal engagement and government-to-government consultation. In alignment with former Governor Jerry Brown's Executive Order B-10-11 each state department has a Tribal Liaison and departmental Tribal Consultation policies, guiding their departments related activities. The CEC adopted a Tribal Consultation Policy in 2014, the CPUC adopted a similar policy in 2018, and both agencies actively engage in consultation with Tribes to shape the future clean energy in California. This consultation policies ensure effective consultation and provide meaningful tribal input into the development of regulations, rules, policies, plans, and activities that may affect Tribes. In addition to government-to-government consultations, the state's Tribal Programs conduct outreach to increase tribal participation, host and sponsors tribal energy and climate events, and foster grant funding opportunities for Tribes.

In addition, to maximize benefits for tribal communities across all **CA-S4A** programs, state agencies will commit to effective tribal consultation and culturally appropriate engagement throughout program development and implementation to all eligible Tribes. The state will continue collaborative partnerships with California Native American Tribes - supporting eligible tribes through TA, advisory groups, workforce development, project realization, and partnerships. The state will implement a variety of engagement strategies to reach Tribal governments, including: sending communications to Tribal leaders and staff through various communication platforms using an existing robust distribution list of California Native American Tribe, and opening consultation to hear from Tribal leaders on how to best shape the programs

for their greater impact. Therefore, the **CA-S4A** programs are regarded as catalyst initiatives to leverage additional investments and an opportunity to improve intertribal and state collaboration on energy initiatives of this scale.

**IOU-S4A SOMAH** will:
- Encourage tribal member representation on the program Advisory Council on an ongoing basis.
- For workforce development, develop relationships with tribal labor development and job training organizations to encourage SOMAH job training opportunities. This effort is expected to be higher in the first half of the grant with the goal of connecting these organizations' students to sign up for the SOMAH Job Board.
- The CPUC will hire a consultant to provide tribal outreach assistance will also provide findings to the SOMAH program leads.

**IOU-S4A Community Solar** will:
Encourage tribal participation during the planning phase and technical assistance. The CPUC will hire a consultant to provide concierge tribal outreach assistance, informed by market data, solar suitability mapping, and cultural competency to inform Tribes of potential community solar project options.
- Consider prioritizing Tribal projects meeting the federal Indian Lands Low-Income Community Bonus Credit (LICBC) category
- Build upon the DAC-GT program's explicit eligibility of California Indian Country:
  - "all California Indian Country as defined in 18 United States Code Section 1151, with the exception of privately held in-holdings, which are defined as non-Indian owned fee land located within the exterior boundaries of California Indian Country; in the event of multiple owners, such land shall be considered Indian owned if at least one owner is a tribe or tribal member, regardless of the use of the land."

**POU-S4A** will:
- Engage in outreach and co-development, listening sessions, and develop a Tribal Engagement and Inclusion Plan during the program planning phase
- Encourage tribal participation during the planning phase to develop program requirements in partnership with tribes for greatest impact
- Offer funds for the deployment of tribal led solar and storage projects (including microgrids), filling the gap of existing state and utility programs.

**Strategy for Customer Acquisition and Management:** Electric IOUs and Community Choice Aggregators can be directed by the CPUC to develop an outreach plan to make customers aware of the programs and of the availability of TA offerings provided under **IOU-S4A Community Solar**. The **POU-S4A** program will require participants to implement best practices as a condition for funding. **IOU-S4A** and **POU-S4A** Community Solar programs can consult the joint agency (between CPUC and CEC) Disadvantaged Community Advisory Group (DACAG) to receive input on appropriate tactics. The DACAG was formed to ensure that disadvantaged communities, including tribal and rural communities, benefit from proposed clean energy and pollution reduction programs.

Under **IOU-S4A Community Solar**, it is anticipated that each implementing utility will create annual marketing plans. **IOU-S4A SOMAH** creates an annual marketing education and outreach plan which is distributed to its own Advisory Council, the DACAG, and to proceeding stakeholders distribution list for feedback before being finalized. Outreach plans include reaching LIDAC, Tribal, disadvantaged business enterprises to participate in the programs and access workforce development opportunities. Typical tactics include participating in industry events or conferences, building a contact list for email outreach, or targeted online ads. **IOU-S4A-Community Solar** will also leverage the Tribal Outreach Consultant and consider prioritization of projects that take advantage of the federal Indian Lands Low Income Communities Bonus Credit (LICBC), a tax credit, during the planning period.

For the **POU-S4A,** the CEC plans to work with POUs during the planning year to determine opportunities to leverage existing need-based programs or other utility programs for the purpose of alerting eligible participants to the availability of this program.

The investments made under **RWP-S4A** are structured to ensure local stakeholder engagement and ensure that worker and disinvested community voices are included throughout the planning and development phase. **RWP-S4A** staff, and the TA provider, will also support grantees in developing outreach and engagement strategies to ensure they reach diverse groups of training participants.

Any work directly solicited by the California administering agencies will follow protocols for open and fair solicitations that seek to increase participation from priority groups.

Additional steps to realize entrepreneurial support are covered in the sections under *Tribal Engagement* and *Meaningful Engagement with Stakeholders*.


## Section 3:  Fiscal Stewardship Plan

The state entities administering the actions within **CA-S4A** ("coalition members") will develop the final fiscal stewardship plan during the planning period and incorporate it into the interagency agreements which permit the flow of funds between state agencies. The coalition members (CPUC, CEC, and  the California Labor and Workforce Development Agency (LWDA) will design the fiscal stewardship plan to ensure program administration prioritizes reducing waste, fraud, and abuse, building robust infrastructure for program oversight, investing in consumer protection, and incorporating guardrails to ensure programs achieve desired impact.

The fiscal stewardship plan for **CA-S4A** will address applicable state and federal requirements, including 2 CFR § 200.303 and 2 CFR § 200.332(b), to track, manage, and report on funding through well-developed processes and systems and employ a robust risk management processes developed through existing programs to deliver funds as effectively and efficiently as possible, while also preventing fraud, waste, and potential mismanagement of grant funds. The state agencies are bound by the same federal and state laws regarding solicitations, ethics and conflicts

of interest, disadvantaged business engagement, and whistle blower protections. The coalition will align standards, where they might differ from the below, for financial reporting frequency and metrics collection to support S4A grant terms and conditions.

*Competitive Vendor Solicitations:* All third-party program administrators and implementers, and, if applicable, program applicants, will be required to provide sufficient information demonstrating their management and financial capacity to implement the grant and/or provide fiscal sponsorship for program participants, as well as the ability to conduct all applicable coordination, community outreach, evaluation, and reporting components critical to the grant. State of California runs its solicitations through the Department of General Services (DGS). Statutory authority for purchasing all goods and services for State government resides with the control agency. Non-IT Services are overseen by the DGS Office of Legal Services. Non-IT Goods and Leveraged Procurement Agreements (LPAs) are overseen by the DGS Procurement Division. The Executive Director of CPUC has signature authority for all CPUC Non-IT Contracts and Procurements. CPUC information Technology goods and services purchases are procured by the CPUC Information Technology Services Division in alignment with DGS guidelines.

*Ethics and Conflict of Interest:* All staff involved in procurement activities are expected to act responsibly, ethically, honestly, avoid wasteful practices, and to observe a high level of moral conduct. In accordance with Public Contract Code (PCC) 10410, employees of CPUC involved in the procurement process, whether directly or indirectly, are expected to be free of conflict of interest or relationships that are actually or potentially detrimental to the best interest of the State. CPUC employees are prohibited from participating in any part of the contracting process, including being a member of an evaluation team, if they have a financial interest in the outcome of a contract. CPUC employees cannot accept directly or indirectly any gifts of value from anyone who is doing or seeking to do business with CPUC. It is illegal for any State employee to use their position to bestow any preferential benefit on anyone related to them by family, business, or social relationship.  For goods purchases, CPUC procurement staff fill out a Conflict-of-Interest Statement that is kept on file for each purchase. For service contracts, CPUC Contracting Unit staff and any other CPUC employees involved in the evaluation process must fill out and sign a Conflict-of-Interest Statement for any competitive purchase. These standards will be extended to sub-awardees and subrecipients as part of S4A related interagency agreements.

All purchasing files are to be maintained in a confidential manner. Access to purchasing files is restricted to P&C staff or other CPUC employees authorized by P&C management. Any disclosure of confidential information by a State employee during the purchasing process is a basis for
disciplinary action. Total confidentiality during the process is vital to preserve the integrity of the process.

*Small Business and Disabled Veteran Business Participation:* Pursuant to State law, CPUC must offer procurement and contracting opportunities to California certified Small Businesses (SB), and Disabled Veteran Business Enterprises (DVBE) whenever possible. The CPUC has an annual statewide participation goal of not less than twenty-five percent (25%) for SB and not less

than three percent (3%) for DVBE in reportable purchases. To meet these goals CPUC uses a SB/DVBE First Policy to prioritize purchasing and awarding to SB/DVBE firms. The State offers SB Contractors a preference and DVBE Contractors an incentive in competitive solicitations, giving them an advantage over Non-SB or Non-DVBE businesses as a method of increasing SB/DVBE participation. These incentives or preferences are specified and included in CPUC's solicitation. This incentive or preference is used only for evaluation purposes, any contract awarded will be in the amount of the Contractor's actual submitted cost.

*Whistleblower Protections:* In addition, all coalition members and entities interacting with recipients of **CA-S4A** funding will be subject to the protections under the robust federal and state legal framework for confidential reporting and whistleblower protections, including the California Whistleblower protection Act, California Labor Code Section 1102.5, Government Code Section 12653, and Dodd-Frank Wall Street Reform and Consumer Protection Act.

Interagency Agreements: The CPUC will draft separate agreements with each agency partner – CEC and EDD. The agreements will restate the grant terms and conditions, the workplan, the fiscal stewardship plan, and will allow for the exchange of confidential and/or deliberative material in support of reporting and/or procedural requirements. During the planning period these agreements will be finalized. The fiscal stewardship plan will include processes for dispensing funds and reporting. The EPA's quality management and quality assurance requirements make for natural checkpoints that the agencies will need to collaborate on to satisfy. Beyond the EPA requirement, we expect the agency staff to meet regularly and that the vendors supporting each agency partner (with grant compliance) will also be in communication to align schedules and data quality.

The CPUC and CEC have an existing memorandum of understanding that allows the agencies to coordinate on confidential legal and policy matters. As this is already in-place, once the planning period commences there are no barriers for staff coordination in navigating the outstanding policy issues identified for the planning period in the prior sections.

## 3.1 Consumer Protections

Any program implementer having direct interaction with residential utility customers will be required to abide by certain practices to protect consumers against unfair, deceptive or abusive practices in compliance with consumer financial laws. CA-S4A will abide by the consumer protection requirements terms of the SFA grant to comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply; provide plainly written disclosures (regarding purchasing, leasing, financing other costs, construction liens, consumer rights, key contact information, etc.); require all in-person and marketing will be conducted in a language that consumer can understand; and maintain a process for handling and referring complaints.[19] As described below, most of these requirements are already available or will be required to cover gaps.

---

[19] SFA Terms and Conditions, Additional Terms and Conditions, M. Consumer Protection Requirements

The CPUC has a [California Solar Consumer Protection Guide](#).[20] Solar providers submitting applications to interconnect residential solar customers in the service areas of Pacific Gas and Electric Company (PG&E), Southern California Edison (SCE), San Diego Gas & Electric (SDG&E), Bear Valley Electric Service (BVES), and PacifiCorp are required to collect customer initials and a signature on the California Solar Consumer Protection Guide. The CPUC recommends that solar providers give out this guide during their first contact with potential customers. The Consumer Protection Guide is available in nine languages. The Consumer Protection Guide covers solar system basics, dispels common myths, explains consumer rights, low-income programs, and contact information at the utilities.

The CEC will require use of the California Solar Consumer Guide or require an equivalent, mandatory consumer guide for **POU-S4A** grants delivering rooftop solar for residential customers. No additional or new guide would be required if the POU territory already has one available and in use. If using the CPUC California Solar Consumer Guide directly, the POU will add a coversheet explaining where their billing systems or solar policies differ from the investor-owned utilities. CEC will require winning grants to provide such a guide to customers.

Programs are designed to ensure customers have a choice of pre-vetted solar installers and to allow customers to receive multiple bids. Project audits are part of this process, with program administrators conducting project audits to ensure project completion prior to issuing final incentives. Additionally, there will be minimum requirements for product and workmanship warranties, as noted above, to correct any defects or performance shortfalls. **IOU-S4A SOMAH** already includes these additional protections, and **POU-S4A** will include these as mandatory, minimum requirements for grant applicants.

California's Contractors State Licensing Board (CSLB) handles consumer affairs complaints, including those against solar project installers, as this agency issues the licenses by which contractors are permitted to install renewable energy facilities (solar and storage).[21] This information is also included in the California Solar Consumer Protection Guide.

CPUC's Consumer Affairs Branch is available to handle consumer complaints against the IOUs that the CPUC regulates. If issues arise such as problems with interconnection, solar plan billing or metering that the customer is not able to resolve directly with their utility, they are able to contact CPUC Consumer Affairs by phone or online to receive support.[22] CPUC also shares essential contact information on filing complaints directed to customer generators on its website.[23]

---

[20] The Consumer Protection Guide is available at:
https://www.cpuc.ca.gov/solarguide/#:~:text=The%20California%20Public%20Utilities%20Commission%20(CPUC)%20presents%20the%20California%20Solar
[21] More information at
https://www.cslb.ca.gov/OnlineServices/ConstructionComplaint/ComplaintFormProcess.aspx
[22] More information online at https://www.cpuc.ca.gov/about-cpuc/contacting-the-puc and
https://www.cpuc.ca.gov/consumer-support/file-a-complaint
[23] More information at https://www.cpuc.ca.gov/industries-and-topics/electrical-energy/demand-side-management/customer-generation/resources-for-solar-customers

Sub-awardees and other S4A funding recipients will need to share references to these CPUC and relevant CA state agency resources or generate matching materials to be dispersed to potential program applicants.

*Audits of Vendors (Consultants and Program Administrators):* **CA-S4A** Coalition partners will conduct periodic audits and spot checks of program partners or other entities that directly interact, transact or contract with customers to ensure that customers' rights are protected. Program administrators and implementers, as well as program recipients will be required to ensure all records, physical and electronic, are collected regularly and adequately protected from loss, damage, or destruction for possible audit(s), and that a designated representative will have the right during normal business hours to review and to copy any records pertaining to the performance of the agreements issued through **CA-S4A**. These release of information requirements will come in different forms – consultants and program implementers will incorporate these requirements into their contracts and agreements with state agencies; and recipients of incentives must agree to disclose certain information to participate in the programs and receive assistance or incentives. Performance audits may include a performance evaluation to assess if household savings are materializing for program beneficiaries. For example, on a weekly or monthly cadence, CPUC requires program administrators (including IOUs) to report project progress data and administrative cost information to public repositories – publishing reports, as outlined in the Reporting Plan, to the CPUC website and archives. The CPUC uses program evaluation vendors to independently assess program spending and review that it was used appropriately, including auditing the program administrator expenses. Financial auditing occurs during the regular course of payment and may also be included in an independent assessment from a program evaluator.

For multifamily properties, **IOU-S4A SOMAH** already requires property owners to share essential information about solar billing and expected changes to their future electrical bills after a solar system is interconnected. **IOU-S4A SOMAH** runs a hotline telephone service that can be accessed by tenants as well. **POU-S4A** will consider such best practices when scoring grants that wish to target and treat multifamily properties with rooftop solar. Not only are disclosures to property owners important prior to solar installations, but programs can help to close the information gap between landlords and tenants with additional educational materials. In compliance with the CPUC's regulations, each of the three large IOUs (Pacific Gas & Electric, San Diego Gas & Electric, and Southern California Edison) are working to improve the readability of monthly billing statements to aid customer understanding of electricity bill changes post-solar. Billing systems upgrades are a large, infrastructure investment, so while these updates will become available for most Californians served by the three largest IOUs, this update is not required or mandated for other utilities. **POU-S4A** will determine in the planning period whether to ask applicants to describe solar credit bill presentment in their applications. The tradeoff being while this may improve the billing experience, it does not add to program uptake.

As part of its administration, CPUC will hire a consultant with federal grant expertise to prepare and execute our semi-annual transactions and progress reporting.

**CA-S4A** has sought to install meaningful consumer protections and increased accessibility in line with federal E.O 13166: Improving Access to Services in the design of all programs as outlined in the Financial Assistance Strategy.

## Section 4: Timeline and Milestones

As described in earlier sections, the **CA-S4A** coalition of agencies, led by the CPUC, each have a commitment to working with a diverse group of stakeholders in its planning and implementation.

*Resources for expanding regulatory stakeholders:* As a public agency, the CPUC depends on input, questions, and feedback from the general public, including industry. By hearing from different perspectives, the CPUC is better able to make informed decisions that consider the impact of utility costs and services on all Californians. The Public Utilities Code allows qualified parties in proceedings before the CPUC to request compensation for their participation. The Intervenor Compensation Program is intended to ensure that individuals and groups that represent residential or small commercial electric utility customers have the financial resources to bring their concerns and interests to the CPUC during formal proceedings.[24] This is available for all milestones and tasks related to regulatory proceedings described below.

*Increasing diverse perspectives:* The CPUC and CEC both can receive support from a joint committee, called the Disadvantaged Communities Advisory Group (DACAG). The DACAG is an 11-member group that meets several times a year to review CPUC and CEC clean energy programs and policies to ensure that disadvantaged communities, including tribal and rural communities, benefit from proposed clean energy and pollution reduction programs.[25] Its three guiding principles (increase access to clean energy technologies, maintain or enhance affordability of energy services, and increase benefits of programs in disadvantaged communities) strongly connects to the objectives of this S4A work. The DACAG is an independent advisory body.

*Incorporating equity:* The CPUC adopted an Environmental, Social, and Justice (ESJ) Action Plan which has nine main goals guiding the CPUC's mission to regulate essential utility services to protect consumers and safeguard the environment, assuring safe and reliable access to all Californians. The ESJ Action Plan works in accordance with the CPUC's institutional values of accountability, excellence, integrity, open communication, and stewardship. The goals are:

1. Consistently integrate equity and access considerations throughout CPUC proceedings and other efforts
2. Increase investment in clean energy resources to benefit ESJ communities, especially to improve local air quality and public health.
3. Strive to improve access to high-quality water, communications, and transportation services for ESJ communities.
4. Increase climate resiliency in ESJ communities.
5. Enhance outreach and public participation opportunities for ESJ communities to meaningfully participate in the CPUC's decision-making process and benefit from CPUC programs.
6. Enhance enforcement to ensure safety and consumer protection for ESJ communities.

---

[24] More information available at: https://www.cpuc.ca.gov/proceedings-and-rulemaking/intervenor-compensation
[25] More information available at:
https://www.cpuc.ca.gov/dacag/#:~:text=The%20CPUC%20and%20the%20California%20Energy%20Commission%20on%20August%201,

7. Promote high road career paths and economic opportunity for residents of ESJ communities.
8. Improve training and staff development related to ESJ issues within the CPUC's jurisdiction.
9. Monitor the CPUC's ESJ efforts to evaluate how they are achieving their objectives.

For S4A Coalition work, here is an overview of key tasks by year, and quarter.

| Timeline of Tasks + Milestones | | |
|---|---|---|
| **Year** | **Program, Description of Task or Milestone** | **Estimated Time Period** |
| **Year 1** | **Grant Period Begins** | May 24, 2024 |
| | **Quality Management Plan & Quality Assurance Project Management Plan** | Due 90 days after first amendment |
| | **Revised Workplan and Budget to EPA** | November 30, 2025 |
| | **Planning Period** | From Q4 2024 until Q4 2025 |
| | **Planning Period - POU-S4A** | |
| | CEC participates in **CA-S4A** Kick-Off Workshop | (Q4 2024 – Q1 2025) |
| | Scoping Workshops, Stakeholder meetings, Tribal Co-development, Consultation, Engagement, and listening sessions | (Q4 2024 - Q1 2025) |
| | Develop Tribal Engagement and Inclusion Plan | (Q4 2024 – Q4 2025) |
| | CEC Drafts Solicitation Manual | (Q1-Q2 2025) |
| | Draft solicitation released; host public workshop and solicit public comment | (Q3 2025) |
| | Milestone: CEC releases final solicitation package; Notice of Funding Availability (NOFA); applications open.<br>• CEC encourages selectees to use community benefit agreements (CBAs) | (Q4 2025). |
| | CEC provides technical assistance to interested POUs to develop siting plan or requirements to include as part of their procurement documentation and should include the following elements if applicable: climate hazards, greenspace, pollinators, building resilient assets, and agrivoltaics (as requested) | TBD |
| | CEC establishes agreements with POUs to share customer billing data (as needed). | TBD |
| **Year 1** | **Planning Period - IOU-S4A SOMAH** | From Q4 2024 until Q4 2025 |
| | CPUC hosts **CA-S4A** Kickoff Workshop | (Q4 2024 – Q1 2025) |
| | CPUC integrates **IOU-S4A** program elements via established processes | (by Q4 2025) |

| | | |
|---|---|---|
| | Program administrator will request to revise key program oversight documents | (by Q4 2025) |
| | Advisory Council and Job Training Taskforce engaged | Quarterly |
| | IOUs submit compliance regulatory documents to implement directives (if directed by the CPUC). | TBD |
| | Program administrator will educate contractors and interested applicants on eligibility for additional funds.<br>• Host at least one contractor education webinar on new measures (by Q4 2025)<br>• Incorporate S4A education into existing Public Forums (typically Q2 and Q4 each year) | Various |
| | Marketing, Education, and Outreach plan will include notification of new funding (typically finalized by February of each year). | Annually |
| | Program administrators amend application processes to accommodate requests for new funding and review applications. Program may begin to deploy financial assistance. | Q1 – Q3 2025 |
| | CPUC addresses master-metered property treatment in a regulatory proceeding. | TBD |
| | Milestone: SOMAH **IOU-S4A** funds are reservable, at the Reservation Request phase of an application. | Q2 or Q3 2025 |
| | Milestone: SOMAH **IOU-S4A** funds are available for projects at the final incentive phase of an application. | Q3 or Q4 2025 |
| **Year 1** | **Planning Period - IOU-S4A Community Solar** | From Q4 2024 until Q4 2025 |
| | CPUC hosts **CA-S4A** Kickoff Workshop | Q4 2024 – Q1 2025 |
| | CPUC adopts the first of two decisions on community solar programs on May 30, 2024, pursuant to AB 2316. | (by Q3 2025) |
| | Milestone: CPUC adopts second of two decisions finalizing outstanding program design and implementation details in early 2025. | Q1 – Q2 2025 |
| | IOUs and CCAs develop websites, customer enrollment, billing and other systems necessary for program launch. | Q3 – Q4 2025 |
| | CPUC hires financial services consultant to provide tax credit monetization consultant for non-profit property owners. | By Q3 2025 |
| | CPUC integrates **IOU-S4A** amendments to the program(s) via established processes.<br>• CPUC encourages selected developers to use | By Q4 2025 |

| | | |
|---|---|---|
| | community benefit agreements (CBAs). <br>• IOUs and CCAs to develop siting plan or requirements to include as part of their procurement documentation and should include the following elements if applicable: climate hazards, greenspace, pollinators, building resilient assets, and agrivoltaics. | |
| **Year 1** | **Planning Period - RWP-S4A** | From Q4 2024 to Q4 2025 |
| | EDD and Labor Department participates in **CA-S4A** Kick-Off Workshop | Q4 2024 – Q1 2025 |
| | Engage with CEC and CPUC to understand any labor workforce gaps to consider whether adjustments are feasible. | Q1 2024 – Q2 2025 |
| | Review training options in LIDAC geographic areas to assess availability and access. | By Q3 2025 |
| | RWP guidelines updated to include Solar for All sub-fund upon execution of Solar for All grant agreement | By Q3 2025 |
| | Application solicitation for regional hub grantees are received. | By Q3 2025 |
| | Program team provides TA to regional hub applicants, including supporting coordination amongst local entities to develop or expand workforce development and training programs. | Q3 – Q4 2025 |
| | Milestone: Regional Hub grants awarded. Grant agreements and contract processing. | By Q1 2026 |
| | Milestone: Regional hub grant period of performance begins. <br>• Program team provides TA to regional hub awardees, including support in developing training curriculum and facilitating networking and best practice sharing between hubs. <br>• Develop guidelines with partner feedback for Training & Implementation funds. | TBD |
| **Years 2 - 5** | **Implementation Grant Period** | Q1 2026 through Q2 2029 (April 30, 2029) |
| **Years 2 - 5** | **Implementation Grant Period - POU-S4A** | |
| | Round 1 Applications Due | (Q1 2026) |

| | | |
|---|---|---|
| | CEC reviews, scores, approves tentative awards; approves at business meeting. | (Q2 2026) |
| | CEC approves awards. | (Q2 2026) |
| | CEC executes grant agreements with Round 1 awardees; manage agreements through term of grant. | Starting in Q3 2026) |
| | Public workshops for Round 2 solicitation. | (Q3 2026). |
| | Incorporate public feedback, lessons learned; draft and finalize Round 2 solicitation package | (Q3-Q4 2026) |
| | Round 2 NOFA released. | (Q4 2026). |
| | Education and Outreach | (Q4 2026). |
| | S4A Coalition-building<br>• Liaise with RWP S4A on training opportunities.<br>• Annual S4A meeting to share wins, lessons learned, and shared challenges. | On-going |
| | Round 2 Applications due and CEC reviews, scores, approves awards. | Q1 – Q2 2027 |
| | CEC executes grant agreements with Round 2 awardees; manage agreements through term of grant | (Q2 2027 – Q2 2029) |
| | Continuous grant management, collection of progress reports, outreach and engagement with stakeholders and grant recipients | (starting in Q3 2026) |
| | If additional funding is unencumbered: Incorporate lessons learned, draft and release round 3 solicitation, approve awards, etc. | (starting in Q3 2027). |
| **Years 2 - 5** | **Implementation Grant Period - IOU-S4A (Community Solar)** | |
| | CPUC integrates **IOU-S4A** program elements via established processes. | Q1 2026 through Q1 2027 |
| | Program Administrators (**IOUs** and participating community choice aggregators) will request to revise key program oversight documents. | Q1 2026 through Q1 2027 |
| | IOUs submit compliance regulatory documents to implement directives. | As Directed |
| | Program administrator will educate contractors and interested applicants on eligibility for additional funds. | Q3 2026 through Q2 2029 |

| | | |
|---|---|---|
| | Marketing, Education, and Outreach plan will include notification of new funding | Annually |
| | Program administrators amend application processes to accommodate requests for new funding and review applications. Program may begin to deploy financial assistance | Q3 2026 through Q2 2029 |
| | Upon completion of solar developments, IOUs conduct auto-enrollment in Community Solar tariff to receive bill discounts. | Q3 2026 through Q2 2029 |
| | CPUC reviews progress reports and data collection. | Monthly through Q2 2029 |
| | Annual S4A meeting to share wins, lessons learned, and shared challenges. | Annually through Q2 2029 |
| **Years 2 - 5** | **Implementation Grant Period – IOU-S4A SOMAH** | |
| | Program Administrator and community-based organizations conduct outreach and marketing on an ongoing basis | Q1 2026 through Q2 2029 |
| | Program Administrator offers technical assistance to potential projects as requested. | Q1 2026 through Q2 2029 |
| | Subsidies distributed to program beneficiaries upon meeting project milestones on an ongoing basis | Q1 2026 through Q2 2029 |
| | Program Administrator tracks S4A progress in semi-annual reports throughout the grant period. | Q1 2026 through Q2 2029 |
| | Continued engagement with Advisory Council and Job Training Advisory Group throughout the grant period. | Q1 2026 through Q2 2029 |
| | | |
| | CPUC reviews progress reports and conducts data collection. | Monthly and Semi-Annually |
| | In 2026 and 2029, CPUC will evaluate the program and issue reports to the Legislature per Public Utilities Code 913.8 and 2870. | July 2026 & July 2029 |
| | Annual S4A meeting to share wins, lessons learned, and shared challenges. | Annually through Q2 2029 |

| Years 2 - 5 | Implementation Grant Period – RWP-S4A | |
|---|---|---|
| | TBD in the planning phase | Q1 2026 through Q2 2029 |
| | Annual S4A meeting to share wins, lessons learned, and shared challenges | Annually through Q2 2029 |

See the following section for a timeline of more in-depth reporting requirements.

# Section 5:  Reporting Requirements

California will utilize credible methodologies for measuring program outputs and outcomes.[26] The state will leverage the annual reporting process, as well as the other reporting touchpoints described below, to continuously assess how program impact measurement can be made more precise. As per the grant Terms and Conditions, California agrees to provide performance reports and transaction-level and project-level data. As lead grantee, CPUC will use its administrative budget to hire additional support staff and/or consultants to delivery timely and complete reports and information requests.

The following metrics, at a minimum, will be included in all future reporting:

| |
|---|
| **Climate and Air Pollution Benefits** |
| Solar Capacity Installed (MW) |
| Number of Projects Financed (#) |
| Storage Capacity Installed  (MWh) |
| Clean Energy Generation (MWh) |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) |
| Other Air Pollution Reduced and Avoided (Nitrogen, Dioxide, Ozone, etc.)  SO2 (lb); NOX (lb); PM2.5 (lb); VOCs (lb); and NH3 (lb) |
| **Equity and Community Benefits** |
| Number of Households Benefitting from Projects (#) |
| Amount of Household Savings Delivered ($) |
| Average Savings per Household Benefitting ($) |
| Average Electricity Bill  in California ($) |
| Average Savings per Benefitting Household (%) |
| Workers Trained by Workforce Development Programs (#) |
| Projects Executed Using Tools to Promote Good Jobs and Community Benefits (#) |
| Investments in or in partnership with disadvantaged business enterprises (#) |
| Number of households with resiliency benefits (#) |
| Clean energy capacity owned by communities in direct ownership models (MW) |
| Number of solar jobs created (#) |
| Average percentage point reduction in disparity in energy burden b/w low-income and non-low-income households due to Solar for All benefit (%) |
| Average increased wages for individuals working in solar energy  (%) |
| **Market Transformation Benefits** |
| Grant Funds Deployed ($) |
| Financial Assistance Deployed ($) |
| Total private sector financing mobilized alongside projects funded directly by Solar for All ($) |
| Number of community-based organizations engaged by Solar for All services (#) |

---

[26] An updated version of the Impact Metrics spreadsheets can be provided.

The administering state agencies will communicate expectations and reporting requirements to all subrecipients and agree to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The agencies have the following plans for executing on the anticipated federal reporting requirements through enhancements to established infrastructure and capacity:

*CEC:*
As a component of grant management, grant and incentive recipients comply with the established program reporting requirements including regular check in calls, quarterly progress reports, and periodic reviews and requests for information. CEC receives project-specific information via regular reporting, including information about partnership building, project successes and challenges, and the environmental and community benefits of project activities as applicable (e.g., energy savings, GHG reduction, etc.). The CEC will establish reporting protocols and activity dashboards as the programs are developed, and all federal requirements will flow to recipients. The CEC may have a contractor to support its efforts to ensure all federal requirements are met by both the CEC and its recipients receiving federal funding.

*CPUC:* The CPUC has existing reporting requirements and timelines driven by state statute or Commission direction, which will support and inform the EPA's annual reporting process. The CPUC requires each of its programs to be evaluated periodically by an independent, external evaluator. Additionally, the CPUC will issue data requests to regulated entities and implementers to align reporting periods with Solar for All award reporting requirements. As part of its Solar for All award planning phase, the CPUC can formally direct compliance with reporting or data collection through its proceedings. Evaluators of incentive programs are expected to meet the standards set forth in the Commission's "California Energy Efficiency Evaluation Protocols" guidelines. The Protocols cover several types of evaluation efforts, such as impacts, market effects, and process evaluations – with the primary goal to specify acceptable evaluation approaches and the operational environments in which evaluations are conducted. The methodologies for measuring the outputs and outcomes central to the EPA Solar for All objectives are pre-established in these Protocols. These reports go through a public comment period, including public webinars. Final reports are made available on the CPUC webpage and archived online. CPUC often leads a "Response to Recommendations" process where select evaluation recommendations are accepted and implemented; this process has a public review and comment period and the final plan is published on the CPUC website.

*EDD:* As a component of grant management, EDD grant recipients comply with the established program reporting requirements including semi-annual and closeout narrative reports, monthly check in meetings, and periodic reviews and requests for information. Information requests are made by contracted TA providers or program evaluators, with project data and impacts uploaded online to a portal hosted by the state on a quarterly basis. The EDD will leverage CalJOBS[SM], the case management system that tracks participants characteristics including barriers, services, received, project progress, and employment and training-related outcomes. EDD also receives project-specific information via regular narrative reporting, including information about partnership building, and project successes and challenges. The **RWP-S4A** will include reporting

requirements that allow for the collection of output and outcome data related to the federal Solar for All objectives and outlined in the Impact Assessment – submitted through the portal quarterly and periodically via narrative reporting.  As part of the program evaluation, EDD will work with the evaluator to share program data as necessary.

As provided in the Terms and Conditions for the award, as the administering agencies we agree to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. As stated above, the administering agencies agree to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. CPUC will hire a federal grant expertise expert to support on these deliverables.

**Timeline of Reporting Requirements**

| Reporting | Anticipated Start Date | Anticipated Completion Date |
|---|---|---|
| Draft QMP and submit to EPA for Approval (within 90 days of the first amendment) | 1/1/2025 | 3/30/2025 |
| Draft QAPP and submit to EPA for Approval (within 90 days of the first amendment) | 1/1/2025 | 3/30/2025 |
| Revised Workplan | | 11/30/2025 |
| MBE/WBE Reporting: EPA Form 5700-52A Annual Report Submitted (when the combined total of funds budgeted for procuring supplies, equipment, construction or services exceeds the Simplified Acquisition Threshold) | | 10/30/2024, 10/30/2025, 10/30/2026, 10/30/2027, 10/30/2028, 10/30/2029 |
| Submit Interim Federal Financial Report (SF425) annually | | Annually |
| Submit Final Federal Financial Report | 01/01/2029 | 04/30/2029 |
| July 1-December 31 2024 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2024 | 1/30/2025 |
| January 1-June 30 2025 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2025 | 7/30/2025 |
| July 1-December 31 2025 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2025 | 1/30/2026 |
| January 1-June 30 2026 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2026 | 7/30/2026 |
| July 1-December 31 2026 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2026 | 1/30/2027 |

| | | |
|---|---|---|
| January 1-June 30 2027 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2027 | 7/30/2027 |
| July 1-December 31 2027 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2027 | 1/30/2028 |
| January 1-June 30 2028 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2028 | 7/30/2028 |
| July 1-December 31 2028 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2028 | 1/30/2029 |
| January 1-April 30 2029 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 01/01/2029 | 04/30/2029 |
| Post-closeout program strategy Submitted Prior to Program Closeout | 10/1/2028 | 01/01/2029 |
| Final Report submitted | 01/01/2029 | 04/30/2029 (or up to 120 days after) |
| Review approved QMP annually | | Annually |
| Review approved QAPP annually | | Annually |

## 5.1 Performance Reports

**Semi-Annual Report**

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

**Final Report**

CA S4A coalition agencies agree to submit a final report in a format conducive for immediate public consumption. The final report will contain required detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the implementation of CA's EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, CA S4A will detail its program strategy and plans for performance reporting under the Closeout Agreement. The following broad, non-exhaustive elements will be in the final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

CA S4A (CPUC) agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 5.2 Transaction-Level and Project-Level Data

CA S4A coalition partners agree to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). CA S4A agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

Additionally, it is agreed to submit the data securely and to use the Environmental Information Exchange Network or EPA's Central Data Exchange to ensure connections meet the EPA security requirements. This will apply to collecting and managing environmental data.

# Section 6:  Budget Narrative

## 6.1 Overall Project Budget

| Budget Item[27, 28, 29] | | Cost |
|---|---|---|
| Total Personnel | | $8,097,264 |
| Total Fringe Benefits | | $2,483,495 |
| Total Travel, Supplies, and Equipment | | $69,000 |
| Total Contractual | | $4,314,187 |
| Total Other (including Financial Assistance and DOE In-Kind Assistance) | | $233,416,054 |
| | | |
| Total Direct Costs | | $248,380,000 |
| Total Indirect Costs | | $1,420,000 |
| | | |
| **Total** | | **$249,800,000** |

*Covers **CA-S4A** Coalition: CPUC, CEC and EDD Budgets.*

| Total Budget By Activity Bucket | | |
|---|---|---|
| Financial Assistance | Administration (Including Contractual and Indirect Costs) | Technical Assistance |
| $233,280,000 | $14,205,815 | $2,314,185 |
| 93.39% | 5.69% | 0.93% |

*Covers **CA-S4A** Coalition: CPUC, CEC and EDD Budgets.*

*The Budget will be fully used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.[30]*

---

[27] As noted in SFA Terms and Conditions, National Terms and Conditions, E. 'In-Kind Assistance', there is $400,000 of in-kind assistance from the Department of Energy (DOE) which may be used for, but is not limited to, convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist CA S4A coalition agencies.

[28] SFA Terms and Conditions, National Terms and Conditions, Section G.1 Leveraging, "The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan."

[29] SFA Terms and Conditions, Additional Programmatic Terms and Conditions Section A. "Conflicts Among Authorities" *"any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the Federal Register, Executive Orders, and these award agreement terms and conditions."*

[30] SFA Terms and Conditions, Additional Programmatic Terms and Conditions, F. Low-Income and Disadvantaged Communities Expenditure Requirement

*The Budget will follow federal guidelines for the appropriate use of funds. The funds will not be used for unallowable costs, including:*

- *For subawards or contracts to non-profits: no transfers of funds to affiliated entities that may create conflict of interest risks*
- *For unions: grant funds may not be used to support or oppose union organizing*
- *For lobbying: grant funds will not be used for lobbying purposes, and incorporate restrictions from 2 CFR 200.450*
- *For ineligible projects: disallow activities that support deployment of projects that do not meet the EPA Solar For All definition of eligible zero-emissions technologies*
- *For intangible property: no costs for acquiring "intangible property," as defined in 2 CFR 200.1. Equity investments such as purchases of ownership interests in companies through acquisition of intangible personal property, as defined in 2 CFR 200.1*
- *For outside of EPA regions: no costs for deployment of projects outside of EPA regions*
- *For claims: no costs for defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the CA's compliance with the terms and conditions of the award agreement or (b) CA has obtained prior written approval from the EPA Project Officer.*

## 6.2 Personnel

**CPUC**

The Personnel costs include the cost-of-leave. It is processed as part of the regular payroll. Here is a table showing the new personnel and summary information:

| CPUC Personnel S4A Summary Table | | | | |
|---|---|---|---|---|
| **Job Title** | **Annual Salary or Other rate** | **Number of Personnel** | **Percentage of Time Assigned to the Program** | **Total Cost (Salary for Grant Years 1-5)** |
| Program Supervisor | Annual Salary | 1 | 100% | $830,000 |
| Public Utility Regulatory Analyst 5 | Annual Salary | 2 | 100% | $1,008,00 |
| Public Utility Regulatory Analyst 3 | Annual Salary | 3 | 100% | $1,212,000 |
| Associate Governmental Program Analyst | Annual Salary | 1 | 100% | $395,000 |
| Legal Division Attorney IV | Annual Salary | 1 | 100% | $805,000 |

Approximately $4.25 million will be utilized for personnel salary doing S4A program administration. Personnel costs include eight staff positions (detailed above), and fringe benefits for those full-time positions. Public Utilities Regulatory Analysts salaries and benefits are subject to a Bargaining Unit Master Agreement between the state of California and Service Employees International Union Local 1000. As noted in the Master Agreement, at the discretion of the direct supervisor, CPUC may annually elect to raise salaries based on performance (merit adjustment up to 5%).[31]

- Program and Project Supervisor: Plans and organizes the work and directs the staff of the new S4A section within Energy Division at the CPUC concerned with service, safety, certification, operations, tariffs, and coordinates the work of the section with others in the Division, as well as external agencies. Performs technical work relating to the oversight of the IOUs and S4A grant work.

- Public Utility Regulatory Analyst, Level 5: Positions at this level are intended to accommodate the broadest and the most advanced level of expertise. Develop and implement major studies or programs involving the coordination of regulatory disciplines with federal, statewide, or industry-wide policy implications. May exercise lead responsibility over professional subordinates and conduct workshops on difficult issues or direct major studies.

- Public Utility Regulatory Analyst, Level 3: The positions are characterized by independently performing complex, sensitive and responsible overview of S4A work which requires, on a regular basis, a high degree of knowledge, skill and ability. Under general direction, this position may develop original solutions, approaches and methodologies around regulation and grant implementation work.

- Associate Governmental Program Analyst: Under direction, this position provides support services such as program evaluation and planning, systems development, budgeting, and continually provides consultant services to management and others on the S4A team.

- Legal Division Attorney IV: This position requires the attorney to provide specialized legal advice and services, exercise broad discretion and independence in the most complex legal matters, work cooperatively with S4A team, coalition agencies, and grantees.

## CEC

The proposed **POU-S4A** has a total budget $30M. The budget will be allocated across financial assistance (83%), technical assistance (4%), administration (11%), and indirect costs (2%). Financial assistance ($25 million) will be awarded to LIDAC residents of POU territory as well as tribes in the same territory. In the original **CA-S4A** application, the proposed administrative budget was approximately 7%. The revised down-scoped Workplan Budget for

---

[31] https://www.calhr.ca.gov/state-hr-professionals/Pages/about-salaries.aspx#:~:text=After%20each%2012%20months%20of%20satisfactory%20performance%2C%20employees,annual%20performance%20appraisals%20of%20successful%20or%20better%20performance.

**POU-S4A** includes a larger share going to administration costs because the CEC still requires a minimum number of staff to feasibly administer a viable program. While the revised proposal reduces total staff for this program, the minimum staff deemed necessary for this program slightly increases the proportion of the budget going to personnel costs.

Approximately $3.2 million is set-aside for personnel and program administration. Personnel costs include five staff positions, and fringe benefits are included as part of staff salary:

- Program and Project Supervisor ($273,086 per year, 100% time). The Program Supervisor will perform program planning and oversight for the **S4A**-POU programs, which includes designing the programs, mentoring staff, and reviewing documents.
- Electric Generation System Specialist I ($200,691 per year, 100% time). The EGSS I will develop an implementation plan and general program design and develop, design the program applications and application review process, develop, and manage a database system to support the **S4A-POU** program, perform data analysis, write program guidelines and lead public communication and stakeholder processes.
- Energy Commission Specialist (ECS) I ($158,669 per year, 100% time). The ECS I will perform financial tracking and encumbrance accounting for the **S4A-POU** program, develop the grant agreement packages, review and approve invoices, develop program outreach and education materials.
- Two Energy Analysts ($114,976 per year, 2-year limited term). The Analysts will process applications, which includes reviewing applications, manage the call center, which includes responding to public inquiries and managing public emails, and perform data analysis which includes managing and updating datasets and developing program data statistics.

**EDD**
- The proposed **RWP-S4A** has a total budget of approximately $9.2 million with $8 million dedicated to support workforce training grantees. EDD staff costs cover 11 staff at partial time, including program, accounting and legal oversight.

## 6.3 Fringe Benefits

CPUC: For all staff, we compute fringe benefits as 53.46% of the total salary cost. The following table breaks down the services/allowances provided via the fringe rate. Cost of leave is a part of personnel costs.

| Staff Benefits (use rounded-to-thousands amount to calculate) | | |
|---|---|---|
| OASDI (Old Age, Survivors, and Disability Insurance Program) and Medicare | 6.2% OASDI 1.45% Medicare per SAM | 7.65% |
| Retirement | 26.31% per 2024-25 Retirement Rate in Budget Letter | 26.31% |
| Health | 15.18% (SAM) + 4.32% increase starting 01/01/2021 | 19.50% |

| Total Staff Benefits | 53.46% |
| --- | --- |

CEC: **POU-S4A** program does not plan on using funds for Fringe Benefits. Fringe benefits are included in personnel costs.

EDD: **RWP-S4A** includes total fringe benefits at $211,445.

6.4 Travel
Travel needs for inter-agency Solar For All coordination, outreach, education and conferencing are outlined below.

In California, exempt, excluded, and represented state employees may be eligible for the reimbursement of authorized out-of-pocket expenses that are reasonably, actually, and necessarily incurred as a result of conducting state business.[32] In accordance with current state policy, employees may be eligible to receive reimbursement for expenses such as:
- Method of travel (transportation)
- Meals and incidentals
- Short-term lodging
- Out-of-state travel
- Personal vehicle mileage
- Other actual and necessary business and/or travel costs incurred while conducting official state business

California Travel Reimbursement Policy as of January 1, 2024 permits the following rates:
- All employees should book travel with preferred vendors for flights, car rentals, hotels, etc.
- Total Daily Allowance for Meals and Incidental Expenses is up to $59/day
- Personal Vehicle Mileage Reimbursement Rate is $0.655/mile
- For relevant travel destinations to CPUC, CEC, or EDD offices, the maximum Lodging Rates are San Francisco $270/night, Sacramento $145/night, and Los Angeles $169/night. The general lodging rate is $107 per night unless otherwise specified.

All CA-S4A coalition partners must abide by the state's travel policies, unless where federal rules are more stringent than CA's existing regulations.

**CPUC**: Staff may be located at any office – San Francisco (HQ), Los Angeles, or Sacramento. All trips are expected to be in-state, unless EPA or DOE convenes Solar For All awardees elsewhere. Total grant period travel costs are $48,000.

CPUC S4A Planned Travel:
- All Staff not located at San Francisco Headquarters will be expected to travel 2x to San Francisco Headquarters Office for CPUC for 2 to 4 days. The location of staff will not be known until hiring is completed. Estimated travel is ~$1,600 per 4-day trip, per traveler

---

[32] More information on California Department of Human Resources state employee travel policies is here: https://www.calhr.ca.gov/employees/Pages/travel-reimbursements.aspx.

(estimated costs of $155 flight, $1,080 for lodging, $125 for local transportation, and $236 for meals and incidentals) for four days and ~$1000 per 2-day trip (estimated costs of $155 flight, $540 for lodging, $125 for local transportation, and $118 for meals and incidentals). Budget includes one traveler with a 4-day trip and a 2-day trip.

- All Staff will be expected to attend an annual S4A inter-agency meeting either in San Francisco or Sacramento. Total trips is 8 per year, and total travelers is also eight; this budget also includes funding for one traveler who is located more than 200 miles from the meeting location (see 2-day trip of ~$1,000 above and average car-based travel is ~$63/traveler including bridge tolls, $7 per span, and parking fees of $12 at CPUC HQ).

- Energy Division Staff will be permitted to attend ribbon-cuttings for S4A community solar or SOMAH projects, up to 1 per year for each staff person. Total trips are 8 per year, and total travelers are also eight. Site visits (at least 3 days) are expected to be more than 200 miles from a staff persons' home or office location (estimated costs of ~$800 per trip consisting of $175 flight, $321 for lodging, $125 for local transportation, and $177 for meals and incidentals).

- Energy Division Staff will be permitted to attend a relevant educational conference, up to 1 over the grant period, except Project and Program Supervisor who may attend 2 such conferences. Total trips are up to 9 over the grant period (from years 1-5), and total travelers are eight. Attendance will be based on relevancy to S4A work, determined by the Project and Program Supervisor. These estimated costs will be updated during the Planning Period.

- On an ad hoc basis, if there are speaking engagements about the program's implementation in-state travel will be covered. Estimated total trips are 1 per year with one traveler, a local engagement within 50 miles of the employee's office-base is estimated at $63 per trip with a one-day travel engagement more than 50 miles from the employee's office-base is ~$500 ($175 flight, $170 lodging, $100 local transport, and $88.50 for meals and incidentals).

**CEC**: Total grant period travel costs are $5,000 and are mostly anticipated to be use in the program planning phase for stakeholder outreach (including tribal engagement) via public workshops. We plan on conducting 3 workshops in geographically diverse parts of the state:

- Northern CA: 2-3 staff for a day trip to a Northern CA location. Primary cost is car rental and possible facility rental (staff intend to coordinate with local POU or tribal community for optimal facility). Estimated Cost: $500. Typical car rental + gas is <$150 for the day, plus up to $450 for facility rental if necessary.

- Central CA: This workshop may be hosted in Sacramento as it is already strategically located near larger POUs and some tribal stakeholders. This would incur negligible cost if hosted at CEC headquarters.

- Southern CA: Workshop possibly in LADWP (LA) territory. 2-3 staff, most likely 1 night at hotel, airfare, car rental, and meals. Estimated cost: $4,500. Roundtrip Flight cost ~$250 per person, overnight lodging in LA County is $169 per person, and Meal and Incidental cost is up to $59 per person per day. Total per person trip cost could be ~$550 not including car rental and gas, and possible facility rental.

- Any leftover travel budget would be intended for any additional off-site stakeholder outreach and engagement, potentially in the form of tribal listening sessions or co-development of program.

**EDD**: Travel will include onsite visits to training programs as well as attendance to interagency convenings. Meal and Incidentals costs are limited to $59 per day. Estimated number of trips is ~10 trips of 1-day, by personal car (at $49 for mileage reimbursement, $20 parking, and $14 bridge tolls) per staff services persons (count of 4), over the duration of the grant period.

## 6.5 Equipment

The CPUC will not purchase equipment with the S4A award. Equipment is covered separately.

The CEC does not plan on using funds for equipment. Equipment is covered separately.

The EDD does not plan on using funds for equipment. Equipment is covered separately.

## 6.6 Supplies

The CPUC does not plan on using funds for supplies.

The CEC does not plan on using funds for supplies.

The EDD does not plan on using funds for supplies.

## 6.7 Contractual

For all contractual services, the individual rates and total hours are components of the competitive bidding process (pursuant to DGS practices described above). As part of the solicitation request for bids package, CPUC will include federal rate caps in accordance with the Solar For All terms and conditions. The federal rate cap is set by the Office of Personnel Management (OPM). The components of rate and hours (total and per staff person) will be finalized during the planning period. For individual consultants, the rate cap is limited to the maximum daily rate for a OPM Level IV of the Executive Schedule, which is adjusted annually.[33] Contracts or subcontracts with multi-employee firms are not subject to the consultant compensation limit so long as the contractor or subcontractor selects, directs, and controls individual employees providing the consulting services.[34] All contracts below are planned to be fixed-price contracts through a sealed bid in alignment with California's current contracting policies.

---

[33] OPM Salary Table No. 2024-EX shows a Level IV annual maximum rate of $191,900, retrieved at: https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2024/EX.pdf. The method for calculating the hourly maximum daily rate is to (1) Divide the Level IV salary by 2087 to determine the hourly rate. Rates must be rounded to the nearest cent, counting one-half cent and over as the next higher cent (e.g., round $18.845 to $18.85) and (2) Multiply the hourly rate by 8 hours. The product is the maximum daily rate.

[34] 'Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements' (November 2022) at page 17, retrieved from: https://www.epa.gov/sites/default/files/2021-03/documents/best-practice-guide-for-procuring-services-supplies-equipment.pdf

| Contract Services | Amount | Duration |
|---|---|---|
| ***IOU-S4A Community Solar*** Modeling Support | $679,948 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes. | |
| | Description: Ongoing analytical work to research and quantitatively model program design options; recommend program design aspects; and measure impacts, realization rates, and bill savings. Part of *Meaningful Benefits Plan & Project Deployment Technical Assistance* | |
| | Expertise: Winning bid will have extensive technical advisory experience on complex energy regulations in the renewable energy sector, with experience in California. | |
| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
| | Hours: Time to achieve the tasks is a component that will be competitively bid. | |
| ***IOU-S4A Community Solar*** Community Renewable Energy Program Evaluation Consultant | $300,000 | 1 year |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Develop a set of comprehensive program metrics, a program logic model, recommendations for the programs' data collection activities, provide answers to key program reporting requirements, and deliver an evaluation of the program's processes and recommendations for program improvement. Part of *Meaningful Benefits Plan, Financial Assistance Strategy, Equitable Access, and Project Deployment* | |
| | Expertise: Winning bid will have extensive knowledge of program evaluation procedures and study methods and familiarity with the California Evaluation Framework and California Energy Efficiency Evaluation Protocols. | |
| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The | |

| | services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
|---|---|---|
| Semiannual Transactions, Projects, Progress Reporting and Davis-Bacon Act Wage Compliance Consultant | $800,002 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Provide ongoing analytical, administrative, and drafting support to ensure California's compliance with EPA's Solar for All reporting requirements. Project management assistance to synchronize existing regulatory and legislative program reporting with grant reporting. Davis-Bacon Act Wage Compliance will include federally compliant payroll record collection and support monitoring and enforcement.<br><br>Expertise: Winning bid will have in-depth knowledge of federal regulations, broad experience with federal reporting, analysis and data collection, and some knowledge of the California renewable energy sector and the EPA Solar For All funding opportunity.<br><br>Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
| ***IOU-S4A SOMAH***<br>Tax Credit Monetization Consultant for Non-Profit Property Owners | $450,000 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Concierge tax credit consulting for participating low-income affordable housing owners to monetize, transfer and convert unusable tax credits into cash for tax exempt entities (like non-profits, tribes and local governments) unlocked by recent changes pursuant to the Inflation Reduction Act. Part of *Financial Assistance Strategy*.<br><br>Expertise: Winning bid will have expertise in affordable housing finance and tax credit regulations, as well as financial markets. Broad experience offering financial services, including auditing and tax form services, will also be considered. | |

| | | |
|---|---|---|
| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
| ***IOU-S4A Community Solar*** | $400,000 | 5 years |
| Tribal Outreach Consultant | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Provide Tribal outreach consulting complete with a deep knowledge of California's Tribal governance structures, and thorough critical cultural competence. Consultant will link together expertise of California's Tribal needs with CA-S4A clean energy program offerings. Combines comprehensive data sources and a centralized database of tribal market actors for outreach, education and technical assistance to drive potential solar development, close to transmission lines or on previously disturbed lands and avoiding protected lands, sensitive cultural resources and important wildlife habitat. Part of *Equitable Access and Meaningful Involvement.*

Expertise: Winning bid will have broad knowledge of solar energy technology and existing relationships with California Native Tribes.

Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |

CEC
*Technical assistance ($534,237):* Technical assistance funding is allocated for targeted application outreach, assistance, and compensation for Tribes participating in the development of the engagement and inclusion plan. Winning bid will need to have expertise with solar and storage energy technologies and outreach experience with the same audiences that S4A targets. Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes.

*Compliance contracting ($700,000)*: The proposed **POU-S4A** budget includes limited funding for an annual compliance contracting services. Winning bid will need to have expertise with such services, including in-depth knowledge of federal regulations and familiarity with the energy sector. Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes.

EDD

*Technical Assistance ($250,000):* Technical assistance for outreach to target regions as well as to assist in amending existing programs to S4A projects as needed, or to establish new programs in targeted regions. Establish inclusive outreach to ensure that worker and disinvested community voices are included throughout the process.  Assistance with the CalJOBS system (all local workforce boards use this database, however, new programs may need assistance).

*Evaluation of grant program ($200,000):* Work with independent program evaluators to ensure the program design meets the intended outcomes and needs of workers and employers. Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes.

## 6.8 Construction

No construction is planned for this grant.

## 6.9 Other

The administering agencies will follow our current guidelines for managing program delivery. All participant support costs are managed by the program administrator, utility program administrator, or contractual services vendor. We will not be providing financial assistance in the form of credit enhancements, such as loan loss reserves or loan guarantees.

**Participant Support Costs**

The administering agencies will not directly pay participant support costs. Contractual services will permit Vendors to charge work related travel or other fees, including items like survey participations stipends.

**Subawards**

Pass-through grants for S4A Coalition Application: Both subrecipients of the subawards are state governmental agencies. As per the EPA Solar For All Notice of Funding Opportunity, for a coalition application the lead applicant is now the grantee who will administer the grant as a pass-through entity for the purposes of 2 CRF Part 200. The California Public Utilities Commission is the lead applicant and the pass-through entity, and the CEC and EDD are subrecipients.

CEC will receive $30,200,000 million of which $25,000,000 is for financial assistance. The duration of this award is for the full grant period.

- POU-S4A competitive grants for establishment of POU LIDAC solar programs ($25,000,000) issued in either two or three tranches as determined in the planning period. Duration for distributed grant awards is up to five years, limited to when the grant period ends.
- This subaward is part of the application, please refer above for a description of activities.

Labor-Workforce Development/Employee Development Department (EDD) will receive $9,200,000 million, of which $8,000,000 is for financial assistance. The duration of this award is for the full grant period.

- RWP S4A Residential Solar High Road Training Partnership Grants ($8,000,000) - Establish or expand training programs to increase knowledge and competency of workers within the solar and storage sectors. This subaward is non-competitive, as the EDD will distribute funding based on fulfilling the grant goals to increase training in LIDAC communities. Duration is up to five years, limited to when the grant period ends.
- This subaward is part of the application, please refer above for a description of activities.

Subawards to For-Profit Entities: All will conform to the limits in the S4A terms and conditions, including:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

Subrecipient to Community Solar program administrators and/or utilities (listed in prior section), which are for-profit entities, is determined through a competitive process. The value is $190,190,000. The competitive process is determined by CPUC regulations and will be finalized during the planning period. Duration is up to five years, limited to when the grant period ends.

- This subaward is part of the application, please refer above for a description of activities.

Subawards to Non-Profit Entities & For-Profit Entities:
Subrecipient to SOMAH program ($9,690,000) administered by four non-profit organizations where utilities pass through incentives to participants (all entities listed in prior section). This

subaward is non-competitive, since the contract was previously selected through a competitive bidding process in alignment with CPUC regulations. Southern California Edison holds the contract with Center for Sustainable Energy, SOMAH program administrator lead. Participating Utilities dispense all incentives directly to participants. Duration is up to five years, limited to when the grant period ends.

- This subaward is part of the application, please refer above for a description of activities.

## 6.10 Additional Items

**Indirect Charges**

CPUC: The CPUC includes $920,000 for indirect costs. This is calculated using a Modified Total Direct Cost multiplied by the De Minimis Indirect Rate of 10%. Indirect costs will be used for administration services in service of the grant implementation. No additional signed agreement is needed as CPUC will use the de minimis rate of 10 percent.

| MOTIDIFIED TOTAL DIRECT COSTS (MTDC) - Inclusions | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|
| SALARIES | $406,000 | $961,000 | $961,000 | $961,000 | $961,000 | $4,250,000 |
| BENEFITS | $217,048 | $513,751 | $513,751 | $513,751 | $513,751 | $2,272,050 |
| TRAVEL | $4,000 | $11,000 | $11,000 | $11,000 | $11,000 | $48,000 |
| SERVICE CONTRACTS | $510,000 | $870,000 | $449,948 | $445,000 | $355,002 | $2,629,950 |
| TOTAL MTDC - excluding subawards | $1,137,048 | $2,355,751 | $1,935,699 | $1,930,751 | $1,840,753 | $9,200,000 |
| DE MINIMIS INDIRECT (10%) | $113,705 | $235,575 | $193,570 | $193,075 | $184,075 | $920,000 |

CEC: The **S4A-POU** budget includes $500,000 for indirect costs. The CEC uses an indirect rate cost of 14% through an approved Memorandum of Understanding on file for the 2023-24 Fiscal Year and can be shared with the EPA upon request.

Indirect costs are those costs incurred for common or joint purposes of a public or private entity, benefitting more than one project or activity, and not easily assignable to the projects and activities. For example, it is difficult to assign the cost of a building's operations to each activity performed by a company.

The following are terms for indirect costs: indirect, overhead, general and administration, and facilities and administrative costs. Typical examples of indirect costs may include depreciation on buildings and equipment, the costs associated with operating and maintaining facilities and equipment, and general administration and expenses, such as salaries and expenses of executive officers, personnel administration and accounting. This category typically covers other general business expenses such as printer paper, printer toner, pencils, rent, and utilities.

Labor/EDD: No indirect charges.

**Workshops:**
Solar for All Awardees (including subrecipient) Annual Convening for Years 2-5
- An hybrid in-person/virtual informal workshop for all administrative agencies, utilities, and subrecipients to share successes, challenges, lessons learned, and opportunities for levering.
- CPUC will convene this meeting annually if needed.
- CPUC, CEC, and EDD will all share their logo on the agenda materials
- The meeting will be open to the public and stakeholders and noticed appropriately to the general public.  The findings from the meeting will inform implementers on how to reform their tactics and increase outcomes in service of the Solar For All award goals.
- No income will be generated.

CEC:
- For POU Customers: The CEC will host multiple workshops for the **S4A-POU** program. First the CEC will host a scoping workshop to determine what types of projects will be eligible for funding. The second workshop will be a pre-solicitation workshop for stakeholders to ask and submit any comments. Lastly, the CEC may host an application workshop for the eligible recipients.
- For tribal stakeholders: The CEC will engage tribes through existing channels of communication[35] including tribal consultations and workshops.
- CEC staff will initiate the workshops.
- The CEC's logo will be on the agenda for the workshops.
- Workshop attendees are anticipated to be 50% public participants and 50% representatives of local POUs.
- Typically a recording of the workshop will be published, as well as a question and answer document responding to questions received from the workshop
- Income will not be generated from any workshops that the CEC initiates.
- The award will not result in the development of any copyrighted software or written materials.
- The CEC does not expect an invention resulting from this project.
- This project does not involve animal subjects.
- The project will not collect identical information from 10 or more people.

EDD
- None planned at this time, this may be updated during the planning period.

---

[35] https://www.energy.ca.gov/programs-and-topics/programs/tribal-program

- Any planned workshops or otherwise will not generate income, result in inventions or similar, involve testing subjects, and will abide by all required personal information protections.

**Meals and Refreshments:**

There is no plan to provide meals or light refreshments from the administering agencies.

**Program Income**

There is no program income that will be generated.

## 6.11 Additional Workplan and Budget Questions

| Questions | Responses |
|---|---|
| Does this scope of work include conducting conferences or workshops? | Yes |
| Who is initiating the conference/workshop/meeting? | CPUC will initiate one annual workshop for sub-awardees and subrecipients |
| How is the conference/workshop/meeting being advertised? | Administering agency public notification lists and online. |
| Whose logo will be on the agenda and conference/workshop/meeting materials? | All administering agencies.<br><br>If EPA logo is requested, will confirm with SFA Terms and Conditions Section L. 'Use of Logos.' |
| What is the percentage distribution of persons attending (I.e. % federal govt, public participants, state and local)? | We anticipate the following breakdown:<br>- 15% state government<br>- 25% utilities<br>- 25% implementers<br>- 35% stakeholders and/or public participants |
| Will there be proceedings or analysis and will the information be disseminated back to the appropriate (state/local/scientific) community? | Presentation from each sub-awardee on successes, challenges, and lessons learned. |
| Do you anticipate program income being generated from this conference/workshop/meeting including registration fees? | No. |

| | |
|---|---|
| Are costs for light refreshments, meals or beverages included in the workplan or budget? | No. |
| Will the assistance award result in the development of any copyrighted software or written materials? | No. |
| Could an invention result from this project? (If yes, provide disposition instructions) | No. |
| Does the project involve animal subjects? | No. |
| Does the project involve collecting identical information from 10 or more people? | No. |
| Does the grant involve or relate to geospatial information? Includes info identifying geographic location , or application/tools associated with such information – GPS, mapping or statistical data | Yes. The CPUC consultants to provide tribal outreach assistance, GIS mapping support, and data consolidation for potential community solar projects. |
| Any work outside the US included in the grant? | No. |

**Publicly Owned Utility-Solar for All - California Energy Commission**
*Detailed Budget Table*

### BUDGET BY YEAR

| COST-TYPE | CATEGORY | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|---|
| Direct Costs | **Personnel (Fringe Benefits included as salary)** | | | | | | |
| | *Program and Project Supervisor ($273,086 per year, 100% time)* | $ 204,815 | $ 273,086 | $ 273,086 | $ 273,086 | $ 273,086 | $ 1,297,159 |
| | *Electric Generation System Specialist I ($200,691 per year, 100% time)* | $ 100,346 | $ 200,691 | $ 200,691 | $ 200,691 | $ 200,691 | $ 903,110 |
| | *Energy Commission Specialist I ($158,669 per year, 60% time)* | $ - | $ 158,669 | $ 158,669 | $ 158,669 | $ - | $ 476,007 |
| | *Assoc. Energy Specialist ($146,520 per year, 100% time)* | $ 73,260 | $ 146,520 | $ 146,520 | $ 73,260 | $ - | $ 439,560 |
| | *Energy Analyst ($114,976 per year, 100% time)* | $ 57,488 | $ 114,976 | $ 114,976 | $ 57,488 | $ - | $ 344,928 |
| | TOTAL PERSONNEL | $ 435,908 | $ 893,942 | $ 893,942 | $ 763,194 | $ 473,777 | $ 3,460,763 |
| | **Fringe Benefits** | | | | | | |
| | TOTAL FRINGE BENEFITS | $ - | $ - | $ - | $ - | $ - | $ - |
| | **Travel** | | | | | | |
| | | $ 4,000 | $ 1,000 | | | | $ 5,000 |
| | TOTAL TRAVEL | $ 4,000 | $ 1,000 | $ - | $ - | $ - | $ 5,000 |
| | **Equipment** | | | | | | |
| | TOTAL EQUIPMENT | $ - | $ - | $ - | $ - | $ - | $ - |
| | **Supplies** | | | | | | |
| | TOTAL SUPPLIES | $ - | $ - | $ - | $ - | $ - | $ - |
| | **Contractual** | | | | | | |
| | *Compliance contracting* | $ 180,000 | $ 180,000 | $ 180,000 | $ 160,000 | $ - | $ 700,000 |
| | *Technical assistance* | $ 200,000 | $ 200,000 | $ 134,237 | $ - | $ - | $ 534,237 |
| | TOTAL CONTRACTUAL | $ 380,000 | $ 380,000 | $ 314,237 | $ 160,000 | $ - | $ 1,234,237 |
| | **OTHER** | | | | | | |
| | *Financial Assistance (Awards)* | $ - | $ 6,250,000 | $ 6,250,000 | $ 6,250,000 | $ 6,250,000 | $ 25,000,000 |
| | TOTAL OTHER | $ - | $ 6,250,000 | $ 6,250,000 | $ 6,250,000 | $ 6,250,000 | $ 25,000,000 |
| | TOTAL DIRECT | $ 775,164 | $ 7,524,942 | $ 7,458,179 | $ 7,173,194 | $ 6,723,777 | $ 29,700,000 |
| **Indirect Costs** | **Indirect Costs** | | | | | | |
| | *Indirect Costs* | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 500,000 |
| | TOTAL INDIRECT | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 500,000 |
| **TOTAL FUNDING** | | $ 875,164 | $ 7,624,942 | $ 7,558,179 | $ 7,273,194 | $ 6,823,777 | $ 30,200,000 |

### TOTAL BUDGET BY ACTIVITY BUCKET

| CATEGORY | FINANCIAL ASSISTANCE | ADMIN | TECHNICAL ASSISTANCE |
|---|---|---|---|
| Program and Project Supervisor | | 1,297,159 | |
| Electric Generation System Specialist I | | 903,110 | |
| Energy Commission Specialist I | | 476,007 | |
| Assoc. Energy Specialist | | 439,560 | |
| Energy Analyst | | 344,928 | |
| Travel | | 5,000 | |
| Compliance contracting | | 700,000 | |
| Technical assistance | | | 534,237 |
| Financial Assistance (Awards) | 25,000,000 | | |
| Indirect Costs | | 500,000 | |
| **TOTAL FUNDING** | $ 25,000,000 | $ 4,665,763 | $ 534,237 |
| **Share of funding by activity** | 83% | 15% | 2% |

| | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|
| MTDC BASE | $ 819,908 | $ 1,274,942 | $ 1,208,179 | $ 923,194 | $ 473,777 | $ 4,700,000 |
| De Minimis Indirect (15%) | $ 122,986 | $ 191,241 | $ 181,227 | $ 138,479 | $ 71,067 | $ 705,000 |

**Solar for All Program Timeline - California Coalition S4A**

Planning Period Type Used: Full

Planning Period (12 Months)

Period of Performance: 05/24/2024- 4/31/2029

| Activity Type | Anticipated Start Date | Anticipated Completion Date |
|---|---|---|
| **Pre-Award and Conditional Drawdown Period Activities** | | |
| Submit SF4 standard workplan and budget for approval within 90 days of award | | Award date + 90 days |
| **Program Planning Activities** | | |
| Draft QWP and submit to EPA for Approval within 90 days of the first amendment | 1/1/2025 | 3/30/2025 |
| Draft QAPP and submit to EPA for Approval (within 90 days of the first amendment) | 1/1/2025 | 3/30/2025 |
| CA S4A Kick-Off Workshop | Q4 2024 | Q1 2025 |
| CEC Scoping Workshops, Stakeholder meetings, Tribal Co-development, Consultation, Engagement, and listening sessions | Q4 2024 | Q4 2025 |
| CEC Develop Tribal Engagement and Inclusion Plan | Q4 2024 | Q4 2025 |
| CEC Drafts Solicitation Manual | Q2 2025 | Q2 2025 |
| CEC Draft solicitation released; host public workshop and solicit public comment | Q2 2025 | Q3 2025 |
| CEC releases final solicitation package; Notice of Funding Availability (NOFA); applications open | Q4 2025 | Q4 2025 |
| CPUC integration IOU-S4A program elements via established processes | Q2 2025 | by Q4 2025 |
| SONMH Program administrator will request to revise key program oversight documents | Q2 2025 | by Q4 2025 |
| SONMH Advisory Council and Job Training Taskforce engaged | | Quarterly |
| SONMH Marketing, Education, and Outreach plan will include notification of new funding (typically finalized by February of each year). | | Annually |
| SONMH Program administrators amend application processes to accommodate requests for new funding and review applications. Program may begin to deploy financial assistance | Q2 2025 | Q3 2025 |
| CPUC adopts the first of two decisions on community solar programs on May 30, 2024, pursuant to AB 2316. | | by Q2 2025 |
| (CPUC Community Solar) IOUs and CCAs develop websites, customer enrollment, billing and other systems necessary for program launch | Q2 2025 | Q4 2025 |
| CPUC hires financial services consultant to provide tax credit monetization consultant for non-profit property owners. | | by Q2 2025 |
| CPUC integration IOU-S4A amendments to the programs via established processes | | by Q4 2025 |
| (CPUC Community Solar) CPUC encourages selected developers to use community benefit agreements (CBAs). | | by Q4 2025 |
| (CPUC Community Solar) IOUs and CCAs to develop siting plan or requirements to include as part of their procurement documentation and should include the following elements if applicable: climate hazards, greenspace, pollinators, building resilient assets, and agrivoltaics. | | by Q4 2025 |
| EDD engage with CEC and CPUC to understand any labor workforce gaps to consider whether adjustments are feasible | Q2 2024 – Q2 2025 | |
| EDD review training systems in LOHC geographic areas to assess availability and access. | by Q2 2025 | |
| JEDD RMP guidelines updated to include Solar for All sub-fund upon execution of Solar for All grant agreement | by Q2 2025 | |
| RMP Application solicitation for regional hub grantees are received. | by Q2 2025 | |
| RMP Program team provides TA to regional hub applicants, including supporting coordination amongst local entities to develop or expand workforce development and training programs. | Q2 – Q4 2025 | |
| **Project Deployment** | | |
| Each partner will solicit and begin vendor services. | | by Q4 2025 |
| CEC reviews, scores, approves tentative awards; approves at business meeting | Q2 2026 | Q2 2026 |
| CEC approves awards | Q2 2026 | Q2 2026 |
| CEC executes grant agreements with Round 1 awardees, manage agreements through term of grant | Starting in Q2 2026 | |
| Public workshops for Round 1 solicitation | Q2 2026 | |
| Incorporate public feedback, lessons learned, draft and finalize Round 2 solicitation package | Q2-Q4 2026 | |
| Round 2 NOFA released. | (Q4 2026) | |
| Education and Outreach | Q4 2026 | |
| Round 2 Applications due and CEC reviews, scores, approves awards. | Q2 2027 | Q2 2027 |
| CEC executes grant agreements with Round 2 awardees, manage agreements through term of grant | Q2 2027 | Q2 2029 |
| (CEC) Continuous grant management, collection of progress reports, outreach and engagement with stakeholders and grant recipients | Starting in Q2 2026 | |
| (CEC) if additional funding is unencumbered: incorporate lessons learned, draft and release round 3 solicitation, approve awards, etc. | Starting in Q2 2027 | |
| CPUC integration any remaining IOU-S4A program elements via established processes. | Q2 2026 | Q2 2029 |
| (CPUC) SONMH Program Administrators (IOUs and participating community choice aggregators) revise key program oversight documents as needed | Q2 2026 | Q2 2027 |
| (CPUC) SONMH Program administrator will educate contractors and interested applicants on eligibility for additional funds. | Q2 2026 | Q2 2029 |
| (CPUC) SONMH Marketing, Education, and Outreach plan will include plan for new funding | | Annually |
| (CPUC) SONMH Program administrators amend application processes to accommodate requests for new funding and review applications. Program may begin to deploy financial assistance | Q2 2026 | Q2 2029 |
| CPUC SONMH Continued engagement with Advisory Council and Job Training Advisory Group throughout the grant period | Ongoing | |
| (CPUC Community Solar) Upon completion of solar developments, IOUs conduct auto-enrollment in Community Solar tariff to receive bill discounts. | Q2 2026 | Q2 2029 |
| Annual S4A meeting to share wins, lessons learned, and shared challenges. | | Annually |
| All program Administrators and community-based organizations conduct outreach and marketing on an ongoing basis | Q2 2026 | Q2 2029 |
| All program administrator(s) offers technical assistance to potential projects as requested or noted in the program implementation. | Q2 2026 | Q2 2029 |
| All programs distribute subsidies to program beneficiaries upon meeting project milestones on an ongoing basis. | Q2 2026 | Q2 2029 |
| CPUC reviews progress reports and conducts data collection. | Ongoing | |

| Reporting | | |
|---|---|---|
| Revised Workplan | | 11/30/2025 |
| M&E/MBE Reporting: EPA Form 5700-52A Annual Report Submitted (when the combined total of funds budgeted for procuring supplies, equipment, construction or services exceeds the Simplified Acquisition Threshold) | | 10/30/2024, 10/30/2025, 10/30/2026, 10/30/2027, 10/30/2028, 10/30/2029 |
| Submit Interim Federal Financial Report (SF425) annually | | Annually |
| Submit Final Federal Financial Report | 1/1/2029 | 4/30/2029 |
| July 1-December 31 2024 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2024 | 1/30/2025 |
| January 1-June 30 2025 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2025 | 7/30/2025 |
| July 1-December 31 2025 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2025 | 1/30/2026 |
| January 1-June 30 2026 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2026 | 7/30/2026 |
| July 1-December 31 2026 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2026 | 1/30/2027 |
| January 1-June 30 2027 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2027 | 7/30/2027 |
| July 1-December 31 2027 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2027 | 1/30/2028 |
| January 1-June 30 2028 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2028 | 7/30/2028 |
| July 1-December 31 2028 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2028 | 1/30/2029 |
| January 1-April 30 2029 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 1/1/2029 | 4/30/2029 |
| Post-closeout program strategy Submitted Prior to Program Closeout | 10/1/2018 | 1/1/2029 |
| Final Report submitted | 1/1/2029 | 04/30/2029 (or up to 120 days after) |
| Review approved QAPP annually | | Annually |
| Review approved QAPP annually | | Annually |

## EXHIBIT B - BUDGET DETAIL AND PAYMENT PROVISIONS

1. **Invoicing and Payment**

   A. **Payments**

   As compensation for the services specified in Exhibit A and upon receipt and approval of Contractor invoices by the CPUC, the Contractor shall be entitled to a sum not to exceed the total dollar amount noted on the STD 213 and/or its Amendment.

   If Contractor discovers it has received an overpayment, Contractor must notify the State and refund the overpayment immediately.

   Expenditures that do not satisfy the Solar for All federal regulations and/or grant terms will not be reimbursed or paid. If necessary, retroactive retrievals of funding may be required if it is later determined that prior expenditures did not satisfy the federal regulations and/or grant terms and conditions.

   B. **Invoice Details**

   Invoices shall be submitted electronically not more frequently than monthly to:

   California Public Utilities Commission
   Attn: Markanday Ravi, Associate Government Program Analyst
   505 Van Ness Avenue, 4th floor
   San Francisco, CA 94102
   Email: markanday.ravi@cpuc.ca.gov

   CPUC will alert Energy Commission within five business days if the invoice delivery contact changes.

   1. An invoice shall consist of the Agreement number, invoice date, budget broken down by grant expense categories, and billing period. Invoice will also show a history of all expenditures to date against the approved budget. Receipts will be provided for travel related expenses if requested.

   2. Invoice for expenses incurred in a month are due no later than 45 days after the last day of the close of the invoice period . Energy Commission is requested to respond to questions and/or provide additional requested information within 5 business days. CPUC Solar For All Staff will seek to complete invoice review within 14 business days when no further questions or revisions are required. CPUC Administrative Branch completes final review and processing of invoices and payments.

   3. CPUC will inform CEC when the drawdown for an invoice has been processed. CEC is then responsible 1) providing transfer fund account details for reimbursement processing, and 2) for contacting the State Treasurer's Office (STO) and submitting remittance advice to the STO.

### C. Retention of Records and Audit Requirement

The Contractor's invoices will be subject to a financial audit by CPUC at any time within three (3) years of completion of the work.

## 2. Non-Payment Clause

A. Pursuant to Government Code section 11255, departments that provide services to another department may recover outstanding receivables by initiating a Transaction Request (TR) with the State Controller's Office (SCO) to transfer funds from the debtor department. The option shall be used on a limited basis and only when the following conditions are met: (1) the invoice was not paid by the requested due date; (2) non-payment provisions are included in the interagency agreement between the departments; (3) the invoice has not been disputed; and (4) a thirty (30) day notice has been provided to the debtor department that a transfer of funds will be initiated for non-payment.

B. Consistent with Department of Finance Budget Letter No. 10-10, the department receiving the services (or debtor department) shall provide the appropriation to charge if payment is not made timely. The appropriation data must include fund number, organization code, fiscal year, reference, and category or program. If applicable, also include element, component, and task. It is the responsibility of the department providing the services to ensure that no disputes exist prior to submitting a TR to the SCO.

## 3. Federally Funded Contract

A. It is mutually understood between the parties that this contract may have been written for the mutual benefit of both parties before ascertaining the availability of congressional appropriation of funds to avoid program and fiscal delays that would occur if the contract were executed after that determination was made.

B. This contract is valid and enforceable only if sufficient funds are made available to the State by the United States Government for the purpose of this program. In addition, this contract is subject to any additional restrictions, limitations, or conditions enacted by the Congress or to any statute enacted by the Congress that may affect the provisions, terms, or funding of this contract in any manner.

C. The parties mutually agree that if the Congress does not appropriate sufficient funds for the program, this contract shall be amended to reflect any reduction in funds. If funding is reduced, rescinded, or otherwise becomes unavailable due to congressional action or other federal government measures, the CPUC reserves the right to modify, suspend, or terminate this contract, in whole or in part, without penalty or further obligation.

D. The CPUC has the option to invalidate the contract under the 30-day cancellation clause or to amend the contract to reflect any reduction in funds.

4. **Budget Contingency Clause**

   A.  It is mutually agreed that if the Budget Act of the current year and/or any subsequent years covered under this Agreement does not appropriate sufficient funds for the program, this Agreement shall be of no further force and effect.  In this event, the CPUC shall have no liability to pay any funds whatsoever to Contractor or to furnish any other considerations under this Agreement and Contractor shall not be obligated to perform any provisions of this Agreement.

   B.  If funding for any fiscal year is reduced or deleted by the Budget Act for purposes of this program, the CPUC shall have the option to either cancel this Agreement with no liability occurring to the CPUC or offer an agreement amendment to Contractor to reflect the reduced amount.

5. **Prompt Payment Clause**

   Payment will be made in accordance with, and within the time specified in, Government Code Chapter 4.5, commencing with Section 927.

## EXHIBIT D, SPECIAL TERMS AND CONDITIONS

1. **Excise Tax**

The State of California is exempt from federal excise taxes, and no payment will be made for any taxes levied on employees' wages. The State will pay for any applicable State of California or local sales or use taxes on the services rendered or equipment or parts supplied pursuant to this Agreement. California may pay any applicable sales and use tax imposed by another state.

2. **Dispute Resolution**

A dispute for purposes of this section is a disagreement between Contractor and CPUC in the performance of the Agreement, which is unable to be resolved between Contractor and Program Staff ("Dispute"). In the event of a Dispute, Contractor shall file a "Notice of Dispute" with the California Public Utilities Commission, Executive Director, or designee within ten (10) days of discovery of the problem. Within ten (10) days, the Executive Director or designee shall meet with the Contractor and Contract Manager for purposes of resolving the dispute. The decision of the Executive Director or designee shall be final.

In the event of a dispute, the language contained within this Agreement shall control over any other.

State reserves the right to issue an order to stop work in the event that a dispute should arise, The stop work order will be in effect until the dispute has been resolved.

3. **Subcontracts**

A. If the terminated subcontractor is a DVBE, the contractor must replace that subcontractor with another DVBE subcontractor, and such replacement must be approved by the Commission. Failure to adhere to DVBE Participation will be reported to DGS DVBE program for possible enforcement action, including without limitation be cause for contract termination and recovery of damages under the rights and remedies due the state under the default section of the contract.

B. Nothing contained in this Agreement or otherwise, shall create any contractual relation between the State and any subcontractors, and no subcontract shall relieve the Contractor of his responsibilities and obligations hereunder. The Contractor agrees to be as fully responsible to the State for the acts and omissions of its subcontractors and of persons either directly or indirectly employed by any of them as it is for the acts and omissions of persons directly employed by the Contractor. The Contractor's obligation to pay its subcontractors is an independent obligation from the State's obligation to make payments to the Contractor. As a result, the State shall have no obligation to pay or to enforce the payment of any moneys to any subcontractor.

C. It is the intention of the parties than no subcontractors shall be deemed an employee of the State. Contractor agrees to take any and all actions necessary to comply with this intention.

331

    D.  Failure of a subcontractor to perform for any reason shall not relieve Contractor of the responsibility for competent and timely performance of duties under this contract.

## 4.  **Commission Staff**

Commission staff will be permitted to work side by side with Contractor's staff to the extent and under conditions directed by the Commission's Contract Manager. In this connection, Commission staff will be given access to all data, working papers, etc., which Contractor may seek to utilize.

## 5.  **Commencement of Work**

Performance will start not later than five (5) business days, or on the express date set by the State and the Contractor, after all approvals have been obtained and the agreement is fully executed. Should the Contractor fail to commence work at the agreed upon time, the State upon five (5) days written notice to the Contractor, reserves the right to terminate the agreement. In addition, the Contractor will be liable to the State for the difference between Contractor's bid price and the actual cost of performing work by another contractor.

## 6.  **Ownership of Data**

Data developed for this contract shall become the property of the State. Contractor shall notification the Commission's Contract Manager. Each report shall also become the property of the State and shall not be disclosed except in such manner and such time as the Commission's Contract Manager may direct, with the exception of data which have become part of the public records of the State, as discussed in Paragraph 7.

## 7.  **Confidentiality of Data/Nondisclosure Agreement**

The Contractor, by signing this agreement recognizes they may be required to have access to data, information and documents within the knowledge and possession of various entities under the regulatory jurisdiction of the Commission. The Contractor recognizes that some of this data, information and documents may be proprietary, confidential, or privileged in nature.

The Contractor further recognizes that Commission Staff has broad statutory authority to compel the production of such information subject to the provisions of Public Utilities Code 583 and General Order 66-D. The Contractor understands that these legal provisions generally preclude public disclosure of information obtained in confidence except during the course of a public hearing or with permission of the Commission.

The Contractor acknowledges that it has received a copy and read Public Utilities Code Section 583 and General Order 66-D and agrees to be subject to and to fully comply with these legal provisions in discharging its responsibilities. Such compliance includes abiding by the terms of prohibiting public disclosure of confidential information and submitting to the jurisdiction of the Commission for the purposes of enforcing Public Utilities Code Section 583.

The Contractor further recognizes that  the data, information and documents obtained during the course of its work for the Commission may be subject to other requirements for nondisclosure which include, but are not limited to, attorney work product privilege, the official information privilege, the attorney-client privilege, and other prohibitions precluding disclosure of confidential information and Contractor may not disclose such data, information and documents without the prior written consent of the Commission or its Staff..

The Contractor agrees not to disclose any information regarding its work to third parties except with the Commission Staff's express prior written consent, and to return all data, information and documents obtained during the course of the Agreement immediately upon request or termination. The Contractor agrees to immediately notify the Commission Staff of any inquiries from third parties which request disclosure of any data, information, or documents.

The Contractor will not comment publicly to the press or any other media regarding its work, or the Commission's action on the same, except to the Commission Staff, Signatory's own personnel and/or subcontractors involved in the completion of tasks under this agreement, or at a public hearing, or in response to questions from a legislative committee.

In addition, the Signatory agrees that prior to commencement of any work associated with this Agreement, the signatory shall: (1) provide a copy of this section of the Agreement, Public Utilities Code Section 583 and General Order 66-D to all who will be performing tasks under this Agreement; and (2) inform all those working under this Agreement that they are bound by these legal provisions and must comply with Confidentiality of Data Agreement/Nondisclosure Section.

The requirements of this Section are in addition to, not in substitution, of any separate Non-Disclosure Agreement or similar agreement which may be required by Commission Staff prior to accessing CPUC data, information, or documents

Ninety days after any document submitted has become a part of the public records of the State, Contractor may at its own expense, publish or utilize the same but shall include the following legend:

LEGAL NOTICE

This report was prepared as an account of work sponsored by the California Public Utilities Commission. It does not necessarily represent the views of the Commission or any of its employees except to the extent, if any, that it has formally been approved by the Commission at a public meeting. For information regarding any such action, communicate directly with the Commission at 505 Van Ness Avenue, San Francisco, California 94102. Neither the Commission nor the State of California, nor any officer, employee, or any of its contractors or subcontractors makes any warranty, express or implied, or assumes any legal liability whatsoever for the contents of this document.

8. **Termination for Convenience**

State may at its option terminate this contract, with or without cause, at any time upon giving thirty (30) days' notice in writing to Contractor. In such event, Contractor agrees to adhere to the instructions provided in such termination notice, including immediately stopping work, and to use all reasonable efforts to mitigate its expenses and obligations hereunder. In such event, State shall pay Contractor for all services satisfactorily rendered prior to such notice of termination and for all reasonable expenses incurred by Contractor prior to said termination which are not included in charges for service rendered prior to termination and which could not by reasonable efforts of Contractor have been avoided.

9. **Termination in Event of Breach**

In the event of any breach of this contract after notice and failure to cure a default, the State may without any prejudices to any of its other legal remedies terminate this contract upon five days' written notice to the Contractor.

10. **Waiver**

No waiver of any breach of this contract shall be held to be a waiver of any other or subsequent breach. All remedies afforded in this contract shall be taken and construed as cumulative: that is, in addition to every other remedy provided herein or by law. The failure of State to enforce at any time any of the provisions of this agreement, or to require at any time performance by Contractor of any of the provisions thereof, shall in no way be construed to be a waiver of such provision nor in any way to affect the validity of this agreement or any part thereof or the right of State to thereafter enforce each and every such provision.

11. **Gratuities**

A.  The State may, by written notice to the Contractor, terminate the right of Contractor to proceed under this contract if it is found, after notice and hearing by the State or by Executive Director of the Public Utilities Commission or duly authorized representative, that gratuities were offered or given by the Contractor, or any agent or representative of the Contractor, to any officer or employee of the State with a view toward securing a contract, securing favorable treatment with respect to award amendment, or the evaluation of performance of such contract, provided that the facts upon which either the Commission or the Executive Director makes such findings may be reviewed in any competent court.

B.  In the event this contract is terminated, State shall be entitled (i) to pursue the same remedies against Contractor as it could pursue in the event of the breach of the contract by the Contractor, and (ii) to a penalty in addition to any other damages to which it may be entitled by law, and to exemplary damages in an amount which shall be not less than three nor more than ten times the cost incurred by the Contractor in providing any such gratuities to any such officer or employee.

The rights and remedies of State provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

334

12. **Conflict of Interest**

Contractor agrees to refrain from entering into any relationship which could result in a conflict of interest in the performance of this Agreement; and to notify the Commission's Contract Manager promptly of any potential conflict of interest, including subcontractors. The Commission may exercise its option to terminate this Agreement if a conflict is found.

13. **Complete Agreement**

Other than as specified herein, no document or communication passing between the parties hereto shall be deemed a part of this Agreement.

14. **Captions**

The clause headings appearing in this agreement have been inserted for the purpose of convenience and ready reference. They do not purport to and shall not be deemed to define, limit, or extend the scope or intent to the clauses to which they appertain.

15. **Force Majeure**

Neither party shall be liable to the other for any delay in or failure of performance, nor shall any such delay in or failure of performance constitutes default, if such delay or failure is caused by "Force Majeure."  As used in this section, "Force Majeure" is defined as follows: Acts of war and acts of god such as earthquakes, floods, and other natural disasters such that performance is impossible.

16. **Tax Delinquencies**

Public Contract Code Section 10295.4 provides that a State agency shall not enter into any contract for goods or services with a contractor whose name appears on either list of the 500 largest tax delinquencies pursuant to Section 7063 or 19195 of the Revenue and Taxation Code. Franchise Tax Board (FTB) and California Department of Tax and Fee Administration (CDTFA) will post and periodically update lists of the 500 largest tax delinquencies on their websites as required by law. If the Commission determines that the Contractor or any of its subcontractors are on either the FTB or CDTFA list at any time before or during the contract term, this will be grounds for termination of the contract.

17. **Registration with Secretary of State**

All business entities doing business within the State must be admitted and registered with the State of California Secretary of State and maintain applicable State of California licenses as required by law. All businesses who do not possess active State of California licenses required to perform the contract services in the scope of work, or who are not admitted or registered with the Secretary of State as required by law during the Agreement term may have their Agreement terminated at the discretion of the Commission.

18. **Amendments**

   A. No amendment or variation of the terms of this Agreement shall be valid unless made in writing, signed by the parties, and approved as required. No oral understanding or agreement not incorporated in this Agreement is binding on any of the parties.

   B. CPUC reserves the right to amend this Agreement through a formal written amendment, signed by the parties, for additional time and/or funding.

19. **Russia Sanctions**

   On March 4, 2022, Governor Gavin Newsom issued Executive Order N-6-22 https://www.gov.ca.gov/wp-content/uploads/2022/03/3.4.22-Russia-Ukraine-Executive-Order.pdf regarding Economic Sanctions against Russia and Russian entities and individuals. "Economic Sanctions" refers to sanctions imposed by the U.S. government in response to Russia's actions in Ukraine, as well as any sanctions imposed under state law. The EO directs state agencies to terminate contracts with, and to refrain from entering any new contracts with, individuals or entities that are determined to be a target of Economic Sanctions. Accordingly, should the State determine Contractor is a target of Economic Sanctions or is conducting prohibited transactions with sanctioned individuals or entities, that shall be grounds for termination of this agreement. The State shall provide Contractor advance written notice of such termination, allowing Contractor at least 30 calendar days to provide a written response. Termination shall be at the sole discretion of the State.

20. **Conditions of Service**

   A. Contractor will abide by all State and Federal laws in performance of this contract.

   B. Contractor and all subcontractors shall abide by all health and safety mandates issued by federal, state, and local governments and/or public health officers as well as those issued by DGS, and worksite specific mandates. If multiple mandates exist, the Contractor and subcontractors shall abide by the most restrictive mandate. The term "employee", "worker", "state worker" or "state employee" in health and safety mandates includes contractor and subcontractor personnel.

   C. It is unlawful for a State Contractor to assist, promote, or deter union organizing by employees who are performing work on a service contract for the State or a State agency. This action is subject to fines in accordance with Government Code section 16645 et seq.

21. **Order of Precedence**

   Any ambiguity, conflict or inconsistency between documents comprising this agreement shall be resolved according to the following order of precedence: (1) EPA grant terms and conditions, (2) CPUC-CEC Interagency Agreement terms and conditions.

336

# EXHIBIT 4

**Greenhouse Gas Reduction Fund**
**Solar for All**
**California Solar for All Program**
**Work Plan**
**Project Period: 5/1/24 – 4/30/29, Submitted 10/9/24, Revised 11/15/24 (11/19/24 Correction)**

**Project Title:** The State of California's Solar for All Program (**CA-S4A**)
**Grant Number:** #84092301
**Organization Name:** The California Public Utilities Commission, on behalf of the State of California
**Geography:** State of California

## Table of Contents

Definition of LIDAC: ........................................................................................................ 3

Section 1:  Project Description ......................................................................................... 4

   1.1 Overview ................................................................................................................... 4

      1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals ................ 6

Section 2:  Project Design Plan ...................................................................................... 10

   2.1 Activities to be Conducted ...................................................................................... 10

      2.1.1 Meaningful Benefits Plan ................................................................................ 10

      2.1.2 Planning Period Tasks .................................................................................... 14

      2.1.3 Household Savings - Bill Benefit ..................................................................... 18

      2.1.4 Resiliency Benefits ......................................................................................... 20

      2.1.5 LIDAC Access ................................................................................................. 20

      2.1.6 Household and Community Ownership ........................................................... 22

      2.1.7 Quality Jobs and Businesses .......................................................................... 22

   2.2 Financial Assistance Strategy ................................................................................. 25

   2.3 Project-Deployment Technical Assistance Strategy ................................................ 30

      2.3.1 Workforce Development .................................................................................. 31

      2.3.2 Project Siting, Permitting. And Interconnection (to the grid) ......................... 33

      2.3.3 Equitable Access and Meaningful Involvement Plan ...................................... 38

      2.3.4 Summary Matrix of Customers with Barriers and CA S4A Tactics to Address Barriers .................................................................................................................. 40

      2.3.5 Plan for Participatory Governance-Formalized Structures: .......................... 44

Section 3:  Fiscal Stewardship Plan ............................................................................... 47

   3.1 Consumer Protections ............................................................................................ 49

Section 4: Timeline and Milestones ............................................................................... 53

Section 5:  Reporting Requirements ............................................................................ 60

5.1 Performance Reports.......................................................................................63

5.2 Transaction-Level and Project-Level Data ...................................................64

Section 6:  Budget Narrative.......................................................................................... 65

6.1 Overall Project Budget....................................................................................65

6.2 Personnel..........................................................................................................66

6.3 Fringe Benefits.................................................................................................68

6.5 Equipment ........................................................................................................71

6.6 Supplies.............................................................................................................71

6.7 Contractual.......................................................................................................71

6.8 Construction.....................................................................................................75

6.9 Other .................................................................................................................75

6.10 Additional Items............................................................................................77

6.11 Additional Workplan and Budget Questions ..............................................79

## Definition of LIDAC:

California Solar for All (**CA-S4A**) intends to use criterion that align with the US Environmental Protection Agency (EPA) definition of low-income and disadvantaged communities (LIDAC) as defined in Section I.D: Competition Terminology of the Notice of Funding Opportunity was used to determine if a household is eligible for Solar for All assistance.

Meeting any of the following four categories qualifies as a low-income and disadvantaged community:

1. Located in a census tract within an identified disadvantaged community (DAC) according to the latest version of CalEnviroScreen, meaning those census tracts scoring in the highest 25% among the designated factors and land within the boundaries of Federally Recognized Tribes.
2. Any additional communities identified as disadvantaged by the Climate and Economic Justic Screening Tool (CEJST) or EJScreen mapping tool, which includes American Indian Reservations, American Indian Off-reservation Trust Lands.
3. Geographically dispersed low-income households:
   a. Metropolitan Areas: (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Guidelines (FPG), wherein the maximum of these two figures determines the income limit.
   b. Non-Metropolitan Areas: (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level, wherein the maximum of these three figures determines the income limit.
4. Properties providing affordable housing (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs:
   a. (1) Low-Income Housing Tax Credit;
   b. (2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program;
   c. (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or
   d. (4) a housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22))

# Section 1:  Project Description

## 1.1 Overview

**CA-S4A** represents a coalition of state entities with deep programmatic expertise in regulatory design, capacity building, clean energy infrastructure development, and sophisticated grid management. Together, the coalition will leverage California's historical transformation of its solar energy markets to reach households and businesses statewide that are most in need of affordable, reliable clean energy. With this new infusion of highly flexible, equity-focused resources, California will build new programmatic designs, expand current efforts, address funding gaps, and add momentum to new strategies under development. California will continue its march to address changing market and real-world conditions as the state continues to advance its decarbonization goals. California has matured the solar energy landscape, at home and globally, in the last two decades. Through these new equity-focused partnerships, designed with an emphasis on a modernized and cost-effective grid, the **CA-S4A** program will continue to accelerate deployment of clean energy generation options for additional priority, communities.

In the 1990s, California's vertically integrated utilities, responsible for delivery, power generation, and transmission, were bifurcated into separate functions. **IOUs** (IOUs) run distribution grids and deliver power to customers while generation companies own power plants and sell into wholesale power markets. California's Independent System Operator (CAISO) runs the state's transmission system.

The California Public Utilities Commission (CPUC) regulates privately owned public utilities, including electric power. The California Energy Commission is the state energy office that oversees energy planning and the publicly-owned utilities (POUs). The California Labor and Workforce Development Agency (LWDA) is a cabinet-level agency that coordinates workforce programs across state departments including the Employment Development Department (EDD), which provides employment service programs along with its other core functions.

Since 2007, California ratepayers have dedicated over $1 billion in subsidies towards low-income and community renewable energy programs. The state's low-income rooftop solar, low-income multifamily solar, and community solar programs have resulted in over 13,365 approved projects and 430 MW of solar capacity online or in process. During this same time, two community solar programs were also launched for general market customers and for low-income renters in disadvantaged community census tracts.

California requires renewable energy facilities, typically rooftop solar, for most new construction projects, including residential, commercial and industrial facilities. These requirements are incorporated into the state building energy code (Title – 24 Building Energy Code) that the CEC develops and local jurisdictions, in charge of planning and permitting construction, implement.

In 2022, California approved a high roads job legislation that requires construction workers and apprentices of customer-owned renewable energy facilities be paid the prevailing wage rate. This

applies to workers on certain, mainly commercial, renewable energy projects in Pacific Gas & Electric, Southern California Edison, and San Diego Gas & Electric territories.[1]

The administering agencies of **CA-S4A** are the California Public Utilities Commission (CPUC), California Energy Commission (CEC), and the Labor and Workforce Development Agency with the Employee Development Department (EDD). The CPUC will implement programs serving LIDAC and Tribal customers in the investor-owned utility (IOU) territories. The CEC will focus on the same audiences in publicly-owned utilities (POU) territories. While many of the state's POUs are committed to the deployment of clean energy programs that benefit low-income and disadvantaged communities (LIDAC) in their service territories, not all have the technical ability, funding, and/or regulations in place to sufficiently deploy solar and storage projects to their LIDAC customers. EDD will offer labor training programs through the Resilient Workforce Program (RWP). Only a small part of the grant (7% of funds) will cover gaps in existing programs.

**IOU-S4A Community Solar (~$200 million):** A new program that will support new mid-scale capacity solar systems (about 5 MW each) that offer 20% monthly electricity bill discounts to participating households. Competitively selected solar PV power-producing facilities or solar energy purchasing program from a power-producing facility will dedicate nearly 100% of their generated power to low-income residential customers in the same utility territory. These plants may be community-owned or third-party owned.[2]

**IOU-S4A SOMAH (~$10 million):** Solar on Multifamily Affordable Housing (SOMAH) site readiness grants to affordable multifamily participants to improve structures and grid connections enabling upgrades to deploy residential rooftop solar and associated storage (including tribal customers). Expected bill benefits to tenants range from at least 20% but may be as high as 60% of monthly electricity bills. Since 2019, SOMAH has funded rooftop solar that offsets tenant electricity bills through tenant benefit agreements administered by the IOUs. This established bill crediting process is known as virtual net energy metering.[3]

**POU-S4A (~$25 million):** Establish new programs to deploy community solar, multifamily rooftop solar, and single-family rooftop solar or solar with associated storage systems (including tribal stakeholders) in multiple POU territories. **POU-S4A** will offer at least the minimum bill expected of 20% monthly electricity bill savings. The CEC will run two to three granting cycles to which POUs or Tribes will apply to start new programs and tariffs in their territories during the grant period to expand solar access to LIDAC customers.

**RWP-S4A (~$9 million):** Establish and expand training programs to increase knowledge and competency of workers within the solar and storage sectors. Selected programs will include outreach to increase participants from identified LIDAC communities. EDD Workforce Services Branch (WSB) has managed funding programs that create pathways for job growth via training partnerships with California employers. These programs include those authorized by the federal

---

[1] Assembly Bill 2143 (2022, Carrillo)
[2] Notice of Funding Opportunity, "Residential-Serving Community Solar" at page 9
[3] Notice of Funding Opportunity, "Enabling Upgrades" permits that 20% of total financial assistance deployed may go towards enabling upgrades. Only one-fifth of CA S4A financial assistance is allocated to IOU-S4A SOMAH.

Workforce Innovation and Opportunity Act (WIOA) and the Wagner-Peyser Act. EDD WSB delivers programs that prepare all job seekers, including dislocated workers, youth, veterans, people with disabilities, for the workforce. With this experience EDD WSB will work with local workforce development boards, community colleges, and other key training providers to establish or expand training programs for jobs in the solar market.  EDD tracks trainee information through the CalJOBS system which includes data on program completion, job placement, wage progression and career advancement.

Due to its downscaling efforts from a reduced EPA grant award, California has integrated work originally planned for the Strategic Growth Council (SGC-S4A) and the California Energy Commission (Tribal-S4A), and incorporated its audiences (low-income, single-family households, tribes) into its IOU and POU Community Solar programs. A community solar program removes financing and technical barriers to for these LIDAC recipients as it eliminates the need for up-front capital.

## 1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Environmental Results - Outputs and Outcomes:**

California anticipates that the grant will result in the following outputs (measurable over the grant period) and outcomes (over the lifecycle of new solar or solar with storage systems) to improve the environment and equity in the California solar market. California's tactics are focused on expanding community solar for LIDAC customers, leveraging an existing affordable multifamily program (for on-site, multi-tenant benefitting systems), and growing its solar and energy workforce development opportunities. California has diligently planned an approach to increase equity and avoid duplication of existing offerings. As an example, **IOU-S4A Community Solar** and **IOU-S4A SOMAH** will use non-interest bearing utility balancing accounts[4] and subaccounts to bifurcate and firewall CA-S4A funds from existing funding sources such as utility greenhouse gas auction proceeds, general state taxpayer funds, or funds sourced via Public Purpose Program funds collected in rates. Clearly separating these funds will simplify tracking outcomes and impacts of the grant. *At this time, the following outputs and outcomes are projected in alignment with the components of the Meaningful Benefits Plan*:

**Objective 1, reducing emissions of greenhouse gases and other air pollutants:**
- Estimated output of deploying ~**$233M** to promote up to **75MW** new solar and **37 MWh** new associated storage to the grid.[5]
  - These systems will generate 205,330 MWh annually and reduce key pollutants harming the atmosphere:
    - $CO_2$ 104,546 tons
    - $SO_2$ 6,603 lbs
    - NOX 44,895 lbs
    - PM2.5 30,211 lbs

---

[4] A utility balancing account is an account used to match the collection of actual revenues against actual costs after an adjustment for unanticipated changes in expenditures.
[5] This output estimate utilizes the low case scenario for IOU-S4A Community Solar, see table below for details on the case ranges.

- ▪ VOCs 4,642 lbs
- ▪ NH3 6,707 lbs
- A typical solar system lasts twenty years, the **CA-S4A** Coalition's estimated outcome is that this work can offset nearly 3 billion tons of CO2, equivalent to 566,182 homes' electricity use for one year.[6]

**Objective 2, deliver benefits of greenhouse gas and air pollution reducing projects to communities, particularly low-income and disadvantaged communities:**
- Encouraging installation of roughly 600 new renewable energy facilities in tribal and disadvantaged communities.
- Community Solar for nearly 29,000 LIDAC multifamily and single-family households, with a third of those directly owning their solar systems.
- Achieving up to 31% average annual bill savings per household. This will deliver over $151.3 million dollars in savings per year.
- Delivering the benefits of solar or solar + storage to over 29,000 low-income households.
- Ensuring equitable benefits for residents, regardless of whether they own their home.
- Promoting prevailing wage standards across **CA-S4A** funded projects.
- Providing high-road job training opportunities to make long-term career pathways to good jobs in priority communities. Creating an estimated 395 new solar and energy storage jobs of which 225 will be high-road jobs expected to achieve a 10.5% increase in wages.

**Objective 3, mobilizing financing and private capital to stimulate additional deployment of greenhouse gas and air pollution reducing projects:**
- Creating pathways for community-centered projects that provide climate resilience and economic opportunity.
- Leveraging over $1B in new and existing investor-owned utility ratepayer funded programs.
- Developing a free tool to prevent predatory sales tactics and support customers in determining simple payback.
- Incentivizing property owners and developers to co-fund new systems.
- Engage and support twelve community-based organizations for Solar For All services

Throughout the grant's period of performance, the California Solar for All program will be evaluated on its ability to deliver on meaningful benefits, strict accountability, and verified benefits to uphold the GGRF program objectives.

---

[6] Calculated using EPA's Greenhouse Gas Equivalencies Calculator

**Objectives 1, 2, and 3 Key Metrics from CA-S4A By Program:**
The following tables show the expected outputs during the grant period for each part of the **CA-S4A** Coalition.



For total amount of household bill savings, these amounts are cumulative; for example, the households with solar treated in Year 1 will have four years of bill savings, whereas households treated in Year 5 will have one year of bill savings during the grant period.

| CA-S4A-IOU Community Solar Program Estimated Outputs[7] | Financial Assistance: $190.2 Million |
|---|---|
| Solar Capacity Installed (MW) | 50-100 MW |
| Number of Projects Financed (#) | 10-20 Community Solar Sites |
| Clean Energy Generation (MWh) | 115,925-231,850 MWh |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) | 54,713-109,426 (tons CO2) |
| Number of Households Benefitting from Projects (#) | 15,000-30,000 households |
| Amount of Household Bill Savings Delivered Cumulative Total ($) (*in Year 5*) | $6,678,180-13,356,360 ($/average month) |
| Average Savings per Benefitting Household (%) | 20% |
| Private Sector Financing Mobilized (Developer Co-Pay) | TBD |
| Note: At this time, it is expected the program funding (from S4A and other public funding sources) will cover all project costs. The estimated output range is associated with two scenarios, the high output case is based on lower-cost, solar-only projects and the low output case is higher-cost, hybrid solar + storage projects. This will be updated as result of Planning Period activities. | |

---

[7] Since the proceeding that will determine the final CA-IOU Community Solar application of federal funding is still ongoing, this table shows an estimate only and will be updated in the final workplan at the end of the planning year.

| CA-S4A-IOU SOMAH Estimated Outputs | Financial Assistance: $9.69 Million |
|---|---|
| Solar Capacity Installed (Residential Solar) (MW) | 12.1 MW |
| Number of Projects Financed (#) | 85 projects |
| Storage Capacity Installed (MWh) | 24 MWh |
| Clean Energy Generation (MWh) | 37,643 MWh |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) | 18,129 CO2 |
| Number of Households Benefitting from Projects (#) | 6,446 households |
| Amount of Household Bill Savings Delivered Cumulative Total ($) (*in Year 5*) | $5,359,898 ($/average month) |
| Average Savings per Benefitting Household (%) | 39% |
| Private Sector Financing Mobilized (Property Owner Co-pay) | $22,185,000 |
| Note: These outputs are additive to the SOMAH program and are the expected increase from S4A funding. SOMAH's administrative costs and solar incentives are provided through its current budget. | |

| CA-S4A-POU Program Estimated Outputs | Financial Assistance: $25 Million |
|---|---|
| Solar Capacity Installed (Residential Solar) (MW) | 13.1 |
| Number of Projects Financed (#) | 512 |
| Storage Capacity Installed (MWh) | 13.1 |
| Clean Energy Generation (MWh) | 51,762 |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) | 31,705 |
| Number of Households Benefitting from Projects (#) | 7,956 |
| Amount of Household Bill Savings Delivered Cumulative Total ($) (*in Year 5*) | $7,764,750 ($/average month) |
| Average Savings per Benefitting Household (%) | 20% to 30.3% |
| Private Sector Financing Mobilized (POU Matching Funds and/or Owner Co-Pay) | $12,000,000 |
| Note: Private Sector Financing mobilized may be adjusted based on the outcomes of Planning Period tasks. Average Bill Savings per Benefiting Household estimate high case is based on previous programs analyses, and low case is based on minimum S4A requirements. | |

| CA-S4A RWP Estimated Outputs | Financial Assistance: $8 Million |
|---|---|
| Workers Trained by Workforce Development Programs | 225 |
| Projects Executed Using Tools to Project Good Jobs and Community Benefits | 17 |
| Average increased wages for individuals working in solar energy (%) | 10.5% |

California has ongoing and active programs for solar that the Solar For All programs will complement. Under the CPUC's jurisdiction are these other incentive programs: Disadvantaged Communities Solar Affordable Homes Program (DAC-SASH), Disadvantaged Communities Green Tariff (DAC-GT), Solar on Multifamily Affordable Housing (SOMAH), and the Self-Generation Incentive Program (SGIP) serving LIDAC customers.[8] Of these, only SOMAH is being expanded through S4A funding. The CPUC also oversees several customer generation export tariffs: net energy metering, net billing, fuel-cell net energy metering, and tariff variations to support customers with disaggregated sites (such as agricultural customers), multitenant properties, local governments, schools, and tribal governments.

This work will comply with Title VI of the Civil Rights Act and other Federal statutes (including Section 504 of the Rehabilitation Act of 1973 and The Age Discrimination Act of 1975) and regulations prohibiting discrimination in Federal financial assistance programs, as applicable. Participation in Solar For All programs will *not* be determined based on any personal factors such as race, color, gender, or national origin.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

# Section 2:  Project Design Plan

## 2.1 Activities to be Conducted

### 2.1.1 Meaningful Benefits Plan

Across all of the **CA-S4A** program's actions, California will deliver on the five US EPA Solar for All meaningful benefits, with a focus on targeting new distributed solar and storage projects to LIDAC customers: (1) delivering a minimum of 20% of household savings (Bill Benefits), (2) increasing LIDAC access to solar + storage through financing products and deployment options

---

[8] More information available at: https://www.cpuc.ca.gov/industries-and-topics/electrical-energy/demand-side-management

(Financing Products and Deployment), (3) increasing resiliency and grid benefits by creating capacity that can deliver energy to LIDACs during grid outages (Increase Resiliency and Grid Benefits), (4) maximizing household and community ownership models, and (5) investing in quality jobs and businesses (Quality Jobs and Businesses) per President's Executive Order on Investing in America and Investing in American Workers, the Administration's Good Jobs Principles and E.O. 14082. As indicated, California intends to take advantage of USEPA's provision for a twelve-month planning period before several of the **CA-S4A** programs begin committing funds. During this planning period, as policy decisions are made and program designs advance to reflect them, the state's ability to predict specific outcomes will necessarily improve.

California law already requires all workers and apprentices involved in the construction of net energy metering solar generating facilities supporting commercial, industrial, and large multifamily properties to be paid prevailing wage akin to public works projects.

California has simplified the application process. After the passage of SB 379, California Energy Commission oversaw the implementation of the California Automated Permit Processing Program (CalAPP) to expedite local jurisdiction permitting. Currently, a total of 242 counties and cities have automated platforms for issuing solar permits. Additionally, California's Title 24 Building Code sets minimum building energy efficiency standards, and as part of a regular update cycle that went into effect in 2020, virtually all new residential construction is required to incorporate rooftop solar or an alternative.

California also offers two community solar programs, one of which DAC-Green Tariff specifically designed for low-income renters living in disadvantaged communities. The program enables income-qualified, residential customers in DACs who may be unable to install solar on their roof to benefit from utility scale clean energy and receive a 20% monthly bill discount. The program is available to customers who meet the income eligibility requirements for the California Alternate Rates for Energy (CARE) and Family Electric Rate Assistance (FERA) programs (200% FPG).

California's Native population is one of the largest in America. Native American tribes located within POU territories are included as eligible participants in the portion of funding administered by the CEC, and the California Public Utilities Commission (CPUC) is the agency that will consider awarding funds to Tribes located in IOU territory.

Two barriers that impact the breadth and diversity of solar deployment are 1) the lack of programs focused on opportunities to advance solar and storage in partnership with California's Native American tribes, and 2) the lack of programs focused on improving California's aging housing and building stock to allow the buildings to accommodate solar and storage. To create and measure meaningful benefits, California S4A addresses these barriers and utilize an expert consultant contract to provide ongoing analytical work to quantitatively model program design options; recommend program design aspects; and measure impacts, realization rates, and bill savings.

The majority of the Solar For All grant is going to new programs (93% of grant funds) California has key elements already in place, which will be maintained through the grant period:

1. Tariffs
   a. **IOU-S4A SOMAH** utilizes a virtual net energy metering tariff to share generation credits amongst multiple benefitting accounts at a set-rate. Participating tenants must be on a time-of-use import rate and may also receive additional energy rate discounts through income qualified discount programs such as the California Alternate Rates for Energy (CARE) and the Family Electric Rate Assistance (FERA) program. Net export compensation (for solar added to the grid) funding comes from non-participating ratepayers.

2. Per-Watt Incentives
   a. **IOU-S4A SOMAH** offers a per-watt incentive for solar or solar with storage systems. The incentive is higher for capacity dedicated to tenants; and to reduce double compensation, it is lowered with the use of complimentary tax incentives. At most, the incentive is $3.50/watt for tenant capacity and $1.19/watt for common areas. This is funded by participating IOUs' greenhouse gas auction revenues.
   b. **IOU-S4A Community Solar** may offer a per-watt upfront incentive or per kilowatt hour performance incentive for new solar+storage projects in LIDACs. The incentive level will be determined through a stakeholder process during the period of performance. **IOU-S4A Community Solar** may also apply funding to the 20% low-income subscriber saving threshold.

3. Existing Programs
   a. **POU-S4A** will leverage existing POU programs in applicable territories to expand their impact and offer new funding opportunities for other POUs that lack sufficient resources.
   b. **POU-S4A** includes funding for tribes in POU territories to enhance tribal energy sovereignty through programs such as Long Duration Energy Storage (LDES) and microgrid funding through California's Electric Program Investment Charge (EPIC) Program. Funding can also expand tribal partnerships to support leveraging capital through the CEC's Energy Conservation Assistance Act loan program.
   c. **IOU-S4A SOMAH** expands the SOMAH program, which provides solar incentives to affordable multifamily property since 2019 and has a current budget over $700 million. The incentive is higher for the solar capacity supporting tenants ($3.50/watt) than common areas ($1.19/watt). To-date, the program has installed 23.25 MW at 162 sites with over 13,000 LIDAC renter households. The program has a significant amount of unspent incentive funds, $507.4 million, and eligible, but non-participating property owners need support covering additional site remediations to facilitate on-site solar.
      i. SOMAH workforce training requirements are a precursor to receiving incentives. Incentives (for the solar system) will not be disbursed if the contractor does not follow and document workforce training.
   d. **IOU-S4A** may leverage the CPUC's existing DAC-GT program which subsidizes the renewable energy premium or delta above low-customers' otherwise applicable rate and 20% average customer monthly bill discount for low-income

residential customers. To-date, the DAC-GT program has procured 74 MW and serves 24,000 LIDAC households. The program capacity was recently expanded and has approximately 140 MW available for new procurement.

4. Achieving a 20% Bill Discount
   a. **IOU-S4A Community Solar** and SOMAH calculate the 20% low-income customer bill discount on a monthly basis.
   b. **POU-S4A** will use the 12-month planning period to determine exact methodology for calculating 20% savings. It is expected that as a condition of receiving an award, POUs must agree to apply a minimum 20% subsidy/discount/bill credit to a recipient household's cost of electrical usage over a monthly or annual period.

5. Data Collection to Verify Bill Savings
   a. **IOU-S4A Community Solar** has mandated monthly bill savings, so the IOUs and CCAs will automatically apply a 20% average monthly bill discount for all participating low-income customers. The CPUC will periodically request customer billing data to verify the outcomes over the grant period, however the IOUs may be found to be out of compliance with CPUC directives should this outcome not be achieved.
   b. **IOU-S4A SOMAH** already requires that a majority of generating capacity (at least 51 percent) is dedicated to tenants for the life of the solar system (20 years). **IOU-S4A SOMAH** will update program agreements so Solar For All recipients will have to acknowledge the 20% minimum bill savings required. Applicants must submit system design characteristics and their credit allocation agreements in order to receive incentive payments. The current average bill reduction for a SOMAH participant far exceeds a 20 percent minimum. In 2022, SOMAH participants had an average savings of $39/month or a 60% percent average monthly reduction. The CPUC will periodically request customer billing data to verify outcomes over the grant period.
      i. When designing a SOMAH solar system, the applicant looks at the property's common area and tenants' electricity usage from the past year to determine the baseline needs and may add future electrical vehicle charging. The property also conducts an energy efficiency audit to determine if additional capacity adjustments should be made. After the entire system is designed, the property owner determines the split between tenants and the common areas. For tenant households, it is often set by the number of bedrooms in each tenant household.

6. No construction costs for participating LIDAC Households **IOU-S4A Community Solar** will disallow construction costs from being passed on to beneficiaries; there will be cost-sharing with beneficiaries.

7. **IOU-S4A SOMAH** prohibits landlord from passing on any costs to multifamily renters either directly or indirectly through raised rents. Property owners must sign an agreement which requires them to return their incentives if they do not abide by this term.

8. Throughout the grant, **CA S4A Coalition Agencies** will meet regularly to coordinate policies and implementation, including reporting and enforcement of the S4A terms and conditions.

## 2.1.2 Planning Period Tasks

In the 12-month planning period:

- **CA-S4A** coalition agencies will hire new personnel and vendors as specified in their budgets and timelines.
- At the onset, CPUC will host a virtual, public workshop to release CA's S4A approved workplan and preview the timeline and key milestones. There would be an opportunity for public feedback and to answer questions. This would be noticed on the CPUC website, social media, regulatory list serves, CPUC's daily calendar, as well as other agency communication lists, calendars, and websites. To expand our reach further, CPUC staff would directly reach out to provide notice to relevant community-based organizations that participate in statewide advisory groups or that participate in existing low-income programs.
- Engage in tasks (data, monitoring, reporting, etc.) in support of quality management plan and quality assurance.
- Create interagency agreements between prime grantee, CPUC, and each CA coalition agency to facilitate confidential information sharing, implementation, and funding.
- Coalition agency staff will coordinate regularly on planning period tasks, with CPUC staff as administrator lead. Coalition agency staff will also attend S4A EPA trainings, and inter-state meetings organized by Clean Energy States Alliance (CESA).

**IOU-S4A Community Solar** Planning Period Tasks

*Grant and Incentive Funding:*

1) Finalize community solar program implementation details with diverse group of stakeholders including but not limited to environmental justice groups, environmental and energy nonprofit groups, solar industry trade organizations, solar developers, subscription managers and subscribing organizations, ratepayer advocates, IOUs, and CCAs.
2) Identify budget per IOU territory and identify initial enrollment approaches including automatic enrollment for reaching households meeting income, tribal status, and geographic criteria to simplify household participation. Review utility balancing accounts and, if necessary, direct adjustments to comply with S4A terms and conditions.
3) Establish funding set-asides, if any, for technical assistance.
4) Outline criteria for proposals and selecting winning community solar development proposals, which include satisfaction of quality jobs and businesses criteria and Build America, Buy America Act standards and satisfying Davis-Bacon Act federal wage compliance. CPUC will permit third-party owned community solar to compete and operate residential-serving community solar. Ownership by third-parties such as experienced independent power producers will likely result in least-cost projects, with developers being able to take full advantage of government incentives and private financing measures. While this option may not necessarily result in direct community ownership, an indirect form of ownership under this model occurs when projects are owned by POUs or community choice aggregators, which are overseen by local governments.
5) Deploy incentive structures for capital mobilization and tax credit leveraging.
6) Implement automated processes for eligible customers to receive and maintain solar bill credits.

7) Finalize new program documentation to operationalize and implement all above noted steps through the ministerial review and approval process.

8) Hire consultant to provide concierge tribal outreach assistance, guided by comprehensive data consolidation, a deep familiarity with programmatic elements, cultural competence and expertise to connect Tribes with viable program offerings.

9) The CPUC has already directed mandatory customer savings threshold. However, in the planning period, the IOUs will establish tariffs that enshrine the 20% discount.

10) Workforce requirements will not be provided a separate budget or funding, as any workforce requirements that are adopted must be followed to receive incentives. Additionally, the CPUC will follow the best practice establishing and enforcing clawing back provisions for incentive funds if criteria, including workforce training obligations are not met.

*Tariffs*:
1) Proceeding to determine need for distinct community solar tariffs and if adopted, conduct a ministerial review process to finalize implementation. After which the IOUs will modify their billing systems to accommodate new rates.

**IOU-S4A SOMAH** Planning Period Tasks
*Grant and Incentive Funding:*
1) Determine whether program changes are needed to increase resiliency through incentivizing solar with storage at affordable multifamily sites. Assess whether existing SOMAH utility balancing accounts are S4A award-compliant and direct changes if needed.
2) Define eligible measures for rooftop remediation and site readiness.
3) Generate mapping showing overlay of LIDAC geographic criteria with current SOMAH LIDAC criteria.
4) Design incentive structures for capital mobilization, including advance payments to eliminate financial barriers for cash-strapped affordable housing operators.
5) Address incorporation of quality jobs and businesses criteria and Build America, Buy America Act standards, as well as, satisfying federal wage compliance standards with the Davis-Bacon Act and other rules.
6) **IOU-S4A SOMAH** will update program agreements so Solar For All SOMAH recipients will have to attest to the 20% minimum bill savings requirement. Property owners will adjust the capacity dedicated to tenants if needed to do so. However, in practice SOMAH properties already achieve this outcome with an average monthly discount of 39%. Finalize updated program documentation to operationalize and implement all above noted steps through the ministerial review and approval process.
7) Hire consultants to provide tribal outreach assistance (in conjunction with **IOU-S4A Community Solar**) and provide affordable housing finance and tax credit monetization support to increase system ownership benefits for affordable housing owners.
8) Senate Bill 355 (2023, Eggman) adjusted SOMAH's enacting public utility code to lessen the prohibition against master-metered properties' participation. The CPUC efforts to address outstanding issues from this legislation will coincide with the S4A planning period and may result in eligibility changes for affordable, master-metered properties or those that are individually metered, but tenants do not pay their electricity bills, like a short-term homeless shelter. In both instances there must be verifiable tenant benefit agreements in place to ensure that financial benefits accrue to the renters in an appropriate manner.
9) CPUC is currently considering expanding SOMAH funding to be used for solar with integrated storage through its regulatory processes. If adopted, the program would need to determine a rebate amount or rate for integrated storage. This would be funded through existing program funds, and not S4A.

**POU-S4A** Planning Period Tasks
*Grant and Incentive Funding*
1) Upfront project costs are a barrier for housing owners and operators in LIDAC as combined installation of battery storage brings the most benefit when utilizing this

program. **POU-S4A** plans to alleviate this barrier for program participants by directing solar and storage grant funds to benefit LIDAC households in POU territories (including tribal stakeholders).
- Conduct scoping Workshops, Stakeholder meetings, Tribal Co-development, Consultation, Engagement, and listening sessions.
- Develop Tribal Engagement and Inclusion Plan
- Draft Solicitation Manual, which will include satisfaction of quality jobs and businesses criteria and Build America, Buy America Act standards as well as satisfying Davis-Bacon Act federal wage compliance and all other Solar For All terms and conditions.
- Release draft solicitation; host public workshop and solicit public comment.
- Release final solicitation package; Notice of Funding Availability (NOFA); applications open.

2) CEC will engage in agreements with the POUs (as needed) to share customer billing data as condition of receiving funding to verify that savings are being realized. Some POUs may have existing agreements or may not participate.

3) CEC intends to incorporate the 20% minimum bill savings requirements into its granting criteria. As part of its regulatory process, with input from stakeholders, will determine whether the bill savings will be calculated monthly or over a 12-month period. It is possible that the CEC will take a mixed approach – with a 12-month period for single-family homeowners, and a monthly approach for multifamily residents. Single-family electricity bills tend to be much higher and less consistent than multifamily, so even with a smaller solar allocation, multifamily electricity bills are likely to have higher percentage decrease of their electricity bill than single-family customer.

4) CEC will determine if cost-sharing with the LIDAC household will be permissible or not during its planning period. If cost-sharing is permissible, it will be incorporated into the household benefit calculation to achieve the 20% minimum savings outcome required. CEC will also take care to avoid impacts to household income that could affect taxes or other income-based eligibility. CEC will consider applicant's capital mobilization as part of the grant criteria. There may be a minimum matching funds requirement, so the POU contributed funding as well.

5) CEC will consider adjustments for master-metered and/or rental properties as part of its stakeholder feedback within the regulatory process.

6) Community ownership risk mitigation will be a component of the granting criteria for selecting awardees. CEC will follow best practices for consumer protection available in existing programs, such as clear disclosures, consideration of ability to pay, and protections against overly burdensome debt, as well as protections against passing on community solar construction costs from property owners to renters either directly or indirectly unless the renters choose to participate in the program. The details on this component will be determined during the planning period.

7) Define essential quality control components to ensure that installed solar or solar + storage systems perform as expected and that contractors are held accountable for their workmanship. CEC will set minimum criteria following best practices on product and workmanship warranties and will give additional points for applications that go beyond the minimum required.

**RWP-S4A** Planning Period Tasks
*Workforce Training Development*
1) Planning processes to expand existing programs or establish new offerings in LIDAC areas and receive stakeholder input to refine plans. Review and confirm accounting practices do not result in the generation of profit (such as an interest-bearing banking account) and, if necessary, adjust to comply with Solar For All terms and conditions.
2) Assess current programs throughout the state, focused on existing partnerships with the state's 45 local workforce development boards and state high road training partnerships.
3) Confer with CPUC and CEC and S4A program administrator leads on training needs to identify workforce gaps – meet at least twice with one public convening. For any workforce gaps identified, work with training partners to adjust lessons as necessary/feasible.
4) If new training programs are needed, they will be developed during the planning period.
5) Establish grants within target areas with S4A projects to be awarded or underway. Competitive grant process to increase the number of skilled workers from LIDACs in high-quality jobs.
6) Require trainee data to be reported through CalJOBS including participant wages, and rates of completion.

S4A Coalition has included estimating timing and key milestones in the Timeline Section at the end of the Workplan. As planning period tasks are completed, the **CA-S4A** Coalition Workplan will be updated.

## 2.1.3 Household Savings - Bill Benefit

- **IOU-S4A Community Solar** adopted a policy to require that each participating low-income customer will receive a minimum 20% bill benefit. This will be included on customer electricity bills and will be incorporated into the customer's existing tariff. Eligible customers may also receive additional energy rate discounts through income qualified discount programs such as the California Alternate Rates for Energy (CARE) and the Family Electric Rate Assistance (FERA) program. The **IOU-S4A Community Solar** will leverage an expert consultant to provide ongoing analytical work, research and quantitative model program design review to measure impacts, realization rates, and bill savings.
- **IOU-S4A Solar on Multifamily Affordable Housing (SOMAH)** requires that at least 51% of the solar capacity is dedicated to tenants at the site and the customer generation tariff export compensation is equivalent to that benefitting customer's price of energy. The CPUC already has a tariff in place to facilitate transfer of solar credits to tenant's monthly electricity bills – via virtual net energy metering (VNEM) arrangements.
  - Property owners will work with their contractor or the SOMAH PA to determine the percentage of capacity for each tenant household; typically, this is determined by the number of bedrooms within an apartment (low-income household). Please see the overview above for more detail.

- **POU-S4A** is committed to achieving the minimum bill benefit expected and will use the planning period to develop its policies and guidelines. The POUs do not have uniform tariffs and some may need to adopt new policies in order to add the bill discount. In the planning period: 1) develop grant criteria, 2) customer billing data access requirements, 3) determine whether 20% bill benefit is calculated monthly or over 12 months, and 4) if cost-sharing is allowed, how to incorporate it into the overall bill benefit (see above for more detail).

- **POU-S4A** program will offer grant/incentive funding to install new solar and storage capacity for eligible applicants in POU territories. Applicants are also required to demonstrate how the proposal will deliver at least 20% household savings to program beneficiaries. Applicants will provide supporting evidence on how the applicant's chosen mechanism – whether it be subscriptions, utility bill subsidies, bill credit, etc. – will deliver household savings, while maintaining a cost-effective approach to delivering savings for the most significant number of recipients. Methodology for calculating 20% bill savings is expected to be based on a monthly/annual percentage of a customer's electrical usage. This could take into account local utility rates and related factors and will be further refined in the 12-month planning period.

- **IOU-S4A Community Solar, IOU-S4A SOMAH, and POU-S4A** have different approaches to master-metered and/or rental properties. For IOU customers, any resident of a master-metered multifamily building has a right to their qualified bill discounts, however they must claim them indirectly via their landlord. The CPUC does not have oversight of these pass-through arrangements and to adjust this would require legislative intervention. California prohibited the construction of new master-metered, multi-tenant buildings in 1982.
  - For **IOU-S4A Community Solar**, a landlord can apply on behalf of their tenant or tenant(s) and should have submetering in place such that they can pass on the bill benefits.
  - For **IOU-S4A SOMAH**, only rental properties with individually metered tenant apartments can participate, and properties cannot be master-metered at this time. This may be adjusted during the planning period in compliance with CPUC directives and guardrails.
  - For **POU-S4A**, the CEC will use the planning period to determine its approach to master-metered and/or rental properties. POUs have the same barriers as the CPUC as to insights on whether landlords correctly pass-through rate discounts to tenants. This, too, will be addressed within the granting criteria.

| **Savings Calculation Methods Overview** |
|---|
| Community Solar, pre-determined discount rates: |
| • Utilities automatically apply a 20 percent discount for each participating low-income customer on their monthly bill. The discount reduces energy consumption charges. This follows current practices for other low-income discount programs. |
| • Community solar program administrator links Community Solar project generation and customer subscriptions to ensure that generated power is equivalent to the required bill benefit. |
| Shared, on-site solar: |

- Program manager reviews the applicant's solar system design, property's past energy use, and solar allocation agreement to determine that the generation and estimated savings (of at least 20% monthly) can be met.
- Utility and property owner identify all customer accounts at a property. The utility and property owner (as the owner/operator of the on-site solar) identify the percent of the generation for each customer account. This is set by an allocation agreement or similar document for use by the utility's billing services.
- Utility uses the allocation agreement to distribute the solar system's monthly energy exports as energy offsets (kWh) and/or value ($/kWh exported) to reduce each benefiting customer's monthly energy bills.

Individual, on-site solar:
- Program manager reviews the applicant's solar system design, property's past energy use, and solar allocation agreement to determine that the generation and estimated savings (of at least 20% monthly) can be met.

If there is a co-pay required, the CA partners will use the planning period to determine how to incorporate this element in the 20% savings requirement. The most straightforward approach is to amortize any customer upfront costs over the lifetime of the solar system. Additionally, these savings methods may differ slightly between programs and are also dependent on the utility's interconnection and billing practices where the project is located.

## 2.1.4 Resiliency Benefits
- **POU-S4A** and **IOU-S4A SOMAH** will encourage solar + storage installations.
- **POU-S4A** will include resiliency as a criterion in determining its grant awards. Ultimately the outcome of this aspect is determined by the owners' willingness to install a battery. In the **POU-S4A** programs, they may encourage tariff adjustments like California's IOU net billing tariff where the highest value comes from shifting load to use solar to offset late afternoon or evening peak charges.
- **IOU-S4A SOMAH** will use the planning period to consider how to better encourage solar + storage. On September 30, 2024, the CPUC released a proposed decision to authorize existing program funding to go towards incentivize storage integrated with solar.

## 2.1.5 LIDAC Access
- **IOU-S4A Community Solar, POU-S4A**, and **RWP S4A** will use the planning period to determine their outreach best practices. The community solar programs will focus on making customer enrollment simple and automatic, preferably through existing utility billing portals that utilize utility data to determine (and enroll) those low-income customers most at risk of energy insecurity.

- **IOU-S4A and POU-S4A** will invest resources reaching Tribal communities. [9] Tribal sovereignty, complex land ownership arrangements, and matrices of multifamily property ownership models present challenges to tribes in accessing traditional third-party ownership loans or other forms of project financing. In 2022, there were 50 MW of solar and 40 MWh of storage installed in tribal lands.[10] Currently, some of California's funding programs include program design elements tailored to increasing access to solar energy and energy storage for tribes, providing an important starting point that will be leveraged in the **POU-S4A** and **IOU-S4A** programs as applicable. To elevate the needs of all tribes in California, and to ensure that their interests are both represented and likely to be funded in this Solar for All competition, the CEC and CPUC will work to formalize partnerships with tribes and tribal organizations through the development of Memorandums of Agreement and other mechanisms. For example, four tribes (Campo Band of Mission Indians, La Jolla Band of Luiseño Indians, Morongo Band of Mission Indians, Soboba Band of Luiseño Indians) have organized an informal consortium of tribal governments to develop a partnership with **CA-S4A**.
- **IOU-S4A SOMAH** issues an annual marketing, education, and outreach plan. Part of the program's administration includes subcontracting with community-based organizations to provide culturally sensitive and in-language outreach on program participation and job training. Also, **IOU-S4A SOMAH** works with local governments and tribes to educate them on program requirements, offerings, and benefits and to provide technical assistance. **IOU-S4A SOMAH** will expand technical assistance to provide the in-kind services of a financial advisor to improve project financing and tax credit monetization. After solar and storage projects are constructed and interconnected, property owners can allocate bill credits to tenant units without the need for individual approvals or paperwork. Generated solar credits are automatically applied to reduce tenants' monthly electricity bills.
- **POU-S4A** program will leverage the Strategic Reliability Reserve (SRR) to strengthen its reach to LIDAC households, grow DER resources, and fortify aggregate demand response measures. In 2022, California made an unprecedented investment in the SRR to support the state's electric grid reliability during extreme events. The CEC administers two programs under the SRR: 1) the Distributed Electricity Backup Assets program, which incents the construction of clean distributed assets, and 2) the Demand Side Grid Support Program, which compensates for load reduction during extreme events. Together, these programs provide support to grow California's virtual power plants.
- **POU-S4A** program is filling a gap of historically underinvested stakeholders in California. Investment varies across different POU's, and **POU-S4A** will provide opportunities in POU territories that will be flexible to address differences across regulatory regimes.

---

[9] CPUC, SOMAH "Tribal Pathways Requirements Guide". https://calsomah.org/resources/tribal-requirements-guide; California Environmental Protections Agency (EPA), Disadvantaged Communities Map Update (2022). https://calepa.ca.gov/wp-content/uploads/sites/6/2022/05/Updated-Disadvantaged-Communities-Designation-DAC-May-2022-Eng.a.hp_-1.pdf, May 2022.

[10] CEC, "Renewable Energy Market Data Report" (2022). https://www.energy.ca.gov/datareports/ energy-almanac/data-renewable-energy-markets-and-resources.

- **RWP S4A** will leverage existing programs with local workforce development boards and partnerships to maximize funding while also identifying any gaps in program delivery within targeted regions where new programs may be needed.

## 2.1.6 Household and Community Ownership

- **IOU-S4A Community Solar** will build on the state's existing third-party ownership market structure in which IOUs and community choice aggregators (CCAs) hold competitive procurements and sign power purchase agreements for up to 20-year terms with selected bidders that meet least cost best fit requirements. This model will allow low-income customers to access economic benefits similar to rooftop asset ownership such as a 20% minimum monthly bill savings.
- **CA-S4A** will use the majority of its funding for **IOU-S4A Community Solar** which will not facilitate direct financial ownership as this would add additional barriers and complexity, increase risk and cost to ratepayers, and make it difficult to expend funding within the period of performance. The CPUC's experience running the now discontinued Enhanced Community Renewables (ECR) and Community Solar Green Tariff (CSGT) demonstrated that community interest requirements were a significant barrier to success and have not yielded successful enrollment or engagement by a community sponsor. Direct community ownership is also difficult as developing a successful community solar project requires significant financial and technical expertise. Additionally, subscribers must rely on their local utility to procure all other services needed to serve retail load – transmission, reliability services, ancillary services, distribution, and resource adequacy. Prior CPUC program and market evaluations have surveyed existing and potential community solar participants and found that monthly bill savings are ranked highest before any community ownership of assets.
- **POU-S4A Community Solar** bill discounts are linked with the customer even if they move to a new location (so long as it still in the service territory where the community solar project is located). Determining the process for maintaining this benefit will be a part of the planning period.
- **IOU-S4A SOMAH** does not allow property owners to shift their installation costs to tenants either directly or indirectly through increases in rent. Additionally, the solar benefit will last 20 years and stays with the rented apartment, so will pass to the next tenant if there is tenant turnover. **IOU-S4A SOMAH** provides meaningful bill benefits to low-income renters. **IOU-S4A SOMAH** funded financial advisor support will help owners maximize tax credit monetization or navigate complicated debt structures. This support will help raise the number of SOMAH incented host-owned systems, increasing the likelihood of expanded capacity, future storage additions, or bill benefits beyond the expected useful life of incentivized systems.
- **POU-S4A Community Solar** may also offer grants to homeowners to install on-site, rooftop systems or to a community to establish microgrids. This will be determined in the planning phase. Planning phase will include developing a strategy to avoid ownership risks.

## 2.1.7 Quality Jobs and Businesses

- **CA-S4A** has dedicated $9 million of its budget to **RWP-S4A** for direct workforce training, and the other programs will establish workforce criteria, like number of trainees,

as mandatory criteria for receiving incentives. This follows best practices for limiting overly complex and burdensome incentive program deigns or requirements.

- **IOU-S4A and POU-S4A Community Solar**, as well as **IOU-S4A SOMAH and RWP-S4A,** will use the planning period to determine how best to incorporate Administration's Good Jobs Principles and E.O. 14082. Plans include:
    1. Recruiting and hiring from underserved communities.
    2. Provide benefits for full or part-time workers
    3. Ensure Diversity, Equity, Inclusion and Accessibility to provide equal opportunities to a diverse range of program participants.
    4. Empower workforce representation, including the support of unionization.
    5. Establish job security and working conditions to ensure the highest standards.
    6. Profligate an organizational culture that ensures workers are valued and respected.
    7. Mandate that workers are paid a stable and predictable living wage.
    8. Provide skill and career advancement offerings for workers to have equitable opportunities and tools to progress towards future, good quality jobs.
    9. For **POU-S4A** and **IOU-S4A Community Solar**, program will follow California's programs' best practice of making workforce criteria part of the general, mandatory criteria for receiving incentives.
    10. Determine best approach on metrics collection to target and track impact to LIDAC participants. Given that LIDAC definitions heavily rely on geographic location, training participants should be able to self-disclose their home zip code or census tract for metrics without compromising privacy.

- **IOU-S4A SOMAH** program handbook already has requirements in place that overlap with the principles noted above, however the CPUC will use the planning period to confirm if any refinements are needed. Contractors for SOMAH projects must pass a SOMAH training course to be eligible for building SOMAH incented projects and pursuant to new state law, workers must be paid prevailing wages
    1. SOMAH requires each project to hire at least one trainee and meet a certain minimum number of training hours. Number of trainees and working hours escalates with the capacity size of a system. Trainees must be paid the prevailing wage rate or a living wage rate that is 1.4 times the city minimum wage, whichever is higher.
    2. SOMAH incentives (for the solar system) are dependent on the contractor satisfying workforce requirements.

- **POU-S4A** projects aims to support hands-on training for rural communities and tribal members to both foster a skilled workforce and to build rural and tribal staff capacity to operate and maintain energy assets over time. For example, program scoring criteria could include additional bonus points for applicants that leverage assistance with the RWF-S4A program. Each applicant will be asked how they will meet the workforce goals of a diverse workforce or provide training opportunities. Additionally, in the planning period, **POU-S4A** would intend to match the best practice from the SOMAH program to require at least one trainee per project and to pay that trainee the prevailing wage or 1.4xs the minimum wage for that city, whichever is higher. At a minimum each winning grant must satisfy the following in compliance with S4A funding requirements:

1. Commitment to providing family-sustaining benefits and predictable work schedules to promote economic security and mobility.
2. Pay a stable and predictable living wage.
3. Provide safe and healthy working conditions, including the free and fair choice to join and/or form a union.
4. Aims to expand workforce opportunity for underserved communities who face disproportionate barriers to training and employment.

- **RWP-S4A Resilient Workforce Program** will foster regional hubs that will design new and/or support the expansion of existing solar & storage installation training programs, including earn-and-learn models such as pre-apprenticeships and apprenticeships that cover both technical skills and job quality aspects, job readiness, personal development, and offer wraparound support services, such as childcare assistance and transportation options, to ensure barriers to participation are minimized. Under the umbrella of the Labor and Workforce Development Agency, California's workforce agencies – EDD WSB, Department of Industrial Relations Division of Apprenticeship Standards, California Workforce Development Board and the Employment Training Panel - deliver a range of services to job seekers, including job training for unemployed and incumbent workers, apprenticeships and pre-apprenticeships, supportive services, and establishing employer partnerships. Programs aim to build workers' skills and meet industry needs to support workers with entering career pathways where employment and earnings outcomes increase over time. California has established programs to reach underserved communities such as programs that assist formerly incarcerated individuals with job training, placement and wrap around services as well as grants to increase participation of opportunity youth in pre-apprenticeship and apprenticeship programs. The state's high road training partnerships also have established pre-apprenticeship programs that link local building and construction trades councils to workforce boards, community colleges, and community-based organizations, creating structured pathways — with a standard core curriculum and critical supportive services — to state-certified apprenticeships in a variety of crafts.
  1. EDD has significant experience overseeing workforce training grants that include worker outcomes such as wage progression, program graduation and job placement. Using this experience, EDD will use the planning time to work with local partners – including local workforce development boards, labor unions, and educational institutions to, build on existing programs or establish new programs as needed to increase LIDAC customer participation.
  2. During the planning period EDD will work with state agencies to identify key regions where S4A projects will take place, and then determine where partnerships can be targeted to reach workers with a focus on programs with experience reaching underserved communities.

## 2.2 Financial Assistance Strategy

**CA-S4A** will allocate approximately $233M in financial assistance towards solar+storage planning and deployment in LIDACs, with special care to address prominent barriers to LIDAC participation in existing state programs. **POU-S4A** and **IOU-S4A** provide financial assistance mechanisms that are additive to existing resources for solar deployment in LIDACs and avoid duplication of services. IOU-S4A Community Solar and IOU-S4A SOMAH will use a non-interest bearing utility balancing accounts[11] and subaccounts to bifurcate and firewall CA-S4A funds from existing funding sources such as utility greenhouse gas auction proceeds, general state taxpayer funds, or funds sourced via Public Purpose Program funds collected in rates. Clearly separating these funds will simplify tracking outcomes and impacts of the grant. Importantly, California intends to solicit significant funding from both the National Clean Investment Fund (NCIF) and Clean Communities Investment Accelerator (CCIA) programs, which will enable further financial assistance beyond what S4A provides. **CA-S4A** components include (1) funding for TA and capacity- building, (2) expanding available financial assistance to municipal-owned utility, public-owned utility, and tribal utility customers, and (3) reducing project costs, including upfront costs, enabling upgrades (if necessary, cannot be more than 20% of financial assistance funds), payback periods, and costs associated with site remediation activities. None of the programs will provide direct funding to households.

The **CA-S4A** program funding allocations are summarized below.[12]
- **POU-S4A** (CEC): $30.2M Total, $25M financial assistance
- **IOU-S4A** (CPUC): $210.4M Total, ~$200M financial assistance
- **RWP-S4A** (EDD): $9.2M Total, $8M financial assistance
- **TOTAL**: $249.8M Total, ~$233M financial assistance

**POU-S4A** will award its $25 million in financial assistance towards solar and storage planning and deployment to eligible participants, with special care to address prominent barriers to LIDAC participation in existing state programs. **POU-S4A** will provide financial assistance mechanisms that are additive to existing resources for solar deployment in LIDAC and avoid duplication of services. **POU-S4A** will develop grants and incentives with specific program design informed by a robust stakeholder process during the first year and will leverage existing state and utility programs.

CEC staff will work with each POU to identify whether its low-income electric rate tier falls within the boundaries of EPA LIDAC guidelines. If a POU does not have a low-income electric rate tier within the boundaries of EPA LIDAC guidelines, prospective applicants in an individual household must demonstrate an income that is at or below the greater of the definition for #3 Geographically Dispersed Low-Income Households. The process the program will use for income verification will be determined during the program planning year.

---

[11] A utility balancing account is an account used to match the collection of actual revenues against actual costs after an adjustment for unanticipated changes in expenditures.
[12] In alignment with the SFA Terms and Conditions (National Programmatic Terms and Conditions, D. Signage Required), if financial assistance exceeds $250,000 to a single site, the participating benefiter will be asked to place a sign displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act."

California's POUs serve diverse communities across California with unique characteristics, such as customer base, geographic location, and size. The POUs are committed to supporting California's greenhouse gas emission reduction goals and to advancing a range of resource solutions, including solar and energy storage, while providing support to their LIDAC. **POU-S4A** will provide grants and incentives to stakeholders (including Tribes) in POU territory to augment their existing and future community solar, rooftop solar, and energy storage installation programs.

The **POU-S4A** program will utilize the 12-month planning period to determine exact eligibility among LIDAC residents, however staff intend to allow for the largest pool of potential applicants as feasible and intend to enable both single-family housing and multifamily housing residents. **POU-S4A** does not envision offering grants or incentives to non-residential customers.

Additionally, **POU-S4A** will use the 12-month planning period to determine how funding will be disbursed. All applicants to **POU-S4A** will be required to demonstrate basic eligibility criteria including income verification if income is used to meet LIDAC criteria. However, the CEC plans to make every effort to avoid changes to household income eligibility requirements of existing POU programs. For this reason, it may be best for a POU to apply for funding on behalf of specific eligible households in their territory, with the household receiving benefits through bill discounts and other mechanisms such as inclusion on community solar installation.

Some POUs may already have existing utility rates that are income restricted. If applicable, the CEC may work with a POU during the 12-month planning period to identify whether its income-restricted rate falls within EPA's LIDAC parameters, and in that case can use an applicant's participation in applicable POU programs as an alternative means of demonstrating income verification.

As existing resources vary widely across the 47 different POUs, we will use the 12-month planning period to design a program that maximizes flexibility to offer grants or incentives that meet the needs of each stakeholder without duplicating resources. For example, the biggest POU (LADWP) has existing residential solar+storage incentive programs that would enable **POU-S4A** funding to expand existing programs. Other smaller POU territories may have limited existing resources and **POU-S4A** grants or incentives may constitute a new funding opportunity in these territories.

All community solar funded under **POU-S4A** will conform to the definition of residential serving community solar. Specifically, they will have a nameplate capacity of 5 $MW_{AC}$ or less, 2) deliver at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and 3) verify that at least 50% of the benefits and/or credits of the power generated from a community solar system be delivered to residential customers in the same service territory.

**POU-S4A** subrecipients will be updated during the planning period.

**IOU-S4A Community Solar and SOMAH** ($9.69M in financial assistance for rooftop remediation and site suitability (SOMAH) and $190.19M in financial assistance for Community Solar projects) will support on-site ("rooftop") residential solar or solar with associated storage as well as community solar and storage developments. The **IOU-S4A Community Solar** funding leverages $33 million in additional California taxpayer funding. **IOU-S4A SOMAH** leverages its $730 million in current funding, which is expected to reach a final amount of $940 million by June 2026.

All community solar funded under **IOU-S4A Community Solar** will conform to the definition of residential serving community solar. Specifically, they will have a nameplate capacity of 5 $MW_{AC}$ or less, 2) deliver through bill credits at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and 3) verify that at least 50% of the benefits and/or credits of the power generated from a community solar system be delivered to residential customers in the same service territory.

Under **IOU-S4A SOMAH,** participants will have renewable energy facilities installed on their property and can make use of the system for resiliency. The **IOU-S4A SOMAH** rooftop remediation and site readiness funds will be dedicated to the Solar on Multifamily Affordable Housing (SOMAH) program participants. **IOU-S4A SOMAH** will cover the costs of a building's solar readiness, equivalent up to 20% of the total solar or solar + storage incentive. This approach leverages an existing statewide program, solves a participation hurdle, and targets funding to priority communities. SOMAH eligibility aligns most closely with the LIDAC definition of affordable multifamily properties. **IOU-S4A SOMAH** will reduce upfront project costs by, for example, upgrading or replacing transformers, replacing or adding meters, fire safety measures (when storage is being added), or structural repairs to roofs (to accept weight of solar panels and racking). Roof repairs in particular have been a longstanding hurdle to increasing solar installations. Should roof-readiness costs be too high, eligible properties may forgo the installation of a PV system altogether. If SOMAH participants are unable to complete necessary remediations such as roof repairs without incentives, they may instead select alternative sites like a solar shading system over a parking lot, which, though eligible to receive SOMAH funding, could increase total project costs compared to roof-mounted options. Additionally, it is reasonable to anticipate that total project costs could be lower with a roof-mounted option than with a carport-mounted option as carport-mounted solar requires significantly more labor, materiel, and planning.

Once in place, these renewable energy systems will last for two decades or more, ensuring that this financial assistance will generate benefits well past the initial incentive. This financial assistance is neutral as to the solar ownership type, however, lowered upfront costs will better enable customers to choose between financing options (leasing or owning their systems). The planning period will be used to consider advance payments and capital mobilization for affordable housing owners and community solar developers. For example, when two or more LIDAC criteria are met (affordable housing and being in a CESJT community) or if a property owner is willing to match the S4A grant, a 1:1 advance payment could be automatically issued by the program.

Should readiness costs add an additional 20% to the overall project costs, the influx of funds for site preparation under **IOU-S4A SOMAH** can facilitate approximately 12 MW of solar and 85 MWh of storage at 85 multifamily properties and impact 6,450 LIDAC multifamily renter households. CPUC expects the average site abatement award to range between $100,000 to $115,000 per multifamily property. This funding will only go towards affordable properties that house low-income renters, including properties owned by California Native Tribes. Participating properties must have at least five units or more to be eligible. The final incentive or grant amount per property is dependent on the size of its renewable energy facility and its total costs; the amounts here are illustrative and are based on averages from recent application data. **IOU-SFA SOMAH** creates capital mobilization by requiring an owner co-pay, and reducing the (ratepayer paid) solar incentive based on use of federal or state tax credits. This capital mobilization metric will be tracked as part of the grant outputs.[13] As part of the down scoping effort, CPUC will focus **IOU-S4A** resources on affordable multifamily properties. An award at a multifamily property is a more efficient investment even though there will be fewer sites treated, the number of benefitting households will be higher. With a focus on affordable multifamily properties, more low-income households per grant dollar will be reached than with a focus on low-income single-family households.

As part of a May 5th 2023 ruling the CPUC asked stakeholders how to improve financing access for SOMAH participants, including expanding partnerships with financial service providers. It is expected that the CPUC will make a determination on this feedback during the planning phase and could expand the program's ability to leverage external financing partnerships. Further, the SOMAH program has an existing program implementation plan (laying out its high-level goals and key tactics) and a more detailed program handbook which will be updated through the CPUC's ministerial review process to operationalize any necessary changes. This effort is expected to be completed early in the planning period.

**IOU-S4A SOMAH** is available to deed-restricted affordable multifamily property owners, as such these property owners have complicated financing and debt holdings. CPUC will contract a financial expert, as part of its administrative budget, to provide in-kind advisory services to interested property owners. The advisor will support property owners interested in pursuing host-owned systems. Providing additional support can increase ownership rates of SOMAH incented systems. When a system is owned, instead of leased, it is more likely that the owner will make continuous improvements like expanding capacity, future storage additions, or realizing bill benefits beyond the expected useful life of the system. Further, capitalizing on recent tax credit monetization schemas may enable participating properties to install larger systems and drive down upfront costs. CPUC will contract a financial consultant to provide in-kind customer services to **IOU-S4A SOMAH** non-profit properties. Such advice and expertise are necessary to support property owners to make use of recent changes to tax laws (by the Inflation Reduction Act) and create an economical debt structure. Financial support services can reduce barriers to participation and complements existing tax credit options.

---

[13] SOMAH applications already must disclose their total project costs including use of tax credits, so it can be easily determined by an evaluator as to the final capital mobilization amounts in dollars, per project, and per capacity (kW).

The **IOU-S4A Community Solar** will maximize customer participation in IOU territories by providing meaningful bill savings to residential customers in LIDACs that subscribe to community solar projects, with final design details determined during the planning phase of the grant. On May 30, 2024 the CPUC adopted a decision that improves existing community solar programs and authorizes a new community solar program that meets the legislative requirements established in AB 2316. On June 5, 2024, the CPUC issued a ruling directing parties to file comments to questions regarding the implementation of the Decision including aspects of its new Community Renewable Energy Program including revenue share, bill credits, and method for disbursing federal and state incentives among other topics. Party comments were filed in July and are currently under review. **CA-S4A** will take advantage of the available twelve-month planning period to resolve these programmatic issues before expending funds.

The federal funding for community solar is expected to deliver an equivalent of 40 MW of solar serving 15,000-30,000 LIDAC customer households. **IOU-S4A** anticipates that these funds will likely be used to support projects that leverage external private capital and innovative financing structures available to developers, potentially including leveraging tax credits and public revolving loan programs, by providing a predictable source of funding for offsetting customer bills and enhancing participation in the program. Critically, the funding can help developers finance storage, in addition to solar, which is an essential technology for allowing these projects to shift their exports to the evening hours, when they provide maximum value to California's electric grid needs.

In the one-year planning period, the CPUC will finalize the Community Solar program design through its existing regulatory proceeding. The proceeding will establish policies or rules affecting regulated entities as to how they must implement the Community Solar program in accordance with state policy and in alignment with the grant's parameters. After the proceeding concludes, the IOUs and CCAs may be instructed to file compliance documentation before the program can be fully implemented. Industry stakeholders are parties to CPUC proceedings and can provide input on the final financial subsidy via established public processes.

**IOU-S4A SOMAH** Subrecipients include: SOMAH Program Administrator organizations (led by Center for Sustainable Energy), Pacific Gas & Electric Company, San Diego Gas & Electric Company, Southern California Edison, PacifiCorp or Liberty Utilities. Southern California Edison holds the contract with the SOMAH Program Administrator organizations.

**IOU-S4A Community Solar** Subrecipients include: CCAs which may include but are not limited to Ava Community Energy, Clean Energy Alliance, Clean Power Alliance, CleanPowerSF, Desert Community Energy, Lancaster Energy, Marin Clean Energy, Peninsula Clean Energy, Pico Rivera Innovative Municipal Energy, San Jacinto Power, San Diego Community Power, San Jose Clean Energy, Silicon Valley Clean Energy, and IOUs including Pacific Gas & Electric, San Diego Gas & Electric, and Southern California Edison. Grant funds will be distributed and tracked in IOU balancing accounts (each IOU will distribute and track funds on behalf of respective CCAs in each IOU service territory as the CPUC does not have direct jurisdiction over CCAs).

**RWP-S4A** ($9.2M Total, $8M in grants) will foster four regional hubs that will design new and/or support the expansion of existing solar and storage installation training programs, including earn-and-learn models such as pre-apprenticeships and apprenticeships that cover both technical skills and job quality aspects, job readiness, and personal development, and offer wraparound support services, such as childcare assistance and transportation options, to ensure barriers to participation are minimized.

**RWP-S4A** subrecipients will be determined during the planning period.

*For all C4A Coalition partners, subawards to for-profit entities*, will meet the 'subawards to for-profit entities' term and condition. If they do not meet these requirements, they are not an eligible subaward. CPUC agrees to require that any subaward to a for-profit entity will abide by these terms and conditions, where applicable, these may be updated during the planning period as awards are finalized.

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;
2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;
3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and
5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports. As an alternative, recipient may demonstrate it has the capacity and capability already to comply with 2 CFR 200.509 criteria.

## 2.3 Project-Deployment Technical Assistance Strategy

LIDACs face numerous barriers to accessing solar energy and its economic benefits. High upfront costs, site barriers, and other challenges present challenges. California is addressing these barriers by providing technical assistance (TA) to communities and solar market stakeholders that will allow for the development of a robust project pipeline, increased solar deployment, and wealth-building spurred by the clean energy transition in LIDACs.

Efforts include robust plans to (1) invest in a skilled workforce needed to deploy solar and storage, (2) provide solar developers and communities with TA to address interconnection challenges, and (3) ensure projects funded under the program are efficiently deployed and resilient by providing solar developers and communities with TA for project siting, land-use, permitting, building codes, inspection, and quality control. California has also already adopted best-in-class policies and directed funding to overcome building and safety permit barriers by creating online platforms to expedite and streamline local permitting.

### 2.3.1 Workforce Development

All of California's S4A program components **invest in a skilled workforce** through direct financial assistance and program design. California has a statewide training network in place, which allows S4A to leverage its existing resources and expertise. This includes pre-existing energy related multi-sector partnerships and relationships with CBOs. RWP-S4A will increase training and close access gaps for LIDAC customers, the outputs of the new projects from IOU-S4A and POU-S4A will be on-the-job learning opportunities. The estimated new job opportunities from IOU-SFA and POU-SFA will be updated as part of the Planning Period activities. As a baseline, this grant is estimated to have these workforce outputs:

| CA-S4A RWP Estimated Outputs | |
|---|---|
| Workers Trained by Workforce Development Programs (#) | 225 |
| Number of Solar Jobs Created (#) | 225 |
| Average increased wages for individuals working in solar energy (%) | 10.5% |

| IOU-S4A SOMAH Estimated Outputs | |
|---|---|
| Workers Trained by SOMAH Projects | 170 |
| Number of Solar Jobs Created (#) | 51 |
| Average increased wages for individuals working in solar energy (%) | TBD |

**RWP-S4A**'s technical assistance includes support for application development, inclusive recruitment and coalition building, curriculum development and training deployment, and job standards development. Standing up new training programs is time intensive, so using S4A funds to expand in LIDAC geographic areas is more efficient. During the planning period, if **RWP-S4A** identifies any workforce gaps, it may adjust curriculum or add new learning modules (developed over the same period).

How workforce training opportunities are provided: In addition to direct outreach, California maintains a database of Eligible Training Providers on its CalJobs website. CalJobs is also available in Spanish. Programs are available statewide and often accept new entrants on a rolling basis; certificate programs may require on-the-job training for energy related career training.

Engagement Strategy: California's Employment Development Department (EDD) staff have decades of program management experience as well as dedicated field specialists, an evaluation team, and access to University of California Labor Centers that can provide additional support efforts. As EDD aims to foster regional support through the planning and development of workforce training curriculum and the implementation of training programs, EDD will work with applicants and local workforce boards and regional coalitions to build a cohort model that allows for consistent curriculum and opportunities. Additionally, EDD will review potential partnerships with the California Community College system to support the development of clear career pathways that outlines the progression from entry-level solar installation roles to advanced positions, such as battery storage installation, project management or system design.

**POU-S4A** applicants will be encouraged to consider Workforce Development, Education, and Training in their proposal, anchored by the **RWP-S4A**. Workforce development and training programs will train participants for transferable jobs and skills, resulting in high-quality jobs that reflect **CA-S4A** goals and priorities.

How workforce training opportunities are provided: Trainees will come to **POU-S4A** projects already having received basic skills training, from **RWP-S4A** or similar. **POU-S4A** will offer job site training under a qualified contractor. Additionally, grantees may propose other job-training readiness webinars like soft skills (behavior, time management, etc.) or in-depth training like solar engineering and design to earn additional points in the competitive grant delivery.

Engagement Strategy: The CEC will leverage **POU-S4A** program grant funds in the following way: (a) developing program requirements in partnership with Tribes for greatest impact; (b) offering funds for the deployment of Tribal led solar and storage projects (including microgrids), filling the gap of existing state and utility programs; (c) coordinating with coalition agencies to support the development of clean energy transition plans, energy feasibility studies, and other predevelopment activities to support solar and storage deployment projects and coordinating with CPUC grantees by providing job training and economic development opportunities, such as leveraging tribal apprenticeship programs and supporting tribal energy enterprises; and (d) leveraging capital to advance decarbonization.

**IOU-S4A SOMAH** has existing workforce measures that will be leveraged to support S4A goals. SOMAH assists contractors in hiring trainees that are local or targeted hires from participating properties and disadvantaged communities. The program requires that trainees are paid at least 1.4x the minimum wage of the city where the project is located to ensure fair, stable wages. To expand the pool of active contractors, Program Administrators have begun to connect eligible contractors as subcontractors on larger projects to help provide them with more experience. The program is also expected to leverage a consultant to provide concierge tribal outreach assistance, guided by market data, familiarity with the SOMAH program elements and cultural competence to assist potential SOMAH Tribal projects.

How workforce training opportunities are provided: Trainees will come to **IOU-S4A SOMAH** projects already having received basic skills training, from SOMAH's online training partner (Heatspring), **RWP-S4A** or a similar training organization. **IOU-S4A** offers job site training under a qualified contractor. Trainees can work in installation, design/engineering, or in

operations. SOMAH periodically offers webinars on job readiness application and interview skills.

Engagement Strategy: The program utilizes a Solar Career Center and Job Board where resumes, openings, and applications can be posted and connections between job seekers and participating contractors can be made. SOMAH hosts open, public webinars to support trainees with job-readiness skills, and the Jobs Trainings Organization Task Force engages with the training community (community colleges, apprenticeship programs, etc.) to discuss benefits, challenges, and opportunities for solar trainees. The program requires that trainees are paid at least 1.4x the minimum wage of the city where the project is located to ensure fair, stable wages. To expand the pool of active contractors, Program Administrators have begun to connect eligible contractors as subcontractors on larger projects to help provide them with more experience.

**IOU-S4A Community Solar** will use the planning period to assess the feasibility of encouraging or formally adopting workforce training opportunities. A May 2024 Decision laid out the following frameworks and plan for determining final implementation rules and guidelines:

The Decision expands the current DAC-GT program by 60 megawatts (MWs), bringing the program total to 144 MWs. This program provides subsidies to participants that reduce their monthly electricity bills by 20 percent. California's three largest IOUs and 10 CCAs currently administer this program across the state to reach wide range of vulnerable customers.

The Decision also authorizes an additional community solar program that will be available to customers of all income levels, as well as commercial customers. The new program will directly benefit low-income customers as 51 percent of the subscribers must be low-income and receive a guaranteed 20% electricity bill credit. The program will allow California to take advantage of federal and state funding opportunities for low-income customers by creating a mechanism to capture available funding for community solar. A ruling has been issued in this proceeding to collect stakeholder feedback on program details, including the method for dispersing state and federal funding to the projects and participating customers, and tribal outreach. The CPUC will also hire a consultant to provide concierge tribal outreach assistance, informed by market data, solar suitability mapping, and cultural competency to inform Tribes of potential community solar project options.

### 2.3.2 Project Siting, Permitting. And Interconnection (to the grid)

While IOUs and POUs in California continue to implement and improve processes for **interconnecting renewable energy facilities**, there are several opportunities to help foster development of more transparent, equitable, and efficient processes across all the state's electric distribution utilities. A critical component of **CA-S4A** in this regard will be to help improve sharing of information and best practices between different utilities, developers, and customers with an emphasis on rural, low-income, and tribal communities. Specifically, as part of this proposal **IOU-S4A Community Solar** and **POU-S4A** will consider in the planning phase:

- Provide direct technical and/or financial assistance to project sites applying for interconnection through this program, including funding for interconnection fees and potential utility-side upgrades or mitigations required for safe interconnection.

- o Confirm that enabling upgrades for grid capacity upgrades conform to the following three requirements:
  - ▪ 1) That capital upgrades are necessary for the Solar For All program and
  - ▪ 2) That grid upgrades will only be funded where non-wire alternatives are not a feasible solution
  - ▪ 3) The proposed costs for grid upgrades if available (anticipated cost per solar capacity for NREL to review)
  - o The share of financial assistance expended on enabling upgrades cannot exceed 20% of the financial assistance (not total budget) over the lifetime of the program.
  - o CPUC will hire a modelling support contractor to assess siting proposals and capabilities of selected projects to meet subscriber bill savings minimums.
  - o CPUC will hire a tribal outreach consultant to leverage data sources and coupled with a cultural awareness of Tribal governance structures and needs to connect interested Tribes to **IOU-S4A Community Solar** options.
- Host annual convenings of all electric distribution utilities and load serving entities in California focused on sharing knowledge and examples of successful programs and strategies to improve customer interconnection experiences.
- Develop and administer targeted outreach and assistance programs for the state's small POUs, cooperative, and Tribal utilities that help disseminate best practices and increase consistency in interconnection processes and requirements.
- When solar is added on-site to an existing multifamily property or single-family home, there is no way to practically add requirements around greenspaces, climate resiliency or agrivoltaics. For multifamily properties, sometimes a solar photovoltaic mounting system doubles as a carport, adding shading over an existing parking lot. Adding shading over darker, lower albedo surfaces can help limit local warming (heat islands). For siting on greenspaces, residential properties have space at a premium in California. It is unlikely that a previously open greenspace is an option for a residential system. Similarly, undergrounding conduit through trenching to connect a system behind the meter is expensive Instead, placing the solar system as near to the electricity loads as possible reduces construction costs and this cost burden naturally disincentivizes using greenspaces on residential sites for a solar installation. The more requirements put upon a site design the fewer applicants there are that can comply, so it would undercut program participation to have climate resiliency or greenspace requirements on siting residential systems. Additionally, as these projects are expected to involve existing residential parcels, we expect all projects will be CEQA/NEPA exempt. Details will be developed during the program year and follow applicable CEQA/NEPA review processes.
- **POU-S4A**: In cases where a POU applies for funding involving a community solar project, the applicant will be required to submit supporting documentation indicating CEQA Exemption or otherwise demonstrate that the project complies with all siting requirements. Exact documentation and procedures will be outlined during the program planning phase.

The program will require documentation verifying completion of applicable CEQA review, permitting, and safety requirements, including California Senate Bill 38 (Laird, Chapter 377, Statutes of 2023) requirements for energy storage systems. Also, during the program planning year, the program will consider opportunities to leverage California's Residential Solar Permit

Program (Senate Bill 379, Wiener, 2022) requirements for local governments to implement online solar permitting platforms that verify code compliance.

Building on existing programs, such as the California Automated Permit Processing Program (CalAPP), California IOUs and POUs will seek to support solar developers and communities with **TA for project siting, land-use, permitting, building codes, inspection, and quality control**.

Both **IOU-S4A Community Solar** and **POU-S4A** will consider how and to what extent to offer these services during the planning phase period. Offering some level of TA will be critical to ensuring that there is a diverse group of bidders for community solar projects. The administering agencies will also consider whether to offer post-award TA to selected community solar projects to open the door to newer market entrants. Such an approach will increase representation and expand equitable access to community solar development contracts.

For **quality control of assets regarding safety and engineering standards**, there is nothing different or unique about S4A projects that necessitate the hiring of new engineers to conduct initial or ongoing inspections. In other words, inspection to meet federal laws and state mandates is being absorbed by existing agency departments, utilities, and local jurisdictions already tasked with that work. For **quality control regarding solar output performance**, **IOU-S4A Community Solar** and **POU-S4A** will determine their approach in the performance period.[14] The CEC will use the 12-month planning period to develop a plan on long-term operation and maintenance costs. Although details will be developed during the planning period, the program will require contractors to provide at least a 10-year workmanship warranty to provide for no-cost repair or replacement of the system, as well as a performance monitoring and reporting service to alert customers if maintenance is needed. Programs anticipate following these best practices:

1. Community solar plants (5 MW or less): developer must maintain operational logs, insurance and permit financial audits. These details are typically outlined in competitive solicitation documents and power purchase agreement contract between the utility or CCA and the third-party developer.
2. On-site residential systems: As a baseline, current requirements include an equipment warranty, a workmanship warranty, and a performance monitoring and reporting service. Systems must have a performance warranty of not less than 10 years to protect against defects and undue degradation of electrical generation output. Contractors must provide at least a 10-year workmanship warranty to provide for no-cost repair or replacement of the system. A performance monitoring and reporting service will alert customers if maintenance is needed, preferably required for the life of the system. Other elements could include longer warranty periods from those described above or additional warranties such as protecting the customer against meter breaks (or damage).
3. The **CA-S4A** program will require funded projects to meet California Contractors State License Board (CSLB) requirements for the installation of solar and battery energy storage systems.

---

[14] CPUC Public Utilities Code 387.5(d)(4) requires that all solar energy systems that receive an incentive (from a program subject to the Public Utilities Code) must have a warranty of not less than 10 years to protect against defects and undue degradation of electrical generation output.

**IOU-S4A SOMAH** already has quality control requirements in place with expansive warranty requirements, required performance monitoring and reporting services for customers, and the program administrator intakes all performance data into its own fleeting monitoring system. The fleet monitoring system is a new innovation to account for affordable multifamily building owner management staff constraints to consistently monitor their systems independently. The SOMAH program administrator will contact the host customer and contractor if the system is underperforming. SOMAH's expanded warranty requirements include: equipment warranty for a minimum 20 years, contractors providing a minimum 20-year warranty to protect the customer against more than 10% degradation of electrical performance, and a one-year warranty for meters to protect against defective workmanship, degradation, or breaks. Warranty requirements are captured in the program handbook and the property owner must provide an affidavit attesting to these requirements. **IOU-S4A SOMAH** and **POU-S4A** will review report recommendations and consider how to incorporate improvements.

**IOU-S4A Community Solar** implementers will conduct bidder workshops and the CPUC will consider additional pre- and post-bidding TA support during the planning phase. Predevelopment support could include energy feasibility studies, coordinating with job training or apprenticeship programs, and supporting tribal enterprises. CPUC will hire an expert consultant to liaise with Tribes and advise them on solar options, including community solar projects or **IOU-S4A SOMAH**.

**POU-S4A** will conduct targeted outreach and engage in dialogue with the state's small POUs and associated tribal stakeholders within **CA-S4A**-POU responsibility to help disseminate best practices and increase consistency in interconnection processes and requirements.

**IOU-S4A SOMAH** currently offers upfront TA services for property owners and building managers to evaluate solar and associated storage potential and feasibility, including whether the system should be expanded to support resiliency, electrification of end-uses and electric vehicle charging stations. TA also includes providing financial modeling and a cost/savings analysis; as noted above this service will be expanded to include tax credit monetization **IOU-S4A SOMAH** does offer online resources, such as a project bidding tool, which supports interested property owners in requesting and receiving bids from multiple, eligible contractors. This pool of services will be expanded to include rooftop remediation and site readiness measures that can be funded with S4A grants.

Prior to an application, SOMAH offers a pre-review of an interested property owner's affordability status to ensure that it meets LIDAC criteria. This proactive offering helps avoid unnecessary application rejections or additional burden on property owners who ultimately do not qualify and gives increased confidence to others who learn that they are indeed eligible.

Towards this end, SOMAH will make and offer these resources over the course of the grant period:
1. Adjust and expand online resources to list common remedies for known site barriers
2. Promote and share ancillary benefits from rooftop and site remediation
3. Develop 1 to 2 case studies showcasing successful **IOU-S4A SOMAH** projects

4. Incorporate new informational materials into property owner, contractor, and stakeholder outreach (workshops, webinars, 1-1 support calls, etc.).

### 2.3.3 Equitable Access and Meaningful Involvement Plan

**CA-S4A** will maximize access to the program for low-income disadvantaged communities and California Native American Tribes by addressing the elements outlined in the Meaningful Benefits Plan and Distributed Solar Market Strategy, including maximizing the breadth and diversity of households and communities served, building participatory governance-formalized structures, meaningfully engaging with stakeholders, and strategizing for customer acquisition and management.

During the planning year, the S4A program will further develop pathways to achieve these elements, such as processes to encourage the use of community benefits agreements.[15]

All administering agencies will promote outreach and technical assistance that benefit community-centered engagement across all relevant geographies. When possible, programs will recruit and serve Project Area residents and aim to reduce barriers to participation through project elements such as the training program design and recruitment strategy.

Each administering agency will use their existing websites and public distribution lists to announce the new S4A funding and program development or expansion. This is more effective than California's previous proposal to invest time and resources in building a new site. Additionally, California has an open data initiative – data.ca.gov – where agencies can share public datasets and the CPUC publicly tracks customer-owned solar and solar with storage projects at DGStats (CaliforniaDGStats). The CPUC plans to expand DGStats to include community solar project information. DGStats data is updated monthly and is part of the public domain.

The CPUC and CEC are able to support customers as a meaningful point of entry and coordination to efficiently access S4A opportunities and other state and federal funding opportunities.

As permitted in the notice for funding, all **CA-S4A** programs will offer applicants flexibility as to their LIDAC status, they must only satisfy one of the LIDAC definitions.[16] The income related status must be supported by appropriate documentation (pay stubs, bank statements, annuity letter, etc.) or enrollment (and award letter) in a program with income requirement equivalency.

As stated in the Overview section, California has long history of investment in the solar industry and current solar programs and initiatives, some of which are also targeted or exclusive to low-income customers. California is directing 93% of its S4A grant to stand up new programs to increase equitable access. Further, California is reserving $19M of its **IOU-S4A Community Solar** budget to encourage the development of projects on tribal lands. Should these funds not be

---

[15] The following fact sheet provides a helpful summary of community benefits agreements in relation to community development projects: "Strategies to Minimize Displacement: Community Benefits Agreements." https://www.epa.gov/system/files/documents/2023-04/Brownfields_CBA_FINAL.pdf.
[16]

<u>fully allocated after three years, funds will return to the general allocation of **IOU-S4A Community Solar** funds.</u>

*Maximizing Breadth and Diversity:* Each **CA-S4A** program will have a framework for creating a continuum of engagement where some elements are only open to California's LIDAC communities and others are tailored to ensure equitable access by the state's LIDAC stakeholders. For example, existing CPUC programs to be integrated into **IOU-S4A** have specific eligibility criteria to increase participation in under-served communities and contribute to increasing the diversity of solar owners in California overall. To ensure equitable access, the programs will utilize trusted messengers, incorporate community leadership, and seek to work with disadvantaged business enterprises and LIDAC-based workforce trainees. **POU-S4A** will ensure solar reaches various parts of the state, including rural or tribal areas often unreached by programs, and often with the least energy reliability. This program will incorporate various POUs not currently engaged by state supported programs.

*Community Based Organization Engagement:* Each **CA-S4A** program will either continue or seek to work with community-based organizations (CBOs) over the grant period. **IOU-S4A Community Solar** will use the planning period to consider how CBOs can be involved in the development and siting of community solar plants. **POU-S4A** Community Solar will consider structuring the granting criteria to favor applicants who seek to work with CBOs, especially for treating single-family households in the same geographic areas. The extent of **POU-S4A** incorporation of CBOs will be finalized in the planning period. **IOU-S4A SOMAH** already directly contracts with eight CBOs on marketing and outreach efforts. In 2024, SOMAH budgeted $800k for CBOs with a budget for oversight ($229k) and contracts ($524k). RWP S4A will use the planning period to build connections with CBOs familiar with workforce outreach. The CPUC will host an annual convening of the agencies to discuss S4A grant work and opportunities for leveraging, part of this effort will explicitly include a focus on growing relationships with CBOs.

**2.3.4 Summary Matrix of Customers with Barriers and CA S4A Tactics to Address Barriers**

| Customers with Barriers | CA-S4A Ameliorate or Remove Barriers |
|---|---|
| Rural Communities and Tribal Communities | • **POU-S4A** and IOU S4A will offer technical assistance.<br>• **IOU-S4A SOMAH** offers in-depth technical assistance to design projects and run a bidding process.<br>• **IOU-S4A SOMAH** (pre-dating S4A) has tribal representation on its Advisory Council and is looking to find an aligned tribal CBO.<br>• **IOU-S4A Community Solar** will be available anywhere in a given utility territory, including rural areas.<br>• In **IOU-S4A** and **POU-S4A**, tribal communities can collaborate with third-party developers to propose community solar projects.<br>• **RWP-S4A** will use the planning period to assess coverage in rural communities and seek to increase job training opportunities where there are gaps. |
| Language, other than English | • All programs will offer materials in languages other than English. The primary non-English language in California is Spanish.<br>• Pre-existing resources are offered in multiple languages, including the California Solar Consumer Protection Guide and CalJobs online portal website. |
| Renters | • **IOU-S4A Community Solar** beneficiaries are only qualified by their LIDAC status, so renters are able to opt-in to this program and continue it even if they move within the same utility territory.<br>• **IOU-S4A SOMAH** permits owners to receive a lesser incentive for solar for common areas, so they also receive a program benefit, which reduces their split incentives.<br>• **POU-S4A** will consider benefits to renters as part of the granting criteria. |
| Mobile home or Modular Communities | • **IOU-S4A Community Solar** is not limited by housing type, so mobile home or modular community households can participate.<br>• **IOU-S4A SOMAH** is available to deed-restricted, mobile home parks or modular communities. Even if the mobile home is owned by the resident, and they only rent the land underneath.<br>• **POU-S4A** will allow applicants to propose to treat mobile home or modular communities via community solar or rooftop solar. |

More specifically, **IOU-S4A SOMAH** will:

- Continue to subcontract with CBOs to do outreach to property owners, public housing authorities, and workforce training entities such as apprenticeship programs and community colleges.
- Work towards a voluntary benchmark to raise participation from properties located in disadvantaged communities to 40% of all participants.
- Liaise with tribal organizations and governments to increase tribal participation.
- Ease participation for tribes and likely implement new policies based on feedback from stakeholders during the planning phase.
- Update its annual marketing and outreach plan tactics to 1) ensure sufficient job trainee and preparation for job training opportunities and 2) educate eligible tenants to maximize their benefits.
- Continue to encourage disadvantaged business enterprises to become SOMAH eligible. Expand online web resources (SOMAH | Solar on Multifamily Affordable Housing (calsomah.org) to include new information related to S4A funding opportunities.
- Every three years the SOMAH program must be evaluated, so in July 2026, there will be recommendations from an independent evaluator to further refine meaningful community involvement.
- Income Verification: SOMAH is only eligible for deed-restricted, low-income affordable housing that have at least five rental units. Properties must be funded by low-income housing tax credits, tax-exempt mortgage revenue bonds, general obligation bonds, or have received a local, state or federal loan or grant. The deed agreement must be independently enforceable, and verifiable. There must be at least 10 years remaining on the affordability restriction. Additionally, the site must at least one of the other criteria:
  - At least 66% of property residents must have incomes at our below 80% of the Area Median Income; or
  - Property is located in a Disadvantaged Community as defined by CalEPA, which is the top 25 percent of the census tracts statewide in the CalEnviroScreen tool; or
  - Property is owned by a California Native American Tribe; or
  - Property is owned by a Public Housing Authority or Public Housing Agency.
  - SOMAH does not independently verify individual tenant income data as this would be intrusive to tenants, time consuming for the property owner, developer, and the program administrator, and duplicative of the deed agreements already in place.
  - In the planning period, SOMAH will overlay the geographic LIDAC criteria with SOMAH LIDAC geographic eligibility criteria and issue guidance to applicants if there are discrepancies. **IOU-S4A SOMAH** is providing relief to solve a gap in the program's offerings, and this will be limited to properties that meet both SOMAH and **IOU-S4A SOMAH** eligibility requirements. **IOU-S4A SOMAH** is expected to treat 85 properties with over 6,400 renter households.
- Continue successful program designs and efforts to ensure housing affordability. As noted above, SOMAH is only available to multifamily properties with at least 10 years remaining on their affordability restrictions.  By reducing operating and tenant electric bills, SOMAH also protects mission-driven program participants' commitments to maintain the affordability of their properties. Under current rules, participating property owners must submit an affidavit that ensures that 100% of the program's tenant economic

benefit is retained by tenants. SOMAH is designed, in part, to relieve tenants' energy cost burden through on-bill credits. The property owner must demonstrate that the portion of the solar energy system allocated to offsetting tenant load will result in the tenants receiving 100% of the economic benefit of the generation allocated to their unit and meter on a monthly basis for the life of the system or 20 years, whichever is less. Tenants may not bear any portion of the cost of the solar energy system nor be subject to the recapture or diminishment of SOMAH's required tenant economic benefits. Property owners will be required to exclude solar credits from utility allowance calculations, may not assume control of tenant utility accounts, nor increase rents in relation to the SOMAH-funded PV installation. The property owner will also certify that it will not use the California Utility Allowance Calculator to recapture and/or diminish tenant economic benefits from solar.

- Customer Acquisition: Most of the program's applications are contractor-led, meaning that a contractor is marketing the SOMAH program to a property owner or building manager. The SOMAH program administrator and its CBO networks also actively recruit property owners. SOMAH offers technical assistance to design a solar system and find a contractor to help ease entry into the program. SOMAH also generates an annual marketing, education, and outreach plan detailing its key tactics.[17] This approach will not shift as a result of new S4A funds, however it will provide a new benefit to communicate with property owners. SOMAH tracks reasons for not participating from warm leads or those who have had cancelled applications. SOMAH will review this list to see if site readiness was a barrier and will re-engage with previously interested applicants to see if their projects can be revived.

**IOU-S4A Community Solar** will:
- In the planning phase, the CPUC will encourage project developers and subscriber organizations to invest directly in communities through workforce development efforts that benefit residents beyond the projects themselves.
- Continue to build on successful elements of projects which achieved commercial operation under the DAC-GT program requiring workforce development and work with a community sponsor to enroll customers.
- In the planning phase, the CPUC will seek to align outcomes with our Environmental Social Justice Action Plan to explore opportunities for program modifications, such as stacking diverse incentives, implementing auto-enrollment of eligible customers, and improved outreach to best reach ESJ communities. These efforts also include targeting tribal customers. California expects to set aside $19M of its **IOU-S4A Community Solar** budget to preferentially encourage the development of projects on tribal lands. Should these funds not be fully allocated after three years, funds will return to the general allocation of **IOU-S4A Community Solar** funds.
- CPUC has received feedback from parties to ease participation for tribes and is considering new policies based on that feedback during the planning phase.
- Encourage utilities and community choice aggregators to include in their marketing, education and outreach plans commitments to developing diverse and culturally

---

[17] SOMAH Annual Marketing, Education, and Outreach Plan 2024 retrieved at 2024_SOMAH_MEO_Plan (ca.gov)

appropriate communication strategies to ensure that stakeholders can participate in decisions and actions that impact their communities.

- Leverage a consultant to provide concierge tribal outreach assistance, informed by market data, solar suitability mapping, and cultural competency to inform Tribes of potential community solar project options.
- Income Verification: Subscribing customers must be eligible for either the California Alternative Rates for Energy (CARE) or Family Electric Rate Assistance (FERA) program. Customers apply online through their utility's website to verify that their household income is 200% or less of FPG or someone in the household is enrolled in a public assistance program such as:
  - Bureau of Indian Affairs General Assistance
  - CalFresh/SNAP (Food Stamps)
  - CalWORKs (TANF) or Tribal TANF
  - Head Start Income Eligible (Tribal Only)
  - Low Income Home Energy Assistance Program (LIHEAP)
  - Medicaid/Medi-Cal
  - Medi-Cal for Families (Healthy Families A&B)
  - National School Lunch Program (NSLP)
  - Supplemental Security Income (SSI)
  - Women, Infants, and Children (WIC)
- Customer Acquisition: Program administrators will automatically enroll eligible low-income customers, with priority given to customers who meet the Arrearage Management Program criteria (meaning that they are in debt to the utility), followed by all other low-income customers to be automatically enrolled until subscriptions are full. Customers may opt-out if requested.[18]

The **POU-S4A** program will ensure solar reaches various parts of the state, including rural areas often unreached by programs, and often with the least energy reliability. These programs will incorporate various utilities not currently engaged by state supported programs.

- Income Verification: For grant applicants using criteria #3 to meet LIDAC eligibility, the CEC will require supporting documentation demonstrating appropriate eligibility. Exact procedures and requirements will be determined during the 12-month planning period. To the extent possible, CEC will work with each POU to determine of existing income-restricted utility rate programs fall within the parameters of **CA-S4A** LIDAC income requirements. In these cases, applicants can use their participation in their POU's income-restricted rate plan to meet this requirement. Otherwise, CEC will identify appropriate documentation to confirm eligibility (such as a W-2 combined with location-based information).
- Customer Acquisition: Grant applicants will be scored higher if they have a more robust outreach strategy or connections to the utility or a community group that can support direct outreach. Depending on the targeted audience, the CEC will be evaluating for certain best practices:
  - Single-Family Customers; Partnerships with CBOs in the same area.

---

[18] D.24-05-065 at 118-119

> - o   Multifamily Customers; Partnerships with Utilities that can identify the contact information for the property owner and facilitate an introduction.
> - o   Tribal Areas: Partnerships with the Tribe(s) of the tribal lands
> - o   The details of the customer acquisition strategy will be determined in the planning period.

**RWP-S4A** – EDD will build on the state's existing workforce development program that create pathways for job growth via partnerships with employers, local workforce boards, community organizations and educational entities. With the state's high road training partnerships - focus on quality job principles such as worksite safety, stable family-sustaining wages and worker voice – as a model, the RWP will target programs that directly increase the number of skilled workers from LIDACs.  One example is the state's partnership with Joint Apprenticeship and Training Committees that has trained over 2,800 pre-apprentices with a stated goal of reaching underserved workers.  **RWP-S4A** set aside funding to increase targeted outreach to LIDACs and ensure grantees continue that outreach for recruitment of trainees. During the planning period, EDD will set a process for how to track income verification or other criteria for self-identification of a trainee's LIDAC status. For similar programs EDD receives monthly or quarterly updates from grantees regarding activities centered around outreach events aimed at increasing training participation in the programs.

## 2.3.5 Plan for Participatory Governance-Formalized Structures:
**POU-S4A** and **IOU-S4A** will develop program guidelines with substantial engagement from utility and community stakeholders. Both **POU-S4A** and **IOU-S4A** will provide TA.

For **IOU-S4A**, in the planning phase the CPUC's regulatory proceedings are open to the public and advertised on social media to promote engagement. **IOU-S4A Community Solar** will explore the possibilities of incorporating continuous engagement via advisory boards, annual developer forums, or surveys. These tools are currently used in the CPUC's Green Tariff and DAC-GT programs. The CPUC S4A administrative budget for the CPUC includes funding for an evaluation consultant who will also be able to conduct primary data collection and surveys of targeted communities. Their findings will generate recommendations to improve **IOU-S4A** roll out. This overlaps with the 'Meaningful Engagement with Stakeholders' section below. An evaluation consultant will be brought on as soon as possible for the duration of the grant period.

**POU-S4A** awards for tribal projects will be tribally led, -owned, and -initiated, with other program components in a supporting role to tribal leadership's project direction. Tribes or tribal organizations will be eligible applicants, with anyone submitting on the tribe's behalf, also submitting a letter from Tribal Council to ensure the project is tribally driven and lead to significant benefits for tribal communities. **POU-S4A** will develop solicitation requirements with substantial engagement from utility and community stakeholders.

**Meaningful Engagement with Stakeholders: IOU-S4A** will leverage existing multicultural outreach approaches. Through owned and earned media, these efforts create a pipeline of timely, relevant and culturally connected content to introduce program offerings and raise awareness about program benefits to specific audiences.

The **IOU-S4A SOMAH** program details these approaches in its annual Marketing, Education, and Outreach plan, which is also distributed to the CPUC's Low-Income Oversight Board and Disadvantaged Community Advisory Group for feedback. Guides are produced for specific audiences, both property owners and eligible trainees. For example, SOMAH program staff created the guide: "Application Resources for Tribal Groups: Documentation of Multifamily Low-Income Housing Eligibility" to educate Tribes on how to document deed restriction. Program staff also work with CBOs and local governments to conduct marketing and outreach to reach eligible participants. There are two program features, an Advisory Council and a Job Training Taskforce, that incorporate community engagement the program's day-to-day administration. Both groups meet regularly and provide feedback to the administrator. Advisory Council and Job Training Taskforce members receive honorariums to remove any economic barriers to participation in meetings. Properties that receive **IOU-S4A** funding will provide culturally sensitive and in-language education on how to understand net energy metering tariffs, distributed generation monthly bill impacts, and ways to conserve energy.

For the **IOU-S4A Community Solar** program during the planning phase the CPUC will review adding these best practices. There are basic requirements for inclusion and meaningful engagement such as culturally sensitive and in-language marketing, education, and outreach when recruiting households to sign up for subscriptions. Throughout the planning period, program design will benefit from input from a range of stakeholders, such as IOUs, CBOs, and labor organizations who participate in the CPUC's proceeding processes. Program Administrators will develop customer-facing websites, conduct informational webinars, and hold developer-community matchmaking exercises.

**Tribal Engagement:** Under the direction of the State of California Office of the Tribal Advisor, the **CA-S4A** coordinating agencies engage with 109 federally recognized tribes within California. The State of California has a robust system of Tribal engagement and government to-government consultation. In alignment with former Governor Jerry Brown's Executive Order B-10-11 each state department has a Tribal Liaison and departmental Tribal Consultation policies, guiding their departments related activities. The CEC adopted a Tribal Consultation Policy in 2014, the CPUC adopted a similar policy in 2018, and both agencies actively engage in consultation with Tribes to shape the future clean energy in California. This consultation policies ensure effective consultation and provide meaningful tribal input into the development of regulations, rules, policies, plans, and activities that may affect Tribes. In addition to government-to-government consultations, the state's Tribal Programs conduct outreach to increase tribal participation, host and sponsors tribal energy and climate events, and foster grant funding opportunities for Tribes.

In addition, to maximize benefits for tribal communities across all **CA-S4A** programs, state agencies will commit to effective tribal consultation and culturally appropriate engagement throughout program development and implementation to all eligible Tribes. The state will continue collaborative partnerships with California Native American Tribes - supporting eligible tribes through TA, advisory groups, workforce development, project realization, and partnerships. The state will implement a variety of engagement strategies to reach Tribal governments, including: sending communications to Tribal leaders and staff through various communication platforms using an existing robust distribution list of California Native American Tribe, and opening consultation to hear from Tribal leaders on how to best shape the programs

for their greater impact. Therefore, the **CA-S4A** programs are regarded as catalyst initiatives to leverage additional investments and an opportunity to improve intertribal and state collaboration on energy initiatives of this scale.

**IOU-S4A SOMAH** will:

- Encourage tribal member representation on the program Advisory Council on an ongoing basis.
- For workforce development, develop relationships with tribal labor development and job training organizations to encourage SOMAH job training opportunities. This effort is expected to be higher in the first half of the grant with the goal of connecting these organizations' students to sign up for the SOMAH Job Board.
- The CPUC will hire a consultant to provide tribal outreach assistance will also provide findings to the SOMAH program leads.

**IOU-S4A Community Solar** will:

Encourage tribal participation during the planning phase and technical assistance. The CPUC will hire a consultant to provide concierge tribal outreach assistance, informed by market data, solar suitability mapping, and cultural competency to inform Tribes of potential community solar project options.

- Consider prioritizing Tribal projects meeting the federal Indian Lands Low-Income Community Bonus Credit (LICBC) category
- Build upon the DAC-GT program's explicit eligibility of California Indian Country:
  - "all California Indian Country as defined in 18 United States Code Section 1151, with the exception of privately held in-holdings, which are defined as non-Indian owned fee land located within the exterior boundaries of California Indian Country; in the event of multiple owners, such land shall be considered Indian owned if at least one owner is a tribe or tribal member, regardless of the use of the land."

**POU-S4A** will:

- Engage in outreach and co-development, listening sessions, and develop a Tribal Engagement and Inclusion Plan during the program planning phase
- Encourage tribal participation during the planning phase to develop program requirements in partnership with tribes for greatest impact
- Offer funds for the deployment of tribal led solar and storage projects (including microgrids), filling the gap of existing state and utility programs.

**Strategy for Customer Acquisition and Management:** Electric IOUs and Community Choice Aggregators can be directed by the CPUC to develop an outreach plan to make customers aware of the programs and of the availability of TA offerings provided under **IOU-S4A Community Solar**. The **POU-S4A** program will require participants to implement best practices as a condition for funding. **IOU-S4A** and **POU-S4A** Community Solar programs can consult the joint agency (between CPUC and CEC) Disadvantaged Community Advisory Group (DACAG) to receive input on appropriate tactics. The DACAG was formed to ensure that disadvantaged communities, including tribal and rural communities, benefit from proposed clean energy and pollution reduction programs.

Under **IOU-S4A Community Solar**, it is anticipated that each implementing utility will create annual marketing plans. **IOU-S4A SOMAH** creates an annual marketing education and outreach plan which is distributed to its own Advisory Council, the DACAG, and to proceeding stakeholders distribution list for feedback before being finalized. Outreach plans include reaching LIDAC, Tribal, disadvantaged business enterprises to participate in the programs and access workforce development opportunities. Typical tactics include participating in industry events or conferences, building a contact list for email outreach, or targeted online ads. **IOU-S4A-Community Solar** will also leverage the Tribal Outreach Consultant and consider prioritization of projects that take advantage of the federal Indian Lands Low Income Communities Bonus Credit (LICBC), a tax credit, during the planning period.

For the **POU-S4A,** the CEC plans to work with POUs during the planning year to determine opportunities to leverage existing need-based programs or other utility programs for the purpose of alerting eligible participants to the availability of this program.

The investments made under **RWP-S4A** are structured to ensure local stakeholder engagement and ensure that worker and disinvested community voices are included throughout the planning and development phase. **RWP-S4A** staff, and the TA provider, will also support grantees in developing outreach and engagement strategies to ensure they reach diverse groups of training participants.

Any work directly solicited by the California administering agencies will follow protocols for open and fair solicitations that seek to increase participation from priority groups.

Additional steps to realize entrepreneurial support are covered in the sections under *Tribal Engagement* and *Meaningful Engagement with Stakeholders*.

## Section 3:  Fiscal Stewardship Plan

The state entities administering the actions within **CA-S4A** ("coalition members") will develop the final fiscal stewardship plan during the planning period and incorporate it into the interagency agreements which permit the flow of funds between state agencies. The coalition members (CPUC, CEC, and  the California Labor and Workforce Development Agency (LWDA) will design the fiscal stewardship plan to ensure program administration prioritizes reducing waste, fraud, and abuse, building robust infrastructure for program oversight, investing in consumer protection, and incorporating guardrails to ensure programs achieve desired impact.

The fiscal stewardship plan for **CA-S4A** will address applicable state and federal requirements, including 2 CFR § 200.303 and 2 CFR § 200.332(b), to track, manage, and report on funding through well-developed processes and systems and employ a robust risk management processes developed through existing programs to deliver funds as effectively and efficiently as possible, while also preventing fraud, waste, and potential mismanagement of grant funds. The state agencies are bound by the same federal and state laws regarding solicitations, ethics and conflicts

of interest, disadvantaged business engagement, and whistle blower protections. The coalition will align standards, where they might differ from the below, for financial reporting frequency and metrics collection to support S4A grant terms and conditions.

*Competitive Vendor Solicitations:* All third-party program administrators and implementers, and, if applicable, program applicants, will be required to provide sufficient information demonstrating their management and financial capacity to implement the grant and/or provide fiscal sponsorship for program participants, as well as the ability to conduct all applicable coordination, community outreach, evaluation, and reporting components critical to the grant. State of California runs its solicitations through the Department of General Services (DGS). Statutory authority for purchasing all goods and services for State government resides with the control agency. Non-IT Services are overseen by the DGS Office of Legal Services. Non-IT Goods and Leveraged Procurement Agreements (LPAs) are overseen by the DGS Procurement Division. The Executive Director of CPUC has signature authority for all CPUC Non-IT Contracts and Procurements. CPUC information Technology goods and services purchases are procured by the CPUC Information Technology Services Division in alignment with DGS guidelines.

*Ethics and Conflict of Interest:* All staff involved in procurement activities are expected to act responsibly, ethically, honestly, avoid wasteful practices, and to observe a high level of moral conduct. In accordance with Public Contract Code (PCC) 10410, employees of CPUC involved in the procurement process, whether directly or indirectly, are expected to be free of conflict of interest or relationships that are actually or potentially detrimental to the best interest of the State. CPUC employees are prohibited from participating in any part of the contracting process, including being a member of an evaluation team, if they have a financial interest in the outcome of a contract. CPUC employees cannot accept directly or indirectly any gifts of value from anyone who is doing or seeking to do business with CPUC. It is illegal for any State employee to use their position to bestow any preferential benefit on anyone related to them by family, business, or social relationship.  For goods purchases, CPUC procurement staff fill out a Conflict-of-Interest Statement that is kept on file for each purchase. For service contracts, CPUC Contracting Unit staff and any other CPUC employees involved in the evaluation process must fill out and sign a Conflict-of-Interest Statement for any competitive purchase. These standards will be extended to sub-awardees and subrecipients as part of S4A related interagency agreements.

All purchasing files are to be maintained in a confidential manner. Access to purchasing files is restricted to P&C staff or other CPUC employees authorized by P&C management. Any disclosure of confidential information by a State employee during the purchasing process is a basis for
disciplinary action. Total confidentiality during the process is vital to preserve the integrity of the process.

*Small Business and Disabled Veteran Business Participation:* Pursuant to State law, CPUC must offer procurement and contracting opportunities to California certified Small Businesses (SB), and Disabled Veteran Business Enterprises (DVBE) whenever possible. The CPUC has an annual statewide participation goal of not less than twenty-five percent (25%) for SB and not less

than three percent (3%) for DVBE in reportable purchases. To meet these goals CPUC uses a SB/DVBE First Policy to prioritize purchasing and awarding to SB/DVBE firms. The State offers SB Contractors a preference and DVBE Contractors an incentive in competitive solicitations, giving them an advantage over Non-SB or Non-DVBE businesses as a method of increasing SB/DVBE participation. These incentives or preferences are specified and included in CPUC's solicitation. This incentive or preference is used only for evaluation purposes, any contract awarded will be in the amount of the Contractor's actual submitted cost.

*Whistleblower Protections:* In addition, all coalition members and entities interacting with recipients of **CA-S4A** funding will be subject to the protections under the robust federal and state legal framework for confidential reporting and whistleblower protections, including the California Whistleblower protection Act, California Labor Code Section 1102.5, Government Code Section 12653, and Dodd-Frank Wall Street Reform and Consumer Protection Act.

Interagency Agreements: The CPUC will draft separate agreements with each agency partner – CEC and EDD. The agreements will restate the grant terms and conditions, the workplan, the fiscal stewardship plan, and will allow for the exchange of confidential and/or deliberative material in support of reporting and/or procedural requirements. During the planning period these agreements will be finalized. The fiscal stewardship plan will include processes for dispensing funds and reporting. The EPA's quality management and quality assurance requirements make for natural checkpoints that the agencies will need to collaborate on to satisfy. Beyond the EPA requirement, we expect the agency staff to meet regularly and that the vendors supporting each agency partner (with grant compliance) will also be in communication to align schedules and data quality.

The CPUC and CEC have an existing memorandum of understanding that allows the agencies to coordinate on confidential legal and policy matters. As this is already in-place, once the planning period commences there are no barriers for staff coordination in navigating the outstanding policy issues identified for the planning period in the prior sections.

## 3.1 Consumer Protections

Any program implementer having direct interaction with residential utility customers will be required to abide by certain practices to protect consumers against unfair, deceptive or abusive practices in compliance with consumer financial laws. CA-S4A will abide by the consumer protection requirements terms of the SFA grant to comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply; provide plainly written disclosures (regarding purchasing, leasing, financing other costs, construction liens, consumer rights, key contact information, etc.); require all in-person and marketing will be conducted in a language that consumer can understand; and maintain a process for handling and referring complaints.[19] As described below, most of these requirements are already available or will be required to cover gaps.

---

[19] SFA Terms and Conditions, Additional Terms and Conditions, M. Consumer Protection Requirements

The CPUC has a California Solar Consumer Protection Guide.[20] Solar providers submitting applications to interconnect residential solar customers in the service areas of Pacific Gas and Electric Company (PG&E), Southern California Edison (SCE), San Diego Gas & Electric (SDG&E), Bear Valley Electric Service (BVES), and PacifiCorp are required to collect customer initials and a signature on the California Solar Consumer Protection Guide. The CPUC recommends that solar providers give out this guide during their first contact with potential customers. The Consumer Protection Guide is available in nine languages. The Consumer Protection Guide covers solar system basics, dispels common myths, explains consumer rights, low-income programs, and contact information at the utilities.

The CEC will require use of the California Solar Consumer Guide or require an equivalent, mandatory consumer guide for **POU-S4A** grants delivering rooftop solar for residential customers. No additional or new guide would be required if the POU territory already has one available and in use. If using the CPUC California Solar Consumer Guide directly, the POU will add a coversheet explaining where their billing systems or solar policies differ from the investor-owned utilities. CEC will require winning grants to provide such a guide to customers.

Programs are designed to ensure customers have a choice of pre-vetted solar installers and to allow customers to receive multiple bids. Project audits are part of this process, with program administrators conducting project audits to ensure project completion prior to issuing final incentives. Additionally, there will be minimum requirements for product and workmanship warranties, as noted above, to correct any defects or performance shortfalls. **IOU-S4A SOMAH** already includes these additional protections, and **POU-S4A** will include these as mandatory, minimum requirements for grant applicants.

California's Contractors State Licensing Board (CSLB) handles consumer affairs complaints, including those against solar project installers, as this agency issues the licenses by which contractors are permitted to install renewable energy facilities (solar and storage).[21] This information is also included in the California Solar Consumer Protection Guide.

CPUC's Consumer Affairs Branch is available to handle consumer complaints against the IOUs that the CPUC regulates. If issues arise such as problems with interconnection, solar plan billing or metering that the customer is not able to resolve directly with their utility, they are able to contact CPUC Consumer Affairs by phone or online to receive support.[22] CPUC also shares essential contact information on filing complaints directed to customer generators on its website.[23]

---

[20] The Consumer Protection Guide is available at:
https://www.cpuc.ca.gov/solarguide/#:~:text=The%20California%20Public%20Utilities%20Commission%20(CPUC)%20presents%20the%20California%20Solar
[21] More information at
https://www.cslb.ca.gov/OnlineServices/ConstructionComplaint/ComplaintFormProcess.aspx
[22] More information online at https://www.cpuc.ca.gov/about-cpuc/contacting-the-puc and https://www.cpuc.ca.gov/consumer-support/file-a-complaint
[23] More information at https://www.cpuc.ca.gov/industries-and-topics/electrical-energy/demand-side-management/customer-generation/resources-for-solar-customers

Sub-awardees and other S4A funding recipients will need to share references to these CPUC and relevant CA state agency resources or generate matching materials to be dispersed to potential program applicants.

*Audits of Vendors (Consultants and Program Administrators):* **CA-S4A** Coalition partners will conduct periodic audits and spot checks of program partners or other entities that directly interact, transact or contract with customers to ensure that customers' rights are protected. Program administrators and implementers, as well as program recipients will be required to ensure all records, physical and electronic, are collected regularly and adequately protected from loss, damage, or destruction for possible audit(s), and that a designated representative will have the right during normal business hours to review and to copy any records pertaining to the performance of the agreements issued through **CA-S4A**. These release of information requirements will come in different forms – consultants and program implementers will incorporate these requirements into their contracts and agreements with state agencies; and recipients of incentives must agree to disclose certain information to participate in the programs and receive assistance or incentives. Performance audits may include a performance evaluation to assess if household savings are materializing for program beneficiaries. For example, on a weekly or monthly cadence, CPUC requires program administrators (including IOUs) to report project progress data and administrative cost information to public repositories – publishing reports, as outlined in the Reporting Plan, to the CPUC website and archives. The CPUC uses program evaluation vendors to independently assess program spending and review that it was used appropriately, including auditing the program administrator expenses. Financial auditing occurs during the regular course of payment and may also be included in an independent assessment from a program evaluator.

For multifamily properties, **IOU-S4A SOMAH** already requires property owners to share essential information about solar billing and expected changes to their future electrical bills after a solar system is interconnected. **IOU-S4A SOMAH** runs a hotline telephone service that can be accessed by tenants as well. **POU-S4A** will consider such best practices when scoring grants that wish to target and treat multifamily properties with rooftop solar. Not only are disclosures to property owners important prior to solar installations, but programs can help to close the information gap between landlords and tenants with additional educational materials. In compliance with the CPUC's regulations, each of the three large IOUs (Pacific Gas & Electric, San Diego Gas & Electric, and Southern California Edison) are working to improve the readability of monthly billing statements to aid customer understanding of electricity bill changes post-solar. Billing systems upgrades are a large, infrastructure investment, so while these updates will become available for most Californians served by the three largest IOUs, this update is not required or mandated for other utilities. **POU-S4A** will determine in the planning period whether to ask applicants to describe solar credit bill presentment in their applications. The tradeoff being while this may improve the billing experience, it does not add to program uptake.

As part of its administration, CPUC will hire a consultant with federal grant expertise to prepare and execute our semi-annual transactions and progress reporting.

**CA-S4A** has sought to install meaningful consumer protections and increased accessibility in line with federal E.O 13166: Improving Access to Services in the design of all programs as outlined in the Financial Assistance Strategy.

## Section 4: Timeline and Milestones

As described in earlier sections, the **CA-S4A** coalition of agencies, led by the CPUC, each have a commitment to working with a diverse group of stakeholders in its planning and implementation.

*Resources for expanding regulatory stakeholders:* As a public agency, the CPUC depends on input, questions, and feedback from the general public, including industry. By hearing from different perspectives, the CPUC is better able to make informed decisions that consider the impact of utility costs and services on all Californians. The Public Utilities Code allows qualified parties in proceedings before the CPUC to request compensation for their participation. The Intervenor Compensation Program is intended to ensure that individuals and groups that represent residential or small commercial electric utility customers have the financial resources to bring their concerns and interests to the CPUC during formal proceedings.[24] This is available for all milestones and tasks related to regulatory proceedings described below.

*Increasing diverse perspectives:* The CPUC and CEC both can receive support from a joint committee, called the Disadvantaged Communities Advisory Group (DACAG). The DACAG is an 11-member group that meets several times a year to review CPUC and CEC clean energy programs and policies to ensure that disadvantaged communities, including tribal and rural communities, benefit from proposed clean energy and pollution reduction programs.[25] Its three guiding principles (increase access to clean energy technologies, maintain or enhance affordability of energy services, and increase benefits of programs in disadvantaged communities) strongly connects to the objectives of this S4A work. The DACAG is an independent advisory body.

*Incorporating equity:* The CPUC adopted an Environmental, Social, and Justice (ESJ) Action Plan which has nine main goals guiding the CPUC's mission to regulate essential utility services to protect consumers and safeguard the environment, assuring safe and reliable access to all Californians. The ESJ Action Plan works in accordance with the CPUC's institutional values of accountability, excellence, integrity, open communication, and stewardship. The goals are:

1. Consistently integrate equity and access considerations throughout CPUC proceedings and other efforts
2. Increase investment in clean energy resources to benefit ESJ communities, especially to improve local air quality and public health.
3. Strive to improve access to high-quality water, communications, and transportation services for ESJ communities.
4. Increase climate resiliency in ESJ communities.
5. Enhance outreach and public participation opportunities for ESJ communities to meaningfully participate in the CPUC's decision-making process and benefit from CPUC programs.
6. Enhance enforcement to ensure safety and consumer protection for ESJ communities.

---

[24] More information available at: https://www.cpuc.ca.gov/proceedings-and-rulemaking/intervenor-compensation
[25] More information available at:
https://www.cpuc.ca.gov/dacag/#:~:text=The%20CPUC%20and%20the%20California%20Energy%20Commission%20on%20August%201,

7. Promote high road career paths and economic opportunity for residents of ESJ communities.
8. Improve training and staff development related to ESJ issues within the CPUC's jurisdiction.
9. Monitor the CPUC's ESJ efforts to evaluate how they are achieving their objectives.

For S4A Coalition work, here is an overview of key tasks by year, and quarter.

| Timeline of Tasks + Milestones | | |
|---|---|---|
| Year | Program, Description of Task or Milestone | Estimated Time Period |
| Year 1 | Grant Period Begins | May 24, 2024 |
| | Quality Management Plan & Quality Assurance Project Management Plan | Due 90 days after first amendment |
| | Revised Workplan and Budget to EPA | November 30, 2025 |
| | Planning Period | From Q4 2024 until Q4 2025 |
| | Planning Period - POU-S4A | |
| | CEC participates in CA-S4A Kick-Off Workshop | (Q4 2024 – Q1 2025) |
| | Scoping Workshops, Stakeholder meetings, Tribal Co-development, Consultation, Engagement, and listening sessions | (Q4 2024 - Q1 2025) |
| | Develop Tribal Engagement and Inclusion Plan | (Q4 2024 – Q4 2025) |
| | CEC Drafts Solicitation Manual | (Q1-Q2 2025) |
| | Draft solicitation released; host public workshop and solicit public comment | (Q3 2025) |
| | Milestone: CEC releases final solicitation package; Notice of Funding Availability (NOFA); applications open.<br>• CEC encourages selectees to use community benefit agreements (CBAs) | (Q4 2025). |
| | CEC provides technical assistance to interested POUs to develop siting plan or requirements to include as part of their procurement documentation and should include the following elements if applicable: climate hazards, greenspace, pollinators, building resilient assets, and agrivoltaics (as requested) | TBD |
| | CEC establishes agreements with POUs to share customer billing data (as needed). | TBD |
| Year 1 | Planning Period - IOU-S4A SOMAH | From Q4 2024 until Q4 2025 |
| | CPUC hosts CA-S4A Kickoff Workshop | (Q4 2024 – Q1 2025) |
| | CPUC integrates IOU-S4A program elements via established processes | (by Q4 2025) |

| | | |
|---|---|---|
| | Program administrator will request to revise key program oversight documents | (by Q4 2025) |
| | Advisory Council and Job Training Taskforce engaged | Quarterly |
| | IOUs submit compliance regulatory documents to implement directives (if directed by the CPUC). | TBD |
| | Program administrator will educate contractors and interested applicants on eligibility for additional funds.<br>• Host at least one contractor education webinar on new measures (by Q4 2025)<br>• Incorporate S4A education into existing Public Forums (typically Q2 and Q4 each year) | Various |
| | Marketing, Education, and Outreach plan will include notification of new funding (typically finalized by February of each year). | Annually |
| | Program administrators amend application processes to accommodate requests for new funding and review applications. Program may begin to deploy financial assistance. | Q1 – Q3 2025 |
| | CPUC addresses master-metered property treatment in a regulatory proceeding. | TBD |
| | Milestone: SOMAH **IOU-S4A** funds are reservable, at the Reservation Request phase of an application. | Q2 or Q3 2025 |
| | Milestone: SOMAH **IOU-S4A** funds are available for projects at the final incentive phase of an application. | Q3 or Q4 2025 |
| **Year 1** | **Planning Period - IOU-S4A Community Solar** | From Q4 2024 until Q4 2025 |
| | CPUC hosts **CA-S4A** Kickoff Workshop | Q4 2024 – Q1 2025 |
| | CPUC adopts the first of two decisions on community solar programs on May 30, 2024, pursuant to AB 2316. | (by Q3 2025) |
| | Milestone: CPUC adopts second of two decisions finalizing outstanding program design and implementation details in early 2025. | Q1 – Q2 2025 |
| | IOUs and CCAs develop websites, customer enrollment, billing and other systems necessary for program launch. | Q3 – Q4 2025 |
| | CPUC hires financial services consultant to provide tax credit monetization consultant for non-profit property owners. | By Q3 2025 |
| | CPUC integrates **IOU-S4A** amendments to the program(s) via established processes.<br>• CPUC encourages selected developers to use | By Q4 2025 |

| | | |
|---|---|---|
| | community benefit agreements (CBAs).<br>• IOUs and CCAs to develop siting plan or requirements to include as part of their procurement documentation and should include the following elements if applicable: climate hazards, greenspace, pollinators, building resilient assets, and agrivoltaics. | |
| **Year 1** | **Planning Period - RWP-S4A** | From Q4 2024 to Q4 2025 |
| | EDD and Labor Department participates in **CA-S4A** Kick-Off Workshop | Q4 2024 – Q1 2025 |
| | Engage with CEC and CPUC to understand any labor workforce gaps to consider whether adjustments are feasible. | Q1 2024 – Q2 2025 |
| | Review training options in LIDAC geographic areas to assess availability and access. | By Q3 2025 |
| | RWP guidelines updated to include Solar for All sub-fund upon execution of Solar for All grant agreement | By Q3 2025 |
| | Application solicitation for regional hub grantees are received. | By Q3 2025 |
| | Program team provides TA to regional hub applicants, including supporting coordination amongst local entities to develop or expand workforce development and training programs. | Q3 – Q4 2025 |
| | Milestone: Regional Hub grants awarded. Grant agreements and contract processing. | By Q1 2026 |
| | Milestone: Regional hub grant period of performance begins.<br>• Program team provides TA to regional hub awardees, including support in developing training curriculum and facilitating networking and best practice sharing between hubs.<br>• Develop guidelines with partner feedback for Training & Implementation funds. | TBD |
| **Years 2 - 5** | **Implementation Grant Period** | Q1 2026 through Q2 2029 (April 30, 2029) |
| **Years 2 - 5** | **Implementation Grant Period - POU-S4A** | |
| | Round 1 Applications Due | (Q1 2026) |

| | | |
|---|---|---|
| | CEC reviews, scores, approves tentative awards; approves at business meeting. | (Q2 2026) |
| | CEC approves awards. | (Q2 2026) |
| | CEC executes grant agreements with Round 1 awardees; manage agreements through term of grant. | Starting in Q3 2026) |
| | Public workshops for Round 2 solicitation. | (Q3 2026). |
| | Incorporate public feedback, lessons learned; draft and finalize Round 2 solicitation package | (Q3-Q4 2026) |
| | Round 2 NOFA released. | (Q4 2026). |
| | Education and Outreach | (Q4 2026). |
| | S4A Coalition-building<br>• Liaise with RWP S4A on training opportunities.<br>• Annual S4A meeting to share wins, lessons learned, and shared challenges. | On-going |
| | Round 2 Applications due and CEC reviews, scores, approves awards. | Q1 – Q2 2027 |
| | CEC executes grant agreements with Round 2 awardees; manage agreements through term of grant | (Q2 2027 – Q2 2029) |
| | Continuous grant management, collection of progress reports, outreach and engagement with stakeholders and grant recipients | (starting in Q3 2026) |
| | If additional funding is unencumbered: Incorporate lessons learned, draft and release round 3 solicitation, approve awards, etc. | (starting in Q3 2027). |
| **Years 2 - 5** | **Implementation Grant Period - IOU-S4A (Community Solar)** | |
| | CPUC integrates **IOU-S4A** program elements via established processes. | Q1 2026 through Q1 2027 |
| | Program Administrators (**IOUs** and participating community choice aggregators) will request to revise key program oversight documents. | Q1 2026 through Q1 2027 |
| | IOUs submit compliance regulatory documents to implement directives. | As Directed |
| | Program administrator will educate contractors and interested applicants on eligibility for additional funds. | Q3 2026 through Q2 2029 |

| | | |
|---|---|---|
| | Marketing, Education, and Outreach plan will include notification of new funding | Annually |
| | Program administrators amend application processes to accommodate requests for new funding and review applications. Program may begin to deploy financial assistance | Q3 2026 through Q2 2029 |
| | Upon completion of solar developments, IOUs conduct auto-enrollment in Community Solar tariff to receive bill discounts. | Q3 2026 through Q2 2029 |
| | CPUC reviews progress reports and data collection. | Monthly through Q2 2029 |
| | Annual S4A meeting to share wins, lessons learned, and shared challenges. | Annually through Q2 2029 |
| **Years 2 - 5** | **Implementation Grant Period – IOU-S4A SOMAH** | |
| | Program Administrator and community-based organizations conduct outreach and marketing on an ongoing basis | Q1 2026 through Q2 2029 |
| | Program Administrator offers technical assistance to potential projects as requested. | Q1 2026 through Q2 2029 |
| | Subsidies distributed to program beneficiaries upon meeting project milestones on an ongoing basis | Q1 2026 through Q2 2029 |
| | Program Administrator tracks S4A progress in semi-annual reports throughout the grant period. | Q1 2026 through Q2 2029 |
| | Continued engagement with Advisory Council and Job Training Advisory Group throughout the grant period. | Q1 2026 through Q2 2029 |
| | | |
| | CPUC reviews progress reports and conducts data collection. | Monthly and Semi-Annually |
| | In 2026 and 2029, CPUC will evaluate the program and issue reports to the Legislature per Public Utilities Code 913.8 and 2870. | July 2026 & July 2029 |
| | Annual S4A meeting to share wins, lessons learned, and shared challenges. | Annually through Q2 2029 |

| Years 2 - 5 | Implementation Grant Period – RWP-S4A | |
|---|---|---|
| | TBD in the planning phase | Q1 2026 through Q2 2029 |
| | Annual S4A meeting to share wins, lessons learned, and shared challenges | Annually through Q2 2029 |

See the following section for a timeline of more in-depth reporting requirements.

## Section 5:  Reporting Requirements

California will utilize credible methodologies for measuring program outputs and outcomes.[26] The state will leverage the annual reporting process, as well as the other reporting touchpoints described below, to continuously assess how program impact measurement can be made more precise. As per the grant Terms and Conditions, California agrees to provide performance reports and transaction-level and project-level data. As lead grantee, CPUC will use its administrative budget to hire additional support staff and/or consultants to delivery timely and complete reports and information requests.

The following metrics, at a minimum, will be included in all future reporting:

| **Climate and Air Pollution Benefits** |
| --- |
| Solar Capacity Installed (MW) |
| Number of Projects Financed (#) |
| Storage Capacity Installed  (MWh) |
| Clean Energy Generation (MWh) |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) |
| Other Air Pollution Reduced and Avoided (Nitrogen, Dioxide, Ozone, etc.)  SO2 (lb); NOX (lb); PM2.5 (lb); VOCs (lb); and NH3 (lb) |
| **Equity and Community Benefits** |
| Number of Households Benefitting from Projects (#) |
| Amount of Household Savings Delivered ($) |
| Average Savings per Household Benefitting ($) |
| Average Electricity Bill  in California ($) |
| Average Savings per Benefitting Household (%) |
| Workers Trained by Workforce Development Programs (#) |
| Projects Executed Using Tools to Promote Good Jobs and Community Benefits (#) |
| Investments in or in partnership with disadvantaged business enterprises (#) |
| Number of households with resiliency benefits (#) |
| Clean energy capacity owned by communities in direct ownership models (MW) |
| Number of solar jobs created (#) |
| Average percentage point reduction in disparity in energy burden b/w low-income and non-low-income households due to Solar for All benefit (%) |
| Average increased wages for individuals working in solar energy  (%) |
| **Market Transformation Benefits** |
| Grant Funds Deployed ($) |
| Financial Assistance Deployed ($) |
| Total private sector financing mobilized alongside projects funded directly by Solar for All ($) |
| Number of community-based organizations engaged by Solar for All services (#) |

---

[26] An updated version of the Impact Metrics spreadsheets can be provided.

The administering state agencies will communicate expectations and reporting requirements to all subrecipients and agree to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The agencies have the following plans for executing on the anticipated federal reporting requirements through enhancements to established infrastructure and capacity:

*CEC:*
As a component of grant management, grant and incentive recipients comply with the established program reporting requirements including regular check in calls, quarterly progress reports, and periodic reviews and requests for information. CEC receives project-specific information via regular reporting, including information about partnership building, project successes and challenges, and the environmental and community benefits of project activities as applicable (e.g., energy savings, GHG reduction, etc.). The CEC will establish reporting protocols and activity dashboards as the programs are developed, and all federal requirements will flow to recipients. The CEC may have a contractor to support its efforts to ensure all federal requirements are met by both the CEC and its recipients receiving federal funding.

*CPUC:* The CPUC has existing reporting requirements and timelines driven by state statute or Commission direction, which will support and inform the EPA's annual reporting process. The CPUC requires each of its programs to be evaluated periodically by an independent, external evaluator. Additionally, the CPUC will issue data requests to regulated entities and implementers to align reporting periods with Solar for All award reporting requirements. As part of its Solar for All award planning phase, the CPUC can formally direct compliance with reporting or data collection through its proceedings. Evaluators of incentive programs are expected to meet the standards set forth in the Commission's "California Energy Efficiency Evaluation Protocols" guidelines. The Protocols cover several types of evaluation efforts, such as impacts, market effects, and process evaluations – with the primary goal to specify acceptable evaluation approaches and the operational environments in which evaluations are conducted. The methodologies for measuring the outputs and outcomes central to the EPA Solar for All objectives are pre-established in these Protocols. These reports go through a public comment period, including public webinars. Final reports are made available on the CPUC webpage and archived online. CPUC often leads a "Response to Recommendations" process where select evaluation recommendations are accepted and implemented; this process has a public review and comment period and the final plan is published on the CPUC website.

*EDD:* As a component of grant management, EDD grant recipients comply with the established program reporting requirements including semi-annual and closeout narrative reports, monthly check in meetings, and periodic reviews and requests for information. Information requests are made by contracted TA providers or program evaluators, with project data and impacts uploaded online to a portal hosted by the state on a quarterly basis. The EDD will leverage CalJOBS$^{SM}$, the case management system that tracks participants characteristics including barriers, services, received, project progress, and employment and training-related outcomes. EDD also receives project-specific information via regular narrative reporting, including information about partnership building, and project successes and challenges. The **RWP-S4A** will include reporting

requirements that allow for the collection of output and outcome data related to the federal Solar for All objectives and outlined in the Impact Assessment – submitted through the portal quarterly and periodically via narrative reporting. As part of the program evaluation, EDD will work with the evaluator to share program data as necessary.

As provided in the Terms and Conditions for the award, as the administering agencies we agree to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. As stated above, the administering agencies agree to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. CPUC will hire a federal grant expertise expert to support on these deliverables.

**Timeline of Reporting Requirements**

| Reporting | Anticipated Start Date | Anticipated Completion Date |
|---|---|---|
| Draft QMP and submit to EPA for Approval (within 90 days of the first amendment) | 1/1/2025 | 3/30/2025 |
| Draft QAPP and submit to EPA for Approval (within 90 days of the first amendment) | 1/1/2025 | 3/30/2025 |
| Revised Workplan | | 11/30/2025 |
| MBE/WBE Reporting: EPA Form 5700-52A Annual Report Submitted (when the combined total of funds budgeted for procuring supplies, equipment, construction or services exceeds the Simplified Acquisition Threshold) | | 10/30/2024, 10/30/2025, 10/30/2026, 10/30/2027, 10/30/2028, 10/30/2029 |
| Submit Interim Federal Financial Report (SF425) annually | | Annually |
| Submit Final Federal Financial Report | 01/01/2029 | 04/30/2029 |
| July 1-December 31 2024 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2024 | 1/30/2025 |
| January 1-June 30 2025 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2025 | 7/30/2025 |
| July 1-December 31 2025 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2025 | 1/30/2026 |
| January 1-June 30 2026 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2026 | 7/30/2026 |
| July 1-December 31 2026 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2026 | 1/30/2027 |

| | | |
|---|---|---|
| January 1-June 30 2027 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2027 | 7/30/2027 |
| July 1-December 31 2027 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2027 | 1/30/2028 |
| January 1-June 30 2028 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2028 | 7/30/2028 |
| July 1-December 31 2028 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2028 | 1/30/2029 |
| January 1-April 30 2029 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 01/01/2029 | 04/30/2029 |
| Post-closeout program strategy Submitted Prior to Program Closeout | 10/1/2028 | 01/01/2029 |
| Final Report submitted | 01/01/2029 | 04/30/2029 (or up to 120 days after) |
| Review approved QMP annually | | Annually |
| Review approved QAPP annually | | Annually |

## 5.1 Performance Reports

**Semi-Annual Report**

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

**Final Report**

CA S4A coalition agencies agree to submit a final report in a format conducive for immediate public consumption. The final report will contain required detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the implementation of CA's EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, CA S4A will detail its program strategy and plans for performance reporting under the Closeout Agreement. The following broad, non-exhaustive elements will be in the final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

CA S4A (CPUC) agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 5.2 Transaction-Level and Project-Level Data

CA S4A coalition partners agree to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). CA S4A agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

Additionally, it is agreed to submit the data securely and to use the Environmental Information Exchange Network or EPA's Central Data Exchange to ensure connections meet the EPA security requirements. This will apply to collecting and managing environmental data.

# Section 6:  Budget Narrative

## 6.1 Overall Project Budget

| Budget Item[27, 28,29] | | Cost |
|---|---|---|
| Total Personnel | | $8,097,264 |
| Total Fringe Benefits | | $2,483,495 |
| Total Travel, Supplies, and Equipment | | $69,000 |
| Total Contractual | | $4,314,187 |
| Total Other (including Financial Assistance and DOE In-Kind Assistance) | | $233,416,054 |
| | | |
| Total Direct Costs | | $248,380,000 |
| Total Indirect Costs | | $1,420,000 |
| | | |
| **Total** | | **$249,800,000** |

*Covers **CA-S4A** Coalition: CPUC, CEC and EDD Budgets.*

| Total Budget By Activity Bucket | | |
|---|---|---|
| Financial Assistance | Administration (Including Contractual and Indirect Costs) | Technical Assistance |
| $233,280,000 | $14,205,815 | $2,314,185 |
| 93.39% | 5.69% | 0.93% |

*Covers **CA-S4A** Coalition: CPUC, CEC and EDD Budgets.*

*The Budget will be fully used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.[30]*

---

[27] As noted in SFA Terms and Conditions, National Terms and Conditions, E. 'In-Kind Assistance', there is $400,000 of in-kind assistance from the Department of Energy (DOE) which may be used for, but is not limited to, convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist CA S4A coalition agencies.

[28] SFA Terms and Conditions, National Terms and Conditions, Section G.1 Leveraging, "The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan."

[29] SFA Terms and Conditions, Additional Programmatic Terms and Conditions Section A. "Conflicts Among Authorities" *"any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the Federal Register, Executive Orders, and these award agreement terms and conditions."*

[30] SFA Terms and Conditions, Additional Programmatic Terms and Conditions, F. Low-Income and Disadvantaged Communities Expenditure Requirement

*The Budget will follow federal guidelines for the appropriate use of funds. The funds will not be used for unallowable costs, including:*

- *For subawards or contracts to non-profits: no transfers of funds to affiliated entities that may create conflict of interest risks*
- *For unions: grant funds may not be used to support or oppose union organizing*
- *For lobbying: grant funds will not be used for lobbying purposes, and incorporate restrictions from 2 CFR 200.450*
- *For ineligible projects: disallow activities that support deployment of projects that do not meet the EPA Solar For All definition of eligible zero-emissions technologies*
- *For intangible property: no costs for acquiring "intangible property," as defined in 2 CFR 200.1. Equity investments such as purchases of ownership interests in companies through acquisition of intangible personal property, as defined in 2 CFR 200.1*
- *For outside of EPA regions: no costs for deployment of projects outside of EPA regions*
- *For claims: no costs for defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the CA's compliance with the terms and conditions of the award agreement or (b) CA has obtained prior written approval from the EPA Project Officer.*

## 6.2 Personnel

**CPUC**

The Personnel costs include the cost-of-leave. It is processed as part of the regular payroll. Here is a table showing the new personnel and summary information:

| CPUC Personnel S4A Summary Table | | | | |
|---|---|---|---|---|
| **Job Title** | **Annual Salary or Other rate** | **Number of Personnel** | **Percentage of Time Assigned to the Program** | **Total Cost (Salary for Grant Years 1-5)** |
| Program Supervisor | Annual Salary | 1 | 100% | $830,000 |
| Public Utility Regulatory Analyst 5 | Annual Salary | 2 | 100% | $1,008,00 |
| Public Utility Regulatory Analyst 3 | Annual Salary | 3 | 100% | $1,212,000 |
| Associate Governmental Program Analyst | Annual Salary | 1 | 100% | $395,000 |
| Legal Division Attorney IV | Annual Salary | 1 | 100% | $805,000 |

Approximately $4.25 million will be utilized for personnel salary doing S4A program administration. Personnel costs include eight staff positions (detailed above), and fringe benefits for those full-time positions. Public Utilities Regulatory Analysts salaries and benefits are subject to a Bargaining Unit Master Agreement between the state of California and Service Employees International Union Local 1000. As noted in the Master Agreement, at the discretion of the direct supervisor, CPUC may annually elect to raise salaries based on performance (merit adjustment up to 5%).[31]

- Program and Project Supervisor: Plans and organizes the work and directs the staff of the new S4A section within Energy Division at the CPUC concerned with service, safety, certification, operations, tariffs, and coordinates the work of the section with others in the Division, as well as external agencies. Performs technical work relating to the oversight of the IOUs and S4A grant work.

- Public Utility Regulatory Analyst, Level 5: Positions at this level are intended to accommodate the broadest and the most advanced level of expertise. Develop and implement major studies or programs involving the coordination of regulatory disciplines with federal, statewide, or industry-wide policy implications. May exercise lead responsibility over professional subordinates and conduct workshops on difficult issues or direct major studies.

- Public Utility Regulatory Analyst, Level 3: The positions are characterized by independently performing complex, sensitive and responsible overview of S4A work which requires, on a regular basis, a high degree of knowledge, skill and ability. Under general direction, this position may develop original solutions, approaches and methodologies around regulation and grant implementation work.

- Associate Governmental Program Analyst: Under direction, this position provides support services such as program evaluation and planning, systems development, budgeting, and continually provides consultant services to management and others on the S4A team.

- Legal Division Attorney IV: This position requires the attorney to provide specialized legal advice and services, exercise broad discretion and independence in the most complex legal matters, work cooperatively with S4A team, coalition agencies, and grantees.

**CEC**
The proposed **POU-S4A** has a total budget $30M. The budget will be allocated across financial assistance (83%), technical assistance (4%), administration (11%), and indirect costs (2%). Financial assistance ($25 million) will be awarded to LIDAC residents of POU territory as well as tribes in the same territory. In the original **CA-S4A** application, the proposed administrative budget was approximately 7%. The revised down-scoped Workplan Budget for

---

[31] https://www.calhr.ca.gov/state-hr-professionals/Pages/about-salaries.aspx#:~:text=After%20each%2012%20months%20of%20satisfactory%20performance%2C%20employees, annual%20performance%20appraisals%20of%20successful%20or%20better%20performance.

**POU-S4A** includes a larger share going to administration costs because the CEC still requires a minimum number of staff to feasibly administer a viable program. While the revised proposal reduces total staff for this program, the minimum staff deemed necessary for this program slightly increases the proportion of the budget going to personnel costs.

Approximately $3.2 million is set-aside for personnel and program administration. Personnel costs include five staff positions, and fringe benefits are included as part of staff salary:

- Program and Project Supervisor ($273,086 per year, 100% time). The Program Supervisor will perform program planning and oversight for the **S4A**-POU programs, which includes designing the programs, mentoring staff, and reviewing documents.
- Electric Generation System Specialist I ($200,691 per year, 100% time). The EGSS I will develop an implementation plan and general program design and develop, design the program applications and application review process, develop, and manage a database system to support the **S4A-POU** program, perform data analysis, write program guidelines and lead public communication and stakeholder processes.
- Energy Commission Specialist (ECS) I ($158,669 per year, 100% time). The ECS I will perform financial tracking and encumbrance accounting for the **S4A-POU** program, develop the grant agreement packages, review and approve invoices, develop program outreach and education materials.
- Two Energy Analysts ($114,976 per year, 2-year limited term). The Analysts will process applications, which includes reviewing applications, manage the call center, which includes responding to public inquiries and managing public emails, and perform data analysis which includes managing and updating datasets and developing program data statistics.

**EDD**
- The proposed **RWP-S4A** has a total budget of approximately $9.2 million with $8 million dedicated to support workforce training grantees. EDD staff costs cover 11 staff at partial time, including program, accounting and legal oversight.

## 6.3 Fringe Benefits

CPUC: For all staff, we compute fringe benefits as 53.46% of the total salary cost. The following table breaks down the services/allowances provided via the fringe rate. Cost of leave is a part of personnel costs.

| Staff Benefits (use rounded-to-thousands amount to calculate) | | |
|---|---|---|
| OASDI (Old Age, Survivors, and Disability Insurance Program) and Medicare | 6.2% OASDI<br>1.45% Medicare per SAM | 7.65% |
| Retirement | 26.31% per 2024-25 Retirement Rate in Budget Letter | 26.31% |
| Health | 15.18% (SAM) + 4.32% increase starting 01/01/2021 | 19.50% |

| Total Staff Benefits | 53.46% |
|---|---|

CEC: **POU-S4A** program does not plan on using funds for Fringe Benefits. Fringe benefits are included in personnel costs.

EDD: **RWP-S4A** includes total fringe benefits at $211,445.

6.4 Travel
Travel needs for inter-agency Solar For All coordination, outreach, education and conferencing are outlined below.

In California, exempt, excluded, and represented state employees may be eligible for the reimbursement of authorized out-of-pocket expenses that are reasonably, actually, and necessarily incurred as a result of conducting state business.[32] In accordance with current state policy, employees may be eligible to receive reimbursement for expenses such as:
- Method of travel (transportation)
- Meals and incidentals
- Short-term lodging
- Out-of-state travel
- Personal vehicle mileage
- Other actual and necessary business and/or travel costs incurred while conducting official state business

California Travel Reimbursement Policy as of January 1, 2024 permits the following rates:
- All employees should book travel with preferred vendors for flights, car rentals, hotels, etc.
- Total Daily Allowance for Meals and Incidental Expenses is up to $59/day
- Personal Vehicle Mileage Reimbursement Rate is $0.655/mile
- For relevant travel destinations to CPUC, CEC, or EDD offices, the maximum Lodging Rates are San Francisco $270/night, Sacramento $145/night, and Los Angeles $169/night. The general lodging rate is $107 per night unless otherwise specified.

All CA-S4A coalition partners must abide by the state's travel policies, unless where federal rules are more stringent than CA's existing regulations.

**CPUC**: Staff may be located at any office – San Francisco (HQ), Los Angeles, or Sacramento. All trips are expected to be in-state, unless EPA or DOE convenes Solar For All awardees elsewhere. Total grant period travel costs are $48,000.

CPUC S4A Planned Travel:
- All Staff not located at San Francisco Headquarters will be expected to travel 2x to San Francisco Headquarters Office for CPUC for 2 to 4 days. The location of staff will not be known until hiring is completed. Estimated travel is ~$1,600 per 4-day trip, per traveler

---

[32] More information on California Department of Human Resources state employee travel policies is here: https://www.calhr.ca.gov/employees/Pages/travel-reimbursements.aspx.

(estimated costs of $155 flight, $1,080 for lodging, $125 for local transportation, and $236 for meals and incidentals) for four days and ~$1000 per 2-day trip (estimated costs of $155 flight, $540 for lodging, $125 for local transportation, and $118 for meals and incidentals). Budget includes one traveler with a 4-day trip and a 2-day trip.

- All Staff will be expected to attend an annual S4A inter-agency meeting either in San Francisco or Sacramento. Total trips is 8 per year, and total travelers is also eight; this budget also includes funding for one traveler who is located more than 200 miles from the meeting location (see 2-day trip of ~$1,000 above and average car-based travel is ~$63/traveler including bridge tolls, $7 per span, and parking fees of $12 at CPUC HQ).

- Energy Division Staff will be permitted to attend ribbon-cuttings for S4A community solar or SOMAH projects, up to 1 per year for each staff person. Total trips are 8 per year, and total travelers are also eight. Site visits (at least 3 days) are expected to be more than 200 miles from a staff persons' home or office location (estimated costs of ~$800 per trip consisting of $175 flight, $321 for lodging, $125 for local transportation, and $177 for meals and incidentals).

- Energy Division Staff will be permitted to attend a relevant educational conference, up to 1 over the grant period, except Project and Program Supervisor who may attend 2 such conferences. Total trips are up to 9 over the grant period (from years 1-5), and total travelers are eight. Attendance will be based on relevancy to S4A work, determined by the Project and Program Supervisor. These estimated costs will be updated during the Planning Period.

- On an ad hoc basis, if there are speaking engagements about the program's implementation in-state travel will be covered. Estimated total trips are 1 per year with one traveler, a local engagement within 50 miles of the employee's office-base is estimated at $63 per trip with a one-day travel engagement more than 50 miles from the employee's office-base is ~$500 ($175 flight, $170 lodging, $100 local transport, and $88.50 for meals and incidentals).

**CEC**: Total grant period travel costs are $5,000 and are mostly anticipated to be use in the program planning phase for stakeholder outreach (including tribal engagement) via public workshops. We plan on conducting 3 workshops in geographically diverse parts of the state:

- Northern CA: 2-3 staff for a day trip to a Northern CA location. Primary cost is car rental and possible facility rental (staff intend to coordinate with local POU or tribal community for optimal facility). Estimated Cost: $500. Typical car rental + gas is <$150 for the day, plus up to $450 for facility rental if necessary.

- Central CA: This workshop may be hosted in Sacramento as it is already strategically located near larger POUs and some tribal stakeholders. This would incur negligible cost if hosted at CEC headquarters.

- Southern CA: Workshop possibly in LADWP (LA) territory. 2-3 staff, most likely 1 night at hotel, airfare, car rental, and meals. Estimated cost: $4,500. Roundtrip Flight cost ~$250 per person, overnight lodging in LA County is $169 per person, and Meal and Incidental cost is up to $59 per person per day. Total per person trip cost could be ~$550 not including car rental and gas, and possible facility rental.

- Any leftover travel budget would be intended for any additional off-site stakeholder outreach and engagement, potentially in the form of tribal listening sessions or co-development of program.

**EDD**: Travel will include onsite visits to training programs as well as attendance to interagency convenings. Meal and Incidentals costs are limited to $59 per day. Estimated number of trips is ~10 trips of 1-day, by personal car (at $49 for mileage reimbursement, $20 parking, and $14 bridge tolls) per staff services persons (count of 4), over the duration of the grant period.

## 6.5 Equipment

The CPUC will not purchase equipment with the S4A award. Equipment is covered separately.

The CEC does not plan on using funds for equipment. Equipment is covered separately.

The EDD does not plan on using funds for equipment. Equipment is covered separately.

## 6.6 Supplies

The CPUC does not plan on using funds for supplies.

The CEC does not plan on using funds for supplies.

The EDD does not plan on using funds for supplies.

## 6.7 Contractual

For all contractual services, the individual rates and total hours are components of the competitive bidding process (pursuant to DGS practices described above). As part of the solicitation request for bids package, CPUC will include federal rate caps in accordance with the Solar For All terms and conditions. The federal rate cap is set by the Office of Personnel Management (OPM). The components of rate and hours (total and per staff person) will be finalized during the planning period. For individual consultants, the rate cap is limited to the maximum daily rate for a OPM Level IV of the Executive Schedule, which is adjusted annually.[33] Contracts or subcontracts with multi-employee firms are not subject to the consultant compensation limit so long as the contractor or subcontractor selects, directs, and controls individual employees providing the consulting services.[34] All contracts below are planned to be fixed-price contracts through a sealed bid in alignment with California's current contracting policies.

---

[33] OPM Salary Table No. 2024-EX shows a Level IV annual maximum rate of $191,900, retrieved at: https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2024/EX.pdf. The method for calculating the hourly maximum daily rate is to (1) Divide the Level IV salary by 2087 to determine the hourly rate. Rates must be rounded to the nearest cent, counting one-half cent and over as the next higher cent (e.g., round $18.845 to $18.85) and (2) Multiply the hourly rate by 8 hours. The product is the maximum daily rate.

[34] 'Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements' (November 2022) at page 17, retrieved from: https://www.epa.gov/sites/default/files/2021-03/documents/best-practice-guide-for-procuring-services-supplies-equipment.pdf

| Contract Services | Amount | Duration |
|---|---|---|
| **_IOU-S4A Community Solar_** Modeling Support | $679,948 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes. | |
| | Description: Ongoing analytical work to research and quantitatively model program design options; recommend program design aspects; and measure impacts, realization rates, and bill savings. Part of _Meaningful Benefits Plan & Project Deployment Technical Assistance_ | |
| | Expertise: Winning bid will have extensive technical advisory experience on complex energy regulations in the renewable energy sector, with experience in California. | |
| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
| | Hours: Time to achieve the tasks is a component that will be competitively bid. | |
| **_IOU-S4A Community Solar_** Community Renewable Energy Program Evaluation Consultant | $300,000 | 1 year |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Develop a set of comprehensive program metrics, a program logic model, recommendations for the programs' data collection activities, provide answers to key program reporting requirements, and deliver an evaluation of the program's processes and recommendations for program improvement. Part of _Meaningful Benefits Plan, Financial Assistance Strategy, Equitable Access, and Project Deployment_ | |
| | Expertise: Winning bid will have extensive knowledge of program evaluation procedures and study methods and familiarity with the California Evaluation Framework and California Energy Efficiency Evaluation Protocols. | |
| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The | |

| | services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
|---|---|---|
| Semiannual Transactions, Projects, Progress Reporting and Davis-Bacon Act Wage Compliance Consultant | $800,002 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Provide ongoing analytical, administrative, and drafting support to ensure California's compliance with EPA's Solar for All reporting requirements. Project management assistance to synchronize existing regulatory and legislative program reporting with grant reporting. Davis-Bacon Act Wage Compliance will include federally compliant payroll record collection and support monitoring and enforcement.<br><br>Expertise: Winning bid will have in-depth knowledge of federal regulations, broad experience with federal reporting, analysis and data collection, and some knowledge of the California renewable energy sector and the EPA Solar For All funding opportunity.<br><br>Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
| ***IOU-S4A SOMAH***<br>Tax Credit Monetization Consultant for Non-Profit Property Owners | $450,000 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Concierge tax credit consulting for participating low-income affordable housing owners to monetize, transfer and convert unusable tax credits into cash for tax exempt entities (like non-profits, tribes and local governments) unlocked by recent changes pursuant to the Inflation Reduction Act. Part of *Financial Assistance Strategy*.<br><br>Expertise: Winning bid will have expertise in affordable housing finance and tax credit regulations, as well as financial markets. Broad experience offering financial services, including auditing and tax form services, will also be considered. | |

| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. |
|---|---|
| ***IOU-S4A Community Solar*** | $400,000 | 5 years |
| Tribal Outreach Consultant | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes |
| | Description: Provide Tribal outreach consulting complete with a deep knowledge of California's Tribal governance structures, and thorough critical cultural competence. Consultant will link together expertise of California's Tribal needs with CA-S4A clean energy program offerings. Combines comprehensive data sources and a centralized database of tribal market actors for outreach, education and technical assistance to drive potential solar development, close to transmission lines or on previously disturbed lands and avoiding protected lands, sensitive cultural resources and important wildlife habitat. Part of *Equitable Access and Meaningful Involvement.* |
| | Expertise: Winning bid will have broad knowledge of solar energy technology and existing relationships with California Native Tribes. |
| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. |

CEC

*Technical assistance ($534,237):* Technical assistance funding is allocated for targeted application outreach, assistance, and compensation for Tribes participating in the development of the engagement and inclusion plan. Winning bid will need to have expertise with solar and storage energy technologies and outreach experience with the same audiences that S4A targets. Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes.

*Compliance contracting ($700,000)*: The proposed **POU-S4A** budget includes limited funding for an annual compliance contracting services. Winning bid will need to have expertise with such services, including in-depth knowledge of federal regulations and familiarity with the energy sector. Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes.

EDD
*Technical Assistance ($250,000):* Technical assistance for outreach to target regions as well as to assist in amending existing programs to S4A projects as needed, or to establish new programs in targeted regions. Establish inclusive outreach to ensure that worker and disinvested community voices are included throughout the process. Assistance with the CalJOBS system (all local workforce boards use this database, however, new programs may need assistance).

*Evaluation of grant program ($200,000):* Work with independent program evaluators to ensure the program design meets the intended outcomes and needs of workers and employers. Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes.

## 6.8 Construction
No construction is planned for this grant.

## 6.9 Other
The administering agencies will follow our current guidelines for managing program delivery. All participant support costs are managed by the program administrator, utility program administrator, or contractual services vendor. We will not be providing financial assistance in the form of credit enhancements, such as loan loss reserves or loan guarantees.

**Participant Support Costs**

The administering agencies will not directly pay participant support costs. Contractual services will permit Vendors to charge work related travel or other fees, including items like survey participations stipends.

**Subawards**

Pass-through grants for S4A Coalition Application: Both subrecipients of the subawards are state governmental agencies. As per the EPA Solar For All Notice of Funding Opportunity, for a coalition application the lead applicant is now the grantee who will administer the grant as a pass-through entity for the purposes of 2 CRF Part 200. The California Public Utilities Commission is the lead applicant and the pass-through entity, and the CEC and EDD are subrecipients.

CEC will receive $30,200,000 million of which $25,000,000 is for financial assistance. The duration of this award is for the full grant period.

- POU-S4A competitive grants for establishment of POU LIDAC solar programs ($25,000,000) issued in either two or three tranches as determined in the planning period. Duration for distributed grant awards is up to five years, limited to when the grant period ends.
- This subaward is part of the application, please refer above for a description of activities.

Labor-Workforce Development/Employee Development Department (EDD) will receive $9,200,000 million, of which $8,000,000 is for financial assistance. The duration of this award is for the full grant period.

- RWP S4A Residential Solar High Road Training Partnership Grants ($8,000,000) - Establish or expand training programs to increase knowledge and competency of workers within the solar and storage sectors. This subaward is non-competitive, as the EDD will distribute funding based on fulfilling the grant goals to increase training in LIDAC communities. Duration is up to five years, limited to when the grant period ends.
- This subaward is part of the application, please refer above for a description of activities.

Subawards to For-Profit Entities: All will conform to the limits in the S4A terms and conditions, including:
1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;
2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;
3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and
5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

Subrecipient to Community Solar program administrators and/or utilities (listed in prior section), which are for-profit entities, is determined through a competitive process. The value is $190,190,000. The competitive process is determined by CPUC regulations and will be finalized during the planning period. Duration is up to five years, limited to when the grant period ends.

- This subaward is part of the application, please refer above for a description of activities.

Subawards to Non-Profit Entities & For-Profit Entities:
Subrecipient to SOMAH program ($9,690,000) administered by four non-profit organizations where utilities pass through incentives to participants (all entities listed in prior section). This

subaward is non-competitive, since the contract was previously selected through a competitive bidding process in alignment with CPUC regulations. Southern California Edison holds the contract with Center for Sustainable Energy, SOMAH program administrator lead. Participating Utilities dispense all incentives directly to participants. Duration is up to five years, limited to when the grant period ends.

- This subaward is part of the application, please refer above for a description of activities.

## 6.10 Additional Items

**Indirect Charges**

CPUC: The CPUC includes $920,000 for indirect costs. This is calculated using a Modified Total Direct Cost multiplied by the De Minimis Indirect Rate of 10%. Indirect costs will be used for administration services in service of the grant implementation. No additional signed agreement is needed as CPUC will use the de minimis rate of 10 percent.

| MOTIDIFIED TOTAL DIRECT COSTS (MTDC) - Inclusions | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | | TOTAL |
|---|---|---|---|---|---|---|---|
| SALARIES | $406,000 | $961,000 | $961,000 | $961,000 | $961,000 | | $4,250,000 |
| BENEFITS | $217,048 | $513,751 | $513,751 | $513,751 | $513,751 | | $2,272,050 |
| TRAVEL | $4,000 | $11,000 | $11,000 | $11,000 | $11,000 | | $48,000 |
| SERVICE CONTRACTS | $510,000 | $870,000 | $449,948 | $445,000 | $355,002 | | $2,629,950 |
| TOTAL MTDC - excluding subawards | $1,137,048 | $2,355,751 | $1,935,699 | $1,930,751 | $1,840,753 | | $9,200,000 |
| DE MINIMIS INDIRECT (10%) | $113,705 | $235,575 | $193,570 | $193,075 | $184,075 | | $920,000 |

CEC: The **S4A-POU** budget includes $500,000 for indirect costs. The CEC uses an indirect rate cost of 14% through an approved Memorandum of Understanding on file for the 2023-24 Fiscal Year and can be shared with the EPA upon request.

Indirect costs are those costs incurred for common or joint purposes of a public or private entity, benefitting more than one project or activity, and not easily assignable to the projects and activities. For example, it is difficult to assign the cost of a building's operations to each activity performed by a company.

The following are terms for indirect costs: indirect, overhead, general and administration, and facilities and administrative costs. Typical examples of indirect costs may include depreciation on buildings and equipment, the costs associated with operating and maintaining facilities and equipment, and general administration and expenses, such as salaries and expenses of executive officers, personnel administration and accounting. This category typically covers other general business expenses such as printer paper, printer toner, pencils, rent, and utilities.

Labor/EDD: No indirect charges.

**Workshops:**
Solar for All Awardees (including subrecipient) Annual Convening for Years 2-5
- An hybrid in-person/virtual informal workshop for all administrative agencies, utilities, and subrecipients to share successes, challenges, lessons learned, and opportunities for levering.
- CPUC will convene this meeting annually if needed.
- CPUC, CEC, and EDD will all share their logo on the agenda materials
- The meeting will be open to the public and stakeholders and noticed appropriately to the general public.  The findings from the meeting will inform implementers on how to reform their tactics and increase outcomes in service of the Solar For All award goals.
- No income will be generated.

CEC:
- For POU Customers: The CEC will host multiple workshops for the **S4A-POU** program. First the CEC will host a scoping workshop to determine what types of projects will be eligible for funding. The second workshop will be a pre-solicitation workshop for stakeholders to ask and submit any comments. Lastly, the CEC may host an application workshop for the eligible recipients.
- For tribal stakeholders: The CEC will engage tribes through existing channels of communication[35] including tribal consultations and workshops.
- CEC staff will initiate the workshops.
- The CEC's logo will be on the agenda for the workshops.
- Workshop attendees are anticipated to be 50% public participants and 50% representatives of local POUs.
- Typically a recording of the workshop will be published, as well as a question and answer document responding to questions received from the workshop
- Income will not be generated from any workshops that the CEC initiates.
- The award will not result in the development of any copyrighted software or written materials.
- The CEC does not expect an invention resulting from this project.
- This project does not involve animal subjects.
- The project will not collect identical information from 10 or more people.

EDD
- None planned at this time, this may be updated during the planning period.

---

[35] https://www.energy.ca.gov/programs-and-topics/programs/tribal-program

- Any planned workshops or otherwise will not generate income, result in inventions or similar, involve testing subjects, and will abide by all required personal information protections.

**Meals and Refreshments:**

There is no plan to provide meals or light refreshments from the administering agencies.

**Program Income**

There is no program income that will be generated.

## 6.11 Additional Workplan and Budget Questions

| Questions | Responses |
|---|---|
| Does this scope of work include conducting conferences or workshops? | Yes |
| Who is initiating the conference/workshop/meeting? | CPUC will initiate one annual workshop for sub-awardees and subrecipients |
| How is the conference/workshop/meeting being advertised? | Administering agency public notification lists and online. |
| Whose logo will be on the agenda and conference/workshop/meeting materials? | All administering agencies.<br><br>If EPA logo is requested, will confirm with SFA Terms and Conditions Section L. 'Use of Logos.' |
| What is the percentage distribution of persons attending (I.e. % federal govt, public participants, state and local)? | We anticipate the following breakdown:<br>• 15% state government<br>• 25% utilities<br>• 25% implementers<br>• 35% stakeholders and/or public participants |
| Will there be proceedings or analysis and will the information be disseminated back to the appropriate (state/local/scientific) community? | Presentation from each sub-awardee on successes, challenges, and lessons learned. |
| Do you anticipate program income being generated from this conference/workshop/meeting including registration fees? | No. |

| | |
|---|---|
| Are costs for light refreshments, meals or beverages included in the workplan or budget? | No. |
| Will the assistance award result in the development of any copyrighted software or written materials? | No. |
| Could an invention result from this project? (If yes, provide disposition instructions) | No. |
| Does the project involve animal subjects? | No. |
| Does the project involve collecting identical information from 10 or more people? | No. |
| Does the grant involve or relate to geospatial information? Includes info identifying geographic location , or application/tools associated with such information – GPS, mapping or statistical data | Yes. The CPUC consultants to provide tribal outreach assistance, GIS mapping support, and data consolidation for potential community solar projects. |
| Any work outside the US included in the grant? | No. |

# EXHIBIT 5

| DOCKETED | |
|---|---|
| **Docket Number:** | 25-SOLAR-01 |
| **Project Title:** | Solar for All Program |
| **TN #:** | 264822 |
| **Document Title:** | Notice of Workshop on CEC Solar for All (POU Territories) Solicitation Concept Proposal |
| **Description:** | The California Energy Commission (CEC) will host a virtual workshop to review the CEC Solar for All Program's solicitation concept proposal, published on July 11, 2025. |
| **Filer:** | KMaddox |
| **Organization:** | California Energy Commission |
| **Submitter Role:** | Commission Staff |
| **Submission Date:** | 7/15/2025 3:25:43 PM |
| **Docketed Date:** | 7/15/2025 |

STATE OF CALIFORNIA — NATURAL RESOURCES AGENCY                                    Gavin Newsom, *Governor*

**CALIFORNIA ENERGY COMMISSION**
715 P Street
Sacramento, California 95814

energy.ca.gov

CEC-70 (Revised 7/22)



| IN THE MATTER OF: | DOCKET NO. 25-SOLAR-01 |
|---|---|
| *CEC Solar for All (POU Territories)* | NOTICE OF REMOTE-ACCESS WORKSHOP |

# Notice of Workshop on CEC Solar for All (POU Territories) Solicitation Concept Proposal
## July 30, 2025
10:00 a.m. − 12:00 p.m.
Remote Access Only
See Attendance Instructions.

The California Energy Commission (CEC) will host a virtual public workshop to review the CEC Solar for All (Publicly Owned Utilities (POU) Territories) Program solicitation concept proposal published on July 11, 2025, and available on the CEC Solar for All webpage at: https://www.energy.ca.gov/programs-and-topics/programs/solar-all-program. At the workshop, there will be an opportunity for participants to ask questions and provide feedback.

The public can participate in the virtual workshop consistent with the attendance instructions below. The CEC aims to begin promptly at the start time posted and the end time is an estimate based on the proposed agenda. The workshop may end sooner or later than the posted end time.

The CEC is planning to conduct additional forums to solicit feedback from California Native American tribes and also welcomes consultation with California Native American tribes.

**Agenda**
The proposed agenda is as follows:

1. Welcome and Introduction: meeting housekeeping and introduction of the program.

2. Solicitation Concept Proposal: overview of the solicitation concept proposal including proposed funding, timeline, applicant and project eligibility, project requirements, and screening/scoring criteria.

3. Next Steps: guidance on how participants can provide feedback on the solicitation concept proposal.

4. Question and Answer Session: address questions from participants.

5. Comments: participants can provide comment on the concept proposal.

The workshop will be recorded, and a copy of the presentation and recording will be posted on the CEC Solar for All website at https://www.energy.ca.gov/programs-and-topics/programs/solar-all-program.

**Background**
Under the federal Inflation Reduction Act of 2022 117th (Pub. L. No. 117-169, 136, Stat. 1818), administered by the United States Environmental Protection Agency (US EPA), the State of California received just under $250 million for a coalition of state agencies including the California Public Utilities Commission (CPUC), the California Employment Development Department (EDD), and the CEC. The CPUC will implement Solar for All programs serving low-income and disadvantaged community (LIDAC) residents in the investor-owned utility (IOU) territories, and the CEC's Solar for All Program will implement projects in POU territories. EDD will offer workforce development and labor training programs.

This CEC Solar for All (POU territories) solicitation will provide $25 million in awards to support investments in eligible technologies, including residential rooftop (for single- or multi-family), community solar, and associated storage systems, serving LIDACs in POU territories that achieve at least 20% electricity bill savings for program participants. This solicitation concept proposal is designed to incorporate and implement US EPA requirements, with additional CEC requirements included as appropriate.

The CEC Solar for All (POU Territories) solicitation concept proposal is intended to describe proposed concepts to solicit feedback for developing a formal solicitation document, expected to be released later this calendar year. The intent of the anticipated CEC Solar for All (POU Territories) Program is to accelerate the deployment of solar, or solar with storage, and reduce electric bill pressures on LIDAC customers, including tribes, in California's POU territories.

**Attendance Instructions**
**Remote** participants may join via Zoom by internet or phone.
- **To join via Zoom.** Click on https://energy.zoom.us/j/82973107402?pwd=tEowUz81jof0mEFsHUC0F3GisbVuEC.1 or login in at https://zoom.us/ and enter the Webinar ID **829 7310 7402** and passcode **123568** and follow all prompts.
- **To join by telephone.** Call toll-free at (888) 475-4499 or toll at (669) 219-2599. When prompted, enter the Webinar ID **829 7310 7402** and passcode **123568**.

**Zoom Closed Captioning Service.** At the bottom of the screen, click the Live Transcript CC icon and choose "Show Subtitle" or "View Full Transcript" from the pop-up menu. To stop closed captioning, close the "Live Transcript" or select "Hide Subtitle" from the pop-up menu. If joining by

phone, closed captioning is automatic and cannot be turned off. While closed captioning is available in real-time, it can include errors.

**Zoom Difficulty.** Contact Zoom at (888) 799-9666 ext. 2, or the CEC Public Advisor at publicadvisor@energy.ca.gov, or by phone at (916) 957-7910.

**Public Comment.**
The CEC encourages the use of its electronic commenting system. Visit the e-commenting page for the Solar for All docket at https://efiling.energy.ca.gov/Ecomment/Ecomment.aspx?docketnumber=25-SOLAR-01. Enter your contact information and a subject title that describes your comment. Comments may be included in the "Comment Text" box or attached as a downloadable, searchable document in Microsoft® Word or Adobe® Acrobat®. The maximum file size allowed is 10 MB.

**Oral comments** will be accepted at the end of the workshop. Comments may be limited to three minutes or less per speaker and one person per organization. To comment via Zoom, use the "raise hand" feature so the administrator can announce your name and unmute you. To comment via telephone, press *9 to "raise your hand" and *6 to mute/unmute.

**Written comments** may be submitted to the Docket Unit by 5:00 p.m. on August 11, 2025. Written and oral comments, attachments, and associated contact information (including address, phone number, and email address) will become part of the public record of this proceeding with access available via any internet search engine. Written comments may also be submitted by email. Include docket number 25-SOLAR-01 and Solar for All Program in the subject line and email to docket@energy.ca.gov.

A paper copy may be mailed to:
California Energy Commission
Docket Unit, MS-4
Docket No. 25-SOLAR-01
715 P Street
Sacramento, California 95814

**Public Advisor.** The CEC's Public Advisor assists the public with participation in CEC proceedings. To request assistance, interpreting services, or reasonable modifications and accommodations, call (916) 957-7910 or email publicadvisor@energy.ca.gov as soon as possible but at least five days in advance of the workshop. The CEC will work diligently to meet all requests based on availability.

**Media Inquiries.** Email mediaoffice@energy.ca.gov or call (916) 654-4989.

**General and Technical Inquiries:** Email CASolarForAll@energy.ca.gov or call (279) 226-1151.

**Availability of Documents:** Documents and presentations for this meeting will be available at the CEC Solar for All Program webpage at https://www.energy.ca.gov/programs-and-topics/programs/solar-all-program, or at https://efiling.energy.ca.gov/Lists/DocketLog.aspx?docketnumber=25-SOLAR-01.

3

When new information is posted, an email will be sent to those subscribed to the Solar for All Program listserv. To receive these notices or notices of other email subscription topics, visit Subscriptions, at https://www.energy.ca.gov/subscriptions.

**Dated:** July 15, 2025, at Sacramento, California.


*Deana J Carrillo*
Deana Carrillo
Reliability, Renewable Energy, & Decarbonization Incentives (RREDI) Division Director

**Subscriptions:**
POU Solar for All

EXHIBIT 6

# California Solar for All Informational Webinar

*Solar for All Grant Awarded by US Environmental Protection Agency (EPA)*

California Public Utility Commission (CPUC)

California Energy Commission (CEC)

Employment Development Department (EDD)



California Public
Utilities Commission

# Webinar Logistics

- Today's presentation will be posted online: www.cpuc.ca.gov/solarforall
- Questions can be sent to the Host & Panelists using Slido (within Webex)
- There will be a Q&A session after the presentations.
- Call-in Information:
  - 1-855-282-6330 or
  - 1-415-655-0002
  - Access code: 249 534 63565

California Public Utilities Commission

## Tips + Tricks



If you click the down arrow next to mute/unmute, a new menu will pop up. You can select **"switch audio"** to receive a phone call instead of using your computer audio.

Click the "…" bubble to send your questions to panelists.

Click the person shape with lines to see the participant list.

# Overview of Today's Content

Each agency will share details of their SFA Workplan and how the public can engage in their planning processes.

1. Welcome Address

2. California Solar For All Workplan, Budget and Timeline

3. California Public Utilities Commission (CPUC) Community Solar and Solar on Multifamily Affordable Housing programs

4. California Energy Commission (CEC) Publicly-Owned Utility Solar Grants

5. Employment Development Department (EDD) Resilient Workforce Training program

6. Other California SFA Opportunities

7. Questions + Answers

California Public Utilities Commission

427

# Welcome Address

Candace Morey, Interim Director Office Distributed Energy Resources, Natural Gas, and Retail Rates



California Public Utilities Commission

  

# California Solar for All Workplan, Budget, and Timeline

- **Budget ~$250 million**
  - $190.2M for Community Solar financial incentives
  - $25M for Publicly-Owned Utility (POU) program grants
  - $9.7M for Solar on Multifamily Affordable Housing (SOMAH) Program financial incentives
  - $8M for Residential Solar High Road Training Partnership grants
  - $400k of technical assistance from National Renewable Energy Laboratory
- **Communities To Reach**
  - Disadvantaged Communities, including federally recognized tribal lands
  - Geographically dispersed low-income households (80% of Area Median Income or 200% of Federal Poverty Guidelines)
  - Affordable, deed-restricted multifamily rental properties
- **Timeline**
  - Grant work ends April 30, 2029

# SFA Requirements & Estimated Outcomes

- Achieve a required minimum of 20% average monthly savings
- Increase equitable access to rooftop and community solar
- Integrate consumer protections
- Meet federal wage compliance and sourcing standards

| Estimated Outcomes | Community Solar | Publicly Owned Utilities | SOMAH |
|---|---|---|---|
| **Budget** | $190.2M | $25M | $9.7M |
| **Solar Capacity** | 50 to 100 MW | 13 MW | 12.1 MW |
| **Sites or Households** | 10-20 (Sites) | 512 | 85 (MF Properties) |
| **Number of Benefiting Households** | 15,000-30,000 | 8,000 | 6,500 |
| **Average Monthly Electrical Bill Savings per Household** | 20% | 20% to 30% | 39% |

| Estimated Outcomes | Workforce Development |
|---|---|
| **Budget** | $8M |
| **Workers Trained** | 225 |
| **Projects Executed** | 17 |
| **Average increased wages** | 10.5% |

*Program outcomes are estimated and dependent on in-progress policy determinations governing those programs and applications.*

California Public Utilities Commission

430

# EPA SFA Grant Criteria

The US Environmental Protection Agency (EPA) Solar for All grant has certain criteria to follow for all work funded by the grant.

## Household Impacts

Achieve 20% Estimated Bill Savings

Provide Consumer Protections

## Good Jobs

Prevailing Wages for Construction Workers (Community Solar)

## Eligibility

Section 134(a)(1) of the Clean Air Act provide assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies."

# California Public Utilities Commission (CPUC)

Independent state agency that regulates the investor-owned utilities (IOUs) that offer electrical, water, transit, gas, and communications services.

California Public Utilities Commission



# CPUC Timeline

**2024**
**2025**
**2026**
**2027**
**2028**
**2029**

May 1, 2024,
Grant Begins

Dec. 2024
Workplan
Approved

Dec. 2025
Planning Period Closes

April 30, 2029
Grant Ends

SOMAH + Community Solar Implementation

California Public Utilities Commission



Image: Peninsula Clean Energy

# Community Solar – SFA Overview

- Funds will support new mid-scale capacity solar systems (about 5 MW each)

- 51% of each project's capacity is dedicated to low-income subscribers

- 20% monthly electricity bill discounts offered to participating households in PG&E, SCE, + SDG&E

- $19M of 190.2M budget reserved to encourage the development of projects on tribal lands

- Details on the distribution of these funds will be determined in the CPUC's Community Solar Proceeding, A.22-05-022

California Public Utilities Commission

434

# Community Solar – How to Engage/Timeline

- Ruling questions on program implementation issued April 1, 2025. Party comments filed by May 8, 2025.

- The CPUC will issue a decision finalizing the program by the current statutory deadline of January 1, 2026.

- Official filings are posted on the A.22-05-022 docket card. To be notified of new documents, sign up for the proceeding's service list here.

California Public Utilities Commission

435

# Solar on Multifamily Affordable Housing (SOMAH) + SFA Overview



**https://calsomah.org/**



SOMAH in Mission Viejo, CA. Photo Credit: Sunrun

**Eligibility**

**Affordable Rental Multifamily Properties in:**

☀ Electric IOU Territory (PG&E, SCE, SDG&E, PacifiCorp, Liberty)

☀ Individually metered tenant units (5 or more)

**Affordable with:**

☀ 66% of tenants at 80% of area median income or less,

☀ Located in a disadvantaged community,

☀ Owned by a CA Native Tribe, or

☀ Owned by a Public Housing Agency

California Public Utilities Commission

436

# Solar on Multifamily Affordable Housing (SOMAH) + SFA Overview

**SOMAH**



https://calsomah.org/

SOMAH in Mission Viejo, CA. Photo Credit: Sunrun

<u>Incentive</u>

**SOMAH Solar and Integrated Storage**

* $3.50/watt for solar supporting tenants
* $1.19/watt for solar supporting common areas
* $1.10/kilowatt-hour for integrated storage*
* Funded through utility greenhouse gas auction revenue.
* Reduced with use of tax credits and total incentive cannot exceed total project costs.

**SFA Site-readiness Grants:**

* Structural roof repair
* Safety and code compliance
* Roof repairs for patching or remediating water or other leak damage
* Transformer or panel upgrades

*Awaiting disposition in Center for Sustainable Energy (CSE) Advice Letter 164-E

California Public Utilities Commission

437

# SOMAH + SFA: How to Engage/Timeline

**To implement SFA site-readiness grants,** the SOMAH Program will by December 2025:

- Program Handbook Update
- SFA Request Form and Grant Agreement
- SFA budgets by utility territory

**To support these outcomes:**

- D.24-11-006 directed updates to the Program Handbook to list site-readiness measures under consideration in Center for Sustainable Energy Advice Letter 164-E.
- Program Administrator can request further changes to the Program Handbook using the advice letter process to create forms per D.17-12-022.
- Advice letters can be commented on by the public.
- CPUC General Order 96-B governs the advice letter process.
- SOMAH Advice Letters are issued to the service lists for Rulemaking R.14-07-002 and R.25-01-005.

California Public Utilities Commission

438

# Community Solar + SOMAH
# How to Provide Input

**Community Solar Proceeding**

- **A.22-05-022**

**SOMAH Proceeding**

- **R.14-07-002** (now closed)
- **R.25-01-005**

**Learn about a Regulatory Proceeding**
Visit the CPUC's **brochures webpage** to find information on what happens in a proceeding, informal/formal participation, the CPUC's Intervenor Compensation Program, and CPUC decisionmakers.
**https://www.cpuc.ca.gov/about-cpuc/divisions/news-and-public-information-office/public-advisors-office/providing-public-comments-at-the-cpuc/brochures-on-cpuc-processes**

**Learn about an Advice Letter**
Visit the CPUC's **advice letter webpage** to find information on how utilities request ministerial approval for changes.
**https://www.cpuc.ca.gov/industries-and-topics/internet-and-phone/advice-letter-information**

**How to Join a CPUC Service List:**
1. Sign up at **https://ia.cpuc.ca.gov/servicelists/sl_index.htm**
2. Email your request to **process_office@cpuc.ca.gov** or call (415) 703-2021

**How Join the SOMAH Program Email List:**
1. Sign up at **https://calsomah.org/email-sign**
2. Email your request to **contact@CalSOMAH.org** or call 858-244-1177, ext. 5

# CPUC SFA Vendor Solicitations*

- **#1 SFA GIS and Energy Modeling Support**
  - Status: Not yet published
  - Amount: $679,000 until grant's end (4/30/29)
  - Scope:
    - Provide quantitative energy modeling and analysis to support semi-annual reporting requirements.
    - Provide GIS mapping support for energy programs and SFA efforts touching tribal and LIDAC communities.

- **#2 Tribal Outreach**
  - Status: Not yet published
  - Amount: $400k until grant's end (4/30/29)
  - Scope:
    - Act as liaison to connect Tribes to clean energy programs overseen by CPUC, particularly solar and storage programs, among other stakeholders.
    - Provide assessment on improving outreach to Tribes related to existing and future clean energy programs.

*All solicitations are competitively sourced via CalEprocure

# CPUC SFA Vendor Solicitations

**#3 S4A Federal Grants Compliance**

- Status: Not yet published
- Amount: $800k until grant's end (4/30/29)
- Scope:
  - Provide administrative, process development, training, audit, and drafting support to ensure the CPUC's compliance with the grant.
  - Provide project management assistance to synchronize existing regulatory and legislative program reporting with grant reporting.

**#4 Multifamily Housing Tax Credit Monetization & Technical Assistance**

- Status: Not yet published
- Amount: $450k until grant's end (4/30/29)
- Scope:
  - Support low-income affordable housing owners in monetizing, transferring, and converting unusable tax credit. Enhance existing technical assistance provided through SOMAH, including financial modeling and cost/savings analysis.

California Public Utilities Commission

441

# CPUC SFA Vendor Solicitations

- **#5 California Shared Renewables Portfolio Evaluation**
  - <u>Status</u>: RFP posted and closed (5/8/2025)
  - <u>Amount</u>: $300,000 until grant's end (4/30/29)
  - <u>Scope</u>:
    - Conduct impact evaluation of California Shared Renewables Portfolio by developing program logic models, program metrics, and data collection protocols, and compiling findings.

**Stay engaged with upcoming alerts for competitive vendor solicitations!**
  - State of California Solar for All Program
    - (https://www.cpuc.ca.gov/industries-and-topics/electrical-energy/demand-side-management/customer-generation/state-of-california-solar-for-all-program)
  - **Cal eProcure**
    - California State Government Marketplace
    - (https://caleprocure.ca.gov/pages/index.aspx)

# California Energy Commission (CEC)

State agency responsible for energy policy planning and related programs under the Governor's Office.

California Public Utilities Commission



# CEC Solar for All (POU Territories)

Michelle Slocombe, Program Lead

California Energy Commission

21



# Agenda

- Overview of CEC Solar for All (POU Territories)

- Timeline, Workplan

- Solicitation Process

- Stakeholder Engagement

- CEC Contacts

445

# CEC Solar For All (POU Territories)



22

- **Funding:** $25M for grant awards

- **Scope:** Projects benefiting LIDACs and Tribes in Publicly Owned Utility (POU) territories

- **Eligible Technologies:**

  o Residential rooftop solar (single and multifamily)

  o Community solar (<5MW, residential-serving)

  o Associated energy storage

  o Enabling upgrades (maximum 20% of budget)



446

# Timeline





447

23

# Workplan & Solicitation

## Workplan Key Components

Solicitation Development – Engage with stakeholders and tribes

Finalize and release solicitation in Q4 2025

Score, recommend proposed awards, approve at a CEC Business Meeting

Execute and manage grant agreements through period of performance

Submit progress reports and required reporting

Continue outreach and engagement with stakeholders and recipients

## Solicitation Key Components

Eligible applicants and project requirements

20% minimum household utility bill savings

Federal requirements for prevailing wage and domestic sourcing

Consumer protection and workforce development



24

448

25

# CEC Solicitation Process

**Quarter 4, 2025**
- Solicitation released; application period begins (anticipated 90 days).

**Quarter 1, 2026**
- Applications are scored.
- Notice of Proposed Award (NOPA) is released.
- Proposed awardees are notified with recommended funding amount.

**Quarter 2, 2026**
- Grant agreement approval at a CEC Business Meeting.
- Agreement execution; project tasks commence.

**April 30, 2029**
- US EPA deadline to spend grant funds.





# Stakeholder Engagement

## Solar for All Program

**SUBSCRIBE**

Solar for All Program

Email *

Email

SUBSCRIBE

- CEC Solar for All Webpage and Listserv are live
  - Docket Log

- Please subscribe to the listserv to be notified of upcoming opportunities for engagement

26

450

# Contacts

- Program Lead: Michelle Slocombe, michelle.slocombe@energy.ca.gov

- General Inquiries: CASolarForAll@energy.ca.gov

- CEC Solar for All Webpage: https://www.energy.ca.gov/programs-and-topics/programs/solar-all-program



# Employment Development Department

State agency responsible for training workers.

California Public Utilities Commission

452



# High Road Training Partnership – Resilient Workforce Program California Solar for All

Program Year 2025-26

**Brandon Raveling,** Staff Services Manager II

Employment Development Department Workforce Services Branch Deputy Director's Office



# Overview: EDD's Workforce Services Branch

- Experience managing federal grant funding programs.

- Awareness and understanding of federal regulations and grant terms and conditions.

- Works with Local Workforce Development Boards and other key training providers.

- Tracks information through the CalJOBS$^{SM}$ system.

# Purpose of the Grant Funding

**HRTP – RWP – CA-S4A Program Grant:**

Supports the development of four regional hubs focused on designing new, or expanding existing, solar and storage installation training programs. These programs may include earn-and-learn models such as pre-apprenticeships and apprenticeships and will incorporate both technical skills and job quality components.

**HRTP – RWP – CA-S4A Technical Assistance and Developmental Evaluation Grant:**
Funding supports low-income individuals living in disadvantaged communities by providing ongoing coaching and consultation, delivering targeted technical assistance, and fostering a collaborative community of practice. This will promote continuous learning and improvement among CA-S4A program awardees.

# Funding Amount and Target Population

## HRTP – RWP – CA-S4A PY 25-26

### Target Population



### Funding Amount

**Funding Amount**

Up to
$8.4 million



# Who is eligible to apply for the grant?

- Public agencies
- Private non-profits
- Tribal government

Individuals and for-profit entities are not eligible.

Note: Applicants must clearly show how they will provide services to the targeted population.



457



# EDD's Role

Planning and Writing

↑

Grant Release

↑

Application and Proposal Processing

↑

Grant Award

↑

Managing Program Outcomes

# Timeline Program Year 2025-26



Employment Development Department EDD
State of California

**June**
06.04 — Webinar

**August**
08.05 — EDD SFP HRTP – RSW CA-S4A Released

**October**
09.05 — EDD SFP CA-S4A TA DE Released
10.02 — Applications Due

**December**

**February**
02.01 — Regional Hubs & TA/DE Awarded

**April**
TBD — Period of Performance Begins



# System for Award Management (SAM)

The SAM is the official U.S. government website where entities register to do business with the federal government.

- Home | SAM.gov
- Register early
- Applicant SAM account must be:
  - Active
  - In good standing

460



# Employment Development Department

For grant information, visit the EDD's
Workforce Development Solicitations for Proposals

Email grant inquiries to: **WSBSFP1@edd.ca.gov.**

461

# Solar for All in California

Other grantees offering new opportunities in California.

California Public Utilities Commission

# SFA Tribal Grants in California

- **Solar Access for Nationwide Affordable Housing (SANAH)**
  - https://gridalternatives.org/solarforall
  - GRID Alternatives

- **Western Indigenous Network Solar for All (WIN-SFA)**
  - https://www.tribalalternatives.org/solar-for-all/
  - Tribal Energy Alternatives (A GRID Affiliate, formerly National Tribal program of GRID Alternatives)

This work is funded separately through US EPA.

California Public Utilities Commission

For more information:

CPUC: https://www.cpuc.ca.gov/industries-and-topics/electrical-energy/demand-side-management/customer-generation/state-of-california-solar-for-all-program

CEC: https://www.energy.ca.gov/programs-and-topics/programs/solar-all-program

EDD: https://edd.ca.gov/en/jobs_and_training/wdsfp_workforce_development_solicitations_for_proposals

# Questions?

# California Public Utilities Commission

https://www.cpuc.ca.gov/



EXHIBIT 7

WEBVTT

1
00:00:00.000 --> 00:00:01.630
Savi Ellis-Pachori: We're gonna let some folks

2
00:00:02.450 --> 00:00:07.180
Savi Ellis-Pachori: good morning. We're gonna let some folks log in and
we'll start in just a few minutes.

3
00:02:55.440 --> 00:02:59.420
Savi Ellis-Pachori: Good morning, folks. Can I get a confirmation that
everyone can hear me.

4
00:03:02.970 --> 00:03:04.160
Deana Carrillo: Audio's good.

5
00:03:04.440 --> 00:03:09.000
Savi Ellis-Pachori: Alright. How about those in the audience saw a hand
go up.

6
00:03:09.190 --> 00:03:10.120
Savi Ellis-Pachori: Okay.

7
00:03:10.440 --> 00:03:34.980
Savi Ellis-Pachori: alright. Thank you. Everyone for joining. We'll get
started. Now, we're very excited about today's workshop. I'll come on
camera and I'll open with some logistics and we'll we'll go into the
Content. So good morning and welcome to the California Energy Commission
Solicitation Concept workshop for the Home Efficiency rebates also known
as Homes pay for performance programs.

8
00:03:35.520 --> 00:03:44.520
Savi Ellis-Pachori: My name is Savvy Elis Paciotti, and I am the program
manager of the Federal Incentives and Financing Branch, which is
responsible for developing the Homes program.

9
00:03:47.170 --> 00:03:58.270
Savi Ellis-Pachori: We'll go into some workshop logistics and set some
expectations for the day. I'll then introduce Commissioner Mcallister for
some opening comments, and then we'll get into the substance of the
workshop.

10
00:03:58.910 --> 00:04:15.979

Savi Ellis-Pachori: The workshop event page has several materials that may be useful to you during this workshop. This includes the workshop Notice, which has an input request with key questions related to the solicitation design the URL for the event. Webpage is shown in the slide, and we'll also drop it in the chat.

11
00:04:16.089 --> 00:04:20.050
Savi Ellis-Pachori: We'll be putting links into the chat, and during the presentation

12
00:04:20.860 --> 00:04:29.719
Savi Ellis-Pachori: you can find additional background for the Homes paper performance program on the California Energy Commission's Inflation Reduction Act program web page.

13
00:04:30.440 --> 00:04:38.170
Savi Ellis-Pachori: The workshop is being recorded, and a link to the recording transcript and presentation will be posted to the event. Page following the workshop.

14
00:04:41.620 --> 00:05:04.139
Savi Ellis-Pachori: If you experience any difficulties joining Zoom during the workshop. Please. Contact zoom at 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, extension 2, or the Public Advisor at Public advisor@energy.ca, dot, Gov, or by phone at (916) 957-7910.

15
00:05:07.140 --> 00:05:20.630
Savi Ellis-Pachori: Our objectives today are to provide an update on the homes pay for performance program development and obtain stakeholder feedback needed to develop a solicitation for the statewide implementer for the pay for performance program.

16
00:05:21.090 --> 00:05:34.660
Savi Ellis-Pachori: After Commissioner Mcallister's opening remarks, we will provide a series of staff presentations that will cover the background on the Homes program program designed to date in California the solicitation concept paper and the draft scope of work

17
00:05:34.990 --> 00:05:37.979
Savi Ellis-Pachori: at or around 1030 we will have a break.

18
00:05:38.170 --> 00:05:46.589
Savi Ellis-Pachori: and at or around 1040, or another announced time. If we're running early or late, we will start the 1st of 2 public comment periods

19
00:05:47.450 --> 00:05:53.780
Savi Ellis-Pachori: session. One of public comment will focus on a few of the topics that staff have identified in the workshop. Notice

20
00:05:53.900 --> 00:06:02.280
Savi Ellis-Pachori: session 2 will be open to other topics on the Homes paper performance, solicitation, concept, paper program design and open comments.

21
00:06:04.960 --> 00:06:17.769
Savi Ellis-Pachori: This slide shows the focus topics that Staff have selected for the 1st public input session. These topics are taken from the input request in the workshop notice and you can read the text in full there.

22
00:06:20.700 --> 00:06:23.710
Savi Ellis-Pachori: Staff will prompt for comments related to these topics.

23
00:06:24.010 --> 00:06:27.709
Savi Ellis-Pachori: First, st there are 3 general areas of feedback.

24
00:06:27.920 --> 00:06:34.590
Savi Ellis-Pachori: the feasibility of the scope of work concerns stemming from Federal actions and financing of rebates.

25
00:06:35.230 --> 00:06:43.980
Savi Ellis-Pachori: The next focus area has to do with the agreement structure and Cec's plans to release it as a grant funding opportunity, also known as a Gfo.

26
00:06:45.310 --> 00:06:52.170
Savi Ellis-Pachori: I'm gonna pause here for just a moment so that folks can absorb these questions, and we've got another slide on these as well.

27
00:07:02.390 --> 00:07:04.879
Savi Ellis-Pachori: Alright. And let's move on to the next slide.

28
00:07:05.850 --> 00:07:23.490
Savi Ellis-Pachori: And I'll speak about the final focus area, which is roles and responsibilities, and it includes the residential aggregator role tools and resources as well as marketing. I'll pause here again, and a reminder to folks that these questions, among others, are in some of the links in the chat.

29
00:07:32.900 --> 00:07:36.160
Savi Ellis-Pachori: Okay, let's move on on how to comment.

30
00:07:36.720 --> 00:07:45.339
Savi Ellis-Pachori: If you have any questions during today's workshop,
there is a Q&A window in the zoom. Application which you can use and
staff will respond as appropriate

31
00:07:46.150 --> 00:08:07.989
Savi Ellis-Pachori: as noted. We will have 2 public comment sessions
after the break, to make a comment or to ask a live question. During that
part of the workshop there is a zoom. Raise hand feature that can be used
for an opportunity to speak. Or if you're attending via the phone press,
star 9, to raise your hand and star 6 to unmute the chat function will
not be utilized during today's workshop.

32
00:08:11.230 --> 00:08:21.889
Savi Ellis-Pachori: Public input is critically important to the
development of our programs. The Cac is very appreciative of the comments
we will receive and encourages you to send comments through our docket.

33
00:08:22.820 --> 00:08:34.489
Savi Ellis-Pachori: You can find the input requests as part of the
workshop. Notice at the link on this slide staff is seeking comments in
response to this input request. But you may comment on any aspect of the
Homes program.

34
00:08:34.940 --> 00:08:38.930
Savi Ellis-Pachori: Comments are due on Thursday, August 21st at 5 Pm.

35
00:08:39.080 --> 00:08:45.339
Savi Ellis-Pachori: You may submit comments through the Ira docket which
is accessed on our program page, which has been linked in the chat.

36
00:08:46.860 --> 00:08:55.070
Savi Ellis-Pachori: The California Energy Commission is committed to
hearing from all interested parties, and encourages comments from the
public and other interested parties.

37
00:08:55.200 --> 00:09:01.130
Savi Ellis-Pachori: We will encourage the submission of detailed comments
to our docket through the links included in this notice

38

00:09:01.240 --> 00:09:08.510
Savi Ellis-Pachori: for the workshop, and we are committed to giving
equal consideration to comments submitted both orally and in writing
written form.

39
00:09:09.810 --> 00:09:18.060
Savi Ellis-Pachori: I'm now going to welcome our Commissioner Mcallister,
Lead Commissioner for Energy Efficiency and building decarbonization.
Turn it over to you, Commissioner.

40
00:09:18.600 --> 00:09:44.697
Andrew McAllister: Thank you very much. Really appreciate it, savvy? And
the whole team. A lot of work has gone into preparation for this
workshop. Super appreciative of the team. At the Energy Commission. Just
really thinking this through and coming up with with the preliminary plan
for the pay for performance portion of the Homes program. I wanted to
just provide a little bit of context.

41
00:09:45.260 --> 00:10:04.430
Andrew McAllister: you know, this is a complicated time. And for a number
of reasons. You know, we're we're really looking for ways building on a
lot of experience that the State and and nation other states across the
country actually already have with how to get upgrades retrofits done on
our existing building stock.

42
00:10:04.920 --> 00:10:18.772
Andrew McAllister: Yeah, yeah, it's a big challenge. It's gonna take a lot of
money, and for the homes and Hera and the smaller programs like Trek and
some others that you'll hear about that are part of the the Federal
universe.

43
00:10:19.400 --> 00:10:28.600
Andrew McAllister: we are focusing largely on low income sort of the the
bottom end of the of the economic spectrum to start to build

44
00:10:29.108 --> 00:10:56.369
Andrew McAllister: programmatic infrastructure in this area, because
well, maybe for obvious reasons, but trying to go where the need is
greatest and use the learnings from that, you know, largely direct
install program for the 1st for phase, one of the Homes program and the
equitable decarbonization program, which is the State funded program that
we're also nearing rollout of. And so the the it's super important to
focus on the, the.

45
00:10:56.550 --> 00:11:03.520
Andrew McAllister: the lower income spectrum. And and that's the area we
really need to do direct install right? There's not a lot of free capital

46
00:11:03.900 --> 00:11:18.460
Andrew McAllister: to the the lower income. Folks don't have free
capital. They don't have a lot of savings to put into their buildings.
And it's not, you know, necessarily the top priority. And so we're
focusing, you know, large chunk of our programmatic funds on on direct
install.

47
00:11:18.600 --> 00:11:26.820
Andrew McAllister: The pay for performance program is an effort to really
build sort of Upmarket infrastructure, programmatic infrastructure to

48
00:11:27.632 --> 00:11:34.808
Andrew McAllister: Leverage private capital to really incentivize
performance in the marketplace, to work through

49
00:11:35.400 --> 00:11:59.400
Andrew McAllister: through a program structure that's gonna really
incentivize delivery of of energy savings and economic benefits and
market growth and sort of in the ways that are that are sustainable for
the long term. And so that approach is what we're talking about today and
in in the Ebd, the Equitable Building, Dcarp program, we've got a
different structure with 3 regional implementers.

50
00:12:00.110 --> 00:12:09.999
Andrew McAllister: and you know. Similarly, for the 1st for the the 1st
chunk of the Homes program for this program for pay for performance.
We're looking for one statewide

51
00:12:10.090 --> 00:12:39.191
Andrew McAllister: approach. And so really interested. We're we're
interested in getting feedback for the specifics that are in the the
questions or the the what you'll hear staff present. In a little bit. And
then response to questions about the program structure and various
aspects of it. So it's, we believe it's really important for California
to continue to be a pioneer in this area. We have, pioneered

52
00:12:39.870 --> 00:12:43.149
Andrew McAllister: methods to take advantage of.

53
00:12:43.687 --> 00:12:49.579
Andrew McAllister: You know, analytical tools and meter data to really
understand the performance of buildings and the building stock

54
00:12:50.224 --> 00:13:00.425

Andrew McAllister: and be able to understand the impacts of different
retrofits on those buildings. And so performance is actually something
that we can measure and have a good

55
00:13:01.497 --> 00:13:10.029
Andrew McAllister: a good sort of understanding of, maybe not at every
building level, but certainly at a portfolio level. That we can

56
00:13:10.450 --> 00:13:28.650
Andrew McAllister: build a program around. So we'll be able to say, Okay,
well, this type of house really does deliver savings. These contractors
in this area or this climate, we'll be able to really understand sort of
how our investments are working and be able to dial in the incentives to

57
00:13:28.650 --> 00:13:50.045
Andrew McAllister: the market actors, data aggregators, the the
contractor, perhaps. But the program implementation to really understand
where we're getting the best performance and then focus on those types of
projects so excited to leverage the work that we've been engaged in for,
you know, a decade plus now to understand, to really utilize advanced
metering, infrastructure and and interval meter data to understand

58
00:13:50.410 --> 00:13:57.281
Andrew McAllister: the impacts of actual investments in actual buildings.
So the program will leverage that infrastructure

59
00:13:57.850 --> 00:14:06.479
Andrew McAllister: and also utilize sort of a more private market
structure to bring private capital to match the incentives that the
program will be offering

60
00:14:06.530 --> 00:14:24.779
Andrew McAllister: from from the Ira funds. So it's super important to
calibrate with folks that are knowledgeable out there doing projects in
the marketplace. And that's 1 of the main reasons for this workshop
really want to float these ideas that we've been working through. We have
a very capable, competent staff that has a lot of experience out there.

61
00:14:25.132 --> 00:14:46.979
Andrew McAllister: In the world, in addition to their work at the Energy
Commission. And so, you know, confident in the ability to have a really
informed and high level dialogue with all of you who are attending today
and going forward. So really want to thank everyone for attending for
attending today. And I'm super excited about really the fact that the Ira

62
00:14:46.980 --> 00:15:03.759

474

Andrew McAllister: did enable this model specifically, we want to leverage that and really show that there is a path, a clear path to bring in private capital, often matching it with some kind of State or Federal funds

63
00:15:03.780 --> 00:15:04.690
Andrew McAllister: and

64
00:15:05.780 --> 00:15:34.740
Andrew McAllister: and and really focusing on, you know, proving out success with this program structure and then moving forward with potentially significant private sector partner, private sector partners to build a program and get to scale over the coming years and and decades. Really right? This is a this is a decade of effort to upgrade our building stock and to improve its performance and really continue long after you know, these initial funds are are expended.

65
00:15:35.080 --> 00:15:37.740
Andrew McAllister: So the

66
00:15:37.820 --> 00:16:01.180
Andrew McAllister: questions are actually savvy. Went through the sort of character nature of the questions categorically, structurally, we would like to know people's thoughts about about how feasible the approach were. You know, the the approach that you'll hear about is, and and any tweaks to that that might make sense. There's some tricky financing issues like bridge funding and and the like. That we want to help work through as well.

67
00:16:01.578 --> 00:16:12.081
Andrew McAllister: Emmv, and data use of data data access things like that. So with that, I'll I'll pass it pass it on to staff. Jacob Walgren is gonna pick up

68
00:16:12.590 --> 00:16:22.929
Andrew McAllister: with the agenda. But I really just want to thank everyone for your participation and your interest and your thoughtfulness right? We all need to have our thinking caps on as we move forward.

69
00:16:23.322 --> 00:16:47.979
Andrew McAllister: In what's a challenging environment? Right? We have we do have affordability issues, obviously generally in the state and also in in the energy sector. And so, you know, moving forward and and doing the right projects the right scopes and funding. So we're focusing on the project scopes that are really going to produce benefits for for the customer, the consumer, the resident, the building owner.

70
00:16:48.371 --> 00:16:55.709
Andrew McAllister: So really want to focus on that. And I think we're all
familiar with some of the potential upsides here in terms of job growth
and economic

71
00:16:56.158 --> 00:17:20.529
Andrew McAllister: sort of local economic growth, and really having boots
on the ground doing projects that really benefit people. The people of
California, so very high expectations and high hopes for this program, as
well as the monopoly of other programs that are that are under
development and actually already out there in the world. So thanks again
for for your attention, and on to you, Jacob. Thank you.

72
00:17:22.430 --> 00:17:23.640
Jacob Wahlgren, CEC: Thank you, Commissioner.

73
00:17:26.770 --> 00:17:33.660
Jacob Wahlgren, CEC: So yeah, my name is good morning. My name is Jacob
Waldron. And I'm gonna provide a brief overview of the Homes program.

74
00:17:33.950 --> 00:17:58.670
Jacob Wahlgren, CEC: So the Federal Inflation Reduction Act authorized an
appropriate nearly 8.8 billion toward States Territories and tribes to
lower energy costs and increase energy efficiency for households through
2 residential energy upgrade programs known as the home Efficiency
rebates program or homes, which is the topic of today's workshop and the
home electrification appliance rebates program also known as Hira

75
00:17:58.890 --> 00:18:09.510
Jacob Wahlgren, CEC: homes around here are collectively known as the home
energy rebate programs are being implemented through State energy offices
in California. The State Energy Office is the California Energy
Commission.

76
00:18:10.460 --> 00:18:24.230
Jacob Wahlgren, CEC: As many are likely aware, the recent Congressional
Budget Reconciliation Bill amended several provisions of the Inflation
reduction act. However, the homes in here programs were not impacted and
we are continuing to develop and implement these programs

77
00:18:24.560 --> 00:18:33.049
Jacob Wahlgren, CEC: next slide last spring staff held a workshop and
announced plans to divide the homes funding between 2 programs.

78
00:18:33.620 --> 00:18:49.240

Jacob Wahlgren, CEC: 60% of rebate dollars from the Homes program would go to the Energy Commission's Equit building decarbonization statewide direct install program, which is a state program and 40% of the Homes funds would go toward a new statewide pay for performance program.

79
00:18:50.230 --> 00:18:58.499
Jacob Wahlgren, CEC: And as a refresher the Direct install program will use the Us. Department of Energy's modeled pathway to estimate energy savings under the Homes program.

80
00:19:00.130 --> 00:19:08.240
Jacob Wahlgren, CEC: The Direct Install program exclusively serves low income households who may benefit from efficiency and electrification upgrades at no cost.

81
00:19:08.730 --> 00:19:18.579
Jacob Wahlgren, CEC: and the statewide Install direct Install program is being implemented by 3 regional administrators who entered agreements with the Energy Commission in January of 2025.

82
00:19:18.870 --> 00:19:22.619
Jacob Wahlgren, CEC: The program expects the 1st retrofits to begin later this fall.

83
00:19:24.070 --> 00:19:33.199
Jacob Wahlgren, CEC: The department energy requires that at least 40% of homes rebate funds benefit low-income households, and the 10% of rebate funds benefit low income multifamily, households

84
00:19:33.460 --> 00:19:42.539
Jacob Wahlgren, CEC: and staff anticipates that the State and Statewide Direct Install program will satisfy this requirement requirement for the host program in its entirety.

85
00:19:43.630 --> 00:19:44.980
Jacob Wahlgren, CEC: Next slide, please.

86
00:19:46.500 --> 00:19:52.139
Jacob Wahlgren, CEC: So I'll briefly lay out the steps that have been taken to this point. And what will happen after this? Today's workshop?

87
00:19:52.730 --> 00:19:59.400
Jacob Wahlgren, CEC: Towards the end of 2023, the Energy Commission released a request for information or Rfi regarding the Homes Program design.

88
00:19:59.740 --> 00:20:06.789
Jacob Wahlgren, CEC: And then, in the spring of 2024 staff held a
workshop to discuss potential statewide pay for performance pathway.

89
00:20:07.410 --> 00:20:23.170
Jacob Wahlgren, CEC: And later that year, in August of 2024, staff
submitted the Homes application to the Department of Energy, which was
approved. In January 2025, the Department of Energy approved the Homes
Award and the approach of dividing the funds between 2 programs.

90
00:20:24.340 --> 00:20:45.929
Jacob Wahlgren, CEC: So staff are hosting today's workshop to receive the
input on an expected forthcoming solicitation for a pay for performance
implementer. And this fall staff will work to submit the remaining
application documents to the department energy and the blueprint
blueprint implementation plans. These plans will include both the
Statewide direct install and the pay for performance programs.

91
00:20:46.900 --> 00:20:55.709
Jacob Wahlgren, CEC: The Department of energy must approve the blueprint
plans before Energy Commission can access. American use home rebate funds
to pay for projects under either program.

92
00:20:56.160 --> 00:21:02.770
Jacob Wahlgren, CEC: and staff would concurrently be incorporating public
comments and working on issuing a solicitation for the pay for
performance program.

93
00:21:04.770 --> 00:21:11.020
Jacob Wahlgren, CEC: So I want to take a minute to address the question,
and you may have on the status of Federal funds for the home efficiency
rate programs.

94
00:21:11.640 --> 00:21:24.009
Jacob Wahlgren, CEC: In January, as I said in January 2025, the Cec. Was
awarded the Full Homes award of 291 million dollars. The funding is
obligated, and the Energy Commission has signed a contract with the
Department energy for the full award. Mount

95
00:21:24.270 --> 00:21:30.019
Jacob Wahlgren, CEC: Staff continues to work with the Department of
Energy on required reporting and submission of the blueprints.

96
00:21:31.100 --> 00:21:38.259

Jacob Wahlgren, CEC: We have not received any indication from the
Department of Energy of any funding changes to these programs.

97
00:21:39.660 --> 00:21:44.179
Jacob Wahlgren, CEC: So I'm now gonna pass it over to my colleague,
Brennan Mccoy, to cover our next section.

98
00:21:48.260 --> 00:21:54.930
Brennan McCoy CEC: Thank you, Jacob. Good morning. All. I am Brendan
Mccoy, and I'm a specialist in the Federal Incentives and

99
00:21:55.590 --> 00:21:57.999
Brennan McCoy CEC: Financing Branch working on the Homes program

100
00:21:58.710 --> 00:22:06.270
Brennan McCoy CEC: before I get into California's program design, I want
to provide a quick refresher on some of the DOE rules and expectations
for the measured pathway.

101
00:22:07.300 --> 00:22:14.720
Brennan McCoy CEC: First.st The expectation from DOE is that homeowners
receive the value of their rebate based on estimated savings at the time
of installation.

102
00:22:14.900 --> 00:22:27.749
Brennan McCoy CEC: That means that aggregators are going to need to
determine a reasonable estimate of energy savings prior to install, and
that the rebate value will need to be financed from the time of
installation through the 12 months measurement verification period.

103
00:22:28.470 --> 00:22:34.210
Brennan McCoy CEC: Second, this is a difference from some of the Cpuc
authorized market access programs in California.

104
00:22:35.130 --> 00:22:50.920
Brennan McCoy CEC: In this program Cec must provide DOE. The minimum
percentage of the expected rebate value that the aggregator will share
with the homeowner. The rebate split between homeowner and aggregator
needs to balance, passing as many benefits to homeowners as possible
while attracting aggregators to the program.

105
00:22:51.510 --> 00:22:57.769
Brennan McCoy CEC: 3, rd the final rebate value is determined after a 12
month post project measurement and verification period.

106
00:22:58.320 --> 00:23:02.860
Brennan McCoy CEC: and finally, rebates are only paid to aggregators if a
portfolio of projects.

107
00:23:17.930 --> 00:23:23.320
Brennan McCoy CEC: But our equivalent savings for this pay performance
program, California's program goals include

108
00:23:23.620 --> 00:23:34.779
Brennan McCoy CEC: lowering the upfront costs for energy upgrades for
homeowners, increasing energy efficiency in residential buildings,
aligning with the State's load shift goal improving grid resilience and
supporting innovation.

109
00:23:35.340 --> 00:23:59.129
Brennan McCoy CEC: To accomplish these goals, the program has a few key
features and strategies. First, st we are planning to use the Cec's
access to utility billing data and interval meter data or Imd Imd is
sometimes referred to as advanced metering infrastructure data or ami
data and consists of hourly meter level energy consumption data. This
data will be used to help drive aggregators towards high impact projects.

110
00:23:59.160 --> 00:24:07.509
Brennan McCoy CEC: Second, the rebate pricing structure will incentivize
peak load reduction and load flexibility by rewarding savings. When
energy demand is highest

111
00:24:08.320 --> 00:24:09.500
Brennan McCoy CEC: or at its peak.

112
00:24:09.660 --> 00:24:16.369
Brennan McCoy CEC: 3rd projects will be delivered by aggregators.
However, the measurement and verification will be centralized and
performed by the implementer.

113
00:24:16.810 --> 00:24:25.329
Brennan McCoy CEC: we'll talk more about aggregators a little further on
in the presentation in terms of eligibility.

114
00:24:25.490 --> 00:24:33.789
Brennan McCoy CEC: First, st the program will be open to residents of all
income levels, the value of rebates will be doubled for low income
households to encourage participation.

115

```
00:24:34.910 --> 00:24:38.250
Brennan McCoy CEC: Second, because of the challenges with the measured
savings program

116
00:24:38.680 --> 00:24:52.640
Brennan McCoy CEC: and multifamily properties. We are expecting this
program to primarily serve single family properties multifamily,
properties will still be eligible, but we expect much of the demand will
come from the single family market. 3, rd DOE rules require Hvac.

117
00:24:57.730 --> 00:25:00.920
Miriam Joffe-Block, CEC: Hey, Brennan, this is Miriam speaking.

118
00:25:01.350 --> 00:25:03.750
Miriam Joffe-Block, CEC: We are losing your audio.

119
00:25:03.750 --> 00:25:05.199
Brennan McCoy CEC: And that the portfolio.

120
00:25:05.200 --> 00:25:05.540
Miriam Joffe-Block, CEC: Right now.

121
00:25:06.050 --> 00:25:07.930
Miriam Joffe-Block, CEC: Can you hear me? This is Miriam.

122
00:25:07.930 --> 00:25:08.750
Brennan McCoy CEC: Yes, I can.

123
00:25:08.750 --> 00:25:15.140
Miriam Joffe-Block, CEC: Your your audio is going in and out, and I'm
wondering if you turn off your camera, if that might help your bandwidth.

124
00:25:16.280 --> 00:25:17.449
Brennan McCoy CEC: Sure. How is it now?

125
00:25:17.870 --> 00:25:22.110
Miriam Joffe-Block, CEC: Now it's good. Let's try that, and I will jump
back in. If we lose you again.

126
00:25:22.870 --> 00:25:23.540
Brennan McCoy CEC: Okay?

127
```

00:25:23.730 --> 00:25:49.599
Brennan McCoy CEC: All right. So sorry about that. So DOE rules. I'll
back up a little bit. DOE rules require Hvac and water heating products
to be energy star certified and show have the portfolio show 15% energy
savings. The Cec may establish eligible equipment lists or performance
requirements. Final project rules, including what costs are allowed to be
included in the full project cost will be determined in consultation with
the statewide implementer.

128
00:25:50.820 --> 00:26:18.210
Brennan McCoy CEC: Finally, Staff understands that other measured savings
programs like the Cpuc's market access programs require customers to have
data sufficiency or enough utility data history to construct a baseline
for measured savings calculations with regard to homes, pay for
performance. The Cec. Wishes to be as inclusive as possible, and allow
participation from customers who have lived in their home less than 12
months, or who have installed, or plan to install solar or ev charging to
the extent that DOE approved.

129
00:26:18.390 --> 00:26:26.830
Brennan McCoy CEC: Mnv. Protocols. Allow for this, we will discuss this
more later on. And there are questions in the input request that ask for
comment on the topic of data sufficiency.

130
00:26:30.100 --> 00:26:40.630
Brennan McCoy CEC: I mentioned a few minutes ago that the pay for
performance program will incentivize peak load reduction. I want to talk
about how that works under DOE program rules and what that means for pay
for performance.

131
00:26:41.130 --> 00:26:43.049
Brennan McCoy CEC: First, st the left

132
00:26:43.390 --> 00:27:05.450
Brennan McCoy CEC: home of this slide shows how DOE arrives at a default.
Kilowatt hour or kilowatt hour. Equivalent savings value. The top of the
slide includes the home statutory language that explains that the
incentive rate paid should provide the average home in the State that has
a 20% energy savings with a $2,000 rebate if they are a market rate
household and a $4,000 rebate, if they are a low income household.

133
00:27:05.610 --> 00:27:18.440
Brennan McCoy CEC: what DOE did say did define. The average home energy
use was to use the energy Information Administration's energy consumption
survey data. They looked total statewide use and divided it by total
number of households.

134

00:27:19.100 --> 00:27:36.759
Brennan McCoy CEC: From that average household use, and calculating a 20% savings. DOE derived a value of 55 cents for every kilowatt hour or kilowatt hour, equivalent of energy saved, or a dollar 10 for a low income household, a kilowatt hour equivalent of energy saved is worth the same, no matter what time of day or year it was saved.

135
00:27:37.000 --> 00:27:45.199
Brennan McCoy CEC: Now, moving to the right side of the slide, the home statute allows States to value savings based on time, location, or greenhouse gas emissions.

136
00:27:45.440 --> 00:28:05.849
Brennan McCoy CEC: Cec proposed structuring the Home's incentives to reward savings based on time to align with California's load shift goal of 7 gigawatts. In this approach staff applied a weighting factor, so that energy savings during peak electricity demands, such as late summer afternoons and evenings are valued several times more compared to energy savings during off-peak periods.

137
00:28:05.980 --> 00:28:22.849
Brennan McCoy CEC: The intent is to incentivize projects that deliver energy savings when the grid needs them the most, while adhering to the requirement that energy savings are valued on average at 55 cents per kilowatt hour or kilowatt hour, equivalent on an annual basis of energy savings were equally distributed over every hour of the year.

138
00:28:23.760 --> 00:28:24.640
Brennan McCoy CEC: As far

139
00:28:24.950 --> 00:28:33.349
Brennan McCoy CEC: we know, California was the 1st state in the country to receive approval. To take advantage of this option rebate values will remain doubled for low income households.

140
00:28:36.320 --> 00:28:49.970
Brennan McCoy CEC: As we are talking about rebate values, I want to be clear that the final incentive formula for this pay for performance program is still to be determined. Cec, along with the statewide implementer, will decide the final weightings and peak hours to most appropriately incentivize Peak

141
00:28:50.190 --> 00:28:51.330
Brennan McCoy CEC: the reduction.

142
00:28:51.520 --> 00:29:12.879

Brennan McCoy CEC: Additionally, the Cec is exploring potential higher incentives for grid constrained locations per the statutory allowance to value savings in specific locations. Second, when our staff looked at modeling of savings for potential heat pump, Hvac with air sealing project. The savings for older homes were much, much greater than 20% of the average home's energy use, especially in climates with very hot or cold weather.

143
00:29:15.010 --> 00:29:39.609
Brennan McCoy CEC: This means that rebates are likely to be significantly higher than 2,000 or $4,000 for some homes doing heat, pump and air seal projects. The home statute. Already caps rebate values at 50% of project costs for market rate customers and 80% of project costs for low income customers and rebates are only paid for actual savings, however, high saving projects that are also high cost could end up with very high rebates.

144
00:29:39.610 --> 00:29:53.380
Brennan McCoy CEC: To avoid this and ensure rebate dollars are available for a large number of participants, Cec. Was approved to implement a per home. Max rebate cap of $15,000 for market rate customers and $24,000 for low income customers.

145
00:29:53.960 --> 00:30:05.389
Brennan McCoy CEC: I want to stress that this cap is not final. Cec. Staff plan to work with the statewide implementer and may lower the cap further to avoid over incentivizing where it is not needed to move projects.

146
00:30:05.580 --> 00:30:09.000
Brennan McCoy CEC: Finally, DOE requires that States put a cap on

147
00:30:09.120 --> 00:30:24.100
Brennan McCoy CEC: payment of rebates for savings exceed estimates. Cec proposed 120%. This avoids aggregators, deliberately underestimating savings and lowering what is passed on to the homeowner. As the homeowner receives the estimated savings value.

148
00:30:28.210 --> 00:30:30.479
Brennan McCoy CEC: Now I'll talk a little bit about

149
00:30:30.790 --> 00:30:39.040
Brennan McCoy CEC: difference between 3 key program players, the statewide implementer aggregators and energy contractors. First, st the statewide implementer.

150

00:30:39.410 --> 00:30:53.900
Brennan McCoy CEC: as you'll hear more about when we go into the scope of
work. The implementer is responsible for recruiting, overseeing, and
supporting both aggregators and contractors. The word contractor in our
context today refers to the installers who are making the upgrades.

151
00:30:54.250 --> 00:31:13.209
Brennan McCoy CEC: The statewide implementer will use Cec's interval
meter data to help identify high impact projects. They are responsible
for running the rebate application and reservation process. They confirm
eligibility and conduct the post project, Qaqc. They also perform the
Mnv. On projects and calculate the final rebate amounts

152
00:31:13.620 --> 00:31:33.659
Brennan McCoy CEC: next the aggregators. The role of aggregator is
critical to measured pathway and is somewhat unique in terms of program
delivery aggregators deliver the savings to the program. They work with
contractors to identify projects and help contractors estimate savings.
They sit between the contractors and the program and help facilitate the
transfer of required project data.

153
00:31:34.100 --> 00:31:40.950
Brennan McCoy CEC: It is the aggregators who assume the performance risk
on the project because they are not paid until the 12 months of Mnv. Is
complete.

154
00:31:41.720 --> 00:31:56.519
Brennan McCoy CEC: Recall that earlier we mentioned that DOE expects that
homeowners receive their rebate at time installation. We are assuming
that contractors also must be paid after installation for the discount.
They passed on to the customer. Therefore someone needs to finance the
rebates.

155
00:31:56.570 --> 00:32:23.469
Brennan McCoy CEC: Cec proposed to DOE that we utilize homes, rebate
dollars for 50% progress payments to aggregators to reduce the amount of
financing that would be needed and reduced the interest cost on these
projects. DOE just recently responded to Cec. That they are not expecting
to allow progress payments as part of the measured pathway. Therefore,
aggregators should expect to finance these projects for contractors. We
have this topic set for discussion during our 1st public input session.

156
00:32:24.460 --> 00:32:44.610
Brennan McCoy CEC: Finally, the energy contractors. This is who will be
doing the actual installation of the energy upgrades. The contractors
will also be providing detailed project data and installation records to
the program, possibly through aggregators, or possibly straight to the

implementer. They will also need to follow program rules around
compliance and eligibility requirements

157
00:32:44.870 --> 00:32:56.480
Brennan McCoy CEC: not shown here is the Cec. Cec. Is responsible for
program oversight, including monitoring compliance, finding out
finalizing applications to DOE and overseeing, reporting.

158
00:33:00.560 --> 00:33:03.929
Brennan McCoy CEC: This slide walks through project steps at a high
level.

159
00:33:04.340 --> 00:33:13.180
Brennan McCoy CEC: First, st as we've talked about the statewide
implementer or Swi will help guide aggregators towards geographic areas
with high potential projects.

160
00:33:13.480 --> 00:33:24.239
Brennan McCoy CEC: Second contractors can initiate projects even without
aggregators sending them to certain zip codes. Contractors will scope
projects and potentially with the help of aggregators. Estimate energy
savings.

161
00:33:24.450 --> 00:33:29.540
Brennan McCoy CEC: I want to note that for the measured pathway DOE does
not require the energy saving

162
00:33:29.760 --> 00:33:40.759
Brennan McCoy CEC: things to be estimated using actual meter data. Cec is
not expecting that the savings estimates rely on actual data, we do have
an expectation that the implementer checks that they are reasonable,
which you see in step 3.

163
00:33:41.380 --> 00:33:44.430
Brennan McCoy CEC: Additionally in step 3. The statewide implementation

164
00:33:45.080 --> 00:33:57.509
Brennan McCoy CEC: is performing upfront eligibility checks, estimating
the value of the incentive, and then making a rebate reservation with
DOE's pnnl system or the system required by DOE, and then confirming that
reservation back to the aggregator.

165
00:33:57.740 --> 00:34:12.610
Brennan McCoy CEC: In step 4. The contractor does the installation. The
customer receives the value of the rebate, most likely as a discount on

their invoice. The implementer performs the project. Qaqc. And the
aggregator pays the contractor for the share that they discounted to the
customer.

166
00:34:13.730 --> 00:34:16.299
Brennan McCoy CEC: Next we have the 12 month performance period.

167
00:34:16.610 --> 00:34:27.909
Brennan McCoy CEC: and then finally, in step 6. The statewide implementer
conducts the project measurement and verification confirms portfolio
savings and pays the aggregator for the final incentives on the
portfolio.

168
00:34:30.610 --> 00:34:40.130
Brennan McCoy CEC: We are interested in your reactions to that series of
steps, and we have a more detailed draft workflow available for comment.
The detailed draft workflow includes the homeowner's perspective.

169
00:34:40.860 --> 00:34:42.419
Brennan McCoy CEC: The workflow is available

170
00:34:42.760 --> 00:34:54.280
Brennan McCoy CEC: download on the workshop events. Page. We also have
specific questions around the workflow, the timing of the various checks
and the implementer versus aggregator and contractor responsibilities. In
the input request.

171
00:34:57.740 --> 00:35:04.959
Brennan McCoy CEC: we are now going to pause to answer some questions
that have come in, and I'm going to invite our unit, supervisor, Miriam
Joffey Block to come in and assist in answering them.

172
00:35:06.520 --> 00:35:12.740
Miriam Joffe-Block, CEC: Thank you so much, Brennan. And Hello, everyone.
Thank you for being here. I wanted to just repeat

173
00:35:12.940 --> 00:35:24.129
Miriam Joffe-Block, CEC: one thing out loud. That Brendan was saying,
when his audio got a little cut, just to make sure folks are clear that
rebates in the program only get paid

174
00:35:24.480 --> 00:35:46.614
Miriam Joffe-Block, CEC: to aggregators if their portfolios realize at
least 15% kilowatt hour kilowatt hour equivalent savings. And so that's a
DOE rule is that measured pathway is that the projects have to hit that

15% threshold. So I just want to make sure we heard that that actually relates to a question that came into the chat about

175
00:35:47.710 --> 00:36:12.749
Miriam Joffe-Block, CEC: Where does the to? Who does the Ira rebate flow to? So that's a good question. And that hopefully, was somewhat answered in that process flow slide that Brennan just showed. But the so the homeowner is getting the value of the rebate. But they're not getting it directly from the Ira funding because of the 12 month measurement period.

176
00:36:12.750 --> 00:36:26.359
Miriam Joffe-Block, CEC: So the contractor is most likely giving the homeowner a discount off of their project, and it's an DOE requirement also that the invoice, show the home's value of the home's rebate on their invoice.

177
00:36:26.871 --> 00:36:36.809
Miriam Joffe-Block, CEC: We also expect that the contractors won't be able to carry that cost for the 12 months M. And B. Period. Hence the need for financing. Hence the aggregator role.

178
00:36:36.920 --> 00:36:52.940
Miriam Joffe-Block, CEC: So the aggregators are floating the cost of the rebate so that the contractor can discount it to the homeowner, and then it's the aggregators who will actually get the payment when the 12 month M. And B. Period is over, and the savings are measured.

179
00:36:53.450 --> 00:37:07.079
Miriam Joffe-Block, CEC: So crystal clear, right? So hopefully, that answers the question that we could also foresee there could be some situations in which contractors act as their own aggregator. And then they're actually end up being the recipient of the rebate.

180
00:37:07.590 --> 00:37:09.040
Miriam Joffe-Block, CEC: When that comes in.

181
00:37:12.100 --> 00:37:15.660
Miriam Joffe-Block, CEC: Okay, I'm gonna look at some other.

182
00:37:15.910 --> 00:37:42.790
Miriam Joffe-Block, CEC: Okay, I'm going to look at some other questions coming in. Okay? So there's a related question, will the program allow contractors to act as aggregators? Yes, if they are able to perform the aggregator role, and especially with the financing. And we have questions about that for the public input section. But contractors could step in

and act as aggregators and sort of cut out that secondary party in their transactions.

183
00:37:47.330 --> 00:38:05.659
Miriam Joffe-Block, CEC: Okay, there's a couple questions about cities. And these questions are from John tribs. And I'm going to encourage you also to maybe say more during the public input session and and talk about your city's needs because we would welcome that comment. So

184
00:38:06.620 --> 00:38:22.930
Miriam Joffe-Block, CEC: the city there, there's not. This is not structured as sort of a funding opportunity for cities. It's going to be implemented by one statewide implementer who will have an agreement with the Cec. To carry out the program. I think there, there is a lot of.

185
00:38:22.980 --> 00:38:45.810
Miriam Joffe-Block, CEC: There are questions in our input request, where we're specifically looking for comment on the ways in which this program would integrate with local programs that the city could be running. I think your question is also sort of hinting at the possibility that cities could serve as aggregators, or maybe that a publicly owned utility in a city could serve as aggregators.

186
00:38:45.810 --> 00:38:59.210
Miriam Joffe-Block, CEC: And that's a really interesting concept. We do have a concept of a super aggregator which is something that some of the Ccas brought up, and I encourage you to say more in the public comment.

187
00:39:03.280 --> 00:39:09.919
Miriam Joffe-Block, CEC: okay, I'm gonna look for some more here. The question is, about the

188
00:39:10.170 --> 00:39:15.109
Miriam Joffe-Block, CEC: Us. Department of Energy regarding cuts to funding. And how do you square? How do we square

189
00:39:15.700 --> 00:39:43.869
Miriam Joffe-Block, CEC: Our statement that we haven't heard anything about cuts to funding with what the trump administration is doing. I'll just sort of repeat what we said that we're continuing to work with staff there are fewer staff, as everybody knows, at DOE. We are continuing to work with them. On a regular basis with the reporting, and to submit our plans. And at the moment we are submitting our invoices and

190
00:39:44.400 --> 00:39:46.530
Miriam Joffe-Block, CEC: and continuing to work with them.

489

191
00:39:50.490 --> 00:39:52.554
Miriam Joffe-Block, CEC: Okay, let's see here.

192
00:39:55.570 --> 00:40:05.759
Miriam Joffe-Block, CEC: okay, how do we define over incentivizing?
That's a good question. And we welcome your input. Your answer to that
question in the public comment session.

193
00:40:06.050 --> 00:40:12.689
Miriam Joffe-Block, CEC: I think the idea with the program caps that
Brennan mentioned is.

194
00:40:12.800 --> 00:40:30.179
Miriam Joffe-Block, CEC: we want to make sure that as many households as
possible have access to the home's funds to complete projects. And so we
don't want to have an imbalance where a particular household may have a
very high cost project, with also very high savings that could be a very
lucrative rebate.

195
00:40:30.566 --> 00:40:46.579
Miriam Joffe-Block, CEC: And then there's fewer resources to sort of go
to other households. I think there's another way to look at over
incentivizing. If it's a lot more than somebody actually needs to make
the project happen. Then we might be over incentivizing. But we welcome
your input on that.

196
00:40:49.970 --> 00:41:01.530
Miriam Joffe-Block, CEC: How quickly do contractors get paid? That's a
really good question. That's also related to what I just said about the
aggregator financing. So the sort of DOE envisioned model here.

197
00:41:01.660 --> 00:41:20.020
Miriam Joffe-Block, CEC: and which the aggregator industry also, I think,
sort of helped to create is this idea that aggregators are working with
contractors, and they are supplying the financing, and so contractors
would have a relationship with aggregators. So they're getting
contractors are getting paid in 2 ways. They're getting the

198
00:41:20.486 --> 00:41:47.283
Miriam Joffe-Block, CEC: the payment from the customer for the portion of
the project that's not covered by the rebate, and then they're getting
the part that they discounted to the customer covered by the aggregator
until that, you know 12 to 15 month period where the aggregators get
their payment and we'll explain the I'll explain the 15 months more in a

second we have questions about the aggregators, ability to provide this
financing and to pay the contractors and cover that gap

199
00:41:47.750 --> 00:41:56.260
Miriam Joffe-Block, CEC: on our notice and our input request. And we have
dedicated session for that in our public comment period.

200
00:41:56.630 --> 00:41:59.249
Miriam Joffe-Block, CEC: But we understand that contractors can't float

201
00:41:59.835 --> 00:42:16.869
Miriam Joffe-Block, CEC: the cost of these rebates for very long. The 12
to 15 months that I referred to has to do with the data when it becomes
available to the implementer, and how quickly they would be able to
crunch the savings.

202
00:42:17.900 --> 00:42:22.699
Miriam Joffe-Block, CEC: How are saving? How are estimated savings
calculated?

203
00:42:23.400 --> 00:42:40.659
Miriam Joffe-Block, CEC: that's a good question. That is also something
we'd welcome public input into. But that is really the contractor doing a
home assessment and estimating the energy savings from the project, and
then the aggregator

204
00:42:40.720 --> 00:42:58.140
Miriam Joffe-Block, CEC: and the statewide implementer sort of together
doing a reasonableness check. And we have some questions about what tools
contractors already have, what tools aggregators are bringing to the
table, what tools the statewide implementer would need to provide. And I
know, I sound like I'm repeating myself. But for the public

205
00:42:58.320 --> 00:42:59.960
Miriam Joffe-Block, CEC: input session.

206
00:43:00.960 --> 00:43:11.009
Miriam Joffe-Block, CEC: okay, I think I'm gonna look for like one or 2
more, and then we're gonna continue because we'll have more time for this
at the end. Let me see if there's anything else that we have

207
00:43:11.300 --> 00:43:12.960
Miriam Joffe-Block, CEC: clarified.

208

00:43:22.770 --> 00:43:43.509
Miriam Joffe-Block, CEC: Okay, I think these are all really good
questions in here. I think we'll we'll I think some of these will be
answered as we talk about the scope of work that we're going through,
that we're going to go through in the next presentation, and I think
we'll get to some of those responding to you in the chat where we don't
have

209
00:43:43.630 --> 00:43:47.479
Miriam Joffe-Block, CEC: things planned, where we don't have presentation
planned to answer it.

210
00:43:48.960 --> 00:43:54.579
Miriam Joffe-Block, CEC: So I'm going to go into. Now we're going to move
to our next section

211
00:43:54.750 --> 00:43:59.199
Miriam Joffe-Block, CEC: and talk a little bit about the concept paper,
the budget and agreement structure.

212
00:43:59.640 --> 00:44:14.650
Miriam Joffe-Block, CEC: so much of the background that we've talked
about this morning is explained in more detail in our solicitation
concept paper. So if we don't get to your questions today, there are also
some answers there which is available on the workshop event, Webpage, as
well as in the docket.

213
00:44:14.830 --> 00:44:31.450
Miriam Joffe-Block, CEC: The concept paper is a proposed early draft of
what will become a solicitation manual. When it's time for release. It
will definitely change between now and that time, and we encourage
participants to read it ahead of submitting comments as today's workshop
will be covering the highlights.

214
00:44:32.130 --> 00:44:34.980
Miriam Joffe-Block, CEC: And we're going to put links to that in our
chat.

215
00:44:36.050 --> 00:44:40.740
Miriam Joffe-Block, CEC: The solicitation is anticipated to include 2
budget categories.

216
00:44:40.890 --> 00:44:57.479
Miriam Joffe-Block, CEC: The 1st is 16.5 million dollars for
administrative services, and these services will be comprised of 2 parts.

The 1st is $15,750,000 for administrative expenses related to planning and implementation of the program.

217
00:44:57.620 --> 00:45:02.650
Miriam Joffe-Block, CEC: The second 750,000 is reserved as performance incentives for the implementer.

218
00:45:02.880 --> 00:45:23.819
Miriam Joffe-Block, CEC: So one big difference between this program and the Cpuc's market access program is that the statewide implementer themselves will not be paid based on energy savings performance. So it's the aggregators who are paid on energy savings performance. But the implementer serves as the arbitrator of those savings.

219
00:45:24.210 --> 00:45:38.899
Miriam Joffe-Block, CEC: So Cec is interested in aligning the implementers compensation with performance metrics that are not related to energy savings. And so we do give some examples in the concept paper. And there's a question on this topic. In the input request.

220
00:45:39.610 --> 00:45:48.779
Miriam Joffe-Block, CEC: the second budget category is rebate reimbursement funds, and there are just under 91 million in rebate reimbursement funds available.

221
00:45:48.980 --> 00:45:56.770
Miriam Joffe-Block, CEC: These are funds paid to eligible rebate recipients, as I mentioned, most likely aggregators and sometimes contractors for energy savings.

222
00:45:57.910 --> 00:46:09.239
Miriam Joffe-Block, CEC: So next, I'm going to talk about the agreement structure. So Cec is planning on releasing the solicitation as a grant funding opportunity or Gfo.

223
00:46:09.490 --> 00:46:20.749
Miriam Joffe-Block, CEC: There are many important implications of a Gfo. And I'll go over a few of interest to potential implementers. The 1st is that awardees cannot be reimbursed for profit.

224
00:46:21.060 --> 00:46:31.210
Miriam Joffe-Block, CEC: however subcontractors on a grant award may be eligible to reimburse, to be reimbursed for profit up to 10% of services delivered.

225

00:46:32.350 --> 00:46:38.099
Miriam Joffe-Block, CEC: and a second implication is that awardees become
subrecipients to the federal award.

226
00:46:38.250 --> 00:46:58.490
Miriam Joffe-Block, CEC: The flow down requirements. The Federal flow
down. Requirements differ for subrecipients compared to contractors on a
Federal award, and we have prepared 2 sets of sample federal terms and
conditions for both subrecipients and contractors, so that you can
understand the difference, and those are available on the workshop event
page.

227
00:46:59.840 --> 00:47:08.590
Miriam Joffe-Block, CEC: Another difference is that contracts must be
reviewed and approved by the State Department of General services. While
grants do not have to be.

228
00:47:08.840 --> 00:47:20.229
Miriam Joffe-Block, CEC: We are interested in receiving comments on this
plan. This is a focus topic for the 1st public input session today. And
there are also questions posed in the input request.

229
00:47:21.170 --> 00:47:31.309
Miriam Joffe-Block, CEC: So we've now come to the section of the workshop
where we're going to cover the scope of work, and I want to invite out my
colleague, Michael Dioha, to present on this topic.

230
00:47:32.830 --> 00:47:35.710
Michael Dioha, CEC: Thank you very much, Miriam, and Hello, everyone.

231
00:47:35.820 --> 00:47:40.789
Michael Dioha, CEC: My name is Michael Joha, and I'm the technical lead
for the Homes pay for pay program.

232
00:47:43.200 --> 00:47:57.309
Michael Dioha, CEC: So this slide outlines the draft scope of work for
the hons. P. 4, P. Program. These are the major responsibilities that
will be carried out by the statewide implementer with oversight and input
from the Cec. And the Commission agreement manager.

233
00:47:57.880 --> 00:48:00.979
Michael Dioha, CEC: As you can see on your screen, there are 8 primary
tasks.

234
00:48:01.960 --> 00:48:07.200

494

Michael Dioha, CEC: So we are going to go over most of the scope of work, but not all of it.

235
00:48:07.620 --> 00:48:18.439
Michael Dioha, CEC: I'll be covering one of the subtask of task, one which is agreement administration, and I won't be speaking to task 8. That is, compliance and compliance. Reporting

236
00:48:19.670 --> 00:48:30.209
Michael Dioha, CEC: some of these tasks will cover them at a high level. So participants are encouraged to review the full concept paper document that is posted on the workshop event page for completeness.

237
00:48:33.130 --> 00:48:45.090
Michael Dioha, CEC: You also see a note here about optional tasks. These are tasks for which, in partnership with the statewide implementer, the Cac. Will determine if they are needed, or if they are applicable.

238
00:48:53.300 --> 00:48:54.589
Michael Dioha, CEC: next slide, please.

239
00:48:56.730 --> 00:49:02.120
Michael Dioha, CEC: So task one governs how the implementer we administer their agreement with the Cec.

240
00:49:02.390 --> 00:49:10.669
Michael Dioha, CEC: Most of the activities outlined in task one are standard requirements for Cec agreements. So I will just touch on one of the subtasks.

241
00:49:11.471 --> 00:49:23.820
Michael Dioha, CEC: softtax. 1.3. That is, rebate reimbursement account management. This is an optional task, as it depends on Cec's determination that advance payments are permissible under State rules.

242
00:49:24.840 --> 00:49:33.810
Michael Dioha, CEC: The purpose of this task is to enable timely rebate payments to aggregators after the 12 month project, performance and measurement and verification period

243
00:49:34.280 --> 00:49:42.319
Michael Dioha, CEC: advance payments would allow the statewide implementer to have funds on hand at the time. Aggregators submit their portfolios for reimbursement.

244
00:49:42.760 --> 00:49:51.689
Michael Dioha, CEC: Also please note that this task is quite different
from the concept of progress payments which will be payments paid prior
to 12 month Mmv. Period.

245
00:49:53.050 --> 00:50:02.000
Michael Dioha, CEC: the implementer will be responsible for administering
account and following the Federal financial standards outlined by the
code of Federal regulations. Section 200

246
00:50:04.840 --> 00:50:11.470
Michael Dioha, CEC: tax 2 contains the support the implementer will
provide to the Cec. In refining and communicating program design

247
00:50:11.950 --> 00:50:14.860
Michael Dioha, CEC: under subtax 2.1 design impose.

248
00:50:15.110 --> 00:50:23.329
Michael Dioha, CEC: The implementer will provide proposals and analysis
to inform Cec's decision making on key program and process design
elements.

249
00:50:23.930 --> 00:50:39.060
Michael Dioha, CEC: An optional component of this task is also exploring,
stacking, or layering homes rebates with other incentive programs, such
as those that are run by state agencies, local government, the community
choice aggregators or Ccas or utilities

250
00:50:40.490 --> 00:50:44.270
Michael Dioha, CEC: moving to subtask 2.2. Research and analysis

251
00:50:44.550 --> 00:50:54.549
Michael Dioha, CEC: as needed. The implementer may be asked to conduct
targeted research, provide market assessments or industry analysis to
help guide Cec's design decisions

252
00:50:55.160 --> 00:51:00.039
Michael Dioha, CEC: under subtask 2.3 DOE application and communication.

253
00:51:00.200 --> 00:51:08.929
Michael Dioha, CEC: The statewide implementer will be expected to assist
the Cec. With the revision of DOE required implementation plans and other
documents if needed.

254
00:51:09.120 --> 00:51:21.850
Michael Dioha, CEC: Additionally, the implementer will support Cec in
communicating program design decisions and assisting with any program
design related inquiries that come from the DOE during the implementation
process.

255
00:51:22.480 --> 00:51:26.329
Michael Dioha, CEC: Moving to softtax, 2.4 program communication.

256
00:51:26.690 --> 00:51:35.019
Michael Dioha, CEC: The implementer will provide input as needed into
draft memos and summary materials intended for internal use for external
stakeholders.

257
00:51:35.260 --> 00:51:45.820
Michael Dioha, CEC: Lastly, subtask 2.5, that is, continuous
improvements. This applies the implementers role in applying a data-
informed approach to improve the program.

258
00:51:45.930 --> 00:51:49.819
Michael Dioha, CEC: The implementer will monitor program metrics and data

259
00:51:50.350 --> 00:51:55.710
Michael Dioha, CEC: and data identify areas for improvement and make
recommendations for adjustments.

260
00:51:55.900 --> 00:52:06.560
Michael Dioha, CEC: Importantly, once the homes, p, 4, P program is up
and running. The implementer will also be expected to seek input on the
impact of homes on local energy programs.

261
00:52:10.130 --> 00:52:17.389
Michael Dioha, CEC: So task 3 focuses on the implementer's
responsibilities for overseeing and supporting aggregators and
contractors

262
00:52:17.870 --> 00:52:31.489
Michael Dioha, CEC: under subtax 3.1 aggregator and contractor
qualifications, the implementer will be responsible for establishing the
qualifications required for aggregators and contractors to enroll in the
homes. P. 4. P. Program.

263
00:52:31.870 --> 00:52:39.750

Michael Dioha, CEC: The implementer will also establish a clear process for enrollment into the program and define grounds and procedures for removal.

264
00:52:40.170 --> 00:52:42.589
Michael Dioha, CEC: Now moving to subtask 3.2

265
00:52:42.700 --> 00:52:45.829
Michael Dioha, CEC: aggregator and contractor outreach and education.

266
00:52:46.470 --> 00:52:50.970
Michael Dioha, CEC: The implementer with development is a Qt. Work, outreach and education plan

267
00:52:51.160 --> 00:52:58.559
Michael Dioha, CEC: this plan should ensure. There is statewide contractor coverage and provide Californians with a choice pool of qualified contractors.

268
00:52:59.000 --> 00:53:10.299
Michael Dioha, CEC: The implementer will be expected to develop outreach partnerships with interested parties and to coordinate with implementers of other relevant incentive programs where rebate stacking opportunities exist.

269
00:53:10.780 --> 00:53:15.200
Michael Dioha, CEC: The implementer we identify the most effective communication channel outreach

270
00:53:15.440 --> 00:53:22.450
Michael Dioha, CEC: to reach contractors and aggregators, including digital platforms, trade publications, and targeted events.

271
00:53:22.660 --> 00:53:33.159
Michael Dioha, CEC: They will also be responsible for developing and disseminating outreach materials, such as program websites, digital brochures, print collateral and training resources.

272
00:53:36.640 --> 00:53:41.329
Michael Dioha, CEC: Under subtax 3.3 aggregator contractor oversight.

273
00:53:41.500 --> 00:53:48.630

Michael Dioha, CEC: the implementer will be required to develop a participation agreement that outlines the rules and expectations of participation.

274
00:53:48.870 --> 00:53:56.330
Michael Dioha, CEC: the implementer will enroll aggregators and contractors and maintain a publicly accessible statewide list of active participants.

275
00:53:56.530 --> 00:54:07.760
Michael Dioha, CEC: In addition to onboarding, the implementer is responsible for delivering training on homes, program requirements, project tools, installation standards and documentation expectations.

276
00:54:08.030 --> 00:54:12.459
Michael Dioha, CEC: Regular monitoring will be required to ensure all participants remain compliant.

277
00:54:12.900 --> 00:54:23.100
Michael Dioha, CEC: The implementer must also develop and implement a disciplinary process to address cases of noncompliance, including corrective actions or removal from the program.

278
00:54:23.770 --> 00:54:30.069
Michael Dioha, CEC: Finally, we've noted that we expect the program to primarily serve single family properties.

279
00:54:30.460 --> 00:54:38.220
Michael Dioha, CEC: If multifamily properties are served, then the implementer will need to monitor compliance with prevailing wage laws and requirements

280
00:54:38.870 --> 00:54:42.929
Michael Dioha, CEC: moving to subtas 3.4 aggregator and contractor supports.

281
00:54:43.380 --> 00:54:57.080
Michael Dioha, CEC: The implementer will also be responsible for ensuring aggregators and contractors receive the technical and administrative assistance needed to succeed under the program. This includes supporting contractors through the process of rebate applications.

282
00:54:57.990 --> 00:55:08.800

Michael Dioha, CEC: When the implementer identifies savings estimates that appear unreasonable during the rebate reservation, they will work with aggregators and contractors to revise and refine those estimates.

283
00:55:09.170 --> 00:55:20.370
Michael Dioha, CEC: As the project advances into Mrv phase, the implementer will share mid-cycle Mrv data to identify installation issues early and improve outcomes across the project portfolio.

284
00:55:20.610 --> 00:55:32.990
Michael Dioha, CEC: Finally, the implementer is expected to establish regular feedback loops soliciting input from aggregators and contractors to understand their program experience and adapt support strategies accordingly.

285
00:55:36.010 --> 00:55:41.390
Michael Dioha, CEC: So task 4 outlines. The responsibilities for consumer, outreach and protection

286
00:55:41.780 --> 00:55:49.650
Michael Dioha, CEC: under subtask 4.1 household outreach. The statewide implementer will develop and carry out an outreach plan.

287
00:55:49.810 --> 00:55:56.820
Michael Dioha, CEC: This includes forming partnerships with relevant organizations, such as regional energy networks and local governments.

288
00:55:57.080 --> 00:56:12.709
Michael Dioha, CEC: The implementer is expected to utilize a mix of outreach channels and develop outreach materials, including a program website, fact sheets, toolkits and customizable collateral for use by aggregators, contractors and local partners.

289
00:56:12.900 --> 00:56:21.179
Michael Dioha, CEC: This material should be made available in multiple languages based on commission agreement manager, or what we call the Comms direction.

290
00:56:21.860 --> 00:56:32.380
Michael Dioha, CEC: Additionally, the implementer will integrate the approved contractor list into existing consumer facing platforms so that household can easily identify eligible contractors

291
00:56:32.540 --> 00:56:45.640

Michael Dioha, CEC: where applicable, the implementer will align homes,
rebates with other available incentive programs and inform households
about opportunity to layer or stack available rebates with greater for
greater impact.

292
00:56:46.280 --> 00:57:03.909
Michael Dioha, CEC: Moving on to subtask 4.2 participant agreement, the
implementer must develop a participant agreement that secures participant
consent for sharing their energy consumption data as well as clarifying
building owner's obligation regarding tenant protections

293
00:57:04.340 --> 00:57:09.089
Michael Dioha, CEC: under socktas. 4.3 quality assurance and quality
control.

294
00:57:09.200 --> 00:57:17.580
Michael Dioha, CEC: The implementer must establish installation, quality
standards and procedures for desktop reviews and virtual or on-site
inspections.

295
00:57:17.840 --> 00:57:35.450
Michael Dioha, CEC: These inspections and reviews will ensure the
accuracy of home assessment. Data confirm the eligibility and quality of
installed measures verify that required permits are closed and validate
compliance with DOE combustion, appliance, safety protocols, and all
other applicable regulations

296
00:57:36.390 --> 00:57:40.109
Michael Dioha, CEC: for subtask 4.4 consumer satisfaction.

297
00:57:40.230 --> 00:57:50.970
Michael Dioha, CEC: The statewide implementer will be responsible for
maintaining a dedicated consumer complaint hotline to ensure participants
and prospective participants can report concerns or issues.

298
00:57:51.160 --> 00:57:57.609
Michael Dioha, CEC: Also, the implementer will be expected to develop and
administer post-project satisfaction service.

299
00:57:57.890 --> 00:58:02.719
Michael Dioha, CEC: The implementer must report on consumers, complaints
and actions taken to resolve them.

300
00:58:03.300 --> 00:58:07.210
Michael Dioha, CEC: Moving to soft task. 4.5 project certificates

301
00:58:07.440 --> 00:58:21.100
Michael Dioha, CEC: per DOE requirements. The implementer is required to
issue a 3rd party post measurement and verification Project certificate
to each participant, which serves as a formal documentation of the
project's verified energy savings.

302
00:58:21.570 --> 00:58:28.139
Michael Dioha, CEC: Lastly, subtars for Princess customer opting
websites, which is also an optional task.

303
00:58:28.460 --> 00:58:38.249
Michael Dioha, CEC: If deemed necessary, the implementer will configure
the program website to allow customers to opt in to be contacted by
participating aggregators or contractors.

304
00:58:38.440 --> 00:58:47.519
Michael Dioha, CEC: Additionally, the website could allow users to view
their estimated energy savings potential and request a list of
contractors active in their area.

305
00:58:48.380 --> 00:58:58.659
Michael Dioha, CEC: Please note that the implementers responsibility
related to marketing captured here in soft task 4.1 and 4.6 is a topic
for our 1st public comment session.

306
00:59:02.490 --> 00:59:13.550
Michael Dioha, CEC: So task 5 outlines. The statewide implementers
responsibilities for providing the infrastructure that we support tribate
application, intake contractor tools and data submission processes.

307
00:59:14.000 --> 00:59:19.050
Michael Dioha, CEC: beginning with soft task, 5.1 ability to receive
rebate applications.

308
00:59:19.250 --> 00:59:25.410
Michael Dioha, CEC: The implementer will be required to develop or
maintain a secure platform for receiving rebate applications.

309
00:59:25.560 --> 00:59:31.730
Michael Dioha, CEC: This system will support project eligibility checks
and provide a user friendly experience for participants.

310
00:59:31.970 --> 00:59:39.259

Michael Dioha, CEC: In addition, the implementer will establish a secure portal for uploading proof of income eligibility.

311
00:59:39.560 --> 00:59:47.679
Michael Dioha, CEC: Sorry. In addition, the implementer will establish a secure portal for uploading proof of income eligibility for low income participants

312
00:59:47.980 --> 00:59:52.949
Michael Dioha, CEC: moving on to subtask 5.2 tool slash application for contractors.

313
00:59:53.740 --> 01:00:03.829
Michael Dioha, CEC: The implementer provide what we refer to here as a kitchen table tool. This tool is intended for use by contractors while on site at the participants home.

314
01:00:04.040 --> 01:00:21.339
Michael Dioha, CEC: The tool should allow contractors to input DOE required data, collect any additional programmatic details as directed by the cam and generate an estimated comps before period value in real time. Finally, subtas 5.3.

315
01:00:21.540 --> 01:00:25.859
Michael Dioha, CEC: This includes optional application, features that may be determined necessary.

316
01:00:26.450 --> 01:00:41.299
Michael Dioha, CEC: This include the ability to accept applications, not only from aggregators, but also directly from contractors acting as their own aggregators, or from super aggregators, such as the Cce or other entities managing portfolios of projects.

317
01:00:41.450 --> 01:00:42.440
Michael Dioha, CEC: Lastly.

318
01:00:42.630 --> 01:00:55.179
Michael Dioha, CEC: this subtask allows for the development of a secure compliant portal where customers can upload utility bills for those that are served by utilities not currently sharing usage data directly with the program

319
01:00:58.270 --> 01:01:02.130
Michael Dioha, CEC: subtask 5.4 data management.

320
01:01:02.380 --> 01:01:11.990
Michael Dioha, CEC: The implementer must build or maintain systems
capable of storing, organizing and formatting all project level data
required by DOE and the Cec.

321
01:01:12.370 --> 01:01:22.000
Michael Dioha, CEC: This includes energy savings information and Xml data
files in accordance with DOE's Ira home energy rebates data and tools
requirement guide.

322
01:01:22.180 --> 01:01:29.919
Michael Dioha, CEC: The system should also incorporate aggregator savings
estimates and post-installation Mn. View results into project records.

323
01:01:30.310 --> 01:01:42.829
Michael Dioha, CEC: In addition, the implementer is expected to retain
all relevant transaction documentation, including proof of combustion,
safety testing and geotact photographs as required under DOE program
rules

324
01:01:43.350 --> 01:01:47.950
Michael Dioha, CEC: moving to softtask 5.5 project reporting to Cec.

325
01:01:48.160 --> 01:01:55.850
Michael Dioha, CEC: The implementer will be required to report both
transaction level and programmatic data to a central Cec database on a
regular basis.

326
01:01:56.000 --> 01:02:08.520
Michael Dioha, CEC: While some reporting fields are set by DOE program
rules. The Cec. May also define additional data fields such as but not
limited to project stage measures installed and estimated savings.

327
01:02:09.290 --> 01:02:22.279
Michael Dioha, CEC: All data will eventually need to be reported via Api,
and the exact settings and format will be determined in coordination with
the calm. The Cec. May also request additional metrics and documentation
as needed.

328
01:02:22.600 --> 01:02:27.769
Michael Dioha, CEC: Finally, under subtas 5.6 project reporting to do

329
01:02:28.040 --> 01:02:46.230

Michael Dioha, CEC: the implementer will submit required rebate
transaction data in accordance with DOE program rules, either using the
Pnnl Api, that's Pnnl 5, 0 1, 2, 1 reporting spreadsheet or its successor
platform. Please kindly note that Pnnl stands for the Pacific Northwest
National Laboratory.

330
01:02:51.170 --> 01:03:05.279
Michael Dioha, CEC: Now I will cover 2 optional tags on the task. 5. So
just as a reminder, these optional tags are tags for which, in
partnership with the statewide implementer. The Cac will determine if
they are needed or applicable

331
01:03:05.530 --> 01:03:20.740
Michael Dioha, CEC: under software 5.7, that is, api integration with DOE
systems. The implementer may be tasked with developing and maintaining a
secure Api connection to Federal platforms such as the Pnl or other DOE
successful systems.

332
01:03:20.980 --> 01:03:47.489
Michael Dioha, CEC: This Api will support several program critical
functions, including address, validation and duplication checks. To
ensure the same property is not receiving overlapping rebates under homes
or era, rebate reservations and tracking integration with DOE's quality
installation tool and energy star equipment, verification as well as
facilitating DOE required project reporting through automated data
exchange

333
01:03:47.940 --> 01:03:57.179
Michael Dioha, CEC: nest, which is subtask 5.8 local program. Single
point of entry is another optional enhancement. In this program. As part
of the scope of work.

334
01:03:57.400 --> 01:04:14.320
Michael Dioha, CEC: the implementer will assess the feasibility and
benefits of creating a unified application process that allows
aggregators to enroll a project in both programs through a single
submission. If approved by the camp. The implementer will then design and
implement the streamlined mechanism.

335
01:04:18.290 --> 01:04:24.969
Michael Dioha, CEC: Taxis outlines the process. The implementer must
follow. To ensure accurate rebate applications and payments.

336
01:04:25.320 --> 01:04:33.979
Michael Dioha, CEC: Under subtax 6.1. The implementer is required to
receive and process freebie applications submitted primarily by
aggregators

337
01:04:34.140 --> 01:04:46.820
Michael Dioha, CEC: depending on how the program evolves. Applications
may also come directly from contractors serving as their own aggregator,
or from entities acting as super aggregators, such as the community
choice aggregators.

338
01:04:47.310 --> 01:04:51.819
Michael Dioha, CEC: the implementer will conduct thorough pre and post
installation eligibility checks.

339
01:04:51.990 --> 01:04:55.040
Michael Dioha, CEC: There are a lot of checks, as you can see on the
slide.

340
01:04:55.320 --> 01:05:08.270
Michael Dioha, CEC: Please note that as my colleague Brennan, mentioned
earlier, we do have a draft workflow document for public comment and
several questions in the input request. In the notice that asks about
workflows and eligibility shots.

341
01:05:09.570 --> 01:05:19.500
Michael Dioha, CEC: the implementer is also responsible for conducting a
reasonableness, check of aggregator energy Savings estimates to help
mitigate the risk of overestimating savings

342
01:05:20.120 --> 01:05:24.349
Michael Dioha, CEC: now moving on to subtax 6.2 rebate reservations.

343
01:05:24.580 --> 01:05:30.729
Michael Dioha, CEC: The implementer will utilize a do Espnl system or
another approved platform to reserve rebates.

344
01:05:30.920 --> 01:05:39.069
Michael Dioha, CEC: Once a reservation is confirmed, the implementer will
issue a rebate confirmation or coupon to the aggregator and building
owner

345
01:05:41.890 --> 01:05:59.419
Michael Dioha, CEC: under subtax 6.3. The implementer will be responsible
for issuing final rebate reimbursements in a timely manner. Payments will
primarily be made to aggregators, but in some cases it may go directly to
contractors depending on the project structure and participation
framework

346
01:05:59.770 --> 01:06:02.239
Michael Dioha, CEC: moving on to software 6.4,

347
01:06:02.420 --> 01:06:13.690
Michael Dioha, CEC: that is pay disadvantage, community incentives. This
task is noted as optional as it is contingent on DOE's direction as to
how to implement this statutory requirements.

348
01:06:13.970 --> 01:06:24.850
Michael Dioha, CEC: If the task is required, the implementer will issue
$200 incentive payment to contractors for each project completed in a
disadvantaged community by DOE's program rule.

349
01:06:30.400 --> 01:06:48.409
Michael Dioha, CEC: So before I talk about tax 7, which involves utility
data. I'm going to zoom out a bit to give us a little more background. So
this slide outlines for potential pathways through which utility, energy
consumption data can be assessed for use in the homes before P program.

350
01:06:48.950 --> 01:06:55.769
Michael Dioha, CEC: Each of these pathways has different implications for
project eligibility, timing, and Mrv. Processes.

351
01:06:56.080 --> 01:07:01.520
Michael Dioha, CEC: The 1st part way is title 20, section 1353,
reporting.

352
01:07:01.770 --> 01:07:13.659
Michael Dioha, CEC: So under title 20, section 1353. Large investor owned
and publicly owned. Utilities in California are required to report
disaggregated energy demand data quarterly to the Cec.

353
01:07:13.930 --> 01:07:22.980
Michael Dioha, CEC: This data includes interval and billing data and is
available in Cec's data warehouse, and as discussed earlier, it is
sometimes referred to as Imd.

354
01:07:23.110 --> 01:07:32.860
Michael Dioha, CEC: This pathway covers about 90% of California
households is also the only pathway that may include non-participant data
enabling project screening.

355
01:07:33.550 --> 01:07:40.059

Michael Dioha, CEC: Please see the exhibit on Section 1353 data on the
workshop event page for more details on the Imd.

356
01:07:40.410 --> 01:07:48.159
Michael Dioha, CEC: Second, we have the direct sharing from publicly
owned utilities or Po use that are not subject to section 1353,

357
01:07:48.580 --> 01:07:54.210
Michael Dioha, CEC: the Cec. Will work to encourage those puus to enter
into voluntary data sharing agreements.

358
01:07:54.330 --> 01:08:08.840
Michael Dioha, CEC: However, the frequency and timing of this data
transfer are still to be determined, and it's likely that the Cec. Will
only be of, and it's likely that the data will only be available after
project completion, meaning it will not be available for pre-project
screening.

359
01:08:09.421 --> 01:08:12.940
Michael Dioha, CEC: The 3rd option is customer provision of utility
bills.

360
01:08:13.260 --> 01:08:31.090
Michael Dioha, CEC: This applies when the customer is served by a pou
that does not report Imd under section 1353, and has not entered into a
voluntary sharing agreement. In these cases customers will be required to
directly provide 12 months of pre-project utility data as a condition of
participation.

361
01:08:31.200 --> 01:08:40.459
Michael Dioha, CEC: However, the aggregator bears the risk. If the
customer fails to share post-project data which is also essential for
Mmv. And rebate payment.

362
01:08:40.939 --> 01:08:44.859
Michael Dioha, CEC: I would like to know that aggregators may decide that
they do not want to take on this risk.

363
01:08:45.319 --> 01:09:01.839
Michael Dioha, CEC: The 4th pathway is utility data that is independently
sourced by the statewide implementer. So in this case the implementer
would independently procure data from a utility through a separate
arrangement. But this pathway is subject to a prior Cec. Approval.

364
01:09:05.550 --> 01:09:14.900

Michael Dioha, CEC: So this slide summarizes ways in which the statewide implementer will engage with the utility data throughout the lifecycle of a home's p. 4. P project.

365
01:09:15.140 --> 01:09:26.610
Michael Dioha, CEC: The 1st is screening the statewide implementer. We analyze a live set of disaggregated metadata to identify high impact projects and priority geographic areas.

366
01:09:26.790 --> 01:09:42.450
Michael Dioha, CEC: The statewide implementer will work with the Cec to determine appropriate levels of data aggregation, such as Z plus 4 addresses, and may also share these high impact geographies with aggregators to support the program, outreach and planning.

367
01:09:42.720 --> 01:09:54.390
Michael Dioha, CEC: Please note that this data is obtained private to participant consent sharing, therefore, the statewide implementer will be subject to special terms and conditions regarding data, privacy and security.

368
01:09:55.200 --> 01:10:03.990
Michael Dioha, CEC: This activity is limited to data in the Cec's interval meter data warehouse, which only includes utilities subject to section 1353, reporting

369
01:10:04.580 --> 01:10:11.389
Michael Dioha, CEC: the second type of engagement with utility data is post-project measurement and verification, or what we call Mmv.

370
01:10:11.610 --> 01:10:24.100
Michael Dioha, CEC: The statewide implementer will be responsible for calculating energy savings at both individual project level and at the aggregator's portfolio level, based on 12 months of pre and post installation data.

371
01:10:24.430 --> 01:10:32.399
Michael Dioha, CEC: This analysis we draw from all available utility data pathways, some of it intervals, some of it monthly, depending on the utility.

372
01:10:33.120 --> 01:10:38.209
Michael Dioha, CEC: The 3rd use of utility data has to do with supporting aggregators with performance.

373

01:10:38.360 --> 01:10:44.219
Michael Dioha, CEC: The implementer will provide aggregators with interim
savings reports. When sufficient data is available.

374
01:10:44.440 --> 01:10:50.669
Michael Dioha, CEC: This function is likely limited to section 1353, of
utility data

375
01:10:51.010 --> 01:11:05.089
Michael Dioha, CEC: by receiving performance updates at the mid cycle of
the performance period. Aggregators have the opportunity to identify and
correct any installation or performance issues and also refine their
estimates, their savings estimates.

376
01:11:05.230 --> 01:11:09.379
Michael Dioha, CEC: This supports higher realization rates and overall
program performance.

377
01:11:14.300 --> 01:11:18.720
Michael Dioha, CEC: Excuse me. So now I'm going to go back to the scope
of work.

378
01:11:19.130 --> 01:11:28.220
Michael Dioha, CEC: So tax 7 outlines, the statewide implementers and
responsibilities for data analysis and measurement and verification. Or
Mmv.

379
01:11:28.350 --> 01:11:31.450
Michael Dioha, CEC: so, starting with subtask 7.1.

380
01:11:31.570 --> 01:11:45.859
Michael Dioha, CEC: As I just described the implementer, we use the Imd
and other type of data to help point aggregators towards high impact
project sites, and we work with the calm on customer privacy and avoiding
unwanted harassment.

381
01:11:46.230 --> 01:12:00.199
Michael Dioha, CEC: Under Socta 7.2, as I described, with the slide on
engagement with utility data. The implementer is tasked with project and
portfolio level. Mmv. Using a DOE approved open source advanced Mmv.
Software.

382
01:12:00.670 --> 01:12:08.679

510

Michael Dioha, CEC: Importantly, the implementer must confirm whether the aggregate or portfolio has achieved the 15% minimum energy saving thresholds.

383
01:12:08.830 --> 01:12:28.619
Michael Dioha, CEC: Both gas and electric usage must be included in these calculations. Even when customers receive services from different utilities. This may require the implementer to link customer accounts across utilities, using addresses or meter numbers and provide linked data back to the Cec for validation.

384
01:12:29.000 --> 01:12:56.589
Michael Dioha, CEC: Additionally, the implementer will need to develop protocols that are consistent with the DOE, approved Mrv. Methodology to fulfill Cac's goal of broadening program eligibility to include elements such as households that haven't resided in their current home for a full 12 months, homes that have installed or plan to install solar Pv. Systems and households with at home ev charging, which can also complicate baseline comparisons

385
01:12:59.480 --> 01:13:06.860
Michael Dioha, CEC: under sopta 7.3. As discussed. The implementer we coordinate view results with aggregators.

386
01:13:07.380 --> 01:13:15.400
Michael Dioha, CEC: Sota 7.4 requires the implementer to calculate final rebate values using the count approved incentive formula

387
01:13:15.870 --> 01:13:19.120
Michael Dioha, CEC: software 7.5 is data sufficiency check.

388
01:13:19.660 --> 01:13:36.950
Michael Dioha, CEC: Cec, staff understands that in order pay for performance programs, data sufficiency checks are necessary to determine whether there is sufficient utility data to establish a baseline. So in this task the implementer will assess whether submitted project data is adequate for standard Mmv.

389
01:13:37.050 --> 01:13:50.789
Michael Dioha, CEC: If not, the implementer must flag the project for engineering adjustments to establish a reliable energy baseline, especially in cases with incomplete pre-installation data or abnormal energy usage patterns.

390
01:13:52.050 --> 01:14:00.620

Michael Dioha, CEC: Also please note that in the input request, in the notice we have a question that poses whether this program requires a data sufficiency check.

391
01:14:01.060 --> 01:14:10.910
Michael Dioha, CEC: Lastly, an optional task subtask 7.6, which outlines additional Mmv processes process development.

392
01:14:11.502 --> 01:14:22.980
Michael Dioha, CEC: If needed. The implementer will explore the feasibility of developing a single Mrv process for projects that are enrolled in both the Homes program and the local market access program.

393
01:14:23.330 --> 01:14:32.820
Michael Dioha, CEC: If deemed appropriate, the implementer may then be taxed with implementing a unified Mrv approach in partnership with local program administrators.

394
01:14:33.520 --> 01:14:44.609
Michael Dioha, CEC: This subtax may also require the implementer to expand Mmv. Protocols to include customers who rely on alternative fuels, such as propane or wood stoves.

395
01:14:45.850 --> 01:14:50.768
Michael Dioha, CEC: So that concludes our walkthrough of the scope of work.

396
01:14:51.430 --> 01:14:59.539
Michael Dioha, CEC: I want to note that the statewide implementer is expected to coordinate with the Cec. On all of these tasks that I have mentioned.

397
01:15:00.080 --> 01:15:04.690
Michael Dioha, CEC: the Cec. Will be an engaged oversight partner for all this task

398
01:15:05.140 --> 01:15:18.470
Michael Dioha, CEC: also, as a reminder, I have gone over a lot of detail, but it has just been the highlights. We did not cover Task 8. That is compliance. And so I encourage interested parties to review the concept paper.

399
01:15:19.830 --> 01:15:22.770
Michael Dioha, CEC: So it is now time for a break.

400
01:15:23.390 --> 01:15:30.430
Michael Dioha, CEC: and we'll return at 1040 for public comment, or
earlier. Before that time.

401
01:15:30.430 --> 01:15:45.760
Miriam Joffe-Block, CEC: Michael, since we're we're actually running a
little ahead of schedule. I think we'll return at 1030 if folks are okay
with that so little longer. Break 13 min instead of 10. But we're running
ahead schedule so we can have more. That'll help us have more time for
public input.

402
01:15:46.500 --> 01:15:48.660
Michael Dioha, CEC: We'll see you at 1030. Thank you.

403
01:15:49.190 --> 01:15:50.640
Michael Dioha, CEC: Hey? Thank you all.

404
01:28:54.470 --> 01:29:02.500
Miriam Joffe-Block, CEC: All right. Welcome back everyone. We're going to
continue now. In just a minute. We're going to move on to our 1st comment
session.

405
01:29:02.650 --> 01:29:21.809
Miriam Joffe-Block, CEC: I am going to take a minute to answer a few
questions, especially because we're running a little bit early, and also
I want to clear something up that I understand why it may have gotten a
little confused. Brendan. Are you able to navigate us back to the slide?
That shows the different program roles. I think it is slide.

406
01:29:28.850 --> 01:29:39.020
Miriam Joffe-Block, CEC: 18. Okay, perfect. Thank you so much. Okay, so I
I think there's we've been using the term contractor to mean a couple of
different things here. And so I just want to clarify

407
01:29:39.580 --> 01:29:55.109
Miriam Joffe-Block, CEC: So on this slide, you see the program delivery
roles and on the left, and we went over this pretty fast. So just to kind
of reiterate, because there's some questions about the profitability and
also competition in the marketplace and customer protection. And there's
a lot of interrelated topics here. So

408
01:29:55.550 --> 01:29:58.549
Miriam Joffe-Block, CEC: when you see on the left the statewide
implementer.

409
01:29:58.880 --> 01:30:25.979
Miriam Joffe-Block, CEC: this is the entity that the solicitation that we are going to put forth is for. So this is an entity that will be working directly with the Cec. And paid with the homes. Admin funds to implement the program, and we expect that this implementer may have subcontractors that are working with them. And when we say the term subcontractor here, we don't mean

410
01:30:26.130 --> 01:30:46.499
Miriam Joffe-Block, CEC: organizations, businesses that are installing heat pumps or Hvacs or doing retrofits. We mean organizations companies that are helping the statewide implementer carry out their responsibility to deliver the program and to implement the program, and to do all of the things that Michael

411
01:30:46.690 --> 01:30:58.359
Miriam Joffe-Block, CEC: went over in the scope of work from the M. And V. To the marketing and consumer, outreach to the contractor, support and management, to the aggregator, recruitment and all that.

412
01:30:58.660 --> 01:31:08.819
Miriam Joffe-Block, CEC: and under the grant funding opportunity rules the statewide implementer that lead or prime on that agreement with the CC.

413
01:31:09.320 --> 01:31:13.260
Miriam Joffe-Block, CEC: Cannot earn a profit. However, the subs that they work with

414
01:31:13.770 --> 01:31:22.289
Miriam Joffe-Block, CEC: are may be eligible up to 10%. So there's that limit there. And again, those are entities that are helping them run the program

415
01:31:22.720 --> 01:31:49.660
Miriam Joffe-Block, CEC: now moving on to the aggregators. The aggregators are not paid from the Admin funds. The aggregators are competing in the private market for relationships with contractors and business, and they are providing the financing for the rebates, and they're supporting the contractors. And they're packaging projects into portfolios, as you see there. And after the Mnv. Period finishes

416
01:31:49.790 --> 01:31:57.670
Miriam Joffe-Block, CEC: and the statewide implementer crunches the final savings. Those aggregators get paid with homes, rebate dollars

417
01:31:58.438 --> 01:32:04.490
Miriam Joffe-Block, CEC: so not admin, but homes rebate dollars, a
separate separate bucket of of funds from DOE

418
01:32:04.860 --> 01:32:10.520
Miriam Joffe-Block, CEC: and contractors all the way on the right. What
we really mean here now are installers

419
01:32:10.730 --> 01:32:20.759
Miriam Joffe-Block, CEC: or energy contractors, or you know, the people
that are going into the homes, doing the home assessments, installing the
staff, pulling the permits, and all that really important work.

420
01:32:20.930 --> 01:32:48.109
Miriam Joffe-Block, CEC: These folks are also competing in the private
marketplace with each other, and we are always encouraging of customers
to get multiple bids and to get referrals and check reviews and
contractors are forming relationships with aggregators and finding out,
which aggregators are, you know, really helpful to work with and help
them with the paperwork and pay them quickly. And all those things and
these contractors are getting paid by customers for the customer

421
01:32:48.390 --> 01:33:12.209
Miriam Joffe-Block, CEC: portion. So we did get a question in the chat
that the rebate will not cover the full cost of the project. It is
statutorily limited by DOE to cover only 50% of the project for a
customer who is not low income or market rate, and then for a low income
customer it may cover up to 80%. Again, if those savings estimates are
there.

422
01:33:12.780 --> 01:33:23.509
Miriam Joffe-Block, CEC: the contractors are getting paid by the
customer, and then the aggregator is covering that portion of the rebate
that they passed on to the customer, so that they're not waiting that the
12 months

423
01:33:24.108 --> 01:33:27.879
Miriam Joffe-Block, CEC: so hopefully that clears up. Sorry about the
terminology.

424
01:33:28.000 --> 01:33:31.120
Miriam Joffe-Block, CEC: And hopefully, that answers a few of the
questions we just had.

425
01:33:31.695 --> 01:33:39.729

Miriam Joffe-Block, CEC: I'm gonna stay on the subject of contractors for a moment. And actually, Michael or sorry Brandon, ask you to navigate to

426
01:33:39.870 --> 01:33:42.950
Miriam Joffe-Block, CEC: a different slide to

427
01:33:44.470 --> 01:33:49.839
Miriam Joffe-Block, CEC: task. Let's see, let's do slide. Let's go to slide 30 while I answer this one.

428
01:33:50.070 --> 01:33:54.332
Miriam Joffe-Block, CEC: Thank you so much for moving around there. So there are.

429
01:33:56.030 --> 01:34:21.999
Miriam Joffe-Block, CEC: There are a bunch of questions about standards, labor standards, and related to how those are going to be developed and what the rules are. So the statewide implementer is responsible for defining those qualifications for enrollment for contractors, and setting grounds and procedures for removal. There are some DOE standards, and I encourage folks to

430
01:34:22.502 --> 01:34:34.109
Miriam Joffe-Block, CEC: jacobs. Put this into the chat, but we can put it in again. We have published the Home, the DOE's guidance on our Cec website because they're not easily accessible from the

431
01:34:34.742 --> 01:34:56.619
Miriam Joffe-Block, CEC: Doe website at the moment there is the homes. It's called the application requirements and program requirements and application instructions document. And it has a lot of requirements there that are kind of baseline for the program. If you have additional input recommendations supporting information like labor standards or best practices for enforcement.

432
01:34:56.960 --> 01:35:05.089
Miriam Joffe-Block, CEC: please submit those to our docket to help us finalize the part of the program design that's going to be covered through this solicitation.

433
01:35:05.746 --> 01:35:18.110
Miriam Joffe-Block, CEC: And then, similarly, there's some sort of similar questions about the risk for consumers. And what about, you know a contractor quality and problems. And if you just flip through, I think

434

01:35:19.210 --> 01:35:21.419
Miriam Joffe-Block, CEC: one slide there, Brennan.

435
01:35:21.946 --> 01:35:50.399
Miriam Joffe-Block, CEC: So the aggregator and contractor oversight is
also a set of tasks that the implementer has, and there's more tasks in
the scope of work that speak to this, and so take a look at the actual
solicitation concept paper. I think under the consumer outreach there's
some protections there about hotlines for complaints, and so again send
us your feedback on how those tasks are structured and supporting
information, and please submit that to our docket to help us develop
those

436
01:35:52.164 --> 01:35:56.719
Miriam Joffe-Block, CEC: and then sort of just stepping back and zooming
out

437
01:35:57.130 --> 01:36:13.889
Miriam Joffe-Block, CEC: just to back to that roles just to clarify where
the Cec fits in. So the Cec. Is the State Energy office for the State of
California, and so we are the only eligible entity who can submit and
receive an award for homes.

438
01:36:13.890 --> 01:36:35.680
Miriam Joffe-Block, CEC: I saw that there was a question about, or
comment about why the funds aren't flowing through the Cpuc or Po. Use
welcome you to say more about that in the comment session, or submit to
the docket that would have to be an after we received as the prime kind
of decision about implementation. The proposal right now is to implement
through a statewide implementer.

439
01:36:36.090 --> 01:36:38.539
Miriam Joffe-Block, CEC: I'm going to get welcome your thoughts on that.

440
01:36:39.740 --> 01:36:51.530
Miriam Joffe-Block, CEC: All right. I think we're going to go to some
public comment, and then we'll keep checking that. We'll kind of pivot
back and forth between the questions in the chat or the Q. And a sorry,
not the chat and the public comment.

441
01:36:52.700 --> 01:36:58.679
Miriam Joffe-Block, CEC: So I'm sorry I've got to move my, get my screens
in order here.

442
01:37:01.630 --> 01:37:31.009

Miriam Joffe-Block, CEC: All right. So our 1st focus area. So this 1st
session actually, let me let me say some some more generic words here.
Sorry about that. Okay, so the California Energy Commission is committed
to hearing from all interested parties, and encourages comments from the
public and interested parties. We encourage the submission of detailed
comments to our docket through the links included in the notice for this
workshop, and we are committed to giving equal consideration to comments
submitted orally and in written form.

443
01:37:31.950 --> 01:37:49.320
Miriam Joffe-Block, CEC: So our 1st focus area is going to cover general
questions related to feasibility and federal actions. And so I'm going to
read these questions and then give folks a chance to comment on them, and
if your comment has to do with a different topic, we'll have another
session for that. Following this.

444
01:37:49.790 --> 01:37:54.579
Miriam Joffe-Block, CEC: So are there any tasks. The 1st section is about
feasibility.

445
01:37:54.680 --> 01:38:07.220
Miriam Joffe-Block, CEC: Are there any tasks not contemplated in the
homes pay for performance, solicitation, concept, paper, draft, scope of
work that are necessary for the implementation of the homes. Pay for
performance program please describe.

446
01:38:07.420 --> 01:38:14.969
Miriam Joffe-Block, CEC: are there components of the solicitation,
concept, paper, and or scope of work that will be infeasible? Please
describe.

447
01:38:15.250 --> 01:38:19.979
Miriam Joffe-Block, CEC: Are there any issues or concerns I'm getting
into the Federal actions resulting

448
01:38:20.510 --> 01:38:27.799
Miriam Joffe-Block, CEC: from recent Federal actions or orders that may
influence your entity's interest in this solicitation.

449
01:38:29.480 --> 01:38:34.569
Miriam Joffe-Block, CEC: and I'm looking at the slide and realizing that
1st bullet under Federal action should be under feasibility.

450
01:38:34.770 --> 01:38:51.929
Miriam Joffe-Block, CEC: But I think you can follow us here. So we are
going to open it up. If you have a question, you can type it into the

Zoom. Q. And a. If you'd like to comment verbally, use the raised hand
feature in zoom, so we can announce your name and unmute you

451
01:38:52.100 --> 01:39:08.279
Miriam Joffe-Block, CEC: to comment by telephone, press, star 9 to raise
your hand and star 6 to mute or unmute when called upon. Please unmute
yourself, say, and spell your name, state your affiliation, and make your
comment, and there's a 3 min limit to ensure everyone has an opportunity
to speak.

452
01:39:09.470 --> 01:39:14.200
Miriam Joffe-Block, CEC: We also strongly encourage you to follow up with
written comments to the docket after the workshop.

453
01:39:14.620 --> 01:39:20.500
Miriam Joffe-Block, CEC: so are there any comments on the

454
01:39:22.190 --> 01:39:27.669
Miriam Joffe-Block, CEC: feasibility questions, or recent Federal
actions? Does anybody want to speak to that?

455
01:39:35.670 --> 01:39:37.760
Miriam Joffe-Block, CEC: Just gonna allow a few seconds.

456
01:39:43.110 --> 01:39:48.738
Jacob Wahlgren, CEC: Hey, Miriam? I see one question in the public or so
one raised 10 in public comment.

457
01:39:49.470 --> 01:39:51.729
Jacob Wahlgren, CEC: Alex Landsberg, I'm Gonna

458
01:39:52.818 --> 01:39:58.490
Jacob Wahlgren, CEC: unmute your line. Please state your name,
affiliation, and you may proceed with your comments.

459
01:40:09.240 --> 01:40:17.009
Alex Lantsberg: Hi, I thought I unmuted. Alex Landsberg, sf, electrical
industry. My my principal question about the Federal

460
01:40:17.140 --> 01:40:21.910
Alex Lantsberg: piece is, I think it's you said in the work plan. You
showed in the work plan that

461

519

01:40:23.130 --> 01:40:35.220
Alex Lantsberg: staff have to sign off on the blueprint but that the
money is in hand, essentially in the State's accounts, in terms of like
how to in terms of the resources for this program is there?

462
01:40:35.650 --> 01:40:41.260
Alex Lantsberg: I mean, what's the likelihood that they just basically
sit on this thing and never actually let you spend the money

463
01:40:42.780 --> 01:40:44.190
Alex Lantsberg: that that's kind of where.

464
01:40:44.190 --> 01:41:00.260
Miriam Joffe-Block, CEC: Yeah, no, I hear the concern. I appreciate the
concern. I just want to clarify that the way that the Federal Government
works with funding these types of home energy rebate programs. The way
the DOE works is that States have an account.

465
01:41:00.260 --> 01:41:21.799
Miriam Joffe-Block, CEC: and we can see the funds in the account. But
they're not in state coffers. So that's just not the way DOE works. They
sort of set up an account, and we can view it. And then we submit
invoices, and they approve. And it's actually a pretty quick and
efficient process of their approval. So I just want to be transparent
about that. The money has been fully awarded, and we can view it in our
accounts.

466
01:41:22.170 --> 01:41:31.300
Alex Lantsberg: And have, just as a as a related question other programs
that the Cec has that the function the same way. Have you been having

467
01:41:31.490 --> 01:41:38.359
Alex Lantsberg: any hiccups in accessing those funds, or getting, you
know, getting those invoices paid? Or have there been delays, or anything
like that?

468
01:41:38.600 --> 01:41:40.219
Miriam Joffe-Block, CEC: There was. Yeah, jump in.

469
01:41:40.220 --> 01:41:51.419
Deana Carrillo: Jump in here. Hi, Alex! I'm having. My name is Dina
Carrillo. I'm the director of the Ready Division and who's implementing
this program and a number of other federal Federal programs.

470
01:41:51.560 --> 01:41:54.430

Deana Carrillo: I think one of the challenging things that

471
01:41:55.107 --> 01:42:07.549
Deana Carrillo: the public sees right now is a lot of headlines around specific funding sources or specific federal actions. I understand the need for certainty.

472
01:42:08.018 --> 01:42:10.321
Deana Carrillo: And that question and some of the

473
01:42:11.810 --> 01:42:23.836
Deana Carrillo: Some of the actions that happen at the Federal level. You know, there's a lot of questions from the public of what does this impact? So these funds, the homes and hero funds are

474
01:42:24.700 --> 01:42:36.510
Deana Carrillo: population based kind of pro forma funding that every State received. We have not had an issue accessing these funds.

475
01:42:36.953 --> 01:42:55.379
Deana Carrillo: Beyond initially, when any administration changes there's sometimes a slowdown, and that is what we experience. So we anticipate these funds will be available. There will be a a few different checkpoints along the way. So from a process perspective, our contracts are awarded in a contract

476
01:42:55.782 --> 01:43:23.349
Deana Carrillo: our administrative funds get reimbursed, and we haven't had any issues with that reimbursement of funds, we will be submitting our blueprints, and that will give DOE another opportunity, to, you know, to to make some policy decisions as as they move forward. But this program and a number of other programs, we, we are moving forward because our awards are intact and they haven't been impacted by recent legislation.

477
01:43:23.950 --> 01:43:25.159
Alex Lantsberg: Okay. Great. Thank you.

478
01:43:25.160 --> 01:43:30.649
Deana Carrillo: Yeah. And if I could predict the future, I you know we that that would be different. And so you know.

479
01:43:30.650 --> 01:43:31.799
Alex Lantsberg: Buying lottery tickets.

480
01:43:31.800 --> 01:43:34.450
Deana Carrillo: Yep, that is our circumstances today.

481
01:43:34.830 --> 01:43:35.520
Alex Lantsberg: Thank you.

482
01:43:35.520 --> 01:43:39.630
Deana Carrillo: Yeah. And thanks for that space, Miriam, I just know that this is, you know, this is a hard question.

483
01:43:39.880 --> 01:43:44.340
Deana Carrillo: These are challenging times. Given some of the the shifts and uncertainty.

484
01:43:45.590 --> 01:44:01.439
Andrew McAllister: I want to jump in here, too. I really appreciate your answer, Dina, and agree 100. This Commissioner Mcallister, and I'll just say that the similar conversations are happening in states across the land, and actually states are talking to one another and keeping sort of fingers on the pulse of all the different programs that Dina

485
01:44:01.480 --> 01:44:28.099
Andrew McAllister: referred to, that she oversees in other divisions, in the, in the other agencies and divisions. You know, in the Cec. And beyond overseas. So you know, there's the the future is inherently uncertain. But, we're confident in our path forward on homes. And Hira. For the reasons, Dina articulated. And you know, of course, we have a docket we have. You know, ongoing proceeding, and

486
01:44:29.050 --> 01:44:37.005
Andrew McAllister: if anything you know significant occurs then, obviously we'll open up a channel for that conversation. But for now we think we're in good shape and and

487
01:44:37.710 --> 01:44:43.239
Andrew McAllister: you know, as Dina said, have the the funds obligated in in our accounts at DOE.

488
01:44:44.520 --> 01:44:45.260
Alex Lantsberg: Right.

489
01:44:49.250 --> 01:44:50.290
Miriam Joffe-Block, CEC: Thank you so much.

490
01:44:50.290 --> 01:44:51.519
Miriam Joffe-Block, CEC: Oh, go ahead, Jacob.

491
01:44:51.520 --> 01:45:02.550
Jacob Wahlgren, CEC: Yeah, thank you, Alex. We'll go ahead and we have
another raised hand. John Tribbs, I'm gonna mute your line. Please state
your name affiliation, and you may proceed with your comment.

492
01:45:02.760 --> 01:45:06.470
John Shribbs: That's John Shribs, SHRI. BBS.

493
01:45:06.560 --> 01:45:30.520
John Shribbs: In the city of Petaluma. I'm a city Council member also on
the Climate Action Committee and do quite a bit here for climate actions.
I just built an adu all electric in my garage, so I've been trying to do
all sorts of things, including upgrading all my home things, quite
involved. Anyway, the problem I'm seeing

494
01:45:30.520 --> 01:45:46.660
John Shribbs: is that this is a really nice theoretical process, and
working all the way down the line I see 2 kinks or roadblocks. I just
read the book abundance which talks about how to identify roadblocks to
processes.

495
01:45:46.710 --> 01:46:08.929
John Shribbs: and the 2 things that I see is the actual homeowner being
sold on this whole concept, and the actual amount of rebate that gets
down to them versus the actual additional costs of the installation which
may or may not cover the actual energy savings cost at all. I've done
that. My calculations and I did not do the

496
01:46:09.150 --> 01:46:30.030
John Shribbs: installations I changed over from gas to gas, from old to
new rather than going electric, because I calculated, even with rebates,
even with large 50% rebates on installation, it still did not cover the
actual savings that I might obtain. So it was a lot cheaper just to stay
with gas. At that point

497
01:46:30.030 --> 01:46:46.920
John Shribbs: quantities of rebates have to be very high for the
installation. The second issue is on the aggregators. Whether it be a
city small utility, I'm sure Finance Bank. Whoever is doing that the
incentives, the cost of actually running this program because that's
where the bulk of the work is going to be.

498

01:46:46.920 --> 01:47:13.739
John Shribbs: The work is going to be done to find the customers, find the contractors do the sales pitch, do the financing. There's a huge staff effort in that, and I'm not seeing enough incentives or compensation to whoever those folks are, to really make them do all that work because they're the middleman who are doing the real work behind all this to make this program work. So how is that the aggregators going to come together and say, Oh, we want to do that we want to do all this work.

499
01:47:13.840 --> 01:47:27.169
John Shribbs: Why would they do it theoretically? Yeah, they would love to do it. But financially, can they afford to do it, I'm not sure. So you have to still convince me of those 2 things. So those are my 2 questions I'd like to get answered.

500
01:47:31.380 --> 01:47:34.105
Miriam Joffe-Block, CEC: Thank you, John. I'm I'm gonna

501
01:47:34.730 --> 01:47:44.100
Miriam Joffe-Block, CEC: sort of pause on that and treat that as a comment right now. And we might speak to that a little bit more later and kind of keep going with other other public input.

502
01:47:44.618 --> 01:47:47.820
Miriam Joffe-Block, CEC: Jacob, do we have another ham.

503
01:47:47.820 --> 01:47:54.349
Jacob Wahlgren, CEC: Yes, we have another hand. So yeah, thank you, John, for your comment. We'll go next in the queue.

504
01:47:54.976 --> 01:48:03.370
Jacob Wahlgren, CEC: Lk, 16 E. I'm gonna unmute you. Please state your name affiliation. You may proceed with your comment.

505
01:48:10.040 --> 01:48:15.740
LK's 16e: Hi, this is Lloyd Cass from Franklin energy. Can you hear me.

506
01:48:18.110 --> 01:48:19.570
Miriam Joffe-Block, CEC: Sorry. Yes, we can hear you.

507
01:48:20.240 --> 01:48:20.920
LK's 16e: Great.

508

01:48:21.120 --> 01:48:33.630
LK's 16e: Yeah. So I just want to comment on this Franklin energy. Has already gone on the record on this docket in recent months on this topic. But you know, just to

509
01:48:33.840 --> 01:48:36.608
LK's 16e: come back to the fact that

510
01:48:37.510 --> 01:48:49.789
LK's 16e: we see some real constraints to this solicitation being put out as a Gfo versus an Rfp. We certainly understand.

511
01:48:49.950 --> 01:48:57.968
LK's 16e: you know, Miriam, you you made the comment about it, not having to go through certain approvals. We obviously also understand

512
01:48:58.510 --> 01:49:12.665
LK's 16e: if a program like this can be done at a lower cost in the market, it it certainly should be, but I think our our sense of the expertise in this type of program is

513
01:49:13.120 --> 01:49:28.140
LK's 16e: for better or for worse is, you know, companies, that already you have this expertise and could really help execute this program efficiently and effectively, are for profit organizations. And

514
01:49:28.520 --> 01:49:46.769
LK's 16e: you know, we, we you know, a a 3rd party such as us could potentially partner with a not for profit. But that adds more another administrative layer. So where you already have aggregators, contractors, customers, and so forth. So just wanted to go on the record

515
01:49:47.290 --> 01:49:53.310
LK's 16e: and you know about the about the topic and hope maybe

516
01:49:53.780 --> 01:49:57.830
LK's 16e: you know, there'd be consideration for making this a traditional Rfp, thank you.

517
01:50:02.890 --> 01:50:03.990
Miriam Joffe-Block, CEC: Thank you.

518
01:50:04.968 --> 01:50:11.100

Miriam Joffe-Block, CEC: Is anyone else interested in speaking to this topic of feasibility or Federal actions?

519
01:50:11.500 --> 01:50:18.290
Miriam Joffe-Block, CEC: I think maybe we'll go. Oh, okay, I'm sorry. Let's go. I think we've somebody who hasn't spoken.

520
01:50:19.770 --> 01:50:31.110
Jacob Wahlgren, CEC: Yes, let's see, we have another hand in the queue Cooper at a quick carbon. Please state your name affiliation, and mute your line, and you may proceed with your comment.

521
01:50:47.640 --> 01:50:53.330
Jacob Wahlgren, CEC: Group, your line is unmuted on zoom, it might be on your line, on your end.

522
01:51:05.990 --> 01:51:08.619
Miriam Joffe-Block, CEC: Hooper. I'm sorry we still can't hear you.

523
01:51:11.340 --> 01:51:12.955
Miriam Joffe-Block, CEC: I why don't we?

524
01:51:13.610 --> 01:51:25.900
Miriam Joffe-Block, CEC: Let's advance the slide and kind of present the next topic, and then, Cooper, we can keep trying, and and then, Alex, we'll we'll take your comment as well. I just want to make sure we get a chance to move to the next topic.

525
01:51:32.360 --> 01:51:53.269
Miriam Joffe-Block, CEC: Our next topic is around the financing and speaking to some of this, it's another sort of part of this feasibility. So, as we mentioned, DOE Staff has advised, it does not expect to allow partial payments for the homes measured pathway prior to the 12 month period, and in addition, Cec. Does not foresee any State funds being available for this action.

526
01:51:53.500 --> 01:52:10.590
Miriam Joffe-Block, CEC: What are the options for financing the rebate value given that homes and State funds are not available, and do aggregators have the capacity to finance all or part of rebate values? Do recent Federal actions, impact aggregators, ability to access financing.

527
01:52:13.070 --> 01:52:18.199
Miriam Joffe-Block, CEC: If there's anyone who'd like to speak to these topics, please raise your hand.

528
01:52:25.100 --> 01:52:29.059
Jacob Wahlgren, CEC: Okay, Cooper, at quick carbon will. I'm gonna mute
your line.

529
01:52:29.572 --> 01:52:31.110
Cooper at QuitCarbon: Again! Yep, Cooper.

530
01:52:31.110 --> 01:52:31.550
Jacob Wahlgren, CEC: Sorry Kelvin.

531
01:52:32.490 --> 01:52:32.870
Miriam Joffe-Block, CEC: There we go!

532
01:52:32.870 --> 01:52:46.609
Cooper at QuitCarbon: Carbon CEO and chief quitter. So to the question of
financing incentives, and also the uncertainty at the Federal funding
level. No, I don't believe aggregators generally have the ability to
finance

533
01:52:46.780 --> 01:52:52.289
Cooper at QuitCarbon: incentives given the 12 month timeline, but more
acutely given the uncertainty at the Federal level.

534
01:52:52.500 --> 01:53:06.109
Cooper at QuitCarbon: I can't imagine going to any bank or backup funding
source and saying, Hey, I need you to loan money to cover a rebate. The
Feds are going to pay out in 12 to 15 months. Given the current
administration's behavior.

535
01:53:06.220 --> 01:53:13.619
Cooper at QuitCarbon: I would add a comment that the Cec's stance that
we're gonna proceed in sort of a

536
01:53:14.198 --> 01:53:26.850
Cooper at QuitCarbon: assuming the future will be like the past. With
regards to DOE behavior on funding and meeting commitments is just deeply
unwarranted and ill-advised. In this circumstance

537
01:53:27.260 --> 01:53:39.450
Cooper at QuitCarbon: the Administration has shown again and again that
it does not constrain itself by behavior in the past, let alone law,
regulation commitments. Anything else.

538
01:53:39.730 --> 01:54:00.820
Cooper at QuitCarbon: I would request that the Cec. Actively pursue publicly alternate pathways for this program that make assumptions about the Administration behaving more like it has in the last few weeks and months, and not behaving like it has in the last few years, or, as law or regulation require.

539
01:54:01.100 --> 01:54:03.439
Cooper at QuitCarbon: In the absence of the Cec.

540
01:54:03.800 --> 01:54:14.429
Cooper at QuitCarbon: Developing and publicizing alternate pathways. This entire program poses, acute risk to contractors, aggregators, and even the statewide implementer

541
01:54:14.620 --> 01:54:27.420
Cooper at QuitCarbon: that suggest to me that participation in any of those would be very muted. Given the risk imposed by the Federal Government's unreliability. Thanks.

542
01:54:30.240 --> 01:54:31.869
Miriam Joffe-Block, CEC: Thank you. Cooper.

543
01:54:34.510 --> 01:54:38.773
Jacob Wahlgren, CEC: Thank you, Cooper. We'll go to the next comment.

544
01:54:39.320 --> 01:54:48.710
Jacob Wahlgren, CEC: David Colada, I hope I didn't mispronounce your name. When I mute your line. Please state your name, affiliation, and you may proceed with your comments.

545
01:54:49.070 --> 01:54:50.649
David Kolata: Yeah. Can you hear me?

546
01:54:52.800 --> 01:54:53.570
Miriam Joffe-Block, CEC: We can.

547
01:54:53.570 --> 01:55:21.550
David Kolata: Excellent. Yeah, David Colada, I'm Vice President of policy for sealed. We have put this in our written comments, and we're going to file some additional ones. Obviously we would prefer, if and we do believe it is legal. Under the law of Holmes rules that prepayment be allowed, that having been said, if there no prepayment option, we are still able to, and looking forward to finance

548
01:55:21.550 --> 01:55:35.789
David Kolata: projects. We are part of the flex coalition. There's over
20 groups that have signed a letter saying that they plan on
participating in the paper performance program in

549
01:55:35.790 --> 01:55:40.780
David Kolata: in California. And so I certainly know that there's a fair
amount of

550
01:55:40.860 --> 01:56:03.899
David Kolata: instability right now in DC. It's our impression, though,
that new guidance will be issued, and these programs will move forward,
and that there will be some certainty, and I do think that the private
sector that aggregators are there to step up. I think you know our hope
is is that over time. Perhaps we can change the opinion of DOE on the
prepayment issue.

551
01:56:03.900 --> 01:56:27.430
David Kolata: But even if that were not to occur, I think that it would
be okay, and that we could move forward. And there are some real huge
benefits, as you know, from a paper performance model. Primarily it can
start to turn the energy efficiency space into a grid reliability
resource. So we're very encouraged by all of this. We're very supportive
of this program.

552
01:56:27.430 --> 01:56:37.270
David Kolata: We filed this in our comments and just wanted you to know
that I do think that the aggregator community would step up, even if it
isn't the perfect system.

553
01:56:37.530 --> 01:56:38.580
David Kolata: Thank you.

554
01:56:42.840 --> 01:56:43.810
Miriam Joffe-Block, CEC: Thank you.

555
01:56:44.190 --> 01:56:45.350
Jacob Wahlgren, CEC: Thank you, David.

556
01:56:45.986 --> 01:56:53.509
Jacob Wahlgren, CEC: Let's see, we'll move to the next in the queue. We
have another comment, Alex Landsberg. I'm going to

557

01:56:54.187 --> 01:56:58.470
Jacob Wahlgren, CEC: unmute your line, please again state your name and
affiliation. You may proceed with your comment.

558
01:56:58.470 --> 01:57:16.629
Alex Lantsberg: Thank you. And this is in a way sort of echoing what
Cooper was saying. That's sort of the reason I I ended up Alex.
Landsberg. Electrical industry San Francisco electrical industry. Just as
you guys were talking about the your expectation that this thing would be
sort of

559
01:57:16.810 --> 01:57:26.009
Alex Lantsberg: working as it has been recently. A friend of mine in
Illinois sent me notice about the cancellation of the solar for all
program. So I I

560
01:57:26.120 --> 01:57:34.289
Alex Lantsberg: I I'm sure they're absolutely structured different ways
in terms of like payment and and receipt. But how are you guys learning
from?

561
01:57:34.985 --> 01:57:59.020
Alex Lantsberg: I I you know just the Comp, the complete unpredictability
of this administration. In terms of risk management for for everyone else
involved. Because I think that you know, from the standpoint of
contractors. They wanna make sure that they get paid, I think, from the
standpoint of of your statewide implementer, nobody wants to float a
tremendous amount of

562
01:57:59.200 --> 01:58:04.260
Alex Lantsberg: payroll dollars, and then ultimately get whacked by by
the Federal Government.

563
01:58:07.350 --> 01:58:15.419
Miriam Joffe-Block, CEC: Right. No, I hear, I hear. Thank you so much. I
hear the concern, and that is why we're posing the question right now,
right to to hear from the entities that would be doing

564
01:58:15.660 --> 01:58:25.829
Miriam Joffe-Block, CEC: the implementation and how they are feeling
about this environment. I will just echo what Commissioner Mcallister
said earlier that we are coordinating with, you know.

565
01:58:25.940 --> 01:58:52.999
Miriam Joffe-Block, CEC: 50 other States as part of the National
Association of State Energy Offices. We have regular calls. We compare

530

notes. There's a lot of organizing and advocacy and conversations about this. As Dina said, we can't predict the future. You know, we are posing the question here today to give the potential implementers and posing in our in our input request for comments on our docket as well to give folks a chance to

566
01:58:53.668 --> 01:58:55.510
Miriam Joffe-Block, CEC: a chance to weigh in.

567
01:58:56.580 --> 01:59:02.599
Miriam Joffe-Block, CEC: I I will say. I think the way that the program is structured as we've gone over a couple of times now is that

568
01:59:03.080 --> 01:59:06.580
Miriam Joffe-Block, CEC: It's really the, you know. The homeowners

569
01:59:06.710 --> 01:59:33.150
Miriam Joffe-Block, CEC: are getting their rebate at the time of installation or the value of their rebate at the time of installation. And I know there's comments about the risk of savings, not materializing and Bill impact estimates. That's sort of a separate issue. We encourage comment on that as well. But that's not a Federal issue. The aggregators are really bearing that performance risk and waiting for the rebates to come, and the implementer is the one who is directly paid with the homes funding. So just to kind of differentiate

570
01:59:33.910 --> 01:59:36.190
Miriam Joffe-Block, CEC: where where these parties are sitting.

571
01:59:39.410 --> 01:59:43.479
Miriam Joffe-Block, CEC: do we have anyone else who wants to speak to financing.

572
01:59:45.350 --> 01:59:49.139
Miriam Joffe-Block, CEC: Alright. So let's keep moving. Then we'll go on to our last

573
01:59:49.664 --> 02:00:06.189
Miriam Joffe-Block, CEC: focus topic here, which has to do with the agreement structure. I know I already had one comment related to it. But if there's others who want to speak to this live here for potential implementers and others? Will your entity respond to a solicitation structured as a grant funding opportunity?

574
02:00:06.420 --> 02:00:10.699

Miriam Joffe-Block, CEC: What factors would influence your decision to bid or apply?

575
02:00:10.870 --> 02:00:20.849
Miriam Joffe-Block, CEC: And if you are typically not inclined to apply to a Gfo. Could your existing business model be modified to support or accommodate a Grant agreement vehicle.

576
02:00:21.460 --> 02:00:23.940
Miriam Joffe-Block, CEC: So I'll pause there to see if there are.

577
02:00:24.350 --> 02:00:26.950
Miriam Joffe-Block, CEC: If there's anyone who wants to speak to that.

578
02:00:41.280 --> 02:00:55.879
Miriam Joffe-Block, CEC: Okay, not seeing any hands. Let's go on. I think what I might do is just pause to go back to the questions for a minute and

579
02:00:57.610 --> 02:01:03.809
Miriam Joffe-Block, CEC: I will see if there's any I can answer. Live, and then we'll open it up for general comment.

580
02:01:05.461 --> 02:01:25.650
Miriam Joffe-Block, CEC: There is a question here of will we publish the answers to questions we've answered here in the live Q. And a. And a. Follow up Q. And a response to be posted in writing for those never on this webinar. I don't know if we'll publish them. But we do plan to host the recording. So this conversation will be available for folks.

581
02:01:27.406 --> 02:01:32.099
Miriam Joffe-Block, CEC: There's a question of aggregators have access to energy usage data

582
02:01:32.390 --> 02:01:51.159
Miriam Joffe-Block, CEC: through their relationship with households. Can aggregator share the utility data with the implementer. I think that would really depend on the nature of what the agreement with the household was, and what the permissions permissions that the household gave were. So we I think we'd have to look at the specifics.

583
02:01:56.460 --> 02:02:18.720
Miriam Joffe-Block, CEC: There's a question about where the specific terms and conditions for the potential contract pathways. Those are on our event. Workshop page. Maybe. Actually, one of my colleagues, Jacob.

Maybe you can paste those links into that particular question so the person can access them there, and they're also on the links that were posted into our chat.

584
02:02:26.358 --> 02:02:39.210
Miriam Joffe-Block, CEC: How will the program cover? Emergency installs? Will aggregators and contractors be granted the ability to proceed with projects before the program has approved the rebate. That would be, I think that would be up to aggregator

585
02:02:39.740 --> 02:02:53.244
Miriam Joffe-Block, CEC: taking on the risk. There is a rebate reservation system. There are what you saw on the scope of work that Michael went over. There are DOE rules about customer eligibility for rebates and

586
02:02:53.640 --> 02:03:16.259
Miriam Joffe-Block, CEC: You know. Customers can't get more than one homes rebate customers also can't get a homes measured pathway rebate if they've gotten a rebate through our hero program. So there are some risks. And so that would be sort of an aggregator, I believe, sort of determination of how much risk they would want to take without going through eligibility. Checks.

587
02:03:18.190 --> 02:03:32.330
Miriam Joffe-Block, CEC: will homes, rebates, be able to cover, electric to electric home energy upgrades? That is a really interesting question. The DOE does not set rules on measure eligibility other than

588
02:03:32.670 --> 02:03:37.369
Miriam Joffe-Block, CEC: energy star requirements as as of the current guidance, energy star requirements

589
02:03:37.470 --> 02:04:03.539
Miriam Joffe-Block, CEC: for heat pumps and heat pump Hvacs. The project is going to need to save. Still, on a portfolio, level, projects are going to need to save 15%. So it would be combination of 2 things. One would be the final rules that the statewide implementer would set around, measure eligibility with Cec. Approval, and then also whether the aggregator felt like that project was going to contribute sufficiently enough to the portfolio.

590
02:04:04.500 --> 02:04:10.366
Miriam Joffe-Block, CEC: Okay, let's take a break from questions at the moment. And

591

02:04:11.630 --> 02:04:30.100
Miriam Joffe-Block, CEC: My colleague Jacob, is reminding me that we are.
We have one more focus topic here. Thank you for reminding me that. So
before we go into the totally open session, I did just want to highlight
these questions that we have in the input request and see if anyone
wanted to to talk to them, speak to them.

592
02:04:30.230 --> 02:04:33.429
Miriam Joffe-Block, CEC: So this focus is roles and responsibilities.

593
02:04:33.740 --> 02:04:39.889
Miriam Joffe-Block, CEC: First, st which types of companies or
organizations are likely to step into the residential aggregator role.

594
02:04:40.120 --> 02:04:57.840
Miriam Joffe-Block, CEC: What capacities, for example, existing tools or
platform or financing do they have. Are these entities likely to be
working locally across the State or across the country? But I know David
Colada spoke to this a few moments ago. If there's others who want to, we
would appreciate it.

595
02:04:58.110 --> 02:05:13.939
Miriam Joffe-Block, CEC: Tools and resources, what will the statewide
implementer need to provide to aggregators and to contractors to
facilitate participation and success. And then marketing what marketing
and outreach activities should be conducted by the statewide implementer
versus aggregator.

596
02:05:14.090 --> 02:05:19.089
Miriam Joffe-Block, CEC: So I'll pause for a moment to see if anybody
wants to speak to any of those questions.

597
02:05:32.830 --> 02:05:38.260
Miriam Joffe-Block, CEC: Okay, well, not seeing any hands, let's move
forward.

598
02:05:42.060 --> 02:05:58.399
Miriam Joffe-Block, CEC: And so this is. Now we are now in an open
comment session. So any any topic that folks would like to comment on or
ask a live question? I mean, if we can't answer it. We will. If not,
we'll see if we can get back to you. All comments are welcome now on the
Homes, pay for performance program.

599
02:06:05.590 --> 02:06:14.420

Jacob Wahlgren, CEC: See one raised hand of the queue. John Shribs, I'm gonna mute your line, please state your name affiliation, and you may proceed with your comments.

600
02:06:14.420 --> 02:06:38.670
John Shribbs: John Shribs, City Council, member for city of Petaluma again, and I've talked to Staff about rebate programs to see if I could convince them to be an aggregator for our local city, working with Sonoma, clean power or local Pg. And E. Representatives to do something here, and after talking with them rebates just to do like gas blowers to electric

601
02:06:38.670 --> 02:07:05.510
John Shribbs: here in town and talking to Staff, and the effort that they would have to go through to find the actual folks that are actually users and do the rebate, and then getting the things turned in and running the program. And I started talking to them about the costs of running a rebate type program, and it turned out that the costs of running the rebate program would be hugely, much greater than anything, any advantage of doing the of getting folks to convert over for the actual equipment.

602
02:07:05.510 --> 02:07:18.499
John Shribbs: So again, this is where I'm a little concerned about the work on the ground. Who's going to do it? How is it going to get done? Could I convince my city to actually participate in this program?

603
02:07:18.500 --> 02:07:38.050
John Shribbs: And so I'm seeing that little bit of a difficulty because we would love. One of our general plan is to get our lower economic folks to sign up and do exactly what we want to do here. So theoretically, I would love to do this, but I'm seeing how I can help my city to get involved, to do things like this.

604
02:07:38.050 --> 02:07:49.150
John Shribbs: And I'm just seeing a couple of these roadblocks and problems. And so I was hoping that you could get an idea of okay, practically on the ground. How you actually see this working

605
02:07:49.150 --> 02:08:04.529
John Shribbs: for the folks who are here local, both from the endpoint of the homeowner, the contractors, and running it through the system. Who's going to actually do this work? And how can they do it financially, feasibly, with staff time and staff and the monies that are available.

606
02:08:04.660 --> 02:08:05.670
John Shribbs: Thank you.

607
02:08:07.091 --> 02:08:16.648
Miriam Joffe-Block, CEC: John, I think I'll I'll try to answer that a
little bit, and pointing back to some of the scope of work tasks that we
showed. It's a great question and appreciate the comment.

608
02:08:17.340 --> 02:08:37.260
Miriam Joffe-Block, CEC: so if you look later into the the full kind of
scope of work, the statewide implementer. You know, this is is, I think,
the current agreement amount I showed was 17.5 million dollar budget for
the statewide implementer, and as part of that budget. They would be
tasked with doing

609
02:08:37.260 --> 02:08:59.980
Miriam Joffe-Block, CEC: aggregator and contractor outreach, so they
would be recruiting contractors and aggregators and to join the program
and to be listed as part of the program, and they would also be
responsible for some degree of consumer outreach and for coordinating
with local partners. So if you look at the tasks related to

610
02:09:01.440 --> 02:09:30.050
Miriam Joffe-Block, CEC: consumer outreach, and you know marketing they
would be responsible for doing that. If you have thoughts and
recommendations of how they could best coordinate with local localities,
with cities and counties or local entities, you know. Please put those in
our docket and so they could be doing anything from putting a blurb about
the program, working with the city to put it on a website to hosting a
info session or anything, you know. It's sort of.

611
02:09:30.350 --> 02:09:37.460
Miriam Joffe-Block, CEC: It's a little bit broad right now, the way it's
written in in the scope of work. Because they'll be putting together an
outreach plan.

612
02:09:37.570 --> 02:10:02.630
Miriam Joffe-Block, CEC: And we have some questions in the input request
about how much responsibility is on the aggregators versus the statewide
implementer to do the recruitment. Once contractors. The theory is, once
contractors are enrolled in the program, and they understand that they
will be able to offer these rebates. You know. Then they are going about
their normal course of business, working with customers who are
identifying projects. And also

613
02:10:02.910 --> 02:10:23.749
Miriam Joffe-Block, CEC: you might recall, there's a task in there that
the statewide implementer is using to the extent that we have it for the
utilities that provide it is using the interval and billing data to

identify geographies that are going to really benefit from these rebates
and helping aggregators locate

614
02:10:24.193 --> 02:10:34.880
Miriam Joffe-Block, CEC: pro customers with projects with, you know,
Michael talked about some of the caveats around privacy concerns and
details that we have to work out. So there are pretty significant plans

615
02:10:35.310 --> 02:10:46.449
Miriam Joffe-Block, CEC: that we've drafted around kind of the outreach
in these roles, and then, would, you know, would be very welcoming of
your feedback on on any of the specifics or any recommendations you have.

616
02:10:47.980 --> 02:10:56.511
Andrew McAllister: Miriam. I I'm I'm listening in with interest. And
apologies for sort of dropping in occasionally here. But I want to just
thank

617
02:10:57.564 --> 02:11:07.665
Andrew McAllister: the the council member for Mr. Shribbs. I think it was
from Petaluma, I think. You make some really good points. We're
certainly,

618
02:11:08.250 --> 02:11:20.180
Andrew McAllister: you know, not looking to add lots of burdensome
administrative requirements unnecessarily. A lot of this comes from DOE's
guidance. We we are. Gonna get some new guidance soon. So you know,
waiting for that

619
02:11:20.774 --> 02:11:40.440
Andrew McAllister: which here is is rough, relatively imminent. But I did
want to just point out. You know, you talked about the bill impacts. And
you know, the the reality in California is that much of the State has
quite expensive electricity, and that tends to be the investment utility
territories

620
02:11:40.965 --> 02:12:02.100
Andrew McAllister: in which Petaluma finds itself. That you know some of
the other parts of the State that have publicly owned and municipal
utilities, I think, don't have that problem to anywhere near that extent,
so I think the the sort of benefit. The customer will vary quite a bit
across the State, and Miriam just mentioned the use of interval meter
data and some of the pre planning we can do with that.

621
02:12:02.643 --> 02:12:14.679

Andrew McAllister: So that's a work in progress. But I think, you know, in general, you're gonna find better cost effectiveness for electrification measures logically, where electricity is less expensive. And so you know those.

622
02:12:14.800 --> 02:12:32.469
Andrew McAllister: We have a big, complicated state, with lots of climate zones and and lots of utilities of different flavors. And and so we do have to work through that and find where the value proposition is the greatest, and that largely is going to be on the shoulders of the statewide implementer, together with the Energy Commission to to do that planning.

623
02:12:37.340 --> 02:12:39.350
Miriam Joffe-Block, CEC: Thank you for jumping in, Commissioner.

624
02:12:40.940 --> 02:12:53.160
Jacob Wahlgren, CEC: Thank you, Commissioner. Thank you for your comment, Josh. We'll move to next comment in the queue. Joe Sullivan. I'm going to mute your line. Please state your name, affiliation, and you may proceed with your comment.

625
02:12:53.870 --> 02:12:58.509
Joe Sullivan IBEW/NECA: Yes. Good morning. Joe Sullivan, Los Angeles electrical industry.

626
02:12:58.660 --> 02:13:18.560
Joe Sullivan IBEW/NECA: And in the Equitable building decarbonization program there are workforce guidelines or requirements to achieve that, I think, are designed to help achieve savings and program success? Have there been thoughts of adopting similar

627
02:13:19.218 --> 02:13:23.530
Joe Sullivan IBEW/NECA: contractor standards or workforce standards for this program.

628
02:13:23.840 --> 02:13:30.199
Joe Sullivan IBEW/NECA: And do you see that as potentially helping, achieve desired energy savings.

629
02:13:31.190 --> 02:13:36.029
Miriam Joffe-Block, CEC: The thank you for the question. And you know, I think

630
02:13:36.100 --> 02:13:46.750

Miriam Joffe-Block, CEC: so. The 2 programs have a different delivery
model in in the Equitable Building, Dcarp Direct install program. The
contractors who are doing the installation work

631
02:13:46.820 --> 02:14:11.339
Miriam Joffe-Block, CEC: are directly, and I'm going to merge all those
terms that I was differentiating before right, are directly working with
the regional administrators, and are being hired by them and paid by the
program to do the installs, whereas this is really a sort of a market
delivery program. Contractors and customers are finding each other and
then coming to the program. So I think, it's not a you know it's not an
easy sort of one to one, but I think we're very interested in your

632
02:14:11.560 --> 02:14:31.559
Miriam Joffe-Block, CEC: comments on this, as I mentioned earlier. If you
have recommendations or best practices. Please do submit them to our
docket. You know. Please please take a look at how we have the scope of
work for the implementer outlined. Now about how they would set sort of
rules for contractors. And then, you know, I encourage you to weigh in on
that specifically, and and we welcome the input from the trades.

633
02:14:36.630 --> 02:14:47.000
Jacob Wahlgren, CEC: Thank you, Joe, for your comment. We'll move to the
next comment in the queue, Carmen. Best. I'm gonna mute your line, please
state your name, affiliation, we may proceed with your comment.

634
02:14:48.750 --> 02:15:14.520
Carmen Best: Great Carmen best CARM. ENBE. ST. And I am with recurve
analytics. I have a quick question for you, Miriam, about well, might not
be quick. But the differentiation of the Gfo. And the Rfp. You had noted
that the specifics of data, access and

635
02:15:14.580 --> 02:15:38.340
Carmen Best: the terms and conditions would be slightly different. And in
looking at those documents, it looks like there's kind of one word that's
different. That being for a Gfo confidential data would be able to be
provided. And under an Rfp. You can get more into that personal
information component and wondering if you could comment more about

636
02:15:38.340 --> 02:15:46.330
Carmen Best: how you guys are thinking about access to to data and how
that will be operationalized.

637
02:15:46.400 --> 02:15:48.160
Carmen Best: Because

638

```
02:15:48.830 --> 02:16:18.719
Carmen Best: if it's a, it's a really important risk mitigation tool.
Commissioner Mcallister just pointed that out that upfront planning is
going to be really critical and and the contracting pathways that you
choose may have differentiated differential challenges for how that
information can be used for optimizing with aggregators, or farther down
the chain for identifying customers who would have benefits.


639
02:16:20.030 --> 02:16:21.519
Carmen Best: So that's a comment and a.


640
02:16:21.520 --> 02:16:42.470
Miriam Joffe-Block, CEC: Question. Yeah, thank you. I'm going to provide
a little more context, because I I see how a few things got sort of
mixed. So in the solicitation concept paper, I think what you're
referring to, Carmen is sort of up towards the very top. There's a chart,
and it shows what what additional sort of terms and conditions would go
with a


641
02:16:42.580 --> 02:16:53.450
Miriam Joffe-Block, CEC: contract versus a grant. And you're talking
about. There's a difference between the what the Cec. Would attach. One
of them is confidential information, and the other has the word privacy
also in it.


642
02:16:53.830 --> 02:17:03.740
Miriam Joffe-Block, CEC: I can, and I'm sorry I can't follow up with you.
I can't tell you right now the specific differences between those 2 sets
of terms, so we'll have to get back to you on that.


643
02:17:03.740 --> 02:17:04.110
Carmen Best: Okay.


644
02:17:04.430 --> 02:17:08.919
Miriam Joffe-Block, CEC: What we were highlighting and trying to draw
people's attention to in the workshop.


645
02:17:09.080 --> 02:17:19.499
Miriam Joffe-Block, CEC: And I think we just put it in the chat, and the
we're putting it in the in. The response to a question is that the
Federal flow downs are quite.


646
02:17:19.500 --> 02:17:19.980
Carmen Best: Oh!


647
```

02:17:19.980 --> 02:17:22.050
Miriam Joffe-Block, CEC: Distinct for a

648
02:17:22.150 --> 02:17:44.349
Miriam Joffe-Block, CEC: contractor versus a subrecipient. And again,
here we're talking about the implementer, not the bill for everyone
listening. We're not talking about the building. Energy installers. The
Federal contracts. The Federal terms are different. Some of them overlap,
some of the subrecipient has more. And so we were encouraging you to take
a look at those. And we have published those on the Events website.

649
02:17:44.570 --> 02:17:53.819
Miriam Joffe-Block, CEC: I will take back your question to our contracts
team and our legal on. If there are, what if any meaningful differences
there are

650
02:17:54.389 --> 02:17:59.799
Miriam Joffe-Block, CEC: in terms of the data access between the 2

651
02:18:00.260 --> 02:18:02.340
Miriam Joffe-Block, CEC: when we're talking about the energy data.

652
02:18:03.080 --> 02:18:13.180
Carmen Best: Thank you. Might, I note, turn it into a comment? I think
it's important that the data access is factored into the risk mitigation
strategies for the program.

653
02:18:16.250 --> 02:18:17.110
Miriam Joffe-Block, CEC: Thank you.

654
02:18:20.299 --> 02:18:27.529
Jacob Wahlgren, CEC: Thank you, Carmen, for your comment. We'll move to
the next comment in the queue, Alex Landsberg. Your line.

655
02:18:28.129 --> 02:18:31.059
Jacob Wahlgren, CEC: You state your day of affiliation, and you may
proceed with your comments.

656
02:18:31.250 --> 02:18:47.350
Alex Lantsberg: Yes, thank you very much. This is related to Joe's
comment, and I know that you guys are trying to Alex Einsberg, Sf,
electrical industry. I'm sorry about that. Related to Joe's comment. I
know you guys are trying to really structure this in sort of like a

657

541

```
02:18:47.660 --> 02:19:00.459
Alex Lantsberg: it what feels like a sort of a quasi decentralized sort
of market led type of program. I think the big concern that that I have.
And I think what maybe a lot of ee folks have seen is that
```

```
658
02:19:01.208 --> 02:19:08.879
Alex Lantsberg: you know, when this equipment is not installed properly
on the front end, we don't get the savings that's that are
```

```
659
02:19:09.309 --> 02:19:16.330
Alex Lantsberg: that are expected, plus, we get significantly more
greenhouse gas impacts. And there's, you know, this has been. This has
especially been
```

```
660
02:19:17.670 --> 02:19:22.059
Alex Lantsberg: been clear when we're dealing with a track systems which
I think this is going to be
```

```
661
02:19:22.420 --> 02:19:37.849
Alex Lantsberg: really sort of Hvac forward in many in many respects. So
the question of labor standards isn't just about labor. It's really about
install quality on the front end and making sure that
```

```
662
02:19:38.820 --> 02:19:44.512
Alex Lantsberg: the customers, or, you know, potential end. Users don't
have to go through.
```

```
663
02:19:45.430 --> 02:20:12.979
Alex Lantsberg: I don't know just the gauntlet of trying to find the
right contractors and all, and I think, and then. But however, the
incentives for the aggregators, or at least for the maybe not the
aggregator, but for the statewide entity, or whoever is going to be
working with contractors is to try to do this as cheap as possible. So I
think one of the things that the Energy Commission in its thinking
through is going to have to address is, are these
```

```
664
02:20:12.980 --> 02:20:17.420
Alex Lantsberg: sort of contradictory incentives that that exist for
everyone.
```

```
665
02:20:17.420 --> 02:20:44.560
Alex Lantsberg: for everyone involved? The other thing I wanted to note
is that I've heard extensively about these rebate programs where
contractors come in and actually use the open door that's created through
by people reaching out and being interested in this to upsell people, and
```

you know, I mean, I guess it's great for the from the standpoint of the
contractor, but I think it may redirect people from the

666
02:20:44.740 --> 02:20:50.219
Alex Lantsberg: the biggest, the biggest impacts. For in terms of like
the program goals. Thank you.

667
02:20:53.440 --> 02:20:54.769
Miriam Joffe-Block, CEC: Thank you for that, Alex.

668
02:20:58.920 --> 02:21:08.429
Jacob Wahlgren, CEC: Thank you, Alex, for your comment. Well, we have one
other comment in the queue, David Colada, I'm gonna mute. Your land,
please state your name affiliation, and you may proceed with your
comment.

669
02:21:09.230 --> 02:21:34.180
David Kolata: Yeah, thank you. I just want to respond real quickly on the
labor standards point which we support strong labor standards. I will say
that I think the incentives for a paper performance program are actually
kind of the opposite. It's sort of a race to the top. And that's because
ultimately, whoever is taking the risk here, my aggregators, they, if
it's not a well done job.

670
02:21:34.220 --> 02:21:59.819
David Kolata: they lose money. And so what you have is a situation that
kind of rewards. The best quality work, you know at the end of the day
that tends to be a lot of trade work, union work, and all of that. And
just so, I do think the incentive structure is aligned here for working,
you know, for strong labor standards, and you know we work with labor in
Wisconsin and other States. So just want to talk about the incentive
structure.

671
02:22:03.280 --> 02:22:04.150
David Kolata: Thank you.

672
02:22:07.240 --> 02:22:08.270
Jacob Wahlgren, CEC: Thank you, David.

673
02:22:09.774 --> 02:22:13.600
Jacob Wahlgren, CEC: I don't see any other comments in the queue at this
time. Miriam.

674
02:22:14.130 --> 02:22:14.910
Miriam Joffe-Block, CEC: Okay.

675
02:22:15.410 --> 02:22:19.579
Miriam Joffe-Block, CEC: I'm taking a look at the questions, and I'm
seeing if there's any that I can.

676
02:22:20.380 --> 02:22:25.040
Miriam Joffe-Block, CEC: easily answer. Now. Okay, I'm sorry. There is a
question from much earlier about

677
02:22:25.350 --> 02:22:31.347
Miriam Joffe-Block, CEC: how are energy? How are estimated savings
calculated? And I said we would answer it, live. So

678
02:22:32.090 --> 02:22:35.270
Miriam Joffe-Block, CEC: Going back to our

679
02:22:35.280 --> 02:23:02.149
Miriam Joffe-Block, CEC: kind of initial flow. Our initial broad strokes
workflow. So the contractor is doing a home assessment at the at the very
beginning with the customer to estimate the savings. DOE does not require
that that home assessment utilize actual meter data, and there's nothing
to prevent, you know, the contractor from getting the data shared from
the customer and using it, you know, and then that's a higher standard.
But it's not a requirement.

680
02:23:02.150 --> 02:23:28.109
Miriam Joffe-Block, CEC: So the contractor is estimating their savings,
working to some degree with the aggregator. And then we do have in the
scope of work that the statewide implementer is doing a reasonableness
check of those energy savings. I mean, that's for a few reasons, you
know, consumer protection also, making sure we're not over reserving
rebates that aren't going to perform, because once those rebate dollars
are reserved, you know, as the budget goes, then others can't access
them.

681
02:23:28.441 --> 02:23:39.390
Miriam Joffe-Block, CEC: And so what that reasonableness check ensures,
and you know, standards on this are all kind of open for for public input
if if you're interested in in commenting on that more.

682
02:23:39.940 --> 02:23:43.050
Miriam Joffe-Block, CEC: But ultimately it's it's the contractor in the
home.

683
02:23:47.535 --> 02:23:59.540

Miriam Joffe-Block, CEC: There's a question on whether batteries are acceptable as a measure to reduce peak demand. I think we're going to need to get back to you on the specifics. DOE has rules that distributed generation. Technology cannot be

684
02:23:59.730 --> 02:24:10.403
Miriam Joffe-Block, CEC: counted for the purpose of measuring the savings. And I need to confirm whether batteries are are considered part of that distributed generation technology.

685
02:24:10.960 --> 02:24:15.549
Miriam Joffe-Block, CEC: so so we will have to to follow up on that.

686
02:24:19.150 --> 02:24:21.380
Miriam Joffe-Block, CEC: Okay, it looks like Jacob. We have a hand.

687
02:24:22.140 --> 02:24:27.850
Jacob Wahlgren, CEC: Yes, Jeremy Zidik, I'm gonna mute your line, just state your name

688
02:24:28.220 --> 02:24:31.279
Jacob Wahlgren, CEC: affiliation, and you may proceed with your comments.

689
02:24:32.960 --> 02:24:44.400
Jeremy Zeedyk: Hello! My name is Jeremy Zdyke, ZEED. As in Dog YK. And I'm with the Western States Council of Sheet metal workers. I just have a little concern, and I just wanted to express it publicly

690
02:24:44.400 --> 02:25:09.129
Jeremy Zeedyk: that you know, not having some sort of concrete measurement for what those energy savings are or performance based data on the unit itself being installed. Kind of brings this to a race to the bottom where energy savings are theoretical. They're not realized. It's not helping the State achieve its goals, you know. A lot of research has been done particularly recently with showing that

691
02:25:09.130 --> 02:25:31.989
Jeremy Zeedyk: installs are abysmal. At this point, where you start to see 85% of new and 50% of renovation installations are just not performing as designed. So not having some concrete markers to kind of benchmark the performance, you know, before and after the installation, really doesn't do a lot of justice to.

692
02:25:31.990 --> 02:25:46.229

Jeremy Zeedyk: you know, showing what the actual energy savings are and and having a performance program without actual measuring performance kind of kind of laughs at that. So I just wanted to get that on the record and would appreciate any feedback.

693
02:25:47.390 --> 02:26:04.439
Miriam Joffe-Block, CEC: Thank you for bringing that up. And I do want to be clear that this is a measured program with a measured, with a measurement component. So the statewide implementer will be responsible for doing measurement and verification on every single project. And that's the 12 month delay.

694
02:26:04.580 --> 02:26:19.032
Miriam Joffe-Block, CEC: So in the the risks that you're talking about. You know up front that the energy savings are sloppy. There's not standards. They're not realized. The aggregator only gets paid. If the

695
02:26:19.520 --> 02:26:26.839
Miriam Joffe-Block, CEC: portfolio reaches that required 15% of energy savings. That's the bottom threshold, and they are only paid.

696
02:26:26.880 --> 02:26:47.530
Miriam Joffe-Block, CEC: If the on the actual savings that are realized as well. We went over a little bit of the incentive structure and how that's calculated. So the aggregator has front finance to the contractor, the money for the savings they're expected to see, and they don't get paid unless they're there.

697
02:26:47.530 --> 02:27:14.740
Miriam Joffe-Block, CEC: So there are some mechanisms in there for kind of a market course correction. One of the things that we also added into the scope of work that you may have seen is that the statewide implementer, to the extent they have the data mid cycle will be advising aggregators on the performance so they can work with contractors if they need to either correct installs, or if they need to adjust their estimates to get the realization rates to be more accurate.

698
02:27:14.740 --> 02:27:25.060
Miriam Joffe-Block, CEC: So they're absolutely so. I hear the concerns we take them and and thank you for the comment, and and please, you know, add more to our docket. But I did want to mention there is a measurement component.

699
02:27:25.290 --> 02:27:48.420
Jeremy Zeedyk: I appreciate that, but it just doesn't do a lot for the consumer that purchases that thinking that they're going to get a particular amount of savings, and then having to wait a year later to

find out that the aggregate projects didn't quite make it. And maybe your project was one of them, and you spent a lot of time and money and didn't get what you expect. And now it's you know, you got a lengthy process to get it

700
02:27:48.420 --> 02:28:09.600
Jeremy Zeedyk: established or fixed, or whatever, when that could have been taken care of, upfront at the installation by having, you know, labor standards and performance standards that are that are concrete, that are there at the beginning, that the consumer can then feel pretty good about when they walk away from that I mean the mechanical acceptance testing program is, is there for a reason? And I think we should utilize that. So thank you.

701
02:28:09.970 --> 02:28:13.420
Miriam Joffe-Block, CEC: Yeah, thank you. Thanks for clarifying the consumer angle as well.

702
02:28:15.860 --> 02:28:25.179
Jacob Wahlgren, CEC: Thank you, Jeremy, for your comment. We have another hand in the queue. I'm gonna mute your line, please state your name affiliation, and proceed with your comments.

703
02:28:25.340 --> 02:28:40.309
Cooper at QuitCarbon: Cooper, Marcus CEO, and Chief Quitter at quick carbon. I'd like to reiterate the prior comments and build on them. This program seems to be implementing in relative isolation

704
02:28:41.197 --> 02:28:48.210
Cooper at QuitCarbon: mechanisms for ensuring or making more likely quality installations.

705
02:28:48.720 --> 02:29:15.573
Cooper at QuitCarbon: Though such mechanisms already exist in some format in various other places across the State. It seems relatively wasteful and inefficient for a whole parallel set of mechanisms to be developed rather than existing mechanisms to be improved. For example, contractor licensing mechanism permit and inspection mechanisms at the local level.

706
02:29:16.230 --> 02:29:28.080
Cooper at QuitCarbon: mechanisms related to other rebate and financing programs that are likely to overlap with this one the additional and separate

707
02:29:28.180 --> 02:29:34.629

Cooper at QuitCarbon: quality control quality assurance mechanisms seem likely to produce sort of

708
02:29:34.920 --> 02:29:59.289
Cooper at QuitCarbon: wasteful effort and cost within this program, without any spillover benefits outside of this program. Would it not be better for the State? The contractors, and most especially the homeowners, that are served in and out of this program, if existing mechanisms were strengthened and made more rigorous, so that the benefits could

709
02:29:59.290 --> 02:30:09.977
Cooper at QuitCarbon: extend both outside of the program and pass the program's existence in time, for example, superior contractor licensing and

710
02:30:10.870 --> 02:30:20.560
Cooper at QuitCarbon: project inspection rules and processes would make things better for everybody across California well, into the future

711
02:30:21.000 --> 02:30:25.437
Cooper at QuitCarbon: in a way that this program could potentially do

712
02:30:26.320 --> 02:30:37.719
Cooper at QuitCarbon: compared to what I think I'm hearing, which is, there will be quality control and assurance within the program, but it won't necessarily produce any kind of lasting or widespread benefits outside of the program. Thank you.

713
02:30:40.190 --> 02:30:45.276
Miriam Joffe-Block, CEC: Thank you for those comments I did want to clarify Cooper. That.

714
02:30:46.150 --> 02:31:02.570
Miriam Joffe-Block, CEC: I don't know if these are the mechanism existing mechanisms you're talking about, but every project will need to have a permit pulled and permit closed. So the the infrastructure that exists with local permitting departments like that is part of the mix. I just want to make sure.

715
02:31:02.570 --> 02:31:18.399
Cooper at QuitCarbon: Totally, I think the problem is that the local infrastructure is highly inconsistent. And in many cases is simply insufficient. The permitting and inspection process is, as the prior caller pointed out, unlikely to consistently produce quality

716
02:31:18.400 --> 02:31:33.819
Cooper at QuitCarbon: installations and subsequent outcomes for
homeowners, and I would much prefer to see this program support those
existing processes rather than set up a whole separate set of parallel
processes that try to achieve the same goals.

717
02:31:36.800 --> 02:31:45.280
Andrew McAllister: So I wanted to jump in as a Commissioner Mcallister.
And I really appreciate this discussion. And I agree actually with the
points that you're making

718
02:31:46.031 --> 02:32:09.299
Andrew McAllister: you know. The fact is that if we're talking about say,
water heaters and Hvac systems residential water heater and and Hvac
change outs right existing buildings mechanical and and heating equipment
change outs 90 plus percent of those installations currently do not even
get a permit. So the local building department never even touches them.

719
02:32:09.550 --> 02:32:39.550
Andrew McAllister: And and so that's unacceptable. And I will just say
that there is a suite of activities that the Energy Commission is
focusing on currently which I won't go into. They're not part of this
program, but much more broadly is building the infrastructure to track
equipment, to start, to connect dots such that we are able to actually
point out, and you know, understand where compliance is worse, better,
and worse across the State and then start to work with local governments
and contractors to close that gap.

720
02:32:40.171 --> 02:33:08.980
Andrew McAllister: So this program actually, is, I think, an important
component of that overall effort. For improving import enforcement across
the State, because every, as Miriam said, every project that participates
it gets a rebate that's running through this program as well as homes.
And Hera, you know, has to get a has to pull a permit, and so that to
some extent, you know, should sort of condition the marketplace that if
you that that you should be expecting a permit

721
02:33:09.392 --> 02:33:38.710
Andrew McAllister: if no program ever touches a pro. You know a project,
then contractors often sort of sell the the customer us, you know a
project without a permit, and that's not acceptable. So this is a long
term sort of steering the ship towards better compliance and more
permitting and and closing out permits right then, just it's not enough
to just you know, pull a permit. You need to go through with the
inspection, with the verification and and the closure of the permit.

722
02:33:39.194 --> 02:34:01.600

Andrew McAllister: But I think, your points are well taken that the existing systems don't aren't aren't perfect. But I think in this program, there is a lot of opportunity, a lot of potential to do tight coordination with local governments. You know. Also to to council member member shrimps, comments to coordinate with local governments around. The permitting and compliance and and enforcement

723
02:34:01.650 --> 02:34:29.940
Andrew McAllister: at the local level. So so I think we are singing from the same hymnal. It might actually not not sound like it. But this is a this is an ongoing you know, challenge around permitting. And when we have sort of a program structure that touches these that is aware of these projects, then it makes it, I think, imperative that we that we insist on the permitting process being complied with the compliance process being complied with.

724
02:34:30.040 --> 02:34:47.040
Andrew McAllister: and that aligns with Qaqc. That aligns with the goals that we all want for quality installations. Just remind folks that the Energy Commission develops the building code. The many of these measures covered by this and other programs do require permit. They are covered by the by the California Building code.

725
02:34:47.728 --> 02:35:00.611
Andrew McAllister: and the enforcement of that code happens at the local jurisdiction, the local building department. And so this is something that requires cooperation at the local level with the building department and and local officials. So

726
02:35:01.050 --> 02:35:18.220
Andrew McAllister: wanted to just make sure to to explain a little bit the broader landscape. And that that compliance and permitting is something that the Energy Commission takes very seriously, and that also has a lot of other stakeholders involved in it that we have to work with to improve. So, thanks.

727
02:35:22.690 --> 02:35:27.150
Jacob Wahlgren, CEC: Thank you, Commissioner, and thank you, Cooper, for your comment.

728
02:35:27.790 --> 02:35:37.340
Jacob Wahlgren, CEC: So we have another hand raised in the queue. Chris. Rook. Please. I'm gonna mute your line, please. State your name affiliation. You may proceed with your comments.

729
02:35:38.040 --> 02:35:39.093
Chris Ruch: Yes, Chris

730
02:35:40.350 --> 02:36:09.389
Chris Ruch: Chris Rook, sheet metal workers, local 104. Last name is
Ruch. I definitely appreciate you bringing this up and having time for us
to discuss this. I agree with the Commissioner's comment there that,
recognizing that we do have a problem with the current permit process,
and I would like to just ensure that we're not just talking about pulling
a permit. We're talking about that. No funds would be allocated until the
permit is completely closed. That's kind of a key part to this.

731
02:36:09.390 --> 02:36:31.609
Chris Ruch: And we should remember there that when we're talking about
the permit we're talking about, the bare minimum quality has been met. So
really, we should not have any kind of rebate program in this State that
is not requiring a permit before any funding is done, and we should
recognize again that that's just hitting the bare minimum. Now, when
we're talking about the actual energy savings here.

732
02:36:31.660 --> 02:36:59.190
Chris Ruch: I do have some concerns and would agree with the previous
caller, Mr. Z. About how that we're determining those energy savings, and
it must be recognized that field technicians know darn well that there
are plenty of ways to manipulate projected energy savings and the final
energy savings that are there. A true test to this is doing exactly what
was suggested of that verifying that the technician doing the work is
qualified.

733
02:36:59.190 --> 02:37:09.730
Chris Ruch: and the DOE themselves, in their 2018 report, clarified that
that does not mean an 8 h online training, a 5 h online training. You're
talking about a true apprenticeship

734
02:37:09.730 --> 02:37:34.700
Chris Ruch: to see that these are State approved apprenticeship to see
there. It's the technician that's going to be out there. The contractor's
license simply says that somebody that works for the contractor is
knowledgeable does not say that the person that's going to be out there.
So I would encourage this program to take this as an opportunity to
improve what's being done in the State, and use this as a pilot to really
show what happens when you really enforce workforce standards, and you

735
02:37:34.700 --> 02:37:45.640
Chris Ruch: ensure that you have technicians on the job that can ensure
that you're going to achieve design intent, meaning not only the safety
but also the energy savings. Appreciate your time. I will submit written
comments.

736

02:37:49.050 --> 02:37:50.009
Jacob Wahlgren, CEC: Thank you, Chris.

737
02:37:50.010 --> 02:37:51.080
Miriam Joffe-Block, CEC: Yeah, thank, you.

738
02:37:52.350 --> 02:37:56.889
Jacob Wahlgren, CEC: I'm not seeing any other comments in the queue at
this time, Miriam.

739
02:37:59.313 --> 02:38:05.760
Miriam Joffe-Block, CEC: Are there any other comments anybody else would
like to speak to any aspect of the homes program?

740
02:38:07.646 --> 02:38:19.690
Miriam Joffe-Block, CEC: Okay, then, I think so I apologize. If we did
not get to your question. Live. I know there's a couple we need to get
back to and we will see what we can do about others.

741
02:38:21.680 --> 02:38:32.370
Miriam Joffe-Block, CEC: I'm going to go to our closing. Then, actually,
what I want to do is once again encourage interested parties to submit
comments in writing after the workshop.

742
02:38:32.530 --> 02:38:36.359
Miriam Joffe-Block, CEC: And you can find the input request on the
workshop event. Page.

743
02:38:36.480 --> 02:38:41.649
Miriam Joffe-Block, CEC: Remind folks that the comments are due on
Thursday, the 21st at 5 pm.

744
02:38:42.128 --> 02:38:52.209
Miriam Joffe-Block, CEC: And you'll submit those comments through our
docket which you can find on our program page. So they're all linked up
there. But program page has the docket workshop event. Page has all these
materials.

745
02:38:53.010 --> 02:39:08.560
Miriam Joffe-Block, CEC: And so that brings us to our closing. Thank you
for attending the solicitation concept workshop today, we really
appreciate all of your input. Thank you to the Commissioner for joining
us and to my team. And we are now adjourned.

# EXHIBIT 8

Question Report

Report gen|                    | 8/8/2025 15:26 |
Topic     Webinar ID          Actual Start Time  Actual Duration (minutes)     # Question
Notice of S 872 4231 0143     8/8/2025 8:07                         213                              58
Question Details

| # | Question | Answer | Question Time | Answered Time | Answer Name |
|---|----------|--------|---------------|---------------|-------------|
| 1 | Is this workshop still relevant given recent and easily anticipated federal funding cuts? (Please give us workshop participants some confidence that we are not wasting our time engaging with this program) | live answered | 8/8/2025 9:10 | | 8/8/2025 9:11 Miriam Joffe-Block |
| 2 | Will these slides and a recording be sent following this workshop? | Yes, the slides an | 8/8/2025 9:10 | | 8/8/2025 9:11 Miriam Joffe-Block |
| 3 | Focusing on low income, in an environment of quickly rising electric utility rates, risks saddling low income families with higher utility bills after electrification. Even if the retrofits are free, the bill increases (which will inevitably occur in at least some homes) will harm the families we are trying to help. Why not instead reduce this risk by motivating decarbonization in homes that could easily absorb utility bill increases? | Thank you for you | 8/8/2025 9:16 | | 8/8/2025 10:03 Jennifer Nelson |
| 4 | What are the steps a small city can take to get funding (competitive?) and then implement program locally with minimal staff effort. | live answered | 8/8/2025 9:20 | | 8/8/2025 9:40 Miriam Joffe-Block |
| 5 | "We have not received any indication from US Department of Energy regarding cuts to funding" (paraphrasing) How do you square that statement with consistent actions and statements from the Trump administration that suggest all IRA funding, including obligated and contracted funds, are to be withheld/cancelled? | live answered | 8/8/2025 9:26 | | 8/8/2025 9:41 Miriam Joffe-Block |
| 6 | How do you define "over incentivizing"? | live answered | 8/8/2025 9:32 | | 8/8/2025 9:42 Miriam Joffe-Block |
| 7 | Who does the IRA rebate flow to? Homeowners, aggregators, contractors? | live answered | 8/8/2025 9:35 | | 8/8/2025 9:38 Miriam Joffe-Block |
| 8 | How quickly do contractors get paid here? | live answered | 8/8/2025 9:37 | | 8/8/2025 9:43 Krishneeta Chand |
| 9 | Will the program allow contractors to also act as aggregators? This could create some efficiencies. | live answered | 8/8/2025 9:37 | | 8/8/2025 9:39 Miriam Joffe-Block |
| 10 | Why does the SWI need to do QA/QC when the retrofit work is already subject to local building code rules, permits, and inspections? Isn't this a wasteful duplication that adds program complexity without notable benefit? | The DOE guidanc | 8/8/2025 9:37 | | 8/8/2025 9:51 Miriam Joffe-Block |
| 11 | Will city or utility (agreggator) recieve any funding for running the program? This progam will take large staqff effort. | live answered | 8/8/2025 9:38 | | 8/8/2025 9:43 Krishneeta Chand |
| 12 | How are estimated savings calculated again please? | live answered | 8/8/2025 9:39 | | 8/8/2025 9:44 Miriam Joffe-Block |
| 13 | Will the program allow gas measures? | . Rules for allowa | 8/8/2025 9:39 | | 8/8/2025 9:51 Miriam Joffe-Block |
| 14 | At the end of the 12-month period, if desired savings aren't realized, would the aggregator be the one impacted? Or would homeowner and contractor also be at risk to lose rebate? Who faces the risk if performance isn't realized? | The homeowner w | 8/8/2025 9:39 | | 8/8/2025 9:53 Miriam Joffe-Block |
| 15 | To reduce peak demand. are batteries acceptable as a measure. | live answered | 8/8/2025 9:39 | | 8/8/2025 11:25 Krishneeta Chand |
| 16 | Do you have a proposed method for converting gas savings to kWh equivalents, and will you be asking for public input on that? | | 8/8/2025 9:40 | | |
| 17 | Could you please clarify the type of data being collected? Will the program rely on actual field data, including physical measurements, rather than assumptions or estimates that could be subject to manipulation? | On our event web | 8/8/2025 9:41 | | 8/8/2025 9:54 Miriam Joffe-Block |
| 18 | Will iBank or GoGreen provide rebate financing to aggregators? Or is no publicly-supported rebate financing anticipated? (This financing would bridge the cash flow gap caused by aggregators paying rebates 12+ months before receiving repayment from SWI) | GoGreen's curren | 8/8/2025 9:41 | | 8/8/2025 10:14 Miriam Joffe-Block |
| 19 | What specific labor standards are applicable for contractors/technicians performing the installations? | live answered | 8/8/2025 9:41 | | 8/8/2025 9:49 Miriam Joffe-Block |
| 19 | What specific labor standards are applicable for contractors/technicians performing the installations? | The SWI will be re | 8/8/2025 9:41 | | 8/8/2025 9:56 Miriam Joffe-Block |
| 20 | Is the min 15% savings threshold by project or portfolio? | By portfolio, and p | 8/8/2025 9:41 | | 8/8/2025 9:49 Miriam Joffe-Block |
| 21 | Can the implementer combine funds from other programs (e.g. market access programs) for incentives to aggregators/customers? | Stacking or layeri | 8/8/2025 9:41 | | 8/8/2025 9:55 Miriam Joffe-Block |
| 22 | Speaking to the labor standards question, if labor standards exist, how will they be enforced? Is there a built in mechanism? | live answered | 8/8/2025 9:43 | | 8/8/2025 10:23 Miriam Joffe-Block |
| 23 | How can the homeowners trust they will benefit from the contractors and/or aggregators are pocketing the rebates, and still charging same or higher prices to homeowners that they charge without the IRA program? | | 8/8/2025 9:45 | | |
| 24 | HOMES program requirements reference "open-source advanced M&V software" that must be used to evaluate savings. How is CEC applying this requirement? | The M&V will be p | 8/8/2025 9:45 | | 8/8/2025 10:02 Miriam Joffe-Block |

| | | | | |
|---|---|---|---|---|
| | If there is a difference between the estimated savings and actual savings, how will low-income homeowners be protected against unaffordable utility expenses? Will the projects be fully covered by grant funding for low-income populations or is it anticipated there | | | |
| 25 | may need to be homeowner contributions? | | 8/8/2025 9:46 | |
| 26 | is it fair to call this HVAC/heat pump forward? | | 8/8/2025 9:46 | |
| | | | | |
| 27 | how much weight is given to administrative efficiency through leveraging infrastructure from other CEC funded programs? | When the actual s | 8/8/2025 9:48 | 8/8/2025 10:09  Miriam Joffe-Block |
| 28 | Are Rebate Delivery Funds available to pay aggregators for allowable costs? | What would thos | 8/8/2025 9:49 | 8/8/2025 10:08  Miriam Joffe-Block |
| 29 | Is the entirety of the ~$16.5M budget anticipated to be awarded to a single SWI? | At this point, we a | 8/8/2025 9:49 | 8/8/2025 9:57  Miriam Joffe-Block |
| 30 | why isn't this routed through the public utilities (both investor & publicly owned) which seem to have the systems in place to ramp up this program quickly? | live answered | 8/8/2025 9:50 | 8/8/2025 11:26  Miriam Joffe-Block |
| 31 | Please clarify How will you prevent perverse incentives by allowing "up to + 10% of costs" ...to contractors or subrecipients, etc. (?) for install or performance (?) that drives up "costs" artificially for consumers? | I think the terms r | 8/8/2025 9:52 | 8/8/2025 9:59  Miriam Joffe-Block |
| 32 | What alternatives is CEC developing given uncertainty of federal funding? Or is CEC developing only one plan, that assumes federal funding comes through as was assumed when this program design process commenced? | | 8/8/2025 9:53 | |
| 33 | The phrase "Awardee not reimbursed for profit" and accompanying explanation is still a bit murky. Are all actors in this program - SWI, Aggregators, and Contractors - allowed to make any profit? Is there a limit on how much profit can be made? | Aggregators and E | 8/8/2025 9:54 | 8/8/2025 10:05  Miriam Joffe-Block |
| 34 | I asked local contractors about costs of installation and rebates and seems like rebates do not comver enough of the costs of installation even with energy savings added in. I calculated for my home and cost (6-8K) to replace gas water heater minut rebates (2-3K) leaves a cost of 4-5K and there isn't enough energy savings to cover the difference. Rebates will need to be close to 100% of install cost. Cost of running program by aggregator is high so will their cost also be covered? | | 8/8/2025 9:54 | |
| 35 | Why are contractor qualifications required given existing regulations that govern contractors? (Licensing, permitting, inspections, federal regulations, etc) | live answered | 8/8/2025 9:55 | 8/8/2025 10:23  Miriam Joffe-Block |
| 36 | Is there a reason there's a separate contractor agreement for utility data, and the implementers aren't using the utility ShareMyData platforms? | The Participation | 8/8/2025 9:59 | 8/8/2025 10:11  Miriam Joffe-Block |
| 37 | Are aggregators expected to directly interact with and serve homeowners? Or are homeowners expected to interact only with contractors, with aggregators serving only those same contractors? | Good question. V | 8/8/2025 10:00 | 8/8/2025 10:12  Miriam Joffe-Block |
| 38 | Commissioner McAllister indicated that the EBD program had not yet launched. When is it anticipated that the EBD program will be in the market (because there will be some overlap between these programs - noting that EBD seems more focused on income-qualified while HOMES is not)? | Three regional ad | 8/8/2025 10:01 | 8/8/2025 10:07  Krishneeta Chand |
| 39 | Does CEC already have the $ in its accounts and/or are there remaining fund that must be provided by DOE to fulfill the program's obligations? [strongly implied concern about relying on any forthcoming $ from DOE to fully implement the program] | live answered | 8/8/2025 10:08 | 8/8/2025 11:04  Krishneeta Chand |
| 40 | Will home energy audits be offered to ensure the accuracy of modeled energy savings? | Per DOE rules, th | 8/8/2025 10:09 | 8/8/2025 10:28  Miriam Joffe-Block |
| 41 | How will the Program ensure customers get quality installations ? And who is responsible for holding accountability for poor installation/defecfts or added costs to correct such, without harming the customers? | live answered | 8/8/2025 10:12 | 8/8/2025 10:23  Miriam Joffe-Block |
| 42 | Will the Statewide Implementer (SWI) be required to adopt and enforce workforce standards that apply specifically to the technicians performing the work in the field? As we all know, current contractor licensing requirements are insufficient, they only verify that someone within the company holds the necessary qualifications, not the individuals actually installing or servicing the equipment. How will the program ensure that meaningful workforce standards are implemented and enforced at the technician level? | live answered | 8/8/2025 10:12 | 8/8/2025 10:22  Miriam Joffe-Block |
| 43 | Regarding allowable Rebate Delivery Costs Aggregators would incur, these would primarily be activities directly related to equipment, tools, models, and procedures used to assess a home and estimate energy savings in the course of the delivery of rebates to eligible rebate recipients. | | 8/8/2025 10:16 | |
| 44 | "Contractors do need to supply customers with a bill impact estimate" - please confirm that is a contractor responsibility, not an aggregator responsibility? | We will need to g | 8/8/2025 10:30 | 8/8/2025 11:23  Miriam Joffe-Block |

| | | | | | |
|---|---|---|---|---|---|
| 45 | "Contractors do need to supply customers with a bill impact estimate" - bill impact estimates depend on future utility rate predictions. Will CEC supply those future rate predictions? Or will contractors/aggregators be responsible for estimate future utility rates? | Please submit yo | 8/8/2025 10:30 | | 8/8/2025 10:44 Miriam Joffe-Block |
| 46 | I work for a public electric utility what do you envision the best role for our organization? | Thanks for asking | 8/8/2025 10:35 | | 8/8/2025 11:36 Miriam Joffe-Block |
| 47 | Why is the CEC choosing to pursue this as a GFO instead of a RFP? | | 8/8/2025 10:38 | | |
| 48 | Will HOMES rebates be able to cover electric to electric home energy upgrades? | live answered | 8/8/2025 10:38 | | 8/8/2025 11:05 Miriam Joffe-Block |
| 49 | How will the program cover emergency installs? Will aggregators & contractors be granted the ability to proceed with projects before the program has approved the rebate? | live answered | 8/8/2025 10:40 | | 8/8/2025 11:04 Miriam Joffe-Block |
| 50 | Where are the specific terms and conditions for the potential contract pathways to get more information on the data access boundaries for each pathway? | complete for each pathway are available on | 8/8/2025 10:40 | | 8/8/2025 11:19 Krishneeta Chand |
| 51 | Still not convinced that homeowners and aggregators will be incetivized. | | 8/8/2025 10:40 | | |
| 52 | If aggregators have access to energy usage data through their relationships with households, can aggregators share the utility data with the implementer? | live answered | 8/8/2025 10:41 | | 8/8/2025 11:03 Miriam Joffe-Block |
| 53 | Will you publish the answers to questions you have answered here in the live Q&A in a  follow up Q&A response to be posted in writing for those never on this webinar?  thanks. | live answered | 8/8/2025 10:42 | | 8/8/2025 11:02 Miriam Joffe-Block |
| 54 | Thank you for allowing Franklin Energy to register its comments about the GFO approach (versus a traditional RFP). Our comments on this topic can be found in this docket (23-DECARB-01) here: https://efiling.energy.ca.gov/GetDocument.aspx?tn=259470&DocumentContentId=95571 | | 8/8/2025 11:00 | | |
| 55 | Is there a reason why state funds cannot be used to finance rebates? What about state financing sources such as GoGreen? | | 8/8/2025 11:00 | | |
| 56 | Will a list of attendees be shared? | We will not be sh | 8/8/2025 11:07 | | 8/8/2025 11:08 Miriam Joffe-Block |
| 57 | (apologize if I missed this in the explanations) If the program uses kWh savings as the mechanism to assess 15 percent savings, how would this be handled for fuel substitution measures which may increase kWh consumption? Will there be a conversion from overall BTU savings to kWh? | Yes, it's 15% kWh | 8/8/2025 11:33 | | 8/8/2025 11:34 Miriam Joffe-Block |
| 58 | Lots of good work here. We appreciate your efforts to navigate the federal requirements, manage the process and figure out ways to make it work. | | 8/8/2025 11:40 | | |