# EXHIBIT 1

5H - 84090401 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Grant Agreement | GRANT NUMBER (FAIN): 84090401<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5H | DATE OF AWARD<br>07/09/2024 |
|---|---|---|
| | TYPE OF ACTION<br>New | MAILING DATE<br>07/12/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>80568 |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**<br>COLORADO ENERGY OFFICE<br>1600 BROADWAY STE 1960<br>DENVER, CO 80202-4955<br>EIN: 84-0644739 | **PAYEE:**<br>COLORADO ENERGY OFFICE<br>1600 BROADWAY STE 1960<br>DENVER, CO 80202-4955 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Ida Mae Isaac<br>1600 Broadway<br>STE 1960<br>DENVER, CO 80202-4955<br>**Email:** idamae.isaac@state.co.us<br>**Phone:** 303-866-2100 | Cynthia Gonzales<br>1595 Wynkoop Street, 5103<br>Denver, CO 80202<br>**Email:** Gonzales.Cynthia@epa.gov<br>**Phone:** 303-312-6569 | Matthew Forte<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>**Email:** Forte.Matthew@epa.gov<br>**Phone:** 202-564-2245 |

**PROJECT TITLE AND DESCRIPTION**

State of Colorado - Solar For All "Note: A Special payment condition applies to this award".

See Attachment 1 for project description.

| BUDGET PERIOD<br>09/01/2024 - 08/31/2029 | PROJECT PERIOD<br>09/01/2024 - 08/31/2029 | TOTAL BUDGET PERIOD COST<br>$ 0.00 | TOTAL PROJECT PERIOD COST<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Avenue NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** LaShaun Phillips - Associate Award Official | DATE<br>07/09/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41055 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

5H - 84090401 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

#### *Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

### _Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

> Progress towards objectives on key performance metrics over the entire period of performance,

> Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

> Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

> Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

> Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service

Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the***

*Notice of Award:*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

## 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must

identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

## 1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this

agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

### Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the

conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

## A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor,

whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic

requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal

Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall

include the following text:

> "[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

> **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

> **ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

> **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

> **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F. DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

### 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

### L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

### M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

### O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above.

The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistoric, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, Reporting Subaward and Executive Compensation.

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).**

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

### 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business

information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.
Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA

has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

## B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

**EXHIBIT 2**

COS4A_Workplan_15Jan2025_R1
EPA Grant Number 84090401

**Greenhouse Gas Reduction Fund**
**Solar for All**

# Colorado Solar for All

**Work Plan Revision 1**
**Project Period 9/1/2024 – 8/31/2029**

Section 1: Project Description.................................................................................................2
  1.1 Overview........................................................................................................................ 2
  1.2 Environmental Results - Outputs and Outcomes...........................................................2
       Output and Outcome Methodology..............................................................................3
  1.3 Linkage to the U.S. EPA's Strategic Goals......................................................................4
Section 2: Project Design Plan................................................................................................ 5
  2.1 Meaningful Benefits & Equitable Access........................................................................ 5
     2.1.1 Meaningful Benefits through Electricity Bill Savings...............................................5
     2.1.2 Meaningful Benefits through Increased & Equitable Access for LIDACs.................. 6
     2.1.3 Meaningful Benefits Through Resilience.................................................................8
     2.1.4 Meaningful Benefits Through Ownership................................................................ 8
     2.1.5 Meaningful Benefits Through Investment in Jobs & Businesses in LIDACs..............9
  2.2 Financial Assistance Strategy.......................................................................................10
     2.2.1 Single-Family Residential Rooftop Solar and Enabling Upgrades.......................... 11
         Single-Family Immediate Solar Ownership Model (100% Subsidy)......................... 11
         Single-Family Third-Party Owned Solar Lease Ownership Model............................12
     2.2.2 Multifamily Affordable Housing Rooftop Solar..................................................... 13
         Multifamily Affordable Housing Solar Loan with Revolving Loan Fund...................13
         Multifamily Affordable Housing Solar Lease..........................................................13
     2.2.3 Community Solar Subsidy.....................................................................................14
         Developer Led Community Solar............................................................................14
         Community-Led Community Solar..........................................................................15
  2.3 Project-Deployment Technical Assistance Strategy......................................................16
     2.3.1 Technical Assistance through Trusted Partners.....................................................16
     2.3.2 Investment in Workforce Development.................................................................16
     2.3.3 Siting, Permitting, Interconnection......................................................................17
     2.3.4 Agrivoltaics Technical Assistance.........................................................................18
Section 3: Fiscal Stewardship & Consumer Protections.........................................................18
  3.1 Fiscal Stewardship.......................................................................................................18
  3.2 Consumer Protections.................................................................................................19
Section 4: Timeline and Milestones......................................................................................19
Section 5: Reporting Requirements......................................................................................19
Section 6: Budget Narrative.................................................................................................20

COS4A_Workplan_15Jan2025_R1
EPA Grant Number 84090401

# Section 1:  Project Description

Project Title:  Colorado Solar for All
Grant Number: 5H-84090401
Organization Name: Colorado Energy Office
Geography:  Entire State of Colorado

## 1.1 Overview

In July of 2024, Colorado was awarded $156M to establish a Colorado Solar for All (COS4A) program from the Environmental Protection Agency. COS4A will expand access to low-income, historically underserved and disadvantaged communities by focusing on targeted and contextualized technical assistance and heavily subsidized financing products while also looking to address any localized barriers. The program will provide a combination of single-family rooftop solar, affordable multifamily rooftop solar, and community solar to balance serving the highest energy burdened residents, maximizing the resident cost savings and emissions reductions, and the market transformation potential of such a large-scale program.  COS4A will dedicate 75% of the awarded funds towards financial assistance to ensure low-income households have access to residential rooftop and residential-serving community solar energy across Colorado. Funds will be deployed through a combination of fully subsidized grants, low-interest loans and incentives to allow the benefits to flow to qualifying Colorado residents.

COS4A is positioned to deliver the benefits of solar to more than 20,000 low-income households. The program will do this by providing technical assistance, subsidized workforce development training, financial incentives to increase the options for solar ownership and wealth building opportunities, and community benefits agreements. The EPA's Solar for All grant will complement the robust solar market in Colorado by enabling the state to increase the number of low-income households that can take advantage of distributed solar investments and provide access to affordable, resilient, and clean solar energy as well as the related benefits of lower utility bills, improved public health through reduced pollution from power generation, and creation of wealth and jobs for local communities. These efforts are critical to achieving the Governor's objective of 100% carbon-free electricity for Colorado by 2040 while protecting Colorado consumers from the high and unpredictable costs of natural gas and other fossil fuels.

## 1.2 Environmental Results - Outputs and Outcomes

While the following outcomes are based on reasonable (vetted with solar developers and industry professionals) and ambitious (maximizing households served and household savings) modeling assumptions, COS4A recognizes that on-going performance evaluation of programmatic offerings and overall participation may result in reallocation of resources across programs, which could mean modified and potentially improved performance over current estimates. The values below represent an estimation of outputs and outcomes based on funding allocations; however market conditions and actual uptake will ultimately inform final program results, and Colorado remains committed to offering real-world data to EPA on the efficacy of the program in the spirit of continuous improvement. Colorado expects the final deployment numbers will change throughout the program and reserves the right to reallocate dollars appropriately to serve the market.

COS4A_Workplan_15Jan2025_R1
EPA Grant Number 84090401

After coordination with industry stakeholders and careful modeling based on the best available market data and appropriate estimation, COS4A is projecting the following outputs and outcomes for households served, megawatts (MW) of solar deployed, and GHG emissions (short tons) reduced and estimated savings ($/household and % of electricity bill) across these three primary categories of solar deployment. All of the outcomes and outputs identified below are related to new solar generation.

*Table 1.2: Colorado Solar for All summary table of projected outcomes and outputs*

| Type of Installation | Total Households Served | Total Installed Capacity (MW) | Program Period (4 yrs) GHG Avoided ($CO_2$) | System Life (20 yrs) GHG Avoided ($CO_2$) | Estimated Annual Household Savings ($/household) | Estimated Household Savings as % of Electricity Bill |
|---|---|---|---|---|---|---|
| Single-Family 100% Subsidy | 976 | 4.9 | 30,040 | 150,200 | $1,131 | 95% |
| Single Family TPO Lease | 1000 | 5 | 30,800 | 154,000,200 | $330-$395 | 30-35% |
| Affordable Multifamily | 8,635 | 12.7 | 76,920 | 384,600 | $333 | 30% |
| Community Solar | 10,380 | 19.2 | 138,080 | 205,840 | $418 | 50% |

Additional Outputs:
- Workers Trained: TBD
- Storage Capacity Installed (MWh): 4.4 Megawatt Hours

## Output and Outcome Methodology

Program estimates are calculated based on system design which is required to be 75%-120% of the resident's use. Installed capacity is then then input into the EPA AVerted Emissions and geneRation Tool (AVERT) web edition for the Rocky Mountains region to calculate the CO2 avoided annually and then multiplied for a 4-year program period and a 20-year lifetime period. NREL's PVWatt's Calculator is used to calculate the production and the U.S. Energy Information Administration's average residential electricity cost in Colorado is used to calculate cost savings. Each installation type is further detailed below.

Single-Family: Allocating $38M for single-family residences and assuming a $3.85/W install cost, yields a total 9.9MW installed capacity. At an average 5kW system, 1,976 single family homes can be served. Capacity is input into the EPA AVerted Emissions and geneRation Tool (AVERT) web edition for the Rocky Mountains region to calculate the CO2 avoided annually and then multiplied for a 4-year program period and a 20-year lifetime period. NREL's PVWatt's Calculator for a 5kW system in Colorado estimates an average 7,990 kWh per year production. Using the U.S. Energy Information Administration's average residential electricity cost in Colorado of 14.16 cents in July of 2023, a $1,131 annual savings would be realized for the 100% subsidy model assuming systems are designed

COS4A_Workplan_15Jan2025_R1
EPA Grant Number 84090401

for 75%-120% of usage with an average 95% savings. With the third-party owned (TPO) lease model, the systems are still designed for 75%-120% but after the lease payment and loan repayment the savings is 30%-35% depending on the federal tax credits that can be monetized.

Affordable Multifamily: Allocating $38M for multifamily affordable housing and assuming a $3/W install cost, yields a total 12.7MW installed capacity. Assuming an average 50kW system with an average 34 units/buildings, 8,365 units can be accommodated.  Capacity is input into the EPA AVerted Emissions and geneRation Tool (AVERT) web edition for the Rocky Mountains region to calculate the $CO_2$ avoided annually and then multiplied for a 4-year program period and a 20-year lifetime period. NREL's PVWatt's Calculator for a 19,202kW system in Colorado estimates an average 30,660,951 kWh per year production. According to the U.S. Energy Information Administration, the average residential electricity cost in Colorado was 14.16 cents in July of 2023 yielding a $418 annual savings per residential unit. Percent savings will be modeled based on current usage and system design.

Community Solar: Allocating $34M for community solar and assuming a $1.80/W install cost, yields a 19.2MW installed capacity. Assuming an average 3.7MW system size (smaller than single family because rental units are typically smaller and have a lower energy burden) with a 50% minimum savings, yields 10,379 subscriptions that can be provided. Capacity is input into the EPA AVerted Emissions and geneRation Tool (AVERT) web edition for the Rocky Mountains region to calculate the $CO_2$ avoided annually and then multiplied for a 4-year program period and a 20-year lifetime period. NREL's PVWatt's Calculator for a 50kW system in Colorado estimates an average 79,877 kWh per year production. According to the U.S. Energy Information Administration the average residential electricity cost in Colorado was 14.16 cents in July of 2023 yielding a $333 annual savings per residential unit. Percent savings will be modeled based on current usage and system design.

**TASK 1.2A:**  Verify outputs, outcomes and calculation methodology with DOE technical assistance during the first year of implementation  for Colorado's four different climate zones and 53 different utilities including determination of 20% savings defined by utility territory. Projected system revenues and benefits to participating residents will be calculated in a manner specific to each program, incorporating components including projected electricity rates and utility engagement, community outreach with contractors and third-party owners, cash flow modeling and capital stack development. Throughout all calculations, consideration will be made to participant costs including loan payments, fees, O&M, and other costs to ensure savings are based on net impact.

**TASK 1.2.B:** Develop a workforce development plan to  identify pathways for recruitment and upskilling incumbent workers needed to deploy solar and the associated metrics.  This will include development of a prioritization matrix for workforce development subaward selection.

# 1.3 Linkage to the U.S. EPA's Strategic Goals

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
    - Objective 1.1: Reduce Emissions that Cause Climate Change

COS4A_Workplan_15Jan2025_R1
EPA Grant Number 84090401

# Section 2: Project Design Plan

## 2.1 Meaningful Benefits & Equitable Access

### 2.1.1 Meaningful Benefits through Electricity Bill Savings

Single-family rooftop systems will be designed to provide 75% to 120% of household electricity use where sufficient solar access and roof space is available. Percent savings will be modeled based on current usage and system design. Weatherized homes will be prioritized and still undergo a site assessment in order to determine system size and whether the home is a good candidate for solar PV which includes analysis of the following:

o   Age and condition of the roof, the roof covering type, roof orientation and roof tilt.
o   Any potential shading obstructions.
o   An evaluation of electricity usage.
o   The status and size of the home's main electrical panel.
o   Available locations for mounting electrical components.
o   Available square footage and estimate the number of modules that can fit on the roof.

During the first year of implementation, a methodology will be developed to determine how non-weatherized homes will be qualified.

Affordable multifamily properties participating in the program will be required to demonstrate that tenants are receiving at least a 30% reduction in average electricity bills or that they are receiving an equivalent benefit. Affordable housing owners (including housing authorities) will be required to demonstrate protections against increased rents or supplanting of already existing benefits. Similar to the single-family rooftop design, a site assessment will be performed in order to determine system size and whether the facility is a good candidate for solar PV which includes analysis of the following:

o   Age and condition of the roof, the roof covering type, roof orientation and roof tilt.
o   Any potential shading obstructions.
o   An evaluation of electricity usage.
o   The status and size of the home's and or/building's main electrical panel.
o   Available locations for mounting electrical components.
o   Available square footage and estimate the number of modules that can fit on the roof.

Colorado will follow the guidance in the memos from the Office of Public Housing and Voucher Program to Directors of HUD Regional and Field Offices of Public Housing Public Housing Directors dated August 4, 2022 regarding *Treatment of Community Solar Credits on Tenant Utility Bills*[1] and August 2, 2023 regarding *Treatment of Solar Credits in Master Metered Buildings in Public Housing*[2] when assessing the credit or equivalent benefit.

---

[1] https://www.hud.gov/sites/dfiles/documents/Solar%20Credits_PH_HCV.pdf
[2] https://www.hud.gov/sites/dfiles/PIH/documents/PH%20Memo%20Community%20Solar%20Credits%20in%20Master%20Meter-Final%20Bldgs%202030801.pdf

Community solar projects will be required to provide a reduction of at least 50% of the average household electricity bill when compared to the average bill in the utility territory. As funding for community solar will be a competitive process, projects that cost-effectively reduce bills by more than 50%, provide benefits to disadvantaged communities as defined by the EPA's Climate and Environmental Justice Screening Tool (CEJST) or demonstrate other additional meaningful benefits will be prioritized.

The state of Colorado requires competitive bidding for any contracts that exceed $50,000. Each of the programs above will go through the state's competitive solicitation process to select one or multiple partners or vendors to implement the work.  All Competitive Grants shall be conducted in a manner providing full and open competition where practicable and at the discretion of CEO's Procurement Official.

**TASK 2.1.1.A:** Develop a methodology to determine what qualifies a non-weatherized home for solar.

**TASK 2.1.1.B:** Explore best practices for customer retention/moves with DOE/NREL technical assistance.  This will also include engagement with third party owners, contractors and low-income residential customers.

## 2.1.2 Meaningful Benefits through Increased & Equitable Access for LIDACs

In order to increase access to low-income households, COS4A will undertake a multi-pathway approach to maximize solar deployment across Colorado, ensuring equitable access to and participation in the program. This will include:

- developing culturally competent messaging and educational materials that are accessible and translated into commonly spoken languages;
- working through local partners that have demonstrated long-term trusted relationships with historically underserved and disadvantaged communities including
  - existing state programs such as WAP, LIHEAP/LEAP, IRA home rebate programs and affordable housing partners
  - the state's ecosystem of non-profit organizations, local governments, and utility companies that serve income-qualified households with energy efficiency, renewable energy and/or housing rehabilitation programs
- incubating community-led and designed projects (see section 2.2.3 below);
- incorporating and promoting strong consumer protections;
- offering both rooftop and community solar options;
- and designing financial options that make solar for low (and possibly medium) income households financially attractive and low risk.

To ensure that those who need it most are being served by the program, COS4A will serve low-income and disadvantaged communities as defined by the Solar for All terms and conditions for "geographically dispersed low-income households" and "properties providing affordable housing."  Eligibility will be verified in one of two ways. Option 1 will allow applicants to qualify through public assistance proof with an award letter within the last 12 months. Option 2 allows

for income verification of applicants either by submission and review of pay stubs or other verification or through use of third party technology that verifies household income. Income documentation must be included for each household member with an income. Income is defined as money received from and of the following: job income, social security, retirement, disability, spousal support (alimony), workers' compensation, unemployment or self-employment.

In alignment with the Solar for All terms and conditions LIDAC will be defined as:

- **Geographically dispersed low-income households** for individuals and households with incomes at or below the greater of:
    - For Metropolitan Areas: (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Level
    - For Non-Metropolitan Areas: (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level

- **Properties providing affordable housing** which includes properties serving low-income individuals and households defined as properties that fall within either of the two categories listed below.
    - Multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on the goal of ending homelessness funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally-designated housing entity, as defined in Section 4(21) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. § 4103(22); or (5) any other housing assistance program designated by the EPA Administrator.
    - Naturally occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units

- **Income Qualification + CEJST-Identified Disadvantaged Communities:** Household incomes at or below 120% AMI and located in any communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

**TASK 2.1.2.A:** Develop educational and engagement materials that can be delivered through trusted partners inclusive of consumer protections and risk management. This will include

developing a strategic communications and engagement plan, creating compelling messaging and materials, and intentional, culturally relevant outreach to low-income, historically underserved and disadvantaged communities. The plan will incorporate best practices for community engagement in serving LIDACs, including translation of materials into languages to be identified.

**TASK 2.1.2.B:**  Perform an income analysis to determine which programs have income limits at or below the qualifying income level for COS4A. This will include comparing income levels for programs including but not limited to:  (1) U.S. Department of Health and Human Services' (HHS) Low Income Home Energy Assistance Program; (2) U.S. Department of Agriculture's (USDA) Supplemental Nutrition Assistance Program; (3) U.S. Department of Energy's (DOE) Weatherization Assistance Program; (4) Federal Communications Commission's Lifeline Support for Affordable Communications; (5) USDA's National School Lunch Program; (6) U.S. Social Security Administration's Supplemental Security Income; or (7) any other verified government or non-profit program serving Asset Limited, Income Constrained, Employed (ALICE) individuals or households designated by the EPA Administrator.

## 2.1.3 Meaningful Benefits Through Resilience

As an additional meaningful benefit, a limited amount of investment will be made in battery storage (approximately $6M - see section 2.2 Financial Assistance Strategy for more detail). Storage projects will be prioritized in areas identified with high electricity rates or areas vulnerable to grid stability. Storage will be primarily reserved for community solar and based on a cost benefit analysis for additional benefits provided.  Additionally, single-family residences may be considered in certain critical needs situations such as emergency back-up for medical equipment.

**TASK 2.1.3:**  Develop priority matrix for projects that are to receive battery storage.  This will include an evaluation and analysis of critical needs versus community resilience and number of households served.

## 2.1.4 Meaningful Benefits Through Ownership

COS4A will include community ownership opportunities through both single-family rooftop solar and community solar. See section 2.2 Financial Assistance Strategy for financing details associated with ownership models.

The single-family rooftop solar offerings will provide low-income households with the opportunity for ownership through (1) grants providing 100% subsidy and (2) a path to ownership through third-party solar leases.  These systems will provide customer benefits by reducing utility bills and increasing the value of the home at sale.

Community ownership can be defined in multiple ways, but primarily refers to (1) direct or cooperative ownership of solar assets, (2) decision-making power over project siting and business outcomes, and/or (3) receipt of direct, intentional benefits, often delivered through Community Benefits Agreements or similar contracts. Different communities may want different levels or types of ownership, based on the benefits that are most important to them. COS4A will provide technical assistance, training, and financial incentives to increase the options for

financial ownership, governance oversight, wealth building opportunities for members, and community benefits agreements. CEO will offer trainings for nonprofits, resident coops, community organizations, housing authorities and other entities interested in exploring community-owned community solar projects, on these ownership and benefit models.  Community solar projects will be evaluated for funding with consideration for additional benefits gained through community ownership such as wealth building, energy sovereignty, resilience, and community co-benefits. For example, Colorado's rural communities have expressed a strong interest in agrivoltaics to preserve agricultural farmland while addressing energy burden. $2M will be allocated to provide funding for community-led, community-designed programs and projects as well as innovative replicable models of community solar with community ownership.

**TASK 2.1.4:** Develop consumer protections and best practices that can be included in the contracting to limit risk to individuals and communities with ownership opportunities. This will include researching best practices and developing a training toolkit to help communities consider the benefits, costs, and levels of involvement of the different ownership models.

## 2.1.5 Meaningful Benefits Through Investment in Jobs & Businesses in LIDACs

COS4A will build systems and policies that focus the opportunities for high-quality jobs in the low-income and disadvantaged communities where solar energy is being deployed through targeted job training, entrepreneurship and business development support, and local hiring preferences.  COS4A will devote approximately 7% or $11.5M of the total Solar for All funding to workforce development to leverage existing program capacity while seeking innovative ways to address gaps and barriers to participation by residents of low-income and disadvantaged communities. COS4A will increase and diversify the baseline workforce, upskilling the existing workforce including small contractors located in low-income communities, and supporting local business incubation and development. This is anticipated to be accomplished through grants to (1) developers with existing workforce training programs and (2) partnership with Colorado Department of Labor and Employment, Office of Economic Development and International Trade and/or local educational training organizations that prioritize as many of the objectives listed below as possible.

COS4A program elements to achieve this vision include:
- Work with Colorado's Minority Business Office and community-based organizations to identify and encourage participation from LIDAC businesses in all competitive bidding through education and outreach on the state procurement process.
- Implementing application scoring criteria that values local hiring commitments, local training commitments, community workforce agreements and project labor agreements.
- Consider providing enhanced financial incentives for qualified entities such as disadvantaged business enterprises, small business enterprises, non-profit organizations and tribal entities or entities located in and serving disadvantaged communities as defined by CEJST.
- In conjunction with unions, consider ways to aggregate resulting projects to ensure more opportunity for Project Labor Agreements (PLA) that support prevailing wages and 'high road' labor practices.

- Explore using innovative ways to address the geographic limitations of existing workforce training opportunities, such as mobile labs.
- Incubate entrepreneurship through localized micro-financing and assistance to build and grow clean energy businesses in disadvantaged communities.
- Supporting solar business development and incubation.
- Partner with Serve Colorado's youth corps to encourage participation in Energy pre-apprenticeship programs
- Expanding and deepening recruitment for workforce development in low-income and disadvantaged communities by partnering with community-based organizations and local workforce development centers with inclusion of wrap-around services.

## 2.2 Financial Assistance Strategy

75% of the total award amount, or $116,790,000, will be dedicated to financial assistance split between three programs - single family rooftop, affordable multifamily rooftop and community solar - plus a set-aside for battery storage. Each of the three programs are further divided into different financial offerings including grants, loans, and production incentives. In all of the offerings, financial assistance will be subgranted to implementers (contractors, multifamily buildings owners, developers, non-profits, etc.) with benefits to residents. The program does not intend to provide funds directly to households. A revolving loan fund is planned for a portion of the funds and described further below in Single-Family Third-Party Owned Solar Lease Ownership Model, the Multifamily Affordable Housing Solar Loan with Revolving Loan Fund and the Multifamily Affordable Housing Solar Lease. Over the life of the program, it is estimated that the revolving loan will generate approximately $2.5M. Enabling upgrades (new and in most cases upsized electrical panels) have been budgeted for a portion of the single-family rooftop installations based on historical data from Colorado's Weatherization Program and account for less than 5% of the total program funding. CEO will explore ways in which the IRA home energy rebates and weatherization assistance programs can address energy efficiency measures and enabling upgrades.  For applicants that participate in either of these programs, COS4A will not fund any measures that can be covered by these other programs. Colorado does not have any state tax credits available for solar panels, but the COS4A program intends to leverage the federal tax investment tax credits for solar enabling the COS4A to serve more residents and utility incentives where available. This financial assistance package will complement, and not duplicate, existing subsidies, tax credits, and other sources of financing to support deployment that would not have occurred otherwise.

The funding allocations are estimated as follows aligning with the $156M award:

| | |
|---|---|
| Single-family Rooftop (lease & 100% subsidy): | $38,031,100 |
| Multifamily On-Site and Rooftop (loan and lease): | $38,096,840 |
| Community Solar (per/watt subsidy): | $32,562,751 |
| Community-led Solar Garden: | $2,000,000 |
| Storage (paired with solar): | $6,099,309 |
| ***Total Financial Assistance:*** | ***$116,790,000*** |

**TASK 2.2:**  Hire a financial program consultant to refine financing methodology and establish the financing mechanism including:

- Engage with a stakeholder network of non-profit solar lease providers and additional interested private capital providers to vet assumptions, including subsidy amounts, and refine financing options and details inclusive of consumer protection strategies.
- Verify subsidy for IOU territory and determine subsidy for non-IOU territory utility participation with input from utilities and industry.
- Explore local jurisdiction, utility rebates and any other incentives that can be applied to projects to reduce federal dollars needed.
- Develop a plan, with DOE/NREL technical assistance to support operations, maintenance, and recycling of the assets funded under the program for the lifetime of the assets (i.e., approximately 20 years), including ensuring maximum energy output of the assets and conducting audits of assets to ensure operations and maintenance is performed.

## 2.2.1 Single-Family Residential Rooftop Solar and Enabling Upgrades

Approximately $38M will be allocated to the single-family residential financial assistance package and is projected to serve approximately 1,976 households through a combination of 100% subsidy models and leasing structures.  Both deliveries will produce significant energy utility bill savings since systems are required to be designed to support 75-120% of participating households' energy usage. CEO's financial estimates modeled that the 100% subsidy will serve approximately 976 households and the leasing structure (i.e., subsidy, short term bridge and long-term revolving loan fund package), is projected to support approximately 1,000 households. Based on historical data from the Weatherization program, it is assumed that 40% of the homes would require main electrical service panel upgrades (i.e. enabling upgrades). This set-aside for enabling upgrades is approximately 3-5% of the total program funding and well below the 20% allowable amount.

**Single-Family Immediate Solar Ownership Model (100% Subsidy)**

**Planning Term and Conditions Definitions**
1. Solar technologies they will fund: Single family rooftop and potential storage
2. Financial products that will be provided: Grants for 100% of the costs
3. Who will receive financial assistance: Contractor/solar installer
4. How funding/benefit will flow to households: Funds go to a non-profit agency to reimburse contractors/solar installers.  The low-income resident receives solar at no cost with 100% ownership. Systems are designed for 75-120% of electric usage which allows homeowners to receive equivalent electric utility bill savings.

Colorado will create a solar ownership model by leveraging the long-standing and successful infrastructure of the WAP program. CEO has a pipeline of weatherized and solar ready homes - over 10,000 single-family homes have been serviced by WAP over the last decade - and will install solar on the homes best situated for rooftop solar.  The program will also be available to other qualified households, however by leveraging homes that have been weatherized, CEO will ensure solar is installed on homes that have already received building envelope and HVAC improvements and enabling upgrades, extending the impact of Colorado's Solar for All allocation (i.e., by enabling more households to benefit from this funding and ensuring funding leads to an optimized solar system). In either case, CEO will grant funds to implement these installations at

no cost to the homeowners (i.e., 100% subsidy). In addition to direct ownership, CEO will work with nonprofit solar developers and relevant third-party project owners who are eligible to monetize the federal investment tax credits (ITC) through direct pay on behalf of these households. The entities receiving these tax credits will be required to utilize these funds to provide ongoing operations and maintenance associated with the long-term performance of the solar asset (20+ years in most cases) and when applicable reduce the system's installation price accordingly. These projects will deliver nearly 100% electricity savings (systems are designed for 75%-120% of the customers usage and estimated at 95% savings over the portfolio) for Colorado's most vulnerable and energy burdened households. CEO will direct approximately $18.7M through this fully subsidized model and anticipates providing approximately 976 households with rooftop solar photovoltaic systems.

### Single-Family Third-Party Owned Solar Lease Ownership Model

**Planning Term and Conditions Definitions**
1. **Solar technologies they will fund: Single family rooftop and potential storage**
2. **Financial products that will be provided: Combination of grant and loan**
3. **Who will receive financial assistance: Third Party Owners (TPO)**
4. **Funds go to a financial entity that issues a loan+grant product to a third party owner. The third party owner leverages the investment tax credit (ITC) and can provide deeper savings to the low-income resident with the combination of the grant, ITC and low-interest loan.  30% minimum** electric utility bill **savings must be achieved by low-income residents in order for the TPO to be eligible for grant.**

Colorado will work with entities who will deliver a solar ownership model, based on a third-party owned solar lease that will lead to solar asset ownership over time. Third-party owned solar lease models are an effective tool to expand access to solar for low-income single-family homeowners and renters.  CEO will allocate $19.2M towards this model and will use approximately $1.25M in the form of a $0.30 - $0.65/watt subsidy for participating households. The remaining approximately $18M will be used to provide two different forms of financing to third-party solar lease providers. First, CEO will capitalize a revolving bridge loan fund with approximately $2.7M that will be used for bridge financing of third-party lease providers to bridge the time between when a project is installed and when the tax credits are captured, including state and local rebates and incentives. The timing between when a lease provider funds installation and receives the relevant tax credits can create cash flow issues which is mitigated with low-cost bridge loans. Paired with a long-term revolving loan product, CEO will offer this directly to selected third-party lease providers. This low-cost loan product will be blended with the existing capital base of lease providers, allowing the selected lease providers to offer reduced cost lease rates (1-2%) to participating households, with the option for the household to assume ownership at the completion of the lease term.

This lease program allows eligible households without tax liability (or otherwise unable to realize tax credits) a pathway to monetize and receive these benefits via lease providers creating a reduced lease. This third-party owned solar lease allows households to enjoy the benefits of solar without assuming the burden of operating and maintaining the system – this responsibility remains with the lease providers throughout the lease term. Households that wish to take

ownership of the solar asset will have the option to purchase at "fair market value" after all tax incentives, including the ITC and depreciation, have been realized and the recapture period has passed or the developers can transfer ownership to the homeowner.

## 2.2.2 Multifamily Affordable Housing Rooftop Solar

Approximately $38M will be allocated to the multifamily affordable housing financial assistance package and is projected to serve approximately 8,600 units through a combination of a revolving loan fund and third-party owned solar lease options. This figure assumes that an average project size is approximately 50 kW and that an average installed solar cost will be approximately $3 per watt. Multifamily affordable housing building owners must agree to pass-through at least 30% electricity savings to tenants or equivalent benefits that will be defined and developed through resident input.

**Multifamily Affordable Housing Solar Loan with Revolving Loan Fund**

**Planning Term and Conditions Definitions**
1. Solar technologies they will fund: Multi-family rooftop and potential storage
2. Financial products that will be provided: Combination of grant and loan
3. Who will receive financial assistance: Affordable Multifamily Building Owners
4. How funding/benefit will flow to households: Funds go to a financial entity that issues a loan+grant product to an affordable multifamily housing building owner.  The building owner leverages the investment tax credit (ITC) and can provide deeper savings to the low-income resident with the combination of grant, ITC and low-interest loan.  Savings are shared between the building owner and resident but residents must receive a minimum 30% electric utility bill savings.

CEO will use Solar for All funding to support and complement the expansion and growth of existing affordable multifamily loan programs managed by specialty lenders experienced in underwriting and financing energy efficient affordable housing developments. This model will provide low-cost bridge financing (i.e., priced at a 4% interest rate) to secure rebates, incentives, and tax credits, associated with solar and pair this with long-term financing (i.e., priced at a 1% interest rate) to affordable multifamily housing building owners that agree to pass-through at least 30% electricity savings to tenants. The financing terms of this program will be paired with a $0.25 - $0.40/watt subsidy directed at solar developers and/or project owners that will produce the desired electricity savings for building owners and tenants.

**Multifamily Affordable Housing Solar Lease**

**Planning Term and Conditions Definitions**
1. Solar technologies they will fund: Multi-family rooftop and potential storage
2. Financial products that will be provided: Combination of grant and loan
3. Who will receive financial assistance: Third Party Owners
4. How funding/benefit will flow to households: Funds go to a financial entity that issues a loan+grant product to a third party owner.  The third party owner leverages the investment tax credit (ITC) and can provide deeper savings to the low-income resident with the combination of the grant, ITC and low-interest loan. Savings are shared

between the building owner and resident but residents must receive a minimum 30% electric utility bill savings.

In addition, a third-party owned solar lease product will be available for multifamily affordable housing developments. This allows the project owner to monetize the federal IRA investment tax credit and require that O&M costs and responsibilities are borne by the third-party lease provider rather than the building owner and provides a flexible approach for the state's multifamily affordable housing sector. This flexible approach allows multifamily affordable housing owners to access a third-party ownership and solar lease financing arrangement to provide solar benefits to their tenants without increasing debt and ensuring long term system performance is managed by the solar project owner.  Like the single-family third party owned solar lease product described above, this will pair a subsidy approximately $0.25 - $0.45/watt with two different forms of financing available for the third-party lease provider - a low-cost revolving bridge loan (i.e., 3%) and long-term revolving loan (i.e., 1%). The long-term loan may be blended with the lease provider's existing capital base (philanthropic, and/or other public and private sources), reducing the lease rate to ensure an affordable low-cost solar lease to the multifamily housing owner and tenants. This model recycles the capital available and doesn't require the building owner to assume ownership or a debt liability but delivers solar benefits to tenants.

## 2.2.3 Community Solar Subsidy

### Developer Led Community Solar

**Planning Term and Conditions Definitions**
1. Solar technologies they will fund: Community solar and potential storage
2. Financial products that will be provided: Per watt grant as a partial subsidy
3. Who will receive financial assistance: Solar developer
4. How funding/benefit will flow to households: Grant is issued to the community solar developer which allows the developer to offer subscriptions at a reduced rate to the low-income resident increasing the savings passed on to the low-income resident.  50% minimum electric utility savings must be passed on to the low-income residents in order for the developer to be eligible for grant.

CEO will direct approximately $32M towards community solar in both IOU and non-IOU community solar development. Colorado's financial assistance strategy for community solar will focus on one deployment model - an upfront incentive that will be used to buy down the cost of the community solar subscriptions for the household. Assuming a 3.7 - 5 kW average size subscription for households, and an average installed cost of $1.80/watt, and an average upfront incentive of $0.50/watt CEO anticipates serving approximately 10,000 households and offering approximately 50% electricity bill savings to those households. Community solar funded under this program will conform to the definition of residential serving community solar. Specifically that they will have a nameplate capacity of 5 MW ac or less, 2) deliver at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and 3) verify that at least 50% of the benefits and/or credits of the power generated from a community solar system be delivered to residential customers in the same service territory.

In order to deliver the most efficient capital for large scale solar development in eligible communities, developers and owners will be allowed to pool incentives at the project level to pass through subsidized subscription rates to participating households. In this incentive model, the community solar project owner or developer will be required to manage their project finance and capital requirements; they will be responsible to build a business model and secure long-term financing that delivers approximately 50% electricity bill savings to their enrolled subscribers. The project finance will come from financial partners including state "greenbanks" and/or any awardees of NCIF and CCIA and other applicable community lenders. This incentive model payable to the project owner allows for maximum flexibility for community solar project owners to capture relevant tax credits (solar ITC, energy communities, domestic content and other state and local credits) and rebates. These additional tax credits and rebate benefits will be transferred to the community solar subscribers, via any mechanism the project owner may choose. Both direct pay and transferability are encouraged in this program design and can be in the form of bill credits or reduced project cost for subscribers. Community solar developers, project owners, utilities and project originators will utilize CEO's incentives for any of the following: project design including development of project models that allocate adequate benefits to a CJEST identified disadvantaged community, project development process, equipment purchasing, other development costs necessary for solar deployment, and for securing necessary long term project finance.

In IOU territory, CEO will leverage existing frameworks for pipeline and project development. The proposed incentive amount available to solar developers, utilities or other project owners will range from $0.40-$0.60/watt based on current market data and the corresponding utility territory, recognizing electric costs in IOU territories are lower compared to cooperative distribution utility territories. CEO will maximize rapid solar deployment in this model by leveraging the economies of scale for community solar projects and working to adapt and align eligible projects in established programs from Xcel Energy (Public Service Company of Colorado) and Black Hills Electric servicing eligible communities.

The incentive amount will be larger for projects in non-IOU utilities and co-op territories. This will allow community solar project owners to complete projects in hard to access rural communities and when possible, bundle solar projects across rural territories, to build a portfolio of projects and achieve economies of scale. This approach supports the state's goals of providing a geographically dispersed financial assistance package while incentivizing solar developers to ensure projects are successful.

### Community-Led Community Solar

**Planning Term and Conditions Definitions**
1. Solar technologies they will fund: Community solar and potential storage
2. Financial products that will be provided: Grant
3. Who will receive financial assistance: Community partner
4. How funding/benefit will flow to households: Grant is issued to the community partner which allows the community to offer subscriptions at a reduced rate to the low-income resident increasing the savings passed on to the low-income resident. 50% minimum

savings must be passed on to the low-income residents in order for the community to be eligible for grant.

$2M will be allocated to provide funding for community-led, community-designed programs and projects as well as innovative replicable models of community solar with community ownership. These pilot projects will demonstrate best practices and innovation and will showcase and streamline models for community-ownership, demonstrate best practices for engaging hard to reach populations and geographies, identify and rapidly solve emerging barriers to solar, and foster relationships to expand workforce development programs targeted at discrete workforce gaps. Working with rural cooperatives, Colorado will support innovative projects that produce multiple meaningful benefits for rural communities, including, where feasible, integrating community solar projects with working farms and ranches.

## 2.3 Project-Deployment Technical Assistance Strategy

Technical Assistance will be multifaceted across the program through different strategies to support project deployment.

### 2.3.1 Technical Assistance through Trusted Partners

Colorado will subgrant to community based organizations (CBOs), local governments, and other trusted outreach partners to enable messaging and access to low-income residents. CBOs play an essential role by supporting low- to moderate-income communities to access the benefits of solar energy by bridging the gap between regulators, policymakers, and the needs of the community. Their established relationships are a result of the importance of investing the time to get to know the community and of moving their projects forward at the speed of trust. Similarly, local governments are often the most well-known level of government in rural areas, and are considered grassroots governments because they are closest to the people. In addition to CBOs and local governments, other trusted partners will be sought to deliver information, benefits and educational resources of solar in general and the COS4A program. This will also include engaging a portion of the 69,000 federally assisted units of multifamily housing, 9,000 Colorado Weatherization Assistance Program database of weatherized and renter occupied units, over 30,000 eligible participants identified through the Colorado LIHEAP program and affordable multifamily properties that are required to comply with the Colorado's Building Performance Standard and ensure that they know the Solar for All opportunities exist.

### 2.3.2 Investment in Workforce Development

CEO and their workforce development partners will develop capacity by removing barriers to access workforce training, improving trainee retention by improving soft-skills and cultural competency among trainers, incentivizing local hiring, and fostering local business development and entrepreneurship. We will pursue partnerships with high schools, community colleges, trade schools, unions and universities to expand workforce training capacity, and recruit and retain individuals from disadvantaged and historically underserved communities. Further, we will incubate entrepreneurship through localized micro-financing and assistance to build and grow clean energy businesses in disadvantaged communities. Microfinance refers to the financial services provided to low-income individuals or groups who are typically excluded from traditional banking. See Section **2.1.5 Meaningful Benefits Through Investment in Jobs and Businesses in LIDACs** for more detail on the investment in workforce development.

### 2.3.3 Siting, Permitting, Interconnection

CEO will be leveraging and coordinating with existing initiatives at the state to address siting, permitting and interconnection throughout Colorado including CEO's Automated Permit Processing for Solar (APPS) program, Senate Bill 24-212 (SB24-212) concerning measures to facilitate the construction of renewable energy projects and a recent award under the DOE's Renewable Siting and through Technical Engagement and Planning (R-STEP) opportunity. A brief description of each of these initiatives is listed below.

**CEO's Automated Permit Processing for Solar (APPS) program** is a non-competitive grant program offering financial assistance to local and Tribal governments to adopt an automated online solar permitting software, such as [SolarAPP+](#) or [Symbium](#). These platforms verify the code compliance of solar and storage systems and instantly issue permits, saving local governments hours of time normally spent on manual permit reviews. APPS will help jurisdictions streamline their residential solar and storage permitting procedures and proactively manage the increased permitting volume to be expected as a result of the COS4A program.

**Local Governments Renewable Energy Projects (SB24-212)** is a bill that directs CEO in cooperation with the Department of Local Affairs (DOLA), and the Department of Natural Resources (DNR) to develop a repository of model codes and ordinances for renewable energy projects for the purpose of providing conceptual frameworks that local and tribal governments may consider to adapt to suit local circumstances and address local energy resources.

While SB24-212 focuses on utility scale renewables (>5 MW for commercial solar facilities), the repository of codes and ordinances, as well as recommendations for streamlining siting and permitting processes that will result from the study, the COS4A program will be able to take valuable lessons from the community engagement needed for proper siting of community solar projects, as well as help local governments evaluate their existing codes and ordinances on ground mounted solar projects.

Renewable Energy Siting through Technical Engagement and Planning (R-STEP) is a Department of Energy Grant that CEO received to establish the Colorado Renewable Energy Technical Assistance Hub (the Hub) to facilitate the development and siting of large-scale renewable energy projects. Key services offered by the Hub include:
- **Model Codes Development**: facilitated discussions in rural and other strategic communities, and collaboration with trusted organizations to develop model codes and ordinances that support renewable energy projects and development that can be adopted by local governments.
- **Online Portal**: A centralized platform providing simplified and streamlined access for local governments to model codes, best practices, and other technical assistance to facilitate renewable energy permitting and siting processes.
- **Online Technical Tools**: Interactive tools enabling county land use planners to select model land use codes or decision support models.
- **Local government grants**: Direct support to local governments to assist them in evaluating large renewable energy projects.

**TASK 2.3.3:** COS4A will coordinate with CEO staff assigned to SolarAPPS, SB24-212 and R-STEP to align efforts and identify if there are one or more ways to supplement or bridge gaps in funding related to sitting, permitting and interconnections.

### 2.3.4 Agrivoltaics Technical Assistance

CEO will collaborate with the Colorado Department of Agriculture's long-standing ACRE3 Program which provides project feasibility studies and technical assistance to coordinated permitting, financing, and contractor services, and grant funding for on-farm or ranch solar and other renewable energy projects. Technical services will include developing and implementing models for community ownership of community solar projects that also prioritize dual land-use practices, such as agrivoltaics. By providing these technical assistance services, the state will ensure that larger, ground-mount, community solar projects are designed to preserve the existing ecosystem services, agricultural enterprises and other land-based values whenever possible. As a leader in dual land-use solar practices, Colorado believes that agrivoltaics can reduce siting conflicts, while increasing renewable energy for rural communities and support the state's agricultural economy.

# Section 3: Fiscal Stewardship & Consumer Protections

## 3.1 Fiscal Stewardship

As an existing state agency, CEO has robust internal controls in place that align with §200.303. In February 2016 the Office of State Controller issued a policy entitled "Internal Control System." The policy makes it mandatory that State agencies adopt and follow the U.S. Government Accountability Office's (USGAO) Standards for Internal Control in the Federal Government (commonly referred to as the Green Book). As part of this, there is segregation of duties in the submission and approval process as well as procurement and accounting. The current structure is set up so that each expense is reviewed by multiple staff for compliance in alignment with federal statutes, regulations, and terms of the award. CEO utilizes Salesforce for approval of purchases. If a staff member wants to make a purchase, a request is logged into the system and reviewed for approval. After approval, the expense is processed with full back up by the accounting team. When processing requests for reimbursement from DOE, the operations team reviews a summary of expenses, to ensure compliance and accurate chart of account elements. If an instance of noncompliance is identified, the issue is resolved promptly. CEO expects a similar level of internal controls from subrecipients. The state through CEO shall pass down all of the applicable requirements described in the EPA's National Terms and Conditions for Subawards, and any program specific restrictions on subrecipient eligibility in addition to the regulations found in 2 CFR 200, 2 CFR 1500 and 40 CFR 33 as applicable.

CEO requires a risk assessment form be completed during the contracting phase of the award. The risk assessment is a framework that was developed by the Colorado Office of the State Controller to assess risk based on a number of factors including: previous experience with similar subawards, previous audit findings/provide a copy of the latest audit, reporting of new personnel or systems in place at the agency and details of their accounting system to ensure they can maintain segregated accounts to manage the funds. This is documented in the OSC Guide for Monitoring Subrecipients. These procedures are consistent with §200.332(b). After award and in alignment with §200.332(d) CEO conducts monitoring based on assessed risk level, high risk grantees receive more comprehensive frequent monitoring and lower risk level grantees receive sampling style monitoring. This process ensures that all subrecipient spending is evaluated for compliance with the terms and conditions of the award. For both CEO and any subrecipient, waste, fraud, and abuse will not be tolerated and will be identified and rectified.

CEO mitigates the risk of fraud, waste, and abuse by ensuring all expenditures are allowable via all of the reconciliations and approval processes as described above with the Salesforce process. This approval process is mapped and documented through the Salesforce Active Approval Matrix.

## 3.2 Consumer Protections

CEO will ensure comprehensive consumer protections throughout the COS4A program to ensure that contracted savings are actually achieved and to reduce participant risk. These include:

- Training and potentially vetting for contractors completing projects funding through COS4A.
- Standard disclosure forms written in clear and concise language and available in all common languages across Colorado.
- Warranties and guarantees of workmanship for all COS4A projects.
- Multilingual customer service to answer questions, explain program requirements, disclosures and warranties.
- Standard branding to clarify projects that are and are not connected to COS4A.
- Financial protections: no securing solar loans against single-family properties; seek to avoid placing liens on properties to secure loans, unless the size and risk profile of the project necessitates a lien on the real estate; full disclosure of grant opportunities prior to loans; exploring opportunities for replacement reserve funds for malfunctioning systems post warranty but pre-20 year.
- No upfront costs and no penalties for termination of community solar subscriptions.
- Clear multilingual communications around costs, savings, and risks.
- 5% physical inspection rate of rooftop systems
- 5% client follow up on single-family rooftop systems

# Section 4: Timeline and Milestones

Refer to the COS4A_Program Timeline_16Jan2025 spreadsheet document attached separately.

# Section 5: Reporting Requirements

CEO intends to hire one data analyst dedicated to developing and executing a plan to publish data, evidence, and evaluation reports publicly during the program lifetime. This individual will be responsible for developing the underlying methodologies, identifying technologies, data sources, inputs and assumptions, and other significant analytical choices used to calculate or estimate outputs and outcomes. They will also be responsible for submitting annual reports within 30 days of the end of each reporting period, as well as a final program report, within 120 days after the end of the project period.

CEO will conduct quarterly program evaluation, tracking measures including: household income or income-qualified program participation; household demographics; geographic location (county); location in disadvantaged community (y/n); rural/urban/suburban location; and occupant tenancy (renter/homeowner). Program outcomes such as electricity generated; greenhouse gas emissions reductions and installed capacity (MW) will also be gathered. All avoided emissions calculations will be calculated utilizing the EPA AVERT web edition unless determined otherwise with the NREL

Technical Assistance. This information will be publicly available for program transparency. Evaluations will be conducted in adherence with EPA Order 1000.33, U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings.

# Section 6: Budget Narrative

## 6.1 Total Budget: The total budget for all program activities is **$156,120,000**. This amount includes the $400,000 allocated to in-kind technical assistance with DOE/NREL which is listed under the "Other" cost category.

## 6.2 Scaling

The majority of the funds for the grant will remain allocated to financial assistance. The financial assistance was originally 75% of the application request and remains at 75% of the awarded amount and therefore was scaled at 62% of the original allocation. Administrative costs which include personnel, fringe, community outreach and quality assistance travel, equipment, supplies and indirect costs were scaled to 73% of the original award. This is in part because certain personnel could not be eliminated (i.e. one data analysts was originally budgeted and deemed to still be necessary whereas when multiple FTE were assigned to a single position reductions could be made (i.e. two FTE fiscal project managers were initially budgeted and this line item was reduced to one FTE). Supplies for non-capitalized IT for new FTE including Salesforce licenses, laptop ($1,000), monitor ($200), a docking station ($150), a cell phone ($190), and other smaller costs were erroneously omitted in the initial budget and corrected in this revision. To accommodate 73% administrative costs and the $400,000 in-kind technical assistance with NREL, the combined technical assistance and workforce development categories were collectively scaled at 57.8%. Additionally, Davis Bacon reporting software and an application portal were added to the budget under subawards through further development of those program elements.

## 6.3 Personnel: The total personnel costs across all positions and throughout the program period of performance is **$5,344,497**. Salary specific costs are listed below.

- 90% FTE Solar for All Director @$135,000 annual salary with 3% cost of living adjustment (COLA) annually. Total salary over the program = $645,060. The Director of Colorado Solar For All will develop and lead CEO's Solar for All (COS4A) program including a complex set of program offerings, financial tools, resources including technical assistance and workforce development, and community engagement initiatives. They will hire and organize a new team, develop a process to collect quantitative and qualitative data including program feedback, regularly evaluate program outcomes, manage the team's budget and ensure program compliance with federal grant requirements.
- 90% FTE Solar for All Associate Director at $100,000 annual salary with 3% COLA. Total salary over the program = $477,822. The Associate Director will manage the COS4A program and be critical in helping the Director hire and organize a dynamic team while coordinating closely with other CEO units and a variety of stakeholders including industry, local governments, utilities, and community-based organizations. They will have oversight for the workforce development, and

outreach and community engagement activities including affordable housing partners, and spearhead community-led and designed pilot projects.

- 3 FTE Program Managers annual @$85,000 salary with 3% COLA. The total salary for these three positions over the program = $1,353,830. The PMs will manage each of the three programs: (1) single-family rooftop solar, (2) affordable multifamily rooftop solar and (3) community solar and subscriptions. They will lead program design and strategy, develop the request for proposal for the third-party administrator(s), manage the application portal, execute the program and collect program metrics.
- 1 FTE Financial Program Manager @$85,000 annual salary with 3% COLA. The total salary over the program = $451,277. This position will develop the financing program for Solar for all including evaluating revolving loan structures and viable seed funding, engage with local lenders to gauge interest and capacity to support the program including lend to lender options, evaluate the gaps and needs to foster activities that will build the market and attract private investment in relevant sectors, evaluate braiding with IRA home efficiency rebate and weatherization programs and federal tax credits.
- 1 FTE Workforce Development Manager @$85,000 annual salary with 3% COLA. The total salary over the program = $451,277. This position will implement the workforce development program including, evaluation of apprenticeship programs, managing relationships with unions or trade groups, and the Department of Labor (federal and state) and developing programs both with solar developers and through educators.
- 1 FTE Compliance Manager @$85,000 annual salary with 3% COLA. The total salary over the program = $451,277. This position will ensure the program maintains compliance with Uniform Grant Guidance (OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards to Non-Federal Entities guidance in 2 CFR 200 as supplemented by 2 CFR 1500), manage accounting according to state and federal rules, implement oversight and fraud prevention processes and oversee federal reporting and regulations associated with Davis-Bacon wages, Build America Buy America and State Historic Preservation Office.
- 1 FTE Data Analyst @$80,000 annual salary with 3% COLA. The total salary over the program = $424,731. The Data Analyst will be responsible for developing the underlying methodologies, data sources, inputs and assumptions, and other significant analytical choices used to calculate or estimate  outputs and outcomes.  They will also be responsible for submitting annual reports within  30  days of the end of each reporting  period, as well as a final program report, within 120 days after the end of the project period.
- 2 FTE Community Engagement, Marketing and Educational Specialists @$75,000 annual salary with 3% COLA. The total salary for these two positions over the program = $796,370. These positions will design the strategy to source projects and market incentives and financing programs with developers, building owners, banking sector, utilities and communities as relevant.  They will be integral to outreach and engagement with community-based organizations and other trusted partners to reach customers.
- 1 FTE Quality Assurance Inspector @$70,000 annual salary with 3% COLA. The total salary over the program = $292,854. This position will be responsible for physical inspections of 5% of all installations resulting from the program.

## 6.4 Fringe Benefits

The total fringe for all personnel listed above is estimated at **$1,929,363**. Fringe benefits vary by based on what each individual selects for their coverage and can range from 23.8% to 54.74%. The average fringe at CEO is 36.1% which is the amount used for each position listed above. Included in fringe are the following benefits: health/life/dental insurance, short term disability, medicare, Colorado Family and Medical Leave Insurance, Colorado retirement benefits (PERA), amortization equalization disbursement (PERA), and supplemental amortization equalization disbursement (PERA). Fringe estimates based on 36.1% and salaries noted above are listed below for the duration of the grant program.

- Fringe for 90% FTE Solar for All Director: $232,867
- Fringe for 90% FTE Solar for All Associate Director: $172,494
- Fringe for 3 FTE Program Managers: $488,732
- Fringe for 1 FTE Fiscal Program Manager: $162,911
- Fringe for 1 FTE Workforce Development Manager: $162,911
- Fringe for 1 FTE Data Analyst: $153,328
- Fringe for 1 FTE Compliance Manager: $162,911
- Fringe for 2 FTE Community Engagement, Marketing and Educational Specialists: $287,490
- Fringe for 1 FTE Quality Assurance Inspector: $ 105,720

## 6.5 Travel

The total cost for travel over the program is **$243,749.** The travel budget includes funding for (1) in-state outreach and engagement trips to each region for a total amount of $83,292, (2) travel associated with conferences for professional development for a total of $52,477 as well as (3) travel for a quality inspector with a total budget of $107,980.

**In-state Outreach and Engagemen**t: Funding for in-state outreach and engagement trips assume one trip in the first and last year and three trips per region for years 2-4 for two project team staff. These trips will be important for promoting the program, conducting community engagement, and supporting implementation. The average trip cost is $1,500 including per diem, lodging and car rental costs for 5 different regions across the state. This assumes the Denver Metro area are day trips with only car rentals necessary. A travel detail tab is included with the budget which estimates per diem ($79/day), lodging ($134-$235/night), and car rental ($100/day) based on the region. The total budget for in-state outreach and engagement trips is $83,292.

Professional Development: This includes through state and/or national conferences to stay abreast of the most current trends or educational training opportunities. Opportunities will be split between (1) state focused conferences in order to learn best practices from other states such as the National Associate of State Energy Offices annual conference, Clean Energy States Alliance conferences, Convenor's Network or similar, and (2) industry focused conferences bringing together industry experts, policy leaders, and other major players such as RE+, Clean Power or Greenbuild. The budget includes two professional development opportunities for 3FTE in year one and then 6 FTE for the subsequent years. An additional tab has been included in the budget worksheet to show estimates of per diem ($79), mileage ($53), lodging ($258), airfare ($600), ground transportation ($200).

Conference Fees of $1,500 are allocated to the "other" budget category below. The total estimated travel costs associated with professional development is $52,477.

**Quality Assurance Inspector:** Funding for the quality assurance inspector is estimated to include per diem and lodging. This is a full-time position that will travel across the state to make physical inspections of 5% of all the installations to ensure quality standards are met.  It is assumed that half of the inspections will require overnight travel or 130 days (out of 260 work days per year) of per diem and 100 days of lodging (assumes some trips are two nights).  In lieu of mileage, a car has been budgeted since it is more economical than renting a car for the duration of the program. $100/day for 130 days is $13,000/year or $52,000 for the four years during which inspections are expected to take place. A truck to haul a ladder necessary for roof inspections has been budgeted for $45,000 instead. The truck is budgeted under the "Equipment" cost category.  The total budget for travel associated with executing quality assurance is $107,980.

## 6.6 Equipment

One vehicle will be purchased to allow the quality assurance project manager to drive across the state to verify a sampling of projects. In lieu of mileage, a car has been budgeted since it is more economical than renting a car for the duration of the program. $100/day for 130 days is $13,000/year or $52,000 for the four years during which inspections are expected to take place. A truck to haul a ladder necessary for roof inspections has been budgeted for **$45,000** instead.

## 6.7 Supplies

The total cost of supplies is estimated at **$60,550** over the entire program. Supplies are estimated for each new full-time employee (FTE) with 11 employees anticipated in the first year and an additional employee in year 2. Non-capitalized IT needs for new FTE include Salesforce licenses for grants management and invoicing, a laptop, laptop docking stations, monitors, cell phone and cell service and other software needs and supplies for use only for this program. These costs include a new laptop ($1,000), a new monitor ($200), a docking station ($150), a cell phone ($500) and software licenses and cell service ($650). These are based on actual costs from current and recently hired CEO employees.

## 6.8 Contractual

The estimated total that will be contracted out is **$2,100,000**.  The state of Colorado requires competitive bidding for any contracts that exceed $50,000. At a minimum the following services are anticipated to be procured through the state's competitive process to select one or multiple partners or vendors to implement the work. The state through CEO shall pass down all of the applicable requirements described in the EPA's National Terms and Conditions for Subawards, and any program specific restrictions on subrecipient eligibility in addition to the regulations found in 2 CFR 200, 2 CFR 1500 and 40 CFR 33 as applicable.

- **Davis Bacon Act (DBA) Reporting Software** - contract for a reporting software to track and report DBA wages.  Total project cost is estimated at $550,000.  CEO is currently evaluating if  it will seek a sole source procurement for software they are currently using or competitively bid this service.

- **Application portal** - contract to build an application portal for residential customers. Total project cost is estimated at $550,000.
- **Market Research, Branding, Multi-lingual Materials** - contract to develop materials that are culturally accessible. Total project cost is estimated at $500,000
- **Language Services** - contract to develop linguistically accessible materials. Total project cost is estimated at $250,000.
- **Technical Assistance Tax Credit Subcontractor** - the state intends to leverage the federal solar investment tax credits (ITC) but will need to partner with entities that have tax liability in order to do so. CEO will hire and work with tax professionals to ensure that all regulations are being met and to advise on any tax liability transactions.

## 6.9 Construction

Planned construction activities include installation of solar panels and associated storage, and a limited amount of enabling upgrades as well as development of community solar. The construction is expected to occur within years 2 through 4.5 of the 5 year project duration. Planned procurement is through subgrants as identified below under the Subawards category.

## 6.10 Other

- **Professional development opportunities.** The total budget allocated for professional development opportunities is $121,551 over the life of the program. This includes through the conference fees estimated at an average of $1,500 per conference to accompany the travel described above and a $3,000 per employee stipend for training, educational opportunities, accreditations or certification related professional development.
- **One parking space** near the Denver office for the vehicle purchased to accommodate the quality assurance activities across the state. The total cost of one parking space is estimated at $3,000 per year with a 3% cost of living increase each year for a total of $12,551 over the life of the program.
- **DOE Technical Assistance Match** - $400,000. Assumes among other tasks to be identified that these funds will be used to develop the residential energy savings verification methodology.

## 6.11 Other - Participant Support Costs

The total advisory council participant support cost is estimated at $270,000. $30,000 is allocated for participant support costs for the first year and $60,000 for each subsequent year for the COS4A Advisory Council made up of stakeholders who represent historically underserved and disadvantaged communities, workforce and labor, local governments and utilities, affordable housing, service providers, financing and lenders, and others key to the successful implementation of this program. Council participation will receive a subsidy for members who are not participating as part of a paid full-time role, and members will be provided with a series of training opportunities and facilitated conversations to develop a shared vision of best practices for COS4A. Participant support costs will include compensation for time, food, travel, childcare or other wrap around services for them to participate.

## 6.12 Other - Subawards

There are no named subawards in the workplan as the state of Colorado requires competitive bidding for any contracts that exceed $50,000. Each of the programs (Single Family, Affordable Multifamily, Community Solar and Community-Led Community Solar) will go through the state's competitive solicitation process to select one or multiple partners to implement the work. All Competitive Grants shall be conducted in a manner providing full and open competition where practicable and at the discretion of CEO's Procurement Official. The state through CEO shall pass down all of the applicable requirements described in the EPA's National Terms and Conditions for Subawards, and any program specific restrictions on subrecipient eligibility in addition to the regulations found in 2 CFR 200, 2 CFR 1500 and 40 CFR 33 as applicable. The portions of the award that will be subgranted are as follows:

**Financial Assistance: $116,790,000** (75% of the award) in subgrants to financial entities or implementers to subsidize contractors, developers, multi-family building owners, community-led, community-owned solar gardens to pursue and install solar for the benefit of low-income residents.
- Single-family Rooftop (100% subsidy and lease): $38,031,100
- Affordable Multifamily On-Site and Rooftop (loan and lease): $38,096,840
- Community Solar (per/watt subsidy): $32,562,751
- Community-led Solar Garden: $2,000,000
- Storage (paired with solar): $6,099,309

**Workforce Development: $11.5M** in subgrants to either solar developers with workforce development programs or education institutions/training centers to subsidize training.

**Technical Assistance: $14,131,387** for
- Community based organizations, local government and outreach entities to enable trusted partners to message and access low-income residents.
- Permitting, siting and interconnection coordination with SolarAPPS, HB24-212 or R-Step initiatives.
- Coordination with Colorado Department of Agriculture to support agrivolatics.
- Other software or consulting services needed to implement and manage the program.

## 6.13 Additional Items

No additional items.

## 6.14 Indirect Charges

The Colorado Energy Office's negotiated indirect cost rate (NICRA) with the federal government for use on grants, contracts and other agreements is 43.6% for FY25 through FY28. The indirect cost base is direct salaries and wages including all fringe benefits but excluding flow-through funds. A copy of the NICRA is attached. The total indirect costs are $3,171,403.

## 6.15 Conferences and Workshops:

CEO will subgrant to non-profits, community-based organizations and other local entities that will likely host events or workshops. These subgrantees have not been identified yet as they will be

selected through the state's competitive process (see above). Once partners have been identified, these details can be provided. This exact cost is unknown but will be a portion of the $14.1M identified under technical assistance above.

## 6.16 Meals and Refreshments:

CEO will subgrant to non-profits, community-based organizations and other local entities that will likely host events that include food and refreshments. These subgrantees have not been identified yet as they will be selected through the state's competitive process. Once partners have been identified, these details can be provided.

Food is included in the participant support costs for the advisory committee and noted under participant support costs above.

## 6.17 Program Income

The only program income planned is through a revolving loan fund for a portion of the funds. See section 2.2 Financial Assistance for more details. Over the life of the program, it is estimated that the revolving loan will generate $2.5M. The programs that will offer revolving loan funds include:

- **Single-Family Third-Party Owned Solar Lease Ownership Model** through a revolving bridge loan that will be used for bridge financing of third-party lease providers to bridge the time between when a project is installed and when the tax credits are captured, including state and local rebates and incentives, paired with a long-term revolving loan product.
- **Multifamily Affordable Housing Solar Loan with Revolving Loan Fund** with low-cost bridge financing from a revolving loan fund.
- **Multifamily Affordable Housing Solar Lease** with two different forms of financing available for the third-party lease provider - a low-cost revolving bridge loan and long-term revolving loan**.**

# EXHIBIT 3



**OFFICE OF MISSION SUPPORT**

WASHINGTON, D.C. 20460

August 7, 2025

<u>MEMORANDUM</u>

**SUBJECT:**    Termination of EPA Assistance Agreement 5H-84090401 under 2 CFR 200.340

**FROM:**    Devon Brown, EPA Award Official

**TO:**    Gregg Hefner, Director of Finance and Operations
Colorado Energy Office

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84090401 awarded to Colorado Energy Office. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Matthew Forte, EPA Grant Specialist
    Melissa Hopkinson, EPA Project Officer
    Ida Mae Isaac, Grantee Program Manager

# EXHIBIT 4

| | |
|---|---|
| **From:** | Hefner - CEO, Gregg |
| **To:** | Schindel, Phillip |
| **Cc:** | natalie.doerre@state.co.us; Isaac, Ida Mae; Brown, Devon; Carpenter, Wesley; Forte, Matthew; Hopkinson, Melissa; Dominique Gomez - CEO; Christian Williss - CEO |
| **Subject:** | Re: Termination of EPA Assistance Award: 5H-84090401 awarded to Colorado Energy Office |
| **Date:** | Monday, August 25, 2025 3:23:29 PM |

Mr. Schindel,

This is Colorado Energy Office's (CEO) official notice of disagreement per the EPA assistance amendment dated 8/7/2025.  CEO did draw down funds after the date of the termination (8/7/2025), but that draw was only for financial obligations incurred before the date of the termination (8/7/2025), consistent with 2 CFR 200.343.


Respectfully,

Gregg Hefner

On Wed, Aug 13, 2025 at 6:38 AM Schindel, Phillip <Schindel.Phillip@epa.gov> wrote:

> Good morning Mr. Hefner,
>
>
> There are no prescribed forms or specific guidance beyond what is outlined in the last full paragraph of the termination notice. The language there mirrors EPA's dispute regulations at 2 CFR 1500.15. A dispute received within 30 days of that notice will be timely under the regs.
>
>
> Phil
>
>
>
> Phillip Schindel
>
> Acting Director
>
> US EPA Grants Management and Business Operations Division
>
> 202-564-5293
>
> Schindel.Phillip@epa.gov
>
> _____
>
> **From:** Hefner - CEO, Gregg <gregg.hefner@state.co.us>
> **Sent:** Tuesday, August 12, 2025 6:09 PM
> **To:** Schindel, Phillip <Schindel.Phillip@epa.gov>
> **Cc:** natalie.doerre@state.co.us; Isaac, Ida Mae <IdaMae.isaac@state.co.us>; Brown, Devon <Brown.Devon@epa.gov>; Carpenter, Wesley <Carpenter.Wesley@epa.gov>; Forte, Matthew

<Forte.Matthew@epa.gov>; Hopkinson, Melissa <Hopkinson.Melissa@epa.gov>
**Subject:** Re: Termination of EPA Assistance Award: 5H-84090401 awarded to Colorado Energy Office

**Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Mr. Schindel,

Colorado Energy Office (CEO) has received EPA modification number two to grant number 84090401 that terminates the grant.  We note that in the Notice of Award section, CEO has the option to file a notice of disagreement with this award.  The notice of disagreement must be filed within 21 days of the date of the award notice, 8/7/2025.

CEO would like to exercise this right and submit a notice of disagreement to this award. During the period of disagreement, CEO will not draw down any funds on this grant and understands that costs are incurred at our risk.

CEO can not find any documentation or instructions on filing a notice of disagreement. Please provide instructions, forms, and guidance to enable CEO to complete and submit the notice of disagreement within the required period.

Gregg Hefner

Director of Finance

On Fri, Aug 8, 2025 at 8:33 AM Schindel, Phillip <Schindel.Phillip@epa.gov> wrote:

Attached, please find the amended award referenced yesterday. Again, we recommend you forward the document to any other personnel in your organization requiring information about the award.

Sincerely,

Phillip Schindel

Acting Director

US EPA Grants Management and Business Operations Division

202-564-5293

Schindel.Phillip@epa.gov

_

Attachment:

Assistance Amendment

---

**From:** Schindel, Phillip
**Sent:** Thursday, August 7, 2025 7:14 PM
**To:** gregg.hefner@state.co.us; natalie.doerre@state.co.us; idamae.isaac@state.co.us
**Cc:** Brown, Devon <Brown.Devon@epa.gov>; Carpenter, Wesley
<Carpenter.Wesley@epa.gov>; Forte, Matthew <Forte.Matthew@epa.gov>; Hopkinson,
Melissa <Hopkinson.Melissa@epa.gov>
**Subject:** Termination of EPA Assistance Award: 5H-84090401 awarded to Colorado Energy
Office

Dear EPA Grant Recipient:

Attached is your Termination Notification from the U.S. Environmental Protection
Agency. An amended award document will follow.

We recommend you forward the notification and forthcoming award document to
any other personnel in your organization requiring information about the award.

If you have any questions, please contact Wesley Carpenter, Senior Resource Official, at carpenter.wesley@epa.gov.

Sincerely,

Phillip Schindel

Acting Director

Grants Management and Business Operations Division

Schindel.Phillip@epa.gov

Attachment:

Termination Memo

--
**Gregg Hefner**
**Director of Finance & Operations**

P: 303.866.2601  |  C: 720.672.2839
1600 Broadway St., Suite 1960 Denver, CO 80202
gregg.hefner@state.co.us |  www.colorado.gov/energy

--
**Gregg Hefner**
**Director of Finance & Operations**

P: 303.866.2601  |  C: 720.672.2839
1600 Broadway St., Suite 1960 Denver, CO 80202
gregg.hefner@state.co.us |  www.colorado.gov/energy

# EXHIBIT 5



**C O L O R A D O**
Energy Office

To: Michael Molina
EPA Disputes Decision Official
Environmental Protection Agency
Office of Mission Support
Washington, D.C. 20460

Date: September 5, 2025

Re:    Wrongful Termination of Environmental Protection Agency Assistance
Amendment 5H-84090401-1 under 2 C.F.R. § 200.340

Dear Mr. Molina:

Pursuant to 2 C.F.R. § 1500.15, we are writing to notify you, as the designated Environmental Protection Agency (EPA) Dispute Decision Official, that we disagree with EPA's termination of Colorado's Solar for All award, grant number 84090401, which was awarded to the Colorado Energy Office (CEO) on July 9, 2024. The Memorandum from EPA Award Official Devon Brown, as well as the Termination Notice (Assistance Amendment 5H-84090401-2), both dated August 7, 2025: (1) violate the plain language of the One Big Beautiful Bill Act (OBBBA) Section 60002, which rescinded only unobligated balances from the Greenhouse Gas Reduction Fund and preserved funds already awarded to grantees; (2) violate EPA's legal obligation under 2 C.F.R. § 200.340 and the binding Assistance Amendment 5H-84090401-1 issued by EPA to CEO on December 4, 2024 , and any attempts to liquidate the remaining funds in CEO's ASAP account would violate due process; (3) provide no other valid reason for termination pursuant to 2 C.F.R. § 200.341; and (4) violate the Constitution's Separation of Powers clause. This termination is contrary to law, arbitrary and capricious, and is a breach of the Assistance Amendment 5H-84090401-1. CEO requests that EPA rescind the termination and make all obligated funds that were available in CEO's ASAP account as of August 6, 2025 (the day before the Termination Notice) available to CEO again.

The August 7, 2025, Memorandum indicates that EPA is terminating CEO's award because EPA's cost appropriations and the "grant appropriations" were rescinded, so "the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All," and continued administration of the program is no longer legally permissible. Based on this legal conclusion, EPA determined it would end the Solar for All program and all existing grants.



Respectfully, the rescission of unobligated funds and repeal of granting authority under 42 U.S.C. § 7434 do not give EPA the authority to terminate all legally binding Solar for All grant agreements unilaterally under 2 C.F.R. § 200.340. Doing so is contrary to law and arbitrary and capricious. We therefore ask that the termination of CEO's award be reconsidered via an administrative appeals process. As such, *please accept this letter as a timely request to initiate an administrative dispute under 2 C.F.R. § 1500 Subpart E.*

**(1) EPA's asserted grounds for termination violate the plain language of OBBBA Section 60002, which rescinded unobligated balances but preserved funds already awarded to grantees.**

EPA's conclusion that OBBBA rescinded the grant appropriations for Solar for All is incorrect and contrary to law. By its plain language, Section 60002 only authorized rescission of the *unobligated* balance in the appropriations account established by 42 U.S.C. § 7434:

> *SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.*

Where the plain language of a statute is unambiguous, no further analysis is required. *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (". . . when the meaning of the statute's terms is plain, our job is at an end."). Indeed, after OBBBA passed Congress, the Department of Justice wrote to the court presiding over *Climate United Fund v. Citibank, N.A.* to inform it that new legislation, if signed, would "rescind all *unobligated funds* appropriated for it." (Letter dated July 3, 2025, to the Clerk of the Court from Yaakov Roth, DOJ.).

By its plain language, the OBBBA only rescinded funds that were unobligated on the date the OBBBA was enacted. And there is no basis to conclude that Congress expressly or impliedly intended to de-obligate or claw back funds that were properly and timely obligated pursuant to 42 U.S.C. § 7434(a)(1). Funds awarded to Solar for All grantees, including CEO under the subject award, were *obligated* upon award and subject to a legally binding agreement which "create[d] a legal liability or definite commitment on the part of [EPA], or create[d] a legal duty that could mature into a legal liability by



virtue of an action that is beyond the control of the government."[1] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[2] In other words, the Solar for All grant funds were obligated upon award, and remained obligated when OBBBA was passed. The OBBBA did not change this and could not have legally rescinded these obligated funding awards.

Additionally, this termination did not automatically de-obligate CEO's funds because termination of an award cannot automatically or retroactively de-obligate funds. But even if termination of an award could result in the de-obligation of funds, CEO's Solar for All grant was not terminated until August 7, 2025, well after OBBBA became law on July 4, 2025, and contrary to the direction of that statute. At the time the OBBBA was enacted, CEO's Solar for All funds remained obligated so they could not be impacted by Section 60002 of the OBBBA.

EPA also cannot avoid administering the entire Solar for All program merely because OBBBA rescinded other unobligated funds. For the reasons stated above, CEO's grant funds remain obligated, so EPA has a legal duty and obligation to fulfill its part of the agreement by administering the funds.

(2) **EPA's unilateral termination of CEO's grant violates EPA's legal obligation under 2 C.F.R. § 200.340 and constitutes a breach of the signed grant agreement, and any attempts to liquidate the remaining funds in CEO's ASAP account would violate due process.**

EPA has offered a laundry list of potential and contradictory grounds on which it might have based the termination of CEO's award, but no indication or substantiation of the actual reason. Regardless, there is no merit to any of the numerous potential grounds suggested by EPA. As an initial matter, EPA's failure to make CEO aware of the specific grounds for its termination is a violation of 2 C.F.R. § 200.341(a), which requires that a written notice of termination should include the reasons for termination.

---

[1] United States Government Accountability Office, Office of the General Counsel, Principles of Federal Appropriations Law, Third Edition, Volume II, at 7-2, https://www.gao.gov/assets/gao-06-382sp.pdf.
[2] Grants Policy Issuance- 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds, at 1, https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf.



In the August 7th Memorandum, EPA indicated that federal spending legislation was the basis for the termination. The Termination Notice, however, said that the termination was instead based on a list of entirely different and unspecified reasons, purportedly any of the possible reasons included in EPA's General Terms and Conditions and 2 C.F.R. § 200.340, which governs Assistance Amendment 5H-84090401-1. Consistent with federal Office of Management and Budget regulations and the Assistance Agreement, an award can be terminated for the following reasons:

1) if the recipient or subrecipient fails to comply with the terms and conditions of the federal award;[3]

2) if the recipient or subrecipient consents to terminate the federal award;[4]

3) if the recipient or subrecipient of the federal award so requests;[5]

4) pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities; or[6]

5) The grounds provided in 2 C.F.R. § 200.339 (those being where the recipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award).[7]

Between the Memorandum and Termination Notice, EPA has offered at least six potential - and different - reasons why a federal award could in theory be terminated. But EPA has not offered a single valid reason why this specific grant agreement with CEO was terminated, providing no reasoned basis for termination or any individualized assessment of CEO's grant agreement. Nor did EPA preserve all available regulatory grounds for termination in this case, so not all of the options presented in EPA's long list are actually available to it. *See* 2 C.F.R. § 200.340(b) ("The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.").

---

[3] 2 C.F.R. § 200.340(a)(1).
[4] 2 C.F.R. § 200.340(a)(2).
[5] 2 C.F.R. § 200.340(a)(3).
[6] 2 C.F.R. § 200.340(a)(4).
[7] 2 C.F.R. § 200.339.



Consistent with 2 C.F.R. § 200.340(a), EPA is bound by the termination provisions specified in the terms and conditions of the Solar for All award. The terms and conditions applicable to this grant do not allow for unilateral termination absent a recipient's failure to comply with the terms and conditions of the grant. Any subsequent changes to the grounds for unilateral termination of an assistance agreement must be agreed to by both EPA and the grantee. We have not, and unequivocally do not, agree to any attempts to terminate this grant award based on an erroneous, bad faith interpretation of OBBBA Section 60002. Congress intended for CEO's obligated funds to continue to support our legally binding award, and these funds cannot be unilaterally terminated by the executive branch in this way. This unilateral termination decision is therefore contrary to law and a breach of the Assistance Amendment 5H-84090401-1.

In addition, EPA has taken further action that unlawfully pulled back funding that was still legally obligated to CEO. Prior to the Termination Notice, on August 6, 2025, CEO's ASAP account available balance was $155,429,817.43, which represents the cumulative authorized amount of the EPA Award $155,720,000 minus funds drawn down by CEO for authorized work prior to that date. On August 11, 2025, CEO's ASAP account access changed to a "liquidated" status and a small portion of the awarded funds appeared to be available to draw down. However, the "available balance" on the account had been substantially reduced from $155,429,817.43 to $11,170,269.80, and the performance period end date had been changed from August 31, 2029, to August 7, 2025.

This adjustment to CEO's account balance, which was done prior to the expiration of the 30-day dispute period detailed at 2 C.F.R. § 1500 Subpart E and prior to any actions from CEO to close out the award[8] violates CEO's right to due process and ignores its reliance interests. CEO reasonably relied on this funding to hire eight staff members. Additionally, three large solicitations to deploy funds were about to be published: $18.7 million for single family rooftop systems, $55 million in loan products to support single and multi-family properties and $11.5 million in workforce development grants. Without this funding, CEO will have to lay off staff dedicated to the program and will be unable to move forward on its commitments to fund solar deployments and workforce development.

---

[8] To be clear, because CEO disputes the termination of its Solar for All funding, the agency is not taking any steps to close out the award.



**COLORADO**
**Energy Office**

(3) **None of the potential reasons for termination apply here, nor does EPA provide any other valid justification.**

Even if EPA had met its obligation to provide specificity in its reasoning for termination, no possible cited ground for termination finds support on this record. And neither the Termination Notice nor the Memorandum, both dated August 7, 2025, give any other valid reason for termination.

Under the Termination provisions of the Assistance Amendment 5H-84090401-1, termination for noncompliance is only possible under this grant's terms when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination." Neither case exists here. EPA has neither identified any non-compliance nor requested that CEO take action to cure any deficiencies in its agreement performance. Moreover, it bears noting that all competitive grants were awarded per 2 C.F.R. § 200.205, which requires a merit review before awarding funding; nothing that the Agency has stated in our termination letter raises concerns about the meritorious nature of our organization or the projects that we are undertaking with our federal funds.

Furthermore, CEO has not failed to comply with the terms or conditions of this award. EPA has not claimed that the grant will not accomplish the purposes for which it was made, which include providing financial and technical assistance support to a wide variety of communities in Colorado. And EPA has not raised any concerns specific to CEO's administration of its award relative to fraud, waste or duplication.

Assuming, *arguendo*, that CEO did fail to comply with the terms and conditions of the Assistance Amendment 5H-84090401-1, EPA has failed to provide CEO with a reasonable opportunity to remedy the noncompliance as required by the Agreement. Section III(P) of the Solar for All Programmatic Terms and Conditions to the Assistance Amendment 5H-84090401-1 provides that:

> Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to



**COLORADO**
Energy Office

comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America, or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

The Assistance Amendment 5H-84090401-1 goes on to say that if EPA determines that noncompliance cannot be remedied by imposing additional conditions, EPA may [only then] seek remedies under 2 C.F.R. § 200.339 up to and including termination. *Id.* EPA's failure to provide CEO with its procedural due process rights as provided for in the Assistance Amendment 5H-84090401-1 renders EPA's termination decision unlawful and arbitrary.

Given that no valid grounds for this termination exist, and EPA does not point to any in the Termination Notice or Memorandum or provide any other valid justification, such termination is arbitrary and capricious and contrary to law. EPA must follow the law, rescind this unlawful termination, and restore CEO's access to our obligated funds to complete crucial solar deployment projects in underserved communities to add energy to the grid and significantly lower household energy prices for low-and-middle-income Coloradans.

### (4) EPA's Withdrawal of Commerce's Duly Appropriated and Obligated Solar for All Assistance Agreement Violates the Constitution's Separation of Powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[9] The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[10] The Executive has no power "to enact, to amend or to repeal statutes."[11] Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

---

[9] U.S. Const. art. I, § 1.
[10] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).
[11] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).



**COLORADO**
Energy Office

*Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[12] The U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[13]

The Termination Notice, the Memorandum and their implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[14] For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of CEO's funding agreement.

*Take Care Clause*

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[15] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[16] Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and CEO's individual Assistance Amendment 5H-84090401-1 on the grounds that Section 60002 "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the program's administration. . .is no longer legally permissible."

---

[12] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).
[13] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).
[14] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).
[15] U.S. Const. art. II, § 3.
[16] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").



COLORADO
**Energy Office**

Section 60002 did not authorize or direct EPA to rescind CEO's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[17] EPA's Termination of CEO's Assistance Amendment 5H-84090401-1 contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to CEO prior to the September 30, 2024, deadline for awarding funds set forth in the Inflation Reduction Act.[18] EPA violated constitutional separation-of-powers constraints because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[19] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[20] Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[21] For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[22] When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating CEO's Solar for All Assistance Amendment 5H-84090401-1. For the same

---

[17] OBBBA Section 60002.

[18] *See* 42 U.S.C. § 7434(a)(1) (requiring EPA to award all funds under that subsection by September 30, 2024).

[19] U.S. Const. Art. I, § 9, cl. 7.

[20] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

[21] *See Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring).

[22] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").



COLORADO
**Energy Office**

reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[23] When actions by the federal government come in the form of "threats to terminate. . .significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[24] EPA's termination of CEO's Solar for All Assistance Amendment 5H-84090401-1 altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Amendment 5H-84090401-1. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Notice, the Memorandum, and subsequent termination of CEO's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind Commerce's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

### (5) Relief Requested

CEO seeks rescission of the termination of this award; reinstatement of the Assistance Amendment 5H-84090401-1 for the originally awarded amount, scope of work, and performance period; reinstatement of the notice to proceed; and the full and immediate reinstatement of the $155,429,817.43[25] that was available in CEO's ASAP account as of August 6, 2025 (the day before the Termination Notice).

Until our dispute with EPA has been resolved, we will also object to any claims of noncompliance under 2 C.F.R. § 200.344(i).

---

[23] U.S. Const. amend. X.
[24] *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 580 (2012).
[25] This dollar amount represents the cumulative authorized amount of the EPA Award $155,720,000 minus funds drawn down by CEO for authorized work prior to the August 7, 2025 termination notice.



We would be happy to answer any questions you may have about this letter or our program. The program manager, Ida Mae Isaac, can be contacted at 720-258-6389 and idamae.isaac@state.co.us.

Very truly yours,

Gregg Hefner
Director of Finance & Operations
Colorado Energy Office
1600 Broadway St., Suite 1960
Denver, CO 80202
gregg.hefner@state.co.us

CC:
Devon Brown, EPA Award Official
Melissa Hopkinson, EPA Project Officer
Matthew Forte, EPA Grant Specialist

# EXHIBIT 6

Case 2:25-cv-02015-TMC   Document 68-1   Filed 11/14/25   Page 90 of 98



**STATE OF COLORADO**

Isaac - CEO, Ida Mae <idamae.isaac@state.co.us>

---

## Solar for All Grant Closeout Instructions

**SFA** <SFA@epa.gov>
To: SFA <SFA@epa.gov>

Wed, Oct 1, 2025 at 2:21 PM

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

### Final Federal Financial Report (SF-425)

**Submission Instructions**:

- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:

- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.
  - If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.

- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

<u>Final Technical Report</u>

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance <u>during the entire performance period</u> (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - Progress towards objectives on program key performance metrics during the performance period.
  - Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:

- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)

- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,

Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 7



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

October 28, 2025

**MEMORANDUM**

**SUBJECT:**   Update on Dispute of EPA Assistance Agreement 5H-84090401 under 2 CFR 200.340

**FROM:**   Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**   Gregg Hefner, Director of Finance & Operations
Colorado Energy Office

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84090401. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 25, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.28
16:43:43 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# EXHIBIT 8



**COLORADO**
Energy Office

From: Gregg Hefner
Director of Finance & Operations
Colorado Energy Office
1600 Broadway St., Suite 1960
Denver, CO 80202
gregg.hefner@state.co.us

To: Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC  20460

CC: Michael Molina

Date: November 4, 2025

Re:    Objection to Closeout of EPA Assistance Agreement 5H-84090401-1

Dear Mr. Brown:

On September 5, 2025, I submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 5H-84090401-1 pursuant to 2 C.F.R. § 1500.15.  Despite that timely dispute, on October 1, 2025, I received email correspondence from  SFA@epa.gov  containing "Solar for All Grant Closeout Instructions" and demanding that the Colorado Energy Office (CEO) complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." On October 28, 2025, I received EPA's letter purporting to declare moot CEO's "dispute regarding the termination of Assistance Agreement 5H-84090401-1." The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that CEO close out Assistance Agreement 5H-84090401-1.





**COLORADO**
Energy Office

As an initial matter, clarification is needed because EPA's October 28, 2025 letter references "your dispute . . . submitted on August 25, 2025." But CEO did not submit its Part 1500 dispute on August 25, 2025. Rather, August 25, 2025 is the date that CEO submitted its 21-day Notice of Disagreement in accordance with EPA's August 7, 2025 Assistance Amendment. Thus, it is unclear which of CEO's disputes "EPA has rendered" moot.   CEO disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending.  EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation. At a minimum, EPA should stay the administrative dispute until the conclusion of Colorado's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of Colorado's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, Colorado has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require CEO to close out while litigation is pending that directly concerns EPA's termination of this grant.  *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed."  CEO has complied—and continues to comply—with the terms and conditions of the Solar for All program.  EPA unilaterally terminated these grants and illegally deobligated $144,549,730.21 from CEO's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire.  As a result of EPA's unlawful actions, CEO has not been able to complete the work required under Assistance Agreement 5H-84090401-1.  Accordingly, EPA necessarily cannot "determine[] that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

1600 Broadway, Suite 1960, Denver, CO 80202
P: 303.866.2100   F: 303.866.2930
energyoffice.colorado.gov





**COLORADO**
**Energy Office**

CEO does <u>not</u> agree to close out Assistance Agreement 5H-84090401-1 while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)-(c).

Please confirm receipt of this correspondence no later than 5:00pm on November 6, 2025.

Gregg Hefner

Senior Director, Finance & Operations

1600 Broadway, Suite 1960, Denver, CO 80202
P: 303.866.2100   F: 303.866.2930
energyoffice.colorado.gov