# EXHIBIT 1

5H - 84090001 - 0     Page 1

| | | GRANT NUMBER (FAIN): 84090001 | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Grant Agreement | | MODIFICATION NUMBER:     0 PROGRAM CODE:     5H | **DATE OF AWARD** 07/09/2024 |
| | | **TYPE OF ACTION** New | **MAILING DATE** 07/12/2024 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** 10109 |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| DEPT OF ENERGY & ENVIRONMENTAL PROTECTION 79 ELM STREET HARTFORD, CT 06106-5127 EIN:  86-1154163 | DEPT OF ENERGY & ENVIRONMENTAL PROTECTION 79 ELM STREET HARTFORD, CT 06106-5127 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Claire Sickinger 10 Franklin Square New Britain, CT 06051 **Email:** claire.sickinger@ct.gov **Phone:** 860-827-2618 | Nicholas Bradford 1201 Constitution Ave NW, 1101R Washington, DC 20004 **Email:**  bradford.nicholas@epa.gov **Phone:** 202-566-0813 | Caitlyn Chandler OGD-GMBOD, 3903R 1200 Pennsylvania Ave NW Washington, DC 20460 **Email:**  Chandler.Caitlyn@epa.gov **Phone:** 202-564-0592 |

**PROJECT TITLE AND DESCRIPTION**

Project SunBridge: Connecting Communities to a Solar Future - "Note: A special payment condition applies to this award."

See Attachment 1 for project description.

| **BUDGET PERIOD** 09/01/2024 - 08/31/2029 | **PROJECT PERIOD** 09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST** $ 0.00 | **TOTAL PROJECT PERIOD COST** $ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 62,450,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA - Office of the Administrator 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** Barbara Proctor - Associate Award Official | **DATE** 07/09/2024 |

5H - 84090001 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 62,050,000 | $ 62,050,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 62,450,000 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41049 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 62,050,000 |
| | | | | | | | | | $ 62,050,000 |

5H - 84090001 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 62,450,000 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed <u>prior</u> to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

## Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. Programmatic Terms and Conditions

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

## 1. Performance Reports

### *Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

### _Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

## 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

### 1. Leveraging
The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*__The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:__*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

<u>Disposition</u>

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

## A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during

the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements.* The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

### 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on

behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

### B. Davis-Bacon and Related Acts

[Davis-Bacon and Related Acts (DBRA)](#) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

    **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

    **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

    **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

    **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

<u>2. Mega Construction Project Program</u>

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

<u>3. Compliance with Federal Statutes and Regulations</u>

The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Health and Safety Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

### 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its

financial risk management policies and procedures.\

<u>3. Additional Requirements</u>

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

<u>National Historic Preservation Act (NHPA)</u>

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made

available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Claire Sickinger (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao. gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry

out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards  unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to

execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

## B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a

personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

<u>3. Legal Counsel</u>

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

5H - 84090001 - 1    Page 1

| | | GRANT NUMBER (FAIN): | 84090001 | |
|---|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | | MODIFICATION NUMBER: | 1 | **DATE OF AWARD** 12/11/2024 |
| | | PROGRAM CODE: | 5H | |
| | | **TYPE OF ACTION** No Cost Amendment | | **MAILING DATE** 12/11/2024 |
| | | **PAYMENT METHOD:** ASAP | | **ACH#** 10109 |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| RECIPIENT: | PAYEE: |
|---|---|
| DEPT OF ENERGY & ENVIRONMENTAL PROTECTION 79 ELM STREET HARTFORD, CT 06106-5127 EIN:  86-1154163 | DEPT OF ENERGY & ENVIRONMENTAL PROTECTION 79 ELM STREET HARTFORD, CT 06106-5127 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Claire Sickinger 10 Franklin Square New Britain, CT 06051 **Email:** claire.sickinger@ct.gov **Phone:** 860-827-2618 | Cynthia Gonzales 1201 Constitution Ave NW, 1101R Washington, DC 20004 **Email:** Gonzales.Cynthia@EPA.GOV **Phone:** 720-429-4080 | Caitlyn Chandler OGD-GMBOD, 3903R 1200 Pennsylvania Ave NW Washington, DC 20460 **Email:** Chandler.Caitlyn@epa.gov **Phone:** 202-564-0592 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Project SunBridge: Connecting Communities to a Solar Future

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD 09/01/2024 - 08/31/2029 | PROJECT PERIOD 09/01/2024 - 08/31/2029 | TOTAL BUDGET PERIOD COST $ 62,450,000.00 | TOTAL PROJECT PERIOD COST $ 62,450,000.00 |
|---|---|---|---|

# NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share <u>100.00%</u> of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Barbara Proctor - Associate Award Official | **DATE** 12/11/2024 |

5H - 84090001 - 1     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328) <br> Clean Air Act: Sec. 134(a)(1) <br> National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84090001 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 442,067 |
| 2. Fringe Benefits | $ 399,938 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 61,450,000 |
| 9. Total Direct Charges | $ 62,292,005 |
| 10. Indirect Costs: 35.74 % Base MTDC | $ 157,995 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 37,500,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

## Administrative Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/032024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

  a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

  b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

  c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

  d. Being funded by public or charitable contributions; and

  e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa. gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

    1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

    2. Privately-owned commercial buildings when they meet the "public function" test;

    3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

EXHIBIT 3

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Project SunBridge: Connecting Communities to a Solar Future Work Plan**

**Project Title: Project SunBridge: Connecting Communities to a Solar Future**
**Project Period:  Start:  9/1/2024; End: 8/31/2029**
**Date of submittal: 10/17/2024**
**Grant Number: 5H-84090001**
**Organization Name: Connecticut Department of Energy and Environmental Protection (DEEP)**
**Geography: State of Connecticut**
**Deadline for revised workplan and budget after the 1-year planning period:** 8/31/25
**Definition of LIDAC:**   Project SunBridge defines "low-income and disadvantaged community" as it is defined by the Environmental Protection Agency's (EPA's) Notice of Funding Opportunity (NOFO) for Solar for All (EPA-R-HQ-SFA-23-01), as amended by any subsequent terms and conditions or updates from EPA:

- CEJST-Identified Disadvantaged Communities: All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.
- EJScreen-Identified Disadvantaged Communities: All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.
- Geographically Dispersed Low-Income Households: Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development. Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using the U.S. Department of Housing Development's Family Size Adjustment factor.
- Properties Providing Affordable Housing: Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment

1

Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or (4) a housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

Based on the federal LIDAC definition included above, the Connecticut Consortium has identified the top ten urban and top five rural communities with the highest number of LIDAC households in Connecticut; see Appendix A for the list. The Connecticut Consortium developed separate lists of urban and rural communities based on the Connecticut Office of Rural Health's rural towns definition.  To conduct this analysis, the Connecticut Consortium integrated multiple federal and state datasets, including the EJScreen, CEJST, and American Community Survey demographic and housing data (2022) to identify and map eligible census block groups. Additionally, the Connecticut Consortium applied available participation data in the Supplemental Nutrition Assistance Program to serve as a proxy for geographically dispersed low-income households eligible as a LIDAC based on household income. The analysis then aggregated the number of LIDAC households by block group to the municipal level to develop the top 10 urban and top 5 rural communities list.  The analysis therefore captures both geographically disadvantaged communities as well as individual eligible low-income households across Connecticut, while avoiding double-counting and providing appropriate consideration to both urban and rural areas of the state.

While the Connecticut Consortium may ultimately reference the towns with the highest number of LIDAC households to prioritize financial and/or technical assistance, all LIDAC households that meet the Solar for All definition are eligible to participate in Project SunBridge and the Connecticut Consortium is not limiting the deployment of financial and/or technical assistance to these municipalities.

**Introduction**

**Section 1:  Project Description**

**1.1 Overview**

Project SunBridge aims to reach low income and disadvantaged community (LIDAC) households across the state of Connecticut, with a priority focus on affordable housing units, to allow for greater access to residential solar and community solar, increased resilience and grid benefits, community ownership models, and investments in quality jobs and businesses. The program has the potential to reach more than 7,400 households, saving Connecticut residents nearly $78 million over the lifetime of the projects and avoiding more than 14,702 short tons of $CO_2$ emissions annually. Connecticut residents will benefit from financial assistance with increased incentives, more accessible loans and leases, and low-cost capital for solar and storage, as well as technical assistance for clean energy workforce development and community engagement. This blend of financial and technical assistance will create a sustainable funding stream for LIDAC households to participate in the green economy that will last beyond the Solar for All funding years, attract private investment into LIDACs, and drive market transformation.

The funding to implement Project SunBridge is managed by the Connecticut Consortium, which includes the Connecticut Department of Energy and Environmental Protection (DEEP) as the

Recipient, the Connecticut Green Bank (Green Bank) and Connecticut Housing Finance Authority (CHFA) as Subrecipients, the Connecticut Public Utilities Regulatory Authority (PURA), Connecticut Department of Housing (DOH), and Connecticut Department of Economic and Community Development (DECD) as supporting partners, and other Subawardees to be identified through competitive solicitations.

## 1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Environmental Results - Outputs and Outcomes:**

The Connecticut Consortium expects to achieve the following outcomes through Project SunBridge. These outcomes will be new and additional on top of existing projected deployment levels across the state because of Solar for All funding.

| Outcomes | Total | $ of Funding per Outcome |
|---|---|---|
| Number of new Projected Households Reached | 7,400 households | $8,439 per household |
| MW of new Projected Solar Capacity Deployed | 27 MW | $2,312,962 per MW |
| MWh of new Projected Storage Capacity Deployed | 6.5 MWh | $9,607,692 per MWh |
| Projected Short Tons of new Annual CO2 Emissions Avoided | 14,702 short tons | $4,248 per short ton |
| Projected new Total Household Savings | $76,220,000 | $0.82 per $1 |
| Workforce development | | *As identified in the workforce needs assessment during the implementation period* |

The Connecticut Consortium intends to track which distributed solar and storage projects use financial assistance using Solar for All funding to ensure there will be no double counting of outputs or outcomes if other federal funding is leveraged for the same project. If a project uses multiple federal funding sources, the Connecticut Consortium will assign the outputs or outcomes to the relevant program's metrics reporting on a pro rata basis.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

## Section 2:  Project Design Plan

## 2.1 Activities to be Conducted

Project SunBridge will deliver meaningful benefits to LIDACs in Connecticut, including greater access to solar, increased resilience and grid benefits, and investments in quality jobs and businesses.

To amplify the impact of Solar for All funding, Project SunBridge will leverage, but not duplicate, existing state-run programs that support solar and storage adoption.

- Residential Renewable Energy Solutions (RRES): This statewide program provides incentives through either (a) "buy all" tariff, or (b) monthly netting tariff. However, the upfront cost of purchasing solar to participate in RRES is a significant barrier to reaching LIDAC customers. Therefore, Project SunBridge will offer loan and lease products financed on the basis of these incentive streams for single- and multi-family buildings to address the barrier of upfront cost.

- Energy Storage Solutions (ESS): This program provides both upfront and performance incentives for behind-the-meter storage deployment for residential and non-residential customers. However, the upfront cost of purchasing storage to participate in ESS is a significant barrier to reaching LIDAC customers, especially for solar + storage systems. Therefore, Project SunBridge will offer supplemental incentives to storage that is co-installed with solar to address the barrier of upfront cost.

Connecticut also offers several other programs that provide funding for activities such as energy audits, energy efficiency upgrades, and weatherization. Project SunBridge customers will be encouraged to participate in all relevant state-funded programs.

Project SunBridge will also seek to maximize federal benefits such as the Inflation Reduction Act (IRA) Investment Tax Credit (ITC) benefits to participants such as the Energy Community Tax Credit and Low-Income Communities Bonus Credit. Such federal benefits would either be blended into the financial assistance offerings or participants would be educated about the availability of such benefits through their participation in Project SunBridge.

During the first year of the implementation period, the Connecticut Consortium will investigate the viability of leveraging the ITC adders in creative ways, including but not limited to, establishing a SunBridge Community Fund (Fund). Such a Fund could be administered as an endowment to provide grants in perpetuity to LIDACs to achieve their community benefit plans.

**Meaningful Benefit Plan**

<u>Minimum Household Savings</u>
The average residential Connecticut household pays more than $2,500 in annual electricity bills. Correspondingly, 20% household savings per year is $515 for the average household in Connecticut – or an equivalent reduction in electricity price of approximately $0.06/kWh. This initial estimate was calculated by taking the average 2024 electric utility rate for residential customers across Connecticut's two electric distribution companies, Eversource Energy and The United Illuminating Company, and assuming the average residential customer uses 700 kWh of energy per month. Over the course of the project period, the Connecticut Consortium will continue to refine the household savings calculation based on additional data inputs, such as usage data from eligible customers receiving the low-income discount rate. The Connecticut Consortium will also establish protocols to check to ensure savings through the program.

Project SunBridge will provide additional financial assistance to enable LIDAC households to participate in the current RRES program. These households would not be able to participate in RRES, absent new financial assistance provided by Solar for All funding. The RRES program annually sets an administrative price for energy and Renewable Energy Certificates for residential solar systems based on the cost of deploying the solar in the state plus a reasonable rate of return for

4

the developer to allow for household savings to be retained by the homeowner. The RRES program has requirements in place to ensure participants receive a 9-11% return for customers after the costs of installing the system are accounted for, resulting in savings of $0.03-$0.04/kWh. When you add on the low-income adder of $0.055/kWh or distressed municipality adder of $0.0275/kWh, this results in savings of $0.06-$0.09/kWh, greater than the 20% household savings per year. The Connecticut Consortium will monitor any changes to the RRES incentive each year and will adjust the financial incentives offered through Project SunBridge if the RRES incentive decreases and no longer provides savings of at least $515 per year.

Household savings will be delivered through the following mechanisms:

- **Single-Family Residential Solar** – As of January 2024, the current RRES program provides a base "buy-all" tariff incentive of $0.3189/kWh, with a $0.055/kWh adder for low-income households, defined as households at or below 60% of state median income, or a $0.0275/kWh adder for households located in distressed municipalities as defined by the Connecticut Department of Economic and Community Development. Therefore, the average annual household savings for low-income single-family projects under the RRES program typically meets the Solar for All 20% requirement, with participating customers typically retaining a financial benefit ranging from approximately $0.0637/kWh - $0.0748/kWh, resulting in approximately $535-$628 in annual savings. PURA conducts an annual review of the RRES program to assess the incentive level for the year, among other program design considerations. The Connecticut Consortium will review any changes to the incentive level to evaluate the impact to Project SunBridge offerings.

- **Affordable Multi-Family Housing Community Solar** –The RRES program allows participation only through the "buy all" tariff for individually metered and master-metered affordable multifamily housing properties based upon a methodology jointly developed by members of the Connecticut Consortium, the electric utilities, the U.S. Department of Housing and Urban Development (HUD) and other key stakeholders. Based on an EPA presentation on potential household savings methodologies during a webinar in October 2024 (household savings webinar), the Connecticut Consortium refined its methodology to calculate savings for multifamily tenants for a multifamily building.

  Beginning on August 1, 2024, master-metered affordable multifamily housing properties, where tenants do not have an individual electric bill, are able to receive the buy-all tariff under RRES, provided that the 20% financial benefit requirement can be met through qualified building upgrades that must be at least 25% of the net present value of the RRES incentive over its 20-year term. RRES multifamily housing property owner participants must provide documentation of planned building upgrades that are additional to any scope of work for other construction projects at the building. Eligible building upgrades under the RRES program include: (1) energy efficiency measures; (2) energy storage; (3) broadband internet access; (4) energy efficiency barrier remediation; (5) operational reserve; (6) electric vehicle charging stations; (7) balanced ventilation systems; (8) greenspaces and community amenities; (9) onsite mental health and supportive services or residential service coordinator; (10) security enhancements; and (11) bill credits on electric bills that are delivered by landlords. During the household savings webinar, EPA confirmed that non-utility benefits are allowable for participating multifamily housing sites. Therefore, for any master-metered affordable multifamily housing properties, Project SunBridge will meet the Solar for All 20% requirement by dividing the value of qualified building upgrades authorized in RRES

5

by the number of tenants. The Connecticut Consortium will review any changes to these RRES program requirements to evaluate the impact to Project SunBridge offerings.

Beginning in January 2023, individually metered affordable multifamily housing properties may participate in the RRES program provided that such housing distributes at least 20% of the financial benefit of the RRES tariff evenly across tenants. Depending on the number of units and the system size of the solar installation at a given project site, which is determined by the historical load and available roof space, it is possible that 20% bill savings may not be achieved for each individual tenant. During the household savings webinar, EPA indicated that 20% of the total energy consumption across a multifamily building would be an acceptable approach to achieving the 20% savings requirement.

In summary, single-family and multifamily projects supported by Project SunBridge will meet the required 20% savings through varying approaches. Single-family participants will meet 20% household savings as the existing state RRES program, and its additional incentives for low-income participants, has been designed to meet this target. For master-metered affordable multifamily housing properties, 20% savings will be achieved through a combination of financial and non-utility benefits by conducting one or more eligible building upgrades that the U.S. HUD and other key stakeholders recommended to PURA as part of an RRES program review proceeding. For individually metered affordably multifamily properties, 20% savings will be achieved for the project site, at a minimum, again as required by the existing RRES program, with an aim to maximize the financial benefit to individual tenants.

PURA's November 2022 and July 2024 decisions that enabling individually metered and master-metered affordable multifamily housing properties to participate in the RRES program through the "buy all" tariff is the result of a multi-year stakeholder engagement process led by a working group comprised of members of the Connecticut Consortium, and other key stakeholder groups. The multi-family housing working group examined a range of topics prior to making recommendations to PURA, including measures to maintain housing affordability following solar installations and supporting building upgrades. The RRES program requires participating naturally occurring affordable housing properties that are not subsidized to ensure tenant protections for a period of ten years. Further, building owners of unsubsidized affordable housing must provide the following documentation in their RRES application: (1) an attestation that for households at or below 80% of AMI, the rents following building upgrades will be at or below 30% of income equal to or less than 80% AMI; (2) a lease addendum stating there will be no lapse of time evictions; and (3) incorporation of tenant lease agreement language that states the property owner agrees not to raise the rent of a unit because of the increased value of the unit due solely to infrastructure improvements provided by the RRES program. The working group also confirmed that subsidized master-metered affordable multifamily housing properties already have tenant protections embedded in their agreements, which range from 10 to 40 years depending on the type of assistance. As a result, the existing tenant protection requirements through the RRES program address housing affordability considerations for master-metered affordable multifamily housing properties.

Household Savings Data: Tracking, Reporting, Verification, Auditing, and Evaluation

The Connecticut Consortium will build out the platform(s), such as Salesforce, currently used for data compilation and reporting in existing programs and evaluate the need for other platform(s) or methodologies to ensure sufficient verification, auditing, and evaluation of savings data to meet EPA's reporting requirements.

Equitable Access to Solar

Funding deployed through Project SunBridge will be available to all customers who qualify as a LIDAC (see definition above) that are eligible to participate in the Connecticut RRES and ESS programs.

The Connecticut Consortium will use best practices and community engagement strategies to develop the technical assistance programs supporting workforce development and community outreach and increase access to residential solar and associated storage in LIDACs. The technical assistance deployment within the categories defined in the workplan will be informed by engagement and outreach to LIDAC communities throughout the implementation period.

Energy Resilience and Grid Benefits

Project SunBridge will seek to support customers to co-install storage with solar that is also being funded through Solar for All, as discussed in more detail below, to increase resilience, especially for those families that rely on Home Monitoring Devices (HMD). Energy storage systems will enable LIDAC households to have power during a grid outage.

Household and Community Ownership

Project SunBridge is committed to maximizing household and community ownership models and supporting equity-building for LIDACs. Determining how to support appropriate ownership models will be dependent on property type (e.g. single- vs. multifamily building).

Project SunBridge will advance two different models for affordable multifamily housing properties – a loan and a lease option. While this primarily affords ownership options to the multi-family property owners, Project SunBridge will structure the program to maximize benefits to tenants and residents, while also limiting risk to communities when ownership is offered. The Connecticut Consortium will conduct outreach to single family and multi-family households throughout the implementation period as it deploys funds to identify customer interest in ownership models, such as lease-to-own models. Based on customer interest, the Connecticut Consortium will also assess risks to communities before offering ownership pathways and communicate those risks to communities and individuals interested in owning solar. If it is feasible to implement solar ownership model(s), the Connecticut Consortium will also create a plan for reducing risks of solar ownership for LIDAC customers.

Low-Income and Disadvantaged Community Jobs

Funds deployed through Project SunBridge will invest in developing high-quality jobs and businesses in LIDACs and work to ensure graduates from any workforce programs funded through Solar for All graduate to high-quality jobs. As part of Connecticut's GreenerGov efforts, the Connecticut Technical High Schools are deploying 5.2 MW of solar PV. Project SunBridge will seek out opportunities to provide students with apprenticeship opportunities to learn and earn their credentials with the prospect of full employment.

Project SunBridge will leverage the network of the Office of Workforce Strategy's (OWS) CareerConneCT initiative in conducting outreach to the clean energy workforce needed to support Project SunBridge and seek feedback on the best use of technical assistance funding.

Project SunBridge will provide funding to the state's OWS to conduct a workforce needs assessment and identify gaps in the current distributed solar and storage workforce. Based on the results of the needs assessment, Project SunBridge will develop a workforce development plan during the implementation period and provide technical assistance to support workforce development initiatives based on the results of this needs assessment, which may include but is not limited to support for job training and technical schools. Technical assistance funding for workforce development will aim to deliver to low-income and disadvantaged communities where distributed solar and storage is being deployed.

## Financial Assistance Strategy

Financial Assistance Initiatives

The Connecticut Consortium intends to provide financial assistance to approximately 7,400 LIDAC households through the following five measures. Approximately 77% of the Solar for All funding will be used for financial assistance measures. These measures were selected to complement existing programs (both state and federal), enabling customers to adopt solar that otherwise could not do so, ensure funding sustainability to maintain solar deployment momentum beyond the five program implementation years, and maximize the number of households benefiting from Solar for All funds. All community solar funded under this program will consist of onsite solar on affordable multifamily housing properties, which conform to the EPA's definition of residential serving community solar. Specifically, projects will have a nameplate capacity of 5 MW ac or less, deliver at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and verify that at least 50% of the benefits and/or credits of the power generated from a community solar system be delivered to residential customers in the same service territory. All storage funded under this program will be paired with solar that is also funded through this program.

The financial assistance measures outlined below will be further developed with input from stakeholders. The financial assistance initiatives outlined in 2-5 below for single-family and affordable multifamily housing projects in LIDACs provide for the opportunity to generate program income through lease and loan financing offerings. Single-family and affordable multifamily housing projects will receive the RRES tariff value through the state's existing incentive program. Program income generated through financing provided by Project SunBridge will be tracked and expended to support additional solar and solar plus storage projects in affordable multifamily housing and single-family properties, thereby leveraging the original federal funding. See Section 6.1, Budget Narrative, for more details on program income. The Connecticut Consortium does not anticipate that Project SunBridge funds will be provided directly to single-family households, and therefore there are no expected tax impacts as a result in tax liability considerations.

In addition, for financial measures 2-4 discussed below, no more than 20 percent of the financial assistance funding will be reserved for upgrades required to enable solar deployment using Solar for All funding. Enabling upgrades are as defined by the Solar for All NOFO, including but not limited to roof repairs/replacements and electric panel upgrades in furtherance of solar and/or storage deployment funded by Solar for All. Project SunBridge will ensure any enabling upgrades funded by Solar for All are necessary to deploy or maximize the benefits of a residential rooftop or multi-family community solar project that is also being funded by Solar for All. The Connecticut Consortium will ensure enabling upgrades funded by Solar for All are (1) an investment in energy or building infrastructure, and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar

project. Enabling upgrades funding will be provided as a grant or applied against a loan principal to single-family and multi-family properties. The Connecticut Consortium allocates up to $6 million in financial assistance for enabling upgrades across all multifamily project sites and up to $1.5 million in financial assistance for enabling upgrades across all single-family sites (i.e., 20 percent of multifamily and single-family financial assistance measures, respectively). During the first year of the implementation period, the Connecticut Consortium will further refine the enabling upgrades allocation methodology in a manner that does not result in a tax liability for program beneficiaries.

Lastly, the financial assistance measures led by the Green Bank incorporate quality assurance and asset management protections. In addition to project financing, the Green Bank's Solar Marketplace Assistance Program (MAP) provides no-cost technical support and project development support for affordable multifamily housing properties to navigate RRES program participation. The Green Bank retains third party technical and engineering services to assist with Solar MAP program implementation.

Through the Solar MAP lease offering for affordable multifamily housing properties, the Green Bank conducts the solicitation process for engineering, procurement and construction services on a portfolio basis for participating project sites to obtain competitive project pricing. As part of the solicitation process, the Green Bank identifies acceptable product manufacturers for major system components through an approved vendor list. In addition, contractors must develop a fully engineered system signed and sealed by a Connecticut-registered professional engineer that complies with all applicable regulations, codes, and requirements. This includes, but is not limited to, building, electrical and fire codes, zoning regulations, utility interconnection requirements, as well as industry best practices. In addition, the Green Bank includes contractor qualifications and prior experience as criteria in its bid evaluation framework. Once a contractor is selected, the Green Bank manages all steps to develop, construct and energize the project. The Green Bank requires a data acquisition system to be installed at the project in addition to the utility owned production meter that enables the Green Bank to conduct remote performance monitoring of the system's power and energy production. Warranties for major equipment, including solar modules, inverters, and racking are also required. As the asset owner of the leased systems, the Green Bank contracts for operations and maintenance services, thereby removing the risk of non-performance of the system for affordable multifamily housing property owners.

Affordable multifamily housing property owners may alternatively choose a loan option through the Solar MAP program. Under the loan offering, the Green Bank provides technical assistance to the property owners to select a contractor to develop the project. The loan agreement requires that the property owner retain contracted operations and maintenance services for the system.

While Project SunBridge intends to focus on the five financial assistance measures listed below, the Connecticut Consortium will continually assess whether these measures are achieving the desired goals and may reprioritize funding to better align with Solar for All funding goals based on program data and stakeholder feedback.

1. Increased Incentives for Residential Solar + Storage through Existing Programs - $5.55 million

Project SunBridge will provide an increased upfront incentive for storage systems co-installed with solar funded by Solar for All. Any storage deployed will be in conjunction with an eligible residential rooftop solar multi-family community solar project, thereby aligning with the Solar for All eligible zero-emissions technology definition. This product will increase the benefits of installing storage for resilience, which will increase energy storage adoption. The incentive offered

under this program will be incorporated into a financing package offered through other Solar for All financial assistance offerings as detailed below. The upfront incentive will be structured so that adoption of associated storage is cost-neutral to a solar project.

**Purpose**: to support the co-installation of storage with solar funded by Solar for All
**Product**: subaward
**Financial Product**: grant
**Transaction Counterparty**: Green Bank
**Program Beneficiary**: single family and multi-family residential properties
**Estimated Size per Transaction**: estimated up to $400/kWh upfront incentive
**Types of Products Financed**: energy storage systems co-installed with residential solar

2. Expand Access for Single Family Households - $7.5 million

Project SunBridge will support single family households to adopt solar through loan and/or lease options. Project SunBridge will leverage an ecosystem of local lenders (e.g., credit unions, community development financial institutions, community banks) that participate in the green economy by providing loans and or/leases for homeowners interested in installing residential solar, associated storage, and/or enabling upgrade projects. This product will allow more single-family households to adopt solar. During the first year of the implementation period, the Connecticut Consortium will launch a single-family loan and/or lease offering depending on market feedback. The Connecticut Consortium will determine customer eligibility for this offering that aligns with the federal LIDAC definition and determine other program design components, including whether there will be interest, whether any loan offering will be forgivable, and the payback period.

**Purpose**: to provide support for single family households to adopt solar through loan and/or lease options
**Product**: subaward
**Financial Product**: loan and/or lease product for solar, and loan, lease, or grant for enabling upgrades
**Transaction Counterparty**: Green Bank
**Program Beneficiary**: single family residential properties
**Estimated Size per Transaction**: Estimated average of $30,000 per project (8.8 kW)
**Types of Products Financed**: residential solar and associated enabling upgrades

3. Affordable Multifamily Housing Solar and Storage Revolving Loan Funds - $10 million

The Connecticut Green Bank and Connecticut Housing Finance Authority (CHFA) will partner to offer loans to affordable multi-family properties for solar, associated battery storage, and enabling upgrade projects. Connecticut's solar PV incentive structure allows affordable multifamily properties, inclusive of the CHFA portfolio, to participate in the RRES program thus allowing projects to take advantage of the higher tariff offering compared to the state's commercial solar PV incentive program. This product will allow more affordable multifamily housing to adopt solar.

- For CHFA properties: When properties are going through CHFA traditional financing process for either new construction/repositioning or recapitalization, CHFA will use the new funds to provide incremental low-cost funding through a revolving loan mechanism so a larger universe of housing stock can feasibly support investment in solar PV and battery storage for resiliency.

- For non-CHFA properties: The Connecticut Green Bank will expand its existing multifamily solar and storage loan program to offer low-cost loans to properties who seek financing for a project.  As part of the low-cost loan agreement, the Green Bank will require that the borrower/project owner obtain an operations and maintenance contract that covers the term of the loan.

**Purpose**: to provide loans to affordable multi-family properties for solar, associated battery storage, and enabling upgrade projects
**Product**: subaward
**Financial Product**: revolving loan product for solar and co-located storage, and loan or lease for enabling upgrades
**Transaction Counterparty**: Green Bank and CHFA
**Program Beneficiary**: multi-family affordable residential properties
**Estimated Size per Transaction**: Estimated average of $600,000 per project (200 kW) for Green Bank projects, up to $1 million for CHFA projects (or higher if need is demonstrated to CHFA)
**Types of Products Financed**: residential solar, co-installed energy storage, and associated enabling upgrades

4. Multi-Family Affordable Housing Solar + Storage Lease or Power Purchase Agreement - $20 million

For affordable multi-family housing properties that prefer to lease onsite solar (and storage), the Green Bank will support the expansion of an existing Green Bank solar lease product. This lease will primarily cover on-site solar, either rooftop, ground mount or canopy, and storage for affordable multi-family housing properties that meet the EPA eligibility criteria. The lease will also include operations and maintenance for the term of the contract. The Solar for All funding will be utilized to reduce the cost of capital for the Green Bank in providing these leases. As a result, this product will allow more affordable multifamily housing to adopt solar.

**Purpose**: to provide leases to affordable multi-family properties for solar, associated battery storage, and enabling upgrade projects
**Product**: subaward
**Financial Product**: lease product for solar and co-located storage, and loan or lease for enabling upgrades
**Transaction Counterparty**: Green Bank
**Program Beneficiary**: multi-family affordable residential properties
**Estimated Size per Transaction**: Estimated average of $600,000 per project (200 kW)
**Types of Products Financed**: residential solar, co-installed energy storage, and associated enabling upgrades

5. Funding for Capital Solutions - $5 million

The Green Bank Capital Solutions program is an open solicitation for technologies that have already proven to be commercially viable. This existing tool will allow the Connecticut Consortium to recruit project developers or third-party owners interested in financing residential solar, associated storage, enabling upgrades, and/or community solar projects in alignment with the zero-emission technologies definition through access to low-cost and long-term debt benefiting low-income and disadvantaged communities.  Through its Capital Solutions program, the Green Bank can offer a range of financing arrangements and capital support dependent upon the identified needs, including: (1) senior and subordinate loans (e.g., bridge, construction, term, and working

11

capital loans); (2) loan loss reserves; (3) loan guarantees; (4) other forms of credit enhancement; (5) participation in other lender's loans; and (6) equity. The Green Bank has an established evaluation framework to review proposals received through the Capital Solutions program based on the following criteria: (1) Meeting Green Bank goals; (2) Green Bank essentiality (i.e., to what extent is participation by the Green Bank essential to the success of the project?); (3) Project feasibility; (4) Project replicability; (5) Project timetable; (6) Relevant experience; (7) References; and (8) Any pending litigation. The Green Bank's current ongoing Capital Solutions Request for Proposals (RFP) for clean energy and environmental infrastructure investment is included in Appendix B for reference.

During the implementation period, Connecticut Consortium will review the market landscape and identify any gaps in the residential and residential-serving community solar project market. Based on this assessment, the Green Bank will work with the Connecticut Consortium to refine its Capital Solutions RFP to be tailored to identify additional solution(s) to enable single-family and/or multifamily households in LIDACs to meaningfully benefit from onsite solar installations. The Connecticut Consortium will also identify any necessary modifications to the evaluation framework outlined above to meet Project SunBridge's stated outputs and outcomes and ensure alignment with the Solar for All terms and conditions. Ultimately, tailoring the Green Bank's Capital Solutions solicitation tool will ultimately allow more affordable single-family and/or multifamily housing to adopt solar.

**Purpose**: to provide an open solicitation for third party providers to deliver on Solar for All initiatives identified as barriers
**Product**: subaward
**Financial Product**: grant, lease or loan product for solar and co-located storage and enabling upgrades
**Transaction Counterparty**: Green Bank
**Program Beneficiary**: single family or multi-family affordable residential properties
**Estimated Size per Transaction**: Up to $5 million
**Types of Products Financed**: residential solar, co-installed energy storage, and associated enabling upgrades

Program Longevity and Market Transformation
The five financial assistance measures above were identified because of their potential to have a long-term positive impact on the market for solar PV in LIDACs. The financing issued through this program will create a sustainable funding source to support LIDACs in perpetuity to access financing to support solar adoption.

Additionally, the Connecticut Consortium anticipates that the workforce development compliance requirements will have an impact in the solar industry that long outlasts the funding period for Solar for All.

Finally, Project SunBridge will incorporate operations and maintenance requirements for assets funded in its financial assistance offerings, as outlined above. At the end of the Green Bank's Solar MAP lease term, the Green Bank will assume responsibility for the systems. In August 2024, members of the Connecticut Consortium and other stakeholders presented a report to PURA from a working group on solar and battery end of life considerations in Connecticut. The Connecticut Consortium will continue to monitor ongoing discussions statewide regarding end of life plans for solar and storage assets and incorporate any applicable solutions into Project SunBridge's financial assistance offerings, as applicable.

**Project-Deployment Technical Assistance Strategy**

Project-Deployment Technical Assistance Strategy

Project SunBridge includes four categories of technical assistance that will help identify and remove barriers for LIDAC households to access distributed solar and/or storage. Approximately 21% of the Solar for All funding will be used for technical assistance measures. Project SunBridge will leverage existing tools and support in building out the technical assistance. After receiving the Solar for All award, the Connecticut Consortium conducted stakeholder engagement on how to use the technical assistance funding, which helped inform this workplan. The Connecticut Consortium will continue to leverage this network of stakeholders, including but not limited to solar developers, disadvantaged communities, municipalities, community-based organizations, and other interested stakeholders, during the implementation period and make adjustments to the program offerings as needed.

DEEP is in the process of developing a Connecticut Clean Energy and Incentives Connectivity Calculator, which is an online tool that will showcase state, federal, and municipal incentives supporting deployment of clean energy, energy efficiency, demand response capabilities, and internet connectivity as a tool for both customers and vendors, with a specific target of low-income customers. The Connecticut Consortium will leverage this statewide portal, which will not be funded with Solar for All funds, as it develops the scopes of the technical assistance discussed below.

1. Workforce Development Technical Assistance - $3 million

Project SunBridge will rely on the robust solar and storage workforce already in Connecticut because of state-sponsored programs and use technical assistance to identify gaps in the current workforce and provide additional support to prepare that workforce for additional funding through Solar for All. The Connecticut Consortium will work closely with Connecticut's Department of Economic and Community Development and the Office of Workforce Strategy (OWS), responsible for the state's economic development efforts, including workforce development. Programs administered by OWS will inform Project SunBridge's workforce development priorities and activities and are based on (1) lowering barriers to equitable access of training, sustainable work, and high-quality career opportunities; (2) building a dynamic and diverse workforce via regional sector partnerships between businesses and supporting parties; (3) helping students explore and enter programs aligned with in-demand career pathways; and (4) designing and implement innovative workforce technology solutions to better serve job-seekers and employers. In addition, the Connecticut Consortium will work closely with the Connecticut Clean Economy Council (CCEC), which includes leaders across state government and industry and has been tasked with advising on strategies and policies to strengthen Connecticut's climate mitigation, clean energy, resilience, and sustainability programs.

The Connecticut Consortium will leverage the contacts in the existing CareerConneCT initiative and work with relevant stakeholders to conduct a workforce needs assessment and identify workforce barriers and gaps for solar deployment. This needs assessment will identify technical assistance such as training and education programs, work-based learning opportunities including internships and apprenticeships, certification programs, and support services such as career counseling, mentorship, and job readiness to target for Solar for All funding.

2. Community Outreach and Engagement Technical Assistance - $3 million

13

Project SunBridge includes funding to support outreach and engagement with LIDAC communities, including but not limited to outreach and education about the financial offerings available for distributed solar and storage deployment. The subgrantee(s) performing this technical assistance will be required to produce and execute a plan for education and engagement, ensuring it is culturally appropriate and responsive to the needs of the communities served through Project SunBridge. The plan will include strategies to reach different types of communities, including urban, suburban, and rural communities, communities with limited English proficiency, and different types of residential buildings, including single-family, multifamily, condominiums, and manufactured homes. Project SunBridge will identify one or more contractors to implement this funding after conducting a competitive request for proposals.

3. Tools and Technical Support for Communities - $3 million

Project SunBridge will include tools and support for municipalities to overcome barriers and challenges presented by increase solar and/or storage deployment in their towns. This technical assistance may include assistance for permitting and planning for climate hazards. Project SunBridge will identify one or more contractors to implement this funding after conducting a competitive request for proposals.

4. Building Audits for Solar and/or Storage – $4 million

Project SunBridge will provide funding for building audits through the Green Bank and CHFA to assess the feasibility of deploying solar and/or storage for LIDAC households.

<u>Resilient Assets/Project Siting and Permitting</u>

Project SunBridge will leverage the existing RRES program in Connecticut, as discussed above. This program requires solar to be located on-site for residential customers, which is typically installed on the customer's rooftop. Projects supported by Solar for All permitting will avoid siting issues, like avoiding greenspaces and siting on prime agricultural land, because the solar is located on-site for both single family and multi-family affordable housing properties. Additionally, through outreach to municipalities, Project SunBridge will identify permitting and other barriers for municipalities and provide technical assistance.

Project SunBridge will rely on the work of the existing interconnection working group to ensure efficient interconnection of Solar for All projects. Through its Equitable Modern Grid Initiative, PURA initiated an interconnection working group comprised of industry representatives and interested stakeholders that includes both a policy and technical component to conduct reviews of interconnection guidelines and application forms, work to improve transparency in the interconnection process, conduct a review of interconnection guidelines and technical criteria/screens, continue to evaluate ways to improve hosting capacity maps, and identify ways to establish a formal technical regional working group.

In addition to its broad mandate on interconnection issues, the interconnection working group has been utilized to investigate discrete interconnection issues since its inception. The working group has been used to enhance hosting capacity maps and investigate interconnection concerns raised by energy storage stakeholders, including but not limited to: streamlining the documentation needed for energy storage interconnection; defining timelines for energy storage interconnection approval; and determining how to model energy storage systems for Interconnection.

14

**Equitable Access and Meaningful Involvement Plan**

<u>Breadth and Diversity of Communities Served</u>
All solar and storage projects funded through Project SunBridge will also utilize the RRES and/or ESS programs as applicable. The RRES program has an adder for installations for households with income that is at or below 60% of the state median income, or if they are located in an economically distressed community (as defined by DECD). These adders do not stack – if a customer qualifies for both, the higher adder will apply. Participation in state income-based energy programs like Winter Protection Program, New Start, Matching Payment Program, Low Income Discount Rate, or the Home Energy Solutions Income Eligible can qualify a customer for the RRES income-based added incentive, in addition to other state benefit programs, pay stubs, or income documentation. Eligibility for the economically distressed community adder is determined by the EDCs at time of application and applied automatically.

Connecticut has existing programs for low-income assistance that will be leveraged to perform robust income verification above and beyond attestation and that conform with Solar for All requirements. As Connecticut already uses these income-verification methods, it will be easy to translate them to Project SunBridge. One way in which existing state programs conduct income verification is through customer participation in other programs ("categorical eligibility"). If a customer currently receives Connecticut Energy Assistance Program (CEAP) benefits or they are enrolled in Eversource's Matching Payment Plan or New Start, or United Illuminating's Matching Payment Plan or Forgiveness Matching Payment Program, or the customer has participated in or became income- verified by the HES-IE program in the past three years, they are eligible to participate as low-income customers without having to go through another cumbersome income verification process.  If a customer does not participate in any of these programs, they have many options for documentation that can be provided to show proof of income. Acceptable proof of income documentation can include a CEAP energy award letter, a letter proving qualifying benefit for disability/supplemental security income, Temporary Assistance to Need Families (TANF), State Administered General Assistance (SAGA), CT Department of Social Services Cash Assistance, Women Infants and Children (WIC), SNAP, Medicaid or Connecticut's public health insurance, public income assistance, aid to the blind, elderly, families with dependent children, Connecticut free or reduced lunch program or Head Start or financial support from the US Department of Veterans Affairs. Other options include a voucher for Section 8 housing, unemployment benefit letter, recent consecutive pay stubs, most recent 1099 Tax Form (if self-employed), or a benefit letter or documentation that Social Security is one's sole source of income. Project SunBridge will rely on these existing programs for income verification and the Connecticut Consortium will ensure they align with the low-income definition used in Solar for All.

<u>Participatory Governance and Community Outreach and Involvement</u>
Project SunBridge will conduct public meetings and release requests for information and/or surveys to seek input from solar developers, disadvantaged communities, municipalities, community-based organizations, and other interested stakeholders on how the structure the financial and technical assistance measures discussed above. After this outreach, Project SunBridge will publicly report on progress in spending Solar for All funding and related metrics to provide transparency into the program. Throughout program implementation, the Connecticut Consortium will work with the Connecticut Equity and Environmental Advisory Council (CEEJAC) to reach community-based organizations. One of CEEJAC's main purposes is to strengthen DEEP's partnerships with community leaders and organizations regarding environmental justice issues and there are at least

three members of CEEJAC that are representatives of Environmental Justice Communities. CEEJAC holds quarterly public meetings, and the energy subcommittee meets most months. In addition, as discussed above, a portion of the technical assistance will be used to support community outreach and engagement through one or more community-based organizations, focusing on community-based organizations that reflect the communities Project SunBridge intends to serve.

<u>Customer Acquisition Strategy</u>
Project SunBridge seeks to combine the lessons learned from community-based marketing campaigns such as Solarize Connecticut with the community engagement efforts being piloted through the U.S. Department of Energy's Communities Local Energy Action Program, or LEAP. Project SunBridge will also coordinate with other customer-based energy programs like the C&LM program and Residential Energy and Preparation Services (REPS) to identify potential participating customers.

Under current RRES program rules, the financial benefit of the installed solar system stays with the dwelling and can be transferred to new owners. The Connecticut Consortium will continue to monitor any changes to the RRES program to ensure they comply with Solar for All requirements.

**Section 3:  Fiscal Stewardship Plan**

<u>Plans and Policies for Program Oversight</u>
DEEP will continue to utilize procedures and tools already in place and modify certain procedural and staffing requirements to ensure Project SunBridge funds are used in accordance with the terms and conditions outlined in the award.

DEEP's organizational chart has several offices which will handle different aspects of the award, creating an environment of multiple checks and balances. The programmatic portion of the award will be handled by the department in charge of applying for the funding, the Bureau of Energy & Technology Policy (BETP), and the financial and administrative pieces will be handled in the Bureau of Central Services (BCS). BCS will handle the administration and financial aspects of the federal award through the employment of multiple units within its Department of Financial Management. The Federal Grants management team will be responsible for the creation and custodianship of funding strings to identify and keep award funds separate. In addition, the Federal Grants unit will share pertinent funding string information with BETP staff to ensure the correct funding is used throughout the duration of the award. Funds will be received and expended using the funding strings created by the Federal Grants team, including contractual payments, staff coding, travel, and any other cost category that may be approved in the final budget.

BETP will engage with BCS' Contracts unit in generating one or more RFP(s) that outline(s) sub-grantee responsibilities and expectations that will then go out for the bidding and selection process. In this process, applicants will be reviewed and rated, using a risk assessment tool to evaluate the overall confidence rating in selecting and moving forward with a particular sub-grantee. Criteria being evaluated includes, but is not limited to, the following:
• Dollar value being requested by sub-grantee
• Complexity of the work proposed to be completed
• Sub-grantee's prior experience with receiving Federal funds
• Existing experience and internal controls
• Prior audit(s)
• Activities supported by rebates

• Entity consumer protection practices

After all proposals within the given selection period have been received and reviewed, the sub-grantee(s) will be selected and the contracting process shall continue. Upon execution of contracts, BETP will have continued correspondence with the selected sub-grantees. This communication will be programmatic in nature and include, but not be limited to, the submission of invoices to be paid, and documents relating to the sub-grantees' interactions with consumers. BETP will review all documentation to ensure that costs are allowable and accurate per the conditions set forth in the grant award and as part of the requirements in 2 CFR § 200.329. BETP will then work in unison with Financial Management to aid in the reporting aspects of the award.

<u>Consumer Protection</u>
Project SunBridge will incorporate consumer protection best practices in utilizing this funding  The RRES and ESS programs were developed through a lengthy stakeholder process, with an opportunity to review the program annually, and included input from the Office of Consumer Counsel, which is an independent state agency that serves as the ratepayer advocate in all PURA proceedings. Currently, the RRES and ESS programs have a customer disclosure form explaining the terms and conditions of the programs. PURA recently directed the EDCs to develop robust electronic signature processes for potential inclusion in the RRES program where the proposals must implement at least one feature to ensure customers are informed of the relevant financial data and education materials, such as a hyperlink that must be visited before signatures are accepted. Further, the Green Bank reviews all sales contracts in the ESS program to ensure that benefits are passed to customers via upfront discounts or lease/PPA. PURA is in the process of reviewing methods for improving customer protections through standardizing data reporting, increasing data requirements and transparency, and better ensuring participants are passed benefits.

PURA's Office of Education, Outreach, and Enforcement (EOE) aims to provide customers interacting with PURA with an improved customer service experience and will receive and try to resolve complaints from members of the public. EOE also conducts renewable energy developer enforcement activities for the RRES program, which can lead to the removal of a developer from the program after several violations. PURA recently indicated a commitment to additional clean energy developer reporting and EOE auditing measures as part of the RRES program, which aims to ensure accurate customer communications and marketing. Project SunBridge will work closely within these existing frameworks to ensure the financial measures deployed in this program have robust consumer protections in place.

The Green Bank's Solar Marketplace Assistance Program (MAP) provides a combination of technical and financial assistance for affordable multifamily housing properties to navigate RRES program participation, thereby embedding consumer protection measures by working closely with property owners to provide expertise.  For example, through its loan offering through Solar MAP, the Green Bank manages an RFP process on behalf of the property owners and provides technical assistance in contractor selection.  For the Solar MAP lease offering, the Green Bank is responsible for monitoring and ensuring system performance.

Finally, members of the Connecticut Consortium will be participating in a newly established statewide task force to examine recommendations and policies relating to solar consumer protections required by Section 7 of Public Act 24-38. Therefore, Connecticut Consortium members will be well positioned to incorporate any best practices and lessons learned to promote quality installations and other consumer protection measures into Project SunBridge.

<u>Guardrails for Household Savings</u>

17

The Connecticut Consortium will monitor the financial assistance provided with this funding to ensure the anticipated household savings materialize. PURA recently indicated a commitment to requiring clean energy developers to annually report on the financial benefits passed through customers, with a proposed requirement of 20% savings demonstrated by all developers receiving funding through Project SunBridge.

**Section** 4:  Timeline and Milestones

See the attached timeline.

The Connecticut Consortium intends to work with a diverse group of stakeholders including, but not limited to, distributed solar and storage developers, disadvantaged communities, municipalities, community-based organizations, affordable housing property owners, and other interested stakeholders to receive input and feedback on its financial offerings and technical assistance.

**Section 5:  Reporting Requirements**

<u>Program Evidence and Evaluation Reporting</u>
DEEP will require all subgrantees to submit quarterly reports to track progress in achieving the goals of Project SunBridge, including but not limited to, amount of funding spent, number of customers reached, and amount of solar and/or storage deployed. Project SunBridge will publicly report on progress in spending Solar for All funding and related metrics to provide transparency into the program, and make refinements and changes, as necessary, to Project SunBridge.

PURA conducts an annual review of clean energy programs administered by the EDCs to track progress in achieving the state's goals. PURA will similarly utilize the annual review processes, which include multiple, additional opportunities for public stakeholder engagement, to ensure that the existing state clean energy program are: (1) realizing the objectives of Solar for All; and (2) appropriately utilizing any incentive funding provided by Solar for All.

As provided in the Terms and Conditions for the award, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award.  Additional details on reporting requirements are provided in the Terms and Conditions of the grant.

1. Performance Reports
Semi-Annual Report
The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

Final Report
The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for

18

performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

2. Transaction-Level and Project-Level Data
The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

**Section 6:  Budget Narrative**

**6.1 Project Budget**

**Personnel**  -
Both Research Analysts will work to achieve the goals of the grant through program administration, participating in stakeholder feedback processes, and program reporting. They will work with the subgrantees to refine the open elements to comply with Solar for All requirements, and manage invoicing and other program support once funding is being spent.

| CATEGORY | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Personnel** | | | | | | |
| 1 FTE Research Analyst @ $75,000/yr. with 58.94%-time allocation to the program | $44,206.70 | $44,206.70 | $44,206.70 | $44,206.70 | $44,206.70 | $221,033.50 |
| 1 FTE Research Analyst @ $75,000/yr. with 58.94%-time allocation to the program | $44,206.70 | $44,206.70 | $44,206.70 | $44,206.70 | $44,206.70 | $221,033.50 |
| TOTAL PERSONNEL | $88,413 | $88,413 | $88,413 | $88,413 | $88,413 | $442,067.00 |

19

**Fringe Benefits** -

| Fringe Benefits | | | | | | |
|---|---|---|---|---|---|---|
| 1 FTE Research Analyst @90.47% of salaries, listed in "Personnel." Breakdown of 90.47% Fringe Rate is as follows: FICA 6.20%, Group Life Ins. 0.11%, Medical Ins. 23.14%, Medicare 1.45%, State Employee Retirement System 59.57%. | $39,993.80 | $39,993.80 | $39,993.80 | $39,993.80 | $39,993.80 | $199,969.00 |
| 1 FTE Research Analyst @90.47% of salaries, listed in "Personnel." Breakdown of 90.47% Fringe Rate is as follows: FICA 6.20%, Group Life Ins. 0.11%, Medical Ins. 23.14%, Medicare 1.45%, State Employee Retirement System 59.57%. | $39,993.80 | $39,993.80 | $39,993.80 | $39,993.80 | $39,993.80 | $199,969.00 |
| TOTAL FRINGE BENEFITS | $79,988 | $79,988 | $79,988 | $79,988 | $79,988 | $399,938 |

**Travel** -
None

**Equipment** -
None

**Supplies** -
None

**Contractual** -
None

**Construction (if applicable)** -
None

**Other** -

| OTHER | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Subgrant to the Connecticut Green Bank for additional incentives in the Energy Storage Solutions programs | $1,110,000 | $1,110,000 | $1,110,000 | $1,110,000 | $1,110,000 | $5,550,000 |
| Subgrant to the Connecticut Green Bank for single-family loans/leases | $1,500,000 | $1,500,000 | $1,500,000 | $1,500,000 | $1,500,000 | $7,500,000 |
| Subgrants to the Connecticut Green Bank and CHFA for | $2,000,000 | $2,000,000 | $2,000,000 | $2,000,000 | $2,000,000 | $10,000,000 |

20

| | | | | | | |
|---|---|---|---|---|---|---|
| affordable multi-family housing revolving loan funds | | | | | | |
| Subgrant to the Connecticut Green Bank for affordable multi-family housing leases | $4,000,000 | $4,000,000 | $4,000,000 | $4,000,000 | $4,000,000 | $20,000,000 |
| Subgrant to the Connecticut Green Bank for Capital Solutions program | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $5,000,000 |
| Subgrant for workforce development programs and trainings | $600,000 | $600,000 | $600,000 | $600,000 | $600,000 | $3,000,000 |
| Subgrant for tools and other technical support for local communities deploying solar | $600,000 | $600,000 | $800,000 | $600,000 | $600,000 | $3,000,000 |
| Subgrant to support customer outreach, engagement, and community-based organizations | $600,000 | $600,000 | $600,000 | $600,000 | $600,000 | $3,000,000 |
| Subgrant for building assessments and audits | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $4,000,000 |
| In-kind technical assistance from DOE | | | | | | $400,000 |
| TOTAL OTHER | $12,210,000 | $12,210,000 | $12,210,000 | $12,210,000 | $12,210,000 | $61,450,000 |

**Participant Support Costs**
None

**Subawards**
The Connecticut Consortium is comprised of agencies and quasi-public agencies in the Executive Branch of the State of Connecticut. Connecticut is a state as defined by Section 302(d) of the Clean Air Act. All named and unnamed subawards will adhere to the respective Solar for All Terms and Conditions.

*Connecticut Green Bank*
The Green Bank is a quasi-public organization established in 2011 through a bipartisan act of legislation whose vision is a planet protected by the love of humanity.  The mission of the Green Bank is to confront climate change by increasing and accelerating investment into Connecticut's green economy to create more resilient, healthier, and equitable communities.

To achieve its vision and mission, the Green Bank has established the following three goals:
1. To leverage limited public resources to scale-up and mobilize private capital investment in the green economy of Connecticut.
2. To strengthen Connecticut's communities, especially vulnerable communities, by making the benefits of the green economy inclusive and accessible to all individuals, families, and businesses.
3. To pursue investment strategies that advance market transformation in green investing while supporting the organization's pursuit of financial sustainability.

21

*Connecticut Housing Finance Authority*
CHFA is a self-funded quasi-public organization established in 1969 that lends more than $500 million dollar each year for affordable housing. CHFA's mission is to alleviate the shortage of housing for low- to moderate-income families and persons in Connecticut and, when appropriate, to promote or maintain the economic development of Connecticut through employer-assisted housing efforts. CHFA is guided by the following principles: (1) driven by community; (2) devoted to service; (3) committed to innovation; (4) energized by collaboration; (5) committed to opportunity; (6) grounded in communication; (7) empowered by ownership; and (8) stewarding resources.

*Subaward for Workforce Development*
DEEP has not selected an entity for this subaward yet and will do so in the first year of the implementation period. Please see the "Project Deployment Technical Assistance Strategy" section for more details regarding contemplated activities. The Connecticut Consortium plans to conduct further stakeholder engagement to develop the types of activities supported with this subaward. When the subaward is selected, DEEP will submit the necessary guidelines to the project officer for approval prior to drawing down any funds for this subaward.

*Subaward for Tools and Technical Support for Communities*
DEEP has not selected an entity for this subaward yet and will do so in the first year of the implementation period. Please see the "Project Deployment Technical Assistance Strategy" section for more details regarding contemplated activities. The Connecticut Consortium plans to conduct further stakeholder engagement to develop the types of activities supported with this subaward. When the subaward is selected, DEEP will submit the necessary guidelines to the project officer for approval prior to drawing down any funds for this subaward.

*Subaward for Customer Outreach, Engagement, and Community Based Organizations*
DEEP has not selected an entity for this subaward yet and will do so in the first year of the implementation period. Please see the "Project Deployment Technical Assistance Strategy" section for more details regarding contemplated activities. The Connecticut Consortium plans to conduct further stakeholder engagement to develop the types of activities supported with this subaward. When the subaward is selected, DEEP will submit the necessary guidelines to the project officer for approval prior to drawing down any funds for this subaward.

*Subaward for Building Assessments and Audits*
DEEP has not selected an entity for this subaward yet and will do so in the first year of the implementation period. Please see the "Project Deployment Technical Assistance Strategy" section for more details regarding contemplated activities. The Connecticut Consortium plans to conduct further stakeholder engagement to develop the types of activities supported with this subaward. When the subaward is selected, DEEP will submit the necessary guidelines to the project officer for approval prior to drawing down any funds for this subaward.

## Additional Items

**Indirect Charges**

| Indirect Costs | | | | | | |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Indirect Costs at the approved rate of 35.74% are charged on direct salaries only, base amount as indicated in "Personnel." | $31,599 | $31,599 | $31,599 | $31,599 | $31,599 | $157,995 |
| TOTAL INDIRECT | $31,599 | $31,599 | $31,599 | $31,599 | $31,599 | $157,995 |

**Conferences and Workshops:**
None

**Meals and Refreshments:**
None

**Program Income**
The Connecticut Consortium anticipates that the Green Bank's Capital Solutions program and the Solar MAP for affordable multifamily housing properties will generate program income by deploying Solar for All funds through its lease and loan offerings. For single-family residential solar offerings, the Connecticut Consortium will leverage an ecosystem of local lenders (e.g., credit unions, community development financial institutions, community banks) that participate in the green economy by providing loans and or/leases for homeowners interested in installing residential solar, associated storage, and/or enabling upgrade projects.

Program income generated through financing provided by Project SunBridge will be tracked and expended to support additional solar and solar and storage projects affordable multifamily housing and single-family properties, thereby leveraging the original federal funding.  In addition, program income will support the Green Bank's operating expenses to support Project SunBridge as the Green Bank is not separately seeking funds for personnel costs. The amount of program income that will be generated is dependent upon the financing rates offered through this program. As discussed above, the Connecticut Consortium will continue to refine both single and multifamily Project SunBridge offerings to meet market need.

The Connecticut Consortium anticipates that CHFA's to-be-developed Energy Solutions Program (ESP) for affordable multifamily housing properties will generate program income by deploying Solar for All funds through loan offerings. Program income will fund CHFA's operating expenses to support Project SunBridge as CHFA is not separately seeking funds for personnel costs. The amount of program income that will be generated is dependent upon the below-market financing rates offered by CHFA through the ESP program. As discussed above, the Connecticut Consortium will continue to refine both single and multifamily Project SunBridge offerings to meet market need.

At a minimum, the subawardees will recover the principal value of its loans and leases (i.e., $37.5 million in financial assistance measures) considered program income based on the Solar for All terms and conditions. Additional variables that may contribute to program income above the principal repayment amount may include interest payments and revenue from electricity generation and tariff payments for leased projects owned by the Green Bank.

## Appendix A

Table 1. "Top 10" Urban LIDACs in Connecticut

| Town | # of Single-Family Housing Units | # of Multifamily Housing Units | # of Rental Units | # Households with Public Assistance (SNAP) | Total LIDAC Households |
|---|---|---|---|---|---|
| Bridgeport | 13,199 | 7,608 | 27,833 | 455 | 49,095 |
| Stamford | 12,389 | 6,245 | 27,617 | 432 | 46,683 |
| Hartford | 5,923 | 4,512 | 33,073 | 825 | 44,333 |
| New Haven | 6,352 | 4,394 | 33,012 | 559 | 44,317 |
| Waterbury | 13,232 | 3,050 | 23,388 | 1008 | 40,678 |
| New Britain | 5,054 | 2,806 | 14,508 | 464 | 22,832 |
| Danbury | 6,417 | 2,037 | 10,623 | 805 | 19,882 |
| Norwalk | 5,190 | 1,851 | 8,262 | 1752 | 17,055 |
| Meriden | 4,143 | 1,300 | 8,129 | 1293 | 14,865 |
| East Hartford | 5,243 | 849 | 7,789 | 509 | 14,390 |
| **Total** | **77,142** | **34,652** | **194,234** | **8,102** | **314,130** |

Table 2. "Top 5" Rural LIDACs in Connecticut

| Town | # of Single-Family Housing Units | # of Multifamily Housing Units | # of Rental Units | # Households with Public Assistance (SNAP) | Total LIDAC Households |
|---|---|---|---|---|---|
| Windham | 2,533 | 515 | 3,205 | 717 | 6,253 |
| Torrington | 1,418 | 513 | 2,338 | 1,549 | 4,269 |
| Watertown | 1,003 | 53 | 330 | 833 | 1,386 |
| New Milford | 681 | 148 | 456 | 760 | 1,285 |
| Putnam | 392 | 32 | 817 | 424 | 1,241 |
| **Total** | **6,027** | **1,261** | **7,146** | **4,283** | **14,434** |

24

**Appendix B**

**OPEN REQUEST FOR PROPOSALS FOR CLEAN ENERGY & ENVIRONMENTAL INFRASTRUCTURE INVESTMENT**

I.    PURPOSE

Through the Open Request for Proposals ("Open RFP" Program), the Connecticut Green Bank ("Green Bank") seeks to provide access by project developers and capital providers / investors to Green Bank capital that will catalyze investment which – but for the Green Bank's participation – would either not happen or be realized at a much slower pace or with less impact. This Open RFP for clean energy and environmental infrastructure investment is targeted towards proposals with financing requirements which are not met by existing Green Bank financing programs. Since inception, the Green Bank has demonstrated its ability to work with a variety of developers and capital providers to accelerate investment in clean energy, including energy efficiency as well as commercially deployed renewable technologies like solar PV, on-shore wind, run-of-the-river hydroelectric power, fuel cells and anaerobic digesters. The Green Bank Open RFP will:

- Receive proposals for Green Bank investment on an open and rolling basis, as received;
- Evaluate proposals in accordance with objective and transparent criteria;
- Be "market responsive" and adaptable – meaning that the Green Bank will endeavor to render preliminary responses to proposals in days and weeks rather than months and to offer guidance to those proposals that fall short of our criteria where the proposals by a commercially sophisticated counterparty offer the promise of significant market potential; and
- Have sufficient budget for investment in order to deliver significant impact quickly.

This Open RFP will support a variety of developers and capital providers – from emerging developers of commercially established technologies, to well-established manufacturers of emerging technologies, to lenders and investors of all types. It is important to note that the Open RFP is not intended to be a venture capital program, nor will it seek to assume risks that are more appropriate for other elements of a project's or business's capital stack. At its core, the Green Bank is a special purpose financial institution, with a responsibility to be good stewards of funds committed to it by statute to promote the clean energy and environmental infrastructure goals of the state.

II.    GREEN BANK BACKGROUND

The Green Bank is a quasi-public state agency. As the nation's first full-scale green bank, it is leading both the clean energy and environmental finance movements by leveraging public and private funds to scale-up projects to confront climate change by reducing greenhouse gas emissions and increasing climate adaptation and resilience across Connecticut. The Green Bank's success in increasing and accelerating private investment in clean energy and environmental infrastructure is helping Connecticut create jobs, increase economic prosperity, promote energy security, and address climate change. In 2017, the Green Bank received the Innovations in American Government Award from the Harvard Kennedy School Ash Center for Democratic Governance and innovation for their "Sparking the Green Bank Movement" entry. And in 2020, the Green Bank was named Bond Buyer's Deal of the Year for Innovative Financing for the Green Liberty Bonds modelled after the Series-E War

25

Bonds of the 1940's. For more information about the Green Bank, please visit www.ctgreenbank.com.

III.     ELIGIBLE TECHNOLOGIES AND METHODS

In order to not limit access to promising technologies or business models, some of which may be on the verge of becoming commercially established, this Open RFP is available to any technology, method, or business model that is able to help the Green Bank achieve its statutory mandate as voiced through its Comprehensive Plan which staff reasonably determines: (a) is either already commercially viable (based on success in markets other than Connecticut or even other than the United States) and (b) has demonstrated clear potential for commercial viability through, for instance, well-documented feasibility studies and pilot programs where there is clear evidence of a viable business model and demonstrable cash flows as well as a path to substantial impact.

In June 2021, the green bank model was expanded beyond clean energy to include environmental infrastructure. The Green Bank's investment focus on "clean energy" and "environmental infrastructure" is statutorily defined in Section 16-245n of the General Statutes of Connecticut and set forth below.

Clean Energy – "clean energy" means solar photovoltaic energy, solar thermal, geothermal energy, wind, ocean thermal energy, wave or tidal energy, fuel cells, landfill gas, hydropower that meets the low-impact standards of the Low-Impact Hydropower Institute, hydrogen production and hydrogen conversion technologies, low emission advanced biomass conversion technologies, alternative fuels, used for electricity generation including ethanol, biodiesel or other fuel produced in Connecticut and derived from agricultural produce, food waste or waste vegetable oil, provided the Commissioner of Energy and Environmental Protection determines that such fuels provide net reductions in GHG emissions and fossil fuel consumption, usable electricity from combined heat and power systems with waste heat recovery systems, thermal storage systems, other energy resources and emerging technologies which have significant potential for commercialization and which do not involve the combustion of coal, petroleum or petroleum products, or nuclear fission, financing of energy efficiency projects, projects that seek to deploy electric, electric hybrid, natural gas or alternative fuel vehicles and associated infrastructure, any related storage, distribution, manufacturing technologies or facilities and any Class I renewable energy source, as defined in CGS 16-1(a)(2).

Environmental Infrastructure – "environmental infrastructure" means structures, facilities, systems, services, and improvement projects related to (A) water, (B) waste and recycling, (C) climate adaptation and resiliency, (D) agriculture, (E) land conservation, (F) parks and recreation, and (G) environmental markets, including, but not limited to carbon offsets and ecosystem services. Carbon offsets means an activity that compensates for the emission of carbon dioxide or other greenhouse gases by providing for an emission reduction elsewhere. Ecosystem services means benefits obtained from ecosystems, including, but not limited to, (A) provisioning services such as food and water, (B) regulating services such as floods, drought, land degradation and disease, and (C) supporting services such as soil formation and nutrient cycling.

IV.     REQUIREMENT FOR CLEAN ENERGY OR ENVIRONMENTAL
         INFRASTRUCTURE AND FINANCIAL IMPACT

26

Of considerable importance to the program will be achieving leverage of private capital with its limited public resources as the Green Bank seeks to act in furtherance of Connecticut's ambitious environmental / GHG and $CO_2$ reduction goals, Green Bank clean energy or environmental infrastructure deployment objectives to "scale up" to achieve the market potential, and in support of public health outcomes, jobs and economic development.

## V.     FINANCING ARRANGEMENTS AND CAPITAL SUPPORT

The Green Bank does not intend for its role to be prescriptive, but to be determined in a manner that maximizes the potential for leverage of Green Bank resources while balancing the need for risk containment and Green Bank sustainability (i.e., the Green Bank's financial returns vs. the potential for financial losses). As such, the Green Bank expects investments to take the usual forms, such as:

- Senior and Subordinate loans
  - Bridge loans
  - Construction loans
  - Term loans
  - Working capital loans
- Loan loss reserves
- Loan guarantees
- Other forms of credit enhancement
- Participation in other lender's loans
- Equity (including participation as a member of a limited liability company, holder of preferred stock or other instruments that could be a hybrid of debt and equity, debt with conversion rights, debt with warrants for equity, etc.)
- Access to federal tax-exempt Private Activity Bonds for qualified private activities

All the above is to be considered in accordance with Green Bank operating procedures and its enabling statute.

The most successful proposals to this Open RFP will demonstrate the ability to make a significant impact across the desired outcomes and the ability to measure and track such performance over time. Examples of clean energy performance-tracking metrics are renewable kWh produced, $CO_2$ equivalent avoided, number of jobs created, public health savings, state and local revenues and private investment generated. Examples of environmental infrastructure performance-tracking metrics are $CO_2$ equivalent avoided, number of jobs created, acreage preserved or restored, ecosystem service benefits such as water quality or quantity benefits. public health savings, state and local revenues and private investment generated.

## VI.     GREEN BANK CAPITAL COMMITMENT

All staff recommended proposals to this open RFP are subject to all necessary approvals, including but not limited to the board of directors of the Green Bank or other governing body approval, bylaws, and Section 16-245n of the Connecticut General Statutes. Please see the Comprehensive Plan and Budget for further details on the type and scale of previously approved proposals.

## VII.     ELIGIBLE PROPOSERS

The Open RFP will accept proposals from:

1) Private sector financial institutions or other third-party capital providers that finance, or intend to finance, clean energy or environmental infrastructure projects in State of Connecticut (although proposals that are part of a "multi-state" concept whereby the competitive procurement benefits reside with Connecticut ratepayers or there is a demonstrable benefit to Connecticut communities and ecological systems will also be welcomed and encouraged); and/or

2) Industry participants including project developers, energy service companies ("ESCOs"), building and facility owner/operators, equipment manufacturers, or others that provide equipment, materials and/or services where the object of the activity being proposed is entirely or meaningfully related to the State of Connecticut.

Proposers can apply on a standalone basis or as part of a team, such as a developer/sponsor, lead equipment provider, lead equity and/or debt provider.

Regardless of whether the proposal comes from a standalone entity or as part of a team, proposers must have directly relevant experience in the transaction/project type being submitted, and the relevant technologies or project design.

## VIII.    PROPOSAL REQUIREMENTS

Each Proposer shall carefully examine the RFP and all amendments, exhibits, revisions, and other data and materials provided with respect to this RFP process. Proposers should familiarize themselves with all requirements in that contract prior to submitting their proposal. Should a Proposer have any questions or require clarifications or wish to request interpretations of any kind, the Proposer shall submit a written request to RFP@ctgreenbank.com. Green Bank shall respond to such written requests in kind and may, if it so determines, disseminate such written responses to other prospective Proposer(s) or post to Green Bank's website, subject to section H of Article XII.

A.  Investment Focus
List the primary category of investment focus, either clean energy or environmental infrastructure. List and describe all applicable categories of investment (e.g., solar photovoltaic energy, water).

B.  Proposer Qualifications
The Proposer shall include the following:

Corporate:
- Company overview and relevant experience, which shall include at a minimum (A) the number of employees, (B) the office locations, (C) and an outline of any clean energy or environmental infrastructure operational projects showing (as relevant) project locations, technology or technologies involved, project design, system output, host/offtaker, utility service area, whether such projects were developed under a state energy or environmental infrastructure program (and if so, a description of that program or webpage/URL).

Team:

- Highlight key personnel and (if known) subcontractors who will be assigned to the project.
- Describe their respective experiences and skills with the development, engineering and installation of similar projects.
- Highlight the relevant licenses and certifications held by these key personnel.
- Highlight any initiatives or partnerships with disadvantaged business enterprises as defined under 40 CFR Part 33 for the U.S. Environmental Protection Agency or whether the Proposer is certified as a small or minority business enterprise per the Connecticut Department of Administrative Services.

Project Experience:
- Provide track record of actual annual generation relative to projected generation for proposed clean energy project or actual annual carbon offset or ecosystem service to projected for environmental infrastructure project within the Proposer's operational projects (if applicable).
- Outline approach Proposer takes to ensure the installed Systems meets the projected generation or environmental market values.
- Experience, if any dealing with prevailing wage requirements or the federal Davis-Bacon Act. This is not a requirement under this RFP, but such experience could provide access to even lower cost federal capital for the Proposer's consideration.

Preferred qualifications
- Years of experience – five years minimum in the proposed project's field of expertise.

C.  Project Scope and Schedule
Include a general scope of the Project the Proposer intends to provide upon selection and execution of Green Bank financing arrangements. The scope narrative shall outline (as relevant) all major tasks and milestones necessary to design and obtain permits to construct, coordinate with utility company and/or landowner, mobilize, construct and commission the project. Proposals should include a complete project schedule indicating major project milestones and durations, such as engineering, construction, and siting council approval, where applicable. Indicate if the project requires the award of any other Federal or State grants or financing awards (e.g., USDA financing, ZREC award, DECD brownfield remediation program award, etc.)

This Open RFP is geared towards projects requiring a financing requirement of $250,000 or greater from the Green Bank, though smaller sized projects could be considered on a case-by-case basis.

D.  Project Design and Equipment
Depending upon the nature of the financing request for a clean energy project, proposals shall provide a design layout for each project (e.g., a solar project would include the make/model, wattage and quantity for both inverters and modules, racking product, azimuth, tilt and system size kW-AC and kW-DC, and DC:AC ratio), or typical design layout for a portfolio of projects seeking financing. Proposals shall provide specified equipment manufacturer data sheets, warranties, pricing, etc. All equipment shall be new with warranties that meet industry standards and (as appropriate) be UL Listed.

Depending upon the nature of the financing request for an environmental infrastructure project, proposals shall provide a project or transaction design layout (e.g., a land conservation project by a land trust would include the organization's service area, parcel data, borrowing history and track record, takeout strategy, and development plan if applicable to loan repayment), or typical project or transaction design layout for a portfolio of projects seeking financing.

E.  Project Production

Where relevant, clean energy proposals shall provide details about the estimated kWhAC to be generated by the project, or a portfolio of projects, including all necessary assumptions. A solar project, for example, would include: Insolation (or sunlight availability), maintenance down time, soiling losses, shading losses, efficiency losses, AC losses, etc. Copies of PVSyst or Helioscope reports used to estimate production for each proposed solar system design should be included with the proposal.

Where relevant, environmental infrastructure proposals shall provide details about the estimated conservation outcomes to be generated by the project, or a portfolio of projects, including all necessary assumptions. A land conservation project, for example, could include: acreage protection, habitat protection, public access and outdoor recreation opportunities, ecosystem services, water quality and/or quantity benefits, carbon sequestration or avoided emissions benefits, and threats to related conservation benefits if the project is not completed.

F.  Project Model

Proposer shall submit a project model setting for the entirety of the project's economics, feasibility and stress-testing. Capital sourcing will include: the Proposer's cash financial commitment; other financing sourced (or to be sourced) – identifying any preferred/mezzanine equity, senior capital, tax equity, grants, as well as identifying each stakeholder providing such capital support and the nature of their commitment (i.e., committed, proposed, likely, or "initial feasibility stage").

G.  Other Relevant Information

Depending on the nature of the proposal, Proposer may be required to submit additional supporting information, such as audited financial statements, energy audits or project feasibility studies.

H.  Clean Energy or Environmental Infrastructure Impact and Need for Green Bank Funding

The Proposer's proposal must demonstrate how the Green Bank's investment will leverage additional private capital and support the Green Bank's ambitious environmental / GHG and CO reduction goals, clean energy deployment objectives, public health outcomes, incremental jobs and economic development as outlined in its Comprehensive Plan.

I.   Statement on Proposers Financial Strength

Preference is for Proposer to provide three years of audited financial statements and/or last 3 years tax returns.

J.   Operations, Maintenance and Management Approach

The proposal should include approach to asset management, billing, preventative and corrective operations and management as is relevant to the project for the expected duration of the project's estimated useful life.

30

IX.    Indicative Green Bank Financing Terms

Green Bank financing terms, including financial product type, interest rate and payback period can be tailored to suit each individual project. Green Bank financial terms will be the result of project need as determined by the Green Bank and will follow a satisfactory assessment and due diligence of the following indicative and non-exhaustive areas of review:

- Project and technology or method type
- Risk (technical, financial, delivery and implementation, and credit)
- Life of the project
- Anticipated energy and carbon savings or environmental infrastructure benefits
- Amount of finance being requested from the Green Bank
- Amount of finance sourced from parties external to the Green Bank

X.    PROPOSAL PROCESS

A. Timeline

This is an Open RFP – submissions are to be accepted on a rolling basis until the program is withdrawn.

B. Submittal Process

In submitting a proposal, the following requirements should be observed:

 i. Proposals shall be submitted electronically to RFP@ctgreenbank.com. The subject line should be identified as: either "OPEN RFP FOR CLEAN ENERGY INVESTMENT" or "OPEN RFP FOR ENVIRONMENTAL INFRASTRUCTURE INVESTMENT".

 ii. Proposers may be required to interview with Green Bank staff if deemed necessary.

 iii. Transactions which involve financing or investment by the Green Bank require approval by (a) the Deployment Committee of the Board (up to $2,500,000) or (b) by the Board (over $2,500,000).

C. Q&A

Respondents can submit questions to RFP@ctgreenbank.com.

XI.    EVALUATION

Proposals will be evaluated on the following criteria:

A. Meeting Green Bank Goals – Will the potential activity achieve a meaningful level of energy efficiency, renewable energy deployment, resiliency goals, or environmental infrastructure goals, especially in vulnerable communities?

B. Green Bank Essentiality – to what extent is participation by the Green Bank essential to the success of the project? Please be explicit here – Proposers are expected to have sought out other capital (submit which capital providers were contacted, names and e-mail addresses and the response by the capital provider(s) (can be written or a summary of meeting notes)).

C. Project Feasibility – How feasible is the project to achieve its stated goals? What is the basis for this assessment? Has the proposed project been completed elsewhere? If so, provide project location and relationship of the project to the proposer. Provide details of any system performance guarantees.

D. Project Replicability – Could a similar project be replicated in Connecticut or elsewhere, or is this a unique opportunity?

E. Project timetable – total development and construction (or project execution) timeline

F. Relevant Experience – Does the proposer offer relevant and sufficient experience for the type of project being proposed?

G. References – List of three (3) clients for reference use for whom proposer has performed similar services as those contemplated by proposer's project. Include the name, e-mail address and telephone number(s) of the contact person at each reference.

H. Pending Litigation – Description of any litigation, pending judgments, etc., which could affect the proposer's ability to enter into an agreement with Green Bank. A description of the circumstances involved in any defaults by the proposer. If you have been subjected to any outside performance or financial audits in the past three years, state by whom the audit was performed, for whom, the facility involved, and the results of the audit.

## XII.    GENERAL TERMS AND CONDITIONS
Submission of your proposal assumes the acceptance of the following understandings:

A. Green Bank reserves the right to reject any or all of the proposals received in response to the Open RFP, to waive irregularities or to cancel or modify the Open RFP in any way, and at any Green Bank chooses, in its sole discretion, if Green Bank determines that it is in the interest of Green Bank.

B. Green Bank further reserves the right to make selections under this Open RFP without discussion of the proposals received. Proposals should be submitted on the most favorable terms from a technical, qualifications, and price standpoint.

C. Submissions must be signed by an authorized officer of the Proposer. Submissions must also provide name, title, address and telephone number for individuals with authority to negotiate and contractually bind Proposer, and for those who may be contacted for the purpose of clarifying or supporting the information provided in the proposal.

D. Green Bank will not be responsible for any expenses incurred by any Proposer in conjunction with the preparation or presentation of any proposal with respect to this Open RFP. Legal fees of the Green Bank for the drafting of definitive loan documentation will be the responsibility of the Applicant.

E. Green Bank's selection of a Proposer through this Open RFP is not an offer and Green Bank reserves the right to continue negotiations with the selected Proposer until the parties reach a mutual agreement.

F. Submission of Proposal by Proposer and Acceptance of Proposal by Green Bank does not constitute an agreement: The actual terms and conditions under which the Green Bank may be willing to provide a financing facility or investment to the Proposer shall be subject to, inter alia, (i) satisfactory completion by the Green Bank of its due diligence process in scope and with results satisfactory to the Green Bank in the Green Bank's sole and absolute

discretion, (ii) the accuracy and completeness of all representations that Proposer makes to the Green Bank, (iii) obtaining necessary internal credit approvals and Green Bank Board of Director authorization and the negotiation, execution and delivery of definitive documentation consistent with the terms ultimately agreed with Proposer and otherwise satisfactory to the Green Bank (iv) no change, occurrence or development shall occur or shall have occurred that has had or could reasonably be expected to have a material adverse effect on the Proposer, their respective businesses or any contemplated collateral for the proposed financing facility or investment (v)(1) all financial projections concerning the Proposer that have been or are hereafter made available to the Green Bank by the Proposer (the "Projections") have been or will be prepared in good faith based upon reasonable assumptions and (2) all information, other than Projections, which has been or is hereafter made available to the Green Bank by the Proposer in connection with any aspect of the proposed project(s) contemplated in the proposal, as and when furnished, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading.

G. State Contracting Obligations. Consultant understands and agrees that the Green Bank will comply with Conn. Gen. Stat. Sections 4a-60 and 4a-60a and all other applicable state contracting requirements as a quasi-public state agency.

H. Confidentiality – All proposals and associated information are treated as commercially confidential to the extent possible. Applicants supplying information to the Green Bank should be aware that we are subject to the provisions of the CT Freedom of Information Act (CT-FOIA) and information provided to us may become the subject of a CT-FOIA access request.

I. GREEN BANK IS SUBJECT TO THE REQUIREMENTS OUTLINED IN SECTIONS 16-245N OF THE CONNECTICUT GENERAL STATUTES. GREEN BANK SHALL HAVE NO LIABILITY OR OBLIGATION OF ANY SORT HEREUNDER, INCLUDING, WITHOUT LIMITATION, IF FOR ANY REASON OR NO REASON A BINDING AGREEMENT IS NOT ENTERED INTO WITH ANY PROPOSER. IN MAKING ITS SELECTION OF A SUCCESSFUL RESPONDENT, GREEN BANK MAY CONSIDER ANY AND ALL FACTORS AND CONSIDERATIONS WHICH GREEN BANK, IN ITS SOLE DISCRETION, DEEMS RELEVANT, THE RELATIVE IMPORTANCE OF WHICH SHALL BE IN THE SOLE DISCRETION OF GREEN BANK.

EXHIBIT 4



### OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

<u>**MEMORANDUM**</u>

**SUBJECT:**     Termination of EPA Assistance Agreement 5H-84090001 under 2 CFR 200.340

**FROM:**     Devon Brown, EPA Award Official

**TO:**     Joseph Stein, Fiscal Administrative Supervisor
Dept Of Energy & Environmental Protection

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84090001 awarded to Dept Of Energy & Environmental Protection. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Jennifer Brooks, EPA Grant Specialist
    Melissa Hopkinson, EPA Project Officer
    Claire Sickinger, Grantee Program Manager

EXHIBIT 5

5H - 84090001 - 2    Page 1

| | | GRANT NUMBER (FAIN): | 84090001 | |
|---|---|---|---|---|
| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** *Assistance Amendment* | MODIFICATION NUMBER: | 2 | **DATE OF AWARD** 08/08/2025 |
| | | PROGRAM CODE: | 5H | |
| | | **TYPE OF ACTION** No Cost Amendment | | **MAILING DATE** 08/08/2025 |
| | | **PAYMENT METHOD:** ASAP | | **ACH#** 10109 |

| RECIPIENT TYPE: State | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** DEPT OF ENERGY & ENVIRONMENTAL PROTECTION 79 ELM STREET HARTFORD, CT 06106-5127 EIN:  86-1154163 | **PAYEE:** DEPT OF ENERGY & ENVIRONMENTAL PROTECTION 79 ELM STREET HARTFORD, CT 06106-5127 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Claire Sickinger 10 Franklin Square New Britain, CT 06051 **Email:** claire.sickinger@ct.gov **Phone:** 860-827-2618 | Melissa Hopkinson 1300 Pennsylvania Ave NW Washington, DC 20460 **Email:** Hopkinson.Melissa@epa.gov **Phone:** 202-566-0810 | Jennifer Brooks 1200 Pennsylvania Ave NW 3903R Washington, DC 20460 **Email:** Brooks.Jennifer@epa.gov **Phone:** 202-564-6374 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Project SunBridge: Connecting Communities to a Solar Future

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements.  Administrative terms and conditions are added.

Per 2 CFR 200.340 (a)(4) and the administrative terms and conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| **BUDGET PERIOD** 09/01/2024 - 08/08/2025 | **PROJECT PERIOD** 09/01/2024 - 08/08/2025 | **TOTAL BUDGET PERIOD COST** $ 62,450,000.00 | **TOTAL PROJECT PERIOD COST** $ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official for Devon Brown - Branch Chief, GMB | **DATE** |
| by Keva Lloyd - Award Official Delegate | 08/08/2025 |

5H - 84090001 - 2    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84090001 - 2    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 442,067 |
| 2. Fringe Benefits | $ 399,938 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 61,450,000 |
| 9. Total Direct Charges | $ 62,292,005 |
| 10. Indirect Costs: 35.74 % Base MTDC | $ 157,995 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 37,500,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

    a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

    b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

    c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect.  The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

    a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

    b. Explanations on why established outputs/outcomes were not met; and

    c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

    a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

    b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

## Programmatic Conditions

All Programmatic Conditions Remain the Same.

EXHIBIT 6

**Connecticut**
**Department of Energy &**
**Environmental Protection**

ENERGY & TECHNOLOGY POLICY

August 28, 2025

*Via Email*

Devon Brown, Award Official
U.S. Environmental Protection Agency
brown.devon@epa.gov

**Re:    Notice of Disagreement with Modification No. 2 to Grant Number (FAIN): 84090001,
dated August 8, 2025**

Dear Mr. Brown:

On August 7, 2025, the Connecticut Department of Energy and Environmental Protection
(CT DEEP) received a memorandum from you that purported to terminate EPA Assistance
Agreement 5H-84090001 under 2 CFR 200.340 ("Termination Letter"). The Termination Letter
outlined a Dispute process pursuant to 2 CFR 1500.15 with a Dispute deadline of 30 days. The
Termination Letter also stated: "The EPA Grants Management Office will issue an amendment to
the agreement to document the termination."

The next day, CT DEEP received a document titled "Assistance Amendment" dated August
8, 2025. That document states it is "Modification Number: 2" to Grant Number 84090001. Under
its "Explanation of Changes," the document states that it requires CT DEEP to stop work;
terminates the agreement; reduces performance period duration; curtails the scope of work; and
adds administrative terms and conditions. In the "Notice of Award" section, the document states
that if the recipient disagrees with the terms and conditions specified, it must furnish a notice of
disagreement within 21 days.

Please accept this letter as CT DEEP's notice of disagreement with Modification No. 2
dated August 8, 2025, issued under your signature as EPA Award Official. CT DEEP also
disagrees with any suggestion in the Assistance Amendment that any attempt to draw down funds
could function as a waiver of CT DEEP's dispute rights. CT DEEP reserves all rights to dispute
the termination.

Sincerely,

**Joseph DeNicola**
Deputy Commissioner, Bureau of Energy and Technology Policy
Connecticut Department of Energy & Environmental Protection
joseph.denicola@ct.gov



EXHIBIT 7

**Connecticut**
**Department of Energy &**
**Environmental Protection**

To: Michael Molina
EPA Disputes Decision Official
Environmental Protection Agency
Office of Mission Support
Washington, D.C. 20460

Date: September 5, 2025

*Via email*

Re:      **Wrongful Termination of EPA Assistance Amendment 5H-84090001-1 under 2 CFR 200.340**

Dear Mr. Molina:

Pursuant to 2 CFR 1500.15, we are writing to notify you, as the designated EPA Dispute Decision Official, that we disagree with EPA's attempt to terminate Connecticut's Solar for All award, grant number 84090001, which was awarded to the Connecticut Department of Energy and Environmental Protection (CT DEEP) on July 12, 2024. The Memorandum from EPA Award Official Devon Brown, dated August 7, 2025, as well as the Termination Notice (Assistance Amendment 5H-84090001-2), dated August 8, 2025: (1) violate the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only unobligated balances from the Greenhouse Gas Reduction Fund and preserved funds already awarded to grantees; (2) violate EPA's legal obligation under 2 C.F.R. 200.340 and the binding Assistance Amendment 5H-84090001-1 issued by EPA to CT DEEP on December 12, 2024, and any attempts to  liquidate the remaining funds in CT DEEP's ASAP account would violate due process; (3) provide no other valid reason for termination pursuant to 2 C.F.R. 200.341; and (4) violate the Constitution's Separation of Powers. This termination is contrary to law, arbitrary and capricious, and is a breach of the Assistance Amendment 5H-84090001-1. CT DEEP requests that EPA rescind the termination and make all obligated funds that were available in CT DEEP's ASAP account as of August 6, 2025 (the day before the Termination Memorandum) available to CT DEEP again.

The August 7, 2025, Memorandum indicates that EPA is terminating CT DEEP's award because EPA's cost appropriations and the "grant appropriations" were rescinded, so "the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All," and continued administration of the

program is no longer legally permissible. Based on this legal conclusion, EPA determined it would end the Solar for All program and all existing grants.

Respectfully, the rescission of unobligated funds and repeal of granting authority under 42 U.S.C. 7434 do not give EPA the authority to terminate all legally binding Solar for All grant agreements unilaterally under 2 CFR 200.340. Doing so is contrary to law and arbitrary and capricious. We therefore ask that the termination of CT DEEP's award be reconsidered via an administrative appeals process. As such, please accept this letter as a timely request to initiate an administrative dispute under 2 C.F.R. 1500 Subpart E.

**(1) EPA's asserted grounds for termination violate the plain language of OBBBA Section 60002, which rescinded unobligated balances but preserved funds already awarded to grantees.**

EPA's conclusion that OBBBA rescinded the grant appropriations for Solar for All is incorrect and contrary to law. By its plain language, Section 60002 only authorized rescission of the unobligated balance in the appropriations account established by 42 U.S.C. 7434:

> *SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.*

Where the plain language of a statute is unambiguous, no further analysis is required. *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (". . . when the meaning of the statute's terms is plain, our job is at an end."). Indeed, after OBBBA passed Congress, the Department of Justice wrote to the court presiding over *Climate United Fund v. Citibank, N.A.*  to inform it that new legislation, if signed, would "rescind all unobligated funds appropriated for it." (Letter dated July 3, 2025, to the Clerk of the Court from Yaakov Roth, DOJ.).

By its plain language, the OBBBA only rescinded funds that were unobligated on the date the OBBBA was enacted. And there is no basis to conclude that Congress expressly or impliedly intended to de-obligate or claw back funds that were properly and timely obligated pursuant to 42 U.S.C. § 7434(a)(1). Funds awarded to Solar for All grantees, including CT DEEP under the subject award, were obligated upon award and subject to a legally binding agreement which "create[d] a legal liability or definite commitment on the part of [EPA], or create[d] a legal duty that could mature into a legal liability

by virtue of an action that is beyond the control of the government."[1] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[2] In other words, the Solar for All grant funds were obligated upon award, and remained obligated when OBBBA was passed.  The OBBBA did not change this and could not have legally rescinded these obligated funding awards.

Additionally, this termination did not automatically de-obligate CT DEEP's funds because termination of an award cannot automatically or retroactively de-obligate funds. But even if termination of an award could result in the de-obligation of funds, CT DEEP's Solar for All grant was not terminated until August 7, 2025, well after OBBBA became law on July 4, 2025, and contrary to the direction of that statute. At the time the OBBBA was enacted, CT DEEP's Solar for All funds remained obligated so they were not impacted by Section 60002 of the OBBBA.

EPA also cannot avoid administering the entire Solar for All program merely because OBBBA rescinded other unobligated funds. For the reasons stated above, CT DEEP's grant funds remain obligated, so EPA has a legal duty and obligation to fulfill its part of the agreement by administering the funds.

**(2) EPA's unilateral termination of CT DEEP's grant violates EPA's legal obligation under 2 C.F.R. 200.340 and constitutes a breach of the signed grant agreement, and any attempts to liquidate the remaining funds in CT DEEP's ASAP account would violate due process.**

EPA has offered a laundry list of potential and contradictory grounds on which it might have based the termination of CT DEEP's award, but no indication or substantiation of the actual reason. Regardless, there is no merit to any of the numerous potential grounds suggested by EPA.  As an initial matter, EPA's failure to make CT DEEP aware of the specific grounds for its termination is a violation of 2 C.F.R. § 200.341(a), which requires that a written notice of termination should include the reasons for termination.

---

[1] United States Government Accountability Office, Office of the General Counsel, Principles of Federal Appropriations Law, Third Edition, Volume II, at 7-2, available at https://www.gao.gov/assets/gao-06-382sp.pdf.
[2] Grants Policy Issuance- 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds at https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf

In the August 7th Memorandum, EPA indicated that federal spending legislation was the basis for the termination. The Termination Notice, however, said that the termination was instead based on a list of entirely different and unspecified reasons, purportedly any of the possible reasons included in EPA's General Terms and Conditions and 2 CFR 200.340, which govern Assistance Amendment 5H-84090001-1. Consistent with federal Office of Management and Budget regulations and the Assistance Agreement, an award can be terminated for the following reasons:

> (1)  if the recipient or subrecipient fails to comply with the terms and conditions of the federal award;[3]

> (2)  if the recipient or subrecipient consents to terminate the federal award;[4]

> (3)  if the recipient or subrecipient of the federal award so requests;[5]

> (4)  pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities; or[6]

> (5)  The grounds provided in 2 CFR 200.339 (those being where the recipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award).[7]

Between the Memorandum and Termination Notice, EPA has offered at least six potential - and different - reasons why a federal award could in theory be terminated. But EPA has not offered a single valid reason why this specific grant agreement with CT DEEP was terminated, providing no reasoned basis for termination or any individualized assessment of CT DEEP's grant agreement. Nor did EPA preserve all available regulatory grounds for termination in this case, so not all of the options presented in EPA's long list are actually available to it. *See* 2 C.F.R. 200.340(b) ("The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.").

Consistent with 2 C.F.R. 200.340(a), EPA is bound by the termination provisions specified in the terms and conditions of the Solar for All award.  The terms and conditions applicable to this grant do not allow for unilateral termination absent a recipient's failure to comply with the terms and conditions of the grant. Any subsequent

---

[3] § 2 CFR 200.340 Termination.(a)(1).
[4] § 2 CFR 200.340 Termination.(a)(2).
[5] § 2 CFR 200.340 Termination.(a)(3).
[6] § 2 CFR 200.340 Termination.(a)(4).
[7] § 2 CFR 200.339 Remedies for noncompliance.

changes to the grounds for unilateral termination of an assistance agreement must be agreed to by both EPA and the grantee.  We have not, and unequivocally do not, agree to any attempts to terminate this grant award based on an erroneous, bad faith interpretation of OBBBA Section 60002. Congress intended for CT DEEP's obligated funds to continue to support our legally binding award and these funds cannot be unilaterally terminated by the executive branch in this way. This unilateral termination decision is therefore contrary to law and a breach of the Assistance Amendment 5H-84090001-1.

In addition, EPA has taken further action that unlawfully pulled back funding that was still legally obligated to CT DEEP. Prior to the Termination Memorandum, on August 6, 2025, CT DEEP's ASAP account available balance was $62,014,423.09, which represents the cumulative authorized amount of the EPA Award $62,050,000[8] minus funds drawn down by CT DEEP for authorized work prior to that date. On August 8, 2025, CT DEEP's ASAP account access changed to a "liquidated" status and a small portion of the awarded funds appeared to be available to draw down. However, the "available balance" on the account had been substantially reduced from $62,014,423.09 to $4,341,009.62.

This adjustment to CT DEEP's account balance, which was done prior to the expiration the 30-day dispute period detailed at 2 CFR 1500 Subpart E and prior to any actions from CT DEEP to close out the award[9] violates CT DEEP's right to due process and ignores its reliance interests. CT DEEP reasonably relied on this funding to begin the contracting process with two subgrantees, the Connecticut Green Bank and Connecticut Housing Finance Authority, to deploy a combined $5.55 million for increased incentives for residential energy storage installed with solar, $7.5 million for a new loan or lease program for single-family households to adopt solar, energy storage, and enabling upgrades, $10 million for a revolving loan fund for multifamily affordable housing owners to access solar, energy storage, and enabling upgrades, $20 million for a lease option for multifamily affordable housing owners to access solar, energy storage, and enabling upgrades, $5 million for additional solar financing for single-family and/or multifamily affordable housing projects based on identified market gaps through the Green Bank's existing Capital Solutions program, $4 million in technical assistance for building assessments and audits, and $500,000 in technical assistance for community outreach and engagement, as described in CT DEEP's work plan that was approved by EPA on January 15, 2025. Additionally, CT DEEP was about to issue a final request for proposals for additional subgrantees to administer up to $5.5 million in technical

---

[8] CT DEEP was awarded $62,450,000, $400,000 of which was in-kind assistance from EPA and is therefore not included in the $62,050,000 amount originally available in ASAP.

[9] To be clear, because CT DEEP disputes the termination of its Solar for All funding, the agency is not taking any steps to close out the award.

assistance, including community outreach and engagement and tools and technical support for communities. CT DEEP also had a contract with an entity to perform a workforce needs assessment that would have informed the deployment of $3 million in technical assistance for workforce development programs and trainings. Without this funding, CT DEEP will be unable to move forward on its commitments to fund solar and energy storage deployments, community outreach and engagement, technical support for communities, and workforce development.

**(3) None of the potential reasons for termination apply here, nor does EPA provide any other valid justification.**

Even if EPA had met its obligation to provide specificity in its reasoning for termination, no possible cited ground for termination finds support on this record. And neither the Termination Notice dated August 8, 2025, nor the Memorandum, dated August 7, 2025, give any other valid reason for termination.

Termination for noncompliance is only possible under this grant's terms when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Amendment 5H-84090001-1 is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination." Neither case exists here. EPA has neither identified any non-compliance nor requested that CT DEEP take action to cure any deficiencies in its agreement performance. Moreover, it bears noting that all competitive grants were awarded per 2 CFR 200.205, which requires a merit review before awarding funding; nothing that the Agency has stated in our termination letter raises concerns about the meritorious nature of our organization or the projects that we are undertaking with our federal funds.

Furthermore, CT DEEP has not failed to comply with the terms or conditions of this award. EPA has not claimed that the grant will not accomplish the purposes for which it was made, which include providing financial and technical assistance support to a wide variety of communities in Connecticut. And EPA has not raised any concerns specific to CT DEEP's administration of its award relative to fraud, waste or duplication.

Assuming, *arguendo*, that CT DEEP did fail to comply with the terms and conditions of the Assistance Amendment 5H-84090001-1, EPA has failed to provide CT DEEP with a reasonable opportunity to remedy the noncompliance as required by the Agreement. Section III(P) of the Solar for All Programmatic Terms and Conditions to the Assistance Amendment 5H-84090001-1 provides that:

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America, or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

The Assistance Amendment 5H-84090001-1 goes on to say that if EPA determines that noncompliance cannot be remedied by imposing additional conditions, EPA may [only then] seek remedies under 2 CFR 200.339 up to and including termination. *Id.* EPA's failure to provide CT DEEP with its procedural due process rights as provided for in the Assistance Amendment 5H-84090001-1 renders EPA's termination decision unlawful and arbitrary.

Given that no valid grounds for this termination exist, and EPA does not point to any in the Termination Notice or Memorandum or provide any other valid justification, such termination is arbitrary and capricious and contrary to law. EPA must follow the law, rescind this unlawful termination, and restore CT DEEP's access to our obligated funds to complete crucial solar deployment projects in underserved communities to add energy to the grid and significantly lower household energy prices for participating customers.

### (4)  EPA's Withdrawal of CT DEEP's Duly Appropriated and Obligated Solar for All Assistance Agreement Violates the Constitution's Separation of Powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[10] The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[11] The Executive has no power "to enact, to amend or to repeal statutes."[12] Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

*Spending Clause*

---

[10] U.S. Const. art. I, § 1.
[11] Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585 (1952).
[12] Clinton v. City of New York, 524 U.S. 417, 438 (1998).

The Constitution "exclusively grants the power of the purse to Congress, not the President."[13] U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress — not the Executive — "shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[14]

The Termination Notice, the Memorandum and their implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[15] For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of CT DEEP's funding agreement.

*Take Care Clause*

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[16] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[17] Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and CT DEEP's individual Assistance Amendment 5H-84090001-1 on the grounds that Section 60002 "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the program's administration. . .is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind CT DEEP's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[18] EPA's Termination of CT DEEP's Assistance Amendment 5H-84090001-1 contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and

---

[13] City County of San Francisco v. Trump, 897 F.3d 1225, 1231 (9th Cir. 2018).
[14] See Pennhurst State Sch. & Hospital v. Halderman, 451 U.S. 1, 17, 25 (1982); NFIB v. Sebelius, 567 U.S. 519, 583-84 (2012).
[15] South Dakota v. Dole, 483 U.S. 203, 207, 208 (1987).
[16] U.S. Const. art. II, § 3.
[17] See In re United Mine Workers of Am. Int'l Union, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); Kendall v. United States, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").
[18] OBBBA Section 60002.

de-obligate funds that were obligated to CT DEEP well before the day before OBBBA's enactment. EPA violated constitutional separation-of-powers constraints because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[19] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[20] Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[21] For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[22] When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating CT DEEP's Solar for All Assistance Amendment 5H-84090001-1. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[23] When actions by the federal government come in the form of "threats to terminate. . .significant independent

---

[19] U.S. Const. Art. I, § 9, cl. 7.
[20] Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).
[21] See Youngstown, 343 U.S. at 637–38 (Jackson, J., concurring).
[22] U.S. Const. art. I, § 1; see also Clinton, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").
[23] U.S. Const. amend. X.

grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[24] EPA's termination of CT DEEP's Solar for All Assistance Amendment 5H-84090001-1 altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Amendment 5H-84090001-1. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

 *Ultra Vires*

The Termination Notice, the Memorandum, and subsequent termination of CT DEEP's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind CT DEEP's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

### (5) Relief Requested

CT DEEP seeks rescission of the termination of this award; reinstatement of the Assistance Amendment 5H-84090001-1 for the originally awarded amount, scope of work, and performance period; reinstatement of the notice to proceed; and the full and immediate reinstatement of the $62,014,423.09[25] that was available in CT DEEP's ASAP account as of August 6, 2025 (the day before the Termination Memorandum).

Until our dispute with EPA has been resolved, we will also object to any claims of noncompliance under 2 C.F.R. 200.344(i).

We would be happy to answer any questions you may have about this letter or our program. The project manager, Claire Sickinger, can be contacted at 860-827-2618 and claire.sickinger@ct.gov.

(Signature page follows)

---

[24] Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 580 (2012).
[25] This dollar amount represents the cumulative authorized amount of the EPA Award $62,050,000 minus funds drawn down by CT DEEP for authorized work prior to the August 7, 2025 termination notice.

Very truly yours,



**Joseph DeNicola**
Deputy Commissioner, Bureau of Energy and
Technology Policy
Connecticut Department of Energy &
Environmental Protection
10 Franklin Square
New Britain, CT 06051
joseph.denicola@ct.gov

CC:
Devon Brown, EPA Award Official
Melissa Hopkinson, EPA Project Officer
Jennifer Brooks, EPA Grant Specialist

EXHIBIT 8

| | |
|---|---|
| **From:** | SFA |
| **To:** | SFA |
| **Subject:** | Solar for All Grant Closeout Instructions |
| **Date:** | Wednesday, October 1, 2025 4:21:21 PM |

---

EXTERNAL EMAIL: This email originated from outside of the organization. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

### Final Federal Financial Report (SF-425):

**Submission Instructions**:

- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:

- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of

the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

- ○ If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance during the entire performance period (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - ○ In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - ○ Progress towards objectives on program key performance metrics during the performance period.
  - ○ Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - ○ Geographic coverage of financial assistance and project-deployment technical

assistance deployed during the performance period.
  - Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 9



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 20, 2025

**MEMORANDUM**

**SUBJECT:**     Update on Dispute of EPA Assistance Agreement 5H-84090001 under 2 CFR 200.340

**FROM:**        Michael D. Molina, Principal Deputy Assistant Administrator
                 Grants Dispute Decision Official

**TO:**          Joe DeNicola, Deputy Commissioner
                 Connecticut Department of Energy & Environmental Protection

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84090001. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.20
17:02:50 -04'00'

Michael D. Molina
Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# EXHIBIT 10



**Connecticut**
Department of Energy &
Environmental Protection

portal.ct.gov/DEEP

From: Katie S. Dykes
Commissioner
Connecticut Department of Energy and Environmental Protection
79 Elm St, Hartford CT 06106
Katie.dykes@ct.gov

To: Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC 20460
brown.devon@epa.gov

cc: Michael Molina, molina.michael@epa.gov

Date: November 3, 2025

Re:     **Objection to Closeout of EPA Assistance Agreement 5H-84090001**

Dear Mr. Brown:

On September 5, 2025, the State of Connecticut Department of Energy and Environmental Protection (CT DEEP) submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 5H-84090001 pursuant to 2 C.F.R. § 1500.15. Despite that timely dispute, on October 1, 2025, CT DEEP received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that CT DEEP complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." CT DEEP has now received EPA's October 20, 2025 letter purporting to declare moot CT DEEP's "dispute regarding the termination of Assistance Agreement 5H-84090001." The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that CT DEEP close out Assistance Agreement 5H-84090001.



As an initial matter, clarification is needed because EPA's October 20, 2025 letter references "your dispute . . . submitted on August 28, 2025." But CT DEEP did not submit its Part 1500 dispute on August 28, 2025. Rather, August 28, 2025 is the date that CT DEEP submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025 Assistance Amendment. Thus, it is unclear which of CT DEEP's disputes "EPA has rendered" moot. CT DEEP disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending. EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation. We request that EPA reverse its mootness determination and allow the administrative dispute to proceed. At a minimum, EPA should stay the administrative dispute until the conclusion of CT DEEP's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of CT DEEP's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, CT DEEP has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require CT DEEP to close out while litigation is pending that directly concerns EPA's termination of this grant. *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if (1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." CT DEEP has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated funds from CT DEEP's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, CT DEEP has not been able to complete the work required under Assistance Agreement 5H-84090001. Accordingly, EPA necessarily cannot "determine[] that all administrative actions and required work of the Federal award have been completed" as would be required to close out.



CT DEEP does <u>not</u> agree to close out Assistance Agreement 5H-84090001 while litigation relating to this grant is pending.  We seek an extension for our close-out date until all litigation has been resolved, including any appeals.  Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00 pm on November 5, 2025.

Very truly yours,

Katie S. Dykes
Commissioner
Connecticut Department of Energy and Environmental Protection
79 Elm St, Hartford CT 06106
<u>Katie.dykes@ct.gov</u>