# EXHIBIT 1

5H - 84088001 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN): 84088001<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5H | DATE OF AWARD<br>07/09/2024 |
|---|---|---|
| | TYPE OF ACTION<br>New | MAILING DATE<br>07/12/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>30122 |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**<br>Department of Energy and Environment<br>DISTRICT DEPARTMENT OF ENERGY AND ENVIRONMENT<br>Washington, DC 20002-3361<br>EIN: 53-6001131 | **PAYEE:**<br>Department of Energy and Environment<br>1200 First Street, NE<br>Washington, DC 20002 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Thomas Bartholomew<br>1200 First Street NE, 5th Floor<br>Washington, DC 20002-3361<br>**Email:** thomas.bartholomew@dc.gov<br>**Phone:** 202-671-4096 | Lydia Kidane<br>1300 Pennsylvania Ave NW, 20460<br>Washington , DC<br>**Email:** Kidane.Lydia@epa.gov<br>**Phone:** 202-564-0506 | Alison Hanlon<br>OGD-GMB, 3903R<br>1200 Pennsylvania Ave, NW, 3903R<br>Washington DC, DC 20460-0000<br>**Email:** Hanlon.Alison@epa.gov<br>**Phone:** 202-564-0244 |

**PROJECT TITLE AND DESCRIPTION**

Washington DC's Solar for All- "Note: A special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.
Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.
No subawards are included in this assistance agreement.

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 0.00 | TOTAL PROJECT PERIOD COST<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 62,450,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS**<br>Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | **ORGANIZATION / ADDRESS**<br>Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1300 Pennsylvania Avenue NW<br>Washington , DC 20460-0000 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official LaShaun Phillips - Associate Award Official | DATE<br>07/09/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 62,050,000 | $ 62,050,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 62,450,000 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41058 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 62,050,000 |
| | | | | | | | | | $ 62,050,000 |

5H - 84088001 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 62,450,000 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**A. Performance Reporting**

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once,

and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*<u>The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition</u>*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient

to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1)

must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

#### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

#### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

**C. Solar for All Workplan**

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate

program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to

a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

<u>2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs</u>

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

<u>K. Labor and Equitable Workforce Development Requirements</u>

<u>1. Davis-Bacon and Related Acts (DBRA)</u>

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant

construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

**B. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for

Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

## a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

## b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

### 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the

performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims**

Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient

agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the

Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

<u>8. Record-Keeping</u>
In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.
Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

<u>9. Other Federal Requirements</u>

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at

any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that

the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

### AA. Compliant URL Links

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

### AB. Flow-Down Requirements

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form

of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

#### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

#### 2. Governance Requirements

#### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient

agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

5H - 84088001 - 1    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN): 84088001<br>MODIFICATION NUMBER: 1<br>PROGRAM CODE: 5H | DATE OF AWARD<br>12/19/2024 |
|---|---|---|---|
| | | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>12/19/2024 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>30122 |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**<br>Department of Energy and Environment<br>DISTRICT DEPARTMENT OF ENERGY AND ENVIRONMENT<br>1200 1ST ST., NE 5TH FLOOR<br>Washington, DC 20002-3361<br>EIN: 53-6001131 | **PAYEE:**<br>Department of Energy and Environment<br>1200 First Street, NE<br>Washington, DC 20002 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Thomas Bartholomew<br>1200 First Street NE, 5th Floor<br>Washington, DC 20002-3361<br>**Email:** thomas.bartholomew@dc.gov<br>**Phone:** 202-671-4096 | Lydia Kidane<br>1300 Pennsylvania Ave NW, 1101R<br>Washington , DC 20460-0000<br>**Email:** Kidane.Lydia@epa.gov<br>**Phone:** 202-564-0506 | Alison Hanlon<br>OGD-GMB<br>1200 Pennsylvania Ave, NW, 3903R<br>Washington DC, DC 20460-0000<br>**Email:** Hanlon.Alison@epa.gov<br>**Phone:** 202-564-0244 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Washington DC's Solar for All Program Application for the Greenhouse Gas Reduction Fund's Solar for All Competition

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 62,450,000.00 | TOTAL PROJECT PERIOD COST<br>$ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1300 Pennsylvania Avenue NW<br>Washington , DC 20460-0000 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY ||
|---|---|
| Digital signature applied by EPA Award Official LaShaun Phillips - Associate Award Official | DATE<br>12/19/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84088001 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 1,458,535 |
| 2. Fringe Benefits | $ 357,341 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 5,000 |
| 6. Contractual | $ 36,024,070 |
| 7. Construction | $ 0 |
| 8. Other | $ 23,632,689 |
| 9. Total Direct Charges | $ 61,477,635 |
| 10. Indirect Costs: 18.00 % Base SW+FB | $ 972,364 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,449,999 |
| 12. Total Approved Assistance Amount | $ 62,449,999 |
| 13. Program Income | $ 2,647,212 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

## Programmatic Conditions

### Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/032024)

### I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's [Environmental Information Quality Policy](). Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's [Environmental Information Quality Policy](). Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well [SFA@epa.gov]() such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States: Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition*:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

>    (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

>    (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

>    (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

    **a. Solicitation and Contract Requirements:**

        **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

        **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

    **b. After Award of Contract:**

        **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

        **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

    **a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

    **b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

    **c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program**

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

> "[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:
>
> **a. Solicitation and Contract Requirements:**
>
>> **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
>>
>> **ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
>
> **b. After Award of Contract:**
>
>> **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
>>
>> **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

> 1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

> 2. Privately-owned commercial buildings when they meet the "public function" test;

> 3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

　　1. Single family homes;

　　2. Privately-owned, non-mixed-use, multi-family housing properties;

　　3. Privately-owned residential portions of mixed-use properties;

　　4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

　　1. Low-Income Housing Tax Credit (LIHTC);

　　2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

　　3. Federal Housing Administration Insured Multifamily Mortgages;

　　4. HUD Section 8 Funding;

　　5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

　　1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

　　2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities**. As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

<u>B. Board Independence</u>

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

<u>C. Board Policies and Procedures</u>

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the <u>EPA's Final Financial Assistance Conflict of Interest Policy</u>.

<u>3. Legal Counsel</u>

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

<u>AB. Amendments to Award Agreement</u>

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

<u>AC. Preservation of Guidance and Data</u>

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

EXHIBIT 3

**Greenhouse Gas Reduction Fund**
**Solar for All**
**DC Solar for All (SFA)**
**Work Plan**
*Project Period: 05/01/2024-04/30/2029*
*November 14, 2024*

**Project Title:** DC Solar for All
**Grant Number:** 84088001
**Organization Name:** Washington, DC Department of Energy and Environment (DOEE)
**Geography:** The District of Columbia
**Definition of LIDAC:** DOEE will define LIDAC communities based on a combination of CJEST data, geographically dispersed low-income households and properties providing affordable housing.

**Introduction**

**Section 1:  Project Description**

**1.1 Overview**

The District of Columbia is committed to energy equity and reducing greenhouse gas (GHG) emissions by expanding the deployment of residential serving solar, storage and enabling upgrades to benefit low-income residents. Per the Renewable Portfolio Standard (RPS), the District has set a climate goal that by 2032, 100% of the electricity supply will come from renewable sources. By 2045, DC aims to achieve carbon neutrality. The GGRF funds received by the Department of Energy and Environment (DOEE) will directly benefit low-income and disadvantaged District residents through the delivery of household savings, quality jobs, increased resiliency to power outages, and/or community ownership. The DC Solar for All (SFA) Program will mobilize financing and private capital to catalyze investment that will increase the scale of deployment of residential-serving rooftop and community solar projects. Delivering enabling upgrades such as roof repair, electrical upgrades and energy efficiency retrofits will unlock greater solar potential for rooftop solar systems for low-income homeowners, decrease energy burden for low-income homeowners and renters, increase resiliency, maximize solar potential, and increase opportunities for training and placement in good jobs in the renewable energy and building trades industries.

**Distributed Solar Market Strategy**

Net Metering Policy – The District of Columbia has net metering laws that allow residential customers to be credited at the retail rate for each kilowatt produced by their renewable energy system up to 100 kW in capacity. Systems over 100 kW and up to 1MW are credited at the generation rate. There is no state-wide net metering cap in the District. In 2020, the DC PSC amended the municipal regulations to allow consumers to generate and be compensated for up to 200% (by 2024) of their historical usage so that customers can size their solar systems according to increased demand from anticipated electrification. The net metering credits roll over month to month, do not expire, and are valued at the full retail rate. Allowing residents to be paid for such a

significant amount of overgeneration allows for quicker pay back periods for residents installing NEM solar systems. DOEE will take advantage of these supportive policies by offering financial assistance and project deployment technical assistance for NEM systems through the DCSEU competitive RFP process, and to community organizations and master-metered buildings committed to maximizing the benefits of solar to LMI residents and customers.

Third-Party Ownership – The District solar market utilizes third party ownership models such as power purchase agreements (PPAs) and solar leases to deploy solar. DOEE contracts with solar developers for the deployment of CREF projects utilizing a PPA-like structure. DOEE offers a per watt incentive payment for the installation of the solar system in exchange for the rights to the power generated for at least 15 years. The developer owns, operates, and maintains the PV system on various host sites. DOEE receives the energy produced at no additional cost and passes on the benefits of this energy to LMI customers under the SFA program. District regulation allows for third-party PPAs, as well as residential solar leasing arrangements. The more common financing mechanism in the District is a PPA structure. The third-party ownership model leverages SFA incentives for both community solar and rooftop solar. Since the developer owns the system, they also receive tax incentives and SREC revenue. This model has allowed DOEE to provide solar PV systems for residents at no cost to them, and the residents benefit from the energy savings. Because of the District's third-party ownership laws,[50] DOEE will utilize the benefits provided by third party developers to monetize tax credits and other incentives in exchange for the rights to the power that they produce, for a term of at least 15 years for the direct benefit of LMI residents across the District.

Interconnection and Permitting Challenges – Project interconnection has been a challenge, particularly for larger community solar projects in the District, given the aging grid-infrastructure and related systems. High and uncertain interconnection costs, long interconnection queue delays, inconsistently applied permitting regulations, and lengthy permit wait times are barriers to successfully connecting distributed energy resources (DERs) to the grid. While current regulations require timelines for interconnection, those timelines are not consistently met, particularly for larger community solar systems. Another challenge is the cost of interconnection. When a solar project applies for interconnection, the utility (Pepco) will evaluate the impact the project will have on the local grid system. If the utility determines that a specific project will trigger the need for distribution upgrades, they will charge that homeowner or developer for the full cost of the upgrades. The cost of these required upgrades has, in some cases, prevented projects from moving forward.

DOEE will address this barrier by contracting with one or more providers of project-based technical assistance to vet solar hosting sites proposed for bid through DCSEU, help projects move expeditiously through the Pepco solar interconnection queue, as well as support action before the DC PSC to continue to support improvements to the solar interconnection process. Pepco does not always proactively offer alternative interconnection options, such as switching feeders, splitting systems between feeders, and incorporating battery storage. The technical assistance providers could help ensure that alternative options are considered on a more consistent basis. DOEE will also address this barrier by offering grants and financial support for battery storage systems to avoid costly grid upgrades and system curtailments. Finally, DOEE will incorporate information

learned from its current solar hosting capacity study and prioritize installations in less constrained portions of the grid where feasible.

To address inconsistent permitting regulations and wait times, DOEE has a Solar Coordinator who is housed at the District of Columbia Department of Buildings (DOB), which issues District permits for solar systems, to improve coordination with the agency. DOEE will work with DOB to develop a process for solar systems to meet set permitting criteria. DOB will ensure that solar systems are in compliance with local codes and regulations and troubleshoot with DOEE staff and developers to avoid common errors and issues that can result in permit denials and/or delays.

Renewable Portfolio Standard (RPS) - The District of Columbia requires suppliers to source 100% of their electricity from renewable sources by 2032. The RPS currently also stipulates a 3% carve out for electricity from local solar generation, which rises annually to 15% by 2041.55 Together with demand constraints in the District, the RPS ensures a high SREC value, providing a generation incentive that is attractive for developers, residents, and organizations alike. DOEE will continue to leverage the aggressive RPS mandates to incentivize solar developers to install third-party owned solar systems, and to share at least 50% of the benefits with LMI residents.

Regulatory Market for Community Solar – In 2013, the passage of the Community Renewable Energy Amendment Act (CREA) allowed residents to purchase electricity generated by a "community renewable energy facility" through virtual net metering policies and receive CNM credits directly on their utility bill.56 This legislation set the stage for the creation of the District's SFA Program in 2016. The SFA program is funded through the proceeds from alternative compliance payment fees collected from energy suppliers when they do not meet the requirements of the RPS. The program's statutory goal is to serve 100,000 District households by 2032 with enough solar benefits to cut the average District electric bill by 50%.57 While there is no aggregate capacity limit for the amount of solar that can subscribe to community net metering, there are individual system capacity limits. The deployment cap for CREF projects is 5 MW per system. To date, there has not been a proposed CREF that has been hindered by this cap. However, meeting the District's clean energy targets may eventually require higher capacity projects. Subscribers to energy generated by CREFs are also entitled to virtual net metering. These customers can have up to 120% of their monthly electricity demand credited via CREF credits.58 Solar energy generated by CREFs is credited at the residential retail electricity rate for residential customers, and credits appear directly on the consumer's utility bill. These policies have been supportive of robust community solar development; however, Pepco's billing system initially had challenges managing the large increase in the number of community solar subscribers starting in 2020 under SFA. As a result, DOEE worked with other parties to open a proceeding at the DC PSC to address the billing challenges. Recent rulings by the Commission should help ensure that those billing errors are rectified, and that technical issues are addressed by using modern billing technology.

**1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**

**Environmental Results - Outputs and Outcomes:**

Number of households served: **12,394**

3

New generation capacity from residential solar: **1.5MW**
New generation capacity from residential-serving community solar: **41.74MW**
Estimated GHG emissions reduced and avoided: **546,600 tons of CO2e**
Total number of household savings realized over performance period: **$16,122,200***
Estimated household savings per household: **$1,300/household***

*These estimates take into account that not all 12,394 households will be enrolled in the first year and receive benefits for all four years of the performance period. Enrollment is increased by 25% each year and savings calculated accordingly.*

Note that the MW targets are an initial estimated range. The SFA Team continues to refine incentive rate models taking into account a number of potential market conditions and criteria, as well as feedback from stakeholders. All estimates have taken into account the overlap for projects that receive both loan and incentive financing.

|  | Output | Outcome |
|---|---|---|
| **Climate and Air Pollution** | -**613** total projects financed<br>-**404** residential rooftop projects financed (3.5kW/project)<br>-**209** residential serving community solar projects financed (average 200kW/project)<br>-**712,800** tons of CO2e reduced or avoided<br>-**18,584** tons of CO2e reduced or avoided through rooftop solar<br>-**694,216** tons of CO2e reduced or avoided through CREFs | -**33-43.24 MW** total capacity generated<br>-**1.5MW** clean energy generation through rooftop solar<br>-**3.5-41.74MW** clean energy generation through residential serving community solar<br>-Increase in the amount of electricity sold in the District coming from solar |
| **Equity and Community** | -**12,394** households served through SFA<br>-**404** households receive rooftop solar<br>-**11,990** benefitting from community solar<br>-**20-60** households receiving battery storage system<br>-**11-31** residential serving community solar projects include battery storage systems<br>-**24,800** residents receive information about the SFA through direct community engagement (community meetings, door to door campaigns, etc.)<br>-**200** residents trained in electricity/solar installation | -**100%** of households served receive an annual savings on of at least $520 or 50% of average annual energy costs<br>- **$16,112,200** in household savings<br> -**60** households receiving a battery storage system who experience increased resiliency<br>-**200** households referred to non-SFA partners for the finance and purchase of homeowner owned systems<br>-**519** new jobs created<br>-**100** community organizations engaged by SFA services for solar deployment, technical assistance and education |

| | -Average starting wage of **$22/hour** for workers on SFA funded projects<br>-**$17,412,500** in financial assistance directed to local Certified Business Entities | -**155** residential serving community solar projects completed using tools to promote good jobs and community benefits |
|---|---|---|
| **Market Transformation** | -**$62,450,000** in grant funds deployed including:<br>　　- **$53,072,447** in financial assistance<br>　　- **$6,560,312** in technical assistance<br>　　- **$2,400,000** in program administration<br>-**$53,072,447** in financial assistance by type of cost:<br>　　-**$45,887,500** for solar<br>　　-**$4,462,500** for storage<br>　　-**$7,150,000** for enabling upgrades<br>-**$53,072,447** by type of assistance:<br>　　-**$24,000,000** in subsidies<br>　　-**$25,070,344** in loans<br>　　-**$3,389,830** in grants<br>　　-**$612,273** in participant support costs<br>-**$56,182,538** in financial assistance provided through loans after recycling<br>-**$18,228,000** federal tax credits leveraged<br>-**$75,200,000** in private sector financing mobilized, with projects funded directly by SFA | -**90%** of solar projects in the District meet required interconnection timelines for authorization to install and authorization to operate |

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.

- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change
- Goal 2: Take Decisive Action to Advance Environmental Justice and Civil Rights
  - Objective 2:1: Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels
  - Objective 2:2: Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and Activities
- Goal 4: Ensure Clean and Healthy Air for All Communities
  - Objective 4:1: Improve Air Quality and Reduce Localized Pollution and Health Impacts

**Section 2:  Project Design Plan**

**2.1 Activities to be Conducted**

**Meaningful Benefit Plan**

The DOEE SFA program has prioritized providing meaningful benefits to District residents since the program's inception in 2016. GGRF funds will allow DOEE to broaden the scope and reach of the meaningful benefits the SFA program provides for low-income and disadvantaged households.

1.  *Maximizing household savings (50% average annual savings, or greater)*: DOEE's SFA program expansion will build from a strong foundation of maximizing participation and direct household utility bill savings for LMI households. The program provides subscriptions to Community Renewable Energy Facilities (CREFs) at no cost to subscribers, with each subscription sized so that the resulting Community Net Metering (CNM) credits will reduce the average DC electric bill by 50% of the average annual utility rate. The program will continue to reduce subscribers' electricity bills by providing CNM credits corresponding to the monetary value of solar electricity produced by the facility connected to each subscription. DOEE is committed to providing benefits that will reduce the energy burden for LMI households to 3% (the average energy burden for non-LMI residents). Each year, DOEE will analyze energy inflation costs and adjust benefit amounts as necessary to ensure that benefits continue to meet 50% of the average annual utility bill.

2.  DOEE and subscriber management partner Groundswell are able to verify benefits are delivered because they can access Pepco billing details/credit amounts. They use two methods to make sure subscribers are on track to reach the $500/year goal. The first is ad-hoc resizing; if a CREF is over/underproducing, they will adjust subscription sizes or move the subscriber to a different CREF until the production becomes more stable. The second check is the bi-annual credit check which includes comparing credit amounts for all CREFs and wards to make sure they're equitable. If there is a major discrepancy, those subscriptions will be resized.

3.  Participants receiving rooftop solar will receive a system sized to at least 3.5kW to ensure that bill savings meet, and many times exceed, the threshold of 50% of the average annual utility rate.  Indirect benefit models will need to provide an indirect benefit equal in value to the 50% annual average bill savings. Community benefits agreements will detail the benefit amount as well as the benefit delivery plan.

4.  *Equitable access*: The SFA program has and will continue to exclusively serve LMI households,  specifically households who earn 80% of the Area Median Income (AMI) or less. Income-qualified residents who rent and/or live in multi-family buildings can access community solar through SFA and either receive direct bill credits or a comparable indirect benefit. DOEE recently developed and will replicate an indirect benefit model for LMI households that do not pay a utility bill. The value of the indirect benefit will be equal to the bill credit of at least $500/year in savings and/or increased resiliency and will be

6

detailed in community benefits agreements. The indirect benefit delivery will be managed and tracked the same way that bill credits are managed and tracked. Single-family homeowners may also enroll in community solar. If they prefer to install rooftop solar systems, they may also choose to receive enabling upgrades and/or a solar rooftop system through SFA. Under SFA, homeowners will pay no upfront costs, and will receive all the energy generated by the solar system. Homeowners may benefit from shared incentives with developers, such as SREC revenue and tax credits. With guidance from education and technical assistance partners IPL and GHHI, homeowners may also choose to purchase and install a solar system through the private market, in which case they will be connected with trusted community resources.

5. *Resilience and grid benefits*: The meaningful benefits plan prioritizes policies and projects that co-locate solar and storage facilities in areas that will benefit the grid in low-income and disadvantaged communities. DOEE's Hosting Capacity Study, in tandem with CEJST disadvantaged census tract data, will allow SFA to focus on the areas in the District that would benefit most from solar installations, storage facilities, and microgrids and maximize community benefits.

6. *Community ownership*: The meaningful benefits plan supports household and community ownership of solar systems through a comprehensive mix of community engagement and education, incentives, and innovative financing options. The Solar for All Program will not provide financing for single family homeowners to purchase and own a solar system. Solar systems for single family homeowners through SFA will be third-party owned; however, single-family homeowners will be connected with SFA's technical assistance and education partner, Green and Healthy Homes Initiative (GHHI), who will provide support in navigating and assessing the resources and various solar models available to them. GHHI will connect residents interested in owning their solar system to Energy Sage, a trusted online solar comparison-shopping landing page with whom DOEE hosts an ongoing webinar series. GHHI will also refer residents interested in owning their solar system to DC Solar United Neighbors (DC SUN), whose mission is to help people go solar, organize, and advocate for their energy rights. DOEE promotes the Capital Area Solar Switch organized by DC SUN and managed by iChoosr. Similar to a cooperative, Solar Switch is a group buying program, which unites customers who want to install solar and then allows local, vetted solar installers to bid for the group's business, resulting in savings for the customers. SFA will limit the risk to residents by serving as a trusted advocate and navigator. We will share best practices and ensure that the homeowners are educated about the risks and benefits of purchasing and owning a solar system.

For community organizations such as congregations and nonprofit entities, DC Solar for All will offer affordable financing options for entity-owned solar systems as well as technical assistance in accessing the associated tax benefits. These entities will receive support from SFA's technical assistance and education partner, Interfaith Power and Light of the DMV.

7. *Workforce development:* Recognized as a central component of the plan, DOEE anticipates that 519 jobs will be created as a result of projects supported by the expanded SFA program. As DOEE expands investment in workforce training programs with IBEW, the SFA

program will also invest in measures to ensure that the jobs created pay a prevailing wage, offer a full benefits package including family-supporting benefits, retirement benefits, safe working conditions, the ability to join a labor union and more. Under this plan, DOEE will facilitate the creation of project labor agreements between solar developers receiving funding through SFA for the development of rooftop and CREF projects. DOEE will work with IBEW to define the requirements for such agreements.

Finally, this plan will provide supports for disadvantaged, local businesses entering the solar market, many of which are Certified Based Enterprises (CBEs) DOEE will offer incentives for these small, local businesses who hire local skilled workers to compete with larger developers for funding. Small, local businesses often lack the capital to pay for the upgrades that enable solar deployment and struggle to secure private financing. The no-cost loan products offered through SFA are specifically designed to remove barriers for these companies to install solar systems. In addition, DCGB and DCSEU have committed to providing at least 35% of their allocated funds for commercial entities to Certified Business Enterprises (CBE).

**Financial Assistance Strategy**

The financial assistance strategy is designed to deploy $53,072,447 (85% of grant) to transform the District's solar market and create solutions to common barriers for renewable energy projects serving LMI customers, including both NEM systems and CREF projects (community solar) located on single- and multifamily residential, public, and commercial properties. Any community solar project funded by SFA will have a nameplate capacity of 5MW or less and will deliver at least 50% of the electricity generated to multiple LMI customers in the District of Columbia, which is entirely within one service territory. District SRECs provide a significant financial incentive for any project able to overcome the financial, regulatory, and other hurdles to deployment. The financial assistance products below are designed to work both individually and in combination to maximize solar deployment and provide meaningful benefits for low-income and disadvantaged households (e.g., household savings, increased access, resiliency, shared ownership, and job creation). Under this strategy, DOEE projects we will deploy 33-43.4 MWs of solar capacity, avoid 712,800 tons of $CO_2$ emissions, and provide 12,394 low-income households with direct solar benefits. Furthermore, we estimate this strategy will crowd-in $75,200,000 in private capital.

The financial assistance products below are sequenced in order from the beginning to the end of the project deployment life cycle. The pre-development phase includes pre-development loans and funds for enabling upgrades. The development and operations phase includes direct incentives, and debt products consisting of construction, bridge, and permanent loans. Financial assistance will not be delivered directly to households. The financial assistance counterparties will be both for profit and nonprofit solar developers, community-based organizations such as nonprofit community organizations, faith-based institutions and congregations and multifamily affordable housing developers and property owners. Beneficiaries will be low-income District residents, including community solar subscribers, members of congregations, residents of affordable housing communities and recipients of services from nonprofit community organizations. The SFA team has estimated that the average project cost will be $700,000 with $500,000 coming from SFA funds. The average project size is 200kW.

8

*Pre-Development Period Assistance*

1. *Pre-Development Loans* – SFA's capital partners DC Green Bank (DCGB) and City First Enterprises (CFE) have a strong track record of delivering pre-development financing to support clean energy and energy efficiency projects and generate solar jobs. To date, DCGB has deployed millions of dollars in pre-development loans to enable projects to move forward from the initial evaluation stage as well as increase the direct benefits to low-income and disadvantaged communities. DCGB and CFE will build on this past performance to offer pre-development loans as part of the full $25,750,000 revolving loan fund. These investments will be used for project feasibility assessments and other direct project costs, resulting in an entirely new set of solar and battery storage projects able to move forward. The vast majority of these projects will be community-based projects that require additional funding to successfully advance the project from pre-development to the construction phase. The average pre-development loan is estimated at $150,000.

2. *Funds for Enabling Upgrades* – The most common reason that a District resident or a capital constrained entity is unable to install rooftop solar is that they cannot afford the prerequisite roof improvements and electrical work to host the solar. DOEE will administer a $4,000,000 grant fund to finance roof repairs, electrical upgrades, energy efficiency upgrades, and battery storage for individual households. DCGB and CFE will administer $3,750,000 in affordable loans for multifamily affordable housing properties, and community-based organizations, with established criteria for maximizing meaningful benefits for LMI residents. Enabling upgrades funded by GGRF will only be deployed in conjunction with solar systems also funded with GGRF funds through SFA. For certain entities who lack access to capital, these loans may be forgivable. Delivering these funds in the form of loans instead of grants allows for the funds to be bundled more easily with other loan products and recycled to increase access and maximize impact. DOEE will administer the enabling upgrades grant fund for individual households in coordination with other District programs providing energy retrofit upgrades, such as the Affordable Housing Retrofit Accelerator, Affordable Housing Electrification Program and Weatherization Assistance Program. Properties that receive energy efficiency upgrades through these programs will receive additional enabling upgrades and solar installations through SFA. Because these programs are within the same agency, the program teams will work together in a complementary way to braid resources and serve residents seamlessly, without additional application or administrative burdens. The average enabling upgrade loan for multifamily affordable housing projects and community-based organizations is estimated at $250,000. The average enabling upgrade grant for single family homeowners is estimated at $8,000.

*Development & Operations Period Assistance.*

1. *Direct Incentive* – Since 2019, the DC Sustainable Energy Utility (DC SEU) has offered a per watt incentive of capacity delivered to the SFA program. The incentive structure applies to both single-family and CREF projects. Single-family customers own the electricity the solar

9

system generates for the system's lifetime. CREF systems have operated similar to a PPA with DOEE as the off taker of the electricity. DOEE has budgeted a total of $24,000,000 for this direct incentive which will result in 24.84 MWs of solar capacity and provide 5,174 low-income District households with direct solar benefits. SFA incentives helped to grow the community solar market substantially, in spite of historic barriers to interconnections in the District. Developers have also started to incorporate roof repairs and other enabling upgrades into both single-family and community solar projects. This incentive structure has been successful in delivering capacity, especially given the various challenges of developing solar in the constrained environment of the District. However, the significant value of the new federal tax credits and lessons learned from the first seven years of DOEE's SFA program support revising the existing incentive structure. The SFA Team has worked to develop a number of criteria that would impact the amount of subsidy provided including whether a project plans to apply for IRA tax adders, whether the developer brings the site or DOEE brings the site, whether the project is receiving zero percent interest loan financing, whether a developer is a CBE or *disadvantaged*-owned business, etc. The team has provided an initial range of MW production as it continues to refine the incentive rate models to reflect current market conditions and maximize funds. The incentive application process will be incorporated into the loan application process for efficiency and projects may receive incentive funds only or a combination of incentive funds and loan funds.

2. *Revolving Loan Fund* – SFA capital partners, DCGB and CFE, have a successful track record of deploying loan products to benefit low-income and disadvantaged communities in the District. A revolving loan fund of $25,750,000 will support low interest financing, including for solar projects developed by the DCSEU, with a focus on community-owned solar and battery storage projects. The fund will enable the deployment of 25.24 MWs of solar capacity and provide 7,120 low-income households with direct solar benefits over five years. The loan fund anticipates a 10x multiplier effect, meaning that the initial fund capitalization of $25,750,000 will lead to approximately $56,182,538 in loans deployed. In addition, the fund is designed to complement existing sources of capital and financial assistance, while leveraging additional private capital sources. DCGB will work with its existing network of capital partners and engage additional private capital providers. Recycled loan funds and program income will be deployed during the five-year performance period. Any remaining capital in the revolving loan fund (estimated to be approximately $19,995,827) will be available for reinvestment in additional projects. Along with the capital multiplier effects, the remaining capital will ensure longevity and market transformation in subsequent years. The loan fund will support solar and/or battery storage pre-development, installation, and operation. The revolving loan fund can also be used in combination with loans for pre-development, as well as loans for solar-enabling building upgrades and battery storage. Financing will be conditional on meaningful benefits from the solar projects being assigned to income-qualified District residents for at least 15 years at no cost. In the case of community-owned projects, a benefits agreement would be included in the loan terms. This agreement would define the benefit flow mechanisms, which could include a community-based organization using the energy savings generated by the solar system to expand its community benefits delivery model. As loans are repaid

through project revenue and/or permanent financing sources, the capital will be reinvested into additional projects.

3. *Loan Funds for Affordable Housing* – The SFA Revolving Loan Fund will designate funds specifically for at least 24 multi-family affordable housing properties to be supported. Targeting increased solar adoption at affordable housing sites with dedicated financing is an important strategy for reaching LMI households. Funding (in the amount of $3,250,000) allocated for equity grants in the original application have been redirected towards capital funds for the revolving loan programs so they may be recycled to maximize impact. Thus, the amount of funds designated specifically for multi-family affordable housing is $5,450,000 with up to $250,000 in funding available per project with a total estimate of at least 24 projects. Similar to shifting the equity grants to loan funds, the pre-development grants proposed in the original application will be allocated as pre-development loans. This is both to maximize the impact of a reduced award amount and also to improve the efficiency of administrating the funds. All loans will be zero-low interest and for entities that meet pre-determined criteria, the loans may be forgiven after a period of time.

4. *Pre-development Loans for affordable housing sites:* As solar adoption typically involves high upfront costs and given the regulatory and operational complexities affordable housing operators face, low-cost loan options are a critical tool to further incentivize solar deployment for affordable multifamily housing sites. CFE will administer pre-development loans to allow organizations to explore the suitability of their proposed solar projects. Eligible costs will include energy audits to understand baseline energy use, High Performance Building Reports to determine if properties are suitable for solar PV systems, and Technical Solar Assessments that contain in-depth analysis of potential solar system designs and cost-benefit calculations. A total of $645,300 has been allocated for pre-development loans. In the original application, these funds were proposed as a grant, but considering the reduced award amount and the goal to support as many projects as possible, it makes more sense to offer these funds as affordable loans so they can be recycled to maximize impact. Average pre-development loan amounts for affordable housing are estimated at $150,000.

5. *Energy Storage Strategy* – DOEE's SFA program will expand and implement comprehensive energy storage projects based on 1) a building's vulnerability to power outages, 2) the need for occupants to have an uninterrupted electricity supply for medical devices, lifesaving medication storage, and/or health conditions, making them vulnerable to extreme heat or cold, 3) the resilience of the surrounding community, and 4) the ability to maximize solar energy system production. Projects located in low-income and disadvantaged communities and fulfilling one or more of these criteria will be considered for energy storage project funding. DOEE estimates that installing storage on 5% to 15% of the solar projects will yield approximately 0.7-1.3 MWhs in total capacity, and provide approximately 85-248 residents with resilience benefits. This estimate is based on DOEE's experience installing solar in constrained parts of the District grid relative to available grid hosting capacity.

6. *Leveraging Other Public Capital Sources for Solar and Storage* – The District is taking a whole-of-government approach to ensure that the resources available through the SFA

program are augmented by other investments. With funding from the Bipartisan Infrastructure Law (BIL), DOEE recently released two grant opportunities to provide incentives to developers to include the installation of battery storage in solar projects. The first grant opportunity is designed to promote DERs, such as microgrids, with the capability of islanding, thereby continuing to operate in situations when the grid may be offline. This opportunity targets commercial (including multifamily buildings with five or more units) and a small number of single-family residential properties serving LMI residents. The second grant opportunity is for the installation of solar plus energy storage on a resilience hub project located in a disadvantaged community. This resilience hub will be located at a community center; and future resilience hubs will be located on buildings such as schools, recreation centers, and community service centers.

7. *Leveraging Private Capital Sources* – The financial assistance strategy leverages CFE's and DCGB's existing network of private capital providers, such as Amalgamated Bank, M&T Bank, Virginia Community Capital Bank, Capital Impact Partners, City First Bank, and the Latino Economic Development Corporation. As a certified Community Development Financial Institution (CDFI), serving low-income communities is a core part of CFE's mission. It has existing lending capital available to deploy towards SFA projects, including those from private sources such as JPMorgan Chase and US Bank.

8. *Long Term Impact of Financial Assistance* – DOEE and its coalition partners see the transformative potential for expanding the benefits of clean energy to low-income and disadvantaged communities through financial assistance. Not only are these communities most affected by poor air quality and other environmental burdens, but they also have experienced limited solar adoption when compared to higher income tracts. DOEE's SFA program and related financial assistance strategy is centered on maximizing direct benefits from the transition to clean energy in underserved communities, including quality jobs, energy cost savings, and wealth building opportunities from solar investments.

*Asset Management* – To ensure maximum energy output from the solar assets, the SFA program will implement a comprehensive assessment of the system design and solar production estimates at the time the proposed design is submitted for consideration. These items will be benchmarked to data from existing projects, as well as assessed for accuracy via an industry standard third-party software. During the operational period of the project, the project owner will be required to provide regular solar production reports, comparing actual versus estimated values. Solar installation projects will be required to have an operations and maintenance (O&M) contract in place prior to the project becoming operational. The O&M provider and contract will be reviewed and vetted to ensure optimal performance over the lifetime of the PV system. During the operational period of the project, the project owner will be required to provide regular O&M reports to the SFA Team confirming the services have been performed and the project is operating and performing as expected. In addition, the SFA program will consult with partners like DOE and the DC Department of Public Works (DPW) to develop resources and guidance for solar developers to safely and responsibly recycle PV assets.

**Project-Deployment Technical Assistance Strategy**

A total of $6,560,312 (9.5% of grant funds) will go towards technical assistance to support the deployment of projects. DOEE will provide technical assistance to stakeholders in the form of workforce development investment, outreach and education, evaluation of host sites, and permitting and interconnection support.

*Workforce Development Plan*

Funding from the Greenhouse Gas Reduction Fund will allow DOEE to:
1. Expand the capacity of solar and electrical training programs and allow SFA's workforce partner the International Brotherhood of Electrical Workers (IBEW) to recruit and train a greater number of LMI District residents for placement in good jobs supporting the deployment of solar energy and battery storage.
2. Expand the range and increase the capacity of wraparound services for an increased number of trainees. A total of $457,750 has been allocated for participant support costs that includes supplies and materials and wraparound services, such as childcare, transportation, and tutoring for 200 participants.
3. Leverage procurement policy, municipal buildings, and public infrastructure projects for training opportunities and local-level job creation. DOEE has identified a pipeline of potential private and public CREF host sites that may also need enabling upgrades. DOEE will make these solar and storage installations, electrical upgrades, roof repairs and energy efficiency upgrades into training and apprenticeship opportunities for District residents. For DOEE-funded green infrastructure projects, we will include hire-local provisions, community benefit agreements, and project labor agreements to the procurements.
4. DOEE will continue to partner with IBEW to actively recruit and train District residents for paid electrical pre-apprenticeships and apprenticeships that will prepare them for sustainable careers as electricians in the solar and renewable energy sectors. IBEW Step-Up pre-apprenticeship program (dubbed "Energy in Motion") was created to increase enrollment of District residents into the Electrical Alliance Joint Apprenticeship Training Committee program. With existing DOEE resources and proposed GGRF funding, DOEE expects that 200 District residents per year will enter the Energy in Motion program. In addition to the pre-apprenticeship programs, IBEW offers a 48-month journeyman program. Trainees are paid an average of $22/hour with an increase every six months and a full benefits package for them and their families. The local union offers 420 training slots per year, 75 of which are currently reserved for District residents. Under this proposal, IBEW will enroll and train an additional 200 District residents.

DOEE's Workforce Development Plan includes a number of key partnerships, including DOES' DC Infrastructure Academy (DCIA), a facility created to recruit, screen, and train District residents from disadvantaged communities for infrastructure jobs that provide a pathway to the middle class; and 2) UDC's Workforce Development and Lifelong Learning Division, that focuses on certifying residents for tracks, such as building technician, construction, and HVAC as well as preparing residents to enter the green workforce. DOEE's solar training program Solar Works has been folded into an umbrella of green workforce training programs at the agency and is now referred to as Green Trades DC.

13

Working through the DCSEU, DOEE has also implemented the Train Green Program to provide workforce training for District residents in energy-related fields, including green buildings. Through job skills development, on-the-job training, OSHA training, certifications, direct work experience with mentors, and job placement assistance, DCSEU helps externs discover new careers in sustainability. Though not explicitly part of the SFA program, many of the externs from the DCSEU workforce development program go on to work for subcontractors of the SFA program. DOEE will leverage these trained workers to perform the enabling upgrades, including energy efficiency work.

*Recruitment* – IBEW recruits LMI residents from underserved communities, specifically targeting limited English-speaking populations and other disadvantaged populations. DOEE has significant experience conducting outreach to LMI households for enrollment in the utility assistance programs, and we leverage these efforts to recruit for job training programs. IBEW works with the Electrical Training Alliance and the Baltimore-DC Metro Building and Construction Trades Council to recruit trainees from disadvantaged communities for their various paid apprenticeship programs that provide training for lucrative careers in the building trades industry.

*Wrap Around Services* – In order for participants to successfully complete their training program, a number of support systems must be in place to address the barriers that typically prevent workers from being successful. IBEW will provide transportation assistance, childcare, on-the-job mentoring support, tutoring sessions, testing help, and business and financial planning to trainees. DCIA offers case management services that include mental health and job placement support.

*Outreach and Education* – DOEE has selected through an RFP process two coalition partners to provide outreach and education technical assistance for the program. Interfaith Power and Light of the DMV (IPL-DMV) and the Green and Healthy Homes Initiative (GHHI) will help to educate the community about solar offerings through SFA by canvassing door to door and connecting with community partners. They will provide navigation supports to individual residents and community-based organizations who are going through the process of procuring solar. They will connect individuals and organizations with other related resources.

*Evaluation of Host Sites* - DOEE has created a pipeline of potential solar site hosts on buildings that are owned or supported by District government. District government partners have agreed to assess annually their property portfolio to identify properties for solar and battery storage site development. Other property owners who approach SFA with an interest in hosting a solar system will also be assessed by DOEE. Developers with properties in their pipeline can choose to bring their own sites or to bid on DOEE assessed sites.

The majority of solar host sites in the District of Columbia are rooftops. DOEE will conduct site assessments that include site location and orientation, the amount of full sun exposure and shading, estimated system size, annual energy production, mounting options, roof and building condition, climate hazards, stormwater management needs, storage potential/necessity and more. Site assessment reports will include a history of electrical usage at the site as well as a financial analysis of the investment over time including estimated outputs. Host sites will that are considered suitable candidates for a solar system will be offered to solar developers for bid. This

14

process will maximize financial assistance funds by lowering project costs associated with siting soft costs and utilizing a competitive bidding model.

*Permitting and Interconnection Assistance* - DOEE will hire technical assistance engineers to address permitting and interconnection barriers. Project-based technical assistance will help projects move expeditiously through the Pepco solar interconnection queue, as well as advocate before the DC PSC for improvements to the solar interconnection process. Pepco does not always proactively offer alternative interconnection options such as switching feeders, splitting systems between feeders, and incorporating battery storage. The technical assistance providers could help to ensure that alternative options are considered on a more consistent basis. They will also incorporate data from the DOEE solar hosting capacity study to prioritize installations in less constrained portions of the grid where feasible. DOEE engineers could help offer proactive solutions to common interconnection challenges as well as create tools that help with program siting and utilize utility data to identify and avoid interconnection barriers. DOEE also plans to utilize TA tools offered by SolSmart.

**Equitable Access and Meaningful Involvement Plan**

Several elements of DOEE's equity framework have contributed to making solar more accessible, namely program design, community outreach initiatives, and strategic partnerships. Per DOEE's Racial Equity Action Plan, DOEE will conduct a Racial Equity Impact Assessment (REIA) on the proposed design of the SFA expansion to ensure that the program will be equitable, beneficial and accessible to the population we aim to serve. The SFA program's statutory requirement of providing solar benefits to 100,000 LMI District households ensures all program resources will flow exclusively to disadvantaged communities. The eligibility requirements were designed to be inclusive and lower the barriers associated with income verification. Frequent income re-verification can pose a barrier to program participation, so the SFA program mandates that customers remain subscribed for fifteen years after the subscription start date. SFA customers will incur no cost for their participation in the program, and DOEE has ensured that participation does not adversely impact LMI residents, such as unintentionally lowering other government-provided benefits.

Thoughtful customer acquisition and management is also required to ensure equitable outcomes are achieved. Customers will begin their SFA journey through an online portal where they will enter basic information to determine need and eligibility and be referred to the relevant SFA partner. Every customer using the portal, regardless of whether they qualify for SFA, will be connected to resources on solar, financing and workforce development. The SFA team has created a process flow map to detail how different entities will be referred and access SFA and other resources available to them. Residents, faith-based congregations and community organizations will receive navigation support through one of our SFA partners where they will be connected with other relevant programs, presented with all available options for solar to promote informed decision-making and assisted in navigating through the SFA process. The role of the navigator is to provide consistent and reliable consumer support throughout the process including after service delivery. DOEE prioritizes bundling benefits of various government programs and has taken steps to streamline this process by incorporating these services into the portal. DOEE released a unified application for the Low-Income Home Energy Assistance Program (LIHEAP) that includes the terms

and conditions for SFA, which acts as an "opt-out" model for the program. Additionally, DOEE is one of the entities to pilot the Low-Income Clean Energy Connector (LICEC) Tool that will automatically connect LIHEAP recipients with a community solar subscription at the time of applying. This stacking of benefits will not only maximize each recipient's assistance but will also reach a wider pool of applicants, thereby also maximizing the number of eligible residents who are participating in the program.

The SFA team will create a comprehensive outreach plan that will detail the outreach activities performed by each team member to expand community knowledge of the program. DOEE has built strong partnerships within diverse organizations and communities to ensure that outreach efforts are culturally appropriate and delivered from a trusted source. SFA education and outreach partner Interfaith Power and Light, through a partnership with Washington Interfaith Network (WIN), will lead outreach efforts. IPL is a highly recognized community organization that focuses its efforts on the District's faith-based community. They help faith facilities install solar by meeting with congregational decision-makers, connecting congregations with available resources and financing, supporting contract negotiations, and assisting with the legal review of PPAs. Also a SFA education and outreach partner, the Green and Healthy Homes Initiative targets low-income District homeowners requiring efficiency upgrades and home repairs to address health and safety issues as potential SFA solar system recipients. Other SFA team members including the DC Green Bank, DC Sustainable Energy Utility, Groundswell and DOEE also provide outreach and recruitment services.

DOEE's outreach team hosts a variety of community outreach events to educate and enroll District residents in the program. By meeting residents where they are, the outreach team lowers the administrative barriers associated with enrolling and accessing the SFA program. To further reduce barriers, DOEE has implemented categorical eligibility where residents may show proof of enrollment in other income qualified programs, such as LIHEAP, SNAP, SSI, TANF and housing voucher programs, to satisfy SFA income verification requirements. DOEE has verified that the income requirements for these programs are 80% of the AMI or below and has reviewed and approved the program's income qualification procedures. Residents in multi-unit buildings with affordable housing covenants that meet SFA income requirements are pre-approved and are not required to show any income verifying documents, greatly simplifying the enrollment process. DOEE will continue to seek community input through participatory governance efforts and community outreach to identify buildings with income covenants eligible for pre-approval and any additional relevant programs to be included for categorical eligibility.

In order to collect feedback from the community about SFA on an ongoing basis, DOEE will resume the Solar Task Force, which was initially established shortly after the enactment of the District's SFA statute. The initial task force was comprised of finance, real estate, education, and customer acquisition subgroups, who convened to give feedback and recommendations for SFA implementation. The new task force will have a standing committee comprised of representatives from each of the coalition partners, who will meet regularly to provide program governance and manage implementation of the program to ensure that all aspects of the program are coordinated. The standing committee will also hold semi-regular meetings with the group of domain experts included in the original task force to gather their input.

16

Equitable, bottom-up feedback structures are vital to ensuring just outcomes are realized. Participatory governance will empower the low-income District residents served by SFA to represent their community and lend their voices to the public policy decisions that impact them. DOEE will establish a Community Advisory Council (CAC) to facilitate community involvement in decisions. This forum will provide feedback and address community concerns about the SFA program. The CAC advisory council will include the nomination of residents from disadvantaged communities as identified by CEJST data (specifically from Wards 5, 7, and 8). Representatives will be selected for their capacity to engage their respective communities about the SFA program, and relay information and recommendations back to the District of Columbia Council and DOEE. Representatives will be compensated by DOEE for their time and work with the community. This structure will be well-suited for collecting feedback about the SFA program and changes that should be made because it draws on existing networks and trusted community leaders. The advisory council will join the Solar Task Force meetings to further collaborate and address common barriers to SFA participation.

**Section 3:  Fiscal Stewardship Plan**

*Ensuring Compliance with Grant's Terms and Conditions*
DOEE staff will routinely monitor program operations, outputs, and outcomes to ensure compliance with all grant terms and conditions. Staff are supported in these efforts by other agency and District government personnel, including the Grants Management Division, the Office of General Counsel, and the Office of the Chief Financial Officer. Compliance reports related to this grant will be delivered to the EPA accurately and by requested deadlines. To ensure program staff is adequately trained, they will meet weekly as a team, have individual supervision sessions to troubleshoot issues, and receive bi-monthly training on grant compliance. DOEE also recognizes the importance of grant subrecipients adhering to all grant terms and conditions. To ensure compliance, agency staff will thoroughly vet any entity that may interact with residents. An organization's standing within a community and customer service record across the District will be taken into account as a part of this process. DOEE will communicate to subrecipients clear expectations on how to properly interact with residents when executing portions of this grant program. Agency staff will continuously monitor subrecipients by conducting site visits and reviewing quarterly program reports and expenditures. Program staff will verify invoices before expenditures are approved for payment and perform annual risk assessments.

All SFA subawards will operate on a cost reimbursement basis and the following process will ensure the accuracy of payments: 1) when the invoice is received, the Program Manager and their supervisor will review the invoice and sign off, 2) a Receiver will upload the invoice in the District's Integrated Financial System (DIFS), and 3) the payment will be routed through DIFS, which requires additional reviews as a final quality assurance check to ensure that funding is expended appropriately. DIFS also avoids the commingling of funds by separating grants by unique index codes.

*Consumer Protections*
The District maintains a comprehensive series of policies and practices that actively protect SFA participants' interests. For the community solar component of the program, DOEE receives and assigns the energy benefits, so our team of data specialists, including staff with our coalition

partner Groundswell, regularly monitor CREF generation and bill credits to ensure subscribers receive the intended level of the benefit. Groundswell also manages a public portal named SharePoint, enabling consumers to track their energy savings and carbon emissions reductions. Groundswell will oversee participant enrollment and SFA subscriptions, operate a customer contact center for participant inquiries, and proactively reach out to subscribers when their subscription becomes inactive to update utility information and reactivate subscriptions. DOEE has posted publicly the terms of the SFA subscriber agreement and provides subscribers with the opportunity to review the full terms of agreement. The terms make clear that the program does not require either a monthly or a termination fee should a subscriber wish to terminate their subscription. DOEE also manages and regularly monitors the SFA Hotline and program email account where residents can contact SFA staff with questions or concerns. Residents can also submit complaints to DOEE or the District's Office of the People's Counsel about contractors or other aspects of their experience with SFA.

To comply with federal rules on program income generated by the revolving loan fund, CFE and DCGB each plan to maintain their funds in separate accounts. As income from principal and interest repayments and loan origination fees are earned, those amounts will be transferred directly into the program accounts. During the period of performance, program income, including interest earned on the accounts, will be recycled and redeployed for SFA.

**Section 4:  Timeline and Milestones**

DOEE plans to use the pre-amendment period for program planning and will begin program implementation on 1/1/2025. Some activities which begin during the pre-amendment period may carry over into the implementation period. DOEE will regularly assess progress towards outcomes to be proactive in amending program model as needed in the face of unforeseen barriers, changes in market conditions, etc.

During the pre-amendment phase, the following activities will occur to prepare for the implementation of the program:

Meaningful Benefits Plan:
1. Utilizing data from DOEE's Hosting Capacity Study, Pepco utility data, CJEST data and more, the SFA team will identify priority areas where battery storage will provide the most benefit to maximize solar production and/or resiliency. (1/15/2025)
2. As a component of the Outreach Plan, SFA partners will develop and update resource materials including materials around solar ownership models. (1/1/2025 and ongoing)

Financial Assistance:
1. DOEE will deliver grant award instruments and subgrantee agreements to partners in preparation of delivering funds. (1/31/2025)
2. In anticipation of conducting site assessments for solar host site properties, DOEE will develop policies and procedures around the project siting process. (3/31/2025)
3. The SFA Team will continue to run financial models and develop criteria around interest rates and incentive payment amounts. Interest rates will be influenced by whether the loan recipient is a Certified Business Enterprise (CBE), a disadvantaged business, a community organization,

18

affordable housing provider, etc. Incentive payment levels will be adjusted based on criteria such as whether the developer of the project applies for ITC adders, receives low-interest financing through SFA, and is a CBE and/or disadvantaged-owned entity. Financial models will also consider the leveraging of non-SFA funds including private capital, ITC adders, and NCIF. (12/31/2024)

4. The SFA Capital Partners (DC Green Bank and City First Enterprises) will develop policies and procedures around the revolving loan fund, including the streamlined application and underwriting process. The application will incorporate the revised Request for Proposals (RFP) process used by the DC Sustainable Energy Utility to deliver incentive funds. (12/31/2024)

5. The SFA Team will draft and approve financial application documents, contracts and loan agreements in advance of the implementation phase. (12/31/2024)

Project Deployment Technical Assistance

1.  DOEE will hire Technical Assistance staff and begin to develop tools for interconnection support, project siting, tax benefits, financial modeling and more. (3/31/2025, ongoing)

2. DOEE will facilitate the creation of a mechanism (labor agreements, community agreements, etc.) to connect highly skilled electrical workers with high-quality jobs on SFA and other solar projects. Solar developers working with DC SEU or other partners will be connected with the electrical union IBEW. (3/31/2025, ongoing)

3. DOEE will begin discussions with the Department of Buildings to revise the current solar permitting process by developing a standard, set criteria by which permits will be issued. (1/1/2026)

Equitable Access and Meaningful Engagement

1. The SFA Team will finalize the process flow model currently being developed which will serve as a map for how different entities (single-family homeowners, renters, congregations, solar developers, etc.) will move through the SFA program and where they will be referred. The process flow is being developed collaboratively with partners and incorporates stakeholder feedback. It will serve as the blueprint for the development of the Solar for All Portal, a public facing portal to serve as a single-entry port for the range of services provided through the program. In time, the portal will incorporate referrals for other services including Weatherization, Home Energy Rebates and more. (2/1/2025)

2. The SFA Team will collaboratively create a comprehensive Outreach Plan to detail the outreach activities and targets of each team member in making the community aware of SFA. (3/1/2025)

3. DOEE staff will work with the District's Office of the Chief Technology Officer (OCTO) staff to create the SFA Portal. The Portal will be thoroughly tested by potential users before it is launched. (8/31/2025)

4. DOEE staff will conduct a Racial Equity Impact Assessment (REIA), a tool developed by the agency's Equity Committee as part of the Racial Equity Action Plan. The REIA will ensure that the SFA program expansion model is equitable, provides the intended benefit to the target community, avoids unintended negative impact and incorporates best practices. (12/15/2024)

5. DOEE uses categorical eligibility for income qualification to reduce the burden of applying to SFA. Each year, DOEE will analyze and consider additional programs to use to establish income qualification so as to provide easier access to LMI residents. (Annually)

6. DOEE will recruit the six members of the Community Advisory Committee and confirm the member roster for the existing SFA Task Force. (2/30/2025)

19

7. DOEE will continue to refine indirect benefit models for residents who live in a master-metered building and do not have a utility bill. Projects funded through SFA that are net metered where the property owner maintains ownership of the system and receives the electricity generated by the system will be required to share at least 50% of these benefits with LMI households who cannot receive a bill credit. Indirect benefits will be delivered through a Community Benefits Agreement and will be monitored to ensure that that benefits are being delivered for a 15-year period. (3/1/2025)

Fiscal Stewardship and Administration
1. DOEE will comply with all EPA requirements to submit amendment documents, QMP and QAPP documents and the DBRA and Labor and Equitable Workforce Development Plan. (3/30/2025)
2. DOEE will post and recruit for new SFA-funded staff positions during this phase to have new staff in place upon implementation. (3/1/2025)
3. DOEE will assign grant managers to sub awardees to assist in the preparation of award documents and monitoring. (12/1/2024, ongoing)
4. DOEE will select project management software and purchase licenses for users, including subgrantee staff, develop procedures for using the software and train users. (12/1/2024)
5. DOEE's Data Management and Science (DMS) and SFA teams will develop an updated program evaluation framework that will incorporate EPA reporting requirements. (4/15/2025)

During the Implementation Period starting on 1/1/2025, the following activities will occur:

Meaningful Benefits Plan
1. DOEE will regularly analyze changing grid capacity in order to target areas where energy storage would deliver the most resiliency benefits and allow for the installation of solar. Single family projects within these target areas would be eligible for a grant for battery storage and residential serving projects will be eligible for lower interest and incentive rates, and forgivable loans. (1/15/2025, ongoing)
2. DOEE will analyze utility cost data every year to ensure 50% of average bill cost is delivered as a benefit. (Annually)

Financial Assistance
1. A revised, integrated application for financial assistance will be launched during the implementation phase. The effectiveness and accessibility of the application will be regularly assessed and adjusted as needed. (4/1/2025)
2. DOEE will begin to conduct site assessments on District government owned properties as well as properties recruited by SFA partners to be a solar host site. Properties will be bundled and offered for bidding by developers. (4/1/2025)
3. Developers who wish to bid on DOEE sited projects or wish to utilize SFA financial assistance will be vetted and approved by various partners depending on the model they choose. (3/31/2025)
4. Project funds will begin to be dispersed to entities who successfully pass through the application and/or bidding process. (4/1/2025)
5. A resource guide will be developed to provide guidance to developers on properly recycling defunct solar panels. (1/1/2027)

6. After one year of implementation, the SFA Team will review the financial model with stakeholders and implement any identified improvements. (11/1/2025, annually)

Project Deployment Technical Assistance
1. Recruitment efforts will begin for District residents to enter the various workforce training programs offered through DOEE Green Trades Program, Green and Health Homes Initiative workforce training sessions and IBEW's Energy in Motion and Electrical Apprenticeship programs. Residents may be connected with workforce training opportunities through the online SFA portal as well as through individual partners. IBEW will launch a coordinated marketing campaign to recruit participants. (4/1/2025)
2. A coordinated workforce strategy will be implemented that includes recruitment, participant wrap-around supports as they work through various levels of training and once fully trained, placement in good jobs, particularly on projects funded by SFA. (3/1/2025)
3. DOEE will develop and implement TA resources for interconnection, project siting, tax credits and more. (1/1/2025, ongoing)

Equitable Access and Meaningful Investment
1. The SFA Team will develop an Indirect Benefits Plan that will include the parameters and requirements for delivering indirect benefits via a Community Benefits Agreement including the form that the indirect benefit may take, the value of the indirect benefit (must be equivalent to the direct benefit), how the benefit will be delivered and accounted for, and how the delivery of benefits will be monitored. (4/1/2025, ongoing)
2. The template for the Community Benefits Agreement will be finalized and included as part of the Indirect Benefit Plan. The Plan will be provided to community organizations and other solar host sites who wish to own their systems and share in at least 50% of the benefits. (5/1/2025)
3. Memoranda of Agreement will be drafted and finalized with government agency partners at the Mayor's Office on Latino Affairs and Mayor's Office on African Affairs. The agreements will include funding for translation services, as well as SFA recruitment and outreach support. (7/1/2025)
4. Outreach materials will be finalized, translated, and distributed. Materials will be regularly revised and updated as necessary. (12/1/2024, ongoing)
5. The SFA Team will conduct outreach activities that include a door-to-door campaign, attending community meetings, hosting webinars and educational sessions, attending fairs and tabling events, and more. (4/1/2025, ongoing)
6. The online SFA portal will be developed and targeted for launch during the summer of 2025. (9/1/2025)
7. The Community Advisory Committee and Solar for All Task Force will be convened and will meet together twice a year and separately twice a year. These bodies will provide input on the ongoing operations of Solar for All from the community and industry group and recommend changes when necessary. (3/1/2025, quarterly)
8. The SFA Team will regularly analyze and update as necessary the list of programs that have been approved for categorical eligibility for SFA enrollment. (Annually)

Fiscal Stewardship and Administration

21

1. DOEE Grant Managers will provide ongoing grant monitoring which includes project performance according to work plan goals, the receipt and approval of invoices for reimbursement, and spending down of grant funds. Grant Managers will meet with subgrantees on a regular basis and meet internally weekly. They will also receive regular bi-monthly trainings from DOEE's Grants Division. (1/1/2025, ongoing)
2. DOEE Grant Managers will collect quarterly and annual reports from subgrantees and synthesize for EPA reports. (4/15/2025, ongoing)
3. DOEE will implement the revised program evaluation framework that will allow the collection of data required for both EPA reporting requirements as well regular reports to DC Council on mandated Key Performance Indicators. (5/1/2025)

**Section 5:  Reporting Requirements**

DOEE will include detailed reporting requirements for coalition partners in award notices and MOUs that incorporate EPA requirements, including data that demonstrates compliance with the Justice40 Initiative, Buy America Build America (BABA) provisions, and the Davis-Bacon Act. Sub grantees are required to submit four quarterly and one annual report each year. DOEE will track and report on all relevant outcomes and outputs and report to EPA annually and at the end of the performance period, using the provided templates to ensure compliance. DOEE will submit a revised work plan annually to EPA for approval of any proposed program changes.

DOEE will develop a public facing online portal to serve as a single port of entry for entities interested in participating with SFA. This portal will allow us to connect participants with the appropriate partners and also collect data on income, demographics, referrals and services provided. DOEE will also use internal facing project management software to track project progress and communicate with partners. SFA maintains centralized databases containing SFA data on CREFs, subscribers, customer outreach, and benefits. This data is synthesized for analysis.

To track progress toward the SFA legislative mandate, DOEE reports on two quarterly Key Performance Indicators (KPIs): 1) Low-income households with solar benefits; and 2) Solar capacity installed (MW) through DOEE-funded projects. This reporting tracks DOEE's progress on SFA's goal of providing 100,000 low-income households with benefits by 2032. The SFA team conducts an annual analysis to ensure participants achieve a minimum 50% electric bill reduction using data from the electric utility. The SFA subscriber management partner, Groundswell, also monitors subscribers, enrollment, and cancellations and collects capacity data from solar developers. Results are reported in annual SFA reports to the District of Columbia Council. Anticipated changes include increased collaboration among DOEE programs and yearly energy burden assessments using LIHEAP recipients' income and assistance. A public energy burden report will guide program revisions, including benefit level updates, to maintain the 3% energy burden target.

An expanded SFA program would require development and/or revision to program evaluation both internally and in conjunction with our coalition partners. DOEE prioritizes evidence-based policymaking and evaluation, which is exemplified by the recently formed Data Management & Science (DMS) Team. While all administrations within DOEE employ evidence-building activities, DMS was created for the sole purpose of addressing data gaps and deficiencies, and assisting

programs in using data to validate operations and optimize impacts. The SFA and DMS teams will work in close collaboration during the planning period to develop and test a robust program evaluation framework. Changes in the program will also be informed by the Solar Task Force and the public advisory council. In collaboration with DOEE, coalition partners will also select and report on meaningful metrics quarterly, which will vary depending on the SFA activity they undertake. DOEE's award notices for the partners will have data reporting requirements that includes updating key indicators for their scopes of work, ranging from resident engagement to solar financing. SFA team project managers will also oversee and work closely with their respective partners to develop evaluation and reporting processes and revise them as needed.

## 1. Performance Reports

### Semi-Annual Report
The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

### Final Report
The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

## Section 6: Budget Narrative

### 6.1 Project Budget

**Personnel -**
DOEE has allocated $1,458,534.91 of GGRF funds for personnel costs (exclusive of fringe which is included below) to ensure the grant is implemented as intended and serves the needs of the public. DOEE has in-house expertise in grant administration, program management, and outreach and engagement. One (1) FTE Program Specialist will manage coalition partner deliverables under the cooperative Agreement (FY25 Salary: $92,657.00, Grade 12). One (1) FTE Program Analyst (FY25 Salary: $106,761.00, Grade 13) and .6 FTE (FY25-27 with reduced % in FY28-29) Program Specialist (60% of FY25 Salary: $59,048.00, Grade 12) will manage the grant fund deployment for enabling upgrades from pre-award to close-out. The .4 FTE (FY25-27 with reduced % in FY28-29) Program Director (40% of FY25 Salary: $55,389.11, Grade 15) will be responsible for direct supervision of the program, including overseeing spending and budgets. The Program Director will also act as the primary liaison to EPA for this grant.

To remain competitive with other employers in the area, the District government provides employees with a cost-of-living adjustment (COLA) between 2 to 3% each year. The salaries listed in this budget assume a 3% annual COLA.

**Fringe Benefits** -
DOEE has allocated $357,341.05 in fringe benefits at a District-wide calculated rate of 24.5% of salaries to cover health insurance, health savings accounts and retirement benefits.

**Travel** -
 **N/A**

**Equipment** -
 **N/A**

**Supplies** -
DOEE has allocated $5,000 to cover IT supplies for two (2) new hires, estimated at $2,500 per person. IT supplies include laptop, two external monitors, keyboard, mouse, and cellphone. DOEE will acquire supplies through the DC government approved procurement process, including the use of a purchasing card for micro purchases such as these supplies.

**Contractual** -

DOEE has allocated $36,024,070.40 to be distributed through contractual services to bolster the District's capacity and perform the following functions:

- Solar Deployment: The total budget for DCSEU is $24,003,658.80. The GGRF funds will cover financial incentives for solar deployment ($18,000,000), program management costs ($2,353,949.80), associated marketing and IT ($517,911), and indirect costs ($3,131,799).
- Financial Assistance: The total budget for CFE is $6,003,658.80. The GGRF funds will cover financial products to disadvantaged communities ($3,650,000 for low/subsidized interest lending capital to support eligible solar projects), predevelopment loans ($645,300) that will benefit up to 7 organizations exploring solar adoption for their multi-family site, loan loss reserve fund ($247,030, 5% of the lending capital and 10% for unsecured pre-development loans), program management costs ($991,258.80), and indirect costs ($470,044, 8.5%).
- Workforce Development: The total budget for IBEW is $3,003,658.80. GGRF funds will cover IBEW's "Solar Ready, Solar Steady" project, aimed at forging a skilled and equipped workforce; the workforce will contribute to the District's clean energy objectives through participant support ($612,272.73), including student equipment, wrap-around services, and technical assistance for pre-apprentice and apprentice trainings, program coordination ($893,658.80), marketing ($1,225,000), and indirect costs ($272,727,27, 10%).
- Subscription Management: The total budget for Groundswell is $1,503,658.80. The GGRF funds will cover program management ($1,122,522.49) for subscriber management services, supplies and software to support subscriber management ($157,327,58), and indirect costs ($223,778.74).
- Community Outreach and Education: The total budget for IPL is $603,658.80. GGRF funds will cover program management costs ($538,819.80) for outreach in low-income and disadvantaged neighborhoods, contractual ($4,839) for legal review of PPAs, and indirect costs ($60,000, 10%). The total budget for GHHI is $800,000. The GGRF funds will cover program management costs ($666,666.67) for community outreach and workforce development trainings, and indirect costs ($133,333.33, 20%).
- IT/Project Management technical support: DOEE has allocated $7,317.60 for Asana (Project Management Platform) subscriptions for DOEE staff ($365.88 per year per person x 4 DOEE staff in FY25-29). $80,000 has been allocated for the District's Office of the Chief Technology Officer to implement a one-stop SFA portal for residents, solar developers, multi-family building owners and community organizations and to connect with the program and its various offerings. $14,800 ($3,700 annually through FY28) has been allocated for LCP Tracker software for Davis Bacon (DBRA) compliance.

**Construction (if applicable)** -
**N/A**

**Other** -
DOEE has allocated $23,632,689.31 for "Other" costs, including $3,389,830.51 for enabling upgrades that DOEE will distribute as grants to support single-family home projects (with DOEE indirect costs of 18%, listed below, the total allocation for the DOEE enabling upgrade fund equals $4,000,000). Another $3,750,000 for enabling upgrades will be deployed through a subaward

(listed below) to DCGB to support multi-family and commercial solar projects for a total of $7,750,000 (12.4% of total award) for enabling upgrades. "Other" costs also include the $400,000 in-kind Technical Assistance support from NREL. The remaining costs are detailed below under "Participant Support Costs" and "Subawards."

**Participant Support Costs**

Participant support costs will include compensation for advisory council (DOEE-led) ambassadors (estimating 6 appointees spending 120 hours (20 hours/year) over four years (FY25-28) at $50/hour = $24,000).

The community advisory council will be made up of community ambassadors. The ambassadors will provide feedback from the community on the accessibility, equity and impact of the Solar for All program. They will highlight any challenges and represent the concerns of the community. Ambassadors will also promote Solar for All through their community networks helping to ensure that the community is aware of the program and how to apply. They will promote trust of the program within the target communities. The advisory council will meet four times per year, twice with the full stakeholder group comprised of the coalition partners as well as industry stakeholders. This ensures knowledge sharing between the groups and additional opportunities for community members to focus on community issues.

Ambassadors will be community members chosen via application based on diversity of ward of residence, interest in and knowledge of solar, demographics, housing type and economic background. The application for community ambassadors will be widely advertised across the District, particularly in Disadvantaged Census Tracts (DACs), and shared through social media channels to ensure a diversity of voices. Community members with strong community relationships will be encouraged to apply.

Additional participant support with GGRF funds will be included under the subaward to IBEW (listed above under "Contractual").

**Subawards**

DOEE has allocated $19,818,858.80 to be distributed through subawards to bolster the District's capacity and perform the following functions:

- Financial Assistance: The total budget for DCGB is $16,003,658.80. The GGRF funds will cover a revolving loan fund ($13,987,400), loan loss reserve fund ($432,600, 3.1% of revolving loan fund), program management costs ($1,188,658.80), and indirect costs ($395,000).
- Enabling Upgrades: Of the $7,750,000 (12.4% of total award) of GGRF funds DOEE has allocated for enabling upgrades, $3,750,000 will be deployed through DCGB as loans to support multi-family and commercial solar projects.
- Translation services: DOEE is allocating $65,200 ($16,300/year for both Spanish and Amharic translation services over four core years) due to the large Spanish-speaking and Amharic-speaking populations in the District. These services will be provided through an MOU with the District's Mayor's Office of Latino Affairs and Mayor's Office of African Affairs.

**Additional Items**

**Indirect Charges**
DOEE's federally negotiated indirect cost rate is 18% and equals $972,364.33 over the 5-year grant period.

The District is leveraging locally-funded staff positions to support the program efforts. Additionally, site access and land-use partnerships with local non-profits and District Government agencies, including the Department of Housing and Community Development, Department of Public Works, DC Housing Authority, Events DC, DC Fire and Emergency Medical Services Department, DC Housing Finance Agency, DC Public Libraries, and University of the District of Columbia will significantly reduce the cost of solar development throughout the District.

DC's RPS Compliance Cost for 2022 was $129.1 million. The RPS increases annually, and the minimum expected leveraged funds paid by District residents to support solar development over five years is $645.5 million.

**Conferences and Workshops:**
**N/A**

**Meals and Refreshments:**
**N/A**

**Program Income:**
Program income will be generated through loan origination fees and loan interest income. At the end of the compliance period, an estimated $2,647,212 of program income will have been generated. All program income is recycled back in the SFA program via additional loans.

**EPA's Solar for All Instructions for Additional Workplan and Budget Questions**

| Questions | Responses |
|---|---|
| Does this scope of work include conducting conferences or workshops? | No |
| Who is initiating the conference/workshop/meeting? | N/A |
| How is the conference/workshop/meeting being advertised? | N/A |
| Whose logo will be on the agenda and conference/workshop/meeting materials? | N/A |
| What is the percentage distribution of persons attending (I.e. % federal govt, public participants, state and local)? | N/A |
| Will there be proceedings or analysis and will the information be disseminated back to the | N/A |

| | |
|---|---|
| appropriate (state/local/scientific) community? | |
| Do you anticipate program income being generated from this conference/workshop/meeting including registration fees? | N/A |
| Are costs for light refreshments, meals or beverages included in the workplan or budget? | N/A |
| Will the assistance award result in the development of any copyrighted software or written materials? | No |
| Could an invention result from this project? (If yes, provide disposition instructions) | No |
| Does the project involve animal subjects? | No |
| Does the project involve collecting identical information from 10 or more people? | No |

EXHIBIT 4



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

<u>**MEMORANDUM**</u>

**SUBJECT:**    Termination of EPA Assistance Agreement 5H-84088001 under 2 CFR 200.340

**FROM:**    Devon Brown, EPA Award Official

**TO:**    Richard Jackson, Director
Department Of Energy And Environment

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84088001 awarded to Department Of Energy And Environment. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Alison Hanlon, EPA Grant Specialist
    Lydia Kidane, EPA Project Officer
    Thomas Bartholomew, Grantee Program Manager

# EXHIBIT 5

11/12/25, 3:17 PM
Case 2:25-cv-02015-TMC Document 31-1 Filed 11/14/25 Page 119 of 141
FW: Disagreement with Solar for All Grant Termination 5H-84088001 - Lauren Lauren (OAG) - Outlook

Web: doee.dc.gov

---

**From:** Bartholomew, Thomas (DOEE)
**Sent:** Tuesday, August 26, 2025 1:05 PM
**To:** molina.michael@epa.gov <molina.michael@epa.gov>; brown.devon@epa.gov <brown.devon@epa.gov>
**Cc:** Kidane, Lydia (she/her/hers) <kidane.lydia@epa.gov>; Pimentel, Laura (DOEE) <Laura.Pimentel@dc.gov>;
Burger, Nick (DOEE) <nick.burger@dc.gov>; Dickman, David (DOEE) <david.dickman@dc.gov>; Karim, Hussain
(DOEE) <hussain.karim@dc.gov>
**Subject:** Disagreement with Solar for All Grant Termination

Hello Michael and Devon,

The District of Columbia Department of Energy and Environment hereby provides notice that it disagrees
with the termination of EPA Assistance Agreement No. 5H-84088001 (Solar for All Grant) and intends to
file a dispute with the Disputes Division Official within the required 30-day time period established in the
EPA Memo of Aug. 7, 2025, and applicable federal regulations.

Best,

Thomas


Thomas Bartholomew

Associate Director

Clean Energy Division

Department of Energy & Environment

Government of the District of Columbia

1200 First Street NE, 5th Flr

Washington, DC 20002

Desk: (202) 671-4096

Cell: (202) 313-2186

Web: doee.dc.gov

# EXHIBIT 6

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Energy and Environment

September 5, 2025

Michael Molina
Disputes Decision Official (DDO)
Environmental Protection Agency
Washington, DC 20460

**Re: DOEE's Notice of Dispute with EPA's August 7, 2025, Memo for EPA Assistance Agreement 5H-84088001**

  Pursuant to 2 C.F.R. § 1500.15, the District of Columbia Department of Energy and Environment (DOEE) hereby formally disputes the termination notice issued by the Environmental Protection Agency (EPA) on August 7, 2025, with the subject "Termination of EPA Assistance Agreement 5H-84088001 under 2 CFR 200.340". This notice (Termination Memo) is appended as Attachment 1. DOEE also formally disputes the EPA's proposed "Unilateral Termination" Assistance Amendment (Termination Amendment) received by DOEE on August 8, 2025 (unsigned), appended as Attachment 2.

  Specifically, and as discussed below, EPA's decision to terminate: (1) violates the plain language of the One Big Beautiful Bill Act (OBBBA) Section 60002, which rescinded only unobligated balances and preserved funds already awarded to grantees; (2) violates the legally binding Assistance Agreement issued by EPA to DOEE on July 9, 2024; and (3) provides no other valid reason for termination pursuant to 2 C.F.R. § 200.340. This termination is contrary to law and arbitrary and capricious.

  The Termination Memo states that EPA is terminating DOEE's award because EPA's cost appropriations and the "grant appropriations" were rescinded, so "[EPA] no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All," and thus, continued administration of the program is no longer legally permissible. Based on this legal conclusion, EPA determined it would end the Solar for All program and terminate all existing grants. But the rescission of unobligated funds and repeal of granting authority under 42 U.S.C. § 7434 do not give EPA the authority to unilaterally terminate all legally binding Solar for All grant agreements under 2 C.F.R. § 200.340. Doing so is contrary to law and arbitrary and capricious. We therefore ask that the termination of DOEE's award be reconsidered via this administrative appeals process.

## I. The Termination Decision is Not in Accordance with Law

### A. Section 134 of the Clean Air Act (GGRF) Funds for DOEE's Solar for All Grant Are Obligated Funds





1200 First Street NE, 5th Floor, Washington, DC 20002 (202) 535-2600 | doee.dc.gov

The EPA's Solar For All grant funds awarded to the District are obligated funds because EPA and DOEE entered an Assistance Agreement on July 9, 2024. The Congressional Research Service (CRS) lists these steps in the federal grant funding process: 1) The appropriation of funding by Congress; 2) Apportionment of those funds by the Office of Management and Budget (OMB) to federal agencies; 3) Allocation of funds by federal agencies to specific programs or purposes; and 4) The obligation of funds to individual grant awards. CRS also references 31 U.S.C. §1501 establishing when grant funds are obligated:

> "[A]n obligation is recorded when there is documentary evidence of:
> ….
>
> (a)(5) a grant or subsidy payable –
> > (A) from appropriations made for payment of, or contributions to, amounts required to be paid in specific amounts fixed by law or under formulas prescribed by law;
> > (B) under an agreement authorized by law; or
> > (C) under plans approved consistent with and authorized by law."[1]

The CRS states that a variety of transactions can constitute an obligation. With respect specifically to grants, "[g]enerally, grant funding is considered obligated when a grant agreement or cooperative agreement is executed by the federal agency and the primary grant recipient."[2] Based on this analysis by CRS, the funds for EPA's Solar for All grant award to DOEE are obligated funds because Assistance Agreement No. 5H-82088001 was executed on July 9, 2024, between EPA and DOEE in accordance with the requirements of the Assistance Agreement.

Consistent with the CRS analysis, on November 8, 2024, DOEE's EPA Project Officer confirmed in an email (Attachment 3) that "OGGRF [had] already obligated programmatic funds to grantees." Specifically, the Project Officer stated that:

> "We can confirm that **GGRF grantees will retain their funds as long they comply with their award agreements**. GGRF was funded through the Inflation Reduction Act, which was passed by Congress and signed by the President. As such, program funding, which includes funds awarded to grantees as well as OGGRF administrative funds, does not rely on annual agency appropriations from Congress and is therefore less susceptible to funding cycles.
>
> **OGGRF has already obligated programmatic funds to grantees, meaning the government and grant recipients have entered legal contracts known as award agreements. Award agreements are definite commitments that create a legal liability of the government for the award.** Once signed—and as long as the recipient complies with the award agreement—the obligated funds are committed to that purpose." [emphasis added] (appended as Attachment 3).

---

[1] Congressional Research Service, Understanding Federal Agency Grant Disbursement, Payment Processes, and "Freezes", Feb 21, 2025, p.1, https://www.congress.gov/crs-product/IF12924

[2] Congressional Research Service, Understanding Federal Agency Grant Disbursement, Payment Processes, and "Freezes", Feb 21, 2025, pp.1-2, https://www.congress.gov/crs-product/IF12924

As discussed below, in section 60002 of the OBBBA, Congress rescinded only "unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act)." The status of Solar for All grants as obligated funds was in effect on the day before enactment of the OBBBA, as is confirmed by EPA itself. As of August 19, 2025, EPA's website states that "Solar for All funds were formally obligated to grant recipients in the summer of 2024."[3] In addition, the Federal Government's Sam.Gov website shows $6,976,000 of the $7 billion in GGRF Solar for All funding as being "Obligation(s)."[4]

**B. OBBBA Section 60002 Does Not Permit Termination of DOEE's Grant Award**

EPA's Termination Letter states that the subject grant is terminated because it is required by OBBBA. This is incorrect because while OBBA rescinds unobligated balances, it does not rescind amounts that were already obligated. OBBBA Section 60002 reads as follows:

Sec. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND.

Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the **unobligated balances of amounts made available to carry out that section** (as in effect on the day before the date of enactment of this Act) are rescinded. (Emphasis added).

As discussed above, DOEE's funds were all obligated many months before OBBBA. Therefore, they were not rescinded by Section 60002.

When the plain language of a statute is unambiguous, no further analysis is required. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). As is obvious from the plain language of Section 60002 of the OBBBA, only the unobligated balances of amounts made available to carry out the Solar for All program were rescinded. If Congress intended the repeal of the legislative authority for Section 134 of the Clean Air Act and the GGRF Solar for All program to be overall recission of all funds (obligated and unobligated) for the GGRF Solar for All program, Congress would not have specified that only "the unobligated balances. . . are rescinded."

In taking the termination action, EPA is conflating "unobligated funds" in Section 60002 with "unspent funds." The first part of Section 60002 must be read in harmony with Congress' explicit rescission of only the unobligated funds in the second part.  In terminating DOEE's Solar for All grant, EPA ignored the plain, unambiguous language of Section 60002 and erroneously proceeded as if that law directed the de-obligation of amounts that were already obligated. It did not. While the statute rescinds unobligated balances, it does not rescind amounts that were already obligated.

---

[3] https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund
[4] https://sam.gov/fal/cffd228dd8a34254b68d497672a5235e/view

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.[5] Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. Congress did not direct or otherwise authorize EPA to terminate the Solar for All program. EPA is acting beyond its authority because it is defying Congress's express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All appropriations are rescinded. EPA should therefore reinstate the full amount of DOEE's Solar for All grant.

## C. Congressional Intent Is Clear That DOEE's Grant Award Funds Were Not Impacted by One Big Beautiful Bill Act (OBBBA) Section 60002 and EPA Exceeded its Authority.

The Congressional record makes clear that EPA's reading of Section 60002 of OBBBA is flawed and the termination action exceeded EPA's authority.

During the Committee markup by the House Energy and Commerce Committee on May 13, 2025, Representative Morgan Griffith of Virginia, Chairman of the Environment Subcommittee, was asked about the impact of the OBBBA on funds already obligated and grants already awarded. Chairman Griffith stated the following, "I just want to point out that these provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. So if a grant was already given, as far as this bill is concerned, then that would still be going forward."[6] He then further stated that "[i]f the grant has already been granted and the money is obligated, then this--then our language does not affect that."[7] And finally, he stated "[W]e can't rescind expenditures that have already been obligated."[8] Therefore, EPA's Termination Memo's claim that the intent of Congress in the OBBBA was to "repeal grant appropriations" is not supported by the legislative history of and Congressional record on the OBBBA.

Further, the U.S. Constitution "exclusively grants the power of the purse to Congress, not the [Executive Branch]."[9] Article I Section 9 of the U.S. Constitution states in part that "No money shall be drawn from the treasury, but in consequence of appropriations made by law." The U.S. Constitution in Article I, Section 8 grants Congress the "powers of the purse" to collect revenues, borrow money, and pay debts of the federal government. The Congressional record on the OBBBA, particularly the May 13, 2025, OBBBA markup hearing of the House Energy and Commerce Committee, makes abundantly clear that Congress did not exercise its authority under

---

[5] 5 U.S.C. § 706.

[6] House of Representatives, Committee on Energy and Commerce, Transcript of Markup of Budget Reconciliation (Transcript of Markup of OBBBA), May 13, 2025, p. 244, lines 5959 – 5964, available online at: https://docs.house.gov/meetings/IF/IF00/20250513/118261/HMKP-119-IF00-Transcript-20250513.pdf; video of hearing available online at https://www.youtube.com/watch?v=J4fGR1CiNGg, time of quoted remarks: 5:40 – 5:45.

[7] Transcript of Markup of OBBBA, May 13, 2025, p. 244, lines 5968 – 5970, available online at: https://docs.house.gov/meetings/IF/IF00/20250513/118261/HMKP-119-IF00-Transcript-20250513.pdf

[8] Transcript of Markup of OBBBA, May 13, 2025, pp. 247-248, lines 6056 – 6057, available online at: https://docs.house.gov/meetings/IF/IF00/20250513/118261/HMKP-119-IF00-Transcript-20250513.pdf

[9] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

the Constitution to rescind the appropriation of obligated funds for the GGRF Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. § 7434.[10] This is further supported by Senator Capito, Chairman of the Senate Committee on Environment and Public Works, who confirmed the section 60002 of the OBBBA " both repeals Section 134 of the Clean Air Act which established the Greenhous Gas Reduction Fund—GGRF—and rescinds all **unobligated funds** that were appropriated to carry it out."[11]  It is clear from the congressional record that Congress did not intend the funds appropriated and obligated for DOEE's $62.45 million Solar for All grant to be rescinded by the OBBBA, as claimed by EPA in its Termination Memo. Moreover, EPA's Termination Memo and subsequent termination of DOEE's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind DOEE's obligated funds or otherwise terminate the Solar for All program as relates to those obligated funds. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and constitutional limitations.

### D. The Congressional Budget Office's (CBO) Budget Score for OBBBA Section 60002 Is Only $19 million, not the full amount of all funds appropriated under the GGRF provisions.

The relatively low CBO Budget Score for OBBBA Section 60002 indicates that Congress did not intend to rescind all GGRF grant funding. On July 9, 2025, Senator Sheldon Whitehouse discussed on the Senate floor the budgetary impact of Section 60002 of the OBBBA, stating that the "CBO score for rescinding all unobligated funds from the Greenhouse Gas Reduction Fund [GGRF] … was $19 million … . The repeal and rescission together only saved the $19 million EPA had remaining to oversee the program." [12] Senator Whitehouse also pointed out that "at no point in [the Democrats'] discussions with the majority … was the score disputed."[13] Finally, Senator Whitehouse referenced and inserted in the record Representative Griffith's statements during the House Energy and Commerce Committee's Markup hearing on the OBBBA held on May 13, 2025 (discussed above).[14]

The CBO's budgetary score of $19 million for Section 60002 of the OBBBA is far below DOEE's grant award of $62.45 million, and a negligible amount compared to the almost $7 billion in grant awards funded by the GGRF Solar for All program. If Congress' language in Section 60002 and its intent in the OBBBA were to rescind all GGRF grant funding, the CBO score would have been much higher. There is no record of the majority in the House or Senate disputing the CBO score prior to passage of the OBBBA. Moreover, the CBO score is consistent with the statements made by Rep. Griffith that Congress, in drafting the OBBBA language in Section 60002, did not intend to rescind obligated (grant) funds. In short, EPA's interpretation of

---

[10] Transcript of Markup of OBBBA, May 13, 2025, p. 244, lines 5959 – 5970, available online at: https://docs.house.gov/meetings/IF/IF00/20250513/118261/HMKP-119-IF00-Transcript-20250513.pdf
[11] Congressional Record for June 30, 2025, p. S4080 (statement of Sen. Capito) (emphasis added).
[12] Congressional Record for Wednesday, July 9, 2025, pp. S4281 – S4283, available online at: https://www.govinfo.gov/content/pkg/CREC-2025-07-09/pdf/CREC-2025-07-09-senate.pdf
[13] Congressional Record for Wednesday, July 9, 2025, pp. S4281, available online at: https://www.govinfo.gov/content/pkg/CREC-2025-07-09/pdf/CREC-2025-07-09-senate.pdf
[14] Congressional Record for Wednesday, July 9, 2025, pp. S4282, available online at: https://www.govinfo.gov/content/pkg/CREC-2025-07-09/pdf/CREC-2025-07-09-senate.pdf

Section 60002 as mandating the recission of GGRF Solar for All program obligated funds is not supported by the CBO's budgetary score for that section.

## II. The Termination Memo Violates the Terms and Conditions of EPA's Assistance Agreement 5H-84088001 with DOEE.

EPA's termination violates the Assistance Agreement between EPA and DOEE. The Notice of Award section on page 1 of EPA's Assistance Agreement 5H-84088001 (Attachment 4), as amended by its December 19, 2024, Assistance Amendment (Attachment 5), requires the following actions for a recipient to demonstrate its commitment to carry out the award: "either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date." DOEE did not file a notice of disagreement within 21 days of December 19, 2024, and has drawn down grant funds. Therefore, DOEE met both criteria to demonstrate its acceptance of and agreement with the Assistance Agreement and its commitment to carry out the terms of the award.

EPA's Assistance Agreement 5H-84088001, as amended, states the limited circumstances for which EPA may terminate the grant award (Page 36, Section 5):

"EPA maintains the right to terminate the Assistance Agreement **only as specified** in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, **when the noncompliance with the terms and conditions is substantial** such that effective performance of the Assistance Agreement is Materially Impaired or **there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status**, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination." [emphasis added]

As highlighted in bold above, termination of Assistance Agreement 5H-84088001 is permissible only if noncompliance by the recipient is substantial, or if there is adequate evidence of waste, fraud, or abuse, or a material misrepresentation of eligibility status. Nowhere in EPA's Termination Memo does EPA assert that DOEE is noncompliant with the terms and conditions of Assistance Agreement 5H-84088001, much less that there was substantial noncompliance, nor does EPA assert that there has been waste, fraud, or abuse, or a material misrepresentation of eligibility status by DOEE in its performance of the grant.

Neither the Termination Memo dated August 7, 2025, nor the Termination Amendment received by DOEE on August 8, 2025, gives any other valid reason for termination. Therefore, EPA's Termination Memo violates the terms and conditions of Assistance Agreement 5H-84088001 by citing to bases for the termination that are not specified in the Assistance Agreement and should be set aside.

**III. EPA's Proposed Unilateral Termination Pursuant to 2 C.F.R. § 200.340 is Unlawful.**

In its Termination Memo, EPA cited to 2 C.F.R. § 200.340(a) as a basis for termination of DOEE's Solar For All grant. This provision does not provide EPA with a legitimate basis for its action. 2 C.F.R. § 200.340 has four possible justifications for termination of the federal award – an award may be terminated:

> (a)(1) by the Federal agency or pass-through entity if the recipient fails to comply with the terms and conditions of the Federal award;
> (a)(2) by the Federal agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions;
> (a)(3) by the recipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination; and
> (a)(4) by the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

2 C.F.R. § 200.340(a)(1), (2), and (3) do not apply to EPA's proposed unilateral termination of the DOEE Solar for All grant award -- EPA has not alleged that DOEE has failed to comply with the terms and conditions of the federal award; DOEE has not consented to EPA's proposed unilateral termination; and DOEE has not requested termination of the award.

Consistent with 2 C.F.R. § 200.340, EPA is bound by the termination provisions specified in the terms and conditions of the Solar for All award. The terms and conditions applicable to this grant do not allow for unilateral termination absent a recipient's failure to comply with the terms and conditions of the grant. Any subsequent changes to the grounds for unilateral termination of an assistance agreement must be agreed to by both EPA and the grantee. DOEE has not agreed, and unequivocally does not agree, to any attempts to terminate this grant award based on an erroneous and unsupported interpretation of OBBBA Section 60002 by EPA.

With respect to 2 C.F.R. § 200.340(a)(4), EPA's proposed unilateral termination of a grant cannot violate laws passed by Congress. As described above in this letter, in enacting Section 60002 of the OBBBA, Congress' express intent was to rescind only unobligated GGRF Solar for All funds. Congress, during the House Committee markup of the OBBBA, made clear "if a grant was already given, as far as this bill is concerned, then that would still be going forward."[15] Because EPA's proposed unilateral termination of DOEE's Solar for All grant terminates a grant "already given" and rescinds obligated funds, it violates Section 60002 and EPA therefore cannot rely on 2 C.F.R. § 200.340(a)(4) for its termination action. In addition, under 2 C.F.R. § 200.340(a)(4), EPA's unilateral termination must be "pursuant to the terms and conditions of the Federal award." As noted above, the justifications cited in EPA's Termination Memo violate the terms and conditions of Assistance Agreement 5H-84088001 related to termination of the grant. Therefore, EPA's proposed action to unilaterally terminate does not

---

[15] House of Representatives, Committee on Energy and Commerce, Transcript of Markup of Budget Reconciliation (Transcript of Markup of OBBBA), May 13, 2025, p. 244, lines 5962 – 5964, available online at: https://docs.house.gov/meetings/IF/IF00/20250513/118261/HMKP-119-IF00-Transcript-20250513.pdf; video of hearing available online at https://www.youtube.com/watch?v=J4fGR1CiNGg, time of quoted remarks: 5:40 – 5:45.

comply with the requirements of 2 C.F.R. § 200.340(a)(4). Congress intended that DOEE's obligated funds continue to support its legally binding award, and these funds cannot be unilaterally terminated by the Executive Branch in this way.

Given that no valid grounds for this termination exist, and EPA does not point to any in the Termination Memo or Termination Amendment or provide any other valid justification, the termination is arbitrary and capricious and contrary to law. EPA must follow the law, rescind this unlawful termination, and restore DOEE's access to its legally obligated funds.

## IV. EPA Can Administer the GGRF Solar for All Program Even Though Unobligated Amounts Have Been Rescinded.

Although unobligated GGRF grant funding has been rescinded, EPA can nevertheless administer Solar For All. In its Termination Memo, EPA states it must terminate DOEE's grant award because Section 60002 "rescinds unobligated amounts to carry out Section 134" and that "[EPA] no longer possesses …. the financial appropriations needed to continue implementation, oversight or monitoring …. of Solar for All." However, as a federal government agency, EPA's FY2025 $10 plus billion budget provides budget appropriations and funding for general administrative functions and expenditures, including grant management. EPA can use a small portion of these funds for general administrative functions to administer Solar for All. Alternatively, EPA could carve out a portion of the $7 billion in GGRF Solar for All funding that is still appropriated and obligated to pay its administrative costs, as is the practice for some other federal grant programs.

## V. Even If EPA's Grounds for Termination Were Valid, which DOEE Disputes, Grant Activities Should Continue Because the Expenditures for the Activities Were Properly Incurred by DOEE.

Regardless of the validity of any termination, DOEE's costs incurred under the grant award should be reimbursed. Prior to August 7, 2025, DOEE had executed contracts and subawards under its GGRF Solar for All grant with a total value in excess of $55 million. As stated in your letter:

> [C]osts incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

While DOEE's $55 million in costs have not all been expensed yet, they are valid and allowable even under EPA's erroneous reading of the requirements of the OBBBA and applicable regulations. These costs were properly incurred, through the execution of contracts and grants with contractors and subrecipients, based on the criteria in EPA's Termination Memo

prior to the effective date of the Termination Memo. Therefore, at a minimum, these costs should be reimbursed by EPA under DOEE's Solar for All grant award.

DOEE and its six SFA grant partners would suffer significant harm without the GGRF SFA grant funds. DOEE and the District relied on the availability of the GGRF SFA funding, as confirmed by EPA, to plan for a significant expansion of a number of solar-related programs and activities. Among the various programs DOEE intended to offer using GGRF SFA funding, DOEE expected to serve an additional 12,000 low- to moderate- income households, reducing their household electricity costs by at least $500 annually for 15 years at a time of increasing electricity and grid infrastructure costs.[16] In addition, federal SFA funding is expected to create more than 500 new jobs in the District of Columbia's solar industry. With DOEE's partner International Brotherhood of Electrical Workers (IBEW), the local electrical union's workforce development program has already received 1,051 applications for its IBEW Electrical Apprenticeship Programs. Further, without this EPA grant funding, at least six projects for which there are executed contracts have been halted and will not be able to proceed.

For the foregoing reasons, EPA's proposed termination action with respect to Assistance Agreement 5H-84088001, as stated in its August 7, 2025, Termination Memo to DOEE, is invalid, unlawful, and arbitrary and capricious, and therefore DOEE disputes this action. I am requesting that EPA fully restore the $62.45 million for DOEE's grant award that was inappropriately and unlawfully made unavailable and allow DOEE's Solar for All grant activities to continue, even as any administrative and legal processes play out.

Sincerely,

_____

Richard A. Jackson
Director

Cc:  Devon Brown, EPA Award Official

---

[16] https://51st.news/dc-electricity-bill-high-pepco/

EXHIBIT 7

 Outlook

---

## Solar for All Grant Closeout Instructions

---

**From** SFA <SFA@epa.gov>

**Date** Wed 10/1/2025 4:21 PM

**To** SFA <SFA@epa.gov>

---

**CAUTION:** This email originated from outside of the DC Government. Do not click on links or open attachments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for additional analysis by OCTO Security Operations Center (SOC).

---

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425)

**Submission Instructions:**

- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details:**

- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

- If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance during the entire performance period (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - Progress towards objectives on program key performance metrics during the performance period.
  - Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:

- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 8



## OFFICE OF MISSION SUPPORT
### WASHINGTON, D.C. 20460

October 28, 2025

**MEMORANDUM**

**SUBJECT:**    Update on Dispute of EPA Assistance Agreement 5H-84088001 under 2 CFR 200.340

**FROM:**    Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**    Thomas Bartholomew, Associate Director
DC Department of Energy and Environment

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84088001. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 27, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# EXHIBIT 9

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Energy and Environment

November 6, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC  20460

Re:     Objection to Closeout of EPA Assistance Agreement 5H-84088001

Dear Mr. Brown:

On September 5, 2025, the District of Columbia's Department of Energy and the Environment (DOEE) submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 5H-84088001 pursuant to 2 C.F.R. § 1500.15.  Despite that timely dispute, on October 1, 2025, DOEE received email correspondence from <u>SFA@epa.gov</u> containing "Solar for All Grant Closeout Instructions" and demanding that DOEE complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." DOEE has now received EPA's October 28, 2025, letter purporting to declare moot DOEE's "dispute regarding the termination of Assistance Agreement 5H-84088001."  The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that DOEE close out Assistance Agreement 5H-84088001.

As an initial matter, clarification is needed because EPA's October 28, 2025, letter references "your dispute . . . submitted on August 27, 2025." But DOEE did not submit its Part 1500 dispute on August 27, 2025.  Rather, DOEE sent a short email to the EPA Officials on August 26, 2025, stating its disagreement with the termination, and on August 28, 2025,  DOEE submitted its 21-day Notice of Disagreement in accordance with EPA's August 7, 2025 Assistance Amendment. Further, on September 5, 2025, DOEE timely filed a dispute with the Disputes Division Official. Thus, it is unclear which of DOEE's disputes "EPA has rendered" moot.  DOEE disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending.  EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation.  We request that EPA reverse its mootness determination and allow the administrative dispute to proceed.  At a minimum, EPA should stay the administrative dispute until the conclusion of the District of Columbia's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).





1200 First Street NE, 5th Floor, Washington, DC 20002 (202) 535-2600 | doee.dc.gov

More importantly, and regardless of any determination regarding the status of DOEE's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, the District of Columbia has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require DOEE to close out while litigation is pending that directly concerns EPA's termination of the District's grant. *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." DOEE has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated $57,085,673.21 from DOEE's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, DOEE has not been able to complete the work required under Assistance Agreement 5H-84088001. Accordingly, EPA necessarily cannot determine that "all administrative actions and required work of the Federal award have been completed" as would be required to close out.

DOEE does not agree to close out Assistance Agreement 5H-84088001 while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00pm on November 7, 2025.

Sincerely,

*Richard A. Jackson*

_____

Richard A. Jackson
Director

Cc: Michael Molina

# EXHIBIT 10

 Outlook

---

**RE: Question around Administration Change**

---

**From**  Kidane, Lydia (she/her/hers) <Kidane.Lydia@epa.gov>
**Date**  Fri 11/8/2024 11:16 AM
**To**    Pimentel, Laura (DOEE) <Laura.Pimentel@dc.gov>
**Cc**    Bartholomew, Thomas (DOEE) <thomas.bartholomew@dc.gov>; Holloway, Amanda (DOEE) <amanda.holloway@dc.gov>

---

> **CAUTION:** This email originated from outside of the DC Government. Do not click on links or open attachments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for additional analysis by OCTO Security Operations Center (SOC).

Hi Laura,

I am doing well; hope you are too!

We can confirm that GGRF grantees will retain their funds as long they comply with their award agreements. GGRF was funded through the Inflation Reduction Act, which was passed by Congress and signed by the President. As such, program funding, which includes funds awarded to grantees as well as OGGRF administrative funds, does not rely on annual agency appropriations from Congress and is therefore less susceptible to funding cycles.

OGGRF has already obligated programmatic funds to grantees, meaning the government and grant recipients have entered into legal contracts known as award agreements. Award agreements are definite commitments that create a legal liability of the government for the award. Once signed—and as long as the recipient complies with the award agreement—the obligated funds are committed to that purpose.

At this time, we are not planning to make any changes related to disbursement requirements. Once the amended notice of award is sent out, programs are expected to move forward as per the requirements on the award agreement.

Thanks,
Lydia

---

**From:** Pimentel, Laura (DOEE) <Laura.Pimentel@dc.gov>
**Sent:** Friday, November 8, 2024 10:58 AM
**To:** Kidane, Lydia (she/her/hers) <Kidane.Lydia@epa.gov>
**Cc:** thomas.bartholomew_dc.gov <thomas.bartholomew@dc.gov>; amanda.holloway_dc.gov <amanda.holloway@dc.gov>
**Subject:** Question around Administration Change

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Hi Lydia. I hope you're doing well. I imagine that like us, you all have been inundated since the election with questions about whether the Greenhouse Gas Reduction Fund is in jeopardy of being rescinded if the new administration chooses to do that. I know that's why you all were intent on making sure the

funds were obligated before end of the year, but it's not clear to us whether it is still legally possible. And our grantees and stakeholders are reaching out to us with questions and concerns.

We're also wondering whether this current reality means that there is any reconsideration to the disbursement requirements around loan funds and the approval of large seed payments? We're able to get these funds dispersed to projects relatively quickly and that would help to do that.

Thanks very much,

Laura

Laura Pimentel
Pronouns: she/her/hers
Energy Program Specialist
Renewable Energy and Clean Transportation Branch
Policy and Compliance Division
Department of Energy and Environment
Government of the District of Columbia

1200 First Street NE, 5th Floor
Washington, DC 20002
Cell: (202) 570-9002
doee.dc.gov