# EXHIBIT 1

5H - 84091801 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Grant Agreement | GRANT NUMBER (FAIN): 84091801<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5H | DATE OF AWARD<br>07/08/2024 |
|---|---|---|
| | TYPE OF ACTION<br>New | MAILING DATE<br>07/11/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:<br><br>Hawaii Green Infrastructure Authority<br>P.O. Box 2359<br>Honolulu, HI 96804<br>EIN: 47-2212679 | PAYEE:<br><br>Hawaii Green Infrastructure Authority<br>P.O. Box 2359<br>Honolulu, HI 96804 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Gwen S Yamamoto Lau<br>P.O. Box 2359<br>Honolulu, HI 96804<br>**Email:** gwen.s.yamamotolau@hawaii.gov<br>**Phone:** 808-587-2690 | Rebecca Taylor<br>1200 Pennsylvania Ave NW, 4410C<br>Washington, DC 20460<br>**Email:** taylor.rebecca@epa.gov<br>**Phone:** 202-564-5211 | Jennifer Brooks<br>1200 Pennsylvania Ave, NW, 3903R<br>Washington, DC 20460<br>**Email:** brooks.jennifer@epa.gov<br>**Phone:** 202-564-6374 |

**PROJECT TITLE AND DESCRIPTION**

Solar for All - HI Financing Program - "Note: A special payment condition applies to this award"

See Attachment 1 for project description.

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 0.00 | TOTAL PROJECT PERIOD COST<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 62,450,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Acting Chief, Grants Management Branch | DATE<br>07/08/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 62,050,000 | $ 62,050,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 62,450,000 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41040 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 62,050,000 |
| | | | | | | | | | $ 62,050,000 |

5H - 84091801 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 62,450,000 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

- MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

- Payment requests (if applicable): EPA Project Officer

- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with

local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

 Progress towards objectives on key performance metrics over the entire period of performance,

 Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

 Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

 Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

 Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

<u>*The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition*</u>:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

II. Additional Programmatic Terms and Conditions

A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

K. Labor and Equitable Workforce Development Requirements

1. Davis-Bacon and Related Acts (DBRA)

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the [EPA Build America, Buy America General Term and Condition](), which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

**with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).**

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

#### 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

#### 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

### 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

### 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping
In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.
Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

> Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

> Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

> National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

> Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

> Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

> Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

#### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

#### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

**AA. Compliant URL Links**

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

**AB. Flow-Down Requirements**

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Solar For All – Hawaii Financing Program**
**Work Plan**
**Period: 5/1/24-4/30/29**
[December 10, 2024]

**Project Title:** Solar for All - HI (SFA-HI) Financing Program
**Grant Number:** #84091801
**Organization Name:** Hawaii Green Infrastructure Authority
**Geography:** State of Hawaiʻi (including all Counties)
**Definition of LIDAC:** Eligible households must meet Federal grant requirements by one of the following:

- Eligible CEJST-Identified Census Tracts:  Explore the map - Climate & Economic Justice Screening Tool (geoplatform.gov) and EPA EJScreen:  EJScreen (epa.gov)

- For individuals currently approved for assistance from or participation in at least one of the following income-based or income-verified federal assistance programs, with an award letter within the last 12 months, HGIA will ensure that SFA-HI's program income qualifications are aligned with the Low-income definition in the Terms and Conditions:

  1. US Department of Health and Human Services Low Income Home Energy Assistance Program:  Low Income Home Energy Assistance Program (LIHEAP) | The Administration for Children and Families (hhs.gov)
  2. US Department of Agriculture Supplemental Nutrition Assistance Program:  Supplemental Nutrition Assistance Program (SNAP) | Food and Nutrition Service (usda.gov)
  3. US Department of Energy Weatherization Assistance Program:  Weatherization Assistance Program | Department of Energy
  4. Federal Communications Commission's Lifeline Support for Affordable Communities:  Lifeline Support for Affordable Communications | Federal Communications Commission (fcc.gov)
  5. USDA's National School Lunch Program:  National School Lunch Program | Food and Nutrition Service (usda.gov)
  6. US Social Security Administration's Supplemental Security Income:  Supplemental Security Income (SSI) | SSA
  7. Multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on the goal of ending homelessness funded under HUD's Continuum of Care Program; and (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515.

- For Metropolitan Areas: (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Level; For Non-Metropolitan Areas: (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level.

The NOFO included a 7th category in the Geographically Dispersed Low-Income Households, (7) any other verified government or non-profit program serving Asset Limited, Income Constrained, Employed (ALICE) individuals or households designated by the EPA Administrator. As approximately 42% of Hawaii's households are ALICE (2020 Asset Limited, Income Constraint, Employed (ALICE) Report – Hawai'i Health Data Warehouse (hhdw.org), post SFA-HI launch, HGIA will work with the EPA Administrator on obtaining a designation to assist a broader population in Hawaii that needs assistance in lowering its energy burden. However, HGIA will not start financing ALICE households until it receives EPA approval to do so.

While SFA-HI does not plan to serve a more specific subset of the definition of low-income and disadvantaged communities, if subsequent to program launch, EPA approves native Hawaiian communities residing in Department of Hawaiian Home Lands homesteads as "ALICE" then in addition to all other eligible LIHH and Disadvantaged Communities, SFA-HI will be serving the Native Hawaiian communities.

While in theory, all SFA programs should prioritize serving the most overburdened and low-income households within the CEJST and EJ Screen census tracts. In reality, there are a number of challenges in implementation, such as:

- There is no efficient, effective or accurate way to "stack-rank" these household against each other to determine who is the "most" overburdened;
- The rooftops of many households are typically not "solar-ready" requiring costly repairs or replacement, the cost of which, if financed will prevent the household from obtaining the minimum estimated 20% bill savings, therefore disqualify them for the loan/lease;
- While HGIA's financing programs have a proven track record of repayment through energy savings, with an average system cost exceeding $60,000 or a long-term (20 to 25 year) leases, these significant financial decisions are difficult for a low-income household, and they should not be rushed to obligate themselves to achieve the Program's prioritization objectives;
- HGIA's existing program finances low and moderate-income households using stated income. HGIA will continue to utilize this eligibility screen in CEJST and EJ Screen census tracts; and
- With the limited amount of SFA-HI funds available to finance less than 1,000 residential rooftops, there isn't any "fair" way, except for first come, first serve, to facilitate solar adoption for LIHH and disadvantaged communities that meet SFA-HI eligibility requirements.

Due to the high cost of land and construction in Hawaii, the competition is fierce for a Low-Income Housing Tax Credit (LIHTC) award. As such, the Area Median Income (AMI) limit for LIHTC projects in Hawaii are less than 60%, utilizing the following three tests:

- 20-50 Test: At least 20% of the units must be both rent-restricted and occupied by households earning 50% or less of the Area Median Income (AMI).
- 40-60 Test: At least 40% of the units must be both rent-restricted and occupied by households earning 60% or less of the AMI.
- Average Income Test (Income Averaging): Introduced in 2018, allows for a broader range of income levels. Under this test, at least 40% of the units must be both rent-restricted and occupied by households with incomes averaging no more than 60% of the AMI. Individual units can be designated for households earning 20%, 30%, 40%, 50%, 60%, 70%, or 80% of the AMI, as long as the overall average does not exceed 60%.

Financial Assistance will be provided to LIHTC projects.

**Introduction**

**Section 1:  Project Description**

**1.1    Overview**

The Hawaii Green Infrastructure Authority (HGIA or Authority), an agency attached to the State of Hawaii's Department of Business, Economic Development and Tourism, is Hawaiʻi's Green Bank. A leader in energy equity, Act 211, Session Laws of Hawaiʻi 2013, constituted HGIA in November 2014, capitalized with the proceeds of Green Energy Market Securitization (GEMS) Bonds[1] , to create and implement non-traditional financing programs to reach ratepayers previously locked out of solar.

Under its existing Green Energy Money $aver On-Bill Financing Program (GEM$), HGIA currently has over 1,600 applications in process for low and moderate-income homeowners and renters.  These applications will likely deplete HGIA's remaining funds available to lend, therefore eliminating the concern that SFA-HI funds are duplicative.  The receipt of Solar for All – Hawaii (SFA-HI) funds is timely as it will enable HGIA to continue providing inclusive solar financing to low-income households (LIHH) and disadvantaged communities and expand financing to community solar projects.

The development of the GEM$ on-bill financing program was a collaborative effort that spanned eight (8) years beginning with the passage of Act 204, SLH 2011 which tasked the Hawaii Public Utilities Commission (PUC) to investigate the viability of on-bill financing (OBF), and if viable, to implement.  On August 15, 2011, the PUC opened the On-Bill docket.  After a thorough investigation, OBF was deemed viable on February 1, 2013.  Between February 2013 to May 2016, the PUC and Hawaii's Public Benefits Fee (PBF) Administrator  worked on the design of the program, however, in May 2016, the PUC suspended the program under the PBF Administrator due to the loss of its Finance Administrator, and instead directed the electric utility to work with HGIA to design and implement an on-bill financing mechanism.  On April 20, 2018, the Green Energy Money $aver On-Bill program was conditionally approved by the PUC; on June 1, 2018, HGIA began accepting GEM$ applications; on December 6, 2018, the PUC provided its final approval and on April 8, 2019, the on-bill financing mechanism went "live" on the utility bill.  Stakeholders who were involved in the

---

[1] The Green Energy Market Securitization Bonds, while issued by the State and administered by HGIA, are obligations of the ratepayers of the Hawaiian Electric Companies, thereby falling under the governance of the Hawaii Public Utilities Commission (PUC).

vetting and design of the financing program included but were not limited to the Consumer Advocate, Hawaiian Electric Company, Kauai Island Utility Cooperative, Blue Planet Foundation, Hawaii Energy, Hawaii Renewable Energy Alliance, Hawaii Solar Energy Association, Sierra Club, Earth Justice, Solar City, and more.

Leveraging HGIA's inclusive and risk mitigating financing mechanisms, SFA-HI will dedicate 83.5%[2] of program funds to finance residential solar + storage systems and residential-serving community-owned, community solar systems for low-income households, in disadvantaged communities statewide. Based on its proven track-record of attracting private capital, $53.4 million in financial assistance (FA) is expected to be leveraged with an additional $46.9 million[3] in private capital to invest in solar PV projects aggregating $82.7 million over the five-year program period.

## 1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Environmental Results - Outputs and Outcomes:**

HGIA's proforma projections and impact metrics, as outlined below, are based on assumed averages for costs[4], system size, and battery capacity for a "typical" residential and multi-family project. Community solar projects assumptions are based on three sizes (small (0.25 MW), medium (1.225 MW) and large (2.45 MW)). Please note, due to the suspension of net energy metering in Hawaii, the interconnection program(s) available require at least one energy storage system to be paired with SFA-HI financed solar PV, to be economically viable. The energy storage systems will be installed on the site (e.g., within the property) that the solar PV system(s) are installed. The following metrics distinguish between Rooftop (which includes multi-family) and Community Solar projects, and can also be found on the orange "Outputs" tab in the budget:

| Category | Outputs | | Outcomes | |
|---|---|---|---|---|
| | Number of Projects Financed (#) | | Clean Energy Generation (MWh) | |
| | Rooftop: | 547 | Rooftop (year 1 production): | 9,911.8 |
| | Community: | 3 | Rooftop (over life of system): | 233,482.6 |
| Climate and Air Pollution Benefits | Solar Capacity Installed (MW) | | Community (year 1 production): | 6,738.8 |
| | Rooftop: | 6.3 | Community (over life of system): | 158,739.6 |
| | Community: | 3.9 | GHG Emissions Reduced & Avoided (tons C02) | |
| | Storage Capacity Installed (MWh) | | Rooftop (year 1 production): | 2,982.7 |
| | Rooftop: | 20.7 | Rooftop (over life of system): | 70,261.3 |
| | Community: | 17.5 | Community (year 1 production): | 17,450.0 |
| | | | Community (over life of system): | 47,769.1 |
| | Number of Households Benefitting (#) | | Number of households with resiliency benefits (#) | |
| | Rooftop: | 1,739 | Rooftop: | 1,739 |
| | Community: | 2,330 | Community: | N/A |
| Equity and Community Benefits | Average estimated savings per household ($) | | Clean energy capacity owned by Communities | |
| | Rooftop SFD (Loan): | $ 98,752 | MW | 3.9 |
| | Rooftop SFD (Lease): | $ 95,301 | MWh | 17.5 |
| | Rooftop MF: | $ 11,647 | Workers trained by WFD programs | 75 |
| | Community Solar: | $ 3,600 | Investments in or partnerships with energy businesses owned by low-income households, located in disadvantaged communities or serving disadvantaged communities: | 25 |

---

[2] HGIA's original application contemplated over 81% of the grant funds being used for Financial Assistance (FA).

[3] $34.4 million private capital attracted with solar financing and $12.5 million in private capital mobilized with credit enhancements.

[4] The cost estimate for the solar system is based on HGIA's existing maximum cost/watt Consumer Protection measure of $4.50/watt.

| | Grant funds deployed by type ($) | | | Capital deployed through credit enhancements to finance energy businesses ($): | $ 12,500,000 |
|---|---|---|---|---|---|
| Market Transfor-mation Benefits | FA | $ | 53,393,110 | | |
| | TA | $ | 3,107,500 | | |
| | Program Administration | $ | 5,949,390 | | |
| | Financial assistance deployed ($) | | | | |
| | EE upgrades - Loans: | $ | 233,131 | | |
| | EE upgrades - Subsidies: | $ | - | | |
| | Rooftop Solar + Storage - Loans: | $ | 28,603,759 | | |
| | Rooftop Solar + Storage - Subsidies: | $ | 1,476,219 | | |
| | Community Solar - Loans: | $ | 15,750,000 | | |
| | Community Solar - Subsidies: | $ | 2,330,000 | | |
| | Total private capital mobilized ($) | | | | |
| | Rooftop: | $ | 17,103,902 | | |
| | Community: | $ | 17,250,000 | | |
| | Number of community-based organizations engaged (#): | | 10 | | |

The Outputs and Outcomes are based over the 5-year period of performance unless indicated by "Year 1 Production" or "over life of the system".

The average estimated savings per household is the estimated savings, net of the loan or solar lease repayment. For loans, the estimated savings also includes Federal and Hawaii state tax credit benefits.

In reviewing HGIA's existing portfolio of applications currently under process, the cost of the battery has increased over the past year due to supply chain challenges, thereby making the "average" PV+Storage system cost $61,600 (from $50,000).

As indicated in the original application, other deviations that may impact the initial output and outcome metrics provided above are funding needed for enabling upgrades (electrical and/or meter upgrades) as well as funding requested for system O&M reserves.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

**Linkage to U.S. EPA's Solar For All Program Objectives:**
1. Program Objective #1: Reduce emissions of greenhouse gases and other air pollutants.
2. Program Objective #2: Deliver benefits of greenhouse gas and air-pollution reducing projects to American communities, particularly low-income and disadvantaged communities.
3. Program Objective #3: Mobilize financing and other capital to stimulate additional deployment of greenhouse gas and air-pollution reducing projects.

**Section 2:  Project Design Plan**

**2.1  Activities to be Conducted**

HGIA will not be utilizing the one-year planning period and instead will immediately begin implementing its Solar for All financing program.

**Meaningful Benefit Plan**

The SFA-HI Program will achieve the objectives of the Solar for All program by providing meaningful benefits to low-income households and disadvantaged communities in the following ways:

1) Inclusive and equitable access to financing for increased solar adoption
    A. Unlike most financing programs, SFA-HI's Green Energy Money $aver (GEM$) On-Bill Financing Program eliminates **all** credit barriers that often prevent low-income households from making energy improvements.  GEM$ underwriting does not rely on credit scores or debt-to-income ratios, instead, it relies on utility bill savings and its risk mitigating on-bill repayment mechanism[5].  Even the presence of Disconnection Notices from the applicant's electric utility does not disqualify an applicant from obtaining GEM$ solar financing.  The only eligibility criteria an applicant must meet is the low-income or disadvantaged community criteria.  In addition to census tract data, HGIA will use allowable Federal proxies (e.g., SNAP, etc.) to determine eligibility. As may be required, HGIA will income qualify geographically dispersed low-income households based on the income thresholds for metropolitan and non-metropolitan areas[6].
    B. HGIA has been accepting GEM$ applications from low and moderate-income households since June 2018 and funding GEM$ loans beginning April 2019.  Up until now, if HGIA was not able to achieve the estimated required bill savings threshold, the applicant was required to place a down payment to buy down the loan in an amount sufficient to meet the bill savings threshold.

        Solar Contractors, LIHHs, disadvantaged communities and other stakeholders are appreciative that the SFA-HI program will deploy a combination of debt and subsidies, as may be required, to achieve the minimum estimated 20% benefit target for applicants who prefer owning the solar system and requesting loans.  This is especially important since SFA-HI will be limited to only LIHHs and disadvantaged communities, many of whom don't have sufficient reserves to provide a down payment.

        For applicant's installing solar through an Energy Services Agreement (aka power purchase agreement or solar lease) (ESA), no subsidies will be provided as the third-party investor is eligible for 65% in solar tax credits (30% Federal and 35% state of Hawaii), as well as modified accelerated depreciation benefits, and as such, should pass

---

[5] HGIA began accepting GEM$ On-Bill Financing applications in June 2018.  During the pandemic, the majority of HGIA's Direct loans were migrated to on-bill following an optional 6-month loan deferment period.  To date, the Agency has not suffered any loan losses, which speaks to the strength of this risk mitigating mechanism.
[6] Per the NOFO, "For Metropolitan Areas: (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Level; For Non-Metropolitan Areas: (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level."

on the minimum required savings to the low-income household (LIHH) when pricing the ESA. Please refer to Section 2 below on the calculation of estimated bill savings for a LIHH with an Energy Services Agreement and a loan. While every household's utility bill and consumption patterns are bespoke, the following is an example providing a comparison between a purchase and a lease. Both loans and leases provides similar estimated household benefits over the life of the system:

| Purchase: $52,600.00 Loan w/P&I Payments of $307.19/month | | |
|---|---|---|
| Estimated Bill Savings Over Lifetime | $ | 77,072 |
| Federal & State Tax Credits | | 21,680 |
| **Total Benefits Over Lifetime** | **$** | **98,752** |
| | | |
| **Solar PPA: 20 cents/kWh; 1% Escalator** | | |
| **Estimated Bill Savings Over Lifetime** | **$** | **95,301** |

While a household who leases a system will not benefit from solar tax credits, it will typically have deeper estimated[7] savings. In the example above, the estimated bill savings is 38%, year one. However, depending on the amount of the escalator, actual benefits for LIHH that purchase the solar system, may exceed that of a lease. The example provided has a 1.0% annual escalator.

As many of the LIHH household do not have sufficient tax liabilities, approximately 60% of HGIA's applications currently in process are for solar leases or solar power purchase agreements. Similarly, HGIA's outcomes are based on originating 100% more leases/PPAs than loans.

Hawaii has a solar investment tax credit of 35%. Each system owner (whether it's the low-income household or the 3rd party owner) has the option to either offset state tax liability with the 35% tax credit, or request cash back from the State under its 24.5% refundable tax credit option. This option is ideal for system owners without Hawaii state tax liabilities.

Please note that while the decision to apply for a loan or a lease/PPA is the ratepayer's decision, the bill savings calculation is the same as HGIA does not include any solar tax credit benefit as part of its bill savings calculation. For a loan, the annual principal and interest payment replaces the annual PPA or Lease payment. If an escalator is included in the PPA, said escalators are incorporated in the bill savings calculations over the term of the PPA. In order to be approved, the estimated bill savings threshold must maintain a minimum, 20%, over the life of the loan or PPA/Lease.

If the IRS allows "chaining" whereby eligible taxpayers can transfer (sell) its tax credits to the State, HGIA will establish a program to purchase Federal tax credits from LIHH at a set amount (so that the LIHH is not reliant on pricing fluctuations due to "market demand") to provide LIHHs the ability to monetize the Federal tax credit along with the

---

[7] All bill savings are estimates and are not guaranteed because energy consumption and utility bills, even after the solar is install have variables outside of HGIA's control, including, the weather, cost of oil and human behavior (e.g., increased consumption after installing solar by using more air conditioning, etc.)

State refundable tax credit, and provide them the option to own the system, free of future escalators.

2) <u>Minimum estimated 20% savings & financial education</u>
   A. Through loans, subsidies, and technical assistance, the SFA-HI Program will increase the utility bill savings threshold for each household in single family and multi-family units to a minimum estimate of at least 20% (including the loan or lease repayment) and provide every participant access to complimentary financial education.

   Master-metered multi-family projects (MFP) will also be underwritten to a minimum estimated 20% utility bill savings after the repayment of the loan or PPA. While individual renters will not have direct economic benefits from the electric utility bill savings, SFA-HI will make available complimentary financial education to all tenants. The MFP owner or property manager will also attest that they will provide at least one or more additional non-financial benefit(s), including but not limited to examples provided by the U.S. Department of Housing and Urban Development[8]:

| Benefit | Description |
|---|---|
| Job training and workforce development | A combination of social services, community supports, job training and/or education that positions an individual for success in the workforce. These services exclude any cash benefits, reimbursements, stipends, or gift cards to a family. |
| Additional support staff | Hiring of additional staff to serve residents and/or building needs. Examples include resident services staff, building security guards, leasing specialists, maintenance staff, etc. |
| Facility upgrades | Improvements to the building and/or its grounds. Examples include energy efficiency upgrades, playgrounds, community gardens, renovation, bike racks, etc. |
| Free or reduced cost high-speed internet service | Free Wi-Fi provided throughout the building and/or in common areas or the owner negotiates Wi-Fi services for the building and the residents are offered a discounted service. |

---

[8] https://www.hud.gov/sites/dfiles/Housing/documents/MF_Memo_re_Community_Solar_Credits_in_MM_Buildings.pdf

| Wellness programs and services | Wellness programs and services provided to residents as a preventive measure to help avoid illness while improving and maintaining general health.  These services exclude any cash benefits, reimbursements, stipends, or gift cards to a family. |
| --- | --- |
| Shuttle services | Free shuttle services for residents can include a variety of paratransit services that use small buses or vans to provide shared mobility services.  These services exclude any cash benefits, reimbursements, stipends, or gift cards to a family. |
| Community events and/or support for resident associations | Hosting events for residents and/or providing financial support for resident associations.  These services exclude any cash benefits, reimbursements, stipends, or gift cards to a family. |
| Increased operating or replacement reserves for the property | Accounts established by property owners to pay for operating and/or large property expenses like long-term major repairs and unexpected expenses, like emergencies. |
| Resilience center | Creation or designation of a space to provide critical services during a power outage and/or a weather-induced extreme event. Examples include community facilities for cooling or heating during periods of extreme heat or cold and access to refrigeration, power to charge devices, and telecommunications during a power outage. |
| Non-monetary donations | Non-monetary, in-kind donations, such as food, clothing, or toiletries. |

Minimum estimated utility bill savings for the examples provided above, are calculated as follows:

1.  Aggregate actual monthly kWh consumption for the previous 12-month period, as reported on the applicant's electric utility bill.  Divide by 12 for the applicant's average monthly energy consumption.

| Historical Utility Bill Information: | | |
| --- | --- | --- |
| | Date | kWh |
| Past Mo | 8/2/2024 | 1120 |
| 2 Mos | 7/2/2024 | 1,101 |
| 3 Mos | 6/2/2024 | 1,127 |
| 4 Mos | 5/2/2024 | 1,082 |
| 5 Mos | 4/2/2024 | 1,098 |
| 6 Mos | 3/2/2024 | 1,110 |
| 7 Mos | 2/2/2024 | 1,120 |
| 8 Mos | 1/2/2024 | 1,071 |
| 9 Mos | 12/2/2023 | 1,065 |
| 10 Mos | 11/2/2023 | 1,055 |
| 11 Mos | 10/2/2023 | 998 |
| 12 Mos | 9/2/2023 | 980 |
| Total Historical HH Consumption | | 12927 |
| Additional EV load | | - |
| Total Annual Consumption | | 12,927 |
| Ave. Monthly Consumption | | 1,077 |

If the applicant submits an attestation that they will be replacing a gas combustion vehicle with an electric vehicle within the next 12-month period, the additional estimated energy[9] needed to power the vehicle by the sun may be added as "Additional EV load" as part of the energy load to be offset by PV.

2. The cost of the average monthly kWh energy consumed is calculated based on the actual electric utility rate[10] during the month the application is submitted. Multiply the average monthly energy cost by 12 for the estimated year one energy cost.

| Rates as of 10/1/2024 | Rate | kWh | Total |
|---|---|---|---|
| First 350 kWh | 0.369422 | 350 | $ 129.30 |
| Next 850 kWh | 0.383475 | 727 | $ 278.79 |
| Over 1200 kWh | 0.406347 | | $ - |
| Average Monthly Energy Cost | | 1,077 | $ 408.08 |
| | | | |
| Average Annual Energy Cost | | | $4,897.01 |

3. If smart meter data is not available[11], calculate the household's coincident load based on what household members[12] are doing during the day (when the system is producing energy). If smart meter data is available, tabulate by the different timeframes:
   i. 9:00 a.m. to 5:00 p.m.
   ii. 5:00 p.m. to 9:00 p.m.
   iii. 9:00 p.m. to 9:00 a.m.

4. Based on the PV + Storage[13] system proposed to be installed, the following data is used to calculate estimated bill savings:
   i. Historical consumption (kWh);
   ii. Estimated Year 1 PV (kWh) production;
   iii. Amount of energy expected to be consumed as produced (coincident load);
   iv. Amount of energy available to charge the battery[14];
   v. Amount of energy discharged from the battery[15];
   vi. Amount of energy expected to be exported to the grid (if applicable);
   vii. Amount of energy (as applicable) to be purchased from the grid.

---

[9] The additional energy needed to power an electric vehicle is based on the average miles traveled per year, which is converted to kWh. The average miles traveled per year is based on the most recent safety check of the gas vehicle to be retired by an EV. The historical cost of gas is added to the "Pre-Solar Utility Bill" amount.

[10] Electric utility rates change on a monthly basis. Therefore, HGIA estimates utility costs based on the rates assessed during the month the application is submitted.

[11] Not all meters have been upgraded to smart meters. For applicants with smart meters, green button data is provided with the application, reflecting actual use during different time intervals.

[12] HGIA's applications requires applicants to indicate the number of household members, three age groups (under 12 years, 13 and older and retired); if household members are away from the home during the day (e.g., work or school); if household members are away from the home at night (e.g. night shift or night school); and if household members are working from home).

[13] Hawaii's Public Utilities Commission suspended the Net Energy Metering Interconnection program in October 2015, offering "interim" programs beginning November 2015. However, in April 2024, all interim programs were suspended and the only interconnection program available requires at least one battery to maximize the economic benefit for the ratepayer.

[14] Usable capacity, based on the battery manufacturer's spec sheet.

[15] Based on the round-trip efficiency from battery manufacturer's spec sheet.

    viii.   PPA Rate **OR** Principal and Interest Payment

| Year 1 Data | | | Annual |
|---|---|---|---|
| 4.i. | Historical Consumption | | 12,927 |
| 4.ii. | PV Yr 1 Production | | 13,300 |
| 4.iii. | Coincident Load | 31.36% | 4,054 |
| 4.iv. | Amount of Energy to ESS (kWh) | 770.51 | 9,246 |
| 4.v. | Roundtrip Efficiency | 89.0% | 8,229 |
| 4.vi. | Energy exported to grid | 0 | 0 |
| 4.vii. | Energy purchased from grid | 53.67 | 644 |
| 4.viii. | Initial PPA Rate | | $ 0.200 |
| **OR** | $52,600 Loan: P&I Loan Payment | 307.19 | $ 3,686.28 |

5. Calculate the post-installation electric utility bill as follows:

    i.   Cost of energy purchased from the grid (if applicable) using the same utility rate in #2 above[16] or time of use (TOU) rates, as may be applicable;

    ii.   Add Solar system loan payments (principal and interest) or Power Purchase Agreement (PPA) payments (based on the energy produced and the PPA rate)

    A) <u>For loans</u>.  Subsidies will be provided, depending on the proposed system's ability to achieve a minimum 20% estimated bill savings, relative to the LIHH's utility bill.  For example, a $9,000 subsidy was needed for the Solar Loan below to buy-down the loan amount and related monthly loan payment to get to the minimum estimated bill savings threshold.  Similar to Public Benefit Fee energy efficiency rebates, said subsidy will be paid directly to the Solar Contractor and not be given to the LIHH.  As such said subsidy is not considered household income subject to income taxes, nor will it put the LIHH at risk of losing eligibilty for income related safety net programs, such as SNAP, LIHEAP, etc.

    Some loans won't require any subsidies, while other loans may require a larger subsidy.  On average, HGIA estimates the subsidy amount will be approximately $9,000 per loan.

    B) <u>For Solar Leases/PPAs</u>.  As may be required, HGIA will adjust the monthly solar lease amount or PPA rate (and escalator) to get to the required minimum 20% savings threshold.

    Subsidies are not provided for TPO systems and the decrease in revenue adjustments will be borne by the TPO.

    C) <u>For Multi-family Projects</u>.  Similar to the Solar Lease/PPA systems mentioned in Section B. above, subsidies will not be provided for TPO systems installed on multi-family projects.   The investor's PPA

---

[16] Once the solar system is connected to the electric grid, the applicant's rate schedule migrates to TOU.  However, the applicant can choose to opt out of the TOU rate to revert back to the existing Residential rate schedule.

11

rate and escalator will be adjusted to meet the minimum savings threshold requirements.

For LIHTC multi-family rental projects interested in owning the solar system and based on projects it has financed in the past, HGIA does not anticipate having to provide additional subsidies, as the pre-solar utility bill is typically large enough to accommodate the system costs and meet the minimum savings thresholds.

The solar system financed by SFA-HI will benefit residents of individually metered multi-family projects with:

a. Minimum estimated 20% bill savings;
b. Increased resilience due to the energy storage system; and
c. Complimentary financial education.

The solar system financed by SFA-HI will benefit residents of master-metered multi-family projects with:

a. Increased resilience due to the energy storage system;
b. Complimentary financial education; and
c. At least one of the non-financial items identified in Section 2.A. above.

D) <u>For Community Solar projects</u>.  Due to shortcomings in Hawaii's community solar program, HGIA anticipates providing $1,000/subscriber subsidies for community solar projects.  As needed, the subsidies will be used to buy down the system cost and paid directly to the Solar Contractor.  It will not be provided directly to the Subscribers in the form of cash or credits to their electric utility bills, in order to ensure that it will not be considered household income.

The solar system financed by SFA-HI will benefit subscribers with:

a. Minimum estimated 20% kwh savings; and
b. Complimentary financial education.

iii. Add energy purchased from the grid;
iv. Subtract interconnection credits or grid services credits, as may be applicable.

| **Year 1 Bill Savings Calculation:** | | Monthly | | Annual | | |
|---|---|---|---|---|---|---|
| Pre-Solar Bill | | $ | 408.08 | $ | 4,897.01 | |
| | | | | | | |
| 5.i. | **Rates as of 10/1/2024** | **Rate** | | **kWh** | | **Total** |
| | First 350 kWh | 0.369422 | | 53.67 | $ | 19.83 |
| | Next 850 kWh | 0.383475 | | 0 | $ | - |
| | Over 1200 kWh | 0.406347 | | | $ | - |
| | Average Monthly Energy Cost | | | 54 | $ | 19.83 |
| | | | | | | |
| Post Solar Bill - Solar **PPA** | | | | | | |
| 5.ii. | PPA Payment | $ | 232.11 | $ | 2,785.34 | |
| 5.i. | Energy purchased from grid | | 19.83 | | 237.93 | |
| 5.iii. | Interconnection or Grid Svs Credits | | 0 | | 0 | |
| | Total Post-Solar Energy Bill | $ | 251.94 | $ | 3,023.27 | |

| Post Solar Bill - **Solar Loan** | | | | | | |
|---|---|---|---|---|---|---|
| 5.ii. | Monthly Loan Payment | $ | 307.19 | $ | 3,686.28 | |
| 5.i. | Energy purchased from grid | | 19.83 | | 237.93 | |
| 5.iii. | Interconnection or Grid Svs Credits | | 0 | | 0 | |
| | Total Post-Solar Energy Bill | $ | 327.02 | $ | 3,924.21 | |

6. Determine estimated year one bill savings:
   i. Subtract the estimated post-installation energy costs (#5 above) from the pre-installation energy costs (#2 above) to determine estimated dollar savings.
   ii. Calculate the percentage difference between the pre and post energy costs to determine if it meets the minimum 20%[17] estimated savings threshold.

| Post Solar Bill - Solar **PPA** | | | | | |
|---|---|---|---|---|---|
| 6.i. | Bill Savings $ | $ | 156.14 | $ | 1,873.74 |
| 6.ii. | Bill Savings % | | 38% | | 38% |

| Post Solar Bill - **Solar Loan** | | | | | |
|---|---|---|---|---|---|
| 6.i. | Bill Savings $ | $ | 81.07 | $ | 972.79 |
| 6.ii. | Bill Savings % | | 20% | | 20% |

7. Calculate estimated savings over the life of the system by applying the following on an annual basis from years two through twenty-five:
   i. Increase the utility rate by the compounded annual growth rate determined by rate schedule and island;
   ii. Decrease the solar production based on the degradation rate of the solar system (provided by the manufacturer);
   iii. increase in PPA rate, if there is an escalator, as applicable.

---

[17] If the estimated savings falls below the minimum 20%, the following adjustments are made, as may be applicable: (1) downsize the system; (2) increase or decrease the number of batteries; (3) if a loan, provide a subsidy to buy-down the cost of the system; and/or (4) if a PPA, decrease the PPA rate.

       iv. Decrease the usable capacity of the battery based on the degradation rate of the battery (provided by the manufacturer).

       v. There must be a minimum 20% estimated savings every year over the life of the loan or PPA for HGIA to approve the installation.

B. HGIA will ensure that every Community Solar subscriber shall benefit from a minimum estimated 20% energy (kWh) savings[18].

    1. Saving calculations are the same as in A, except instead of comparing pre and post-installation utility bills, HGIA will be comparing the cost of the energy compared to the benefits provided to the Subscriber.

    2. As an example, the Bill Credits provided to the Subscriber is $100.00 per month. The cost of the Subscription is $75.00 per month. The LIHH will have a 25% savings:

| | |
|---|---|
| Bill Credit (Value of Energy): | $100.00 |
| Subscription Cost: | 75.00 |
| Monthly Energy Savings | $ 25.00 or 25% |

3) <u>Household energy and grid resilience</u>

A. The SFA-HI Program shall pair all solar systems with at least one energy storage system to increase savings and household energy resilience and security, while supporting the grid. The SFA-HI Program shall also provide low-income ratepayers additional opportunities to increase savings by financing the installation of energy efficiency measures and/or participating in utility offered incentives (e.g., battery incentives and/or utility grid services programs), decreasing consumption bundled with solar+storage systems, and/or through smart inverters installed with solar+storage systems, which help balance the supply and demand of active power.

4) <u>Consumer Protection Measures</u>

As a state agency focused on financing underserved ratepayers, HGIA has incorporated a number of consumer protection measures that are not typical for other lenders (e.g., banks, credit unions, etc.), including but not limited to the following:

A) <u>Solar Contractor Due Diligence</u>. Solar Contractors interested in installing systems financed by HGIA must go through a due diligence process <u>Hawaiʻi Green Infrastructure Authority | Contractor Toolkit</u>, which includes confirming:

    a. the Contractor is registered to do business in the state of Hawaii;

    b. the Contractor maintains the required license(s) to install solar systems and is in good standing;

    c. the Contractor is current on its Federal and state taxes;

    d. the Contractor does not have any department of Labor issues;

    e. the Contractor maintains minimum insurance coverage requirements naming HGIA as Additional Insured;

    f. the Contractor has a satisfactory Better Business Bureau rating. If there has been a complaint filed in the past, that the Contractor responded adequately and timely.

---

[18] Achieving a minimum percentage <u>utility bill</u> savings for Community Solar projects is not practicable as the calculated <u>bill savings</u> depends on the number of Participants and the size of each Participant's utility bill relative to the energy production of the system being proposed. The larger the utility bill, the harder it will be to achieve a minimum 20% utility bill savings on non-utility-scale community solar projects. Instead, HGIA will ensure a minimum 20% energy (kWh) cost savings for Community Solar participants.

g. Prior to giving final approval, the Contractor must go through a Contractor Training with HGIA to ensure they understand the goals and requirements of HGIA's financing program.

B) <u>Minimum Warranty Thresholds</u>. The Contractor must provide the following minimum warranty thresholds for systems financed by HGIA:

    a. the manufacturer's warranty must match the term of the loan or the lease (e.g., 20-year manufacturer's warranty results in a maximum 20-year loan or lease term; 25-year manufacturer's warranty results in a maximum 25-year loan or lease term).

    b. Minimum workmanship warranty of 10 years for residential solar PV installations;

C) <u>Maximum System Size Threshold</u>. In order to prevent "super-sizing" of systems, HGIA has a 5% maximum system size tolerance as part of its underwriting criteria. This is especially important because Hawaii's Public Utilities Commission suspended the Net Energy Metering program in October 2015. The current interconnection program provides credits for energy exported to the grid, however, the credits only apply against energy purchased from the grid (therefore, supersizing adds to the system cost (which benefits the solar contractor), however, provides no economic benefit to the LIHH.

D) <u>Maximum Cost Per Watt Threshold</u>. In order to prevent Contractors from taking advantage of LIHH, who are often not financial or energy literate, and avoid price gouging, HGIA has a maximum cost per watt threshold of $4.50/watt.

E) <u>Explanation for PV Watts Production Estimates variations exceeding 10%</u>. Solar Contractors provide the LIHH with an estimated year 1 production on the solar system being proposed using NREL PV Watts, Helioscope or other PV production estimation tools. For HGIA financing, Solar Contractors are required to provide a "PV Watts (or similar tool) Certification" certifying their estimated year 1 production. If there is more than a 10% variance between the Contractor's estimate and the estimate provided by PV Watts (or similar tool), the Contractor needs to provide an explanation for the variance (e.g., shading, weather patterns, etc.).

F) <u>Minimum Estimated Savings Thresholds</u>. As HGIA is providing financing to LIHH and other underserved ratepayers, many of whom lack discretionary income or savings reserves, it is extremely important that these LIHH are in a better financial position <u>after</u> the solar is installed, including the loan or lease repayment requirements, then they were before the solar is installed. As such, HGIA's existing program requires a minimum estimated bill savings of at least 5%, 10% or 15%, based on disconnection notices the ratepayer may have received over the last 12-month period. For SFA-HI loans and leases, the minimum post-solar estimated savings will be at least 20%.

G) <u>Contractor Funding Requirements</u>. Unlike banks or credit unions who underwrite solar loans based on the creditworthiness of the applicant, with its repayment not reliant on energy savings, HGIA's underwriting and financing program relies on energy savings to repay the loan or PPA. As such, loan proceeds are not given to our Borrowers and are instead, paid directly to the Solar Contractor to avoid Mechanics Liens after they provide the following required documents:

    a. 50% Funding:

        i. Open building permit from the County; and

        ii. HGIA being named as Lender Loss Payee on the homeowner's insurance policy.

    b. Final Funding is provided after the Contractor submits:

        i. Closed building permit, which signifies that the County has inspected the installation of the system and it meets County code;

    ii. Utility Interconnection validation or approval, which signifies that the electric utility has inspected the system, it meets the utility's interconnection requirements, and the system has been placed in service and connected to the grid;

    iii. Access to system monitoring, with which HGIA staff confirms that the system is producing energy as intended; and

    iv. Certificate of Completion and lien release executed by (1) the LIHH, indicating that the system has been installed per the Sales contract, to their satisfaction and authorizes HGIA to pay the Contractor; as well as (2) the Contractor attesting that the system has been installed per the Sales Contract and county/utility codes, and provides a lien release signifying the end of the installation/construction period.

Please note that HGIA conducts rigorous analysis upfront in approving loans and/or solar leases to maximize utility bill savings for the ratepayer. It also incorporates consumer protection measures into underwriting requirements and funding, including longer workmanship warranty requirements, pricing caps, and assures the system is installed to the satisfaction of the LIHH before making final payment.

HGIA however, does not do any post-installation audit, nor does it guarantee electric utility bill savings. In lieu of an audit, the County's building inspectors as well as the utility's quality control staff and engineers provide assurance, through their approvals, that the systems have been installed per code and to their satisfaction; and access to the system monitoring account provides HGIA assurance that the system is producing the anticipated energy.

Electric utility bill savings are not guaranteed because energy consumption and its related utility bill, after solar has been installed, have variables outside of HGIA's control, including, (1) the weather, (2) the cost of oil (for the remaining energy purchased from the grid) and (3) human behavior. Post-solar, some households use more air conditioning; others add more household members or purchase additional appliances (e.g. standup freezers, etc.). While we encourage LIHH to maintain the same or lower energy consumption patterns after solar is installed, these changes deviate from the historical consumption patterns the solar system and estimated bill savings were modeled after, thereby making it impossible for HGIA to guarantee savings.

5) <u>Equity-building ownership models</u>

    A. SFA-HI will facilitate solar adoption through Financial Assistance and Technical Assistance, for rooftop solar and community solar projects.

        a. SFA-HI will be complementing the State Energy Office's Wayfinders program by providing their army of outreach VISTAS with toolkits to help educate LIHH and Disadvantaged communities on the benefits of solar for increased adoption, through local community based organizations.

        Education and outreach includes the financial benefits and responsibilities of solar ownership, providing information for the households to determine whether an ownership or a lease model best fits the needs of their household.

Financial education is also an important aspect of asset building, even if the household selects the lease model, as disciplined post-solar financial decisions made regarding the monthly energy saving benefits over the life of the lease/PPA can help these vulnerable households build a cash reserve and safety net.

b. For communities interested in community-owned solar projects, the playbooks and outreach will help them better understand the process and requirements to accelerate project planning and implementation.

B. SFA-HI will facilitate ownership models to maximize asset building and other benefits to low-income households and communities

a. <u>Residential Rooftop Solar</u>.  Many LIHH lack federal and state tax liability which currently makes a solar lease/PPA their only option to participate in solar.  There are a number of national, regional, state and local Third-Party Owner/Investors (TPO) specializing in solar leases/PPAs, each with a different business and profit model.  Some may be profit driven, while others, such as impact investors, may be more impact driven.  Many of these contracts have escalators that increase the cost of energy for the LIHH over the term of the lease/PPA.

If it's favorable for the LIHH and offered by the TPO, HGIA facilitates system buy-out opportunities, by allowing the LIHH to assume HGIA's low-cost, long-term debt from the TPO, eliminating or decreasing the need for the LIHH to come up with cash or the need to borrow funds to exercise the purchase option.  In many cases, although the LIHH will be responsible for the operations and maintenance of the systems, these assumptions stabilizes the energy cost and provides increased savings, beyond the solar maintenance cost, for the LIHH.  It also provides the LIHH an opportunity to increase household assets and build equity.

Another way to facilitate equity building ownership models is to provide LIHHs (with limited tax liability) the <u>option</u> to directly purchase the solar system, if the direct purchase scenario is more beneficial for the LIHH.  As mentioned above in Section 1.B. under the Meaningful Benefits Plan, LIHHs already have the ability to monetize Hawaii's 24.5% refundable tax credit.  If the IRS approves "chaining", HGIA will purchase Federal Tax credits at a set price to eliminate market variability, to help LIHHs also monetize the Federal tax credit.  Together with SFA-HI financing, more LIHHs will have opportunities to increase household assets and build equity over time.

b. <u>Community Solar</u>.  SFA-HI will finance community solar projects that have a nameplate capacity of 5 MW AC or less and deliver at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility.

There are two community solar models: (1) Developer-owned; and (2) Community-owned.  In Hawaii, due to the significant upfront investment required for these utility scale projects, thus far, all community solar projects have been Developer-owned.

i. <u>Developer-Owned</u>. In a developer-owned model, the developer typically forms an Special Purpose Entity (SPE) that owns, maintains, constructs and operates the solar farm. Subscribers sign a lease or PPA, purchasing the energy at a pre-determined rate or amount in exchange for a credit on their monthly electric utility bill.

While HGIA prefers financing community-owned solar projects to facilitate asset and equity building, SFA-HI will also finance SPEs for developer-owned community solar projects as long as said projects (1) has a focus on LIHH subscribers, and (2) also offers additional community benefits. The additional benefits could be in the form of underwriting resiliency hubs (in full or part), or helping LIHH become more resilient against hurricanes[19], etc., depending on the needs of the community. Said Community Benefits Agreements will be developed during the planning and pre-development stages of the project.

ii. <u>Community-Owned</u>. In a community-owned model, a nonprofit Cooperative owns, maintains, constructs and operates the solar farm. Members of the Cooperative are also subscribers, purchasing the energy at a pre-determined rate or amount in exchange for a credit on their monthly electric utility bill.

Unlike out of state developer-owned models, community-owned projects perpetuate a circular economy, where energy revenues remain in and are re-invested in Hawaii, increasing its economic multiplier impact.

Lastly, the community not only has a voice in the development of these community-owned solar projects, but it will also have a voice as to how excess cash flow, profits and benefits will be shared with subscribers and/or invested within the community. This model builds equity for the Cooperative and assets (cash) for the subscribers.

<u>Mitigating risks</u>. There are significant subscriber repayment risks for both developer-owned or community-owned projects that offer subscriptions to low-income subscribers. A developer's inability to collect subscriptions will result in cash flow challenges and the project's ability to pay its operating expenses and debt-service requirements. To mitigate risk, HGIA's on-bill repayment mechanism will be used to collect the subscription fees on the subscriber's electric utility bill, which will not only decrease servicing costs for the projects, but also significantly decrease repayment risks. By servicing the subscription payments for the community-solar project, HGIA will be able to verify that at least 50% of the power generated by the system is delivered to Residential Rate Schedule customers in the same service territory.

Nonprofit owned community solar projects are difficult to finance as the "community" typically does not have any additional assets to pledge as collateral, nor does it have excess cash flow to provide a secondary or tertiary source of

---

[19] Hurricane clips and straps were not mandated for new construction in Hawaii until 1994. As such, approximately 64% or 125,000 single-family homes on Oahu have no hurricane protections.

repayment. HGIA existing programs finance nonprofits and the only obligor is the nonprofit organization. No personal guarantees are required, thereby limiting financial risk to community members.

Non-recourse financing, coupled with the risk-mitigating on-bill repayment mechanism which increases the assurance of revenue collection, increases the project's success rate, while limiting risk for LIHH and disadvantaged communities. Lastly, financing made under HGIA's GEM$ program is made to the electric utility meter and not necessarily to an individual. The on-bill obligation transfers from ratepayer to ratepayer. This also limits risks for LIHH who finance or lease solar systems as their obligation to repay the loan or the lease ends when they close their electric utility account. Repayments begin again when a new electric utility account is established for that particular meter which is benefiting from the solar system.

6) <u>Capacity building and targeted workforce development for energy companies and green lenders to scale deployment in disadvantaged communities</u>
   A. Modeled after the existing State Small Business Credit Initiative (SSBCI) Collateral Support Program administered by HGIA, HGIA will co-design a credit enhancement program with local lenders to fill access to capital gaps and support working capital facilities for solar companies to scale deployment.
      a. Instead of a maximum of 20% collateral support offered under the HI-CAP Collateral Support Program, the SFA-HI program may initially provide up to 40% collateral support for Participating Lenders to provide working capital lines to energy companies.
      b. As said working capital lines season and Participating Lenders gain comfort over the creditworthiness and repayment history of the solar companies. The percentage of collateral support may decrease, to increase leverage and allow more working capital facilities to be approved and deployed.
   B. SFA-HI will complement the Good Jobs Challenge Clean Energy Sector Partnership ("CESP") in Hawaiʻi funded by the U.S. Department of Commerce, Economic Development Administration (EDA) and other funding sources, to develop pathways to high quality jobs in the energy industry for low-income and disadvantaged communities (described in more detail below).
   C. SFA Green Lenders Workforce Development and Deployment Program (described in detail below).

**Financial Assistance Strategy**

<u>Exceed Financial Assistance Targets</u>
HGIA plans to invest 85.5% in Solar for All funds towards financial assistance (FA) to maximize solar deployment. Of the $53.3 million allocated for FA, 83.5% or $44.6 million will be deployed as inclusive, long-term, below-market loans, with 7.1% or $3.8 million invested as subsidies and 9.4% or $5.0 million used to provide credit enhancements to build capacity for solar contractors installing projects for LIHH and Disadvantaged communities.
- $3.1 million in loans for Energy Efficiency, Rooftop Solar + Storage installations; $10.1 million in loans and subsidies for Rooftop Solar + Storage installations;

- $10.1 million in loans for Rooftop Solar + Storage Energy Services Agreements (a.k.a. solar leases), which is expected to leverage $10.1 million in private capital for a total investment of $20.2 million;
- $7.0 million in loans for Multi-family Solar + Storage installations, which is expected to leverage $7.0 million in private capital for a total investment of $14.0 million;
- $18.1 million in loans and subsidies for residential serving community-owned, community solar projects, which is expected to leverage $17.2 million in private capital for a total investment of $35.3 million.

SFA-HI will leverage the GEM$ onbill repayment mechanism for all financing, as follows:
- For loans to LIHH and disadvantaged communities, the principal and interest payments will be placed on the electric utility bill as a Program Charge;
- For solar leases/PPAs to LIHH and disadvantaged communities, the solar lease or PPA payments will be placed on the electric utility bill as a Program Charge;
- For individually metered multi-family projects, the solar lease or PPA payments will be placed on the electric utility bill of the LIHH as a Program Charge;
- For master-metered multi-family projects, the PPA payment or loan payments (for direct financed systems) will be placed on the electric utility bill of the multi-family project; and
- For community solar projects (both developer owned or community owned), the monthly Subscription fee will be placed on the ratepayer's electric utility bill as a Program Charge.

In addition to mitigating repayment risks, because these Program Charges (whether loan or lease/PPA) are attached to the electric utility meter and not necessarily a person, the obligation transfers from ratepayer to ratepayer, allowing renters to participate as well as accommodating the sale of property.  Unlike a traditional loan which needs to be paid off when the property is sold and increases the sales price, negatively affect housing affordability, the ability for the on-bill obligation to transfer to the buyer through the electric utility bill and paid through energy savings, reduces the mortgage (and related down payment) required to purchase the property.

SFA-HI will provide up to a 25-year (dependent on the manufacturer's warranty) permanent, fixed rate loan to make repayment affordable for underserved ratepayers.  No prepayment penalties will be assessed.

SFA-HI loans provided to LIHHs are not considered income because it is tied to an obligation that needs to be repaid.  Further, loans are not taxable.  The only time a loan would be considered income is if the loan was cancelled by the lender or bank.[20]  Additionally, similar to how energy efficiency rebates from Public Benefit Fee Administrators are paid directly to solar hot water (or other) contractors, SFA-HI subsidies provided to buy down the system cost will be paid directly to the Solar Contractor.  This will ensure that the subsidies will not be considered household income subject to income taxes, and more importantly, it will not put the LIHH at risk of no longer being eligible for income related programs, such as SNAP, LIHEAP, etc.

For all solar+storage projects on both single-family dwellings and multi-family projects, HGIA will be using a "Construction/Permanent" financing structure, where HGIA will be utilizing the $15.0 million State of Hawaii CIP funds to finance the installation (or construction).  Said construction

---

[20] Forbes Advisor; March 29, 2021; "Are Personal Loans Taxable & Considered Income?"

loan will be refinanced with SFA funds (both loan and/or subsidy, as may be required) for long-term permanent financing.  The following describes the process for this Construction/Permanent structure:

1. HGIA will underwrite the construction loan following its existing Green Energy Money $aver On-Bill financing program guidelines for low-income households (verified with SNAP, LIHEAP and other allowable Award letters) and disadvantaged communities (verified by census tracts), including a minimum 20% estimated post-installation bill savings (including loan repayment or ESA charges).
2. Upon loan approval, the construction and permanent loan documents will be executed by Applicants.
   a. The HGIA (state funded) Construction loan documents will be dated;
   b. The SFA Federal funded permanent loan documents will not be dated since the installation period may vary.
3. Notice to Proceed is given to the Contractor.  Upon submitting a Building Permit, HGIA will fund 50% of the construction loan to the Contractor with state funds.
4. Following the installation of the solar system, with the system placed in service and the required documents (Closed Building Permit; Certificate of Completion with lien release; Utility Interconnection Validation; Certificate of Insurance naming HGIA as lender loss payee; and access to the System monitoring) submitted by the Contractor, HGIA will make the final payment to the Contractor signifying the end of the construction period.
5. HGIA will then refinance the Construction loan with a SFA permanent loan, at which time, the permanent loan documents will be dated, and the Exhibit B (Truth in Lending) schedule will be updated based on the actual date when the obligation is onboarded to the Borrower's electric utility account.  HGIA will mail the "paid in full" construction program documents and the dated SFA Permanent program documents to the borrowers for their files.

SFA-HI will deploy between $17.2 million to $421,000 in loans and subsidies annually, for an average $8.9 million SFA-HI FA deployed annually over the five-year grant period.

<u>Path to Market Transformation</u>

**Leverage for greater impact**
We anticipate that the $53.3 million in SFA-HI Financial Assistance funds will attract some $46.8 million in private capital.  Additionally, loans repaid will be leveraged with more private capital and re-lent and invested into more solar systems, which will double and triple the impact of the initial grant funds over the long-term, helping Hawaii achieve its clean energy and decarbonization goals.

**Increase internal capacity**
In order to ensure ongoing sustainability without employee burn-out and with sufficient redundancies and controls, a critical component to the success of the SFA-HI program was to increase HGIA's full-time employees (FTE).  Due to EPA's SFA Award, in May 2024, the Hawaii State Legislature approved the addition of three FTE (a 60% increase from the previous 5 FTE) for HGIA, including a Residential Program Manager, Fiscal and Compliance Manager and Community Outreach Officer.  These positions will be funded in part or in whole with SFA-HI funds, depending on the time spent working on SFA-HI related tasks, as detailed on the pink Personnel tab in

Attachment E.  However, as a sustainable, ongoing program, said positions will be funded by earned revenue following the 5-year program period.

**Technical Assistance for Green Lenders**
Green Banks and Green Lenders like HGIA who are implementing and administering non-traditional financing programs to expand access to capital to low-income households and disadvantaged communities, are "stuck" between finance and climate.  Candidates from Banks or credit unions may understand traditional lending; however, they are ignorant to non-traditional lending, clean energy technology and utility interconnection programs.  Candidates from the energy industry understand clean energy technology and utility interconnection programs; however, they are ignorant to traditional and non-traditional lending.  As such, every single HGIA employee needs to be trained "on the job" and this lengthens the amount of time it takes for new hires to become proficient in their work.

The starting pay for an **entry level** residential loan underwriter and processor for HGIA is equivalent[21] to mechanical engineering technicians, cardiovascular technologists and technicians and first-line supervisors of non-retail sales (to name a few).  Further, HGIA's entry-level underwriter's salary is higher than teachers[22] in both Hawaii and on the mainland, making Green Lending a good career choice for individuals from low-income households or rural areas.

This technical assistance program will support the growth, development and deployment of a diverse professional workforce to enable state and community lenders, project developers, and low-income communities in Hawaii to conduct state of the art planning, assessment, financing, and entity-level implementation of rooftop solar projects funded through the Hawaii Solar for All (SFA) grant.  In the process, it will help build an equitable new market for solar program development and lender-based financing to accelerate deployment of direct investment funds of SFA to low-income households and disadvantaged communities.

This program will create and provide university faculty and professional based instruction and capacity building for two sequential, accreditation level, upper-level undergraduate, graduate, and early/mid-career professional courses. These will address 1) foundational skills and tools needed for planning, design, and assessment of rooftop solar projects and programs, and 2) financing and entity level implementation of solar projects and programs with a focus on lending, leveraging (e.g., mobilizing private capital) and green budgeting. The courses will be coupled with experiential learning-by-doing technical assistance opportunities through education program-based assistance to a stream of new SFA projects in Hawaii.  The program will be designed to be launched through an NGO partnership platform led by thought leaders experienced in strategy, analysis, innovation, training, advanced facilitation and technical assistance, as well as an educational organization focused on creating intellectual and economic wealth through providing education and programming, with more than 44 chapters across the country.  In addition to SFA financial support, HGIA will assist in the design of the program to not only train FTE in Hawaii, but also help scale inclusive green lending nationwide.

The two courses and the project level learning by doing and technical assistance will be fully integrated as a cohesive program. The program will be structured to transition to a sustainable

---

[21] According to CareerBuilder 15 jobs that pay $55K a year (careerbuilder.com)
[22] According to iteach, the starting salary for teachers in Hawaii is $50,123 Hawaii Teacher Salary - iteach

business model by the end of the grant period and designed to scale to university MBA curricula and other educational partners.  It will also be designed for optional expansion to additional zero emitting technologies beyond solar.

While the impetus for this technical assistance program is to help accelerate the development of HGIA's workforce and other potential green lenders in Hawaii, feedback from energy stakeholders indicate high levels of additionality benefitting other professionals in the energy sector, such as:

1. Foundational Skills and Tools
    a. Lenders (Green Banks, banks, credit unions, CDFIs)
    b. PUC staff
    c. Consumer Advocate Staff
    d. Energy attorney staff
    e. Energy office staff
    f. Solar contractors
2. Financing and Entity Level Implementation (participants must take #2 or have functional equivalency)
    a. Lenders
    b. Investors
    c. Nonprofits
    d. Local and state government

These workforce development efforts will interact with solar projects being deployed by SFA-HI, with the potential to scale to SFA projects nationwide, as follows:

| Professional Sector | Interaction with Solar Projects Deployed by SFA-HI & Beyond |
|---|---|
| Lenders (Green Banks, banks, credit unions, CDFIs) | Trained lenders will be able to underwrite and process financing for LIHH and Disadvantaged Communities, either through direct SFA funding or by mobilizing private capital in concert with SFA funding. |
| Investors | Investors will better understand how SFA funding will mitigate project risks, which will mobilize private capital in SFA financed projects. |
| PUC Staff | The education and/or experience of many staffers are generally more policy-focused or high-level energy focused. Staffers will have a deeper understanding around rooftop and community solar projects, as well as the economics behind said projects, with the ability to advocate for policy decisions facilitating more projects deployed by SFA. |
| Consumer Advocate Staff | |
| Energy Office Staff | |
| Local & State Government | |
| Energy Attorney Staff | Having the foundational skills around solar projects, coupled with a deeper understanding of financing and leveraging, will facilitate legal documents related to SFA projects, as well as advocacy efforts around additional capital to leverage SFA funds. |
| Solar Contractors | Providing foundational training to new employees in a variety of positions (e.g., installers, sales, back-office support, |

| | |
|---|---|
| | customer service, etc.) will help accelerate the expertise of staff and increase their ability focus on SFA projects. |
| Nonprofits | HGIA and the state energy office will be working through nonprofit community-based organizations to facilitate outreach in disadvantaged communities.  Increasing their knowledge and expertise in energy and financing will help accelerate their ability to communicate and educate community members on the benefits of solar, which will lead to SFA-HI financing. |

We anticipate program launch in Fall 2025 or Spring 2026 and are conservatively estimating 10 participants from Hawaii over the program period.  While initially focused on Hawaii projects, this initiative has the potential to scale nationwide and can help accelerate deployment of GHGRF for many years to come.

Assistance for Storage and Enabling Upgrades.
All PV systems financed, including community solar projects, will be paired with energy storage systems to increase energy resiliency.

HGIA anticipates that approximately 1% of the loan funds will be used to finance energy efficiency upgrades such as heat pumps or solar water heaters, and bundled with solar+storage. Additionally, while not explicitly budgeted since it will not significantly, on average, increase system cost, HGIA currently finances electrical and meter upgrades that are required to install solar and anticipates approximately 5% of Financial Assistance funds may be used for this purpose.

Operations & Maintenance (O&M)
SFA-HI Program will also offer optional financing of O&M reserves for low-income homeowners. This additional program enhancement may erode the minimum 20% estimated bill savings threshold, however, it will provide program participants assurance that funds will be available to maintain their solar systems to maximize energy production over the life of the system.

Solar Recycling
Solar Contractors are responsible for discarding end of life solar panels and parts according to state and federal regulations.  Used solar panels are often donated to Re-Use Hawaii, a nonprofit established to preserve the island's ecosystem in a sustainable, thriving circular economy by reducing waste through deconstruction and building material reuse.

Due to the importance of sustainable waste management, plans are in place by a local company to construct a solar recycling processing facility under the Section 48C tax credit.  Upon completion, this facility will have the capacity to process used and end of life solar equipment for the state.

Supporting the Territories
The Commonwealth of Northern Marianas (CWNM) and American Samoa have reached out to HGIA requesting SFA funds and assistance in helping them establish a green financing programs in their respective Territory.

Due to the 40% reduction on the amount requested, Hawaii is not able to share its award with these Territories at this time. However, if Hawaii finds itself unable to timely deploy its SFA-HI funds, or if the EPA is able to provide unused funds from other states to these Territories, HGIA would be more than willing to assist them in establishing financing programs for their LIHH residents and disadvantaged communities.

**Project-Deployment Technical Assistance Strategy**

Ensuring Skilled Workforce for Deployment.
SFA-HI workforce development investments made by HGIA will be additive and not duplicative to other existing efforts. In order to achieve this, HGIA will continue its workforce development collaborations statewide, as well as on a national level.

The Good Jobs Clean Energy Sector workforce development program (CESP) launched last year and a significant amount of work is being conducted around identifying needs, gaps and obstacles. Based on its findings, SFA-HI will complement CESP by offering wrap-around services to increase the clean energy workforce with low-income and/or rural employees in solar installations and/or solar sales; or workforce for solar contractors focused on installing solar on low-income households and in disadvantaged communities.

For solar installers and solar sales professionals, HGIA is currently partnering with HSEO's CESP Good Jobs initiative and has plans to expand collaboration efforts with other partners that could include the State's Workforce Development Council, Chamber of Commerce of Hawaii, Climate Coalition, Makaha Learning Center, etc.).

While not yet definitive, the $7,500/intern budget, which would only be available to solar contractors installing SFA-HI financed projects, could be used to offset the cost of required trainings, or provide stipends to employers to offset the cost of hiring interns, or it may be used to assist with childcare or transportation costs to get said interns to the jobsites. HGIA will gather feedback from solar contractors during the first year of the program and will design and implement this initiative during the 2nd program year. The workplan, updated for this WFD initiative, will be submitted to the EPA no later than 365 days from the date of the first amendment.

Plan to Support and Scale Solar Contractors
Banks and credit unions are not relying on energy savings to repay their loan. They are relying on the borrower's character (credit score) and income (debt-to-income ratio), and as such, will provide loan proceeds directly to their borrowers.

However, (1) as a non-traditional lender relying on energy savings to repay our loans, (2) as a consumer protection measure, and (3) to prevent mechanics liens, HGIA pays the solar contractor directly, in two progress payments, based on milestone achievements. Progress Payment #1 - 50% when the building permit is approved for the solar project and the remaining Progress Payment #2 - 50% after:

- the system is installed;
- the installation inspected by the County's Permitting Department and building permit closed;

- the utility reviews and issues its installation validation connecting the system to the grid;
- HGIA is able to confirm (through the system monitoring software) that the system is producing energy;
- HGIA receives the executed Completion Certificate and lien release; and
- HGIA receives a Certificate of Insurance naming HGIA as lender loss payee.

Depending on supply chain issues, permitting backlogs and utility validation backlogs, the installation and construction completion and closing process can sometimes take up to 18 months. Meanwhile, the solar contractor has already paid for the equipment and labor, which results in cash flow challenges.

SFA-HI funds will be used to co-create credit enhancements to bridge access to capital gaps and encourage banks and credit unions to provide solar contractors with working capital facilities and/or pre-development lines/loans to increase operational cash flow to grow and scale.

Plan to Support Communities with Technical Assistance
While HGIA's initial application contemplated supporting communities through Solarize808 campaigns, over the past year, after the application was submitted in September 2023, one of HGIA's Solarize808 program partners, the Council for Native Hawaiian Advancement, a native Hawaiian CDFI, launched Kalahiki, which repurposes staff that assisted with the Lahaiana wildfire relief efforts to lead the Solarize808 efforts as a one-stop resource to facilitate solar adoption in low-income and disadvantaged communities, many of which are native Hawaiian communities.

Additionally, the focus of the Hawaii State Energy Office (HSEO) Wayfinder's program, designed to reflect Hawai'i's rich cultural and historical tradition of wayfinding in which trained navigators helped lead their communities to a new place where they could sustain a better quality of life, is on outreach and capacity building efforts in low-income and disadvantaged communities.

As both CNHA and HSEO will be taking the lead in coordinating outreach efforts, HGIA will instead pivot and focus on creating tools and guides to complement their efforts and help facilitate solar adoption.  Four versions will be created:
1. Rooftop Solar for Homes
2. Solar for Multi-family Projects
3. Community Solar
4. A simplified version for the classroom

These guides will be 85% to 90% "baked" giving each community the opportunity to customize these tools to their community.  Best practices and industry standards to ensure quality installations (both pre and post-installation) shall be included in these Play Books.  HGIA will be requesting NREL technical assistance to validate and finalize these guides.  HGIA will also be engaging a firm to conduct focus groups on these guides to ensure it is easy to understand and will be helpful in serving our intended audience (low-income households and disadvantaged communities).

As Hawaii is the melting pot of many ethnic minorities, these resources will be translated into different languages prevalent in disadvantaged communities. Additionally, as it has done in the past, on an as needed basis, HGIA will hire interpreters for in-person meetings.

A version of the Rooftop solar for homes playbook will also be created for students as HGIA plans to include outreach to schools as a means of having students help "educate" their parents on the benefits of solar.

In collaboration with HSEO and other partners, and armed with said Playbooks, HGIA's community outreach team will be proactively participating in community outreach efforts. As an example, the following are a partial list of events HGIA has/will participate in during this calendar year: CNHA Native Hawaiian Conference (Hawaii Island); Molokai Resource Fair; Oahu Climate Fair, Hawaii Solar Energy Association Solar Expo, Priced Into Paradise Expo, Youth Climate Fair at the Capitol, Christmas on the Avenue (Community convening in Nanakuli, Hawaii, a low-income community); Maui Energy Conference; Kailua Emergency Preparedness Fair, etc. The budget for community outreach, community fairs and expos are for promotional logo products, exhibitor's fees (if applicable), printing and exhibitor activities, etc. Additionally, the travel budget is provided for non-Oahu outreach.

Project Siting and Permitting

A majority of the solar systems will be installed on built environments (e.g., residential rooftops, MFP rooftops; solar canopies over parking lots, etc.) which significantly simplifies the project siting and permitting process.

Project siting and permitting are more complex for community solar projects, requiring a more sophisticated solar developer to implement. As may be required, HGIA will utilize the in-kind technical assistance provided with the SFA-HI award to engage NREL to assist with siting and permitting community solar projects to ensure it meets state and county requirements, all of which must be also approved by the utility during its due diligence process.

**Equitable Access and Meaningful Involvement Plan**

Equitable Access at its Core

As mentioned, HGIA will translate its TA Playbooks into languages that are prevalent in Hawaii (e.g., Tagalog, Vietnamese, Korean, etc.), as may be required.

HGIA has and will continue to collaborate with Native Hawaiian CBOs and NPOs, including DHHL Homestead Associations and nonprofit Community Development Corporations, to ensure that SFA-HI financial and technical assistance resources are invested in these communities.

HGIA will collaborate with other governmental agencies and NPOs that serve SFA eligible households. Examples include the Department of Education (Free lunch); Department of Human Services (SNAP); Hawaiʻi Housing and Finance Development Corporation (low-income housing tax credit (LIHTC) housing), and the Maui Economic Development Opportunity, Inc. (LIHEAP & WAP), etc., which will help to expand outreach to low-income households eligible for SFA benefits. Due to confidentiality constraints, although these organizations will not be able to share client lists, HGIA plans to provide SFA-HI articles and collateral material for distribution in Agency/NPO

newsletters, exhibit at targeted outreach events benefiting these clients and educate Case Managers on the SFA-HI Program for referrals.

Participatory Governance: SFA-HI Starts by Listening

As mentioned above, HGIA will engage a contractor to convene approximately six Listening Sessions in the form of Focus Groups to gather feedback on the Solar guides.  During the session, the discussions will also include feedback on obstacles facing low-income households and disadvantaged community members on both the installation of solar and insights on opportunities or obstacles regarding a potential solar installation workforce development track.

If it can be logistically accommodated, HGIA will invite partners (e.g., HSEO, CNHA, Climate Commission, Consumer Advocate, etc.) to sit behind the "glass" observing and hearing the feedback of focus group participants for a collaborative approach to collectively assisting this hard-to-reach segment in solar adoption.

Armed with the feedback received from these Listening Sessions, HGIA will finalize its SFA-HI technical assistance and workforce development programs.

Meaningful engagement with stakeholders.

HGIA's Community Outreach Officer has been and will continue to focus on engaging, educating and collaborating with low-income households, nonprofits and energy businesses in disadvantaged communities.

HGIA plans to engage a communications contractor to develop and deploy a robust communications strategy, including traditional (press releases, newspaper and magazine articles, TV, etc.) and non-traditional (social media, digital media, etc.) communications tools.  Said contractor will also provide graphics expertise to finalize the TA playbooks and create a digital version for HGIA to customize and deploy for each community.

HGIA is part of the Rocky Mountain Institute's Renewable Investment for Social Equity (RISE) cohort to assist Waimea Nui, the Waimea Hawaiian Homesteaders' Association create a solar leasing program for the native Hawaiian nonprofit to install solar on homestead rooftops and take advantage of the IRA's Direct Pay tax credits.

Expediting the permit process for Native Hawaiian Homesteaders

The Department of Hawaiian Home Lands (DHHL) is governed by the Hawaiian Homes Commission Act of 1920, enacted by the U.S. Congress to protect and improve the lives of native Hawaiians. Due to the cost of land in Hawaii, DHHL provides homesteaders a 99-year lease for $1.00/year to make housing more affordable.  There are almost 10,000 leases, and many of these homes do not have solar.

Due to its governance structure, in order for a solar contractor to obtain a building permit necessary to install solar, the paper submitted to the respective County's Department of Planning and Permitting (DPP), must also be submitted to DHHL for its approval, before it can be re-submitted to DPP to complete the permit application process.  This elongates the permit approval process for the many of the families SFA is trying to help.  HGIA will be collaborating with DHHL

and DPP to investigate the viability of automating the solar permit approval process for DHHL homesteaders.

<u>Customer management and acquisition</u>
In order to ensure additional inclusion of rural and disadvantaged communities, particularly on the islands outside of O'ahu, HGIA will conduct community outreach to neighbor island communities and contractors serving these areas, for customer acquisition and community engagement.

HGIA is currently working with a technology company to customize an origination platform to increase efficiencies in loan processing. It will also investigate the viability of upgrading its on-bill repayment (OBR) servicing platform to improve effectiveness and efficiency of loan and lease servicing. The current system requires corrections and manual intervention on every on-bill loan.

**Section 3:  Fiscal Stewardship Plan**

In June 2024, HGIA hired a Fiscal & Compliance Manager responsible for directing and managing all fiscal, reporting and compliance related activities related to HGIA's funds, including:
- $150.0 million Green Energy Market Securitization Bond;
- $40.0 million State Small Business Initiative Federal funds;
- $50.0 million General Funds;
- $15.0 million CIP Funds;
- Solar Hui Investment Fund; and
- $67.450 million Solar for All Funds

As an existing financing program, HGIA adheres to federal and state consumer financial protection policies and regulations in its practices and program documents, including but not limited to Regulation B (Equal Credit Opportunity Act); Regulation F (Fair Debt Collection Practices Act); Regulation M (Consumer Leasing); Regulation Z (Truth in Lending). Please note that Regulation V does not apply as HGIA does not utilize credit reports to approve loans, nor are past due amounts reported to the credit agencies.

HGIA has existing policies, procedures and internal controls in place with its existing programs and both its Green Energy Market Securitization Bond Audit and Loan Fund Audit have consistently met generally accepted accounting principles. Additionally, an annual independent Auditor's Report on internal controls over financial reporting and compliance, have also found that HGIA has performed in accordance with government auditing standards.

The Executive Director and Fiscal and Compliance Manager will ensure that Solar for All funds will be used as allowed by the EPA and continue its diligence over internal control and compliance.

**Section 4:  Timeline and Milestones**

Please refer to the purple Timeline on the purple tab in Attachment E on the activities and milestones for the SFA-HI program, with stakeholder/agency involved in completing tasks and responsibilities, as well as the start and end dates. A brief overview follows:

- HGIA has begun accepting SFA-HI applications since it will be using state CIP funds to finance the construction and installation of the solar systems. Applications will continue to be accepted on an on-going basis.
- HGIA has also already started its community outreach activities and will continue to do so on an ongoing basis.
- HGIA has already been collaborating with the CESP Good Jobs program and will continue to do so on an ongoing basis.
- HGIA has begun work on the RFPs for the Communications, Focus Group and Green Lending TA contractors.
- HGIA has begun work on drafting the Construction Loan Program Documents and SFA-HI Program Documents.
- Applications will be approved on an ongoing basis. The Timeline includes target applications to be approved over the duration of the program. HGIA currently has over 1,600 applications in process and while this number includes "moderate-income" households, HGIA feels confident that it should be able to approve and fund the aggregate 539 residential single family solar systems and the 8 multi-family solar systems.

  Hawaii's community solar process is lengthy and needs reform. HGIA believes that it will be able to approve three community solar projects within the program period, however, this is dependent on a number of factors outside of HGIA's control. If the small and medium community solar projects are not ready for financing during the program period, HGIA will re-purpose the $8.0 million earmarked for said community solar projects to residential and multi-family solar projects.

  During year 2, HGIA will engage NREL to assist with enhancing Hawaii's Community Solar program if the PUC and utility are open to program enhancements.
- HGIA expects to receive the SFA funds in January 2025.
- During 1Q2025, HGIA will be engaging NREL for additional TA requests, including providing data points and calculations acceptable to EPA for HGIA's ongoing metrics reporting and to validate and help finalize the Playbooks (which are currently a work in progress). Throughout the program period, HGIA will also request TA from NREL, as may be required.
- During 1-2Q2025, the Communications, Focus Group and Green Lending TA Contractors will be engaged to begin work.
- While HGIA has already been in discussion with nonprofit financial literacy providers, during the 1Q2025, HGIA will finalize the process of referring SFA-HI participants to their programs and classes.
- HGIA anticipates the Solar Playbooks to be finalized during 3Q2025. At this time, its Community Outreach Officer, in concert with HSEO Wayfinders, will meet with communities to customize the Playbook to meet the needs of said communities, then distribute at community outreach events and community meetings.
- Beginning 3Q2025, HGIA will work with local lenders to co-design a credit enhancement program to provide working capital and pre-development facilities to solar companies and launch the credit enhancement program in 2026.
- Beginning 2Q2025, HGIA will collaborate with DHHL and DPP to determine the viability of automating the building permitting process for Homesteaders. If viable, HGIA will issue an RFP for an IT programmer in 4Q2025, and contract with IT programmer in year 2 for

development.  If not viable, the amounts budgeted for this project will be repurposed to be used for FA.

- Beginning 2Q2025, HGIA will collaborate with the utility on the viability of upgrading the OBR platform.  If viable, HGIA will issue an RFP for a servicer and IT programmer to upgrade the OBR platform in 4Q2025 and contract with said servicer/IT programmer in late 2025/early 2026 for development.  If not viable, the amounts budgeted for this project will be repurposed to be used for FA.
- Fall 2025 or Spring 2026, the Green Lender TA Program will launch.
- During year 2, upon EPA approval, HGIA will launch its Green Energy workforce development program.

Additional details found in Attachment E are as follows:

| Activity | Stakeholder/Agency Responsible | Start and End Dates |
|---|---|---|
| **SFA-HI Applications** | | |
| Accept Applications from Eligible Participants | HGIA | October 1, 2024 to April 30, 2029 |
| Approve & Fund HGIA Construction/Installation Residential Solar Loans/ESA | HGIA | November 1, 2024 to April 30, 2029 |
| Refinance HGIA Construction/Installation Residential Solar Loans/ESA with SFA-HI Funds | HGIA | April 1, 2025 to April 30, 2029 |
| Approve & Fund HGIA Construction/Installation MF Solar Loans/ESA | HGIA | January 1, 2025 to April 30, 2029 |
| Refinance HGIA Construction/Installation MF solar loans/ESA with SFA-HI Funds | HGIA | June 1, 2025 to April 30, 2029 |
| Approve & Fund Community Solar Loans | HGIA | January 1, 2025 to April 30, 2029 |
| Collaborate with Financial Education providers & Finalize process of referring SFA-HI Participants | HGIA, Participants, FE TA Providers | January 2025 to April 30, 2029 |
| **Request for Proposals** | | |
| Draft RFP for Communications & Focus Group Contractors | HGIA | October 2024 to December 2024 |
| Post RFP for Communications & Focus Group Contractors | HGIA, Interested | December 2024 to January 2025 |
| Award and implement Communications Contract | HGIA, Awarded Contractor | February 2025 to April 30, 2029 |
|     Develop marketing strategy | HGIA, Awarded Contractor | February 2025 to April 2025 |
| NREL to validate and finalize playbooks | NREL, HGIA | January 2025 to March 2025 |
|     Incorporate graphic design into Playbooks | HGIA, Awarded Contractor | February 2025 to April 2025 |
|     Obtain feedback on Marketing Strategy and Playbooks from LIDAC through Focus Groups | HGIA, Awarded Contractor | April 2025 to September 2025 |
|     Revise marketing strategy and/or Playbooks based on LIDAC feedback | HGIA, Awarded Contractor | September 2025 to December 2025 |
|     Implement Marketing Strategy and Plan | HGIA, Awarded Contractor | September 2025 to April 30, 2029 |
|     On an annual basis, re-visit marketing strategy and plan and revise, as needed | HGIA, Awarded Contractor | July 2026 to July 2028 |
| Award and implement Focus Group Contract | HGIA, Awarded Contractor | February 2025 to November 2025 |
|     Host LIDAC focus groups to obtain feedback on Marketing strategy and Playbooks | HGIA, Awarded Contractor and LIDAC | April 2025 to November 2025 |
|     Host Solar Contractors installing SFA-HI financed projects to gather feedback on credit enhancements and workforce development needs | HGIA, Awarded Contractor and Solar Contractors | April 2025 to November 2025 |
| Draft RFP for Green Lending TA Contractor | HGIA | December 2024 to January 2025 |
| Post RFP for Green Lending TA Contractor | HGIA, Interested | December 2024 to January 2025 |
| Award and implement Green Lending TA Contract | HGIA, Awarded Contractor | February 2025 to April 30, 2029 |
|     Work with Contractor to design Phase I, Green Lending program | HGIA, Awarded Contractor | February 2025 to Fall 2025 |
|     Work with Contractor to deploy Green Lending Program through an established educational platform | HGIA, Awarded Contractor & Eductional platform | Summer 2025 |
|     Launch Phase I Green Lending Program | & Eductional platform | Fall 2025 or Spring 2026 |
|     Work with Contractor to design Phase II Green Lending Program | HGIA, Awarded Contractor | Fall 2025 |
|     Launch Phase II Green Lending Program | HGIA, Awarded Contractor & Eductional platform | Spring 2026 or Fall 2026 |
|     Deploy Green Lending workforce development program to relevant professionals | HGIA, Awarded Contractor & Eductional platform | Spring 2026 and beyond |
| Draft RFP for Single Audit | HGIA | January 2025 |
| Post RFP for Single Audit | HGIA, Interested | February to March 2025 |
| Award and Implement Single Audit Contractor | HGIA, Awarded Contractor | April 2025 |
|     Conduct annual HGIA financial and single audits | HGIA, Awarded Contractor | July 2025 to December 2029 |

31

| | | | |
|---|---|---|---|
| **Conduct Ongoing Community Outreach** | | HGIA, HSEO, CNHA | October 1, 2024 to April 30, 2029 |
| | Continue to attend Energy Equity Hui meetings and participate in Energy Equity Hui activities | HGIA, LIDAC, Energy Equity Stakeholders | October 1, 2024 to April 30, 2029 |
| | Train Hawaii State Energy Office Wayfinders on Playbooks | HGIA, HSEO Wayfinders | Fall 2025 |
| | Solar Playbooks finalized and Distributed | Contractor, | July 1, 2025 to April 30, 2029 |
| | Participate in Community outreach meetings, activities, fairs and expos on all islands | HGIA | October 1, 2024 to April 30, 2029 |
| | Participate in classroom trainings for schools in LIDAC on the benefits of solar | HGIA | Year 2 and beyond |
| | Expand community outreach to neighbor island CBOs and LIDAC | HGIA | Spring 2025 and beyond |
| | Engage with CBOs in LIDAC and support their efforts to help their community members adopt solar to lower their energy burden on all islands | HGIA, CBOs | October 1, 2024 to April 30, 2029 |
| | Engage nonprofit Financial Education providers in community outreach as appropriate | HGIA, nonprofit Financial Education providers | Spring 2025 and beyond |
| **Program Documents, Metrics & Reporting** | | | |
| | Finalize Contruction Loan Program Documents | HGIA, Legal Counsel | December 1, 2024 to January 31, 2025 |
| | Finalize construction loan program procedures | HGIA | |
| | Finalize SHA-HI Program Documents | HGIA, Legal Counsel | December 1, 2024 to January 31, 2025 |
| | Finalize SHA-HI program procedures | HGIA | |
| | Working with NREL, finalze data points and calculations for EPA reporting | NREL, HGIA | February 2025 to March 2025 |
| | Submit Program Reports to EPA | | |
| | Semi-Annual Report (due Jan 30 and July 30) | HGIA | January 2025 to May 30, 2029 |
| | Transaction & Project Level Data Reports (due April 30 and October 30) | HGIA | January 2025 to August 30, 2029 |
| | Final Report (due August 30, 2029) | HGIA | January 2025 to August 30, 2029 |
| **Solar For All Funds** | | | |
| | Receive SFA Funds from EPA | EPA, HGIA | January 2025 |
| **Credit Enhancement Program for Solar Contractors** | | | |
| | With feedback received from Solar Contractors during the focus group meetings, collaborate with Lenders to co-design Credit enhancement program for solar contractors | HGIA, credit unions, banks | September 2025 to Debember 2025 |
| | Finalize Credit Enhancement program documents and procedures | HGIA | December 2025 |
| | Launch credit enhancements for solar contractors through Participating | HGIA, credit unions, banks | January 2026 to April 30, 2029 |
| **Expediting the Permit Process for Native Hawaiian Homesteaders** | | | |
| | Collaborate with DHHL & DPP on viability of Automating Permitting Process | HGIA, DHHL, DPP | June 2025 to August 2025 |
| | If viable, draft Competitive (or Sole Source) RFP to automate communication system between DHHL and DPP | HGIA, DHHL, DPP | August 2025 to September 2025 |
| | Post RFP to automate commucation system between DHHL and DPP | HGIA | October 2025 to November 2025 |
| | Award RFP to Contactor | HGIA | December 2025 to January 2026 |
| | Work with Contractor on programming requirements | DHHL, DPP | January 2026 to March 2026 |
| | Contractor to program and test | DHHL, DPP | April 2026 to August 2026 |
| | Launch and implement DHHL-DPP Automated Permitting Process | DHHL, DPP | September 2026 and beyond |
| **HGIA - HECO OBR Programming Upgrade** | | | |
| | Collaborate with Utility and loan servicer to determine the viability of upgrading HGIA's OBR platform | HGIA, Loan Servicer, HECO | May 2025 to August 2025 |
| | If viable, draft competitive or sole source RFP for IT Programmers to upgrade the OBR Platform | HGIA, Loan Servicer, HECO | August 2025 to September 2025 |
| | Post RFP to automate commucation system between DHHL and DPP | HGIA | October 2025 to November 2025 |
| | Award RFP to Contactor | HGIA | December 2025 to January 2026 |
| | Work with Contractor on programming requirements | HGIA, Loan Servicer, HECO | January 2026 to March 2026 |
| | Contractor to program and test | Loan Servicer, HECO | April 2026 to August 2026 |
| | Launch and implement OBR upgrade | HGIA, Loan Servicer, HECO | September 2026 and beyond |
| **Green Energy Workforce Development Program** | | | |
| | With feedback received from Solar Contractors during the focus group meetings, design Green Workforce Development Program for solar contractors | HGIA, Solar Contractors | September 2025 to Debember 2025 |
| | Collaberate with CESP Good Jobs Program | Commerce, HGIA, Unions, | October 1, 2024 to April 30, 2029 |
| | Submit revised workplan to include finalized SFA-HI workforce development program. | HGIA, EPA | January 1, 2025 to no later than 365 days from the date of the first amendment. |
| | Launch Green Energy Workforce Development Program | HSEO, Chamber, Workforce Development Council, etc. | After receiving EPA Approval to April 30, 2029 |
| **Recommend Changes to Hawaii's Community-Based Renewable Energy (CBRE) (Community Solar Program** | | | |
| | NREL to assist with enhancing Community Solar Program | PUC, HECO | January 1, 2026 to December 31, 2028 |
| **NREL Technical Assistance** | | | |
| | NREL to provide HGIA with TA, as required | NREL, HGIA | April 1, 2025 to April 30, 2029 |

**Section 5:  Reporting Requirements**

Due to the additional reporting required, HGIA has invested in the addition of a Fiscal and Compliance Manager, who will also be responsible for compliance and reporting requirements.

**1. Performance Reports**
**Semi-Annual Report**
The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

**Final Report**
The recipient agrees to submit a final report in the format conducive for immediate public consumption. The final report must contain detail narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with the qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its final report:
- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

**2. Transaction-Level and Project-Level Data**
The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

33

**Section 6:  Budget Narrative**

**6.1 Project Budget**

Please refer to Attachment E, HGIA's updated Budget for numerical details.

**Personnel - $1,911,905**
Personnel are critical to the successful implementation of the SFA-HI Program, and its related costs are estimated to aggregate $1.9 million.  While actual salary adjustments are subject to the Hawaii Government Employee Association's (union) negotiation, the projection includes a 3% annual salary increase.  Please refer to the pink Personnel worksheet in Attachment E for details on the eight positions supporting this grant, including annual salary, percentage of time assigned to the program, overview of responsibility to the SFA program and total personnel cost for the budget period.

100% of the Community Outreach Officer's time will be spent on outreach and engagement with low-income households and disadvantaged communities.

The Residential Program Manager and two Underwriter/Loan Processors will spend a significant portion of their time approving and deploying SFA-HI funds to eligible participants as we expect approximately 539 loans and ESAs to be funded in the residential sector.  The Executive Assistant will also spend a small portion of her time assisting with residential loan processing.  While the number of loans approved decrease during the grant period, the funding and servicing requirements increase as new loans are onboarded.  As noted by the significant percentage of time the Community Outreach Officer, Residential Program Manager and two Underwriters will be dedicating to the SFA-HI Program, HGIA's intention is to place a higher priority on SFA deployment over the 5-year program period, over its other existing funding sources and programs for rooftop solar financing.

While there are only 11 commercial loans anticipated (8 multi-family and 3 community solar) over the 5-year program period, the aggregate investment comprises almost half of the SFA Award.  However, the actual time spent for the Managing Director responsible for the commercial loan portfolio only ranges from 1% to 7% of his time due to the low loan volume.

The Fiscal and Compliance Manager will oversee the reporting and compliance aspects of this Program and while SFA funds make up approximately 20% of all of HGIA's funds under management, we expect her to spend approximately 25% of her time on the SFA program as we focus on actively deploying said funds timely within the program period.

Lastly, the Executive Director has and will be continue to be "hands on" with the SFA-HI program and expects to dedicate approximately 18% of her time to ensure timely deployment and oversight, as well as continuing to increase program visibility and manage stakeholder relationships.

**Fringe Benefits - $1,228,395**
Fringe required per the State's Department of Budget and Finance is estimated at $1.2 million (64.25% of salary).  Please refer to the pink Personnel worksheet for the calculation of fringe

benefits for the eight employees, as well as the Fringe worksheet in Attachment E, which contains the related memo from Hawaii's Director of Finance for the FY2024 Fringe Benefit rate.  Please note that Fringe benefit rates are subject to change annually.

Benefits for Hawaii state employees include comprehensive health care insurance, life insurance, retirement programs (e.g., pension plan), sick leave, vacation leave and paid holidays.

**Travel - $88,065**
Ongoing, consistent community outreach and engagement, to build trust and establish relationships with community leaders and community members will be critical for the success of SFA-HI.  In order to do so, a significant amount of time must be invested to meet the community where they are at in low-income and disadvantaged communities (LIDAC) (not forcing them to drive or catch the bus into downtown Honolulu where our offices are located).  Outreach and community engagement activities includes meetings with community based organizations, low-income households, CDFIs, technical assistance providers, state and local government officials (e.g. Department of Hawaiian Home Lands, public housing , etc.) and community outreach events.

Mileage Reimbursement assumptions start at 65.5 cents (the 2023 reimbursement rate when the application was submitted) with a 3% annual projected increase.  While Oahu is not a very large island, most LIDACs are located in very rural areas.  As an example, the roundtrip mileage from HGIA's office to Nanakuli is 58 miles; Makaha is 70 miles; Kalaeloa is 42 miles; Wahiawa is 40 miles, etc.  Additionally, financing is complicated, and it is not unusual for applicants to prefer face to face meetings to better understand the financing program.

Using an average of 48.08 miles/trip, the COO is estimated to average approximately 13 meetings and/or community outreach activities per month while the Executive Director and Residential Program Manager or VISTA is estimated to average approximately 4.334 meetings/outreach activities per month.  Mileage is also needed to and from the airport for neighbor island travel.

Unlike states on the continent, Hawaii is comprised of six separate islands (Kauai, Oahu, Maui, Lanai, Molokai and Hawaii island).  Travel, including airfare for outreach on all neighbor islands, ground transportation and per diem, is estimated to aggregate $88,065 over the program period, for community outreach, project pipeline acquisition and contractor and stakeholder meetings.  Please refer to the pink Travel – worksheet in Attachment E for details.

Neighbor island travel are typically on Hawaiian Airlines or Southwest with average roundtrip airfare ranging from $170.00 to $200.00 depending on the time of year, day of travel and island.

Per diem is $20/day for these day trips.  We typically fly out early in the morning and return in the evening.  No lodging is being budgeted.

Rental car rates ranges from $80.00 to $120.00 depending on island.  For community outreach events, ideally, at least two team members will attend to ensure adequate back-up and sufficient capacity at the event or meeting, however, often there are questions requiring specific expertise of HGIA's various team members.  To date, most of HGIA's community outreach has been Oahu centric, however HGIA plans to increase outreach efforts to the more rural and lower-income demographics of the other five neighboring islands.

The estimated cost breakdown is as follows:

|  | Low | | Average | | High | |
|---|---|---|---|---|---|---|
| Airfare | $ | 170 | $ | 180 | $ | 200 |
| Per Diem | $ | 20 | $ | 20 | $ | 20 |
| Rental Car | $ | 80 | $ | 100 | $ | 120 |
|  | $ | 270 | $ | 300 | $ | 340 |

For budgeting purposes, HGIA is using an average cost per trip for the Community Outreach Officer (COO) is estimated at $300 (which includes airfare, per diem and rental car). The average cost per trip for the Executive Director, Residential Program Manager or VISTA who will be accompanying the COO, is estimated at $200 as it does not include a rental car. Similar to the mileage budget, we are projecting a 3% annual expense increase for marketing and outreach efforts. There may be situations where the Executive Director and/or Residential Program Manager will travel without the COO. In those cases, the extra budget needed for the rental car will be re-allocated from the COO's travel budget.

On average, the Community Outreach officer will be conducting one neighbor island outreach per month with the Executive Director and Residential Program Manager or VISTA with one every two months or so.

Funds not used for travel will be repurposed to FA to deploy more solar systems for eligible participants.

**Equipment:**
HGIA does not plan to purchase equipment with SFA funds.

**Supplies:**
HGIA does not plan to purchase supplies with SFA funds.

**Contractual - $4,566,025**
All of the Contracts below shall be procured through the State of Hawaii's Competitive Sealed Proposal Procurement Method. Please refer to the blue Contractual worksheet in Attachment E for details. However, the HGIA - HECO Programming and DHHL - DPP Programming contracts may be conducted via the Sole Source Procurement Method if the providers involved (e.g. HGIA's Servicer's servicing system, Utility's billing system, Department of Permitting online permitting system, etc.) can only be updated by its existing IT provider(s).

The Contractors categorized as "Internal" are included in HGIA's Administration cost; and "External" are included as Community Capacity Building on the yellow Budget worksheet.

<u>Financial and Single Audit of SFA Funds</u> - $221,025
HGIA is planning to issue an RFP for auditors to include a Single Audit for SFA with HGIA's financial audit.

The contractor will be procured through a competitive procurement method and the duration is for the 5-year program period and beyond.

If actual costs are lower than estimated, the remaining budgeted audit funds will be repuposed to FA to deploy more solar systems for eligible participants.

Programming Upgrade OBR platform - $2,500,000
As described above, HGIA's existing OBR platform requires a significant amount of manual intervention as the automated pushes between the utility's billing system and HGIA's servicer's loan system is faulty. While the number of loans budgeted at 539 is not alarming, the number of on-bill Program Charges are estimated to exceed 4,000 as it includes Subscriber charges for community solar and units in multi-family projects. As a result, it is imperative that these programming glitches are remedied in order to assure accurate billing and collection of loan and lease payments, while increasing efficiencies for HGIA, the utility and loan servicer.

The contractor will be procured through a competitive procurement method and the duration is during years 1 and 2.

If the actual programing costs are lower than estimated or the OBR upgrade project is deemed to be not viable, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

Focus Groups – Community Feedback - $95,000
In order to ensure the solar playbooks are effectively meeting the needs of our low-income households and disadvantaged communities, HGIA will engage a Contractor to conduct at least 4 focus groups and/or convening. With feedback garnered from these listening sessions, HGIA will be able to finalize the playbooks to 85%-90% complete to allow customization based on community feedback. Feedback garnered from the solar contractors will help in the design of the credit enhancement product for working capital facilities.

The contractor will be procured through a competitive procurement method and the duration is during year 1.

If actual focus group costs are lower than estimated, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

Communications & Outreach - $750,000
Supporting in-person outreach will be a SFA-HI communications strategy that will reach our target audience and prospective participants through a number of media channels including mainstream, social media, and energy specific programming. The communications contractor will also provide graphic design expertise for the solar playbooks.

The contractor will be procured through a competitive procurement method and the duration is for the 5-year program period.

If actual communications and outreach costs are lower than estimated, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

<u>Workforce Development – Green Lender Program</u> - $500,000
Scaling the deployment of SFA funds requires increased installers, solar sales professionals and green lenders.  HGIA plans to partner with a technical assistance provider to develop curriculum and an educational provider, as described above, to accelerate green lending technical skills.

The contractors will be procured through a competitive procurement method and the duration is for the 5-year program period and beyond.

If actual Green Lender program related costs are lower than estimated, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

<u>Expediting Permitting for Native Hawaiian Homesteaders</u> - $500,000
As described above, Native Hawaiian homesteaders are at a disadvantage in getting building permit approvals due to the dual approval process of both the Department of Planning & Permitting (DPP) and the Department of Hawaiian Home Lands (DHHL).

HGIA will work with both DHHL and DPP to explore the viability of automating the building permit approval process, and if viable, issue an RFP to design and implement an electronic approval process.

The contractor will be procured through a competitive procurement method and the duration is planned for year 2.

If actual DHHL programming costs are lower than estimated or if this project is deemed to not be viable, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

**Construction (if applicable)** -
HGIA will not engage in any construction activity for the agency during the program period.

HGIA will finance "construction" loans for the installation of solar+storage systems on single family and multi-family properties, however, funding for said construction loans will be state (not SFA) funds.

**Other - $6,150,000**
Other costs are detailed on the blue PSC, SA & Other worksheet in Attachment A.

<u>Workforce Development</u> - $500,000
While not yet definitive, the $7,500/intern budget, which would only be available to solar contractors installing SFA-HI financed projects, could be used to offset the cost of required trainings, or provide stipends to employers to offset the cost of hiring interns, or it may be used to assist with childcare or transportation costs to get said interns to the jobsites.  HGIA will gather feedback from solar contractors during the first year of the program and will design and implement this initiative during the 2nd program year.  The workplan, updated for this WFD initiative, will be submitted to the EPA no later than 365 days from the date of the first amendment.

If actual workforce development expenditures are lower than estimated, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

Credit Enhancements for Solar Contractors - $5,000,000
As described above, solar contractors for SFA program loans may be cash constrained due to the program's progress payment requirements.  Working with local lenders, HGIA will co-design a credit enhancement program to increase the likelihood of said contractor being approved for a working capital or pre-development facility.  HGIA expects the $5.0 million budgeted to initially provide some $12.5 million in credit facilities, with the leverage slowly increasing as the contractors are able to demonstrate their ability to repay.

If actual credit enhancement costs are lower than estimated, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

Exhibit Fees, Logo Items & Outreach Material for Community Outreach, Fairs & Expos - $250,000
With existing outreach conducted by HGIA over the past two years, we have found that building relationships and trust takes time and ongoing effort.  Additionally, many households in this demographic are neither financially literate nor energy literate, making $61,600 solar systems not only expensive and out of the household's budget, but also foreign on how it can help them lower their energy burden.  Having been turned down for loans in the past, many of these households self-exclude themselves from participating, not understanding how inclusive the GEM$ financing program is.  Building trust and increasing understanding of HGIA's SFA program requires being visible in the communities that we are trying to serve.

Partnering with community nonprofits, state and local agencies, HGIA will proactively conduct community outreach via Fairs and community meetings.  The Community Outreach budget will be used towards exhibitor expenses (Exhibitor fees, promotional logo items, activities to engage attendees (e.g., wheel of fortune, etc.) and demonstration projects to help students and adults understand how solar works.  Items will be procured through the state's normal small purchase procurement method.

If actual community outreach costs are lower than estimated, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

Technical Assistance from NREL - $400,000
HGIA would like to engage NREL to provide technical assistance for the following initiatives:
- Due to the cost of housing and shortage of land in Hawaii, many households are locked out of solar because they live in multi-family rentals or condominium units and don't own their roofs.  In collaboration with the utility and Hawaii Public Utilities Commission, HGIA would like to engage NREL to work with and recommend changes to Hawaii's Community Solar program to make it more viable for both developers and offtakers to scale deployment to enable more households to participate.
- Provide calculations and data points acceptable to EPA for HGIA's reporting metrics;
- Validate and finalize the Solar Playbooks prior to publication;
- Miscellaneous technical assistance over the 5-year program period for community solar project siting and permitting, etc.

**Participant Support Costs - $48,505,610**

Participant Support costs are detailed on the blue PSC, SA & Other worksheet in Attachment A. HGIA will adhere to EPA's guidelines regarding Participant Support Cost, including the following:

a. Describe the activities that will be supported by the participant support costs:
   - The activities to be supported by the participant support costs include financial assistance in the form of loans and subsidies to low-income households and disadvantaged communities to install and own solar systems on their single family dwellings; loans to third party owners to own and install solar systems on low-income households and disadvantaged community single family dwellings to sell the energy produced by the solar system to LIDAC; loans to multifamily owners or third party owners to install solar on multifamily projects; and loans and subsidies to community solar projects to own and sell at least 50% of the electricity generated from the system to residential customers in the form of subscriptions.

b. Specify the range of funding to be provided through the participant support costs:
   - Depending on who is being provided the financing, the range could be 100% of the system cost (in the case of a low-income household installing and owning the system) or approximately 50% of the system cost (in the case of third party owned systems and multifamily project systems).

c. Identify which types of entities will have title to equipment purchased with a rebate, subsidy or loan:
   - Homeowners, multifamily project owners, community solar owners or third-party investors will have title to the equipment financed.

d. Establish source documentation requirements (e.g. invoices) for accounting records:
   - HGIA requires Sales Contracts or Engineering, Procurement & Construction (EPC) Services Contracts for every system financed.
   - HGIA also requires lien releases from the Solar Contractor upon final payment.

e. Describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404:
   - HGIA vets solar contractors interested in installing systems that HGIA finances, however, the homeowner, multifamily rental project owner, community solar owner or third-party owner has the responsibility of conducting due diligence in selecting a Contractor. The Solar Playbooks will provide tips and advice on conducting due diligence and HGIA recommends that multiple proposals be obtained. This method facilitates competition and allows market forces to be incorporated into the proposals and sales contracts.
   - Additionally, HGIA also has a maximum cost/watt restriction on residential rooftop solar systems to further protect LIDAC from price gauging.

Per program guidelines, loans and subsidies to implement zero-emissions technologies are considered Participant Support Costs. As such, SFA-HI's Participant Support Costs consists of loans and subsidies to install solar systems on LIDAC residential rooftops, loans to third-party investors that install solar systems on LIDAC residential rooftops, loans to multifamily projects; and loans and subsidies to community solar projects, as follows:

- Residential Solar Loans - $11,732,989
- Residential Solar Subsidies - $1,476,219
- Residential Solar Lease/PPA - $10,103,902

40

o    Multi-family Solar Loans - $7,000,000
o    Community Solar Loans - $15,750,000
o    Community Solar Subsidies - $2,330,000

Assumptions are detailed on the white Assumptions tab in Exhibit E, which provides an "average" single family dwelling solar+storage system size and cost; "average" multi-family project size and cost, and three (small, medium and large) community solar sizes and related estimated costs. Underlying the FA budget as well as Outputs are these assumptions.

With tourism (instead of manufacturing or farming) as its number one industry, Hawaii imports most of its goods and food. As goods and equipment are shipped from Oahu to neighboring islands, its related costs increase. As an example, a gallon of milk on Maui cost $7.69 as compared to $3.99 in Minnesota. Similarly, as solar systems, batteries, and related equipment are all imported, its costs are significantly higher the cost for the same solar system on the mainland.

Calculating utility bill savings is bespoke depending on the energy consumed, number of household members, energy consumption patterns during the day and the cost of the solar systems. HGIA has found that down payments are sometimes required to get to the desired estimated bill savings threshold. As such it is budgeting an average of $9,000 in subsidies to buy-down the cost of the system for PV+Storage loans on single family dwellings, aggregating $1.5 million over the program period.

Additionally, when Hawaii's Community Solar program launched in 2017, the PUC fixed the credit per kWh at 15 cents. At that time, the average residential kWh rate was 28.22 cents. In 2023, the average residential kWh rate was 43.22 cents, a 53% increase, however, the Community Solar credit is still fixed at 15 cents/kWh. Increasing energy rates have significantly decreased the value of the community solar credit, making it hard for both the developer and offtaker to pencil. As such, HGIA is budgeting a $1,000 stipend per community solar subscriber.

While these are HGIA's best guestimates of the amount of loans and subsidies in these various sub-categories, depending on demand (or lack of demand) in certain categories, the funding will be shifted within these six buckets.

Financial Education - $112,500
SFA-HI's financing will be repaid through energy bill savings. Participants who own or lease their systems, on average, are estimated to receive over $95,000 in financial benefits over the life of the system. This is significant and over time, can provide a safety net for these families currently living paycheck to paycheck. However said safety net will be the result of sound financial decisions. As such, through nonprofit CDFIs and technical assistance providers, SFA-HI program will make complimentary financial education available to all participants through nonprofit partners.

Partnering with existing nonprofit CDFIs and community development corporations, the SFA-HI Program will leverage their existing financial education workshops and classes and make it available, free of charge to all SFA participants in single family dwellings, multi-family projects, including residents of master-metered multi-family projects, and community solar subscribers.

As an example, Hoʻoulu Waiwai works with individuals and families to strengthen financial well-being through partnerships, pathways and learning experiences that nurture personal financial

41

wellness and entrepreneurial development. Another program offer financial education to assist local families in building genuine wealth that can be shared and passed on to future generations. HGIA will partner financial education providers on all islands.

While this benefit is being provided, it is not mandated and as such, HGIA estimates only 50% of the participants will enroll in Financial Education classes/workshops. If actual Financial Education costs are lower than estimated, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

If actual financial education costs are lower than estimated, unused funds will be repurposed to FA to deploy more solar systems for eligible participants.

**Additional Items**

**Indirect Charges**
N/A

**Conferences and Workshops:**
HGIA does not plan on hosting any conference or workshop.

**Meals and Refreshments:**
HGIA does not anticipate providing meals or refreshments with SFA funds.

If however, there is a need to provide meals or refreshments, upon approval from EPA, HGIA shall pay for these unbudgeted travel and/or registration fees out of SFA-HI Program Income.

**Program Income**
As detailed on the top of the green Loans tab in Attachment E, by the end of the five-year program period, HGIA anticipates the SFA-HI Program will generate over $6.2 million in program income, consisting of an estimated $6.0 million in loan interest income and $241,000 earned on deposits. All program income will be reinvested into the SFA-HI Program to cover administrative overhead and provide an ongoing source of subsidies for future program loans.

| Conferences and Workshops | |
|---|---|
| Does this scope of work include conducting conferences or workshops? | No |
| Who is initiating the conference/workshop/meeting? | N/A |
| How is the conference/workshop/meeting being advertised? | N/A |
| Whose logo will be on the agenda and conference/workshop/meeting materials? | N/A |
| What is the percentage distribution of persons attending (I.e. % federal govt, public participants, state and local)? | N/A |
| Will there be proceedings or analysis and will the information be disseminated back to the appropriate (state/local/scientific) community? | N/A |
| Do you anticipate program income being generated from this conference/workshop/meeting including registration fees? | N/A |

| Meals and Light Refreshments, Other | |
|---|---|
| Are costs for light refreshments, meals or beverages included in the workplan or budget? | No |
| Will those attending the event receive a per diem financed through grant funds? | N/A |
| Why is the provision of light refreshments and/or meals necessary to achieve the objectives of the assistance agreement? | N/A |
| When will meals and/or light refreshments be made available (before, during, or after the event)? | N/A |
| | |
| Will the assistance award result in the development of any copyrighted software or written materials? | No |
| Could an invention result from this project? (If yes, provide disposition instructions) | No |
| Does the project involve animal subjects? | No |
| Does the project involve collecting identical information from 10 or more people? | Yes* |
| Any work outside the US included in the grant? | No |
| Does the grant involve or relate to geospatial information? Includes info identifying geographic location , or application/tools associated with such information – GPS, mapping or statistical data | Yes** |

\* Information and data collected from HGIA's applications are aggregated and anonymized for reporting purposes (e.g., system size, production, environmental attributes, etc.).

\*\* Eligible disadvantaged communities are identified via the Climate & Economic Justice Screening Tool (geoplatform.gov) and the EPA EJ Screen.

EXHIBIT 3

5H - 84091801 - 1     Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN): 84091801<br>MODIFICATION NUMBER: 1<br>PROGRAM CODE: 5H | DATE OF AWARD<br>12/16/2024 |
|---|---|---|
| | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>12/16/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| RECIPIENT: | PAYEE: |
|---|---|
| Hawaii Green Infrastructure Authority<br>P.O. Box 2359<br>Honolulu, HI 96804<br>EIN: 47-2212679 | Hawaii Green Infrastructure Authority<br>P.O. Box 2359<br>Honolulu, HI 96804 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Gwen S Yamamoto Lau<br>P.O. Box 2359<br>Honolulu, HI 96804<br>**Email:** gwen.s.yamamotolau@hawaii.gov<br>**Phone:** 808-587-2690 | Vineet Pandharpurkar<br>1200 Pennsylvania Ave NW, 4410C<br>Washington, DC 20460<br>**Email:** pandharpurkar.vineet@epa.gov<br>**Phone:** 202-564-5211 | Jennifer Brooks<br>1200 Pennsylvania Ave, NW, 3903R<br>Washington, DC 20460<br>**Email:** brooks.jennifer@epa.gov<br>**Phone:** 202-564-6374 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Solar for All - HI Financing Program

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 62,450,000.00 | TOTAL PROJECT PERIOD COST<br>$ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Associate Award Official | DATE<br>12/16/2024 |

5H - 84091801 - 1    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 1,911,905 |
| 2. Fringe Benefits | $ 1,228,395 |
| 3. Travel | $ 88,065 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 4,566,025 |
| 7. Construction | $ 0 |
| 8. Other | $ 54,655,610 |
| 9. Total Direct Charges | $ 62,450,000 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 6,201,291 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

## Administrative Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the [Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance](#) for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the [EPA Grants Management Training for Applicants and Recipients](#) and the [How to Develop a Budget](#) training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to [RAIN-2024-G01](#).

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa. gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition*:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

    **a. Solicitation and Contract Requirements:**

        **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

        **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

    **b. After Award of Contract:**

        **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

        **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

    **a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

    **b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

    **c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program**

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

> 1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

> 2. Privately-owned commercial buildings when they meet the "public function" test;

> 3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

_**The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:**_

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

EXHIBIT 4



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

<u>MEMORANDUM</u>

**SUBJECT:**   Termination of EPA Assistance Agreement 5H-84091801 under 2 CFR 200.340

**FROM:**   Devon Brown, EPA Award Official

**TO:**   Gwen Yamamoto Lau, Executive Director
Hawaii Green Infrastructure Authority

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84091801 awarded to Hawaii Green Infrastructure Authority. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Brandon Pierce, EPA Grant Specialist
    Vineet Pandharpurkar, EPA Project Officer
    Gwen S Yamamoto Lau, Grantee Program Manager

# EXHIBIT 5

**JOSH GREEN, M.D.**
GOVERNOR

**SYLVIA LUKE**
LT GOVERNOR



## Hawaii Green Infrastructure Authority
An Agency of the State of Hawaii

**JAMES KUNANE TOKIOKA**
CHAIR

**GWEN S YAMAMOTO LAU**
EXECUTIVE DIRECTOR

August 27, 2025

Michael Molina, EPA Award Official
molina.michael@epa.gov

RE:  Notice of Disagreement with Termination of EPA Assistance Agreement 5H-84091801, dated August 7, 2025

Dear Mr. Molina:

On August 7, 2025, the Hawaiʻi Green Infrastructure Authority (HGIA) received a memorandum from Devon Brown that purported to terminate EPA Assistance Agreement 5H-84091801 under 2 CFR 200.340. The termination letter outlined a Dispute process pursuant to 2 CFR 1500.15 with a Dispute deadline of 30 days.

On August 8, 2025, HGIA received Assistance Amendment Modification No. 2 purporting to change the terms of Assistance Amendment Modification No. 1, by amongst other things, reducing the performance period duration and scope of work of the Award. Modification No. 2 states that the recipient should file a Notice of Disagreement to the EPA Award official within 21 days if it disagrees with the terms of Assistance Amendment Modification No. 2.

Please accept this letter as HGIA's Notice of Disagreement with the decision to terminate Assistance Agreement 5H-84091801. HGIA also disagrees with any suggestion that attempting to draw down funds could waive HGIA's dispute rights. Relevant regulations authorize grantees to draw down eligible costs incurred prior to termination. 2 CFR 200.305(b)(3). The August 7 Termination Letter also notes that costs incurred prior to the termination date are allowable.

HGIA will formally dispute the EPA's termination by separate letter, within the 30 days provided in the termination letter.

Please acknowledge receipt of this Notice of Disagreement using the contact information appearing below my signature.

Sincerely,

Gwen Yamamoto Lau
Executive Director
gwen.s.yamamotolau@hawaii.gov

cc.  Devon Brown, brown.devon@epa.gov
Vineet Pandharpurkar, Pandharpurkar.vineet@epa.gov
Phillip Schindel, schindel.phillip@epa.gov
Wesley Carpenter, carpenter.wesley@epa.gov
Brandon Pierce, pierce.brandon@epa.gov

EXHIBIT 6

**JOSH GREEN, M.D.**
GOVERNOR

**SYLVIA LUKE**
LT GOVERNOR

## Hawaii Green Infrastructure Authority

An Agency of the State of Hawaii

**JAMES KUNANE TOKIOKA**
CHAIR

**GWEN S YAMAMOTO LAU**
EXECUTIVE DIRECTOR

September 5, 2025

Michael Molina, EPA Dispute Decision Official
U.S. Environmental Protection Agency
molina.michael@epa.gov
Office of Mission Support
1200 Pennsylvania Avenue NW
Washington DC 20460

RE:     Dispute of Termination of EPA Grant Agreement 5H-84091801 dated August 7, 2025

Dear Mr. Molina:

    Please accept this letter as the Hawaiʻi Green Infrastructure Authority (HGIA) dispute with the termination notice issued by the Environmental Protection Agency ("EPA") on August 7, 2025, purporting to terminate EPA Grant[1] Agreement 5H-84091801 under 2 CFR 200.340 ("Termination Letter").[2] The following day, HGIA received a document titled "Assistance Amendment".[3] On August 27, HGIA submitted a notice of disagreement with EPA's termination decision. Now, HGIA timely files this letter in accordance with 2 C.F.R. § 1500.15 disputing the August 7, 2025 termination.

    Pursuant to 2 CFR 1500.15, HGIA disputes the attempt to terminate the Grant Agreement. The termination notice: (1) violates the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only unobligated balances and preserved funds already awarded to grantees; (2) violates the legally binding grant agreement dated July 8, 2024; (3) provides no valid reason for termination pursuant to 2 C.F.R. 200.341; (4) is arbitrary, capricious, and not supported by substantial evidence; (5) violates constitutional boundaries; and (6) causes irreparable harm to the people and state of Hawaiʻi.

    The following is a more detailed statement of the specific legal and factual grounds for this dispute.

### FACTUAL GROUNDS

    On October 10, 2023, HGIA submitted an application under EPA's Solar for All[4] Notice of Funding Opportunity EPA-R-HQ-SFA-23-01. In developing its application, HGIA consulted with dozens of stakeholder organizations, and HGIA's application included 26 stakeholder letters supporting the program proposal. On April 22, 2024, EPA announced that it had selected 60

---

[1] Referred to as Assistance Agreement 5H-84091801.
[2] Ex. 1 (attached).
[3] Ex. 2 (attached).
[4] *Greenhouse Gas Reduction Fund,* U.S. EPA, https://www.epa.gov/greenhouse-gas-reduction-fund; https://www.epa.gov/system/files/documents/2023-04/GGRF%20Implementation%20Framework_730am.pdf at pp. 41-52.

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 2 of 11

applicants to receive Solar for All awards, including "states, territories, Tribal governments, municipalities, and nonprofits."[5]  EPA announced that it obligated these funds as part of the larger Greenhouse Gas Reduction Fund.[6]  As one of the recipients of the obligated funds, HGIA received a Grant Agreement for $62.45 million dated July 8, 2024.[7]

Relying on the Grant Agreement, HGIA negotiated its Work Plan and budget with EPA.[8] HGIA's Work Plan dedicates 85.5% of the award to financial assistance that will leverage private capital, bridge the access to capital gap, and lower the energy burden for over 5,700 vulnerable households. The Work Plan also includes technical assistance, capacity building, strategic communications, community outreach, workforce development and credit enhancements to increase access to capital for solar contractors serving disadvantaged communities, such as:

- Financial Literacy. Making available financial literacy for all participants to help them make sound financial decisions with future electric bill savings and, as applicable, solar tax credits, expected to aggregate, on average, almost $100,000 for these low-income families;
- Climate Finance Training. Creating and providing education and training to address planning, design and assessment of rooftop solar projects and financing and implementing solar projects and programs.
- Workforce development. Developing pathways to high quality green jobs for low-income and disadvantaged communities.
- Credit Enhancements. Filling access to capital gaps for solar contractors servicing disadvantaged communities.
- Solar Playbooks. Creating tools and guides that complement outreach efforts of other local organizations to help facilitate solar adoption.

HGIA received an Assistance Amendment from the EPA on December 16, 2024, removing the 2% funding restriction from the Solar for All award and incorporating the approved revised budget and workplan documentation submitted on December 10, 2024; which is attached as Exhibit 5.[9]

With the issuance of Assistance Amendment, except for $500,000 budgeted for the Green Energy Workforce Development[10] Initiative, HGIA was officially approved by EPA to exit the Planning Period with the remaining grant funds of $61,950,000, on December 16, 2024.  HGIA has been working to implement the Work Plan, including the issuance and subsequent contracting

---

[5] *See* https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.

[6] *See* https://www.epa.gov/newsreleases/epa-awards-27b-greenhouse-gas-reduction-fund-grants-accelerate-clean-energy-solutions.

[7] Ex. 3 (attached).

[8] Ex. 4 (attached).

[9] Ex. 5 (attached).

[10] HGIA elected to take a one-year planning period only for the $500,000 Green Energy Workforce Development Initiative to provide sufficient time to ensure the funds would be used to complement (not duplicate) existing workforce development programs in Hawaii.

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 3 of 11

of 4 Requests for Proposals and the development of plans to finance 7 community solar projects statewide totaling 15.45 MW. At the time of the termination notice, HGIA was also in the process of underwriting and processing residential rooftop applications consistent with its Work Plan.

The Termination Letter states that OBBBA repealed the underlying authority for the Solar for All program and rescinded unobligated amounts to carry out the program. EPA's opinion is that OBBBA "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and that EPA "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the Solar for All program. The letter also noted that recipients could continue to request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of the Termination Letter.

The subject line of the Termination Letter states that the termination is under 2 C.F.R. § 200.340, and the Letter states that HGIA should follow the closeout process outlined in 2 C.F.R. § 200.344. However, the Letter does not state the grounds EPA relied upon to require the closeout process. To be clear, OBBBA did not eliminate EPA's entire administrative budget. To the contrary, on March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" in fiscal year 2025.[11]  Further, HGIA has complied with all Agreement terms and conditions and was achieving all the deliverables and activities within the agreed upon scope of work.

Prior to the Termination Letter, HGIA's ASAP account contained $61,586,182.54 of HGIA's Solar for All award. On August 12, HGIA learned that its ASAP account for the Solar for All program had been suspended; HGIA's ASAP account for the Solar for All program was no longer visible on the ASAP site. On August 18, the ASAP account reappeared. As of September 5, HGIA's ASAP account access displays a "liquidated" status and $4,112,822.98 is available to draw down. However, the "available balance" on the account was substantially reduced from the prior balance of $61,586,182.54. In addition, performance period end dates were substantially shortened from May 1, 2024 to April 30, 2029 on the Grant Agreement dated July 8, 2024; to May 1, 2024 to August 7, 2025 on the Assistance Amendment dated August 7, 2025.

## LEGAL GROUNDS

1. **EPA's Termination of HGIA's Solar for All Grant Agreement Exceeds and Contradicts OBBBA's Language, Which Rescinded Unobligated Balances and Preserved Funds Already Awarded to Recipients.**

EPA's Termination Letter states that the Grant Agreement is terminated because it is required by OBBBA.  Section 60002 of OBBBA provides:

---

[11] Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 4 of 11

Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

HGIA's funds were all obligated many months before OBBBA and were, therefore, not rescinded by Section 60002.[12]

Funds awarded to Solar for All grantees were obligated upon award and subject to a legally binding Grant Agreement whereby EPA "promise[d] to spend the money, either immediately or in the future, as work under the obligation is completed."[13] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[14] In other words, the Solar for All funds were obligated at the time OBBBA was passed. OBBBA did not change this and could not have legally rescinded these obligated funding awards.[15]

Where the plain language of a statute is unambiguous, no further analysis is required.[16] Here, the plain language of OBBBA is clear that obligated funds are not affected by Section 60002. EPA's action in terminating HGIA's Solar for All Grant Agreement is therefore contrary to the plain language of OBBBA.

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.[17] Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. Congress did not direct or otherwise authorize EPA to terminate the Solar for All program. EPA is acting beyond its authority because it defies Congress's express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All appropriations are rescinded. EPA should therefore reinstate HGIA's Solar for All Grant Agreement.

---

[12] On August 11, 2025, three members of Congress wrote to Administrator Zeldin that he had "falsely claimed that passage and enactment of H.R.1 gives [him] the authority to take back obligated funds." Contrary to this claim, "grant funding awarded before [H.R. 1] was enacted does not constitute unobligated funds subject to OBBBA. *See* https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/august-11-epa-letter-re-ggrf-ejcj-and-hr1.pdf.

[13] *See* https://www.usaspending.gov/explorer?glossary=obligation.

[14] *See* https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf.

[15] On August 14, 2025, 32 senators wrote to Administrator Zeldin to inform him that his interpretation of OBBBA was incorrect. *See* https://www.epw.senate.gov/public/_cache/files/7/f/7fc428d4-aafa-4991-a25e-655d295fc0e2/D93F6E6E26805AFA241C4D39073BED3B75A6F496F4350B82CC4D782AAE9BC35C.8.14.25-letter-to-epa-re-solar-for-all.pdf.

[16] *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end.").

[17] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 5 of 11

**2. EPA's Decision to Terminate HGIA's Solar for All Grant Agreement Lacks Any Legal Basis.**

The Termination Letter does not give any reason for termination other than its alleged reliance on OBBBA.  The uniform grant regulations at 2 C.F.R. § 200.340(a) provide the circumstances under which the government may terminate an award agreement, which include (1) failure to comply with the agreement's terms and conditions; (2) with consent of the recipient; (3) by request of the recipient; or (4) otherwise pursuant to the terms and conditions of the agreement, to the extent authorized by law.

2 C.F.R. § 200.340 does not authorize EPA to terminate a grant agreement when EPA believes that it "no longer possess either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring" of a Federal program. Nor does it authorize EPA to terminate a grant agreement when Congress rescinds EPA's "administrative cost appropriation" as the Termination Letter alleges.  Indeed, EPA has not identified any provision of 2 C.F.R. § 200.340 which authorizes termination of HGIA's Solar for All Grant Agreement.

The terms and conditions of the Grant Agreement do not allow for termination under the circumstances described in the Termination Letter. HGIA has not, and unequivocally does not, agree to any attempts to terminate the Agreement based on EPA's erroneous, bad faith interpretation of OBBBA Section 60002.  Congress intended for these funds to benefit the public by providing efficient and sustainable energy options to meet the country's growing energy needs. HGIA complied with the Grant Agreement's terms and conditions and does not consent to the Grant Agreement being terminated.

EPA has identified no basis for unilateral termination of HGIA's Solar for All Agreement. Termination for noncompliance is only possible when "the noncompliance with the terms and conditions is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."[18] Neither condition exists.  Indeed, EPA has not identified any noncompliance, has provided no evidence of waste, fraud, or abuse, nor has it requested that HGIA take action to cure any deficiencies in its performance.

2 C.F.R. § 200.340(a)(4)'s language allowing termination "if an award no longer effectuates the program goals or agency priorities" does not apply either.  When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget ("OMB") confirmed that the termination language relating to agency priorities did not allow agencies to implement arbitrary cancellations.[19] In 2024, OMB completed another round of revisions to this provision.[20]  After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that may form a ground for termination, but only if

---

[18] Ex. 3 at p. 30; Ex. 5 at p. 36-37.
[19] Guidance for Grants and Agreements 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).
[20] Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024).

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 6 of 11

"the language is included in the terms and conditions of the award."[21] The agency must "clearly and unambiguously" include (a)(4) in the Grant Agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4).[22]

Here, because the Grant Agreement does not include the "agency priorities" provision of (a)(4) as a ground for potential termination in its terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the Agreement. EPA acted contrary to the governing regulations.[23] HGIA's award must be immediately restored to its full amount.[24] HGIA requests no more or less than for EPA to follow the law and rescind this unlawful termination.

### 3. EPA's Decision to Terminate HGIA's Solar for All Grant Agreement is Arbitrary and Capricious.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[25] In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[26]

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[27] Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decision-making process."[28] Agency action taken on pretextual grounds violates the requirement of reasoned agency decision-making.

EPA's decision to terminate HGIA's Solar for All Grant Agreement is arbitrary and capricious because: (1) EPA provided no reasoned basis for the termination, (2) EPA failed to undertake any individual assessments of HGIA's Solar for All Grant Agreement, (3) EPA failed to provide HGIA notice and an opportunity to cure, and (4) EPA ignored HGIA's substantial reliance interests and the harmful impact of an abrupt and complete termination of the Solar for All Agreement.

---

[21] *Id.* at 30,089.

[22] *Id.*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

[23] 2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30,089.

[24] 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.

[25] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[26] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[27] *Dep't of HGIA v. New York*, 588 U.S. 752, 785 (2019).

[28] *Id.*

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 7 of 11

EPA's sole stated rationale for the Termination Letter—that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 award recipients"—is a contrived, irrational, and insufficient explanation and thus not a reasoned basis for that action. EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that Congress appropriated to EPA in March to pay for "Environmental Programs and Management."

EPA likewise failed to engage in reasoned consideration of HGIA's Solar for All Grant Agreement before categorically terminating the Solar for All program. EPA has identified no facts that would support the termination. EPA's public statements[29] demonstrate that its stated rationale was pretextual.

Also arbitrary was EPA's failure to give notice to HGIA so HGIA could address any alleged failures. 2 C.F.R. 200.208 requires EPA to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to satisfy the conditions.[30] It is only after a grantee fails to meet the conditions imposed that an agreement can be terminated.[31] EPA's actions are contrary to these procedures. EPA terminated the Grant Agreement without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure.[32] Contrary to Section 200.208's notice-and-cure requirements, EPA operated in secret to withdraw access to HGIA's accounts. The lack of notice was arbitrary, capricious, and deprived HGIA of due process.

### 4. EPA's Withdrawal of HGIA's Duly Appropriated and Obligated Solar for All Grant Agreement Violates the Constitution's Separation of Powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[33] The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[34] The Executive has no power "to enact, to amend or to repeal statutes."[35] Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

---

[29] Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025, 11:07 AM), https://x.com/epaleezeldin/status/1953518426602803684; *see also* https://www.youtube.com/watch?v=CfU3bYKmBOA (referring to Solar for All as a grift).
[30] 2 C.F.R. § 200.208(d)-(e).
[31] 2 C.F.R. § 200.339(a) & (c) (authorizing a temporary hold on payments, suspension or termination unless or until the recipient takes corrective action).
[32] 2 C.F.R. § 200.208.
[33] U.S. Const. art. I, § 1.
[34] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).
[35] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 8 of 11

*Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[36]  U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States."  The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[37]

The Termination Letter and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[38]  For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of HGIA's funding agreement.

*Take Care Clause*

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[39] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[40]   Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and HGIA's individual Grant Agreement on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind HGIA's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[41]  EPA's Termination of HGIA's Grant Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to HGIA prior to September 30, 2024.   EPA violated constitutional separation-of-powers constraints

---

[36] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

[37] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).

[38] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

[39] U.S. Const. art. II, § 3.

[40] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

[41] OBBBA Section 60002.

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 9 of 11

because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[42] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[43] Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[44] For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[45] When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating HGIA's Solar for All Grant Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[46] When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[47] EPA's termination of HGIA's Solar for All Grant Agreement altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Grant

---

[42] U.S. Const. Art. I, § 9, cl. 7.

[43] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).

[44] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

[45] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

[46] U.S. Const. amend. X.

[47] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 10 of 11

Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Letter and subsequent termination of HGIA's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind HGIA's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

## 5. The Termination of HGIA's Solar for All Grant Agreement Will Cause Irreparable Harm to Hawaii and its residents.

HGIA's Solar for All Grant Agreement supports the Trump Administration's stated priorities of supporting energy independence, reducing energy costs, and protecting clean air and water, thereby reducing the cost of living. HGIA's Solar for All Work Plan was designed to serve thousands of low-income Hawai'i households, reducing electrical bills by at least 20%. In addition, SFA funding was expected to create/retain at least 1,436 green jobs; generate some $18.3 million in state tax revenue and have an overall economic impact of $356 million in the state – representing a nearly sixfold return.

The premature end of Solar for All funding also harms HGIA as an employer. HGIA relied on the funding to support three employees and has already been forced to reduce employee work hours and require staff to take on responsibilities outside of their job description.

HGIA also has executed contracts with vendors. Those vendors remain in limbo due to the uncertainty and may need to adjust their staffing levels due to the loss of funds.

More generally, loss of Solar for All funding and the loss of federal support for solar energy generally will harm Hawai'i and its residents. At a time of expanding electrical demand, solar and wind represent the least expensive way to add electrical supply in Hawai'i. Rising energy prices and reduced economic growth will hit low- and moderate-income residents the most—exactly the population that Solar for All seeks to help. That does not even account for the public health savings that come from the fact that, compared with other means of generating electricity, solar energy is pollution free

Moreover, HGIA acted in reasonable reliance on its fully-obligated Solar for All funding continuing to be available. HGIA has spent thousands of employee hours on Solar for All programming. In so doing, HGIA necessarily had to forgo other funding opportunities, program structures, and scaling of other solar deployment opportunities. There is no way to recover this lost time or effort. Nor can HGIA simply backfill with state funds to keep its Solar for All offerings available. The Solar for All program also allowed HGIA to work closely with EPA in developing

Mr. Michael Molina
U.S. Environmental Protection Agency
September 5, 2025
Page 11 of 11

its work plan and with the National Renewable Energy Lab in scoping out technical assistance needs. The loss of these collaborations and programmatic support cannot be remedied.

## REMEDY OR RELIEF SOUGHT

If EPA claims that it no longer possesses the requisite personnel or administrative funding required to oversee and administer the Award, HGIA respectfully proposes the appointment of an independent third party to administer and oversee the Award, subject to EPA's reasonable oversight and supervision.

Until HGIA's dispute with EPA has been resolved, it objects to any claims of noncompliance under 2 C.F.R. 200.344(i).

The specific remedy or relief sought here is rescission of the termination of this Grant Agreement, reinstatement of the Grant Agreement for the originally awarded amount, scope of work, and performance period, restoration of the prior balance of 61,586,182.54 to HGIA's ASAP account, and reinstatement of the notice to proceed. In furtherance of this dispute, please find supporting exhibits attached, as described above.

The name and contact information, including email address, of HGIA's designated point of contact for this dispute is: Gwen Yamamoto Lau, Executive Director; gwen.s.yamamotolau@hawaii.gov; 808-587-2690.

Please acknowledge receipt of this dispute and contact me to discuss resolution as soon as possible.

Very truly yours,

Gwen S. Yamamoto Lau
Executive Director

CC:    Devon Brown, EPA Award Official *via email* brown.devon@epa.gov
       Vineet Pandharpurkar, EPA Program Officer *via email* Pandharpurkar.vineet@epa.gov

# EXHIBIT 7

**Yamamoto Lau, Gwen S**

| | |
|---|---|
| **From:** | SFA <SFA@epa.gov> |
| **Sent:** | Wednesday, October 1, 2025 10:21 AM |
| **To:** | SFA |
| **Subject:** | [EXTERNAL] Solar for All Grant Closeout Instructions |

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425)
**Submission Instructions**:
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.
  - If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance <u>during the entire performance period</u> (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - Progress towards objectives on program key performance metrics during the performance period.
  - Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:

- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 8



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 23, 2025

**MEMORANDUM**

**SUBJECT:**  Update on Dispute of EPA Assistance Agreement 5H-84091801 under 2 CFR 200.340

**FROM:**  Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**  Gwen S Yamamoto Lau, Executive Director
Hawaii Green Infrastructure Authority

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84091801. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.24
17:04:14 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# EXHIBIT 9

**JOSH GREEN, M.D.**
GOVERNOR

**SYLVIA LUKE**
LT GOVERNOR


Hawaii Green Infrastructure Authority
An Agency of the State of Hawaii

**JAMES KUNANE TOKIOKA**
CHAIR

**GWEN S YAMAMOTO LAU**
EXECUTIVE DIRECTOR

November 6, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC  20460

Re:    Objection to Closeout of EPA Assistance Agreement 5H-84091801

Dear Mr. Brown:

On September 5, 2025, the Hawaii Green Infrastructure Authority ("HGIA") submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 5H-84091801 pursuant to 2 C.F.R. § 1500.15.  Despite that timely dispute, on October 1, 2025, HGIA received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that HGIA complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." HGIA has now received EPA's October 23, 2025 letter purporting to declare moot HGIA's "dispute regarding the termination of Assistance Agreement 5H-84091801."  The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that HGIA close out Assistance Agreement 5H-84091801.

As an initial matter, clarification is needed because EPA's October 23, 2025 letter references "your dispute was submitted on August 28, 2025." But HGIA did not submit its Part 1500 dispute on August 28, 2025.  Rather, August 27, 2025 is the date that HGIA submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025 Assistance Amendment. Thus, it is unclear which of HGIA's disputes "EPA has rendered" moot.  HGIA disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending.  EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation.  We request that EPA reverse its mootness determination and allow the administrative dispute to proceed.  At a minimum, EPA should stay the administrative dispute until the conclusion of HGIA's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
November 6, 2025
Page 2 of 2

More importantly, and regardless of any determination regarding the status of HGIA's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, HGIA has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require HGIA to close out while litigation is pending that directly concerns EPA's termination of this grant. *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." HGIA has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated $57,473,359.56 from HGIA's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, HGIA has not been able to complete the work required under Assistance Agreement 5H-84091801. Accordingly, EPA necessarily cannot "determine[] that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

HGIA does not agree to close out Assistance Agreement 5H-84091801 while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence as soon as practicable.

Sincerely,

Gwen Yamamoto Lau
Executive Director

CC: Michael Molina