1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| STATE OF ARIZONA, et al., | NO. 2:25-cv-02015-TMC |
| Plaintiffs, | DECLARATION OF LEUWAM TESFAI IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; and LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, | |
| Defendants. | |

18
19   I, Leuwam Tesfai, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746

20   that the following is true and correct:

21       1.       I am a resident of the State of California. I am familiar with the information in

22   the statements set forth below either through personal knowledge, consultation with California

23   Public Utilities Commission (CPUC) staff, or from my review of relevant documents and

24   information. If called as a witness, I could and would testify competently to the matters set forth

25   below.

26

1    2.    I am the Deputy Executive Director for Energy and Climate Policy at the

2    California Public Utilities Commission.

3    3.    I was named the CPUC's Deputy Executive Director for Energy and Climate

4    Policy in 2022, leading the CPUC's Energy Division.

5    a.    The CPUC is responsible for regulating investor-owned utilities within

6    California, including electricity, natural gas, telecommunications, and water companies, and

7    common carriers.

8    b.    In my capacity as Deputy Executive Director for Energy and Climate

9    Policy of the CPUC, I am responsible for leading the approximately 270-member staff of the

10   CPUC's Energy Division.  Within the CPUC, the Energy Division develops energy policy and

11   programs for California's investor-owned utilities, including electric power procurement and

12   demand-side programs like energy efficiency to provide reliable, safe, and affordable services

13   for the public. The division provides expert analysis to the CPUC Commissioners and

14   Administrative Law Judges, ensures compliance with regulations and statutory mandates, and

15   maintains approved utility tariffs. The Energy Division also provides oversight of customer

16   programs to increase affordability, energy efficiency, and customer-owned renewable

17   generation.  The division oversaw a major part of the California Solar Initiative, California

18   Senate Bill 1 (2006), with first of its kind programs offering incentives for residential solar.

19   c.    I previously served as Commissioner Genevieve Shiroma's Chief of

20   Staff and Legal Advisor, a position I held since 2019 when appointed by Governor Gavin

21   Newsom. I have worked at the CPUC since 2011 in several roles including as an Advisor to

22   former Commissioner Liane M. Randolph and in the CPUC's Legal, Energy and

23   Administrative Law Judge Divisions. My private sector experience includes development of

24   renewable energy markets, siting and permitting generation facilities, and commercialization of

25   clean energy technologies.

26

d.      In 2023, I received national recognition for outstanding leadership and accomplishments in energy from the United States Department of Energy with the C3E Clean Energy Education and Empowerment Government Award. I serve on the advisory board for the Center for Law, Energy & the Environment at University of California Berkeley School of Law, on the executive committee of the Environmental Law Section of the California Lawyers Association, and on the board of directors for the League of Women Voters San Francisco. I am a graduate of Emory University and the University of San Francisco School of Law.

e.      As Deputy Executive Director for Energy and Climate Policy, I supervise and work closely with the staff responsible for implementing the California Solar for All (SFA) program (Program), which aims to increase the adoption of solar and battery storage in low-income, disadvantaged, and tribal communities and provide electric bill relief to customers in these communities. The SFA work involves establishing and overseeing program guidelines, funding mechanisms, and consumer protections for these customers. The SFA team drew on expertise built in implementing Senate Bill 1 (2006)—discussed in Paragraph 3.b above—when planning Solar for All funded residential renewable energy programs.

4.      I submit this declaration to provide details on the ways in which the United States Environmental Protection Agency's (EPA) termination of the SFA Program has harmed California.

**The Solar for All Program**

5.      In 2022, I understand that President Biden signed the Inflation Reduction Act of 2022, Public Law No. 117-169 (2022) (Inflation Reduction Act or IRA). Among other things, my understanding is that the Inflation Reduction Act amended the Clean Air Act to authorize and appropriate to EPA $7 billion, to remain available until September 30, 2024, to make competitive grants to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies. Inflation Reduction Act Sec. 60103, 136 Stat. 2065-66

DECLARATION OF LEUWAM TESFAI IN
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
No. 2:25-cv-02015-TMC

3

(codified at 42 U.S.C. § 7434). I am aware that this $7 billion appropriation was part of the Greenhouse Gas Reduction Fund, a $27 billion investment to combat the climate crisis by supporting greenhouse gas- and air pollution-reducing projects in communities across the country.

6.     In accordance with Congress' directive, EPA designed and launched the Solar for All Program. I understand that it was intended to encourage the deployment of residential distributed solar energy to lower energy bills for millions of Americans and catalyze transformation in markets serving low-income and disadvantaged communities. My understanding is that grantees would provide subsidies and other financial assistance to residential rooftop and residential-serving community solar projects to benefit low-income and disadvantaged communities, in addition to project-deployment technical assistance such as workforce development, community outreach, and other support to help overcome barriers to solar deployment.

7.     On June 28, 2023, I understand that EPA published its Notice of Funding Opportunity (NOFO), EPA-R-HQ-SFA-23-01, outlining application requirements for the SFA Program. The NOFO indicated that, pursuant to the IRA and the Clean Air Act, EPA would award up to 60 grants to States, territories, Tribal governments, municipalities, and eligible nonprofits to expand the number of low-income and disadvantaged communities that have access to affordable, resilient, and clean solar energy programs.

**California Applied for and Received SFA Funding**

8.     I understand that the State of California through the California Infrastructure and Economic Development Bank (IBank) submitted an application under the NOFO in October 2023 and included the CPUC, the California Energy Commission (CEC), the California Strategic Growth Council (SGC), and the California Employment Development Department (EDD) for subawards.  In developing its application, I was aware that IBank consulted extensively with the CPUC, other state agencies, and municipal energy stakeholders known as community choice

aggregators.  The CPUC also directly engaged in significant work, including attending EPA-hosted Solar for All webinars, working to develop its portion of the application, and consulting extensively with other California state agencies and stakeholders.  For example, the CPUC met every two weeks with IBank, the CEC, the SGC, and the EDD from July 26, until October 12, 2023, and met on other occasions with a variety of other California stakeholders.

9.      On May 29, 2024, I understand that the CEC requested that EPA allow the CEC to replace IBank as the lead applicant.

10.     On July 8, 2024, EPA awarded the CEC $249,800,000 of SFA funding for the coalition of government agencies listed in the original application, which included the CPUC for a subaward.

11.     Between July 8 and November 2024, the CEC and CPUC negotiated the SFA work plan and budget with EPA.

12.     On September 5, 2024, the CPUC requested that EPA allow the CPUC to replace the CEC as the prime grantee.

13.     On November 15, 2024, the CPUC submitted its final Work Plan and Budget to EPA, and subsequently filed a corrected version on November 19, 2024. As explained further below, the Work Plan details how CPUC will plan, design, and implement its SFA Program. The Work Plan also included subawards to the CEC and EDD. A true and correct copy of CPUC's Work Plan is attached hereto as **Exhibit 1.**

14.     On December 16, 2024, EPA issued the CPUC an amended award that listed the CPUC as the prime grantee and awarded the CPUC $249,800,000 of SFA funding. The EPA transmitted the amended Assistance Agreement to CPUC on December 16, 2024. The amended Assistance Agreement removed the 2 percent funding restriction and incorporated the necessary budget and work plan documentation. A true and correct copy of CPUC's December 16, 2024, Assistance Agreement is attached hereto as **Exhibit 2.**

15.     The EPA later explained to CPUC it erred in the December 16, 2024, Assistance Agreement by not issuing CPUC a new grant award number. So, on January 16, 2025, EPA re-issued the Assistance Award with a correct grant award number and again included the removal of the 2 percent funding restriction and incorporated the necessary budget and work plan documentation. A true and correct copy of CPUC's January 16, 2025, Assistance Agreement (Assistance Agreement) is attached hereto as **Exhibit 3**.

16.     Pursuant to the Assistance Agreement, EPA obligated the entire $249,800,000 balance of CPUC's SFA award as of the date of the Agreement; a portion of this award was for in-kind technical assistance services of $400,000 from the National Renewable Energy Laboratory. However, EPA did not make the funds available to CPUC in its ASAP account until late March 2025. EPA staff have provided various and shifting explanations to CPUC as to why the obligated funds were not made available to CPUC for drawdown, including that "internal issues" on EPA's end were causing the delay, without further elaboration.

## California Plans and Designs its SFA Offerings

17.     CPUC's EPA-approved Work Plan sets for the framework for how CPUC will plan, design, and implement an SFA Program within California. More specifically, the Work Plan proposes issuing financial assistance of approximately $233 million over five years to promote up to 75MW of new solar and 37 MWh of new associated storage to its grid.  Three California agencies will administer various aspects of the Work Plan: the CPUC, and the two agencies receiving subawards under the grant, CEC and EDD.  The CPUC will implement programs serving Low-Income and Disadvantaged Communities (LIDAC) and Tribal customers in the investor-owned utility (IOU) territories. The CEC will focus on the same audiences in publicly-owned utility (POU) territories.  EDD will offer labor training programs through the Resilient Workforce Program (RWP).  A small part of the grant will cover gaps in existing programs.  The budget specifically includes:

1        a.      $190.2 million (M) of financial incentives for community solar, with

2    $19M for community solar supporting tribes.

3        b.      $25M of financial incentives for rooftop and community solar program

4    grants, as well as enabling upgrades.

5        c.      $9.7M of financial incentives for enabling upgrades for low-income,

6    affordable multifamily solar, as part of Solar on Multifamily Affordable Housing (SOMAH)

7    program.

8        d.      $8M for Residential Solar High Road Training Partnership grants.

9        e.      $400,000 of in-kind technical assistance from National Renewable

10    Energy Laboratory to support implementation.

11    18.    As required by the terms of the SFA grant, the Work Plan is expected to generate

12    at least a 20% savings in customer electric bills over the grant period.  In total, the impact from

13    SFA funded programs will result in bill savings of approximately $210 million (without

14    adjusting for inflation or electricity rate increases) over the twenty-year expected lifespan of the

15    solar systems.  These systems will generate 205,330 MWh annually and annually reduce key

16    pollutants harming the atmosphere: $CO_2$ (estimated reduction of 104,546 tons); $SO_2$ (6,603 lbs);

17    $NO_X$ (44,895 lbs); $PM_{2.5}$ (30,211 lbs); Volatile Organic Compounds (VOCs) (4,642 lbs); and

18    $NH_3$ (6,707 lbs).  Based on the expected twenty-year life span, the approved Work Plan estimates

19    that this work can offset nearly 3 billion tons of $CO_2$ (equivalent to 566,182 homes' electricity

20    use for one year).

21    19.    In the approved Work Plan, subawardees are obligated to utilize the CPUC's

22    Consumer Protections Guide disclosure document, which solar contractors and customers must

23    sign.  This tool informs customers of their rights, financing risks, and basic information about

24    solar systems and utility billing.  The Consumer Protection Guide would have become a nearly

25    statewide resource.

26

20.     In the California Work Plan budget, of the $249,800,000 grant, 93.39% will go to financial assistance, 0.93% will go to technical assistance, and 5.69% is reserved for administration.

21.     Pursuant to its approved Work Plan, the CPUC elected to take the full 12-month Planning Period, as allowed under the SFA program, to design and prepare for implementation its SFA funded programs.

22.     During this Planning Period, the CPUC has performed the following actions, despite the delay imposed by EPA in making grant funds available until March 2025:

    a.     Completed interagency agreements: the CPUC has completed an interagency agreement with CEC for $30.2 million, and a similar agreement with the EDD for $9.2 million is in-progress.

    b.     The CPUC, CEC, and EDD hosted an informational webinar on the Work Plan on June 4, 2025 with 182 attendees. The webinar summarized the Work Plan and informed the public on how to engage on developing the programs and future incentives.

    c.     The CPUC presented the California Work Plan to the CEC-CPUC Disadvantaged Communities Advisory Group on July 18, 2025.

    d.     The CPUC created the role of Quality Assurance Manager within the Audits branch to execute and implement EPA's required Quality Assurance Project Plan for environmental data.

    e.     The CPUC is in the process of hiring new staff, including a Program and Project Supervisor, two senior Public Utility Regulatory Analyst positions, three Public Utility Regulatory Analyst positions, and one Associate Governmental Program Analyst.

    f.     The CPUC, CEC, and EDD staff met weekly to coordinate roll out of the SFA work.

    g.     As the prime grant recipient, CPUC is also meeting EPA's reporting requirements on finance, progress and transactions data.  In the Planning Period, CPUC has been

collecting and reviewing information from subawardees on expenses and completed tasks for the semi-annual progress reports. Once financial assistance becomes active, CPUC intends to track and collect transaction level details for each program beneficiary, of its own programs and for each subawardees' funded programs, with renewable energy system details, location, award amounts, and other identifying information.

h.     The CPUC has attended weekly meetings with other SFA grantees to align work and learn about best practices.

i.     The CPUC has met regularly with its EPA Project Officer to provide updates on progress and share information.

j.     The CPUC has attended EPA webinars and other meetings to stay up to date with its latest guidance on grant implementation.

k.     The CPUC has had multiple meetings with National Renewable Energy Laboratory staff to plan the work for its in-kind technical assistance (the award from EPA included a budget of $400,000 for this work) to support California's SFA implementation. CPUC is in-progress to create a goal and task plan.

23.    CPUC has also used the Program Planning Period to further develop its two programs outlined in its application. For example, CPUC:

a.     Issued a set of ruling questions to stakeholders (also called parties by the CPUC) in its community solar proceeding on remaining implementation issues such as SFA timing and compliance considerations.  Currently, the CPUC is scheduled to vote on a second decision to finalize program implementation details and require IOUs and community choice aggregators (CCAs) to establish or update their relevant tariffs by the January 1, 2026 statutory deadline (D.24-12-046).

b.     Included the California Tribal Energy Collective in its community solar proceeding, who are participating in a regulatory proceeding for the first time. CPUC staff

provided information to California Tribal Energy Collective on the CPUC's regulatory processes to support their engagement.

         c.    Amended the SOMAH program to allow site readiness measures (enabling upgrades) to be included as part of the project's total allowable cost—laying the foundation for combining federal and state funding. The Program Administrator filed an Advice Letter (CSE AL 164-E) in April 2025 to add additional support documents for advance payments and established request forms and processes. CPUC approved the Advice Letter in June 2025.

25. The CPUC, CEC, and EDD are on track to start issuing awards or incentives starting mid-2026 shortly following conclusion of the Planning Period.

**EPA Eliminates the Solar For All and Terminates CPUC's SFA Grant**

26. On August 7, 2025, I became aware that EPA had decided to terminate the SFA program. EPA first announced the decision through an X post from EPA Administrator Zeldin. The post is reproduced below.[1]



Lee Zeldin ✔ 🔵
@epaleezeldin

The One Big Beautiful Bill eliminated the Greenhouse Gas Reduction Fund, which included a $7 billion pot called "Solar for All".

In some cases, your tax dollars were diluted through up to FOUR pass-through entities, each taking their own cut off the top!

The bottom line is this: EPA no longer has the statutory authority to administer the program or the appropriated funds to keep this boondoggle alive.

Today, the Trump EPA is announcing that we are ending Solar for All for good, saving US taxpayers ANOTHER $7 BILLION!

---

[1] Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025, 11:07 AM), https://x.com/epaleezeldin/status/1953518426602803684

DECLARATION OF LEUWAM TESFAI IN        10
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
No. 2:25-cv-02015-TMC

27.    Later that same day, CPUC received a letter from EPA purporting to terminate CPUC's SFA grant (Termination Letter).  A true and correct copy of the letter is attached hereto as **Exhibit 4**.

28.    The letter stated that the One Big Beautiful Bill Act (OBBBA) had repealed the underlying authority for the SFA program and rescinded unobligated amounts to carry out the program. EPA stated that it believed OBBBA had "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the SFA program.

29.    An amended assistance agreement, dated August 8, 2025, was transmitted the day after the Termination Letter.  A true and correct copy of the amended assistance agreement is attached hereto as **Exhibit 5**.  The Termination Letter was sent by email on August 7, 2025, and the amended assistance agreement was sent by email on August 8, 2025. The amended assistance agreement's 'Type of Action' was labeled a "No Cost Amendment," adjusted the project period by changing the performance period end date from April 30, 2029, to August 8, 2025, and stated that "the US Environmental Protection Agency (EPA) hereby awards $0.00."  In the CPUC's previous award letter, dated January 16, 2025, this same sentence contained an amount of $249,800,000.  The stated total budget period cost and the total project period cost remained $249,800,000. The PDF title of the assistance amendment document was "OMB Form 84092302-1" and it was not explained why the OMB, a different agency, not a party to CPUC's Solar for Award grant contract, was referenced in the document title.

30.    Before the CPUC received the Termination Letter, its ASAP account contained $249,045,222.95 of CPUC's SFA award.  On August 11, 2025, the "available balance" on the account had been substantially reduced from $249,045,222.95 to $17,422,106.08.

31.    As of the date of this Declaration, EPA has not provided CPUC with any explanation as to (1) why the available balance has been substantially reduced to $17,422,106.08

1   and how the new balance amount was determined, (2) why the performance period end dates

2   have been modified, or (3) the status of the $231,623,116.87 in funds that are no longer reflected

3   in CPUC's SFA ASAP account.

4       32.     On August 29, 2025, pursuant to the amended assistance agreement, the CPUC

5   submitted a Notice of Disagreement to EPA's Award Official, Devon Brown.  A true and correct

6   copy of the Notice of Disagreement is attached hereto as **Exhibit 6**.

7       33.     On September 5, 2025, pursuant to the Termination Letter, the CPUC submitted

8   a Dispute of Termination to EPA's Dispute Decision Official, Devon Brown. A true and correct

9   copy of the Dispute of Termination is attached hereto as **Exhibit 7**.

10      34.     On October 1, 2025, CPUC received an email containing instructions on how

11  CPUC was to close out their SFA grant. This email did not acknowledge CPUC's pending

12  administrative dispute. A true and correct copy of this email is attached hereto as **Exhibit 8**.

13      35.     On October 23, 2025, CPUC received a letter from EPA stating that it had

14  determined that CPUC's administrative dispute was moot. A true and correct copy of this letter

15  is attached hereto as **Exhibit 9**.

16      36.     On November 5, 2025, CPUC responded to this letter, objecting both to the

17  determination that the administrative dispute was moot and to the direction that CPUC begin

18  closing out their grants. A true and correct copy of CPUC's letter is attached hereto as **Exhibit

19  10.**

20      **Termination of the Solar for All Program Has Harmed and Will Harm California**

21      **and its Residents**

22      37.     The loss of the Solar for All Program will harm California and its residents.

23  Between the various programs the CPUC intended to offer using the funding EPA awarded

24  pursuant to the SFA program, the CPUC was expecting, through the SFA Program, to be able

25  to serve 29,402 low-income households, reducing those customers' electric bills (over the five

26  year grant period) a cumulative total ranging from $20M to $26.5M by the grant's end in April

2029.  With the loss of the previously obligated funds, the CPUC's low-income community solar and multifamily solar programs will be diminished, and its partner CEC, will no longer be able to offer the planned support for rooftop and community solar and storage installations for low-income households in public-utility territories.  In addition, solar workforce training and such programs that were to be offered by EDD using the grant funds will also be diminished.

38.     Even a delay in the availability of funding will impose irreparable costs on California.  During the Community Solar Proceeding prehearing conference, various parties (including those representing community solar developers and their advocates), argued for an accelerated timeline in the CPUC's decision-making because delays or prolonged timelines would hurt the financial and overall viability of projects seeking to interconnect under the new program. Those costs are magnified by the termination and uncertainty over whether and when funding may be restored.

39.     The inability of CPUC to carry out its plan as part of the SFA Program—to cover the costs of enabling upgrades, up to 20% of a project's total cost, of its low-income, affordable multifamily solar program (the SOMAH program)—will harm program participants.  This damage is compounded by the end of the federal tax credits, which most participating multifamily solar projects previously relied on to make their solar installations financially viable.[2]  After initial program approval, reserving future program incentives, participating affordable multifamily property owners can secure low or no-cost bridge financing to fund their solar projects until completion when program incentives are distributed. If EPA deobligates the funds and allows them to pass back to Treasury, the CPUC can no longer provide assurances to

---

[2] Verdant Associates and Illume Advising in its July 14, 2023, 'Solar on Multifamily Affordable Housing Second Triennial Report' at page 42 states "As shown in the table above, tax credits provide additional funding for SOMAH projects and can help to extend the reach of SOMAH Program incentives. As of the end of 2022, 77 percent of completed SOMAH projects are leveraging either the ITC or the LIHTC to offset a portion of their solar installation costs." Retrievable at: https://www.cpuc.ca.gov/industries-and-topics/electrical-energy/demand-side-management/customer-generation/somah.

future program participants that SFA funding for enabling upgrades will be available. As noted in the Work Plan, SFA-funded enabling upgrades incentives could have increased tribal participation, increased the rate of system ownership instead of leasing, and could have covered expensive repairs often present in older, existing structures, which are identified barriers to installing rooftop solar.

40.    The CPUC's inability to obtain the SFA funding previously obligated by EPA also harms the CPUC. First, it will harm the CPUC as an employer. The CPUC has already begun the process of hiring staff to administer California's SFA programs. The CPUC currently has over 150 candidates that have applied for the CPUC's SFA job postings. If the SFA Program is dismantled, and funds are rendered permanently unavailable because they pass back to Treasury, the CPUC will be unable to hire candidates to fill these positions. Moreover, even the uncertainty caused by EPA's termination of the Program will cause many qualified applicants not to wait, and instead take positions elsewhere. As a result, the potential talent pool for these positions has been and will continue to be negatively impacted. The posting of job openings, and a subsequent lack of hirings, creates the potential for reputation harm as candidates are more likely to see CPUC job applications as "high risk." In the case of its Associate Governmental Program Analyst position, the CPUC has directed existing Utility Audits Division staff to assume SFA compliance tasks. If the SFA Program is terminated, hired staff for the SFA program will no longer have authorized funding and may have to be terminated or their duties will have to be funded through other unplanned sources.

41.    The CPUC's inability to proceed with the programs it has promised in reliance on the SFA Program will harm the CPUC's reputation among potential contractors. The CPUC has active or impending solicitations for vendors for a total of $2.33 million in future contracts providing outreach, financial assistance, compliance and modeling support. If the SFA Program no longer exists, CPUC will not be able to complete its hiring and consultant contracting plans. CPUC will have to truncate the contract solicitation process. Vendors may be less likely to

undergo the solicitation process in the future or contract with CPUC if it is forced to arbitrarily and suddenly terminate contracts or solicitation occurring as part of the SFA Program. Even if the SFA Program is in the future revived, in the same or substantially similar form, the reputational harm suffered by the CPUC among prospective contractors may impede or altogether prevent the CPUC's ability to carry out the Program.

42.    The CPUC's inability to obtain the SFA funding and proceed with the programs it has promised in reliance on the SFA Program will also harm the CPUC's reputation among other stakeholders. Entities representing ratepayers, disadvantaged communities, and tribes have advocated for the CPUC to establish a community renewable energy program that enables low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. The CPUC has committed to create such a program as part of the SFA Program and has been working with stakeholders in the CPUC's community solar proceeding to determine details on distribution. With the possibility that the SFA Program will be eliminated, or the funds previously obligated by EPA will be delayed or unavailable, stakeholders are not just blaming EPA, they are also upset with the CPUC.

43.    Moreover, the CPUC has acted in reasonable reliance on the existence of the SFA Program and the funds obligated by Congress to carry out that Program, by expending limited staff resources on Solar for All programs. The CPUC Energy Division expended more than 416 employee hours on SFA Work Plan development (from September to December 2024) and CPUC Energy Division and the Utility Audits Branch expended more than 880 employee hours on Planning Period tasks since. CPUC administrative staff have also supported the program's implementation with accounting, hiring, and vendor solicitations. In so doing, CPUC Energy Division had to forgo other work products and slowed down its analysis supporting ongoing regulatory proceedings to prioritize Solar for All tasks. There is no way to recover this lost time or effort.

44.     Nor can the CPUC simply backfill with ratepayer or state funds to keep its SFA offerings available. California law, through Public Utilities Code Section 769.3(c)(6), prohibits the CRE community solar program's costs from being paid by nonparticipating customers in excess of its avoided costs.

45.     The SFA Program also allowed CPUC to work closely with EPA and other SFA grantees in developing its work plan. The loss of that collaboration and programmatic support cannot be remedied.

46.     If the EPA were to take action against CPUC for any alleged non-compliance with the closeout procedures specified in 2 C.F.R. § 200.344(i), such as by reporting a "material failure to comply with the terms and conditions of the Federal award in SAM.gov," EPA's action would irreparably harm CPUC's reputation and goodwill.  If CPUC's SAM.gov profile were to indicate that it has previously failed to comply with required terms and conditions of federal awards, CPUC would have a more difficult time obtaining federal grants in the future.  Other grant partners, like contractors, subgrantees, or other stakeholders, may also be less likely to partner with CPUC to carry out federal awards in the future.

**Conclusion**

47.     EPA's decision to terminate the entire Solar for All Program has caused and will continue to cause irreparable harm to California and its residents.

1        I declare under penalty of perjury under the laws the United States of America that the

2  foregoing is true and correct to the best of my knowledge.

3        Executed on this 7th day of November, 2025, at San Francisco, CA.

4

5

6  *Leuwam Tesfai*

7  Leuwam Tesfai
    Deputy Executive Director for Energy and

8  Climate Policy
    California Public Utilities Commission

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF LEUWAM TESFAI IN      17
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
No. 2:25-cv-02015-TMC