EXHIBIT 7

**From:** Buch, Daniel
**To:** molina.michael@epa.gov
**Cc:** Brown, Devon; Bloom, Aaron
**Subject:** California Public Utilities Commission Dispute to Termination of EPA Assistance Agreement 5H-84092302
**Date:** Friday, September 5, 2025 10:51:17 AM
**Attachments:** California Public Utilities Commission Dispute to Termination of EPA Assistance Agreement 5H-84092302.pdf
Ex. 1 California Public Utilities Commission Dispute to Solar for All Termination.pdf
Ex. 2 California Public Utilities Commission Dispute to Solar for All Termination.pdf
Ex. 3 California Public Utilities Commission Dispute to Solar for All Termination.pdf
Ex. 4 California Public Utilities Commission Dispute to Solar for All Termination.pdf

Dear Mr. Molina,

Attached please find the California Public Utilities Commission's Dispute to EPA's Termination of EPA Assistance Agreement 5H-84092302 along with four supporting documents.  EPA Assistance Agreement 5H-84092302 awarded the CPUC $249,800,000 under the Solar for All Program.

Please acknowledge receipt of this dispute and contact Aaron Bloom, Deputy General Counsel for the CPUC and copied here, to discuss resolution as soon as possible.

Sincerely,

Daniel Buch
Program Manager
Electric Rates, Customer Generation, Demand Response, and Rate Discounts Branch
Energy Division
California Public Utilities Commission
Daniel.Buch@cpuc.ca.gov
(415) 703-2292


****

Aaron Bloom
Deputy General Counsel
*California Public Utilities Commission*

505 Van Ness Avenue
San Francisco, California 94102
Office:  (415)-696-7374
Mobile:  (628) 999-5241
Email:  aaron.bloom@cpuc.ca.gov


Sincerely,

Dan Buch (*he/him/his*)
Program Manager

Electric Rates, Customer Generation, Demand Response, and Rate Discounts Branch
Energy Division
California Public Utilities Commission
Daniel.Buch@cpuc.ca.gov
(415) 703-2292

September 5, 2025
Michael Molina
Disputes Decision Official
Office of Mission Support
U.S. Environmental Protection Agency
By electronic mail: Molina.Michael@epa.gov

Re: Dispute of Termination of EPA Assistance Agreement 5H-84092302

Dear Mr. Molina,

Per 2 C.F.R. § 1500.15, the California Public Utilities Commission (CPUC), on behalf of itself and subawardees the California Energy Commission and the California Employment Development Department, disputes the U.S. Environmental Protection Agency's (EPA) decision to terminate EPA Assistance Agreement 5H-84092302 (Assistance Agreement). The Assistance Agreement awarded the CPUC $249,800,000 for the California Solar for All Program per 42 U.S.C. § 7434.  *See* **Exhibit 1**.  EPA has claimed to terminate the Assistance Agreement by an August 7, 2025 memorandum and an August 8, 2025 amendment to the Assistance Agreement.[1]  *See* **Exhibits 2 and 3**.

As explained below, EPA's unilateral termination (1) relies on but violates the plain language of the One Big Beautiful Bill Act (OBBBA), Section 60002, which rescinded only unobligated balances and preserved funds already awarded to grantees; (2) violates the legally binding Assistance Agreement; (3) provides no valid reason for termination as required under 2 C.F.R. § 200.341; (4) is arbitrary, capricious, and not supported by substantial evidence; and (5) violates constitutional boundaries.  The CPUC disputes the termination decision, and requests that the decision be promptly reversed and that the CPUC's Solar for All grant be immediately reinstated without additional conditions, , including by fully and immediately reinstating the $249,045,222.95[2] that was available in the CPUC's ASAP account as of August 6, 2025 (the day before the Termination Notice).  .

//

---

[1] The CPUC responded to the amendment to the Assistance Agreement on August 29, 2025.
[2] This dollar amount represents the cumulative authorized amount of the EPA Award $249,800,000 minus funds drawn down by the CPUC for authorized work before the August 7, 2025 termination notice.

1. **History of CPUC Award**

   A. **The CPUC receives a $249,800,000 Solar for All award.**

The State of California through the California Infrastructure and Economic Development Bank (IBank) submitted an application under EPA's Solar for All Notice of Funding Opportunity EPA-R-HQ-SFA-23-01 and included the CPUC, the California Energy Commission (CEC), the California Strategic Growth Council (SGC), and the California Employment Development Department (EDD). On May 29, 2024, the CEC requested that EPA allow the CEC to replace IBank as the lead applicant. On July 8, 2024, EPA awarded the CEC $249,800,000 in SFA funding.

Because the CPUC would be distributing most of the awarded funds, the CPUC on September 5, 2024 requested that EPA allow the CPUC to replace the CEC as the prime grantee. On January 16, 2025, EPA issued the CPUC an amended award that listed the CPUC as the prime grantee and awarded the CPUC $249,800,000 of SFA Funding. *See* **Exhibit 1.** EPA transmitted the Assistance Agreement to CPUC on February 3, 2025.

The Assistant Agreement contains a Section entitled "Termination." **Exhibit 1** at 37-38. In that section, the Assistance Agreement provides that EPA maintains the right to terminate the award only as specified in 2 C.F.R. § 200.339 and the version of 2 C.F.R. § 200.340 in effect as of October 1, 2024, when one of three circumstances occurs:

1. That the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired;
2. There is adequate evidence of Waste, Fraud, or Abuse; or
3. There is adequate evidence of material misrepresentation of eligibility status, prompting adverse action by EPA per 2 C.F.R. § 200.339.

Prior to and since receiving the Assistance Agreement, the CPUC has extensively worked with the EPA and others to implement its award. On November 15, 2024, the CPUC submitted its final Work Plan and Budget to EPA that outlined the CPUC's plan for planning, designing, and implementing its SFA program. *See* **Exhibit 4**. On December 16, 2024, EPA approved the CPUC's Work Plan. Since that time, the CPUC has been in the permitted Planning Period, and has been taking the needed steps to disburse the award following the Planning Period, such as completing interagency agreements with subawardees, creating the steps to execute and implement EPA's required Quality Assurance Project Plan, hiring new staff, and meeting with stakeholders to solicit feedback on the distribution of funds.

The CPUC's approved Work Plan and budget includes:

- $190.2 million of financial incentives for community solar, with $19 million for community solar supporting tribes.
- $25 million of financial incentives for rooftop and community solar program grants, as well as enabling upgrades.
- $9.7 million of financial incentives for enabling upgrades for low-income affordable multifamily solar.
- $8 million for residential solar high road training partnership grants.
- $400,000 of in-kind technical assistance from the National Renewable Energy Laboratory to support implementation.

Of the $249,800,000 grant, 94.32% will go to financial and technical assistance, and just 5.69% is reserved for administration.

### B. EPA announces termination of the Solar for All Program, including the CPUC's award.

On August 7, 2025, EPA announced the decision to terminate the entire SFA program through an X post from EPA Administrator Lee Zeldin.



**Lee Zeldin** ✔ 🌐
@epaleezeldin

The One Big Beautiful Bill eliminated the Greenhouse Gas Reduction Fund, which included a $7 billion pot called "Solar for All".

In some cases, your tax dollars were diluted through up to FOUR pass-through entities, each taking their own cut off the top!

The bottom line is this: EPA no longer has the statutory authority to administer the program or the appropriated funds to keep this boondoggle alive.

Today, the Trump EPA is announcing that we are ending Solar for All for good, saving US taxpayers ANOTHER $7 BILLION!

3

Later on August 7, 2025, the CPUC received a memorandum from EPA Award Official Devon Brown that stated it was to notify the CPUC that EPA terminated the SFA program, including the CPUC award (the Termination Letter). *See* **Exhibit 2**. The Termination Letter states that Section 60002 of the OBBBA had repealed the underlying authority for the Solar for All program and rescinded unobligated amounts to carry out the program. It asserts that Section 60002 had "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and that the agency "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the Solar for All program. The Termination Letter provides that the "EPA Grants Management Office will issue an amendment to the agreement to document the termination."

On August 8, 2025, the CPUC received an amended Assistance Agreement that states it was to "stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements." *See* **Exhibit 3**. The amended Assistance Agreement states that EPA terminated the award "per 2 C.F.R. 200.340(a)(4) and the administrative terms and conditions of this agreement."

EPA has not indicated to the CPUC or provided the CPUC with evidence that the CPUC or subawardees failed to comply with the terms and conditions of the Assistance Agreement, have engaged in Waste, Fraud, or Abuse, or have materially misrepresented their eligibility status.

Before the Termination Letter, the CPUC's ASAP account contained $249,045,222.95 of the CPUC's SFA award. Following the Termination Letter, the CPUC's ASAP account "available balance" was reduced to $17,422,106.08. The August 8th amended Assistance Agreement also changed the performance period end dates from April 30, 2029, to August 8, 2025. To date, EPA has not provided the CPUC with an explanation as to why the available balance was reduced and how the new balance amount was determined or why the performance period end dates were modified.

### 2. The CPUC's Dispute Is Timely

2 C.F.R. § 1500.15 and the Termination Letter each provide that the CPUC may dispute the termination decision no later than 30 calendar days from the date the Termination Letter was electronically sent to the CPUC. The Termination Letter further instructs the CPUC to submit the Dispute by electronic mail to the Disputes Decision Official, molina.michael@epa.gov. The CPUC submits this dispute by electronic mail to molina.michael@epa.gov on September 5, 2025, within the 30-day period.

4

### 3. The EPA's Attempt to Terminate the CPUC Award Is Unlawful and Should Be Rescinded

#### a. EPA's asserted grounds for termination violate the plain language of OBBBA Section 60002.

EPA's Termination Letter states that the Assistance Agreement was terminated because that is required by the OBBBA Section 60002. Section 60002 provides:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

As is clear from this language, Section 60002 only rescinds unobligated amounts. The CPUC's full award was obligated before the OBBBA and so were not rescinded by Section 60002.

The CPUC's award was obligated at the time it was made and subject to a legally binding Assistance Agreement under which EPA promised to spend the money. GAO, A Glossary of Terms Used in the Federal Budget Process, at 70 (GAO-05-734SP) (stating that "an agency incurs an obligation, for example, when it . . . awards a grant"). EPA's own guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[3]

EPA's reliance on Section 60002 to terminate the Assistance Agreement and the CPUC award is thus unlawful. An agency action is not in accordance with the law when it conflicts with the language of the statute relied upon by the agency. *See City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007). Where the plain language of a statute is unambiguous, no further analysis is required. *Bostock v. Clayton* County, 590 U.S. 644, 674 (2020). And the plain language of Section 60002 confirms that EPA's representation that Section 60002 eliminates EPA's statutory basis or funding for the grant is false.

---

[3] *See* https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf.

5

To the extent EPA contends that the termination of its administrative cost appropriation justifies termination of the CPUC's SFA award, that also conflicts with the plain language of Section 60002. If Congress had intended to rescind obligated balances, it would not have expressly limited the rescission to "unobligated balances." The cardinal rule of statutory interpretation is that "a legislature says in a statute what it means and means in a statute what it says." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

By arguing that Section 60002 rescinds the CPUC's obligated award, EPA ignores that plain, unambiguous language of Section 60002. EPA cannot rely on Section 60002 to terminate CPUC's access to its already obligated funds. EPA is acting beyond its authority by defying Congress's express statutory directive that only the unobligated balances of Solar for All appropriations are rescinded.

**b. EPA's decision to terminate the CPUC's Solar for All Assistance Agreement lacks a legal basis.**

The Termination Letter does not provide a reason for termination other than its alleged reliance on the OBBBA Section 60002. The uniform grant regulations at 2 C.F.R. § 200.340(a) provide the circumstances under which the government may terminate an award agreement. Those circumstances include (1) failure to comply with the agreement's terms and conditions; (2) with consent of the recipient; (3) by request of the recipient; or (4) otherwise pursuant to the terms and conditions of the agreement, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

2 C.F.R. § 200.340 does not authorize EPA to terminate an assistance agreement when EPA believes that it "no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight, or monitoring." Nor does it authorize EPA to terminate an assistance agreement when Congress rescinds EPA's "administrative cost appropriation," as the Termination Letter alleges.[4]

And EPA in the Termination Letter does not identify a provision of 2 C.F.R. § 200.340 which authorizes termination of the CPUC's Assistance Agreement. The CPUC has not agreed and does not agree with EPA's attempts to terminate the Assistance Agreement based on

---

[4] The OBBBA also did not eliminate EPA's entire administrative budget such that EPA was left unable to perform work. On March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" for fiscal year 2025. Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

EPA's false interpretation of the OBBBA Section 60002.  And EPA does not and cannot contend that the conditions for termination in the Assistance Agreement—that there is noncompliance so substantial that effective performance of the Assistance Agreement is materially impaired, or that there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status—have been met.  Indeed, EPA has not identified any noncompliance or evidence of waste, fraud, or abuse of material misrepresentation, nor has it requested the CPUC take action to cure identified deficiencies in its performance.

To the extent EPA relies on 2 C.F.R. § 200.340(a)(4), as EPA indicated in the August 8 amended Assistance Agreement but not in the Termination Letter, that also lacks a legal basis.  When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget ("OMB") confirmed that the termination language relating to agency priorities did not allow agencies to implement arbitrary cancellations.[5]  In 2024, OMB completed another round of revisions to this provision.[6]  After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that may form a ground for termination, but only if "the language is included in the terms and conditions of the award."[7] The agency must "clearly and unambiguously" include (a)(4) in the Assistance Agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4).[8]

Here, because the Assistance Agreement does not include the (a)(4) "agency priorities" provision in its terms and conditions as a ground for potential termination, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the Agreement.  EPA acted contrary to the governing regulations.[9]

### c. EPA's decision to terminate the CPUC's Solar for All Assistance Agreement is arbitrary and capricious.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

---

[5] Guidance for Grants and Agreements 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).
[6] Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024).
[7] *Id.* at 30,089.
[8] *Id.*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).
[9] 2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30,089.

7

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id*. Agency action taken on pretextual grounds violates the requirement of reasoned agency decision-making.

EPA's decision to terminate the CPUC's Solar for All Assistance Agreement is arbitrary and capricious because: (1) EPA provided no reasoned basis for the termination, (2) EPA failed to undertake an individual assessment of the CPUC's Solar for All Assistance Agreement, (3) EPA failed to provide the CPUC notice and an opportunity to cure, and (4) EPA ignored the CPUC's substantial reliance interests and the harmful impact of an abrupt and complete termination of the Solar for All Agreement.

EPA's sole stated rationale for the Termination Letter—that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 award recipients"—is a contrived, incongruent , and insufficient explanation and thus not a reasoned basis for that action. EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that Congress appropriated to EPA in March to pay for "Environmental Programs and Management" to administer and oversee the award.

EPA likewise failed to engage in reasoned consideration of the CPUC's Solar for All Assistance Agreement before categorically terminating the Solar for All program. EPA has identified no facts that would support the termination. EPA's public statements, such as Administrator Zeldin's X post stating that the Solar for All grants were a "boondoggle" demonstrate that its stated rationale was pretextual.

Also arbitrary was EPA's failure to give notice to the CPUC so the CPUC could address any alleged failures. 2 C.F.R. § 200.208 requires EPA to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to satisfy the conditions. It is only after a grantee fails to meet the conditions imposed that an

8

agreement can be terminated.[10]  EPA's actions are contrary to these procedures.  EPA terminated the Assistance Agreement without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure.  Contrary to Section 200.208's notice-and-cure requirements, EPA operated in secret to limit the CPUC's access to its accounts.  The lack of notice was arbitrary, capricious, and deprived the CPUC of due process.

### d. EPA's withdrawal of the CPUC's appropriated and obligated Solar for All Assistance Agreement violates the Constitution's separation of powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."  The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  The Executive has no power "to enact, to amend or to repeal statutes."  *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018).  No agency may take an action that exceeds the scope of its constitutional or statutory authority.  And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

***Spending Clause.***  The Constitution "exclusively grants the power of the purse to Congress, not the President."  *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  The Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.  *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).

EPA's attempts to terminate the CPUC's SFA award ignore these constitutional constraints and contradict the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.  *South Dakota v. Dole*, 483 U.S. 203, 207-208 (1987).  For the same reasons that EPA's conduct was contrary to the plain language of the OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of the CPUCs funding agreement.

---

[10] 2 C.F.R. § 200.339(a) & (c) (authorizing a temporary hold on payments, suspension or termination only when the noncompliance cannot be remedied by imposing specific conditions such as corrective action).

**Take Care Clause.**  The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."  U.S. Const. art. II, § 3.  The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."). Where the Executive Branch overrides a statute or the legislative intent of Congress, it thus violates the separation of powers doctrine.

EPA terminated the Solar for All program and the CPUC's Assistance Agreement on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."  But as explained above, Section 60002 did not authorize or direct EPA to rescind the CPUC's funds, which were obligated.  EPA's termination of the CPUC's Assistance Agreement overrides Section 60002 and the legislative intent of Congress.

**Appropriations Clause.**  The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. ar. I, § 9.  The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).  Consistent with these principles, the Executive cannot frustrate the will of Congress by unilaterally declining to spend appropriated funds.  For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

**Legislative Vesting Clause.**  Congress possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."  When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers.  EPA cannot usurp the will of Congress by unilaterally terminating the CPUC's Solar for All Assistance Agreement.

**Tenth Amendment.**  The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the

10

States, are reserved to the States respectively, or to the people." When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012). EPA's termination of the CPUC's Solar for All Assistance Agreement altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. The alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Agreement, and so violate the Tenth Amendment.

***Ultra Vires.*** The Termination Letter and subsequent termination of the CPUC's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind the CPUC's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of the OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

### 4. Remedy or Relief Sought

The CPUC seeks rescission of the termination of its Assistance Agreement, reinstatement of the Assistance Agreement for the originally awarded amount, scope of work, and performance period, and reinstatement of the notice to proceed. The CPUC further seeks that EPA immediately reinstate $249,045,222.95 that was available in the CPUC's ASAP account as of August 6, 2025 (before the Termination Letter). If EPA claims that it no longer possesses the requisite personnel or administrative funding to oversee and administer the CPUC's award, the CPUC respectfully proposes the appointment of an independent third party to administer and oversee the award, subject to EPA's reasonable oversight and supervision.

Until the CPUC's dispute with EPA has been resolved, the CPUC objects to any claims of noncompliance under 2 C.F.R. § 200.344(i).

The name and contact information, including email address, of the CPUC's designated point of contact for this Dispute is:

> Aaron Bloom
> Deputy General Counsel
> California Public Utilities Commission
> 505 Van Ness Avenue, San Francisco, CA 94102

11

aaron.bloom@cpuc.ca.gov

Please acknowledge receipt of this Dispute and contact Mr. Bloom to discuss resolution of the Dispute as soon as possible.

Sincerely,

*Daniel Buch*

Daniel Buch
Program Manager
Electric Rates, Customer Generation, Demand Response, and Rate Discounts Branch
Energy Division
California Public Utilities Commission
Daniel.Buch@cpuc.ca.gov
(415) 703-2292


Cc:  Devon Brown, EPA Award Official *via email* (brown.devon@epa.gov)

5H - 84092302 - 0    Page 1

| | | |
|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** **Grant Agreement** | **GRANT NUMBER (FAIN):** 84092302 **MODIFICATION NUMBER:** 0 **PROGRAM CODE:** 5H | **DATE OF AWARD** 01/16/2025 |
| | **TYPE OF ACTION** Novation | **MAILING DATE** 01/22/2025 |
| | **PAYMENT METHOD:** ASAP | **ACH#** |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| California Public Utilities Commission 505 Van Ness Avenue San Francisco, CA 94102-3298 EIN:  94-3031353 | California Public Utilities Commission 505 Van Ness Avenue San Francisco, CA 94102-3298 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Tory Francisco 505 Van Ness Aveue San Francisco, CA 94102-3298 **Email:** tory.francisco@cpuc.ca.gov **Phone:** 415-703-2743 | Vineet Pandharpurkar 1200 Pennsylvania Ave NW, 4410C Washington, DC 20460 **Email:**  Pandharpurkar.Vineet@epa.gov **Phone:** 202-564-5211 | Jennifer Brooks 1200 Pennsylvania Ave, NW, 3903R Washington , DC 20460 **Email:**  Brooks.Jennifer@epa.gov **Phone:** 202-564-6374 |

**PROJECT TITLE AND DESCRIPTION**

California Solar for All Program - The award removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

See Attachment 1 for project description.

| **BUDGET PERIOD** | **PROJECT PERIOD** | **TOTAL BUDGET PERIOD COST** | **TOTAL PROJECT PERIOD COST** |
|---|---|---|---|
| 09/06/2024 - 04/30/2029 | 09/06/2024 - 04/30/2029 | $ 249,800,000.00 | $ 249,800,000.00 |

## NOTICE OF AWARD

Based on your Application dated 09/06/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 249,800,000.00. EPA agrees to cost-share 100.000% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,800,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, The Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Associate Award Official | **DATE** 01/16/2025 |

5H - 84092302 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 249,400,000 | $ 249,400,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 249,800,000 | $ 249,800,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 – Greenhouse Gas Reduction Fund:  Solar for All | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41038 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 249,400,000 |
| | | | | | | | | | $ 249,400,000 |

5H - 84092302 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| **1. Personnel** | $ 4,250,000 |
| **2. Fringe Benefits** | $ 2,272,050 |
| **3. Travel** | $ 48,000 |
| **4. Equipment** | $ 0 |
| **5. Supplies** | $ 0 |
| **6. Contractual** | $ 2,629,950 |
| **7. Construction** | $ 0 |
| **8. Other** | $ 239,680,000 |
| **9. Total Direct Charges** | $ 248,880,000 |
| **10. Indirect Costs: 10.00 % Base MTDC** | $ 920,000 |
| **11. Total (Share: Recipient ___0.00 % Federal __100.00 %)** | $ 249,800,000 |
| **12. Total Approved Assistance Amount** | $ 249,800,000 |
| **13. Program Income** | $ 0 |
| **14. Total EPA Amount Awarded This Action** | $ 249,800,000 |
| **15. Total EPA Amount Awarded To Date** | $ 249,800,000 |

## Attachment 1 - Project Description

The award removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.

The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

  a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

  b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

  c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

  d. Being funded by public or charitable contributions; and

  e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

**Freely Associated States:** *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a)** the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity. Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the [EPA Guidance on Selected Items of Cost for Recipients](#)). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### Semi-Annual Report

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### Final Report

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition*:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or

requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such

Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not

"profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1, EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in

the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as

determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program**

## Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

    1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

    2. Privately-owned commercial buildings when they meet the "public function" test;

    3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

1. Single family homes;

2. Privately-owned, non-mixed-use, multi-family housing properties;

3. Privately-owned residential portions of mixed-use properties;

4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

### O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

### P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

_**The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:**_

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.



## OFFICE OF MISSION SUPPORT
### WASHINGTON, D.C. 20460

August 7, 2025

<u>**MEMORANDUM**</u>

**SUBJECT:**     Termination of EPA Assistance Agreement 5H-84092302 under 2 CFR 200.340

**FROM:**        Devon Brown, EPA Award Official

**TO:**          Dan Buch, Branch Manager
                 California Public Utilities Commission

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84092302 awarded to California Public Utilities Commission. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Jennifer Brooks, EPA Grant Specialist
    Vineet Pandharpurkar, EPA Project Officer
    Tory Francisco, Grantee Program Manager

5H - 84092302 - 1    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY  Assistance Amendment | GRANT NUMBER (FAIN):  84092302  MODIFICATION NUMBER:  1  PROGRAM CODE:  5H | DATE OF AWARD  08/08/2025 |
|---|---|---|---|
| | | TYPE OF ACTION  No Cost Amendment | MAILING DATE  08/08/2025 |
| | | PAYMENT METHOD:  ASAP | ACH# |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| RECIPIENT: | PAYEE: |
|---|---|
| California Public Utilities Commission  505 Van Ness Avenue  San Francisco, CA 94102-3298  EIN:  94-3031353 | California Public Utilities Commission  505 Van Ness Avenue  San Francisco, CA 94102-3298 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Tory Francisco  505 Van Ness Aveue  San Francisco, CA 94102-3298  **Email:** tory.francisco@cpuc.ca.gov  **Phone:** 415-703-2743 | Vineet Pandharpurkar  1200 Pennsylvania Ave NW, 4410C  Washington, DC 20460  **Email:** Pandharpurkar.Vineet@epa.gov  **Phone:** 202-564-5211 | Jennifer Brooks  1200 Pennsylvania Ave, NW, 3903R  Washington , DC 20460  **Email:** Brooks.Jennifer@epa.gov  **Phone:** 202-564-6374 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

California Solar for All Program

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements.  Administrative terms and conditions are added.

Per 2 CFR 200.340 (a)(4) and the administrative terms and conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD  09/06/2024 - 08/08/2025 | PROJECT PERIOD  09/06/2024 - 08/08/2025 | TOTAL BUDGET PERIOD COST  $ 249,800,000.00 | TOTAL PROJECT PERIOD COST  $ 249,800,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 09/06/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,800,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division  1200 Pennsylvania Ave, NW Mail code 3903R  Washington, DC 20460 | Environmental Protection Agency, The Greenhouse Gas Reduction Fund  OA - Office of the Administrator  1200 Pennsylvania Ave NW  Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Devon Brown - Branch Chief, GMB | DATE  08/08/2025 |

5H - 84092302 - 1     Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 249,400,000 | $ 0 | $ 249,400,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 249,800,000 | $ 0 | $ 249,800,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 – Greenhouse Gas Reduction Fund:  Solar for All | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84092302 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 4,250,000 |
| 2. Fringe Benefits | $ 2,272,050 |
| 3. Travel | $ 48,000 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 2,629,950 |
| 7. Construction | $ 0 |
| 8. Other | $ 239,680,000 |
| 9. Total Direct Charges | $ 248,880,000 |
| 10. Indirect Costs: 10.00 % Base MTDC | $ 920,000 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 249,800,000 |
| 12. Total Approved Assistance Amount | $ 249,800,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 249,800,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

   a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

   b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

   c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect.  The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

   a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

   b. Explanations on why established outputs/outcomes were not met; and

   c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

   a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

   b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

# Programmatic Conditions

All Programmatic Conditions Remain the Same.

**Greenhouse Gas Reduction Fund**
**Solar for All**
**California Solar for All Program**
**Work Plan**
**Project Period: 5/1/24 – 4/30/29, Submitted 10/9/24, Revised 11/15/24 (11/19/24 Correction)**

**Project Title:** The State of California's Solar for All Program (**CA-S4A**)
**Grant Number:** #84092302
**Organization Name:** The California Public Utilities Commission, on behalf of the State of California
**Geography:** State of California

## Table of Contents

Definition of LIDAC: ........................................................................................................... 3

Section 1:  Project Description ............................................................................................ 4

1.1 Overview ......................................................................................................................... 4

1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals ................ 6

Section 2:  Project Design Plan ......................................................................................... 10

2.1 Activities to be Conducted ............................................................................................ 10

2.1.1 Meaningful Benefits Plan ........................................................................................ 10

2.1.2 Planning Period Tasks ............................................................................................ 14

2.1.3 Household Savings - Bill Benefit ............................................................................ 18

2.1.4 Resiliency Benefits ................................................................................................. 20

2.1.5 LIDAC Access ......................................................................................................... 20

2.1.6 Household and Community Ownership .................................................................... 22

2.1.7 Quality Jobs and Businesses ................................................................................. 22

2.2 Financial Assistance Strategy ....................................................................................... 25

2.3 Project-Deployment Technical Assistance Strategy ...................................................... 30

2.3.1 Workforce Development ........................................................................................... 31

2.3.2 Project Siting, Permitting. And Interconnection (to the grid) ................................... 33

2.3.3 Equitable Access and Meaningful Involvement Plan .............................................. 38

2.3.4 Summary Matrix of Customers with Barriers and CA S4A Tactics to Address Barriers ...................................................................................................................... 40

2.3.5 Plan for Participatory Governance-Formalized Structures: ..................................... 44

Section 3:  Fiscal Stewardship Plan ................................................................................. 47

3.1 Consumer Protections .................................................................................................. 49

Section 4: Timeline and Milestones .................................................................................. 53

Section 5:  Reporting Requirements ................................................................. 60

   5.1 Performance Reports................................................................................63

   5.2 Transaction-Level and Project-Level Data ...........................................64

Section 6:  Budget Narrative ......................................................................... 65

   6.1 Overall Project Budget............................................................................65

   6.2 Personnel..................................................................................................66

   6.3 Fringe Benefits........................................................................................68

   6.5 Equipment ...............................................................................................71

   6.6 Supplies....................................................................................................71

   6.7 Contractual ..............................................................................................71

   6.8 Construction............................................................................................75

   6.9 Other ........................................................................................................75

   6.10 Additional Items....................................................................................77

   6.11 Additional Workplan and Budget Questions .......................................79

## Definition of LIDAC:

California Solar for All (**CA-S4A**) intends to use criterion that align with the US Environmental Protection Agency (EPA) definition of low-income and disadvantaged communities (LIDAC) as defined in Section I.D: Competition Terminology of the Notice of Funding Opportunity was used to determine if a household is eligible for Solar for All assistance.

Meeting any of the following four categories qualifies as a low-income and disadvantaged community:

1. Located in a census tract within an identified disadvantaged community (DAC) according to the latest version of CalEnviroScreen, meaning those census tracts scoring in the highest 25% among the designated factors and land within the boundaries of Federally Recognized Tribes.
2. Any additional communities identified as disadvantaged by the Climate and Economic Justic Screening Tool (CEJST) or EJScreen mapping tool, which includes American Indian Reservations, American Indian Off-reservation Trust Lands.
3. Geographically dispersed low-income households:
   a. Metropolitan Areas: (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Guidelines (FPG), wherein the maximum of these two figures determines the income limit.
   b. Non-Metropolitan Areas: (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level, wherein the maximum of these three figures determines the income limit.
4. Properties providing affordable housing (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs:
   a. (1) Low-Income Housing Tax Credit;
   b. (2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program;
   c. (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or
   d. (4) a housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22))

# Section 1:  Project Description

## 1.1 Overview

**CA-S4A** represents a coalition of state entities with deep programmatic expertise in regulatory design, capacity building, clean energy infrastructure development, and sophisticated grid management. Together, the coalition will leverage California's historical transformation of its solar energy markets to reach households and businesses statewide that are most in need of affordable, reliable clean energy. With this new infusion of highly flexible, equity-focused resources, California will build new programmatic designs, expand current efforts, address funding gaps, and add momentum to new strategies under development. California will continue its march to address changing market and real-world conditions as the state continues to advance its decarbonization goals. California has matured the solar energy landscape, at home and globally, in the last two decades. Through these new equity-focused partnerships, designed with an emphasis on a modernized and cost-effective grid, the **CA-S4A** program will continue to accelerate deployment of clean energy generation options for additional priority, communities.

In the 1990s, California's vertically integrated utilities, responsible for delivery, power generation, and transmission, were bifurcated into separate functions. **IOUs** (IOUs) run distribution grids and deliver power to customers while generation companies own power plants and sell into wholesale power markets. California's Independent System Operator (CAISO) runs the state's transmission system.

The California Public Utilities Commission (CPUC) regulates privately owned public utilities, including electric power. The California Energy Commission is the state energy office that oversees energy planning and the publicly-owned utilities (POUs). The California Labor and Workforce Development Agency (LWDA) is a cabinet-level agency that coordinates workforce programs across state departments including the Employment Development Department (EDD), which provides employment service programs along with its other core functions.

Since 2007, California ratepayers have dedicated over $1 billion in subsidies towards low-income and community renewable energy programs. The state's low-income rooftop solar, low-income multifamily solar, and community solar programs have resulted in over 13,365 approved projects and 430 MW of solar capacity online or in process. During this same time, two community solar programs were also launched for general market customers and for low-income renters in disadvantaged community census tracts.

California requires renewable energy facilities, typically rooftop solar, for most new construction projects, including residential, commercial and industrial facilities. These requirements are incorporated into the state building energy code (Title – 24 Building Energy Code) that the CEC develops and local jurisdictions, in charge of planning and permitting construction, implement.

In 2022, California approved a high roads job legislation that requires construction workers and apprentices of customer-owned renewable energy facilities be paid the prevailing wage rate. This

applies to workers on certain, mainly commercial, renewable energy projects in Pacific Gas & Electric, Southern California Edison, and San Diego Gas & Electric territories.[1]

The administering agencies of **CA-S4A** are the California Public Utilities Commission (CPUC), California Energy Commission (CEC), and the Labor and Workforce Development Agency with the Employee Development Department (EDD). The CPUC will implement programs serving LIDAC and Tribal customers in the investor-owned utility (IOU) territories. The CEC will focus on the same audiences in publicly-owned utilities (POU) territories. While many of the state's POUs are committed to the deployment of clean energy programs that benefit low-income and disadvantaged communities (LIDAC) in their service territories, not all have the technical ability, funding, and/or regulations in place to sufficiently deploy solar and storage projects to their LIDAC customers. EDD will offer labor training programs through the Resilient Workforce Program (RWP). Only a small part of the grant (7% of funds) will cover gaps in existing programs.

**IOU-S4A Community Solar (~$200 million):** A new program that will support new mid-scale capacity solar systems (about 5 MW each) that offer 20% monthly electricity bill discounts to participating households. Competitively selected solar PV power-producing facilities or solar energy purchasing program from a power-producing facility will dedicate nearly 100% of their generated power to low-income residential customers in the same utility territory. These plants may be community-owned or third-party owned.[2]

**IOU-S4A SOMAH (~$10 million):** Solar on Multifamily Affordable Housing (SOMAH) site readiness grants to affordable multifamily participants to improve structures and grid connections enabling upgrades to deploy residential rooftop solar and associated storage (including tribal customers). Expected bill benefits to tenants range from at least 20% but may be as high as 60% of monthly electricity bills. Since 2019, SOMAH has funded rooftop solar that offsets tenant electricity bills through tenant benefit agreements administered by the IOUs. This established bill crediting process is known as virtual net energy metering.[3]

**POU-S4A (~$25 million):** Establish new programs to deploy community solar, multifamily rooftop solar, and single-family rooftop solar or solar with associated storage systems (including tribal stakeholders) in multiple POU territories. **POU-S4A** will offer at least the minimum bill expected of 20% monthly electricity bill savings. The CEC will run two to three granting cycles to which POUs or Tribes will apply to start new programs and tariffs in their territories during the grant period to expand solar access to LIDAC customers.

**RWP-S4A (~$9 million):** Establish and expand training programs to increase knowledge and competency of workers within the solar and storage sectors. Selected programs will include outreach to increase participants from identified LIDAC communities. EDD Workforce Services Branch (WSB) has managed funding programs that create pathways for job growth via training partnerships with California employers. These programs include those authorized by the federal

---

[1] Assembly Bill 2143 (2022, Carrillo)
[2] Notice of Funding Opportunity, "Residential-Serving Community Solar" at page 9
[3] Notice of Funding Opportunity, "Enabling Upgrades" permits that 20% of total financial assistance deployed may go towards enabling upgrades. Only one-fifth of CA S4A financial assistance is allocated to IOU-S4A SOMAH.

Workforce Innovation and Opportunity Act (WIOA) and the Wagner-Peyser Act. EDD WSB delivers programs that prepare all job seekers, including dislocated workers, youth, veterans, people with disabilities, for the workforce. With this experience EDD WSB will work with local workforce development boards, community colleges, and other key training providers to establish or expand training programs for jobs in the solar market. EDD tracks trainee information through the CalJOBS system which includes data on program completion, job placement, wage progression and career advancement.

Due to its downscaling efforts from a reduced EPA grant award, California has integrated work originally planned for the Strategic Growth Council (SGC-S4A) and the California Energy Commission (Tribal-S4A), and incorporated its audiences (low-income, single-family households, tribes) into its IOU and POU Community Solar programs. A community solar program removes financing and technical barriers to for these LIDAC recipients as it eliminates the need for up-front capital.

## 1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Environmental Results - Outputs and Outcomes:**

California anticipates that the grant will result in the following outputs (measurable over the grant period) and outcomes (over the lifecycle of new solar or solar with storage systems) to improve the environment and equity in the California solar market. California's tactics are focused on expanding community solar for LIDAC customers, leveraging an existing affordable multifamily program (for on-site, multi-tenant benefitting systems), and growing its solar and energy workforce development opportunities. California has diligently planned an approach to increase equity and avoid duplication of existing offerings. As an example, **IOU-S4A Community Solar** and **IOU-S4A SOMAH** will use non-interest bearing utility balancing accounts[4] and subaccounts to bifurcate and firewall CA-S4A funds from existing funding sources such as utility greenhouse gas auction proceeds, general state taxpayer funds, or funds sourced via Public Purpose Program funds collected in rates. Clearly separating these funds will simplify tracking outcomes and impacts of the grant. *At this time, the following outputs and outcomes are projected in alignment with the components of the Meaningful Benefits Plan*:

**Objective 1, reducing emissions of greenhouse gases and other air pollutants:**
- Estimated output of deploying ~**$233M** to promote up to **75MW** new solar and **37 MWh** new associated storage to the grid.[5]
  - These systems will generate 205,330 MWh annually and reduce key pollutants harming the atmosphere:
    - $CO_2$ 104,546 tons
    - $SO_2$ 6,603 lbs
    - $NOX$ 44,895 lbs
    - $PM2.5$ 30,211 lbs

---

[4] A utility balancing account is an account used to match the collection of actual revenues against actual costs after an adjustment for unanticipated changes in expenditures.
[5] This output estimate utilizes the low case scenario for IOU-S4A Community Solar, see table below for details on the case ranges.

- - VOCs 4,642 lbs
  - NH3 6,707 lbs
- A typical solar system lasts twenty years, the **CA-S4A** Coalition's estimated outcome is that this work can offset nearly 3 billion tons of $CO_2$, equivalent to 566,182 homes' electricity use for one year.[6]

**Objective 2, deliver benefits of greenhouse gas and air pollution reducing projects to communities, particularly low-income and disadvantaged communities:**

- Encouraging installation of roughly 600 new renewable energy facilities in tribal and disadvantaged communities.
- Community Solar for nearly 29,000 LIDAC multifamily and single-family households, with a third of those directly owning their solar systems.
- Achieving up to 31% average annual bill savings per household. This will deliver over $151.3 million dollars in savings per year.
- Delivering the benefits of solar or solar + storage to over 29,000 low-income households.
- Ensuring equitable benefits for residents, regardless of whether they own their home.
- Promoting prevailing wage standards across **CA-S4A** funded projects.
- Providing high-road job training opportunities to make long-term career pathways to good jobs in priority communities. Creating an estimated 395 new solar and energy storage jobs of which 225 will be high-road jobs expected to achieve a 10.5% increase in wages.

**Objective 3, mobilizing financing and private capital to stimulate additional deployment of greenhouse gas and air pollution reducing projects:**

- Creating pathways for community-centered projects that provide climate resilience and economic opportunity.
- Leveraging over $1B in new and existing investor-owned utility ratepayer funded programs.
- Developing a free tool to prevent predatory sales tactics and support customers in determining simple payback.
- Incentivizing property owners and developers to co-fund new systems.
- Engage and support twelve community-based organizations for Solar For All services

Throughout the grant's period of performance, the California Solar for All program will be evaluated on its ability to deliver on meaningful benefits, strict accountability, and verified benefits to uphold the GGRF program objectives.

---

[6] Calculated using EPA's Greenhouse Gas Equivalencies Calculator

**Objectives 1, 2, and 3 Key Metrics from CA-S4A By Program:**
The following tables show the expected outputs during the grant period for each part of the **CA-S4A** Coalition.



For total amount of household bill savings, these amounts are cumulative; for example, the households with solar treated in Year 1 will have four years of bill savings, whereas households treated in Year 5 will have one year of bill savings during the grant period.

| CA-S4A-IOU Community Solar Program Estimated Outputs[7] | Financial Assistance: $190.2 Million |
|---|---|
| Solar Capacity Installed (MW) | 50-100 MW |
| Number of Projects Financed (#) | 10-20 Community Solar Sites |
| Clean Energy Generation (MWh) | 115,925-231,850 MWh |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) | 54,713-109,426 (tons CO2) |
| Number of Households Benefitting from Projects (#) | 15,000-30,000 households |
| Amount of Household Bill Savings Delivered Cumulative Total ($) (*in Year 5*) | $6,678,180-13,356,360 ($/average month) |
| Average Savings per Benefitting Household (%) | 20% |
| Private Sector Financing Mobilized (Developer Co-Pay) | TBD |
| Note: At this time, it is expected the program funding (from S4A and other public funding sources) will cover all project costs. The estimated output range is associated with two scenarios, the high output case is based on lower-cost, solar-only projects and the low output case is higher-cost, hybrid solar + storage projects. This will be updated as result of Planning Period activities. | |

[7] Since the proceeding that will determine the final CA-IOU Community Solar application of federal funding is still ongoing, this table shows an estimate only and will be updated in the final workplan at the end of the planning year.

| CA-S4A-IOU SOMAH Estimated Outputs | Financial Assistance: $9.69 Million |
|---|---|
| Solar Capacity Installed (Residential Solar) (MW) | 12.1 MW |
| Number of Projects Financed (#) | 85 projects |
| Storage Capacity Installed (MWh) | 24 MWh |
| Clean Energy Generation (MWh) | 37,643 MWh |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) | 18,129 CO2 |
| Number of Households Benefitting from Projects (#) | 6,446 households |
| Amount of Household Bill Savings Delivered Cumulative Total ($) (*in Year 5*) | $5,359,898 ($/average month) |
| Average Savings per Benefitting Household (%) | 39% |
| Private Sector Financing Mobilized (Property Owner Co-pay) | $22,185,000 |
| Note: These outputs are additive to the SOMAH program and are the expected increase from S4A funding. SOMAH's administrative costs and solar incentives are provided through its current budget. | |

| CA-S4A-POU Program Estimated Outputs | Financial Assistance: $25 Million |
|---|---|
| Solar Capacity Installed (Residential Solar) (MW) | 13.1 |
| Number of Projects Financed (#) | 512 |
| Storage Capacity Installed (MWh) | 13.1 |
| Clean Energy Generation (MWh) | 51,762 |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) | 31,705 |
| Number of Households Benefitting from Projects (#) | 7,956 |
| Amount of Household Bill Savings Delivered Cumulative Total ($) (*in Year 5*) | $7,764,750 ($/average month) |
| Average Savings per Benefitting Household (%) | 20% to 30.3% |
| Private Sector Financing Mobilized (POU Matching Funds and/or Owner Co-Pay) | $12,000,000 |
| Note: Private Sector Financing mobilized may be adjusted based on the outcomes of Planning Period tasks. Average Bill Savings per Benefiting Household estimate high case is based on previous programs analyses, and low case is based on minimum S4A requirements. | |

| CA-S4A RWP Estimated Outputs | Financial Assistance: $8 Million |
|---|---|
| Workers Trained by Workforce Development Programs | 225 |
| Projects Executed Using Tools to Project Good Jobs and Community Benefits | 17 |
| Average increased wages for individuals working in solar energy (%) | 10.5% |

California has ongoing and active programs for solar that the Solar For All programs will complement. Under the CPUC's jurisdiction are these other incentive programs: Disadvantaged Communities Solar Affordable Homes Program (DAC-SASH), Disadvantaged Communities Green Tariff (DAC-GT), Solar on Multifamily Affordable Housing (SOMAH), and the Self-Generation Incentive Program (SGIP) serving LIDAC customers.[8] Of these, only SOMAH is being expanded through S4A funding. The CPUC also oversees several customer generation export tariffs: net energy metering, net billing, fuel-cell net energy metering, and tariff variations to support customers with disaggregated sites (such as agricultural customers), multitenant properties, local governments, schools, and tribal governments.

This work will comply with Title VI of the Civil Rights Act and other Federal statutes (including Section 504 of the Rehabilitation Act of 1973 and The Age Discrimination Act of 1975) and regulations prohibiting discrimination in Federal financial assistance programs, as applicable. Participation in Solar For All programs will *not* be determined based on any personal factors such as race, color, gender, or national origin.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

# Section 2:  Project Design Plan

## 2.1 Activities to be Conducted

### 2.1.1 Meaningful Benefits Plan

Across all of the **CA-S4A** program's actions, California will deliver on the five US EPA Solar for All meaningful benefits, with a focus on targeting new distributed solar and storage projects to LIDAC customers: (1) delivering a minimum of 20% of household savings (Bill Benefits), (2) increasing LIDAC access to solar + storage through financing products and deployment options

---

[8] More information available at: https://www.cpuc.ca.gov/industries-and-topics/electrical-energy/demand-side-management

(Financing Products and Deployment), (3) increasing resiliency and grid benefits by creating capacity that can deliver energy to LIDACs during grid outages (Increase Resiliency and Grid Benefits), (4) maximizing household and community ownership models, and (5) investing in quality jobs and businesses (Quality Jobs and Businesses) per President's Executive Order on Investing in America and Investing in American Workers, the Administration's Good Jobs Principles and E.O. 14082. As indicated, California intends to take advantage of USEPA's provision for a twelve-month planning period before several of the **CA-S4A** programs begin committing funds. During this planning period, as policy decisions are made and program designs advance to reflect them, the state's ability to predict specific outcomes will necessarily improve.

California law already requires all workers and apprentices involved in the construction of net energy metering solar generating facilities supporting commercial, industrial, and large multifamily properties to be paid prevailing wage akin to public works projects.

California has simplified the application process. After the passage of SB 379, California Energy Commission oversaw the implementation of the California Automated Permit Processing Program (CalAPP) to expedite local jurisdiction permitting. Currently, a total of 242 counties and cities have automated platforms for issuing solar permits. Additionally, California's Title 24 Building Code sets minimum building energy efficiency standards, and as part of a regular update cycle that went into effect in 2020, virtually all new residential construction is required to incorporate rooftop solar or an alternative.

California also offers two community solar programs, one of which DAC-Green Tariff specifically designed for low-income renters living in disadvantaged communities. The program enables income-qualified, residential customers in DACs who may be unable to install solar on their roof to benefit from utility scale clean energy and receive a 20% monthly bill discount. The program is available to customers who meet the income eligibility requirements for the California Alternate Rates for Energy (CARE) and Family Electric Rate Assistance (FERA) programs (200% FPG).

California's Native population is one of the largest in America. Native American tribes located within POU territories are included as eligible participants in the portion of funding administered by the CEC, and the California Public Utilities Commission (CPUC) is the agency that will consider awarding funds to Tribes located in IOU territory.

Two barriers that impact the breadth and diversity of solar deployment are 1) the lack of programs focused on opportunities to advance solar and storage in partnership with California's Native American tribes, and 2) the lack of programs focused on improving California's aging housing and building stock to allow the buildings to accommodate solar and storage. To create and measure meaningful benefits, California S4A addresses these barriers and utilize an expert consultant contract to provide ongoing analytical work to quantitatively model program design options; recommend program design aspects; and measure impacts, realization rates, and bill savings.

The majority of the Solar For All grant is going to new programs (93% of grant funds) California has key elements already in place, which will be maintained through the grant period:

1. Tariffs
   a. **IOU-S4A SOMAH** utilizes a virtual net energy metering tariff to share generation credits amongst multiple benefitting accounts at a set-rate. Participating tenants must be on a time-of-use import rate and may also receive additional energy rate discounts through income qualified discount programs such as the California Alternate Rates for Energy (CARE) and the Family Electric Rate Assistance (FERA) program. Net export compensation (for solar added to the grid) funding comes from non-participating ratepayers.

2. Per-Watt Incentives
   a. **IOU-S4A SOMAH** offers a per-watt incentive for solar or solar with storage systems. The incentive is higher for capacity dedicated to tenants; and to reduce double compensation, it is lowered with the use of complimentary tax incentives. At most, the incentive is $3.50/watt for tenant capacity and $1.19/watt for common areas. This is funded by participating IOUs' greenhouse gas auction revenues.
   b. **IOU-S4A Community Solar** may offer a per-watt upfront incentive or per kilowatt hour performance incentive for new solar+storage projects in LIDACs. The incentive level will be determined through a stakeholder process during the period of performance. **IOU-S4A Community Solar** may also apply funding to the 20% low-income subscriber saving threshold.

3. Existing Programs
   a. **POU-S4A** will leverage existing POU programs in applicable territories to expand their impact and offer new funding opportunities for other POUs that lack sufficient resources.
   b. **POU-S4A** includes funding for tribes in POU territories to enhance tribal energy sovereignty through programs such as Long Duration Energy Storage (LDES) and microgrid funding through California's Electric Program Investment Charge (EPIC) Program. Funding can also expand tribal partnerships to support leveraging capital through the CEC's Energy Conservation Assistance Act loan program.
   c. **IOU-S4A SOMAH** expands the SOMAH program, which provides solar incentives to affordable multifamily property since 2019 and has a current budget over $700 million. The incentive is higher for the solar capacity supporting tenants ($3.50/watt) than common areas ($1.19/watt). To-date, the program has installed 23.25 MW at 162 sites with over 13,000 LIDAC renter households. The program has a significant amount of unspent incentive funds, $507.4 million, and eligible, but non-participating property owners need support covering additional site remediations to facilitate on-site solar.
      i. SOMAH workforce training requirements are a precursor to receiving incentives. Incentives (for the solar system) will not be disbursed if the contractor does not follow and document workforce training.
   d. **IOU-S4A** may leverage the CPUC's existing DAC-GT program which subsidizes the renewable energy premium or delta above low-customers' otherwise applicable rate and 20% average customer monthly bill discount for low-income

residential customers. To-date, the DAC-GT program has procured 74 MW and serves 24,000 LIDAC households. The program capacity was recently expanded and has approximately 140 MW available for new procurement.

4. Achieving a 20% Bill Discount
   a. **IOU-S4A Community Solar** and SOMAH calculate the 20% low-income customer bill discount on a monthly basis.
   b. **POU-S4A** will use the 12-month planning period to determine exact methodology for calculating 20% savings. It is expected that as a condition of receiving an award, POUs must agree to apply a minimum 20% subsidy/discount/bill credit to a recipient household's cost of electrical usage over a monthly or annual period.

5. Data Collection to Verify Bill Savings
   a. **IOU-S4A Community Solar** has mandated monthly bill savings, so the IOUs and CCAs will automatically apply a 20% average monthly bill discount for all participating low-income customers. The CPUC will periodically request customer billing data to verify the outcomes over the grant period, however the IOUs may be found to be out of compliance with CPUC directives should this outcome not be achieved.
   b. **IOU-S4A SOMAH** already requires that a majority of generating capacity (at least 51 percent) is dedicated to tenants for the life of the solar system (20 years). **IOU-S4A SOMAH** will update program agreements so Solar For All recipients will have to acknowledge the 20% minimum bill savings required. Applicants must submit system design characteristics and their credit allocation agreements in order to receive incentive payments. The current average bill reduction for a SOMAH participant far exceeds a 20 percent minimum. In 2022, SOMAH participants had an average savings of $39/month or a 60% percent average monthly reduction. The CPUC will periodically request customer billing data to verify outcomes over the grant period.
      i. When designing a SOMAH solar system, the applicant looks at the property's common area and tenants' electricity usage from the past year to determine the baseline needs and may add future electrical vehicle charging. The property also conducts an energy efficiency audit to determine if additional capacity adjustments should be made. After the entire system is designed, the property owner determines the split between tenants and the common areas. For tenant households, it is often set by the number of bedrooms in each tenant household.

6. No construction costs for participating LIDAC Households **IOU-S4A Community Solar** will disallow construction costs from being passed on to beneficiaries; there will be cost-sharing with beneficiaries.

7. **IOU-S4A SOMAH** prohibits landlord from passing on any costs to multifamily renters either directly or indirectly through raised rents. Property owners must sign an agreement which requires them to return their incentives if they do not abide by this term.

8. Throughout the grant, **CA S4A Coalition Agencies** will meet regularly to coordinate policies and implementation, including reporting and enforcement of the S4A terms and conditions.

## 2.1.2 Planning Period Tasks

In the 12-month planning period:

- **CA-S4A** coalition agencies will hire new personnel and vendors as specified in their budgets and timelines.
- At the onset, CPUC will host a virtual, public workshop to release CA's S4A approved workplan and preview the timeline and key milestones. There would be an opportunity for public feedback and to answer questions. This would be noticed on the CPUC website, social media, regulatory list serves, CPUC's daily calendar, as well as other agency communication lists, calendars, and websites. To expand our reach further, CPUC staff would directly reach out to provide notice to relevant community-based organizations that participate in statewide advisory groups or that participate in existing low-income programs.
- Engage in tasks (data, monitoring, reporting, etc.) in support of quality management plan and quality assurance.
- Create interagency agreements between prime grantee, CPUC, and each CA coalition agency to facilitate confidential information sharing, implementation, and funding.
- Coalition agency staff will coordinate regularly on planning period tasks, with CPUC staff as administrator lead. Coalition agency staff will also attend S4A EPA trainings, and inter-state meetings organized by Clean Energy States Alliance (CESA).

**IOU-S4A Community Solar** Planning Period Tasks

*Grant and Incentive Funding:*

1) Finalize community solar program implementation details with diverse group of stakeholders including but not limited to environmental justice groups, environmental and energy nonprofit groups, solar industry trade organizations, solar developers, subscription managers and subscribing organizations, ratepayer advocates, IOUs, and CCAs.
2) Identify budget per IOU territory and identify initial enrollment approaches including automatic enrollment for reaching households meeting income, tribal status, and geographic criteria to simplify household participation. Review utility balancing accounts and, if necessary, direct adjustments to comply with S4A terms and conditions.
3) Establish funding set-asides, if any, for technical assistance.
4) Outline criteria for proposals and selecting winning community solar development proposals, which include satisfaction of quality jobs and businesses criteria and Build America, Buy America Act standards and satisfying Davis-Bacon Act federal wage compliance. CPUC will permit third-party owned community solar to compete and operate residential-serving community solar. Ownership by third-parties such as experienced independent power producers will likely result in least-cost projects, with developers being able to take full advantage of government incentives and private financing measures. While this option may not necessarily result in direct community ownership, an indirect form of ownership under this model occurs when projects are owned by POUs or community choice aggregators, which are overseen by local governments.
5) Deploy incentive structures for capital mobilization and tax credit leveraging.
6) Implement automated processes for eligible customers to receive and maintain solar bill credits.

7) Finalize new program documentation to operationalize and implement all above noted steps through the ministerial review and approval process.

8) Hire consultant to provide concierge tribal outreach assistance, guided by comprehensive data consolidation, a deep familiarity with programmatic elements, cultural competence and expertise to connect Tribes with viable program offerings.

9) The CPUC has already directed mandatory customer savings threshold. However, in the planning period, the IOUs will establish tariffs that enshrine the 20% discount.

10) Workforce requirements will not be provided a separate budget or funding, as any workforce requirements that are adopted must be followed to receive incentives. Additionally, the CPUC will follow the best practice establishing and enforcing clawing back provisions for incentive funds if criteria, including workforce training obligations are not met.

*Tariffs*:
1) Proceeding to determine need for distinct community solar tariffs and if adopted, conduct a ministerial review process to finalize implementation. After which the IOUs will modify their billing systems to accommodate new rates.

## IOU-S4A SOMAH Planning Period Tasks

*Grant and Incentive Funding:*
1) Determine whether program changes are needed to increase resiliency through incentivizing solar with storage at affordable multifamily sites. Assess whether existing SOMAH utility balancing accounts are S4A award-compliant and direct changes if needed.
2) Define eligible measures for rooftop remediation and site readiness.
3) Generate mapping showing overlay of LIDAC geographic criteria with current SOMAH LIDAC criteria.
4) Design incentive structures for capital mobilization, including advance payments to eliminate financial barriers for cash-strapped affordable housing operators.
5) Address incorporation of quality jobs and businesses criteria and Build America, Buy America Act standards, as well as, satisfying federal wage compliance standards with the Davis-Bacon Act and other rules.
6) **IOU-S4A SOMAH** will update program agreements so Solar For All SOMAH recipients will have to attest to the 20% minimum bill savings requirement. Property owners will adjust the capacity dedicated to tenants if needed to do so. However, in practice SOMAH properties already achieve this outcome with an average monthly discount of 39%. Finalize updated program documentation to operationalize and implement all above noted steps through the ministerial review and approval process.
7) Hire consultants to provide tribal outreach assistance (in conjunction with **IOU-S4A Community Solar**) and provide affordable housing finance and tax credit monetization support to increase system ownership benefits for affordable housing owners.
8) Senate Bill 355 (2023, Eggman) adjusted SOMAH's enacting public utility code to lessen the prohibition against master-metered properties' participation. The CPUC efforts to address outstanding issues from this legislation will coincide with the S4A planning period and may result in eligibility changes for affordable, master-metered properties or those that are individually metered, but tenants do not pay their electricity bills, like a short-term homeless shelter. In both instances there must be verifiable tenant benefit agreements in place to ensure that financial benefits accrue to the renters in an appropriate manner.
9) CPUC is currently considering expanding SOMAH funding to be used for solar with integrated storage through its regulatory processes. If adopted, the program would need to determine a rebate amount or rate for integrated storage. This would be funded through existing program funds, and not S4A.

## POU-S4A Planning Period Tasks

*Grant and Incentive Funding*
1) Upfront project costs are a barrier for housing owners and operators in LIDAC as combined installation of battery storage brings the most benefit when utilizing this

program. **POU-S4A** plans to alleviate this barrier for program participants by directing solar and storage grant funds to benefit LIDAC households in POU territories (including tribal stakeholders).

- Conduct scoping Workshops, Stakeholder meetings, Tribal Co-development, Consultation, Engagement, and listening sessions.
- Develop Tribal Engagement and Inclusion Plan
- Draft Solicitation Manual, which will include satisfaction of quality jobs and businesses criteria and Build America, Buy America Act standards as well as satisfying Davis-Bacon Act federal wage compliance and all other Solar For All terms and conditions.
- Release draft solicitation; host public workshop and solicit public comment.
- Release final solicitation package; Notice of Funding Availability (NOFA); applications open.

2) CEC will engage in agreements with the POUs (as needed) to share customer billing data as condition of receiving funding to verify that savings are being realized. Some POUs may have existing agreements or may not participate.

3) CEC intends to incorporate the 20% minimum bill savings requirements into its granting criteria. As part of its regulatory process, with input from stakeholders, will determine whether the bill savings will be calculated monthly or over a 12-month period. It is possible that the CEC will take a mixed approach – with a 12-month period for single-family homeowners, and a monthly approach for multifamily residents. Single-family electricity bills tend to be much higher and less consistent than multifamily, so even with a smaller solar allocation, multifamily electricity bills are likely to have higher percentage decrease of their electricity bill than single-family customer.

4) CEC will determine if cost-sharing with the LIDAC household will be permissible or not during its planning period. If cost-sharing is permissible, it will be incorporated into the household benefit calculation to achieve the 20% minimum savings outcome required. CEC will also take care to avoid impacts to household income that could affect taxes or other income-based eligibility. CEC will consider applicant's capital mobilization as part of the grant criteria. There may be a minimum matching funds requirement, so the POU contributed funding as well.

5) CEC will consider adjustments for master-metered and/or rental properties as part of its stakeholder feedback within the regulatory process.

6) Community ownership risk mitigation will be a component of the granting criteria for selecting awardees. CEC will follow best practices for consumer protection available in existing programs, such as clear disclosures, consideration of ability to pay, and protections against overly burdensome debt, as well as protections against passing on community solar construction costs from property owners to renters either directly or indirectly unless the renters choose to participate in the program. The details on this component will be determined during the planning period.

7) Define essential quality control components to ensure that installed solar or solar + storage systems perform as expected and that contractors are held accountable for their workmanship. CEC will set minimum criteria following best practices on product and workmanship warranties and will give additional points for applications that go beyond the minimum required.

**RWP-S4A** Planning Period Tasks
*Workforce Training Development*
1) Planning processes to expand existing programs or establish new offerings in LIDAC areas and receive stakeholder input to refine plans. Review and confirm accounting practices do not result in the generation of profit (such as an interest-bearing banking account) and, if necessary, adjust to comply with Solar For All terms and conditions.
2) Assess current programs throughout the state, focused on existing partnerships with the state's 45 local workforce development boards and state high road training partnerships.
3) Confer with CPUC and CEC and S4A program administrator leads on training needs to identify workforce gaps – meet at least twice with one public convening. For any workforce gaps identified, work with training partners to adjust lessons as necessary/feasible.
4) If new training programs are needed, they will be developed during the planning period.
5) Establish grants within target areas with S4A projects to be awarded or underway. Competitive grant process to increase the number of skilled workers from LIDACs in high-quality jobs.
6) Require trainee data to be reported through CalJOBS including participant wages, and rates of completion.

S4A Coalition has included estimating timing and key milestones in the Timeline Section at the end of the Workplan. As planning period tasks are completed, the **CA-S4A** Coalition Workplan will be updated.

## 2.1.3 Household Savings - Bill Benefit

- **IOU-S4A Community Solar** adopted a policy to require that each participating low-income customer will receive a minimum 20% bill benefit. This will be included on customer electricity bills and will be incorporated into the customer's existing tariff. Eligible customers may also receive additional energy rate discounts through income qualified discount programs such as the California Alternate Rates for Energy (CARE) and the Family Electric Rate Assistance (FERA) program. The **IOU-S4A Community Solar** will leverage an expert consultant to provide ongoing analytical work, research and quantitative model program design review to measure impacts, realization rates, and bill savings.
- **IOU-S4A Solar on Multifamily Affordable Housing (SOMAH)** requires that at least 51% of the solar capacity is dedicated to tenants at the site and the customer generation tariff export compensation is equivalent to that benefitting customer's price of energy. The CPUC already has a tariff in place to facilitate transfer of solar credits to tenant's monthly electricity bills – via virtual net energy metering (VNEM) arrangements.
  - Property owners will work with their contractor or the SOMAH PA to determine the percentage of capacity for each tenant household; typically, this is determined by the number of bedrooms within an apartment (low-income household). Please see the overview above for more detail.

- **POU-S4A** is committed to achieving the minimum bill benefit expected and will use the planning period to develop its policies and guidelines. The POUs do not have uniform tariffs and some may need to adopt new policies in order to add the bill discount. In the planning period: 1) develop grant criteria, 2) customer billing data access requirements, 3) determine whether 20% bill benefit is calculated monthly or over 12 months, and 4) if cost-sharing is allowed, how to incorporate it into the overall bill benefit (see above for more detail).

- **POU-S4A** program will offer grant/incentive funding to install new solar and storage capacity for eligible applicants in POU territories. Applicants are also required to demonstrate how the proposal will deliver at least 20% household savings to program beneficiaries. Applicants will provide supporting evidence on how the applicant's chosen mechanism – whether it be subscriptions, utility bill subsidies, bill credit, etc. – will deliver household savings, while maintaining a cost-effective approach to delivering savings for the most significant number of recipients. Methodology for calculating 20% bill savings is expected to be based on a monthly/annual percentage of a customer's electrical usage. This could take into account local utility rates and related factors and will be further refined in the 12-month planning period.

- **IOU-S4A Community Solar, IOU-S4A SOMAH, and POU-S4A** have different approaches to master-metered and/or rental properties. For IOU customers, any resident of a master-metered multifamily building has a right to their qualified bill discounts, however they must claim them indirectly via their landlord. The CPUC does not have oversight of these pass-through arrangements and to adjust this would require legislative intervention. California prohibited the construction of new master-metered, multi-tenant buildings in 1982.
  - For **IOU-S4A Community Solar**, a landlord can apply on behalf of their tenant or tenant(s) and should have submetering in place such that they can pass on the bill benefits.
  - For **IOU-S4A SOMAH**, only rental properties with individually metered tenant apartments can participate, and properties cannot be master-metered at this time. This may be adjusted during the planning period in compliance with CPUC directives and guardrails.
  - For **POU-S4A**, the CEC will use the planning period to determine its approach to master-metered and/or rental properties. POUs have the same barriers as the CPUC as to insights on whether landlords correctly pass-through rate discounts to tenants. This, too, will be addressed within the granting criteria.

| **Savings Calculation Methods Overview** |
| --- |
| Community Solar, pre-determined discount rates: <ul><li>Utilities automatically apply a 20 percent discount for each participating low-income customer on their monthly bill. The discount reduces energy consumption charges. This follows current practices for other low-income discount programs.</li><li>Community solar program administrator links Community Solar project generation and customer subscriptions to ensure that generated power is equivalent to the required bill benefit.</li></ul><br>Shared, on-site solar: |

- Program manager reviews the applicant's solar system design, property's past energy use, and solar allocation agreement to determine that the generation and estimated savings (of at least 20% monthly) can be met.
- Utility and property owner identify all customer accounts at a property. The utility and property owner (as the owner/operator of the on-site solar) identify the percent of the generation for each customer account. This is set by an allocation agreement or similar document for use by the utility's billing services.
- Utility uses the allocation agreement to distribute the solar system's monthly energy exports as energy offsets (kWh) and/or value ($/kWh exported) to reduce each benefiting customer's monthly energy bills.

Individual, on-site solar:
- Program manager reviews the applicant's solar system design, property's past energy use, and solar allocation agreement to determine that the generation and estimated savings (of at least 20% monthly) can be met.

If there is a co-pay required, the CA partners will use the planning period to determine how to incorporate this element in the 20% savings requirement. The most straightforward approach is to amortize any customer upfront costs over the lifetime of the solar system. Additionally, these savings methods may differ slightly between programs and are also dependent on the utility's interconnection and billing practices where the project is located.

### 2.1.4 Resiliency Benefits
- **POU-S4A** and **IOU-S4A SOMAH** will encourage solar + storage installations.
- **POU-S4A** will include resiliency as a criterion in determining its grant awards. Ultimately the outcome of this aspect is determined by the owners' willingness to install a battery. In the **POU-S4A** programs, they may encourage tariff adjustments like California's IOU net billing tariff where the highest value comes from shifting load to use solar to offset late afternoon or evening peak charges.
- **IOU-S4A SOMAH** will use the planning period to consider how to better encourage solar + storage. On September 30, 2024, the CPUC released a proposed decision to authorize existing program funding to go towards incentivize storage integrated with solar.

### 2.1.5 LIDAC Access
- **IOU-S4A Community Solar, POU-S4A**, and **RWP S4A** will use the planning period to determine their outreach best practices. The community solar programs will focus on making customer enrollment simple and automatic, preferably through existing utility billing portals that utilize utility data to determine (and enroll) those low-income customers most at risk of energy insecurity.

- **IOU-S4A and POU-S4A** will invest resources reaching Tribal communities.[9] Tribal sovereignty, complex land ownership arrangements, and matrices of multifamily property ownership models present challenges to tribes in accessing traditional third-party ownership loans or other forms of project financing. In 2022, there were 50 MW of solar and 40 MWh of storage installed in tribal lands.[10] Currently, some of California's funding programs include program design elements tailored to increasing access to solar energy and energy storage for tribes, providing an important starting point that will be leveraged in the **POU-S4A** and **IOU-S4A** programs as applicable. To elevate the needs of all tribes in California, and to ensure that their interests are both represented and likely to be funded in this Solar for All competition, the CEC and CPUC will work to formalize partnerships with tribes and tribal organizations through the development of Memorandums of Agreement and other mechanisms. For example, four tribes (Campo Band of Mission Indians, La Jolla Band of Luiseño Indians, Morongo Band of Mission Indians, Soboba Band of Luiseño Indians) have organized an informal consortium of tribal governments to develop a partnership with **CA-S4A**.

- **IOU-S4A SOMAH** issues an annual marketing, education, and outreach plan. Part of the program's administration includes subcontracting with community-based organizations to provide culturally sensitive and in-language outreach on program participation and job training. Also, **IOU-S4A SOMAH** works with local governments and tribes to educate them on program requirements, offerings, and benefits and to provide technical assistance. **IOU-S4A SOMAH** will expand technical assistance to provide the in-kind services of a financial advisor to improve project financing and tax credit monetization. After solar and storage projects are constructed and interconnected, property owners can allocate bill credits to tenant units without the need for individual approvals or paperwork. Generated solar credits are automatically applied to reduce tenants' monthly electricity bills.

- **POU-S4A** program will leverage the Strategic Reliability Reserve (SRR) to strengthen its reach to LIDAC households, grow DER resources, and fortify aggregate demand response measures. In 2022, California made an unprecedented investment in the SRR to support the state's electric grid reliability during extreme events. The CEC administers two programs under the SRR: 1) the Distributed Electricity Backup Assets program, which incents the construction of clean distributed assets, and 2) the Demand Side Grid Support Program, which compensates for load reduction during extreme events. Together, these programs provide support to grow California's virtual power plants.

- **POU-S4A** program is filling a gap of historically underinvested stakeholders in California. Investment varies across different POU's, and **POU-S4A** will provide opportunities in POU territories that will be flexible to address differences across regulatory regimes.

---

[9] CPUC, SOMAH "Tribal Pathways Requirements Guide". https://calsomah.org/resources/tribal-requirements-guide; California Environmental Protections Agency (EPA), Disadvantaged Communities Map Update (2022). https://calepa.ca.gov/wp-content/uploads/sites/6/2022/05/Updated-Disadvantaged-Communities-Designation-DAC-May-2022-Eng.a.hp_-1.pdf, May 2022.

[10] CEC, "Renewable Energy Market Data Report" (2022). https://www.energy.ca.gov/datareports/energy-almanac/data-renewable-energy-markets-and-resources.

- **RWP S4A** will leverage existing programs with local workforce development boards and partnerships to maximize funding while also identifying any gaps in program delivery within targeted regions where new programs may be needed.

## 2.1.6 Household and Community Ownership

- **IOU-S4A Community Solar** will build on the state's existing third-party ownership market structure in which IOUs and community choice aggregators (CCAs) hold competitive procurements and sign power purchase agreements for up to 20-year terms with selected bidders that meet least cost best fit requirements. This model will allow low-income customers to access economic benefits similar to rooftop asset ownership such as a 20% minimum monthly bill savings.
- **CA-S4A** will use the majority of its funding for **IOU-S4A Community Solar** which will not facilitate direct financial ownership as this would add additional barriers and complexity, increase risk and cost to ratepayers, and make it difficult to expend funding within the period of performance. The CPUC's experience running the now discontinued Enhanced Community Renewables (ECR) and Community Solar Green Tariff (CSGT) demonstrated that community interest requirements were a significant barrier to success and have not yielded successful enrollment or engagement by a community sponsor. Direct community ownership is also difficult as developing a successful community solar project requires significant financial and technical expertise. Additionally, subscribers must rely on their local utility to procure all other services needed to serve retail load – transmission, reliability services, ancillary services, distribution, and resource adequacy. Prior CPUC program and market evaluations have surveyed existing and potential community solar participants and found that monthly bill savings are ranked highest before any community ownership of assets.
- **POU-S4A Community Solar** bill discounts are linked with the customer even if they move to a new location (so long as it still in the service territory where the community solar project is located). Determining the process for maintaining this benefit will be a part of the planning period.
- **IOU-S4A SOMAH** does not allow property owners to shift their installation costs to tenants either directly or indirectly through increases in rent. Additionally, the solar benefit will last 20 years and stays with the rented apartment, so will pass to the next tenant if there is tenant turnover. **IOU-S4A SOMAH** provides meaningful bill benefits to low-income renters. **IOU-S4A SOMAH** funded financial advisor support will help owners maximize tax credit monetization or navigate complicated debt structures. This support will help raise the number of SOMAH incented host-owned systems, increasing the likelihood of expanded capacity, future storage additions, or bill benefits beyond the expected useful life of incentivized systems.
- **POU-S4A Community Solar** may also offer grants to homeowners to install on-site, rooftop systems or to a community to establish microgrids. This will be determined in the planning phase. Planning phase will include developing a strategy to avoid ownership risks.

## 2.1.7 Quality Jobs and Businesses

- **CA-S4A** has dedicated $9 million of its budget to **RWP-S4A** for direct workforce training, and the other programs will establish workforce criteria, like number of trainees,

as mandatory criteria for receiving incentives. This follows best practices for limiting overly complex and burdensome incentive program deigns or requirements.

- **IOU-S4A and POU-S4A Community Solar**, as well as **IOU-S4A SOMAH and RWP-S4A,** will use the planning period to determine how best to incorporate Administration's Good Jobs Principles and E.O. 14082. Plans include:
    1. Recruiting and hiring from underserved communities.
    2. Provide benefits for full or part-time workers
    3. Ensure Diversity, Equity, Inclusion and Accessibility to provide equal opportunities to a diverse range of program participants.
    4. Empower workforce representation, including the support of unionization.
    5. Establish job security and working conditions to ensure the highest standards.
    6. Profligate an organizational culture that ensures workers are valued and respected.
    7. Mandate that workers are paid a stable and predictable living wage.
    8. Provide skill and career advancement offerings for workers to have equitable opportunities and tools to progress towards future, good quality jobs.
    9. For **POU-S4A** and **IOU-S4A Community Solar**, program will follow California's programs' best practice of making workforce criteria part of the general, mandatory criteria for receiving incentives.
    10. Determine best approach on metrics collection to target and track impact to LIDAC participants. Given that LIDAC definitions heavily rely on geographic location, training participants should be able to self-disclose their home zip code or census tract for metrics without compromising privacy.
- **IOU-S4A SOMAH** program handbook already has requirements in place that overlap with the principles noted above, however the CPUC will use the planning period to confirm if any refinements are needed. Contractors for SOMAH projects must pass a SOMAH training course to be eligible for building SOMAH incented projects and pursuant to new state law, workers must be paid prevailing wages
    1. SOMAH requires each project to hire at least one trainee and meet a certain minimum number of training hours. Number of trainees and working hours escalates with the capacity size of a system. Trainees must be paid the prevailing wage rate or a living wage rate that is 1.4 times the city minimum wage, whichever is higher.
    2. SOMAH incentives (for the solar system) are dependent on the contractor satisfying workforce requirements.
- **POU-S4A** projects aims to support hands-on training for rural communities and tribal members to both foster a skilled workforce and to build rural and tribal staff capacity to operate and maintain energy assets over time. For example, program scoring criteria could include additional bonus points for applicants that leverage assistance with the RWF-S4A program. Each applicant will be asked how they will meet the workforce goals of a diverse workforce or provide training opportunities. Additionally, in the planning period, **POU-S4A** would intend to match the best practice from the SOMAH program to require at least one trainee per project and to pay that trainee the prevailing wage or 1.4xs the minimum wage for that city, whichever is higher. At a minimum each winning grant must satisfy the following in compliance with S4A funding requirements:

1.  Commitment to providing family-sustaining benefits and predictable work schedules to promote economic security and mobility.
2.  Pay a stable and predictable living wage.
3.  Provide safe and healthy working conditions, including the free and fair choice to join and/or form a union.
4.  Aims to expand workforce opportunity for underserved communities who face disproportionate barriers to training and employment.

- **RWP-S4A Resilient Workforce Program** will foster regional hubs that will design new and/or support the expansion of existing solar & storage installation training programs, including earn-and-learn models such as pre-apprenticeships and apprenticeships that cover both technical skills and job quality aspects, job readiness, personal development, and offer wraparound support services, such as childcare assistance and transportation options, to ensure barriers to participation are minimized. Under the umbrella of the Labor and Workforce Development Agency, California's workforce agencies – EDD WSB, Department of Industrial Relations Division of Apprenticeship Standards, California Workforce Development Board and the Employment Training Panel - deliver a range of services to job seekers, including job training for unemployed and incumbent workers, apprenticeships and pre-apprenticeships, supportive services, and establishing employer partnerships. Programs aim to build workers' skills and meet industry needs to support workers with entering career pathways where employment and earnings outcomes increase over time. California has established programs to reach underserved communities such as programs that assist formerly incarcerated individuals with job training, placement and wrap around services as well as grants to increase participation of opportunity youth in pre-apprenticeship and apprenticeship programs. The state's high road training partnerships also have established pre-apprenticeship programs that link local building and construction trades councils to workforce boards, community colleges, and community-based organizations, creating structured pathways — with a standard core curriculum and critical supportive services — to state-certified apprenticeships in a variety of crafts.
  1.  EDD has significant experience overseeing workforce training grants that include worker outcomes such as wage progression, program graduation and job placement. Using this experience, EDD will use the planning time to work with local partners – including local workforce development boards, labor unions, and educational institutions to, build on existing programs or establish new programs as needed to increase LIDAC customer participation.
  2.  During the planning period EDD will work with state agencies to identify key regions where S4A projects will take place, and then determine where partnerships can be targeted to reach workers with a focus on programs with experience reaching underserved communities.

## 2.2 Financial Assistance Strategy

**CA-S4A** will allocate approximately $233M in financial assistance towards solar+storage planning and deployment in LIDACs, with special care to address prominent barriers to LIDAC participation in existing state programs. **POU-S4A** and **IOU-S4A** provide financial assistance mechanisms that are additive to existing resources for solar deployment in LIDACs and avoid duplication of services. IOU-S4A Community Solar and IOU-S4A SOMAH will use a non-interest bearing utility balancing accounts[11] and subaccounts to bifurcate and firewall CA-S4A funds from existing funding sources such as utility greenhouse gas auction proceeds, general state taxpayer funds, or funds sourced via Public Purpose Program funds collected in rates. Clearly separating these funds will simplify tracking outcomes and impacts of the grant. Importantly, California intends to solicit significant funding from both the National Clean Investment Fund (NCIF) and Clean Communities Investment Accelerator (CCIA) programs, which will enable further financial assistance beyond what S4A provides. **CA-S4A** components include (1) funding for TA and capacity- building, (2) expanding available financial assistance to municipal-owned utility, public-owned utility, and tribal utility customers, and (3) reducing project costs, including upfront costs, enabling upgrades (if necessary, cannot be more than 20% of financial assistance funds), payback periods, and costs associated with site remediation activities. None of the programs will provide direct funding to households.

The **CA-S4A** program funding allocations are summarized below.[12]
- **POU-S4A** (CEC): $30.2M Total, $25M financial assistance
- **IOU-S4A** (CPUC): $210.4M Total, ~$200M financial assistance
- **RWP-S4A** (EDD): $9.2M Total, $8M financial assistance
- **TOTAL**: $249.8M Total, ~$233M financial assistance

**POU-S4A** will award its $25 million in financial assistance towards solar and storage planning and deployment to eligible participants, with special care to address prominent barriers to LIDAC participation in existing state programs. **POU-S4A** will provide financial assistance mechanisms that are additive to existing resources for solar deployment in LIDAC and avoid duplication of services. **POU-S4A** will develop grants and incentives with specific program design informed by a robust stakeholder process during the first year and will leverage existing state and utility programs.

CEC staff will work with each POU to identify whether its low-income electric rate tier falls within the boundaries of EPA LIDAC guidelines. If a POU does not have a low-income electric rate tier within the boundaries of EPA LIDAC guidelines, prospective applicants in an individual household must demonstrate an income that is at or below the greater of the definition for #3 Geographically Dispersed Low-Income Households. The process the program will use for income verification will be determined during the program planning year.

---

[11] A utility balancing account is an account used to match the collection of actual revenues against actual costs after an adjustment for unanticipated changes in expenditures.
[12] In alignment with the SFA Terms and Conditions (National Programmatic Terms and Conditions, D. Signage Required), if financial assistance exceeds $250,000 to a single site, the participating benefiter will be asked to place a sign displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act."

California's POUs serve diverse communities across California with unique characteristics, such as customer base, geographic location, and size. The POUs are committed to supporting California's greenhouse gas emission reduction goals and to advancing a range of resource solutions, including solar and energy storage, while providing support to their LIDAC. **POU-S4A** will provide grants and incentives to stakeholders (including Tribes) in POU territory to augment their existing and future community solar, rooftop solar, and energy storage installation programs.

The **POU-S4A** program will utilize the 12-month planning period to determine exact eligibility among LIDAC residents, however staff intend to allow for the largest pool of potential applicants as feasible and intend to enable both single-family housing and multifamily housing residents. **POU-S4A** does not envision offering grants or incentives to non-residential customers.

Additionally, **POU-S4A** will use the 12-month planning period to determine how funding will be disbursed. All applicants to **POU-S4A** will be required to demonstrate basic eligibility criteria including income verification if income is used to meet LIDAC criteria. However, the CEC plans to make every effort to avoid changes to household income eligibility requirements of existing POU programs. For this reason, it may be best for a POU to apply for funding on behalf of specific eligible households in their territory, with the household receiving benefits through bill discounts and other mechanisms such as inclusion on community solar installation.

Some POUs may already have existing utility rates that are income restricted. If applicable, the CEC may work with a POU during the 12-month planning period to identify whether its income-restricted rate falls within EPA's LIDAC parameters, and in that case can use an applicant's participation in applicable POU programs as an alternative means of demonstrating income verification.

As existing resources vary widely across the 47 different POUs, we will use the 12-month planning period to design a program that maximizes flexibility to offer grants or incentives that meet the needs of each stakeholder without duplicating resources. For example, the biggest POU (LADWP) has existing residential solar+storage incentive programs that would enable **POU-S4A** funding to expand existing programs. Other smaller POU territories may have limited existing resources and **POU-S4A** grants or incentives may constitute a new funding opportunity in these territories.

All community solar funded under **POU-S4A** will conform to the definition of residential serving community solar. Specifically, they will have a nameplate capacity of 5 MW$_{AC}$ or less, 2) deliver at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and 3) verify that at least 50% of the benefits and/or credits of the power generated from a community solar system be delivered to residential customers in the same service territory.

**POU-S4A** subrecipients will be updated during the planning period.

**IOU-S4A Community Solar and SOMAH** ($9.69M in financial assistance for rooftop remediation and site suitability (SOMAH) and $190.19M in financial assistance for Community Solar projects) will support on-site ("rooftop") residential solar or solar with associated storage as well as community solar and storage developments. The **IOU-S4A Community Solar** funding leverages $33 million in additional California taxpayer funding. **IOU-S4A SOMAH** leverages its $730 million in current funding, which is expected to reach a final amount of $940 million by June 2026.

All community solar funded under **IOU-S4A Community Solar** will conform to the definition of residential serving community solar. Specifically, they will have a nameplate capacity of 5 $MW_{AC}$ or less, 2) deliver through bill credits at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and 3) verify that at least 50% of the benefits and/or credits of the power generated from a community solar system be delivered to residential customers in the same service territory.

Under **IOU-S4A SOMAH,** participants will have renewable energy facilities installed on their property and can make use of the system for resiliency. The **IOU-S4A SOMAH** rooftop remediation and site readiness funds will be dedicated to the Solar on Multifamily Affordable Housing (SOMAH) program participants. **IOU-S4A SOMAH** will cover the costs of a building's solar readiness, equivalent up to 20% of the total solar or solar + storage incentive. This approach leverages an existing statewide program, solves a participation hurdle, and targets funding to priority communities. SOMAH eligibility aligns most closely with the LIDAC definition of affordable multifamily properties. **IOU-S4A SOMAH** will reduce upfront project costs by, for example, upgrading or replacing transformers, replacing or adding meters, fire safety measures (when storage is being added), or structural repairs to roofs (to accept weight of solar panels and racking). Roof repairs in particular have been a longstanding hurdle to increasing solar installations. Should roof-readiness costs be too high, eligible properties may forgo the installation of a PV system altogether. If SOMAH participants are unable to complete necessary remediations such as roof repairs without incentives, they may instead select alternative sites like a solar shading system over a parking lot, which, though eligible to receive SOMAH funding, could increase total project costs compared to roof-mounted options. Additionally, it is reasonable to anticipate that total project costs could be lower with a roof-mounted option than with a carport-mounted option as carport-mounted solar requires significantly more labor, materiel, and planning.

Once in place, these renewable energy systems will last for two decades or more, ensuring that this financial assistance will generate benefits well past the initial incentive. This financial assistance is neutral as to the solar ownership type, however, lowered upfront costs will better enable customers to choose between financing options (leasing or owning their systems). The planning period will be used to consider advance payments and capital mobilization for affordable housing owners and community solar developers. For example, when two or more LIDAC criteria are met (affordable housing and being in a CESJT community) or if a property owner is willing to match the S4A grant, a 1:1 advance payment could be automatically issued by the program.

Should readiness costs add an additional 20% to the overall project costs, the influx of funds for site preparation under **IOU-S4A SOMAH** can facilitate approximately 12 MW of solar and 85 MWh of storage at 85 multifamily properties and impact 6,450 LIDAC multifamily renter households. CPUC expects the average site abatement award to range between $100,000 to $115,000 per multifamily property. This funding will only go towards affordable properties that house low-income renters, including properties owned by California Native Tribes. Participating properties must have at least five units or more to be eligible. The final incentive or grant amount per property is dependent on the size of its renewable energy facility and its total costs; the amounts here are illustrative and are based on averages from recent application data. **IOU-SFA SOMAH** creates capital mobilization by requiring an owner co-pay, and reducing the (ratepayer paid) solar incentive based on use of federal or state tax credits. This capital mobilization metric will be tracked as part of the grant outputs.[13] As part of the down scoping effort, CPUC will focus **IOU-S4A** resources on affordable multifamily properties. An award at a multifamily property is a more efficient investment even though there will be fewer sites treated, the number of benefitting households will be higher. With a focus on affordable multifamily properties, more low-income households per grant dollar will be reached than with a focus on low-income single-family households.

As part of a May 5th 2023 ruling the CPUC asked stakeholders how to improve financing access for SOMAH participants, including expanding partnerships with financial service providers. It is expected that the CPUC will make a determination on this feedback during the planning phase and could expand the program's ability to leverage external financing partnerships. Further, the SOMAH program has an existing program implementation plan (laying out its high-level goals and key tactics) and a more detailed program handbook which will be updated through the CPUC's ministerial review process to operationalize any necessary changes. This effort is expected to be completed early in the planning period.

**IOU-S4A SOMAH** is available to deed-restricted affordable multifamily property owners, as such these property owners have complicated financing and debt holdings. CPUC will contract a financial expert, as part of its administrative budget, to provide in-kind advisory services to interested property owners.  The advisor will support property owners interested in pursuing host-owned systems. Providing additional support can increase ownership rates of SOMAH incented systems. When a system is owned, instead of leased, it is more likely that the owner will make continuous improvements like expanding capacity, future storage additions, or realizing bill benefits beyond the expected useful life of the system. Further, capitalizing on recent tax credit monetization schemas may enable participating properties to install larger systems and drive down upfront costs. CPUC will contract a financial consultant to provide in-kind customer services to **IOU-S4A SOMAH** non-profit properties. Such advice and expertise are necessary to support property owners to make use of recent changes to tax laws (by the Inflation Reduction Act) and create an economical debt structure. Financial support services can reduce barriers to participation and complements existing tax credit options.

---

[13] SOMAH applications already must disclose their total project costs including use of tax credits, so it can be easily determined by an evaluator as to the final capital mobilization amounts in dollars, per project, and per capacity (kW).

The **IOU-S4A Community Solar** will maximize customer participation in IOU territories by providing meaningful bill savings to residential customers in LIDACs that subscribe to community solar projects, with final design details determined during the planning phase of the grant. On May 30, 2024 the CPUC adopted a decision that improves existing community solar programs and authorizes a new community solar program that meets the legislative requirements established in AB 2316. On June 5, 2024, the CPUC issued a ruling directing parties to file comments to questions regarding the implementation of the Decision including aspects of its new Community Renewable Energy Program including revenue share, bill credits, and method for disbursing federal and state incentives among other topics. Party comments were filed in July and are currently under review. **CA-S4A** will take advantage of the available twelve-month planning period to resolve these programmatic issues before expending funds.

The federal funding for community solar is expected to deliver an equivalent of 40 MW of solar serving 15,000-30,000 LIDAC customer households. **IOU-S4A** anticipates that these funds will likely be used to support projects that leverage external private capital and innovative financing structures available to developers, potentially including leveraging tax credits and public revolving loan programs, by providing a predictable source of funding for offsetting customer bills and enhancing participation in the program. Critically, the funding can help developers finance storage, in addition to solar, which is an essential technology for allowing these projects to shift their exports to the evening hours, when they provide maximum value to California's electric grid needs.

In the one-year planning period, the CPUC will finalize the Community Solar program design through its existing regulatory proceeding. The proceeding will establish policies or rules affecting regulated entities as to how they must implement the Community Solar program in accordance with state policy and in alignment with the grant's parameters. After the proceeding concludes, the IOUs and CCAs may be instructed to file compliance documentation before the program can be fully implemented. Industry stakeholders are parties to CPUC proceedings and can provide input on the final financial subsidy via established public processes.

**IOU-S4A SOMAH** Subrecipients include: SOMAH Program Administrator organizations (led by Center for Sustainable Energy), Pacific Gas & Electric Company, San Diego Gas & Electric Company, Southern California Edison, PacifiCorp or Liberty Utilities. Southern California Edison holds the contract with the SOMAH Program Administrator organizations.

**IOU-S4A Community Solar** Subrecipients include: CCAs which may include but are not limited to Ava Community Energy, Clean Energy Alliance, Clean Power Alliance, CleanPowerSF, Desert Community Energy, Lancaster Energy, Marin Clean Energy, Peninsula Clean Energy, Pico Rivera Innovative Municipal Energy, San Jacinto Power, San Diego Community Power, San Jose Clean Energy, Silicon Valley Clean Energy, and IOUs including Pacific Gas & Electric, San Diego Gas & Electric, and Southern California Edison.  Grant funds will be distributed and tracked in IOU balancing accounts (each IOU will distribute and track funds on behalf of respective CCAs in each IOU service territory as the CPUC does not have direct jurisdiction over CCAs).

**RWP-S4A** ($9.2M Total, $8M in grants) will foster four regional hubs that will design new and/or support the expansion of existing solar and storage installation training programs, including earn-and-learn models such as pre-apprenticeships and apprenticeships that cover both technical skills and job quality aspects, job readiness, and personal development, and offer wraparound support services, such as childcare assistance and transportation options, to ensure barriers to participation are minimized.

**RWP-S4A** subrecipients will be determined during the planning period.

*For all C4A Coalition partners, subawards to for-profit entities*, will meet the 'subawards to for-profit entities' term and condition. If they do not meet these requirements, they are not an eligible subaward. CPUC agrees to require that any subaward to a for-profit entity will abide by these terms and conditions, where applicable, these may be updated during the planning period as awards are finalized.

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;
2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;
3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and
5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports. As an alternative, recipient may demonstrate it has the capacity and capability already to comply with 2 CFR 200.509 criteria.

## 2.3 Project-Deployment Technical Assistance Strategy

LIDACs face numerous barriers to accessing solar energy and its economic benefits. High upfront costs, site barriers, and other challenges present challenges. California is addressing these barriers by providing technical assistance (TA) to communities and solar market stakeholders that will allow for the development of a robust project pipeline, increased solar deployment, and wealth-building spurred by the clean energy transition in LIDACs.

Efforts include robust plans to (1) invest in a skilled workforce needed to deploy solar and storage, (2) provide solar developers and communities with TA to address interconnection challenges, and (3) ensure projects funded under the program are efficiently deployed and resilient by providing solar developers and communities with TA for project siting, land-use, permitting, building codes, inspection, and quality control. California has also already adopted best-in-class policies and directed funding to overcome building and safety permit barriers by creating online platforms to expedite and streamline local permitting.

### 2.3.1 Workforce Development

All of California's S4A program components **invest in a skilled workforce** through direct financial assistance and program design. California has a statewide training network in place, which allows S4A to leverage its existing resources and expertise. This includes pre-existing energy related multi-sector partnerships and relationships with CBOs. RWP-S4A will increase training and close access gaps for LIDAC customers, the outputs of the new projects from IOU-S4A and POU-S4A will be on-the-job learning opportunities. The estimated new job opportunities from IOU-SFA and POU-SFA will be updated as part of the Planning Period activities. As a baseline, this grant is estimated to have these workforce outputs:

| CA-S4A RWP Estimated Outputs | |
|---|---|
| Workers Trained by Workforce Development Programs (#) | 225 |
| Number of Solar Jobs Created (#) | 225 |
| Average increased wages for individuals working in solar energy  (%) | 10.5% |

| IOU-S4A SOMAH Estimated Outputs | |
|---|---|
| Workers Trained by SOMAH Projects | 170 |
| Number of Solar Jobs Created (#) | 51 |
| Average increased wages for individuals working in solar energy  (%) | TBD |

**RWP-S4A**'s technical assistance includes support for application development, inclusive recruitment and coalition building, curriculum development and training deployment, and job standards development. Standing up new training programs is time intensive, so using S4A funds to expand in LIDAC geographic areas is more efficient. During the planning period, if **RWP-S4A** identifies any workforce gaps, it may adjust curriculum or add new learning modules (developed over the same period).

How workforce training opportunities are provided: In addition to direct outreach, California maintains a database of Eligible Training Providers on its CalJobs website. CalJobs is also available in Spanish. Programs are available statewide and often accept new entrants on a rolling basis; certificate programs may require on-the-job training for energy related career training.

Engagement Strategy: California's Employment Development Department (EDD) staff have decades of program management experience as well as dedicated field specialists, an evaluation team, and access to University of California Labor Centers that can provide additional support efforts. As EDD aims to foster regional support through the planning and development of workforce training curriculum and the implementation of training programs, EDD will work with applicants and local workforce boards and regional coalitions to build a cohort model that allows for consistent curriculum and opportunities. Additionally, EDD will review potential partnerships with the California Community College system to support the development of clear career pathways that outlines the progression from entry-level solar installation roles to advanced positions, such as battery storage installation, project management or system design.

**POU-S4A** applicants will be encouraged to consider Workforce Development, Education, and Training in their proposal, anchored by the **RWP-S4A**. Workforce development and training programs will train participants for transferable jobs and skills, resulting in high-quality jobs that reflect **CA-S4A** goals and priorities.

How workforce training opportunities are provided: Trainees will come to **POU-S4A** projects already having received basic skills training, from **RWP-S4A** or similar. **POU-S4A** will offer job site training under a qualified contractor. Additionally, grantees may propose other job-training readiness webinars like soft skills (behavior, time management, etc.) or in-depth training like solar engineering and design to earn additional points in the competitive grant delivery.

Engagement Strategy: The CEC will leverage **POU-S4A** program grant funds in the following way: (a) developing program requirements in partnership with Tribes for greatest impact; (b) offering funds for the deployment of Tribal led solar and storage projects (including microgrids), filling the gap of existing state and utility programs; (c) coordinating with coalition agencies to support the development of clean energy transition plans, energy feasibility studies, and other predevelopment activities to support solar and storage deployment projects and coordinating with CPUC grantees by providing job training and economic development opportunities, such as leveraging tribal apprenticeship programs and supporting tribal energy enterprises; and (d) leveraging capital to advance decarbonization.

**IOU-S4A SOMAH** has existing workforce measures that will be leveraged to support S4A goals. SOMAH assists contractors in hiring trainees that are local or targeted hires from participating properties and disadvantaged communities. The program requires that trainees are paid at least 1.4x the minimum wage of the city where the project is located to ensure fair, stable wages. To expand the pool of active contractors, Program Administrators have begun to connect eligible contractors as subcontractors on larger projects to help provide them with more experience. The program is also expected to leverage a consultant to provide concierge tribal outreach assistance, guided by market data, familiarity with the SOMAH program elements and cultural competence to assist potential SOMAH Tribal projects.

How workforce training opportunities are provided: Trainees will come to **IOU-S4A SOMAH** projects already having received basic skills training, from SOMAH's online training partner (Heatspring), **RWP-S4A** or a similar training organization. **IOU-S4A** offers job site training under a qualified contractor. Trainees can work in installation, design/engineering, or in

operations. SOMAH periodically offers webinars on job readiness application and interview skills.

Engagement Strategy: The program utilizes a Solar Career Center and Job Board where resumes, openings, and applications can be posted and connections between job seekers and participating contractors can be made. SOMAH hosts open, public webinars to support trainees with job-readiness skills, and the Jobs Trainings Organization Task Force engages with the training community (community colleges, apprenticeship programs, etc.) to discuss benefits, challenges, and opportunities for solar trainees. The program requires that trainees are paid at least 1.4x the minimum wage of the city where the project is located to ensure fair, stable wages. To expand the pool of active contractors, Program Administrators have begun to connect eligible contractors as subcontractors on larger projects to help provide them with more experience.

**IOU-S4A Community Solar** will use the planning period to assess the feasibility of encouraging or formally adopting workforce training opportunities. A May 2024 Decision laid out the following frameworks and plan for determining final implementation rules and guidelines:

The Decision expands the current DAC-GT program by 60 megawatts (MWs), bringing the program total to 144 MWs. This program provides subsidies to participants that reduce their monthly electricity bills by 20 percent. California's three largest IOUs and 10 CCAs currently administer this program across the state to reach wide range of vulnerable customers.

The Decision also authorizes an additional community solar program that will be available to customers of all income levels, as well as commercial customers. The new program will directly benefit low-income customers as 51 percent of the subscribers must be low-income and receive a guaranteed 20% electricity bill credit. The program will allow California to take advantage of federal and state funding opportunities for low-income customers by creating a mechanism to capture available funding for community solar. A ruling has been issued in this proceeding to collect stakeholder feedback on program details, including the method for dispersing state and federal funding to the projects and participating customers, and tribal outreach. The CPUC will also hire a consultant to provide concierge tribal outreach assistance, informed by market data, solar suitability mapping, and cultural competency to inform Tribes of potential community solar project options.

## 2.3.2 Project Siting, Permitting. And Interconnection (to the grid)

While IOUs and POUs in California continue to implement and improve processes for **interconnecting renewable energy facilities**, there are several opportunities to help foster development of more transparent, equitable, and efficient processes across all the state's electric distribution utilities. A critical component of **CA-S4A** in this regard will be to help improve sharing of information and best practices between different utilities, developers, and customers with an emphasis on rural, low-income, and tribal communities. Specifically, as part of this proposal **IOU-S4A Community Solar** and **POU-S4A** will consider in the planning phase:

- Provide direct technical and/or financial assistance to project sites applying for interconnection through this program, including funding for interconnection fees and potential utility-side upgrades or mitigations required for safe interconnection.

- o Confirm that enabling upgrades for grid capacity upgrades conform to the following three requirements:
  - 1) That capital upgrades are necessary for the Solar For All program and
  - 2) That grid upgrades will only be funded where non-wire alternatives are not a feasible solution
  - 3) The proposed costs for grid upgrades if available (anticipated cost per solar capacity for NREL to review)
- o The share of financial assistance expended on enabling upgrades cannot exceed 20% of the financial assistance (not total budget) over the lifetime of the program.
- o CPUC will hire a modelling support contractor to assess siting proposals and capabilities of selected projects to meet subscriber bill savings minimums.
- o CPUC will hire a tribal outreach consultant to leverage data sources and coupled with a cultural awareness of Tribal governance structures and needs to connect interested Tribes to **IOU-S4A Community Solar** options.
- Host annual convenings of all electric distribution utilities and load serving entities in California focused on sharing knowledge and examples of successful programs and strategies to improve customer interconnection experiences.
- Develop and administer targeted outreach and assistance programs for the state's small POUs, cooperative, and Tribal utilities that help disseminate best practices and increase consistency in interconnection processes and requirements.
- When solar is added on-site to an existing multifamily property or single-family home, there is no way to practically add requirements around greenspaces, climate resiliency or agrivoltaics. For multifamily properties, sometimes a solar photovoltaic mounting system doubles as a carport, adding shading over an existing parking lot. Adding shading over darker, lower albedo surfaces can help limit local warming (heat islands). For siting on greenspaces, residential properties have space at a premium in California. It is unlikely that a previously open greenspace is an option for a residential system. Similarly, undergrounding conduit through trenching to connect a system behind the meter is expensive Instead, placing the solar system as near to the electricity loads as possible reduces construction costs and this cost burden naturally disincentivizes using greenspaces on residential sites for a solar installation. The more requirements put upon a site design the fewer applicants there are that can comply, so it would undercut program participation to have climate resiliency or greenspace requirements on siting residential systems. Additionally, as these projects are expected to involve existing residential parcels, we expect all projects will be CEQA/NEPA exempt. Details will be developed during the program year and follow applicable CEQA/NEPA review processes.
- **POU-S4A**: In cases where a POU applies for funding involving a community solar project, the applicant will be required to submit supporting documentation indicating CEQA Exemption or otherwise demonstrate that the project complies with all siting requirements. Exact documentation and procedures will be outlined during the program planning phase.

The program will require documentation verifying completion of applicable CEQA review, permitting, and safety requirements, including California Senate Bill 38 (Laird, Chapter 377, Statutes of 2023) requirements for energy storage systems. Also, during the program planning year, the program will consider opportunities to leverage California's Residential Solar Permit

Program (Senate Bill 379, Wiener, 2022) requirements for local governments to implement online solar permitting platforms that verify code compliance.

Building on existing programs, such as the California Automated Permit Processing Program (CalAPP), California IOUs and POUs will seek to support solar developers and communities with **TA for project siting, land-use, permitting, building codes, inspection, and quality control**.

Both **IOU-S4A Community Solar** and **POU-S4A** will consider how and to what extent to offer these services during the planning phase period. Offering some level of TA will be critical to ensuring that there is a diverse group of bidders for community solar projects. The administering agencies will also consider whether to offer post-award TA to selected community solar projects to open the door to newer market entrants. Such an approach will increase representation and expand equitable access to community solar development contracts.

For **quality control of assets regarding safety and engineering standards**, there is nothing different or unique about S4A projects that necessitate the hiring of new engineers to conduct initial or ongoing inspections. In other words, inspection to meet federal laws and state mandates is being absorbed by existing agency departments, utilities, and local jurisdictions already tasked with that work. For **quality control regarding solar output performance**, **IOU-S4A Community Solar** and **POU-S4A** will determine their approach in the performance period.[14] The CEC will use the 12-month planning period to develop a plan on long-term operation and maintenance costs. Although details will be developed during the planning period, the program will require contractors to provide at least a 10-year workmanship warranty to provide for no-cost repair or replacement of the system, as well as a performance monitoring and reporting service to alert customers if maintenance is needed. Programs anticipate following these best practices:

1. Community solar plants (5 MW or less): developer must maintain operational logs, insurance and permit financial audits. These details are typically outlined in competitive solicitation documents and power purchase agreement contract between the utility or CCA and the third-party developer.
2. On-site residential systems: As a baseline, current requirements include an equipment warranty, a workmanship warranty, and a performance monitoring and reporting service. Systems must have a performance warranty of not less than 10 years to protect against defects and undue degradation of electrical generation output. Contractors must provide at least a 10-year workmanship warranty to provide for no-cost repair or replacement of the system. A performance monitoring and reporting service will alert customers if maintenance is needed, preferably required for the life of the system. Other elements could include longer warranty periods from those described above or additional warranties such as protecting the customer against meter breaks (or damage).
3. The **CA-S4A** program will require funded projects to meet California Contractors State License Board (CSLB) requirements for the installation of solar and battery energy storage systems.

---

[14] CPUC Public Utilities Code 387.5(d)(4) requires that all solar energy systems that receive an incentive (from a program subject to the Public Utilities Code) must have a warranty of not less than 10 years to protect against defects and undue degradation of electrical generation output.

**IOU-S4A SOMAH** already has quality control requirements in place with expansive warranty requirements, required performance monitoring and reporting services for customers, and the program administrator intakes all performance data into its own fleeting monitoring system. The fleet monitoring system is a new innovation to account for affordable multifamily building owner management staff constraints to consistently monitor their systems independently. The SOMAH program administrator will contact the host customer and contractor if the system is underperforming. SOMAH's expanded warranty requirements include: equipment warranty for a minimum 20 years, contractors providing a minimum 20-year warranty to protect the customer against more than 10% degradation of electrical performance, and a one-year warranty for meters to protect against defective workmanship, degradation, or breaks. Warranty requirements are captured in the program handbook and the property owner must provide an affidavit attesting to these requirements. **IOU-S4A SOMAH** and **POU-S4A** will review report recommendations and consider how to incorporate improvements.

**IOU-S4A Community Solar** implementers will conduct bidder workshops and the CPUC will consider additional pre- and post-bidding TA support during the planning phase. Predevelopment support could include energy feasibility studies, coordinating with job training or apprenticeship programs, and supporting tribal enterprises. CPUC will hire an expert consultant to liaise with Tribes and advise them on solar options, including community solar projects or **IOU-S4A SOMAH**.

**POU-S4A** will conduct targeted outreach and engage in dialogue with the state's small POUs and associated tribal stakeholders within **CA-S4A-POU** responsibility to help disseminate best practices and increase consistency in interconnection processes and requirements.

**IOU-S4A SOMAH** currently offers upfront TA services for property owners and building managers to evaluate solar and associated storage potential and feasibility, including whether the system should be expanded to support resiliency, electrification of end-uses and electric vehicle charging stations. TA also includes providing financial modeling and a cost/savings analysis; as noted above this service will be expanded to include tax credit monetization **IOU-S4A SOMAH** does offer online resources, such as a project bidding tool, which supports interested property owners in requesting and receiving bids from multiple, eligible contractors. This pool of services will be expanded to include rooftop remediation and site readiness measures that can be funded with S4A grants.

Prior to an application, SOMAH offers a pre-review of an interested property owner's affordability status to ensure that it meets LIDAC criteria. This proactive offering helps avoid unnecessary application rejections or additional burden on property owners who ultimately do not qualify and gives increased confidence to others who learn that they are indeed eligible.

Towards this end, SOMAH will make and offer these resources over the course of the grant period:
1. Adjust and expand online resources to list common remedies for known site barriers
2. Promote and share ancillary benefits from rooftop and site remediation
3. Develop 1 to 2 case studies showcasing successful **IOU-S4A SOMAH** projects

4. Incorporate new informational materials into property owner, contractor, and stakeholder outreach (workshops, webinars, 1-1 support calls, etc.).

### 2.3.3 Equitable Access and Meaningful Involvement Plan

**CA-S4A** will maximize access to the program for low-income disadvantaged communities and California Native American Tribes by addressing the elements outlined in the Meaningful Benefits Plan and Distributed Solar Market Strategy, including maximizing the breadth and diversity of households and communities served, building participatory governance-formalized structures, meaningfully engaging with stakeholders, and strategizing for customer acquisition and management.

During the planning year, the S4A program will further develop pathways to achieve these elements, such as processes to encourage the use of community benefits agreements.[15]

All administering agencies will promote outreach and technical assistance that benefit community-centered engagement across all relevant geographies. When possible, programs will recruit and serve Project Area residents and aim to reduce barriers to participation through project elements such as the training program design and recruitment strategy.

Each administering agency will use their existing websites and public distribution lists to announce the new S4A funding and program development or expansion. This is more effective than California's previous proposal to invest time and resources in building a new site. Additionally, California has an open data initiative – data.ca.gov – where agencies can share public datasets and the CPUC publicly tracks customer-owned solar and solar with storage projects at DGStats (CaliforniaDGStats). The CPUC plans to expand DGStats to include community solar project information. DGStats data is updated monthly and is part of the public domain.

The CPUC and CEC are able to support customers as a meaningful point of entry and coordination to efficiently access S4A opportunities and other state and federal funding opportunities.

As permitted in the notice for funding, all **CA-S4A** programs will offer applicants flexibility as to their LIDAC status, they must only satisfy one of the LIDAC definitions.[16] The income related status must be supported by appropriate documentation (pay stubs, bank statements, annuity letter, etc.) or enrollment (and award letter) in a program with income requirement equivalency.

As stated in the Overview section, California has long history of investment in the solar industry and current solar programs and initiatives, some of which are also targeted or exclusive to low-income customers. California is directing 93% of its S4A grant to stand up new programs to increase equitable access. Further, California is reserving $19M of its **IOU-S4A Community Solar** budget to encourage the development of projects on tribal lands. Should these funds not be fully allocated after three years, funds will return to the general allocation of **IOU-S4A Community Solar** funds.

---

[15] The following fact sheet provides a helpful summary of community benefits agreements in relation to community development projects: "Strategies to Minimize Displacement: Community Benefits Agreements." https://www.epa.gov/system/files/documents/2023-04/Brownfields_CBA_FINAL.pdf.

[16]

*Maximizing Breadth and Diversity:* Each **CA-S4A** program will have a framework for creating a continuum of engagement where some elements are only open to California's LIDAC communities and others are tailored to ensure equitable access by the state's LIDAC stakeholders. For example, existing CPUC programs to be integrated into **IOU-S4A** have specific eligibility criteria to increase participation in under-served communities and contribute to increasing the diversity of solar owners in California overall. To ensure equitable access, the programs will utilize trusted messengers, incorporate community leadership, and seek to work with disadvantaged business enterprises and LIDAC-based workforce trainees. **POU-S4A** will ensure solar reaches various parts of the state, including rural or tribal areas often unreached by programs, and often with the least energy reliability. This program will incorporate various POUs not currently engaged by state supported programs.

*Community Based Organization Engagement:* Each **CA-S4A** program will either continue or seek to work with community-based organizations (CBOs) over the grant period. **IOU-S4A Community Solar** will use the planning period to consider how CBOs can be involved in the development and siting of community solar plants. **POU-S4A** Community Solar will consider structuring the granting criteria to favor applicants who seek to work with CBOs, especially for treating single-family households in the same geographic areas. The extent of **POU-S4A** incorporation of CBOs will be finalized in the planning period. **IOU-S4A SOMAH** already directly contracts with eight CBOs on marketing and outreach efforts. In 2024, SOMAH budgeted $800k for CBOs with a budget for oversight ($229k) and contracts ($524k). RWP S4A will use the planning period to build connections with CBOs familiar with workforce outreach. The CPUC will host an annual convening of the agencies to discuss S4A grant work and opportunities for leveraging, part of this effort will explicitly include a focus on growing relationships with CBOs.

**2.3.4 Summary Matrix of Customers with Barriers and CA S4A Tactics to Address Barriers**

| Customers with Barriers | CA-S4A Ameliorate or Remove Barriers |
|---|---|
| Rural Communities and Tribal Communities | • **POU-S4A** and IOU S4A will offer technical assistance.<br>• **IOU-S4A SOMAH** offers in-depth technical assistance to design projects and run a bidding process.<br>• **IOU-S4A SOMAH** (pre-dating S4A) has tribal representation on its Advisory Council and is looking to find an aligned tribal CBO.<br>• **IOU-S4A Community Solar** will be available anywhere in a given utility territory, including rural areas.<br>• In **IOU-S4A** and **POU-S4A**, tribal communities can collaborate with third-party developers to propose community solar projects.<br>• **RWP-S4A** will use the planning period to assess coverage in rural communities and seek to increase job training opportunities where there are gaps. |
| Language, other than English | • All programs will offer materials in languages other than English. The primary non-English language in California is Spanish.<br>• Pre-existing resources are offered in multiple languages, including the California Solar Consumer Protection Guide and CalJobs online portal website. |
| Renters | • **IOU-S4A Community Solar** beneficiaries are only qualified by their LIDAC status, so renters are able to opt-in to this program and continue it even if they move within the same utility territory.<br>• **IOU-S4A SOMAH** permits owners to receive a lesser incentive for solar for common areas, so they also receive a program benefit, which reduces their split incentives.<br>• **POU-S4A** will consider benefits to renters as part of the granting criteria. |
| Mobile home or Modular Communities | • **IOU-S4A Community Solar** is not limited by housing type, so mobile home or modular community households can participate.<br>• **IOU-S4A SOMAH** is available to deed-restricted, mobile home parks or modular communities. Even if the mobile home is owned by the resident, and they only rent the land underneath.<br>• **POU-S4A** will allow applicants to propose to treat mobile home or modular communities via community solar or rooftop solar. |

More specifically, **IOU-S4A SOMAH** will:

- Continue to subcontract with CBOs to do outreach to property owners, public housing authorities, and workforce training entities such as apprenticeship programs and community colleges.
- Work towards a voluntary benchmark to raise participation from properties located in disadvantaged communities to 40% of all participants.
- Liaise with tribal organizations and governments to increase tribal participation.
- Ease participation for tribes and likely implement new policies based on feedback from stakeholders during the planning phase.
- Update its annual marketing and outreach plan tactics to 1) ensure sufficient job trainee and preparation for job training opportunities and 2) educate eligible tenants to maximize their benefits.
- Continue to encourage disadvantaged business enterprises to become SOMAH eligible. Expand online web resources (SOMAH | Solar on Multifamily Affordable Housing (calsomah.org) to include new information related to S4A funding opportunities.
- Every three years the SOMAH program must be evaluated, so in July 2026, there will be recommendations from an independent evaluator to further refine meaningful community involvement.
- Income Verification: SOMAH is only eligible for deed-restricted, low-income affordable housing that have at least five rental units. Properties must be funded by low-income housing tax credits, tax-exempt mortgage revenue bonds, general obligation bonds, or have received a local, state or federal loan or grant. The deed agreement must be independently enforceable, and verifiable. There must be at least 10 years remaining on the affordability restriction. Additionally, the site must at least one of the other criteria:
  - At least 66% of property residents must have incomes at our below 80% of the Area Median Income; or
  - Property is located in a Disadvantaged Community as defined by CalEPA, which is the top 25 percent of the census tracts statewide in the CalEnviroScreen tool; or
  - Property is owned by a California Native American Tribe; or
  - Property is owned by a Public Housing Authority or Public Housing Agency.
  - SOMAH does not independently verify individual tenant income data as this would be intrusive to tenants, time consuming for the property owner, developer, and the program administrator, and duplicative of the deed agreements already in place.
  - In the planning period, SOMAH will overlay the geographic LIDAC criteria with SOMAH LIDAC geographic eligibility criteria and issue guidance to applicants if there are discrepancies. **IOU-S4A SOMAH** is providing relief to solve a gap in the program's offerings, and this will be limited to properties that meet both SOMAH and **IOU-S4A SOMAH** eligibility requirements. **IOU-S4A SOMAH** is expected to treat 85 properties with over 6,400 renter households.
- Continue successful program designs and efforts to ensure housing affordability. As noted above, SOMAH is only available to multifamily properties with at least 10 years remaining on their affordability restrictions. By reducing operating and tenant electric bills, SOMAH also protects mission-driven program participants' commitments to maintain the affordability of their properties. Under current rules, participating property owners must submit an affidavit that ensures that 100% of the program's tenant economic

benefit is retained by tenants. SOMAH is designed, in part, to relieve tenants' energy cost burden through on-bill credits. The property owner must demonstrate that the portion of the solar energy system allocated to offsetting tenant load will result in the tenants receiving 100% of the economic benefit of the generation allocated to their unit and meter on a monthly basis for the life of the system or 20 years, whichever is less. Tenants may not bear any portion of the cost of the solar energy system nor be subject to the recapture or diminishment of SOMAH's required tenant economic benefits. Property owners will be required to exclude solar credits from utility allowance calculations, may not assume control of tenant utility accounts, nor increase rents in relation to the SOMAH-funded PV installation. The property owner will also certify that it will not use the California Utility Allowance Calculator to recapture and/or diminish tenant economic benefits from solar.

- Customer Acquisition: Most of the program's applications are contractor-led, meaning that a contractor is marketing the SOMAH program to a property owner or building manager. The SOMAH program administrator and its CBO networks also actively recruit property owners. SOMAH offers technical assistance to design a solar system and find a contractor to help ease entry into the program. SOMAH also generates an annual marketing, education, and outreach plan detailing its key tactics.[17] This approach will not shift as a result of new S4A funds, however it will provide a new benefit to communicate with property owners. SOMAH tracks reasons for not participating from warm leads or those who have had cancelled applications. SOMAH will review this list to see if site readiness was a barrier and will re-engage with previously interested applicants to see if their projects can be revived.

**IOU-S4A Community Solar** will:
- In the planning phase, the CPUC will encourage project developers and subscriber organizations to invest directly in communities through workforce development efforts that benefit residents beyond the projects themselves.
- Continue to build on successful elements of projects which achieved commercial operation under the DAC-GT program requiring workforce development and work with a community sponsor to enroll customers.
- In the planning phase, the CPUC will seek to align outcomes with our Environmental Social Justice Action Plan to explore opportunities for program modifications, such as stacking diverse incentives, implementing auto-enrollment of eligible customers, and improved outreach to best reach ESJ communities. These efforts also include targeting tribal customers. California expects to set aside $19M of its **IOU-S4A Community Solar** budget to preferentially encourage the development of projects on tribal lands. Should these funds not be fully allocated after three years, funds will return to the general allocation of **IOU-S4A Community Solar** funds.
- CPUC has received feedback from parties to ease participation for tribes and is considering new policies based on that feedback during the planning phase.
- Encourage utilities and community choice aggregators to include in their marketing, education and outreach plans commitments to developing diverse and culturally

---

[17] SOMAH Annual Marketing, Education, and Outreach Plan 2024 retrieved at 2024_SOMAH_MEO_Plan (ca.gov)

appropriate communication strategies to ensure that stakeholders can participate in decisions and actions that impact their communities.

- Leverage a consultant to provide concierge tribal outreach assistance, informed by market data, solar suitability mapping, and cultural competency to inform Tribes of potential community solar project options.
- Income Verification: Subscribing customers must be eligible for either the California Alternative Rates for Energy (CARE) or Family Electric Rate Assistance (FERA) program. Customers apply online through their utility's website to verify that their household income is 200% or less of FPG or someone in the household is enrolled in a public assistance program such as:
  - Bureau of Indian Affairs General Assistance
  - CalFresh/SNAP (Food Stamps)
  - CalWORKs (TANF) or Tribal TANF
  - Head Start Income Eligible (Tribal Only)
  - Low Income Home Energy Assistance Program (LIHEAP)
  - Medicaid/Medi-Cal
  - Medi-Cal for Families (Healthy Families A&B)
  - National School Lunch Program (NSLP)
  - Supplemental Security Income (SSI)
  - Women, Infants, and Children (WIC)
- Customer Acquisition: Program administrators will automatically enroll eligible low-income customers, with priority given to customers who meet the Arrearage Management Program criteria (meaning that they are in debt to the utility), followed by all other low-income customers to be automatically enrolled until subscriptions are full. Customers may opt-out if requested.[18]

The **POU-S4A** program will ensure solar reaches various parts of the state, including rural areas often unreached by programs, and often with the least energy reliability. These programs will incorporate various utilities not currently engaged by state supported programs.

- Income Verification: For grant applicants using criteria #3 to meet LIDAC eligibility, the CEC will require supporting documentation demonstrating appropriate eligibility. Exact procedures and requirements will be determined during the 12-month planning period. To the extent possible, CEC will work with each POU to determine of existing income-restricted utility rate programs fall within the parameters of **CA-S4A** LIDAC income requirements. In these cases, applicants can use their participation in their POU's income-restricted rate plan to meet this requirement. Otherwise, CEC will identify appropriate documentation to confirm eligibility (such as a W-2 combined with location-based information).
- Customer Acquisition: Grant applicants will be scored higher if they have a more robust outreach strategy or connections to the utility or a community group that can support direct outreach. Depending on the targeted audience, the CEC will be evaluating for certain best practices:
  - Single-Family Customers; Partnerships with CBOs in the same area.

---

[18] D.24-05-065 at 118-119

- o Multifamily Customers; Partnerships with Utilities that can identify the contact information for the property owner and facilitate an introduction.
- o Tribal Areas: Partnerships with the Tribe(s) of the tribal lands
- o The details of the customer acquisition strategy will be determined in the planning period.

**RWP-S4A –** EDD will build on the state's existing workforce development program that create pathways for job growth via partnerships with employers, local workforce boards, community organizations and educational entities. With the state's high road training partnerships - focus on quality job principles such as worksite safety, stable family-sustaining wages and worker voice – as a model, the RWP will target programs that directly increase the number of skilled workers from LIDACs.  One example is the state's partnership with Joint Apprenticeship and Training Committees that has trained over 2,800 pre-apprentices with a stated goal of reaching underserved workers.  **RWP-S4A** set aside funding to increase targeted outreach to LIDACs and ensure grantees continue that outreach for recruitment of trainees. During the planning period, EDD will set a process for how to track income verification or other criteria for self-identification of a trainee's LIDAC status. For similar programs EDD receives monthly or quarterly updates from grantees regarding activities centered around outreach events aimed at increasing training participation in the programs.

### 2.3.5 Plan for Participatory Governance-Formalized Structures:

**POU-S4A** and **IOU-S4A** will develop program guidelines with substantial engagement from utility and community stakeholders. Both **POU-S4A** and **IOU-S4A** will provide TA.

For **IOU-S4A**, in the planning phase the CPUC's regulatory proceedings are open to the public and advertised on social media to promote engagement. **IOU-S4A Community Solar** will explore the possibilities of incorporating continuous engagement via advisory boards, annual developer forums, or surveys. These tools are currently used in the CPUC's Green Tariff and DAC-GT programs. The CPUC S4A administrative budget for the CPUC includes funding for an evaluation consultant who will also be able to conduct primary data collection and surveys of targeted communities. Their findings will generate recommendations to improve **IOU-S4A** roll out. This overlaps with the 'Meaningful Engagement with Stakeholders' section below. An evaluation consultant will be brought on as soon as possible for the duration of the grant period.

**POU-S4A** awards for tribal projects will be tribally led, -owned, and -initiated, with other program components in a supporting role to tribal leadership's project direction. Tribes or tribal organizations will be eligible applicants, with anyone submitting on the tribe's behalf, also submitting a letter from Tribal Council to ensure the project is tribally driven and lead to significant benefits for tribal communities. **POU-S4A** will develop solicitation requirements with substantial engagement from utility and community stakeholders.

**Meaningful Engagement with Stakeholders: IOU-S4A** will leverage existing multicultural outreach approaches. Through owned and earned media, these efforts create a pipeline of timely, relevant and culturally connected content to introduce program offerings and raise awareness about program benefits to specific audiences.

The **IOU-S4A SOMAH** program details these approaches in its annual Marketing, Education, and Outreach plan, which is also distributed to the CPUC's Low-Income Oversight Board and Disadvantaged Community Advisory Group for feedback. Guides are produced for specific audiences, both property owners and eligible trainees. For example, SOMAH program staff created the guide: "Application Resources for Tribal Groups: Documentation of Multifamily Low-Income Housing Eligibility" to educate Tribes on how to document deed restriction. Program staff also work with CBOs and local governments to conduct marketing and outreach to reach eligible participants. There are two program features, an Advisory Council and a Job Training Taskforce, that incorporate community engagement the program's day-to-day administration. Both groups meet regularly and provide feedback to the administrator. Advisory Council and Job Training Taskforce members receive honorariums to remove any economic barriers to participation in meetings. Properties that receive **IOU-S4A** funding will provide culturally sensitive and in-language education on how to understand net energy metering tariffs, distributed generation monthly bill impacts, and ways to conserve energy.

For the **IOU-S4A Community Solar** program during the planning phase the CPUC will review adding these best practices. There are basic requirements for inclusion and meaningful engagement such as culturally sensitive and in-language marketing, education, and outreach when recruiting households to sign up for subscriptions. Throughout the planning period, program design will benefit from input from a range of stakeholders, such as IOUs, CBOs, and labor organizations who participate in the CPUC's proceeding processes. Program Administrators will develop customer-facing websites, conduct informational webinars, and hold developer-community matchmaking exercises.

**Tribal Engagement:** Under the direction of the State of California Office of the Tribal Advisor, the **CA-S4A** coordinating agencies engage with 109 federally recognized tribes within California. The State of California has a robust system of Tribal engagement and government-to-government consultation. In alignment with former Governor Jerry Brown's Executive Order B-10-11 each state department has a Tribal Liaison and departmental Tribal Consultation policies, guiding their departments related activities. The CEC adopted a Tribal Consultation Policy in 2014, the CPUC adopted a similar policy in 2018, and both agencies actively engage in consultation with Tribes to shape the future clean energy in California. This consultation policies ensure effective consultation and provide meaningful tribal input into the development of regulations, rules, policies, plans, and activities that may affect Tribes. In addition to government-to-government consultations, the state's Tribal Programs conduct outreach to increase tribal participation, host and sponsors tribal energy and climate events, and foster grant funding opportunities for Tribes.

In addition, to maximize benefits for tribal communities across all **CA-S4A** programs, state agencies will commit to effective tribal consultation and culturally appropriate engagement throughout program development and implementation to all eligible Tribes. The state will continue collaborative partnerships with California Native American Tribes - supporting eligible tribes through TA, advisory groups, workforce development, project realization, and partnerships. The state will implement a variety of engagement strategies to reach Tribal governments, including:  sending communications to Tribal leaders and staff through various communication platforms using an existing robust distribution list of California Native American Tribe, and opening consultation to hear from Tribal leaders on how to best shape the programs

for their greater impact. Therefore, the **CA-S4A** programs are regarded as catalyst initiatives to leverage additional investments and an opportunity to improve intertribal and state collaboration on energy initiatives of this scale.

**IOU-S4A SOMAH** will:

- Encourage tribal member representation on the program Advisory Council on an ongoing basis.
- For workforce development, develop relationships with tribal labor development and job training organizations to encourage SOMAH job training opportunities. This effort is expected to be higher in the first half of the grant with the goal of connecting these organizations' students to sign up for the SOMAH Job Board.
- The CPUC will hire a consultant to provide tribal outreach assistance will also provide findings to the SOMAH program leads.

**IOU-S4A Community Solar** will:
Encourage tribal participation during the planning phase and technical assistance. The CPUC will hire a consultant to provide concierge tribal outreach assistance, informed by market data, solar suitability mapping, and cultural competency to inform Tribes of potential community solar project options.

- Consider prioritizing Tribal projects meeting the federal Indian Lands Low-Income Community Bonus Credit (LICBC) category
- Build upon the DAC-GT program's explicit eligibility of California Indian Country:
  - "all California Indian Country as defined in 18 United States Code Section 1151, with the exception of privately held in-holdings, which are defined as non-Indian owned fee land located within the exterior boundaries of California Indian Country; in the event of multiple owners, such land shall be considered Indian owned if at least one owner is a tribe or tribal member, regardless of the use of the land."

**POU-S4A** will:

- Engage in outreach and co-development, listening sessions, and develop a Tribal Engagement and Inclusion Plan during the program planning phase
- Encourage tribal participation during the planning phase to develop program requirements in partnership with tribes for greatest impact
- Offer funds for the deployment of tribal led solar and storage projects (including microgrids), filling the gap of existing state and utility programs.

**Strategy for Customer Acquisition and Management:** Electric IOUs and Community Choice Aggregators can be directed by the CPUC to develop an outreach plan to make customers aware of the programs and of the availability of TA offerings provided under **IOU-S4A Community Solar**. The **POU-S4A** program will require participants to implement best practices as a condition for funding. **IOU-S4A** and **POU-S4A** Community Solar programs can consult the joint agency (between CPUC and CEC) Disadvantaged Community Advisory Group (DACAG) to receive input on appropriate tactics. The DACAG was formed to ensure that disadvantaged communities, including tribal and rural communities, benefit from proposed clean energy and pollution reduction programs.

Under **IOU-S4A Community Solar**, it is anticipated that each implementing utility will create annual marketing plans. **IOU-S4A SOMAH** creates an annual marketing education and outreach plan which is distributed to its own Advisory Council, the DACAG, and to proceeding stakeholders distribution list for feedback before being finalized. Outreach plans include reaching LIDAC, Tribal, disadvantaged business enterprises to participate in the programs and access workforce development opportunities. Typical tactics include participating in industry events or conferences, building a contact list for email outreach, or targeted online ads. **IOU-S4A-Community Solar** will also leverage the Tribal Outreach Consultant and consider prioritization of projects that take advantage of the federal Indian Lands Low Income Communities Bonus Credit (LICBC), a tax credit, during the planning period.

For the **POU-S4A,** the CEC plans to work with POUs during the planning year to determine opportunities to leverage existing need-based programs or other utility programs for the purpose of alerting eligible participants to the availability of this program.

The investments made under **RWP-S4A** are structured to ensure local stakeholder engagement and ensure that worker and disinvested community voices are included throughout the planning and development phase. **RWP-S4A** staff, and the TA provider, will also support grantees in developing outreach and engagement strategies to ensure they reach diverse groups of training participants.

Any work directly solicited by the California administering agencies will follow protocols for open and fair solicitations that seek to increase participation from priority groups.

Additional steps to realize entrepreneurial support are covered in the sections under *Tribal Engagement* and *Meaningful Engagement with Stakeholders*.

## Section 3:  Fiscal Stewardship Plan

The state entities administering the actions within **CA-S4A** ("coalition members") will develop the final fiscal stewardship plan during the planning period and incorporate it into the interagency agreements which permit the flow of funds between state agencies. The coalition members (CPUC, CEC, and  the California Labor and Workforce Development Agency (LWDA) will design the fiscal stewardship plan to ensure program administration prioritizes reducing waste, fraud, and abuse, building robust infrastructure for program oversight, investing in consumer protection, and incorporating guardrails to ensure programs achieve desired impact.

The fiscal stewardship plan for **CA-S4A** will address applicable state and federal requirements, including 2 CFR § 200.303 and 2 CFR § 200.332(b), to track, manage, and report on funding through well-developed processes and systems and employ a robust risk management processes developed through existing programs to deliver funds as effectively and efficiently as possible, while also preventing fraud, waste, and potential mismanagement of grant funds. The state agencies are bound by the same federal and state laws regarding solicitations, ethics and conflicts

of interest, disadvantaged business engagement, and whistle blower protections. The coalition will align standards, where they might differ from the below, for financial reporting frequency and metrics collection to support S4A grant terms and conditions.

*Competitive Vendor Solicitations:* All third-party program administrators and implementers, and, if applicable, program applicants, will be required to provide sufficient information demonstrating their management and financial capacity to implement the grant and/or provide fiscal sponsorship for program participants, as well as the ability to conduct all applicable coordination, community outreach, evaluation, and reporting components critical to the grant. State of California runs its solicitations through the Department of General Services (DGS). Statutory authority for purchasing all goods and services for State government resides with the control agency. Non-IT Services are overseen by the DGS Office of Legal Services. Non-IT Goods and Leveraged Procurement Agreements (LPAs) are overseen by the DGS Procurement Division. The Executive Director of CPUC has signature authority for all CPUC Non-IT Contracts and Procurements. CPUC information Technology goods and services purchases are procured by the CPUC Information Technology Services Division in alignment with DGS guidelines.

*Ethics and Conflict of Interest:* All staff involved in procurement activities are expected to act responsibly, ethically, honestly, avoid wasteful practices, and to observe a high level of moral conduct. In accordance with Public Contract Code (PCC) 10410, employees of CPUC involved in the procurement process, whether directly or indirectly, are expected to be free of conflict of interest or relationships that are actually or potentially detrimental to the best interest of the State. CPUC employees are prohibited from participating in any part of the contracting process, including being a member of an evaluation team, if they have a financial interest in the outcome of a contract. CPUC employees cannot accept directly or indirectly any gifts of value from anyone who is doing or seeking to do business with CPUC. It is illegal for any State employee to use their position to bestow any preferential benefit on anyone related to them by family, business, or social relationship.  For goods purchases, CPUC procurement staff fill out a Conflict-of-Interest Statement that is kept on file for each purchase. For service contracts, CPUC Contracting Unit staff and any other CPUC employees involved in the evaluation process must fill out and sign a Conflict-of-Interest Statement for any competitive purchase. These standards will be extended to sub-awardees and subrecipients as part of S4A related interagency agreements.

All purchasing files are to be maintained in a confidential manner. Access to purchasing files is restricted to P&C staff or other CPUC employees authorized by P&C management. Any disclosure of confidential information by a State employee during the purchasing process is a basis for
disciplinary action. Total confidentiality during the process is vital to preserve the integrity of the process.

*Small Business and Disabled Veteran Business Participation:* Pursuant to State law, CPUC must offer procurement and contracting opportunities to California certified Small Businesses (SB), and Disabled Veteran Business Enterprises (DVBE) whenever possible. The CPUC has an annual statewide participation goal of not less than twenty-five percent (25%) for SB and not less

than three percent (3%) for DVBE in reportable purchases. To meet these goals CPUC uses a SB/DVBE First Policy to prioritize purchasing and awarding to SB/DVBE firms. The State offers SB Contractors a preference and DVBE Contractors an incentive in competitive solicitations, giving them an advantage over Non-SB or Non-DVBE businesses as a method of increasing SB/DVBE participation. These incentives or preferences are specified and included in CPUC's solicitation. This incentive or preference is used only for evaluation purposes, any contract awarded will be in the amount of the Contractor's actual submitted cost.

*Whistleblower Protections:* In addition, all coalition members and entities interacting with recipients of **CA-S4A** funding will be subject to the protections under the robust federal and state legal framework for confidential reporting and whistleblower protections, including the California Whistleblower protection Act, California Labor Code Section 1102.5, Government Code Section 12653, and Dodd-Frank Wall Street Reform and Consumer Protection Act.

Interagency Agreements: The CPUC will draft separate agreements with each agency partner – CEC and EDD. The agreements will restate the grant terms and conditions, the workplan, the fiscal stewardship plan, and will allow for the exchange of confidential and/or deliberative material in support of reporting and/or procedural requirements. During the planning period these agreements will be finalized. The fiscal stewardship plan will include processes for dispensing funds and reporting. The EPA's quality management and quality assurance requirements make for natural checkpoints that the agencies will need to collaborate on to satisfy. Beyond the EPA requirement, we expect the agency staff to meet regularly and that the vendors supporting each agency partner (with grant compliance) will also be in communication to align schedules and data quality.

The CPUC and CEC have an existing memorandum of understanding that allows the agencies to coordinate on confidential legal and policy matters. As this is already in-place, once the planning period commences there are no barriers for staff coordination in navigating the outstanding policy issues identified for the planning period in the prior sections.

## 3.1 Consumer Protections

Any program implementer having direct interaction with residential utility customers will be required to abide by certain practices to protect consumers against unfair, deceptive or abusive practices in compliance with consumer financial laws. CA-S4A will abide by the consumer protection requirements terms of the SFA grant to comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply; provide plainly written disclosures (regarding purchasing, leasing, financing other costs, construction liens, consumer rights, key contact information, etc.); require all in-person and marketing will be conducted in a language that consumer can understand; and maintain a process for handling and referring complaints.[19] As described below, most of these requirements are already available or will be required to cover gaps.

---

[19] SFA Terms and Conditions, Additional Terms and Conditions, M. Consumer Protection Requirements

The CPUC has a California Solar Consumer Protection Guide.[20] Solar providers submitting applications to interconnect residential solar customers in the service areas of Pacific Gas and Electric Company (PG&E), Southern California Edison (SCE), San Diego Gas & Electric (SDG&E), Bear Valley Electric Service (BVES), and PacifiCorp are required to collect customer initials and a signature on the California Solar Consumer Protection Guide. The CPUC recommends that solar providers give out this guide during their first contact with potential customers. The Consumer Protection Guide is available in nine languages. The Consumer Protection Guide covers solar system basics, dispels common myths, explains consumer rights, low-income programs, and contact information at the utilities.

The CEC will require use of the California Solar Consumer Guide or require an equivalent, mandatory consumer guide for **POU-S4A** grants delivering rooftop solar for residential customers. No additional or new guide would be required if the POU territory already has one available and in use. If using the CPUC California Solar Consumer Guide directly, the POU will add a coversheet explaining where their billing systems or solar policies differ from the investor-owned utilities. CEC will require winning grants to provide such a guide to customers.

Programs are designed to ensure customers have a choice of pre-vetted solar installers and to allow customers to receive multiple bids. Project audits are part of this process, with program administrators conducting project audits to ensure project completion prior to issuing final incentives. Additionally, there will be minimum requirements for product and workmanship warranties, as noted above, to correct any defects or performance shortfalls. **IOU-S4A SOMAH** already includes these additional protections, and **POU-S4A** will include these as mandatory, minimum requirements for grant applicants.

California's Contractors State Licensing Board (CSLB) handles consumer affairs complaints, including those against solar project installers, as this agency issues the licenses by which contractors are permitted to install renewable energy facilities (solar and storage).[21] This information is also included in the California Solar Consumer Protection Guide.

CPUC's Consumer Affairs Branch is available to handle consumer complaints against the IOUs that the CPUC regulates. If issues arise such as problems with interconnection, solar plan billing or metering that the customer is not able to resolve directly with their utility, they are able to contact CPUC Consumer Affairs by phone or online to receive support.[22] CPUC also shares essential contact information on filing complaints directed to customer generators on its website.[23]

---

[20] The Consumer Protection Guide is available at:
https://www.cpuc.ca.gov/solarguide/#:~:text=The%20California%20Public%20Utilities%20Commission%20(CPUC)%20presents%20the%20California%20Solar
[21] More information at
https://www.cslb.ca.gov/OnlineServices/ConstructionComplaint/ComplaintFormProcess.aspx
[22] More information online at https://www.cpuc.ca.gov/about-cpuc/contacting-the-puc and
https://www.cpuc.ca.gov/consumer-support/file-a-complaint
[23] More information at https://www.cpuc.ca.gov/industries-and-topics/electrical-energy/demand-side-management/customer-generation/resources-for-solar-customers

Sub-awardees and other S4A funding recipients will need to share references to these CPUC and relevant CA state agency resources or generate matching materials to be dispersed to potential program applicants.

*Audits of Vendors (Consultants and Program Administrators):* **CA-S4A** Coalition partners will conduct periodic audits and spot checks of program partners or other entities that directly interact, transact or contract with customers to ensure that customers' rights are protected. Program administrators and implementers, as well as program recipients will be required to ensure all records, physical and electronic, are collected regularly and adequately protected from loss, damage, or destruction for possible audit(s), and that a designated representative will have the right during normal business hours to review and to copy any records pertaining to the performance of the agreements issued through **CA-S4A**. These release of information requirements will come in different forms – consultants and program implementers will incorporate these requirements into their contracts and agreements with state agencies; and recipients of incentives must agree to disclose certain information to participate in the programs and receive assistance or incentives. Performance audits may include a performance evaluation to assess if household savings are materializing for program beneficiaries. For example, on a weekly or monthly cadence, CPUC requires program administrators (including IOUs) to report project progress data and administrative cost information to public repositories – publishing reports, as outlined in the Reporting Plan, to the CPUC website and archives. The CPUC uses program evaluation vendors to independently assess program spending and review that it was used appropriately, including auditing the program administrator expenses. Financial auditing occurs during the regular course of payment and may also be included in an independent assessment from a program evaluator.

For multifamily properties, **IOU-S4A SOMAH** already requires property owners to share essential information about solar billing and expected changes to their future electrical bills after a solar system is interconnected. **IOU-S4A SOMAH** runs a hotline telephone service that can be accessed by tenants as well. **POU-S4A** will consider such best practices when scoring grants that wish to target and treat multifamily properties with rooftop solar. Not only are disclosures to property owners important prior to solar installations, but programs can help to close the information gap between landlords and tenants with additional educational materials. In compliance with the CPUC's regulations, each of the three large IOUs (Pacific Gas & Electric, San Diego Gas & Electric, and Southern California Edison) are working to improve the readability of monthly billing statements to aid customer understanding of electricity bill changes post-solar. Billing systems upgrades are a large, infrastructure investment, so while these updates will become available for most Californians served by the three largest IOUs, this update is not required or mandated for other utilities. **POU-S4A** will determine in the planning period whether to ask applicants to describe solar credit bill presentment in their applications. The tradeoff being while this may improve the billing experience, it does not add to program uptake.

As part of its administration, CPUC will hire a consultant with federal grant expertise to prepare and execute our semi-annual transactions and progress reporting.

**CA-S4A** has sought to install meaningful consumer protections and increased accessibility in line with federal E.O 13166: Improving Access to Services in the design of all programs as outlined in the Financial Assistance Strategy.

## Section 4: Timeline and Milestones

As described in earlier sections, the **CA-S4A** coalition of agencies, led by the CPUC, each have a commitment to working with a diverse group of stakeholders in its planning and implementation.

*Resources for expanding regulatory stakeholders:* As a public agency, the CPUC depends on input, questions, and feedback from the general public, including industry. By hearing from different perspectives, the CPUC is better able to make informed decisions that consider the impact of utility costs and services on all Californians. The Public Utilities Code allows qualified parties in proceedings before the CPUC to request compensation for their participation. The Intervenor Compensation Program is intended to ensure that individuals and groups that represent residential or small commercial electric utility customers have the financial resources to bring their concerns and interests to the CPUC during formal proceedings.[24] This is available for all milestones and tasks related to regulatory proceedings described below.

*Increasing diverse perspectives:* The CPUC and CEC both can receive support from a joint committee, called the Disadvantaged Communities Advisory Group (DACAG). The DACAG is an 11-member group that meets several times a year to review CPUC and CEC clean energy programs and policies to ensure that disadvantaged communities, including tribal and rural communities, benefit from proposed clean energy and pollution reduction programs.[25] Its three guiding principles (increase access to clean energy technologies, maintain or enhance affordability of energy services, and increase benefits of programs in disadvantaged communities) strongly connects to the objectives of this S4A work. The DACAG is an independent advisory body.

*Incorporating equity:* The CPUC adopted an Environmental, Social, and Justice (ESJ) Action Plan which has nine main goals guiding the CPUC's mission to regulate essential utility services to protect consumers and safeguard the environment, assuring safe and reliable access to all Californians. The ESJ Action Plan works in accordance with the CPUC's institutional values of accountability, excellence, integrity, open communication, and stewardship. The goals are:

1. Consistently integrate equity and access considerations throughout CPUC proceedings and other efforts
2. Increase investment in clean energy resources to benefit ESJ communities, especially to improve local air quality and public health.
3. Strive to improve access to high-quality water, communications, and transportation services for ESJ communities.
4. Increase climate resiliency in ESJ communities.
5. Enhance outreach and public participation opportunities for ESJ communities to meaningfully participate in the CPUC's decision-making process and benefit from CPUC programs.
6. Enhance enforcement to ensure safety and consumer protection for ESJ communities.

---

[24] More information available at: https://www.cpuc.ca.gov/proceedings-and-rulemaking/intervenor-compensation
[25] More information available at:
https://www.cpuc.ca.gov/dacag/#:~:text=The%20CPUC%20and%20the%20California%20Energy%20Commission%20on%20August%201,

7. Promote high road career paths and economic opportunity for residents of ESJ communities.
8. Improve training and staff development related to ESJ issues within the CPUC's jurisdiction.
9. Monitor the CPUC's ESJ efforts to evaluate how they are achieving their objectives.

For S4A Coalition work, here is an overview of key tasks by year, and quarter.

| Timeline of Tasks + Milestones | | |
|---|---|---|
| **Year** | **Program, Description of Task or Milestone** | **Estimated Time Period** |
| **Year 1** | **Grant Period Begins** | May 24, 2024 |
| | **Quality Management Plan & Quality Assurance Project Management Plan** | Due 90 days after first amendment |
| | **Revised Workplan and Budget to EPA** | November 30, 2025 |
| | **Planning Period** | From Q4 2024 until Q4 2025 |
| | **Planning Period - POU-S4A** | |
| | CEC participates in **CA-S4A** Kick-Off Workshop | (Q4 2024 – Q1 2025) |
| | Scoping Workshops, Stakeholder meetings, Tribal Co-development, Consultation, Engagement, and listening sessions | (Q4 2024 - Q1 2025) |
| | Develop Tribal Engagement and Inclusion Plan | (Q4 2024 – Q4 2025) |
| | CEC Drafts Solicitation Manual | (Q1-Q2 2025) |
| | Draft solicitation released; host public workshop and solicit public comment | (Q3 2025) |
| | Milestone: CEC releases final solicitation package; Notice of Funding Availability (NOFA); applications open.<br>• CEC encourages selectees to use community benefit agreements (CBAs) | (Q4 2025). |
| | CEC provides technical assistance to interested POUs to develop siting plan or requirements to include as part of their procurement documentation and should include the following elements if applicable: climate hazards, greenspace, pollinators, building resilient assets, and agrivoltaics (as requested) | TBD |
| | CEC establishes agreements with POUs to share customer billing data (as needed). | TBD |
| **Year 1** | **Planning Period - IOU-S4A SOMAH** | From Q4 2024 until Q4 2025 |
| | CPUC hosts **CA-S4A** Kickoff Workshop | (Q4 2024 – Q1 2025) |
| | CPUC integrates **IOU-S4A** program elements via established processes | (by Q4 2025) |

| | | |
|---|---|---|
| | Program administrator will request to revise key program oversight documents | (by Q4 2025) |
| | Advisory Council and Job Training Taskforce engaged | Quarterly |
| | IOUs submit compliance regulatory documents to implement directives (if directed by the CPUC). | TBD |
| | Program administrator will educate contractors and interested applicants on eligibility for additional funds.<br>• Host at least one contractor education webinar on new measures (by Q4 2025)<br>• Incorporate S4A education into existing Public Forums (typically Q2 and Q4 each year) | Various |
| | Marketing, Education, and Outreach plan will include notification of new funding (typically finalized by February of each year). | Annually |
| | Program administrators amend application processes to accommodate requests for new funding and review applications. Program may begin to deploy financial assistance. | Q1 – Q3 2025 |
| | CPUC addresses master-metered property treatment in a regulatory proceeding. | TBD |
| | Milestone: SOMAH **IOU-S4A** funds are reservable, at the Reservation Request phase of an application. | Q2 or Q3 2025 |
| | Milestone: SOMAH **IOU-S4A** funds are available for projects at the final incentive phase of an application. | Q3 or Q4 2025 |
| **Year 1** | **Planning Period - IOU-S4A Community Solar** | From Q4 2024 until Q4 2025 |
| | CPUC hosts **CA-S4A** Kickoff Workshop | Q4 2024 – Q1 2025 |
| | CPUC adopts the first of two decisions on community solar programs on May 30, 2024, pursuant to AB 2316. | (by Q3 2025) |
| | Milestone: CPUC adopts second of two decisions finalizing outstanding program design and implementation details in early 2025. | Q1 – Q2 2025 |
| | IOUs and CCAs develop websites, customer enrollment, billing and other systems necessary for program launch. | Q3 – Q4 2025 |
| | CPUC hires financial services consultant to provide tax credit monetization consultant for non-profit property owners. | By Q3 2025 |
| | CPUC integrates **IOU-S4A** amendments to the program(s) via established processes.<br>• CPUC encourages selected developers to use | By Q4 2025 |

| | | |
|---|---|---|
| | community benefit agreements (CBAs).<br>• IOUs and CCAs to develop siting plan or requirements to include as part of their procurement documentation and should include the following elements if applicable: climate hazards, greenspace, pollinators, building resilient assets, and agrivoltaics. | |
| **Year 1** | **Planning Period - RWP-S4A** | From Q4 2024 to Q4 2025 |
| | EDD and Labor Department participates in **CA-S4A** Kick-Off Workshop | Q4 2024 – Q1 2025 |
| | Engage with CEC and CPUC to understand any labor workforce gaps to consider whether adjustments are feasible. | Q1 2024 – Q2 2025 |
| | Review training options in LIDAC geographic areas to assess availability and access. | By Q3 2025 |
| | RWP guidelines updated to include Solar for All sub-fund upon execution of Solar for All grant agreement | By Q3 2025 |
| | Application solicitation for regional hub grantees are received. | By Q3 2025 |
| | Program team provides TA to regional hub applicants, including supporting coordination amongst local entities to develop or expand workforce development and training programs. | Q3 – Q4 2025 |
| | Milestone: Regional Hub grants awarded. Grant agreements and contract processing. | By Q1 2026 |
| | Milestone: Regional hub grant period of performance begins.<br>• Program team provides TA to regional hub awardees, including support in developing training curriculum and facilitating networking and best practice sharing between hubs.<br>• Develop guidelines with partner feedback for Training & Implementation funds. | TBD |
| **Years 2 - 5** | **Implementation Grant Period** | Q1 2026 through Q2 2029 (April 30, 2029) |
| **Years 2 - 5** | **Implementation Grant Period - POU-S4A** | |
| | Round 1 Applications Due | (Q1 2026) |

| | CEC reviews, scores, approves tentative awards; approves at business meeting. | (Q2 2026) |
|---|---|---|
| | CEC approves awards. | (Q2 2026) |
| | CEC executes grant agreements with Round 1 awardees; manage agreements through term of grant. | Starting in Q3 2026) |
| | Public workshops for Round 2 solicitation. | (Q3 2026). |
| | Incorporate public feedback, lessons learned; draft and finalize Round 2 solicitation package | (Q3-Q4 2026) |
| | Round 2 NOFA released. | (Q4 2026). |
| | Education and Outreach | (Q4 2026). |
| | S4A Coalition-building<br>• Liaise with RWP S4A on training opportunities.<br>• Annual S4A meeting to share wins, lessons learned, and shared challenges. | On-going |
| | Round 2 Applications due and CEC reviews, scores, approves awards. | Q1 – Q2 2027 |
| | CEC executes grant agreements with Round 2 awardees; manage agreements through term of grant | (Q2 2027 – Q2 2029) |
| | Continuous grant management, collection of progress reports, outreach and engagement with stakeholders and grant recipients | (starting in Q3 2026) |
| | If additional funding is unencumbered: Incorporate lessons learned, draft and release round 3 solicitation, approve awards, etc. | (starting in Q3 2027). |
| **Years 2 - 5** | **Implementation Grant Period - IOU-S4A (Community Solar)** | |
| | CPUC integrates **IOU-S4A** program elements via established processes. | Q1 2026 through Q1 2027 |
| | Program Administrators (**IOUs** and participating community choice aggregators) will request to revise key program oversight documents. | Q1 2026 through Q1 2027 |
| | IOUs submit compliance regulatory documents to implement directives. | As Directed |
| | Program administrator will educate contractors and interested applicants on eligibility for additional funds. | Q3 2026 through Q2 2029 |

| | | |
|---|---|---|
| | Marketing, Education, and Outreach plan will include notification of new funding | Annually |
| | Program administrators amend application processes to accommodate requests for new funding and review applications. Program may begin to deploy financial assistance | Q3 2026 through Q2 2029 |
| | Upon completion of solar developments, IOUs conduct auto-enrollment in Community Solar tariff to receive bill discounts. | Q3 2026 through Q2 2029 |
| | CPUC reviews progress reports and data collection. | Monthly through Q2 2029 |
| | Annual S4A meeting to share wins, lessons learned, and shared challenges. | Annually through Q2 2029 |
| **Years 2 - 5** | **Implementation Grant Period – IOU-S4A SOMAH** | |
| | Program Administrator and community-based organizations conduct outreach and marketing on an ongoing basis | Q1 2026 through Q2 2029 |
| | Program Administrator offers technical assistance to potential projects as requested. | Q1 2026 through Q2 2029 |
| | Subsidies distributed to program beneficiaries upon meeting project milestones on an ongoing basis | Q1 2026 through Q2 2029 |
| | Program Administrator tracks S4A progress in semi-annual reports throughout the grant period. | Q1 2026 through Q2 2029 |
| | Continued engagement with Advisory Council and Job Training Advisory Group throughout the grant period. | Q1 2026 through Q2 2029 |
| | | |
| | CPUC reviews progress reports and conducts data collection. | Monthly and Semi-Annually |
| | In 2026 and 2029, CPUC will evaluate the program and issue reports to the Legislature per Public Utilities Code 913.8 and 2870. | July 2026 & July 2029 |
| | Annual S4A meeting to share wins, lessons learned, and shared challenges. | Annually through Q2 2029 |

| Years 2 - 5 | Implementation Grant Period – RWP-S4A | |
|---|---|---|
| | TBD in the planning phase | Q1 2026 through Q2 2029 |
| | Annual S4A meeting to share wins, lessons learned, and shared challenges | Annually through Q2 2029 |

See the following section for a timeline of more in-depth reporting requirements.

## Section 5: Reporting Requirements

California will utilize credible methodologies for measuring program outputs and outcomes.[26] The state will leverage the annual reporting process, as well as the other reporting touchpoints described below, to continuously assess how program impact measurement can be made more precise. As per the grant Terms and Conditions, California agrees to provide performance reports and transaction-level and project-level data. As lead grantee, CPUC will use its administrative budget to hire additional support staff and/or consultants to delivery timely and complete reports and information requests.

The following metrics, at a minimum, will be included in all future reporting:

| **Climate and Air Pollution Benefits** |
| --- |
| Solar Capacity Installed (MW) |
| Number of Projects Financed (#) |
| Storage Capacity Installed  (MWh) |
| Clean Energy Generation (MWh) |
| Projected Annual Greenhouse Gas & Carbon Dioxide Emissions Avoided (tons CO2) |
| Other Air Pollution Reduced and Avoided (Nitrogen, Dioxide, Ozone, etc.)  SO2 (lb); NOX (lb); PM2.5 (lb); VOCs (lb); and NH3 (lb) |
| **Equity and Community Benefits** |
| Number of Households Benefitting from Projects (#) |
| Amount of Household Savings Delivered ($) |
| Average Savings per Household Benefitting ($) |
| Average Electricity Bill  in California ($) |
| Average Savings per Benefitting Household (%) |
| Workers Trained by Workforce Development Programs (#) |
| Projects Executed Using Tools to Promote Good Jobs and Community Benefits (#) |
| Investments in or in partnership with disadvantaged business enterprises (#) |
| Number of households with resiliency benefits (#) |
| Clean energy capacity owned by communities in direct ownership models (MW) |
| Number of solar jobs created (#) |
| Average percentage point reduction in disparity in energy burden b/w low-income and non-low-income households due to Solar for All benefit (%) |
| Average increased wages for individuals working in solar energy  (%) |
| **Market Transformation Benefits** |
| Grant Funds Deployed ($) |
| Financial Assistance Deployed ($) |
| Total private sector financing mobilized alongside projects funded directly by Solar for All ($) |
| Number of community-based organizations engaged by Solar for All services (#) |

---

[26] An updated version of the Impact Metrics spreadsheets can be provided.

The administering state agencies will communicate expectations and reporting requirements to all subrecipients and agree to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The agencies have the following plans for executing on the anticipated federal reporting requirements through enhancements to established infrastructure and capacity:

*CEC:*
As a component of grant management, grant and incentive recipients comply with the established program reporting requirements including regular check in calls, quarterly progress reports, and periodic reviews and requests for information. CEC receives project-specific information via regular reporting, including information about partnership building, project successes and challenges, and the environmental and community benefits of project activities as applicable (e.g., energy savings, GHG reduction, etc.). The CEC will establish reporting protocols and activity dashboards as the programs are developed, and all federal requirements will flow to recipients. The CEC may have a contractor to support its efforts to ensure all federal requirements are met by both the CEC and its recipients receiving federal funding.

*CPUC:* The CPUC has existing reporting requirements and timelines driven by state statute or Commission direction, which will support and inform the EPA's annual reporting process. The CPUC requires each of its programs to be evaluated periodically by an independent, external evaluator. Additionally, the CPUC will issue data requests to regulated entities and implementers to align reporting periods with Solar for All award reporting requirements. As part of its Solar for All award planning phase, the CPUC can formally direct compliance with reporting or data collection through its proceedings. Evaluators of incentive programs are expected to meet the standards set forth in the Commission's "California Energy Efficiency Evaluation Protocols" guidelines. The Protocols cover several types of evaluation efforts, such as impacts, market effects, and process evaluations – with the primary goal to specify acceptable evaluation approaches and the operational environments in which evaluations are conducted. The methodologies for measuring the outputs and outcomes central to the EPA Solar for All objectives are pre-established in these Protocols. These reports go through a public comment period, including public webinars. Final reports are made available on the CPUC webpage and archived online. CPUC often leads a "Response to Recommendations" process where select evaluation recommendations are accepted and implemented; this process has a public review and comment period and the final plan is published on the CPUC website.

*EDD:* As a component of grant management, EDD grant recipients comply with the established program reporting requirements including semi-annual and closeout narrative reports, monthly check in meetings, and periodic reviews and requests for information. Information requests are made by contracted TA providers or program evaluators, with project data and impacts uploaded online to a portal hosted by the state on a quarterly basis. The EDD will leverage CalJOBS[SM], the case management system that tracks participants characteristics including barriers, services, received, project progress, and employment and training-related outcomes. EDD also receives project-specific information via regular narrative reporting, including information about partnership building, and project successes and challenges. The **RWP-S4A** will include reporting

requirements that allow for the collection of output and outcome data related to the federal Solar for All objectives and outlined in the Impact Assessment – submitted through the portal quarterly and periodically via narrative reporting.  As part of the program evaluation, EDD will work with the evaluator to share program data as necessary.

As provided in the Terms and Conditions for the award, as the administering agencies we agree to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. As stated above, the administering agencies agree to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. CPUC will hire a federal grant expertise expert to support on these deliverables.

**Timeline of Reporting Requirements**

| Reporting | Anticipated Start Date | Anticipated Completion Date |
|---|---|---|
| Draft QMP and submit to EPA for Approval (within 90 days of the first amendment) | 1/1/2025 | 3/30/2025 |
| Draft QAPP and submit to EPA for Approval (within 90 days of the first amendment) | 1/1/2025 | 3/30/2025 |
| Revised Workplan | | 11/30/2025 |
| MBE/WBE Reporting: EPA Form 5700-52A Annual Report Submitted (when the combined total of funds budgeted for procuring supplies, equipment, construction or services exceeds the Simplified Acquisition Threshold) | | 10/30/2024, 10/30/2025, 10/30/2026, 10/30/2027, 10/30/2028, 10/30/2029 |
| Submit Interim Federal Financial Report (SF425) annually | | Annually |
| Submit Final Federal Financial Report | 01/01/2029 | 04/30/2029 |
| July 1-December 31 2024 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2024 | 1/30/2025 |
| January 1-June 30 2025 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2025 | 7/30/2025 |
| July 1-December 31 2025 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2025 | 1/30/2026 |
| January 1-June 30 2026 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2026 | 7/30/2026 |
| July 1-December 31 2026 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2026 | 1/30/2027 |

| | | |
|---|---|---|
| January 1-June 30 2027 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2027 | 7/30/2027 |
| July 1-December 31 2027 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2027 | 1/30/2028 |
| January 1-June 30 2028 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 6/30/2028 | 7/30/2028 |
| July 1-December 31 2028 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 12/31/2028 | 1/30/2029 |
| January 1-April 30 2029 Semi-annual performance report and semi-annual transaction-level and project-level data submitted | 01/01/2029 | 04/30/2029 |
| Post-closeout program strategy Submitted Prior to Program Closeout | 10/1/2028 | 01/01/2029 |
| Final Report submitted | 01/01/2029 | 04/30/2029 (or up to 120 days after) |
| Review approved QMP annually | | Annually |
| Review approved QAPP annually | | Annually |

## 5.1 Performance Reports

**Semi-Annual Report**
The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

**Final Report**
CA S4A coalition agencies agree to submit a final report in a format conducive for immediate public consumption. The final report will contain required detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the implementation of CA's EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, CA S4A will detail its program strategy and plans for performance reporting under the Closeout Agreement. The following broad, non-exhaustive elements will be in the final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

CA S4A (CPUC) agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 5.2 Transaction-Level and Project-Level Data

CA S4A coalition partners agree to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). CA S4A agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

Additionally, it is agreed to submit the data securely and to use the Environmental Information Exchange Network or EPA's Central Data Exchange to ensure connections meet the EPA security requirements. This will apply to collecting and managing environmental data.

# Section 6:  Budget Narrative

## 6.1 Overall Project Budget

| Budget Item[27, 28, 29] | | Cost |
|---|---|---|
| Total Personnel | | $8,097,264 |
| Total Fringe Benefits | | $2,483,495 |
| Total Travel, Supplies, and Equipment | | $69,000 |
| Total Contractual | | $4,314,187 |
| Total Other (including Financial Assistance and DOE In-Kind Assistance) | | $233,416,054 |
| | | |
| Total Direct Costs | | $248,380,000 |
| Total Indirect Costs | | $1,420,000 |
| | | |
| **Total** | | **$249,800,000** |

*Covers **CA-S4A** Coalition: CPUC, CEC and EDD Budgets.*

| Total Budget By Activity Bucket | | |
|---|---|---|
| Financial Assistance | Administration (Including Contractual and Indirect Costs) | Technical Assistance |
| $233,280,000 | $14,205,815 | $2,314,185 |
| 93.39% | 5.69% | 0.93% |

*Covers **CA-S4A** Coalition: CPUC, CEC and EDD Budgets.*

*The Budget will be fully used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.[30]*

---

[27] As noted in SFA Terms and Conditions, National Terms and Conditions, E. 'In-Kind Assistance', there is $400,000 of in-kind assistance from the Department of Energy (DOE) which may be used for, but is not limited to, convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist CA S4A coalition agencies.

[28] SFA Terms and Conditions, National Terms and Conditions, Section G.1 Leveraging, "The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan."

[29] SFA Terms and Conditions, Additional Programmatic Terms and Conditions Section A. "Conflicts Among Authorities" *"any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the Federal Register, Executive Orders, and these award agreement terms and conditions."*

[30] SFA Terms and Conditions, Additional Programmatic Terms and Conditions, F. Low-Income and Disadvantaged Communities Expenditure Requirement

*The Budget will follow federal guidelines for the appropriate use of funds. The funds will not be used for unallowable costs, including:*

- *For subawards or contracts to non-profits: no transfers of funds to affiliated entities that may create conflict of interest risks*
- *For unions: grant funds may not be used to support or oppose union organizing*
- *For lobbying: grant funds will not be used for lobbying purposes, and incorporate restrictions from 2 CFR 200.450*
- *For ineligible projects: disallow activities that support deployment of projects that do not meet the EPA Solar For All definition of eligible zero-emissions technologies*
- *For intangible property: no costs for acquiring "intangible property," as defined in 2 CFR 200.1. Equity investments such as purchases of ownership interests in companies through acquisition of intangible personal property, as defined in 2 CFR 200.1*
- *For outside of EPA regions: no costs for deployment of projects outside of EPA regions*
- *For claims: no costs for defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the CA's compliance with the terms and conditions of the award agreement or (b) CA has obtained prior written approval from the EPA Project Officer.*

## 6.2 Personnel

**CPUC**

The Personnel costs include the cost-of-leave. It is processed as part of the regular payroll. Here is a table showing the new personnel and summary information:

| CPUC Personnel S4A Summary Table | | | | |
|---|---|---|---|---|
| Job Title | Annual Salary or Other rate | Number of Personnel | Percentage of Time Assigned to the Program | Total Cost (Salary for Grant Years 1-5) |
| Program Supervisor | Annual Salary | 1 | 100% | $830,000 |
| Public Utility Regulatory Analyst 5 | Annual Salary | 2 | 100% | $1,008,00 |
| Public Utility Regulatory Analyst 3 | Annual Salary | 3 | 100% | $1,212,000 |
| Associate Governmental Program Analyst | Annual Salary | 1 | 100% | $395,000 |
| Legal Division Attorney IV | Annual Salary | 1 | 100% | $805,000 |

Approximately $4.25 million will be utilized for personnel salary doing S4A program administration. Personnel costs include eight staff positions (detailed above), and fringe benefits for those full-time positions. Public Utilities Regulatory Analysts salaries and benefits are subject to a Bargaining Unit Master Agreement between the state of California and Service Employees International Union Local 1000. As noted in the Master Agreement, at the discretion of the direct supervisor, CPUC may annually elect to raise salaries based on performance (merit adjustment up to 5%).[31]

- Program and Project Supervisor: Plans and organizes the work and directs the staff of the new S4A section within Energy Division at the CPUC concerned with service, safety, certification, operations, tariffs, and coordinates the work of the section with others in the Division, as well as external agencies. Performs technical work relating to the oversight of the IOUs and S4A grant work.

- Public Utility Regulatory Analyst, Level 5: Positions at this level are intended to accommodate the broadest and the most advanced level of expertise. Develop and implement major studies or programs involving the coordination of regulatory disciplines with federal, statewide, or industry-wide policy implications. May exercise lead responsibility over professional subordinates and conduct workshops on difficult issues or direct major studies.

- Public Utility Regulatory Analyst, Level 3: The positions are characterized by independently performing complex, sensitive and responsible overview of S4A work which requires, on a regular basis, a high degree of knowledge, skill and ability. Under general direction, this position may develop original solutions, approaches and methodologies around regulation and grant implementation work.

- Associate Governmental Program Analyst: Under direction, this position provides support services such as program evaluation and planning, systems development, budgeting, and continually provides consultant services to management and others on the S4A team.

- Legal Division Attorney IV: This position requires the attorney to provide specialized legal advice and services, exercise broad discretion and independence in the most complex legal matters, work cooperatively with S4A team, coalition agencies, and grantees.

**CEC**

The proposed **POU-S4A** has a total budget $30M. The budget will be allocated across financial assistance (83%), technical assistance (4%), administration (11%), and indirect costs (2%). Financial assistance ($25 million) will be awarded to LIDAC residents of POU territory as well as tribes in the same territory. In the original **CA-S4A** application, the proposed administrative budget was approximately 7%. The revised down-scoped Workplan Budget for

---

[31] https://www.calhr.ca.gov/state-hr-professionals/Pages/about-salaries.aspx#:~:text=After%20each%2012%20months%20of%20satisfactory%20performance%2C%20employees, annual%20performance%20appraisals%20of%20successful%20or%20better%20performance.

**POU-S4A** includes a larger share going to administration costs because the CEC still requires a minimum number of staff to feasibly administer a viable program. While the revised proposal reduces total staff for this program, the minimum staff deemed necessary for this program slightly increases the proportion of the budget going to personnel costs.

Approximately $3.2 million is set-aside for personnel and program administration. Personnel costs include five staff positions, and fringe benefits are included as part of staff salary:

- Program and Project Supervisor ($273,086 per year, 100% time). The Program Supervisor will perform program planning and oversight for the **S4A**-POU programs, which includes designing the programs, mentoring staff, and reviewing documents.
- Electric Generation System Specialist I ($200,691 per year, 100% time). The EGSS I will develop an implementation plan and general program design and develop, design the program applications and application review process, develop, and manage a database system to support the **S4A-POU** program, perform data analysis, write program guidelines and lead public communication and stakeholder processes.
- Energy Commission Specialist (ECS) I ($158,669 per year, 100% time). The ECS I will perform financial tracking and encumbrance accounting for the **S4A-POU** program, develop the grant agreement packages, review and approve invoices, develop program outreach and education materials.
- Two Energy Analysts ($114,976 per year, 2-year limited term). The Analysts will process applications, which includes reviewing applications, manage the call center, which includes responding to public inquiries and managing public emails, and perform data analysis which includes managing and updating datasets and developing program data statistics.

**EDD**
- The proposed **RWP-S4A** has a total budget of approximately $9.2 million with $8 million dedicated to support workforce training grantees. EDD staff costs cover 11 staff at partial time, including program, accounting and legal oversight.

## 6.3 Fringe Benefits

CPUC: For all staff, we compute fringe benefits as 53.46% of the total salary cost. The following table breaks down the services/allowances provided via the fringe rate. Cost of leave is a part of personnel costs.

| Staff Benefits (use rounded-to-thousands amount to calculate) | | |
|---|---|---|
| OASDI (Old Age, Survivors, and Disability Insurance Program) and Medicare | 6.2% OASDI 1.45% Medicare per SAM | 7.65% |
| Retirement | 26.31% per 2024-25 Retirement Rate in Budget Letter | 26.31% |
| Health | 15.18% (SAM) + 4.32% increase starting 01/01/2021 | 19.50% |

| Total Staff Benefits | 53.46% |
|---|---|

CEC: **POU-S4A** program does not plan on using funds for Fringe Benefits. Fringe benefits are included in personnel costs.

EDD: **RWP-S4A** includes total fringe benefits at $211,445.

6.4 Travel
Travel needs for inter-agency Solar For All coordination, outreach, education and conferencing are outlined below.

In California, exempt, excluded, and represented state employees may be eligible for the reimbursement of authorized out-of-pocket expenses that are reasonably, actually, and necessarily incurred as a result of conducting state business.[32] In accordance with current state policy, employees may be eligible to receive reimbursement for expenses such as:
- Method of travel (transportation)
- Meals and incidentals
- Short-term lodging
- Out-of-state travel
- Personal vehicle mileage
- Other actual and necessary business and/or travel costs incurred while conducting official state business

California Travel Reimbursement Policy as of January 1, 2024 permits the following rates:
- All employees should book travel with preferred vendors for flights, car rentals, hotels, etc.
- Total Daily Allowance for Meals and Incidental Expenses is up to $59/day
- Personal Vehicle Mileage Reimbursement Rate is $0.655/mile
- For relevant travel destinations to CPUC, CEC, or EDD offices, the maximum Lodging Rates are San Francisco $270/night, Sacramento $145/night, and Los Angeles $169/night. The general lodging rate is $107 per night unless otherwise specified.

All CA-S4A coalition partners must abide by the state's travel policies, unless where federal rules are more stringent than CA's existing regulations.

**CPUC**: Staff may be located at any office – San Francisco (HQ), Los Angeles, or Sacramento. All trips are expected to be in-state, unless EPA or DOE convenes Solar For All awardees elsewhere. Total grant period travel costs are $48,000.

CPUC S4A Planned Travel:
- All Staff not located at San Francisco Headquarters will be expected to travel 2x to San Francisco Headquarters Office for CPUC for 2 to 4 days. The location of staff will not be known until hiring is completed. Estimated travel is ~$1,600 per 4-day trip, per traveler

---

[32] More information on California Department of Human Resources state employee travel policies is here: https://www.calhr.ca.gov/employees/Pages/travel-reimbursements.aspx.

(estimated costs of $155 flight, $1,080 for lodging, $125 for local transportation, and $236 for meals and incidentals) for four days and ~$1000 per 2-day trip (estimated costs of $155 flight, $540 for lodging, $125 for local transportation, and $118 for meals and incidentals). Budget includes one traveler with a 4-day trip and a 2-day trip.

- All Staff will be expected to attend an annual S4A inter-agency meeting either in San Francisco or Sacramento. Total trips is 8 per year, and total travelers is also eight; this budget also includes funding for one traveler who is located more than 200 miles from the meeting location (see 2-day trip of ~$1,000 above and average car-based travel is ~$63/traveler including bridge tolls, $7 per span, and parking fees of $12 at CPUC HQ).
- Energy Division Staff will be permitted to attend ribbon-cuttings for S4A community solar or SOMAH projects, up to 1 per year for each staff person. Total trips are 8 per year, and total travelers are also eight. Site visits (at least 3 days) are expected to be more than 200 miles from a staff persons' home or office location (estimated costs of ~$800 per trip consisting of $175 flight, $321 for lodging, $125 for local transportation, and $177 for meals and incidentals).
- Energy Division Staff will be permitted to attend a relevant educational conference, up to 1 over the grant period, except Project and Program Supervisor who may attend 2 such conferences. Total trips are up to 9 over the grant period (from years 1-5), and total travelers are eight. Attendance will be based on relevancy to S4A work, determined by the Project and Program Supervisor. These estimated costs will be updated during the Planning Period.
- On an ad hoc basis, if there are speaking engagements about the program's implementation in-state travel will be covered. Estimated total trips are 1 per year with one traveler, a local engagement within 50 miles of the employee's office-base is estimated at $63 per trip with a one-day travel engagement more than 50 miles from the employee's office-base is ~$500 ($175 flight, $170 lodging, $100 local transport, and $88.50 for meals and incidentals).

**CEC**: Total grant period travel costs are $5,000 and are mostly anticipated to be use in the program planning phase for stakeholder outreach (including tribal engagement) via public workshops. We plan on conducting 3 workshops in geographically diverse parts of the state:

- Northern CA: 2-3 staff for a day trip to a Northern CA location. Primary cost is car rental and possible facility rental (staff intend to coordinate with local POU or tribal community for optimal facility). Estimated Cost: $500. Typical car rental + gas is <$150 for the day, plus up to $450 for facility rental if necessary.
- Central CA: This workshop may be hosted in Sacramento as it is already strategically located near larger POUs and some tribal stakeholders. This would incur negligible cost if hosted at CEC headquarters.
- Southern CA: Workshop possibly in LADWP (LA) territory. 2-3 staff, most likely 1 night at hotel, airfare, car rental, and meals. Estimated cost: $4,500. Roundtrip Flight cost ~$250 per person, overnight lodging in LA County is $169 per person, and Meal and Incidental cost is up to $59 per person per day. Total per person trip cost could be ~$550 not including car rental and gas, and possible facility rental.
- Any leftover travel budget would be intended for any additional off-site stakeholder outreach and engagement, potentially in the form of tribal listening sessions or co-development of program.

**EDD**: Travel will include onsite visits to training programs as well as attendance to interagency convenings. Meal and Incidentals costs are limited to $59 per day. Estimated number of trips is ~10 trips of 1-day, by personal car (at $49 for mileage reimbursement, $20 parking, and $14 bridge tolls) per staff services persons (count of 4), over the duration of the grant period.

## 6.5 Equipment

The CPUC will not purchase equipment with the S4A award. Equipment is covered separately.

The CEC does not plan on using funds for equipment. Equipment is covered separately.

The EDD does not plan on using funds for equipment. Equipment is covered separately.

## 6.6 Supplies

The CPUC does not plan on using funds for supplies.

The CEC does not plan on using funds for supplies.

The EDD does not plan on using funds for supplies.

## 6.7 Contractual

For all contractual services, the individual rates and total hours are components of the competitive bidding process (pursuant to DGS practices described above). As part of the solicitation request for bids package, CPUC will include federal rate caps in accordance with the Solar For All terms and conditions. The federal rate cap is set by the Office of Personnel Management (OPM). The components of rate and hours (total and per staff person) will be finalized during the planning period. For individual consultants, the rate cap is limited to the maximum daily rate for a OPM Level IV of the Executive Schedule, which is adjusted annually.[33] Contracts or subcontracts with multi-employee firms are not subject to the consultant compensation limit so long as the contractor or subcontractor selects, directs, and controls individual employees providing the consulting services.[34] All contracts below are planned to be fixed-price contracts through a sealed bid in alignment with California's current contracting policies.

---

[33] OPM Salary Table No. 2024-EX shows a Level IV annual maximum rate of $191,900, retrieved at: https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2024/EX.pdf. The method for calculating the hourly maximum daily rate is to (1) Divide the Level IV salary by 2087 to determine the hourly rate. Rates must be rounded to the nearest cent, counting one-half cent and over as the next higher cent (e.g., round $18.845 to $18.85) and (2) Multiply the hourly rate by 8 hours. The product is the maximum daily rate.

[34] 'Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements' (November 2022) at page 17, retrieved from: https://www.epa.gov/sites/default/files/2021-03/documents/best-practice-guide-for-procuring-services-supplies-equipment.pdf

| Contract Services | Amount | Duration |
|---|---|---|
| ***IOU-S4A Community Solar*** Modeling Support | $679,948 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes. | |
| | Description: Ongoing analytical work to research and quantitatively model program design options; recommend program design aspects; and measure impacts, realization rates, and bill savings. Part of *Meaningful Benefits Plan & Project Deployment Technical Assistance* | |
| | Expertise: Winning bid will have extensive technical advisory experience on complex energy regulations in the renewable energy sector, with experience in California. | |
| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
| | Hours: Time to achieve the tasks is a component that will be competitively bid. | |
| ***IOU-S4A Community Solar*** Community Renewable Energy Program Evaluation Consultant | $300,000 | 1 year |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Develop a set of comprehensive program metrics, a program logic model, recommendations for the programs' data collection activities, provide answers to key program reporting requirements, and deliver an evaluation of the program's processes and recommendations for program improvement. Part of *Meaningful Benefits Plan, Financial Assistance Strategy, Equitable Access, and Project Deployment* | |
| | Expertise: Winning bid will have extensive knowledge of program evaluation procedures and study methods and familiarity with the California Evaluation Framework and California Energy Efficiency Evaluation Protocols. | |
| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The | |

| | | |
|---|---|---|
| | services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
| Semiannual Transactions, Projects, Progress Reporting and Davis-Bacon Act Wage Compliance Consultant | $800,002 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Provide ongoing analytical, administrative, and drafting support to ensure California's compliance with EPA's Solar for All reporting requirements. Project management assistance to synchronize existing regulatory and legislative program reporting with grant reporting. Davis-Bacon Act Wage Compliance will include federally compliant payroll record collection and support monitoring and enforcement.

Expertise: Winning bid will have in-depth knowledge of federal regulations, broad experience with federal reporting, analysis and data collection, and some knowledge of the California renewable energy sector and the EPA Solar For All funding opportunity.

Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
| ***IOU-S4A SOMAH***

Tax Credit Monetization Consultant for Non-Profit Property Owners | $450,000 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Concierge tax credit consulting for participating low-income affordable housing owners to monetize, transfer and convert unusable tax credits into cash for tax exempt entities (like non-profits, tribes and local governments) unlocked by recent changes pursuant to the Inflation Reduction Act. Part of *Financial Assistance Strategy*.

Expertise: Winning bid will have expertise in affordable housing finance and tax credit regulations, as well as financial markets. Broad experience offering financial services, including auditing and tax form services, will also be considered. | |

| | Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |
|---|---|---|
| **_IOU-S4A Community Solar_** Tribal Outreach Consultant | $400,000 | 5 years |
| | Procurement Process: Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes | |
| | Description: Provide Tribal outreach consulting complete with a deep knowledge of California's Tribal governance structures, and thorough critical cultural competence. Consultant will link together expertise of California's Tribal needs with CA-S4A clean energy program offerings. Combines comprehensive data sources and a centralized database of tribal market actors for outreach, education and technical assistance to drive potential solar development, close to transmission lines or on previously disturbed lands and avoiding protected lands, sensitive cultural resources and important wildlife habitat. Part of _Equitable Access and Meaningful Involvement._ Expertise: Winning bid will have broad knowledge of solar energy technology and existing relationships with California Native Tribes. Rates: Anticipate that this will be a multi-employee firm, not an individual consultant. See description of rates above. The services required are varied and the staff needed to execute these tasks will require different levels of experience and expertise. | |

CEC

_Technical assistance ($534,237):_ Technical assistance funding is allocated for targeted application outreach, assistance, and compensation for Tribes participating in the development of the engagement and inclusion plan. Winning bid will need to have expertise with solar and storage energy technologies and outreach experience with the same audiences that S4A targets. Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes.

*Compliance contracting ($700,000)*: The proposed **POU-S4A** budget includes limited funding for an annual compliance contracting services. Winning bid will need to have expertise with such services, including in-depth knowledge of federal regulations and familiarity with the energy sector. Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes.

EDD
*Technical Assistance ($250,000):* Technical assistance for outreach to target regions as well as to assist in amending existing programs to S4A projects as needed, or to establish new programs in targeted regions. Establish inclusive outreach to ensure that worker and disinvested community voices are included throughout the process.  Assistance with the CalJOBS system (all local workforce boards use this database, however, new programs may need assistance).

*Evaluation of grant program ($200,000):* Work with independent program evaluators to ensure the program design meets the intended outcomes and needs of workers and employers. Competitive solicitation in accordance with California's Department of General Services' Best Practices and established processes.

## 6.8 Construction
No construction is planned for this grant.

## 6.9 Other
The administering agencies will follow our current guidelines for managing program delivery. All participant support costs are managed by the program administrator, utility program administrator, or contractual services vendor. We will not be providing financial assistance in the form of credit enhancements, such as loan loss reserves or loan guarantees.

**Participant Support Costs**

The administering agencies will not directly pay participant support costs. Contractual services will permit Vendors to charge work related travel or other fees, including items like survey participations stipends.

**Subawards**

Pass-through grants for S4A Coalition Application: Both subrecipients of the subawards are state governmental agencies. As per the EPA Solar For All Notice of Funding Opportunity, for a coalition application the lead applicant is now the grantee who will administer the grant as a pass-through entity for the purposes of 2 CRF Part 200. The California Public Utilities Commission is the lead applicant and the pass-through entity, and the CEC and EDD are subrecipients.

CEC will receive $30,200,000 million of which $25,000,000 is for financial assistance. The duration of this award is for the full grant period.

- POU-S4A competitive grants for establishment of POU LIDAC solar programs ($25,000,000) issued in either two or three tranches as determined in the planning period. Duration for distributed grant awards is up to five years, limited to when the grant period ends.
- This subaward is part of the application, please refer above for a description of activities.

Labor-Workforce Development/Employee Development Department (EDD) will receive $9,200,000 million, of which $8,000,000 is for financial assistance. The duration of this award is for the full grant period.
- RWP S4A Residential Solar High Road Training Partnership Grants ($8,000,000) - Establish or expand training programs to increase knowledge and competency of workers within the solar and storage sectors. This subaward is non-competitive, as the EDD will distribute funding based on fulfilling the grant goals to increase training in LIDAC communities. Duration is up to five years, limited to when the grant period ends.
- This subaward is part of the application, please refer above for a description of activities.

Subawards to For-Profit Entities: All will conform to the limits in the S4A terms and conditions, including:
1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;
2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;
3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and
5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

Subrecipient to Community Solar program administrators and/or utilities (listed in prior section), which are for-profit entities, is determined through a competitive process. The value is $190,190,000. The competitive process is determined by CPUC regulations and will be finalized during the planning period. Duration is up to five years, limited to when the grant period ends.
- This subaward is part of the application, please refer above for a description of activities.

Subawards to Non-Profit Entities & For-Profit Entities:
Subrecipient to SOMAH program ($9,690,000) administered by four non-profit organizations where utilities pass through incentives to participants (all entities listed in prior section). This

subaward is non-competitive, since the contract was previously selected through a competitive bidding process in alignment with CPUC regulations. Southern California Edison holds the contract with Center for Sustainable Energy, SOMAH program administrator lead. Participating Utilities dispense all incentives directly to participants. Duration is up to five years, limited to when the grant period ends.

- This subaward is part of the application, please refer above for a description of activities.

## 6.10 Additional Items

**Indirect Charges**

CPUC: The CPUC includes $920,000 for indirect costs. This is calculated using a Modified Total Direct Cost multiplied by the De Minimis Indirect Rate of 10%. Indirect costs will be used for administration services in service of the grant implementation. No additional signed agreement is needed as CPUC will use the de minimis rate of 10 percent.

| MOTIDIFIED TOTAL DIRECT COSTS (MTDC) - Inclusions | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | | TOTAL |
|---|---|---|---|---|---|---|---|
| SALARIES | $406,000 | $961,000 | $961,000 | $961,000 | $961,000 | | $4,250,000 |
| BENEFITS | $217,048 | $513,751 | $513,751 | $513,751 | $513,751 | | $2,272,050 |
| TRAVEL | $4,000 | $11,000 | $11,000 | $11,000 | $11,000 | | $48,000 |
| SERVICE CONTRACTS | $510,000 | $870,000 | $449,948 | $445,000 | $355,002 | | $2,629,950 |
| TOTAL MTDC - excluding subawards | $1,137,048 | $2,355,751 | $1,935,699 | $1,930,751 | $1,840,753 | | $9,200,000 |
| DE MINIMIS INDIRECT (10%) | $113,705 | $235,575 | $193,570 | $193,075 | $184,075 | | $920,000 |

CEC: The **S4A-POU** budget includes $500,000 for indirect costs. The CEC uses an indirect rate cost of 14% through an approved Memorandum of Understanding on file for the 2023-24 Fiscal Year and can be shared with the EPA upon request.

Indirect costs are those costs incurred for common or joint purposes of a public or private entity, benefitting more than one project or activity, and not easily assignable to the projects and activities. For example, it is difficult to assign the cost of a building's operations to each activity performed by a company.

The following are terms for indirect costs: indirect, overhead, general and administration, and facilities and administrative costs. Typical examples of indirect costs may include depreciation on buildings and equipment, the costs associated with operating and maintaining facilities and equipment, and general administration and expenses, such as salaries and expenses of executive officers, personnel administration and accounting. This category typically covers other general business expenses such as printer paper, printer toner, pencils, rent, and utilities.

Labor/EDD: No indirect charges.

**Workshops:**
Solar for All Awardees (including subrecipient) Annual Convening for Years 2-5
- An hybrid in-person/virtual informal workshop for all administrative agencies, utilities, and subrecipients to share successes, challenges, lessons learned, and opportunities for levering.
- CPUC will convene this meeting annually if needed.
- CPUC, CEC, and EDD will all share their logo on the agenda materials
- The meeting will be open to the public and stakeholders and noticed appropriately to the general public.  The findings from the meeting will inform implementers on how to reform their tactics and increase outcomes in service of the Solar For All award goals.
- No income will be generated.

CEC:
- For POU Customers: The CEC will host multiple workshops for the **S4A-POU** program. First the CEC will host a scoping workshop to determine what types of projects will be eligible for funding. The second workshop will be a pre-solicitation workshop for stakeholders to ask and submit any comments. Lastly, the CEC may host an application workshop for the eligible recipients.
- For tribal stakeholders: The CEC will engage tribes through existing channels of communication[35] including tribal consultations and workshops.
- CEC staff will initiate the workshops.
- The CEC's logo will be on the agenda for the workshops.
- Workshop attendees are anticipated to be 50% public participants and 50% representatives of local POUs.
- Typically a recording of the workshop will be published, as well as a question and answer document responding to questions received from the workshop
- Income will not be generated from any workshops that the CEC initiates.
- The award will not result in the development of any copyrighted software or written materials.
- The CEC does not expect an invention resulting from this project.
- This project does not involve animal subjects.
- The project will not collect identical information from 10 or more people.

EDD
- None planned at this time, this may be updated during the planning period.

---

[35] https://www.energy.ca.gov/programs-and-topics/programs/tribal-program

- Any planned workshops or otherwise will not generate income, result in inventions or similar, involve testing subjects, and will abide by all required personal information protections.

**Meals and Refreshments:**

There is no plan to provide meals or light refreshments from the administering agencies.

**Program Income**

There is no program income that will be generated.

## 6.11 Additional Workplan and Budget Questions

| Questions | Responses |
|---|---|
| Does this scope of work include conducting conferences or workshops? | Yes |
| Who is initiating the conference/workshop/meeting? | CPUC will initiate one annual workshop for sub-awardees and subrecipients |
| How is the conference/workshop/meeting being advertised? | Administering agency public notification lists and online. |
| Whose logo will be on the agenda and conference/workshop/meeting materials? | All administering agencies. <br><br> If EPA logo is requested, will confirm with SFA Terms and Conditions Section L. 'Use of Logos.' |
| What is the percentage distribution of persons attending (I.e. % federal govt, public participants, state and local)? | We anticipate the following breakdown: <br> • 15% state government <br> • 25% utilities <br> • 25% implementers <br> • 35% stakeholders and/or public participants |
| Will there be proceedings or analysis and will the information be disseminated back to the appropriate (state/local/scientific) community? | Presentation from each sub-awardee on successes, challenges, and lessons learned. |
| Do you anticipate program income being generated from this conference/workshop/meeting including registration fees? | No. |

| | |
|---|---|
| Are costs for light refreshments, meals or beverages included in the workplan or budget? | No. |
| Will the assistance award result in the development of any copyrighted software or written materials? | No. |
| Could an invention result from this project? (If yes, provide disposition instructions) | No. |
| Does the project involve animal subjects? | No. |
| Does the project involve collecting identical information from 10 or more people? | No. |
| Does the grant involve or relate to geospatial information? Includes info identifying geographic location , or application/tools associated with such information – GPS, mapping or statistical data | Yes. The CPUC consultants to provide tribal outreach assistance, GIS mapping support, and data consolidation for potential community solar projects. |
| Any work outside the US included in the grant? | No. |