# EXHIBIT 1

5H - 84090101 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN): 84090101<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5H | DATE OF AWARD<br>07/12/2024 |
|---|---|---|
| | TYPE OF ACTION<br>New | MAILING DATE<br>07/17/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

**RECIPIENT TYPE:**
State

**Send Payment Request to:**
Contact EPA RTPFC at: rtpfc-grants@epa.gov

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| MARYLAND CLEAN ENERGY CENTER<br>5000 College Ave Suite 31010<br>Colleg Park MD 20740-3809<br>EIN: 26-3864715 | MARYLAND CLEAN ENERGY CENTER<br>5000 College Avenue, Suite 31010<br>College Park, MD 20740-3809 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Amy Gillespie<br>5000 College Ave Ste 31010<br>College Park, MD 20740-3809<br>**Email:** agillespie@mdcleanenergy.org<br>**Phone:** 301-314-6901 | Lydia Kidane<br>1200 Pennsylvania Ave , 1101R<br>Washington, DC 20460<br>**Email:** kidane.lydia@epa.gov<br>**Phone:** 202-564-0506 | Robin Holder<br>1200 Pennsylvania Ave NW 3903R<br>Washington , DC 20460<br>**Email:** Holder.Robin@epa.gov<br>**Phone:** 202-564-1532 |

**PROJECT TITLE AND DESCRIPTION**

Maryland Solar for All Program (MSFAP) "Note: A special payment condition applies to this award."

See Attachment 1 for project description.

| **BUDGET PERIOD**<br>05/01/2024 - 04/30/2029 | **PROJECT PERIOD**<br>05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 0.00 | **TOTAL PROJECT PERIOD COST**<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 62,450,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of Greenhouse Gas Reduction Fund OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature applied by EPA Award Official for LaShaun Phillips - Associate Award Official<br>**by** LaShaun Phillips - Award Official Delegate | DATE<br>07/12/2024 |
|---|---|

5H - 84090101 - 0     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 62,050,000 | $ 62,050,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 62,450,000 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41057 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 62,050,000 |
| | | | | | | | | | $ 62,050,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 62,450,000 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Attachment 1 - Project Description

"Note: A special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*<u>The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition</u>*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

II. Additional Programmatic Terms and Conditions

A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

<u>2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs</u>

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

**K. Labor and Equitable Workforce Development Requirements**

<u>1. Davis-Bacon and Related Acts (DBRA)</u>

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

**B. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

## a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

> **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

> **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

### 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

### L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

### M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents would be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

**with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).**

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities*.

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

### 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

### 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

   Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

   Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

   National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

   Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

   Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

   Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

**AA. Compliant URL Links**

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

**AB. Flow-Down Requirements**

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

### B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Maryland Solar for All**
**DRAFT Work Plan**
*Project Period: 05/01/2024-04/30/2029*
*1st Draft Submitted 8/9/2024*
*2nd Draft Submitted 10/18/2024*
*3rd Draft Submitted 11/6/2024*
*4TH Draft Submitted 11/19/2024*
*5th Draft Submitted 11/24/2024*

**Project Title:** Maryland Solar for All
**Grant Number:** 84090101
**Organization Name:** Maryland Clean Energy Center (MCEC)
**Geography:** The State of Maryland
**Definition of LIDAC: MSFAP** will recognize disadvantaged communities as those identified through CJEST or as defined by the Maryland Department of the Environment. Underserved populations to be assisted through the MSFAP are identified as those who are dependent on public assistance in some manner for housing.

**Introduction**

**Section 1:  Project Description**

**1.1 Overview**

The Maryland Solar for All Program (MSFAP) assembles a coalition of government, industry, utility, academic and non-profit organizations aligned with intention to achieve the outcomes desired with the use of these federal funds. Efforts related to the initiative proposed will focus on mobilizing capital, facilitating workforce preparedness, and building capacity with and for LIDAC communities to access the benefits of solar energy. Investments will focus on improving single and multi-family residential properties, as well as the development of community solar and community serving solar installations, all intended to reduce the energy burden and provide ownership opportunities for over **10,027** qualified eligible households in the state.  MSFAP will ensure that it is serving the most overburdened populations through verification of income over the last 12 months and/or ensuring that overburdened populations are receiving federal services or meet the definitions of AMI indicated in the NOFO.

**1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**

**Environmental Results - Outputs and Outcomes:**

**Impact Targets:**

| | |
|---|---|
| 10,027 | Household Projects to Benefit |
| $6,188 | Award Funding Requested Per Household |
| 38.0 | me |

1

| | |
|---|---|
| $1.58M | Award Funding Requested per MW |
| 10.7 | MW Hours of Storage Capacity Deployed Over Time |
| $141,182 | Award Funding Requested per MWh Storage Capacity |
| 100,319 | Short Tons of CO2 Emissions Avoided Over Time |
| $619 | Award Funding Requested per Tons of CO2 Avoided in the First 5 Years |
| $7,238,876 | Absolute Household Savings Over the First 5 Years |
| $8.57 | Award Funding Requested per Dollars of Household Savings in the First 5 Years |

**Impact Assessment:**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | 5-year Total |
|---|---|---|---|---|---|---|
| Number of Projects | 274 | 279 | 281 | 280 | 276 | **1,389** |
| Single-family | 261 | 261 | 261 | 261 | 259 | **1,303** |
| Multi-family | 2 | 4 | 4 | 4 | 3 | **17** |
| Community | 0 | 3 | 5 | 4 | 3 | **15** |
| Strategic Financing (Multi-family & Community) | 11 | 11 | 11 | 11 | 11 | **54** |
| Number of Households Added | 1,658 | 2,059 | 2,209 | 2,134 | 1,969 | **10,027** |
| Single-family | 261 | 261 | 261 | 261 | 259 | **1,303** |
| Multi-family | 176 | 352 | 352 | 352 | 264 | **1,496** |
| Community | 0 | 225 | 375 | 300 | 225 | **1,125** |
| Strategic Financing (Multi-family & Community) | 1,221 | 1,221 | 1,221 | 1,221 | 1,221 | **6,103** |

2

| | | | | | |
|---|---|---|---|---|---|
| Solar Capacity Installed (MW) | 5.9 | 7.8 | 8.8 | 8.3 | 7.6 | **38.0** |
| Single-family | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | **6.5** |
| Multi-family | 0.4 | 0.8 | 0.8 | 0.8 | 0.6 | **3.0** |
| Community | 0.0 | 1.5 | 2.5 | 2.0 | 1.5 | **7.5** |
| Strategic Financing (Multi-family & Community) | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | **21.0** |
| Clean Energy Generated (MWh) | 7,691 | 17,816 | 29,195 | 39,864 | 49,570 | **144,136** |
| Single-family | 1,703 | 3,389 | 5,058 | 6,710 | 8,332 | **25,191** |
| Multi-family | 507 | 1,516 | 2,515 | 3,503 | 4,235 | **12,276** |
| Community | - | 1,950 | 5,181 | 7,729 | 9,601 | **24,460** |
| Strategic Financing (Multi-family & Community) | 5,481 | 10,961 | 16,442 | 21,922 | 27,403 | **82,209** |
| Storage Capacity Installed (MWh) | 2.14 | 2.14 | 2.14 | 2.14 | 2.14 | **10.7** |
| GHG Emissions Avoided (tCO2) | 5,353 | 12,400 | 20,320 | 27,745 | 34,501 | **100,319** |
| SO2 avoided (short tons) | 0.6 | 1.1 | 1.7 | 2.2 | 2.7 | **8** |
| NOx avoided (short tons) | 0.2 | 0.4 | 0.7 | 1.0 | 1.3 | **4** |
| Amount of HH Savings (Total $1000) | $402 | $912 | $1,461 | $1,990 | $2,474 | **$7,239** |
| Single-family | $133 | $267 | $400 | $533 | $666 | **$1,999** |
| Multi-family | $49 | $148 | $247 | $346 | $420 | **$1,210** |
| Community | $0 | $59 | $156 | $234 | $293 | **$741** |
| Strategic Financing (Multi-family | $219 | $438 | $658 | $877 | $1,096 | **$3,289** |

3

| | | | | | | |
|---|---|---|---|---|---|---|
| & Community) | | | | | | |

| | Western | Capital | Central | Southern | Eastern Shore | Total |
|---|---|---|---|---|---|---|
| Number of Projects | 116 | 308 | 725 | 70 | 170 | **1,389** |
| Single-family | 113 | 289 | 670 | 69 | 162 | 1,303 |
| Multi-family | 1 | 7 | 8 | 0 | 1 | 17 |
| Community | 2 | 5 | 7 | - | 1 | 15 |
| Strategic Financing (Multi-family & Community) | - | 7 | 40 | 1 | 6 | 54 |
| **Number of Households Added** | 323 | 2,118 | 6,550 | 181 | 856 | **10,027** |
| Single-family | 113 | 289 | 670 | 69 | 162 | 1,303 |
| Multi-family | 60 | 607 | 702 | 40 | 86 | 1,496 |
| Community | 150 | 375 | 525 | - | 75 | 1,125 |
| Strategic Financing (Multi-family & Community) | - | 846 | 4,652 | 72 | 533 | 6,103 |
| **Solar Capacity Installed (MW)** | 1.7 | 8.2 | 24.3 | 0.7 | 3.1 | **38.0** |
| Single-family | 0.6 | 1.5 | 3.4 | 0.3 | 0.8 | 6.5 |
| Multi-family | 0.1 | 1.2 | 1.4 | 0.1 | 0.2 | 3.0 |
| Community | 1.0 | 2.5 | 3.5 | - | 0.5 | 7.5 |
| Strategic Financing (Multi-Family & | - | 3.0 | 16.0 | 0.3 | 1.7 | 21.0 |

4

| Community) | | | | | | |
|---|---|---|---|---|---|---|
| Clean Energy Generated (MWh in Year 5) | 2,172 | 10,714 | 31,684 | 916 | 4,084 | **49,570** |
| Single-family | 723 | 1,850 | 4,285 | 438 | 1,036 | 8,332 |
| Multi-family | 169 | 1,719 | 1,988 | 114 | 244 | 4,235 |
| Community | 1,280 | 3,200 | 4,480 | - | 640 | 9,601 |
| Strategic Financing (Multi-family & Community) | - | 3,945 | 20,930 | 364 | 2,165 | 27,403 |
| Storage Capacity Installed (MWh) | 0.1 | 1.8 | 7.7 | 0.2 | 0.9 | **10.7** |
| GHG Emissions Avoided (tCO2/year in Year 5) | 4,455 | 21,611 | 64,103 | 1,856 | 8,293 | **100,319** |
| Amount of HH Savings (Total $1000) (First 5 years) | $321 | $1,638 | $4,449 | $177 | $655 | **$7,239** |
| Single-family | $173 | $444 | $1,028 | $105 | $249 | $1,999 |
| Multi-family | $48 | $491 | $568 | $33 | $70 | $1,210 |
| Community | $99 | $247 | $346 | $0 | $49 | $741 |
| Strategic Financing (Multi-family & Community) | $0 | $456 | $2,507 | $39 | $287 | $3,289 |

## PROGRAM DELIVERABLES (OUTPUTS AND OUTCOMES):

**Climate and Air Pollution Benefits Outputs:**

**Total Number of Projects: 1,389**
Western MD[i] #116 (113 single family, 1 multi-family, 2 community solar); Capital Area MD #308 (289 single family, 7 multi-family, 5 community solar, 7 strategic financing); Central MD #725 (670 single family, 8 multi-family, 7 community solar, 40 strategic financing); Southern MD #70

(69 single family, 0 multi-family, 0 community solar, 1 strategic financing); Eastern Shore MD #170 (162 single family, 1 multi-family, 1 community solar, 6 strategic financing)

**Solar capacity installed by geography and type of project (MW): 38.0 MW total**
Western MD: 1.7 MW (0.6 MW single family, 0.1 MW multi-family, 1.0 MW community); Capital Area MD: 8.2 MW (1.5 MW single family, 1.2 MW multi-family, 2.5 MW community, 3.0 MW strategic financing); Central MD: 24.3 MW (3.4 MW single family, 1.4 MW multi-family, 3.5 MW community, 16.0 MW strategic financing); Southern MD: 0.7 MW (0.3 MW single family, 0.1 MW multi-family, 0 MW community, 0.3 MW strategic financing); Eastern Shore MD: 3.1 MW (0.8 MW single family, 0.2 MW multi-family, 0.5 MW community, 1.7 MW strategic financing)

**Storage capacity installed by geography (MWh): 10.7 MWh total**

Western MD: 0.1 MWh multi-family and community projects; Capital Area MD: 1.8 MWh multi-family and community projects; Central MD: 7.7 MWh multi-family and community projects; Southern MD: 0.2 MWh multi-family and community projects; Eastern Shore MD: 0.9 MWh multi-family and community projects

**Climate and Air Pollution Benefits Outcomes:**

**Clean Energy Generated (MWh in Year 5): 49,570 MWh total**

Western MD: 2,172 MWh in Year 5; Capital Area MD: 10,714 MWh in Year 5; Central MD: 31,684 MWh in Year 5; Southern MD: 916 MWh in Year 5; Eastern Shore MD: 4,084 MWh in Year 5

**Greenhouse gas emissions reduced and avoided by geography and type of project (short tons CO2e) in Year 5: 100,319 tons CO2e total**

Western MD: 4,455 tons CO2e all project types; Capital Area MD: 21,611 tons CO2e all project types; Central MD: 64,103 tons CO2e all project types; Southern MD: 1,856 tons CO2e all project types; Eastern Shore MD: 8,293 tons CO2e all project types

**Other air pollution reduced and avoided by geography and type of project (tons other air pollutants such as particulate matter, nitrogen dioxide, ozone, etc.): 8.3 SO2 short tons avoided, 3.6 NOx short tons avoided**

Western MD: 0.7 SO2 avoided in short tons, 0.1 NOx avoided short tons all types of projects; Capital Area MD: 1.8 SO2 avoided in short tons, 1.5 NOx avoided short tons all types of projects; Central MD: 4.2 SO2 avoided in short tons, 1.7 NOx avoided short tons all types of projects; Southern MD: 0.4 SO2 avoided in short tons, 0.1 NOx avoided short tons all types of projects; Eastern Shore MD: 1.0 SO2 avoided in short tons, 0.2 NOx avoided short tons all types of projects

**Equity and Community Benefits Outputs:**

**Total Households Added by geography and type of project: 10,027**

6

Western MD[i] #323 (113 single family, 60 multi-family, 150 community solar); Capital Area MD #2,118 (289 single family, 607 multi-family, 375 community solar, 846 strategic financing); Central MD #6,550 (670 single family, 702 multi-family, 525 community solar, 4,652 strategic financing); Southern MD #181 (69 single family, 40 multi-family, 0 community solar, 72 strategic financing); Eastern Shore MD #856 (162 single family, 86 multi-family, 75 community solar, 533 strategic financing)

**Total amount of household savings by type of project and by geography in the first 5 years ($): $7.24M total**

$1,999K single-family, $1,210K multi-family, $741K community, $3,289K strategic financing

**Year 5 annual amount of household savings delivered by geography and type of project ($): $2.47M annually**
Western MD: $321K (Total $ saved, First 5 years), $173K single-family, $48K multi-family, $99K community, $0 strategic financing; Capital Area MD: $1,638K (Total $ saved, First 5 years), $444K single-family, $491K multi-family, $247K community, $456K strategic financing; Central MD: $4,449K (Total $, First 5 years), $1,028K single-family, $568K multi-family, $346 community, $2,507K strategic financing; Southern MD: $177K (Total $, First 5 years), $105K single-family, $33K multi-family, $0 community, $39K strategic financing; Eastern Shore MD: $655K (Total $, First 5 years), $249K single-family, $70K multi-family, $49K community, $287K strategic financing

**Workers trained by workforce development programs by geography: 400 Level 1 Trainees, 600 Level 2/3 union, apprentices/journeypersons (statewide), 10 Level 4 Community College Solar Certification (statewide)**

Western MD: 50 workers Level 2/3 Training Apprentices/Journeypersons, prevailing wage by trade, plus benefits; 2 Level 4 Training Community College Certification/Credit Program (wages/benefits vary); Capital Area MD: 200 workers trained Level 1 Training/NABCEP Certification $18.50 to start, benefits possible; 200 workers Level 2/3 Training Apprentices/Journeypersons, prevailing wage by trade, plus benefits; 2 Level 4 Training Community College Certification/Credit Program (wages/benefits vary); Central MD: 200 workers trained Level 1 Training/NABCEP Certification $18.00 to start, benefits possible; 200 workers Level 2/3 Training Apprentices/Journeypersons, prevailing wage by trade, plus benefits; 2 Level 4 Training Community College Certification/Credit Program (wages/benefits vary); Southern MD: 75 workers Level 2/3 Training Apprentices/Journeypersons, prevailing wage by trade, plus benefits; 2 Level 4 Training Community College Certification/Credit Program (wages/benefits vary); Eastern Shore MD: 75 workers Level 2/3 Training Apprentices/Journeypersons, prevailing wage by trade, plus benefits; 2 Level 4 Training Community College Certification/Credit Program (wages/benefits vary).

**Projects executed using tools to promote good jobs and community benefits (e.g., Community Workforce Agreement, Community Benefits Agreement, Project Labor Agreement) by geography, project type (#):** In the planning year, as MSFAP develops a project pipeline the MSFAP will encourage the incorporation of Community Workforce Agreements, Community Benefits Agreements, Project Labor Agreements in

all geographies/projects where it is appropriate. Our coalition partner, MD DOL, will assist with these agreements.

**Investments in or in partnership with disadvantaged businesses by geography, type of engagement (e.g., investment in a business, partnership on a deal, procurement of services), type of project (# of businesses engaged) ($ of procurement costs):** MSFAP does not currently have named partners or sub-recipients as these partnerships will occur in the procurement processes, but will encourage and track partnerships and investments in the planning phase.

**Equity and Community Benefits Outcomes:**

**Number of households with resiliency benefits by geography (#):**

| Western MD: | Capital Area MD: | Central MD: | Southern MD: | Eastern Shore MD: |
|---|---|---|---|---|
| 43 | 1,282 | 5,156 | 101 | 595 |

**Clean energy capacity owned by communities in direct ownership models by geography, type of project, type of community owner (household, community-based organization) and technology (MW, MWh):**

| | Western | Capital | Central | Southern | Eastern Shore |
|---|---|---|---|---|---|
| Household owners, Solar PV (MW) | 0.3 | 0.7 | 1.7 | 0.2 | 0.4 |
| Community-based organization, Solar PV | 1.0 | 2.5 | 3.5 | 0.0 | 0.5 |
| Community-based organization, Storage (MWh) | 0.1 | 0.6 | 0.8 | 0.0 | 0.1 |

**Number of solar jobs created by geography:** The MSFAP cannot speculate as to jobs created by geography at this point due to 2022 contractions in the solar market.[ii] In most industries it is an accepted Bureau of Labor statistic standard that for every $1M of funding 11.3 jobs result. MSFAP can anticipate at least 682 jobs will be created on that model. MSFAP will investigate this further during the planning year.

**Reduced disparities in energy burden between low-income and non-low-income households by geography ($):** Disparities in energy burden between low-income and non-low-income households by geography will be impacted by reductions in energy costs. Western MD: $321 (Total $1000, First 5 years), $173 single-family, $48 multi-family, $99 community, $0 strategic financing; Capital Area MD: $1,638 (Total $1000, First 5 years), $444 single-family, $491 multi-family, $247 community, $456 strategic financing; Central MD: $4,449 (Total $1000, First 5 years), $1,028 single-family, $568 multi-family, $346 community, $2,507 strategic financing; Southern MD: $177 (Total $1000, First 5 years), $105 single-family, $33 multi-family, $0 community, $39

8

strategic financing; Eastern Shore MD: $655 (Total $1000, First 5 years), $249 single-family, $70 multi-family, $49 community, $287 strategic financing.

**Increased wages for individuals working in solar energy by geography (%):** Entry-level workers make from minimum wage at $13.25 to $17.08 in Maryland. NABCEP Certified installers have a starting wage statewide of around $18.50. Hourly wages for unionized workers at an apprenticeship level are $24 an hour and unionized journeypersons are upwards of $25-$35 depending on their trade. MSFAP anticipates that wages for all workers trained through this program will increase by at least $5 per hour and in most cases would include benefits. Our partnership with MD DOL will help us track prevailing wages.

(Percentile wage estimates for Solar Photovoltaic Installers (www.bls.gov)):

**Market Transformation Benefits Outputs:**

**Grant funds deployed by type of cost (financial assistance, technical assistance, program administration) ($):** Financial Assistance: $41,075,000; Technical Assistance: $2,491,750 plus $400,000 EPA in-kind TA; Program Administration: $6,933,746 (does not include Financial Assistance Indirect Costs).

**Financial assistance deployed by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, loans), type of project, type of technology ($):** The MSFAP budget calls for **$41,075,000** for investment statewide, and will determine how financial assistance will be deployed by geography, type of cost, type of financial assistance, type of project and type of technology in the planning phase.

**Total private sector financing mobilized, alongside projects funded directly by Solar for All by geography, type of project ($):** MSFAP will develop a statewide plan to mobilize private sector financing alongside projects funded by Solar for All in the planning year.

**Number of community-based organizations engaged by Solar for All services (e.g., technical assistance programs for solar deployment, education programs) by geography (#):** Although, some partners have committed to participate others will be determined in the planning phase.

**Financial assistance deployed to consumers with limited credit history by geography, type of financial assistance, type of project, type of technology ($):** MSFAP anticipates tracking consumers with limited credit history by geography as the project progresses. Individuals with a limited credit history would be eligible for grants, low-cost loans, tax credits, etc. funded by SFA, unless private capital leverage is combined. MSFAP will develop and track this metric.

Table 2: Net Metering Capacity as of June 30, 2022 in kW

| Electric Utility | Solar | Wind | Biomass | Utility Total | YOY % Change | kW Change |
|---|---|---|---|---|---|---|
| Kilowatts of Installed Capacity | | | | | | |
| Baltimore Gas and Electric Company | 365,844 | 84 | 0 | 365,928 | 9% | 28,675 |
| Choptank Electric Cooperative | 29,230 | 353 | 30 | 29,613 | 6% | 1,579 |
| Delmarva Power and Light Company | 112,089 | 880 | 240 | 113,209 | 8% | 8,758 |
| Easton Utilities Commission | 3,253 | 0 | 0 | 3,253 | 21% | 555 |
| Hagerstown Municipal Electric Light Plant | 208 | 0 | 0 | 208 | 4% | 9 |
| Thurmont Municipal Light Company | 214 | 0 | 0 | 214 | 7% | 15 |
| Mayor and Council of Berlin | 574 | 0 | 0 | 574 | 19% | 92 |

**Market Transformation Benefits Outcomes:**

**Changes in net metering caps by geography by type of project (MW, %):** The Maryland Public Service Commission tracks and reports on the status of the net metering allocation, annually. The 2022 report states "the current level of installed capacity, approximately 1,033 megawatts ("MW"),1 is 34.4 percent of the eligible State cap of 3,000 MW." The report summarizes the total amount of excess generation credit payouts by rate class for each of the utilities operating in Maryland, indicating approximately $5,154,797 of excess generation credits was paid to customers in the 12-month period ending April 30, 2022. * *"Report on the Status of Net Energy Metering in the State of Maryland Prepared by the Public Service Commission of Maryland Prepared for the General Assembly of Maryland Under Public Utilities Article § 7-306(i) November 1, 2022"*

**Changes in interconnection timelines by geography (days):** Interconnection timelines do vary by utility service territory in Maryland, for both ATI (authorization to install) and PTO (permission to operate) No specific source of data is available. Per installers, the current anticipated timeframe for final interconnection is between 77 days and 6 months, with particular delays All in Delmarva Power and PE territories.

**Changes in Solar Renewable Energy Credit (SREC) values by geography ($):** Senate Bill No. 65 (SB 65) revised Maryland's renewable energy portfolio standard (RPS), increasing the solar alternative compliance payment (SACP) which utilities must pay when they do not meet RPS requirements but decreased the percentage of energy that utilities must procure from Tier I renewable resources and from solar resources under the solar carve-out. By increasing the SACP, the law effectively increased the "price ceiling" for (SRECs), and therefore the likely price at which SRECs will sell. The SACP in 2012 was $80 per SREC and $60 per SREC for 2022. Before SB 65, the SACP was set to drop to $45 per SREC in 2023, then $40 in 2024 and $35 in 2025. SB 65 increased these price ceilings to $60 per SREC in 2023 and 2024, and $55 in 2025.

**Distributed clean energy capacity deployed benefiting communities not directly financed by Solar for All by geography, type of project, type of technology, and recipient-type (households, community-serving institutions), type of community (LIDAC, other communities) (MW, MWh):** MSFAP was not able to ascertain this data in the time allowed for submittal of this application. This data will be obtained during our planning year.

**Capital deployed to finance distributed clean energy capacity not directly financed by Solar for All by geography, type of project, type of technology, and recipient-type (households, community-serving institutions), type of community (LIDAC, other communities) ($):** MSFAP was not able to ascertain this data in the time allowed for submittal of this application. This data will be obtained during our planning year.

**Meaningful Benefits Plan:**
**Household Savings Benefit:** The Maryland Rooftop Solar Coalition advises residential customers in the Baltimore area can save as much as $900 during the first year of

ownership and adding solar increases home values by approximately $15,000. MSFAP will require all projects funded to ensure all impacted households, including multi-family, mastered metered buildings will achieve a 20% minimum household savings, defined as 20% of the average household electricity bill in the utility territory. It is projected that in many cases households will achieve a higher percentage of savings. Households without an individual utility bill will receive a direct non-financial benefit equivalent in value to the savings target in the utility territory. This non-financial benefit will be determined during the planning phase. Absolute Annual Household Savings Over Time (5 years of the program) is $7,239,876, with savings over the life of the solar systems estimated at over $53 million. See Output and Outcomes Section for savings by geographic area. MSFAP anticipates that these numbers will be refined in the planning year.

MSFAP will engage contractual service providers through a competitive bid process, to create and implement a feedback web portal and/or mail-in process to enable residential consumers, who have been identified as having benefitted from the use of SFA funds, to self-report on energy cost savings they are achieving throughout the grant reporting period.

**equitable Access to Solar:** The MSFAP strategy for financial assistance and project technical assistance is based on the strength of partnerships developed in creating the coalition, which will be called on to enable equitable access to solar. The program will work directly with the LIDAC communities to build relationships and trust, bring financial assistance to LIDAC participants including grants, low-cost loans, leveraging of existing resources, assistance with credit issues and provide education around solar installation and benefits it can provide. Financial partners, like MCEC, the Montgomery County Green Bank and the Climate Access Fund, will utilize the appropriate financial assistance based on the needs of the program participant. To increase equitable access to solar, MSFAP will implement outreach and education initiatives through engagement of several non-profit organizations to deploy a network of Community Navigators statewide who are trained in cultural competence and solar industry/installation/financial information. The Community Development Network of Maryland, Civic Works, Black Wall Street, LCV CHISPA, and the Caucus of African American Leaders will provide channels through their networks to the MSFAP consumer target audiences. Each of these organizations have equal employment opportunity policies. The Maryland Rooftop Solar Coalition and the Coalition for Community Solar Access industry organizations will assist partners to facilitate outreach to installers.

**Resilience Benefits:** MSFAP is committed to delivering resilience as an overarching program goal and anticipates the program will deploy 10.7 MW hours of storage capacity. MSFAP will finalize these plans during the planning period. MSFAP program will involve Groundswell, and leverage MEA funds previously invested in feasibility studies to implement projects intended to increase the resiliency of the power grid by creating capacity that can deliver power to LIDAC and/or critical facilities serving low-income and disadvantaged households during a grid outage, The details for resilience benefits will be finalized during the planning period.

11

**Household & Community Ownership Models:** The MSFAP program is committed to deployment of solar with both household and community ownership models and will support solar projects with equity for LIDAC households/communities built into the financial model. MSFAP will invite project proposals for funding to maximize ownership models to be supported by financing models that encourage ownership for participants.

**Workforce Development and Entrepreneurship**: MSFAP program invests in high-quality jobs and businesses in LIDAC communities by supporting union prevailing wages, investing in effective workforce training programs for underserved populations at the apprenticeship readiness and registered apprenticeships levels. Programs at both levels have supportive services support including support for driver's license attainment, food support, transportation support, tools, supplies and textbook support and math remediation support. MSFAP will also support the solar skill upgrade training at the existing journeyperson level so that current journeypersons can receive the training they need to accelerate the deployment of solar throughout the state. MSFAP will work with all levels of training providers to ensure that graduates at the apprenticeship readiness level have access to moving into unionized apprenticeship with the free and fair option to join a union. MSFAP anticipates collaborating with local community colleges as well to incorporate their solar trade programs as another level of opportunity for those individuals looking to move to college credit/degree/certification programs that could move them toward management positions in the solar industry.

**Plans for Investing in Disadvantaged Business Enterprises:** The MSFAP Coalition is committed to prioritizing equitable economic opportunities for disadvantaged businesses and contractors and will award extra points for businesses in these categories during our procurement processes. MSFAP will also consider the HUB Zones in Maryland during our procurement processes.

**Plans with Unions and Signatory Contractors who are Committed to "High Road" Labor Practices:** MCEC reached out directly to the Baltimore-D.C. Metro Building Trades Council and met with the Joint Apprenticeship Training Committee (including Electrical Workers, Insulators, Boilermakers, Plumbers & Gas Fitters, Sprinkler & Steam Fitters, Roofers, Masons, Teamsters, Laborers, Bricklayers, Ironworkers, Sheet Metal Workers, Elevator Constructors, Painters, Operating Engineers and Carpenters) to invite them to participate in the MSFAP. The Electrical Workers (IBEW) and Carpenter's Unions signed up to do Solar Skills Training for both Journeypersons and Apprentices. They have included an element of Math remediation as a supportive service in their apprenticeship element to ensure their success in the program. The programs have a high level of safety training embedded in them and all unionized apprentices/journeypersons are trained in OSHA 10/30 for their trade. MSFAP supports the "High Road" labor practices of unions and signatory contractors. Wage and benefit practices from unionized registered apprenticeships are a path to wealth creation and a giant leap out of poverty for LIDAC populations.

12

**Program Income:** Investments made through the program are anticipated to eventually generate some income for reinvestment. MSFAP will be better able to determine the amount as specific projects materialize during the planning phase, for funding and financing in the implementation phase. MSFAP will set goals for program income and parameters for future use, based on available grant resources and as specific investment strategies and programs are further defined.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

**Section 2:  Project Design Plan**

**2.1 Activities to be Conducted**

**PHASE 1 PLANNING YEAR:**

**May 2024-April 2025 Administration/Program Development**

- Work with EPA on workplan and budget revisions, grant agreements and coalition partners MOUs
- Establish payout processes, sign up for drawdowns with EPA—ASAP.gov
- Hire program staff
- Research and implement industry best practices with technical assistance partners
- Establish robust Governance/Oversight Committee and Workgroups (with representation from the public, LIDAC leadership, etc.)
- Hold initial stakeholder launch meeting and monthly Workgroup and Oversight Committee meetings
- Initiate public communication/public comment
- Develop a program communications plan
- Develop definitions, policies procedures, regulations, processes, procedures, contracts, and reporting templates for use of funds, overall grant management & reporting
- Vet, select, develop partnership agreements with CBO/NPO implementers
- Identify shovel ready projects for initial deployment
- Draft and execute sub-awardee agreements as needed
- Solicit financial/funding partnerships and implementation plans
- Develop funding leveraging options/processes with financial partners
- Develop technical assistance partnerships, needs assessment and implementation plans
- Develop site visit/auditing processes and procedures
- Establish parameters and processes to be implemented in relation to consumer protection
- Develop RFPs for all procurement processes and run procurement processes for necessary services and contracts

13

- Refine Workplan with EPA Project Officer as need/Gain approvals from EPA

- Report progress to the EPA quarterly or as needed/requested

**Contract Date-April 2025 Workforce Development Training Implementation (1st Year, in Planning Year)**

- Work with CBO/NPO partners on MOUs, objectives, processes, procedures
- Review Uniform Guidance, regulations, required reporting statistics, documentation
- Conduct site visits
- Review results/deliverables as program progresses
- Implement Training Levels
  - Level 1 Training Apprenticeship Readiness/NABCEP Certification
  - Level 2 Training Unionized Apprenticeship Solar Training—IBEW/Carpenters
  - Level 3 Training Unionized Journeyperson Solar Training—IBEW/Carpenters
  - Level 4 Training Community College for credit/certification Solar Training
- Refine Workplan with EPA Project Officer as need/Gain approvals from EPA
- Report progress to the EPA quarterly or as needed/requested

**Contract Date-April 2025 Technical Assistance Implementation (1st Year, in Planning Year)**

- Work with CBO/NPO Technical Assistance partners on MOUs, objectives, processes, procedures
- Review Uniform Guidance, regulations, required reporting statistics, documentation
- Set up financial/auditing best practices with financial team
- Review and implement program best practices
- Research/RFP for customer data collections computer systems
- Develop tracking and reporting systems
- Work with TA/Financing & Funding Industry coalition partners and the Funding & Financing Workgroup to create a plan to refine any finances subsidies
- Refine Workplan with EPA Project Officer as need/Gain approvals from EPA
- Report progress to the EPA quarterly or as needed/requested

**Contract Date-April 2025  Outreach and Education Implementation (1st Year, in Planning Year)**

- Work with CBO/NPO partners on MOUs, objectives, process, procedures
- Review Uniform Guidance, regulations, required reporting statistics, documentation
- Hire and train Community Navigators on processes, solar installation education, financing education
- Set up and launch MSFAP webpages for internal and external access
- Create content and translate outreach materials as needed
- Plan outreach events for the year
- Conduct site visits
- Refine Workplan with EPA Project Officer as need/Gain approvals from EPA
- Report progress to the EPA quarterly or as needed/requested

15

**Contract Date-April 2025 Begin Implementation of Identified Shovel Ready Projects (1st Year, in Planning Year)**

- Work with coalition partners/Governance Committee to determine shovel ready projects for early implementation
- Conduct public comment/meetings to discuss projects
- Work with coalition partners and teams to start installation processes
- Conduct site visits
- Refine Workplan with EPA Project Officer as need/Gain approvals from EPA
- Report progress to the EPA quarterly or as needed/requested

**Financial Assistance Strategy:**

The MSFAP intends to utilize a variety of types of financial assistance strategies to achieve the goal of impacting 10,000 plus households and delivering the measurable benefits desired. The MSFAP Coalition, industry advisors and partners will utilize time allowed for a planning period to further refine the specific financing strategies and delivery processes to best serve the various target markets prioritized in this plan.

The MSFAP has committed to using 75% of the EPA grant funds awarded for financing and funding deployment of solar and solar with battery storage.

Target Markets, Maximizing Impact and Leveraging Resources: Regarding criteria for deciding which projects will be funded and/or receive financial assistance, MSFAP has budgeted $41,075,000 in SFA funding, from an overall program budget of $62,450,000 (with $400,000 EPA in-kind Technical Assistance). Approximately 75% of available funds are dedicated to support deployment of residential rooftop, residential serving community solar, and associated storage installations. The following target market audiences and project types have been identified for funding or financial assistance in this category:

- **SINGLE-FAMILY LOW-INCOME OWNER OCCUPIED RESIDENTIAL**: MSFAP budgeted $6,700,000 to provide low-cost financing to assist a target of 1,303 owner-occupied single-family residential households with enabling upgrades and solar installation. The percentage of grants and loans available to this market will be adjusted based on income as a percentage of AMI, so that the lowest income residential property owner is assisted at a greater scale. MSFAP will implement both grants and loans, this planning will be finalized during the planning period. DHCD has verified there are 1,000 units currently weatherized and solar-ready through their programs. MSFAP will connect with the Maryland Department of Social Services to identify and implement outreach customers who are currently receiving LIHEAP and bill payment assistance as a priority target audience for solar deployment using SFA funds.
- **MULTI-FAMILY RESIDENTIAL**: MSFAP funding will be deployed to provide access to cost savings from solar for residents that do not own their home or unit in a multi-family property, through various community solar project models on rooftops, ground-mounted and on canopy structures, including some proposed for development by local government partners on local government properties, intended to serve low-income residents in Justice 40 communities. MSFAP has budgeted $6,700,000 to address this market sector with

16

priority for funding and financing given to those properties verified to have been through DHCD weatherization programs and are solar-ready. Funding and financing to serve this market sector is projected to impact approximately 1,496 households in this market sector, over the grant implementation period.

As the State's Housing Finance Agency, the Maryland Department of Housing and Community Development (DHCD), is uniquely positioned to lead the MSFAP to design, administer and ramp up the Solar for All (SFA) program for multi-family housing projects. DHCD will be able to successfully help MSFAP meet the goals of the Solar for All Program. Specifically, DHCD will:

- o supply a pipeline of 1,303 single-family buildings that are ready for on-site solar.
- o design, administer, deploy, and monitor the funding and technical compliance for all MF projects, to benefit around 1,496 households
- o coordinate with all entities included in this application for outreach, workforce development, and technical assistance
- o refer all clients that are not eligible for on-site solar to the organizations providing community solar.

- **COMMUNITY SOLAR & COMMUNITY SERVING SOLAR with STORAGE**: MSFAP will take advantage of recently enacted regulations shifting the state community solar program from a pilot to permanent and has budgeted $21,675,000 in funding to serve this market sector within the MSFAP plan. To facilitate delivery of outcomes the Climate Access Fund (CAF) will manage project financing. This funding will be utilized to support an estimated 15 projects resulting in a total of 7.5 MW of community solar, and community serving solar with storage projects serving low-income households and projects that serve as resilience hubs or provide power to residential facilities serving special needs consumers through a solar system. MSFAP intends to use the funding budgeted for this consumer sector to impact approximately 1,125 household units. The MSFAP anticipates investment of grant funds will facilitate approximately 10.7 MWh of storage capacity installed in association with funded solar projects. Consumers subscribed to benefit from SFA funded systems, per state law must benefit from the minimum annual cost savings and any system owner/operator will be required to verify those savings. Groundswell has agreed to make its subscriber management platform available to the MSFAP project to assist with this task for up to 10,000 households enrolled. In implementation, this service will be part of the MSFAP plan to ensure customers receive a minimum annual household savings benefit of 20%, directly or indirectly.

- **Serving Special Needs Populations**: The MSFAP has included a budget of $5,000,000 with a desire to facilitate community solar deployment to serve low-income, disadvantaged, underserved audiences housed in critical facilities and residential facilities which will benefit from solar projects designed to provide costs savings and/or an aspect of resilience. MCEC will manage this investment fund which may be deployed in the form of grants, revolving loans, or equity investments, leveraging funding from its Climate Catalytic Capital (C3) Fund to assist. The MSFAP intends to further develop specific criteria to allow financial assistance for associated storage and enabling upgrades to maximize the number of households served and other associated meaningful benefits. The Funding and Financing Workgroup will work with the MCEC Deputy Director of Finance to determine the best financing options (grant, loan, tax credits, existing program funding braiding based on the project needs. They will refine these processes during the planning period.

17

- **Use of Leveraging for Upgrades**: The MSFAP wants to consider how it can help address the volatility currently being experienced in the Maryland SREC market with a loan guarantee program, and how an affordable bridge loan could find projects that would likely have a cash flow delay because of the time it tax credits to be paid in many larger scale solar transactions. The MSFAP will utilize and leverage all federal and state funding, tax incentives, etc. prior to utilizing any funding for enabling upgrades. Our coalition partner DHCD administers the federal WAP funding in Maryland and will ensure that projects that need to have enabling upgrades will utilize that funding prior to utilizing Solar for All funding. MSFAP will continue to develop procedures and definitions of enabling upgrade criteria in our planning phase. DHCD will leverage its existing infrastructure for issuing grants and loans. This includes access to close to $100M annual funding for rehabilitation and energy efficiency work. The MSFAP will complement, and not duplicate, existing subsidies, tax credits, and other sources of financing and will support deployment that would not have occurred otherwise.
- **Addressing Barriers to Adoption**: The MSFAP will align solutions to the needs identified during the program planning period called for in the proposed timeline for delivery in attempting to address those barriers with associated mitigation strategies, including:
  - The need for roof, electrical and efficiency upgrades for low-income owner-occupied and multi-family residential properties would be mitigated by allowing up to 20% of project costs to be funded and/or financed to cover those costs. Those improvements would be identified as part of the overall project plan to be approved by a program manager before contractors can begin work on the project to benefit from SFA funding.
  - Sub-awards may be made to certain project developers who deliver whole home improvements including enabling upgrades with solar, and a workforce development aspect of their work.
  - SREC valuation is unpredictable, and production incentives are declining in Maryland according to installers. MSFAP may elect to implement loss guarantees to offset the volatility and create a less risky environment for private lenders to operate.
  - MSFAP may elect to implement a low bridge loan fund as a revolving financial tool to assist developers working with DACs and low-income households with SFA funds.
  - MSFAP may implement a low-cost revolving bridge loan fund to help cover the gap and expedite projects that would otherwise not be achieved during the delay.
  - MSFAP may implement a project development revolving loan fund which would help address this need. Funds could be rolled into the final project financing costs and the fund repaid for future project applicants.
  - MSFAP is not requesting a waiver of DBRA requirements but conscious of the increased costs, particularly in the single-family residential market. We believe honoring DBRA is an important factor in the wealth creation component of this endeavor.
- **Use of Funds for Enabling Upgrades**: MSFAP will develop and implement strategies, policies, processes, and protocols to ensure no more than 20% of overall financial assistance for the lifetime of the program is used for enabling upgrades. Contractual services will be obtained by MSFAP through open solicitation for these services. Enabling upgrades will only be funded in conjunction with a MSFAP solar investment.

18

- **Long Term Program Impact**: To ensure program longevity and market transformation beyond the grant period, the MSFAP will also engage various consultants, capital providers, lending, and program management partners to crowd-in more private investment for program delivery and long-term impact. Credit enhancements and loss coverage will be used to ensure interest rates are kept to a minimum, and consumer privacy protections are in place. Grant and lending amounts invested will be directly linked to incomes with the lowest income consumers eligible for a greater percentage of grants and higher income consumers participating in MSFAP with a greater debt-to-grant eligibility ratio.
- **Supporting Operations, Maintenance and Recycling of Assets**: The Maryland Department of the Environment (MDE) and MEA will provide technical guidance, programmatic efforts, and enabling policies to support the MSFAP to successfully manage ongoing operations, maintenance, and recycling of the assets funded under the program for the lifetime of the assets. Maryland will also leverage tools from the EPA, such as the EPA's Solar Photovoltaic Waste Estimation Tool, and other resources from the EPA Hazardous Waste Program and EPA Sustainable Materials Management Program and corresponding Maryland efforts. MDE is currently leading an ongoing Solar Recycling Work Group, as part of the Maryland Commission on Climate Change: https://mde.maryland.gov/programs/air/ClimateChange/MCCC/Pages/SPSRRRWG.aspx The Working Group will be producing the report outlined on that page which will shape the next steps for solar recycling in the State and will go to the Maryland Commission on Climate Change and General Assembly for consideration and approval. Once this workgroup presents its findings to the commission, MSFAP will work with MDE and others to implement suggestions during the planning period.
- **Conducting Audits of Assets to Ensure Operations & Maintenance is Performed**: As part of the grant compliance process, MCEC and procured site engineers and auditors will conduct an audit of assets throughout the grant timeframe to ensure that operations and maintenance are performed. MSFAP anticipates that these audits will be ongoing throughout the life of the program.

**Project-Deployment Technical Assistance Strategy:**

MSFAP has included $2,491,750 (not including $400,000 of in-kind TA from EPA) of the overall budget in funds requested to support communities and other solar market stakeholders by providing project-deployment technical services. This will be achieved through service agreements with partner organizations as well as access to software platforms and advisory assistance for project design, engineering, permitting and interconnectivity. Certain technical assistance needs may be identified through the planning process envisioned to occur in the first year of the funding plan timeline.

**MCEC** will provide resources through the Procurement & Technical Assistance division to offer efficient, cost-effective centralized procurement to source the technical expertise, products, equipment, services, software tools, and any other contractual services competitively procured from for-profit vendors. MCEC will also manage a portion of funding in relation to Workforce Development to provide grants, subsidies, reimbursements and loans for tuition and wrap-around services supporting low-income workforce program participants and trainees.

Utility partners will be among advisory stakeholders engaged by MCEC through the Planning & Technical Assistance Workgroup through MSFAP to facilitate cooperation between industry, contractors and consumers and reduce barriers to success. Solar industry, Consumer Advocates and Community Development organization representatives will also be involved in the planning and delivery of MSFAP objectives.

The following non-profit technical assistance partners and service providers will be engaged to assist coalition partners with data collection and reporting on grant deliverables, outputs and outcomes related to project deployment:

- **Center for Climate Strategies (CCS)** will serve to lead the MSFA Planning & Technical Assistance workgroup and provide technical assistance to the MSFA team, including determination of outcome metrics tracking, data management for efficient and effective program design and reporting.
- **Maryland Department of Housing & Community Development (DHCD**) will lead the delivery of the deployment strategy in the multi-family housing arena.
- **Green & Health Homes Initiative (GHHI)** will bring technical assistance for solar developers, implementors and financiers along with a tool kit on braiding federal and utility funding and comprehensive solar assessment tool for implementers.
- **Technical Support Using IT Tools and Programs**: The system will help with the high volume; low difficulty reviews associated with permitting a solar energy system on a residential property. This program, suggested by representatives of the solar industry, builds on a successful pilot implemented in Montgomery County and is slated for permanent adoption.
- **Maryland Energy Administration (MEA)** will fund SolarApps+ using $3.9M in DOE grants to make the software platform available and provide technical training support for code officials and permitting officers and will do training for local officials. MEA will provide grants to local government AHJs, or possibly to an overarching organization that will provide subgrants. Funds may be used for IT systems integration, training, project staffing, and other necessary functions required to implement SolarAPP+, based on the unique needs of each AHJ. MEA, in association with the MSFAP, anticipates providing subgrants between $40,000 and $200,000 per jurisdiction, depending on population and the presence of Justice40 communities, with Justice40 communities being eligible for greater incentives and additional support. A total of 40 to 60 grants or subgrants are anticipated.
- **Groundswell**, through the MSFAP, will provide battery storage to community serving solar projects.
- **Technical Assistance for Efficient Deployment**: MCEC, on behalf of MSFAP, will use competitive solicitation and award processes to engage contractual service providers as deemed necessary and appropriate to support the delivery of the program, during the planning and development period through the phase of program delivery.

The following eligible organizations have also been included among Coalition Partners to provide specific technical assistance to help achieve grant deliverables:
- **Maryland Environmental Services (MES)** as part of the MSFAP plan to ensure a sound project engineering; post-construction inspection and quality control process is in place, MES will be available to assist with MSFAP project design, siting, engineering, construction & interconnection support, as well as to support MCEC with performance measurement &

verification associated with reporting of grant deliverables. MES will assist MCEC with auditing of assets and ensuring operation and maintenance is performed.

- **Maryland Department of the Environment (MDE)** will function as a technical advisor to help ensure habitat and land use standards are met, and associated greenhouse gas reductions are applied to state goals.

- **The University of Maryland Environmental Finance Center (UMD EFC)** will deliver comprehensive services to help build the local capacity of Maryland communities to plan, fund, and implement solar projects and community-based solar outreach campaigns. UMD EFC will take a community-first approach in designing and delivering this assistance, collaborating with communities to address their solar energy adoption challenges, and encouraging them to take the lead in identifying priorities and opportunities for engaging residents in solar solutions. Through direct technical assistance, education and training, community outreach and engagement, and resource and tool development, the UMD EFC will mobilize resources to help communities advance their solar initiatives.

- **Maryland Department of Labor (MDOL)** will lead MSFAP coordination of workforce development activity and training programs. MDOL will advise on the investment of MSFAP program funds to ensure effectiveness of programs and the achievement of desired outcomes. The agency will also help bridge the various local workforce development boards with the MSFAP activities, and track metrics related to reporting for the grant investment.

The MSFAP plan to develop the necessary workforce our partners include training program operators already operating successfully demonstrated training models. Those organizations will be engaged to train over 400 individuals to be ready to sit for NABCEP examinations, and to obtain licenses in the future as credentialed apprentices and journeypersons. MSFAP will fund those training providers to collaborate specifically with individuals from LIDAC communities for career pathways and job placements as performance metrics.

MSFAP will be working directly with the Baltimore-D.C. Metro Building Trades Council and their Apprenticeship Directors through their regional, statewide, and local trade unions to provide Solar Installation trade-specific training to apprentices and journeypersons. This skills upgrade training will provide the trained workforce needed to quickly prepare the trades, particularly the IBEW and the Mid-Atlantic Carpenters, to quickly deploy this level of skilled workers through their signatory contractors throughout the state.

MCEC envisions the Planning & Technical Assistance and Workforce Development Workgroups will be engaged when grant award notices are announced, due to the need to provide opportunity for the largest number of participants to complete the two-year NABCEP and the seven-week, union specific IBEW's PV Solar Online Electrical Training (250 apprentices/250 journeypersons) and the Carpenter's UBC Solar Training Program (100 apprentices and journeypersons). Workforce development programs will start with funding in year one, following the execution of appropriate contracts and agreements. Having our coalition partner MD DOL oversee the program will ensure that Good Job Principles, Multi-Sectoral Partnerships and Job Quality best practices. MSFAP is encouraging the use of Project Labor Agreements, Community Benefit Agreements, prevailing wage, and Registered Apprenticeship requirements throughout our projects.

**Equitable Access and Meaningful Involvement Plan:**

<u>Plan for Participatory Governance & Partnerships:</u> Members of the MSFAP Coalition have created a governance structure, which is envisioned to facilitate participatory governance, and community engagement in the planning and implementation phases of the grant.

Governance will be led by an Oversight Committee, which reports through MCEC staff to the MCEC Board of Directors appointed by the Governor with fiscal and operational management responsibility. MSAFP will also engage workgroups, to include representatives of state and local government, community leaders, industry, labor, utilities, program managers, and capital providers, including Workforce Development, Funding & Financing, and Outreach & Education. These workgroups will deliberate and create implementation strategies, processes, and parameters. The Planning & Technical Assistance workgroup, using input from the others, will be engaged to track outcomes and outputs, manage measurement & verification, and provide technical support to achieve grant deliverables. The Governance Oversight Committee will meet month/quarterly as needed for the life of the project, to direct and advise the MSFAP on project selection, deliverables, outcomes, etc. MSFAP will continue to refine these plans throughout the planning year.

<u>Meaningful Engagement & Community Involvement Strategy:</u> Numerous partners who were engaged in the pre-application process undertaken by MCEC have agreed to participate in work groups, and others who are interested may be involved in the future. To successfully achieve future outcomes related to educating and engaging communities on the benefits of solar energy, and facilitating community involvement in program design and operations, the MSFAP will engage the Center for Energy & Environmental Justice & Health (CEEJH) and the Environmental Finance Center centers housed at the University of Maryland, and collaborate with trusted community-based organizations like the LCV CHISPA, Community Development Network of Maryland, NAACP and the Caucus of African American Leaders can be compensated through the MSFAP to facilitate outreach through their significant networks. Those same organizations will take part in efforts to ensure representatives of low-income, and DACs will be involved in MSFA program design and operations. MSFAP will also conduct public comment and outreach events to ensure that the public is aware of the projects being proposed and have an opportunity to comment. We will use multiple communications techniques to ensure that local communities are made aware of projects/project developments/education and outreach opportunities and employment/workforce development opportunities. MSFAP will continue to refine these plans throughout the planning year.

<u>Outreach to Native American Communities in Maryland:</u> The MSFAP Coalition will continue to reach out to the Maryland Commission on Indian Affairs, the Native American Indian Resource Information Center—Maryland Area, and numerous other tribe-affiliated organizations in Maryland in an effort to include them in the Maryland into the Solar for All program.

<u>Customer Acquisition Strategy to Maximize Breadth & Diversity of Solar Deployment:</u> The MSFAP plans to serve eligible households and communities across the entire state in urban, sub-urban and rural areas. Outreach and education efforts will be overseen by a workgroup focused on creating messaging, web content, and collateral materials with culturally appropriate and translated to remove language barriers. Lending programs to be delivered for single-family household consumers through the MSFAP will be available statewide, multi-family projects will likely be implemented more in urban and suburban areas, and community solar projects planned will serve

renters and special needs populations. MSFAP will continue to refine these plans throughout the planning year.

<u>Plan for Income Verification and Coordinating with Needs-Based Utility Assistance Programs:</u> The MSFAP program will be following the definitions highlighted in the program NOFO to determine eligibility and will work with coalition partners and the Governance Committee to establish policies and procedures around income verification and needs-based utility assistance programs. This work will happen in the planning period. Coalition partners are already working on delivery of home energy improvement programs, combined with community based on the job workforce training will be funded to assist with MSFAP implementation. MSFAP will continue to refine these plans throughout the planning year.

**Section 3:  Fiscal Stewardship Plan**

<u>Reducing Fraud and Waste:</u> As MSFAP lead, MCEC is required to comply with state ethics laws and will implement procedures to control conflicts of interest in relation to SFA grant expenditures. MCEC is Governmental Accounting Standards Board (GASB) compliant and required by statute to prepare independently audited financial statements prepared annually, which are available at www.mdcleanenergy.org. An independent audit will also be prepared in relation to the use of MSFAP federal grant funds annually.

<u>Ensuring Compliance</u>: MCEC, as the lead applicant in Maryland's Solar for All program, will meet the following requirements in 2 CRF 200.332 (b) and (d). MSFAP will: Evaluate each subrecipient's risk of noncompliance with Federal statutes, regulations, and the terms and conditions of the subaward for purposes of determining the appropriate subrecipient monitoring including: the subrecipient's prior experience with the same or similar subawards; the results of previous audits including whether or not the subrecipient receives a Single Audit; whether the subrecipient has new personnel or new or substantially changed systems; and the extent and results of Federal awarding agency monitoring

<u>Administrative and National Policy Requirements:</u> MSFAP intends to honor Build America, Buy America (BABA) as well as Davis-Bacon and Related Acts (DBRA). MSFAP will also honor URA, NHPA and Justice40. The NOFO indicated that NEPA will not apply to projects funded by Solar for All, however, if that changes, we will ensure compliance with NEPA as well.

<u>Consumer Protections:</u> The MSFAP will comply, and screen to ensure that all capital providers and contractors comply with Maryland laws protecting consumers in the program, this includes COMAR sections: 12.106,12.303, 12.314, 12.901, 12.903 and 12.904. Guardrails will be established through contract agreements and reporting requirements implemented with installers and other contracted service providers as part of efforts by MSFAP to combat predatory lending and to ensure household savings materialize for program beneficiaries. MSFAP will require compliance with COMAR regarding unfair trade practices, including sections 13.301 and 14.1302, and all sections of Maryland Home Improvement and Licensing Law. MSFAP will publish grievance procedures and processes for consumers to direct complaints or concerns directly to the Oversight Committee and MCEC staff, as well as to the Maryland Home Improvement Commission.

23

Revolving Loan Funds/Financial Management Plan for Program Income: The MSFAP does envision deploying SFA grant funds in the form of revolving loan funds, leveraging state and private capital in a manner designed to achieve the desired outcomes of the program. The Maryland Clean Energy Center will develop eligibility guidelines, application, and approval processes to purpose funds it manages through Revolving Loan Fund models. MCEC funds deployed in combination with MCEC investments will be overseen by the MCEC Finance Committee and or the C3 Fund Investment Oversight Committee. The MSFAP Funding & Finance Workgroup will develop eligibility guidelines, application, and approval processes to purpose all other SFA funds, with approval from the Oversight Committee, sub-awardees may manage additional revolving funds. Program income generated from SFA supported Revolving Loan Fund investments will be allowed for reinvestment under the terms and guidance applied to the original investments and considered toward the MSFAP goal to achieve program longevity and sustainability.

**Section 4:  Timeline and Milestones**

**Steps and Milestones to implementation:** MSFAP has developed our program timeline in phases to ensure that deliverables are met at each stage.  MSFAP anticipates starting several elements of the program during the planning phase as things progress and will adapt to changes as needed.

| Steps/Milestones: | Phase #: | Activities: | Dates: |
|---|---|---|---|
| 1--Planning Year | Administration | <ul><li>Update Workplan & Budget</li><li>Work with Program Officer on Workplan & Budget</li><li>Sign Grant Contract</li><li>Setup Funding Drawdown Systems</li><li>Staff hiring</li><li>Establish processes and procedures for program</li><li>Meet with Governance Committee/Workgroup, establish expectations, processes</li><li>Further define deliverables highlighted in the application</li><li>Research and Implement Best Practices with TA Partners</li><li>Oversee grant processes/reporting</li><li>Initiate public communication/public comment</li><li>Develop a program communications plan</li><li>Develop definitions, policies procedures, regulations, processes, procedures, contract, and</li></ul> | Contact approval thru 4/30/25 |

reporting templates for use of funds, overall grant management & reporting

- Vet, select, develop partnership agreements with CBO/NPO implementers
- Identify shovel ready projects for initial deployment
- Draft and execute sub-awardee agreements as needed
- Solicit financial/funding partnerships and implementation plans
- Develop funding leveraging options/processes with financial partners
- Develop technical assistance partnerships, needs assessment and implementation plans
- Develop site visit/auditing processes and procedures
- Establish parameters and processes to be implemented in relation to consumer protection
- Develop RFPs for all procurement processes and run procurement processes for necessary services and contracts
- Continually assess program for deliverable goals/milestones, refine as needed
- Report progress to the EPA quarterly or as needed/requested

| | Workforce Development Training Implementation | - Work with CBO/NPO partners on MOUs, objectives, processes, procedures<br>- Review Uniform Guidance, regulations, required reporting statistics, documentation<br>- Conduct site visits | Contract signed thru grant end |

|  |  |  |  |
|---|---|---|---|
|  |  | • Review results/deliverables as program progresses<br>• Implement Training Levels<br>  • Level 1 Training Apprenticeship Readiness/NABCEP Certification<br>  • Level 2 Training/Unionized Apprenticeship Solar Training—IBEW/Carpenters<br>  • Level 3 Training Unionized Journeyperson Solar Training—IBEW/Carpenters<br>  • Level 4 Training Community College for credit/certification Solar Training<br>• Report progress to the EPA quarterly or as needed/requested |  |
|  | Technical Assistance Implementation | • Work with CBO/NPO Technical Assistance partners on MOUs, objectives, processes, procedures<br>• Review Uniform Guidance, regulations, required reporting statistics, documentation<br>• Implement tracking system for data collection and reporting<br>• Interface systems with client intake systems<br>• Review program best practices<br>• Review program plan and change as advised<br>• Report progress to the EPA quarterly or as needed/requested | Contract signed thru grant end |
|  | Outreach and Education Implementation | • Work with CBO/NPO partners on MOUs, objectives, process, procedures<br>• Review Uniform Guidance, regulations, required reporting statistics, documentation<br>• Hire and train Community Navigators on processes, solar installation education, | Contract signed thru grant end |

26

| | | | |
|---|---|---|---|
| | | financing education | |
| | | • Set up and launch MSFAP webpages for internal and external access | |
| | | • Create content and translate outreach materials as needed | |
| | | • Plan outreach events for the year | |
| | | • Conduct site visits | |
| | | • Report progress to the EPA quarterly or as needed/requested | |
| | Shovel Ready Project Implementation | • Complete RFP selection process for contractors/installers | Contract signed thru grant end |
| | | • Review the determined shovel-ready projects with the Governance/Oversight Committee | |
| | | • Work with Technical Assistance/Financial Assistance teams to determine project viability | |
| | | • Conduct public comment/review | |
| | | • Initiate shovel ready programs | |
| | | • Conduct site visits | |
| | | • Report progress to the EPA quarterly or as needed/requested | |
| | | • Begin planning phases for PHASE 2 project implementation in 2025/2026 | |
| Phase #2 Implementation 2025-2026 | | • Hold quarterly Oversight Committee and Workgroup meetings | 5/1/25 thru 4/30/26 |
| | | • Implement Finance & Funding Programs and Investment Strategies | |
| | | • Implement Workforce Development Training Programs and Initiatives | |
| | | • Implement Outreach and Education Programs and Initiatives | |
| | | • Implement Technical Assistance Programs and Initiatives | |
| | | • Review the determined shovel ready projects with the Governance/Oversight Committee | |
| | | • Work with Technical Assistance/Financial Assistance teams to determine project viability | |
| | | • Conduct public comment/review | |
| | | • Initiate shovel ready programs and | |

| | | conduct site visits • Audit prior years' work, revise plans as needed • Report progress to the EPA quarterly or as needed/requested | |
|---|---|---|---|
| Phase #3 Implementation 2026-2027 | | • Hold quarterly Oversight Committee and Workgroup meetings • Evaluate all efforts to date and adjust strategies as needed. • Continue to Implement or Adjust Finance & Funding Programs and Investment Strategies • Continue to Implement or Adjust Workforce Development Training Programs & Initiatives • Continue to Implement or Adjust Outreach and Education Programs and Initiatives • Continue to Implement or Adjust Technical Assistance Programs and Initiatives • Review the determined shovel ready projects with the Governance/Oversight Committee • Work with Technical Assistance/Financial Assistance teams to determine project viability • Conduct public comment/review • Initiate shovel ready programs and conduct project site visits • Audit prior years' work and revise plans as needed • Report progress to the EPA quarterly or as needed/requested | 5/1/26 thru 4/30/27 |
| Phase #4 Implementation 2027-2028 | | • Continue Workforce Development Training Programs • Continue Outreach and Education Programs • Continue Technical Assistance Programs • Review the determined shovel ready projects with the | 5/1/27 thru 4/30/28 |

| | | | |
|---|---|---|---|
| | | Governance/Oversight Committee<br>• Work with Technical Assistance/Financial Assistance teams to determine project viability<br>• Conduct public comment/review<br>• Initiate shovel ready programs and conduct project site visits<br>• Audit prior years' work and revise as needed<br>• Report progress to the EPA quarterly or as needed/requested | |
| Phase #5 Implementation 2028-2029 | | • Continue Workforce Development Training Programs<br>• Continue Outreach and Education Programs<br>• Continue Technical Assistance Programs<br>• Review the determined shovel ready projects with the Governance/Oversight Committee Work with Technical Assistance/Financial Assistance teams to determine project viability<br>• Conduct public comment/review<br>• Initiate shovel ready programs and conduct site visits<br>• Audit prior years' work and report progress to the EPA quarterly or as needed/requested<br>• Grant close out and reporting period with EPA | 5/1/28 thru 4/30/29 plus 120-day closeout |
| | | | |

**Planning Period:** MSFAP planning period will occur from May 2024 to April 30th, 2025. We request that Workforce Development, Technical Assistance, Outreach and Education and shovel ready project implementation be allowed to start early in the planning year (as soon as the contracts are approved and signed).

**Refining the Program:** MSFAP will work with their technical assistance and financial assistance partners to constantly review processes and procedures and adapt the program in response to the solar market nationally and in Maryland.

**Section 5:  Reporting Requirements**

As MSFAP lead, MCEC will prepare quarterly and annual financial and workplan deliverable reports throughout the grant program period, including evidence and evaluation of outcomes and results achieved for each period and cumulatively. MCEC will develop and distribute grant reporting templates and forms to be distributed to and submitted by sub-awardees and contractors engaged to achieve grant deliverables and/or responsible for the use of grant funds. Personnel hours, rates, and overhead will be tracked in association with hours for defined grant expense categories, equipment costs and payments for services rendered and all grant fund recipients will be required to submit invoices, receipts and evidence of expenses incurred to receive funding. The MSFAP Oversight Committee will approve expenses and budgets, along with withdrawal schedules in negotiating contracts for sub-awardees and contractors associated with the use of grant funds.

Grant Reporting Requirements to Achieve Expected Environmental Outputs & Outcomes: MCEC, as the lead applicant in Maryland's Solar for All program, will meet the following requirements in 2 CFR 200.303.:
- Establish and maintain effective internal controls over the Federal award
- Comply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award
- Take reasonable measures to safeguard protected personally identifiable information and other information designated as sensitive

MSFAP will also follow 2 CFR 200.329 including oversight/monitoring; reporting on program including completing non-construction performance reports; construction performance reports; significant developments, including problems, delays, or adverse condition and favorable development in schedules, lower cost, etc.; and site visits. During a planning phase MSFAP will create a plan to integrate program evaluation activities into the reporting plan, including assessing effectiveness and efficiency in achieving outputs and outcomes. These evaluations will follow EPA Order 1000.33 including supporting EPA: Relevance and Utility; Rigor; Independence and Objectivity; Transparency; Ethics and Equity. MSFAP will invest program capacity in performing program evidence and evaluation activities and will communicate those details through State of Maryland networks, the MCEC Board of Directors, MCEC Annual Report and statewide communities at large.

The coalition partners and Governance Oversight Committee will be tasked with helping to ensure that program developments and achievements are communicated in media, social media, and formal reporting documents. Special efforts will be made using Outreach and Education Navigators to ensure that LIDAC communities are communicated with in a culturally competent way and in the language of their choice.

1. Performance Reports

Semi-Annual Report
The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

Final Report
The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.


2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions that originated in the preceding two quarters.

**Section 6:  Budget Narrative**

**6.1 Project Budget**

<u>**Personnel**</u> -
   **Personnel (3% COLA INCLUDED EACH YEAR)**
- 100% FTE Grant Program Director @ $140,000—oversee and support program deliverables/sub awardees, reporting to EPA
- 100% FTE Grant Program Assistant Director  @ $120,000—oversee and support sub awardees, auditing, site visits, reporting
- 100% FTE Grant Program Assistant @ $62,000—provide administrative assistance for staff and sub awardees

- 100% FTE Procurement Assistant @ $65,000—provides procurement support to the program
- 5% of FTE Executive Director @$184,000—oversees staff and grant deliverables
- 25% of FTE Grant Compliance Officer @ $105,000—oversees grant project, administration & compliance
- 10% of FTE Equity and Outreach Manager @ $100,000—supports outreach and education of program, clean energy educational materials
- 10% of FTE Marketing & Communications Director @ $125,000—supports Marketing and Communication of grant program
- 20% of FTE Sr. Manager of Partnerships & Communications @ $110,000—support partnerships and communications of program
- 10% of FTE Deputy Director of Finance & Energy Investment @ $170,000—supports strategic financing, private capital investment, program income
- 10% of Lending Portfolio & Program Manager @ $146,000—supports day to day management of funding and financing platforms
- 10% of Procurement Director @ $134,000—provides procurement support to the program
- 10% of Procurement Manager @ $85,000—provides procurement support to the program

Total Personnel $2,762,843 over 5 years (Year 1 $520,450, Year 2 $536,064, Year 3 $552,146, Year 4 $568,710, Year 5 $585,473.

Creates 4 new staff positions, 1 Grant Program Director, 1 Grant Program Asst Director., 1 Grant Program Asst., 1 Procurement Assistant with market rate salaries for like positions. Existing Staff will be charged out at percentages based on their role on the SFA Grant—Executive Director 5% FTE, Grant Administration and Compliance Officer 25% FTE, Equity and Outreach Manager 10% FTE, Communication Director, 10% FTE Sr. Manager of Partnerships & Communications, 10% FTE, Deputy Director of Finance 10% FTE, Lending Portfolio and Program Manager 10% FTE, Procurement Director 10% FTE and Procurement Manager 10% FTE.

**Fringe Benefits** -
Total Fringe $773,596—Fringe Average is 28% across the organization
4 new staff, 28% average Fringe Rate, 9 existing staff, 28% average fringe rate, calculated based on their percentage on grant. Fringe rate is calculated based on 401k match, benefits, dental, vision, PTO, vacation, sick days, unemployment insurance, etc.

**Travel** -
Administrative Travel includes in-state, local travel visiting sites, conducting site visits, audits, meetings, networking, client outreach, public comment meetings, etc. The estimated number of travelers is 13, with an estimated cost per trip of 100 miles. Program coverage is statewide, and we anticipate all staff allocated to the program conducting site visits, auditing, and doing communication events, public comment sessions, possible EPA training events/conferences, etc. Travel will be throughout the state of Maryland.

The travel line-item totals $15,000 over the 5-year life of the grant. Mileage is calculated at the current Federal Rate of $0.67. Local/in state mileage—373 miles per month on average. Could also include conference expenses (Solar/EPA/SFA) as needed, air travel, per diem as per MCEC policy.

**Equipment** -

We do not have any equipment purchases anticipated in the Administration Budget. Coalition partners have not indicated any need for the purchase of equipment at this time.

**Supplies** –
Total $46,000
- Computer/Hardware, 4 laptops for 4 new staff persons total $4,000--$1,000 each.
- Office Related Supplies (toner, pens, paper, folder, etc.) @ $250 per month—standard office supplies provided by the organization to support goal attainment—printing, organizational office supplies--$15,000 over 5 years
- Office Furnishing and Renovations for Office Space for new employees $15,000 total for 5 years
- Printed Materials @ $200 per month—copier expenses and any external printing needs to support education and outreach activities and communication materials--$12,000 over 5 years

Supply Purchase Policy: We follow MCEC procurement policies to acquire supplies for the MSFAP project. Depending on the cost threshold this process includes a purchase order process and/or getting three bids for purchases up to a $5,000 limit.

**Contractual** -
Total $2,801,534
- Software licensing for 4 new staff persons for Adobe Express/Pro (as needed for job description), Zoom software and Microsoft Office software—total licensing costs for 5 years is $13,020.00 for 4 employees dedicated to the program.
- Single Financial Audit $20,000 annually—1/3rd of annual audit costs—SC&H, procured--grant total $100,000—mandated audit based on Uniform Guidance requirements when funding threshold is over $750,000.
- 100% FTE Bookkeeper @ $90,000 annually—I Heart EBITA Bookkeeping Contractual Services for MSFAP, process invoices/reimbursements/disbursements--procured--grant total $450,000—bookkeepers will assist with the coalition partner/sub awardee and vendor reimbursements. They also add a 2nd level of funding security because outside eyes are on the funding and reporting.

33

- Accounting/Controller Oversight 20 hours per month@ $150 per hour—DK EAST provide Controller oversite of bookkeeping, accounting processes—board appointed (2017) --grant total $180,000—oversee bookkeeping processes and ensure organizational audit compliance.
- Accounting Software @ $1,500 per month, plus upfront system conversion/migration costs—TBD/procured based on accounting needs--grant total $140,000. More robust accounting software needed to support the level of funding and coalition partners/sub awardees/vendors that this program requires. QuickBooks Online is our current system, and it does not support multi-year grants or this level of funding transactions. Recommended by our auditors for financial compliance.
- HR services for New Hires/HR issues @ $400 per month (initial year new hires), $160 per month after—Brenda Foca HR Consultant—procured—support HR/hiring of grant staff--grant total $12,480—support staff hiring/onboarding, HR issues.
- Legal Support Services (25%*$100 per hour)—AAG Martha Absher—Appointed by AG Office—supports grant contracts, vendor contracts, RFP documents and contracts, procurements, MOUS, etc. --grant total $45,000
- IT Support Services ($500 per month)—ALPHA tech services, support tech services, security, IT systems— support grant team IT systems--grant total $30,000. Assists all MCEC staff with their laptops, software, updates, anti-virus, networking systems and troubleshoots any IT issues for staff so that they can accomplish their jobs/grant deliverables.
- Financial Contractual Services/Montgomery Green Bank—coalition partner, assist with supporting Green Bank best practices, financial team supports, systems/processes—coalition partner--grant total $500,000. MCGB has software funding platforms/Open Space that support the Single-Family Solar Installation. Funding supports access to this system.
- Technical Support: Reporting, Site Service Auditing, Engineering Reviews—Maryland Environmental Services (MES) State Agency—Interagency Agreement-- $1,331,034. MES will provide reporting, site auditing, and engineering review for the MSFAP project sites. They will contribute an oversite role to the project and interface with other state agencies on projects/permitting.

**Construction (if applicable)** -

34

We do not currently have any construction costs in the administrative budget.

**Other** – Please see sub awardee table below for specifics of partners/costs, and more detail. Total costs in the other category total **$55,301,027**.

- **MCEC Other Categories ($82,172):**
- Office Parking Expenses--@ $4,000 per year. 4 new staff at $627 per year and 20% of 9 existing staff at $15 per month).  This expense is required by the landlord to pay for access to parking for the MCEC staff.
- Cell Phone Stipends for New Employees $75*4 per month—all staff are required to tie their personal cell phone to the organizational phone system and receive a monthly stipend for the use of their own cell phones. This expense supports the communications of the project.
- Cell Phone Stipends for Existing Employees 9 @ 10% of $75--$8 all staff are required to tie their personal cell phone to the organizational phone system and receive a monthly stipend for the use of their own cell phones. This expense supports the communications of the project.
- *Rent ($598 per month) $22 per sq ft plus 3% escalator annually*—office space for grants team for life of grant--grant total $38,097
- **Workforce Development Subawards ($6,050,875)**—this funding will support sub awardees conducting workforce development training and the attainment of their program goals, level of training, certifications, attendance, grades, employment, salary, benefits, wealth creation.
- **Technical Assistance Subawards ($2,522,125)**—this funding will support sub awardees conducting Technical Assistance for the project--this includes training, oversight, reporting, data collection, industry education.
  - $400,000 in EPA In-Kind Technical Assistance Subawards is included
- **Outreach and Education Subawards ($3,770,855)**—this funding will support the community outreach and education component of the grant. It will assist with developing a project pipeline and educate about the benefits of solar and clean energy initiatives and support the overall grant goals of 10,028 participating households.
- **Financial Assistance Subawards ($42,875,000)**—this funding supports the development of the single family, multi family and community serving solar projects. These projects help us meet the grant goals and the impact assessment targets.

Funding and Financing Partnership: MSFAP Coalition has prepared a budget which maximizes use of grant funds for project funding and financing, identifies significant state and private capital investment as leverage against the funds requested by the applicant. Various financing strategies will be identified and crafted for deployment including direct lending, indirect lending, credit enhancements, guarantees, equity investments, subordination agreements, tax credits, and incentives. MCEC and MCGB do have bond issuance capability that could be utilized depending on the overall funding and financing strategy which will be developed during the planning period. MSFAP will support projects that serve target markets with specific financial tools to enable disadvantaged small businesses to more easily finance projects and enter the marketplace within DACs.
MSFAP partners are engaging capital providers to create leveraged investment opportunities associated with the grant. MCEC, MCGB, CAF, FSC First and SELF are participating in NCIF and CCIA applications and intend to utilize funding available through those vehicles, if possible, to

support delivery of MSFAP strategies. As intended sub-recipients of MSFAP funding for direct

deployment of capital CAF, MCGB and DHCD will utilize innovative financing structures and seek to braid capital as loans, guarantees and grants with renewable energy credits, tax credits, and incentives through PPA and third-party ownership financing structures. MCEC will be responsible to ensure SFA funds are deployed in a timely and efficient manner to achieve grant deliverables, and that funds are deployed in a prudent manner for necessary costs.

**Participant Support Costs:**
The MCEC administrative budget does not contain participant support costs.

Bowie State/Black Wall Street Community Navigators CBO Partner (Outreach & Education) will use participant support costs for their Community Navigators:

Stipends – Participant Support Costs

The supportive services provided as part of this funding for training Community Navigators are designed to remove common barriers and ensure participants can fully engage in the program.

For each year of the program, up to 20 participants (40%) will benefit from supportive services at an annual fee of up to $150 per participant. ($3,000 annually/$15,000 over 5 Years)
These services include Career Counseling Tools, Childcare Services, Transportation Services, and/or Access to Additional Resources

1. **Career Counseling Tools:**
Participants will have access to personalized career counseling, helping them explore various career paths within clean energy and community development. The counseling will be conducted by peer mentors and may include
- Identifying strengths, areas for growth, and aligning their career goals with their interests.
- Providing guidance on progression paths within the clean energy sector, community advocacy, or related fields.
- Developing resumes
- Enhancing interview skills
- Providing networking opportunities to help participants secure meaningful employment
- Connecting participants with professionals in the field who can offer advice, insight, and career development support.

2. **Childcare Services:**
  For participants who are parents, this service is critical to ensure their ability to attend classes, training sessions, and professional events without the added stress of childcare concerns. This will include participants receiving financial support to cover the cost of childcare, reducing the burden on low-income families (Max $150 per participant).

3. **Transportation Assistance:**
We recognize that transportation can be a significant barrier for participants, especially those in underserved or rural areas. This supportive service may include:
- Public transportation subsidies including metro or bus fare
- Rideshare stipends where public transportation is insufficient (including, but not limited to, Uber and Lyft)

37

4. **Access to Tools and Resources:**

Ensuring that all participants have equal access to the resources they need is a priority, and this service will eliminate any financial or logistical disadvantages. These services may include:

- Technology access in the form of tablets
- Internet payment support to complete online training programs
- Participants will have access to resource centers where they can study, access the internet, and utilize other essential tools for learning and professional development.

These supportive services not only aim to reduce barriers but also empower participants to focus on their training and career advancement. They are integral to the holistic success of the apprenticeship program, ensuring that all participants, regardless of their circumstances, have the opportunity to succeed as Clean Energy Community Navigators.

**Subawards:**

| Description of Entity | Funding $$ | Types of Activities Supported | Type of Entity |
|---|---|---|---|
| **Workforce Development Entities** | **Total Funding $6,050,875** | | |
| MD Department of Labor | $358,125 | DBRA/Prevailing Wage Compliance/Partner placement rates, etc./Reporting | State Agency |
| MCEC | $132,000 | Workforce Supportive Services (Community College/Contractor Supports) | Quasi State Agency |
| IBEW Local 24 JATC | $218,125 | Journey Persons/Apprenticeship Training | Labor Union Apprenticeship Training Program |
| Mid Atlantic Carpenter's Training Center | $202,125 | Journey Persons/Apprenticeship Training | Labor Union Apprenticeship Training Program |
| Civic Works (Training) | $1,610,125 | NABCET Training (pre-apprenticeship training) | Non-profit Organization |
| Power52 | $1,010,125 | NABCET Training (pre-apprenticeship training) | Non-profit Organization |
| I'm Still Standing Corporation | $1,010,125 | NABCET Training (pre-apprenticeship training) | Non-profit Organization |
| Black Wall Street/Bowie State | $1,510,125 | Registered Apprenticeship Training | Non-profit Organization |
| **Outreach & Education Entities** | **$3,770,855** | | |
| University of MD, Environmental Finance Center | $510,125 | Municipal Capacity Assistance/Educational Materials | Academic Organization |

| | | | |
|---|---|---|---|
| Bowie State/Black Wall Street | $510,125 | Community Navigators (Statewide) | Academic Organization/CBO |
| Civic Works | $385,105 | Baltimore City Navigators | Non-profit Organization |
| NAACP | $5,000 | Stakeholder Engagement | Non-profit Organization |
| My Brother's Keeper/AA Caucus | $45,125 | Stakeholder Engagement | Non-profit Organization |
| Community Development Network of MD | $385,125 | Stakeholder Engagement | Non-profit Organization |
| CHISPA | $410,125 | Stakeholder Engagement | Non-profit Organization |
| CHESSA | $35,125 | Stakeholder Engagement | Industry Association |
| Local Government Support | $1,485,000 | Outreach & Education support in local communities/Capacity Building | Local Governments |
| | | | |
| **Technical Assistance Entities** | **$2,522,125 (does not include EPA TA Assistance)** | | |
| EPA | $400,000 | In-Kind Technical Assistance Support | Federal Agency |
| MCEC | $565,000 | Software System for Customer Application Intake/Classification/Reporting | Quasi State Agency |
| Center for Climate Strategies | $760,125 | Data reporting/GHG emission reductions/AFLEET system/Reporting Databases | Academic/Research Organization |
| CCSC | $35,125 | Stakeholder Engagement/Solar Best Practices | Solar Association |
| Green & Healthy Homes Initiative | $180,125 | Healthy Homes Contractor Training | Solar Developer Training |
| TA/TBD | $581,750 | Best Practices/Braiding/Leveraging Funding Supports | Best Practices/Leveraging Funding |
| **Funding & Financing Entities** | **$42,875,000** | | |
| MCEC | $5,350,000 | Strategic Financing Funding/Community Enterprise | Quasi State Agency |
| Montgomery County Green Bank | $1,030,000 | Single Family Project Funding/Open Platform | Non-Profit Organization/Green Bank |
| SELF (Solar & Energy Loan Fund) | $3,605,000 | Single Family Loan Fund | Non-Profit Loan Fund |

| | | | |
|---|---|---|---|
| (Single Family Funding) | | | |
| Department of Housing & Community Development (Multi-Family Funding) | $6,895,000 | Multi-Family Housing | State Agency |
| Groundswell (Battery Storage) | $1,030,000 | Battery Storage | Non-profit Battery Storage/Resiliency Coalition Partner |
| Climate Access Fund (Community Solar) | $22,905,000 | Community Serving Solar | Non-Profit Organization/Green Bank |
| Civic Works | $1,030,000 | Installation Partner | Non-profit Organization |
| GHHI | $1,030,000 | Installation Partner | Non-profit Organization |

**Additional Items**

**Indirect Charges**
MCEC will claim $750,000 in indirect charges. We are claiming less than the de minimis indirect rate of 10%. We do not have a NICRA rate currently. This rate includes existing building rent, utilities, phones, management oversight, etc.

**Conferences and Workshops:**
This workplan and/or budget detail do not include conferences or workshops that the recipient will conduct.

**Meals and Refreshments:**
This workplan and/or budget detail do not include activities during which meals and/or light refreshments will be provided. We would anticipate that anyone conducting meetings/training/events would not use federal funding to provide food or light refreshments.

**We do not anticipate providing Meals and Refreshments with Federal Funds.**

**Program Income:**
MCEC is not able to calculate any program income currently but anticipates $1,000 worth of program income. We will work with our Funding & Financing Technical Assistance collaborators and our Workgroup partners to further predict program income for this program in the planning year. Income will be generated over time based on funding strategies that are implemented. All program income will be rolled back into the MSFAP programming to ensure program sustainability.

# EXHIBIT 3

5H - 84090101 - 1    Page 1



| | | | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | **GRANT NUMBER (FAIN):** 84090101 **MODIFICATION NUMBER:** 1 **PROGRAM CODE:** 5H | | **DATE OF AWARD** 12/13/2024 |
| | **TYPE OF ACTION** No Cost Amendment | | **MAILING DATE** 12/13/2024 |
| | **PAYMENT METHOD:** ASAP | | **ACH#** PEND |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| MARYLAND CLEAN ENERGY CENTER 5000 College Ave Suite 31010 Colleg Park, MD 20740-3809 EIN:  26-3864715 | MARYLAND CLEAN ENERGY CENTER 5000 College Avenue, Suite 31010 College Park, MD 20740-3809 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Amy Gillespie 5000 College Ave Ste 31010 College Park, MD 20740-3809 **Email:** agillespie@mdcleanenergy.org **Phone:** 301-314-6901 | Lydia Kidane 1200 Pennsylvania Ave , 1101R Washington, DC 20460 **Email:**  kidane.lydia@epa.gov **Phone:** 202-564-0506 | Brandon EPierce 1200 Pennsylvania Ave NW, 3903R Washington, DC 20460 **Email:**  pierce.brandon@epa.gov **Phone:** 202-564-2972 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Maryland Solar for All Program (MSFAP)

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 62,450,000.00 | **TOTAL PROJECT PERIOD COST** $ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** LaShaun Phillips - Associate Award Official | **DATE** 12/13/2024 |

5H - 84090101 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84090101 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,762,843 |
| 2. Fringe Benefits | $ 773,596 |
| 3. Travel | $ 15,000 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 46,000 |
| 6. Contractual | $ 2,801,534 |
| 7. Construction | $ 0 |
| 8. Other | $ 55,301,027 |
| 9. Total Direct Charges | $ 61,700,000 |
| 10. Indirect Costs: 10.00 % Base MTDC | $ 750,000 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 1,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

## Programmatic Conditions

**Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)**

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the

authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the

benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.
- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer:** EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official:** "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate

buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within

either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are

primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or

subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition can be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a

violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

*The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive

officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance

agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the

Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

### E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

### F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

### G. Leveraging and Fundraising

#### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

#### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

### 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements

specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e.,

under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the

initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.


# III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient

has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

>      (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

>      (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

>      (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This

requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe

the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible

for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor

or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

    1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

    2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Single family homes;

2. Privately-owned, non-mixed-use, multi-family housing properties;

3. Privately-owned residential portions of mixed-use properties;

4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered

additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

## 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply [EPA's Final Financial Assistance Conflict of Interest Policy](#) to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain

important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not

in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All

workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities*.

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met

the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as

well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities**. As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The

"Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

　　1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

　　2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

　　3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the

authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or

individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT 4



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

<u>MEMORANDUM</u>

**SUBJECT:**   Termination of EPA Assistance Agreement 5H-84090101 under 2 CFR 200.340

**FROM:**   Devon Brown, EPA Award Official

**TO:**   Amy Gillespie, Grants Administration and Compliance Officer
Maryland Clean Energy Center

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84090101 awarded to Maryland Clean Energy Center. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Alison Hanlon, EPA Grant Specialist
    Lydia Kidane, EPA Project Officer
    Amy Gillespie, Grantee Program Manager

# EXHIBIT 5



From: Amy Gillespie
Maryland Clean Energy Center
5000 College Avenue, Suite 31010
College Park, MD 20740

To: Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington DC 20460

CC: Molina Micheal
Molina.micheal@epa.gov

Date: August 27, 2025

     Re:    Disagreement with Assistance Agreement Amendment (Grant No./FAIN 5H – 84090101) dated August 8, 2025, and Reservation of Rights to Pursue Administrative Remedies

Dear Mr. Brown,

     The Maryland Clean Energy Center (MCEC) is writing to notify EPA that we disagree with the terms of the Solar for All Assistance Agreement Amendment (Grant No. FAIN 5H – 84090101) we received on August 8, 2025 (attached via email as *Exhibit A*). If we decide to seek administrative remedies to dispute the purported termination of the Solar for All Award, we will do so within the 30 days indicated in the Termination Letter, dated August 7, 2025 (attached via email as *Exhibit B*). The Termination Letter outlined a Dispute process pursuant to the guidelines in 2 C.F.R. § 1500.15, providing us with 30 days to file a dispute with the Dispute Decision Official. We disagree with the Assistance Agreement Amendment terms that attempt to set a shorter timeline for dispute and would construe future drawdowns of awarded funds as a waiver of dispute rights.

     The August 7 Termination Letter stated, "The EPA Grants Management Office will issue an amendment to the agreement to document the termination.". On August 8, 2025, we received the Assistance Agreement Amendment, several aspects of which we consider improper. However, specifically, the following section in the Assistance Agreement Amendment is inconsistent with the 30-day dispute period provided in the Termination Letter:

     *"If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA*



*Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments."*

The Assistance Agreement Amendment also contained an error in its calculation of the original value of the grant.[1] The inconsistency in the award amount and the timeline to file a notice of disagreement, led us to believe that this statement was included in error. Nonetheless, please accept this letter as MCEC's notice of disagreement with the terms and conditions of the Assistance Agreement Amendment dated August 8, 2025.

MCEC also disagrees with any suggestion in the Assistance Agreement Amendment that any attempt to draw down funds could function as a waiver of MCEC's dispute rights. This is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination per 2 C.F.R. § 200.305(b)(3) as well as the Termination Letter's specific statement that costs incurred prior to the termination date are allowable.[2]

As the Termination Letter cites 2 C.F.R § 1500.15 and outlines a dispute process with a 30-day deadline for submission of a dispute, if we decide to pursue administrative remedies, we will follow the dispute process set forth in the Termination Letter and applicable regulations within 30 days from the date of the Termination Letter.

Please acknowledge receipt of this notice of disagreement and contact MCEC via the below signed designee to discuss resolution of this disagreement as soon as possible.

*Amy R Gillespie*

Amy Gillespie
Grants Administration & Compliance Officer
Maryland Clean Energy Center
agillespie@mdcleanenergy.org

---

[1] Specifically, the same provision in the Assistance Agreement Amendment that contained the contradictory dispute timeline also stated: "Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00."

[2] The Assistance Amendment attempts to incorporate terms that state: "Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date." MCEC formally disputes the legality and applicability of this term to its Solar for All award and any future actions it may take pursuant to the original award and the Termination Letter.

# EXHIBIT 6



Michael Molina
Disputes Decision Official
Office of Mission Support
U.S. Environmental Protection Agency
By electronic mail: Molina.Michael@epa.gov


September 5, 2025

      Re:    Dispute of Termination of EPA Assistance Agreement 5H - 84090101

Dear Mr. Molina:

      On August 7, 2025, the Maryland Clean Energy Center (MCEC) received a Memorandum from Mr. Devon Brown, EPA Award Official, (attached via email as *Exhibit A*) purporting to terminate MCEC's Solar for All (SFA) grant (Grant No. FAIN 5H-84090101) awarded on July 12, 2024, and fully executed on December 13, 2024. The following day, August 8, 2025, MCEC received a document titled Assistance Amendment 5H-84090101-2 (attached via email as *Exhibit B*) also claiming to "terminate the agreement". MCEC responded to that Assistance Amendment by letter dated August 27, 2025. MCEC disagrees with these attempts by EPA to unilaterally terminate its SFA grant.  Pursuant to the August 7 Memorandum (Termination Memorandum) and 2 C.F.R. §1500.15, we are writing to dispute EPA's attempt to terminate the MCEC's SFA Assistance Agreement (attached via email as *Exhibit C*).

      The Termination Memorandum: (1) violates the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded unobligated balances from the Greenhouse Gas Reduction Fund but preserved funds already awarded to grantees; (2) violates the legally binding grant agreement issued by EPA to MCEC on December 13, 2024 and provides no other valid reason for termination pursuant to 2 C.F.R. § 200.341, (3) violates constitutional boundaries, and (4) causes harm to Americans in Maryland.

      Additionally, the Assistance Amendment, dated August 8, 2025, which also purported to terminate the Assistance Agreement citing completely different grounds of 2 C.F.R. § 200.340 and the General Terms and Conditions of the Assistance Award is contrary to the law. As explained below no proof or explanation is provided in relation to the grounds for termination in the Assistance Amendment. EPA's basis for the decision to terminate are contrary to law, and arbitrary and capricious. MCEC requests that EPA rescind the termination and provide MCEC with continuing access to all obligated funds that were available in MCEC's ASAP account prior to EPA's unilateral reduction in funds available in MCEC's ASAP account.

      The Termination Memorandum, indicates that the EPA is terminating the grant due to the determination that:

> *As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or*



*abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients.*

Respectfully, the rescission of unobligated funds and repeal of granting authority under 42 U.S.C. § 7434 does not give EPA the authority to unilaterally terminate our legally binding Solar for All Assistance Agreement. Doing so is contrary to law and arbitrary and capricious. We therefore ask that the termination of MCEC's award be reconsidered via an administrative appeals process. As such, <u>please accept this letter as a request to initiate an administrative dispute under 2 C.F.R. § 1500 Subpart E.</u>[1]

## <u>LEGAL AND FACTUAL GROUNDS FOR THE DISPUTE</u>

As explained below EPA's unilateral termination of the MCEC SFA Assistance Agreement is arbitrary and contrary to the law.

**(1) EPA's asserted grounds for termination violate the plain language of OBBBA Section 60002, which rescinded unobligated balances but preserved funds already awarded to grantees.**

According to the Termination Memorandum, EPA terminated the Assistance Agreement under 2 C.F.R. § 200.340 because:

*"As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All."*

We disagree with EPA's interpretation that OBBBA rescinded the grant appropriations for Solar for All. By its plain language, Section 60002 only rescinded the <u>unobligated</u> balance in the appropriations account established by 42 U.S.C. § 7434:

*SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.*

Where the plain language of a statute is unambiguous, no further analysis is required. *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("... when the meaning of the statute's terms is plain, our job is at an end."). Indeed, after OBBBA passed Congress, the Department of Justice wrote to the court

---

[1] The August 8, 2025, Assistance Agreement Amendment provided that if MCEC disagrees with the terms and conditions of the amendment, it must submit a notice of disagreement to the EPA within 21 days from the date of the Agreement amendment. We found no statutory basis for the 21-day period, nonetheless MCEC submitted a Notice of Disagreement to the EPA on August 27, 2025, reserving its right to file a dispute in a timely manner.



presiding over *Climate United Fund v. Citibank, N.A.* to inform it that new legislation, if signed, would "rescind all **unobligated funds** appropriated for it." (Letter dated July 3, 2025, to the Clerk of the Court from Yaakov Roth, DOJ.) (*Emphasis added*)

Funds awarded to SFA grantees were **obligated** upon award and subject to a legally binding agreement whereby the EPA ""create[d] a legal liability or definite commitment on the part of [EPA], or create[d] a legal duty that could mature into a legal liability by virtue of an action that is beyond the control of the government."[2] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[3] In other words, the Solar for All grant funds were obligated upon award, on December 13, 2024, and remained obligated when OBBBA was passed. The OBBBA did not change this and could not have legally rescinded these obligated funds.

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.[4] Agency action is not in accordance with law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. Congress did not direct or otherwise authorize EPA to terminate the Solar for All program. EPA is acting beyond its authority because it defies Congress's express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All appropriations are rescinded.

We therefore, do not agree with any attempts to terminate this grant award on the basis provided in the Termination Memorandum as Congress clearly intended for these funds to flow in our legally mandated award and they cannot be unilaterally terminated by the Executive branch.

## (2) EPA's unilateral termination of MCEC's grant violates its legal obligation under 2 C.F.R. § 200.340 and the signed grant agreement, and any attempts to liquidate the remaining funds in MCEC's ASAP account would violate due process and binding regulations.

At the outset, MCEC will note that the two documents provided by EPA regarding termination, the Termination Memorandum and Assistance Amendment 5H-84090101-2, provide inconsistent justifications for terminating the grant. In the Termination Memorandum, EPA indicated that termination was necessary because Section 60002 of the OBBBA rescinded unobligated funds. As described above, that interpretation of the OBBBA is arbitrary and capricious and otherwise contrary to law. Assistance Amendment 5H-84090101-2, states that "the agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award." That position also lacks merit and EPA's failure to identify the reason for termination violates the agency's duties under 2 CFR 200.341(a).

---

[2] US GAO, Office of General Counsel, Principles of Federal Appropriations Law, Third Edition, Volume II, at 7-2, available at https://www.gao.gov/assets/gao-06-382sp.pdf

[3] Grants Policy Issuance- 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds at https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf

[4] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).



The uniform grant regulations at 2 C.F.R. § 200.340(a) provide the circumstances under which the government may terminate a grant agreement, which include (a) failure to comply with the grant terms and conditions; (b) with consent of the grantee; (c) by request of the grantee; or (d) otherwise pursuant to the terms and conditions of the grant, to the extent authorized by law. None of these circumstances are applicable here.

Moreover, the Assistance Agreement itself provides that termination pursuant to 2 C.F.R. § 200.339 and 2 C.F.R. § 200.340 can only occur when "compliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status…". And any subsequent changes to the grant's termination provisions could only be made upon the mutual agreement of the parties. MCEC has not, and unequivocally does not, agree to any attempts to terminate this grant based on EPA's misinterpretation of OBBBA Section 60002.

The Termination Memorandum does not seek to justify EPA's decision based on any alleged non-compliance with the grant. EPA has neither identified any non-compliance nor requested that MCEC take action to cure any deficiencies in its performance. EPA has not claimed that the grant will not accomplish the purposes for which it was made, and EPA has not raised any concerns specific to MCEC's administration of its award relative to fraud, waste, duplication, or material misrepresentation. On the contrary, any review of the records will demonstrate that MCEC has worked with the designated EPA Grants Officer to comply with all the conditions of the grant and has followed closely all instructions and timelines for developing the workplan, reports, and other quality assurance related documents.

It bears noting that all competitive grants were awarded per 2 C.F.R. § 200.205 which requires a merit review before awarding funding. MCEC applied on October 12, 2023, under the EPA GHG RF SFA Notice of Funding Opportunity (NOFO). The application was a collaborative effort prepared with significant effort made by MCEC which was supported by many stakeholders to provide a comprehensive plan in response to the NOFO. The EPA awarded MCEC $62,450,000.00 of SFA funding on July 12, 2024, and transmitted a full executed Assistance Agreement to MCEC, on December 13, 2024, when MCEC's SFA allocation of $62,450,000.00 was fully obligated. These funds appeared in MCEC's ASAP.gov account and were available for draw down as per the terms of the Assistance Agreement. MCEC has since worked closely with the EPA Grants Officer and other EPA assigned staff to continue developing the workplan and budget, hired and trained staff to work, on grant implementation and worked closely with subrecipients. At no point in the entire process did the EPA make any statement of concern with the administration of the grant.

EPA has also unlawfully pulled back funding that was still legally obligated to MCEC. On Monday, August 14, 2025, MCEC noted that its ASAP account status had changed to "liquidated", that its available balance was reduced from $61,061,101.35 to $4,128,856.58, and that the performance period end date had been unilaterally changed from 04/30/2029 (end date 10/01/2029) to 08/15/2025 (end date 12/08/2025). These changes were made prior to the expiration of the 30-day dispute period detailed at 2 CFR 1500 Subpart E and prior to any action by MCEC to close out the award, see 2 C.F.R. § 200.344 (federal agencies " "must make all necessary adjustments to the Federal share of costs after closeout reports are received (for example, to reflect the disallowance of any costs or the deobligation of an



unliquidated balance")).[5] More pointedly, EPA's Notice of Termination itself references MCEC's option to file an administrative dispute within 30 days, consistent with the due process guarantee at 2 C.F.R. § 200.342 and as detailed at 2 C.F.R. § 1500 Subpart E. Liquidating MCEC's legally obligated funds without providing an opportunity to object, violates MCEC's right to due process, upends decades of agency practice, and ignores MCEC's reliance interests.

Nothing that the EPA has stated in the Termination Memorandum undermines the meritorious nature of our organization or the project that we are undertaking with our federal funds, or that the grant will not accomplish the purposes for which it was made. As described below, grant implementation would have the significant positive impact intended from the federal assistance and MCEC.

**(3) EPA's Withdrawal of MCEC's Duly Appropriated and Obligated SFA Assistance Agreement Violates the Constitution.**

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[6]  The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[7]  The Executive has no power "to enact, to amend or to repeal statutes."[8]  Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority.  And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

> *i.  Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[9]  U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[10]

The Termination Letter and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[11] For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of MCEC's funding agreement.

> *ii.  Take Care Clause*

---

[5] Because MCEC disputes the termination of its Solar for All funding it is not taking any steps to close out the award.
[6] U.S. Const. art. I, § 1.
[7] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).
[8] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).
[9] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).
[10] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).
[11] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

5000 College Avenue ● Suite 31010 ● College Park, MD 20740 ● Phone: 301-314-6061 ● www.mdcleanenergy.org



The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[12]  The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[13] Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

The EPA terminated the Solar for All program and MCEC's individual Assistance Agreement on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind MCEC's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[14]  EPA's Termination of MCEC's Assistance Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to MCEC.  The EPA violated constitutional separation-of-powers constraints because EPA's Termination Memorandum overrode Congress's considered judgments by attempting to rescind obligated SFA funds.

### iii.  Appropriations Clause

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[15] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[16] Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[17] For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

### iv.  Legislative Vesting Clause

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[18]  When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did

---

[12] U.S. Const. art. II, § 3.

[13] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

[14] OBBBA Section 60002.

[15] U.S. Const. Art. I, § 9, cl. 7.

[16] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).

[17] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

[18] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

5000 College Avenue ● Suite 31010 ● College Park, MD 20740 ● Phone: 301-314-6061 ● www.mdcleanenergy.org



so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating MCEC's SFA Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

>    *v.  Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[19] When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[20] EPA's termination of MCEC's SFA assistance altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

>    *vi.  Ultra Vires*

The Termination Memorandum and subsequent withdrawal of MCEC's SFA award is an ultra vires act because no act of Congress authorizes EPA to rescind MCEC's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

**(4) EPA's illegal termination causes harm to Marylanders.**

The Solar for All grant supports energy independence, reduces energy costs, and avoids pollution. Terminating the program would cause harm to MCEC, SFA implementors, and families and communities across Maryland.

>    *(i)  Loss of Access to Affordable Energy*

Retail electricity prices have risen 13% since 2022, outpacing inflation,[21] and it is likely that rising temperatures, extreme weather, and increased demand will continue to drive electricity prices higher in the near future. The U.S. cannot meet this energy moment through fossil fuels alone; a multifaceted approach is necessary to meet demand, build a more resilient grid, and keep costs manageable. Solar energy is a critical piece of the American energy puzzle particularly in areas where other sources may not be readily available. Our Solar for All award would deploy solar technology to add energy to the grid and drastically lower household energy prices for low-and-middle-income Marylanders.

Any further delays in reinstating or processing our award will result in direct harm to Maryland residents. MCEC expected its SFA award to serve 10,027 low-income households, reducing electrical

---

[19] U.S. Const. amend. X.

[20] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

[21] U.S. Energy Information Administration, "U.S. electricity prices continue steady increase," May 14, 2025, at https://www.eia.gov/todayinenergy/detail.php?id=65284.



bills by 20% energy savings from day one of installation. With the loss of SFA funding, MCEC will no longer be able to offer no-cost or low-cost solar installations for low-income households, upgrades for roof replacement and/or electrical work, installation of battery storage, single family, multi-family and community solar projects, and revolving loan funds for strategic financing of solar installations.

     *(ii)    Impact on Maryland's Economic Growth*

While in the planning year MCEC has made every effort to work with the EPA to further the development of the workplan as required under the grant. MCEC has already used grant funding to hire full time staff to work on program implementation, provided training and updates to subrecipients and service providers and members of the public, secured $5 million in state funding for implementation, created the governance and compliance structure to comply with the grant terms, entered into agreements with subrecipients, began putting in place the education and outreach efforts, and circulated RFP and RFQ for companies to provide program support and installation services. Achieving the deliverables of the grants' first year has involved job creation and training which directly achieve the economic growth Maryland residents deserve and our nation aspires to.

Losing this funding will not only jeopardize this economic development but MCEC will have to terminate contracts with vendors and subrecipients as well. MCEC signed a contract with MIP Momentive for Accounting Software for $36,605.90; was in the process of signing a contract with FI Consulting after conducting a full procurement process; and had posted an RFP for a Third-Party Administrator for single family solar installations, and a RFQ for single family solar installers/contractors with an RFQ for multi-family solar installers/contractors prepared to follow. Ten agreements were signed with program subrecipients, with two more out for signatures and three more in negotiation between attorneys. MCEC was also negotiating the terms of an Interagency Agreement with Maryland Environmental Services to provide site auditing and data collection for the program. Stopping at this juncture results in loss of technical assistance, workforce development, outreach and education, solar association, and for-profit partner relationships.

MCEC has complied with all grant terms and conditions and was achieving all the deliverables and activities within the agreed upon scope of work. Termination of the grant at this time deprives the residents of Maryland of the benefits of the efforts made to date, the lower cost energy and energy independence that would be achieved, and the jobs and training that result from implementing the grant.

## RELIEF REQUESTED

The specific relief MCEC requests is that EPA: (i) resolve the dispute in its favor; (ii) rescind the termination of its Assistance Agreement by reinstating the Assistance Agreement for the originally awarded amount, scope of work, and performance period without imposing any new or additional conditions; and (3) promptly reinstate the full $61,061,101.35 of obligated funding that would have been available in MCEC's ASAP account prior to EPA's unilateral reduction in funds available in MCEC's ASAP account.

Until our dispute with EPA has been resolved, we also object to any claims of noncompliance under 2 C.F.R. 200.344(i).



We will take the course of action necessary to prevent irreparable and continuing harm to our employees, contractors, subrecipients, program beneficiaries, and the communities we serve.

## **DESIGNATED POINT OF CONTACT FOR THE DISPUTE**

If you have any questions about this letter or our program please contact me (Amy Gillespie) at 301-314-6091 and agillespie@mdcleanenergy.org, or MCEC's Executive Director, Ms. Katherine Magruder, at 301-314-6067 and ikm@mdcleanenergy.org.

Kindly confirm via email receipt of this letter formally disputing the wrongful termination of our Solar for All grant. We respectfully request that EPA grant the relief we are seeking.


Sincerely,


Amy Gillespie
MARYLAND CLEAN ENERGY CENTER



**cc: by electronic mail**:
    Mr. Devon Brown, EPA Award Official
    Ms. Alison Hanlon, EPA Grant Specialist
    Ms. Lydia Kidane, EPA Project Officer

**Attachments**:
    *Exhibit A*: August 7, Termination Memorandum from Mr. Devon Brown
    *Exhibit B*: Assistance Amendment 5H-84090101-2
    *Exhibit C*: EPA MCEC Solar for All Grant Assistance Agreement dated December 13, 2024

# _EXHIBIT A_



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**   Termination of EPA Assistance Agreement 5H-84090101 under 2 CFR 200.340

**FROM:**   Devon Brown, EPA Award Official

**TO:**   Amy Gillespie, Grants Administration and Compliance Officer
Maryland Clean Energy Center

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84090101 awarded to Maryland Clean Energy Center. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Alison Hanlon, EPA Grant Specialist
    Lydia Kidane, EPA Project Officer
    Amy Gillespie, Grantee Program Manager

# ***EXHIBIT B***

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN): 84090101<br>MODIFICATION NUMBER: 2<br>PROGRAM CODE: 5H | DATE OF AWARD<br>08/08/2025 |
|---|---|---|---|
| | | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>08/08/2025 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:<br>MARYLAND CLEAN ENERGY CENTER<br>5000 College Ave Suite 31010<br>Colleg Park, MD 20740-3809<br>EIN: 26-3864715 | PAYEE:<br>MARYLAND CLEAN ENERGY CENTER<br>5000 College Avenue, Suite 31010<br>College Park, MD 20740-3809 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Amy Gillespie<br>5000 College Ave Ste 31010<br>College Park, MD 20740-3809<br>**Email:** agillespie@mdcleanenergy.org<br>**Phone:** 301-314-6901 | Lydia Kidane<br>1200 Pennsylvania Ave NW, 1101R<br>Washington, DC 20460<br>**Email:** kidane.lydia@epa.gov<br>**Phone:** 202-564-0506 | Alison Hanlon<br>3903R<br>1200 Pennsylvania Ave, NW, 3903R<br>Washington DC, DC 20460-0000<br>**Email:** Hanlon.Alison@epa.gov<br>**Phone:** 202-564-0244 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Maryland Solar for All Program (MSFAP)

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD<br>05/01/2024 - 08/08/2025 | PROJECT PERIOD<br>05/01/2024 - 08/08/2025 | TOTAL BUDGET PERIOD COST<br>$ 62,450,000.00 | TOTAL PROJECT PERIOD COST<br>$ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official for Devon Brown - Branch Chief, GMB<br>**by** LaShaun Phillips - Award Official Delegate | DATE<br>08/08/2025 |

5H - 84090101 - 2    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,762,843 |
| 2. Fringe Benefits | $ 773,596 |
| 3. Travel | $ 15,000 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 46,000 |
| 6. Contractual | $ 2,801,534 |
| 7. Construction | $ 0 |
| 8. Other | $ 55,301,027 |
| 9. Total Direct Charges | $ 61,700,000 |
| 10. Indirect Costs: 10.00 % Base MTDC | $ 750,000 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 1,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

    a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

    b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

    c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect.  The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

    a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

    b. Explanations on why established outputs/outcomes were not met; and

    c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

    a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

    b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

# Programmatic Conditions

All Programmatic Conditions Remain the Same

# EXHIBIT 7

Case 2:25-cv-02015-TMC   Document 76-1   Filed 11/14/25   Page 155 of 163



**Martha Absher -COMMERCE- <martha.absher@maryland.gov>**

---

## FW: Solar for All Grant Closeout Instructions

**Amy Gillespie** <agillespie@mdcleanenergy.org>                    Wed, Oct 1, 2025 at 4:26 PM
To: Martha Absher <martha.absher@maryland.gov>, Katherine Magruder <ikm@mdcleanenergy.org>, Dorothy Kolb
<dkolb@mdcleanenergy.org>
Cc: Damion Trasada <dtrasada@mdcleanenergy.org>, Simón Zimmer <szimmer@mdcleanenergy.org>, Daniella DiRubba
<ddirubba@mdcleanenergy.org>

Just received as a FYI.

---

**From:** SFA <SFA@epa.gov>
**Sent:** Wednesday, October 1, 2025 4:21 PM
**To:** SFA <SFA@epa.gov>
**Subject:** Solar for All Grant Closeout Instructions

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

### Final Federal Financial Report (SF-425)

**Submission Instructions:**

- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details:**

- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These

include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.

- You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.

- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

  - If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

- All of these costs should be included in your final SF-425.

- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.


Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.

- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance <u>during the entire performance period</u> (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.

- Please ensure that, at minimum, the following elements are included:

  - In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.

  - Progress towards objectives on program key performance metrics during the performance period.

  - Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.

  - Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.

  - Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.

  - *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.

- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.

- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.

- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:

- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,

Office of the Greenhouse Gas Reduction Fund

EXHIBIT 8



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 28, 2025

**MEMORANDUM**

**SUBJECT:**    Update on Dispute of EPA Assistance Agreement 5H-84090101 under 2 CFR 200.340

**FROM:**    Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**    Amy Gillespie, Grant Administrator & Compliance Officer
Maryland Clean Energy Center

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84090101. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 27, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

EXHIBIT 9



From: Amy Gillespie
Maryland Clean Energy Center
5000 College Avenue, Suite 31010
College Park, MD  20740

To: Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC  20460

CC: Michael Molina

Date: November 3, 2025

Re:     Objection to Closeout of EPA Assistance Agreement 5H-84090101

Dear Mr. Brown:

On September 5, 2025, Maryland Clean Energy Center (MCEC) submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 5H-84090101 pursuant to 2 C.F.R. § 1500.15.  Despite that timely dispute, on October 1, 2025, MCEC received email correspondence from [SFA@epa.gov](mailto:SFA@epa.gov) containing "Solar for All Grant Closeout Instructions" and demanding that MCEC complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." MCEC has now received EPA's October 28, 2025 letter purporting to declare moot MCEC's "dispute regarding the termination of Assistance Agreement 5H-84090101."  The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that MCEC close out Assistance Agreement 5H-84090101.

As an initial matter, clarification is needed because EPA's October 28 letter references "your dispute . . . submitted on August 27, 2025."  But MCEC did not submit its Part 1500 dispute on August 27.  Rather, August 27 is the date that MCEC submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025 Assistance Amendment.  Thus, it is unclear which of MCEC's disputes "EPA has rendered" moot.  MCEC also disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending.  EPA cites no authority for

**MARYLAND**
CLEAN ENERGY CENTER

his proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation. We request that EPA reverse its mootness determination and allow the administrative dispute to proceed. At a minimum, EPA should stay the administrative dispute until the conclusion of MCEC's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of MCEC's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, MCEC has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require MCEC to close out while litigation is pending that directly concerns EPA's termination of this grant. *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." MCEC has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated $56,932,244.77 from MCEC's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, MCEC has not been able to complete the work required under Assistance Agreement 5H-84090101. Accordingly, EPA necessarily cannot "determine[] that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

MCEC does <u>not</u> agree to close out Assistance Agreement 5H-84090101 while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00pm on November 5, 2025.



Sincerely,

Amy R. Gillespie

Grants Administration & Compliance Officer
Maryland Clean Energy Center
agillespie@mdcleanenergy.org
301.314.6091