# EXHIBIT 1

5H - 84088301 - 0   Page 1

| | | | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Grant Agreement | **GRANT NUMBER (FAIN):** 84088301 **MODIFICATION NUMBER:** 0 **PROGRAM CODE:** 5H | | **DATE OF AWARD** 07/08/2024 |
| | **TYPE OF ACTION** New | | **MAILING DATE** 07/11/2024 |
| | **PAYMENT METHOD:** ASAP | | **ACH#** PEND |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| GOVERNORS ENERGY OFFICE 62 STATE HOUSE STATION AUGUSTA, ME 04333-0062 EIN: 01-6000001 | GOVERNORS ENERGY OFFICE 62 STATE HOUSE STATION AUGUSTA, ME 04333-0062 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Ethan Tremblay 62 STATE HOUSE STATION AUGUSTA, ME 04333-0062 **Email:** ethan.tremblay@maine.gov **Phone:** 207-530-2603 | Lydia Kidane 1300 Pennsylvania Ave NW Washington, DC 20460 **Email:** Kidane.Lydia@epa.gov **Phone:** 202-564-0506 | Shana Etheridge 1200 Pennsylvania Ave NW 3903R  Washington DC 20460 **Email:** Etheridge.Shana@epa.gov **Phone:** 202-564-9777 |

**PROJECT TITLE AND DESCRIPTION**

The Maine Governor's Energy Office. "Note: A Special payment condition applies to this award."

See Attachment 1 for project description.

| **BUDGET PERIOD** | **PROJECT PERIOD** | **TOTAL BUDGET PERIOD COST** | **TOTAL PROJECT PERIOD COST** |
|---|---|---|---|
| 05/01/2024 - 04/30/2029 | 05/01/2024 - 04/30/2029 | $ 0.00 | $ 0.00 |

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 62,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Acting Chief, Grants Management Branch | **DATE** 07/08/2024 |

5H - 84088301 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 61,720,000 | $ 61,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 62,120,000 | $ 62,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41014 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 61,720,000 |
|  |  |  |  |  |  |  |  |  | $ 61,720,000 |

5H - 84088301 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 62,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 62,120,000 |

# Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

<u>Final Report</u>

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

  Progress towards objectives on key performance metrics over the entire period of performance,

  Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

  Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

  Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

  Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

## 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

### 1. Leveraging
The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

### Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

## A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during

the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; that the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements.* The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on

behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

### B. Davis-Bacon and Related Acts

[Davis-Bacon and Related Acts (DBRA)](#) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

   **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

   **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

   **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

   **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Health and Safety Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its

financial risk management policies and procedures.\

<u>3. Additional Requirements</u>

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** <u>EPA's Final Financial Assistance Conflict of Interest Policy</u> **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made

available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Dan Burgess (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar to scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry

out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards  unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to

execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

## B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a

personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

5H - 84088301 - 1    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN): 84088301<br>MODIFICATION NUMBER: 1<br>PROGRAM CODE: 5H | DATE OF AWARD<br>12/19/2024 |
|---|---|---|
| | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>12/19/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:<br><br>GOVERNORS ENERGY OFFICE<br>62 STATE HOUSE STATION<br>AUGUSTA, ME 04333-0062<br>EIN: 01-6000001 | PAYEE:<br><br>GOVERNORS ENERGY OFFICE<br>62 STATE HOUSE STATION<br>AUGUSTA, ME 04333-0062 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Ethan Tremblay<br>62 State House Station<br>Augusta , ME 04333-0062<br>**Email:** ethan.tremblay@maine.gov<br>**Phone:** 207-530-2603 | Lydia Kidane<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460<br>**Email:** Kidane.Lydia@epa.gov<br>**Phone:** 202-564-0506 | Shana Etheridge<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>**Email:** Etheridge.Shana@epa.gov<br>**Phone:** 202-564-9777 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

The Maine Governor's Energy Office.

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 62,120,000.00 | TOTAL PROJECT PERIOD COST<br>$ 62,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Phillip Schindel - Chief, Business Operations Branch | DATE<br>12/19/2024 |

5H - 84088301 - 1     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 61,720,000 | $ 0 | $ 61,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,120,000 | $ 0 | $ 62,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84088301 - 1     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 902,076 |
| 2. Fringe Benefits | $ 585,277 |
| 3. Travel | $ 55,850 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 12,047 |
| 6. Contractual | $ 885,000 |
| 7. Construction | $ 0 |
| 8. Other | $ 59,450,000 |
| 9. Total Direct Charges | $ 61,890,250 |
| 10. Indirect Costs: 9.42 % Base Total Direct Cost | $ 229,750 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,120,000 |
| 12. Total Approved Assistance Amount | $ 62,120,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,120,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

  a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

  b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

  c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

  d. Being funded by public or charitable contributions; and

  e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa. gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States: Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

**_The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:_**

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or

requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such

Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not

"profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in

the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as

determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

> 1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

> 2. Privately-owned commercial buildings when they meet the "public function" test;

> 3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

### 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

### 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

### 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT 3

**Greenhouse Gas Reduction Fund**
**Solar for All**
MESA: Maine Solar for All
**Work Plan**
*Project Period: 05/01/2024-04/30/2029*
***Submitted December 9, 2024***

**Project Title:** MESA: Maine Solar for All
**Grant Number:** 84088301
**Organization Name:** Maine Governor's Energy Office
**Geography:** State of Maine
**Definition of LIDAC:** Maine's Solar for All program proposes three distinct program channels, each designed to serve a different segment of low-income and disadvantaged households as defined by EPA in the Solar for All Notice of Funding Opportunity (the NOFO). In order to maximize the meaningful benefits for participating LIDAC households within each program channel, different eligibility criteria for each channel will be developed as described in this workplan. In all cases, LIDAC definitions will conform to the definition of "eligible household" established in the NOFO. Specifically, MESA will serve geographically dispersed low-income households and properties providing affordable housing.

## Section 1:  Project Description

### 1.1 Overview

MESA proposes three financial assistance program channels to comprehensively address the range of barriers faced by low-income and disadvantaged households: single-family and multifamily on-site solar programs, and an efficient energy assistance community solar program. The original application proposed a fourth financial assistance channel, targeted support for cooperatively-owned community solar. This program channel is still included in this workplan, but has been re-categorized as technical assistance in conformance with EPA definitions. Energy storage is incorporated across all three channels to build resilience and maximize value, as detailed in section 2. MESA also proposes a holistic range of technical assistance, supporting expanded workforce development opportunities, project-deployment technical assistance including siting and permitting supports, and additional support to overcome barriers including interconnection challenges.

### 1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

#### 1.2.1 Environmental Results - Outputs and Outcomes

The overarching anticipated outputs resulting from the MESA program include the financial assistance program channels described in detail in Section 2:
- A Single-Family Residential Solar Leasing Program;
- A Multifamily Solar Program;
- An Energy Assistance Community Solar Program.

Progress toward these overarching outputs will be measured by the establishment of each program channel, performance metrics including the drawdown of associated funds to complete the program activities for each channel, and the subsequent environmental outcomes described below. GEO has modified the total funding proposed for each financial assistance category commensurate with the partial award made by EPA. GEO originally sought $99,500,000 and was awarded $62,100,000. Accordingly, financial assistance categories have been reduced to approximately 62% of their original proposed amounts.

One exception is the Multifamily Program Channel. During initial planning activities subsequent to the award, GEO recognized a reduced share of the overall award should be subject to indirect rate calculation than was reflected in the original application budget. The resulting unallocated funds have been primarily reallocated to the Multifamily Program Channel in recognition of the meaningful benefits and likely speed to deployment available through this channel. Financial assistance budget category modifications resulting from the partial award are summarized in **Table 1-1**.

*Table 1-1: Summary of Financial Assistance Budget Category Modifications Resulting from Partial Award*

| Program Channel (A) | Original Funding Proposed (B) | Revised Funding Proposed (C) | Revised as Percentage of Original (D) = (C / B) |
|---|---|---|---|
| Single Family Lease Program Channel | $16,250,000 | $10,400,000 | 64% |
| Multifamily Program Channel | $20,000,000 | $16,000,000 | 80% |
| Energy Assistance Community Solar Channel | $35,000,000 | $22,000,000 | 63% |

The anticipated environmental outcomes are guided by detailed modeling and grounded in the context of Maine and the experience of Maine-based organizations with decades of providing services to low income and disadvantaged communities and building the rapidly growing residential-serving solar and storage market. Estimated outputs and outcomes are estimated only and may be subject to revision or refinement through subrecipient and/or contracting processes. Proposed environmental outcomes are summarized in **Table 1-2**, along with aligned Greenhouse Gas Reduction Fund (GGRF) program objectives:

- Objective 1: Climate and Air Pollution Benefits
- Objective 2: Equity and Community Benefits
- Objective 3: Market Transformation Benefits

*Table 1-2: Estimated Environmental Outcomes*

| Outcome Metric | Aligned GGRF Program Objectives | Single-Family Solar Lease Channel* | Multifamily Program Channel* | Community Solar Channel* | Total* |
|---|---|---|---|---|---|
| Households benefitting | 2, 3 | 1,280 | 900 | 21,420 | **23,600** |
| Megawatts of solar | 1, 3 | 7.7 | 5.4 | 28.2 | **41.3 MW** |
| Megawatt-hours of storage | 1, 3 | 0.7 | 0.54 | 22.6 | **23.8 MWh** |
| Annual short tons of CO2 avoided[1] | 1, 2 | 774 | 585 | 3,263 | **4,622** |
| Total workforce development participants served | 2, 3 | | | | **750** (New and incumbent workers, students) |

*Estimated by adjusting values included in Solar for All application to scale with anticipated partial award funding amounts.

### 1.2.2 Linkage to U.S. EPA's Strategic Goals

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan:[2]
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

---

[1]Avoided carbon dioxide is calculated using AVERT. As a result, the value accounts only for carbon dioxide reductions from solar production, but cannot account for any time-sensitive variations as a result of battery storage.

[2] Accessed at https://www.epa.gov/system/files/documents/2022-03/fy-2022-2026-epa-strategic-plan.pdf

**Section 2:  Project Design Plan**

**2.1 Activities to be Conducted**

The GEO seeks approval from EPA, via approval of this workplan, to draw down funds for all Solar for All program activities. **Table 2-1** summarizes the approval sought for each financial assistance program channel and technical assistance category.

*Table 2-1: Summary of Approval Sought*

| Program Activity/Budget Category | Funding Allocated | Approval Sought | Timeline and Budget References |
|---|---|---|---|
| Single Family Lease Program Channel (Financial Assistance) | $10,400,000 | Approval of program planning period activities. Authorization to draw down funds to be sought through future workplan amendment. | Budget Workbook: Line 37<br><br>Timeline Workbook: Lines 15-18 |
| Multifamily Program Channel (Financial Assistance) | $16,000,000 | Authorization to draw down funds upon approval of this workplan. | Budget Workbook: Line 38<br><br>Timeline Workbook: Lines 31-35 |
| Energy Assistance Community Solar Channel (Financial Assistance) | $22,000,000 | Approval of program planning period activities. Authorization to draw down funds to be sought through future workplan amendment. | Budget Workbook: Line 39<br><br>Timeline Workbook: Lines 19-22 |
| Cooperative Community Solar (Technical Assistance) | $1,000,000 | Approval of program planning period activities. Authorization to draw down funds to be sought through future workplan amendment. | Budget Workbook: Line 40<br><br>Timeline Workbook: Lines 23-24 |
| Workforce Development (Technical Assistance) | $5,500,000 | Approval of program planning period activities. Authorization to draw down funds to be sought through future workplan amendment. | Budget Workbook: Line 41<br><br>Timeline Workbook: Lines 36-40 |
| Interconnection Challenge Plan (Technical Assistance) | $900,000 | Approval of program planning period activities. Authorization to draw down funds to be sought through future workplan amendment. | Budget Workbook: Line 42<br><br>Timeline Workbook: Line 26 |
| Project-deployment Technical Assistance | $3,250,000 | Approval of program planning period activities. Authorization to draw down | Budget Workbook: Line 43 |

| (Technical Assistance) | | funds to be sought through future workplan amendment. | Timeline Workbook: Line 25 |
| All other categories | $2,440,250 | Authorization to draw down funds upon approval of this workplan. | Budget Workbook: Lines 6-33 |
| | | | Timeline Workbook: Lines 13, 41-43, 45-69 |

## 2.2 Meaningful Benefits Plan

Several characteristics specific to Maine make distributed solar plus storage particularly beneficial to low-income and disadvantaged populations and MESA ensures a comprehensive range of meaningful benefits will be delivered to these households. MESA recognizes and prioritizes delivery of the five meaningful benefits identified by EPA for the Solar for All program, as described below.

### 2.2.1 Household Savings

The MESA Single Family Residential Solar Program Channel will deploy on-site solar and in some cases energy storage for eligible households. Participating households are assumed to deploy solar projects of sufficient capacity to offset approximately 90% of the household's annual electricity costs through net metering credits for customers of Central Maine Power and Versant Power, which serve 96% of electric customers statewide and are required by law to provide net metering arrangements. Although the ten municipal and cooperative electric utilities which combined serve the remaining 4% of residential customers in the state are not required by law to offer net metering arrangements to customers, customers of those that do, or that offer a comparable billing arrangement, will also be eligible to participate in this program channel.

The Single-Family Residential Solar Program Channel will fund solar installations for eligible low-income single-family households through residential solar leases, providing these households with an estimated 90% annual bill savings, an average of $1,400 per household. An estimated 10% of these installations will be paired with battery energy storage to provide additional resiliency benefits, resulting in an estimated 0.7 megawatt-hours of energy storage deployed. GEO anticipates seeking to increase the percentage of installations that are paired with battery storage where practicable to maximize resilience benefits. Electricity bill savings of 90% are assumed based on participation by a typical electric utility customer in net energy billing, which provides retail rate credits to customers.

GEO will subaward to or contract with one or more Single-Family Residential Solar Program Providers to administer the leasing program, and will flow-down all applicable requirements, including the requirement that all households realize a minimum monthly savings equivalent to 20% of the average monthly residential utility bill for their electric utility, net of the monthly lease payment. Minimum household savings will be calculated as follows:

*(Estimated annual kilowatt-hour production of typical residential rooftop solar array \* Applicable residential retail per-kWh rate) / Estimated annual residential electric utility expense >= 0.20*

Deploying approximately 1,280 additional residential-scale solar projects over the five years of the program represents an approximate 13% increase in the number of systems installed annually over the most recent five years.

The Multifamily On-site Solar Program Channel will fund rooftop solar installations to benefit approximately 900 households residing in federally-qualified affordable housing overseen by the Maine State Housing Authority (MaineHousing). GEO and MaineHousing will require all participating projects to deliver eligible building occupants 20% monthly bill savings or an equivalent consistent with applicable EPA and HUD guidance. At least 10% of these installations are anticipated to be paired with battery energy storage. Participating net metering customers living in a multifamily home with shared rooftop solar are estimated to save approximately $1,400 per year. In many cases, households will not be direct net metering participants, and therefore are anticipated to receive a financial or equivalent benefit. Participants without the ability to participate in net metering will be delivered an equivalent financial benefit benchmarked to at least 20% of the average residential utility customer bill.

The Energy Assistance Program Channel will utilize funds from the EPA to reduce the cost of power-purchase agreements for community-scale solar deployment. These investments will enable an estimated 21,420 low-income households in Maine to receive an equivalent financial benefit, delivered as energy bill assistance, corresponding to a minimum of 20% of the applicable average residential electric bill, consistent with the NOFO requirements. On average, the GEO estimates households participating in this program will save approximately $380 annually.

Integrating MESA programming with wraparound services, such as robust existing energy efficiency, weatherization, and electrification incentives, could further maximize benefits for participating households by improving administrative efficiency, easing outreach, and reducing not just electricity but total energy bills, as well as increasing indoor-air quality, comfort and dwelling-unit durability.

### 2.2.2 Equitable Access

Ensuring that the benefits of the energy transition are delivered equitably is a central tenet of Maine's climate action plan, Maine Won't Wait. The MESA program will advance that goal through alignment with existing energy assistance programs, ownership and participatory governance pathways, targeted financial and technical assistance to low-income and disadvantaged communities, and programmatic design that ensures the spectrum of building and tenure types as well as geographic locations are eligible to participate. Where possible, MESA will leverage existing income-verification mechanisms to minimize the burden on participating households. These may include coordination with the suite of income-eligible programs provided by the Maine State Housing Authority; low-income bill assistance provided by electric utilities through the statewide Low Income Assistance Program; or income verification processes established by the Efficiency Maine Trust. In instances where program alignment may be insufficient, MESA will utilize income verification mechanisms that prioritize minimizing burden on participating homeowners.

For the single family and multifamily program channels, financial assistance may be allocated for enabling upgrades, addressing structural and electrical barriers to solar deployment. Throughout

the program, broad outreach and technical assistance using existing, trusted relationships will facilitate trust around solar and storage installations.

### 2.2.3 Resilience Benefits

In the Energy Assistance program channel, 80% of projects are assumed to include deployment of storage, recognizing the substantial incremental value is captured when storage is utilized to capture clipped solar output and optimize the timing of energy delivery. Incorporating energy storage also has the potential to help address potential interconnection barriers. Solar plus storage could also offer additional opportunities for broader grid and program participant benefits, including from providing grid services or participating in demand response programs or virtual power plant opportunities. The GEO intends to actively explore such opportunities during the program design period.

The GEO also intends to explore implementation of one or more pilot programs within the context of the MESA Energy Assistance Program Channel, under which projects sited on or in close proximity to critical facilities, such as municipal or school buildings which provide critical services to disadvantaged communities during emergencies and power outages, might be configured to provide backup power through islanding capabilities. This would deepen benefits provided through MESA to low income and disadvantaged communities, by providing a critical source of resilience in the face of a changing climate and increasing extreme weather events.

### 2.2.4 Community Ownership

MESA dedicates one of its technical assistance programs to deploying cooperative owned solar specifically to deliver the meaningful benefit of solar ownership to eligible households who may face insurmountable barriers to individual rooftop solar ownership or leasing, as described in Section 2.4.5.

### 2.2.5 Workforce Development and Entrepreneurship

As described in Section 2.4.1, MESA will provide additional resources to Maine's existing, successful public-private partnerships to grow solar and storage focused apprenticeship programs and provide accessible career training to aspiring clean energy workers and the skilled incumbent workforce.

Additionally, the GEO will implement a combination of administrative and programmatic approaches to support the objectives of the program and embed Good Jobs Principles as required by the NOFO, which may include requiring third-party leasing companies and/or lending institutions and/or program administrator to have a transparent process that qualifies approved contractors, prioritize lenders who include requirements for consumer protection, electrical board compliance, and fair compensation in their process for approving contractors.

## 2.3 Financial Assistance Strategy

MESA allocates financial assistance to enable deployment of residential and community solar, associated storage, and enabling upgrades to benefit an estimated 23,600 low-income and disadvantaged households, as described in Section 1.2.1. Enabling upgrades may be eligible in certain instances within each program channel; however, enabling upgrades will only be funded in

conjunction with a solar project. In no instance will enabling upgrades exceed 20% of the financial assistance provided through MESA.

Administration of each program channel will involve specification and implementation of operations and maintenance plans during the program planning period, which will be designed to provide for the maximization of energy output from assisted projects, and reasonable audits or inspections to ensure work is performed correctly. Certain projects will be subject to Maine statutory requirements regarding the recycling of solar modules at the end of life.

### 2.3.1 Single-Family Residential Program Channel

The Single-Family Residential Program Channel will utilize one or more public-private partnerships between the GEO as the MESA program administrator and one or more subrecipient residential program administrators -- who may either be residential on-site solar installers themselves, or will coordinate with residential on-site solar installers – which will apply to partner with the GEO through a competitive procurement process, or through one or more negotiated subawards determined during the planning period. The program structure is broadly modeled on the Connecticut Green Bank program. One or more qualified program vendors would propose to serve eligible low-income single-family homeowners by installing on-site solar, associated storage, and enabling upgrades financed through a lease-to-own offering. Qualified program vendors will be required to provide on-site solar products that:

- Are available only to Solar for All-eligible low-income households occupying single-family homes anywhere in the state of Maine.
- Provide a residential on-site solar product lease with no down payment and savings from day one (i.e. "cash flow positive" for the household).
- Maximize the program's leverage of available federal investment tax credits by the lessor.

Utilizing a competitive RFP to select qualified program vendor(s) will enable the GEO to ensure vendors maximize the provision of tax benefits to program participants, maximizing depth of savings, and/or utilize tax benefits for reinvestment into the program, maximizing breadth of participation.

### 2.3.2 Multifamily Residential Program Channel

The Multifamily Residential Program Channel will be administered through a subaward agreement between the GEO as the recipient and the Maine State Housing Authority (MaineHousing) as the subrecipient. The Multifamily Residential Program Channel will:

- Provide low-cost capital that addresses the financing gap that has historically prevented adoption of on-site solar for many federally-qualified affordable (typically Low-Income Housing Tax Credit) multifamily developments during new construction or major renovations, in spite of supportive state policies including net metering.
  - During consultation with housing lenders and developers across the housing ecosystem, the primary barrier to adopting on-site solar during construction of new multifamily housing was cost overruns in other budget areas, which leads developers to "cut solar first."
  - Providing dedicated low-cost capital through MaineHousing will ensure this barrier is addressed in a suitably bespoke fashion, while adhering to all applicable federal and state guidance.

- Provide low-cost capital that encourages adoption of on-site multifamily solar in recently developed buildings, many of which are solar-ready.
  - MaineHousing has required all new subsidized housing to be "solar-ready" in recent years, including appropriate structural documentation, electrical conduit and raceways, and consideration during rooftop layout for other equipment such as HVAC systems.
  - Most recently or soon to be constructed publicly-supported affordable housing developments are well-positioned to rapidly deploy on-site solar with the support of the Multifamily Residential Program Channel.
- Provide low-cost capital and supportive technical assistance to deploy on-site solar where practicable as legacy multifamily units are rehabilitated and retrofitted.
  - MaineHousing has indicated approximately 750 units of affordable multifamily housing units are targeted for rehabilitation during the program period and may be primed for additional investment through on-site solar and storage deployment supported through the Multifamily Residential Program Channel, which will enable additional leveraging of other GGRF funds for complementary deep building retrofits.

### 2.3.3 Energy Assistance Program Channel

MESA Energy Assistance projects will primarily be community-scale paired solar and energy storage projects, consistent with EPA's definitions of eligible technologies and Maine law. Projects will be selected for the program through a competitive bidding process and awarded power purchase agreements (PPAs) with an applicable investor-owned utility under existing authority granted to the GEO and Maine Public Utilities Commission.

Under typical Maine PUC directives, the utilities would monetize the value of energy and any purchased attributes from the PPA, and, after covering costs incurred, return any net revenue to ratepayers through a rate adjustment. For any projects procured through the MESA Energy Assistance Program Channel, such revenues will be placed in a fund to be allocated through utility bill credits or an existing energy assistance program to eligible low-income customers.

Minimum customer bill savings will be estimated for each eligible utility service territory by calculating the average annual residential electric bill for residential customers using data drawn from utility reports submitted annually to the Maine Public Utilities Commission (this data is available sooner than EIA data). The minimum average monthly savings for a participating household will be established as:

*Minimum average monthly savings ($) = ((Average residential customer annual electricity expenses in previous year)/12)\*0.2*

Eligible customers will be enrolled through partnerships with community-serving institutions providing energy assistance, such as community action agencies.

The MESA Energy Assistance program channel will deploy funds to lower the cost of eligible projects bidding into the program, likely through a pre-qualified financing model that would allow

prospective bidders to identify – and subsequently be evaluated during bid selection – necessary funding amounts to ensure delivery of the required minimum financial benefit.

Energy Assistance program channel projects may be encouraged to enter into community benefits agreements (CBA) during project siting. This will be determined during the planning period.

All Energy Assistance program channel projects will conform to the definition of residential-serving community solar. Specifically, they will have a nameplate capacity of 5 MWac or less, 2) deliver at least 50% of the electricity generated from the system (or the bill credits corresponding to the electricity generated) to multiple residential customers within the same utility territory as the facility, and 3) verify that at least 50% of the benefits and/or credits of the power generated from the solar system be delivered to residential customers in the same service territory.

## 2.4 Project-Deployment Technical Assistance Strategy

### 2.4.1 Workforce training and participation plan

Building Maine's workforce of photovoltaic design, installation, and servicing professionals is critical to meeting the demand created through the MESA program. From the customer service representatives educating consumers on available incentives, to the electricians, laborers, and roofers installing the panels and enabling upgrades, to the engineering and IT roles designing and monitoring PV systems, Maine's solar industry offers a variety of quality job opportunities. Maine's workforce training and participation plan includes, but is not limited to, the following occupations:

- Solar photovoltaic installers
- Electricians
- Electrical engineers
- Construction managers
- General and Operations Managers
- Maintenance and Repair Workers
- Project Management Specialists
- Sales Representatives
- Roofers

By strengthening pathways to these occupations, this funding presents an opportunity to create quality jobs for underrepresented communities, ensuring that the MESA investment translates into equitable energy cost savings and economic gains. To accomplish these goals, the GEO, in partnership with the Maine Department of Labor, proposes the following workforce strategies to train 750 new and incumbent solar professionals and students:

*Career Academy Pilot*

Pilot career academies at Maine's K-12 schools, CTEs, and Adult Ed campuses, where learners participate in dual enrollment curriculum, complete a work-based learning experience like pre-apprenticeship, gain industry-recognized credentials, and receive individualized career advising and navigation support. This may include strengthening existing CTE programs with creation of post-CTE bootcamps and establishing more programs in K-12 settings for trades curricula. By increasing the awareness of solar careers among students and prospective job-seekers and

strengthening career on-ramps, the program will increase representation and access for the solar and storage workforce.

*Pre-apprenticeship, Apprenticeship, and Training Programs*
Invest in certified pre-apprenticeship, registered apprenticeship, and short term training programs to build a diverse pipeline of electricians, roofers, carpenters and key outreach roles including sales and IT managers. Built on robust industry and union partnerships, Maine has successful certified pre-apprenticeships programs, such as those offered through the Associated General Contractors of Maine, Maine AFL-CIO, and Portland Adult Education, among others, that provide experiential learning opportunities and equip participants with industry-recognized credentials like OSHA-10. Cross-sector partnerships with employers and existing training and apprenticeship providers will enable the MESA program to better engage with communities, invest in high quality a, advance diversity, equity, inclusion, and accessibility, and help achieve Justice40- compliant benefits to disadvantaged communities and individuals.

*Expand Instructional Capacity*
Bolster instructional capacity to eliminate bottlenecks in existing electrician and related trades programming by providing incentives to supplement wages among retirees and other working professionals to teach courses or other innovations to expand instructional capacity and grow the training pipeline.

*Technical Assistance*
These training programs would be supported by dedicated sector expertise to ensure alignment with State and Federal standards and support successful implementation, connect participants with supportive services to remove barriers to training or work, and connect and guide jobseekers – particularly those from underrepresented communities – to apprenticeship pathways and supportive services. The MESA will also ensure a variety of types of organizations are eligible for to receive technical assistance funding, to maximize the diversity and depth of community-serving organizations that can participate and help the eligible populations they serve.

*Outreach*
Conduct employer education through targeted outreach effort including development of easy-to-digest materials, employer workshops, and virtual resources on high quality job standards and state and federal labor standards (i.e., Davis-Bacon) required through the Greenhouse Gas Reduction Fund. Program participants and worker representatives will also be able to provide feedback to the CEP Advisory Group on curricula, training opportunities, and ongoing needs, challenges, and opportunities to facilitate MESA solar deployments. The CEP Advisory Group meets regularly to inform the ongoing work of the initiative.

*Table 2-2: Example Workforce Development Program Tracking Metrics*

| Example Performance Metric | Target Audience(s) | Numeric Target for the Period of Performance |
|---|---|---|
| Total number of participants served | New and incumbent workers, students | 750 |

| | | |
|---|---|---|
| Number of individuals and/or businesses enrolled in the training program. | | |
| The percentage of individuals that completed the training program. | | |
| The number of individuals that receive a certification. | | |
| Number and type of industry-recognized skill or business certifications obtained through program assistance. | | OSHA 10 (#), NCCER (#), NABCEP XXXX (#) |
| Number of participants from underserved or underrepresented populations | | |
| Number of workers newly employed; promoted within current employment; or placed in a registered apprenticeship as a result of training. | | |
| Estimated cost of training per participant. | | |
| Number of communities of interest served through training. | | |

In recognition of the unique needs and opportunities of individual communities, the GEO anticipates utilizing a competitive procurement process consistent with State and Federal regulations and standards for the deployment of MESA funding to local and regional partners. It is anticipated that one or more subrecipients will be selected to deliver workforce training programs. Subrecipients will use funds from MESA to invest in local workforce development initiatives including those with a focus on preparing individuals from low-income and disadvantaged communities for middle-class career pathways in solar energy deployment.

### 2.4.2 Interconnection

Technical assistance funds for interconnection are anticipated to support capacity and analysis for interconnection working groups, entities involved in interconnection processes, improved technical tools to increase transparency and reduce risk, and other methods based on existing stakeholder-identified priorities to address interconnection challenges. Specific examples may include technical assistance for small cooperative or municipal utilities to increase interconnection capabilities, tools to enhance transparency or facilitate data-sharing, and staffing capacity to support timely interconnection application review, processing, communications, and dispute resolution. Technical assistance may also support identification or analysis to enable prioritization

of interconnection locations that provide grid benefits, such as avoiding more costly investments (i.e. non-wires alternatives), coordinate with load growth due to electrification, or enhance reliability or resilience.

### 2.4.3 Siting and Permitting

MESA will provide technical assistance to developers and municipalities to ensure that projects are efficiently sited and permitted. MESA program design incorporates the recommendations of several stakeholder groups as well as national best practices and tools. Initial analysis by The Nature Conservancy in Maine has indicated that a considerable number of brownfields and capped landfills in Maine may be suitable to support deployment of distributed generation.

MESA will seek to align with the recommendations of the Agricultural Solar Stakeholder Group and The Department of Agriculture, Conservation and Forestry (DGWG) with regard to promoting development on already disturbed lands including brownfields, and to provide additional technical assistance including to communities and municipalities where appropriate. Encouraging brownfield development could also help leverage all possible financial resources, including additional federal tax incentives. MESA technical assistance for siting-related issues may include funding for further site analyses, development of local and state siting processes. Technical assistance can also support siting considerations including community benefit plans for community-scale solar projects, addressing climate hazards, building resilient assets, and other considerations such as greenspaces, pollinators, and agrivoltaics.

MESA will include funds to provide technical assistance to municipalities to efficiently review and permit solar and storage. Such assistance may include support for municipalities to adopt a renewable energy ordinance that allows, enables, or encourages community-appropriate renewable energy and energy storage installation, as well as grants for adoption of a streamlined permitting process for small-scale renewable energy installations, including the Department of Energy's SolarAPP+. SolarAPP+ integrates with existing government software to automate and standardize plan review, permit approval, and project tracking, which can streamline project permitting and development. MESA will also build awareness of complementary tools and opportunities, including the SolSmart program and technical assistance available to communities through national laboratories and other potential service providers.

### 2.4.4 Building Codes

MESA may work to facilitate adoption of practices in municipalities to overcome potential barriers to solar and storage adoption. This may entail dedicated funding to support municipalities to adopt stretch building codes and DOE's model permitting, supporting regular professional development for code enforcement officers, and other related efforts.

### 2.4.5 Cooperatively-owned Community Solar

Technical assistance deployed through this MESA program channel would be directed to specific projects or portfolios of projects to foster a pipeline of viable projects. For example, MESA could provide funding for purchase of a basic operations and maintenance package to overcome a substantial barrier to existing low-income solar efforts of managing long term service.

### 2.4.6 Summary of Technical Assistance

Maine Governor's Energy Office – 84088301 – Solar for All Workplan – December 9, 2024

Throughout this workplan, the MESA program design emphasizes coordination with existing successful partnerships and programs to overcome identified barriers to residential serving solar and storage deployment in low income and disadvantaged communities. The deployment of technical assistance, with the exception of the workforce development program, will be further refined during the program planning period, including with input from stakeholders. The GEO anticipates allocating nearly $10 million through MESA to technical support, including $5.5 million for workforce development, $900,000 for addressing interconnection challenges, and $3.25 million for program delivery technical assistance related to siting, permitting, codes, and related efforts.

## 2.5 Equitable Access and Meaningful Involvement Plan

MESA maximizes the breadth and diversity of communities served while prioritizing the most disadvantaged and lowest-income households. The GEO has proposed a comprehensive set of program channels that ensure a pathway to solar participation is available to any eligible household – renters and homeowners, rural and urban households, and any household that may face insurmountable barriers to on-site solar adoption.

The GEO works closely in support of the Maine Climate Council, which emphasizes the need to advance equity through the state's climate response, including by establishing the Equity Subcommittee (ESC). MESA will provide direct support to, and center the experience of, households living in communities that the ESC has identified as "priority populations" for climate action, specifically: Households with low-income individuals, older adults, low-income residents of rental housing (especially multifamily), mobile home residents, low-income homeowners, rural communities, small towns with limited staff capacity, disadvantaged communities, and Tribal and Indigenous communities.

MESA will be available to support Tribal solar and storage projects and will seek input from and coordination, where appropriate, with Tribal nations on workforce development, technical assistance, and other programmatic activities. The GEO has engaged in initial discussions regarding MESA opportunities with Tribal Staff from the Penobscot Nation, Passamaquoddy Tribe at Sipayik, Mi'kmaq Nation, and Houlton Band of Maliseet Indians, and is committed to collaborating with Tribal nations during the MESA program design period to more fully incorporate support for Tribal solar and storage projects into the MESA program, as well as deployment of technical assistance and meaningful involvement in program development.

### 2.5.1 Participatory governance plan

MESA will establish and support a dedicated program Advisory Board that will convene regularly to:

- Provide strategic input and advice regarding program design and deployment;
- Review and advise on program performance;
- Provide a public forum through which interested stakeholders and members of the public, especially members of disadvantaged communities, may provide feedback and meaningful input into the MESA program.

The Advisory Board will have formal representation from affected stakeholders and industry, and regular public meetings with opportunities for public input and direct outreach to priority communities. Advisory Board membership and procedures will be established consistent with

principles of procedural equity, ensuring that the Advisory Board serves as an effective and responsive venue for meaningful community input and influence on program decision-making. The Advisory Board will be supported by MESA staff, and potentially a neutral facilitator, and comprise diverse representation from community-based organizations, representatives of low-income and disadvantaged communities, key program delivery stakeholders, and other voices. Program participants will also be informed of other opportunities for participatory governance outside of resources provided by the Solar for All program.

### 2.5.2 Education, outreach, and community engagement plan

The GEO will work with partners who have existing relationships with these populations to develop messaging and materials that can be shared within existing information channels used by the populations they serve. This collaboration will also ensure outreach is culturally appropriate. Partnering with trusted community organizations will improve the likelihood that participants feel comfortable sharing their feedback to help improve the program. MESA's outreach strategy will incorporate recommendations of the Maine Climate Council Equity Subcommittee, including to:

- Ensure language accessibility for written and online materials, assistance, and advisory services and meetings;
- Offer a variety of meeting times, agendas, and avenues to participation to align with work and childcare schedules; and
- Work with communities and community-based organizations to align outreach with people's existing and trusted social and community networks and channels.

### 2.5.3 Customer acquisition and management strategy

Customer acquisition and management resources and requirements will be established in consultation with the Advisory Committee and based on established best practices. Electrification and energy efficiency programs already deployed in Maine have utilized robust qualified vendor networks to ensure high standards for contractors interfacing directly with residential customers. Comparable requirements will be established for MESA program delivery, including establishment of a dedicated verification channel (e.g. web-based and 24/7 hotline resources) to ensure households can verify the status of a contractor.

The Energy Assistance Program Channel is specifically designed to reduce customer acquisition barriers, and associated program costs, by providing benefits directly to qualified households by leveraging established channels for delivery of assistance. The GEO will work with key partners during the program design period to refine the delivery method, potentially by utilizing the U.S. DOE and U.S. Department of Health and Human Services Low-Income Clean Energy Connector digital tool, which is currently being piloted through the National Community Solar Partnership.

**Section 3:  Fiscal Stewardship Plan**

The MESA program will ensure full compliance with all applicable EPA requirements established in the NOFO, as well as all other applicable federal and state requirements, including but not limited to:

- 2 CFR § 200.303
- 2 CFR § 200.318
- 2 CFR § 200.322(b) and (d)
- 2 CFR 1500.1(b)

Comprehensive policies and procedures to administer these and other applicable requirements are contained in the State Administrative and Accounting Manual (SAAM) 12 and will be further operationalized in applicable sub agreements utilizing standard form contract riders and addenda. As an agency of state government, the GEO is well-positioned to ensure compliance through the robust resources and procedures, and capacity to develop new or adapt existing specifications and compliance mechanisms, available through state government.

As described in the Program Strategy Narrative, the GEO anticipates deploying funds in a comprehensive manner through multiple program channels. As further detailed in Section 2, it is likely that one or more channels will involve agreements with entities characterized as subrecipients and/or contractors of the GEO under this award. Therefore it is likely that one or much such entities will interact directly with, or will oversee other entities that interact directly with, consumers through sales, leasing, or other transactions. To the extent such activities occur or are supported through MESA funds, the GEO will ensure compliance with all applicable federal and state consumer protection laws, including but not limited to those specified in the NOFO and EPA's Terms and Conditions, through subaward agreement or contract specifications. Strategies for providing oversight of subawards will build on those already utilized by the GEO for more than ten other subaward agreements for federally-funded programs, including regular status meetings and staff engagement, independent monitoring, and periodic quantitative and qualitative/narrative reporting.

Through development of a qualified vendor network, the GEO will ensure entities are screened and qualified, with third-party verification available for consumers to ensure any marketing or contractor qualification claims can be independently verified (e.g. through a dedicated MESA telephone number and online contractor database). Such methods are already utilized for qualified energy efficiency and other clean energy vendor networks in the state.

MESA will provide subrecipients with training and technical assistance on program-related matters, including prudent financial risk management practices, in accordance with 2 CFR 200.332.  Guidance to subrecipients will include indirect cost explaining GEO has a Negotiated Indirect Cost Rate Agreement (NICRA) with the US Department of Energy.

**3.1 Consumer Financial Protections**

State of Maine Bureau of Consumer Credit Protection (part of the Department of Professional and Financial Regulation) oversees many aspects of consumer finance industry, including non-bank mortgage lenders, debt collectors, loan brokers, retail creditors, money transmitters, credit

reporting agencies and non-bank ATMs. The Bureau administers state credit-related statues and protects consumers by conducting compliance examinations, responding to consumer complaints, issuing licenses and providing consumer education and outreach. GEO will coordinate with the Bureau as applicable in the administration of this award.

MESA will monitor and guide subrecipients and/or contractors concerning consumer financial protection requirements in accordance with 2 CFR 200.332(d) and 2 CFR 200.318. The MESA/subrecipient/contractor consumer financial protection plan will include the following key elements:

   i. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;
   ii. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;
   iii. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;
   iv. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and
   v. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.


**Section 4: Timeline and Milestones**

The attached Program Planning Timeline contains anticipated work periods and milestones associated with:
- Implementation activities
  - Multifamily Solar Program Channel
  - Workforce Development Technical Assistance Program
- Additional program planning activities
  - Single Family Solar Leasing Program Channel
  - Energy Assistance Community Solar Program Channel
  - Cooperative Community Solar Technical Assistance
  - Project-deployment Technical Assistance
  - Interconnection Challenge Plan

**Section 5:  Reporting Requirements**

The GEO originally proposed an evaluation, measurement and verification plan in the Solar for All application. In order to maximize the partial award funds utilized for financial and technical assistance, and recognizing the considerable program data collection and reporting required under the EPA Term and Condition which would in many instances appear duplicative of the evaluation, measurement and verification plan activities, the recipient has removed this budget line and associated activities.

**5.1 Performance Reports**

**5.1.1 Semi-Annual Report**

The GEO agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report will cover activities from the preceding two quarters.

**5.1.2 Final Report**

The GEO agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the GEO's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the GEO hereby details its program strategy and plans for performance reporting under the Closeout Agreement. The GEO will include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The GEO agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

**5.2 Transaction-Level and Project-Level Data**

The GEO agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The GEO agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

## Section 6:  Budget Narrative

### 6.1 Project Budget

#### 6.1.1 Personnel

Two full-time personnel are funded to lead the development of the Solar for All program, deployment of funds, and overall program administration and coordination throughout the program period of performance. Salaries supported in this budget allocation include one full-time Clean Energy Finance Program Manager, who will assume MESA program administration and management duties, as well as ensure strategic alignment between Solar for All and other consumer-serving energy, housing, electrification, and related assistance programs in the state. The Clean Energy Finance Program Manager will report to senior leadership within the GEO.

Salary for one full-time Solar for All Program Coordinator is included to enable a program coordination and delivery-focused staff member. The Program Coordinator will report to the Program Manager or to senior leadership within the GEO.

Qualifications and position specifications have been developed through the State of Maine Bureau of Human Resources hiring process and include prior experience and expertise in solar or related clean energy programs, program management experience, financial assistance deployment, and stakeholder engagement. Both positions have been posted for applications in September 2024 with application deadlines of October 4, 2024. The GEO anticipates filling and onboarding both positions before the end of calendar year 2024.

Estimated funding amount: $902,076

#### 6.1.2 Fringe Benefits

Fringe benefits for both salaried personnel described above are calculated utilizing the State of Maine base rate promulgated by the Bureau of Human Resources. The components of this rate are summarized below.

| Enter | **Number of positions** | 1 |
|---|---|---|
| | | **Annual Salary** |
| **Annual Retirement (calculation)** | | |
| % of salary | Normal | 4.84% |
| % of salary | Unfunded | 16.30% |
| % of salary | Retiree Health | 8.45% |
| % of salary | Pickup - X only | 4.80% |
| % of salary | FICA | 1.45% |
| **Benefits - State Portion (enter calculation)** | | |
| Health Insurance | Salary <$30K | $ 1,024.40 |
| Health Insurance | Salary >$30K<$80K | $ 996.37 |
| Health Insurance | Salary>$80K | $ 968.35 |
| Dental Insurance | Any Wage Level | $ 29.49 |
| Worker's Comp | annual amount | $ 1,537.00 |
| Life Insurance | $ per 000s of salary | $ 0.42 |

Estimated funding amount: $585,277

### 6.1.3 Travel

Travel expenses are included for two staff to attend one week-long conference per year. Such conferences could include national or regional convenings relevant to Solar for All administration, including but not limited to convenings of the National Association of State Energy Officials, the Clean Energy States Alliance, or various renewable energy industry conferences. This funding could also support a larger number of shorter duration convenings in the event such conferences are available. Attending national or regional conferences will provide an opportunity for MESA staff to learn about and share program best practices, lessons learned and improve the efficiency and impact of MESA program delivery. Individual conference attendance will be determined on an as-needed basis.

Travel funds are also included for approximately 250 miles of travel, including two overnights per quarter. With more than 35,000 square miles and the second-most rural population in the United States, effectively administering MESA in a manner that involves meaningful engagement and involvement for a diverse population of disadvantaged communities will necessitate in-person attendance at meetings, community events, and related travel. Mileage rates and meals and incidentals are estimated utilizing historical experience, the U.S. General Services Administration per diem rates and State of Maine Office of Comptroller guidance. Flight costs are estimated with a modest annual escalation. As of the date of this workplan, the following cost components are in effect and form the basis of this estimate:

- Daily lodging rate: $110/day
- Meals and incidental expenses: $68/day
- Privately-owned vehicle: $0.67/mile

Estimated funding amount: $55,850

### 6.1.4 Equipment

No funding for equipment is budgeted.

Maine Governor's Energy Office – 84088301 – Solar for All Workplan – December 9, 2024

Estimated funding amount: $0

### 6.1.5 Supplies
Funds are included for supplies to support office functions, printing and communications materials associated with program development and delivery, and other administrative supplies. Supplies will be acquired using State of Maine office supply vendors or on an incidental basis.

Estimated funding amount: $12,047

### 6.1.6 Contractual
Funds are included for MESA program planning and administration support, which is anticipated to involve one or more contractors supporting the GEO with program planning and development activities through technical analysis, legal and regulatory support, compliance support including for Davis-Bacon and Related Acts reporting, and outreach and stakeholder engagement. The proposed duration for most contracts will be one year beginning during the program planning period, with an option for renewal if determined necessary through the program period.

Funds are included for Advisory Board facilitation and administrative support, which is anticipated to include one or more GEO contractors to support the formation, neutral third-party facilitation, and administrative activities of the Advisory Board, and to provide for other administrative needs as identified by the advisory committee in collaboration with GEO. The proposed duration for the contract or contracts will be one to two years, with an option for renewal through the program period.

All contracts will be competitively procured consistent with standards established for the State of Maine by the Division of Procurement Services, and in compliance with EPA's Subaward Policy and all applicable requirements.

Estimated funding amount: $885,000

### 6.1.7 Other
The Other budget category includes planned subawards, detailed in Section 6.3 below. In addition, it includes $400,000 in in-kind technical assistance to be provided by EPA and/or EPA's selected provider(s).

## 6.2 Participant Support Costs

No Participant Support Costs are included in the budget at this time.

## 6.3 Subawards

Funds are included for subawards to entities to deliver financial assistance (budget lines 37-39) through the MESA program channels proposed in the Program Strategy Narrative: The Single Family Solar Lease Program Channel, the Multifamily Program Channel, and the Energy Assistance Program Channel.

### 6.3.1 Single Family Solar Lease Program Channel (budget line 37)

The GEO intends to determine the most appropriate mechanism to disburse funds for the Single Family Solar Lease Program Channel consistent with EPA requirements and all applicable federal and state law and regulations. GEO may make one or multiple subawards for the Single Family Solar Lease Program Channel, which may include governmental, non-profit, or for-profit entities. The total subaward(s) will not exceed $10,400,000. The subawards will not be provided through a revolving loan fund. The duration of subaward(s) is anticipated to be the entire program period.

### 6.3.2 Multifamily Program Channel (budget line 38)

Funds for the Multifamily Program Channel will be sub-awarded to the Maine State Housing Authority. This subaward will be made consistent with EPA requirements and all applicable federal and state law and regulations. The total subaward will not exceed $16,000,000. The subaward will not be provided through a revolving loan fund. The duration of subaward is anticipated to be the entire program period.

### 6.3.3 Energy Assistance Program Channel (budget line 39)

The GEO intends to determine the most appropriate mechanism to disburse funds for the Energy Assistance Program Channel consistent with EPA requirements and all applicable federal and state law and regulations. GEO may make one or multiple subawards for the Energy Assistance Program Channel, which may include governmental, non-profit, or for-profit entities. The total subaward(s) will not exceed $22,000,000. The subawards will not be provided through a revolving loan fund. The duration of subaward(s) is anticipated to be the entire program period.

### 6.3.4 Technical Assistance Program Delivery (budget lines 40-43)

The GEO intends to determine the most appropriate mechanism to disburse funds for this technical assistance consistent with EPA requirements and all applicable federal and state law and regulations, and as described in 2.4 Project-Deployment Technical Assistance Strategy. GEO may make one or multiple subawards, which may include governmental, non-profit, or for-profit entities. The total subaward(s) will not exceed the budgeted amounts. The subawards will not be provided through a revolving loan fund. The duration of subaward(s) is anticipated to be the entire program period.

Estimated total funding amount: $59,050,000

## 6.4 Additional Items

### 6.4.1 Indirect Charges

As described in Appendix B of the Notice of Funding Opportunity, indirect costs are costs incurred by the grantee for a common or joint purpose that benefit one or more cost objective or program and are not readily assignable to specific cost objectives or projects as a direct cost. Indirect costs on all non-financial assistance direct costs (line 53) are calculated using the 9.415% negotiated rate applicable to the Maine Governor's Energy Office per the attached negotiated rate agreement with the U.S. Department of Energy.

Estimated funding amount: $229,750

### 6.4.2 Conferences and Workshops
This scope of work does not include conducting any conferences or workshops.

### 6.4.3 Meals and Refreshments
This scope of work does not include any costs for light refreshments, meals or beverages other than meals and incidentals necessary for program staff traveling for program purposes, which are included in the Travel budget item described above.

### 6.4.4 Program Income
Program income is not anticipated under this scope of work.

### 6.4.5 Copyrighted Materials and Inventions
This scope of work is not anticipated to lead to the development of any copyrighted software or written materials. This scope of work is not anticipated to result in any inventions.

### 6.4.6 Research Activities
This scope of work is not anticipated to involve animal subjects. To the extent the project involves collecting identical information from 10 or more people, that information collection is anticipated to be conducted consistent with the program activities described in the workplan (e.g. verifying household income or other participant qualification criteria; collecting data on program outcomes consistent with EPA requirements).

### 6.4.7 Work Outside the United States
This scope of work does not anticipate any work outside the United States.

### 6.4.8 Compliance Affirmations
GEO has adequate systems in place for complying with:

1) 2 CFR 200.331, the subrecipient eligibility provisions of EPA's National Term and Condition for Subawards, and any program specific restrictions on subrecipient eligibility.

2) 2 CFR 200.332, Requirements for pass-through entities, as described in EPA's National Term and Condition for Subawards.

EXHIBIT 4

**Greenhouse Gas Reduction Fund**
**Solar for All**
MESA: Maine Solar for All
**Work Plan**
*Project Period: 05/01/2024-04/30/2029*
***Submitted July 29, 2025***

**Project Title:** MESA: Maine Solar for All
**Grant Number:** 84088301
**Organization Name:** Maine Governor's Energy Office
**Geography:** State of Maine
**Definition of LIDAC:** Maine's Solar for All program proposes three distinct program channels, each designed to serve a different segment of low-income and disadvantaged households as defined by EPA in the Solar for All Notice of Funding Opportunity (the NOFO). In order to maximize the meaningful benefits for participating LIDAC households within each program channel, different eligibility criteria for each channel will be developed as described in this workplan. In all cases, LIDAC definitions will conform to the definition of "eligible household" established in the NOFO. Specifically, MESA will serve geographically dispersed eligible low-income households and properties providing affordable housing.

## Section 1: Project Description

### 1.1 Overview

MESA proposes three financial assistance program channels to comprehensively address the range of barriers faced by low-income eligible households: single-family and multifamily on-site solar programs, and an efficient energy assistance community solar program. The original application proposed a fourth financial assistance channel, targeted support for cooperatively-owned community solar. This program channel is still included in this workplan but has been re-categorized as technical assistance in conformance with EPA definitions. Energy storage is incorporated across all three channels to build resilience and maximize value, as detailed in section 2. MESA also proposes a holistic range of technical assistance, supporting expanded workforce development opportunities, project-deployment technical assistance including siting and permitting supports, and additional support to overcome barriers including interconnection challenges.

### 1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

#### 1.2.1 Environmental Results - Outputs and Outcomes

The overarching anticipated outputs resulting from the MESA program include the financial assistance program channels described in detail in Section 2:
- A Single-Family Residential Solar Leasing Program;
- A Multifamily Solar Program;
- An Energy Assistance Community Solar Program.

Progress toward these overarching outputs will be measured by the establishment of each program channel, performance metrics including the drawdown of associated funds to complete the program activities for each channel, and the subsequent environmental outcomes described below. GEO has modified the total funding proposed for each financial assistance category commensurate with the partial award made by EPA. GEO originally sought $99,500,000 and was awarded $62,100,000. Accordingly, financial assistance categories have been reduced to approximately 62% of their original proposed amounts.

One exception is the Multifamily Program Channel. During initial planning activities subsequent to the award, GEO recognized a reduced share of the overall award should be subject to indirect rate calculation than was reflected in the original application budget. The resulting unallocated funds have been primarily reallocated to the Multifamily Program Channel in recognition of the meaningful benefits and likely speed to deployment available through this channel. Financial assistance budget category modifications resulting from the partial award are summarized in **Table 1-1**.

*Table 1-1: Summary of Financial Assistance Budget Category Modifications Resulting from Partial Award*

| Program Channel<br><br>(A) | Original Funding Proposed<br>(B) | Revised Funding Proposed<br>(C) | Revised as Percentage of Original<br>(D) = (C / B) |
|---|---|---|---|
| Single Family Lease Program Channel | $16,250,000 | $10,400,000 | 64% |
| Multifamily Program Channel | $20,000,000 | $16,000,000 | 80% |
| Energy Assistance Community Solar Channel | $35,000,000 | $22,000,000 | 63% |

The anticipated environmental outcomes are guided by detailed modeling and grounded in the context of Maine and the experience of Maine-based organizations with decades of providing services to low income and disadvantaged communities and building the rapidly growing residential-serving solar and storage market. Estimated outputs and outcomes are estimated only and may be subject to revision or refinement through subrecipient and/or contracting processes. Proposed environmental outcomes are summarized in **Table 1-2**, along with aligned Greenhouse Gas Reduction Fund (GGRF) program objectives:

- Objective 1: Climate and Air Pollution Benefits
- Objective 2: Equity and Community Benefits
- Objective 3: Market Transformation Benefits

*Table 1-2: Estimated Environmental Outcomes*

| Outcome Metric | Aligned GGRF Program Objectives | Single-Family Solar Lease Channel* | Multifamily Program Channel* | Community Solar Channel* | Total* |
|---|---|---|---|---|---|
| Households benefitting | 2, 3 | 1,280 | 900 | 21,420 | **23,600** |
| Megawatts of solar | 1, 3 | 7.7 | 5.4 | 28.2 | **41.3 MW** |
| Megawatt-hours of storage | 1, 3 | 0.7 | 0.54 | 22.6 | **23.8 MWh** |
| Annual short tons of CO2 avoided[1] | 1, 2 | 774 | 585 | 3,263 | **4,622** |
| Total workforce development participants served | 2, 3 | | | | **750** (New and incumbent workers, students) |

*Estimated by adjusting values included in Solar for All application to scale with anticipated partial award funding amounts.

### 1.2.2 Linkage to U.S. EPA's Strategic Goals

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan:[2]
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

---

[1]Avoided carbon dioxide is calculated using AVERT. As a result, the value accounts only for carbon dioxide reductions from solar production, but cannot account for any time-sensitive variations as a result of battery storage.

[2] Accessed at https://www.epa.gov/system/files/documents/2022-03/fy-2022-2026-epa-strategic-plan.pdf

**Section 2:  Project Design Plan**

**2.1 Activities to be Conducted**

The GEO seeks approval from EPA, via approval of this workplan, to draw down funds for all Solar for All program activities. **Table 2-1** summarizes the approval sought for each financial assistance program channel and technical assistance category.

*Table 2-1: Summary of Approval Sought*

| Program Activity/Budget Category | Funding Allocated | Approval Sought | Timeline and Budget References |
|---|---|---|---|
| Single Family Lease Program Channel (Financial Assistance) | $10,400,000 | Authorization to draw down funds upon approval of this workplan. | Budget Workbook: Line 44<br><br>Timeline Workbook: Lines 44-49 |
| Multifamily Program Channel (Financial Assistance) | $16,000,000 | Authorization to draw down funds previously approved in MESA's December 9, 2024, submitted workplan. | Budget Workbook: Line 41<br><br>Timeline Workbook: Lines 31-35 |
| Energy Assistance Community Solar Channel (Financial Assistance) | $22,000,000 | Authorization to draw down funds upon approval of this workplan. | Budget Workbook: Line 43<br><br>Timeline Workbook: Lines 50-56 |
| Cooperative Community Solar (Technical Assistance) | $1,000,000 | Authorization to draw down funds upon approval of this workplan. | Budget Workbook: Line 45<br><br>Timeline Workbook: Lines 57-60 |
| Workforce Development (Technical Assistance) | $5,201,000 | Authorization to draw down funds upon approval of this workplan. | Budget Workbook: Line 46<br><br>Timeline Workbook: Lines 36-40 |
| Interconnection Challenge Plan (Technical Assistance) | $900,000 | Authorization to draw down funds upon approval of this workplan. | Budget Workbook: Line 47<br><br>Timeline Workbook: Line 65-68 |
| Project-deployment Technical Assistance | $3,122,216 | Authorization to draw down funds upon approval of this workplan. | Budget Workbook: Line 48 |

| (Technical Assistance) | | | Timeline Workbook: Line 61-64 |
| All other categories | $3,096,785 | Authorization to draw down funds previously approved in MESA's December 9, 2024, submitted workplan. | Budget Workbook: Lines 7-36, 56)<br><br>Timeline Workbook: Lines 13, 41-43, 45-69 |

**2.2 Meaningful Benefits Plan**

Several characteristics specific to Maine make distributed solar plus storage particularly beneficial to program participants. MESA ensures a comprehensive range of meaningful benefits will be delivered to these Solar for All eligible households. MESA recognizes and prioritizes delivery of the five meaningful benefits identified by EPA for the Solar for All program, as described below.

### 2.2.1 Household Savings

The MESA Single Family Residential Solar Program Channel will deploy on-site solar and in some cases energy storage for eligible households. Participating households are assumed to deploy solar projects of sufficient capacity to offset approximately 90% of the household's annual electricity costs through net metering credits for customers of Central Maine Power and Versant Power, which serve 96% of electric customers statewide and are required by law to provide net metering arrangements. Although the ten municipal and cooperative electric utilities, which combined serve the remaining 4% of residential customers in the state, are not required by law to offer net metering arrangements to customers, customers of those that do, or that offer a comparable billing arrangement, will also be eligible to participate in this program channel.

The Single-Family Residential Solar Program Channel will fund solar installations for eligible single-family households through residential solar leases, providing these households with an estimated 90% annual bill savings, an average of $1,400 per household. An estimated 10% of these installations will be paired with battery energy storage to provide additional resiliency benefits, resulting in an estimated 0.7 megawatt-hours of energy storage deployed. GEO anticipates seeking to increase the percentage of installations that are paired with battery storage where practicable to maximize resilience benefits. Electricity bill savings of 90% are assumed based on participation by a typical electric utility customer in net energy billing, which provides retail rate credits to customers.

The GEO will subaward with a non-profit Single-Family Residential Solar Program partner to administer the leasing program and will flow-down all applicable requirements, including the requirement that all households realize a minimum monthly savings equivalent to 20% of the average monthly residential utility bill for their electric utility, net of the monthly lease payment. Minimum household savings will be calculated as follows:

*(Estimated annual kilowatt-hour production of typical residential rooftop solar array \* Applicable residential retail per-kWh rate) / Estimated annual residential electric utility expense >= 0.20*

Deploying approximately 1,280 additional residential-scale solar projects over the five years of the program represents an approximate 13% increase in the number of systems installed annually over the most recent five years.

GEO will subaward with a non-profit Multifamily Solar Program partner to administer the Multifamily Program. The Multifamily On-site Solar Program Channel will fund rooftop solar installations to benefit approximately 900 households residing in federally-qualified affordable housing. GEO and the subrecipient will require all participating projects to deliver eligible building occupants 20% monthly bill savings or an equivalent consistent with applicable EPA and HUD guidance. At least 10% of these installations are anticipated to be paired with battery energy storage. Participating net metering customers living in a multifamily home with shared rooftop solar are estimated to save approximately $1,400 per year. In many cases, households will not be direct net metering participants, and therefore are anticipated to receive a financial or equivalent benefit. Participants without the ability to participate in net metering will be delivered an equivalent financial benefit benchmarked to at least 20% of the average residential utility customer bill.

The GEO will subaward with a non-profit Energy Assistance Program partner to administer the Energy Assistance Program and will utilize funds from the EPA to reduce the cost of power-purchase agreements (PPA) between Maine's investor-owned utilities and project owners for community-scale solar deployment. These investments will enable an estimated 21,420 eligible households in Maine to receive an equivalent financial benefit, delivered as energy bill assistance, corresponding to a minimum of 20% of the applicable average residential electric bill, consistent with the NOFO requirements. On average, the GEO estimates households participating in this program will save approximately $380 annually.

Integrating MESA programming with wraparound services, such as robust existing energy efficiency, weatherization, and electrification incentives, could further maximize benefits for participating households by improving administrative efficiency, easing outreach, and reducing not just electricity but total energy bills, as well as increasing indoor-air quality, comfort and dwelling-unit durability.

### 2.2.2 Equitable Access

Ensuring that the benefits of the energy transition are delivered equitably is a central tenet of Maine's climate action plan, Maine Won't Wait. The MESA program will advance that goal through alignment with existing energy assistance programs, ownership and participatory governance pathways, targeted financial and technical assistance to eligible households and communities, and programmatic design that ensures the spectrum of building and tenure types, as well as geographic locations are eligible to participate. Where possible, MESA will leverage existing income-verification mechanisms to minimize the burden on participating households. These may include coordination with the suite of income-eligible programs provided by the Maine State Housing Authority; low-income bill assistance provided by electric utilities through the statewide Low Income Assistance Program; or income verification processes established by the Efficiency Maine Trust. In instances where program alignment may be insufficient, MESA will utilize income verification mechanisms that prioritize minimizing burden on participating homeowners.

For the single family and multifamily program channels, financial assistance may be allocated for enabling upgrades, addressing structural and electrical barriers to solar deployment. Throughout the program, broad outreach and technical assistance using existing, trusted relationships will facilitate trust around solar and storage installations.

### 2.2.3 Resilience Benefits

In the Energy Assistance program channel, 80% of projects are assumed to include deployment of storage, recognizing the substantial incremental value is captured when storage is utilized to capture clipped solar output and optimize the timing of energy delivery. Incorporating energy storage also has the potential to help address potential interconnection barriers. Solar plus storage offers additional opportunities for broader grid and program participant benefits, including providing grid services or participating in demand response programs or virtual power plant opportunities.

The GEO will explore implementation of one or more pilot programs within the context of the MESA Energy Assistance Program Channel, under which projects sited on, or in close proximity to, critical facilities, such as municipal or school buildings which provide critical services to communities during emergencies and power outages, might be configured to provide backup power through islanding capabilities. This would deepen benefits provided through MESA to eligible households and  communities throughout Maine, by providing a critical source of resilience in the face of a changing climate and increasing extreme weather events.

### 2.2.4 Community Ownership

MESA dedicates one of its technical assistance programs to deploying cooperative owned solar specifically to deliver the meaningful benefit of solar ownership to eligible households who may face insurmountable barriers to individual rooftop solar ownership or leasing, as described in Section 2.4.5.

### 2.2.5 Workforce Development and Entrepreneurship

As described in Section 2.4.1, MESA will provide additional resources to Maine's existing, successful public-private partnerships to grow solar and storage focused apprenticeship programs and provide accessible career training to aspiring clean energy workers and the skilled incumbent workforce.

Additionally, the GEO will implement a combination of administrative and programmatic approaches to support the objectives of the program and embed Good Jobs Principles as required by the NOFO, which may include requiring third-party leasing companies and/or lending institutions and/or program administrator to have a transparent process that qualifies approved contractors, prioritize lenders who include requirements for consumer protection, electrical board compliance, and fair compensation in their process for approving contractors.

## 2.3 Financial Assistance Strategy

MESA allocates financial assistance to enable deployment of residential and community solar, associated storage, and enabling upgrades to benefit an estimated 23,600 eligible households, as described in Section 1.2.1. Enabling upgrades may be eligible in certain instances within each

program channel; however, enabling upgrades will only be funded in conjunction with a solar project. In no instance will enabling upgrades exceed 20% of the financial assistance provided through MESA.

Administration of each program channel will involve specification and implementation of operations and maintenance plans, designed to provide for the maximization of energy output from assisted projects, and reasonable audits or inspections to ensure work is performed correctly. Certain projects will be subject to Maine statutory requirements regarding the recycling of solar modules at the end of life.

### 2.3.1 Single-Family Residential Program Channel

The Single-Family Residential Program Channel will utilize a partnership between the GEO, as the MESA program administrator, and a non-profit subrecipient to serve as residential program administrator. Utilizing a competitive procurement process to select a qualified subrecipient will enable the GEO to ensure partners maximize the provision of tax benefits to program participants, maximize the depth of savings and breadth of participation, and/or utilize tax benefits for reinvestment into the program.

Qualified subrecipients will be required to:
- Provide a residential on-site solar product lease with no down payment and savings from day one (i.e. "cash flow positive" for the household).
- Maximize the program's leverage of available federal investment tax credits by the lessor.
- Provide income verification consistent with the definition as stated in the terms and conditions.

Following the subaward agreement with the selected non-profit subrecipient, a qualified vendor network of contractors (vendors) will be developed for eligible households to select from to perform work.  The vendors will provide on-site solar, associated storage, and enabling upgrades to eligible households occupying single-family homes located anywhere within the state of Maine. The subrecipient will contract with the selected vendor directly, while the eligible household enters into a lease agreement with the subrecipient via a lease-to-own offering.

### 2.3.2 Multifamily Residential Program Channel

The Multifamily Residential Program Channel will be administered through a subaward agreement between the GEO, as the MESA program administrator, and a non-profit subrecipient to serve as the Multifamily program administrator.  .. Utilizing a competitive procurement process to select a qualified subrecipient will enable the GEO to ensure partners maximize the depth of savings and breadth of participation. The Multifamily Residential Program Channel will:
- Provide low-cost capital that addresses the financing gap that has historically prevented adoption of on-site solar for many federally-qualified affordable (typically Low-Income Housing Tax Credit) multifamily developments during new construction or major renovations, in spite of supportive state policies including net metering.
  - During consultation with housing lenders and developers across the housing ecosystem, the primary barrier to adopting on-site solar during construction of new

multifamily housing was cost overruns in other budget areas, which leads developers to "cut solar first."
- o Providing dedicated low-cost capital through the subrecipient will ensure this barrier is addressed in a suitably bespoke fashion, while adhering to all applicable federal and state guidance.
- Provide low-cost capital that encourages adoption of on-site multifamily solar in recently developed buildings, many of which are solar-ready.
  - o The Maine State Housing Authority has required all new subsidized housing to be "solar-ready" in recent years, including appropriate structural documentation, electrical conduit and raceways, and consideration during rooftop layout for other equipment such as HVAC systems.
  - o Most recently or soon to be constructed publicly-supported affordable housing developments are well-positioned to rapidly deploy on-site solar with the support of the Multifamily Residential Program Channel.
- Provide low-cost capital and supportive technical assistance to deploy on-site solar where practicable as legacy multifamily units are rehabilitated and retrofitted.
  - o The Maine State Housing Authority has indicated approximately 750 units of affordable multifamily housing units are targeted for rehabilitation during the program period and may be primed for additional investment through on-site solar and storage deployment supported through the Multifamily Residential Program Channel, which will enable additional leveraging of other GGRF funds for complementary deep building retrofits.

### 2.3.3 Energy Assistance Program Channel

MESA Energy Assistance projects will primarily be community-scale paired solar and energy storage projects, consistent with EPA's definitions of eligible technologies and Maine law. Projects will be selected for the program through a competitive bidding process and awarded PPAs with an applicable investor-owned utility under existing authority granted to the GEO and Maine Public Utilities Commission (PUC). To assist with program development, the GEO will competitively procure and select technical analyst support to assist with the development of the Energy Assistance Community Solar PPA procurement methodology.

Under typical Maine PUC directives, the utilities would monetize the value of energy and any purchased attributes from the PPA, and, after covering costs incurred, return any net revenue to ratepayers through a rate adjustment. For projects procured through the MESA Energy Assistance Program Channel, such revenues will be placed in a fund to be allocated through utility bill credits or an existing energy assistance program to Solar for All eligible customers.

The GEO will competitively solicit a qualified subrecipient to administer the Energy Assistance Program Channel. Once the subrecipient has been selected, the GEO will enter into a subaward agreement with the selected non-profit entity. MESA's efficient Energy Assistance program channel will deploy funds, via a subaward, to lower the cost of eligible projects bidding into the program, through a pre-qualified financing model that would allow prospective bidders to identify – and subsequently be evaluated during bid selection – necessary funding amounts to ensure delivery of the required minimum financial benefit.

Minimum customer bill savings will be estimated for each eligible utility service territory by calculating the average annual residential electric bill for residential customers using data drawn from utility reports submitted annually to the Maine Public Utilities . The minimum average monthly savings for a participating household will be established as:

*Minimum average monthly savings ($) = ((Average residential customer annual electricity expenses in previous year)/12)\*0.2*

Eligible customers will be enrolled through  existing energy assistance programs.


All Energy Assistance program channel projects will conform to the definition of residential-serving community solar. Specifically, they will have a nameplate capacity of 5 MWac or less, 2) deliver at least 50% of the electricity generated from the system (or the bill credits corresponding to the electricity generated) to multiple residential customers within the same utility territory as the facility, and 3) verify that at least 50% of the benefits and/or credits of the power generated from the solar system be delivered to residential customers in the same service territory.

## 2.4 Project-Deployment Technical Assistance Strategy

### 2.4.1 Workforce training and participation plan

Maine's workforce training and participation plan includes, but is not limited to, the following occupations:

- Solar photovoltaic installers
- Electricians
- Electrical engineers
- Construction managers
- General and Operations Managers
- Maintenance and Repair Workers
- Project Management Specialists
- Sales Representatives
- Roofers
- Laborers
- Lineworkers


By strengthening pathways to these occupations, this funding presents an opportunity to create quality jobs for Mainers, ensuring that the MESA investment translates into economic benefits for local communities and target populations. To accomplish these goals, the GEO will utilize comprehensive workforce strategies to train 750 new and incumbent workers and learners.

In recognition of the unique needs and opportunities of individual communities, the GEO will utilize a competitive procurement process consistent with State and Federal regulations and standards for the deployment of MESA funding to local and regional partners. One or more subrecipients will be selected to deliver workforce training programs, and subrecipients will use

funds from MESA to invest in local workforce development initiatives. Eligible workforce development and training program types include, but are not limited to, the following:

*Career Academies*
Pilot career academies at Maine's high schools career and technical education program centers, and Adult Education programs, where learners participate in dual enrollment curriculum, complete a work-based learning experience like pre-apprenticeship, gain industry-recognized credentials, and receive individualized career advising and navigation support. These programs help increase the awareness of target occupations and career pathways among students and prospective jobseekers and strengthen career on-ramps.

*Pre-apprenticeship, Apprenticeship, and Training Programs*
Invest in certified pre-apprenticeships, registered apprenticeship, and short-term training programs to build a pipeline of electricians, roofers, carpenters, and other occupations. Building on robust sector partnerships, these programs will provide experiential learning opportunities and equip participants with industry-recognized credentials and lead to quality job outcomes for participants.

*Expand Instructional Capacity*
Bolster instructional capacity to eliminate bottlenecks in existing electrician and related trades programming by providing incentives to supplement wages among retirees and other working professionals to teach courses or other innovations to expand instructional capacity and grow the training pipeline.

*Technical Assistance*
These training programs would be supported by dedicated sector expertise to ensure alignment with State and Federal standards and support successful implementation, connect participants with supportive services to remove barriers to training or work, and connect and guide jobseekers to apprenticeship pathways and supportive services. The MESA will also ensure a variety of types of organizations are eligible to receive technical assistance funding, to maximize the depth of community-serving organizations that can participate and help the eligible populations they serve.

*Outreach*
Conduct employer education through targeted outreach effort including development of easy-to-digest materials, employer workshops, and virtual resources. Program participants and worker representatives will also be able to provide feedback to the CEP Advisory Group on curricula, training opportunities, and ongoing needs, challenges, and opportunities to facilitate program success. The CEP Advisory Group meets regularly to inform the ongoing work of the initiative.

*Table 2-2: Workforce Development Program Tracking Metric*

| Performance Metric | Numeric Target for the Period of Performance |
| --- | --- |
| Total number of participants served | 750 |
| Number of individuals and/or businesses enrolled in the training program. | 750 |

| Performance Metric | Numeric Target for the Period of Performance |
|---|---|
| The percentage of individuals that completed the training program. | 600 |
| The number of individuals that receive a certification. | 120 |
| Number and type of industry- recognized skills or business certifications obtained through program assistance. | OSHA 10 (100) NCCER (80), NABCEP (50) |
| Number of newly employed workers; promoted within current employment; or placed in a registered apprenticeship because of training. | 100 |
| Estimated cost of training per participant. | $6,667 |

### 2.4.2 Interconnection

Technical assistance funds for interconnection will support capacity and analysis for interconnection working groups, entities involved in interconnection processes, improved technical tools to increase transparency and reduce risk, and other methods based on existing stakeholder-identified priorities to address interconnection challenges. Specific examples may include technical assistance for small cooperative or municipal utilities to increase interconnection capabilities, tools to enhance transparency or facilitate data-sharing, and staffing capacity to support timely interconnection application review, processing, communications, and dispute resolution. Technical assistance may also support identification or analysis to enable prioritization of interconnection locations that provide grid benefits, such as avoiding more costly investments (i.e. non-wires alternatives), coordinating with load growth due to electrification, or enhance reliability or resilience.

### 2.4.3 Siting and Permitting

MESA will provide technical assistance to developers and municipalities to ensure that projects are efficiently sited and permitted. MESA program design incorporates the recommendations of several stakeholder groups as well as national best practices and tools. Initial analysis by The Nature Conservancy in Maine has indicated that a considerable number of brownfields and capped landfills in Maine may be suitable to support deployment of distributed generation.

MESA will seek to align with the recommendations of the Agricultural Solar Stakeholder Group and The Department of Agriculture, Conservation and Forestry (DGWG) with regard to promoting development on already disturbed lands including brownfields, and to provide additional technical assistance including to communities and municipalities where appropriate. Encouraging brownfield development could also help leverage all possible financial resources, including additional federal tax incentives. MESA technical assistance for siting-related issues may include funding for further site analyses, development of local and state siting processes. Technical assistance can also support siting considerations including community benefit plans for community-scale solar projects, addressing climate hazards, building resilient assets, and other considerations such as greenspaces, pollinators, and agrivoltaics.

MESA will include funds to provide technical assistance to municipalities to efficiently review and permit solar and storage. Such assistance may include support for municipalities to adopt a renewable energy ordinance that allows, enables, or encourages community-appropriate

renewable energy and energy storage installation, as well as grants for adoption of a streamlined permitting process for small-scale renewable energy installations, including the Department of Energy's SolarAPP+. SolarAPP+ integrates with existing government software to automate and standardize plan review, permit approval, and project tracking, which can streamline project permitting and development. MESA will also build awareness of complementary tools and opportunities, including the SolSmart program and technical assistance available to communities through national laboratories and other potential service providers.

### 2.4.4 Building Codes

MESA will work to facilitate adoption of practices in municipalities to overcome potential barriers to solar and storage adoption. This may entail dedicated funding to support municipalities to adopt stretch building codes and DOE's model permitting, supporting regular professional development for code enforcement officers, and other related efforts.

### 2.4.5 Cooperatively-owned Community Solar

Technical assistance deployed through this MESA program channel will be directed to specific projects or portfolios of projects to foster a pipeline of viable projects. For example, MESA could provide funding for purchase of a basic operations and maintenance package to overcome a substantial barrier to existing solar efforts of managing long term service.

### 2.4.6 Summary of Technical Assistance

Throughout this workplan, the MESA program design emphasizes coordination with existing successful partnerships and programs to overcome identified barriers to enhancing grid resiliency and reliability through solar and storage deployment The GEO proposes allocating nearly $10 million through MESA to technical support, including $5.2 million for workforce development, $900,000 for addressing interconnection challenges, $1 million for cooperatively-owned community solar technical assistance, and $3.25 million for program delivery technical assistance related to siting, permitting, codes, and related efforts.

## 2.5 Equitable Access and Meaningful Involvement Plan

MESA maximizes the breadth of communities served while prioritizing Solar for All eligible households. The GEO has proposed a comprehensive set of program channels that ensure a pathway to solar participation is available to any eligible household – renters and homeowners, rural and urban households, and any household that may face insurmountable barriers to on-site solar adoption.

The GEO works closely in support of the Maine Climate Council, which emphasizes the need to advance grid resiliency through the state's climate response.  MESA will provide direct support to, and center the experience of, households living in communities that the Climate Council has identified as "priority populations" for climate action, specifically: households with limited income individuals, older adults, program eligible  residents of rental housing (especially multifamily), mobile home residents, rural communities, small towns with limited staff capacity, and Tribal and Indigenous communities.

MESA will be available to support Tribal solar and storage projects and will seek input from and coordination, where appropriate, with Tribal nations on workforce development, technical assistance, and other programmatic activities. The GEO has engaged in initial discussions regarding MESA opportunities with Tribal Staff from the Penobscot Nation, Passamaquoddy Tribe at Sipayik, Mi'kmaq Nation, and Houlton Band of Maliseet Indians, and is committed to collaborating with Tribal nations during the MESA program design period to more fully incorporate support for Tribal solar and storage projects into the MESA program, as well as deployment of technical assistance and meaningful involvement in program development.

### 2.5.1 Participatory governance plan

MESA will establish and support a dedicated program Advisory Board that will convene regularly to:

- Provide strategic input and advice regarding program design and deployment;
- Review and advise on program performance;
- Provide a public forum through which interested stakeholders and members of the public, especially members of disadvantaged communities, may provide feedback and meaningful input into the MESA program.

The Advisory Board will have formal representation from affected stakeholders and industry, and regular public meetings with opportunities for public input and direct outreach to priority communities. Advisory Board membership and procedures will be established consistent with principles of procedural  fairness, ensuring that the Advisory Board serves as an effective and responsive venue for meaningful community input and influence on program decision-making. The Advisory Board will be supported by MESA staff, and potentially a neutral facilitator, and comprise diverse representation from community-based organizations, community representatives, key program delivery stakeholders, and other voices. Program participants will also be informed of other opportunities for participatory governance outside of resources provided by the Solar for All program.

### 2.5.2 Education, outreach, and community engagement plan

The GEO will work with partners who have existing relationships with these populations to develop messaging and materials that can be shared within existing information channels used by the populations they serve. This collaboration will also ensure outreach is culturally appropriate. Partnering with trusted community organizations will improve the likelihood that participants feel comfortable sharing their feedback to help improve the program. MESA's outreach strategy will incorporate recommendations of the Maine Climate Council, including to:

- Ensure language accessibility for written and online materials, assistance, and advisory services and meetings;
- Offer a variety of meeting times, agendas, and avenues to participation to align with work and childcare schedules; and
- Work with communities and community-based organizations to align outreach with people's existing and trusted social and community networks and channels.

### 2.5.3 Customer acquisition and management strategy

Customer acquisition and management resources and requirements will be established in consultation with the Advisory Committee and based on established best practices. Electrification and energy efficiency programs already deployed in Maine have utilized robust qualified vendor networks to ensure high standards for contractors interfacing directly with residential customers. Comparable requirements will be established for MESA program delivery, including establishment of a dedicated verification channel (e.g. web-based and 24/7 hotline resources) to ensure households can verify the status of a contractor.

The efficient Energy Assistance Program Channel is specifically designed to reduce customer acquisition barriers and associated program costs, providing benefits directly to qualified households by leveraging established channels to enroll eligible households, such as utilities' low-income assistance programs and utility billing systems for delivery of assistance. The GEO will work with key partners, including but not limited to Maine's investor-owned utilities, during the program period to refine the bill delivery method.

**Section 3: Fiscal Stewardship Plan**

The MESA program will ensure full compliance with all applicable EPA requirements established in the NOFO, as well as all other applicable federal and state requirements, including but not limited to:

- 2 CFR § 200.303
- 2 CFR § 200.318
- 2 CFR § 200.322(b) and (d)
- 2 CFR 1500.1(b)

Comprehensive policies and procedures to administer these and other applicable requirements are contained in the State Administrative and Accounting Manual (SAAM) 12 and will be further operationalized in applicable sub agreements utilizing standard form contract riders and addenda. As an agency of state government, the GEO is well-positioned to ensure compliance through the robust resources and procedures, and capacity to develop new or adapt existing specifications and compliance mechanisms, available through state government.

As described in the Program Strategy Narrative, the GEO anticipates deploying funds in a comprehensive manner through multiple program channels. As further detailed in Section 2, it is likely that one or more channels will involve agreements with entities characterized as subrecipients and/or contractors of the GEO under this award. Therefore, it is likely that one or more such entities will interact directly with, or will oversee other entities that interact directly with, consumers through sales, leasing, or other transactions. To the extent such activities occur or are supported through MESA funds, the GEO will ensure compliance with all applicable federal and state consumer protection laws, including but not limited to those specified in the NOFO and EPA's Terms and Conditions, through subaward agreement or contract specifications. Strategies for providing oversight of subawards will build on those already utilized by the GEO for more than ten other subaward agreements for federally-funded programs, including regular status meetings and staff engagement, independent monitoring, and periodic quantitative and qualitative/narrative reporting.

Through development of a qualified vendor network, the GEO will ensure entities are screened and qualified, with third-party verification available for consumers to ensure any marketing or contractor qualification claims can be independently verified (e.g. through a dedicated MESA telephone number and online contractor database). Such methods are already utilized for qualified energy efficiency and other clean energy vendor networks in the state.

MESA will provide subrecipients with training and technical assistance on program-related matters, including prudent financial risk management practices, in accordance with 2 CFR 200.332. Guidance to subrecipients will include indirect cost explaining GEO has a Negotiated Indirect Cost Rate Agreement (NICRA) with the US Department of Energy.

**3.1 Consumer Financial Protections**

State of Maine Bureau of Consumer Credit Protection (part of the Department of Professional and Financial Regulation) oversees many aspects of consumer finance industry, including non-bank mortgage lenders, debt collectors, loan brokers, retail creditors, money transmitters, credit

reporting agencies and non-bank ATMs. The Bureau administers state credit-related statues and protects consumers by conducting compliance examinations, responding to consumer complaints, issuing licenses and providing consumer education and outreach. GEO will coordinate with the Bureau as applicable in the administration of this award.

MESA will monitor and guide subrecipients and/or contractors concerning consumer financial protection requirements in accordance with 2 CFR 200.332(d) and 2 CFR 200.318. The MESA/subrecipient/contractor consumer financial protection plan will include the following key elements:

      i.   Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

     ii.   Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

   iii.   With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

   iv.   Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

    v.   Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

**Section 4: Timeline and Milestones**

The attached Program Timeline contains anticipated work periods and milestones associated with:

- Implementation activities
  - Multifamily Solar Program Channel
  - Single Family Solar Leasing Program Channel
  - Energy Assistance Community Solar Program Channel
  - Workforce Development Technical Assistance Program
  - Cooperative Community Solar Technical Assistance
  - Project-deployment Technical Assistance
  - Interconnection Challenge Plan

**Section 5: Reporting Requirements**

The GEO originally proposed an evaluation, measurement and verification plan in the Solar for All application. In order to maximize the partial award funds utilized for financial and technical assistance, and recognizing the considerable program data collection and reporting required under the EPA Term and Condition which would in many instances appear duplicative of the evaluation, measurement and verification plan activities, the recipient has removed this budget line and associated activities.

**5.1 Performance Reports**

**5.1.1 Semi-Annual Report**

The GEO agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report will cover activities from the preceding two quarters.

**5.1.2 Final Report**

The GEO agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the GEO's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the GEO hereby details its program strategy and plans for performance reporting under the Closeout Agreement. The GEO will include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The GEO agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

**5.2 Transaction-Level and Project-Level Data**

The GEO agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The GEO agrees to submit the transaction-

level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.


**Section 6: Budget Narrative**

**6.1 Project Budget**

### 6.1.1 Personnel

Two full-time personnel are funded to lead the development of the Solar for All program, deployment of funds, and overall program administration and coordination throughout the program period of performance. Salaries supported in this budget allocation include one full-time Clean Energy Finance Program Manager, who will assume MESA program administration and management duties, as well as ensure strategic alignment between Solar for All and other consumer-serving energy, housing, electrification, and related assistance programs in the state. The Clean Energy Finance Program Manager will report to senior leadership within the GEO.

Salary for one full-time Solar for All Program Coordinator is included to enable a program coordination and delivery-focused staff member. The Program Coordinator will report to the Program Manager or to senior leadership within the GEO.

Qualifications and position specifications have been developed through the State of Maine Bureau of Human Resources hiring process and include prior experience and expertise in solar or related clean energy programs, program management experience, financial assistance deployment, and stakeholder engagement. Both positions have been posted for applications in September 2024 with application deadlines of October 4, 2024. The GEO anticipates filling and onboarding both positions before the end of calendar year 2024.

MESA will also fund two .25 full-time employees, a Workforce Manager and Workforce Coordinator, to administer the MESA workforce development technical assistance.

Estimated funding amount: $1,181,185

### 6.1.2 Fringe Benefits

Fringe benefits for both salaried personnel described above are calculated utilizing the State of Maine base rate promulgated by the Bureau of Human Resources. The components of this rate are summarized below.

| Enter | **Number of positions** | 1 |
|---|---|---|
| | | **Annual Salary** |
| **Annual Retirement (calculation)** | | |
| % of salary | Normal | 4.84% |
| % of salary | Unfunded | 16.30% |
| % of salary | Retiree Health | 8.45% |
| % of salary | Pickup - X only | 4.80% |
| % of salary | FICA | 1.45% |
| **Benefits - State Portion (enter calculation)** | | |
| Health Insurance | Salary <$30K | $ 1,024.40 |
| Health Insurance | Salary >$30K<$80K | $ 996.37 |
| Health Insurance | Salary>$80K | $ 968.35 |
| Dental Insurance | Any Wage Level | $ 29.49 |
| Worker's Comp | annual amount | $ 1,537.00 |
| Life Insurance | $ per 000s of salary | $ 0.42 |

Estimated funding amount: $721,229

### 6.1.3 Travel

Travel expenses are included for two staff to attend one week-long conference per year. Such conferences could include national or regional convenings relevant to Solar for All administration, including but not limited to convenings of the National Association of State Energy Officials, the Clean Energy States Alliance, or various renewable energy industry conferences. This funding could also support a larger number of shorter duration convenings in the event such conferences are available. Attending national or regional conferences will provide an opportunity for MESA staff to learn about and share program best practices, lessons learned and improve the efficiency and impact of MESA program delivery. Individual conference attendance will be determined on an as-needed basis.

Travel funds are also included for approximately 250 miles of travel, including two overnights per quarter. With more than 35,000 square miles and the second-most rural population in the United States, effectively administering MESA in a manner that involves meaningful engagement and involvement for a diverse population of disadvantaged communities will necessitate in-person attendance at meetings, community events, and related travel. Mileage rates and meals and incidentals are estimated utilizing historical experience, the U.S. General Services Administration per diem rates and State of Maine Office of Comptroller guidance. Flight costs are estimated with a modest annual escalation. As of the date of this workplan, the following cost components are in effect and form the basis of this estimate:

- Daily lodging rate: $110/day
- Meals and incidental expenses: $68/day
- Privately-owned vehicle: $0.67/mile

Estimated funding amount: $55,850

### 6.1.4 Equipment

No funding for equipment is budgeted.

Maine Governor's Energy Office – 84088301 – Solar for All Workplan – June 27, 2025

Estimated funding amount: $0

### 6.1.5 Supplies

Funds are included for supplies to support office functions, printing and communications materials associated with program development and delivery, and other administrative supplies. Supplies will be acquired using State of Maine office supply vendors or on an incidental basis.

Estimated funding amount: $12,047

### 6.1.6 Contractual

#### 6.1.6.1 Program Development and Administration Support (budget line 36)

Funds are included for MESA program administration support, which is anticipated to involve one or more contractors supporting the GEO with program development activities through technical analysis, legal and regulatory support, compliance support including for Davis-Bacon and Related Acts reporting, and outreach and stakeholder engagement. The proposed duration for most contracts will be one year with an option for renewal if determined necessary through the program period.

Funds are included for Advisory Board facilitation and administrative support, which is anticipated to include one or more GEO contractors to support the formation, neutral third-party facilitation, and administrative activities of the Advisory Board, and to provide for other administrative needs as identified by the advisory committee in collaboration with GEO. The proposed duration for the contract or contracts will be one to two years, with an option for renewal through the program period.

All contracts will be competitively procured consistent with standards established for the State of Maine by the Division of Procurement Services, and in compliance with EPA's Subaward Policy and all applicable requirements.

Estimated funding amount: $860,000

### 6.1.7 Other

The Other budget category includes planned subawards, detailed in Section 6.3 below. In addition, it includes $400,000 in in-kind technical assistance to be provided by EPA and/or EPA's selected provider(s).

## 6.2 Participant Support Costs

No Participant Support Costs are included in the budget at this time.

## 6.3 Subawards

Funds are included for subawards to entities to deliver financial assistance (budget lines 37-39) through the MESA program channels proposed in the Program Strategy Narrative: The Single Family Solar Lease Program Channel, the Multifamily Program Channel, and the Energy Assistance Program Channel.

### 6.3.1 Multifamily Program Channel (budget line 41)

Funds for the Multifamily Program Channel will be sub-awarded to subrecipients through a competitive Request for Applications process. This subaward will be made consistent with EPA requirements and all applicable federal and state law and regulations. The total subaward will not exceed $16,000,000. The subaward will not be provided through a revolving loan fund. The duration of the subaward is anticipated to be the entire program period.

### 6.3.2 Technical Assistance: Program Delivery (budget lines 45-48)

Funds for the Technical Assistance Program Delivery will be sub-awarded to subrecipients through a competitive Request for Applications process. The subawards will be made consistent with EPA requirements and all applicable federal and state law and regulations. The total subawards will not exceed the budgeted amounts. The subawards will not be provided through a revolving loan fund. The duration of subawards is anticipated to be the entire program period.

Estimated funding amount: $10,223,216

### 6.3.3 Financial Assistance: Single Family Solar Lease Program Channel (budget line 44)

Funds for the Single-Family Program Channel will be sub-awarded to a nonprofit subrecipient(s) through a competitive application process and categorized as contractual. The subaward(s) will be made consistent with EPA requirements and all applicable federal and state law and regulations. The total subaward(s) will not exceed $10,400,000. The subawards will not be provided through a revolving loan fund. The duration of subaward(s) is anticipated to be the entire program period.

Estimated funding: $10,400,000

### 6.3.4 Financial Assistance: Energy Assistance Program Channel (budget line 43)

Funds for the Energy Assistance Program Channel will be sub-awarded to a subrecipient(s) through a competitive application process and categorized as contractual. The subaward(s) will be made consistent with EPA requirements and all applicable federal and state law and regulations. The total subaward(s) will not exceed $22,000,000. The subawards will not be provided through a revolving loan fund. The duration of subaward(s) is anticipated to be the entire program period.

Estimated funding: $22,000,000

All contracts will be competitively procured consistent with standards established for the State of Maine by the Division of Procurement Services, and in compliance with EPA's Subaward Policy and all applicable requirements.

Estimated total funding amount: $59,023,216

## 6.4 Additional Items

### 6.4.1 Indirect Charges

As described in Appendix B of the Notice of Funding Opportunity, indirect costs are costs incurred by the grantee for a common or joint purpose that benefit one or more cost objective or program and are not readily assignable to specific cost objectives or projects as a direct cost. Indirect costs on all non-financial assistance direct costs (line 55) are calculated using the 9.415% negotiated rate applicable to the Maine Governor's Energy Office per the attached negotiated rate agreement with the U.S. Department of Energy.

Estimated funding amount: $266,474

### 6.4.2 Conferences and Workshops
This scope of work does not include conducting any conferences or workshops.

### 6.4.3 Meals and Refreshments
This scope of work does not include any costs for light refreshments, meals or beverages other than meals and incidentals necessary for program staff traveling for program purposes, which are included in the Travel budget item described above.

### 6.4.4 Program Income
Program income is not anticipated under this scope of work.

### 6.4.5 Copyrighted Materials and Inventions
This scope of work is not anticipated to lead to the development of any copyrighted software or written materials. This scope of work is not anticipated to result in any inventions.

### 6.4.6 Research Activities
This scope of work is not anticipated to involve animal subjects. To the extent the project involves collecting identical information from 10 or more people, that information collection is anticipated to be conducted consistent with the program activities described in the workplan (e.g. verifying household income or other participant qualification criteria; collecting data on program outcomes consistent with EPA requirements).

### 6.4.7 Work Outside the United States
This scope of work does not anticipate any work outside the United States.

### 6.4.8 Compliance Affirmations
GEO has adequate systems in place for complying with:
    1) 2 CFR 200.331, the subrecipient eligibility provisions of EPA's National Term and Condition for Subawards, and any program specific restrictions on subrecipient eligibility.
    2) 2 CFR 200.332, Requirements for pass-through entities, as described in EPA's National Term and Condition for Subawards.

# EXHIBIT 5



# OFFICE OF MISSION SUPPORT
### WASHINGTON, D.C. 20460

August 7, 2025

<u>**MEMORANDUM**</u>

**SUBJECT:**    Termination of EPA Assistance Agreement 5H-84088301 under 2 CFR 200.340

**FROM:**    Devon Brown, EPA Award Official

**TO:**    Dan Burgess, Director
Governors Energy Office

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84088301 awarded to Governors Energy Office. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Zachary Lane, EPA Grant Specialist
     Lydia Kidane, EPA Project Officer
     Ethan Tremblay, Grantee Program Manager

EXHIBIT 6



STATE OF MAINE
GOVERNOR'S ENERGY OFFICE
62 STATE HOUSE STATION
AUGUSTA, MAINE

DAN BURGESS, DIRECTOR

August 28, 2025

Phillip Schindel, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington DC 20460

RE: Disagreement with Modification No. 2 to Grant Number (FAIN): 84088301, dated August 8, 2025

Dear Mr. Schindel:

On August 7, 2025, the Maine Governor's Energy Office ("GEO") received a memorandum from you that purported to terminate EPA Assistance Agreement 5H-84088301 under 2 CFR 200.340 ("Termination Letter"). The Termination Letter outlined a Dispute process pursuant to 2 CFR 1500.15 with a Dispute deadline of 30 days. The Termination Letter also stated, "The EPA Grants Management Office will issue an amendment to the agreement to document the termination."

The next day, GEO received a document titled "Assistance Amendment" dated August 8, 2025. That document states it is "Modification Number: 2" to Grant Number 84088301. Under its "Explanation of Changes" the document states that it requires GEO to stop work, terminates the agreement, reduces performance period duration, curtails the scope of work, and adds administrative terms and conditions. In the "Notice of Award" section, it states that if the recipient disagrees with the terms and conditions specified, it must furnish a notice of disagreement within 21 days.

Please accept this letter as GEO's notice of disagreement with Modification No. 2 dated August 8, 2025, issued under your signature as EPA Award Official. GEO also disagrees with any suggestion in the Assistance Amendment that any attempt to draw down funds could function as a waiver of GEO's dispute rights, which is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination per 2 CFR 200.305(b)(3) as well as the Termination Letter's specific statement that costs incurred prior to the termination date are allowable.

GEO does not understand the "notice of disagreement" language in the Assistance Amendment to alter or preempt the formal dispute process governing award terminations set forth in 2 CFR § 1500.15 and described in the August 7, 2025 Termination Letter, which notified the

GEO of the termination of the award. GEO reserves all rights in that regard, including the right to file a formal dispute with the Dispute Decision Official.

GEO will be filing a Dispute of the Termination Letter in a separate letter to the Dispute Decision Official within the 30 days provided in the Termination Letter.

Please acknowledge receipt of this notice of disagreement and contact GEO via the below-signed designee to discuss resolution of this disagreement as soon as possible.


Sincerely,

Dan Burgess
Director
Maine Governor's Energy Office

# EXHIBIT 7



STATE OF MAINE
GOVERNOR'S ENERGY OFFICE
62 STATE HOUSE STATION
AUGUSTA, MAINE

DAN BURGESS, DIRECTOR

Dan Burgess, Director
State of Maine Governor's Energy Office
62 State House Station
Augusta, ME
dan.burgess@maine.gov


To: Michael Molina
EPA Disputes Decision Official
Environmental Protection Agency
Office of Mission Support
Washington, D.C. 20460

Date: September 5, 2025

Re:     Wrongful Termination of EPA Assistance Agreement 84088301 under 2 CFR 200.340

Dear Mr. Molina:

Pursuant to 2 CFR 1500.15, we are writing to notify you, as the designated Environmental Protection Agency (EPA) Dispute Decision Official, that we disagree with EPA's attempt to terminate Maine's Solar for All award, grant number 84088301, which was awarded to the Maine Governor's Energy Office (GEO) on July 8, 2024. The Memorandum from EPA Award Official Devon Brown ("Termination Notice") as well as the Assistance Amendment Modification Number: 2 dated August 7, 2025 and August 8, 2025 respectively: (1) violate the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, of Pub. L. No. 119-21, which rescinded only unobligated balances from the Greenhouse Gas Reduction Fund and preserved funds already awarded to grantees; (2) violate the legally binding assistance agreement issued by EPA to GEO on July 8, 2024; and (3) provide no other valid reason for termination pursuant to 2 C.F.R. 200.341.[1] This termination is contrary to law and arbitrary and capricious. GEO requests that EPA rescind the termination and make all obligated funds that were available in GEO's ASAP account as of August 6, 2025 (the day before the termination notice) available to GEO again.

The August 7, 2025, Termination Notice indicates that EPA is terminating GEO's award because EPA's cost appropriations and the "grant appropriations" were rescinded, so "the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All," and continued administration of the program is no longer legally permissible. Based

---

[1] It is not clear which document EPA believes terminated the Assistance Agreement. For the purposes of this dispute, GEO collectively refers to both documents when referencing EPA's termination decision, unless otherwise indicated.

on this legal conclusion, EPA determined it would end the Solar for All program and all existing grants.

Respectfully, the rescission of unobligated funds and repeal of granting authority under 42 U.S.C. 7434 do not give EPA the authority to terminate all legally binding Solar for All grant agreements unilaterally under 2 CFR 200.340. Doing so is contrary to law and arbitrary and capricious. We therefore ask that the termination of GEO's award be reconsidered via an administrative appeals process. As such, please accept this letter as a request to initiate an administrative dispute under 2 C.F.R. 1500 Subpart E.

**(1) EPA's asserted grounds for termination violate the plain language of OBBBA Section 60002, which rescinded unobligated balances but preserved funds already awarded to grantees.**

EPA's conclusion that OBBBA rescinded the grant appropriations for Solar for All is incorrect and contrary to law. By its plain language, Section 60002 only authorized rescission of the unobligated balance in the appropriations account established by 42 U.S.C. 7434:

> *SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.*

Where the plain language of a statute is unambiguous, no further analysis is required. *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (". . . when the meaning of the statute's terms is plain, our job is at an end."). Indeed, after OBBBA passed Congress, the Department of Justice wrote to the court presiding over *Climate United Fund v. Citibank, N.A.* to inform it that new legislation, if signed, would "rescind all unobligated funds appropriated for it." (Letter dated July 3, 2025, to the Clerk of the Court from Yaakov Roth, DOJ.).

By its plain language, the OBBBA only rescinded funds that were unobligated on the date the OBBBA was enacted. And there is no basis to conclude that Congress expressly or impliedly intended to de-obligate or claw back funds that were properly and timely obligated pursuant to 42 U.S.C. § 7434(a)(1). Funds awarded to Solar for All grantees, including GEO under the subject award, were obligated upon award and subject to a legally binding agreement which "create[d] a legal liability or definite commitment on the part of [EPA], or create[d] a legal duty that could mature into a legal liability by virtue of an action that is beyond the control of the government."[2] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C.

---

[2] United States Government Accountability Office, Office of the General Counsel, Principles of Federal Appropriations Law, Third Edition, Volume II, at 7-2, available at https://www.gao.gov/assets/gao-06-382sp.pdf



STATE OF MAINE
GOVERNOR'S ENERGY OFFICE
62 STATE HOUSE STATION
AUGUSTA, MAINE

DAN BURGESS, DIRECTOR

1501(a)(5)."[3] In other words, the Solar for All grant funds were obligated upon award, and remained obligated when OBBBA was passed. The OBBBA did not change this and could not have legally rescinded these obligated funding awards.

Additionally, this termination did not automatically de-obligate GEO's funds because termination of an award cannot automatically or retroactively de-obligate funds. But even if termination of an award could result in the de-obligation of funds, GEO's Solar for All grant was not terminated until August 7, 2025, well after OBBBA became law on July 4, 2025, and contrary to the direction of that statute. At the time the OBBBA was enacted, GEO's Solar for All funds remained obligated so they were not impacted by Section 60002 of the OBBBA.

EPA also cannot avoid administering the entire Solar for All program merely because OBBBA rescinded other unobligated funds. For the reasons stated above, GEO's grant funds remain obligated, so EPA has a legal duty and obligation to fulfill its part of the agreement by administering the funds.

**(2) EPA's termination of GEO's grant violates EPA's legal obligation under 2 C.F.R. 200.340 and the signed grant agreement, and any attempts to liquidate the remaining funds in GEO's ASAP account would violate due process.**

The uniform grant regulations at 2 C.F.R. 200.340(a) provide the circumstances under which the government may terminate a grant agreement, which include: (1) failure to comply with the grant terms and conditions; (2) with consent of the grantee; (3) by request of the grantee; or (4) otherwise pursuant to the terms and conditions of the grant, to the extent authorized by law.

Consistent with this provision, EPA is bound by the termination provisions specified in the terms and conditions of the Solar for All award. The terms and conditions applicable to this grant do not allow for unilateral termination absent a recipient's failure to comply with the terms and conditions of the grant. Any subsequent changes to the grounds for unilateral termination of an assistance agreement must be agreed to by both EPA and the grantee. We have not, and unequivocally do not, agree to any attempts to terminate this grant award based on an erroneous, bad faith interpretation of OBBBA Section 60002. Congress intended for GEO's obligated funds to continue to support our legally binding award and these funds cannot be unilaterally terminated by the executive branch in this way. Doing so is contrary to law.

In addition, EPA has taken further action that unlawfully pulled back funding that was still legally obligated to GEO. Prior to the Termination Notice, on August 6, 2025, GEO's ASAP account available balance was $61,516,726.92, which represents the cumulative authorized amount of the EPA Award $62,120,000 minus funds drawn down by GEO for authorized work prior to that date.

---

[3] Grants Policy Issuance- 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds at https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf

On August 11, 2025, GEO's ASAP account access changed to a "liquidated" status and a small portion of the awarded funds appeared to be available to draw down. However, the "available balance" on the account had been substantially reduced from $61,516,726.92 to $4,286,289.88, and the performance period end date had been changed from April 30, 2029, and August 30, 2029, to August 15, 2025, and December 8, 2025.

This adjustment to GEO's account balance, which was done prior to the expiration of the 30-day dispute period detailed at 2 CFR 1500 Subpart E and prior to any actions from GEO to close out the award[4] violates GEO's right to due process and ignores its reliance interests.

### (3) The Termination of GEO's Solar for All Assistance Agreement Will Cause Irreparable Harm to Mainers.

Between the various programs GEO intended to offer using Solar for All funding, in its workplan GEO was expecting to serve approximately 23,000 low-income households, reducing electrical bills by 20%, or approximately $390 per year or more, for each participating household. With the loss of Solar for All funding, GEO will no longer be able to offer single-family residential lease products with no up-front cost for low-income households, as well as financial assistance for upgrades to address electrical and structural barriers. It will no longer be able to offer low-cost capital for solar and storage installations on multifamily affordable housing that serve low-income Maine renters. GEO will no longer be able to reduce the cost of efficient energy assistance community scale solar and storage deployment across Maine - offering solar savings regardless of home ownership, solar access, or access to capital to own their own solar array. GEO will no longer be able to support the multiple technical assistance pathways intended to advance project deployment, all while driving energy affordability solutions, including siting and permitting support, targeted support for cooperatively owned community solar, and additional support to overcome barriers including interconnection challenges.

In addition, Solar for All funding was expected to invest over $5.2 million in expanded job training opportunities to help Maine's solar industry. SFA funding was expected to create at least 750 new green jobs in Maine's solar industry.[5] This compounds harm that has already been caused to the solar industry by the early end of federal tax credits for distributed solar. GEO's Solar for All program included funding for workforce training for hundreds of new and incumbent workers and learners for the following occupations: solar photovoltaic installers, electricians, electrical engineers, construction managers, general and operations managers, maintenance and repair workers, project management specialists, sales representatives, roofers, laborers, and line workers. GEO's Solar for All funding was expected to invest in local workforce development initiatives including pilot career academies, pre-apprenticeships, apprenticeships, and training programs to expand instructional capacity and technical expertise.

---

[4] To be clear, because GEO disputes the termination of its Solar for All funding, the agency is not taking any steps to close out the award.

[5] Note that 750 new green jobs refer solely to the metrics encompassed within the Workforce Development Technical Assistance program. Within the state of Maine, the number of green jobs affected by the premature end of SFA funding would likely be significantly higher.



STATE OF MAINE

GOVERNOR'S ENERGY OFFICE

62 STATE HOUSE STATION

AUGUSTA, MAINE

DAN BURGESS, DIRECTOR

The premature end of Solar for All funding also harms GEO as an employer. GEO reasonably relied on Solar for All funding to support hiring two full-time employees and partially support two additional employees.  These employees have been essential in advancing program design, conducting outreach to potential community partners, and working closely with stakeholders - receiving valuable feedback and support. Without this funding, their employment is at risk.  Maine is simply unable to make up for this loss of funds to advance this residential serving solar work.

More generally, loss of Solar for All funding and the loss of federal support for solar energy generally will harm Maine and its residents.  At a time of expanding electrical demand, solar and battery energy storage deployment represent the least expensive way to add electrical supply in Maine.

Moreover, GEO acted in reasonable reliance on its fully-obligated Solar for All funding continuing to be available.  GEO expended more than 2,700 employee hours on Solar for All programming. In doing so, GEO had to forgo other funding opportunities, program structures, and state energy policy development. There is no way to recover this lost time or effort.  Nor can GEO simply backfill with state funds to keep its Solar for All offerings available.  Due to the statewide budget landscape, Maine is unable to leverage sufficient state-level funding to keep its program fully operating, thus, no new funding will be available to make up for this programmatic loss.  The Solar for All program also allowed GEO to work closely with EPA in developing its work plan and with the National Renewable Energy Lab in scoping out technical assistance needs. The loss of these collaborations and programmatic support cannot be remedied.

Additionally, at the time of the termination, GEO had expanded significant staff time in drafting and preparing for imminent release competitive solicitations via Request for Applications (RFAs) to procure sub-recipients and begin administering a number of significant programs. These included: solicitations of $10.4 million for GEO's single family lease program channel, $16 million for the multifamily program channel, $22M for the energy assistance community solar channel and $5.201 million in workforce development grants. Without this funding, GEO may have to lay off staff dedicated to the program and will be unable to move forward on its commitments to fund solar deployments and workforce development.

**(4) The Termination Notice provides no other valid grounds for termination.**

Neither the Termination Notice nor the Assistance Amendment dated August 7, 2025, and August 8, 2025, respectively, give any other reason for termination and the other conditions for termination are inapplicable here.  Termination for noncompliance is only possible under this grant's terms when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination." Neither case exists here. EPA has neither identified any non-compliance nor requested that GEO take action to cure any deficiencies in its agreement performance.  Moreover, it bears noting that all competitive grants were awarded per 2 CFR 200.205, which requires a merit review before awarding funding;

nothing that the Agency has stated in the Termination Notice raises concerns about the meritorious nature of our organization or the projects that we are undertaking with our federal funds.

Furthermore, GEO has not failed to comply with the terms or conditions of this award. EPA has not claimed that the grant will not accomplish the purposes for which it was made, which include providing technical assistance support to a wide variety of communities in Maine. And EPA has not raised any concerns specific to GEO's administration of its award relative to fraud, waste or duplication.

Given that no valid grounds for this termination exist, and EPA does not point to any in the Termination Notice or Assistance Amendment or provide any other valid justification, such termination is arbitrary and capricious and contrary to law. EPA must follow the law, rescind this unlawful termination, and restore GEO's access to our obligated funds to complete crucial solar deployment projects in underserved communities to add energy to the grid and significantly lower household energy prices for low-and-middle-income Mainers.

### (5) EPA's Withdrawal of GEO's Duly Appropriated and Obligated Solar for All Assistance Agreement Violates the Constitution's Separation of Powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[6] The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[7] The Executive has no power "to enact, to amend or to repeal statutes."[8] Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

*Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[9] U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive— "shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[10]

The Termination Notice and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[11] For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of GEO's funding agreement.

---

[6] U.S. Const. art. I, § 1.
[7] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).
[8] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).
[9] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).
[10] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).
[11] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).



STATE OF MAINE

GOVERNOR'S ENERGY OFFICE

62 STATE HOUSE STATION

AUGUSTA, MAINE

DAN BURGESS, DIRECTOR

*Take Care Clause*

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[12] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[13]  Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and GEO's individual Assistance Agreement on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind GEO's funds, which were obligated prior months prior to "the day before the date of enactment of [the] Act."[14]  EPA's Termination of GEO's Assistance Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to  GEO prior to September 30, 2024.  EPA violated constitutional separation-of-powers constraints because EPA's Termination Notice overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[15]  The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[16]  Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[17]  For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

*Legislative Vesting Clause*

---

[12] U.S. Const. art. II, § 3.
[13] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").
[14] OBBBA Section 60002.
[15] U.S. Const. Art. I, § 9, cl. 7.
[16] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).
[17] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[18] When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating GEO's Solar for All Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[19] When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[20] EPA's termination of GEO's Solar for All Assistance Agreement altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Notice and subsequent termination of GEO's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind GEO's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

### (6) Relief Requested

GEO seeks rescission of the termination of this award and the full and immediate reinstatement of the $61,516,726.92[21] that was available in GEO's ASAP account as of August 6, 2025 (the day before the termination notice).

Until our dispute with EPA has been resolved, we will also object to any claims of noncompliance under 2 C.F.R. 200.344(i).

---

[18] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").
[19] U.S. Const. amend. X.
[20] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).
[21] This dollar amount represents the cumulative authorized amount of the EPA Award $62,120,000 minus funds drawn down by GEO for authorized work prior to the August 7, 2025, termination notice.



STATE OF MAINE
GOVERNOR'S ENERGY OFFICE
62 STATE HOUSE STATION
AUGUSTA, MAINE

DAN BURGESS, DIRECTOR

We would be happy to answer any questions you may have about this letter or our program. The designated point of contact for the dispute is listed below.

**DESIGNATED POINT OF CONTACT FOR THE DISPUTE**
Caleb Elwell
Assistant Attorney General
Maine Bar No. 6194
Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333-0006
207-626-8545
caleb.elwell@maine.gov

Very truly yours,

Dan Burgess
Director
Maine Governor's Energy Office
62 State House Station
Augusta, ME
dan.burgess@maine.gov

CC:
   Devon Brown, EPA Award Official
Lydia Kidane, EPA Project Officer
Zachary Lane, EPA Grant Specialist

# EXHIBIT 8

| | |
|---|---|
| **From:** | SFA |
| **To:** | SFA |
| **Subject:** | Solar for All Grant Closeout Instructions |
| **Date:** | Wednesday, October 1, 2025 4:21:17 PM |

**EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425):
**Submission Instructions**:
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of

termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

- ○ If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance during the entire performance period (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - ○ In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - ○ Progress towards objectives on program key performance metrics during the performance period.
  - ○ Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - ○ Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - ○ Descriptions and examples of actions you took during the performance period to

meaningfully involve communities you served in program design and operations.
- ○ *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

EXHIBIT 9



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 28, 2025

**MEMORANDUM**

**SUBJECT:**     Update on Dispute of EPA Assistance Agreement 5H-84088301 under 2 CFR 200.340

**FROM:**     Michael D. Molina, Principal Deputy Assistant Administrator
           Grants Dispute Decision Official

**TO:**     Dan Burgess, Director, State of Maine Governor's Energy Office
         Governors Energy Office, Maine

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84088301. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA
Digitally signed by
MICHAEL MOLINA
Date: 2025.10.28
16:36:30 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# EXHIBIT 10



**STATE OF MAINE**
**DEPARTMENT OF ENERGY RESOURCES**
**62 STATE HOUSE STATION**
**AUGUSTA, MAINE**
**04333-0062**

JANET MILLS
GOVERNOR

DAN BURGESS
ACTING COMMISSIONER
DEPARTMENT OF ENERGY RESOURCES

Dan Burgess, Acting Commissioner
State of Maine Department of Energy Resources
62 State House Station
Augusta, ME
dan.burgess@maine.gov

Michael Molina
EPA Disputes Decision Official
Environmental Protection Agency
Office of Mission Support
Washington, D.C. 20460

November 4, 2025

Re:    Objection to Closeout of EPA Assistance Agreement 5H-84088301

Dear Mr. Molina:

On October 28, 2025, the Maine Department of Energy Resources (DOER)[1] submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 5H-84088301 pursuant to 2 C.F.R. § 1500.15.  Despite that timely dispute, on October 1, 2025, DOER received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that DOER complete closeout within 120 calendar days of  "the date of termination that is listed in your award amendment." DOER has now received EPA's October 28, 2025, letter purporting to declare moot DOER's "dispute regarding the termination of Assistance Agreement 5H-84088301."  The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that DOER close out Assistance Agreement 5H-84088301.

As an initial matter, clarification is needed because EPA's October 28, 2025, letter references "your dispute was submitted on August 28, 2025." but DOER did not submit its Part 1500 dispute on August 28, 2025.  Rather, August 28, 2025, is the date that DOER submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025, Assistance Amendment. Thus, it is unclear which of DOER's termination challenges "EPA has rendered" moot.  DOER disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15  cannot  proceed  if  related  litigation  is  pending.   EPA  cites  no  authority  for  this

---

[1] The Maine Department of Energy Resources ("DOER") is a cabinet-level department which officially replaced the Governor's Energy Office ("GEO") on September 24, 2025, as the State of Maine's designated energy office. PL 2025, c. 476.

1

proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation. We request that EPA reverse its mootness determination and allow the administrative dispute to proceed. At a minimum, EPA should stay the administrative dispute until the conclusion of DOER's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of DOER's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, DOER has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require DOER to close out while litigation is pending that directly concerns EPA's termination of this grant. *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if— (1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." DOER has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated $57,229,437.04 from DOER's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, DOER has not been able to complete the work required under Assistance Agreement 5H-84088301. Accordingly, EPA necessarily cannot "determine that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

DOER does <u>not</u> agree to close out Assistance Agreement 5H-84088301 while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00pm on November 5, 2025.

Very truly yours,

Dan Burgess
Acting Commissioner
Maine Department of Energy Resources
62 State House Station
Augusta, ME

CC:
Devon Brown, EPA Award Official