# EXHIBIT 1

**Exhibit 1: Letters of Support for MI Solar for All Application**

1. **Alter Marquette Community Action Board DBA Community Action Alger Marquette** is a nonprofit whose mission is to improve the economic security and well-being of individuals and families in Alger and Marquette Counties by providing education, housing, and human service programs through community collaborations.

2. **The Clean Energy States Alliance (CESA)** is a leading bipartisan US coalition of state energy agencies working together to advance the rapid expansion of clean energy technologies and bring the benefits of clean energy to all.

3. **Climate First Bank** is the world's first FDIC-insured community bank dedicated to the environment and sustainability providing climate friendly personal and business banking. solutions.

4. **Citizens Utility Board of Michigan** was formed in 2018 to represent the interests of residential energy customers across the state of Michigan. CUB of MI educates and engages Michigan consumers in support of cost-effective investment in energy efficiency and renewable energy and against unfair rate increase requests.

5. **The City of Ann Arbor** is a city in southern Michigan in Washtenaw County. Ann Arbor has a population of around 124,000 and around 26,000 low-income residents.

6. **The City of Detroit** is a city in southeast Michigan in Wayne County. It is the largest city in Michigan with a population of around 620,000 and around 215,000 low-income residents.

7. **The City of Grand Rapids** is a city in southwest Michigan in Kent County. It has a population of 197,000 with around 36,000 low-income residents.

8. **The City of Lansing** is a city in central Michigan in Ingham County It has a population around 113,000 and around 24,000 low-income residents.

9. **The City of Pontiac** is a city in southeast Michigan in Oakland County. It has a population of around 61,000 and around 16,000 low-income residents.

10. **Coalition for Community Solar Access** is a national trade association representing more than 100 community solar companies, businesses, and nonprofits working to expand customer choice and access to solar for all American households and businesses through community solar. We work with customers, utilities, local stakeholders, and policymakers to develop and implement policies and best practices that ensure highly successful community solar programs that champion the energy customer.

11. **Coalition for Green Capital** is a non-profit with a mission to halt climate change by accelerating investment in clean energy technologies. CGC achieves this by advocating for, creating and implementing Green Bank finance institutions. Green Banks are a proven finance model that uses public and philanthropic funds to mobilize private investment in renewable energy, energy efficiency and other decarbonization technologies. For over a decade, CGC has led the Green Bank movement, working at the federal, state and local level in the U.S. and in countries around the world. By

increasing investment and accelerating the construction of clean power, CGC is helping deliver a cleaner, better future.

12. **Consumers Energy** is an investor-owned utility that provides natural gas and electricity to 6.7 million of Michigan's 10 million residents. It serves customers in all 68 of the state's Lower Peninsula counties.

13. **DTE** is a state-regulated investor-owned utility serving 2.3 million residential and business customers throughout Southeast Michigan and the thumb region.

14. **Elevate** is a 501(c)(3) nonprofit organization that works nationally and is headquartered in Chicago. Elevate seeks to create a just and equitable world in which everyone has clean and affordable heat, power, and water in their homes and communities through designing and implementing programs that reduce costs, protect people and the environment, and ensuring the benefits of clean and efficient energy use reach those who need them most.

15. **Grand Valley Metro Council (GVMC)** is an alliance of governmental units in the West Michigan area that are appointed to plan for the growth and development, improve the quality of the community's life, and coordinate governmental services.

16. **Green and Healthy Homes Initiative** is a nonprofit dedicated to creating green, healthy, and safe homes for children and families. These partners are implementing a cost-effective and integrated approach to healthy housing interventions by aligning, braiding, and coordinating resources for health, safety, and energy efficiency.

17. **Grid Alternatives** is the nation's largest nonprofit installer of clean energy technologies, and develops and implements renewable energy projects that serve economic and environmental justice communities. GRID creates and installs solar projects that serve low-income households and communities and is enabling these communities to access a variety of clean mobility and battery storage incentive programs. They partner with affordable housing organizations, job training groups, government agencies, municipalities, utilities, tribes and local communities to make clean energy a win for everyone.

18. **Habitat for Humanity** is a nonprofit organization that helps families build and improve places to call home and believes affordable housing plays a critical role in strong and stable communities. They work together with families, local communities, volunteers and partners from around the world so that more people are able to live in affordable and safe homes. Their advocacy efforts focus on policy reform to remove systemic barriers preventing low-income and historically underserved families from accessing adequate, affordable shelter.

19. **Indian Michigan Power (I&M)** is an investor-owned utility that operates in southeast Michigan and serves 30 counties and 164 cities in Michigan and Indiana.

20. **Inclusive Prosperity Capital** is a not-for-profit investment fund scaling energy financing solutions that channels investment capital to program partners in communities that need it most. They provide a gateway to inclusive prosperity by engaging with communities impacted most by climate change, and

invest in clean energy and resilience in partnership with local initiatives and organizations to provide energy security, climate justice, and economic growth.

21. **Lean and Green** is a nonprofit that helps commercial, industrial, multifamily, nonprofit, and agricultural property owners finance energy efficiency, water conservation, and renewable energy projects that are profitable for all parties – property owners, contractors, and local governments.

22. **Michigan AFL-CIO** is the state federation of labor, representing over 1,000,000 active and members of 40+ unions throughout the state. Their mission is to improve the lives of working families—to bring economic justice to the workplace and social justice to the state and the nation.

23. **Michigan Community Action** is the state association for the 27 designated Community Action Agencies in Michigan. They are part of a national network of over 1000 local organizations that help people move from poverty to economic stability and self-sufficiency.

24. **Michigan Community College Association** is the unified voice for Michigan's community colleges, empowering members to lead in the areas of student success, talent development, and community vitality. It represents over 30 community colleges across the state.

25. **Michigan Department of Health and Human Services** is a principal department of state of Michigan, headquartered in Lansing, that provides public assistance, child and family welfare services, and oversees health policy and management.

26. **Michigan Department of Labor and Economic Opportunity** is a state department that provides the connections, expertise and innovative solutions to drive continued business growth, build vibrant communities, create affordable housing, generate tourism and attract and retain key talent to fill Michigan's vast pipeline of opportunities.

27. **Michigan Department of Treasury** is a state department that is responsible for collecting, disbursing, and investing all state monies. The Department advises the Governor on all tax and revenue policy, collects and administers over $20 billion a year in state taxes, and safeguards the credit of the state.

28. **Michigan Economic Development Corporation** is a public-private partnership between the state and local communities, promoting smart economic growth by developing strategies and providing services to create and retain good jobs and a high quality of life.

29. **Michigan Electric Cooperative Association** is a cooperative that represents the legislative and regulatory interests of Michigan's electric cooperatives with a unified message that ensures their ability to provide safe, reliable and affordable electricity to member-consumers.

30. **Michigan Infrastructure Office** is intentionally housed within the Governor's Executive Office to underscore the state's commitment to investing in its infrastructure, and is responsible for organizing and executing the governor's vision for infrastructure, coordinating across state government, marshalling resources, and partnering with local official, federal partners, and outside stakeholders.

3

31. **Michigan Energy Innovation Business Council** is a trade association representing companies in Michigan's growing advanced energy sector whose mission is to grow Michigan's advanced energy economy by fostering opportunities for innovation and business growth and offering a unified voice in creating a business-friendly environment for the advanced energy industry in Michigan. Michigan EIBC serves the objectives of our member companies by strengthening Michigan's network of advanced energy businesses, engaging the public and policymakers around policy and regulatory initiatives, creating partnerships to expand business opportunities, and advancing energy innovation.

32. **Michigan Green Communities** is a statewide network of local government staff and officials that collaborate with one another, through peer learning and information sharing, to promote innovative sustainability solutions at the local, regional, and state level. The annual Michigan Green Communities Challenge is a key part of the program and allows participants to track and benchmark their sustainability progress.

33. **Michigan Municipal Electric Association** is Michigan's trade group for municipally owned electric utilities, also known as Public Power utilities. The communities in Michigan that own and operate a municipal utility provide approximately 10% of the state's total electricity requirements.

34. **Michigan Public Service Commission** is a board whose mission is to is to protect the public by ensuring safe, reliable, and accessible energy and telecommunications services at reasonable rates for Michigan's residents. The appointments to this board are subject to the advice and consent of the Senate.

35. **Michigan Regional Council of Carpenters** is a union that represents 14,000 carpenters and millwrights across the state of Michigan.

36. **Michigan Saves** is a green bank that makes energy improvements easier for Michigan energy consumers by stimulating and supporting investment in clean energy improvements in Michigan homes, businesses, and public buildings. Established in 2009 through a grant from the Michigan Public Service Commission (MPSC) and supported by a grant from the U.S. Department of Energy (DOE), Michigan Saves envisions a future in which consumer demand for efficient homes, businesses, and communities transforms the building and remodeling industries. Michigan Saves is part of this transformation by offering financing solutions and a contractor network that make clean energy improvements easy and affordable and by advancing a more energy-conscious culture in Michigan.

37. **Michigan State Housing Development Authority** is a state organization that serves the people of Michigan by partnering to provide quality housing that is affordable, a cornerstone of diverse, thriving communities.

38. **North End Woodward Community Coalition** is a North End Detroit-based social/justice/community development organization working to build power by focusing on equitable systems change through building resources, relationships, and skills to equitably shape the communities.

39. **Office of the Environmental Justice Public Advocate** is an office that was created by Governor Whitmer's Executive Order 2019-06 to serve as an external and internal advocate and catalyst for ensuring Environmental Justice throughout the state. The Office works collaboratively across state government to advance Environmental Justice and equity in Michigan, as well as addressing Environmental Justice concerns and complaints.

40. **Southeast Michigan Council of Governments** is a council that supports local planning through its technical, data, and intergovernmental resources. The work SEMCOG does improves the quality of the region's water, makes the transportation system safer and more efficient, revitalizes communities, and spurs economic development.

41. **Utility Workers Union Association** is an association that represents 45,000 members employed in America's utility sectors and related industries.

42. **VoteSolar** is a national nonprofit organization working to bring solar into the mainstream with grassroots action and technical expertise. They work at the state level to implement the policies and programs that build robust solar markets — and pave the way for a transition to a renewable energy economy.

43. **Walker Miller** is one of the largest African American and woman owned energy efficiency companies in the United States based in Detroit. The company provides thought leadership to utilities, municipalities, businesses, and communities to help achieve energy reduction goals and drive the benefits of clean energy to all communities They design programs, source products, train inclusive workforces, develop outreach strategies, and provide innovative research and development, successfully engaging low participation communities.

# EXHIBIT 2

**Exhibit 2. EGLE MI Solar for All Assistance Agreement**

5H - 84090701 - 0    Page 1

| | | | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** **Grant Agreement** | **GRANT NUMBER (FAIN):** 84090701 **MODIFICATION NUMBER:** 0 **PROGRAM CODE:** 5H | | **DATE OF AWARD** 07/08/2024 |
| | **TYPE OF ACTION** New | | **MAILING DATE** 07/11/2024 |
| | **PAYMENT METHOD:** ASAP | | **ACH#** 50232 |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND 525 W ALLEGAN ST LANSING, MI 48909-8157 EIN:  38-6000134 | MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND P.O. Box 30473 Lansing, MI 48909-7773 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Cory  Connolly 525 W. ALLEGAN ST LANSING, MI 48909-8157 **Email:**  connollyc3@michigan.gov **Phone:** 517-881-8972 | Christine Clark 77 West Jackson Boulevard , LL-17J Chicago , IL 60604 **Email:**  Clark.Christine@epa.gov **Phone:** 312-886-9749 | Hazeletta Burgess OGD - GIAMD,, 3903R 1200 Pennsylvania Ave, NW Washington, DC 20460 **Email:**  Burgess.Hazeletta@epa.gov **Phone:** 202-564-1533 |

**PROJECT TITLE AND DESCRIPTION**

"MI SFA program to maximize LIDAC participation via solar and storage improving equity by bolstering the economic health and quality of life. "Note: A special payment condition applies to this award."

See Attachment 1 for project description.

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 0.00 | **TOTAL PROJECT PERIOD COST** $ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official for Keva R. Lloyd - Acting Chief, Grants Management Branch | **DATE** |
| **by Keva Lloyd - Award Official Delegate** | 07/08/2024 |

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 – Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328) <br> Clean Air Act: Sec. 134(a)(1) <br> National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41060 | 2224 | E1SF3 | QU | 000MGBXG 2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

5H - 84090701 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___ 0.00 % Federal ___ 0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Attachment 1 - Project Description

Note: A special payment condition applies to this award.MI Solar for all program intends to maximize participation among low-income communities by delivering solar, and storage improving equity by bolstering the economic health and quality of life.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed <u>prior</u> to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

# Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. Programmatic Terms and Conditions

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

## 1. Performance Reports

### *Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition:*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

*__The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:__*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

*__The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:__*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

## 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

## 1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

### *The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

### Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

### B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during

the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award and amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

### 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on

behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

### B. Davis-Bacon and Related Acts

[Davis-Bacon and Related Acts (DBRA)](#) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

### a. Include DBRA Requirements in All Subawards (including Loans): Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

### b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide-range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Health and Safety Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its

financial risk management policies and procedures.\

## 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** [EPA's Final Financial Assistance Conflict of Interest Policy](#) **to all subawards and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and *Ed Willoughby* (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry

Exhibit 2. EGLE MI Solar for All Grant Agreement

out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards  unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to

execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

## B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a

**Exhibit 2. EGLE MI Solar for All Grant Agreement**

personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 3

**Exhibit 3. EGLE MI SFA Assistance Amendment**

5H - 84090701 - 1    Page 1

| | |
|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | **GRANT NUMBER (FAIN):** 84090701 / **MODIFICATION NUMBER:** 1 / **PROGRAM CODE:** 5H / **DATE OF AWARD** 12/11/2024 |

| | | |
|---|---|---|
| **GRANT NUMBER (FAIN):** 84090701 | | |
| **MODIFICATION NUMBER:** 1 | **DATE OF AWARD** | |
| **PROGRAM CODE:** 5H | 12/11/2024 | |
| **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 12/11/2024 | |
| **PAYMENT METHOD:** ASAP | **ACH#** 50232 | |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND 525 W ALLEGAN ST P.O. BOX 30473 LANSING, MI 48909-8157 **EIN:** 38-6000134 | MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND P.O. Box 30473 Lansing, MI 48909-7773 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Cory  Connolly 525 W. ALLEGAN ST LANSING, MI 48909-8157 **Email:** connollyc3@michigan.gov **Phone:** 517-881-8972 | Bryan Fiedorczyk 1200 Pennsylvania Ave., NW Washington , DC 20460 **Email:**  Fiedorczyk.Bryan@epa.gov **Phone:** 202-564-9623 | Hazeletta Burgess OGD - GIAMD, 1200 Pennsylvania Ave, NW 3903R Washington, DC 20460 **Email:**  Burgess.Hazeletta@epa.gov **Phone:** 202-564-1533 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Michigan Solar For All Program

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 156,120,000.00 | **TOTAL PROJECT PERIOD COST** $ 156,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Associate Award Official | **DATE** 12/11/2024 |

**Exhibit 3. MI SFA Assistance Amendment**

5H - 84090701 - 1    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| **EPA Amount This Action** | $ 155,720,000 | $ 0 | $ 155,720,000 |
| **EPA In-Kind Amount** | $ 400,000 | $ 0 | $ 400,000 |
| **Unexpended Prior Year Balance** | $ 0 | $ 0 | $ 0 |
| **Other Federal Funds** | $ 0 | $ 0 | $ 0 |
| **Recipient Contribution** | $ 0 | $ 0 | $ 0 |
| **State Contribution** | $ 0 | $ 0 | $ 0 |
| **Local Contribution** | $ 0 | $ 0 | $ 0 |
| **Other Contribution** | $ 0 | $ 0 | $ 0 |
| **Allowable Project Cost** | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

**Exhibit 3. MI SFA Assistance Amendment**

5H - 84090701 - 1     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 1,359,835 |
| 2. Fringe Benefits | $ 815,908 |
| 3. Travel | $ 47,691 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 18,587 |
| 6. Contractual | $ 14,381,625 |
| 7. Construction | $ 0 |
| 8. Other | $ 139,168,905 |
| 9. Total Direct Charges | $ 155,792,551 |
| 10. Indirect Costs: 15.00 % Base MTDC | $ 327,449 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

**Exhibit 3. MI SFA Assistance Amendment**

## Administrative Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA **Grants Specialist listed on the award**
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the **EPA Grants Specialist listed on the award**
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications**: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award**
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: **EPA Project Officer listed on the award**

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has initiated the intergovernmental review process on behalf of the Recipient and will direct any pertinent comments from directly affected State, areawide, regional, and local government entities to the Recipient as needed.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

**Exhibit 3. MI SFA Assistance Amendment**

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01

**Exhibit 3. MI SFA Assistance Amendment**

# Programmatic Conditions

**Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)**

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal," "county," or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.
- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.
- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this

program.

*Freely Associated States:* Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) the** limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after

**Exhibit 3. MI SFA Assistance Amendment**

implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1a(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or

Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

*The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

**Exhibit 3. MI SFA Assistance Amendment**

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### Semi-Annual Report

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### Final Report

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with

the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

**Exhibit 3. MI SFA Assistance Amendment**

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

### 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and

**Exhibit 3. MI SFA Assistance Amendment**

resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

**Exhibit 3. MI SFA Assistance Amendment**

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient is at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

**Exhibit 3. MI SFA Assistance Amendment**

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their

overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the

Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

**Exhibit 3. MI SFA Assistance Amendment**

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F. DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

<u>**1. Compliance with Federal Statutes and Regulations**</u>

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

<u>**2. Free and Fair Choice to Join a Union**</u>

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of

2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Single family homes;

2. Privately-owned, non-mixed-use, multi-family housing properties;

3. Privately-owned residential portions of mixed-use properties;

4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

**Exhibit 3. MI SFA Assistance Amendment**

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

**L. Consumer Protection Requirements**

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

**M. Financial Risk Management Requirements**

**1. Cash Management Requirements**

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

**2. Climate-Related Financial Risks**

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating

**Exhibit 3. MI SFA Assistance Amendment**

practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing.

**Exhibit 3. MI SFA Assistance Amendment**

The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.


**P. Remedies for Non-Compliance**


The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.


The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.


Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.


**Q. Clarifications to EPA General Terms and Conditions**


EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.


**1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**


*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*


The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.


The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.


**2. Establishing and Managing Subawards**


2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."


EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.


When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the Subrecipients will comply with the

requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities*.

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

**Exhibit 3. MI SFA Assistance Amendment**

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g) (2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement shall be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

### 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities**. As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping
In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement.* EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;

- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and

- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the

**Exhibit 3. MI SFA Assistance Amendment**

Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate

**Exhibit 3. MI SFA Assistance Amendment**

expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**Exhibit 3. MI SFA Assistance Amendment**

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

### A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

### B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT 4

**Exhibit 4. MI SFA Workplan Approved February 4, 2025**

## 1. PROJECT DESCRIPTION

### 1.1. Overview

The MI Solar for All (MI SFA) program is a strategic step towards achieving climate and environmental justice as outlined in the MI Healthy Climate Plan. This statewide initiative is designed to deploy residential rooftop and residential-serving community solar projects to serve approximately 16,300 low-income and disadvantaged community (LIDAC) households across the state. By addressing existing barriers, the program aims to increase accessibility to solar energy for eligible households. Through collaborative engagement, the State will establish specific criteria for financial and technical assistance that best serves Michigan's LIDAC households and maximizes the use of complementary public and private funding sources to support residential rooftop and community solar installations, as well as storage and enabling upgrades for homes in need. Through intentional collaboration and comprehensive engagement, the State will ensure the MI SFA program not only creates a sustainable program to deploy solar across the State, but also fosters a more equitable energy transition for Michigan.

### 1.2. Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Expected Outputs and Outcomes:**

- Households Served: The program plans to serve approximately 16,300 households, with about 1,950 receiving rooftop solar systems and 14,350 benefiting from residential-serving community solar projects. This focus on both rooftop and community solar ensures widespread participation and maximizes impact.
- New Generation Capacity: The total solar capacity to be deployed over five years is projected to be about 190 MW, with approximately 10 MW for residential rooftop solar and 180 MW for residential-serving community solar. Additionally, an estimated 22MWh of energy storage will be installed to enhance energy resilience across both residential and residential serving community solar.
- Estimated GHG Emissions Reduced and Avoided: Over the five-year program period, it is estimated that 300,000 short tons of $CO_2$ emissions will be avoided, contributing significantly to Michigan's climate goals and reducing the state's carbon footprint.
- Estimated Household Savings: Households participating in the rooftop solar program are expected to save about $11,000 in electricity bills over the 25-year lifespan of the solar installations, translating to annual savings of approximately $400 per household. Community solar participants are projected to save about $17,000 over the same period, with annual savings of $450 per household.
- Workforce Development Outcomes: The program will create workforce opportunities, investing in training programs and job creation within the solar energy sector. The program is expected to create around 700 jobs over five years.

## 2. PROJECT DESIGN PLAN

The MI SFA program envisions a three-phase program: phase one focused on development of program offerings, phase two focused on deployment and selection, and phase three focused on evaluation and continuous improvement. Phases may overlap, with some program elements deployed sooner, as appropriate.

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

During phase one, tasks will focus on the development of program offerings and prioritization. Pilots will be offered to support development of effective program offerings.

During phase two, the developed program offerings will be deployed and projects selected based on the prioritization established in phase one.

Lastly, during phase three, evaluation and assessment of program offerings will occur throughout the five-year program to support program refinement and improvement. The MI SFA program will use evaluations and analyses to understand current program deployment and, if necessary, to improve program offerings or prioritization throughout the program for greater program success.

These three phases, though envisioned to occur sequentially for each program element, may exist simultaneously within the program, where some program elements, once developed in phase one, may move to phase two deployment, even as other program elements are still undergoing phase one development. Phase two (deployment and selection) and phase three (evaluation and continuous improvement) tasks are similar for all developed program offerings. Phase one tasks have greater variability, depending on categories, will be shared in greater detail in subsequent sections.

## 2.1. Meaningful Benefits and Community Benefits
### 2.1.1.  Meaningful Benefits

The MI SFA program will deliver, on average, a 20% savings on electricity bills, either directly or indirectly, to participating households. These savings will be inclusive of any costs incurred by program beneficiaries for participating in the program. Michigan will develop and implement program offerings for both residential rooftop solar and residential-serving community solar, as well as energy storage and enabling upgrades.

During phase one, the State will conduct stakeholder engagement to inform the developed offerings to ensure these savings are achieved. This includes refining financial assistance strategies and identifying additional benefits for households that may not see direct savings on their electricity bills. Additionally, the State will develop financial assistance strategies for energy storage and enabling upgrades to support these savings goals. Criteria for these components will also be developed during phase one to ensure that funded projects achieve the required savings and meet all program standards.

During phase one, Michigan will also define what qualifies as indirect financial benefits or savings and establish criteria for residential and residential-serving community solar projects to guarantee they meet the average 20% savings threshold and other program requirements. Any definitions of indirect financial benefits will comply with the grant's terms and conditions and any other relevant state and federal requirements.

In addition to household savings, the State will consider other meaningful benefits as it develops the eligibility and prioritization criteria for all program aspects—residential solar, residential-serving community solar, energy storage, and enabling upgrades. These criteria will govern project prioritization and set scoring thresholds for MI SFA projects. The State will engage with interested parties and stakeholders while leveraging existing datasets and studies to help identify and prioritize meaningful benefits.

Additionally, throughout phase one, the State of Michigan (SOM) will seek partnerships or additional funding from sources such as philanthropy, state funds, and private capital to expand the program's impact and reach.

### 2.1.2.   Community Ownership

The MI SFA program will increase access to wealth building opportunities and improved credit through distributed energy resources (DER) asset ownership. To achieve this, throughout the initial phase, Michigan will develop financial assistance strategies that enable wealth-building and ownership for residential and residential-serving community solar systems when possible. The State will assess barriers to ownership and evaluate whether they can be addressed directly or if alternative models, such as a Power Purchase Agreement (PPA), would provide more effective solutions. All residential and residential-serving community solar systems will conform with the definitions as provided under the US EPA SFA terms and conditions.

For households participating in the residential solar part of the program, the MI SFA program will design financing strategies to enable residential ownership through direct grants, lease-to- own models, and low-cost loans, potentially offered in partnership with private sector lenders, such as community development financial institutions (CDFIs), green banks, and other community lenders.

For residential-serving community solar projects, the program will evaluate different ownership and wealth building strategies, allowing for third-party, utility-owned, and other project ownership models to be considered. All community solar funded under this program will conform to the US EPA SFA program definition of residential-serving community solar, specifically that they have a nameplate capacity of 5 $MW_{AC}$ or less and that at least 50% of the benefits and/or credits of the power generated from a residential-serving community solar system will be delivered to multiple residential customers within the same utility territory as the facility.

For all ownership pathways included in the MI SFA program, including residential-serving community solar and residential rooftop solar, the State will develop a plan to limit risks to individuals and communities. During phase one, the State will identify potential risks and incorporate strategies to mitigate them into the program design when possible. Some risks associated with solar ownership that is planned to be considered include maintenance costs, weather-related damage, performance risks, grid and regulatory changes, property sale complications, warranty limitations, roof condition and replacement needs, and technology obsolescence.

### 2.1.3.   Household Savings Plan

The MI SFA program will deliver, on average, a 20% savings on electricity bills, either directly or indirectly, to participating households. This section describes the tasks to arrive at a household savings methodology.

For each financial product offered by the MI SFA, program guidance regarding how household savings are calculated will be developed to better ensure that all program offerings result in an average 20% electricity bill reduction or its equivalent benefit. As guidance from the EPA SFA program regarding how to calculate household savings is expected soon, any tasks listed below will be adjusted to ensure that the final developed methodology meets EPA SFA program guidance and requirements regarding household savings calculations.

**Household Savings Related Tasks**

Tasks to develop the household savings methodology include, but are not limited to, the following activities:

1. Methodology Development
   a. Engage utilities to understand household electricity bill statistics (average, minimum, maximum, and median, if available) in their service territory.
   b. Engage communities to understand issues pertinent to household savings calculations and include such considerations when developing the household savings methodology.
   c. Conduct financial analyses and modeling, such as cash flow modeling, capital stack development, and other relevant analyses/modeling to inform MI SFA program development so savings will be inclusive of any costs incurred by program beneficiaries for participating in MI SFA program offerings.
   d. Develop methodology for calculating direct and indirect benefits from MI SFA program investments informed engagement and analyses.
   e. Review EPA SFA program guidance regarding household savings when available to ensure developed methodology is compliant and make revisions as needed.

2. Household Savings Tracking
   a. Clarify the data to be collected by grantees to track household savings for reporting for specific program offerings. This data will help ensure verification, auditing, and evaluation of savings data and may include and is not limited to:
      i. solar energy generated by the installed solar array,
      ii. household electricity use before and after installation,
      iii. average household electricity use for multifamily developments before and after installation,
      iv. average household electricity bill per month in utility service territory, and
      v. indirect benefits provided to participating households in total and per household.

3. Agreements for Household Savings
   a. Develop agreement language for program offerings to ensure that, in order to receive subawards, grantees agree to provide data and adhere to the applicable MI SFA methodology to track household savings (direct or indirect) to verify that an average of 20% electricity bill reduction is achieved. This data will be provided for the duration of the MI SFA program period of performance.

### 2.1.4. Phase One Program Tasks

Tasks the MI SFA seeks to complete during phase one, with stakeholder and interested party input, pertaining to meaningful program benefits are listed below. Tasks are grouped by category.

- Savings Related
  - Develop methodology to verify savings for participating households that pay electric bills.

- o Develop methodology to ensure average household savings of 20% on participants' electric bills inclusive of any costs incurred by program beneficiaries for participating in the program.
- o Develop methodology to ensure average indirect savings of 20% on estimated electricity costs for individuals without electric bills (e.g., master-metered MF).
- Eligibility and Prioritization
  - o Develop and refine eligibility and prioritization criteria for residential solar projects that ensures 20% household savings, either directly or indirectly, on electricity costs and considers additional meaningful benefits.
  - o Develop and refine eligibility and prioritization criteria for residential-serving community solar projects that ensures 20% household savings, either directly or indirectly, on electricity costs and considers additional meaningful benefits.
  - o Develop and refine eligibility and prioritization criteria for associated energy storage projects that considers additional meaningful benefits.
  - o Develop and refine eligibility and prioritization criteria for enabling upgrade projects.
- Wealth Building and Ownership
  - o Develop and refine wealth-building and ownership criteria for residential and residential-serving community solar systems.
  - o Develop and refine financial strategies that prioritize wealth building and community ownership.
  - o Develop and refine program offerings for residential and residential-serving community solar, associated storage, and enabling upgrades, to encourage full use of available tax credits.
- Risk Reduction
  - o Evaluate potential risks, such as those related to maintenance, performance, grid changes, and incorporate mitigating strategies into program design when possible
  - o Develop a plan to inspect projects to ensure quality control of assets funded under the program.
- Additionality
  - o Seek partnerships or additional funding from sources such as philanthropy, state funds, and private capital to expand the program's impact and reach

## 2.2. Financial Assistance for Project Implementation Subawards & Guidelines

Of the $117,000,000 budgeted for total financial assistance for project implementation (75% of total budget), the intended split by project area is detailed below. This financial assistance is expected to be provided as subawards ("Other-Subawards" budget category) to current unnamed recipients. The anticipated share of financial assistance over the five-year program timeline for each project category is provided in dollar amounts and percentage of total budget (TB). The project areas are:

- Residential rooftop solar             $24,350,000   (15.6% of TB)
- Residential-serving community solar $61,650,000   (39.5% of TB)
- Associated storage                    $7,600,000    (4.9% of TB)
- Enabling upgrades                     $23,400,000   (15.0% of TB; 20% of financial assistance)

The share of financial assistance expended on enabling upgrades is planned to be 20% of the total financial assistance provided by the program for project implementation across the five-years. The percentage of enabling upgrades supported by the program will not exceed 20% of the financial assistance (not total budget) over the lifetime of the program.

Financial assistance details will be determined during phase one. All program offerings and designs will seek to result in realizing an average 20% reduction on electricity bills and to maximize the benefits to participating low-income customers.

Throughout phase one, Michigan will develop program offerings for residential and residential community-serving solar, associated energy storage, and enabling upgrades that seeks to:

- Ensure 20% savings, on average, on electricity bills or indirectly, across all participants (inclusive of any costs incurred by program beneficiaries for participating in the program).
- Remove cost barriers for household participation.
- Maximize program-wide impact.
- Leverage private and other public capital.
- Maximize uptake of the federal tax incentives.
- Encourage LIDAC ownership.
- Support the development of a sustainable market for distributed generation (DG) and community solar in LIDAC households.
- Collaborate with existing programs, like existing need-based programs and utility programs, and to leverage their funding to identify and acquire MI SFA program participants

Specific financial assistance strategies and project selection prioritization criteria will be developed during phase one, using input solicited through MI SFA's meaningful involvement plan. Michigan will engage with diverse groups of interested parties, including industry (e.g. developers), to refine program offerings and outreach/recruitment for each project area.

During phase one, MI SFA program also seeks to engage with diverse interested parties to develop a plan to support operations and maintenance funded under the MI SFA program for the estimated lifetime of the assets (i.e., approximately 20 years), including efforts to support maximum energy output of the assets and conducting audits to ensure operations and maintenance is performed. Any developed plans will conform with EPA's General Terms and Conditions.

In addition to project area subawards discussed, subawards are anticipated for Community Assistance, Workforce Training and Industry Development, and Workforce and Industry Sector Hub-LEO discussed in later sections.

Though each area subaward amount is listed as one budget line item, the MI SFA program is open to awarding one or more recipients, as long as the total recipient subawards do not exceed the total budgeted amount for the project area line item.

Expected subawards and guidelines are discussed for each project area (residential rooftop solar; residential-serving community solar, associated storage, and enabling upgrades) in Sections 2.2.2-2.2.5.

### 2.2.1.   *Phase One Pilots*

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

The MI SFA program, prompted by early stakeholder input, seeks to explore pilots during phase one. An online "MI Solar for All Interest Form" gathers names, contact information, and details from interested parties. Thus far, 959 submissions have been made. Of these:

- 65% are individuals interested in learning about how to participate in the MI SFA program (e.g. potential recipient),
- 22% are interested in installation aspects of the MI SFA program (e.g., contractors or manufacturers), and
- 12% are interested in coordination, delivery, and/or outcomes of the MI SFA program (e.g. government, academia, or nonprofits).

Not all respondents leave comments. However, of the 369 comments, many express desires and needs for MI Solar for All program offerings, whether to potentially partner on projects or to help address ongoing energy struggles. Individual low-income homeowners frequently appear to seek relief from high energy costs. Several want to be more environmentally supportive in their energy choices but feel limited financially from doing so. One striking comment says, "URGENCY is missing!"

The MI SFA program appreciates this early feedback and wants to incorporate stakeholder interest, need, and desire for more rapid deployment thoughtfully. Phase one pilots will likely help address the expressed stakeholder interest, need, and desire for urgency, while also supporting successful full program deployment.

During phase one, MI SFA pilots may be funded for:

- residential rooftop solar,
- residential-serving community solar,
- associated storage, and
- enabling upgrades.

Pilots during 2025 will help MI SFA better understand implementation and processes for varied recipients and project types, allowing the program to identify and address potential issues or barriers before full program deployment. Since these pilots may also allow exploration of collaboration with complementary programs, such as those for energy efficiency and home repair programs, it may support MI SFA learning and experience in stacking and braiding resources for greater participant benefit.

By piloting, the MI SFA program will be more likely to troubleshoot issues prior to full deployment planned for 2026. Thus, pilots will help support more rapid program success.

Table 1 describes pilot budget by project area. Further pilot details are described in their respective project area sections in Sections 2.2.4-2.2.6.

**Table 1. Pilot Budget by Project Area**

| Project Area | Pilot Budget ($) |
|---|---|
| Residential Rooftop Solar | $1,000,000 |
| Residential-Serving Community Solar | $6,500,000 |
| Associated Storage | $375,000 |
| Enabling Upgrades | $1,000,000 |
| *Pilot Funding Total* | *$8,875,000* |

Pilot budgets by project area consider MI SFA staffing capacity. The MI SFA program plans to hire one or more program management consultants to help manage program deployment. Though the MI SFA program expects to have three program staff by mid-2025, it still seeks to reduce the administrative burdens from pilots in the period prior to onboarding the program management consultant(s). Due to this consideration, residential rooftop solar, associated storage, and enabling upgrades have lower budgeted pilot funding than community solar. Due to the lower cost of residential projects, which MI SFA expects those project areas to largely focus on, they may involve a higher number of subawards/grants. By lowering the pilot funding for these areas, MI SFA seeks to reduce pilot administrative burdens. Despite a brief period of higher MI SFA staff administration, the program finds pilots worth pursuing for the possible learnings and responsiveness to stakeholder feedback thus far.

The MI SFA program seeks to develop and refine pilot details through input from diverse interested parties in the first quarter of 2025. MI SFA will ensure pilot subawards are designed and developed to meet all pertinent SFA and U.S. EPA terms and conditions. Further subaward guidelines for pilot and full deployment funding are provided by project area in Sections 2.2.2-2.2.5.

The MI SFA program hopes to deploy approved pilot opportunities around mid-2025 to allow time for learnings to inform the final program design.

Pilots will help the MI SFA program better understand processes, issues, barriers, and improvements. Pilots will likely greatly support program success, while also allowing MI SFA to reflect initial stakeholder input and need.

The anticipated pilot timeline is provided in the table below.

**Table 2. Anticipated Pilot Timeline**

| Time Period | Planned Task(s) |
|---|---|
| January – March 2025 | Develop pilot details with stakeholder input |
| March – May 2025 | Develop and post pilot opportunities |
| By October 2025 | Select pilot funding recipients |
| By November 2025 | Evaluate initial pilot learnings |

*2.2.1-1 Pilots: Phase One Tasks*

Phase one tasks for pilots include determining the following with diverse interested party input:
- pilot program structure and expectations,
- specific end-uses to explore,
- pilot procedures, such as an application or RFP process, and
- how to ensure a diverse range of pilot projects and participants.

**2.2.2.  Residential Rooftop Solar**

The table below shares the total subaward budget for pilots and full deployment for this project type, as well as the total budget for this project area for the five-year program.

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

**Table 3. Residential Rooftop Solar Subaward Budget for Year 1-5**

| Type | Budget by Year ($ Million) | | | | | Total ($ Million) |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | |
| Pilot | $1.0 | | | | | |
| Full Deployment | | $5.838 | $5.838 | $5.8378 | $5.838 | |
| *Total Program* | | | | | | *$24.35* |

The MI SFA program aims to pursue residential rooftop solar pilots to understand deployments for different use cases and regions. The program will consider pilot administrative burdens when selecting pilots, recognizing certain residential pilots, such as those serving multi-family homes, can serve a greater number of residents with less MI SFA administrative burden.

For residential rooftop solar, MI SFA anticipates providing subgrants to eligible entities. The intent of the subgrants will be for the subgrantees to provide a combination of direct grants, third-party ownership options such as lease-to-own and Power Purchase Agreements (PPAs), and offerings to reduce borrowing costs for eligible MI SFA projects. The potential uses of subgrants are listed below in Table 4.

**Table 4. Potential Uses for Residential Rooftop Solar Subgrants**

| |
|---|
| Direct grant support |
| Third-party ownership with lease-to-own option |
| Third-party ownership with Power Purchase Agreement (PPA) option |
| Debt offerings |

The State will evaluate a variety of financing options that can be supported by subgrants, throughout phase one with input from diverse interested parties, including industry stakeholders. It will develop program offerings for residential rooftop solar that allow innovative solutions that meet program requirements to be proposed. How benefits may flow to participating low-income beneficiaries are described in section 2.2.2-2.1.

Evaluation of program offerings may be developed to target different segments of eligible low-income households such as using a tiered approach based on average median income (AMI). This will likely allow the program to better address unique needs of different communities and household types. Table 5 presents a possible model.

**Table 5. Potential Tiered Approach to Financial Incentives Based on Average Median Income**

| Funding % of Total Rooftop | Grant Coverage |
|---|---|
| 0-30% AMI Solar | 100% |
| 30-60% AMI Solar | 80% |
| 60-80% AMI Solar | 50% |

During phase one, the MI SFA program will consider how to best mitigate any increase in taxes, impacts to reported income, and eligibility for other income-qualified programs that might arise to residential households from MI SFA program offerings.  Where possible, subgrant opportunities will be designed to encourage full leverage of tax credits.

### 2.2.2-1 Residential Rooftop Solar Specific Phase One Tasks
The following list summarizes Phase One tasks pertinent to residential rooftop solar.
- Design program offerings and project selection prioritization to support fully leveraging tax credits wherever possible.
- Consider how to mitigate tax increases, reported income impacts, and eligibility for income-qualified programs that might arise from residential participation in MI SFA program offerings.
- Consider MI SFA administrative burden for pilot implementation when selecting pilot projects.

Please see Section 2.1.4 for a longer list of details to be established during phase one.

### 2.2.2-2 Subaward Guidelines
The following table describes the subaward guidelines for residential rooftop solar project area subawards.

**Table 6. Subaward Guidelines for Residential Rooftop Solar Project Area**

| Guidelines | Pilots | Full Deployment |
|---|---|---|
| **Supported Activities** | Implementation of behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned. | |
| **Anticipated Funding Range** | up to $500,000 for > 2 awards | up to $1,000,000 for > 23 awards |
| **Entities Receiving Subawards** | Governmental, Tribes, Non-profits, Municipal and Cooperative Utilities, Schools/Colleges/Universities, Eligible property owners | |
| **How Subrecipients are Eligible Subrecipients** | Entities cannot be for-profit entities. Eligible non-profits **must not** be nonprofit organizations exempt from taxation under section 501(c)(4) of the Internal Revenue Code that engage in lobbying activities. Payments to subrecipients will occur on a reimbursement basis only, thus ensuring subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction. | |
| **Financial Products** | Subgrants | Subgrants |

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

| Provided | | |
|---|---|---|
| Provided as part of Revolving Loan Fund? | No | No |
| Subaward Duration | Year 1-5 | Year 1-5 |

2.2.2-2.1 Benefit Flow to Households

Subgrants will be awarded to eligible entities to help implement behind the meter residential solar facilities that deliver all the power generated from the facilities to residential single family and multifamily customers either directly (solar delivered directly to their household) or indirectly, such as through tenant benefit agreements.

The MI SFA program seeks to provide flexibility for program applicants to suggest innovative solutions that meet MI SFA program requirements, as well as the needs of low-income participants. The current plan includes subgrants for:

- Direct reduction of low-income household costs for solar installation.
  - Subgrants will assist with eligible project downpayment costs paid directly to the contractor, with the remainder of the award provided at project completion, or through direct reduction of solar panel costs. These subgrants could be given directly to the low-income household, eligible multifamily development, or to a 3rd party, like a non-profit, governmental body (municipality, county, Tribe), or utility. Third party recipients may develop programs for eligible low-income single family or multi-family developments to reduce the cost to install solar for eligible participants. In single family households, the plan is for the installed solar to directly reduce electricity costs. In multi-family households, the plan is for the installed solar to benefit the household directly or indirectly. Some may directly receive a portion of the installed solar to offset their electricity costs, while others indirectly benefit through agreements like tenant benefit agreements, where they receive a benefit equivalent to an average 20% electricity bill reduction per household.
- Debt offerings
  - Subgrants will enable nonprofit financial institutions to offer loans to low-income participants, such as ones with low-to no- interest lending options. The plan is for program beneficiaries to work directly with nonprofit subgrantees to borrow funds for solar installation at lower financing cost. These program beneficiaries will work with an eligible 3rd party contractor for installation either from a MI SFA qualified vendor program list or from the financial institution's own qualified vendor list.
- Lease to own installations
  - The MI SFA program envisions subgrants enabling 3rd parties like non-profits and local governments to install and own residential roof-top solar upfront, while allowing the households or multifamily developments that host the panels the opportunity to own in the future, and providing support for low-income program beneficiaries that may not have the tax burden to utilize the full tax credit. Allowing the 3rd party to capitalize on the full tax credits enables the overall cost to participating low-income households to be

lower. In these situations, low-income program beneficiaries may rent the solar panels on their home, receive power generated from the solar panels, and can own panels in the future through lease to own arrangements.

- Power purchase agreements
    - Subgrants will enable eligible entities, such as non-profits and governmental organizations, to install solar on residential properties (single family or multifamily), where the residents purchase the electricity from the subgrantee or benefit from the installed panels through agreements like tenant benefit agreements. Subgrants will cover the costs for eligible low-income households to participate to realize a benefit equivalent to an average 20% electricity bill reduction.

For all subgrants, the MI SFA program will support solar install costs to help program beneficiaries realize a benefit equivalent to at least an average 20% reduction in electricity bill, inclusive of any costs incurred to participate in the program.

### 2.2.3. *Residential Serving Community Solar*

The table below shares the total budget for pilots and full deployment for this project type, as well as the total budget for this project area for the five-year program.

**Table 7. Residential Serving Community Solar Subaward Budget for Year 1-5**

| Type | Amount by Year ($ Million) | | | | | Total ($ Million) |
|------|------|------|------|------|------|------|
| | 1 | 2 | 3 | 4 | 5 | |
| **Pilot** | $6.5 | | | | | |
| **Full Deployment** | | $13.788 | $13.788 | $13.788 | $13.788 | |
| *Total Program* | | | | | | *$61.65* |

The MI SFA budget for residential serving community solar currently assumes an estimated 20% of community solar project capital will come from MI SFA financial assistance support, and that the rest of the capital stack will be supplemented by at least 30% investment tax credit and additional private and public capital mobilization.

Throughout phase one, the State will develop program offerings with input from interested parties. Input from diverse interested parties, including industry stakeholders, will be key in developing program offerings and project selection prioritization for residential-serving community solar.

The State aims to build partnerships with entities receiving funding from the National Clean Investment Fund (NCIF) and the Clean Communities Investment Accelerator (CCIA) to see the feasibility of supplementing eligible residential-serving community solar projects with low-cost financing.

Project selection in phase two will occur with clear prioritization criteria identified in phase one to encourage projects to leverage opportunities such as maximizing ITC/Production Tax Credit (PTC) (plus potential adders), build community equity, and use other programs and opportunities to complete capital stack for community solar projects.

As noted before, all community solar funded under this program will conform to the definition of residential serving community solar, specifically where they will be at a nameplate capacity of 5 $MW_{AC}$

or less and at least 50% of the benefits and/or credits of the power generated from a community solar system will be delivered to multiple residential customers within the same utility territory as the facility.

*2.2.3-1 Subaward Guidelines*

The following table describes the subaward guidelines for residential-serving community solar project area subawards.

**Table 8. Subaward Guidelines for Residential-Serving Community Solar Project Area**

| Guidelines | Pilots | Full Deployment |
|---|---|---|
| Supported Activities | Implementation of solar PV power-producing facilities or solar energy purchasing programs from a power-producing facility, with up to 5 MW$_{AC}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility. Solar PV power producing facilities include, but are not limited to, rooftop, pole-mounted, and ground mounted PV systems deployed on one or more sites. | |
| Anticipated Funding Range | up to $6,500,000 for $\geq$ 1 awards | up to $5,000,000 for $\geq$ 11 awards |
| Entities Receiving Subawards | Governmental, Tribes, Non-profits, Municipal and Cooperative Utilities, Schools/Colleges/Universities, Eligible property owners | |
| How Subrecipients are Eligible Subrecipients | Entities cannot be for-profit entities. Eligible non-profits **must not** be nonprofit organizations exempt from taxation under section 501(c)(4) of the Internal Revenue Code that engage in lobbying activities.

Payments to subrecipients will occur on a reimbursement basis only, thus ensuring subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction. | |
| Financial Products Provided | Subgrants | Subgrants |
| Provided as part of Revolving Loan Fund? | No | No |
| Subaward Duration | Year 1-5 | Year 1-5 |

2.2.3-1.1 Benefit Flow to Households

Subgrants will be awarded to eligible entities to help implement residential-serving community solar projects that are solar PV power-producing facilities or solar energy purchasing programs from a power-

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

producing facility, with up to 5 MW$_{AC}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

The MI SFA program seeks to provide flexibility for program applicants to suggest innovative solutions that meet MI SFA program requirements, as well as the needs of low-income participants. The current plan includes subgrants for:

- Direct reduction of residential-serving community solar installation costs.
  - Subgrants to assist with eligible project costs. These subgrants could be given directly to the subgrantee developing the community solar installation. These subgrantees could be a non-profit, governmental body (municipality, county, Tribe), or utility. Community solar installations could be in front of the meter (FTM), like a large utility community solar array, or an aggregation of various behind-the-meter (BTM) installations at host sites like churches, governmental buildings, and commercial properties within communities.
- Debt offerings
  - Subgrants to enable nonprofit financial institutions to offer loans to developers of residential-serving community solar installations that are FTM or aggregated BTM installations.
- Lease to own installations
  - Subgrants to enable 3rd parties, like non-profits who will install and own residential-serving community solar. In cases where the community does not own the community solar up front, there may be opportunities for the host site(s) to own in the future.
- Power purchase agreements
  - Subgrants to enable eligible entities, such as non-profits and governmental organizations, to install residential-serving community solar facilities at host sites, where the host site purchases the produced electricity.

In all cases for residential-serving community solar, installation must be accompanied by a program where 50% or more of the benefits from the solar installation go to eligible low-income residential households in the same utility territory as the solar installation. These program beneficiaries will be enrolled in a program where each beneficiary receives benefits equivalent to at least an average 20% electricity bill reduction, inclusive of program participation costs. These benefits will help offset low-income household costs.

Benefits may be provided in a variety of ways, as proposed by the subgrantees and vetted by MI SFA program staff and/or program management consultants. The MI SFA program seeks to provide flexibility for subgrant applicants for residential-serving community solar projects to propose unique benefit structures to transfer the community solar benefits to eligible participating low-income households.

Residential-serving community solar project benefits will be provided to eligible low-income program beneficiaries through:
- gift cards,
- partial household bill payments, such as for the electric bill,

- cost reductions for educational expenses, such as pre-K programs, after-school programs, summer camps, and training programs,
- academic scholarships, and
- provision of home energy improvements.

For all subgrants, the MI SFA program will support solar install costs to help program beneficiaries realize a benefit equivalent to an average 20% reduction in electricity bill, inclusive of any costs incurred to participate in the program.

### 2.2.4. Associated Storage

The table below shares the total budget for pilots and full deployment for this project type, as well as the total budget for this project area for the five-year program.

**Table 9. Associated Storage Subaward Budget for Year 1-5**

| Type | Amount by Year ($ Million) | | | | | Total ($ Million) |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | |
| **Pilot** | $0.375 | | | | | |
| **Full Deployment** | | $1.806 | $1.806 | $1.806 | $1.806 | |
| *Total Program* | | | | | | $7.6 |

The MI SFA program aims to pursue associated storage pilots to understand deployments for different use cases and regions. The program plans to consider pilot administrative burdens when selecting pilots, recognizing certain residential applications, such as those serving multi-family homes, can serve a greater number of residents with less MI SFA administrative burden.

Criteria for prioritizing solar plus storage in residential and residential-serving community solar projects will be developed throughout phase one. The criteria may consider various factors, including individual household needs (such as use of electricity dependent medical equipment), grid resilience, potential for reducing energy costs, impact on energy equity, and alignment with local and state energy goals. Additionally, the criteria might evaluate the ability to support critical infrastructure during outages, the presence of vulnerable populations, and the potential for leveraging private investment and additional funding sources. EGLE plans to identify opportunities where solar plus storage can enhance community-level resilience, providing crucial support to community centers and other public facilities that play a key role in local emergency response and everyday operations.

Based on the prioritization criteria established during phase one with external input, the State will select eligible storage subgrantees. Additionally, in phase one, the State will determine how much of the anticipated storage will support residential rooftop solar projects versus residential-serving community solar projects.

During phase one, the MI SFA program will consider how to best mitigate any increase in taxes and impacts to reported income and eligibility for other income-qualified programs that might arise to residential households from MI SFA grant support and other financial assistance. Please see Section 2.1.4 for a longer list of details to be established during phase one.

*2.2.4-1 Subaward Guidelines*

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

The following table describes the subaward guidelines for associated storage project area subawards.

**Table 10. Subaward Guidelines for Associated Storage Project Area**

| Guidelines | Pilots | Full Deployment |
|---|---|---|
| Supported Activities | Implementation of infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology. | |
| Anticipated Funding Range | up to $375,000 for > 1 awards | up to $1,000,000 for > 22 awards |
| Entities Receiving Subawards | Governmental, Tribes, Non-profits, Municipal and Cooperative Utilities, Schools/Colleges/Universities, Eligible property owners | |
| How Subrecipients are Eligible Subrecipients | Entities cannot be for-profit entities. Eligible non-profits **must not** be nonprofit organizations exempt from taxation under section 501(c)(4) of the Internal Revenue Code that engage in lobbying activities.<br><br>Payments to subrecipients will occur on a reimbursement basis only, thus ensuring subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction. | |
| Financial Products Provided | Subgrants | Subgrants |
| Provided as part of Revolving Loan Fund? | No | No |
| Subaward Duration | Year 1-5 | Year 1-5 |

2.2.4-1.1 Benefit Flow to Households

Associated storage subgrants will support storage of solar-generated power that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. This will allow solar generated energy to be stored for later use, increasing household or community energy resiliency, and helping further increase benefits from residential rooftop and residential-serving community solar deployment. The program anticipates that not all MI SFA funded solar installations will have associated storage funding.

Though project selection prioritization will be determined in phase one with external input, the MI SFA program anticipates that storage subgrants will likely serve vulnerable low-income households or residential-serving community solar host sites providing critical community services. Associated storage will likely improve electric reliability and resiliency to participating vulnerable households and host sites providing critical services. Vulnerable low-income households include those with:

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

- a child under five, or
- an individual with a disability, or
- an individual over 60, or
- an individual receiving Michigan Department of Health and Human Services cash or food assistance, or Medicaid, or
- an individual who experienced homelessness within the last 12 months and needs energy assistance to secure housing.

Residential-serving community solar host sites providing critical community services may include, but are not limited to:
- police or fire stations,
- water and or wastewater treatment facilities,
- hospitals and urgent care facilities,
- transportation fueling facilities,
- community resilience centers,
- disaster or emergency shelters,
- senior care facilities, and
- Businesses serving critical service providers, such as hotels and restaurants serving electric utility service restoration workers during grid outages.

By supporting greater energy resiliency during grid outages and extreme events in participating low-income households and critical facility host sites, the associated storage supported by the MI SFA program will help some of Michigan's most vulnerable low-income households and support critical community services during disasters or emergencies that low-income households and other community members may benefit from.

The MI SFA program seeks to provide flexibility for program applicants to suggest innovative solutions that meet MI SFA program requirements, as well as the needs of low-income participants. The current plan includes subgrants for:
- Direct reduction of energy storage installation costs with eligible MI SFA funded solar project.
  - Subgrants to be given directly to the subgrantee developing the MI SFA solar installation (residential rooftop or residential-serving community solar). These subgrantees could be a non-profit, governmental body (municipality, county, Tribe), utility, or single family or multi-family building owners where low-income families reside.
- Debt offerings
  - Subgrants to enable nonprofit financial institutions to offer loans to developers of MI SFA solar facilities with accompanying energy storage.
- Lease to own installations
  - Subgrants to enable 3rd parties like non-profits who will install and own the MI SFA supported solar and install accompanying energy storage. In cases where the household, community, or host site does not own the solar and storage up front, there may be opportunities for them to own in the future.
- Power purchase agreements
  - Subgrants to enable eligible entities, such as non-profits and governmental organizations, to install MI SFA supported solar facilities at host sites, where the host

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

site may purchase the produced electricity, and pair the install with accompanying energy storage. Host sites will likely purchase energy services provided by the 3rd party owned energy storage.

In all cases, associated storage installation must be accompanied by a MI SFA supported solar project.

### 2.2.5. Enabling Upgrades

The table below shares the total budget for pilots and full deployment for this project type, as well as the total budget for this project area for the five-year program.

**Table 11. Enabling Upgrades Subaward Budget for Year 1-5**

| Type | Amount by Year ($ Million) | | | | | Total ($ Million) |
|------|------|------|------|------|------|------|
| | 1 | 2 | 3 | 4 | 5 | |
| **Pilot** | $1.0 | | | | | |
| **Full Deployment** | | $5.6 | $5.6 | $5.6 | $5.6 | |
| *Total Program* | | | | | | *$23.4* |

The share of financial assistance expended on enabling upgrades is planned to be 20% of the total financial assistance provided by the program for project implementation across the five-years. The percentage of enabling upgrades supported by the program will not exceed 20% of the financial assistance (not total budget) over the lifetime of the program.

Enabling upgrades will only be funded in conjunction with a solar investment in a household. Enabling upgrades will be defined during phase one to determine which upgrades are eligible based on EPA guidelines and the necessity of the upgrades to address barriers hindering solar deployment in LIDAC households. These upgrades may include roof improvements, behind-the-meter electrical enhancements, and investments in distribution and transmission infrastructure. However, utility rate-based or planned utility capital improvements will not be eligible for enabling upgrade funds.

The MI SFA program aims to pursue associated enabling upgrades pilots to understand deployments for different use cases and regions. Though the MI SFA program aims to collaborate with existing programs providing services for energy efficiency and home repair to help reduce needed enabling upgrades for residential applications, the MI SFA program anticipates there still will be a need for enabling upgrades during the pilots stage too. The program plans to consider pilot administrative burdens when selecting pilots, recognizing certain residential applications, such as those serving multi-family homes, can serve a greater number of residents with less MI SFA administrative burden.

Program offerings for these upgrades will be developed throughout phase one with external input. The MI SFA program will leverage, where possible, other energy efficiency financial assistance programs as much as possible, including the Weatherization Assistance Program (WAP), Low Income Home Energy Assistance Program (LI-HEAP), Home Energy Rebate Program, Community Development Block Grant (CDBG), and additional federal, state, municipal, utility, and community-based programs. The MI Solar for All program will generally prioritize enabling upgrades for LIDAC households facing the greatest barriers to participation.

Details on proposed programs and financial products to be determined during phase one include,

but are limited to:

- purpose of the financial product (e.g. feasibility, implementation)
- specific type of financial product and how financing/grant will function, such as whether there will be interest, whether loans will be forgivable, and the payback period, and
- transaction counterparty (e.g. nonprofits, municipal utility).

During phase one, the MI SFA program will consider how to best mitigate any increase in taxes and impacts to reported income and eligibility for other income-qualified programs that might arise to residential households from MI SFA grant support and other financial assistance.

Please see Section 2.1.4 for a longer list of details to be established during phase one.

*2.2.5-1 Subaward Guidelines*
The following table describes the subaward guidelines for enabling upgrades project area subawards.

**Table 12. Subaward Guidelines for Enabling Upgrades Project Area**

| Guidelines | Pilots | Full Deployment |
|---|---|---|
| **Supported Activities** | Implementation of investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project. ||
| **Anticipated Funding Range** | up to $500,000 for > 2 awards | up to $1,000,000 for > 22 awards |
| **Entities Receiving Subawards** | Governmental, Tribes, Non-profits, Municipal and Cooperative Utilities, Schools/Colleges/Universities, Eligible property owners ||
| **How Subrecipients are Eligible Subrecipients** | Entities cannot be for-profit entities. Eligible non-profits **must not** be nonprofit organizations exempt from taxation under section 501(c)(4) of the Internal Revenue Code that engage in lobbying activities.<br><br>Payments to subrecipients will occur on a reimbursement basis only, thus ensuring subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction. ||
| **Financial Products Provided** | Subgrants | Subgrants |
| **Provided as part of Revolving Loan Fund?** | No | No |
| **Subaward Duration** | Year 1-5 | Year 1-5 |

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

2.2.5-1.1 Benefit Flow to Households

Subaward for enabling upgrades will help implement energy and building infrastructure investments that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. These funds will support investments such as roof repair and needed electrical system upgrades to allow solar to be installed at households and community solar host sites. This will help households or participating host sites to realize financial and health benefits from improved and more energy efficient building envelopes. Building electrical safety will also likely be improved for participating low-income households and MI SFA community solar host sites through electrical system updates needed to support MI SFA supported solar projects.

Though both residential-rooftop solar and residential-serving community solar projects are eligible for enabling upgrades support, the MI SFA program anticipates that low-income residential households will be prioritized to receive enabling upgrades.

The MI SFA program seeks to provide flexibility for program applicants to suggest innovative solutions that meet MI SFA program requirements, as well as the needs of low-income participants. The current plan includes subgrants for:

- Direct reduction of costs for site building and electrical system improvements necessary for installation of an eligible MI SFA funded solar project.
    - Subgrants to enable the subgrantee developing the MI SFA solar installation (residential rooftop or residential-serving community solar) to support energy or building infrastructure investments necessary to install solar. These subgrantees could be a non-profit, governmental body (municipality, county, Tribe), utility, or single family or multi-family building owners where low-income families reside.
- Debt offerings
    - Subgrants to enable nonprofit financial institutions to offer loans to developers of MI SFA solar installations with accompanying enabling upgrades.
- Lease to own installations
    - Subgrants to enable 3rd parties like non-profits who will install and own the MI SFA supported solar and provide enabling upgrades to participating host sites. In cases where the household, community, or host site does not own the solar up front, there may be opportunities for them to own in the future.
- Power purchase agreements
    - Subgrants to enable eligible entities, such as non-profits and governmental organizations, to install MI SFA supported solar facilities at host sites, where the host site may purchase the produced electricity, and provide enabling upgrades to participating host sites. Host sites will likely purchase energy services provided by the 3rd party owned energy storage.

In all cases, enabling upgrades must be accompanied by a MI SFA supported solar project.

### 2.2.6. Leveraging Other Programs

Michigan will develop a strategy throughout phase one to leverage and expand several existing programs and funding strategies that complement the MI SFA program.

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

Below is a non-exhaustive list of key existing complementary programs, with a full inventory to be compiled during phase one.

- **Clean Energy for Low-Income Community Accelerator (CELICA)** – lowers energy bills for low-income communities through voluntary community solar partnerships with the DOE and state government.
- **EGLE Energy Efficiency Revolving Loan Fund (EERLF)** – Targeted at communities of interest that fit into the Justice40 criteria of low-income and environmental justice, layered with other funding programs for maximum leverage to increase the energy savings and reduce energy consumption and GHG emissions.
- **Michigan Saves** – A nonprofit green bank supported by the State of Michigan provides a variety of financial products and will expand offerings as a named subrecipient under the National Clean Investment Fund. For example, Michigan Saves operates the Detroit Loan Fund, a $2.5 million loan program to finance solar and energy efficiency projects in Detroit**,** eliminating credit scores as loan criteria, focusing instead on the borrower's ability to make loan payments. DLF will be considered a leverage source for the households in the middle or higher tier (30-60%, 60-80% AMI) brackets.
- **EGLE Community Energy Management Program (CEM)** – Provides grants to communities for energy-related projects to improve energy management and accelerate energy efficiency and renewable energy adoption. Grant funding is available to local governments, tribal governments, and other public-service entities for energy-related projects.
- **EGLE Energy Planning and Policy Program** – Assists local communities in planning, regulating, and adopting better energy management practices.
- **Energy Efficiency Conservation Block Grant Program (EECBG)** – Assists local governments and tribes in implementing energy strategies to reduce fossil fuel emissions.
- **Home Energy Rebate Programs (HER)** – Develops, implements, and enhances residential energy efficiency and electrification programs for U.S. households.
- **MI-HOPE** – Managed by MSHDA, MI State Housing Opportunities Promoting Energy Efficiency program provides $10,000,000 to local governments and nonprofits for energy-efficiency focused housing repairs and upgrades.
- **Weatherization Assistance Program (WAP)** – Reduces energy costs for low-income households by increasing the energy efficiency of their homes, with $16.6 million available from the latest funding pool.
- **Utility Residential Energy Efficiency Rebates** – DTE Electric and Consumers Energy offer rebates for residents that use energy efficient equipment or improve home insulation.
- **Made in Michigan Competitiveness Fund** – $337 million in state funding to secure federal resources for SFA and other federal funding opportunities.
- **MI Healthy Climate Plan Implementation Funds** – Leveraging repurposed DOE SEP Revolving Loan funding, SOM is leveraging $10,000,000 of funding to aid in the implementation of the MI Healthy Climate Plan and related programs, including MI SFA.

In addition to these programs, EGLE will leverage state support from the MI Healthy Climate Plan, Michigan's CPRG planning grant, and the MI Healthy Climate Corps. The MI Healthy Climate Corps, a $2.6 million program, will deploy a cohort of 30 members over 2 years to support the MI Healthy

Climate Plan implementation, including assisting communities during MI SFA phase one. In future years, the SOM plans to expand the MI Healthy Climate Corps to help meet the workforce and deployment needs of the MI Solar for All program.

To facilitate coordination and integration with other funding sources, including private capital, the SOM will engage with credit unions, CDFIs, and Michigan Saves as well as capital providers who receive federal awards such as the NCIF and CCIA. These recipients will be consulted during phase one to maximize the outputs of SFA, NCIF, and CCIA.

Michigan will also prioritize designing the SFA program to complement the relevant federal tax incentives, including ITC Section 48 (e); Low Income Adder; Energy Community Adder; New Market Tax Credits; Production Tax Credit (PTC); Energy Efficiency Home Improvement Tax Credit (25C); Residential Clean Energy Tax Credit (25D); and New Energy Efficiency Home Tax Credit (45L).

Lastly, the MI SFA program intends to explore how other programs and funding may be leveraged to acquire program participants during phase one. For instance, the MI SFA program may partner with existing need-based programs and utilities to identify eligible MI SFA participants.

### 2.3. Community/Technical Assistance

The MI SFA program is branding MI SFA technical assistance opportunities as "Community Assistance" opportunities. The MI SFA program envisions developing flexible community assistance opportunities to support Michigan communities to address needs pertinent to MI SFA success.

Activities funded under Community Assistance are intended to support community needs regarding MI SFA deployment related topics. Activities that will be supported in this area include:

- Technical assistance for issues like supporting development of MI SFA projects for interested and eligible parties.
- Education, outreach, and marketing related to MI SFA related topics/offerings.
- Provision of MI SFA customers support services in areas such as MI SFA application, project deployment, and ongoing customer needs regarding implemented MI SFA project.
- Funding to community-based organizations to support MI SFA related activities, such as conversations with community members to support MI SFA program development, deployment, and success.
- Grants to local governments to provide support for pertinent MI SFA related activities.

The table below shares the total subaward budget for community assistance by year and in total over the five-year program.

**Table 13. Community Assistance Subaward Budget for Year 1-5**

| Type | Budget by Year ($ Million) | | | | | Total from 2025-2029 ($ Million) |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | |
| Community Assistance Subaward(s) Total Amount | $2.827 | $2.826 | $2.825 | $2.822 | $2.805 | $14.105 |

#### 2.3.1. Phase One Tasks

Technical Assistance tasks for phase one are detailed below.

- Develop community assistance program offerings to support the following activities for MI SFA development, deployment, and success:
  - Education, outreach & marketing
  - Customer support services
  - Community based organizations funding
  - Local government grants
- Support solar deployment within the state through activities such as:
  - Develop and refine a plan to deploy technical resources to assist developers and work with the Michigan Public Service Commission (MPSC) and utilities to enhance the interconnection process.
  - Explore incentive structures to encourage utilities to offer benefits such as expedited applications and more frequent updates to hosting capacity maps.
  - Develop and refine a plan to support local governments to expedite and reduce costs in their permitting process as it relates to solar, and specifically MI SFA.
  - Engage utility companies and other relevant stakeholders across the state to discuss consistent procedures for stakeholder engagement on project siting, community benefits agreements, land use and zoning requirements, and further land use and environmental concerns.
  - Commission statewide studies as/if necessary to assist stakeholders and Michigan in understanding the solar market landscape and navigating deployment challenges.

### 2.3.2.  Subaward Guidelines

The following table describes the subaward guidelines for community assistance subawards, which can be used to provide technical assistance, in addition to any EPA/DOE In-Kind Technical Assistance.

**Table 14. Subaward Guidelines for Community Assistance Project Area**

| Guidelines | Subaward Details |
|---|---|
| Supported Activities | -Education, outreach & marketing on MI SFA pertinent areas such as solar and storage education, interconnection, permitting, solar deployment strategy, technical assistance related to MI SFA application and/or deployment, and MI SFA program related outreach/marketing<br>-Engagement with interested parties and stakeholders to inform program design and/or evaluation<br>-Customer support services<br>-Community based organization funding<br>-Optional local government grants |
| Anticipated Funding Range | Up to $14,105,000<br>for $\geq$ 1 award |
| Entities Eligible to Receive Subawards | Governmental, Tribes, Non-profits, Municipal and Cooperative Utilities, Schools/Colleges/Universities |
| How Subrecipients are Eligible Subrecipients | Entities cannot be for-profit entities. Eligible non-profits **must not** be nonprofit organizations exempt from taxation under section 501(c)(4) of the Internal Revenue Code that engage in lobbying activities.<br><br>Payments to subrecipients will occur on a reimbursement basis only, thus ensuring subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction. |
| Provided as part of Revolving Loan Fund? | No |
| Subaward Duration | Year 1-5 |

Though the community assistance subaward is listed as one line item, the MI SFA program is open to awarding one or more recipients, as long as the total recipient subawards do not exceed the total budgeted amount for the project area line item. Details regarding some expected aspects of technical assistance, like interconnection, permitting, and solar deployment strategy, are discussed in the following sections.

### 2.3.3.  Interconnection Strategy

Michigan updated its interconnection standards in 2023 to streamline and expedite the process for distributed generation (DG) resources. These standards, which apply to all investor-owned utilities, alternative electric suppliers, and electric cooperatives, are designed to reduce interconnection challenges for all residents, including participants in the MI Solar for All program. To further address potential issues, Michigan will develop a plan to deploy technical resources to assist developers and work with the Michigan Public Service Commission (MPSC) and utilities to enhance the interconnection process.

A recently conducted Grid Integration Study investigated the impact of EV charging and distributed energy on the distribution system, projected the growth of DG systems and EVs, evaluated the need

for new technologies, and recommended improvements to utility-collected circuit-level distribution data accessibility. These recommendations include introducing a 'fast track' option for projects <5MW to potentially bypass the lengthy interconnection study process, establishing fee caps for pre-applications, expediting initial review fees, and setting clear timelines for application reviews and interconnection studies. The standards proposed by the Grid Integration Study would require utilities to publish downloadable interconnection queues with application status updates, enhancing transparency to participants in the MI Solar for All program.

During phase one, Michigan will explore incentive structures to encourage utilities to offer benefits such as expedited applications and more frequent updates to hosting capacity maps. This effort will also explore utilizing assistance programs like the DOE's i2x program to streamline the interconnection process and ensure the efficient integration of distributed generation and EV infrastructure across the state.

### 2.3.4.  Permitting Strategy

Michigan plans to provide resources to local governments, including training, educational materials, and funding opportunities. Certain local governments may have the opportunity to receive funding to train and/or hire additional inspectors and permit staff to handle the increased permit applications, reducing approval times. Michigan will support local governments in procuring tools to streamline and reduce costs in the permitting process. Additionally, Michigan will leverage guidelines and recommendations developed in collaboration with the University of Michigan to enhance permitting efficiency and reduce costs for stakeholders, including updates from the June 2023 Grid Integration Study Report published by the MPSC and the regularly updated Michigan zoning database. Throughout phase one, the State will refine the plan to support local governments to expedite and reduce costs in their permitting process and it relates to solar, and specifically MI Solar for All.

### 2.3.5.  Solar Deployment Strategy

Michigan will commission statewide studies, likely through universities, non-profits, CBOs, or contracted partners, to assist stakeholders and Michigan in understanding the solar market landscape and navigating deployment challenges. Topics will be informed by stakeholder input and program design questions and may include:
- Research to identify optimal locations for community solar.
- Landscape analysis of existing and planned workforce development, weatherization, and outreach programs to inform strategies for integrating state and federal programs.
- Studies to assess the current solar and energy storage supply chain and identify gaps.

### 2.3.6.  Other

Michigan will connect stakeholders with existing federal technical assistance programs through a central website. Programs that may be leveraged include DOE i2x, SolarAPP+, SolSmart, State Funding Readiness Project, National Community Solar Partnership (NCSP), EPA's EJTCTAC, and EPA's RE-powering America's Land Initiative. Michigan will utilize existing relationships with the state's seven investor-owned utility companies and other relevant stakeholders to ensure efficient project siting and permitting under the MI Solar for All program. During phase one, Michigan will engage utility companies and other relevant stakeholders across the state to establish consistent procedures for stakeholder engagement on project siting, community benefits agreements, land

use and zoning requirements, and further land use and environmental concerns.

3.   **WORKFORCE DEVELOPMENT**

**Phase 1 Tasks:**

- Develop and refine MI SFA workforce development goals.
- Develop Solar Market Sector Hub.
- Develop plan to invest in existing solar workforce development programs.
- Develop a qualified vendor program if multiple vendors are chosen.
- Define and refine criteria for selecting vendors.
- Define and refine criteria for selecting communities where workforce training programs will be established.

Throughout phase one, the State will work to refine workforce development goals to ensure that the state's workforce is adequate to support the MI SFA program (and growing solar market), while prioritizing workforce development in Michigan's low-income and disadvantaged communities.

Even though details will be determined during phase one, workforce development efforts supported by the MI SFA program will seek to promote the adoption of best practices and industry standards for quality installations, as well as for operations and maintenance of solar and storage investments.

The MI SFA program also seeks to determine workforce development efforts to train individuals to inspect projects to support quality control of assets funded under the program throughout the full product life.

**3.1. Workforce Training and Industry Development**

The table below shares the total subaward budget for workforce training related items, as well as the totals by subaward area for the five-year program.

**Table 15. Workforce Training Related Subaward Budgets for Year 1-5**

| Type | Budget by Year ($ Million) | | | | | Total ($ Million) |
|---|---|---|---|---|---|---|
| | **1** | **2** | **3** | **4** | **5** | |
| **Workforce & Industry Sector Hub-LEO** | $0.2 | $0.2 | $0.2 | $0.2 | $0.2 | $1.0 |
| **Workforce Training & Industry Development** | $1.3 | $1.3 | $1.3 | $1.3 | $1.3 | $6.5 |
| *Total Workforce Training Subawards* | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $7.5 |

During phase one, Michigan will establish a solar market 'sector hub' to align technician training programs by fostering collaboration among solar industry employers, vocational programs, and regulatory bodies. This hub will keep training programs up to date with the evolving needs of the solar market.

To support these efforts, Michigan will develop a strategy to ensure the hub will leverage existing workforce development initiatives from the Michigan Department of Labor and Economic Opportunity (LEO). LEO's programs, including the Going Pro Talent Fund and Registered Apprenticeship program, will be instrumental in training solar workers. The Going Pro Talent Fund helps employers train and retain skilled employees, while the Registered Apprenticeship program offers a blend of classroom instruction and paid on-the-job training. Additionally, the State may leverage the Workforce Development Institute (WDI) to enhance access to high-wage careers

through the Access for All Apprenticeship Program, connecting underserved communities with essential skills and resources.

In addition to, and in coordination with, the solar market sector hub, Michigan will invest in existing workforce development programs that use worker-centered training models, pre-apprenticeship, registered apprenticeship programs, and other relevant aspects to equip workers with the necessary skills to meet the growing demand for solar workers. These programs may offer industry-specific training as well as education on standards and safety procedures.

Training programs will focus on developing workforce pipelines in priority communities based on criteria that will be developed during phase one. The SOM will promote diverse hiring practices by supporting LIDAC member representation in the workforce. Local businesses that commit to hiring from LIDACs will be prioritized for roles in installation, maintenance, outreach, and other support services. Additionally, Michigan will consider strategies to invest in new, local, and diverse businesses by funding entrepreneurship programs that provide upfront capital to help these businesses participate in the solar market.

Michigan aims to ensure that workers trained through MI Solar for All secure high-quality, high-wage careers by establishing hiring criteria and incentives. While the workforce development goals will be refined throughout phase one, Michigan expects that vendors participating in the MI SFA program will be given preference if they commit to hiring criteria such as employing a certain number of MI SFA trainees, apprentices, local hires, diverse labor, and/or union labor.

### 3.1.1.  Subaward Guidelines
The following table describes the subaward guidelines for workforce training area subawards.

**Table 16. Subaward Guidelines for Workforce Training and Industry Development**

| Guidelines | Workforce & Industry Sector Hub-LEO | Workforce Training & Industry Development |
|---|---|---|
| **Supported Activities** | -Establish a solar market 'sector hub' to align technician training programs by fostering collaboration among solar industry employers, vocational programs, and regulatory bodies.<br>-Keep training programs up to date with the evolving needs of the solar market. | - Workforce development programs such as those using worker-centered training models, pre-apprenticeship, & registered apprenticeship programs to equip workers with the necessary skills to meet the growing demand for solar workers.<br>-Industry-specific training as well as education on standards and safety procedures.<br>- Promote best practices and industry standards for quality installations and operations & maintenance of solar and storage investments.<br>-Training to inspect projects for quality control of assets |

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

| | | |
|---|---|---|
| **Anticipated Funding Range** | $1,000,000 for 1 award | up to $6,500,000 for > 1 awards |
| **Entities Eligible to Receive Subawards** | Michigan Department of Labor and Economic Opportunity (State of Michigan) | Governmental, Tribes, Non-profits, Municipal and Cooperative Utilities, Schools/Colleges/Universities |
| **How Subrecipients are Eligible Subrecipients** | Entities cannot be for-profit entities. Eligible non-profits **must not** be nonprofit organizations exempt from taxation under section 501(c)(4) of the Internal Revenue Code that engage in lobbying activities. <br><br> Payments to subrecipients will occur on a reimbursement basis only, thus ensuring subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction. | |
| **Provided as part of Revolving Loan Fund?** | No. | |
| **Subaward Duration** | Year 1- 5 | |

## 3.2. Qualified Vendor Pool

Michigan will select one or more vendors to develop and install rooftop residential and community solar projects, along with associated storage and enabling upgrades. If the State chooses to work with multiple vendors, a qualified vendor program will be developed to establish requirements for participating vendors. These vendors will collaborate with vetted financing organizations and a third-party administrator to design and deliver solutions suitable for each LIDAC market segment.

Criteria for applicants will be defined and refined throughout phase one. Industry standards and best practices will be incorporated into these criteria to ensure quality installations. During phase one, the State expects to engage with industry experts to determine which standards and best practices should be included in the criteria. Vendors will be given preference if they commit to specific criteria chosen by Michigan during phase one. In addition to meeting the requirements of 42 U.S.C. §§3141- 3144 (DBA), the Davis-Bacon Act, compliance with SFA Civil Rights T&C prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance will occur. Other criteria may include:

- Ensuring workers' free and fair choice to collectively bargain or join/form a union.
- Remaining neutral in union organizations/operations through use of Project Labor Agreements and prioritizing local workforce pipelines.
- Demonstrating that a minimum number of hours performed during the installation process are completed by qualified job trainees.
- Hiring a certain percentage of workers from LIDAC workforce development training programs
- Adopting 'high road' labor practices (e.g., family-sustained benefits, predictable work schedules).

- Qualifying as a disadvantaged business (as defined in the Solar for All Terms & Conditions) or a business in historically underutilized business zones (HUBZones) as defined by the Small Business Administration
- Committing to paying prevailing wages.

The exact criteria for approved vendors and any subcontracts will be determined during phase one in accordance with state law and EPA guidelines for Participation by Disadvantaged Business Enterprises in 40 CFR Part 33. This activity is expected to be one or more contracts. See Section 10.6.3 for further information.

### 4.  EQUITABLE ACCESS AND MEANINGFUL INVOLVEMENT PLAN
**Phase One Tasks:**

- Develop and refine eligibility and prioritization criteria, as well as financial and technical assistance models for residential and community-serving solar projects to ensure that the programs are accessible to Michigan's low-income and disadvantaged communities.
- Conduct stakeholder engagement across the state to guide program design decisions.
- Analyze past stakeholder engagement to help inform program design.
- Develop plan to compensate CBOs and build capacity and resources for CBOs to execute intentional, equitable engagement activities.

### 4.1. Equitable Access

During phase one, Michigan will refine eligibility and prioritization criteria, as well as financial and technical assistance models for residential and community-serving solar projects to ensure that the programs are accessible to Michigan's low-income and disadvantaged communities. Through MI SFA's meaningful involvement plan (see 4.2), the State will engage with relevant stakeholders, including communities and representatives of low-income and disadvantaged communities to understand barriers, such as prior experiences with government and lending programs, knowledge of solar technologies, and language and geographic barriers.

Additionally, during phase one, the State will engage diverse interested parties to determine the definition of LIDAC eligibility adopted by the MI SFA program. It will ensure the program defines eligible LIDAC populations in alignment with eligible definitions in the EPA's SFA terms and conditions. One or more of the four eligible definitions from the Solar for All terms and conditions may be used to determine low-income and disadvantaged community status for the MI SFA program. The four eligible definitions are:
- CEJST-identified disadvantaged communities,
- EJScreen-identified disadvantaged communities,
- geographically dispersed low-income households, and
- properties providing affordable housing.

Phase one efforts will also examine how to better ensure the program prioritizes serving the most overburdened and low-income households. Such efforts may include overlaying geographic data on electric reliability and historic outage durations, Medicare beneficiaries with electricity dependent

durable medical equipment, and geographies meeting the program's adopted LIDAC eligibility definition(s).

During phase one, the State will also assess whether participation in other programs, such as WAP or LIHEAP, can be used as the basis for income verification, as allowed by the SFA terms and conditions. If the program uses participation in another program as the basis to verify income (e.g. WAP, LIHEAP), the MI SFA program will check to make sure the program conforms with the 'Low-income' definition in the SFA terms and conditions. Collaborating with other programs currently undergoing income verification is one way the MI SFA program might help perform robust income verification above and beyond attestation while minimizing burdens on interested or participating households. Efforts to explore how to perform income verification while minimizing burdens on participating households will occur during phase one.

**4.2. Meaningful Involvement Plan**

Michigan's community engagement will start at the beginning of phase one to ensure communities are provided ample time to inform and shape the program. This approach will involve ongoing engagement, allowing for the development of partnerships, relationships, and trust.

Michigan will implement a two--way engagement approach that allows community stakeholders to influence program design and implementation. During phase one the State will seek to develop different engagement strategies to reach different types of communities, including urban, rural, and suburban communities; communities with limited English proficiency; and different types of residential buildings, including single-family, multi-family, and manufactured homes. Strategies may include holding meetings in existing community gathering places near public transportation and scheduling these meetings during nights and weekends to accommodate diverse groups. Michigan will consult the Michigan Advisory Council on Environmental Justice (MACEJ) and CBOs to understand community nuances impacting outreach success, such as identifying trusted community voices and addressing technological, educational, cultural, and language barriers. Michigan aims to align program design with existing state initiatives to avoid stakeholder fatigue from multiple concurrent community engagements. Input will be sought through various methods, informed by the MACEJ, impacted community members, and CBOs. These methods may include community forums, surveys, public event informational tabling, webinars, and notifications at town or city events.

This program will also compensate CBOs providing input based on lived experience and community needs. Specifically, Michigan intends to collaborate with trusted partners in the CBOs in the relevant communities to support program design decision-making and community partnerships.

Michigan's meaningful involvement plan will guide phase one for the MI SFA program. Throughout the year, the State will conduct stakeholder engagement across the state to guide program design decisions to help ensure meaningful benefits and equitable access in program design decisions, including the refinement of eligibility and prioritization criteria, as well as financial and technical assistance models for residential and community-serving solar projects and associated energy storage and enabling upgrades.

Throughout phase one, the State seeks to assess communities' awareness of solar energy benefits and use this information to develop culturally appropriate outreach and marketing strategies that are

responsive to the needs of the communities MI SFA will serve while educating and engaging communities on the benefits of solar energy.

Subaward guidelines for community assistance awards are discussed in Section 2.3.2. Though the community assistance subaward is listed as one line item, the MI SFA program is open to awarding one or more recipients, as long as the total recipient subawards do not exceed the total budgeted amount for the project area line item. Details regarding some expected aspects the meaningful involvement plan are discussed in the following sections.

### 4.2.1.  Reaching All Communities

A crucial aspect of ensuring equitable and meaningful community participation involves consulting with the Michigan Advisory Council on Environmental Justice (MACEJ). EGLE, through the Office of the Environmental Justice Public Advocate, will engage the MACEJ at multiple stages throughout the development of the MI Solar for All program.

To maximize solar deployment across LIDAC households, the strategy for equitable access and customer acquisition must prioritize intentional engagement and internal coordination. By aligning stakeholders across Michigan and learning from organizations focused on community representation and practical installation, Michigan aims to develop a program that meets communities where they are. The strategy components include: 1) prioritizing equitable community outreach efforts providing financial assistance; 2) simplifying enrollment processes; 3) prioritizing workforce development 4) providing long-term support.

### 4.2.2.  Community Outreach

Michigan will prioritize community outreach efforts to ensure that all communities, particularly historically underserved households, are aware of the program and have the information and resources needed to fully participate. Michigan will leverage consultation with the MACEJ, grassroots organizations, and community institutions (e.g., churches, community centers, schools) to empower community representatives with the information and resources to conduct outreach activities within their communities. This will include targeted outreach to CBOs, partnerships with local leaders and advocates, and utilizing community meeting spaces to provide educational sessions about the program.

### 4.2.3.  Participant Support Costs & Guidelines

EGLE recognizes that effective community outreach efforts may require participant support or compensation. This section describes Participant Support Costs budget and associated guidelines.

The MI SFA program expects to have higher participant support costs during the first year, when significant engagement with interested parties and stakeholders on the program design will occur. See the table below for a summary of the expected participant support costs for the program.

**Table 17. Participant Support Costs Budget for Year 1-5**

| Type | Budget by Year ($ Million) | | | | | Total from 2025-2029 ($ Million) |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | |
| **Participant Support Costs** | $0.025 | $0.008 | $0.005 | $0.004 | $0.003 | $0.045 |

Eligible participant support costs include:

1. Costs paid directly to or on behalf of participants.
2. Stipends for interns, fellows, trainees, or attendees at community meetings.
3. Registration fees, training materials.
4. Temporary dependent care and travel costs when the purpose of the trip is to participate in the project activity.
5. Light refreshments and/or meals at engagement events.
6. Participation incentives, such as gift bags for participants with health and energy related items, to encourage participation to enable low-income and disadvantaged communities to deploy or benefit from MI SFA related technologies.
7. Travel assistance to non-employee program beneficiaries (e.g. travel assistance that nonprofit "co-regulator" organizations provide to State and Tribal workgroup members), including per diem.
8. Stipends and other incentives paid to participants in research experiments, focus groups, surveys or similar research activities.

Equipment purchases will not be eligible for participant support cost reimbursement.

For eligible participant support costs to be reimbursed by the MI SFA program, prior MI SFA approval must be received. Any payment, reimbursement, voucher, or service provided to eligible participants must submit official documentation of support to the specified MI SFA contact that includes, but is not limited to, the following information:

- Full name of participant
- Support amount (or financial equivalent)
- Type of support provided
- Date support was received
- Approval by MI SFA director or authorized proxy

Submitted invoices must meet EGLE Invoice Guidance for reimbursement, which details invoice details that should generally be included for reimbursement. Purchasing controls will include benchmarking costs to ensure the Participant Support Cost is determined in a commercially reasonable manner. Programs with which to benchmark costs are comparable costs in other programs in EGLE and external meetings where such information is available.

Please note that all participant support costs must be approved by the MI SFA director or authorized proxy. Any costs incurred without prior approval will not be eligible for reimbursement.

### 4.2.4.  *Participatory Governance*

During application development, EGLE engaged the MACEJ, as well as the MPSC and other Michigan state agencies, as well as local solar developers, utilities, trade groups, non-profits, and CBOs for initial input and support. This engagement will continue throughout the program through all phases from program design (phase one) through program implementation.

CBOs will serve as direct links to Michigan communities. Michigan will prioritize funding to build capacity and resources for CBOs to execute intentional, equitable engagement activities in partnership with the MI SFA program. This engagement may include in-person or virtual listening sessions, targeted surveying, focus groups, community workshops, social media engagement, and door-to-door engagement. Through these, and other forms of engagement, CBOs will help solicit feedback from local communities, ensuring their voices are included in program design and implementation, to reflect the communities the program intends to serve. CBOs will also help identify effective ways for the State to provide community-level awareness, education, and resources through engagement activities including, community workshops, social media engagement, and door-to-door engagement. When possible, Michigan will seek to align its consultation with CBOs with ongoing stakeholder engagement work across the state. In other cases, the State may support new CBO stakeholder engagement work.

Michigan will leverage our existing recurring climate-related forums with Tribal representatives to involve federally recognized Tribal communities in program decision-making. EGLE conducts quarterly and monthly discussions focused on climate-related topics, which will be used to discuss program elements and the needs of Tribal communities.

The MI Solar for All program will also utilize the MPSC's existing Low Income Energy Policy Board (LIEPB). The LIEPB includes participation from historically marginalized communities and coordinates state government efforts to develop cohesive energy affordability policies for low-income energy customers. Specifically, the LIEPB may be leveraged to help provide feedback on different MI SFA design decisions such as prioritization and eligibility criteria by utilizing existing focus groups. It may also be leveraged to provide feedback to better integrate MI SFA with existing energy waste reduction programs and services, as well as to promote MI SFA program offerings.

### 4.2.5. *Workforce Development*
Michigan plans to use culturally sensitive, localized outreach strategies through existing Michigan workforce development programs and trusted community organizations to ensure equitable access to workforce training programs for LIDAC members. Outreach efforts will focus on geographic diversity, including rural and underserved communities. Michigan will leverage 16 local Michigan Works Agencies (NWA) and collaborate with Michigan CBOs to reach a broader spectrum of potential candidates. Michigan also intends to build on existing relationships with external partners, including non-profit organizations, unions, and community colleges to expand outreach channels and address any gaps.

## 5.  SUSTAINABILITY AND O&M PLAN
**Phase One Tasks:**
- Develop O&M plan, focusing on the long-term impacts of the financial assistance-funded projects.
- Establish requirements for system recyclability and longevity of solar and storage products.

### 5.1. Customer Support
Michigan will develop its O&M plan during phase one, focusing on the long-term impacts of the financial assistance-funded products. The plan will integrate policies to maintain housing

affordability, prevent displacement, and control cost increases for LIDAC households with solar and/or storage units. The third-party administrator(s) will collaborate with state agencies and CBOs to identify suitable policies for each community and housing type, ensuring that SFA funding benefits LIDAC communities throughout the systems' lifetimes.

EGLE, likely through a third-party administrator, will oversee O&M measures by selecting contractors and managing the local O&M service provider selection process during phase one. The O&M strategy will aim to minimize the number of providers for easier system performance oversight and will include regular audits to ensure routine maintenance. For community solar projects, long-term operations and maintenance contracts will be considered.

## 5.2. Recyclability

During phase one, EGLE will establish requirements for system recyclability and longevity. Michigan is committed to a circular disposal pathway for renewable technology. The Home Energy Rebate program will require that all materials and equipment removed from residential buildings be recycled or properly disposed. EGLE is also pursuing additional funding, such as the DOE Materials, Operation, and Recycling of Photovoltaics (MORE PV) opportunity, to advance the end-of-life recovery of PV systems through NextCycle Michigan. This initiative aims to promote the reuse, remanufacturing, and recycling of solar panels, build robust supply chains, and create new jobs in Michigan by leveraging state and private investments.

Existing recycling companies will be engaged as stakeholders throughout phase one and implementation.

## 6.  SUPPLY CHAIN PLAN

**Phase One Tasks:**
- **Develop plan to procure solar plus storage solutions, prioritizing local manufacturers.**

The SOM will collaborate with local manufacturers to assess the supply and demand of materials and the state's capacity to produce solar plus storage solutions locally. Additionally, the SOM will evaluate the necessity of out-of-state procurement to ensure that supply chain limitations do not impede implementation. The SOM will adhere to EPA guidance on Build American, Buy American (BABA) when addressing procurement requirements for the MI Solar for All program.

## 7.  FISCAL STEWARDSHIP PLAN

**Phase One Tasks:**
- Establish a bill audit or spot- check procedure in coordination with applicable stakeholders and customers.
- Develop a governance and risk management function in accordance with the CFR to fulfill fiscal stewardship requirements.

## 7.1. Fraud, Waste, and Abuse Prevention and Reduction

EGLE is committed to complying with the grant's terms and conditions, as well as applicable federal, state, and local consumer protection laws. Comprehensive policies and procedures will ensure robust risk management, prevent fraud, waste, and consumer abuse, and prudently manage grant funds. These

policies and procedures will apply to all EGLE employees, applicable third-party service providers, and other relevant authorized representatives of EGLE.

Building on existing federal grant processes, Michigan will develop a governance and risk management function in accordance with the CFR to fulfill fiscal stewardship requirements. This risk management function will do the following: proactively manage funds to align with their appropriate use and mitigate fraud, waste, and abuse; provide robust oversight for any federal funds received, ensuring documentation of grant awards spent, including by subrecipients and contractors, in compliance with regulations; and enable ongoing compliance throughout the grant period.

For program subawards, MI SFA will also develop strategies for providing oversight over subawards to ensure subrecipients use funds only for authorized purposes. Interested party input on effective oversight strategies to employ to ensure subaward compliance will be obtained during phase one.

### 7.2. Consumer Protection

Michigan will adhere to applicable consumer protection laws, including consumer protection laws in the jurisdiction(s) the program will serve, in addition to federal consumer protection and consumer financial laws, such as laws prohibiting unfair, deceptive, and abusive practices. If the program partners or other third parties interact with consumers, EGLE will provide written materials detailing expectations for compliance with grant terms and all applicable laws. EGLE will oversee these parties under its Service Provider Oversight Policy, which governs the oversight and risk management of service provider relationships. This policy includes due diligence before entering relationships and monitoring activities to ensure their compliance.

To ensure household savings materialize, Michigan will establish a bill audit or spot- check procedure in coordination with applicable stakeholders and customers. The full process will be determined during phase one, drawing on audit best practices and EPA guidance.

The specific strategies to incorporate consumer protection into program operations will be determined during phase one.  These strategies will support compliance with applicable consumer protections laws and support consumer protections regarding all program partners and entities that directly interact, transact, or contract with consumers as part of the program.

### 8.  REPORTING PLAN

**Phase One Tasks:**
- Develop plan to meet all reporting requirements per the EPA.

The following reports are planned for the MI SFA program:
- **Semi-Annual Report:** EGLE agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report will cover activities from the preceding two quarters.

- **Final Report:** EGLE agrees to submit a final report in a format conducive for immediate public consumption. The final report will contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, EGLE will detail its program strategy and plans for performance reporting under the Closeout Agreement. EGLE agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance. EGLE will include the following broad, non-exhaustive elements in its final report:

- o Progress towards objectives on key performance metrics over the entire period of performance,
- o Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- o Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- o Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- o Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

- **Transaction-Level and Project-Level Data:** EGLE agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). EGLE agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

- **Federal Financial Report:** In accordance with 2 CFR § 200.328 and 2 CFR § 200.344, EGLE agrees to submit the Federal Financial Report (SF-425) at least annually and no more frequently than quarterly. The frequency of reporting and report submission instructions will be specified in the terms and conditions.

- **Single Audit:** In accordance with 2 CFR § 200.501(a), EGLE agrees to obtain a single audit from an independent auditor, if their organization expends $750,000 or more in total federal funds. EGLE agrees to submit the form SF-SAC and a Single Audit Report Package within nine months of the end of the SOM's fiscal year or 30 days after receiving the report from an independent auditor. The SF-SAC and a Single Audit Report Package will be submitted using the Federal Audit Clearinghouse's Internet Data Entry System available at: https://facides.census.gov.

- **Financial Records Retention:** In accordance with 2 CFR § 200.334, EGLE agrees to retain

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

financial records, supporting documents, statistical records, and all other non- federal entity records pertinent to the grant award for a period of three years from the date of submission of the final expenditure report.

- **MBE/WBE Utilization:** When required, EGLE will complete and submit a "MBE/WBE Utilization Under Federal Grants and Cooperative Agreements" report (EPA Form 5700-52A) on an annual basis.

- **Real Property Status Report:** In accordance with 2 CFR § 200.329, EGLE will submit a "Real Property Status Report" (SF-429) to report real property status or request agency instructions on real property that was/will be provided as Government Furnished Property (GFP) or acquired (i.e., purchased or constructed) in whole or in part under a federal financial assistance award.

## 9. TIMELINE AND MILESTONES

During phase one, the timeline will be updated to include interim milestone dates and a timeline for implementation.

**Table 18. Timeline and Milestones**

| Est. Start Date | Est. End Date | Grant Activity | Deliverable |
|---|---|---|---|
| 1/1/2025 | 3/30/2025 | Draft QMP and QAPP. Submit for EPA approval (within 90 days of first amendment). | QMP<br>QAPP |
| 1/1/2025 | 12/31/2025 | Develop a plan to:<br>• verify savings for participating households that pay electric bills,<br>• ensure average household savings of 20% savings directly on participant's electric bills inclusive of any costs incurred by program beneficiaries for participating in the program, and<br>• ensure average equitable indirect savings of 20% for individuals without electric bills (e.g., master-metered MF). | Plan to verify savings for participating households that pay electric bill.<br><br>Plan to ensure average household savings of 20% savings directly on participant's electric bills inclusive of any costs incurred by program beneficiaries for participating in the program.<br><br>Plan to ensure average equitable indirect savings of 20% for individuals without electric bills (e.g., master-metered MF). |
| 1/1/2025 | 12/31/2025 | Develop and refine eligibility and prioritization criteria ensuring 20% household savings, either directly or indirectly, and considers additional meaningful benefits for:<br>• residential solar projects, and<br>• residential-serving community solar projects. | Eligibility and prioritization criteria for residential solar projects.<br><br>Eligibility and prioritization criteria for residential-serving community solar projects. |
| 1/1/2025 | 12/31/2025 | Develop and refine eligibility and prioritization criteria that considers additional meaningful benefits for:<br>• enabling upgrade projects, and<br>• associated energy storage projects. | Eligibility and prioritization criteria for enabling upgrade projects.<br><br>Eligibility and prioritization criteria for associated energy storage projects. |

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

| 1/1/2025 | 12/31/2025 | Develop and refine:<br>• wealth-building and ownership criteria for residential and residential-serving community solar systems, and<br>• financial strategies that prioritize wealthy building and community ownership and allow for the possibility to leverage tax credits. | Wealth-building and ownership criteria for residential and residential-serving community solar systems.<br><br>Financial strategies that prioritize wealthy building and community ownership. |
|---|---|---|---|
| 1/1/2025 | 12/31/2025 | Develop and refine financial products for residential and residential-serving community solar, associated storage, and enabling upgrades, including assessing the feasibility of incorporating financing options. | Financial products for residential and residential-serving community sola, associated storage, and enabling upgrades |
| 1/1/2025 | 12/31/2025 | Evaluate potential risks, such as those related to maintenance, performance, grid changes, and incorporate mitigating strategies into program design when possible | Identified risks |
| 1/1/2025 | 12/31/2025 | Develop a plan to inspect projects to ensure quality control of assets funded under the program. | Plan to inspect projects to ensure quality control of assets funded under the program |
| 1/1/2025 | 12/31/2025 | Develop a plan to deploy technical resources to assist developers and work with the Michigan Public Service Commission (MPSC) and utilities to enhance the interconnection process. | Plan to deploy technical resources to assist developers and work with the Michigan Public Service Commission (MPSC) and utilities to enhance the interconnection process |
| 1/1/2025 | 12/31/2025 | Develop and refine the plan to support local governments expedite and reduce costs in their permitting process and it relates to solar, and specifically MI Solar for All. | Plan to support local governments expedite and reduce costs in their permitting |
| 1/1/2025 | 12/31/2025 | Explore incentive structures to encourage utilities to offer benefits such as expedited applications and more frequent updates to hosting capacity maps. | Discussions on different incentive structures |
| 1/1/2025 | 12/31/2025 | Engage utility companies and other relevant stakeholders across the state to explore establishing consistent procedures for stakeholder engagement on project siting, community benefits agreements, land use | Meetings with utility companies and other relevant stakeholders |

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

| | | and zoning requirements, and further land use and environmental concerns. | |
|---|---|---|---|
| 1/1/2025 | 12/31/2025 | Commission statewide studies as/if necessary to assist stakeholders and Michigan in understanding the solar market landscape and navigating deployment challenges. | Statewide studies – topics TBD |
| 1/1/2025 | 12/31/2025 | Develop and refine MI SFA workforce development goals. | Developed and refined MI SFA workforce development goals. |
| 1/1/2025 | 12/31/2025 | Develop and initiate Solar Market Sector Hub. | Start Solar Market Sector Hub |
| 1/1/2025 | 12/31/2025 | Develop plan to invest in existing solar workforce development programs. | Plan to invest in existing solar workforce development programs. |
| 1/1/2025 | 12/31/2025 | Develop a qualified vendor program if multiple vendors are chosen. | Qualified vendor program if multiple vendors are chosen. |
| 1/1/2025 | 12/31/2025 | Define and refine criteria for selecting:<br>• vendors, and<br>• communities where workforce training programs will be located. | Criteria for selecting vendors.<br><br>Criteria for selecting communities where workforce training programs will be located. |
| 1/1/2025 | 12/31/2025 | Develop and refine eligibility and prioritization criteria, as well as financial and technical assistance models for residential and community-serving solar projects to ensure that the programs are accessible to Michigan's low-income and disadvantaged communities. | Eligibility and prioritization criteria, as well as financial and technical assistance models for residential and community-serving solar projects |
| 1/1/2025 | 12/31/2025 | Conduct stakeholder engagement across the state to guide program design decisions. | In-person and virtual engagement |
| 1/1/2025 | 12/31/2025 | Analyze past stakeholder engagement to help inform program design. | Review of past stakeholder engagement |
| 1/1/2025 | 12/31/2025 | Develop plan to compensate CBOs and build capacity and resources for CBOs to execute intentional, equitable engagement activities. | Plan to compensate CBOs and build capacity and resources for CBOs |
| 1/1/2025 | 12/31/2025 | Develop O&M plan, focusing on the long-term impacts of the financial assistance-funded projects. | O&M plan |
| 1/1/2025 | 12/31/2025 | Establish requirements for system recyclability and longevity of solar and storage products. | Requirements for system recyclability |

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

| | | | and longevity of solar and storage products |
|---|---|---|---|
| 1/1/2025 | 12/31/2025 | Develop plan to procure solar plus storage solutions, prioritizing local manufacturers. | Plan to procure solar plus storage solutions, prioritizing local manufacturers |
| 1/1/2025 | 12/31/2025 | Establish a bill audit or spot- check procedure in coordination with applicable stakeholders and customers. | Bill audit or spot- check procedure in coordination with applicable stakeholders and customers |
| 1/1/2025 | 12/31/2025 | Develop a governance and risk management function in accordance with the CFR to fulfill fiscal stewardship requirements. | Governance and risk management function in accordance with the CFR |
| 1/1/2025 | 12/31/2025 | Develop plan to meet all reporting requirements per the EPA. | Plan to meet all reporting requirements |
| 1/1/2025 | 12/31/2025 | Procure translation services if under $10,000. If over $10,000 expected cost, develop an RFP for translation services. | Selected translation services and an RFP for translation services, if necessary |
| 1/1/2025 | 12/31/2025 | Determine subaward recipients, amounts, and responsibilities to provide targeted services and support the MI SFA's beneficiaries. | Full details of subaward recipients, amounts, and responsibilities |
| 1/1/2025 | 12/31/2025 | Finalize outreach, education and marketing strategy and costs. | Outreach, education and marketing strategy and costs |
| 1/1/2025 | 12/31/2025 | Develop and refine scope of work, RFP, and budget for: third-party administrator(s); qualified vendor management; and monitoring, performance, and compliance. | Scope of work, RFP, and budget for third-party administrator(s) |
| 1/1/2025 | 6/1/2025 | Develop phase one pilot opportunities with diverse stakeholder feedback. | Phase one pilot applications/solicitations |
| 1/1/2025 | 12/31/2028 | Develop full implementation funding opportunities for applications, deploying when ready. | Full implementation applications/solicitations |
| 1/1/2025 | 12/31/2029 | Notify EPA program officer of developed program offerings, as development is complete | Communications with EPA Project Officer |
| 4/1/2025 | 10/1/2025 | Select pilot recipients and begin pilots. | Select pilot projects and sign subaward agreements |
| 6/1/2025 | 12/31/2025 | Pilot Performance Y1 Assessment | Assess pilot(s) performance and |

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

|  |  |  | recommend improvements |
|---|---|---|---|
| 3/1/2025 | 12/31/2026 | Launch of residential rooftop solar program. | Select, fund, and build residential rooftop solar projects |
| 3/1/2025 | 12/31/2026 | Launch of residential-serving community solar program. | Select, fund, and build residential-serving community solar projects |
| 3/1/2025 | 12/31/2026 | Launch of associated storage and enabling upgrades programs. | Select, fund, and build eligible solar projects with associated storage and enabling upgrades |
| 2/1/2025 | 12/31/2026 | Launch of Solar Market Sector Hub. | Solar market sector hub |
| 1/1/2026 | 12/31/2028 | Select program recipients and make awards. | Select and fund program recipients |
| 3/1/2025 | 12/31/2028 | Deploy program related education, outreach, and workforce development activities. | Deploy education outreach and workforce development activities |
| 1/1/2029 | 8/28/2029 | Program closeout activities (analyses, final payments, report writing etc.). | Complete program closeout activities |
| 12/31/2024 | 1/30/2025 | Create and submit Semi-Annual Performance Report #1 | Submit Semi-Annual Performance Report #1. |
| 6/30/2025 | 7/30/2025 | Create and submit Semi-Annual Performance Report #2 | Submit Semi-Annual Performance Report #2. |
| 12/31/2025 | 1/30/2026 | Create and submit Semi-Annual Performance Report #3 | Submit Semi-Annual Performance Report #3. |
| 6/30/2026 | 7/30/2026 | Create and submit Semi-Annual Performance Report #4 | Submit Semi-Annual Performance Report #4. |
| 12/31/2026 | 1/30/2027 | Create and submit Semi-Annual Performance Report #5 | Submit Semi-Annual Performance Report #5. |
| 6/30/2027 | 7/30/2027 | Create and submit Semi-Annual Performance Report #6 | Submit Semi-Annual Performance Report #6. |
| 12/31/2027 | 1/30/2028 | Create and submit Semi-Annual Performance Report #7 | Submit Semi-Annual Performance Report #7. |
| 6/30/2028 | 7/30/2028 | Create and submit Semi-Annual Performance Report #8 | Submit Semi-Annual Performance Report #8. |

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

| 12/31/2028 | 1/30/2029 | Create and submit Semi-Annual Performance Report #9 | Submit Semi-Annual Performance Report #9. |
| 6/30/2029 | 7/30/2029 | Create and submit Semi-Annual Performance Report #10 | Submit Semi-Annual Performance Report #10. |
| 4/1/2025 | 10/30/2029 | Submit Transaction and Project-Level Report semi-annually, by required deadlines | Semi-annual Transaction and Project-Level Report |
| 4/30/2029 | 8/28/2029 | Final report submitted. | Final report |
| 4/30/2029 | 8/28/2029 | Submit Final Federal Financial Report | Final federal financial report |

## 10. PROJECT BUDGET

### 10.1. Personnel

EGLE has hired a full-time program director for MI Solar for All. Two additional MI SFA support staff will be hired, with current plans to hire a program analyst and an engineer. Each of the budgeted staff are anticipated to devote 100% of their time to the MI SFA program and as a result, make up the SOM's Direct MI SFA team. The MI SFA team will be fully responsible for the design, implementation – including the procurement and supervision of contractors for engagement and program development and program administration, evaluation, and ultimate success of the MI SFA program.

Note that for year-over-year personnel estimates, the following assumptions were used:

- For year 1, all positions are estimated to be in place less than 12 months.
- For positions expected to be hired at the top classification level (program manager and program analyst), a cost-of-living increase was budgeted at 3% annually. The SOM sets the COLA rate each February, so the estimated amount reflects the approximate average rate of COLA increases from FY20-FY25.
- For the position expected to be hired in at a lower classification level (engineer), a classification level increase was assumed for years 1 through 4, in accordance with SOM HR guidelines. The COLA increase rate of 3% was then applied for year 5, as it was assumed the position achieved the top classification level in year 4.

Within the personnel category, the program manager role was kept consistent with the SOM's original application, and as a result, does not match the EPA's guidance on scaling. The following information is provided below in accordance with the EPA's Program Scaling Resource:

1. *What we would like to update:* personnel cost for 1- 100% FTE Program Manager
2. *Why we need to make that update:* Despite reduction in award amount, the MI SFA program is still large enough to warrant a senior, experienced FTE staff member to ensure successful implementation of the program. As a result, we did not reduce the Program Manager's salary allocation but instead adjusted the salary allocation of both planned support staff members.
3. *Why we believe the update does not meaningfully change our application score:* By adjusting the support staff member salary allocations, the overall Personnel category, which includes the 1 – 100% FTE Program Manager, is within the EPA program scaling guidelines.

**Program Director (1)**
Full-Time (100% MI Solar for All)
Salary: $120,750 − 135,908
Total 5-year Cost: $620,960

**Program Analyst (1)**
Limited-Term (100% MI Solar for All)
Salary per position: $80,000 − 90,042
Total 5-year Cost: $371,400

**Engineer (1)**
Limited-Term (100% MI Solar for All)
Salary per position: $54,580 − 100,179
Total 5-year Cost: $367,475

**Total Personnel Costs:** $1,359,835

## 10.2.    Fringe Benefits

The SOM applies a fringe benefit rate of 60% for all FTE and LTE, which includes the cost of leave, employee insurance, and retirement benefits. The 60% fringe benefit rate is calculated by using the corresponding staff salary amount as the basis.

**Program Director (1)**
Fringe Rate 60%
Total 5-year Cost: $372,577

**Program Analyst (1)**
Fringe Rate 60%
Total 5-year Cost: $222,843

**Engineer (1)**
Fringe Rate 60%
Total 5-year Cost: $220,488

**Total Fringe Benefit Costs:** $815,908

## 10.3.    Travel

Travel throughout the state of Michigan is necessary for the successful implementation of the MI SFA program, especially for stakeholder engagement during phase one. Travel will also be necessary to monitor projects throughout the period of performance and to occasionally attend SFA-related convenings outside of Michigan, including EPA's required annual SFA training. The following assumptions were used to estimate travel costs. The exact breakdown of travel locations and pricing will vary based on program needs and may be in-state or out-of-state.

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

To estimate travel in the first two years, we assumed all three MI SFA employees will travel from Lansing to each of EGLE's 8 statewide district offices twice per year. A listing of all EGLE District Office locations is included below.

- Local Mileage: 16 round trips for 3 people totaling 2230 miles per year at IRS mileage rate of 65.5 cents per mile. Note that an increasing factor of 1 cent/mile is estimated to account for future IRS mileage rate increases.
- Lodging: 4 hotel stays for 3 people at SOM's approved travel rate of $85 per night. Overnight accommodation is included for travel that exceeds a 2-hour drive from Lansing.
- Per Diem: $59 per person per day per trip.

To estimate travel for years 3-5, we assumed all three MI SFA employees will travel to different parts of the state for the purpose of monitoring and supporting awarded MI SFA projects once per year. As the project locations will not be known until after phase one, we used EGLE's District Office locations as approximate destinations.

- Local Mileage: 8 round trips for 3 people totaling 1115 miles per year at IRS mileage rate of 67.5 – 69.5 cents per mile. Note that an increasing factor of 1 cent/mile is estimated to account for future IRS mileage rate increases.
- Lodging: 2 hotel stays for 3 people at SOM's approved travel rate of $85 per night. Overnight accommodation is included for travel that exceeds a 2-hour drive from Lansing.
- Per Diem: $59 per person per day per trip.

**District Office Locations**
1. 401 Ketchum Street, Suite B, Bay City, MI 48708 (103 miles from Lansing office)
2. 120 West Chapin Street, Cadillac, MI 49601 (161 miles from Lansing office)*
3. 3044 West Grand Boulevard, Detroit, MI 48202 (87 miles from Lansing office)
4. 2100 West M-32, Gaylord, MI 49735 (174 miles from Lansing office)*
5. 350 Ottawa Avenue NW, Unit 10, Grand Rapids, MI 49503 (67 miles from Lansing office)
6. 301 East Louis Glick Highway, Jackson, MI 49201 (39 miles from Lansing office)
7. 7953 Adobe Road, Kalamazoo, MI 49009 (87 miles from Lansing office)
8. 1504 West Washington Street, Marquette, MI 49855 (397 miles from Lansing office)*

*Note: Locations requiring a hotel stay are more than a 2-hour drive from Lansing.*

In addition to travel for stakeholder engagement and project monitoring, all three MI SFA employees are also budgeted one out-of-state conference attendance annually, as required per EPA. At the time of preparing this narrative, details pertaining to the location of the annual training were not available from the EPA. As a result, we have assumed the following:

- Travel: One round trip flight for 3 people at $350 per flight. Washington, DC is the assumed location of the annual training.
- Lodging: Two nights of $200/night hotel lodging for 3 people.
- Per Diem: $59 per person per day.

**Required Program Travel, 5-year cost:  $33,786**
**EPA Required Training, 5-year cost:      $13,905**
**Total Travel: $47,691**

**10.4.    Equipment**

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

Based on a detailed review of the EPA's budget guidance, the SOM has determined no equipment is required for the implementation of the MI SFA program.

**Total Equipment: $0**

### 10.5.    Supplies

Program supplies are necessary to support MI SFA employees in completing their day-to-day work duties throughout the course of the implementation of the MI SFA program. All program supplies will be acquired through the State of Michigan's standard supply procurement procedures.

Estimated supply costs include:
- Laptops
  - Cost per laptop: $1,200
  - Quantity: 3 laptops for 3 FTEs, plus 1 replacement for each during the 5-year period
  - Total cost: $7,200

- Keyboards and Mice
  - Cost per set: $40
  - Quantity: 3 sets for 3 FTEs, plus 1 replacement for each during the 5-year period
  - Total cost: $240

- Monitors
  - Cost for 2 monitors: $500
  - Quantity: 2 monitors each for 3 FTEs, plus 1 replacement set
  - Total cost: $2,000

- Cell phones
  - Cost per cell phone: $500 (initial purchase and 1 replacement for each FTE).
  - Total cost: $3,000

- Office Supplies:
  - Monthly cost: ~$70
  - Duration: 5 years = 60 months
  - Total cost: $4,147

- Presentation Devices or Materials
  - Cost of equipment: $2,000 for necessary items (projectors, screens, banners, etc.).
  - Total cost: $2,000

**Total Supplies: $18,587**

### 10.6.    Contractual
EGLE expects several contracts for the MI SFA program.  The table below summarizes the expected contractual items and their planned budgets by year and in total.

**Table 19. Summary Table of Contractual Budget Items and Associated Costs**

| Line Item | Budget by Year (Million $) | | | | | Total (Million $) |
|---|---|---|---|---|---|---|
| | **1** | **2** | **3** | **4** | **5** | |
| Translation Services | $0.005 | $0.005 | $0.005 | $0.005 | $0.005 | $0.025 |
| Program Development and Engagement Consultant | $1.500 | $0.500 | | | | $2.0 |
| Program Management | | $2.020 | $2.020 | $2.020 | $2.012 | $8.072 |
| Qualified Vendor Management | $0.357 | $0.357 | $0.357 | $0.357 | $0.357 | $1.785 |
| Monitoring, Performance, & Compliance Costs | $0.500 | $0.500 | $0.500 | $0.500 | $ 0.500 | $2.500 |
| **TOTAL CONTRACTUAL** | *$2.362* | *$3.382* | *$2.882* | *$2.882* | *$2.874* | *$14.382* |

**Phase One Tasks:**
- Develop scope of work and budget for third-party administrator(s), including whether any necessary software will be needed for program management especially program compliance.
- Procure translation services if under $10,000.  If over $10,000 expected cost, develop an RFP for translation services.
- Develop RFPs for:
  - program development and engagement consultant
  - third-party administrator(s)
  - qualified vendor management
  - monitoring, performance, and compliance

### 10.6.1 Translation Services

A translation services contract will be pursued to support language access at public meetings and/or through written or video materials EGLE develops.  An annual allocation for language translation and interpretation services has been budgeted throughout the five-year grant period.  Translation services may be provided by one or more entities, depending on the availability of the languages for translation at an entity.

The annual budget for translation services is $5,000, with a total budget of $25,000.

**_Proposed Duration_**
EGLE assumes each project or event requiring translation services will be procured on an ad hoc basis for the specific task(s).

**_Proposed Procurement Method_**
EGLE expects this to be non-competitive, as it does not expect the cost to exceed $10,000.  However, should translation services cost exceed the current expectations, EGLE will use a competitive process to select the translation services consultant to ensure compliance with the fair and open competition requirements in 2 CRF § 200 and 2 CFR § 1500.

### 10.6.1. *Program Development and Engagement Consultant*

The program development and engagement consultant(s) may assist with one or more of the following tasks related to the development of the MI Solar for All program:

1. a thorough understanding of related programs for the purpose of potential program integration
2. facilitating stakeholder engagement,
3. refinement of MI SFA program design, including program guidelines, and
4. ongoing support during phase two.

EGLE expects there may be multiple consultants that help with different aspects of implementation.  For instance, there may be a consultant for stakeholder engagement while another consultant provides the thorough understanding of related programs for potential program integration. All consultant costs are included in a single line item as we do not have sufficient information to estimate the number of contracts and therefore the cost of individual contracts at this time.

EGLE recognizes that firms or individual consultants that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals must be excluded from competing for program management procurements as provided in 2 CFR § 200.319(b).  The MI SFA program will abide by all applicable EPA and SFA program requirements, terms, and conditions.

The current total budget for program development and engagement consulting (noted as "Planning Consultant" in the budget) is $2,000,000.

### *Proposed Duration*
Program development and engagement consultant(s) will be hired for up to a 2-year duration.

### *Proposed Procurement Method*
EGLE will use a competitive RFP process for selecting the program development and engagement consultant(s) to ensure compliance with the fair and open competition requirements in 2 CRF § 200 and 2 CFR § 1500.

### 10.6.2. *Program Management:*

Program Management includes the cost of third-party administration for the MI SFA program. One or more third-party administrator(s) will be hired to implement the program. Their responsibilities may include application and enrollment management, vendor and contractor management, financial management, monitoring and evaluation, and quality assurance and compliance. Activities may include the procurement of any software needed to carry out the MI SFA program as determined during phase one.

All program management costs are included in a single line item as we do not have sufficient information to estimate the number of contracts and, therefore, the cost of individual contracts at this time. The current total budget for this activity is $8,071,625.

### *Proposed Duration*
Any third-party administrator(s) are expected to be hired by mid Year 2 and will likely stay on through the duration of the period of performance.

### *Proposed Procurement Method*

EGLE will use a competitive RFP process to select the third-party administrator(s) to ensure compliance with the fair and open competition requirements in 2 CRF § 200 and 2 CFR § 1500.

Because program offerings may move to deployment at different times, there may be one or more Program Management RFPs for third-party administration of deployed components.

### 10.6.3.  Qualified Vendor Management

If the State chooses to work with multiple vendors, a qualified vendor program will be developed to establish requirements for participating vendors.  These vendors will collaborate with vetted financing organizations and a third-party administrator to design and deliver solutions suitable for each LIDAC market segment. The details and design of the qualified vendor management will be developed during phase one. The estimated cost of this is $357,000 per year, or $1,785,000 total.

***Proposed Duration***

The contractor is expected to be hired during late Year 1 or early Year 2 and will stay on through the duration of the period of performance.

***Proposed Procurement Method***

EGLE will use a competitive RFP process to select the qualified vendor management contractor to ensure compliance with the fair and open competition requirements in 2 CRF § 200 and 2 CFR § 1500.

### 10.6.4.  Monitoring, Performance, and Compliance Costs:

Throughout phase one, the State of Michigan will develop a plan to ensure that the program and individual projects comply with all reporting requirements. It expects to hire one or more parties to assist with monitoring, performance, and compliance costs.

The estimated cost for monitoring, performance, and compliance management is $500,000 per year, or $2,500,000 total.

***Proposed Duration***

The contractor(s) is/are expected to be hired during late Year 1 or early Year 2 and will stay on through the duration of the period of performance.

***Proposed Procurement Method***

EGLE will use a competitive RFP process to select the monitoring, performance, and compliance contractor(s) to ensure compliance with the fair and open competition requirements in 2 CRF § 200 and 2 CFR § 1500.

## 10.7.    Construction – Not Applicable

## 10.8.    Other Costs

The other costs category contains budgeted costs for subawards, participant support costs, and general costs.  The following table provides the "Other" cost category sub-categories and expected total program costs.

**Exhibit 3. MI SFA Workplan Approved February 4, 2025**

| Category/Item | Total Budget |
|---|---|
| *Other: Subawards* | |
|    Residential Rooftop Solar | $24,350,000 |
|    Residential Serving Community Solar | $61,650,000 |
|    Associated Storage | $7,600,000 |
|    Enabling Upgrades | $23,400,000 |
| *Other: Participant Support Costs* | $45,000 |
| *Other General* | |
|    Cell Phone Carrier Services Charge | $9,000 |
|    Virtual Private Network Tokens | $1,116 |
|    Department of Technology, Management & Budget (DTMB) Service Cost | $108,789 |
|    EPA/DOE In-Kind Technical Assistance | $400,000 |
| **Total Other Category** | **$139,168,905** |

Each of the other cost-category items are discussed in sections below.

### 10.8.1. Subawards

The following sections discuss the three areas of expected subawards: financial assistance, community assistance, and workforce training and industry development.

### 10.8.1-1 Financial Assistance

Financial assistance subawards will be provided for the following four project areas: residential rooftop solar, residential serving community solar, associated storage, and enabling upgrades. The MI SFA program recognizes the budgeted amounts for financial assistance for project deployment are aggressive estimates. Even if the budgeted amounts are obligated in a particular year, the MI SFA program recognizes that project spending may not occur until future periods due to project deployment intricacies. The MI SFA program assumes that the funds not spent in the allocated year will be rolled forward to future program years within the period of performance.

- Residential Rooftop Solar:
  - Financial assistance for residential rooftop solar will be provided through a mixture of grants and loans. The total allocated funding for financial support for residential rooftop solar projects is $24,350,000. Of that, $1,000,000 will be available to support the development of residential rooftop solar pilot projects during phase one.
- Residential-Serving Community Solar:
  - Financial assistance for residential-serving community solar will be provided through a mixture of grants and loans. The total allocated funding for financial support for residential rooftop solar projects is $61,650,000. Of that, $6,500,000 will be available to support the development of residential-serving community solar pilot projects during phase one.
- Associated Storage:
  - Financial assistance for associated energy storage will be provided through a mixture of grants and loans. The total allocated funding for financial support for associated storage projects is $7,600,000. Of that, $375,000 will be available to support the development of associated storage pilot projects during phase one.

- Enabling Upgrades:
  - Financial assistance for associated enabling upgrades will be provided through a mixture of grants and loans. The total allocated funding for financial support for associated enabling upgrades is $23,400,000. Of that, $1,000,000 will be available to support the development of residential rooftop solar pilot projects during phase one.

Though there likely will be subawards that address only one project area, EGLE finds it plausible that financial assistance subawards for project implementation may also provide a mix of funding from each of the project areas.

Please see subaward guidelines for each project area in its respective section in this document for further details:
- 2.2.2 Residential Rooftop Solar
- 2.2.3 Residential Serving Community Solar
- 2.2.4 Associated Storage, and
- 2.2.5 Enabling Upgrades.

*10.8.1-2 Community Assistance*

Throughout phase one, the State will finalize the allocation of funds and identify recipients for community assistance subawards based on input gathered during the stakeholder engagement process. Considerations will include priority geographies, government and organizational capacity, trust, the ability to meet the needs of underserved communities, and alignment with the State's climate and equity objectives. The State will also assess opportunities for partnerships that can enhance the impact of the funding, ensure program sustainability, and maximize benefits for vulnerable populations.

Other costs include education, outreach, marketing, and other general customer support services to be determined during phase one. Additionally, these costs may cover potential subgrants to local governments, community-based organizations (CBOs), and other entities that can provide targeted services and support to the program's beneficiaries. The total estimated cost is $2,830,000 per year, or $14,150,000 in total over the program's duration.

For further details, please see guidelines for community assistance subawards in Section 4.2 Meaningful Involvement Plan.

*10.8.1-3 Workforce Training and Industry Development*

As described in Section 3. Workforce Development, Michigan will invest in existing workforce development programs that use worker-centered training models, pre-apprenticeship, and registered apprenticeship programs to equip workers with the necessary skills to meet the growing demand for solar workers. These programs may offer industry-specific training as well as education on standards and safety procedures.

Training programs will focus on developing workforce pipelines in priority communities based on criteria that will be developed during phase one. Additionally, Michigan will consider strategies to invest in new, local, and diverse businesses by funding entrepreneurship programs that provide upfront capital to

help these businesses participate in the solar market. These costs may cover potential subgrants to local governments, community-based organizations (CBOs), and other entities that can provide trainings. Throughout phase one, the State will finalize the allocation of funds and identify recipients based on input gathered during the stakeholder engagement process. The estimated cost of the workforce training and industry development is $1,300,000 per year or $6,500,000 total.

For further details, please see guidelines for community assistance subawards in Section 3.1 Workforce Training and Industry Development.

*10.8.2-4 Solar Market 'Sector Hub'*

The State of Michigan will establish a solar market 'sector hub' to align technician training programs by fostering collaboration among solar industry employers, vocational programs, and regulatory bodies. This hub will keep training programs up to date with the evolving needs of the solar market. The specific role of the hub will be further developed during phase one. The estimated cost of the hub is $200,000 per year or $1,000,000 total.

For further details, please see guidelines for community assistance subawards in Section 3.1 Workforce Training and Industry Development.

### 10.8.2. Participant Support

EGLE recognizes that effective community outreach efforts may require participant support or compensation. This is likely an important aspect of the Meaningful Involvement Plan shared in Section 4.2. The MI SFA program expects to have higher participant support costs during the first year, when significant engagement with interested parties and stakeholders on the program design will occur.

See Section 4.2.3 for participant support costs guidelines.

### 10.8.3. General

Each of the expected "Other-General" costs are described below. These are:
- Cell Phone Carrier Services Charge
- Virtual Private Network Tokens
- Department of Technology, Management & Budget (DTMB) Service Cost, and
- EPA/DOE In-Kind Technical Assistance

**Virtual Private Network (VPN) Cost**

Program staff will be working remotely and a VPN is required per State of Michigan security policies. The cost per month per employee for a VPN token is $6.20. Total cost for 3 FTEs for 5 years is $1,116.

**Cell Phone Carrier Service Cost**

The State of Michigan contracts with Verizon for cell phone service for all state-issued devices. Service charges are $50 per month per employee. Total cost for 5 years is $9,000.

**Department of Technology, Management, and Budget Service Cost**

This is required by State of Michigan to support grants and programming. The rate for DTMB service cost is currently 5%. The total personnel cost is used as the basis to which the rate is applied. Total cost for 5 years is $108,789.

**EPA/DOE In-Kind Technical Assistance**
The Solar for All program received $400,000 in in-kind technical assistance from the Department of Energy.  This in-kind technical assistance may support energy modeling services or other support. The total 5-year cost is $400,000.

**10.9.    Additional Items – Not Applicable**

**10.10.    Indirect Charges**
The indirect rate for EGLE personnel for FY2025 is 15.05%. The total personnel cost is used as the basis to which the indirect rate is applied. This rate will be updated each year in accordance with the official SOM rate.  The total 5-year cost is $327,449.

**10.11.    Conferences and Workshops – Not Applicable**

**10.12.    Meals and Refreshments – Not Applicable**

**10.13.    Program Income- Not Applicable**

# EXHIBIT 5

**Exhibit 5. Termination Memo for EGLE**

## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

August 7, 2025

<u>**MEMORANDUM**</u>

**SUBJECT:**    Termination of EPA Assistance Agreement 5H-84090701 under 2 CFR 200.340

**FROM:**    Devon Brown, EPA Award Official

**TO:**    Ed Willoughby, Federal Aid Coordinator
Michigan Department Of Environment, Great Lakes, And Energy

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84090701 awarded to Michigan Department Of Environment, Great Lakes, And Energy. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

**Exhibit 4. Termination Memo for EGLE**

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Hazeletta Burgess, EPA Grant Specialist
    Bryan Fiedorczyk, EPA Project Officer
    Joy Wang, Grantee Program Manager

2

# EXHIBIT 6



**GRETCHEN WHITMER**
GOVERNOR

STATE OF MICHIGAN
DEPARTMENT OF
ENVIRONMENT, GREAT LAKES, AND ENERGY

MATERIALS MANAGEMENT DIVISION

**EGLE**

PHILLIP D. ROOS
DIRECTOR

August 27, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington DC 20460

**RE    Disagreement with Modification No. 2 to Grant Number (FAIN):
84090701**

Dear Mr. Brown:

On August 11, 2025, the Michigan Department of Environment, Great Lakes, and Energy (EGLE) received a memorandum from you that purported to terminate EPA Assistance Agreement No. 5H-84090701 under 2 CFR 200.340 ("Termination Letter"). (That correspondence was dated August 7, 2025, but due to an error U.S. EPA made in addressing the notification, EGLE did not receive it until August 11.) The Termination Letter outlined a Dispute process pursuant to 2 CFR 1500.15 with a Dispute deadline of 30 days. The Termination Letter also stated, "The EPA Grants Management Office will issue an amendment to the agreement to document the termination."

EGLE received that modification transmission dated August 8, 2025, on August 11, 2025, in the form of a document titled "Assistance Amendment." The Assistance Amendment states that it is "Modification Number: 2" to Grant Number 84090701. Under its "Explanation of Changes" the document states that it requires EGLE to stop work, terminate the agreement, reduce performance period duration, curtail the scope of work, and waive certain reporting requirements. The Assistance Amendment also purports to add administrative terms and conditions. In the "Notice of Award" section, it states that if the recipient disagrees with the terms and conditions specified, it must furnish a notice of disagreement within 21 days.

Please accept this letter as EGLE's notice of disagreement with Modification No. 2 dated August 7, 2025, issued under your signature as EPA Award Official. EGLE also disagrees with any suggestion in the Assistance Amendment that any attempt to draw down funds could function as a waiver of EGLE's dispute rights, which is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination per 2 CFR 200.305(b)(3) as well as the

Termination Letter's specific statement that costs incurred prior to the termination date are allowable.

Please acknowledge receipt of this notice of disagreement and contact EGLE via the below-signed designee to discuss resolution of this disagreement as soon as possible.

Sincerely,

Joy Wang, Ph.D.
Director, MI Solar for All Program
Materials Management Division
Department of Environment, Great Lakes, & Energy


cc: Hazeletta Burgess, EPA Grant Specialist
    Bryan Fiedorczyk, EPA Project Officer
    Paul McDonald, Director, Finance Division

# EXHIBIT 7

**Exhibit 7: MI SPA Dispute of Termination**

STATE OF MICHIGAN
DEPARTMENT OF
ENVIRONMENT, GREAT LAKES, AND ENERGY
MATERIALS MANAGEMENT DIVISION

**EGLE**

GRETCHEN WHITMER
GOVERNOR

PHILLIP D. ROOS
DIRECTOR

September 5, 2025

Michael Molina, EPA Dispute Decision Official
U.S. Environmental Protection Agency
molina.michael@epa.gov
Office of Mission Support
1200 Pennsylvania Avenue NW
Washington, DC 20460

**RE:  Notice of Dispute to Wrongful Termination of EPA Assistance
      Agreement 84090701 under 2 CFR 200.340**

Dear Mr. Molina,

Pursuant to 2 CFR 1500.15, I am writing to notify you, the designated EPA Dispute Decision Official, that the Michigan Department of Environment, Great Lakes, and Energy (EGLE) disputes EPA's attempt to terminate Michigan's Solar for All award, grant number 84090701, which was awarded to EGLE on July 8, 2024.

This purported termination arrived in the form of two pieces of correspondence from EPA to EGLE, both dated August 7, 2025: (1) An Assistance Amendment (Exhibit 1), which EGLE has already responded to on August 27, 2025; and (2) the Termination of EPA Assistance Agreement memorandum from EPA Award Official Devon Brown (Termination Letter) (Exhibit 2), which this Notice of Dispute presently responds to.

These EPA documents and the termination they attempt to effect:

(1) Violate the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only *unobligated* balances from the Greenhouse Gas Reduction Fund and preserved funds already awarded to grantees;
(2) Violate, without any legal basis, the legally binding Solar for All Assistance Agreement (84090701) issued by EPA to EGLE on July 8, 2024;
(3) Are arbitrary, capricious, and not supported by substantial evidence;
(4) Violate constitutional boundaries; and
(5) Cause irreparable harm to Americans in Michigan.

EGLE requests that EPA rescind the termination and make all obligated funds that were available in EGLE's ASAP account as of August 6, 2025 (the day before the termination notice) available to EGLE again.

The August 7, 2025, Termination Letter indicates that EPA is terminating EGLE's award because EPA's cost appropriations and the "grant appropriations" were rescinded, so "the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All,"[1] and continued administration of the program is no longer legally permissible. Based on this legal conclusion, EPA determined it would end the Solar for All program and all existing grants.

The rescission of unobligated funds and repeal of granting authority under 42 U.S.C. 7434 do not give EPA the authority to terminate all legally binding Solar for All assistance agreements unilaterally under 2 CFR 200.340. Doing so is contrary to law and arbitrary and capricious. We therefore ask that the termination of EGLE's award be reconsidered via an administrative appeals process.

As such, please accept this letter as a request to initiate an administrative dispute under 2 C.F.R. 1500 Subpart E. Given the ongoing implementation of the Solar for All program in Michigan, EGLE requests expedited review of this administrative dispute.

**(1) EPA's asserted grounds for termination violate the plain language of OBBBA Section 60002, which rescinded unobligated balances but preserved funds already awarded to grantees.**

EPA's conclusion that OBBBA rescinded the grant appropriations for Solar for All is incorrect and contrary to law. By its plain language, Section 60002 only authorized rescission of the *unobligated* balance in the appropriations account established by 42 U.S.C. § 7434:

> *SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND.*
> *Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the*
> *unobligated balances of amounts made available to carry out that*
> *section (as in effect on the day before the date of enactment of this Act)*
> *are rescinded.*

---

[1] Exhibit 2.

Where the plain language of a statute is unambiguous, no further analysis is required.[2] Indeed, after OBBBA passed Congress, the Department of Justice wrote to the court presiding over *Climate United Fund v. Citibank, N.A.* (D.C. Cir.) to inform it that new legislation, if signed, would "rescind all *unobligated funds* appropriated for it."[3]

By its plain language, the OBBBA only rescinded funds that were unobligated on the date the OBBBA was enacted. And there is no basis to conclude that Congress expressly or impliedly intended to de-obligate or claw back funds that were properly and timely obligated pursuant to 42 U.S.C. § 7434(a)(1). Funds awarded to Solar for All grantees, including EGLE under the subject award, were *obligated* upon award and subject to a legally binding agreement which "create[d] a legal liability or definite commitment on the part of [EPA], or create[d] a legal duty that could mature into a legal liability by virtue of an action that is beyond the control of the government."[4] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[5] In other words, the Solar for All grant funds were obligated upon award, and remained obligated when OBBBA was passed. The OBBBA did not change this and, accordingly, EPA could not legally rescind these obligated funding awards based on OBBBA.

Additionally, EGLE's Solar for All grant was not terminated until August 7, 2025, well after OBBBA became law on July 4, 2025, and contrary to the direction of that statute. At the time the OBBBA was enacted, EGLE's Solar for All funds undoubtedly remained obligated so they were not impacted by Section 60002 of the OBBBA.

EPA also cannot avoid administering the entire Solar for All program merely because OBBBA rescinded other unobligated funds. For the reasons stated above, EGLE's grant funds were not rescinded by Congress and EPA had no valid basis to de-obligate the funds, so EPA has a legal duty and obligation to fulfill its part of the agreement by administering the funds.

---

[2] *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (". . . when the meaning of the statute's terms is plain, our job is at an end.").

[3] Letter dated July 3, 2025, to the Clerk of the Court from Yaakov Roth, DOJ.

[4] United States Government Accountability Office, Office of the General Counsel, Principles of Federal Appropriations Law, Third Edition, Volume II, at 7-2, available at https://www.gao.gov/assets/gao-06-382sp.pdf.

[5] Grants Policy Issuance- 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds at https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf.

**(2) EPA's termination of EGLE's grant violates EPA's legal obligation under 2 C.F.R. 200.340 and the signed Solar for All Assistance Agreement, and any attempts to liquidate the remaining funds in EGLE's ASAP account lacks any legal basis.**

The Termination Letter does not give any reason for termination other than its alleged reliance on OBBBA. However, the uniform grant regulations at 2 C.F.R. § 200.340(a) provide the circumstances under which the government may terminate an award agreement, which include (1) failure to comply with the agreement's terms and conditions; (2) with consent of the recipient; (3) by request of the recipient; or (4) otherwise pursuant to the terms and conditions of the agreement, to the extent authorized by law.

2 C.F.R. § 200.340 does not authorize EPA to terminate an assistance agreement when EPA believes that it "no longer possess either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring" of a Federal program. Nor does it authorize EPA to terminate an assistance agreement when Congress rescinds EPA's "administrative cost appropriation" as the Termination Letter alleges. Indeed, EPA has not identified any provision of 2 C.F.R. § 200.340 which authorizes termination of EGLE's Solar for All Assistance Agreement.

The terms and conditions of the Assistance Agreement also do not allow for termination under the circumstances described in the Termination Letter. EGLE has not, and unequivocally does not, agree to any attempts to terminate the Agreement based on EPA's erroneous interpretation of OBBBA Section 60002. Congress intended for these funds to benefit the public by providing efficient and sustainable energy options to meet the country's growing energy needs. EGLE complied with the Assistance Agreement's terms and conditions and does not consent to the Assistance Agreement being terminated.

Termination for noncompliance is only possible when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."[6] Neither condition exists. Indeed, EPA has not identified any noncompliance, has provided no evidence of waste, fraud, or abuse, nor has it requested that EGLE take action to cure any deficiencies in its performance.

In addition, EPA has taken further action that unlawfully pulled back funding that was still legally obligated to EGLE. Prior to the termination notice, on

---

[6] Exhibit 3, p. 26, Section Q5. Termination.

August 6, 2025, EGLE's ASAP account available balance was $154,709,215.59, which represents the cumulative authorized amount of the EPA Award $155,720,000.00 minus funds drawn down by EGLE for authorized work prior to that date. On August 11, 2025, EGLE's ASAP account access changed to a "liquidated" status and only a small portion of the awarded funds appeared to be available to draw down. The "available balance" on the account substantially reduced from $154,709,215.59 to $10,148,931.94, and the performance period end date had been changed from April 30, 2029, to August 15, 2025.

This adjustment to EGLE's account balance, which was made prior to the expiration of the 30-day dispute period detailed at 2 C.F.R. 1500 Subpart E—and prior to any actions from EGLE to close out the award[7]—violates EGLE's right to due process, violates the Assistance Agreement terms, and ignores its reliance interests.

Additionally, 2 C.F.R. § 200.340(a)(4)'s language allowing termination "if an award no longer effectuates the program goals or agency priorities" does not presently apply either. When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget ("OMB") confirmed that the termination language relating to agency priorities did not allow agencies to implement arbitrary cancellations.[8] In 2024, OMB completed another round of revisions to this provision.[9] After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that may form a ground for termination, but only if "the language is included in the terms and conditions of the award."[10] The agency must "clearly and unambiguously" include (a)(4) in the Assistance Agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4).[11]

Here, because the Assistance Agreement does not include the "agency priorities" provision of (a)(4) as a ground for potential termination in its terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the Agreement based on changed program goals or agency priorities.

EPA acted contrary to the governing regulations and the Assistance Agreement's terms.[12] EGLE's award must be immediately restored to its full

---

[7] To be clear, because EGLE disputes the termination of its Solar for All funding, the agency is not taking any steps to close out the award.

[8] Guidance for Grants and Agreements 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).

[9] Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024).

[10] *Id.* at 30,089.

[11] *Id.*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

[12] 2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30,089.

amount.[13] EGLE requests no more or less than for EPA to follow the law and rescind this unlawful termination.

### (3) EPA's decision to terminate EGLE's Solar for All Assistance Agreement is arbitrary and capricious.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[14] In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[15]

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[16] Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process."[17] Agency action taken on pretextual grounds violates the requirement of reasoned agency decision-making.

EPA's decision to terminate EGLE's Solar for All Assistance Agreement is arbitrary and capricious because: (1) EPA provided no reasoned basis for the termination, (2) EPA failed to undertake any individual assessments of EGLE's Solar for All Assistance Agreement, (3) EPA failed to provide EGLE's notice and an opportunity to cure, and (4) EPA ignored EGLE's substantial reliance interests and the harmful impact of an abrupt and complete termination of the Solar for All Agreement.

EPA's sole stated rationale for the Termination Letter—that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 award recipients"—is a contrived, irrational, and insufficient explanation and thus not a reasoned basis for that action. As addressed above, the relevant statutory basis remains in place and the obligated funding was *not* rescinded by the OBBBA. EPA fails to explain how the recission of unobligated funds in an ongoing program with several obligated grants somehow undercuts the statutory authority for the entire program. And EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that

---

[13] 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.

[14] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[15] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[16] *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

[17] *Id.*

Congress appropriated to EPA in March to pay for "Environmental Programs and Management" to continue its administration of the Solar for All program.

EPA likewise failed to engage in reasoned consideration of EGLE's Solar for All Assistance Agreement before categorically terminating the Solar for All program. EPA has identified no facts related specifically to EGLE's grant that would support the termination of EGLE grant. Rather, EPA's public statements[18] demonstrate that its stated rationale ignored the individual circumstances of each states' awards and was pretextual.

Also arbitrary was EPA's failure to give notice to EGLE so EGLE could address any alleged failures. 2 C.F.R. 200.208 requires EPA to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to satisfy the conditions.[19] It is only after a grantee fails to meet the conditions imposed that an agreement can be terminated.[20] EPA's actions are contrary to these procedures. EPA terminated the Assistance Agreement without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure.[21] Contrary to Section 200.208's notice-and-cure requirements, EPA operated in secret to withdraw access to EGLE's accounts. The lack of notice was arbitrary, capricious, and deprived EGLE of due process.

### (4) EPA's withdrawal of EGLE's duly appropriated and obligated Solar for All Assistance Agreement violates the Constitution's Separation of Powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[22] The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[23] The Executive has no power "to enact, to amend or to repeal statutes."[24] Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

---

[18] Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025, 11:07 AM), https://x.com/epaleezeldin/status/1953518426602803684; *see also* https://www.youtube.com/watch?v=CfU3bYKmBOA (referring to Solar for All as a grift).

[19] 2 C.F.R. § 200.208(d)-(e).

[20] 2 C.F.R. § 200.339(a) & (c) (authorizing a temporary hold on payments, suspension or termination unless or until the recipient takes corrective action).

[21] 2 C.F.R. § 200.208.

[22] U.S. Const. art. I, § 1.

[23] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

[24] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

*Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[25]  U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[26]

The Termination Letter and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[27]  EPA's attempt to withhold funding appropriate by Congress and that was not rescinded by OBBBA infringed upon Congress's exclusive spending domain.

*Take Care Clause*

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[28] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[29] Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and EGLE's individual Assistance Agreement on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind EGLE's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[30] EPA's Termination of EGLE's Assistance Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate

---

[25] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).
[26] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).
[27] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).
[28] U.S. Const. art. II, § 3.
[29] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").
[30] OBBBA Section 60002.

and de-obligate funds that were obligated to EGLE prior to September 30, 2024. EPA violated constitutional separation-of-powers constraints because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

### Appropriations Clause

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[31] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[32] Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[33] For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

### Legislative Vesting Clause

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[34] When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating EGLE's Solar for All Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

### Tenth Amendment

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[35] When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[36] EPA's

---

[31] U.S. Const. Art. I, § 9, cl. 7.

[32] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).

[33] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

[34] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

[35] U.S. Const. amend. X.

[36] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

termination of EGLE's Solar for All Assistance Agreement altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Letter and subsequent termination of EGLE's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind EGLE's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

**(5) The termination of EGLE's Solar for All Assistance Agreement will cause irreparable harm to Michiganders.**

EGLE's Solar for All Assistance Agreement supports the Trump Administration's stated priorities of supporting energy independence, reducing energy costs, and protecting clean air and water, thereby reducing the cost of living. Retail electricity prices are increasing, outpacing inflation, and rising temperatures, extreme weather, and expanding data centers will continue to drive higher demand. Michigan especially needs relief in reducing energy costs and increasing energy independence. In 2023, Michigan had the highest average residential electric rates in the Midwest region (26 cents/kWh), almost double the average across Midwest states when excluding Michigan (13.48 cents/kWh).[37] In 2023, Michigan also had the highest average electric outage duration nationally (730.9 minutes or over 12 hours)[38,39] with nearly 4.8 million customers impacted. Michigan ranked 8th nationally for total customers impacted.[40]

Between the various programs EGLE intended to offer using Solar for All funding, EGLE's approved MI Solar for All (MI SFA) Work Plan proposes to serve approximately 16,300 low-income households through residential rooftop and residential-serving community solar projects that would add about 190 MW of new

---

[37] Electric Sales, Revenue, and Average Price t6 Residential Sector data.  Retrieved on August 22, 2025, from U.S. Energy Information Administration website at: https://www.eia.gov/electricity/sales_revenue_price/.

[38] The Customer Average Interruption Duration Index (CAIDI = total minutes of customer electric outage divided by total number of outages) is the average time required to restore electric service after an outage. Retrieved on August 22, 2025, from: https://www.michigan.gov/mpsc/consumer/electricity/distribution-system-reliability-metrics#CAIDI

[39] U.S. Energy Information Administration, Form EIA-861, 2023 Final Data. Retrieved on August 22, 2025, from: https://www.eia.gov/electricity/data/eia861/.

[40] U.S. Energy Information Administration, Form EIA-861, 2023 Final Data. Retrieved on August 22, 2025, from: https://www.eia.gov/electricity/data/eia861/.

solar generation capacity and 22 MWh of energy storage (See Exhibit 4: MI SFA Approved Workplan, p. 1). EGLE's implementation of work in reliance on the Assistance Agreement was underway, with 13 pilot project awardees selected and announced publicly in two rounds.[41],[42]

The loss of MI SFA funding and federal support for solar energy will harm Michigan's ability to meet its own clean energy standards. Public Act 235 (PA 235) was passed on November 8, 2023, and signed by Governor Gretchen Whitmer on November 28, 2023. PA 235 requires electric providers to meet a clean energy standard of 80% by 2035 and 100% by 2040. PA 235 also sets a statewide energy storage target of 2,500 MW. With MI SFA termination, Michigan's progress towards achieving clean energy and energy storage goals required by statute will be diminished.

The premature end of Solar for All funding also harms EGLE as an employer. EGLE reasonably relied on this funding to hire three MI SFA program staff and contract with two entities. Without this funding, EGLE will have to lay off MI SFA program staff, cancel existing contracts, and will be unable to move forward on its commitments to fund solar deployments, workforce development, and technical assistance opportunities. These employees have been essential in advancing program design, conducting outreach to potential community partners, working with Tribal nations, and deploying MI SFA pilot opportunities. The loss of this funding means that EGLE will have to lay off these staff or shift them to other projects, which will encroach on other programmatic funds and deplete those funds far more quickly than anticipated. Michigan is simply unable to make up for this loss of funds to advance this residential serving solar work.

Further, EGLE acted in reasonable reliance on its fully-obligated Solar for All funding continuing to be available. EGLE expended more than 2,400 employee hours on Solar for All programming. In so doing, EGLE had to forgo other funding opportunities, program structures, and scaling of other solar deployment opportunities. There is no way to recover this lost time or effort. Nor can EGLE simply backfill with state funds to keep its Solar for All offerings available.

Moreover, EPA's unlawful actions will harm Michigan's economy. Saving low-income households money means more money for Michigan's economy. Every low-income dollar spent on food and other necessities spurs 57 cents and 42 cents, respectively, in business growth in Michigan's retail, agriculture, trucking, and rail freight industries.[43] By providing low-income families assistance through MI SFA, they may no longer need assistance from other programs, like the Michigan Energy

---

Assistance Program (MEAP), which can save Michigan ratepayers. If the low-income households assisted by MI SFA do not need MEAP assistance, this is equivalent to about $1.75 million of rate payer savings per year for the approved pilots and about $16.3 million of rate payer savings per year for the full program. Terminating MI SFA's funding and denying low-income Michiganders benefits will harm Michigan's economy.

Finally, loss of Solar for All funding and the loss of federal support for solar energy generally will harm Michigan and its residents. At a time of expanding electrical demand, solar represents a low-cost way to add electrical supply in Michigan. Rising energy prices and reduced economic growth will hit low-income residents the most—exactly the population that Solar for All seeks to help.

**Relief Requested**

EGLE seeks rescission of the termination of this award and the full and immediate reinstatement of the $154,709,215.59[44] that was available in EGLE's ASAP account as of August 6, 2025 (the day before the termination notice). Until its dispute with EPA has been resolved, EGLE will also object to any claims of noncompliance under 2 C.F.R. 200.344(i).

I am happy to answer any questions you may have about this letter or the MI SFA program. You may contact me at wangj5@michigan.gov or 517-643-5230.

Sincerely,

Joy Wang, Ph.D.
Director, MI Solar for All Program
Materials Management Division
Department of Environment, Great Lakes, & Energy
WangJ5@michigan.gov


cc:    Devon Brown, EPA Award Official
       Hazeletta Burgess, EPA Grant Specialist
       Bryan Fiedorczyk, EPA Project Officer
       Paul McDonald, Director, Finance Division

---

[44] This dollar amount represents the cumulative authorized amount of the EPA Award minus funds drawn down by EGLE for authorized work prior to the August 7, 2025, termination notice.

# EXHIBIT 8

Exhibit 8.  EPA Solar for All Closeout Instructions

## Wang, Joy (EGLE)

| | |
|---|---|
| **From:** | SFA <SFA@epa.gov> |
| **Sent:** | Wednesday, October 1, 2025 4:21 PM |
| **To:** | SFA |
| **Subject:** | Solar for All Grant Closeout Instructions |

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

### Final Federal Financial Report (SF-425)
**Submission Instructions**:
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

Exhibit 8. EPA Solar for All Closeout Instructions

- o If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

<u>Final Technical Report</u>

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance <u>during the entire performance period</u> (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - o In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - o Progress towards objectives on program key performance metrics during the performance period.
  - o Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - o Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - o Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - o *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

Exhibit 8.  EPA Solar for All Closeout Instructions

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 9

**Exhibit 9. EPA DDO Moot Decision**

## Transmission Email for Termination Dispute Decision

EPA Dispute Decision for 5H 84090701 - Michigan Dept of Environment, Great Lakes, and Energy



Nguyen, Tiana <Nguyen.Tiana@epa.gov>
To ● McDonald, Paul (EGLE); ● Wang, Joy (EGLE)
Cc ○ Wise, Melissa; ○ Schindel, Phillip; ○ Molina, Michael
Retention Policy   Global Email Deletion Policy (7 years)          Expires   10/25/2032

😊   ← Reply   ≪ Reply All   → Forward

Mon 10/27/2025 6:02 PM

📄 MM - 5H 84090701 Michigan Department of Environment DDO Decision.pdf
296 KB

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Good afternoon,

Please see attached memorandum.

Best,

*Michael D. Molina*
Principal Deputy Assistant Administrator
Office of Mission Support

Exhibit 9. EPA DDO Moot Decision



**OFFICE OF MISSION SUPPORT**

WASHINGTON, D.C. 20460

October 23, 2025

**MEMORANDUM**

**SUBJECT:**    Update on Dispute of EPA Assistance Agreement 5H-84090701 under 2 CFR 200.340

**FROM:**    Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**    Joy Wang, Ph.D., Director, MI Solar for All Program Michigan
Department of Environment, Great Lakes, and Energy

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84090701. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 27, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.24 17:00:34
-04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

EXHIBIT 10

**Exhibit 10. MI SFA Closeout Objection Letter**



TATE OF MICHIGAN
## DEPARTMENT OF
## ENVIRONMENT, GREAT LAKES, AND ENERGY
MATERIALS MANAGEMENT DIVISION



GRETCHEN WHITMER
GOVERNOR

PHILLIP D. ROOS
DIRECTOR

From: Joy Wang, Ph.D., Director, MI Solar for All  JHW
Michigan Department of Environment, Great Lakes, and Energy
525 West Allegan Street
P.O. Box 30473
Lansing, MI 48909-7973

To: Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC  20460

CC: Michael Molina, Bryan Fiedorczyk, Hazeletta Burgess, Julie Zavala, and Paul McDonald

Date:   November 4, 2025

Re:     Objection to Closeout of EPA Assistance Agreement FAIN 5H-84090701

Dear Mr. Brown:

On September 5, 2025, Michigan Department of Environment, Great Lakes, and Energy (EGLE) submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement FAIN 5H-84090701 pursuant to 2 C.F.R. § 1500.15.  Despite that timely dispute, on October 1, 2025, EGLE received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that EGLE complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment."  EGLE has now received EPA's letter dated October 23, 2025, purporting to declare moot EGLE's "dispute regarding the termination of Assistance Agreement 5H-84090701."  The sole basis for EPA's mootness determination is that EGLE is a "party to a lawsuit concerning the termination of [its] grant" and the "initiation of legal proceedings supersedes the internal EPA dispute resolution processes."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that EGLE close out Assistance Agreement FAIN 5H-84090701.

As an initial matter, clarification is needed because EPA's letter dated October 23, 2025, references "your dispute... submitted on August 27, 2025."  But EGLE did not submit its Part 1500 dispute on August 27, 2025.  Rather, August 27, 2025, is the date that EGLE submitted its 21-day Notice of Disagreement in accordance with EPA's Assistance Amendment dated August 7, 2025.  Thus,

**Exhibit 10. MI SFA Closeout Objection Letter**

it is unclear which of EGLE's disputes EPA has rendered "moot." EGLE disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending. EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation. We request that EPA reverse its mootness determination and allow the administrative dispute to proceed. At a minimum, EPA should stay the administrative dispute until the conclusion of the lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of EGLE's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, the State of Michigan has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require EGLE to close out while litigation is pending that directly concerns EPA's termination of this grant. Cf. 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." EGLE has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated $144,560,283.65 from EGLE's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, EGLE has not been able to complete the work required under Assistance Agreement FAIN 5H-84090701. Accordingly, EPA necessarily cannot "determine that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

EGLE does not agree to close out Assistance Agreement FAIN 5H-84090701 while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00 pm on November 5, 2025. Please send receipt confirmation to Joy Wang at WangJ5@michigan.gov. Thank you for your time and cooperation.

# EXHIBIT 11

**Exhibit 11.**

## Average Residential Electricity Rate Comparision
### Michigan versus Midwest States and U.S. Average

Data from Electric Sales, Revenue, and Average Price, T6 Residential Sector
Retrieved on August 22, 2025, from U.S. Energy Information Administration website at:
https://www.eia.gov/electricity/sales_revenue_price/

| Michigan Average Residential Electricity Rate (cents/kWh) | 26.00 |
|---|---|

| Division 3: East North Central | Average Residential Electricity Rate (cents/kWh) |
|---|---|
| Illinois | 14.56 |
| Indiana | 14.71 |
| Michigan | 26.00 |
| Ohio | 14.71 |
| Wisconsin | 13.55 |
| Division 3 Average without Michigan | **14.38** |
| Division 3 Average with Michigan | **18.26** |

| Division 4: West North Central | Avgerage Residential Electricity Rate (cents/kWh) |
|---|---|
| Iowa | 13.39 |
| Kansas | 14.85 |
| Minnesota | 13.84 |
| Missouri | 13.1 |
| Nebraska | 10.77 |
| North Dakota | 10.49 |
| South Dakota | 11.67 |
| Division 4 Average without Michigan | **12.59** |
| Division 4 Average with Michigan | **14.26** |

**Michigan Average Residential Electricity Rate Comparison with Midwest and U.S.**

| Averages without Michigan | Average Residential Electricity Rate (cents/kWh) | MI/Average |
|---|---|---|
| Midwest | 13.48 | 1.93 |
| U.S. | 14.17 | 1.83 |
| Averages with Michigan | Average Residential Electricity Rate (cents/kWh) | MI/Average |
| Midwest | 15.20 | 1.71 |
| U.S. | 14.41 | 1.80 |

# EXHIBIT 12

## Exhibit 12. Select Comments from MI Solar for All Interest Form

MI SFA received 1,266 interest form responses from individuals interested in participating in MI Solar for All. Select comments are excerpted below. All are copied as submitted.

**Expensive Bills**

- My kids & I are currently living with no electricity due to an outstanding thumb electric bill of 2,200.00. average monthly light bill is 5$00

- I am very low income. I struggle with my energy bill. This month alone it's $333! I'd also prefer to reduce my carbon output. I'm open to any programs that can help with energy usage. I'm a single mom, in process of divorce and struggling to make ends meet. Please help!

- Our electric bill is $500 per month.  We are looking for any funding, grants, or programs to help us install rooftop solar panels.  Our roof top almost always has sun.

- My energy bill to consumers is $500 a month during summer. I can't afford this. Its outrageous. Please help

- Interested in the program that helps pay for solar. We pay between 300-600 per month in electricity each month.

- My 900 sq ft home uses roughly $1500 (annually) in propane for heat. Propane companies have minimum fill requirements that are difficult - and often impossible - to meet on my Social Security income, leaving me at the mercy of electric heaters until I can afford propane. If I had to rely on electric heat only, my heat bill would exceed my annual propane cost in under 4 months, based on my actual usage as described above. With that in mind, solar panels would be monumentally beneficial, allowing me to stretch my income to meet other needs.

- I'm low income and my electric bill keeps getting higher. I have trouble affording to pay my electric bill every month. I'm receiving assistance from the state of Michigan with paying my electric bill this month. I've wanted to install solar for a long time but have had a hard time finding solar products and installation that is affordable to me. I really hope to be able to afford to switch to solar soon and any kind of assistance would be a help.

- My electric bill is over $400 a month that is taking a good chunk out of my SSI payment

- Currently have a average electric bill of 3-400$ month. Going solar is a dream.but my credit isn't good enough for any recent installers.are there any low income offers for going solar

- I am a teacher and my husband is a CT Technician, we have 3 beautiful children and are struggling with paying high energy costs. We would love to get solar but cannot afford to pay for it on our own. We would love to be considered as a recipient. Thank you so much!

- We have UPPCO for power and the cost is outrageous

- I'm sending this in for my daughter who is working, just bought her first home 2yrs ago, has 2 children at home, has a heart of gold, works so hard at work and home and I feel she very much deserves and would be so grateful for any and all breaks she may be eligible for. I am retired now living on 950.00 a month Social Security making me unable to help her financially so yes, help would be a Godsend. Thank you for your time.

- I am a single dad in need of a new roof, and sometimes when your low income its ok to ask for help. I came across this article, and was ecstatic how beneficial this could be in so many ways for not just my family either.

- We have been looking into solar energy to offset our electrical costs. We had heard that it would pay for itself but it looks like it's more expensive than we were aware. We're trying to see what options are out there for lower income families. We are making more than last year but everything is continuing to be more expensive.

- Energy bill unaffordable looking for relief

- I am interested in this solar panel program because my energy bill is too expensive and I'm suffering a hardship trying to see what resources that this program may offer so that I can get my home solar panels.

- Super interested in this program! My electric bill is running between $200 & $250 per month. Will the cost of this be shared with the resident or will it be covered 100%?

- Hello, I am a low income homeowner. I am very interested in the possibility of installing solar panels in my home as the light bill is very expensive for me home. I would be extremely grateful to hear back from you guys about any potential grants that would facilitate me with the installation of solar panels. Hope you guys are having a blessed day.

- My electric and gas are costing me around 1600 a month and I'm on social security. I can't afford to live.i need a program that helps people that can't afford there energy bills and needing help to get solor

- I was wondering if I would qualify for the free solar system I saw on my local news station last evening, through the EGLE program as they said there would be up to 15 households chosen in the U.P. I have UPPCO for my service provider and I pay $200.00 a month on budget program and my wife and I only have our social security for income.

- On the surface this appears like a fantastic program that will not only help low-income households like mine, but make a start on lessening our reliance on grid based power and fossil fuels.  I'm excited the program is coming to Michigan and hope to be a part.

- Im interested in having solar, we loose power often and would also like to lower our use of fossil fuels and lower our energy bills

**Elderly/Disabled/Residents with children**

- We live in a multi-generational home with an aging parent and multiple children, including one that is totally and completely disabled, blind and dependent on equipment that needs electricity. We have one income and would like information on assistance with solar to help with rising energy costs. We would also like information on energy storage since our child is dependent on machines to aid him.

- I am interested in the solar program to help lower my high electric bills. My electric bills average 200.00 or more a month. We are in our sixties, and on SSDI limiting our income greatly.

- I'm disabled and finally buying my own home! I'm wanted to reduced my energy usage as much as I can because I required a lot of power for my needs and solar would be fantastic! Thank you

- It's just me and my mother she is in stage 4 copd and the bill are so expensive trying to do it alone please help god bless you

- On disability and have medical equipment. Excell energy is $500 month. To be mostly independent from them would be a blessing!

- I'm a disabled veteran who is currently unemployed. I was looking for ways to get solar.

- I am on disability with a young child ar home. Pur electric bill has gone over $200 a month. Our electric usage has almost doubled and I cannot figure out why. We are not able to pay this every month anymore. Solar would save us!

- I am a disabled veteran that moved to the state for property tax reasons. I am unemployed and live off my military disability.  Anything that would increase the energy efficiency of the house and therefore bring down my monthly costs would be immensely helpful. Thank You!

- I'm interested in getting solar, but I'm disabled and could never afford it without some sort of help, so I thought I'd try this. Thanks for all that you do to help people!

- I am very interested in solar power to save energy costs and the environment. My wife has copd and disabled from working. I am planning on retiring in a couple years and this program would be very helpful in my retirement years. Thank you for creating this and I hope to hear from you.

- Unemployed senior, trying to make ends meet and make my house more efficient

- I am low income family , I only can work part time due to major medical medical issues including an aneurysm on my brain. I can not get unemployment and I can not get social Security disability I do not qualify for anything at my job for help. I do qualify for any kind of help at all I am receiving some food stamps but not much. I have a family of five. I make only $13 an hour at less than 20 hours a week if I get 20 hours a week at my job I'm lucky right now because of my medical issues that have been been increasingly getting worse and that I have gone through surgeries to repair, but even if surgeries are not guaranteed repair the damp damage that I have my electric company is trying to charge me over $400 a month and there's no way I can afford this

- As a senior citizen, and retired public servant on a limited income, I would appreciate the benefits of assistance with the cost of heating my small home.

- Low income Disabled vet interested in home solar power

- I feel this is probably a waste of both of our time.  I live with 2 other seniors who only receive minimal SSA & 1 is on Medicaid (she has MS and is my dependent). I am supporting 3 people on my SSA(disability) & pension.  If Mr Trump does any cuts to SSA &/or Medicare I am deeply concerned about my ability to maintain the household.

4

**Geographic Spread**

- I am interested in obtain a grant for solar energy system. We are in a forested area and get 6-7 outages annually that last 24hours to 7 days.

- I think this will be a great program and help to residents in small lower income communities like mine.  I am a single mother on a fixed income plus a caregiver of an elderly parent.  We are somewhat rural and have outages several times a year including during our U.P. winters.  Expanding solar energy collection to as many residential rooftops as possible is a great idea, every home is like another solar power plant without the expense and environmental impacts of building more solar plants.  It also can decrease energy costs to residents.  I've been hoping to find a way to add solar power and be more climate friendly but it's just too unaffordable for our family.  Low income residents who could benefit the most just will never afford to participate in solar energy production without some financial assistance.

- My wife and I live in a home here in Merritt that has ridiculous over priced electric charges, like $230 a month. We are retired, I only get $1300 a month SS, and my wife gets $1900, but our monthly payments are over 2300 dollars, leaving us little to get by on. We want to get solar panels on our roof to help lower the Consumers price gouging tactics, so please keep me posted on how to do this. We get full sun and have no trees to interfere, so I would like to get in on the first opportunity to get help from this program. I would appreciate any help or forms to get started as soon as they become available to find out what kind of process and cost this project would be at our house. Thanks for any kind of info that you can send us.

- DTE costs continue to rise. I need to come up with a solution that reduces that bill.

- I am interested in the solar to lower my DTE bills.   This bill is very high monthly

- I am interested in solar for my home to help reduce the crippling energy costs in the Upper Peninsula as well as reduce my family's impact on the environment.

- I am in the process of moving to Gladwin.  I have a small cabin that is getting built and the move will happen this summer.  My income is extremely low and I will be on SS in a year and a half.  A program like this would make all of the difference for me.

# EXHIBIT 13

**Exhibit 13.**

## 2023 Electric Reliability Data Comparison
for All Events (With Major Event Days)

Data from:  U.S. Energy Information Administration, Form EIA-861, 2023 Final Data

Retrieved on August 22, 2025, from: https://www.eia.gov/electricity/data/eia861/

| Rank | State | Customer Average Interruption Duration Index (CAIDI) (minutes per year) |
|------|-------|-------------------------------------------------------------------------|
| 1 | MI | 731 |
| 2 | OK | 644 |
| 3 | ME | 562 |
| 4 | KY | 463 |
| 5 | AR | 431 |
| 6 | NH | 398 |
| 7 | LA | 353 |
| 8 | MS | 334 |
| 9 | TN | 331 |
| 10 | IN | 331 |

| Rank | State | Number of Customers Experiencing Electric Outages | |
|------|-------|---------------------------------------------------|---|
| 1 | CA | 15,119,842 | |
| 2 | FL | 9,745,334 | |
| 3 | TX | 9,130,382 | |
| 4 | IL | 5,801,391 | |
| 5 | OH | 5,547,554 | |
| 6 | PA | 5,280,718 | |
| 7 | NC | 5,052,760 | |
| 8 | MI | 4,766,570 | 47.3% of MI's population |
| 9 | GA | 4,687,198 | |
| 10 | NJ | 4,224,165 | |

Note: Michigan's total population is 10,077,331.

Retrieved on August 22, 2025, from U.S. Census Bureau website:

https://data.census.gov/profile/Michigan?g=040XX00US26