# EXHIBIT 1

5H - 84089501 - 0     Page 1

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Grant Agreement

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 84089501 | |
| **MODIFICATION NUMBER:** 0 | **DATE OF AWARD** 07/09/2024 |
| **PROGRAM CODE:** 5H | |
| **TYPE OF ACTION** New | **MAILING DATE** 07/12/2024 |
| **PAYMENT METHOD:** ASAP | **ACH#** 2035 |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| DEPARTMENT OF COMMERCE MINNESOTA | DEPARTMENT OF COMMERCE MINNESOTA |
| 85 E 7TH PL STE 280 | 85 7th Place East, Suite 500 |
| Saint Paul , MN 55101-2198 | Saint Paul, MN 55101-2198 |
| EIN:  41-6007162 | |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Lissa Pawlisch | Christine Clark | Hazeletta Burgess |
| 85 7th Place East, Suite 280 | 77 West Jackson Boulevard, LL-17J | OGD-GMBOD, 3903R |
| Saint Paul, MN 55101-2198 | Chicago, IL 60604 | 1200 Pennsylvania Ave, NW |
| **Email:** lissa.pawlisch@state.mn.us | **Email:** clark.christine@epa.gov | Washington, DC 20460 |
| **Phone:** 651-539-1563 | **Phone:** 312-886-9749 | **Email:** burgess.hazeletta@epa.gov |
| | | **Phone:** 202-564-1533 |

**PROJECT TITLE AND DESCRIPTION**

Minnesota Solar for All "Note: A special payment condition applies to this award. "Note: A special payment condition applies to this award"

See Attachment 1 for project description.

| **BUDGET PERIOD** 09/01/2024 - 08/31/2029 | **PROJECT PERIOD** 09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST** $ 0.00 | **TOTAL PROJECT PERIOD COST** $ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 62,450,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this award. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund |
| 1200 Pennsylvania Ave, NW Mail code 3903R | OA - Office of the Administrator |
| Washington, DC 20460 | 1200 Pennsylvania Avenue NW |
| | Washington, DC 20460 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature applied by EPA Award Official for Keva R. Lloyd - Acting Chief, Grants Management Branch | **DATE** |
|---|---|
| by Keva Lloyd - Award Official Delegate | 07/09/2024 |

5H - 84089501 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 62,050,000 | $ 62,050,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 62,450,000 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41064 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 62,050,000 |
| | | | | | | | | | $ 62,050,000 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 62,450,000 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

- MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

- Payment requests (if applicable): EPA Project Officer

- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with

local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition:*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

*__The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:__*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

*__The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:__*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

### K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

II. Additional Programmatic Terms and Conditions

A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

<u>2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs</u>

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See <u>EPA Guidance on Participant Support Costs</u>

**K. Labor and Equitable Workforce Development Requirements**

<u>1. Davis-Bacon and Related Acts (DBRA)</u>

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

    **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

    **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

    **a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

    **b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

    **c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

    "[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

    **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

    **ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

5H - 84089501 - 0    Page 24

**b. After Award of Contract**:

      **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

      **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the [EPA Build America, Buy America General Term and Condition](#), which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

<u>4. Indirect Cost Rate</u>

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

<u>5. Sufficient Progress</u>

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities*.

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

AA. Compliant URL Links

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

AB. Flow-Down Requirements

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

#### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

#### 2. Governance Requirements

#### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Minnesota Commerce Department**
**Work Plan**
**Project Period: 09/01/24 – 08/31/29**
**Date of Submittal: November 4, 2024**

**Project Title: Minnesota Solar for All**
**Grant Number:** 84089501
**Organization Name:** Minnesota Commerce Department (COMM)
**Geography:** State of Minnesota (including the 11 Federally recognized Indian Tribes)
**Definition of LIDAC:**

Beneficiaries for this project will be identified through multiple pathways:

- For single family programming, loans will be available for owner occupied housing that meets one of the following criteria:
  - Qualified borrower income is at or below 80% Area Median Income (AMI) with the income verification methodology to align with Minnesota's Housing's Fix Up Home Improvement Program Requirements Qualified borrowers are within the boundaries of any Census tract or federally recognized tribal area as defined by the Climate and Economic Justice Screening Tool (CEJST) or
  - Qualified borrowers are within census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation.
  - When utilizing geographic definitions, COMM and its partners will employ existing mechanisms to target outreach in ways that prioritize those households with high energy burdens.
- For the manufactured home strategy, LIDAC will be determined based upon income criteria for the Weatherization Assistance Program; these criteria support households with incomes at or below 200% of Federal Poverty Income Guidelines or who are eligible for assistance under the Low-Income Home Energy Assistance Program (LIHEAP) income by having a State Median Income (SMI) less than 50%, whichever is greater at the time of eligibility determination. This aligns with the NOFO eligibility to serve individuals and households with incomes at or below 80% Area Median Income.
- For multifamily lending, funding will be available to qualified affordable housing entities defined as a rental property where units meet one of the following criteria:
  - Rent and Income Restrictions at or below 80% AMI placed on units by state, federal, or local unit of government as evidenced by a document recorded against the property.
- For community solar participation, COMM will use all of the following to qualify households (and will document eligibility based on the criteria used):
  - Beneficiaries that are within the boundaries of any Census tract or federally recognized tribal area as defined by the Climate and Economic Justice Screening Tool (CEJST)

1

- o Beneficiaries that are within census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation.
- o Individuals and households with incomes at or below 80% AMI with the income verification methodology to be required as part of proposals from potential developer partners
- o Whether a household already participates to one of the social welfare programs – SNAP, WAP, etc.
- o If household resides in a building where Rent and Income Restrictions at or below 80% AMI are placed on units by state, federal, or local unit of government as evidenced by a document recorded against the property
- o When utilizing geographic definitions, COMM and its partners will employ existing mechanisms to target outreach in ways that prioritize those households with high energy burdens.
- For tribal communities, COMM will provide funding that will be distributed equally to the tribes that choose to participate. Initially, COMM will have a $909,000 cap, which is the $10 million tribal portion, divided into 11 parts. If there are Tribes that do not need the full amount, unused funds will be put into a general Tribal fund held by COMM and will be made available to other Tribes through an RFP process.

**Introduction**

**Section 1:  Project Description**

**1.1   Overview**

The Minnesota Commerce Department, Division of Energy Resources (COMM) has secured $62.45 million over five years to support residential-serving solar for over 11,300 low-income and disadvantaged households in communities across Minnesota, including the federally recognized tribal communities that share the same geography. COMM proposes to use the Solar for All (SFA) funds to provide a) $46.85M for financial assistance (grants, loans, and credit enhancements), projected to stimulate $167 million in additional investments, and b) $15.6M in supporting investments (workforce development, interconnection, and pre-development technical assistance, energy navigators, community engagement and education, and administration). COMM estimates that the residential-serving solar projects funded through the SFA will provide significant household energy savings of at least 20% and reduce greenhouse gas emissions (approximately 90,000 short tons of $CO_2$ annually).

**1.2   Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**

2

**Table 1**
**Environmental Results - Outputs and Outcomes**

| | Number of households served | Generation Capacity (MW-AC) of new solar** | GHG Emissions Reduced & Avoided (CO2 emissions in short tons) | Household savings per household ($) |
|---|---|---|---|---|
| Residential Solar* | 2,195 | 9 | 16,700 | $140.50 |
| Community Solar | 8,150 | 34 | 68,000 | $228.00 |
| Tribal | 960 | 2.5 | 4,500 | $228.00 |

*Includes single family, multi-family, and manufactured homes
** All solar identified herein with be new solar implemented as a result of Solar for All.

Workforce/Apprenticeships: COMM will provide $295,000 to fund stipends for trainees to support travel and related expense to allow new workers access to training including paid apprenticeship opportunities and NABCEP certification. COMM will track the number of new workers it provides support to and the success rate of these workers obtaining certification and finding paid opportunities in the clean energy sector.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change
  - Objective 1.2: Accelerate Resilience and Adaptation to Climate Change Impacts
  - Objective 1.3: Advance International and Subnational Climate Efforts
- Goal 2: Take Decisive Action to Advance Environmental Justice and Civil Rights
  - Objective 2.1: Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels Objective
  - Objective 2.2: Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and Activities
- Goal 4: Ensure Clean and Healthy Air for All Communities
  - Objective 4.1: Improve Air Quality and Reduce Localized Pollution and Health Impacts

**Section 2:  Project Design Plan**

**2.1 Activities to be Conducted**

- Meaningful benefits: As described more fully in 2.2, Minnesota will deliver households savings of 20%. Key features of the meaningful benefits activities include:
  - Low-Income and disadvantaged households' access to solar: Design of an Energy Navigators program to serve as community-based advocates and educators. COMM will work with CBOs and non-profits that have established trust relationships in the communities they serve. Additionally, COMM will lead a pre-qualification process to vet solar companies to be certified Minnesota Solar for All installers to protect consumers and support consumer confidence in the program.

- o Resilience and grid benefits: Where appropriate, COMM will work with communities that may benefit from energy resilience and savings from solar with storage, especially vulnerable households, critical facilities, and geographically isolated households such as those on Tribal land. COMM is already discussing with several Tribes the possibility of adding storage to provide energy security and independence.
  - o Workforce Development: As part of the pre-qualification process, COMM will encourage solar installers to provide apprenticeships and/or hire installers from disadvantaged communities.
- Financial Assistance: As described more fully in section 2.3, the financial assistance activities will span five key programmatic areas.
  - o Single family: $2 million will be used for credit enhancements designed to provide a direct-to-consumer interest subsidized loan for the deployment of on-site solar in low-income and disadvantaged single-family homes. Credit enhancements will take the form of a Loan Loss Reserve (LLR) and an Interest Rate Buydown (IRB). Utilizing the Minnesota Housing "Fix-Up Home Improvement Loan Program" as a model, the LLR and IRB, along with ITCs that local lenders will capture on behalf of low-income households, the overall cost of the loans for the households will be decreased, mitigating risk.
  - o Manufactured homes: COMM will allocate $1 million for a program aligned with Minnesota's Weatherization Assistance Program (WAP), specifically functioning as an extension of the WAP's Community Scale Pilot Project (CSPP), to support the deployment of ground-mounted solar alongside weatherization measures using CSPP's existing community-based model. The Solar for All Weatherization Assistance Program (SFA-WAP) will service CSPP's pre-identified manufactured home communities, pre-qualifying households using the WAP criteria, and coordinating outreach and technical assistance through the WAP existing partner network.
  - o Multifamily: These activities will be implemented through the Publicly Owned Housing Program (POHP) and/or the annual Consolidated RFP or relevant RFP.
  - o Community Solar: $23.85 million will be allocated to create and administer targeted financial assistance, including specialized bridge loans and project loans for community solar that prioritizes community ownership across the state.
  - o Tribal: All 11 Tribes will be allocated an equal amount initially to deploy in their respective communities and at their discretion, within the terms and conditions of Solar for All. If any Tribe does not utilize their full allocation, the remaining amount will be made available to the other Tribes through an RFP process.
- Technical Assistance: As described more fully in section 2.4, key technical assistance activities will include: technical assistance to support communities with solar deployment planning, solar+storage assessments, project pre-development, interconnection design, or engineering review work to advance projects. Additional efforts will focus on technical assistance to bring down the soft costs (group buys, mapping tools) and to make deployment scalable (permitting assistance, financial and legal support, open-source billing tools).
- Education and Outreach: As described more fully in section 2.5, COMM will engage with communities across the state to deliver equitable access to SFA programs, with key activities including:

- o COMM will work with established methods of engagement that are currently in use for other energy programs, including engagement and education through the Energy Assistance and Weatherization Assistance network of service providers. COMM has existing networks of partners through the Clean Energy Resource Teams (CERTs), GreenStep Cities, Regional Development Associations, Community Energy Network, and the Minnesota Rural Electric Association and Minnesota Municipal Utilities Association to connect with local jurisdictions, community-based organizations, and local utilities. COMM will utilize proven tools that are part of its robust outreach and education processes including website, and community-based engagement. COMM will also create an Energy Navigator program in conjunction with the Home Energy Rebate program. The Energy Navigator trainings will provide communities with education and information to help determine eligibility for low-income energy programs and create best practices for engagement with particular communities.

- Compliance, Management, and Administration: As described more fully in section 3, COMM has well-established procedures to ensure strong fiscal stewardship of all of its programs, SFA included. COMM will build out additional monitoring and verification procedures to help ensure that COMM and its program partners deliver the program's meaningful benefits in full.

## 2.2 Meaningful Benefit Plan

COMM's proposed SFA program is committed to creating high-quality, middle-class job opportunities in the energy industry. The proposal's goal is to nurture workforce development, establish robust labor standards that include guaranteed safe working conditions, and protect the right to unionize within this industry. COMM plans to ensure that such benefits are accessible to a diverse population.

COMM will deliver on average a 20% reduction in energy bills for residential participants by using several approaches, including requiring that financial assistance provided in each program area results on average in a 20% reduction in electric bills by establishing processes for estimating bill savings calculations. These calculations will not only include direct savings on electric bills but also any additional household expenses incurred as part of program participation such as necessary roof repairs. These calculations will also include indirect household benefits such as improvements in household energy efficiency, detailed in the subsections below. For community solar, projects will be required to document 20% bill savings for households in their applications for funding.

In cases where low-income and disadvantaged households may need to cover upfront costs before reaping the benefits of projects, COMM will monitor implementors of SFA funds to ensure estimations of bill savings are realized. Ongoing monitoring will measure how participants continue to benefit from the promised savings throughout the duration of the program.

### 2.2.1. Greater household savings

The proposed program is committed to delivering 20% household savings through a combination of strategic approaches:

- Energy Efficiency Upgrades and Beneficial Electrification: COMM will encourage participating households to use new and existing programs for energy efficiency, including through the COMM-administered Weatherization Assistance Program, COMM-administered the Home Efficiency Rebate and Home Electrification and Appliance Rebate programs, utility- administered efficiency programs, and other new programs being spurred by federal investments directed to households and local jurisdictions. These programs can support complementary energy efficiency assessments for participating households by identifying and implementing energy-saving measures, such as improved insulation and air sealing, LED lighting, and more efficient—often electric—appliances like heat pump water heaters. Minnesota already allows installation of cold-climate air source heat pumps as part of federally funded Weatherization Assistance Program projects in homes where baseboard or ducted electric resistance is the primary heat source and where this heat source will remain as a back-up heat source. Additionally, COMM is implementing complementary programs to support beneficial residential electrification, including a new heat pump program for income eligible households, that will help to reduce household energy burden when paired with SFA Financial Assistance Programs.
- Solar Installation Cost Mitigation: To ensure affordable access to solar energy, COMM will pre-qualify solar installers who can provide competitive pricing and streamline installation processes, which in turn will help minimize upfront installation costs.
- Standardized Financing: By establishing standardized contracts between solar developers and lenders, COMM will reduce soft costs associated with financing, which will result in lower interest rates and fees.
- Credit Enhancements: The proposed program will leverage credit enhancements using SFA funds to reduce financial risk for lenders to encourage lenders to offer more favorable terms and conditions to homeowners, including lower down payments, lower interest rates, and longer repayment periods.
- Multifamily Housing Providers: For multifamily housing, the proposed program will work closely with multi-family housing owners to fulfill the requirement that a portion of the cost savings from solar are passed on to tenants to achieve an average savings equivalent to at least 20% of electric bills.

### 2.2.2. Low-Income and disadvantaged households' access to solar

The proposed program is designed to increase access to solar for low-income and disadvantaged households, especially to those traditionally underserved by such initiatives such as renters, manufactured home residents, and Tribal communities. COMM recognizes the importance of working with established local outreach and financing institutions, such as community action partnerships, community-based financial institutions, local jurisdictions and CBOs. COMM will build on established structures throughout the program. To bridge the gap between potential participants and the program, COMM proposes to establish an Energy Navigators program. Energy Navigators will serve as community-based advocates and educators, working directly with low-income and disadvantaged households. They will also guide individuals through the process of

accessing financial assistance and provide technical information on options for project deployment and address any concerns or barriers they may encounter. COMM is deploying several initiatives to leverage community-based outreach networks to support other deployment activities spurred by new federal, state, and local policy, such as the Home Efficiency Rebate and Home Electrification and Appliance Rebate programs. The Energy Navigators program will span these varied efforts by leveraging funds from these connected efforts.

Complementing these engagement and outreach strategies, COMM will lead a pre-qualification process to vet solar companies to serve as qualified installers as part of the proposed SFA Financial Assistance Strategy. This process, which builds upon previous work developing solar master contracts to serve units of government, will support consumer confidence in working with a solar contractor. This process will establish terms of contractor participation including but not limited to workforce and reporting requirements, customer engagement requirements and prohibitions, and savings requirements. Any company with a history of deceptive practices or pending legal actions will be disqualified. This approach will provide additional consumer protection and consumer confidence, lowering this barrier to participation. Additionally, the pre-qualification process will support achieving the workforce development and entrepreneurship Meaningful Benefit by connecting pre-qualified contractors to apprenticeship programs and the recruitment of workers from underrepresented backgrounds.

### 2.2.3.  Resilience and grid benefits

COMM's proposed program recognized that adding distributed generation to nodes across the grid provides resilience benefits. For example, community solar projects fund upgrades to local feeders contributing to resilience. COMM's approach will also continue to assess prudent opportunities to enhance energy resilience through strategic deployment of energy storage systems. COMM and its partners are assessing whether there could be strategic deployment of storage with multi-family properties. Minnesota has two state level funds to support distributed storage deployment at capacities up to 50 kWh. A portion of these funds has been set aside for income eligible applicants – including in connection with WAP - as well as for tribal nations and will align well with Solar for All efforts. In addition, COMM will continue to work with local utilities to evaluate how storage could be strategically deployed to reduce demand charges, thereby providing financial benefits to a local distribution utility and both resilience and cost effectiveness to a low-income community solar deployment. Utilities have already articulated the potential benefits this could deliver, but sizing will need to be evaluated on a utility system and project specific basis. Storage will only be included with associated SFA funded solar installation.  Similarly, COMM will work with the individual Tribes on solar plus storage system designs that could allow tribal partners to maximize solar deployments and strategically local microgrids to add to tribal resilience, if they determine this would be a benefit to their plan. COMM's strategy will address creating capacity to deliver power to low-income & disadvantaged households during a grid outage.

### 2.2.4.  Household and community ownership

COMM's SFA plan commits to maximize household and community ownership models that support low-income and disadvantaged households and communities building equity in projects. Numerous examples already exist in Minnesota, including community land trusts and housing cooperatives

serving as community pathways to support residential solar adoption. Similarly, there are existing cooperative businesses currently advancing community solar with cooperative members owning, as well as participating in, the solar gardens. COMM will continue to work with partners to further refine a shared definition of community ownership that will incorporate the principles of this Meaningful Benefit. Importantly, COMM will seek to build agreement around the definition to include a range of models in which equity is owned or eventually owned by a household or a collective apparatus of a community, that returns benefits to households or communities, and that allows for community governance. An agreed upon definition of community ownership already includes ownership by many types of CBOs (e.g., cooperative businesses, housing cooperatives, rural electric cooperatives, municipal utilities, local governments, and Tribal governments or organizations), but how consumer-controlled limited liability companies or models that flip ownership back to a community-based organization after a specific number of years requires further discussion.

In recognition of the required community-based capacity to implement effective and scalable community-ownership models, COMM will continue assessment during the implementation of the program to explore expanding eligibility for financial assistance for community solar to third-party owned projects that can deliver the other aspects of COMM's Meaningful Benefits Plan at scale. By considering eligibility for third-party owned projects that deliver other Meaningful Benefits, the proposed plan will increase the likelihood that all designated financial assistance can be deployed within the period of performance. Similarly, COMM will work to design financial assistance for household ownership of single-family home solar. The Financial Assistance Strategy of credit enhancements will support solar leases and loans that will enable households to build equity in projects and eventually transfer ownership to the household after a predetermined period.

### 2.2.5.   Workforce development and entrepreneurship

COMM's commitment to investing in quality jobs and businesses aligns with the Administration's Good Jobs Principles and Executive Order 14082: Implementation of the Energy Infrastructure Provisions of the IRA. COMM will work closely with labor unions, developers, contractors, and other partners to create a synergistic environment that will foster job quality and business growth. An example is working with contractors to require their commitment to remaining neutral in union organizing operations. COMM's goal is to implement policies and procedures that uphold the highest standards of job quality and worker well-being. This includes family-sustaining wages, health care benefits, plans to prevent wage theft and exploitation of vulnerable workers, potential partnerships with registered apprenticeship programs, predictable work schedules, retirement contributions, safe working conditions, and the guarantee of a free and fair choice for workers to join a union. Additionally, COMM encourages the use of Project Labor Agreements (PLAs) when appropriate, which can establish clear terms and conditions for workers.

As part of an effort to encourage hiring in disadvantaged communities, COMM may establish incentives for pre-qualified contractors and installers to hire workers from those communities and/or to participate in local apprenticeship programs that provide opportunities to residents in disadvantaged communities.

COMM has dedicated funding to support these and other training efforts that invest in workforce

development, support essential community and tribal partners, and provide economic opportunities that promote equity within low-income and disadvantaged communities.

## 2.3 Financial Assistance Strategy

SFA funds will be used to leverage additional funding sources and maximize the number of households benefitting from rooftop and community solar. SFA funds will be extended to five tranches: single family credit enhancements, manufactured housing grants, multifamily deferred loans, community-owned community solar lending, and Tribal development funding, as shown in Table 2. COMM is dedicating $46.85 million, 75% of its award, to its financial assistance programs.

**Table 2. Summary of Financial Assistance Program Areas**

| Financial Assistance Program Areas | Amount Invested | Est. Deployment (MW-AC) | Est. Households Impacted |
|---|---|---|---|
| 4.1.1. Single-Family Home Credit Enhancements | $2.0M | 0.90 | 225 |
| 4.1.2. Manufactured Home Grants Aligned with Weatherization | $1.0M | 0.20 | 70 |
| 4.1.3. Multifamily Deferred Lending | $10.0M | 7.90 | 1900 |
| 4.1.4. Community-Owned Community Solar Lending | $23.85M | 34 | 8,150 |
| 4.1.5. Tribal Development Funding | $10.0M | 2.5 | 960 |
| **Total** | **$46.85M** | **45.5** | **11,305** |

For all programs, COMM will consider long-term impacts of the physical plant itself by working with installers to physically maintain the arrays throughout their lifetimes, and then recycling the panels at the end of their lives. COMM has existing processes through community solar garden operations to collect annual reports from gardens that it will also use with Solar for All to ensure on-going operation. For other projects site visits, follow-up with partners, and compliance checks will all be part of ensuring on-going operations. Regarding panel end of life, Minnesota has advanced legislation to implement a reuse and recycling process for solar panels, and there are related working groups that include industry representatives to also help identify long-term impacts of SFA investments.

Through the Minnesota Climate Action Framework, COMM will work with the Minnesota Pollution Control Agency on programs to keep solar panels out of landfills by recycling reuseable materials and safely dispose of toxic materials.

### *2.3.1*    *Single Family Credit Enhancements*

For single family homes, $2 million will be used for credit enhancements designed specifically to catalyze additional financial resources for the deployment of on-site solar in low-income and disadvantaged single-family homes. These credit enhancements will take the form of two instruments: a Loan Loss Reserve Fund (LLR) and an Interest Rate Buy-down (IRB). COMM's approach leans on strategic collaboration with Minnesota Housing, which has ready- to-deploy capital pools and statewide networks of lenders who already close hundreds of loans including millions of dollars annually for solar installations. These entities will serve as intermediaries, amplifying the impact of SFA credit enhancements by leveraging other public and private financings, grants, tax incentives, and additional credit instruments. The goal of this strategy is to offer homeowners favorable financing terms and conditions in the form of a reduced or zero down payment, lower interest rates and monthly payments, and extended repayment periods that facilitate the adoption of solar for single-family homes that reduces electricity bill payments by an average of 20%.

The key financial assistance strategy and the mechanism to which the majority of funding for single-family homes will be allocated, is to provide an IRB that can significantly reduce the cost of solar leases and loans for low-income households and disadvantaged communities. Under the proposed structure, solar leases and loans will be financed by local lenders, such as community development financial institutions (CDFIs), credit unions, and private banks. COMM and its partners will buy down the interest rate for these lenders to enable solar leases or loans. COMM and Minnesota Housing currently utilize an IRB in tandem with a LLR in an energy "Fix-Up Home Improvement Loan" program, Energy Loan Plus. This Program has successfully provided low-interest loans to low-income households, mitigating the cost and risk to those households through the IRBs. By combining the IRBs with the ability of lenders to capture the ITCs on behalf of the low-income households, the overall cost of the project to the homeowner is decreased, which limits the risk of default by those households. This approach will enable low-income and disadvantaged households with limited tax liability to receive a substantially higher share of tax credit value. Additionally, to align incentives and enable the greatest opportunity for accessing investment tax credit adders, the program will offer greater IRB support, including a greater share of tax credit value to be retained by lenders, if lenders pursue additional investment tax credit adders (available under IRC Section 48) on behalf of households. This program design will provide a monetary incentive for lenders to maximize bonus tax credit incentives on behalf of households who cannot themselves access these tax credit address to deliver the greatest affordability Meaningful Benefit. For example, for lenders that are able to secure more than a 40% investment tax credit, lenders could be allowed to retain between 5-10% of the tax credit value, prorated to the level of tax credit secured, to cover their administrative and customer acquisition costs. COMM anticipates that this approach to monetizing the investment tax credit through the lender can be used to buy down the principal of a solar lease or loan by 30-50%, significantly reducing the monthly payment households make, so that they can achieve an average of 20% bill savings.

COMM will work with stakeholders to ensure the ability of using an IRB to achieve 20% electric bill savings in the Minnesota context through solar leases and loans. If it is determined that an IRB (coupled with the LLR described below) is insufficient to achieve the affordability Meaningful

Benefit, COMM is prepared to pursue additional funding pathways, outside of Solar for All, to provide a direct subsidy program to lower upfront costs. COMM will also work with stakeholders to develop pathways for households to eventually own solar projects supported by SFA enhanced leases and loans, including an assessment of the need for rebates for ownership transfers in the case of leases.

A new state "green bank" was enacted in 2023 and capitalized with $45 million in initial state appropriation for climate mitigation and adaptation activities across the state. The state's credit unions are active in clean energy development, having already formed CU Green to help create home solar loans. At least one National Clean Investment Fund recipient plans to provide direct household solar lending, and several Clean Community Investment Accelerator funding recipients are likely to be similarly positioned to provide direct household lending. Through the duration of the program, all of these institutions will be engaged to increase the ability of Minnesota's credit enhancements to attract and mobilize these additional sources of capital to scale single-family solar deployment.

The proposed credit enhancements are complemented by other policies in the state. Noteworthy among these is Xcel Energy's Solar*Rewards program that provides incentives to projects throughout its service area in the form of upfront or ongoing solar incentives, including higher levels of incentives for income qualified households. A number of other electric utilities across the state also offer solar incentives. If COMM were to secure additional funds for a direct subsidy program, it would target utility territories where complementary programs do not currently exist.

In addition, in the 2023 session, the Legislature allocated over $38 million for weatherization and pre-weatherization work to serve more Minnesota households, and established a $6.5 million residential electric panel upgrade program aimed at households below 150% AMI to cover up to 100% of the cost to upgrade a building's electrical panel, as well as two battery storage incentives programs for a total of $7 million. COMM administers all of these programs and, coupled with new federal Home Energy rebates (which COMM will also administer) and tax credits for efficiency and electrical panel upgrades, can help facilitate enabling upgrades to support solar deployment and increase energy affordability. Because the state has pre-existing incentives for panel upgrades and other technical upgrades, COMM does not envision providing financial assistance for upgrades with SFA funds; however, technical assistance can help lenders bundle solar with other home energy upgrades. Of note, should any enabling upgrades be funded with Solar for All funds, they will only be funded in conjunction with a solar investment. Additionally, any enabling upgrades will be: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project.

COMM also anticipates coupling the single-family program with the proposed Energy Navigators program, promoting access to the program across the state. The Energy Navigators will help weave different strands of project funding beyond solar together, as well as technical assistance, with potential participants (such as the WAP, home energy rebates, and the LIHEAP) ensuring that the program will maintain affordability for low-income and disadvantaged households in general. Energy Navigators will also support efforts to target high energy burden households (e.g., residents of manufactured homes, households who heat with propane) within CEJST census tracts or census block groups identified through EJScreen.

In addition to the IRB, COMM also proposes to establish an LLR that will act as a fund that cushions

against future default losses, assuring lenders that a portion of potential losses on loans made under the program would be covered. The LLR will reduce the perceived risk of lending to low-income single-family homes. The LLR is intended to support Minnesota Housing to leverage funding for single family residential solar from other financial institutions.

### 2.3.2    Manufactured Home Grants Aligned with Weatherization

Manufactured homes form a significant part of Minnesota's housing landscape, and they come with unique challenges and requirements. Minnesota is home to 724 residential manufactured home communities, located with more than 43,000 home sites, as of 2021. COMM will allocate $1 million for a grant program to the WAP to support the deployment of ground-mounted solar alongside weatherization measures. This approach will allow residents of these homes to tap into sustainable energy sources, further reducing their dependency on other costlier and less reliable energy sources.

While the WAP has had funds that can be directed towards rooftop solar installations since 2018, the structural intricacies of manufactured (as well as single-family) homes often make it unfeasible for them to bear the weight and integration of such installations. This has resulted in a relatively small number of homes (< 50) to be fitted with solar via the traditional WAP model. Moreover, those homes that have been fitted with solar have run into some issues such as a gap in funding available for labor to fix any warranty or other system issues that occur on occasion. These are challenges but also opportunities for innovative solutions.

The SFA-WAP grant program is envisioned as a strategy to bridge these gaps, creating opportunities for these households to receive the Meaningful Benefits of solar energy. For example, designing the program to install ground-mounted solar arrays on eligible households allows SFA-WAP to bypass the structural limitations of manufactured homes. SFA-WAP will also partner with the WAP partner network, including the local WAP Service Providers and Clean Energy Resource Teams (CERTs) Regional Coordinators to conduct outreach, technical assistance, identify households, and distribute RFPs to streamline the procurement process. The process will be further streamlined by utilizing the WAP existing prequalification criteria, which requires that dwelling units be occupied by households whose income is at or below 200% of Federal Poverty Income Guidelines or is eligible for assistance under the LIHEAP income by having a State Median Income (SMI) less than 50%, whichever is greater at the time of eligibility determination. This criterion meets and can even exceed the SFA 'low-income' requirements of 80% AMI or 200% FPL, whichever is higher.

COMM additionally plans to coordinate and align SFA-WAP with the WAP Community Scale Pilot Project (CSPP), functioning as a natural extension of the project, which itself is an extension of Minnesota's well established WAP. CSPP's goal is to demonstrate a community-based approach to weatherization services through economies of scale. Nothing is inherently different about the weatherization services provided as part of CSPP except the targeted blanket outreach approach that allows the WAP Service Providers to strategically weatherize multiple clients in high-need communities compromised of manufactured homes. Contractors are therefore able to focus on the scale of work rather than the windshield time between projects. CSPP launched at the beginning of 2024 and is already seeing great success with this method of engagement. CSPP's goal is to conduct work on 80 units across 10 manufactured home communities. Through June 2024, 15 units were completed with another 15 anticipated to be done by the end of Fall 2024.

Using CSPP's existing community-based model, SFA-WAP will take a three-year staged approach, servicing CSPP's pre-identified manufactured home communities, pre-qualifying households using the WAP criteria, and coordinating outreach and technical assistance through the WAP existing partner network. COMM will implement community-wide bulk solar RFPs to select developers to install an estimated 72 ground mounted solar arrays with an average size of 3kW-DC. By issuing RFPs in these communities already serviced via CSPP, SFA-WAP will be able to pre-identify eligible homes as well as determine the total solar capacity to be installed within each community prior to putting out an RFP. Like CSPP, this model will allow SFA-WAP to take advantage of economies of scale, minimizing price premiums common for smaller residential systems.

Manufactured home residents have an energy burden of 6.71%, among the highest among households earning below 200% of the federal poverty level. As a result, these households also stand to experience among the most notable reduction in their energy bills through SFA-WAP's strategic solar deployment, —anticipated to be over 20%. This impact is even further amplified when considering that this solar deployment will work in tandem with other weatherization measures, magnifying the overall savings. Of note, should any enabling upgrades be funded with Solar for All funds, they will only be funded in conjunction with a solar investment. Additionally, any enabling upgrades will be: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project.

### 2.3.3      Multifamily Deferred Lending

$10 million will be used to create a deferred solar loan program dedicated to multifamily homes in partnership with Minnesota Housing. This initiative seeks to integrate deferred solar loans that may be forgivable into the existing frameworks of Minnesota Housing programs that serve urban and rural communities, particularly those that already facilitate property enhancements for both subsidized and naturally occurring multifamily affordable housing. These enhancements range from efficiency upgrades to pre-weatherization tasks. There are two main pathways through Minnesota Housing that could be utilized including the Consolidated RFP and the Publicly Owned Housing Programs (POHP). Other multifamily housing lenders in Minnesota and CDFIs also are prepared to distribute financing that could support solar deployment to benefit low-income and disadvantaged communities. The multifamily lending by SFA is designed with adaptability in mind. All construction and upgrades, including those related to storage, electrification, and energy efficiency, are eligible, allowing for comprehensive integration with existing funds for other property improvements, including efficiency and pre-weatherization work. The funds for associated improvements and storage will be available through the programs' particular application processes, allowing existing properties to assess which these complementary investments can deliver Meaningful Benefits. COMM will work with stakeholders to develop metrics to inform qualification of complementary investments that cost-effectively achieve resilience and other meaningful benefits.

Further complementing this are the existing state policies for multifamily solar. Xcel Energy, the state's largest utility, offers both upfront and ongoing incentives for multifamily solar. The Metropolitan Council previously provided technical assistance to help multifamily property owners install solar energy through its Solar-For-Vouchers Technical Assistance Program, a model that

could be replicated under this program.

A significant value proposition of the proposed program is its long-term impacts. The deferred loan structure, for instance, will provide a non-taxable incentive to affordable multifamily housing providers. As part of the funding agreement, the multifamily housing providers will commit to redistributing a proportional benefit of on average 20% bill savings to tenants—either directly, via rent adjustments, or other services of direct benefit to households. Already-present mechanisms for auditing Minnesota state agency funds will be used to monitor the solar asset as well.

With SFA's deferred loans integrated, COMM foresees a positive trend in upcoming funding cycles. By leveraging existing platforms, the program will optimize the number of households benefiting from the $10 million allocation over a span of 4 years. This maximizes the number of households that can be reached by using existing pathways, like a common platform (the Consolidated RFP), to advance solar with willing and able multifamily housing providers, to coordinate forgivable loan funding with other, already-utilized sources of funding, and to demonstrate the potential of solar to deliver benefits and thereby attract sustained solar adoption from more affordable housing property owners and developers.

### 2.3.4    Community-Owned Community Solar Lending

$23.85 million will be allocated to create and administer targeted financial assistance, including specialized bridge loans and project loans for community solar that prioritizes community ownership. The overarching aim of this financial assistance program area is to bolster community-owned community solar across every utility within the state.

Minnesota has one of the nation's largest community solar markets in the United States and the largest per-capita community solar market in the country. However, most of Minnesota's community solar deployment has been through the program serving customers of Xcel Energy. Despite significant overall deployment levels, the program has primarily supported third party-owned projects, with an important but relatively small minority of projects serving low-income households, renters, or community ownership models. The program has implemented major policy changes in 2024, including COMM taking over program administration, to shift the focus to serving low- and moderate-income households in Xcel territory. SFA financial assistance will leverage these changes to help to deliver the full suite of Meaningful Benefits, including requiring that all gardens deliver 20% bill savings to subscribers, in the reformed program.

In addition to supporting community solar projects for customers of Xcel Energy, this strategy will develop a variety of new loan products to foster innovative ownership models for community-owned community solar throughout the state. This initiative will also complement ongoing statewide efforts to broaden accessibility of community solar by incorporating community solar subscriptions into the state's Energy Assistance Program to reduce some customer engagement and retention costs.

COMM will transfer $23,850,000 in funds to the Minnesota Climate Innovation Finance Authority (MnCIFA) to offer a variety of financial assistance including a mix of bridge and project loans to community solar projects across the state. COMM and MnCIFA will partner to immediately deploy these financial resources. COMM expects the first round of applications to heavily feature community-owned community solar projects inside Xcel territory, given that this where the community solar market is most mature. COMM is already operating an LMI-focused community

solar program that is limited to Xcel's Minnesota territory. Projects in the program must deliver 10% savings to subscribing households with incomes below 150% AMI, and these households must make up at least 30% of every garden. Solar For All funds will be deployed to community-owned projects that go beyond the existing parameters and deliver 20% savings to eligible households. The existing program also requires documentation from developers that income eligible households meet the income requirements; COMM will utilize this existing process in Solar for All utilizing the definitions outlined above. COMM will largely align its definition of community-owned community solar with the one used by the U.S. Treasury's low-income communities bonus energy investment credit program. A facility owner will meet the ownership criterion if it is a Tribal Enterprise, an energy cooperative, a qualified tax-exempt entity, or a qualified renewable energy company (QREC) meeting certain characteristics. QRECs will be defined as entities that "serve low-income communities and provide pathways for the adoption of clean energy by low-income households" and meet multiple requirements related to equity ownership, number of employees and size, experience with development, and experience with serving low-income communities.

Beyond Xcel Energy territory, COMM expects community solar applications to primarily be put forward by Tribal entities, municipal governmental bodies (especially those with their own electric utilities) and cooperative utilities. Many of the community-based entities have recently told COMM that they are eager to move ahead quickly. With more than 180 electric utilities in the state, many with some experience with community solar, COMM expects to receive a wide variety of innovative proposals and technical assistance requests.  COMM expects the financial assistance requests to concentrate on bridge loans to help these entities navigate elective pay provisions and cost reductions to help deliver Meaningful Benefits to subscribing households and the surrounding communities. Technical assistance will need to concentrate on project sizing and siting, as well as subscription savings estimation.

Finally, in recognition of the required community-based capacity to implement effective and scalable community-ownership models, COMM will solicit applications from third party-owned projects that can deliver the other aspects of COMM's Meaningful Benefits Plan at scale. COMM's prioritization of community-owned community solar models will help deliver multiple Meaningful Benefits beyond the community ownership Meaningful Benefit itself. While program performance tracking will be critical to ensuring savings, COMM's prior experience is that building community equity in community solar projects will help to deliver additional household savings and broadened accessibility. Nevertheless, COMM also recognizes that some third-party projects may be able to achieve "above-market" levels of Meaningful Benefits in line with the goals detailed in Section 1.2 but will require an equal, if not greater, level of pre-development commitment and community agreements. Additionally, hybrid models of ownership may begin with third-party ownership and flip ownership to a community-owned instrument, which may be particularly beneficial given the limited availability of accelerated depreciation benefits to taxable entities.

Pre-development technical assistance will be provided to communities that could benefit from community-owned community solar assets. COMM will deploy technical assistance to help communities bring together applicable tax credits, federal and state grants, and assistance and education across the state. Technical assistance for community solar can also help communities identify associated upgrades, which could include distribution and transmission upgrades, alongside household efficiency upgrades for subscribers. Bringing together the investment tax credit (which can now be used for interconnection upgrades for projects less than 5 MW-AC) and

other programs will be helpful to foster the overall goal of community ownership in the program.

Within this program area, COMM will provide that funding can be used for storage resources, according to the need of the applicant and ability to provide resilience benefits to vulnerable populations and critical infrastructure. Across Minnesota, some applicants will be better able to align storage deployment with the resiliency Meaningful Benefit. COMM intends to work with technical assistance providers to support origination of projects with the greatest opportunities for delivering Meaningful Benefits with storage.

Given the revolving nature of the funds, lending products for community solar will have great impact long-term. To help create long-term change, COMM will also couple the community solar program with the proposed Energy Navigators program, to promote broad access. The Energy Navigators will help weave different strands of community and household energy project funding together with engaging potential community solar subscribers, ensuring that the program will maximize household savings for low- income and disadvantaged subscribers. Energy Navigators will also support efforts to target high energy burden households (e.g., residents of manufactured homes, households who heat with propane) within CJEST census tracts or census block groups identified through EJScreen. The Energy Navigators' help will be augmented by technical assistance with law professionals proficient in community ownership incorporation, providing expertise and education to communities around the state.

All community solar funded under this program will conform to the definition of residential-serving community solar. Specifically, all participating community solar projects will have a nameplate capacity of 5 MW-AC or less, will deliver at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and will deliver at least 50% of the benefits and/or bill credits to residential customers within the same utility territory as the facility.

### 2.3.5    Tribal Development Funding

$10 million of SFA funds will be reserved for the Federally Recognized Tribes with reservations within Minnesota's boundaries for single-family, multifamily, and community solar financial assistance programs through an approved procurement process. Additionally, some Tribes may utilize the funding for battery storage to accompany community solar.

Grants will be best spent as directed by Tribal Nations to meet their own defined and sovereign goals, while leveraging state-facilitated technical assistance and other SFA financial assistance programs as relevant. This presents an opportunity for COMM to align SFA goals to the different Tribe's specific priorities and projects goals. Initially, the $10 million in funding will be available equally to the Tribes with a $909,000 cap (i.e., $10 million tribal portion, divided into 11 parts). Based on COMM's calculations, each Tribe could serve roughly 90 households with an average of $10,000 per household. If a Tribe determines that they do not need or will not utilize that full amount, any unspent funds will be made available to the other Minnesota Tribes through an RFP.

For the duration of the program, COMM will coordinate and collaborate with individual Tribes as well as working with the Tribal Advocacy Council on Energy (TACE), a tribally run council committed to energy issues for Minnesota Tribes. COMM will also continue to have regular communication

with the Midwest Tribal Energy Resources Association (MTERA), a coalition recipient of Solar for All funding for Tribal communities in the Upper Midwest. COMM will work with MTERA to ensure that Minnesota Tribes will receive SFA funding that best serves their communities, while remaining compliant with EPA and Federal award requirements and avoiding duplication of efforts. COMM will work with both MTERA and Minnesota Tribes to ensure there is no double counting of outputs or outcomes.

COMM will work with each Tribe to make sure that all deployed SFA funds meet all eligibility requirements, while at the same time giving each participating Tribe the space to make its own programmatic determinations. The Tribes will deploy the funds across a mix of eligible uses including residential PV systems (including rooftop, pole-mounted, and ground-mounted systems), community-owned community solar, associated storage systems, and enabling upgrades. The Tribes will use a mix of grants and loan products (including bridge, term, and forgivable loans) to deploy these projects. Each Tribe will determine the exact ratios of financial products that provide the best fit to help them leverage federal tax credits and deliver Meaningful Benefits to their members. COMM will provide technical assistance throughout the deployment process to support the tribes and help ensure that Meaningful Benefits are maximized.

The proposed program complements existing state policy for Tribal energy. COMM, along with other State of Minnesota agencies, works with Tribal Liaisons to understand Tribal needs. COMM intends to leverage this structure, along with Tribal governing bodies, SFA Energy Navigators, and technical assistance staff, to promote access to the $10 million in the Tribal Development Funding financial assistance program area as well as financial assistance program areas for single family homes, multifamily homes, manufactured homes, and community solar. Additionally, COMM will engage with Tribes to explore how to leverage other funding sources, including from the state of Minnesota and the federal government, to work in conjunction with SFA funding. The proposed program will maximize the number of households benefitting from the funding while respecting tribal sovereignty by working with Tribes during the process to understand and support their goals. Tribal communities across the state have different mixes of on- and off-reservation members, along with varying ages and ownership modes of housing that need to be considered. While a community solar model may be appropriate for one Tribe, a multifamily structure layered into Tribal housing projects may be more appropriate for another.

Through Tribal consultations during the application and workplan development phases, all 11 Tribes expressed interest in receiving Solar for All funding. Through TACE and regular consultation, COMM will work with the Tribes on planning and will offer technical support to plan projects that best serve their Tribal communities. The 11 Federally recognized tribes are:

- Red Lake Band of Chippewa
- Shakopee Mdewakanton Sioux Community
- Bois Forte Band of Chippewa
- Grand Portage Band of Lake Superior Chippewa
- Fond du Lac Reservation
- Mille Lacs Band of Ojibwe
- White Earth Reservation
- Leech Lake Band of Ojibwe
- Lower Sioux Indian Community

17

- Upper Sioux Community
- Prairie Island Indian Community

Tribes will have the option to use up to 20% of the funding for enabling upgrades. Primarily located along long radial distribution lines in rural areas of the state, many Tribes are interested in resiliency strategies, including potentially through storage, and COMM commits to working with Tribes to best leverage SFA funds to meet their needs. In addition, many Tribes run or work with their own Energy Assistance and Weatherization programs, making these program implementers complementary partners to meet SFA's goals.

### 2.3.6    Complementarity with Existing Sources of Capital and Financial Assistance

COMM's Financial Assistance Strategy seeks to maximize opportunities for translating the benefits of federal, state, and utility policies for residential-serving solar into Meaningful Benefits. This includes deliberate structures to align incentives toward monetizing the federal investment tax credit to benefit low-income and disadvantaged households, advance ownership and partnership models that simplify access to complementary sources of financial assistance, and efforts to complement all SFA-related outreach with complementary outreach on other programs that can improve energy efficiency or reduce energy burden.

COMM plans to expand the reach of the Financial Assistance Strategy by tapping into the networks and expertise of well-established entities, including other state agencies and local lenders like CDFIs, credit unions, and private banks. In particular, the establishment of a state "green bank" in the 2023 legislative session comes at an opportune time, as the administration of the "green bank" can be intentionally designed to maximize alignment with COMM's proposed SFA program and other programs under the Greenhouse Gas Reduction Fund. Furthermore, COMM's proposed SFA program demonstrates a commitment to supporting both private and public source of capital, as the strategy aligns with state policies and utility programs and leverages public funding from other state agencies and MN WAP. Simultaneously, COMM will encourage private lenders to participate in solar financing by offering incentives and credit enhancements. Not only does this approach help ensure a diverse pool of capital sources, but it also reduces financial barriers for low-income and disadvantaged communities.

### 2.3.7    Financial Assistance for Associated Storage and Enabling Upgrades

Through the proposed Financial Assistance Program Areas, COMM is not setting a specific target for MWH of associated storage, but it will work to ensure that storage can be strategically deployed to improve resilience with multifamily solar, community solar and Tribal solar deployment.

COMM's priority is to deliver Meaningful Benefits of residential-serving solar to as many low-income households and disadvantaged communities in the state as possible. Considering that Minnesota's WAP and LIHEAP offer an array of energy assistance benefits to its clients, COMM plans to refer households to these programs and other existing and emerging programs state, federal and utility programs for energy efficiency, electrification, electric panel upgrades, and supporting investments. In addition, SFA outreach will also integrate outreach regarding other local programs specifically for panel upgrades and certain enabling upgrades such as roof upgrades or energy efficiency enhancements. It is COMM's priority that participants have access to additional support and resources that COMM has determined are outside of the scope of the SFA Financial Assistance Strategy. However, COMM will consider strategic pathways to support energy efficiency,

pre-weatherization, home weatherization, behind-the-meter electrical upgrades, and beneficial electrification activities especially for single-family and multifamily solar projects, utilizing no more than 20% of the total financial assistance funds.

COMM recognizes the significance of distribution infrastructure investment to enable solar deployment, especially for community solar projects. Investments that are aimed at supporting monetization of the ITC for interconnection of projects below 5MW-AC may be eligible for financial assistance, all of which aligns with the evolving federal and state landscape of solar incentives. Of note, should any enabling upgrades be funded with Solar for All funds, they will only be funded in conjunction with a solar investment. Additionally, any enabling upgrades will be: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project.

### 2.3.8    Long-Term Impacts of Financial Assistance

COMM commits to incorporating financial assistance mechanisms that will ensure the longevity of the program and lead to market transformation. Specifically, COMM envisions that each financial assistance program area can lead to long-run transformation by supporting more stable housing, more affordable access to energy services, new sources of locally tailored financing, new community and household-owned capital, self-determined Tribal energy programs, new high-quality jobs, and improved environmental quality.

COMM is committed to supporting policies that will maintain the affordability of the existing housing stock, prevent displacement of vulnerable communities, and mitigate rapid cost increases for low-income and disadvantaged communities. COMM is committed to ensuring that solar installations do not lead to an increased energy cost and will collaborate with stakeholders to assess potential project risks to avoid any unintended consequences that may lead to the displacement of households.

## 2.4  Project-Deployment Technical Assistance Strategy

The funding for technical assistance funds will be broken into two areas: workforce development, and interconnection and pre-development technical assistance, as shown in Table 3.

Table 3. Summary of Project-Deployment Technical Assistance

| Project-Deployment Technical Assistance | Amount Invested |
|---|---|
| Workforce Development | $2.6M |
| Interconnection and Pre-Development Technical Assistance | $4.8M |
| **Total** | **$7.4M** |

### 2.4.1    Workforce Development

As part of COMM's commitment to the workforce development and entrepreneurship Meaningful Benefit (see Section 1.2.5), proposed workforce development programs will expand participation

from workers in low-income and disadvantaged communities by funding training centers, workforce training, certifications, or direct training. SFA funds used for workforce development will support programmatic efforts to partner with existing registered apprenticeship programs that have a track record of graduating apprentices from underserved communities, including by supporting organizations that partner with such registered apprenticeship programs to recruit qualified candidates and help candidates and new apprentices to overcome barriers including but not limited to lack of transportation, child care, or other social supports needed to facilitate continued employment in the industry.

COMM is currently working with other state agencies, local communities, and community-based organizations to create a plan to recruit and retain participants from low-income and disadvantaged communities and to build on existing training programs. This plan will be built on a foundation of inclusivity and collaboration. Developed plans will address how those participants will be supported with wrap-around supportive service, case management, and on-the-job-support and mentorship. COMM commits to working with pre-existing workforce training programs and union-affiliated programs, as well as local community colleges to provide accessible training opportunities. COMM will explore partnership with other departments in the State, including Employment and Economic Development (DEED), Dept of Labor and Industry (DLI) and Department of Corrections (DOC) to seek pathways for disadvantaged groups in the solar workforce. Collaboration will ensure a Statewide approach. Innovative platforms utilizing artificial intelligence and/or virtual reality technologies are a strategy COMM is also evaluating. These technologies meet jobseekers where they are, and these pose a viable opportunity to bridge the gap of individuals who may not be able to travel or access workforce centers in real-time.

COMM continues to have discussions with state agencies and grant partner organizations on incorporating support around providing services such as childcare assistance, transportation aid, facilitation in training programs, and others. COMM will encourage grant recipients to coordinate, to the extent possible, with registered apprenticeship training programs, which will ensure that trainees have a pathway to a good-paying career in energy infrastructure construction. Further discussions will also include plans for addressing barriers to participation and offer guidance and mentorship as participants embark on their careers in the solar industry. SFA efforts will also include entrepreneurship training and mentorship which could be advanced in collaborations with workforce development centers across the state.

Examples of this support include direct solar workforce training; collaborating with renewable energy training centers and programs (including with institutions serving Tribal Nations and urban American Indian populations and community-based organizations); providing funding for electricians and others to go through formalized certification programs; funding for job training and apprenticeships.

COMM will utilize SFA funds to ensure that the state's solar industry supports development of skilled local workforce and family-supporting jobs and expands access to high-quality jobs and construction career opportunities for residents of low-income communities that have historically been underrepresented. In awarding program funds to subgrantees, applicants will be required to provide detailed information on plans to ensure creation of high-quality jobs that provide health care and retirement benefits; plans to prevent wage theft and exploitation of vulnerable workers; and plans to partner whenever possible with registered apprenticeship programs that have a

demonstrated track record of graduating skilled journeypersons, including workers from communities that are currently underrepresented in the construction industry.

### 2.4.2    Interconnection Technical Assistance

The Minnesota Distributed Interconnection Process (MnDIP) framework, which serves as a critical resource for addressing interconnection challenges, will be used as part of a strategy to support the development of distributed infrastructure for solar projects. However, COMM recognizes that certain interconnection challenges, such as funding extensive grid infrastructure upgrades, fall under the responsibility of utilities and may require separate sources of funding. The proposed program is committed to addressing critical aspects of interconnection through pre-and post-development technical assistance.

Solar projects with a maximum net output of 5 MW-AC or less may be eligible for claiming related interconnection upgrades in the cost basis for the investment tax credit, effectively subsidizing interconnection costs at the rate of the investment tax credit including any applicable adders. The proposal's funding for technical assistance will include assistance to encourage development that leverages the expanded ITC, as well as permitting and regulatory processes, and helping developers meet legal requirements and obtain the necessary approvals efficiently. Part of this strategy also includes engineering consulting support to assist solar developers in overcoming interconnection challenges.

Any projects that receive financial assistance from the program will only utilize financial assistance for capital grid upgrades when the upgrades are necessary for the program and where non-wire alternatives are not a feasible solution. The proposed costs for these grid upgrades are not available at this time; these will be identified during utility engagement activities and individual projects' interconnection applications.

COMM will take advantage of recent changes in state interconnection and solar siting rules to leverage SFA funds. Minnesota's new CSG program removes the previous program's requirement that all subscribers be located in the same or adjacent county as the solar garden, which is incentivizing developers to locate projects in new areas of Xcel Energy territory without congested interconnection queues. In 2023, Minnesota passed a law requiring the PUC to develop an interconnection cost-sharing process for distribution system upgrades and to also create an interconnection ombudsperson position at the PUC. These and other changes should help accelerate the interconnection process, helping bring SFA-supported projects online sooner. The implementation of these new pieces will create some short-term uncertainty, but COMM will provide technical assistance to help stakeholders navigate the transition.

To create efficiencies in the program deployment process, COMM plans to establish strong partnerships with utilities. This collaboration will include coordinating interconnection processes with SFA-supported project development. Different utilities face different challenges, so collaboration will take on different forms. In Xcel Energy territory, the lengthy interconnection queues are about to be shaken up with new laws and regulations, and COMM is positioned to help everyone in the new landscape. Grid congestion is not much of an issue in other utility territories in the state, but that also means that these utilities and developers have less experience working together through interconnection challenges. In these cases, COMM will help build relationships and facilitate interconnection conversations around SFA-supported projects. Additionally, COMM has secured both federal and state funds for work related to grid resilience and scaling renewable

energy deployment that may provide beneficial connections and information sharing.

### 2.4.3    Resilient Project Siting, Permitting, and Other Technical Assistance

The technical assistance component of the proposed program will aid in identifying optimal project locations, considering factors like sun exposure, grid proximity, and community preferences. COMM is committed to engage actively with local stakeholders and authorities to navigate zoning requirements, permitting processes, and compliance with building codes and inspection standards in order to enhance project quality and safety.

On siting, COMM intends to further leverage existing programs to help accelerate deployment. COMM worked with partners to pursue a Department of Energy Renewable Energy Siting through Technical Engagement and Planning (R-STEP) grant that, while not awarded, emphasized the importance of updating resources to support local jurisdictions with siting solar projects <5MW. COMM and its partners will continue proactive planning approaches that build on the Grow Solar Partnership's Local Government Solar Toolkit and leverage Minnesota's work through SolSmart and GreenStep will all facilitate more collaborative siting of project. Local governments have siting jurisdiction over solar projects <50MW and battery projects <10MW. COMM will work with these jurisdictional partners to consider adoption of agrivoltaics practices that harmonize solar installations with agriculture, to advance the use of remediated brownfields for project siting to repurpose underutilized land, and to draw upon the Minnesota Habitat Friendly Solar program to address stakeholder concerns and priorities in siting solar.

On Permitting, the Minnesota legislature directed COMM to establish a program that provides technical assistance and financial assistance to encourage eligible permitting authorities to adopt the Solar Application Permit Processing Plus software (SolarApp+). SolarApp+ is an online platform development by the National Renewable Energy Laboratory to standardize, automate, and streamline the residential solar permitting review process. COMM will leverage this initiative to engage both the Minnesota Department of Labor and Industry and local jurisdictions who share responsibilities for both building and electrical codes. Minnesota has over 850 cities and nearly 90 counties; utilization of this tool can help increase transparency for solar installers working across all of these jurisdictional boundaries and speeding residential solar approval process.

One of the barriers expressed by some utilities to adopting community solar at scale is the challenge of integrating subscription payments and associated credits into their existing billing software. For many utilities, community solar subscription management requires manual entry. While Minnesota is home to over 180 electric utilities, many utilities use the same billing software platforms. Additionally, for many low-income households, managing two bills, one for a community solar subscription and one for ordinary electric bills, is a barrier to subscriber participation. COMM proposes to use a portion of the SFA funds to invest in an open-source billing solution that could be utilized by any utility to streamline utility billing and enable consolidated billing with community solar subscriptions. This will require concerted engagement with utilities and their billing providers. Better integration of community solar with utility billing software platforms will also assist with tracking energy savings for SFA participating projects and households.

## 2.5 Equitable Access and Meaningful Involvement Plan

COMM intends to invest $3.8 million in Energy Navigators, community engagement, and education and $4.9 million for compliance, management, and administration, as shown in Table 4.

**Table 4.** Summary of Equitable Access and Meaningful Involvement Plan Areas

| Equitable Access and Meaningful Involvement Plan Areas | Amount Invested |
|---|---|
| Energy Navigators, Community Engagement, and Education | $3.7M |
| Compliance, Management, and Administration | $4.4M |
| **Total** | **$8.1M** |

### 2.5.1    Commitment to Serving Diverse Communities

The State has an established Government-to- Government (G2G) Consultation protocol with all 11 Minnesota Tribal Nations, the One Minnesota Council on Diversity, Equity and Inclusion, and the Community Council on Equity and Inclusion. COMM itself has 5 strategic pillars, one of which states, "ensure all, especially historically disadvantaged Minnesotans are resilient to Minnesota's climate and engaged in advancing efforts to mitigate climate change." COMM is fully committed to maximizing the breadth and diversity of communities across Minnesota who can engage in and benefit from Solar for All activities. COMM has a strong track record of priorities disadvantaged and low-income communities in grant making and will continue that focus throughout this work. In 2023, the Minnesota Legislature established the language and staffing for COMM to support a Tribal Advocacy Council on Energy, a Tribally governed council to identify and prioritize Tribal energy issues and determine appropriate actions. COMM established the Community Energy Collaborative in 2022 to formalize a policy and programmatic advisory board, made up representatives from community-based organizations who represent diverse communities. COMM hosts the Weatherization Assistance Program – Policy Advisory Committee (WAP-PAC), made up of community action agency representatives, community-based organizations and utilities to advise on residential weatherization programs and policy. Each of these existing efforts, and their formalized structures, speaks to COMM's commitment to this work. COMM believes the array of proposed financial assistance programs is tailored to income eligible households, and in particular, households that do not own their property, those who lease land, and those who do not have space for residential rooftop solar. As with other financial programs, COMM will work with administrators of SFA, along with community-based partners to ensure that those communities of greatest need as defined by CEJST are prioritized. Within DACs as defined by CEJST census tracts or census block groups identified through EJScreen, COMM and its partners will utilize existing mechanisms to reach and prioritize those households in greatest need, such as outreach at the community level, working through community lender networks, and the future Energy Navigator program to target under-resourced and high energy burden households (i.e., those with energy burdens higher than 6%).

As further detailed below, the proposed program will also prioritize communities with limited English proficiency by translating program materials into Spanish, Hmong, Somali, Karen and Vietnamese, work with CBOs based in and around those communities, and target broad geographic investments through engagement, technical assistance, and financial assistance activities.

COMM will ensure compliance with the Civil Rights Terms and Conditions prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

### *2.5.2    Participatory Governance Plan*

COMM will leverage existing formalized structures, as referenced above, and expand upon them to ensure engagement with both culturally and geographically diverse communities. COMM will collaborate with communities through established structures and groups that are currently utilized by COMM and partner organizations and leverage other efforts underway through the Home Energy Rebates programs. Current advisory committees for other assistance programs utilize advisors to the state-administered federal programs and include both local community action agency representatives as well as other key partners in state agencies, local utilities, CBOs, and energy audit technical assistance providers. These are strong starting points for engaged governance and allow COMM to start from a place of trust with existing partners while it also works to draw new organizations into the Solar for All work.

Over the past year, COMM has led the work to establish Minnesota's new "green bank," the Minnesota Climate Innovation Financing Authority (MnCIFA). A COMM representative sits on the Board of MnCIFA along with representatives from community-owned utilities; labor organizations; a member with experience in the impact of climate change on MN communities; community lending institutions; energy conservation; environmental justice; and investment fund management/finance. The Board has led a robust community engagement process to inform MnCIFA's Strategic Plan and Investment Strategy which will provide a strong foundation of engaged governance moving forward.

Minnesota Housing is the state's housing finance agency and finances housing that low and moderate-income Minnesotans can afford while helping Minnesotans buy and fix up their homes. Along with fostering strong communities, Minnesota Housing provides resources to stabilize neighborhoods, communities and families and works cooperatively with others to support the development and preservation of affordable rental housing. Minnesota Housing is managed by a board of directors. The board ensures the Agency's independence when making decisions and maintaining financial assets. The board is composed of the state auditor and six members of the public appointed by the governor with advice and consent of the Senate. The board meets at least once a month. Meetings are open to the public.

For the financial assistance allocated to Tribes, in addition to continued conversations with each of the Tribes to define their individual needs from this program, COMM will work closely with the now newly formalized Tribal Advocacy Council on Energy (TACE). COMM has already established a strong foundation with TACE members and sought their advice and guidance on formalizing this

work plan. This will be an essential relationship to guide COMMs work with Tribes through the Solar for All program period and to ensure that COMM's tribally focused efforts are truly tribally driven.

Further, COMM has long sought engagement from and will include representatives from the solar industry, local government representatives, and representative from labor and workforce development agencies. COMM currently runs numerous solar programs, including a community-solar program. Through these efforts COMM frequently engages with the Minnesota Solar Electric Industries Association and its members as well as directly with solar installers and developments. COMM leads a number of community technical assistance and financing efforts, including for example, a local capacity grants programs and the DOE funded energy efficiency conservation block grant program. Through these programs, COMM has established strong connections to Regional Development Organizations across the state and will harness these existing relationships to inform Solar for All program development and implementation. Finally, COMM has strong relationships with labor partners, in particular LIUNA and the Carpenter's Union, along with its partners agencies Department of Labor and Industry and the Department of Employment and Economic Development. Each of these partners will be essential in shaping Solar for All workforce efforts.

### 2.5.3  Education and Engagement Plan

COMM is proposing a significant investment in Energy Navigators training. Energy Navigators will be trained "front- line" personnel with deep connections in community who are able to use that expertise and experience to connect households and communities with energy programs to make energy-related services more accessible. Additionally, Energy Navigators will be resources for the organizations and companies that will be partners in the administration and implementation of the SFA program. This will include community lending institutions, contractors, and other partners that will help lift up the program. Information for these partners may include lending requirements and parameters or processes and procedures on DBRA and BABA compliance and reporting.

COMM is currently pursuing multiple strategies to bolster Energy Navigator capacity across the state. For example, Minnesota is in the process of standing up navigator capacity to support the new Home Energy Rebate programs as well as related state programs. COMM will invest in complementary capacity to ensure engagement with all SFA-eligible communities. SFA Energy Navigators' missions will be aligned with the SFA's goals: reducing emissions, delivering benefits to low-income and disadvantaged communities, and mobilizing financing and private capital. COMM staff will facilitate close collaboration among navigators to ensure that each can support households with informed energy decision making through an annual training gathering. COMM has existing networks of partners through the Clean Energy Resource Teams (CERTs), GreenStep Cities, Regional Development Associations, Community Energy Network, and the Minnesota Rural Electric Association and Minnesota Municipal Utilities Association to connect with local jurisdictions, community-based organizations, and local utilities. COMM will utilize proven tools that are part of its robust outreach and education processes including website, and community-based engagement. COMM will also create an Energy Navigator program in conjunction with the Home Energy Rebate program. The Energy Navigator trainings will provide communities with education and information to help determine eligibility for low-income energy programs and create best practices for engagement with particular communities. COMM will create a framework for engagement with community-based organizations that work in disadvantaged and low-income

communities. These partners will act as conduits to better understand the unique needs the communities they serve and how COMM can design the Energy Navigator program to best serve them. These partnerships will continue for the duration of the program.

COMM will focus on a unified source of information to streamline the education and outreach process and ensure that households are well-informed. COMM will utilize its Energy Information Center (EIC) to help Minnesotans make informed choices about their energy use. The EIC is a mobile and virtual outreach tool to educate and enroll Minnesotans into clean energy and energy efficiency programs that can be leveraged by navigators, program implementors and the general public.

COMM will leverage existing relationships to host listening sessions with CBOs and partners to strengthen those relationships and engage specific underserved communities. COMM will coordinate in-person and virtual community events to gather input and local insight; contract with key community partners for their insight and connections, and collaboratively design education materials in a variety of mediums that utilize diverse messages, imagery and languages. Engagement and work with Tribes will happen through COMM's Tribal Liaison. and will be guided by the government-to-government protocols the State has utilized since 2019.

### 2.5.4    Customer Acquisition and Management

The proposed strategy for customer acquisition is underpinned by a commitment to community integration, resource leverage, and reaching the most in-need families. Recognizing the pivotal role of grassroots initiatives, this proposal aims to establish strong partnerships with CBOs through Energy Navigators. Additionally, COMM will build on established trust relationships as described above and solicit insight and advice from those existing allies and COMM's, and its partners, existing program implementors. The EIC will work with local partners and service providers to help define the best messages and methods to reach as many low-income and disadvantaged community members as possible.

**Partners:** COMM will work with local partners to help determine energy burdens, identify participation in low-income assistance programs, and utilize established trust relationships. These partners will include local utilities, CBOs, and LIHEAP and WAP service providers.

Alignment with other assistance program providers will help verify eligibility and reporting practices, simplify and expedite applications, and streamline tracking and reporting.

Moreover, the "Connector" tool, a collaboration between the U.S. Department of Energy's National Community Solar Partnership (NCSP) and the U.S. Department of Health and Human Services (HHS), to facilitate community solar subscriptions to LIHEAP clients presents a strategic approach that COMM is considering. This tool could be a tangible strategy to address a recurring challenge faced by community solar developers: finding subscribers who meet the income-eligibility criteria. Tapping into the pool of pre- qualified candidates from HHS' LIHEAP could address a segment of this need for community solar subscriptions. COMM staff who lead community solar programming have been meeting with COMM staff who lead the Energy Assistance program to discern how to address the barriers and potential concerns of capacity at local LIHEAP offices.

**Messaging Techniques:** COMM will provide information about expected savings to households as the primary message in a way that ensures that people receive information that is accessible and

clear. COMM will work with communities to create language, imagery and messaging that is effective and impactful. Language and imagery can be tailored to appeal to cultural or geographic communities.

**Vehicles for Outreach and Messaging:** COMM acknowledges that reaching low-income and disadvantaged community members can be challenging. This is especially true in rural areas and Tribal communities where some have issues with reliable internet and Wi-Fi connectivity. Working with local utilities, EAP/WAP service providers, and Tribal governments to provide information on solar benefits in utility bills, renewal notices and application forms, and Tribal government communications will ensure that those without access to other forms of information are reached. Billboards, local newspapers and locally programmed radio stations also remain a trusted source of information to many Minnesotans and will be part of mix considered for message distribution.

**Section 3:  Fiscal Stewardship Plan**

*3.1    Plans and Policies for Program Oversight, Confidential Reporting, and Managing Conflicts of Interest*

In addition to the annual single audit, COMM regularly undergoes programmatic audits and financial monitoring on these programs. Attachment F provided with the application includes further details as to COMM's financial management practices and fiscal stewardship along with certifications and assurances in compliance with the Code of Federal Regulations on award acceptance.

COMM follows statewide statutes, policies and procedures as set forth by law, Minnesota Management & Budget, Office of Legislative Auditor, and Department of Administration.

Minnesota Statute §16C applies specifically to the Agency's roles and responsibilities. Grants and subawards are administered by dedicated Energy Division staff pursuant to policies set forth by the Office of Grants Management (OGM) and Office of State Procurement (OSP). These policies and processes are regularly refreshed by the State Department of Administration, with whom the Department maintains consulting relationship (along with the State Attorney General's office) and reviewed by Federal agencies such as Health and Human Services and the Department of Energy.

For subawards other than named subrecipients defined in the workplan, COMM will administer a competitive grant solicitation process for eligible entities in accordance with both state and federal procurement practices. COMM follows established state procurement practices to solicit, award, and distribute grant awards; competitive bids will be collected and evaluated per guidelines set forth in the State's OSP and OGM statutory authority and rulemaking. All grant administration and monitoring, including reporting and Federal flow down requirements, such as NEPA, BABA and Davis-Bacon, will be handled through contract terms.

*3.2    Investments in Consumer Protection and Enforcement of Consumer Protection Laws with Partners*

With regard to consumer protections, COMM will implement a pre-qualification process to vet solar companies to participate in the program. This process will establish terms of participation including but not limited to workforce and reporting requirements, customer engagement requirements and prohibitions, and savings requirements. Any company with a history of deceptive

practices or pending legal actions will be disqualified. Once qualified, COMM will also provide oversight of participating companies including compliance checks. Minnesota's Attorney General has also made oversight of solar companies a priority and recently advanced legal action against several companies accused of deceptive practices.

The State adopted a suite of consumer protections for community solar gardens. COMM now administers the community solar garden program that operates within Xcel Energy territory and will utilize these same protections across the Solar for All portfolio of community solar-related projects. Requirements include providing information, in writing and in plain language, regarding rates, contract terms, termination fees and the right to cancel a subscription. Prohibitions on developers/subscriber organizations are as follows:

- checking the credit score or credit history of a new or existing residential subscriber
- charging an exit fee to a residential subscriber
- enrolling a subscriber without the subscribers prior, voluntary consent
- engaging in misleading or deceptive conduct, and
- making false or misleading representations.

COMM will have staff who lead these consumer protection activities aligned with both administering the community solar garden program in Xcel Energy territory and implementing the Solar for All program. Through SFA, COMM will also deploy field monitors to conduct field visits/site visits, as staff currently do for federally funded WAP programming, to confirm projects were completed in keeping with required standards.

Per COMM administration processes and procedures for federally sourced revolving loan funds, COMM will require lending partners to abide by all EPA mandatory flow down requirements.

### 3.3     Guardrails to Ensure Household Savings

COMMs will require all contractors and implementers to file copies of their contracts each year, which will require an average of 20% energy savings (or equivalent for multifamily properties). COMM currently runs a Solar for Schools program through which regularly reviews project proposals and provides independent third-party review and comparison to savings estimates. As part of SFA, COMM will provide calculators and educational resources that explain how the financing is intended to work and the savings households can expect so that all households, and all energy navigators, are working from a common set of information and assumptions.

Spot checks of projects with be conducted each year. As mentioned above, COMM will employ field monitors, building upon the model used in the federally funded weatherization program. This role will drive consumer protection compliance, conducting actual site visits as well as collecting documentation from households themselves along with installers, property owners and community solar subscription managers to estimate bill savings.

**Section 4:  Timeline and Milestones**

See Attached "MN Commerce Solar for All Program Timeline"

**Section 5:  Reporting Requirements**

## 5.1    Investments in Capacity for Program Evidence and Evaluation Activities

COMM will be responsible for overall project management, coordination of the project team and partners, and compliance with EPA requirements.

COMM has included funding from the administrative portion of the budget to add dedicated modules to its existing customer relations management (CRM) platform to manage the request for proposal and reporting processes for SFA. It has also allocated additional funding to customize data tracking tools.

COMM has included funding for contracted support to assist with compliance systems, tracking and reporting for Davis Bacon, BABA, and other reporting requirements. COMM has also budgeted for program evaluation support geared toward understanding how to make financial assistance programs, technical assistance efforts and energy navigator support more effective. Minnesota has a state agency that conducts evaluation, and COMM may work with that agency or bid out the evaluation support activities.

## 5.2    Meeting Reporting Requirements

Based on COMMs past experience with federal grants, the agency is confident in its ability to comply with EPA reporting requirements and its ability to ensure partners and sub-awardees also comply. COMM administers numerous Federally funded energy programs that require monthly or quarterly reports that utilize metrics to track progress based on Federal agency requirements. COMM will require that lending partners provide quarterly reports per EPA instructions. Failure to comply with these reporting requirements will be considered a material noncompliance with terms of the award. Noncompliance may result in withholding of future payment, suspension or termination of the current award and withholding of future awards. COMM will ensure that reports do not contain any protected personal information, limited right data (proprietary data), classified information, information subject to export control classification or other information not subject to release.

### 5.2.1. Performance Reports

*Semi-Annual Report*
COMM agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

*Final Report*
COMM agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. COMM understands that it must include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance;

- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies;
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance;
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations; and
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

COMM agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

### *5.2.2. Transaction-Level and Project-Level Data*

COMM agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). COMM agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

### Section 6: Budget Narrative

### 6.1 Project Budget
**Personnel**

Programmatic and administrative staff include the following positions and estimated time inputs. Hourly rate is based on estimated hourly rate or salary hourly equivalent for each individual position based on comparable historical rates and union contract classifications. Budget Periods 2-5 include 5% cost of living adjustment per standard practice and contract projections. Total personnel cost: $3,272,636.

| Position | Purpose | Hourly rate/ equivalent | # of personnel | Total % Time | Total cost |
|---|---|---|---|---|---|
| Financial programs development & engagement coordinator | To work with lending partners to shape financial programs that will deliver 20% savings | $52.68 | 1 | 42% | $254,471 |
| Community solar technical assistance coordinator | To advance community solar program application; provide support to munis and cooperatives with developing successful CSG models | $52.68 | 1 | 44% | $266,087 |

| | | | | | |
|---|---|---|---|---|---|
| Single Family / WAP solar program coordinator | To design WAP solar deployment; advance single family contractor procurement | $52.68 | 1 | 59% | $348,514 |
| Solar programs coordinator | To provide overall program oversight and direction | $52.68 | 1 | 42% | $248,406 |
| Solar workforce specialist | To work with partners to design and implement workforce development activities | $52.68 | 1 | 48% | $291,090 |
| Tribal outreach and engagement specialist | To serve as the key point of contact with tribal nations and support tech assistance and program development needs | $52.68 | 1 | 24% | $145,545 |
| Navigator outreach and education specialist | To lead navigator programmatic development, training, and coordination | $52.68 | 1 | 48% | $291,090 |
| Financial/grants coordinator | To lead subawards and RFPs for contracting; to ensure activities align with EPA requirements and MN state law | $52.68 | 1 | 48% | $291,090 |
| Grants specialist | To execute contracts; track and provide oversight to invoicing | $34.60 | 1 | 77% | $303,992 |
| Federal Compliance (Davis Bacon, BABA) and labor standard compliance specialist | To establish compliance infrastructure, conduct tracking, ensure compliance | $52.68 | 1 | 65% | $399,759 |
| Field monitor (compliance, on installs, on savings) | To conduct in the field site visits | $48.50 | 1 | 46% | $262,422 |
| Legal Specialist | To provide guidance on contracts, models, statute | $52.68 | 1 | 29% | $170,170 |

## Fringe Benefits

Fringe benefits for personnel total $1,145,423 and are calculated at an agency historical average of 35% as determined by fiscal staff. Fringe rate includes benefits. Fringe Benefits percentage calculation includes the following:

- FICA
- Retirement
- Life Insurance
- Severance Allowance
- Workers Compensation
- Unemployment Insurance
- Health Insurance

*Treatment of Fringe Benefits*: Resultant fringe benefits are specifically identified to each employee and are charged individually as direct costs.

*Treatment of Paid Absences:* Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the

normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

**Travel**

Travel costs total $55,486 and cover in-state administration, management and monitoring as well as out-of-state travel to annual conference events. Costs are based on historical averages. Travel costs are governed by the MN Department of Administration and state employee union contracts; more info can be found at https://mn.gov/mmb/employee-relations/labor-relations/labor/.
In-state travel includes car rental, gasoline, hotel and per diem for meals estimated at $250/day with hotel.

Travel will typically be 1-2 people dependent on task. Full details for each trip are on the Budget Narrative.

Travel activities to include:
- Travel to establish partnerships and collaboration with local units of government, community based organizations, utilities and tribal nations to implement programming; this would include navigator workshop and training activities; as described in the budget, these costs will carry through each year of the program, though are higher in the first year as relationships are established and the initial workshops are conducted
- Travel to conduct engagement activities with utilities, community-based organizations, and tribal nations; to include travel for meetings with utilities and tribal nations and to host the CSG workshop; this work will phase out as after the first two years.
- Travel for staff to attend conferences to learn about other states implementation models, make connections with financing partners; funds allocated for each year of the project.
- Travel for field monitors to visit project sites and verify implementation; this begins in year 3

**Supplies**

Supplies costs total $30,000 and include licensing support for technical components of Solar for All program implementation.

- Module buildout for addition to the Division's Client Relationship Management system (CRM). COMM uses a base grants module to manage competitively bid solicitations; this award will support license needs for reporting and tracking customization as well as development of externally facing community partner portals to manage ongoing relationship management activities, outreach and engagement information sharing.
- License costs are prescribed by the State's Minnesota Information Technology Services arm (Mn.IT), who provides enterprise-wide procurement support across department level agencies and policies and processes governing technology acquisition.

**Contractual**

A range of proposed contract activities totals $9,676,661 and spans across a variety of technical assistance support, tool development, community engagement, and service delivery activities. Contracted initiatives include the following:

| Purpose | Estimated Cost | Duration | Procurement Method |
|---|---|---|---|
| Navigators and community support institutions: Energy navigators will partner with local communities to advance community-based education efforts, to coach and support efforts to weave together funding streams from Solar for All with federal Home Energy Rebates, state programs, the MN Climate Innovation Finance Authority and other greenhouse gas reduction fund funds. Could be local jurisdictions, community-based organizations, etc. Support for 10-20 contracts/year to reach cultural and geographically diverse communities | $2,800,000.00 | 5 years | To be competitively bid |
| Installation support: Contracting with solar installers for ground-mounter solar PV arrays for manufactured home residents (1/3 of the overall program funding / year) | $1,000,000.00 | 2-3 years | To be competitively bid |
| Marketing/education support for outreach and education campaign, including educational materials and resources (written, video, social media); inclusive of translation resources (Spanish, Hmong, Somali, Vietnamese, Karen) | $200,000.00 | 5 years | To be competitively bid |
| Technical assistance consultant: to support communities (community orgs, munis, cooperatives, and tribal nations) with solar deployment planning, solar+storage assessments, project pre-development, interconnection design, or engineering review work to advance projects | $1,220,000.00 | 5 years | To be competitively bid for TA providers or issued to recipients via a grant application process |
| Technical assistance consultant: to support residential solar group buys and residential joint procurement models; to conduct workshops and education, help households understand financing options | $300,000.00 | 4-5 years | To be competitively bid |
| Siting/permitting technical assistance to support local governments to support adoption of Solar App as well as land use zoning updates | $225,000.00 | 3 years | To be competitively bid |
| Utility software system open-source billing tool to support utilities with automating community solar billing; tool to be available to any utility (avoid manual entry) | $600,000.00 | 2-3 years | To be competitively bid |
| Contracted to the Minnesota Geospatial Information Center (MnGeo, a State Agency) or University of Minnesota or updating of the solar map app with new LIDAR data integrated and allowing for polygoning on roofs to estimate array size | $405,000.00 | 2 years | Direct selection and contracting per statutory authority and state procurement |
| Financial/legal consult: tax accountant and legal technical assistance to support successful utilization of tax credits; to advise program partners, subrecipients, and participants | $525,000.00 | 3 years | To be competitively bid |
| Support for existing workforce centers to advance recruitment, education, training, and supportive activities to recruit diverse candidates for solar jobs; | $350,000 | 5 years | Interagency agreement with the Department of Employment and |

| | | | |
|---|---|---|---|
| inclusive of entrepreneurship and business development training | | | Economic Development |
| Training support: Funding to expand training program offerings (at technical colleges and universities, tribal colleges, specialized programs) and support organizations that provide supportive activities in support of registered union apprenticeship programs; funding to be used for coordination, recruitment, curriculum, educator staffing | $1,565,000.00 | 5 years | To be competitively bid |
| Consultant support for compliance systems, tracking, & reporting for Davis Bacon, BABA and other reporting requirements. | $297,661 | 5 years | To be competitively bid |
| Consultant support (potentially another state agency) to lead program evaluation focused on opportunities for program improvement | $135,000 | 3 years | To be competitively bid |
| CRM development: 2 new modules needed a) to build off the base grants modules for the RFPs to manage all competitively bid solicitations' b) to build on the community partner portals to manage ongoing relationship management activities, and outreach / engagement information sharing | $30,000 | 2 years | To be competitively bid |
| Data tracking information system to support build out of data repository to track dedicated Solar for All data. Cost of customization and new tools based on comparable agency activities | $24,000 | | |

### Other

Other direct costs totaling $47,019,700 fall into subawards ($45,850,000); general costs ($769,700) and participant support ($400,000).

In addition, the $400,000 of dedicated technical assistance via the DOE/National Lab is listed as in-kind support over the first two budget periods, to scope utility software system open source billing tool activities; to support financial modeling for community solar, and/or CSG Community Connector (CSG+LIHEAP).

| Type | Description | Estimated Cost | Need and basis |
|---|---|---|---|
| Other - Subaward | Minnesota Housing (MHFA) Multifamily Deferred Loans: To provide loans for solar on multifamily properties as well as 10% administrative costs ($9,000,000 for financing; $1,000,000 for admin); MHFA is another state agency | $10,000,000 | Needed to impact capacity of multi-family housing properties to access solar and deliver 20% savings back to residents. Based on impact determination and current loan program calculation bases. |
| Other - Subaward | Minnesota Climate Innovation Finance Authority (MnCIFA): Community solar revolving loan fund to provide upfront capital and pursuit of federal tax credits from direct pay; MnCIFA is another state agency | $23,850,000 | Needed to drive expansion of low-income serving community solar and deliver 20% savings |
| Other - Subaward | Eleven sovereign tribal nations that share Minnesota's geography: To support residential serving solar for | $10,000,000 | Determined through tribal consultation among sovereign Tribal Nations and the Tribal |

| | | | |
|---|---|---|---|
| | each of the 11 nations (approximately $909,000 per nation reserved) | | Advocacy Council on Energy (TACE) |
| Other - Subaward | MHFA - Single Family financial assistance: To provide supportive credit enhancements (e.g., credit enhancements and buy-downs) to advance residential projects as well as 10% administrative costs ($1.8M financing; $200,000 for Admin) | 2,000,000 | Needed to impact capacity of low-income households to access solar and achieve 20% savings. Assessed by analysis - determination of impact at range of funding level |
| | **Total Other - Subaward** | 45,850,000 | |
| Other - General | Statewide Financial System Resource Allocated Costs: Established Minnesota Management and Budget Statewide distributed costs | 596,000 | Financial Service Hours are needed for creating budgets and setting up in the state's financial system: assisting with federal financial invoicing, reporting, reconciliation, and tracking support. Determined via formula set by agency fiscal unit |
| Other - General | Website updates: Mn Information Technology services customization of web interface, | 115,000 | Needed to develop a landing page/hub of Solar for All content to share resources and progress; based on build from existing Commerce website. Separately billed enterprise services |
| Other - General | Navigator training events and annual gathering: Support to include space, coffee and lunch costs for three Energy Navigator Workshop planning events | 8,200 | Training sessions needed for ongoing trainings, status updates, and shared best practices. Based on historic cost averages for comparable departmental event activities. |
| Other - General | CSG Workshop event: AM session with co-op and municipal utilities | 500 | Needed as a touchpoint for coordinated action connecting and supporting Solar for All initiatives |
| Other - General | IT integration into public facing deployment platform: Mn Information Technology services support of customization of new tools | 50,000 | Needed to align customer facing programming platform with other household facing point-of-sale tools. Based on Mn.IT service costs |
| | **Total Other - General** | 769,700 | |
| Other - Participant Support | Per diem and travel support for community-based organization and local jurisdictions to participate in stakeholder engagement; support engagement from at least 40 community reps/year to reach cultural and geographically diverse communities. Higher in year 1 to participate in initial outreach activities. | 105,000 | Needed to reach a broad cross section of culturally and geographically diverse communities. Based on historic averages and state standards for eligible travel and per diem costs |
| Other - Participant Support | Participant support for workforce trainees: Funding to provide stipends to trainees to support travel and | 295,000 | Needed to improve access to opportunities for new entrants to the workforce coming from a |

| | related expense to allow new workers access to training including paid apprenticeship opportunities and NABCEP certification | | wide variety of geographic and economic backgrounds. Based on historic averages and state standards |
|---|---|---|---|
| Total Other – Participant Support | | 400,000 | |

**Participant Support Costs**

Participant support costs are indicated for assistance to community-based organizations, local jurisdictions, and individual trainees newly entering the workforce. These costs include:

- Per diem and travel support for community-based organization and local jurisdictions to participate in stakeholder engagement; support engagement from at least 40 community reps/year to reach cultural and geographically diverse communities. Higher in year 1 to participate in initial outreach activities.
- Training support: Funding to provide stipends to trainees to support travel and related expense to allow new workers access to training including paid apprenticeship opportunities and NABCEP certification.

**Subawards**

COMM will provide subawards to Minnesota Housing and to the Minnesota Climate Innovation Finance Authority, both of which are state agencies.

- Minnesota Housing will lead the single family and multifamily financing efforts. Minnesota Housing leads housing financing for the State of Minnesota and will align Solar for All funds with existing financing tools to maximize their impact.
- Minnesota Climate Innovation Finance Authority is Minnesota's green bank and will lead the community solar garden financing.

COMM will also provide subawards to each of Minnesota's eleven Tribal Nations to implement residential serving solar, or solar plus storage, projects.

COMM procurement systems are governed by statute and policies set forth by the Office of Grants Management and Office of State Procurement, ensuring compliance with 2 CFR 200 (specifically sections 200.331 and 200.332; Federal T&C. I: "Subawards as Part of Revolving Loan Funds" term; and any additional flow down provisions accompanying the award).

COMM has statutory authority to enter into contractual agreements with sister cabinet level agencies through Interagency Agreements, governed by statute (Minn.Stat. §16 and §216C).

**Other General Direct Costs**

Statewide Financial System Resource Allocated costs: These costs are directed by the enterprise and segregated in the Minnesota state financial system from indirect costs by accounting code or GA ledger number. Financial Resource Allocated costs are assessed for creating budgets and setting up in the state's financial system, assisting with federal financial invoicing, reporting, reconciliation, and tracking support.

- Support is needed to develop a Solar for All content hub to serve as a landing page for sharing resources and progress. Like the CRM, this can be built onto the existing Commerce

36

website content and structure. Costs also support the IT integration into a public facing platform.
- Support to build out a data repository for tracking dedicated Solar for All data that aligns with COMM state statutory authority as the repository of state energy information.


**Additional Items**

**Conferences and Workshops:**

*Solar for All Outreach and Energy Navigator Strategy and Approach Workshop – Budget Year 1*
- Description: COMM will host a workshop in the first budget year to meet with stakeholders to share the outline of COMM's Solar for All plan, and to gather information about the processes and approaches that would best serve Disadvantaged Communities across the State. **COMM anticipates this workshop will host 40-50 people**
- COMM will initiate and host this workshop with support and collaboration from other State agencies
- Logos on the agenda will be from the Minnesota Commerce Department and may also include Minnesota Department of Employment and Economic Development (DEED), Minnesota Department of Labor & Industry (DLI), and/or Minnesota Housing (MHFA).
- Attendees of the workshops may include: 20% state, 20% local, 60% public
  - Community Based Organizations
  - Service Providers for the Weatherization Assistance Program and Energy Assistance Program
  - Local Units of Government
  - Workforce Training programs
  - Minnesota state agency staff
  - Consultants
- COMM will write up any summary reports or provide follow up data, information, and training materials for participants and other community-based organizations and partners
- Program Income or registration fees: None


*Four Energy Navigators Workshops – Budget years 2, 3, 4, & 5*
- Description: – COMM will host four Energy Navigator Workshops in each of the budget years 2, 3, 4, & 5. These workshops will provide ongoing trainings to Energy Navigators, status updates, and sharing of best practices. **COMM anticipates each workshop will host 25-30 people.**
- COMM will initiate and host these conferences with support and collaboration from other State agencies
- Logos on the agendas will be from the Minnesota Commerce Department and may also include Minnesota Department of Employment and Economic Development (DEED), Minnesota Department of Labor & Industry (DLI), and/or Minnesota Housing (MHFA).
- Attendees of the workshops may include: 20% state, 20% local, 60% public
  - Community Based Organizations

- o Service Providers for the Weatherization Assistance Program and Energy Assistance Program
- o Local Units of Government
- o Workforce Training programs
- o Minnesota state agency staff
- o Consultants
- COMM will write up any summary reports or provide follow up data, information, and training materials for participants and other community-based organizations and partners
- Program Income or registration fees: None

*Community Solar Garden Workshop*
- Description: COMM will host a workshop with Municipal and Cooperative electric utilities in Minnesota to share information about the Community Solar Garden plan and to provide a touchpoint for coordinated action connecting and supporting the Solar for All program statewide. **COMM anticipates 20-25 people for this workshop.**
- COMM will initiate and host these conferences with support and collaboration from other State agencies
- Logos on the agendas will be from the Minnesota Commerce Department and may also include Minnesota Department of Labor & Industry (DLI), and/or Minnesota Housing (MHFA).
- Attendees of the workshop may include: 20% state, 20% local, 60% public (utilities)
  - o Local Units of Government
  - o Local Municipal and Cooperative Utilities
  - o Minnesota state agency staff
  - o Consultants
- COMM will write up any summary reports or provide follow up data and information for participants and other community-based organizations, utilities, local units of government, and partners.
- Program Income or registration fees: None

**Meals and Refreshments:**

*Solar for All Outreach and Energy Navigator Strategy and Approach Workshop – Budget Year 1*
- Description: COMM will host a workshop in the first budget year to meet with stakeholders to share the outline of COMM's Solar for All plan, and to gather information about the processes and approaches that would best serve Disadvantaged Communities across the State. **COMM anticipates this workshop will host 40-50 people.**
- Per diem provided: None
- Justification for meals: This initial workshop will engage with community-based representatives and organizations that work in Disadvantaged Communities statewide. They will share information and expectations from their communities and COMM will provide information about the scope and structure of SFA. Based on the amount of information and need for meaningful engagement with participants, this will be an all-day workshop that will begin at the start of the workday and continue until late afternoon.

- This workshop will provide a light breakfast with coffee and juice, and a lunch that will be either a buffet or box lunches. **Anticipated cost for this initial workshop will be $3,000 which will include food and beverages (approximately $2250), and room rental ($750).**

*Four Energy Navigator Workshops*

- Description: COMM will host four Energy Navigator Workshops in each of the budget years 2, 3, 4, & 5. These workshops will provide ongoing trainings to Energy Navigators, status updates, and sharing of best practices. **COMM anticipates each workshop will host 25-30 people.**
- Per diem provided: None
- Justification for meals: In the interest of providing ample time for attendees to share status updates and information, receive trainings, share best practices, and identify barriers and solutions, all day workshops will be planned that will begin at the start of the workday and continue until mid to late afternoon.
- Each workshop will provide a light breakfast with coffee and juice, and a lunch that will be either a buffet or box lunches. **Anticipated cost for each workshop will be $1,300, which will include food and beverages ($970 estimated), and room rental ($325 estimated).**

*Community Solar Garden Workshop*

- Description: COMM will host a workshop with Municipal and Cooperative electric utilities in Minnesota to share information about the Community Solar Garden plan and to provide a touchpoint for coordinated action connecting and supporting the Solar for All program statewide. **COMM anticipates 20-25 people for this workshop.**
- Per diem provided: None
- Justification for meals: This will be a half day workshop to share information about the Solar for All program with utilities and establish a coordinated effort related to community solar gardens. In order to provide ample time for COMM to share that information and hear feedback, ideas, and concerns from the utilities a morning to mid-day meeting will be necessary.
- The workshop will provide a breakfast with coffee and juice. **Anticipated cost for the workshop will be $500, which will include food and beverages (totaling $350), and room rental ($150 estimated)**.

**Indirect Charges**

13.3% is Commerce's currently approved, federally negotiated rate with the Department of Health and Human Services as the cognizant agency. Per Minnesota's current NICRA, the indirect rate is applied to Modified Total Direct Costs including Personnel/Fringe, Travel, Supplies, and the General category of Other Direct Costs, plus the first $25,000 of each new contract arrived at in plan implementation including partner subawards.

**Program Income**

Minnesota anticipates generating returns to a community solar revolving loan fund. Commerce, through its partnership with MnCIFA, will provide both bridge loans to prospective projects while they await receipt of federal tax credits, as well as term financing. MnCIFA does not anticipate charging interest during the bridge loan period, and as such, payment in the form of tax credits would not be considered income. These funds will return to the revolving loan fund to provide funding for the next set of community solar projects.

Full term loans would begin capturing interest payments once the initial tax credit payments are made. MnCIFA anticipates interest rates at approximately 3%, which will generate program income. MnCIFA will also generate program income through interest on its cash deposits of SFA funds. MnCIFA anticipates that this rate will average 3% during the program deployment period.

MnCIFA will recover its administrative costs of administering the $23.85 million in community solar funds by taking a portion of the gross program income. MnCIFA anticipates that a 1% rate on both its SFA cash deposits and SFA term loans will be sufficient to cover its admin costs. Program income will be made up the remaining interest from these two sources, which will be subject to varying interest rates and the amount of SFA funds deployed as interest-free bridge funds in any given month. Given reasonable assumptions, COMM and MnCIFA calculate that program will generate approximately $1.0 million of net program income by the end of the program deployment period. These funds will be reinvested into other disadvantaged community-serving solar projects.

# EXHIBIT 3

5H - 84089501 - 1    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Assistance Amendment | GRANT NUMBER (FAIN): 84089501<br>MODIFICATION NUMBER: 1<br>PROGRAM CODE: 5H | DATE OF AWARD<br>12/09/2024 |
|---|---|---|
| | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>12/09/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>2035 |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:<br>DEPARTMENT OF COMMERCE MINNESOTA<br>85 E 7TH PL STE 280<br>Saint Paul , MN 55101-2198<br>EIN:  41-6007162 | PAYEE:<br>DEPARTMENT OF COMMERCE MINNESOTA<br>85 7th Place East, Suite 500<br>Saint Paul, MN 55101-2198 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Lissa Pawlisch<br>85 7th Place East, Suite 280<br>Saint Paul, MN 55101-2198<br>**Email:** lissa.pawlisch@state.mn.us<br>**Phone:** 651-539-1563 | Bryan Fiedorczyk<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460<br>**Email:** Fiedorczyk.Bryan@epa.gov<br>**Phone:** 202-564-9623 | Hazeletta Burgess<br>OGD-GMBOD, 3903R<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460<br>**Email:** burgess.hazeletta@epa.gov<br>**Phone:** 202-564-1533 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Minnesota Solar for All

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD<br>09/01/2024 - 08/31/2029 | PROJECT PERIOD<br>09/01/2024 - 08/31/2029 | TOTAL BUDGET PERIOD COST<br>$ 62,450,000.00 | TOTAL PROJECT PERIOD COST<br>$ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Avenue NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Acting Chief, Grants Management Branch | DATE<br>12/09/2024 |

5H - 84089501 - 1     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84089501 - 1     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 3,272,636 |
| 2. Fringe Benefits | $ 1,145,423 |
| 3. Travel | $ 55,486 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 9,676,661 |
| 7. Construction | $ 0 |
| 8. Other | $ 47,419,700 |
| 9. Total Direct Charges | $ 61,569,906 |
| 10. Indirect Costs: 13.30 % Base MTDC | $ 880,094 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 1,000,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at:  https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA **Grants Specialist listed on the award**
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the **EPA Grants Specialist listed on the award**
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications**: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award**
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: **EPA Project Officer listed on the award**

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has initiated the intergovernmental review process on behalf of the Recipient and will direct any pertinent comments from directly affected State, areawide, regional, and local government entities to the Recipient as needed.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

### D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

### E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01

# Programmatic Conditions

**Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)**

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.
- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar**: Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar**: A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage**: Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.
- **Enabling Upgrades**: Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information**: Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations**: Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this

program.

**Freely Associated States:** *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) the** limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after

implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or

Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U. S.C. 3729-3733."


## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS


### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### Semi-Annual Report

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### Final Report

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition*:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with

the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

### 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and

resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

### For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

### Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

# III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient is at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their

overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the

Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

### I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

### J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid to over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F. DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

<u>1. Compliance with Federal Statutes and Regulations</u>

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

<u>2. Free and Fair Choice to Join a Union</u>

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of

2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

### K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Single family homes;

2. Privately-owned, non-mixed-use, multi-family housing properties;

3. Privately-owned residential portions of mixed-use properties;

4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating

practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

### 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing.

The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the Subrecipients will comply with the

requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities*.

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

### R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g) (2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement shall be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities**. As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements
The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the

Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate

expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

### A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

### B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

EXHIBIT 4



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**   Termination of EPA Assistance Agreement 5H-84089501 under 2 CFR 200.340

**FROM:**   Devon Brown, EPA Award Official

**TO:**   Grace Arnold, Commissioner
Department Of Commerce Minnesota

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84089501 awarded to Department Of Commerce Minnesota. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Hazeletta Burgess, EPA Grant Specialist
    Bryan Fiedorczyk, EPA Project Officer
    Lissa Pawlisch, Grantee Program Manager

EXHIBIT 5



August 27, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gase Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington DC 20460
*brown.devon@epa.gov*

      RE:  Disagreement with Modification No. 2 to Grant Number (FAIN): 84089501, dated August 8, 2025

Dear Mr. Brown:

      On August 7, 2025, Minnesota Department of Commerce ("Commerce") received a memorandum from you that purported to terminate EPA Assistance Agreement 5H-84089501 under 2 C.F.R. 200.340 ("Termination Letter").  The Termination Letter outlined a Dispute process pursuant to 2 C.F.R. 1500.15 with a Dispute deadline of 30 days.  The Termination Letter also stated, "The EPA Grants Management Office will issue an amendment to the agreement to document the termination."

      The next day, Commerce received a document titled "Assistance Amendment" dated August 8, 2025.  That document states it is "Modification Number: 2" to Grant Number 84089501. Under its "Explanation of Changes" the document states that it requires Commerce to stop work, terminates the agreement, reduces the performance period duration, curtails the scope of work, and adds administrative terms and conditions.  In the "Notice of Award" section, it states that if the recipient disagrees with the terms and conditions specified, it must furnish a notice of disagreement within 21 days.

      Please accept this letter as Commerce's notice of disagreement with Modification No. 2 dated August 8, 2025, issued under your signature as EPA Award Official.  Commerce also disagrees with any suggestion in the Assistance Amendment that any attempt to draw down funds could function as a waiver of Commerce's dispute rights, which is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination per 2 C.F.R. 200.305(b)(3) as well as the Termination Letter's specific statement that costs incurred prior to the termination date are allowable.

      Commerce will file a Dispute of the Termination Letter in a separate letter to the Dispute Decision Official within the 30 days provided in the Termination Letter.

Please acknowledge receipt of this notice of disagreement and contact Commerce via the below-signed designee to discuss resolution of this disagreement as soon as possible.

Sincerely,

Sara Payne
General Counsel

CC: Bryan Fiedorczyk, Program Officer

EXHIBIT 6



September 6, 2025

Michael Molina, EPA Dispute Decision Official
U.S. Environmental Protection Agency
molina.michael@epa.gov
Office of Mission Support
1200 Pennsylvania Avenue NW
Washington DC 20460

RE: Dispute of Termination of EPA Assistance Agreement 5H-84089501 dated August 7, 2025

Dear Mr. Molina:

Please accept this letter as the Minnesota Department of Commerce's ("Commerce") dispute with the termination notice issued by the Environmental Protection Agency ("EPA") on August 7, 2025, purporting to terminate EPA Assistance Agreement 5H-84089501 under 2 C.F.R. § 200.340 ("Termination Letter").[1] The next day, Commerce received a document titled "Assistance Amendment" dated August 8, 2025,[2] which Commerce previously responded to on August 27, 2025. Now, Commerce timely files this letter in accordance with 2 C.F.R. § 1500.15 disputing the August 7, 2025 Termination Letter.

Pursuant to 2 C.F.R. § 1500.15, Commerce writes to notify you as the EPA Dispute Decision Official that it disagrees with the attempt to terminate the Assistance Agreement. The termination notice: (1) violates the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only unobligated balances and preserved funds already awarded to grantees; (2) violates the legally binding assistance agreement dated July 9, 2024; (3) provides no valid reason for termination pursuant to 2 C.F.R. § 200.341; (4) is arbitrary, capricious, and not supported by substantial evidence; (5) violates constitutional boundaries; and (6) causes irreparable harm to Americans in Minnesota.

The following is a more detailed statement of the specific legal and factual grounds for this notice of disagreement:

**FACTUAL GROUNDS**

On October 12, 2023, Commerce submitted its application under EPA's Solar for All[3] Notice of Funding Opportunity EPA-R-HQ-SFA-23-01. In developing its application, Commerce consulted with 78 unique stakeholder organizations, including utilities, local units of government, technical colleges, tribal nations, solar installers and developers, non-profit organizations, and

---

[1] Ex. 1 (attached).
[2] Ex. 2 (attached).
[3] *Greenhouse Gas Reduction Fund,* U.S. EPA, https://www.epa.gov/greenhouse-gas-reduction-fund; https://www.epa.gov/system/files/documents/2023-04/GGRF%20Implementation%20Framework_730am.pdf at pp. 41-52.

finance entities. Nearly 50 of the organizations provided letters supporting the program proposal. On April 22, 2024, EPA announced that it had selected 60 applicants to receive Solar for All awards, including "states, territories, Tribal governments, municipalities, and nonprofits."[4] EPA announced that it obligated these funds as part of the larger Greenhouse Gas Reduction Fund.[5] As one of the recipients of the obligated funds, Commerce received an Assistance Agreement for $62.45 million dated July 9, 2024.[6]

Relying on the Assistance Agreement, Commerce negotiated its Work Plan and budget with EPA.[7] Commerce's Work Plan proposed to invest $46.85 million in financial assistance for residential-serving solar projects across the state. Financial assistance activities were to span five key programmatic areas:

- $2 million for direct-to-consumer funding to support deployment of on-site solar in low-income and disadvantaged single-family homes.
- $1 million to support the deployment of ground-mounted solar for manufactured homes.
- $10 million to support multifamily building owners to install solar that would directly benefit all of a building's residents.
- $23.85 million to create and administer targeted financial assistance, including specialized bridge loans and project loans, for community solar that prioritizes community ownership across the state.
- $10 million to all eleven federally recognized tribal nations to deploy residential serving solar.

Commerce received an Assistance Amendment from EPA on December 9, 2024 that removed a 2% funding restriction and incorporated the Work Plan documentation.[8] Beyond financial assistance, the Minnesota Solar for All effort planned to provide technical assistance for project pre-development, interconnection design, and permitting assistance. Commerce took steps to launch a community energy navigator initiative that would have supported local community-based organizations' efforts to increase residents' understanding of their solar options and potential bill savings. Funds were specifically dedicated for workforce development.

Commerce met with partners at Minnesota Housing and the Minnesota Climate Innovation Finance Agency to refine program design for the multifamily and community solar financing options. Commerce also held meetings with Tribal nations, through the Tribal Advocacy Council on Energy, to further refine program plans. Additionally, Commerce updated its program website to share program details and participated in a number of public meetings and events to share financing and program plans and gather feedback from potential adopters.

---

[4] *See* https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.

[5] *See* https://www.epa.gov/newsreleases/epa-awards-27b-greenhouse-gas-reduction-fund-grants-accelerate-clean-energy-solutions.

[6] Ex. 3 (attached).

[7] Ex. 4 (attached).

[8] Ex. 5 (attached).

Commerce was officially approved by EPA to exit the Planning Period on March 6, 2025. Since that time, Commerce has developed program plans with Minnesota's Weatherization Assistance Program staff to implement the residential solar offerings and was slated to launch pilots with three service providers in September 2025. Similarly, Commerce was in the process of finalizing contracts with two tribal nations, one of which was ready to begin construction in fall 2025. Commerce has also been working to finalize the Memoranda of Understanding with both Minnesota Housing and Minnesota Climate Innovation Finance Agency; Commerce was on the cusp of finalizing these agreements when it received the Termination Letter stating the program efforts must end.

The Termination Letter states that OBBBA repealed the underlying authority for the Solar for All program and rescinded unobligated amounts to carry out the program. EPA's opinion is that OBBBA "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and that EPA "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the Solar for All program. The letter also noted that recipients could continue to request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of the Termination Letter.

The subject line of the Termination Letter states that the termination is under 2 C.F.R. § 200.340, and the Letter states that Commerce should follow the closeout process outlined in 2 C.F.R. § 200.344. However, the Letter does not state the grounds EPA relied upon to require the closeout process. To be clear, OBBBA did not eliminate EPA's entire administrative budget. To the contrary, on March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" in fiscal year 2025.[9] Further, Commerce has complied with all Agreement terms and conditions and was achieving all the deliverables and activities within the agreed upon scope of work.

Prior to the Termination Letter, Commerce's ASAP account contained $62,021,529.96 of Commerce's Solar for All award. On August 13, Commerce learned that its ASAP account for the Solar for All program had been suspended; Commerce's ASAP account for the Solar for All program was no longer visible on the ASAP site. On August 15, the ASAP account reappeared and Commerce submitted a draw for costs incurred pre-termination, specifically for salary expenditures through July 29, 2025. As of September 2, Commerce's ASAP account access displayed a "liquidated" status and funds are available to draw down. However, the "available balance" on the account was substantially reduced from $62,021,529.96 to $4,322,706.18, and the performance period end dates were changed from April 30, 2029 and August 30, 2029 to August 15, 2025 and December 8, 2025 per Modification 5H-84089501-2.

## LEGAL GROUNDS

---

[9] Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

1. **EPA's Termination of Commerce's Solar for All Assistance Agreement Exceeds and Contradicts OBBBA's Language, Which Rescinded Unobligated Balances and Preserved Funds Already Awarded to Recipients.**

EPA's Termination Letter states that the Assistance Agreement is terminated because it is required by OBBBA.  Section 60002 of OBBBA provides:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

Commerce's funds were all obligated many months before OBBBA was enacted and were, therefore, not rescinded by Section 60002.[10]

Funds awarded to Solar for All grantees were obligated upon award and subject to a legally binding Assistance Agreement whereby EPA "promise[d] to spend the money, either immediately or in the future, as work under the obligation is completed."[11]  EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[12]  In other words, the Solar for All funds were obligated before OBBBA was passed.  OBBBA did not change this and could not have legally rescinded these obligated funding awards.[13]

Where the plain language of a statute is unambiguous, no further analysis is required.[14]  Here, the plain language of OBBBA is clear that obligated funds are not affected by Section 60002.  EPA's action in terminating Commerce's Solar for All Assistance Agreement is therefore contrary to the plain language of OBBBA.

---

[10] On August 11, 2025, three members of Congress wrote to Administrator Zeldin that he had "falsely claimed that passage and enactment of H.R.1 . . . gives [him] the authority to take back obligated funds" and that "grant funding awarded before [H.R. 1] was enacted . . . does not constitute unobligated funds subject to OBBBA. *See* https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/august-11-epa-letter-re-ggrf-ejcj-and-hr1.pdf.

[11] *See* https://www.usaspending.gov/explorer?glossary=obligation.

[12] *See* https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining _state_grant_and_expediting_outlays.pdf.

[13] On August 14, 2025, 32 senators wrote to Administrator Zeldin to inform him that his interpretation of OBBBA was incorrect. *See* https://www.epw.senate.gov/public/_cache/files/7/f/7fc428d4-aafa-4991-a25e-655d295fc0e2/D93F6E6E26805AFA241C4D39073BED3B75A6F496F4350B82CC4D782AAE 9BC35C.8.14.25-letter-to-epa-re-solar-for-all.pdf.

[14] *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end.").

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.[15]   Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose.  Congress did not direct or otherwise authorize EPA to terminate the Solar for All program.  EPA is acting beyond its authority because it defies Congress's express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All appropriations are rescinded.  EPA should therefore reinstate Commerce's Solar for All Assistance Agreement.

**2.  EPA's Decision to Terminate Commerce's Solar for All Assistance Agreement Lacks Any Legal Basis.**

The Termination Letter does not give any reason for termination other than its alleged reliance on OBBBA.  The uniform grant regulations at 2 C.F.R. § 200.340(a) provide the circumstances under which the government may terminate an award agreement, which include (1) failure to comply with the agreement's terms and conditions; (2) with consent of the recipient; (3) by request of the recipient; or (4) otherwise pursuant to the terms and conditions of the agreement, to the extent authorized by law.

2 C.F.R. § 200.340 does not authorize EPA to terminate an assistance agreement when EPA believes that it "no longer possess either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring" of a federal program.  Nor does it authorize EPA to terminate an assistance agreement when Congress rescinds EPA's "administrative cost appropriation" as the Termination Letter alleges.  Indeed, EPA has not identified any provision of 2 C.F.R. § 200.340 which authorizes termination of Commerce's Solar for All Assistance Agreement.

The terms and conditions of the Assistance Agreement do not allow for termination under the circumstances described in the Termination Letter.  Commerce has not, and unequivocally does not, agree to any attempts to terminate the Agreement based on EPA's erroneous, bad faith interpretation of OBBBA Section 60002.  Congress intended for these funds to benefit the public by providing efficient and sustainable energy options to meet the country's growing energy needs.  Commerce complied with the Assistance Agreement's terms and conditions and does not consent to the Assistance Agreement being terminated.

EPA has identified no bases for unilateral termination of Commerce's Solar for All Agreement.  Termination for noncompliance is only possible when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."[16] Neither condition exists.  Indeed, EPA has not identified any noncompliance, has provided no evidence of waste, fraud, or abuse, nor has it requested that Commerce take action to cure any deficiencies in its performance.

---

[15] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).
[16] Ex. 3 at p. 30; Ex. 5 at p. 25.

2 C.F.R. § 200.340(a)(4)'s language allowing termination "if an award no longer effectuates the program goals or agency priorities" does not apply either. When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget ("OMB") confirmed that the termination language relating to agency priorities did not allow agencies to implement arbitrary cancellations.[17] In 2024, OMB completed another round of revisions to this provision.[18] After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that may form a ground for termination, but only if "the language is included in the terms and conditions of the award."[19] The agency must "clearly and unambiguously" include (a)(4) in the Assistance Agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4).[20]

Here, because the Assistance Agreement does not include the "agency priorities" provision of (a)(4) as a ground for potential termination in its terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the Agreement. EPA acted contrary to the governing regulations.[21] Commerce's award must be immediately restored to its full amount.[22] Commerce requests no more or less than for EPA to follow the law and rescind this unlawful termination.

### 3. EPA's Decision to Terminate Commerce's Solar for All Assistance Agreement is Arbitrary and Capricious.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[23] In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[24]

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[25] Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and

---

[17] Guidance for Grants and Agreements 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).

[18] Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024).

[19] *Id.* at 30,089.

[20] *Id.*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

[21] 2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30,089.

[22] 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.

[23] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[24] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[25] *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

decision-making process."[26] Agency action taken on pretextual grounds violates the requirement of reasoned agency decision-making.

EPA's decision to terminate Commerce's Solar for All Assistance Agreement is arbitrary and capricious because: (1) EPA provided no reasoned basis for the termination, (2) EPA failed to undertake any individual assessments of Commerce's Solar for All Assistance Agreement, (3) EPA failed to provide Commerce notice and an opportunity to cure, and (4) EPA ignored Commerce's substantial reliance interests and the harmful impact of an abrupt and complete termination of the Solar for All Agreement.

EPA's sole stated rationale for the Termination Letter—that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 award recipients"—is a contrived, irrational, and insufficient explanation and thus not a reasoned basis for that action. EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that Congress appropriated to EPA in March to pay for "Environmental Programs and Management."

EPA likewise failed to engage in reasoned consideration of Commerce's Solar for All Assistance Agreement before categorically terminating the Solar for All program. EPA has identified no facts that would support the termination. EPA's public statements[27] demonstrate that its stated rationale was pretextual.

Also arbitrary was EPA's failure to give notice to Commerce so Commerce could address any alleged failures. 2 C.F.R. § 200.208 requires EPA to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to satisfy the conditions.[28] It is only after a grantee fails to meet the conditions imposed that an agreement can be terminated.[29] EPA's actions are contrary to these procedures. EPA terminated the Assistance Agreement without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure.[30] Contrary to Section 200.208's notice-and-cure requirements, EPA operated in secret to withdraw access to Commerce's accounts. The lack of notice was arbitrary, capricious, and deprived Commerce of due process.

### 4. EPA's Withdrawal of Commerce's Duly Appropriated and Obligated Solar for All Assistance Agreement Violates the Constitution's Separation of Powers.

---

[26] *Id.*

[27] Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025, 11:07 AM), https://x.com/epaleezeldin/status/1953518426602803684; *see also* https://www.youtube.com/watch?v=CfU3bYKmBOA (referring to Solar for All as a grift).

[28] 2 C.F.R. § 200.208(d)-(e).

[29] 2 C.F.R. § 200.339(a) & (c) (authorizing a temporary hold on payments, suspension or termination unless or until the recipient takes corrective action).

[30] 2 C.F.R. § 200.208.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[31]  The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[32]  The Executive has no power "to enact, to amend or to repeal statutes."[33]  Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority.  And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

*Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[34]  The U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[35]

The Termination Letter and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[36]  For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of Commerce's funding agreement.

*Take Care Clause*

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[37]  The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[38]  Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

---

[31] U.S. Const. art. I, § 1.

[32] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

[33] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

[34] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

[35] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).

[36] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

[37] U.S. Const. art. II, § 3.

[38] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

EPA terminated the Solar for All program and Commerce's individual Assistance Agreement on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind Commerce's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[39]    EPA's Termination of Commerce's Assistance Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to Commerce prior to September 30, 2024.  EPA violated constitutional separation-of-powers constraints because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[40]    The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[41]    Consistent with these principles, the Executive acts at the lowest ebb of its constitutional authority and power when it acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[42]  For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[43]    When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers.  EPA cannot usurp the will of Congress by unilaterally terminating Commerce's Solar for All Assistance Agreement.  For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

---

[39] OBBBA Section 60002.

[40] U.S. Const. Art. I, § 9, cl. 7.

[41] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

[42] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

[43] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[44]  When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[45]  EPA's termination of Commerce's Solar for All Assistance Agreement altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Agreement.  For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Letter and subsequent termination of Commerce's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind Commerce's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

## 5. The Termination of Commerce's Solar for All Assistance Agreement Will Cause Irreparable Harm to Minnesotans.

Commerce's Solar for All Assistance Agreement supports the Trump Administration's stated priorities of supporting energy independence, reducing energy costs, and protecting clean air and water, thereby reducing the cost of living.  Retail electricity prices have risen 13% since 2022, outpacing inflation, and rising temperatures, extreme weather, and expanding data centers will continue to drive higher demand.

Between the various programs Commerce intended to offer using Solar for All funding, Commerce was expecting to serve 11,000 low-income households, reducing electrical bills by 20%, or between $250-$300 per year or more, for each participating household. With the loss of Solar for All funding, Commerce will no longer be able to offer no-cost solar installations for low-income homeowners. It will no longer be able to offer funding for solar installations to serve affordable housing properties that serve low-income Minnesota renters. Commerce will no longer be able to provide financing to scale residential-serving community solar gardens across Minnesota – offering solar savings regardless of home ownership, solar access, or access to capital to own their own solar array. Commerce will no longer be able to support the 11 sovereign Tribal Nations in Minnesota with advancing projects to serve their tribal residents, drive energy affordability, and increase tribal energy sovereignty.

In addition, Solar for All funding was expected to invest $2.6 million in expanded job training opportunities to help Minnesota join the solar industry. Projects would have advanced contracts with local installers, construction workers, and electricians, and provided a market for

---

[44] U.S. Const. amend. X.
[45] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

Minnesota-manufactured Heliene solar panels. This compounds harm already caused to the solar industry by the early end of federal tax credits for distributed solar.

The premature end of Solar for All funding also harms Commerce as an employer. Commerce had used Solar for All funding to support 3.5 full-time-equivalent employees. These employees have been essential in advancing program design, conducting outreach to potential community partners, and negotiating memoranda of understanding with two state agencies, and working closely with tribal nations to establish contracts. Without this funding, staff will forgo these collaborations and will have to shift to other projects, eating into other programmatic funds and depleting those funds far more quickly than anticipated. Minnesota is simply unable to make up for this loss of funds to advance this residential serving solar work.

More generally, loss of Solar for All funding and the loss of federal support for solar energy generally will harm Minnesota and its residents. At a time of expanding electrical demand, solar and wind represent the least expensive way to add electrical supply in Minnesota. Rising energy prices and reduced economic growth will hit low- and moderate-income residents the most—exactly the population that Solar for All seeks to help. That does not even account for the public health savings that come from the fact that, compared with other means of generating electricity, solar energy is pollution free

Moreover, Commerce acted in reasonable reliance on its fully-obligated Solar for All funding continuing to be available. Commerce expended more than 1,385 employee hours on Solar for All programming. In so doing, Commerce had to forgo other funding opportunities, program structures, and scaling of other solar deployment opportunities. There is no way to recover this lost time or effort. Nor can Commerce simply backfill with state funds to keep its Solar for All offerings available. Minnesota's Weatherization Assistance Program was primed to scale its work installing solar alongside traditional energy efficiency activities; without Solar for All funds, there are no additional funds to advance this work. The same is true for Minnesota Housing's multifamily efforts. Minnesota has invested considerable funds in solar deployment over the past decade, but Minnesota currently projects deficits in the 2028-2029 fiscal year biennium; there will be no new funds available to make up for this programmatic loss. The Solar for All program also allowed Commerce to work closely with EPA in developing its work plan and with the National Renewable Energy Lab in scoping out technical assistance needs. The loss of these collaborations and programmatic support cannot be remedied.

## REMEDY OR RELIEF SOUGHT

If EPA claims that it no longer possesses the requisite personnel or administrative funding required to oversee and administer the Award, Commerce respectfully proposes the appointment of an independent third party to administer and oversee the Award, subject to EPA's reasonable oversight and supervision.

Until Commerce's dispute with EPA has been resolved, it objects to any claims of noncompliance under 2 C.F.R. § 200.344(i).

The specific remedy or relief sought here is rescission of the termination of this Assistance Agreement, reinstatement of the Assistance Agreement for the originally awarded amount, scope of work, and performance period, and reinstatement of the notice to proceed.  In furtherance of this Dispute, please find attached:

- A copy of the disputed Termination of EPA Assistance Agreement 5H-84089501; and
- Copies of supporting documents.

The name and contact information, including email address, of Commerce's designated point of contact for this notice of disagreement is: Sara Payne, General Counsel, Minnesota Department of Commerce, 85 7th Place, Suite 280, Saint Paul, MN 55101, sara.payne@state.mn.us, 651-539-1456.

Please acknowledge receipt of this Dispute and contact me to discuss resolution of this Dispute as soon as possible.

Sincerely,

Sara Payne
General Counsel
Minnesota Department of Commerce

CC: Devon Brown, EPA Award Official *via email* (brown.devon@epa.gov)

# Exhibit 1
# August 7
# Termination Letter



### OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

<u>MEMORANDUM</u>

**SUBJECT:**  Termination of EPA Assistance Agreement 5H-84089501 under 2 CFR 200.340

**FROM:**  Devon Brown, EPA Award Official

**TO:**  Grace Arnold, Commissioner
Department Of Commerce Minnesota

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84089501 awarded to Department Of Commerce Minnesota. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Hazeletta Burgess, EPA Grant Specialist
    Bryan Fiedorczyk, EPA Project Officer
    Lissa Pawlisch, Grantee Program Manager

# Exhibit 2
# August 8, 2025
# Assistance Amendment

| | | GRANT NUMBER (FAIN): 84089501 | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | | **MODIFICATION NUMBER:** 2 **PROGRAM CODE:** 5H | **DATE OF AWARD** 08/08/2025 |
| | | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 08/08/2025 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** 2035 |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| DEPARTMENT OF COMMERCE MINNESOTA 85 E 7TH PL STE 280 Saint Paul , MN 55101-2198 EIN: 41-6007162 | DEPARTMENT OF COMMERCE MINNESOTA 85 7th Place East, Suite 500 Saint Paul, MN 55101-2198 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Lissa Pawlisch 85 7th Place East, Suite 280 Saint Paul, MN 55101-2198 Email: lissa.pawlisch@state.mn.us Phone: 651-539-1563 | Bryan Fiedorczyk 1200 Pennsylvania Ave, NW Washington, DC 20460 Email: Fiedorczyk.Bryan@epa.gov Phone: 202-564-9623 | Hazeletta Burgess OGD-GMBOD, 3903R 1200 Pennsylvania Ave, NW Washington, DC 20460 Email: burgess.hazeletta@epa.gov Phone: 202-564-1533 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Minnesota Solar for All

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| **BUDGET PERIOD** 09/01/2024 - 08/08/2025 | **PROJECT PERIOD** 09/01/2024 - 08/08/2025 | **TOTAL BUDGET PERIOD COST** $ 62,450,000.00 | **TOTAL PROJECT PERIOD COST** $ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Avenue NW Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | | |
|---|---|---|
| Digital signature applied by EPA Award Official for Devon Brown - Branch Chief, GMB by LaShaun Phillips - Award Official Delegate | | **DATE** 08/08/2025 |

5H - 84089501 - 2    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84089501 - 2    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 3,272,636 |
| 2. Fringe Benefits | $ 1,145,423 |
| 3. Travel | $ 55,486 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 9,676,661 |
| 7. Construction | $ 0 |
| 8. Other | $ 47,419,700 |
| 9. Total Direct Charges | $ 61,569,906 |
| 10. Indirect Costs: 13.30 % Base MTDC | $ 880,094 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 1,000,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

   a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

   b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

   c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect.  The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

   a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

   b. Explanations on why established outputs/outcomes were not met; and

   c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

   a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

   b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

5H - 84089501 - 2     Page 6

# Programmatic Conditions

All Programmatic Conditions Remain the Same

# Exhibit 3
# July 9, 2024
# Assistance Agreement

| | | | |
|---|---|---|---|
|  | **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>**Grant Agreement** | **GRANT NUMBER (FAIN):** 84089501<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5H | **DATE OF AWARD** 07/09/2024 |
| | | **TYPE OF ACTION** New | **MAILING DATE** 07/12/2024 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** 2035 |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| DEPARTMENT OF COMMERCE MINNESOTA<br>85 E 7TH PL STE 280<br>Saint Paul, MN 55101-2198<br>EIN: 41-6007162 | DEPARTMENT OF COMMERCE MINNESOTA<br>85 7th Place East, Suite 500<br>Saint Paul, MN 55101-2198 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Lissa Pawlisch<br>85 7th Place East, Suite 280<br>Saint Paul, MN 55101-2198<br>**Email:** lissa.pawlisch@state.mn.us<br>**Phone:** 651-539-1563 | Christine Clark<br>77 West Jackson Boulevard, LL-17J<br>Chicago, IL 60604<br>**Email:** clark.christine@epa.gov<br>**Phone:** 312-886-9749 | Hazeletta Burgess<br>OGD-GMBOD, 3903R<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460<br>**Email:** burgess.hazeletta@epa.gov<br>**Phone:** 202-564-1533 |

**PROJECT TITLE AND DESCRIPTION**

Minnesota Solar for All "Note: A special payment condition applies to this award. "Note: A special payment condition applies to this award"

See Attachment 1 for project description.

| **BUDGET PERIOD** | **PROJECT PERIOD** | **TOTAL BUDGET PERIOD COST** | **TOTAL PROJECT PERIOD COST** |
|---|---|---|---|
| 09/01/2024 - 08/31/2029 | 09/01/2024 - 08/31/2029 | $ 0.00 | $ 0.00 |

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 62,450,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Avenue NW<br>Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official for Keva R. Lloyd - Acting Chief, Grants Management Branch<br>by Keva Lloyd - Award Official Delegate | **DATE** 07/09/2024 |

5H - 84089501 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 62,050,000 | $ 62,050,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 62,450,000 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41064 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 62,050,000 |
| | | | | | | | | | $ 62,050,000 |

5H - 84089501 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 62,450,000 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

- MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

- Payment requests (if applicable): EPA Project Officer

- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with

local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

   Progress towards objectives on key performance metrics over the entire period of performance,

   Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

   Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

   Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

   Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*<u>The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition</u>*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**_The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:_**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**_The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:_**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

#### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

#### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

<u>2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs</u>

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

**K. Labor and Equitable Workforce Development Requirements**

<u>1. Davis-Bacon and Related Acts (DBRA)</u>

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

## b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

## a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

> **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

> **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the [EPA Build America, Buy America General Term and Condition](), which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

### 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

### 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping
In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

**AA. Compliant URL Links**

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

**AB. Flow-Down Requirements**

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

#### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

#### 2. Governance Requirem

#### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# Exhibit 4
# Commerce Work Plan

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Minnesota Commerce Department**
**Work Plan**
**Project Period: 09/01/24 – 08/31/29**
**Date of Submittal: November 4, 2024**

**Project Title: Minnesota Solar for All**
**Grant Number:** 84089501
**Organization Name:** Minnesota Commerce Department (COMM)
**Geography:** State of Minnesota (including the 11 Federally recognized Indian Tribes)
**Definition of LIDAC:**

Beneficiaries for this project will be identified through multiple pathways:

- For single family programming, loans will be available for owner occupied housing that meets one of the following criteria:
  - Qualified borrower income is at or below 80% Area Median Income (AMI) with the income verification methodology to align with Minnesota's Housing's Fix Up Home Improvement Program Requirements Qualified borrowers are within the boundaries of any Census tract or federally recognized tribal area as defined by the Climate and Economic Justice Screening Tool (CEJST) or
  - Qualified borrowers are within census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation.
  - When utilizing geographic definitions, COMM and its partners will employ existing mechanisms to target outreach in ways that prioritize those households with high energy burdens.
- For the manufactured home strategy, LIDAC will be determined based upon income criteria for the Weatherization Assistance Program; these criteria support households with incomes at or below 200% of Federal Poverty Income Guidelines or who are eligible for assistance under the Low-Income Home Energy Assistance Program (LIHEAP) income by having a State Median Income (SMI) less than 50%, whichever is greater at the time of eligibility determination. This aligns with the NOFO eligibility to serve individuals and households with incomes at or below 80% Area Median Income.
- For multifamily lending, funding will be available to qualified affordable housing entities defined as a rental property where units meet one of the following criteria:
  - Rent and Income Restrictions at or below 80% AMI placed on units by state, federal, or local unit of government as evidenced by a document recorded against the property.
- For community solar participation, COMM will use all of the following to qualify households (and will document eligibility based on the criteria used):
  - Beneficiaries that are within the boundaries of any Census tract or federally recognized tribal area as defined by the Climate and Economic Justice Screening Tool (CEJST)

1

- o Beneficiaries that are within census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation.
- o Individuals and households with incomes at or below 80% AMI with the income verification methodology to be required as part of proposals from potential developer partners
- o Whether a household already participates to one of the social welfare programs – SNAP, WAP, etc.
- o If household resides in a building where Rent and Income Restrictions at or below 80% AMI are placed on units by state, federal, or local unit of government as evidenced by a document recorded against the property
- o When utilizing geographic definitions, COMM and its partners will employ existing mechanisms to target outreach in ways that prioritize those households with high energy burdens.
- For tribal communities, COMM will provide funding that will be distributed equally to the tribes that choose to participate. Initially, COMM will have a $909,000 cap, which is the $10 million tribal portion, divided into 11 parts. If there are Tribes that do not need the full amount, unused funds will be put into a general Tribal fund held by COMM and will be made available to other Tribes through an RFP process.

**Introduction**

**Section 1:  Project Description**

**1.1   Overview**

The Minnesota Commerce Department, Division of Energy Resources (COMM) has secured $62.45 million over five years to support residential-serving solar for over 11,300 low-income and disadvantaged households in communities across Minnesota, including the federally recognized tribal communities that share the same geography. COMM proposes to use the Solar for All (SFA) funds to provide a) $46.85M for financial assistance (grants, loans, and credit enhancements), projected to stimulate $167 million in additional investments, and b) $15.6M in supporting investments (workforce development, interconnection, and pre-development technical assistance, energy navigators, community engagement and education, and administration). COMM estimates that the residential-serving solar projects funded through the SFA will provide significant household energy savings of at least 20% and reduce greenhouse gas emissions (approximately 90,000 short tons of $CO_2$ annually).

**1.2   Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**

2

**Table 1**
**Environmental Results - Outputs and Outcomes**

|  | Number of households served | Generation Capacity (MW-AC) of new solar** | GHG Emissions Reduced & Avoided (CO2 emissions in short tons) | Household savings per household ($) |
|---|---|---|---|---|
| **Residential Solar*** | 2,195 | 9 | 16,700 | $140.50 |
| **Community Solar** | 8,150 | 34 | 68,000 | $228.00 |
| **Tribal** | 960 | 2.5 | 4,500 | $228.00 |

*Includes single family, multi-family, and manufactured homes
** All solar identified herein with be new solar implemented as a result of Solar for All.

Workforce/Apprenticeships: COMM will provide $295,000 to fund stipends for trainees to support travel and related expense to allow new workers access to training including paid apprenticeship opportunities and NABCEP certification. COMM will track the number of new workers it provides support to and the success rate of these workers obtaining certification and finding paid opportunities in the clean energy sector.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change
  - Objective 1.2: Accelerate Resilience and Adaptation to Climate Change Impacts
  - Objective 1.3: Advance International and Subnational Climate Efforts
- Goal 2: Take Decisive Action to Advance Environmental Justice and Civil Rights
  - Objective 2.1: Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels Objective
  - Objective 2.2: Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and Activities
- Goal 4: Ensure Clean and Healthy Air for All Communities
  - Objective 4.1: Improve Air Quality and Reduce Localized Pollution and Health Impacts

**Section 2:  Project Design Plan**

**2.1 Activities to be Conducted**

- Meaningful benefits: As described more fully in 2.2, Minnesota will deliver households savings of 20%. Key features of the meaningful benefits activities include:
  - Low-Income and disadvantaged households' access to solar: Design of an Energy Navigators program to serve as community-based advocates and educators. COMM will work with CBOs and non-profits that have established trust relationships in the communities they serve. Additionally, COMM will lead a pre-qualification process to vet solar companies to be certified Minnesota Solar for All installers to protect consumers and support consumer confidence in the program.

- o Resilience and grid benefits: Where appropriate, COMM will work with communities that may benefit from energy resilience and savings from solar with storage, especially vulnerable households, critical facilities, and geographically isolated households such as those on Tribal land. COMM is already discussing with several Tribes the possibility of adding storage to provide energy security and independence.
  - o Workforce Development: As part of the pre-qualification process, COMM will encourage solar installers to provide apprenticeships and/or hire installers from disadvantaged communities.
- Financial Assistance: As described more fully in section 2.3, the financial assistance activities will span five key programmatic areas.
  - o Single family: $2 million will be used for credit enhancements designed to provide a direct-to-consumer interest subsidized loan for the deployment of on-site solar in low-income and disadvantaged single-family homes. Credit enhancements will take the form of a Loan Loss Reserve (LLR) and an Interest Rate Buydown (IRB). Utilizing the Minnesota Housing "Fix-Up Home Improvement Loan Program" as a model, the LLR and IRB, along with ITCs that local lenders will capture on behalf of low-income households, the overall cost of the loans for the households will be decreased, mitigating risk.
  - o Manufactured homes: COMM will allocate $1 million for a program aligned with Minnesota's Weatherization Assistance Program (WAP), specifically functioning as an extension of the WAP's Community Scale Pilot Project (CSPP), to support the deployment of ground-mounted solar alongside weatherization measures using CSPP's existing community-based model. The Solar for All Weatherization Assistance Program (SFA-WAP) will service CSPP's pre-identified manufactured home communities, pre-qualifying households using the WAP criteria, and coordinating outreach and technical assistance through the WAP existing partner network.
  - o Multifamily: These activities will be implemented through the Publicly Owned Housing Program (POHP) and/or the annual Consolidated RFP or relevant RFP.
  - o Community Solar: $23.85 million will be allocated to create and administer targeted financial assistance, including specialized bridge loans and project loans for community solar that prioritizes community ownership across the state.
  - o Tribal: All 11 Tribes will be allocated an equal amount initially to deploy in their respective communities and at their discretion, within the terms and conditions of Solar for All. If any Tribe does not utilize their full allocation, the remaining amount will be made available to the other Tribes through an RFP process.
- Technical Assistance: As described more fully in section 2.4, key technical assistance activities will include: technical assistance to support communities with solar deployment planning, solar+storage assessments, project pre-development, interconnection design, or engineering review work to advance projects. Additional efforts will focus on technical assistance to bring down the soft costs (group buys, mapping tools) and to make deployment scalable (permitting assistance, financial and legal support, open-source billing tools).
- Education and Outreach: As described more fully in section 2.5, COMM will engage with communities across the state to deliver equitable access to SFA programs, with key activities including:

4

- o COMM will work with established methods of engagement that are currently in use for other energy programs, including engagement and education through the Energy Assistance and Weatherization Assistance network of service providers. COMM has existing networks of partners through the Clean Energy Resource Teams (CERTs), GreenStep Cities, Regional Development Associations, Community Energy Network, and the Minnesota Rural Electric Association and Minnesota Municipal Utilities Association to connect with local jurisdictions, community-based organizations, and local utilities. COMM will utilize proven tools that are part of its robust outreach and education processes including website, and community-based engagement. COMM will also create an Energy Navigator program in conjunction with the Home Energy Rebate program. The Energy Navigator trainings will provide communities with education and information to help determine eligibility for low-income energy programs and create best practices for engagement with particular communities.

- Compliance, Management, and Administration: As described more fully in section 3, COMM has well-established procedures to ensure strong fiscal stewardship of all of its programs, SFA included. COMM will build out additional monitoring and verification procedures to help ensure that COMM and its program partners deliver the program's meaningful benefits in full.

## 2.2 Meaningful Benefit Plan

COMM's proposed SFA program is committed to creating high-quality, middle-class job opportunities in the energy industry. The proposal's goal is to nurture workforce development, establish robust labor standards that include guaranteed safe working conditions, and protect the right to unionize within this industry. COMM plans to ensure that such benefits are accessible to a diverse population.

COMM will deliver on average a 20% reduction in energy bills for residential participants by using several approaches, including requiring that financial assistance provided in each program area results on average in a 20% reduction in electric bills by establishing processes for estimating bill savings calculations. These calculations will not only include direct savings on electric bills but also any additional household expenses incurred as part of program participation such as necessary roof repairs. These calculations will also include indirect household benefits such as improvements in household energy efficiency, detailed in the subsections below. For community solar, projects will be required to document 20% bill savings for households in their applications for funding.

In cases where low-income and disadvantaged households may need to cover upfront costs before reaping the benefits of projects, COMM will monitor implementors of SFA funds to ensure estimations of bill savings are realized. Ongoing monitoring will measure how participants continue to benefit from the promised savings throughout the duration of the program.

### 2.2.1.  Greater household savings

The proposed program is committed to delivering 20% household savings through a combination of strategic approaches:

- <u>Energy Efficiency Upgrades and Beneficial Electrification:</u> COMM will encourage participating households to use new and existing programs for energy efficiency, including through the COMM-administered Weatherization Assistance Program, COMM-administered the Home Efficiency Rebate and Home Electrification and Appliance Rebate programs, utility- administered efficiency programs, and other new programs being spurred by federal investments directed to households and local jurisdictions. These programs can support complementary energy efficiency assessments for participating households by identifying and implementing energy-saving measures, such as improved insulation and air sealing, LED lighting, and more efficient—often electric—appliances like heat pump water heaters. Minnesota already allows installation of cold-climate air source heat pumps as part of federally funded Weatherization Assistance Program projects in homes where baseboard or ducted electric resistance is the primary heat source and where this heat source will remain as a back-up heat source. Additionally, COMM is implementing complementary programs to support beneficial residential electrification, including a new heat pump program for income eligible households, that will help to reduce household energy burden when paired with SFA Financial Assistance Programs.
- <u>Solar Installation Cost Mitigation:</u> To ensure affordable access to solar energy, COMM will pre-qualify solar installers who can provide competitive pricing and streamline installation processes, which in turn will help minimize upfront installation costs.
- <u>Standardized Financing</u>: By establishing standardized contracts between solar developers and lenders, COMM will reduce soft costs associated with financing, which will result in lower interest rates and fees.
- <u>Credit Enhancements:</u> The proposed program will leverage credit enhancements using SFA funds to reduce financial risk for lenders to encourage lenders to offer more favorable terms and conditions to homeowners, including lower down payments, lower interest rates, and longer repayment periods.
- <u>Multifamily Housing Providers:</u> For multifamily housing, the proposed program will work closely with multi-family housing owners to fulfill the requirement that a portion of the cost savings from solar are passed on to tenants to achieve an average savings equivalent to at least 20% of electric bills.

### 2.2.2.  Low-Income and disadvantaged households' access to solar

The proposed program is designed to increase access to solar for low-income and disadvantaged households, especially to those traditionally underserved by such initiatives such as renters, manufactured home residents, and Tribal communities. COMM recognizes the importance of working with established local outreach and financing institutions, such as community action partnerships, community-based financial institutions, local jurisdictions and CBOs. COMM will build on established structures throughout the program. To bridge the gap between potential participants and the program, COMM proposes to establish an Energy Navigators program. Energy Navigators will serve as community-based advocates and educators, working directly with low-income and disadvantaged households. They will also guide individuals through the process of

accessing financial assistance and provide technical information on options for project deployment and address any concerns or barriers they may encounter. COMM is deploying several initiatives to leverage community-based outreach networks to support other deployment activities spurred by new federal, state, and local policy, such as the Home Efficiency Rebate and Home Electrification and Appliance Rebate programs. The Energy Navigators program will span these varied efforts by leveraging funds from these connected efforts.

Complementing these engagement and outreach strategies, COMM will lead a pre-qualification process to vet solar companies to serve as qualified installers as part of the proposed SFA Financial Assistance Strategy. This process, which builds upon previous work developing solar master contracts to serve units of government, will support consumer confidence in working with a solar contractor. This process will establish terms of contractor participation including but not limited to workforce and reporting requirements, customer engagement requirements and prohibitions, and savings requirements. Any company with a history of deceptive practices or pending legal actions will be disqualified. This approach will provide additional consumer protection and consumer confidence, lowering this barrier to participation. Additionally, the pre-qualification process will support achieving the workforce development and entrepreneurship Meaningful Benefit by connecting pre-qualified contractors to apprenticeship programs and the recruitment of workers from underrepresented backgrounds.

### 2.2.3. Resilience and grid benefits

COMM's proposed program recognized that adding distributed generation to nodes across the grid provides resilience benefits. For example, community solar projects fund upgrades to local feeders contributing to resilience. COMM's approach will also continue to assess prudent opportunities to enhance energy resilience through strategic deployment of energy storage systems. COMM and its partners are assessing whether there could be strategic deployment of storage with multi-family properties. Minnesota has two state level funds to support distributed storage deployment at capacities up to 50 kWh. A portion of these funds has been set aside for income eligible applicants – including in connection with WAP - as well as for tribal nations and will align well with Solar for All efforts. In addition, COMM will continue to work with local utilities to evaluate how storage could be strategically deployed to reduce demand charges, thereby providing financial benefits to a local distribution utility and both resilience and cost effectiveness to a low-income community solar deployment. Utilities have already articulated the potential benefits this could deliver, but sizing will need to be evaluated on a utility system and project specific basis. Storage will only be included with associated SFA funded solar installation.  Similarly, COMM will work with the individual Tribes on solar plus storage system designs that could allow tribal partners to maximize solar deployments and strategically local microgrids to add to tribal resilience, if they determine this would be a benefit to their plan. COMM's strategy will address creating capacity to deliver power to low-income & disadvantaged households during a grid outage.

### 2.2.4. Household and community ownership

COMM's SFA plan commits to maximize household and community ownership models that support low-income and disadvantaged households and communities building equity in projects. Numerous examples already exist in Minnesota, including community land trusts and housing cooperatives

serving as community pathways to support residential solar adoption. Similarly, there are existing cooperative businesses currently advancing community solar with cooperative members owning, as well as participating in, the solar gardens.  COMM will continue to work with partners to further refine a shared definition of community ownership that will incorporate the principles of this Meaningful Benefit. Importantly, COMM will seek to build agreement around the definition to include a range of models in which equity is owned or eventually owned by a household or a collective apparatus of a community, that returns benefits to households or communities, and that allows for community governance. An agreed upon definition of community ownership already includes ownership by many types of CBOs (e.g., cooperative businesses, housing cooperatives, rural electric cooperatives, municipal utilities, local governments, and Tribal governments or organizations), but how consumer-controlled limited liability companies or models that flip ownership back to a community-based organization after a specific number of years requires further discussion.

In recognition of the required community-based capacity to implement effective and scalable community-ownership models, COMM will continue assessment during the implementation of the program to explore expanding eligibility for financial assistance for community solar to third-party owned projects that can deliver the other aspects of COMM's Meaningful Benefits Plan at scale. By considering eligibility for third-party owned projects that deliver other Meaningful Benefits, the proposed plan will increase the likelihood that all designated financial assistance can be deployed within the period of performance. Similarly, COMM will work to design financial assistance for household ownership of single-family home solar. The Financial Assistance Strategy of credit enhancements will support solar leases and loans that will enable households to build equity in projects and eventually transfer ownership to the household after a predetermined period.

### 2.2.5.  Workforce development and entrepreneurship

COMM's commitment to investing in quality jobs and businesses aligns with the Administration's Good Jobs Principles and Executive Order 14082: Implementation of the Energy Infrastructure Provisions of the IRA. COMM will work closely with labor unions, developers, contractors, and other partners to create a synergistic environment that will foster job quality and business growth. An example is working with contractors to require their commitment to remaining neutral in union organizing operations. COMM's goal is to implement policies and procedures that uphold the highest standards of job quality and worker well-being. This includes family-sustaining wages, health care benefits, plans to prevent wage theft and exploitation of vulnerable workers, potential partnerships with registered apprenticeship programs, predictable work schedules, retirement contributions, safe working conditions, and the guarantee of a free and fair choice for workers to join a union. Additionally, COMM encourages the use of Project Labor Agreements (PLAs) when appropriate, which can establish clear terms and conditions for workers.

As part of an effort to encourage hiring in disadvantaged communities, COMM may establish incentives for pre-qualified contractors and installers to hire workers from those communities and/or to participate in local apprenticeship programs that provide opportunities to residents in disadvantaged communities.

COMM has dedicated funding to support these and other training efforts that invest in workforce

development, support essential community and tribal partners, and provide economic opportunities that promote equity within low-income and disadvantaged communities.

## 2.3 Financial Assistance Strategy

SFA funds will be used to leverage additional funding sources and maximize the number of households benefitting from rooftop and community solar. SFA funds will be extended to five tranches: single family credit enhancements, manufactured housing grants, multifamily deferred loans, community-owned community solar lending, and Tribal development funding, as shown in Table 2. COMM is dedicating $46.85 million, 75% of its award, to its financial assistance programs.

**Table 2. Summary of Financial Assistance Program Areas**

| Financial Assistance Program Areas | Amount Invested | Est. Deployment (MW-AC) | Est. Households Impacted |
|---|---|---|---|
| 4.1.1. Single-Family Home Credit Enhancements | $2.0M | 0.90 | 225 |
| 4.1.2. Manufactured Home Grants Aligned with Weatherization | $1.0M | 0.20 | 70 |
| 4.1.3. Multifamily Deferred Lending | $10.0M | 7.90 | 1900 |
| 4.1.4. Community-Owned Community Solar Lending | $23.85M | 34 | 8,150 |
| 4.1.5. Tribal Development Funding | $10.0M | 2.5 | 960 |
| **Total** | **$46.85M** | **45.5** | **11,305** |

For all programs, COMM will consider long-term impacts of the physical plant itself by working with installers to physically maintain the arrays throughout their lifetimes, and then recycling the panels at the end of their lives. COMM has existing processes through community solar garden operations to collect annual reports from gardens that it will also use with Solar for All to ensure on-going operation. For other projects site visits, follow-up with partners, and compliance checks will all be part of ensuring on-going operations. Regarding panel end of life, Minnesota has advanced legislation to implement a reuse and recycling process for solar panels, and there are related working groups that include industry representatives to also help identify long-term impacts of SFA investments.

Through the Minnesota Climate Action Framework, COMM will work with the Minnesota Pollution Control Agency on programs to keep solar panels out of landfills by recycling reuseable materials and safely dispose of toxic materials.

### 2.3.1    Single Family Credit Enhancements

For single family homes, $2 million will be used for credit enhancements designed specifically to catalyze additional financial resources for the deployment of on-site solar in low-income and disadvantaged single-family homes. These credit enhancements will take the form of two instruments: a Loan Loss Reserve Fund (LLR) and an Interest Rate Buy-down (IRB). COMM's approach leans on strategic collaboration with Minnesota Housing, which has ready- to-deploy capital pools and statewide networks of lenders who already close hundreds of loans including millions of dollars annually for solar installations. These entities will serve as intermediaries, amplifying the impact of SFA credit enhancements by leveraging other public and private financings, grants, tax incentives, and additional credit instruments. The goal of this strategy is to offer homeowners favorable financing terms and conditions in the form of a reduced or zero down payment, lower interest rates and monthly payments, and extended repayment periods that facilitate the adoption of solar for single-family homes that reduces electricity bill payments by an average of 20%.

The key financial assistance strategy and the mechanism to which the majority of funding for single-family homes will be allocated, is to provide an IRB that can significantly reduce the cost of solar leases and loans for low-income households and disadvantaged communities. Under the proposed structure, solar leases and loans will be financed by local lenders, such as community development financial institutions (CDFIs), credit unions, and private banks. COMM and its partners will buy down the interest rate for these lenders to enable solar leases or loans. COMM and Minnesota Housing currently utilize an IRB in tandem with a LLR in an energy "Fix-Up Home Improvement Loan" program, Energy Loan Plus. This Program has successfully provided low-interest loans to low-income households, mitigating the cost and risk to those households through the IRBs. By combining the IRBs with the ability of lenders to capture the ITCs on behalf of the low-income households, the overall cost of the project to the homeowner is decreased, which limits the risk of default by those households. This approach will enable low-income and disadvantaged households with limited tax liability to receive a substantially higher share of tax credit value. Additionally, to align incentives and enable the greatest opportunity for accessing investment tax credit adders, the program will offer greater IRB support, including a greater share of tax credit value to be retained by lenders, if lenders pursue additional investment tax credit adders (available under IRC Section 48) on behalf of households. This program design will provide a monetary incentive for lenders to maximize bonus tax credit incentives on behalf of households who cannot themselves access these tax credit address to deliver the greatest affordability Meaningful Benefit. For example, for lenders that are able to secure more than a 40% investment tax credit, lenders could be allowed to retain between 5-10% of the tax credit value, prorated to the level of tax credit secured, to cover their administrative and customer acquisition costs. COMM anticipates that this approach to monetizing the investment tax credit through the lender can be used to buy down the principal of a solar lease or loan by 30-50%, significantly reducing the monthly payment households make, so that they can achieve an average of 20% bill savings.

COMM will work with stakeholders to ensure the ability of using an IRB to achieve 20% electric bill savings in the Minnesota context through solar leases and loans. If it is determined that an IRB (coupled with the LLR described below) is insufficient to achieve the affordability Meaningful

Benefit, COMM is prepared to pursue additional funding pathways, outside of Solar for All, to provide a direct subsidy program to lower upfront costs. COMM will also work with stakeholders to develop pathways for households to eventually own solar projects supported by SFA enhanced leases and loans, including an assessment of the need for rebates for ownership transfers in the case of leases.

A new state "green bank" was enacted in 2023 and capitalized with $45 million in initial state appropriation for climate mitigation and adaptation activities across the state. The state's credit unions are active in clean energy development, having already formed CU Green to help create home solar loans. At least one National Clean Investment Fund recipient plans to provide direct household solar lending, and several Clean Community Investment Accelerator funding recipients are likely to be similarly positioned to provide direct household lending. Through the duration of the program, all of these institutions will be engaged to increase the ability of Minnesota's credit enhancements to attract and mobilize these additional sources of capital to scale single-family solar deployment.

The proposed credit enhancements are complemented by other policies in the state. Noteworthy among these is Xcel Energy's Solar*Rewards program that provides incentives to projects throughout its service area in the form of upfront or ongoing solar incentives, including higher levels of incentives for income qualified households. A number of other electric utilities across the state also offer solar incentives. If COMM were to secure additional funds for a direct subsidy program, it would target utility territories where complementary programs do not currently exist.

In addition, in the 2023 session, the Legislature allocated over $38 million for weatherization and pre-weatherization work to serve more Minnesota households, and established a $6.5 million residential electric panel upgrade program aimed at households below 150% AMI to cover up to 100% of the cost to upgrade a building's electrical panel, as well as two battery storage incentives programs for a total of $7 million. COMM administers all of these programs and, coupled with new federal Home Energy rebates (which COMM will also administer) and tax credits for efficiency and electrical panel upgrades, can help facilitate enabling upgrades to support solar deployment and increase energy affordability. Because the state has pre-existing incentives for panel upgrades and other technical upgrades, COMM does not envision providing financial assistance for upgrades with SFA funds; however, technical assistance can help lenders bundle solar with other home energy upgrades. Of note, should any enabling upgrades be funded with Solar for All funds, they will only be funded in conjunction with a solar investment. Additionally, any enabling upgrades will be: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project.

COMM also anticipates coupling the single-family program with the proposed Energy Navigators program, promoting access to the program across the state. The Energy Navigators will help weave different strands of project funding beyond solar together, as well as technical assistance, with potential participants (such as the WAP, home energy rebates, and the LIHEAP) ensuring that the program will maintain affordability for low-income and disadvantaged households in general. Energy Navigators will also support efforts to target high energy burden households (e.g., residents of manufactured homes, households who heat with propane) within CEJST census tracts or census block groups identified through EJScreen.

In addition to the IRB, COMM also proposes to establish an LLR that will act as a fund that cushions

11

against future default losses, assuring lenders that a portion of potential losses on loans made under the program would be covered. The LLR will reduce the perceived risk of lending to low-income single-family homes. The LLR is intended to support Minnesota Housing to leverage funding for single family residential solar from other financial institutions.

### *2.3.2    Manufactured Home Grants Aligned with Weatherization*

Manufactured homes form a significant part of Minnesota's housing landscape, and they come with unique challenges and requirements. Minnesota is home to 724 residential manufactured home communities, located with more than 43,000 home sites, as of 2021. COMM will allocate $1 million for a grant program to the WAP to support the deployment of ground-mounted solar alongside weatherization measures. This approach will allow residents of these homes to tap into sustainable energy sources, further reducing their dependency on other costlier and less reliable energy sources.

While the WAP has had funds that can be directed towards rooftop solar installations since 2018, the structural intricacies of manufactured (as well as single-family) homes often make it unfeasible for them to bear the weight and integration of such installations. This has resulted in a relatively small number of homes (< 50) to be fitted with solar via the traditional WAP model. Moreover, those homes that have been fitted with solar have run into some issues such as a gap in funding available for labor to fix any warranty or other system issues that occur on occasion. These are challenges but also opportunities for innovative solutions.

The SFA-WAP grant program is envisioned as a strategy to bridge these gaps, creating opportunities for these households to receive the Meaningful Benefits of solar energy. For example, designing the program to install ground-mounted solar arrays on eligible households allows SFA-WAP to bypass the structural limitations of manufactured homes. SFA-WAP will also partner with the WAP partner network, including the local WAP Service Providers and Clean Energy Resource Teams (CERTs) Regional Coordinators to conduct outreach, technical assistance, identify households, and distribute RFPs to streamline the procurement process. The process will be further streamlined by utilizing the WAP existing prequalification criteria, which requires that dwelling units be occupied by households whose income is at or below 200% of Federal Poverty Income Guidelines or is eligible for assistance under the LIHEAP income by having a State Median Income (SMI) less than 50%, whichever is greater at the time of eligibility determination. This criterion meets and can even exceed the SFA 'low-income' requirements of 80% AMI or 200% FPL, whichever is higher.

COMM additionally plans to coordinate and align SFA-WAP with the WAP Community Scale Pilot Project (CSPP), functioning as a natural extension of the project, which itself is an extension of Minnesota's well established WAP. CSPP's goal is to demonstrate a community-based approach to weatherization services through economies of scale. Nothing is inherently different about the weatherization services provided as part of CSPP except the targeted blanket outreach approach that allows the WAP Service Providers to strategically weatherize multiple clients in high-need communities compromised of manufactured homes. Contractors are therefore able to focus on the scale of work rather than the windshield time between projects. CSPP launched at the beginning of 2024 and is already seeing great success with this method of engagement. CSPP's goal is to conduct work on 80 units across 10 manufactured home communities. Through June 2024, 15 units were completed with another 15 anticipated to be done by the end of Fall 2024.

Using CSPP's existing community-based model, SFA-WAP will take a three-year staged approach, servicing CSPP's pre-identified manufactured home communities, pre-qualifying households using the WAP criteria, and coordinating outreach and technical assistance through the WAP existing partner network. COMM will implement community-wide bulk solar RFPs to select developers to install an estimated 72 ground mounted solar arrays with an average size of 3kW-DC. By issuing RFPs in these communities already serviced via CSPP, SFA-WAP will be able to pre-identify eligible homes as well as determine the total solar capacity to be installed within each community prior to putting out an RFP. Like CSPP, this model will allow SFA-WAP to take advantage of economies of scale, minimizing price premiums common for smaller residential systems.

Manufactured home residents have an energy burden of 6.71%, among the highest among households earning below 200% of the federal poverty level. As a result, these households also stand to experience among the most notable reduction in their energy bills through SFA-WAP's strategic solar deployment, —anticipated to be over 20%. This impact is even further amplified when considering that this solar deployment will work in tandem with other weatherization measures, magnifying the overall savings. Of note, should any enabling upgrades be funded with Solar for All funds, they will only be funded in conjunction with a solar investment. Additionally, any enabling upgrades will be: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project.

### 2.3.3    Multifamily Deferred Lending

$10 million will be used to create a deferred solar loan program dedicated to multifamily homes in partnership with Minnesota Housing. This initiative seeks to integrate deferred solar loans that may be forgivable into the existing frameworks of Minnesota Housing programs that serve urban and rural communities, particularly those that already facilitate property enhancements for both subsidized and naturally occurring multifamily affordable housing. These enhancements range from efficiency upgrades to pre-weatherization tasks. There are two main pathways through Minnesota Housing that could be utilized including the Consolidated RFP and the Publicly Owned Housing Programs (POHP). Other multifamily housing lenders in Minnesota and CDFIs also are prepared to distribute financing that could support solar deployment to benefit low-income and disadvantaged communities. The multifamily lending by SFA is designed with adaptability in mind. All construction and upgrades, including those related to storage, electrification, and energy efficiency, are eligible, allowing for comprehensive integration with existing funds for other property improvements, including efficiency and pre-weatherization work. The funds for associated improvements and storage will be available through the programs' particular application processes, allowing existing properties to assess which these complementary investments can deliver Meaningful Benefits. COMM will work with stakeholders to develop metrics to inform qualification of complementary investments that cost-effectively achieve resilience and other meaningful benefits.

Further complementing this are the existing state policies for multifamily solar. Xcel Energy, the state's largest utility, offers both upfront and ongoing incentives for multifamily solar. The Metropolitan Council previously provided technical assistance to help multifamily property owners install solar energy through its Solar-For-Vouchers Technical Assistance Program, a model that

could be replicated under this program.

A significant value proposition of the proposed program is its long-term impacts. The deferred loan structure, for instance, will provide a non-taxable incentive to affordable multifamily housing providers. As part of the funding agreement, the multifamily housing providers will commit to redistributing a proportional benefit of on average 20% bill savings to tenants—either directly, via rent adjustments, or other services of direct benefit to households. Already-present mechanisms for auditing Minnesota state agency funds will be used to monitor the solar asset as well.

With SFA's deferred loans integrated, COMM foresees a positive trend in upcoming funding cycles. By leveraging existing platforms, the program will optimize the number of households benefiting from the $10 million allocation over a span of 4 years. This maximizes the number of households that can be reached by using existing pathways, like a common platform (the Consolidated RFP), to advance solar with willing and able multifamily housing providers, to coordinate forgivable loan funding with other, already-utilized sources of funding, and to demonstrate the potential of solar to deliver benefits and thereby attract sustained solar adoption from more affordable housing property owners and developers.

### 2.3.4    Community-Owned Community Solar Lending

$23.85 million will be allocated to create and administer targeted financial assistance, including specialized bridge loans and project loans for community solar that prioritizes community ownership. The overarching aim of this financial assistance program area is to bolster community-owned community solar across every utility within the state.

Minnesota has one of the nation's largest community solar markets in the United States and the largest per-capita community solar market in the country. However, most of Minnesota's community solar deployment has been through the program serving customers of Xcel Energy. Despite significant overall deployment levels, the program has primarily supported third party-owned projects, with an important but relatively small minority of projects serving low-income households, renters, or community ownership models. The program has implemented major policy changes in 2024, including COMM taking over program administration, to shift the focus to serving low- and moderate-income households in Xcel territory. SFA financial assistance will leverage these changes to help to deliver the full suite of Meaningful Benefits, including requiring that all gardens deliver 20% bill savings to subscribers, in the reformed program.

In addition to supporting community solar projects for customers of Xcel Energy, this strategy will develop a variety of new loan products to foster innovative ownership models for community-owned community solar throughout the state. This initiative will also complement ongoing statewide efforts to broaden accessibility of community solar by incorporating community solar subscriptions into the state's Energy Assistance Program to reduce some customer engagement and retention costs.

COMM will transfer $23,850,000 in funds to the Minnesota Climate Innovation Finance Authority (MnCIFA) to offer a variety of financial assistance including a mix of bridge and project loans to community solar projects across the state. COMM and MnCIFA will partner to immediately deploy these financial resources. COMM expects the first round of applications to heavily feature community-owned community solar projects inside Xcel territory, given that this where the community solar market is most mature. COMM is already operating an LMI-focused community

solar program that is limited to Xcel's Minnesota territory. Projects in the program must deliver 10% savings to subscribing households with incomes below 150% AMI, and these households must make up at least 30% of every garden. Solar For All funds will be deployed to community-owned projects that go beyond the existing parameters and deliver 20% savings to eligible households. The existing program also requires documentation from developers that income eligible households meet the income requirements; COMM will utilize this existing process in Solar for All utilizing the definitions outlined above. COMM will largely align its definition of community-owned community solar with the one used by the U.S. Treasury's low-income communities bonus energy investment credit program. A facility owner will meet the ownership criterion if it is a Tribal Enterprise, an energy cooperative, a qualified tax-exempt entity, or a qualified renewable energy company (QREC) meeting certain characteristics. QRECs will be defined as entities that "serve low-income communities and provide pathways for the adoption of clean energy by low-income households" and meet multiple requirements related to equity ownership, number of employees and size, experience with development, and experience with serving low-income communities.

Beyond Xcel Energy territory, COMM expects community solar applications to primarily be put forward by Tribal entities, municipal governmental bodies (especially those with their own electric utilities) and cooperative utilities. Many of the community-based entities have recently told COMM that they are eager to move ahead quickly. With more than 180 electric utilities in the state, many with some experience with community solar, COMM expects to receive a wide variety of innovative proposals and technical assistance requests. COMM expects the financial assistance requests to concentrate on bridge loans to help these entities navigate elective pay provisions and cost reductions to help deliver Meaningful Benefits to subscribing households and the surrounding communities. Technical assistance will need to concentrate on project sizing and siting, as well as subscription savings estimation.

Finally, in recognition of the required community-based capacity to implement effective and scalable community-ownership models, COMM will solicit applications from third party-owned projects that can deliver the other aspects of COMM's Meaningful Benefits Plan at scale. COMM's prioritization of community-owned community solar models will help deliver multiple Meaningful Benefits beyond the community ownership Meaningful Benefit itself. While program performance tracking will be critical to ensuring savings, COMM's prior experience is that building community equity in community solar projects will help to deliver additional household savings and broadened accessibility. Nevertheless, COMM also recognizes that some third-party projects may be able to achieve "above-market" levels of Meaningful Benefits in line with the goals detailed in Section 1.2 but will require an equal, if not greater, level of pre-development commitment and community agreements. Additionally, hybrid models of ownership may begin with third-party ownership and flip ownership to a community-owned instrument, which may be particularly beneficial given the limited availability of accelerated depreciation benefits to taxable entities.

Pre-development technical assistance will be provided to communities that could benefit from community-owned community solar assets. COMM will deploy technical assistance to help communities bring together applicable tax credits, federal and state grants, and assistance and education across the state. Technical assistance for community solar can also help communities identify associated upgrades, which could include distribution and transmission upgrades, alongside household efficiency upgrades for subscribers. Bringing together the investment tax credit (which can now be used for interconnection upgrades for projects less than 5 MW-AC) and

other programs will be helpful to foster the overall goal of community ownership in the program.

Within this program area, COMM will provide that funding can be used for storage resources, according to the need of the applicant and ability to provide resilience benefits to vulnerable populations and critical infrastructure. Across Minnesota, some applicants will be better able to align storage deployment with the resiliency Meaningful Benefit. COMM intends to work with technical assistance providers to support origination of projects with the greatest opportunities for delivering Meaningful Benefits with storage.

Given the revolving nature of the funds, lending products for community solar will have great impact long-term. To help create long-term change, COMM will also couple the community solar program with the proposed Energy Navigators program, to promote broad access. The Energy Navigators will help weave different strands of community and household energy project funding together with engaging potential community solar subscribers, ensuring that the program will maximize household savings for low- income and disadvantaged subscribers. Energy Navigators will also support efforts to target high energy burden households (e.g., residents of manufactured homes, households who heat with propane) within CJEST census tracts or census block groups identified through EJScreen. The Energy Navigators' help will be augmented by technical assistance with law professionals proficient in community ownership incorporation, providing expertise and education to communities around the state.

All community solar funded under this program will conform to the definition of residential-serving community solar. Specifically, all participating community solar projects will have a nameplate capacity of 5 MW-AC or less, will deliver at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility, and will deliver at least 50% of the benefits and/or bill credits to residential customers within the same utility territory as the facility.

### 2.3.5    Tribal Development Funding

$10 million of SFA funds will be reserved for the Federally Recognized Tribes with reservations within Minnesota's boundaries for single-family, multifamily, and community solar financial assistance programs through an approved procurement process. Additionally, some Tribes may utilize the funding for battery storage to accompany community solar.

Grants will be best spent as directed by Tribal Nations to meet their own defined and sovereign goals, while leveraging state-facilitated technical assistance and other SFA financial assistance programs as relevant. This presents an opportunity for COMM to align SFA goals to the different Tribe's specific priorities and projects goals. Initially, the $10 million in funding will be available equally to the Tribes with a $909,000 cap (i.e., $10 million tribal portion, divided into 11 parts). Based on COMM's calculations, each Tribe could serve roughly 90 households with an average of $10,000 per household. If a Tribe determines that they do not need or will not utilize that full amount, any unspent funds will be made available to the other Minnesota Tribes through an RFP.

For the duration of the program, COMM will coordinate and collaborate with individual Tribes as well as working with the Tribal Advocacy Council on Energy (TACE), a tribally run council committed to energy issues for Minnesota Tribes. COMM will also continue to have regular communication

with the Midwest Tribal Energy Resources Association (MTERA), a coalition recipient of Solar for All funding for Tribal communities in the Upper Midwest. COMM will work with MTERA to ensure that Minnesota Tribes will receive SFA funding that best serves their communities, while remaining compliant with EPA and Federal award requirements and avoiding duplication of efforts. COMM will work with both MTERA and Minnesota Tribes to ensure there is no double counting of outputs or outcomes.

COMM will work with each Tribe to make sure that all deployed SFA funds meet all eligibility requirements, while at the same time giving each participating Tribe the space to make its own programmatic determinations. The Tribes will deploy the funds across a mix of eligible uses including residential PV systems (including rooftop, pole-mounted, and ground-mounted systems), community-owned community solar, associated storage systems, and enabling upgrades. The Tribes will use a mix of grants and loan products (including bridge, term, and forgivable loans) to deploy these projects. Each Tribe will determine the exact ratios of financial products that provide the best fit to help them leverage federal tax credits and deliver Meaningful Benefits to their members. COMM will provide technical assistance throughout the deployment process to support the tribes and help ensure that Meaningful Benefits are maximized.

The proposed program complements existing state policy for Tribal energy. COMM, along with other State of Minnesota agencies, works with Tribal Liaisons to understand Tribal needs. COMM intends to leverage this structure, along with Tribal governing bodies, SFA Energy Navigators, and technical assistance staff, to promote access to the $10 million in the Tribal Development Funding financial assistance program area as well as financial assistance program areas for single family homes, multifamily homes, manufactured homes, and community solar. Additionally, COMM will engage with Tribes to explore how to leverage other funding sources, including from the state of Minnesota and the federal government, to work in conjunction with SFA funding. The proposed program will maximize the number of households benefitting from the funding while respecting tribal sovereignty by working with Tribes during the process to understand and support their goals. Tribal communities across the state have different mixes of on- and off-reservation members, along with varying ages and ownership modes of housing that need to be considered. While a community solar model may be appropriate for one Tribe, a multifamily structure layered into Tribal housing projects may be more appropriate for another.

Through Tribal consultations during the application and workplan development phases, all 11 Tribes expressed interest in receiving Solar for All funding. Through TACE and regular consultation, COMM will work with the Tribes on planning and will offer technical support to plan projects that best serve their Tribal communities. The 11 Federally recognized tribes are:

- Red Lake Band of Chippewa
- Shakopee Mdewakanton Sioux Community
- Bois Forte Band of Chippewa
- Grand Portage Band of Lake Superior Chippewa
- Fond du Lac Reservation
- Mille Lacs Band of Ojibwe
- White Earth Reservation
- Leech Lake Band of Ojibwe
- Lower Sioux Indian Community

17

- Upper Sioux Community
- Prairie Island Indian Community

Tribes will have the option to use up to 20% of the funding for enabling upgrades. Primarily located along long radial distribution lines in rural areas of the state, many Tribes are interested in resiliency strategies, including potentially through storage, and COMM commits to working with Tribes to best leverage SFA funds to meet their needs. In addition, many Tribes run or work with their own Energy Assistance and Weatherization programs, making these program implementers complementary partners to meet SFA's goals.

### 2.3.6    Complementarity with Existing Sources of Capital and Financial Assistance

COMM's Financial Assistance Strategy seeks to maximize opportunities for translating the benefits of federal, state, and utility policies for residential-serving solar into Meaningful Benefits. This includes deliberate structures to align incentives toward monetizing the federal investment tax credit to benefit low-income and disadvantaged households, advance ownership and partnership models that simplify access to complementary sources of financial assistance, and efforts to complement all SFA-related outreach with complementary outreach on other programs that can improve energy efficiency or reduce energy burden.

COMM plans to expand the reach of the Financial Assistance Strategy by tapping into the networks and expertise of well-established entities, including other state agencies and local lenders like CDFIs, credit unions, and private banks. In particular, the establishment of a state "green bank" in the 2023 legislative session comes at an opportune time, as the administration of the "green bank" can be intentionally designed to maximize alignment with COMM's proposed SFA program and other programs under the Greenhouse Gas Reduction Fund. Furthermore, COMM's proposed SFA program demonstrates a commitment to supporting both private and public source of capital, as the strategy aligns with state policies and utility programs and leverages public funding from other state agencies and MN WAP. Simultaneously, COMM will encourage private lenders to participate in solar financing by offering incentives and credit enhancements. Not only does this approach help ensure a diverse pool of capital sources, but it also reduces financial barriers for low-income and disadvantaged communities.

### 2.3.7    Financial Assistance for Associated Storage and Enabling Upgrades

Through the proposed Financial Assistance Program Areas, COMM is not setting a specific target for MWH of associated storage, but it will work to ensure that storage can be strategically deployed to improve resilience with multifamily solar, community solar and Tribal solar deployment.

COMM's priority is to deliver Meaningful Benefits of residential-serving solar to as many low-income households and disadvantaged communities in the state as possible. Considering that Minnesota's WAP and LIHEAP offer an array of energy assistance benefits to its clients, COMM plans to refer households to these programs and other existing and emerging programs state, federal and utility programs for energy efficiency, electrification, electric panel upgrades, and supporting investments. In addition, SFA outreach will also integrate outreach regarding other local programs specifically for panel upgrades and certain enabling upgrades such as roof upgrades or energy efficiency enhancements. It is COMM's priority that participants have access to additional support and resources that COMM has determined are outside of the scope of the SFA Financial Assistance Strategy. However, COMM will consider strategic pathways to support energy efficiency,

pre-weatherization, home weatherization, behind-the-meter electrical upgrades, and beneficial electrification activities especially for single-family and multifamily solar projects, utilizing no more than 20% of the total financial assistance funds.

COMM recognizes the significance of distribution infrastructure investment to enable solar deployment, especially for community solar projects. Investments that are aimed at supporting monetization of the ITC for interconnection of projects below 5MW-AC may be eligible for financial assistance, all of which aligns with the evolving federal and state landscape of solar incentives. Of note, should any enabling upgrades be funded with Solar for All funds, they will only be funded in conjunction with a solar investment. Additionally, any enabling upgrades will be: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project.

### 2.3.8    Long-Term Impacts of Financial Assistance

COMM commits to incorporating financial assistance mechanisms that will ensure the longevity of the program and lead to market transformation. Specifically, COMM envisions that each financial assistance program area can lead to long-run transformation by supporting more stable housing, more affordable access to energy services, new sources of locally tailored financing, new community and household-owned capital, self-determined Tribal energy programs, new high-quality jobs, and improved environmental quality.

COMM is committed to supporting policies that will maintain the affordability of the existing housing stock, prevent displacement of vulnerable communities, and mitigate rapid cost increases for low-income and disadvantaged communities. COMM is committed to ensuring that solar installations do not lead to an increased energy cost and will collaborate with stakeholders to assess potential project risks to avoid any unintended consequences that may lead to the displacement of households.

## 2.4  Project-Deployment Technical Assistance Strategy

The funding for technical assistance funds will be broken into two areas: workforce development, and interconnection and pre-development technical assistance, as shown in Table 3.

**Table 3. Summary of Project-Deployment Technical Assistance**

| Project-Deployment Technical Assistance | Amount Invested |
|---|---|
| Workforce Development | $2.6M |
| Interconnection and Pre-Development Technical Assistance | $4.8M |
| **Total** | **$7.4M** |

### 2.4.1    Workforce Development

As part of COMM's commitment to the workforce development and entrepreneurship Meaningful Benefit (see Section 1.2.5), proposed workforce development programs will expand participation

from workers in low-income and disadvantaged communities by funding training centers, workforce training, certifications, or direct training. SFA funds used for workforce development will support programmatic efforts to partner with existing registered apprenticeship programs that have a track record of graduating apprentices from underserved communities, including by supporting organizations that partner with such registered apprenticeship programs to recruit qualified candidates and help candidates and new apprentices to overcome barriers including but not limited to lack of transportation, child care, or other social supports needed to facilitate continued employment in the industry.

COMM is currently working with other state agencies, local communities, and community-based organizations to create a plan to recruit and retain participants from low-income and disadvantaged communities and to build on existing training programs. This plan will be built on a foundation of inclusivity and collaboration. Developed plans will address how those participants will be supported with wrap-around supportive service, case management, and on-the-job-support and mentorship. COMM commits to working with pre-existing workforce training programs and union-affiliated programs, as well as local community colleges to provide accessible training opportunities. COMM will explore partnership with other departments in the State, including Employment and Economic Development (DEED), Dept of Labor and Industry (DLI) and Department of Corrections (DOC) to seek pathways for disadvantaged groups in the solar workforce. Collaboration will ensure a Statewide approach. Innovative platforms utilizing artificial intelligence and/or virtual reality technologies are a strategy COMM is also evaluating. These technologies meet jobseekers where they are, and these pose a viable opportunity to bridge the gap of individuals who may not be able to travel or access workforce centers in real-time.

COMM continues to have discussions with state agencies and grant partner organizations on incorporating support around providing services such as childcare assistance, transportation aid, facilitation in training programs, and others. COMM will encourage grant recipients to coordinate, to the extent possible, with registered apprenticeship training programs, which will ensure that trainees have a pathway to a good-paying career in energy infrastructure construction. Further discussions will also include plans for addressing barriers to participation and offer guidance and mentorship as participants embark on their careers in the solar industry. SFA efforts will also include entrepreneurship training and mentorship which could be advanced in collaborations with workforce development centers across the state.

Examples of this support include direct solar workforce training; collaborating with renewable energy training centers and programs (including with institutions serving Tribal Nations and urban American Indian populations and community-based organizations); providing funding for electricians and others to go through formalized certification programs; funding for job training and apprenticeships.

COMM will utilize SFA funds to ensure that the state's solar industry supports development of skilled local workforce and family-supporting jobs and expands access to high-quality jobs and construction career opportunities for residents of low-income communities that have historically been underrepresented. In awarding program funds to subgrantees, applicants will be required to provide detailed information on plans to ensure creation of high-quality jobs that provide health care and retirement benefits; plans to prevent wage theft and exploitation of vulnerable workers; and plans to partner whenever possible with registered apprenticeship programs that have a

demonstrated track record of graduating skilled journeypersons, including workers from communities that are currently underrepresented in the construction industry.

### 2.4.2    Interconnection Technical Assistance

The Minnesota Distributed Interconnection Process (MnDIP) framework, which serves as a critical resource for addressing interconnection challenges, will be used as part of a strategy to support the development of distributed infrastructure for solar projects. However, COMM recognizes that certain interconnection challenges, such as funding extensive grid infrastructure upgrades, fall under the responsibility of utilities and may require separate sources of funding. The proposed program is committed to addressing critical aspects of interconnection through pre-and post-development technical assistance.

Solar projects with a maximum net output of 5 MW-AC or less may be eligible for claiming related interconnection upgrades in the cost basis for the investment tax credit, effectively subsidizing interconnection costs at the rate of the investment tax credit including any applicable adders. The proposal's funding for technical assistance will include assistance to encourage development that leverages the expanded ITC, as well as permitting and regulatory processes, and helping developers meet legal requirements and obtain the necessary approvals efficiently. Part of this strategy also includes engineering consulting support to assist solar developers in overcoming interconnection challenges.

Any projects that receive financial assistance from the program will only utilize financial assistance for capital grid upgrades when the upgrades are necessary for the program and where non-wire alternatives are not a feasible solution. The proposed costs for these grid upgrades are not available at this time; these will be identified during utility engagement activities and individual projects' interconnection applications.

COMM will take advantage of recent changes in state interconnection and solar siting rules to leverage SFA funds. Minnesota's new CSG program removes the previous program's requirement that all subscribers be located in the same or adjacent county as the solar garden, which is incentivizing developers to locate projects in new areas of Xcel Energy territory without congested interconnection queues. In 2023, Minnesota passed a law requiring the PUC to develop an interconnection cost-sharing process for distribution system upgrades and to also create an interconnection ombudsperson position at the PUC. These and other changes should help accelerate the interconnection process, helping bring SFA-supported projects online sooner. The implementation of these new pieces will create some short-term uncertainty, but COMM will provide technical assistance to help stakeholders navigate the transition.

To create efficiencies in the program deployment process, COMM plans to establish strong partnerships with utilities. This collaboration will include coordinating interconnection processes with SFA-supported project development. Different utilities face different challenges, so collaboration will take on different forms. In Xcel Energy territory, the lengthy interconnection queues are about to be shaken up with new laws and regulations, and COMM is positioned to help everyone in the new landscape. Grid congestion is not much of an issue in other utility territories in the state, but that also means that these utilities and developers have less experience working together through interconnection challenges. In these cases, COMM will help build relationships and facilitate interconnection conversations around SFA-supported projects. Additionally, COMM has secured both federal and state funds for work related to grid resilience and scaling renewable

energy deployment that may provide beneficial connections and information sharing.

### 2.4.3    Resilient Project Siting, Permitting, and Other Technical Assistance

The technical assistance component of the proposed program will aid in identifying optimal project locations, considering factors like sun exposure, grid proximity, and community preferences. COMM is committed to engage actively with local stakeholders and authorities to navigate zoning requirements, permitting processes, and compliance with building codes and inspection standards in order to enhance project quality and safety.

On siting, COMM intends to further leverage existing programs to help accelerate deployment. COMM worked with partners to pursue a Department of Energy Renewable Energy Siting through Technical Engagement and Planning (R-STEP) grant that, while not awarded, emphasized the importance of updating resources to support local jurisdictions with siting solar projects <5MW. COMM and its partners will continue proactive planning approaches that build on the Grow Solar Partnership's Local Government Solar Toolkit and leverage Minnesota's work through SolSmart and GreenStep will all facilitate more collaborative siting of project. Local governments have siting jurisdiction over solar projects <50MW and battery projects <10MW. COMM will work with these jurisdictional partners to consider adoption of agrivoltaics practices that harmonize solar installations with agriculture, to advance the use of remediated brownfields for project siting to repurpose underutilized land, and to draw upon the Minnesota Habitat Friendly Solar program to address stakeholder concerns and priorities in siting solar.

On Permitting, the Minnesota legislature directed COMM to establish a program that provides technical assistance and financial assistance to encourage eligible permitting authorities to adopt the Solar Application Permit Processing Plus software (SolarApp+). SolarApp+ is an online platform development by the National Renewable Energy Laboratory to standardize, automate, and streamline the residential solar permitting review process. COMM will leverage this initiative to engage both the Minnesota Department of Labor and Industry and local jurisdictions who share responsibilities for both building and electrical codes. Minnesota has over 850 cities and nearly 90 counties; utilization of this tool can help increase transparency for solar installers working across all of these jurisdictional boundaries and speeding residential solar approval process.

One of the barriers expressed by some utilities to adopting community solar at scale is the challenge of integrating subscription payments and associated credits into their existing billing software. For many utilities, community solar subscription management requires manual entry. While Minnesota is home to over 180 electric utilities, many utilities use the same billing software platforms. Additionally, for many low-income households, managing two bills, one for a community solar subscription and one for ordinary electric bills, is a barrier to subscriber participation. COMM proposes to use a portion of the SFA funds to invest in an open-source billing solution that could be utilized by any utility to streamline utility billing and enable consolidated billing with community solar subscriptions. This will require concerted engagement with utilities and their billing providers. Better integration of community solar with utility billing software platforms will also assist with tracking energy savings for SFA participating projects and households.

## 2.5 Equitable Access and Meaningful Involvement Plan

COMM intends to invest $3.8 million in Energy Navigators, community engagement, and education and $4.9 million for compliance, management, and administration, as shown in Table 4.

**Table 4.** Summary of Equitable Access and Meaningful Involvement Plan Areas

| Equitable Access and Meaningful Involvement Plan Areas | Amount Invested |
|---|---|
| Energy Navigators, Community Engagement, and Education | $3.7M |
| Compliance, Management, and Administration | $4.4M |
| **Total** | **$8.1M** |

### 2.5.1    Commitment to Serving Diverse Communities

The State has an established Government-to- Government (G2G) Consultation protocol with all 11 Minnesota Tribal Nations, the One Minnesota Council on Diversity, Equity and Inclusion, and the Community Council on Equity and Inclusion. COMM itself has 5 strategic pillars, one of which states, "ensure all, especially historically disadvantaged Minnesotans are resilient to Minnesota's climate and engaged in advancing efforts to mitigate climate change." COMM is fully committed to maximizing the breadth and diversity of communities across Minnesota who can engage in and benefit from Solar for All activities. COMM has a strong track record of priorities disadvantaged and low-income communities in grant making and will continue that focus throughout this work. In 2023, the Minnesota Legislature established the language and staffing for COMM to support a Tribal Advocacy Council on Energy, a Tribally governed council to identify and prioritize Tribal energy issues and determine appropriate actions. COMM established the Community Energy Collaborative in 2022 to formalize a policy and programmatic advisory board, made up representatives from community-based organizations who represent diverse communities. COMM hosts the Weatherization Assistance Program – Policy Advisory Committee (WAP-PAC), made up of community action agency representatives, community-based organizations and utilities to advise on residential weatherization programs and policy. Each of these existing efforts, and their formalized structures, speaks to COMM's commitment to this work. COMM believes the array of proposed financial assistance programs is tailored to income eligible households, and in particular, households that do not own their property, those who lease land, and those who do not have space for residential rooftop solar. As with other financial programs, COMM will work with administrators of SFA, along with community-based partners to ensure that those communities of greatest need as defined by CEJST are prioritized. Within DACs as defined by CEJST census tracts or census block groups identified through EJScreen, COMM and its partners will utilize existing mechanisms to reach and prioritize those households in greatest need, such as outreach at the community level, working through community lender networks, and the future Energy Navigator program to target under-resourced and high energy burden households (i.e., those with energy burdens higher than 6%).

As further detailed below, the proposed program will also prioritize communities with limited English proficiency by translating program materials into Spanish, Hmong, Somali, Karen and Vietnamese, work with CBOs based in and around those communities, and target broad geographic investments through engagement, technical assistance, and financial assistance activities.

COMM will ensure compliance with the Civil Rights Terms and Conditions prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

### 2.5.2    Participatory Governance Plan

COMM will leverage existing formalized structures, as referenced above, and expand upon them to ensure engagement with both culturally and geographically diverse communities. COMM will collaborate with communities through established structures and groups that are currently utilized by COMM and partner organizations and leverage other efforts underway through the Home Energy Rebates programs. Current advisory committees for other assistance programs utilize advisors to the state-administered federal programs and include both local community action agency representatives as well as other key partners in state agencies, local utilities, CBOs, and energy audit technical assistance providers. These are strong starting points for engaged governance and allow COMM to start from a place of trust with existing partners while it also works to draw new organizations into the Solar for All work.

Over the past year, COMM has led the work to establish Minnesota's new "green bank," the Minnesota Climate Innovation Financing Authority (MnCIFA). A COMM representative sits on the Board of MnCIFA along with representatives from community-owned utilities; labor organizations; a member with experience in the impact of climate change on MN communities; community lending institutions; energy conservation; environmental justice; and investment fund management/finance. The Board has led a robust community engagement process to inform MnCIFA's Strategic Plan and Investment Strategy which will provide a strong foundation of engaged governance moving forward.

Minnesota Housing is the state's housing finance agency and finances housing that low and moderate-income Minnesotans can afford while helping Minnesotans buy and fix up their homes. Along with fostering strong communities, Minnesota Housing provides resources to stabilize neighborhoods, communities and families and works cooperatively with others to support the development and preservation of affordable rental housing. Minnesota Housing is managed by a board of directors. The board ensures the Agency's independence when making decisions and maintaining financial assets. The board is composed of the state auditor and six members of the public appointed by the governor with advice and consent of the Senate. The board meets at least once a month. Meetings are open to the public.

For the financial assistance allocated to Tribes, in addition to continued conversations with each of the Tribes to define their individual needs from this program, COMM will work closely with the now newly formalized Tribal Advocacy Council on Energy (TACE). COMM has already established a strong foundation with TACE members and sought their advice and guidance on formalizing this

work plan. This will be an essential relationship to guide COMMs work with Tribes through the Solar for All program period and to ensure that COMM's tribally focused efforts are truly tribally driven.

Further, COMM has long sought engagement from and will include representatives from the solar industry, local government representatives, and representative from labor and workforce development agencies. COMM currently runs numerous solar programs, including a community-solar program. Through these efforts COMM frequently engages with the Minnesota Solar Electric Industries Association and its members as well as directly with solar installers and developments. COMM leads a number of community technical assistance and financing efforts, including for example, a local capacity grants programs and the DOE funded energy efficiency conservation block grant program. Through these programs, COMM has established strong connections to Regional Development Organizations across the state and will harness these existing relationships to inform Solar for All program development and implementation. Finally, COMM has strong relationships with labor partners, in particular LIUNA and the Carpenter's Union, along with its partners agencies Department of Labor and Industry and the Department of Employment and Economic Development. Each of these partners will be essential in shaping Solar for All workforce efforts.

### 2.5.3  Education and Engagement Plan

COMM is proposing a significant investment in Energy Navigators training. Energy Navigators will be trained "front- line" personnel with deep connections in community who are able to use that expertise and experience to connect households and communities with energy programs to make energy-related services more accessible. Additionally, Energy Navigators will be resources for the organizations and companies that will be partners in the administration and implementation of the SFA program. This will include community lending institutions, contractors, and other partners that will help lift up the program. Information for these partners may include lending requirements and parameters or processes and procedures on DBRA and BABA compliance and reporting.

COMM is currently pursuing multiple strategies to bolster Energy Navigator capacity across the state. For example, Minnesota is in the process of standing up navigator capacity to support the new Home Energy Rebate programs as well as related state programs. COMM will invest in complementary capacity to ensure engagement with all SFA-eligible communities. SFA Energy Navigators' missions will be aligned with the SFA's goals: reducing emissions, delivering benefits to low-income and disadvantaged communities, and mobilizing financing and private capital. COMM staff will facilitate close collaboration among navigators to ensure that each can support households with informed energy decision making through an annual training gathering. COMM has existing networks of partners through the Clean Energy Resource Teams (CERTs), GreenStep Cities, Regional Development Associations, Community Energy Network, and the Minnesota Rural Electric Association and Minnesota Municipal Utilities Association to connect with local jurisdictions, community-based organizations, and local utilities. COMM will utilize proven tools that are part of its robust outreach and education processes including website, and community-based engagement. COMM will also create an Energy Navigator program in conjunction with the Home Energy Rebate program. The Energy Navigator trainings will provide communities with education and information to help determine eligibility for low-income energy programs and create best practices for engagement with particular communities. COMM will create a framework for engagement with community-based organizations that work in disadvantaged and low-income

communities. These partners will act as conduits to better understand the unique needs the communities they serve and how COMM can design the Energy Navigator program to best serve them. These partnerships will continue for the duration of the program.

COMM will focus on a unified source of information to streamline the education and outreach process and ensure that households are well-informed. COMM will utilize its Energy Information Center (EIC) to help Minnesotans make informed choices about their energy use. The EIC is a mobile and virtual outreach tool to educate and enroll Minnesotans into clean energy and energy efficiency programs that can be leveraged by navigators, program implementers and the general public.

COMM will leverage existing relationships to host listening sessions with CBOs and partners to strengthen those relationships and engage specific underserved communities. COMM will coordinate in-person and virtual community events to gather input and local insight; contract with key community partners for their insight and connections, and collaboratively design education materials in a variety of mediums that utilize diverse messages, imagery and languages. Engagement and work with Tribes will happen through COMM's Tribal Liaison. and will be guided by the government-to-government protocols the State has utilized since 2019.

### 2.5.4    Customer Acquisition and Management

The proposed strategy for customer acquisition is underpinned by a commitment to community integration, resource leverage, and reaching the most in-need families. Recognizing the pivotal role of grassroots initiatives, this proposal aims to establish strong partnerships with CBOs through Energy Navigators. Additionally, COMM will build on established trust relationships as described above and solicit insight and advice from those existing allies and COMM's, and its partners, existing program implementors. The EIC will work with local partners and service providers to help define the best messages and methods to reach as many low-income and disadvantaged community members as possible.

**Partners:** COMM will work with local partners to help determine energy burdens, identify participation in low-income assistance programs, and utilize established trust relationships. These partners will include local utilities, CBOs, and LIHEAP and WAP service providers.

Alignment with other assistance program providers will help verify eligibility and reporting practices, simplify and expedite applications, and streamline tracking and reporting.

Moreover, the "Connector" tool, a collaboration between the U.S. Department of Energy's National Community Solar Partnership (NCSP) and the U.S. Department of Health and Human Services (HHS), to facilitate community solar subscriptions to LIHEAP clients presents a strategic approach that COMM is considering. This tool could be a tangible strategy to address a recurring challenge faced by community solar developers: finding subscribers who meet the income-eligibility criteria. Tapping into the pool of pre- qualified candidates from HHS' LIHEAP could address a segment of this need for community solar subscriptions. COMM staff who lead community solar programming have been meeting with COMM staff who lead the Energy Assistance program to discern how to address the barriers and potential concerns of capacity at local LIHEAP offices.

**Messaging Techniques:** COMM will provide information about expected savings to households as the primary message in a way that ensures that people receive information that is accessible and

clear. COMM will work with communities to create language, imagery and messaging that is effective and impactful. Language and imagery can be tailored to appeal to cultural or geographic communities.

**Vehicles for Outreach and Messaging:** COMM acknowledges that reaching low-income and disadvantaged community members can be challenging. This is especially true in rural areas and Tribal communities where some have issues with reliable internet and Wi-Fi connectivity. Working with local utilities, EAP/WAP service providers, and Tribal governments to provide information on solar benefits in utility bills, renewal notices and application forms, and Tribal government communications will ensure that those without access to other forms of information are reached. Billboards, local newspapers and locally programmed radio stations also remain a trusted source of information to many Minnesotans and will be part of mix considered for message distribution.

### Section 3:  Fiscal Stewardship Plan

*3.1    Plans and Policies for Program Oversight, Confidential Reporting, and Managing Conflicts of Interest*

In addition to the annual single audit, COMM regularly undergoes programmatic audits and financial monitoring on these programs. Attachment F provided with the application includes further details as to COMM's financial management practices and fiscal stewardship along with certifications and assurances in compliance with the Code of Federal Regulations on award acceptance.

COMM follows statewide statutes, policies and procedures as set forth by law, Minnesota Management & Budget, Office of Legislative Auditor, and Department of Administration.

Minnesota Statute §16C applies specifically to the Agency's roles and responsibilities. Grants and subawards are administered by dedicated Energy Division staff pursuant to policies set forth by the Office of Grants Management (OGM) and Office of State Procurement (OSP). These policies and processes are regularly refreshed by the State Department of Administration, with whom the Department maintains consulting relationship (along with the State Attorney General's office) and reviewed by Federal agencies such as Health and Human Services and the Department of Energy.

For subawards other than named subrecipients defined in the workplan, COMM will administer a competitive grant solicitation process for eligible entities in accordance with both state and federal procurement practices. COMM follows established state procurement practices to solicit, award, and distribute grant awards; competitive bids will be collected and evaluated per guidelines set forth in the State's OSP and OGM statutory authority and rulemaking. All grant administration and monitoring, including reporting and Federal flow down requirements, such as NEPA, BABA and Davis-Bacon, will be handled through contract terms.

*3.2    Investments in Consumer Protection and Enforcement of Consumer Protection Laws with Partners*

With regard to consumer protections, COMM will implement a pre-qualification process to vet solar companies to participate in the program. This process will establish terms of participation including but not limited to workforce and reporting requirements, customer engagement requirements and prohibitions, and savings requirements. Any company with a history of deceptive

practices or pending legal actions will be disqualified. Once qualified, COMM will also provide oversight of participating companies including compliance checks. Minnesota's Attorney General has also made oversight of solar companies a priority and recently advanced legal action against several companies accused of deceptive practices.

The State adopted a suite of consumer protections for community solar gardens. COMM now administers the community solar garden program that operates within Xcel Energy territory and will utilize these same protections across the Solar for All portfolio of community solar-related projects. Requirements include providing information, in writing and in plain language, regarding rates, contract terms, termination fees and the right to cancel a subscription. Prohibitions on developers/subscriber organizations are as follows:

- checking the credit score or credit history of a new or existing residential subscriber
- charging an exit fee to a residential subscriber
- enrolling a subscriber without the subscribers prior, voluntary consent
- engaging in misleading or deceptive conduct, and
- making false or misleading representations.

COMM will have staff who lead these consumer protection activities aligned with both administering the community solar garden program in Xcel Energy territory and implementing the Solar for All program. Through SFA, COMM will also deploy field monitors to conduct field visits/site visits, as staff currently do for federally funded WAP programming, to confirm projects were completed in keeping with required standards.

Per COMM administration processes and procedures for federally sourced revolving loan funds, COMM will require lending partners to abide by all EPA mandatory flow down requirements.

### *3.3    Guardrails to Ensure Household Savings*

COMMs will require all contractors and implementers to file copies of their contracts each year, which will require an average of 20% energy savings (or equivalent for multifamily properties). COMM currently runs a Solar for Schools program through which regularly reviews project proposals and provides independent third-party review and comparison to savings estimates. As part of SFA, COMM will provide calculators and educational resources that explain how the financing is intended to work and the savings households can expect so that all households, and all energy navigators, are working from a common set of information and assumptions.

Spot checks of projects with be conducted each year. As mentioned above, COMM will employ field monitors, building upon the model used in the federally funded weatherization program. This role will drive consumer protection compliance, conducting actual site visits as well as collecting documentation from households themselves along with installers, property owners and community solar subscription managers to estimate bill savings.

**Section 4:  Timeline and Milestones**

**See Attached "MN Commerce Solar for All Program Timeline"**

**Section 5:  Reporting Requirements**

### 5.1    Investments in Capacity for Program Evidence and Evaluation Activities

COMM will be responsible for overall project management, coordination of the project team and partners, and compliance with EPA requirements.

COMM has included funding from the administrative portion of the budget to add dedicated modules to its existing customer relations management (CRM) platform to manage the request for proposal and reporting processes for SFA. It has also allocated additional funding to customize data tracking tools.

COMM has included funding for contracted support to assist with compliance systems, tracking and reporting for Davis Bacon, BABA, and other reporting requirements. COMM has also budgeted for program evaluation support geared toward understanding how to make financial assistance programs, technical assistance efforts and energy navigator support more effective. Minnesota has a state agency that conducts evaluation, and COMM may work with that agency or bid out the evaluation support activities.

### 5.2    Meeting Reporting Requirements

Based on COMMs past experience with federal grants, the agency is confident in its ability to comply with EPA reporting requirements and its ability to ensure partners and sub-awardees also comply. COMM administers numerous Federally funded energy programs that require monthly or quarterly reports that utilize metrics to track progress based on Federal agency requirements. COMM will require that lending partners provide quarterly reports per EPA instructions. Failure to comply with these reporting requirements will be considered a material noncompliance with terms of the award. Noncompliance may result in withholding of future payment, suspension or termination of the current award and withholding of future awards. COMM will ensure that reports do not contain any protected personal information, limited right data (proprietary data), classified information, information subject to export control classification or other information not subject to release.

### 5.2.1. Performance Reports

*Semi-Annual Report*
COMM agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

*Final Report*
COMM agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. COMM understands that it must include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance;

- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies;
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance;
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations; and
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

COMM agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

### 5.2.2. Transaction-Level and Project-Level Data

COMM agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). COMM agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

### Section 6: Budget Narrative

### 6.1 Project Budget
**Personnel**

Programmatic and administrative staff include the following positions and estimated time inputs. Hourly rate is based on estimated hourly rate or salary hourly equivalent for each individual position based on comparable historical rates and union contract classifications. Budget Periods 2-5 include 5% cost of living adjustment per standard practice and contract projections. Total personnel cost: $3,272,636.

| Position | Purpose | Hourly rate/ equivalent | # of personnel | Total % Time | Total cost |
|---|---|---|---|---|---|
| Financial programs development & engagement coordinator | To work with lending partners to shape financial programs that will deliver 20% savings | $52.68 | 1 | 42% | $254,471 |
| Community solar technical assistance coordinator | To advance community solar program application; provide support to munis and cooperatives with developing successful CSG models | $52.68 | 1 | 44% | $266,087 |

| | | | | | |
|---|---|---|---|---|---|
| Single Family / WAP solar program coordinator | To design WAP solar deployment; advance single family contractor procurement | $52.68 | 1 | 59% | $348,514 |
| Solar programs coordinator | To provide overall program oversight and direction | $52.68 | 1 | 42% | $248,406 |
| Solar workforce specialist | To work with partners to design and implement workforce development activities | $52.68 | 1 | 48% | $291,090 |
| Tribal outreach and engagement specialist | To serve as the key point of contact with tribal nations and support tech assistance and program development needs | $52.68 | 1 | 24% | $145,545 |
| Navigator outreach and education specialist | To lead navigator programmatic development, training, and coordination | $52.68 | 1 | 48% | $291,090 |
| Financial/grants coordinator | To lead subawards and RFPs for contracting; to ensure activities align with EPA requirements and MN state law | $52.68 | 1 | 48% | $291,090 |
| Grants specialist | To execute contracts; track and provide oversight to invoicing | $34.60 | 1 | 77% | $303,992 |
| Federal Compliance (Davis Bacon, BABA) and labor standard compliance specialist | To establish compliance infrastructure, conduct tracking, ensure compliance | $52.68 | 1 | 65% | $399,759 |
| Field monitor (compliance, on installs, on savings) | To conduct in the field site visits | $48.50 | 1 | 46% | $262,422 |
| Legal Specialist | To provide guidance on contracts, models, statute | $52.68 | 1 | 29% | $170,170 |

**Fringe Benefits**

Fringe benefits for personnel total $1,145,423 and are calculated at an agency historical average of 35% as determined by fiscal staff. Fringe rate includes benefits. Fringe Benefits percentage calculation includes the following:

- FICA
- Retirement
- Life Insurance
- Severance Allowance
- Workers Compensation
- Unemployment Insurance
- Health Insurance

*Treatment of Fringe Benefits*: Resultant fringe benefits are specifically identified to each employee and are charged individually as direct costs.

*Treatment of Paid Absences:* Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the

normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

**Travel**

Travel costs total $55,486 and cover in-state administration, management and monitoring as well as out-of-state travel to annual conference events. Costs are based on historical averages. Travel costs are governed by the MN Department of Administration and state employee union contracts; more info can be found at https://mn.gov/mmb/employee-relations/labor-relations/labor/.
In-state travel includes car rental, gasoline, hotel and per diem for meals estimated at $250/day with hotel.

Travel will typically be 1-2 people dependent on task. Full details for each trip are on the Budget Narrative.

Travel activities to include:
- Travel to establish partnerships and collaboration with local units of government, community based organizations, utilities and tribal nations to implement programming; this would include navigator workshop and training activities; as described in the budget, these costs will carry through each year of the program, though are higher in the first year as relationships are established and the initial workshops are conducted
- Travel to conduct engagement activities with utilities, community-based organizations, and tribal nations; to include travel for meetings with utilities and tribal nations and to host the CSG workshop; this work will phase out as after the first two years.
- Travel for staff to attend conferences to learn about other states implementation models, make connections with financing partners; funds allocated for each year of the project.
- Travel for field monitors to visit project sites and verify implementation; this begins in year 3

**Supplies**

Supplies costs total $30,000 and include licensing support for technical components of Solar for All program implementation.

- Module buildout for addition to the Division's Client Relationship Management system (CRM). COMM uses a base grants module to manage competitively bid solicitations; this award will support license needs for reporting and tracking customization as well as development of externally facing community partner portals to manage ongoing relationship management activities, outreach and engagement information sharing.
- License costs are prescribed by the State's Minnesota Information Technology Services arm (Mn.IT), who provides enterprise-wide procurement support across department level agencies and policies and processes governing technology acquisition.

**Contractual**

A range of proposed contract activities totals $9,676,661 and spans across a variety of technical assistance support, tool development, community engagement, and service delivery activities. Contracted initiatives include the following:

| Purpose | Estimated Cost | Duration | Procurement Method |
|---|---|---|---|
| Navigators and community support institutions: Energy navigators will partner with local communities to advance community-based education efforts, to coach and support efforts to weave together funding streams from Solar for All with federal Home Energy Rebates, state programs, the MN Climate Innovation Finance Authority and other greenhouse gas reduction fund funds. Could be local jurisdictions, community-based organizations, etc. Support for 10-20 contracts/year to reach cultural and geographically diverse communities | $2,800,000.00 | 5 years | To be competitively bid |
| Installation support: Contracting with solar installers for ground-mounter solar PV arrays for manufactured home residents (1/3 of the overall program funding / year) | $1,000,000.00 | 2-3 years | To be competitively bid |
| Marketing/education support for outreach and education campaign, including educational materials and resources (written, video, social media); inclusive of translation resources (Spanish, Hmong, Somali, Vietnamese, Karen) | $200,000.00 | 5 years | To be competitively bid |
| Technical assistance consultant: to support communities (community orgs, munis, cooperatives, and tribal nations) with solar deployment planning, solar+storage assessments, project pre-development, interconnection design, or engineering review work to advance projects | $1,220,000.00 | 5 years | To be competitively bid for TA providers or issued to recipients via a grant application process |
| Technical assistance consultant: to support residential solar group buys and residential joint procurement models; to conduct workshops and education, help households understand financing options | $300,000.00 | 4-5 years | To be competitively bid |
| Siting/permitting technical assistance to support local governments to support adoption of Solar App as well as land use zoning updates | $225,000.00 | 3 years | To be competitively bid |
| Utility software system open-source billing tool to support utilities with automating community solar billing; tool to be available to any utility (avoid manual entry) | $600,000.00 | 2-3 years | To be competitively bid |
| Contracted to the Minnesota Geospatial Information Center (MnGeo, a State Agency) or University of Minnesota or updating of the solar map app with new LIDAR data integrated and allowing for polygoning on roofs to estimate array size | $405,000.00 | 2 years | Direct selection and contracting per statutory authority and state procurement |
| Financial/legal consult: tax accountant and legal technical assistance to support successful utilization of tax credits; to advise program partners, subrecipients, and participants | $525,000.00 | 3 years | To be competitively bid |
| Support for existing workforce centers to advance recruitment, education, training, and supportive activities to recruit diverse candidates for solar jobs; | $350,000 | 5 years | Interagency agreement with the Department of Employment and |

| | | | |
|---|---|---|---|
| inclusive of entrepreneurship and business development training | | | Economic Development |
| Training support: Funding to expand training program offerings (at technical colleges and universities, tribal colleges, specialized programs) and support organizations that provide supportive activities in support of registered union apprenticeship programs; funding to be used for coordination, recruitment, curriculum, educator staffing | $1,565,000.00 | 5 years | To be competitively bid |
| Consultant support for compliance systems, tracking, & reporting for Davis Bacon, BABA and other reporting requirements. | $297,661 | 5 years | To be competitively bid |
| Consultant support (potentially another state agency) to lead program evaluation focused on opportunities for program improvement | $135,000 | 3 years | To be competitively bid |
| CRM development: 2 new modules needed a) to build off the base grants modules for the RFPs to manage all competitively bid solicitations' b) to build on the community partner portals to manage ongoing relationship management activities, and outreach / engagement information sharing | $30,000 | 2 years | To be competitively bid |
| Data tracking information system to support build out of data repository to track dedicated Solar for All data. Cost of customization and new tools based on comparable agency activities | $24,000 | | |

## Other

Other direct costs totaling $47,019,700 fall into subawards ($45,850,000); general costs ($769,700) and participant support ($400,000).

In addition, the $400,000 of dedicated technical assistance via the DOE/National Lab is listed as in-kind support over the first two budget periods, to scope utility software system open source billing tool activities; to support financial modeling for community solar, and/or CSG Community Connector (CSG+LIHEAP).

| Type | Description | Estimated Cost | Need and basis |
|---|---|---|---|
| Other - Subaward | Minnesota Housing (MHFA) Multifamily Deferred Loans: To provide loans for solar on multifamily properties as well as 10% administrative costs ($9,000,000 for financing; $1,000,000 for admin); MHFA is another state agency | $10,000,000 | Needed to impact capacity of multi-family housing properties to access solar and deliver 20% savings back to residents. Based on impact determination and current loan program calculation bases. |
| Other - Subaward | Minnesota Climate Innovation Finance Authority (MnCIFA): Community solar revolving loan fund to provide upfront capital and pursuit of federal tax credits from direct pay; MnCIFA is another state agency | $23,850,000 | Needed to drive expansion of low-income serving community solar and deliver 20% savings |
| Other - Subaward | Eleven sovereign tribal nations that share Minnesota's geography: To support residential serving solar for | $10,000,000 | Determined through tribal consultation among sovereign Tribal Nations and the Tribal |

| | | | |
|---|---|---|---|
| | each of the 11 nations (approximately $909,000 per nation reserved) | | Advocacy Council on Energy (TACE) |
| Other - Subaward | MHFA - Single Family financial assistance: To provide supportive credit enhancements (e.g., credit enhancements and buy-downs) to advance residential projects as well as 10% administrative costs ($1.8M financing; $200,000 for Admin) | 2,000,000 | Needed to impact capacity of low-income households to access solar and achieve 20% savings. Assessed by analysis - determination of impact at range of funding level |
| | Total Other - Subaward | 45,850,000 | |
| Other - General | Statewide Financial System Resource Allocated Costs: Established Minnesota Management and Budget Statewide distributed costs | 596,000 | Financial Service Hours are needed for creating budgets and setting up in the state's financial system: assisting with federal financial invoicing, reporting, reconciliation, and tracking support. Determined via formula set by agency fiscal unit |
| Other - General | Website updates: Mn Information Technology services customization of web interface, | 115,000 | Needed to develop a landing page/hub of Solar for All content to share resources and progress; based on build from existing Commerce website. Separately billed enterprise services |
| Other - General | Navigator training events and annual gathering: Support to include space, coffee and lunch costs for three Energy Navigator Workshop planning events | 8,200 | Training sessions needed for ongoing trainings, status updates, and shared best practices. Based on historic cost averages for comparable departmental event activities. |
| Other - General | CSG Workshop event: AM session with co-op and municipal utilities | 500 | Needed as a touchpoint for coordinated action connecting and supporting Solar for All initiatives |
| Other - General | IT integration into public facing deployment platform: Mn Information Technology services support of customization of new tools | 50,000 | Needed to align customer facing programming platform with other household facing point-of-sale tools. Based on Mn.IT service costs |
| | Total Other - General | 769,700 | |
| Other - Participant Support | Per diem and travel support for community-based organization and local jurisdictions to participate in stakeholder engagement; support engagement from at least 40 community reps/year to reach cultural and geographically diverse communities. Higher in year 1 to participate in initial outreach activities. | 105,000 | Needed to reach a broad cross section of culturally and geographically diverse communities. Based on historic averages and state standards for eligible travel and per diem costs |
| Other - Participant Support | Participant support for workforce trainees: Funding to provide stipends to trainees to support travel and | 295,000 | Needed to improve access to opportunities for new entrants to the workforce coming from a |

| | | |
|---|---|---|
| | related expense to allow new workers access to training including paid apprenticeship opportunities and NABCEP certification | | wide variety of geographic and economic backgrounds. Based on historic averages and state standards |
| Total Other – Participant Support | 400,000 | |

## Participant Support Costs

Participant support costs are indicated for assistance to community-based organizations, local jurisdictions, and individual trainees newly entering the workforce. These costs include:

- Per diem and travel support for community-based organization and local jurisdictions to participate in stakeholder engagement; support engagement from at least 40 community reps/year to reach cultural and geographically diverse communities. Higher in year 1 to participate in initial outreach activities.
- Training support: Funding to provide stipends to trainees to support travel and related expense to allow new workers access to training including paid apprenticeship opportunities and NABCEP certification.

## Subawards

COMM will provide subawards to Minnesota Housing and to the Minnesota Climate Innovation Finance Authority, both of which are state agencies.

- Minnesota Housing will lead the single family and multifamily financing efforts. Minnesota Housing leads housing financing for the State of Minnesota and will align Solar for All funds with existing financing tools to maximize their impact.
- Minnesota Climate Innovation Finance Authority is Minnesota's green bank and will lead the community solar garden financing.

COMM will also provide subawards to each of Minnesota's eleven Tribal Nations to implement residential serving solar, or solar plus storage, projects.

COMM procurement systems are governed by statute and policies set forth by the Office of Grants Management and Office of State Procurement, ensuring compliance with 2 CFR 200 (specifically sections 200.331 and 200.332; Federal T&C. I: "Subawards as Part of Revolving Loan Funds" term; and any additional flow down provisions accompanying the award).

COMM has statutory authority to enter into contractual agreements with sister cabinet level agencies through Interagency Agreements, governed by statute (Minn.Stat. §16 and §216C).

## Other General Direct Costs

Statewide Financial System Resource Allocated costs: These costs are directed by the enterprise and segregated in the Minnesota state financial system from indirect costs by accounting code or GA ledger number. Financial Resource Allocated costs are assessed for creating budgets and setting up in the state's financial system, assisting with federal financial invoicing, reporting, reconciliation, and tracking support.

- Support is needed to develop a Solar for All content hub to serve as a landing page for sharing resources and progress. Like the CRM, this can be built onto the existing Commerce

36

website content and structure. Costs also support the IT integration into a public facing platform.

- Support to build out a data repository for tracking dedicated Solar for All data that aligns with COMM state statutory authority as the repository of state energy information.


**Additional Items**

**Conferences and Workshops:**

*Solar for All Outreach and Energy Navigator Strategy and Approach Workshop – Budget Year 1*
- Description: COMM will host a workshop in the first budget year to meet with stakeholders to share the outline of COMM's Solar for All plan, and to gather information about the processes and approaches that would best serve Disadvantaged Communities across the State. **COMM anticipates this workshop will host 40-50 people**
- COMM will initiate and host this workshop with support and collaboration from other State agencies
- Logos on the agenda will be from the Minnesota Commerce Department and may also include Minnesota Department of Employment and Economic Development (DEED), Minnesota Department of Labor & Industry (DLI), and/or Minnesota Housing (MHFA).
- Attendees of the workshops may include: 20% state, 20% local, 60% public
  - o Community Based Organizations
  - o Service Providers for the Weatherization Assistance Program and Energy Assistance Program
  - o Local Units of Government
  - o Workforce Training programs
  - o Minnesota state agency staff
  - o Consultants
- COMM will write up any summary reports or provide follow up data, information, and training materials for participants and other community-based organizations and partners
- Program Income or registration fees: None


*Four Energy Navigators Workshops – Budget years 2, 3, 4, & 5*
- Description: – COMM will host four Energy Navigator Workshops in each of the budget years 2, 3, 4, & 5. These workshops will provide ongoing trainings to Energy Navigators, status updates, and sharing of best practices. **COMM anticipates each workshop will host 25-30 people.**
- COMM will initiate and host these conferences with support and collaboration from other State agencies
- Logos on the agendas will be from the Minnesota Commerce Department and may also include Minnesota Department of Employment and Economic Development (DEED), Minnesota Department of Labor & Industry (DLI), and/or Minnesota Housing (MHFA).
- Attendees of the workshops may include: 20% state, 20% local, 60% public
  - o Community Based Organizations

- o Service Providers for the Weatherization Assistance Program and Energy Assistance Program
- o Local Units of Government
- o Workforce Training programs
- o Minnesota state agency staff
- o Consultants
- COMM will write up any summary reports or provide follow up data, information, and training materials for participants and other community-based organizations and partners
- Program Income or registration fees: None

*Community Solar Garden Workshop*
- Description: COMM will host a workshop with Municipal and Cooperative electric utilities in Minnesota to share information about the Community Solar Garden plan and to provide a touchpoint for coordinated action connecting and supporting the Solar for All program statewide. **COMM anticipates 20-25 people for this workshop.**
- COMM will initiate and host these conferences with support and collaboration from other State agencies
- Logos on the agendas will be from the Minnesota Commerce Department and may also include Minnesota Department of Labor & Industry (DLI), and/or Minnesota Housing (MHFA).
- Attendees of the workshop may include: 20% state, 20% local, 60% public (utilities)
- o Local Units of Government
- o Local Municipal and Cooperative Utilities
- o Minnesota state agency staff
- o Consultants
- COMM will write up any summary reports or provide follow up data and information for participants and other community-based organizations, utilities, local units of government, and partners.
- Program Income or registration fees: None

**Meals and Refreshments:**

*Solar for All Outreach and Energy Navigator Strategy and Approach Workshop – Budget Year 1*
- Description: COMM will host a workshop in the first budget year to meet with stakeholders to share the outline of COMM's Solar for All plan, and to gather information about the processes and approaches that would best serve Disadvantaged Communities across the State. **COMM anticipates this workshop will host 40-50 people.**
- Per diem provided: None
- Justification for meals: This initial workshop will engage with community-based representatives and organizations that work in Disadvantaged Communities statewide. They will share information and expectations from their communities and COMM will provide information about the scope and structure of SFA. Based on the amount of information and need for meaningful engagement with participants, this will be an all-day workshop that will begin at the start of the workday and continue until late afternoon.

- This workshop will provide a light breakfast with coffee and juice, and a lunch that will be either a buffet or box lunches. **Anticipated cost for this initial workshop will be $3,000 which will include food and beverages (approximately $2250), and room rental ($750).**

*Four Energy Navigator Workshops*

- Description: COMM will host four Energy Navigator Workshops in each of the budget years 2, 3, 4, & 5. These workshops will provide ongoing trainings to Energy Navigators, status updates, and sharing of best practices. **COMM anticipates each workshop will host 25-30 people.**
- Per diem provided: None
- Justification for meals: In the interest of providing ample time for attendees to share status updates and information, receive trainings, share best practices, and identify barriers and solutions, all day workshops will be planned that will begin at the start of the workday and continue until mid to late afternoon.
- Each workshop will provide a light breakfast with coffee and juice, and a lunch that will be either a buffet or box lunches. **Anticipated cost for each workshop will be $1,300, which will include food and beverages ($970 estimated), and room rental ($325 estimated).**

*Community Solar Garden Workshop*

- Description: COMM will host a workshop with Municipal and Cooperative electric utilities in Minnesota to share information about the Community Solar Garden plan and to provide a touchpoint for coordinated action connecting and supporting the Solar for All program statewide. **COMM anticipates 20-25 people for this workshop.**
- Per diem provided: None
- Justification for meals: This will be a half day workshop to share information about the Solar for All program with utilities and establish a coordinated effort related to community solar gardens. In order to provide ample time for COMM to share that information and hear feedback, ideas, and concerns from the utilities a morning to mid-day meeting will be necessary.
- The workshop will provide a breakfast with coffee and juice. **Anticipated cost for the workshop will be $500, which will include food and beverages (totaling $350), and room rental ($150 estimated)**.

**Indirect Charges**

13.3% is Commerce's currently approved, federally negotiated rate with the Department of Health and Human Services as the cognizant agency. Per Minnesota's current NICRA, the indirect rate is applied to Modified Total Direct Costs including Personnel/Fringe, Travel, Supplies, and the General category of Other Direct Costs, plus the first $25,000 of each new contract arrived at in plan implementation including partner subawards.

**Program Income**

Minnesota anticipates generating returns to a community solar revolving loan fund. Commerce, through its partnership with MnCIFA, will provide both bridge loans to prospective projects while they await receipt of federal tax credits, as well as term financing. MnCIFA does not anticipate charging interest during the bridge loan period, and as such, payment in the form of tax credits would not be considered income. These funds will return to the revolving loan fund to provide funding for the next set of community solar projects.

Full term loans would begin capturing interest payments once the initial tax credit payments are made. MnCIFA anticipates interest rates at approximately 3%, which will generate program income. MnCIFA will also generate program income through interest on its cash deposits of SFA funds. MnCIFA anticipates that this rate will average 3% during the program deployment period.

MnCIFA will recover its administrative costs of administering the $23.85 million in community solar funds by taking a portion of the gross program income. MnCIFA anticipates that a 1% rate on both its SFA cash deposits and SFA term loans will be sufficient to cover its admin costs. Program income will be made up the remaining interest from these two sources, which will be subject to varying interest rates and the amount of SFA funds deployed as interest-free bridge funds in any given month. Given reasonable assumptions, COMM and MnCIFA calculate that program will generate approximately $1.0 million of net program income by the end of the program deployment period. These funds will be reinvested into other disadvantaged community-serving solar projects.

# Exhibit 5
# December 9, 2024
# Assistance Amendment

5H - 84089501 - 1    Page 1

| | | |
|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br>**Assistance Amendment** | **GRANT NUMBER (FAIN):** 84089501<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5H | **DATE OF AWARD**<br>12/09/2024 |
| | **TYPE OF ACTION**<br>No Cost Amendment | **MAILING DATE**<br>12/09/2024 |
| | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>2035 |

| **RECIPIENT TYPE:**<br>State | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| DEPARTMENT OF COMMERCE MINNESOTA<br>85 E 7TH PL STE 280<br>Saint Paul , MN 55101-2198<br>EIN: 41-6007162 | DEPARTMENT OF COMMERCE MINNESOTA<br>85 7th Place East, Suite 500<br>Saint Paul, MN 55101-2198 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Lissa Pawlisch<br>85 7th Place East, Suite 280<br>Saint Paul, MN 55101-2198<br>**Email:** lissa.pawlisch@state.mn.us<br>**Phone:** 651-539-1563 | Bryan Fiedorczyk<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460<br>**Email:** Fiedorczyk.Bryan@epa.gov<br>**Phone:** 202-564-9623 | Hazeletta Burgess<br>OGD-GMBOD, 3903R<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460<br>**Email:** burgess.hazeletta@epa.gov<br>**Phone:** 202-564-1533 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Minnesota Solar for All

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD**<br>09/01/2024 - 08/31/2029 | **PROJECT PERIOD**<br>09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 62,450,000.00 | **TOTAL PROJECT PERIOD COST**<br>$ 62,450,000.00 |
|---|---|---|---|

# NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Avenue NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Acting Chief, Grants Management Branch | **DATE**<br>12/09/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I) <br><br> Clean Air Act: Sec. 134(a)(1) <br><br> 2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84089501 - 1     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 3,272,636 |
| 2. Fringe Benefits | $ 1,145,423 |
| 3. Travel | $ 55,486 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 9,676,661 |
| 7. Construction | $ 0 |
| 8. Other | $ 47,419,700 |
| 9. Total Direct Charges | $ 61,569,906 |
| 10. Indirect Costs: 13.30 % Base MTDC | $ 880,094 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 1,000,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA **Grants Specialist listed on the award**
- MBE/WBE reports (EPA Form 5700-52A): Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the **EPA Grants Specialist listed on the award**
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications**: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award**
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: **EPA Project Officer listed on the award**

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has initiated the intergovernmental review process on behalf of the Recipient and will direct any pertinent comments from directly affected State, areawide, regional, and local government entities to the Recipient as needed.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

### D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

### E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01

# Programmatic Conditions

**Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)**

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.
- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar**: Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.
- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this

program.

**Freely Associated States:** *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) the** limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after

implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or

Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition*:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with

the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

### 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and

resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

## For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their

overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the

Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F. DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

<u>1. Compliance with Federal Statutes and Regulations</u>

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

<u>2. Free and Fair Choice to Join a Union</u>

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of

2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

### K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Single family homes;

2. Privately-owned, non-mixed-use, multi-family housing properties;

3. Privately-owned residential portions of mixed-use properties;

4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating

practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

### 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing.

The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.


## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.


## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.


### 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.


### 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the Subrecipients will comply with the

requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities*.

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar For All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

### R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities**. As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the

Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate

expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

### *The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

### A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

### B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT 7

| | |
|---|---|
| **From:** | SFA |
| **To:** | SFA |
| **Subject:** | Solar for All Grant Closeout Instructions |
| **Date:** | Wednesday, October 1, 2025 3:21:18 PM |

---

**This message may be from an external email source.**
Do not select links or open attachments unless verified. Report all suspicious emails to Minnesota IT Services Security Operations Center.

---

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425)
**Submission Instructions**:
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of

termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

- If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.

- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance during the entire performance period (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.

- Please ensure that, at minimum, the following elements are included:

    - In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.

    - Progress towards objectives on program key performance metrics during the performance period.

    - Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.

    - Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.

    - Descriptions and examples of actions you took during the performance period to

        meaningfully involve communities you served in program design and operations.
- ○ *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 8



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 28, 2025

**MEMORANDUM**

**SUBJECT:**    Update on Dispute of EPA Assistance Agreement 5H-84089501 under 2 CFR 200.340

**FROM:**    Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**    Sara Payne, General Counsel
Minnesota Department of Commerce

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84089501. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 27, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.28
16:40:20 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# EXHIBIT 9



Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC  20460

Date: November 3, 2025

Re:      Objection to Closeout of EPA Assistance Agreement 5H-84089501

Dear Mr. Brown:

On September 6, 2025, Minnesota Department of Commerce ("Commerce") submitted to the U.S. Environmental Protection Agency ("EPA") a Dispute of Termination of EPA Assistance Agreement 5H-84089501 pursuant to 2 C.F.R. § 1500.15.  Despite that timely dispute, on October 1, 2025, Commerce received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that Commerce complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." Commerce has now received EPA's October 28, 2025, letter purporting to declare moot Commerce's "dispute regarding the termination of Assistance Agreement 5H-84089501."  The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that Commerce close out Assistance Agreement 5H-84089501.

As an initial matter, clarification is needed because EPA's October 28 letter references "your dispute … submitted on August 27, 2025."  But Commerce did not submit its Part 1500 dispute on August 27, 2025.  Rather, August 27 is the date that Commerce submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025 Assistance Amendment. Thus, it is unclear which of Commerce's disputes "EPA has rendered" moot.

Commerce disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending.  EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation.  We request that EPA reverse its mootness determination and allow the administrative dispute to proceed.  At a minimum, EPA should stay the administrative dispute until

the conclusion of Commerce's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 ("the District Court litigation").

More importantly, and regardless of any determination regarding the status of Commerce's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, Commerce has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS.  It would be inappropriate and prejudicial to require Commerce to close out while litigation is pending that directly concerns EPA's termination of this grant.  *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." Commerce has complied—and continues to comply—with the terms and conditions of the Solar for All program.  EPA unilaterally terminated these grants and illegally deobligated $57,698,823.78 from Commerce's Automated Standard Application for Payments ("ASAP") account, without determining that the work of the grants had been accomplished, and without even waiting for the 30-day deadline to file a Part 1500 dispute to expire.  As a result of EPA's unlawful actions, Commerce has not been able to complete the work required under Assistance Agreement 5H-84089501. Accordingly, EPA necessarily cannot "determine[] that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

Commerce does <u>not</u> agree to close out Assistance Agreement 5H-84089501 while litigation relating to this grant is pending.  We seek an extension for our close-out date until all litigation has been resolved, including any appeals.  Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00 p.m. on November 5, 2025.

Sincerely,

Sara Payne
General Counsel

CC: Michael Molina