# Exhibit 1

5H - 84091701 - 0     Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN):  84091701<br>MODIFICATION NUMBER:  0<br>PROGRAM CODE:  5H | DATE OF AWARD<br>07/08/2024 |
|---|---|---|---|
| | | TYPE OF ACTION<br>New | MAILING DATE<br>07/11/2024 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>40192 |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:<br>North Carolina Department Of Environmental Quality<br>1606 MAIL SERVICE CENTER<br>RALEIGH, NC 27699<br>EIN:  56-6000372 | PAYEE:<br>North Carolina Department Of Environmental Quality<br>1606 Mail Service Center<br>Raleigh, NC 27604 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Julie Woosley<br>1601 Mail Service Center<br>RALEIGH, NC 27699-1601<br>**Email:**  julie.woosley@deq.nc.gov<br>**Phone:** 909-707-8203 | Nicholas Bradford<br>1201 Constitution Ave NW, 7406M<br>Washington, DC 20460<br>**Email:**  bradford.nicholas@epa.gov<br>**Phone:** 202-566-0813 | Brandon EPierce<br>OGD - GMBOD, 3903R<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460<br>**Email:**  pierce.brandon@epa.gov<br>**Phone:** 202-564-2972 |

**PROJECT TITLE AND DESCRIPTION**

NC Solar for All - "Note: A special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.
Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan. The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.
No subawards are included in this assistance agreement.

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 0.00 | TOTAL PROJECT PERIOD COST<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Barbara Proctor - Associate Award Official | DATE<br>07/08/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41067 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*<u>The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition</u>*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

   Revised SF-424A, Budget Information for Non-Construction Programs

   Indirect Rate Proposal or Agreement, if applicable

   Revised Budget Narrative

   Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

<u>2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs</u>

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

**K. Labor and Equitable Workforce Development Requirements**

<u>1. Davis-Bacon and Related Acts (DBRA)</u>

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the [EPA Build America, Buy America General Term and Condition](), which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents would be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in *2 CFR Part 170, Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

<u>4. Indirect Cost Rate</u>

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

<u>5. Sufficient Progress</u>

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

### 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

### 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

**10. Amendments to the Closeout Agreement**

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

**11. Termination of the Closeout Agreement**

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

**V. Accounting Principles**

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

**AA. Compliant URL Links**

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

**AB. Flow-Down Requirements**

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

5H - 84091701 - 1   Page 1

| | | GRANT NUMBER (FAIN): | 84091701 | |
|---|---|---|---|---|
| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** | MODIFICATION NUMBER: | 1 | **DATE OF AWARD** 12/18/2024 |
| | | PROGRAM CODE: | 5H | |
| | | **TYPE OF ACTION** No Cost Amendment | | **MAILING DATE** 12/18/2024 |
| | Assistance Amendment | **PAYMENT METHOD:** ASAP | | **ACH#** 40192 |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** North Carolina Department Of Environmental Quality 1606 MAIL SERVICE CENTER RALEIGH, NC 27699 EIN:  56-6000372 | **PAYEE:** North Carolina Department Of Environmental Quality 1606 Mail Service Center Raleigh, NC 27604 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Julie Woosley 1601 Mail Service Center RALEIGH, NC 27699-1601 **Email:** julie.woosley@deq.nc.gov **Phone:** 909-707-8203 | Chandler Milhollin 1201 Constitution Ave NW Washington, DC 20460 **Email:**  milhollin.chandler@epa.gov **Phone:** 494-562-9178 | Brandon EPierce OGD - GMBOD, 3903R 1200 Pennsylvania Ave NW Washington, DC 20460 **Email:**  pierce.brandon@epa.gov **Phone:** 202-564-2972 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

NC Solar for All

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 156,120,000.00 | **TOTAL PROJECT PERIOD COST** $ 156,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** ||
|---|---|
| **Digital signature applied by EPA Award Official** Barbara Proctor - Associate Award Official | **DATE** 12/18/2024 |

5H - 84091701 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 155,720,000 | $ 0 | $ 155,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I) <br><br> Clean Air Act: Sec. 134(a)(1) <br><br> 2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,183,335 |
| 2. Fringe Benefits | $ 984,438 |
| 3. Travel | $ 181,179 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 50,221 |
| 6. Contractual | $ 6,143,993 |
| 7. Construction | $ 0 |
| 8. Other | $ 146,179,467 |
| 9. Total Direct Charges | $ 155,722,633 |
| 10. Indirect Costs: 18.20 % Base Salaries and Wages | $ 397,367 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration

Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

## Programmatic Conditions

**Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)**

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the

authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

> a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

> b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

> c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

> d. Being funded by public or charitable contributions; and

> e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the

benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official:** "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate

buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within

either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are

primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or

subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a

violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

# II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

*The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive

officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition*:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance

agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the

Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

### 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements

specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

## For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e.,

under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the

initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

# III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient

has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This

requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe

the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible

for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor

or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:**
Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Single family homes;

2. Privately-owned, non-mixed-use, multi-family housing properties;

3. Privately-owned residential portions of mixed-use properties;

4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered

additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

## 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain

important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not

in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All

workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities*.

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

### R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

### S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met

the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as

well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities**. As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The

"Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the

authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or

individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

### A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

### B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

5H - 84091701 - 2    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN): **84091701**<br>MODIFICATION NUMBER: **2**<br>PROGRAM CODE: **5H** | DATE OF AWARD<br>08/08/2025 |
|---|---|---|---|
| | | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>08/08/2025 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>40192 |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**<br>North Carolina Department Of Environmental Quality<br>1606 MAIL SERVICE CENTER<br>RALEIGH, NC 27699<br>EIN:  56-6000372 | **PAYEE:**<br>North Carolina Department Of Environmental Quality<br>1606 Mail Service Center<br>Raleigh, NC 27604 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Julie Woosley<br>1601 Mail Service Center<br>RALEIGH, NC 27699-1601<br>**Email:**  julie.woosley@deq.nc.gov<br>**Phone:** 909-707-8203 | Clarisa Romero<br>**Email:**  Romero.Clarisa@epa.gov<br>**Phone:** 303-312-6022 | Brandon EPierce<br>OGD - GMBOD, 3903R<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460<br>**Email:**  pierce.brandon@epa.gov<br>**Phone:** 202-564-2972 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

NC Solar for All

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD<br>05/01/2024 - 08/08/2025 | PROJECT PERIOD<br>05/01/2024 - 08/08/2025 | TOTAL BUDGET PERIOD COST<br>$ 156,120,000.00 | TOTAL PROJECT PERIOD COST<br>$ 156,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Devon brown - Branch Chief, GMB | DATE<br>08/08/2025 |

5H - 84091701 - 2     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 155,720,000 | $ 0 | $ 155,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,183,335 |
| 2. Fringe Benefits | $ 984,438 |
| 3. Travel | $ 181,179 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 50,221 |
| 6. Contractual | $ 6,143,993 |
| 7. Construction | $ 0 |
| 8. Other | $ 146,179,467 |
| 9. Total Direct Charges | $ 155,722,633 |
| 10. Indirect Costs: 18.20 % Base Salaries and Wages | $ 397,367 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

   a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

   b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

   c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect. The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

   a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

   b. Explanations on why established outputs/outcomes were not met; and

   c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

   a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

   b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

## Programmatic Conditions

All Programmatic Conditions Remain the Same

# Exhibit 2

**Greenhouse Gas Reduction Fund**
**Solar for All**
**EnergizeNC**
**Work Plan**
**Project Period: 5/1/2024-4/30/2029**
**Date of Submittal: Wednesday, October 9th**

**Project Title:** EnergizeNC
**Grant Number:** 84091701
**Organization Name:** North Carolina Solar for All Coalition
**Geography:** North Carolina
**Definition of LIDAC:** CEJST, EJSCREEN, 200% FPL, and 80% AMI

**Introduction**

**Section 1:  Project Description**

**Updated Executive Summary**

The NC Solar for All Coalition, led by North Carolina Department of Environmental Quality (NCDEQ), has launched a statewide program, - EnergizeNC - to develop and execute a robust and equitable program enabling the rapid deployment of distributed solar and associated storage benefits to low-income and disadvantaged communities across the state, including state- and federally recognized Tribal lands. North Carolina is highly ranked in solar energy and generates >9% of the state's power from solar, giving the state strong experience in solar energy that will help in implementing a large-scale residential solar program. In 2022, SEIA ranked North Carolina 4th in the nation in total installed solar, but the vast majority of that comes from utility-scale projects. North Carolina is ranked much lower in residential net-metered solar capacity (17th), as well as in solar jobs (11th) and solar growth projection over the next 5 years (28th).  The EnergizeNC program application aims to transform solar in the state by expanding access to residential solar for low- and moderate-income families, multi-family housing, and community solar, and strengthening solar job training and the solar job market. Through these efforts, the EnergizeNC program will support the achievement of the ambitious carbon goals already set at the state level while ensuring low- and moderate-income families directly benefit.

Specifically, by enabling the rapid deployment of distributed solar generation and associated storage, EnergizeNC aims to extend the clean energy benefits of solar energy to residential customers in over 12,532 households in low-income and disadvantaged communities (LIDAC) across the state, including state- and federally recognized Tribal lands. Participant eligibility will be defined by the criteria EPA laid out in the 2023 notice of funding availability: 1) Residing in CEJST-Identified Disadvantaged Community; 2) located in an EJScreen-identified disadvantaged community; 3) Meet income limits of geographically dispersed low-income household definition; OR meet EPA criteria as properties providing affordable housing. In addition, participation in WAP and LIHEAP are expected to be a pragmatic way of identifying income eligibility.  The project will result in at least 43.4

1

megawatts (MW) of residential solar and .081 megawatt-hours (MWh) of residential energy storage by the end of the five-year program.

EnergizeNC intends to use the anticipated one-year planning phase to consult with a varied group of stakeholders (including consumers, communities, Tribes, contractors, housing developers, and others) to inform and adjust the setting of program metrics for success and identify potential innovative program pilots that can be explored as part of the market transformation strategy. Moreover, the regulatory and economic environments impacting North Carolina's solar policy and deployment are dynamic. EnergizeNC further intends to use the planning period to respond to and adjust for any changing circumstances. Accordingly, this workplan may further evolve to reflect community input, learnings, and changing economic and regulatory circumstances.

Coalition partners (or, alternatively herein, EnergizeNC) include the following mission-aligned and clean energy expert organizations:
- NCDEQ (which houses the NC State Energy Office [SEO] and the Weatherization Assistance Program [WAP]).
- Two nonprofit organizations, the North Carolina Clean Energy Fund (NCCEF) and North Carolina Advanced Energy Corporation (Advanced Energy); and
- The North Carolina Clean Energy Technology Center (NCCETC), part of the state's flagship land-grant university, NC State University.

While working together to develop and administer EnergizeNC's programs, each of these Coalition partners will bring their own experience and expertise to the EnergizeNC team. As EnergizeNC develops and plans its programs, it expects for Coalition partners' roles and responsibilities to evolve, but, in general, at this point in the process, the Coalition partners' areas of responsibilities are as follows:

NCDEQ:
- Leading the partnership program application and approval efforts.
- Coordinating program design.
- Developing and implementing the fiscal stewardship plan.
- Coordinating stakeholder outreach efforts.
- Ensuring program compliance and quality assurance.
- Collating and submitting program reporting to meet Federal requirements.

NCCEF:
- Designing loan terms and grants.
- Creating a program aimed at public housing authorities and other eligible owners of affordable housing to allow them to install on-site solar.

NCCETC:
- Providing project technical assistance.
- Advising and guiding the Coalition's efforts on contractor engagement and developing contractor training and certification requirements.

- Market transformation efforts.

Advanced Energy will be assisting with planning during the first year. The general areas of roles and responsibility will be further expanded or refined as EnergizeNC progresses toward full implementation of its programs and pilots.

To facilitate achieving EnergizeNC's goals, the Coalition intends to contract with a program implementer. The program implementer, working under the supervision of EnergizeNC, will partner and assist each of the Coalition partners in fulfilling various responsibilities with the programs. The roles and responsibilities of the program implementer are currently being developed and may evolve as necessary. In general, however, EnergizeNC intends for the program implementer to assist the Coalition in: (i) establishing and operating available, accessible channels for customer feedback, questions, and complaints, including on-line portals and customer call centers; (ii) accepting program applications from interested residents and contractors, communicating about application completeness, and communicating eligibility per program guidance; (iii) coordinating with the appropriate Coalition partner(s) as necessary to respond to and resolve questions and complaints coming through the feedback channels; (iv) assisting Coalition partners with fiscal stewardship and (v) promoting education and outreach through portals and other channels. More detail on the work of the program implementer is provided throughout this workplan.

Over the course of a five-year period, the Coalition, with its diverse groups of stakeholders and supporters, will implement EnergizeNC's overarching goals:

> **Goal #1:** Create a comprehensive program management approach over a one-year planning period to include input from low-income and disadvantaged communities.

> **Goal #2:** Reduce greenhouse gas (GHG) emissions, lower energy costs, and foster environmental justice through installation of rooftop solar at low-income single-family and multifamily units across North Carolina, including community solar access.

> **Goal #3:** Foster and develop a trained workforce to deploy solar in all regions of the state, especially in LIDACs.

> **Goal #4:** Provide robust community engagement to ensure that project benefits flow to LIDAC and individuals.

During the anticipated one-year planning phase in Goal #1, EnergizeNC will consult with varied and diverse stakeholders (including consumers, communities, Tribes, contractors, qualified housing developers, and others) to understand both our state's existing solar energy and storage deployment and the barriers to its expansion into underserved LIDAC areas and to low-income households. This initial stakeholder engagement and assessment will guide EnergizeNC in establishing program metrics for success and identifying potential innovative pilots that may contribute to a market transformation strategy for removing deployment barriers and facilitating grid resiliency.

3

In sum, EnergizeNC will harness the full "toolkit" of program and policy tools – both available now and under development – that will pair with the Solar for All (SFA) subsidies to reduce GHG emissions and other harmful pollutants while lowering energy costs for low-income and disadvantaged households and creating environmental and energy justice across the state.

With this workplan, EnergizeNC is updating its accepted application for the SFA funding opportunity. EnergizeNC incorporates that previously approved workplan herein by reference to the extent it is not supplemented or amended herein.  To support reviewers of this supplemental workplan, the supplemental information included herein will refer to the related section of the initial workplan that is being updated.

Table 1 cross-references specific program activities in each section that follow:

**Table 1: Program Activities Mapped to Narrative Section**

| Category | Activity | Section(s) |
|---|---|---|
| Education & Outreach to Market Segments<br><br>(Homeowners, Multifamily Building Owners, Communities) | Design an equitable education, outreach, and deployment plan with all supporting partners. | 1.2.1, 1.2.2, 1.6.3 |
| | Develop a comprehensive online portal for customer education and support, including an 800-number hotline. | 1.5.1, 1.6.3 |
| | Develop culturally appropriate marketing materials and educational resources through the online portal. | 1.5.1, 1.6.2, 1.6.3 |
| | Educate community groups and partners on the benefits of solar and EnergizeNC through workshops and training. Provide stipends for community involvement. | 1.2.3, 1.5.1, 1.6.2, 1.6.3 |
| | Develop a community advisory board with a broad set of represented interests for EnergizeNC. | 1.6.1 |
| | Provide ongoing virtual information sessions and in-person educational events, including listening sessions and community meetings in LIDAC. | 1.5.1, 1.6.1, 1.6.3 |
| | Coordinate with the Commission of Indian Affairs to promote meaningful tribal community involvement. | 1.6.5 |
| | Convene Housing Authorities and affordable housing developers to offer technical assistance support. | 1.2.1 |
| | Develop an engagement strategy and education and awareness campaign for net-metering policy changes. | 1.3.1 |
| Financial Incentive Distribution | Design and administer financial assistance programs to include applicable solar, utility and weatherization incentives that achieve 20% energy savings. | 1.2.1, 1.3.1, 1.4.1, 1.4.2 |

| | | |
|---|---|---|
| and Deployment | Work with community lenders and utilities to design loan, lease and tariffed on-bill programs that leverage private capital investment. | 1.2.1, 1.2.2, 1.3.1, 1.4.1 |
| | Procure a grant administrator for solar subsidies. | 1.4.1 |
| Market Transformation | Develop a resilience pilot and coordinate with the Resilient Ready Communities project. | 1.2.2 |
| | Convene a working group to identify policy and market barriers for community solar and residential storage. Design solutions to address these barriers, including pilot programs and policy changes. | 1.2.4, 1.3.1, 1.3.2, 1.4.2 |
| | Develop model solar guidelines for HOAs and convene a stakeholder group to review and update the state's model solar ordinance. | 1.3.1, 1.5.3 |
| | Research potential purchasing programs that can reduce solar installation costs. | 1.2.1, 1.3.1 |
| Consumer Protection | Develop and administer a contractor certification ("registered vendor") program. | 1.2.5, 1.3.1 |
| | Develop training and certification materials for contractors wishing to participate in the registered vendor program. | 1.3.1 |
| | Design and implement a quality assurance program for system installations and contractor sales practices. | 1.3.1, 1.6.2 |
| | Design accountability mechanisms for property owners to ensure financial benefits flow to tenants. | 1.2.1 |
| Workforce Development and Training | Establish a workforce development advisory board comprised of representatives from workforce development programs, industry partners, and community groups. | 1.2.5, 1.3.1, 1.5.2 |
| | Review existing contractor training materials and update materials to comply with the certification program | 1.3.1 |
| | Develop process to identify and provide workforce training scholarships for LIDAC, veteran, and tribal communities. | 1.3.1, 1.5.2 |
| | Deliver training for registered contractors on existing interconnection processes and standards. | 1.3.1, 1.5.3 |
| Technical Assistance | Establish a stakeholder process to review siting and interconnection processes and make recommendations. | 1.3.1, 1.5.3 |
| | Work with HOAs and local governments to adopt model solar guidelines and ordinances. | 1.5.3, 1.3.1 |

| (Building owners and consumers) | Provide technical assistance to local governments to improve solar permitting processes and coordinate permitting and inspection where applicable. | 1.5.3 |
| | Determine undersubscribed community solar capacity in the state and develop tools to scale up community solar. | 1.5.3 |
| | Provide technical and program design assistance to multifamily building owners. | 1.5.3 |
| Program Evaluation and Reporting | Coordinate with utilities to establish measurement and verification plans for energy bill savings | 1.2.1 |
| | Provide monthly programmatic and financial reports applicant for compliance with EPA reporting guidelines. | 2.3 |
| | Develop a workforce assessment plan in coordination with academic institutions | 2.3 |
| | Evaluate storage and community solar pilot programs to develop recommendations for larger-scale implementation. | 1.2.3 |

*Update to 1.1  Impact Assessment*

*1.1.1 Current Market Assessment and Desired Outcomes*

As noted above, North Carolina ranks high in installed solar, with 8,459 MW of solar installed as of Q2 2023.  Most of this solar capacity, however, is utility scale, and the state's residential solar market has struggled. North Carolina has comparatively low retail electricity rates, which has resulted in challenging economies for installing solar for residences, particularly low-income households.

Although data is limited, residential energy storage capacity in North Carolina also remains quite low. The Energy Information Administration (EIA)  reported that there were 1,369 residential net-metering customers with energy storage in May 2023. A battery storage incentive pilot program ("PowerPair") has been approved by the North Carolina Utilities Commission (NCUC), but it is only available in Duke Energy's service territory and for Duke Energy's retail customers. It does not apply across the state.

According to Lawrence Berkeley National Laboratory's Solar Demographics Tool, only 17% of North Carolina solar adopters in 2021 had an annual household income of $50k or less, with 38% of adopters having household income between $50-$100k and the remaining 45% having household income above $100k. In contrast, in 2010, approximately 11% of the state's solar adopters had an annual household income of $50k or less.

Although community solar enabling legislation exists in North Carolina, none of the state's investor-owned utilities (IOUs), which include Duke Energy and Dominion North Carolina Power, offer a community solar program. However, several co-ops and municipal utilities have developed them.

6

According to the North Carolina Sustainable Energy Association, there are 17 community solar projects in the state, totaling 2.945 MW in capacity.

Against this backdrop, EnergizeNC's desired outcome is to provide approximately 12,000 low-income or disadvantaged households in the state with solar, providing a minimum 20% bill savings starting the year each solar array is installed. The Coalition recognizes that engagement with developers, installers, and utilities will be crucial to the success of EnergizeNC. During the planning period, market transformation activities in the workplan will be further developed. At minimum, the Coalition will convene a working group to identify policy and market barriers and be responsive to the unique needs and circumstances of these stakeholders.

*1.1.2 Current Market Barriers to Deployment*

Despite significant legislative and regulatory policy achievements in the last few years, policy and market barriers continue to challenge the expansion of residential-serving solar and storage in North Carolina. Policy barriers include changes to net metering that will reduce potential savings for residential solar customers, the inability to use third-party power purchase agreements, a 1% cap on solar leasing for the state's largest IOU, and wholesale power contracts limiting opportunities for new community solar development in co-op and municipal utility territories. Market barriers include solar siting restrictions, economic factors associated with relatively low electricity rates, consumer protection requirements, and workforce challenges, especially in rural parts of the state and for historically underutilized businesses. See Section 1.3 for additional details on and plans to address these barriers.

**Figure 1: North Carolina CEJST Disadvantaged Tracks**



*Update to 1.1.3 Anticipated Outcome Goals and Metrics*

EnergizeNC supplements its initial workplan Section 1.1.3 with the required outputs and outcomes (listed below), as well as how to measure against those outputs and outcomes.
- Number of households served

- New generation capacity broken down by residential solar and residential-serving community solar (MW)
- Estimated GHG emissions reduced and avoided (CO2 and CO2e if available)
- Estimated savings per household ($/household)
- Number of jobs created, and other outcomes related to workforce development, based on contractor feedback.

**Project Outputs, Outcomes, and Linkage to the U.S. Environmental Protection Agency (EPA) Strategic Goals**

**Environmental Results - Outputs and Outcomes:**

As noted, EnergizeNC intends to engage with interested stakeholders during the planning year. As such, additional input from these stakeholders may impact the anticipated goals and metrics below. EnergizeNC will revise and update these anticipated goals and metrics as necessary in response to feedback in the planning year.

**Table 2. Anticipated Goals, Outputs, and Metrics***

| Metric | Absolute Number | Percentage / Average |
|---|---|---|
| Total number of households served | 12,532 | Average $9,343 financial assistance per household |
| Total amount of residential solar deployed over time | 43.4 MW | 99.8% of award funding |
| Total amount of residential storage deployed as demonstration pilot | 0.081 MWh | 0.2% of award funding |
| Short tons of annual CO2 emissions avoided over 20-year program period | 817,341 short tons of CO2 | $143 of financial assistance per ton of CO2 |

**\*Numbers in the table above will be refined in the planning period.**

**Table 3. Annual Carbon Reduction Estimate and Outputs by Customer Type (numbers to be refined during planning period)**

| Customer Type | System Size | Number of Households | Total Capacity | Avoided Carbon |
|---|---|---|---|---|
| Single-Family — Low Income | 4 kW | 1,873 | 7.5 MW | 8,243 tons |
| Single-Family — Moderate Income | 6 kW | 3,621 | 21.7 MW | 23,918 tons |
| Multifamily | 2 kW | 6,969 | 13.9 MW | 15,300 tons |
| Community Solar (15 panels) * | 0.45 kW | 69 | 0.28 MW | 312 tons |
| Totals | | 12,532 | 43.4 MW | 47,773 tons |

8

*This community solar generation will come from existing community solar projects.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

1.1.4 *Reasonableness and Achievability of Goals*

Rising interest rates, supply chain constraints, and workforce challenges will also be obstacles to EnergizeNC's efforts.  Please see initial work plan for more information.

*Update to 1.2  Meaningful Benefits Plan*

EnergizeNC will drive meaningful benefits through multi-sector programs and pilots, in which equitable household solar benefits are integrated with workforce and small business expansion, consumer protection, and policy exploration to transform the behind-the-meter solar market in the state.  Further EnergizeNC will seek to integrate and leverage incentives for home energy management tools, which as smart thermostats, that can help customers maximize the economic value of their solar systems.

**The following household incentives and financing will be further defined during the planning period.**

**Rooftop Solar for Single-family Homes** will be offered through three pathways.

- **Low-income single-family, paired with weatherization – this pathway will prioritize low-income households for maximum subsidy amounts, particularly those in CEJST-LIDAC communities, but open to low incomes residents statewide**. In the beginning of the program period, this program will subsidize rooftop solar for SFA-eligible, low-income households receiving weatherization improvements from established WAP programs and partners, thus maximizing comprehensive household energy efficiency benefits. The program will offer rooftop solar to households that have been served with weatherization in the past five years as well as those in the WAP queue. In later years, the program may broaden to serve low-income households in communities across the state.
- **Single-family tariffed on-bill program**. EnergizeNC will work with electric cooperatives (co-ops), municipal utilities, and IOUs to develop programs to compliment a solar and/or energy efficiency tariffed on-bill or an on-utility-bill repayment program. In many areas, these programs create access for households who are unable to take on debt. By working with electric coops particularly, we will be able to focus on the needs of eligible rural communities who are often underserved. The program will deliver 20% energy bill savings and meet utility cost-effectiveness requirements. For programs offered by IOUs, EnergizeNC will work with the IOUs and other stakeholders to obtain the necessary approvals by the North Carolina Utilities Commission (NCUC).

- **Single-family financing programs**.  **While low-income is our primary focus, we recognize that it will be important to provide a pathway for residents who are not income-eligible for WAP. Therefore, EnergizeNC will offer** consumer financing or financing plus a subsidy to moderate-income households, with a focus on those located in the SFA-eligible CEJST-LIDAC geography whose incomes are too high to be eligible for the full subsidy.  The Coalition, with the expertise and experience of NCCEF, will design a package of loan terms, grants, and other incentives needed to deliver 20% savings to participating households. The consumer financing program will be modeled on successful programs such as Michigan Saves, Colorado Residential Energy Upgrade (RENU), and Smart-E. In addition, during the planning period, EnergizeNC will explore the potential for solar leasing consistent with state law, NCUC Rules, and other North Carolina regulations and will seek to overcome current barriers to solar leasing across the state, such as limitations on solar installations in certain North Carolina electric utility service provider service territories.

For affordable multifamily housing, including housing owned and operated by eligible organizations, EnergizeNC will offer:

- **Behind-the-Meter solar installation (Multifamily Solar program).** The program will be designed with and for public housing authorities and qualified owners of affordable multifamily housing and supportive housing, whose portfolios represent permanently affordable housing stock and are an important constituency for market transformation models.

In addition to the rooftop solar pathways for single-family homes and the Multifamily Solar program, EnergizeNC will develop two pilot programs to gain knowledge and experience on solar paired with storage and community solar programs.  These two pilot programs are described below:

- **Single-family Storage Pilot Program (Solar/Storage Pilot).** EnergizeNC will work with community partners to design and administer a solar plus storage (and not standalone storage) pilot focused on resiliency benefits for households reliant on medical equipment. The 20% benefit per participating household will be calculated based on energy savings plus assigning a dollar value to the resilience benefit. To calculate this benefit, the team will review storage and microgrid solutions deployed in the state.
- **Community Solar Pilot Program (Community Solar Pilot).** EnergizeNC will design and implement a community solar pilot aligned with the utility owners of undersubscribed community solar arrays. We will subsidize eligible households to purchase community solar subscriptions, based on the current subscription rate for the electric co-ops' 17 community solar installations. All systems included in the pilot will be required to meet EPA's definition of residential-serving community solar. Specifically, they will have a nameplate capacity of 5 MW ac or less and deliver at least 50% of the electricity generated from the system to multiple residential customers within the same utility territory as the facility. While verification processes will be developed during the planning year, EnergizeNC commits to verifying that at least 50% of the benefits and/or credits of the power generated from a community solar system are delivered to residential customers in the same service territory.

10

The proportion of households in and out of CEJST/LIDAC served in the different financial assistance strategies will be adjusted during the planning period to make sure we meet the requirements of SFA.

*Update to 1.2.1 Household Savings*
Program model assumptions described in this section outline the basis of calculations for household savings estimates. Please refer to Table 3, Section 1.1.3 of the initial workplan. During the planning year, we will refine and update the calculations for the value of the required 20% household savings in each utility territory. The 20% calculations will be based on public data showing ranges of household electric bills in the territories of North Carolina utilities including IOUs, municipal-owned utilities, and co-ops. Financial modelling will integrate the savings target and confirm that all financing or leasing offerings developed for EnergizeNC deliver the 20% household benefit, inclusive of the costs of financing to the program beneficiaries.

As reporting processes and quality assurance are put in place during the planning year, special attention will be paid to mechanisms to verify that predicted household savings are achieved and maintained over time.

*Savings Model for Single Family Rooftop Solar*
EnergizeNC gathered prices from installers of $3.02 per watt, with discounted price of $2.65 per watt for potential large purchases. These prices will be further refined during the planning period based on current tariffs and equipment costs. Input from North Carolina solar installers and the CESA suggest that the Davis-Bacon Act and Build America, Buy America Act compliance will add cost of approximately $0.20 per watt. We included the current inflation rate of 3% for general price increases. Given these assumptions, we estimate a starting cost of $3.22 per watt for single-family installations. We further included a 20% adder for eligible enabling efficiency upgrade costs.

We estimated bill savings resulting from net metering of distributed solar installations using the National Renewable Energy Laboratory's System Advisor Model (SAM), based on each utility's net-metering or net-billing tariff and typical household usage data from Open EI. We calculated the incentive necessary to achieve 20% monthly bill savings in the first year (calculated on a utility basis) using EIA data on total residential revenues and customer counts as well as average utility costs per utility territory and net-metering benefits per household, drawn from the federal SAM model. Scenarios were run for 4-kilowatt (kW) and 6-kW systems based on the experience with regional solarize programs.

*Savings Model for Community Solar Pilot*
For community solar installations, the 20% savings benefit calculation will be drawn from the actual costs of each participating community solar array. During the design of the program, EnergizeNC will analyze utility-specific subscription rates and confirm the level of subsidy necessary to fully subscribe to the arrays and to ensure that participating low-income households benefit by receiving the required 20% savings. Initial community solar subscriptions will fill subscription openings in existing community solar projects. So currently, all solar generation from community solar will come from existing projects. During the planning period, EnergizeNC will investigate near-term and mid-term opportunities to add subscriptions to new community solar projects.

11

*Savings Model for Multifamily Solar program*

Expected savings for multifamily affordable housing are estimated based on data provided by a solar installer. During the design phase of this EnergizeNC program, the Coalition will significantly expand and refine that model based on input from participating qualified, public affordable multifamily owners supporting this effort.  During the planning year, we will model scenarios and mechanisms by which a multifamily owner can pass a benefit to tenants that is equivalent to 20% savings on their electric bill but is conveyed in a way other than credits on a utility bill. EnergizeNC will explore options for non-financial benefits for tenants as appropriate.  The goal will be to assist tenants who could be at risk of losing other forms of federal assistance if utility bill savings count as income for the tenant.

In addition, we will design and implement enforceable mechanisms by which multifamily owners will be held accountable for passing along the benefits of solar to their tenants in master metered buildings.  Moreover, the Coalition will develop standards and requirements for the developers/owners of low-income multifamily homes using SFA fund to improve the multifamily homes.  These standards and requirements will be designed to ensure that the tenants receive the benefits of installed solar.  For example, to ensure that tenants receive *and retain* the benefits of installed rooftop solar, without bearing the risk of corresponding rent increases or eviction, EnergizeNC may include standards and requirements restricting multifamily building owners from evictions and rent increases for a period of time after the rooftop solar installations become operational.  These standards and requirements may include:

- No evictions so the owner can obtain higher rents based on improvements. The owner agrees not to evict a tenant to obtain higher rent tenants based upon the improvements.
- Rent increases resulting from solar improvements will not be allowed apart from increases to recover actual increases in property taxes and/or specified operating expenses for a two-year period after improvements to the housing development are completed.
- The owner must agree that if the property is sold within two years of SFA improvements, the owner must include the language of these conditions in the purchase agreement with the new owner.  The owner must communicate to any prospective new owners in writing these terms and that the same conditions will apply to them as a new owner.

Additionally, to preserve the 20% savings when there is a rent increase due to property taxes or specified operating expenses, EnergizeNC will explore achieving 20% energy savings for delivering an equivalent non-monetary benefit for participating tenants, such as in master-metered buildings. EnergizeNC will also explore ways to assist tenants who could be at risk of losing other forms of federal assistance if utility bill savings count as income for the tenant.

EnergizeNC will ensure that contact information for tenants to notify EnergizeNC of issues related to rental affordability and include this information in the consumer education campaign, so tenants of multifamily buildings are aware of their rights and building owners are aware of their obligations. EnergizeNC will also ensure that participating landlords will not discriminate against tenants based on race, color, religion, sex, or national origin, or to retaliate against someone who complains.

*Activities Related to Household Savings and Affordability Issues*

- Conduct outreach sessions to inform planning and refining of design and models during the planning year.
- During the planning period, evaluate housing affordability considerations and other unintended consequences of solar development that could impact equitable access to solar across the program
- Analyze scenarios in which landlords convey benefits to tenants outside of a utility bill credit.
- During the program planning period, we will update utility bill averages for each utility to create 20% average targets for the program.
- Determine the appropriate subsidy level, non-financial benefit, or combination thereof, needed to achieve 20% energy savings for households participating in the programs and pathways.
- Coordinate with utilities and other partners to establish measurement and verification plans for results.
- Convene Housing Authorities and qualified affordable multifamily housing developers to offer technical assistance to property owners and design the accountability mechanisms to ensure financial benefits flow to tenants.
- Select experienced regional partners to promote EnergizeNC through existing channels.
- Develop and implement communication standards and multifamily housing owner requirements to protect tenants from rent increases and evictions.

*Update to 1.2.2 Equitable Access to Solar*

**Single-family pathway:** Solar adoption in North Carolina among single-family households – especially low-income households – has been hindered by market barriers described in Section 1.3. The financing products, such as leasing (where available), tariffed on-bill financing, and deployment strategy, including coordination with WAP, overcome many of those barriers to significantly increase LIDAC access to solar energy. These strategies will enable low- and moderate-income households to access rooftop solar without an upfront cost and without taking on personal debt. Community engagement efforts are central to the EnergizeNC workplan, which will help overcome cultural barriers and trust barriers.

**Multifamily pathway**: For the Multifamily Solar program, described in updated Sec. 1.2 above, EnergizeNC addresses multiple barriers to expand access for affordable multifamily housing owners. Providing solar subsidy immediately improves the value proposition of solar. Site-specific technical assistance from solar installers and energy contractors will clarify the solar opportunity for a given building or development (including possible parking lot canopies or ground-mount solar). Technical assistance will also analyze net-metering credits. Offering affordable leasing (where allowable) for qualified multifamily owners will offer simplified and flexible pathway to access solar for multifamily owners.

**Pilot pathways**: For the pilot programs, described in updated Sec. 1.2 above, the single-family storage pilot will make solar-plus-storage affordable to pilot participants with critical medical needs. Accordingly, the household's need for medical equipment and location will determine placement and storage capacity.  Likewise, the community solar demonstration pilot will provide access to LIDAC households that are not eligible for the single- or multifamily program offerings.

13

*Activities Related to Equitable Access to Solar*
- Work with WAP to design outreach and offerings that align with WAP clients.
- Coordinate with community groups, local governments, and other trusted advisors to design an equitable education, outreach, and deployment plan.

*Update to 1.2.3 Resilience Benefits*

To create capacity to deliver power to low-income and disadvantaged households during a grid outage, EnergizeNC will leverage current work by Coalition member NCCETC under the Department of Energy's Resilient Renewable Energy to Diminish Disaster Impacts on Communities (Resilient REDDI Communities) project. Tools will include a guide for resilience strategies that include solar/storage assets and will support goals for EnergizeNC.

The Renewable Energy to Diminish Disaster Impacts (REDDI) Communities program is working with communities across the state to identify grid resiliency issues and provide technical assistance to design solutions using solar and storage. The technical assistance provided will examine a community's critical facilities, the types of disasters historically experienced in the community, and recommend a limited subset of facilities to model for installation of resiliency assets (including solar-plus-storage) and microgrid potential. Modeling will use energy data from the facility and, where available, utility data for the circuits on which the facility is located to model various outage scenarios. Using NREL tools like SAM and ReOPT, the REDDI project will recommend various configurations of solar, storage, and existing energy assets to meet the needs of the critical facility during an outage.

The project will also include metrics for valuation of energy resiliency to help emergency managers and other stakeholders compare resiliency projects to each other and to traditional infrastructure projects. This includes Equity-Focused Metrics (e.g. energy burden, social vulnerability indicators), Community Metrics (e.g. critical services unpowered, outage timelines, loss of assets/perishables, business interruption costs), and Operational Metrics (e.g. Cumulative customer-hours of outages, number/proportion of customers experiencing outages, grid damage costs, lost revenues). These metrics will be included in the technical assistance recommendations to partner communities to determine how applicable they are and identify any difficulties in the use of these metrics in real-world scenarios.

Outcomes include resiliency project and program design from the technical assistance provided to community partners and tested metrics in the North Carolina environment with notes on applicability for different projects and resiliency scenarios. These outputs will be able to be utilized for NC's SFA program in calculating resilience benefits and designing the Solar/Storage pilot.

14

*Activities Related to Resilience Benefits*

- Explore alignment between EnergizeNC programs and existing programs, like the Resilient REDDI Communities, and those programs' need for distributed energy resources, including low-income residences.
- Evaluate and quantify resilience benefits provided through the Solar/Storage pilot. Review pilot program results to develop recommendations for a larger-scale Solar/Storage program to be implemented following the EnergizeNC program.
  - Benefit evaluation would be done by comparing system performance (i.e. installed solar and battery capacity) to on-site energy needs and developing plans for various outage durations. The resiliency metrics in the Resilient Renewable Energy to Diminish Disaster Impacts in Communities program (e.g. Operational, Community, and Equity-focused measures) will be applied to the pilot site(s) to help determine a value for the resilience services available. Depending on exact program design, there is a potential for additional value in non-emergency conditions to operate the batteries for site or grid benefits.
  - The pilot will help determine performance of solar and storage assets in real world deployment. This performance, resiliency metric evaluation results, bluesky operation strategy, and (if applicable) operation during a grid outage will be evaluated to help quantify overall benefits and make recommendations for best practices in further solar/storage installations.
  - Modeling power availability for solar and storage is a relatively straightforward process and, as above, can be compared to normal load profiles on the pilot site(s) to determine a potential operational window. Additionally, historical statistical data is available in part from Duke Energy to project outage timelines and scenarios. In the fortunate case of no grid outages, EnergizeNC can use modeled power generation, statistical outage data, and historical weather models to develop projections. The key real-world data that we will obtain irrespective of power system outage will be site loads, battery dispatch strategy, and overall system performance.

*1.2.4 Community Ownership*

Community ownership is not proposed under EnergizeNC because the existing North Carolina law and policy environment does not allow third-party sales of electricity or virtual net metering, precluding most traditional community ownership models, as elaborated further under Section 1.3. The EnergizeNC single-family offerings harness the value of ownership and wealth building. The residential leasing program request for proposals from solar lessors will require a path to ownership for participants.

15

*Update to 1.2.5 Workforce Development and Entrepreneurship*

EnergizeNC will emphasize contractors that hire locally and partner with companies registered or identified in North Carolina historically underutilized businesses. All contractors will be required to pay prevailing wages and offer full benefits packages. In rare cases where the prevailing wage fringe exceeds their benefits, the contractor will be required to make up the difference. As a right-to-work state, North Carolina does not have a strong organized labor presence. However, should contractors choose to participate in organized labor, the Coalition places no restrictions on their ability to do so.

North Carolina has a Workforce Development program in the Department of Commerce called NCWorks and has 20 Workforce Development Board across the state that assist job seekers with improving their skills and finding jobs, and helping businesses develop a qualified workforce. EnergizeNC will coordinate with these organizations to share opportunities for job training more broadly.

EnergizeNC will also collaborate with representatives from the state's eight state-recognized American Indian Tribes, and one Federally recognized American Indian Tribe to create work-based training opportunities for Tribal community members.

**Workforce Development Board**

A large skilled solar workforce is necessary to achieve the goals of EnergizeNC. The Coalition will establish a Workforce Development Board (WDAB) of select North Carolina partners to assist in designing and implementing programs that ensure the creation of high-quality jobs and shared economic opportunity in LIDAC.
The WDAB will meet regularly to:
- Identify training opportunities,
- Recommend any training development to address the need for a trained and local workforce to deploy the program, and
- Provide feedback to NCCETC and other Coalition partners on program design.

*Activities Related to Workforce Development*
- Establish WDAB to include the state's workforce experts.
- Conduct outreach to solar contractors and stakeholders to identify potential workforce challenges and get program feedback.
- The WDAB will review existing state-based workforce training programs to determine their appropriateness for the VRP process and determine new credentialing standards.
- The WDAB will collaborate with the Vendor Registration Program (discussed in more detail below) administrator to establish technical and business/sales practice training along with compliance procedures for both new and existing programs.
- Develop a need-based process to identify potential contractors and sales professionals that can receive a training scholarship through the program.

**Contractor Training and Requirements/Consumer Protection**

16

With EnergizeNC planning a dramatic increase in residential solar, consumer protection issues require a proactive approach. The Coalition will coordinate a working group with solar installers, code officials, academic institutions, and consumer advocacy groups to develop criteria to become a "registered contractor" under the program. NCCETC will guide the design and implementation of the Vendor Registration Program (VRP) criteria. The VRP will include installation contractor training and certification requirements, as well as standards for business practices to participate. EnergizeNC, with guidance from NCCETC and the assistance of the program implementer, will develop the qualifications of contractors, the onboarding process to become a registered contractor, continuing education requirements, and a dispute resolution process for claims of non-compliance. The use of registered contractors will be incorporated into program terms and conditions for financial incentives for all EnergizeNC programs and pilots. In general, requirements for a contractor to participate in the program will include:

- Have all required certifications for the work being performed.
- Meet all federal program requirements
- Pay prevailing wages and offer full benefits packages. In rare cases where the prevailing wage fringe exceeds existing benefits, the contractor will be required to make up the difference.
- Conduct full safety programs, following all Occupational Safety and Health Administration guidelines and 100% open-door policies to report safety issues/concerns.
- Have relevant federal, state, and local certifications and licenses necessary for the installation of equipment.
- Complete program certification, which will include education on all program requirements and how to meet them.

Using NCCETC's expertise and experience, EnergizeNC will work with existing solar associations in North Carolina and reach out to solar companies across the state to encourage them to apply for the approved   contractor list and will gather feedback from solar contractors and stakeholders on program feedback and about workforce development needs and barriers to training workers for underserved areas of the state. EnergizeNC will share these results with the WDAB to inform the efforts on workforce development and entrepreneurship.

For identified areas that are not served by existing solar providers, EnergizeNC will determine incentives to encourage work in these areas. If incentives prove ineffective and interested residents are unable to participate due to lack of service providers in their area, we will revisit the available incentives and consult the North Carolina Department of Commerce to identify available training for individuals interested in starting a new business to meet this need.

*Activities Related to Consumer Protection*
- Convene a working group of industry experts to develop criteria to become a "registered contractor" and be included in a VRP.
- Develop compliance materials for contractors who wish to participate in the VRP.

- Incorporate the use of registered contractors into the program terms and conditions for financial incentives for all EnergizeNC programs.
- NCDEQ's SEO will design and implement a robust quality assurance program, including system design review, photo documentation, and on-site inspections of a subset of installations.

*Update to 1.3 Distributed Solar Market Strategy*

In 2018, North Carolina Gov. Cooper signed Executive Order 80, which laid out an emission reduction goal for the state of 40% by 2025. The order also asked NCDEQ to facilitate a stakeholder process to develop the state's first Clean Energy Plan, finalized in October 2019. In 2021, the North Carolina General Assembly passed House Bill (HB) 951, which requires the NCUC to take "all reasonable steps" to achieve 70% carbon emissions reductions from 2005 levels by 2030 and achieve carbon neutrality by 2050. Despite these achievements, policy and market barriers continue to challenge the expansion of residential-serving solar and storage in North Carolina, as outlined in the sections below.

*Update to 1.3.1 Currently Recognized Market Barriers*

**Net Metering**
The state's net-metering rules and credit rates drive the economics of residential-serving solar and storage. Pursuant to 2017's enacted House Bill 589 (HB 589), the NCUC recently approved tariffs for Duke Energy Carolinas and Duke Energy Progress, which will take effect on October 1, 2023. The tariffs will reduce credit for monthly net excess generation to the avoided cost rate and implement a non-bypassable charge based on solar system capacity. It also includes a monthly minimum bill (with an exemption for low-income and vulnerable customers). The tariffs will be open to a limited amount of solar capacity each year through 2026; additional or later capacity is required to participate in the Residential Solar Choice Rider instead. Residential Solar Choice requires participants to be on the utility's time-of-use rate with critical peak pricing and the non-bypassable charge and minimum bill. Low-income customers will not be exempt from the tariff's minimum bill after 2026.

These upcoming net-metering changes will reduce customer savings from solar, although the specific impacts will depend on system design and customer energy usage patterns due to the time-varying credit structure. The full transition to the Residential Solar Choice tariff will take place in 2027, and the EnergizeNC program will be able to educate customers on these changes.

As the state's net-metering rules do not apply to co-ops and municipal utilities (totaling approximately 33% of the state's households), only a subset of these utilities offers net metering with retail rate compensation. Instead, most of the state's public power utilities allow for net billing with excess generation compensated at the avoided cost rate. Many programs are also limited to a small amount of aggregate capacity, given restrictions in co-op and municipal utility wholesale electric supply contracts.

*Activities Related to Net Metering*

18

- Develop an education and awareness campaign to describe the changes to net metering that will take effect in 2027 (Duke Energy customers only) and net metering more generally (all customers).
- During program design, incorporate utility and federal incentives for home energy incentives in coordination with EnergizeNC solar incentives.
- Work with stakeholders to develop suggested modifications to current net metering tariffs and to develop new programs for small utilities that do not currently offer net metering.

**Third-Party Ownership and Leasing Constraints**

Another barrier to residential-serving solar and storage deployment is the state's limitations on third-party ownership. Third-party power purchase agreements are currently illegal in North Carolina, while solar leasing is allowed in Duke Energy's service territory, up to 1% of the utility's previous average five-year peak demand. Municipal utilities may opt in to allow solar leasing in their territories. Solar lessors must apply and be approved to offer solar leases in the Duke Energy service territory by the NCUC. Local installers have suggested that the underlying economics of residential solar in the state make leasing financially difficult for companies to offer. Although legislation is pending to increase the cap on leasing to 10%, the EnergizeNC Coalition plans to focus its efforts on making alternative non-leasing financing strategies accessible and attractive, including low-interest loans offered through the NC Clean Energy Fund and leveraging partnerships with the state's utilities to offer tariffed on-bill financing and other utility-supported finance mechanisms.

*Activities Related to Third-Party Ownership*
- Develop low-cost financing options through the NC Clean Energy Fund.
- Develop tariffed on-bill programs in partnership with utilities.
- Analyze best practices for low-income residential solar leasing and work with policy experts to adapt to North Carolina regulations to these best practices. Issue an RFP, evaluate and select one or more leasing providers.

**Community Solar**

HB 589 enabling community solar in North Carolina specifically directed IOUs to analyze and develop offerings with a credit rate limited to the utility's avoided cost of electricity, thereby making a community solar program unattractive to customers. However, subsequent legislation (House Bill [HB] 951) potentially opens the door to customer renewable energy programs that utilities may propose and could include a community solar-style offering. The Coalition plans to work with Duke Energy to evaluate the feasibility of developing a community solar program under existing enabling legislation that could provide a 20% savings for participants.

Some electric co-ops and municipal utilities offer community solar subscriptions, though they can encounter administrative and contract complexities. Subscription administration and outreach to fill subscription capacity can tax already burdened administrative staff, and contracts with generation and transmission providers can often limit the amount of self-generation that a municipal utility or co-op may pursue. The Coalition will work with co-ops and municipal utilities to fill existing unsubscribed community solar capacity.  The team will also work with these utilities to

identify opportunities for new community solar program development and provide technical assistance where these opportunities exist.

Finally, the Coalition will convene a working group focused on overcoming community solar market barriers in the state. The group will discuss opportunities to pursue utility-owned community solar projects as well as third party-sponsored community solar development.

*Activities Related to Community Solar*
- Convene a working group focused on overcoming community solar barriers in the state.
- Develop models for community solar development in partnership with utilities:
    - Work with IOUs under HB 951 enabling legislation to develop a community solar program that is accessible and affordable for all customers.
    - Design the EnergizeNC Consumer Solar Pilot to address the low subscription rate of existing co-op-owned community solar installations.
    - Identify opportunities for new community solar program development in co-op and municipal utility territories and provide technical assistance to utilities to design programs that are accessible and affordable for all customers.

**Interconnection**

Interconnection of rooftop systems is spelled out clearly in the rules found in the relevant National Electric Code, Institute of Electrical and Electronics Engineers, and United Laboratory standards, and is regulated primarily through the electrical inspection process at the local level.  However, a significant barrier to interconnection in North Carolina can be a lack of clarity on the utility process. North Carolina's electricity is provided by over 70 municipal utilities, 26 co-ops and two IOUs. Across these utilities, notification processes, fees, and timelines for interconnection may vary. Engaging utilities to understand their processes and make information available to contractors will be critical.

*Activities Related to Interconnection*
- Establish a stakeholder process to review current interconnection processes (fees, timelines, and requirements for paired storage) and recommend improvements.
- Create and deliver training for contractors on utility interconnection processes and standards (See also Section 1.5.3).

**Siting Restrictions**

According to local solar installers, siting issues continue to be a challenge in many parts of the state, particularly at the level of homeowners' associations (HOAs). The Coalition plans to develop model solar guidelines for HOAs and provide outreach to contractors and community organizations to adopt them. The Coalition also plans to convene stakeholders to review and update the state's existing model solar ordinance for local governments, which was last updated in 2016.

*Activities Related to Siting Restrictions*
- Develop model solar guidelines for HOAs and outreach materials for solar developers and community organizations.

- Convene stakeholders to review and update the state's existing model solar ordinance for local governments.

*1.3.2 Plans to Address Market Barriers*

Although several of the barriers in Section 1.3.1 would require action by the North Carolina General Assembly to resolve, EnergizeNC has identified initial strategies to mitigate their impact and improve market conditions. EnergizeNC intends to convene a regular industry stakeholder working group with key decision-makers, such as utilities, throughout the program to (1) identify a comprehensive list of existing distributed solar market barriers, including those identified in this section; (2) discuss potential solutions and pilot programs to address these barriers; (3) develop an implementation strategy for solutions and pilot programs; and (4) assess progress and effectiveness of identified solutions and pilots.

*Activities Related to Plans to Address Market Barriers*

- Establish an industry working group to identify policy and market barriers, including additional detail on those outlined in Section 1.3.
- Implement solutions to market barriers identified in the working group, such as pilot programs (e.g., virtual power plant pilots, community solar pilots) and policy changes.
- Continually evaluate and address this comprehensive list of barriers, discuss potential solutions, develop an implementation strategy, and assess effectiveness.

*Update to 1.4 Financial Assistance Strategy*

EnergizeNC programs will develop financial assistance programs for LIDAC households to benefit from solar investment and enabling upgrades. Crucial to the expected success of EnergizeNC will be bringing additional relevant programs to an online consumer portal. This consumer portal will streamline access to current and emerging rebates (including upcoming Inflation Reduction Act (IRA) rebates or any complementary utility rebates), technical assistance, and other programs. The portal will provide access to EnergizeNC programs and complementary programs. EnergizeNC will ensure that 75% of the award will be financial assistance.

*Update to 1.4.1 Financial Assistance Models*

To prioritize the most overburdened and low-income households within eligible LIDAC geography, we will offer the highest level of subsidy to lowest-income participants. Other households will receive financial support via a mix of grants and financing approaches. Table 4 summarizes financial assistance under EnergizeNC, showing the size, type, and deployment strategy. Program types are summarized in Table 5.

During the planning year, EnergizeNC will identify pragmatic options for income verification. We will adapt lessons learned and best practices from the recent IRA rebates programs, as well as from verification processes used by SEO's WAP program. Income verification will be designed to conform with Terms and Conditions. We will also implement processes to limit the percentage of any

21

enabling upgrades to 20% of the SFA funding for any given beneficiary. Enabling upgrades will be limited to 20% of the financial assistance portion of the SFA award. In addition, we will identify any policies that would need to be put in place to ensure Terms and Conditions continue to be met if a Solar for All beneficiary were to move away.

**Table 4. EnergizeNC Financial Assistance Model (Subsidy amount will be refined during the planning period)**

| Financial Assistance Type | Financial Assistance Size | Other Funding Leveraged | Deployment Strategy |
|---|---|---|---|
| **Single Family:** Homeowner direct grants for solar + enabling upgrades (highest subsidy level for LIDAC). | Estimated subsidy needed per fully subsidized house is $16,485. | Energy efficiency investments from WAP; possibly rebates from selected utility demand-side management programs. | In conjunction with WAP, Community Action Agencies, Habitat for Humanity, United Way, and other grassroots groups, including tribal advocates. |
| **Single Family:** Low-interest loans plus subsidy required to achieve 20% savings; For leasing model, subsidy plus low-interest loan to the lease provider. | Estimated subsidy needed per house is $12,700.<br><br>$23.8 million Solar for All capital to be deployed as loan fund or credit enhancements. | Funding from Greenhouse Reduction Fund (GGRF), Clean Communities Investment Accelerator (CCIA) and NCIF via NCCEF, other NC community development lenders, and possibly other lenders under CCIA. | |
| **Single Family:** Tariffed on-bill financing for solar/enabling upgrades. (Currently available in a limited area of the state) | Grant level expected at approximately $12,700 to deliver 20% bill savings. | Capital is provided by utilities. Possibly rebates from selected utility demand-side management programs. | |
| **Multifamily:** Low-interest loans to qualified owners of multifamily affordable housing. | Size of financial assistance will vary greatly because these building types vary significantly. To be defined during Year 1 planning period. | Capital from GGRF CCIA and NCIF programs, offered by NCCEF and other community lenders. Federal clean energy tax credits. Rebates from selected utility demand-side | In conjunction with qualified housing developers, as shown by letters of support for this application. |

| | | management programs. | |
|---|---|---|---|
| **Solar/Storage** pilot for single-family homeowners reliant on electrically operated medical equipment. | Estimated subsidy needed per house is $34,985 for 7-kW PV + 12.5-kWH storage system. | Potential to leverage Duke Energy's PowerPair pilot program, which subsidizes the cost of combined solar and storage systems; potential for bill savings through demand response and time-of-use rates. | In conjunction with utilities using tools like the North Carolina Department of Health and Human Services (DHHS) emPower map to identify at-risk people. |
| **Community solar** pilot. | Estimated cost per subsidized subscription is $5,150 | Leverage capital from utilities, including potential funding from United States Department of Agriculture (USDA) Rural Services. | In conjunction with utilities/community organizations. |

**Table 5. EnergizeNC Program Types (Numbers of households and share of funding to be refined during the planning period)**

| Program Type | Pathway | Number of Households | Anticipated Share of Funding |
|---|---|---|---|
| Single Family | Homeowner direct grants for solar + enabling upgrades (LIDAC participants, highest subsidy level) | 1,867 | 26% |
| | Residential leasing (as allowed) and direct loans to households in CEJST-LIDAC geography. Low-interest loan plus subsidy required to achieve 20% savings. | 3621 | 52% |
| | Tariffed on-bill financing for solar + enabling upgrades (where available) | | |
| | Solar/Storage pilot | 6 | 0.2% |

| Multifamily | Low-interest loans to qualified owners of multifamily affordable housing | 6969 | 21% |
| Community Solar | Community solar pilot | 10069 | 0.5% |

*Update to 1.4.1 Financial Assistance Models*

**Rooftop Residential Solar for Single-Family Homes.** The financial assistance model for single-family homes leverages the funding of North Carolina's home energy relief programs LIHEAP and WAP as well as any available utility energy efficiency rebates and programs. This funding will be utilized to make homes energy efficient and ready for solar installations. The cost of solar will be fully paid by SFA grant funds for eligible LIDAC households. During the planning period, EnergizeNC will investigate the financial and service impacts of installing rooftop solar to homeowners, including property tax implications and any insurance issues.

To encourage more solar development for North Carolina residents, for households not qualifying for maximum subsidies in CEJST-LIDAC geography, EnergizeNC will build an offering that consists of a suite of tools to encourage solar investment: 1) consumer protection, information, and technical assistance for homeowners; 3) education to help individuals take advantage of the federal tax credits; 4) access to low-cost consumer loans; and 5) offering financing through residential solar leases and tariffed on-bill financing. In addition, EnergizeNC will analyze options for an appropriate leased offering for single family participants (where allowable under state law). The leasing program would be designed to be protective of consumers. For the tariffed on-bill program, utility-financed or on-bill programs will be leveraged. Loans for these programs will be designed by NCCEF, based on stakeholder input collected and financial modeling developed during the planning year of this award. NCCEF anticipates both creating revolving loan funds and credit enhancements from the NC SFA award and leveraging capital from partner lenders such as credit unions and green banks who can access GGRF capital via the GGRF Awardees, who are mostly large national teams. These NCIF/CCIA awardees are currently clarifying the terms they are going to offer and the criteria for funding. NCCEF is not a direct recipient of NCIF and CCIA.

Where funds are leveraged from partners, SEO will ensure that program reporting provides for attributing the impact of that funding appropriately and ensuring that carbon impacts are not double counted.

Conforming to EPA Terms and Conditions, SFA subsidy and financing will only be available to the solar installer or developer if the project installed has robust manufacturer warranties and short-term installer guarantees. Any leased systems will be 100% maintained by the lessor for the period of the lease.

**Multifamily Solar program.** EnergizeNC, using NCCEF's experience and expertise, will create a program aimed at public housing authorities and eligible owners of affordable and supportive housing to allow them to install on-site solar. These entities will be the long-term owners of the financial assistance. The program will encourage property owners to take advantage of the elective federal clean energy tax credits newly available to non-profits under the IRA and will offer: 1) design assistance to identify solar potential; 2) low-cost financing; and 3) enough subsidy to achieve net-metering savings that can be passed through to tenants. In addition, we will analyze the options of creating a simplified leasing option for owners of multifamily affordable housing. To access these benefits, the building owners will need to commit to passing through to their tenants a benefit

25

equivalent to 20% of utility bill costs and demonstrate an enforceable mechanism and documentation to back up that commitment. Additional details will be determined during the planning period. Building owners and lessors will leverage federal tax credits available through the IRA nonprofit investment tax credit and may also take advantage of utility or IRA rebates.

**Community Solar Pilot.** The Community Solar Pilot will build momentum for LIDAC-supporting community solar programs within the bounds of state policy and regulatory constraints. Once existing undersubscribed community solar capacity is allocated, feasibility analyses will be performed for partner utilities serving LIDAC areas for new facility construction which will provide additional community solar subscription openings. A utility engagement process will find pathways to overcome existing barriers that have limited community solar uptake by the state's municipal utilities, co-ops, and IOUs. Lastly, during the planning period, the Coalition will evaluate and mitigate potential impacts of the Pilot to participants' reported income and eligibility for other income-qualified programs.

*Activities Related to Financial Assistance Strategy*
- Determine the appropriate subsidy level needed to achieve 20% energy savings for households participating in the programs and pathways.
- Review options for grant administration, including eligibility verification procedures. Procure via RFP a grant administrator to efficiently manage grant process.
- Analyze best practices for low-income residential solar leasing, including path to ownership; work with policy experts to adapt to North Carolina regulatory ground rules, issue RFP, evaluate and select one or more leasing providers.
- Work with community lenders to design and deploy credit enhancement and interest rate buydown offers that enable them to extend solar loans.
- Assess the loan platforms and products offered by GGRF Awardees. Many GGRF funding applicants include Smart-E, a consumer lending platform that supports EnergizeNC.
- Design, establish and maintain revolving loan funds and credit enhancements using best practices from the EPA, United States Department of Energy, and other green banks.

*Update to 1.4.2 Storage Support and Enabling Upgrades*

Residential solar deployment to WAP-eligible households will be complemented by the Solar/Storage pilot, where EnergizeNC will fully fund the cost of storage deployed with up to ten rooftop solar arrays at households reliant on powered medical equipment.

Our partnership with WAP will help us identify households who have received weatherization services in past years and those currently in the queue for WAP/Low-income Home Energy Assistance Program (LIHEAP). In North Carolina, eligible households *may not* exceed 200% of the federal poverty level (FPL) for WAP and 130% of the FPL for LIHEAP heating assistance; therefore, qualification for WAP or LIHEAP in North Carolina conforms with DOE income eligibility requirements for participation in this program. Homes that have already been through the WAP should require no necessary health and safety repairs, allowing them to participate in this program without delay. Homes currently in the queue for the WAP may be eligible for other programs to support these necessary repairs.

EnergizeNC will incorporate incentives from IRA electrification rebates as appropriate. Where available, utility efficiency rebates and demand-side management/load control programs will be layered into the program to reduce the total cost of the system.

Across the program, qualified enabling upgrades include investments in energy or building infrastructure and upgrades necessary to deploy or maximize the benefits of a residential solar project.

*Activities Related to Storage and Enabling Upgrades Financial Assistance Strategy*
- Identify the type and scale of enabling upgrades needed to bring solar to houses participating in WAP. Integrate these costs into the financial assistance model, making sure that these enabling upgrades do not exceed 20% of the financial assistance portion of the budget. Identify other available rebates and incentives for efficiency and demand-side management and integrate them into the financial assistance model.
- With community partners, design solar/storage pilot to inform establishing evaluation strategies to drive future expansion.

*Update to 1.4.3 Financial Assistance Leveraging Strategy and Long-Term Sustainability*

The EnergizeNC programs described above deploy transformative elements that will be durable, even after the five-year SFA performance period. Notably, the two new pathways for single-family rooftop solar – tariffed on-bill financing and residential leasing – are intended to overcome long-standing policy and market barriers in the state.

The Multifamily Solar program will build internal capacity at public housing authorities and qualified affordable housing developers as well as at the community lenders who provide associated real estate financing.

Other North Carolina assistance programs besides the WAP can be braided with EnergizeNC. These programs include NC Housing Finance Agency (NCHFA) rehabilitation, emergency repair and other NCHFA programs; Duke Energy's residential rebates and Neighborhood Energy Saver programs; and co-op programs like Roanoke Electric's Upgrade to Save tariffed on bill program. EnergizeNC will continue to monitor for any new programs during the GGRF SFA program period.

*Update to 1.5 Project-Deployment Technical Assistance Strategy*

EnergizeNC will develop and implement a technical assistance strategy to support communities, contractors, developers, utilities, partners, and other stakeholders to address financial and non-financial barriers to solar implementation. The Coalition will also ensure that funding is efficiently deployed, particularly in LIDAC. This will be done through an online portal, developed by the Coalition with its program implementer to serve as a primary tool to share information about the program to generate awareness, understanding, and a pipeline of participants.

*Update to 1.5.1 Customer Outreach and Education*

To streamline and standardize education, outreach, and information-sharing, the Coalition and its program implementer will develop and maintain an online portal that provides access to EnergizeNC programs and links to other related programs and services.   The online portal will allow consumers and households to:
1. Identify any federal, state, utility, or local incentives in addition to the EnergizeNC incentives, for which they may be eligible,
2. Connect with consumer-education resources.
3. Identify participating contractors through a certified network; and
4. Reach a support line/concierge service for live customer support. The portal, paired with an 800 number, will be designed to later accommodate information delivery for additional home energy and electrification programs, including other IRA and utility rebates.

In addition to the features outlined above, the portal will include information on approved contractors, financing, incentives, technical assistance, consumer protection, education, events, and announcements.

Experience in community engagement has taught the members of the EnergizeNC coalition that relationship-building and trust-building is a crucial element in effective outreach. During the planning year, EnergizeNC team members based in different regions of the state will focus on outreach to local and state level partners. We expect that pairing a robust online portal with dedicated local personnel will maximize effectiveness and overcome barriers to adoption.

*Activities Related to Customer Outreach and Education*
- Work with community and industry partners to develop the scope of work for the comprehensive online portal and 800 number.
- Assess the technical requirements for the online portal and hire a consultant and/or program implementer to develop and maintain it in conjunction with other residential programs.
- Develop educational materials, including an FAQ list, for the online portal and answer consumer questions asked through the program email and the 800 number hotline.
- Host virtual technical assistance meetings and participate in community-based events.

*Update to 1.5.2 Workforce Development*

EnergizeNC is committed to investing in a skilled and diverse workforce through rigorous contractor training with a focus on recruiting LIDAC and veteran contractors and businesses. North Carolina has numerous specialized training programs for solar and weatherization contractors already in place through partnerships with universities, community colleges, and nonprofit organizations. Many of these programs are registered to provide continuing education credits to trainees through relevant credentialing organizations like the North American Board of Certified Energy Professionals, the U.S. Green Building Council, and the Building Performance Institute. In addition, recent efforts from organizations like the NC Community College System, ApprenticeshipNC, and the North Carolina Business Committee for Education are incorporating solar-related content into traditional high school Career and Technical Education and community college training programs for relevant traditional trades for electrical and construction trainees.

Multiple Coalition members and partners already directly administer training and have connections to these training programs, including organizations that focus on workforce in LIDACs and with under-represented populations. EnergizeNC plans to leverage and support these existing training providers both by providing scholarships for need-based participants and by working with them to ensure that the training they are sharing with interested individuals has curricula and instruction meet acceptable credentialing standards as specified through EnergizeNC contractor certification, registration and training programs, as specified through the VRP and the WDAB outlined in Section 1.2.  The program will also foster a connection between companies and relevant apprenticeship programs in the state.

In addition to establishing a certification process for participating contractors, EnergizeNC will encourage contractors to hire job trainees from qualified job training programs that will be identified across the state. People residing in LIDAC will be especially encouraged to participate in job training programs. A directory of qualified job training, relevant certifications, and other programs will be included on EnergizeNC's portal.

*Activities Related to Workforce Development*

- Leverage partnerships with members of the WDAB and community organizations to attract and retain new workers.
- NCCETC will offer scholarship support for LIDAC, veteran and tribal participants.
- Develop and maintain a list of training providers in the state who offer training that will satisfy program certification, with an emphasis on training that will support individuals in working towards solar-related technologies and related certifications.
- Develop best practices for development of workforce that prioritizes involvement and engagement with CJEST and LIDACs.

*Update to 1.5.3 Project Deployment Technical Assistance*

Some local governments have restrictive ordinances governing solar siting or have no language in their ordinances governing solar, resulting in ambiguity and contentious hearings. The Coalition, leaning on NCCETC's expertise, will provide technical assistance to local governments to address soft-cost barriers to solar deployment, such as permitting processes and zoning rules. EnergizeNC will work with local governments to streamline their solar permitting processes and adopt clear

29

zoning rules that facilitate, rather than restrict, solar deployment. This partnership will also work to develop and update model solar guidelines for HOAs and provide outreach, education, and technical assistance to HOAs to adopt them.

The Coalition will ensure the reliable and flexible integration of the solar and storage assets into the grid through a collaborative process with industry, utilities, the NCUC, and other stakeholders, where this is not already available through the utility. Through stakeholder engagement, an agreed-upon interconnection notification process will be developed where one does not already exist. The Coalition will work to design and deliver training for program contractors on the processes and standards that meet best practices. Finally, the Coalition will work with state electrical inspectors to ensure systems are built in compliance with the relevant interconnection standards through a robust quality assurance process that will include both desktop view and in-field inspections.

the Coalition will provide technical assistance to co-ops and municipal utilities to adopt interconnection best practices and green building programs that may provide expedited permitting or other incentives for solar-ready construction projects. Green building programs are voluntary programs adopted by local governments that provide incentives or recognition for achieving certain energy efficiency, solar-ready, or Electric Vehicle (EV)-ready building standards (since local governments in NC cannot adopt requirements stricter than the state's building codes per state law). In the case of Solar for All, we would be focusing on programs with weatherization and solar-ready building provisions.

The Coalition's strategy for approving and supporting the contractor network will provide regular communication and information regarding site suitability, support for timely interconnection, and permitting support. Technical advisors from NCCETC will be readily available to aid contractors and communities on an as-needed basis.

NCCETC will also lead efforts exploring new and enhanced existing community solar projects. EnergizeNC funds will be used in existing community solar projects to ensure that low-income subscribers reach 20% energy savings. NCCETC will work with co-op and municipal utility partners to iterate on the "Early-Stage Decision" and feasibility analysis tools developed under American Rescue Plan Act of 2021 research administered by the SEO, scaling them up for use in co-ops and municipal utilities throughout the state. These analysis tools provide useful financial pathways to reduce costs of community solar projects and help lower subscription and operating costs so that generation credits are better able to cover subscription costs.

EnergizeNC will leverage existing technical assistance services and resources provided by the Solar Energy Technologies Office, nonprofits, and other market actors to minimize duplication. These include tools for estimating cost savings, emission reductions, and health benefits from renewable energy and the following programs: SolSmart, SolarAPP+, National Community Solar Partnership, Interconnection Innovation e-Xchange, Grid Modernization Initiative Technical Assistance for State Utility Regulators, and additional DOE resources.

*Activities Related to Project Deployment Technical Assistance*
- Provide engineering, financial modeling, and program design assistance to multifamily building owners interested in installing solar as part of the EnergizeNC program.

- Create and deliver training for contractors in the program on the siting interconnection notification processes and standards.
- Develop model solar guidelines for HOAs and outreach materials as a resource for solar developers and community organizations. Conduct outreach and provide technical assistance to HOAs to adopt the model guidelines. This outreach will be targeted to LIDAC communities in NC that have HOAs. EnergizeNC will work with the NC Department of Justice and the NC Community Associations Institute to identify HOAs in LIDAC areas and develop outreach materials.
- Convene stakeholders to review and update the state's existing model solar ordinance for local governments. Conduct outreach and provide technical assistance to local governments to update their solar ordinances.
- Provide technical assistance to local governments to update solar permitting processes and on permitting, inspection, and interconnection.
- Provide guidance on best practices for siting, including avoiding climate hazards and greenspaces, and highlighting special concerns related to agrivoltaics.
- Determine capacity for subsidized subscriptions in existing community solar installations and develop tools to scale up community solar throughout the state.
- Provide engineering, financial modeling, and program design assistance to utilities developing new community solar projects to ensure projects are accessible and maximize participant savings.
- Engage solar developers in North Carolina who are already working with multifamily developers to ensure, among other things, that the design of the financial assistance aligns with their processes and capital stack and that they can access SFA grants to support projects that are not economically viable without the subsidy.

## 1.6    Equitable Access and Meaningful Involvement Plan

Outreach and engagement for EnergizeNC will be designed at the state level and focused on LIDAC households, but it will be customizable at the local and community levels to meet the unique and diverse needs of every North Carolinian. The EnergizeNC online portal will provide educational materials, online calculators, marketing templates, and other resources that can be modified by outreach partners to enable easy distribution through a variety of channels. It will allow for the SEO to connect households to other rebates and technical assistance, such as the IRA rebates, utility rebates, and WAP.

*Update to 1.6.1 Participatory Governance*

Critical components to developing a successful EnergizeNC program are input and feedback from community members, especially from LIDAC populations, in program design and deployment. EnergizeNC will establish appropriate regional relationships with grassroot community-based organizations, service providers, and community action agencies, among others. Further, through partnerships with community and environmental organizations, NCDEQ, working through SEO, will lead engaging a community advisory board during program design for assistance in the decision-making process. This advisory board will be recruited based on input from program engagement partners and will meet regularly   during the design period and quarterly during deployment. As

indicated by the wide spectrum of letters of support received, the Coalition has a wide-ranging network representative of communities served.

In addition to the advisory board, SEO will conduct virtual listening sessions to provide education to communities and households and solicit feedback during the design period. Collaboration with community-based organizations will facilitate hosting meetings in their communities. The Coalition has budgeted for an experienced facilitator to ensure clear communications during these engagement activities.

*Activities Related to Participatory Governance*

- Develop a community advisory board to include representation from a broad set of interests, regions, and demographics.
- Meet with the advisory board regularly during the program design and implementation phase to gather feedback and input.
- Host listening sessions and community meetings in LIDACs and virtually

*1.6.2 Customer Acquisition Strategy*

To maximize solar deployment across the state, specifically in LIDACs, EnergizeNC will utilize existing partnerships, building on already successful outreach and engagement efforts. These partnerships include community-based nonprofits, community action agencies, environmental justice organizations, housing authorities, local governments, utilities, and more. The EnergizeNC Coalition will provide each partnering organization with the training, tools, and resources it needs to educate the communities and constituencies it serves. These will be made available through the online portal, but also through targeted technical assistance sessions with partnering organizations. In addition, we will deploy a best practice developed at Green Banks nationally, and refined in North Carolina, through the current customer loan offerings of the NCCEF.  NCCEF staff located in each region of the state will build relationships and act as the local point of contact for financial assistance for consumers, partner lenders, and installers. They will be crucial in building the trust that will allow community-based organizations to drive uptake of solar by households.  They will further engage with helping households navigate loan applications, building relationships with installers so that the installers may confidently refer eligible clients to load products.

*Community-based Nonprofits* have a broad reach throughout the state, and many already offer services and support to LIDACs to help reduce energy bills, improve the health and safety of homes, and reduce harmful air pollutants in nearby communities. Statewide community-based nonprofit organizations are in regular contact with community members and are natural organizations to serve as a focal point for disseminating statewide information and offering training and technical support as needed.

*Community Action Agencies* provide low-income citizens with the tools they need to become self-sufficient. Statewide community action agencies address barriers to self-sufficiency and reduce poverty. One of their many impactful programs is robust energy assistance program infrastructure, including the deployment of utility and state weatherization programs like LIHEAP, WAP, Duke Energy's Helping Home Fund, and any state-level or utility assistance programs (Medicaid, Supplemental Nutrition Assistance Program (SNAP), and Temporary Assistance for Needy Families

(TANF)). Our partnership with North Carolina community action agencies will reach households who have received weatherization services in past years and those currently in the queue.

*Environmental Justice Organizations* can serve as trusted educators and convenors for impacted communities. Several North Carolina environmental justice organizations have committed their support to providing a two-way feedback loop to ensure the program is being implemented in an equitable and accessible way. EnergizeNC will create a strategy to involve CBOs to assure that environmental justice standards and best practices are incorporated.

*Housing Authorities* provide decent and safe rental housing for eligible low-income families, the elderly, and persons with disabilities. By offering education, capacity building, and technical assistance to the housing authorities, EnergizeNC would be able to benefit a significant number of North Carolina residents.

*Local Governments* will help to support and promote EnergizeNC throughout their communities, including through targeted engagement with community-based organizations and residents of LIDAC.

*Utilities*, including municipal electric utilities, co-ops, and IOUs, will assist with identifying households with high energy burdens, conducting outreach to homeowners about the program, providing technical assistance, and offering other rebates that can be combined with EnergizeNC.

*Activities Related to Customer Acquisition Strategy*
- Provide guidelines for sales-focused staff in the VRP to ensure appropriate sales and marketing practices that are ethical and appropriate for consumer protection.

*Update to 1.6.3 Outreach and Marketing Strategy*

In serving LIDAC communities in North Carolina, we will be serving urban, rural, and suburban populations. As described elsewhere, we will specifically be working with Tribal organizations. EnergizeNC will work with WAP and other stakeholders to develop pathways to reach residents in manufactured housing. Further, our work in community solar will support households who are not able to install rooftop solar – both through offering subscriptions to existing community solar arrays and through market transformation pilot work.

EnergizeNC emphasizes inclusive outreach to community members, contractors, nonprofits, businesses, and community-based organizations for lasting partnerships and successful project implementation. We will provide resources at the state level to be customized at the local level. Resources will include:
- Culturally appropriate and accessible marketing and educational materials in English and Spanish, including tribal and rural communities.
- Online information and resources provided through the EnergizeNC portal, including a list of approved contractors, financing options, incentives, FAQs, technical assistance, consumer protections, grassroots education, events, and announcements.

33

Partnerships with community-based organizations will endeavor to provide outreach and organizing support, especially in the critical eastern and western parts of the state. Where possible, this support will include training of trusted community navigators to help increase utilization in disadvantaged communities.

*Activities Related to Customer Outreach and Marketing Strategy*
- Establish a marketing and outreach plan, including coordination with partner organizations.
- Develop culturally appropriate marketing materials and educational resources to be made available online through the portal, via a customer service phone number, or in print through community organizations. Materials will be offered in English and Spanish, which will reach over 96% of the population (North Carolina Office of State Budget and Management - NC Census Data). Hold virtual and in-person workshops, in coordination with local community leaders, to educate consumers on solar, financing options, and the EnergizeNC program.

*Update to 1.6.4 Community Involvement Strategy*

Community input for the development of EnergizeNC and its successful deployment will be critical to ensure success for its programs and pilots, especially participation. The Coalition engaged experts across the state to establish meaningful connections and support for EnergizeNC, including representatives from academia, affordable housing developers, community-based organizations, faith-based organizations, financial institutions, government agencies, housing agencies, solar developers/installers/contractors, utilities, and workforce development organizations. Please see the initial workplan for attached interest surveys.

When possible, EnergizeNC will provide financial stipends to community groups to enable meaningful participation.

*Activities Related to Community Involvement Strategy*
- Develop a strategy to provide stipends, included in our program budget, for community involvement, especially during the critical program development time. In addition to the funds set aside for community engagement in our budget, we have additional funding sources that can be used if needed.
- Provide virtual information sessions and in-person educational events.

*1.6.5 Engaging with the American Indian Community*

North Carolina is home to eight state-recognized Tribes and four urban Tribal associations, as well as one federally recognized Tribe. The NC Department of Administration's Indian Affairs Division operates various programs to serve the needs of North Carolina American Indians, including workforce development and low-income energy assistance. The EnergizeNC Coalition will work closely with this agency and the NC Commission of Indian Affairs to engage with the Indian community in three ways: 1) collaborate with Tribal community members during program design; 2) promote workforce development and training through the Workforce Innovation Opportunities Act program to provide on-the-job training and pathways to long-term employment; and 3) engage Tribal leaders for effective program rollout in Tribal communities.

*Activities Related to Engaging with the American Indian Community*
- Coordinate with Commission of Indian Affairs to promote meaningful ways for tribal communities to be engaged in program development, workforce training, and deployment.

## 1.7 Program Planning Timeline and Workplan Narrative

To ensure that the funds are deployed in an equitable and impactful way for all programs and pilots, EnergizeNC intends to create a comprehensive program management approach over a one-year planning period to include substantive input from LIDAC. This Year 1 planning period will design a robust implementation program that will fully deploy funds within five years of the award date. Activities for successful EnergizeNC deployment in years 2-5 will include outreach, technical assistance, and workforce development. The programs will be adjusted as needed to ensure the goals of the programs are being met.

The program will provide robust stakeholder and community engagement as well as post-installation reporting to ensure that the required percentage of program benefits flow directly to LIDAC. The coalition will refine program strategies and screening criteria that meet program requirements to select participating households during the planning period.

## 2.    Program Administration Narrative

### *2.1 Budget Narrative*

NCDEQ, through SEO, will be the lead organization that will work with EnergizeNC partners to ensure timely completion of program tasks outlined in this narrative.  The project management team will assist the respective Coalition partners in program development activities, funding processes, federal requirements, guidance, and reporting to ensure that interim deliverables are completed per the developed timeline to achieve program success.  Each quarter, the project management team will access the programs and identify risk areas for delays and how to adjust.

*Update to 2.2 Fiscal Stewardship Plan*

As the lead applicant, NCDEQ has policies and procedures that allow the department to establish and maintain effective internal controls and to manage federal awards in compliance with applicable federal statutes, regulations, terms, and conditions. NCDEQ financial practices and accounting standards are promulgated by the Governmental Accounting Standards Board. Proper financial management is a key area of focus for NCDEQ, and transparency, accountability, oversight, risk management, and efficiency are at the core of this management. Departmental policies shield against waste, fraud, and abuse of funds. The following financial management policies must be adhered to:
- All funds must be budgeted in accounts separate from all other transactions.
- Expenditures and subaward encumbrances must be applied to duly approved budget line items.
- Internal controls for disbursements of funds must have multiple approvals.
- Up-to-date records keeping functions and duties for requisites functions are required.

- Regular reconciliation of budget and expenditures.
- Prior audit findings for subrecipients must be corrected.
- Internal controls ensure robust risk management and prevent fraud, waste, and abuse of funds.

NCDEQ and the program implementer will follow Generally Accepted Accounting Principles (GAAP) and will conduct program audits every 5 years.  In compliance with North Carolina general statutes, NCDEQ performs all accounting functions cash-basis throughout the year in compliance with governmental GAAP.  The North Carolina Office of State Controller monitors and oversees this process.  NCDEQ utilizes its Financial Services Division, legal staff members, and internal auditors to assure that financial protocols and federal requirements are followed.

SEO and the Coalition partners will conduct financial and programmatic monitoring of all subrecipients of these funds. The monitoring is also conducted for consumer protection — to protect consumers, program partners, and make sure contractors directly interacting, transacting, or contracting with consumers are subject to monitoring and training standards. Entities that interact with consumers, including sales and marketing of solar products or services, and consumer purchase, leasing, and financing, must comply with applicable consumer protection laws, including the consumer protection laws in the jurisdictions where EnergizeNC will serve and federal consumer protection and consumer financial laws.

To further protect consumers, the Coalition and the program implementer will perform due diligence on contractors throughout the lifetime of the program to prevent engagement with fraudulent or illegitimate entities. The coalition will establish requirements pertaining to system performance and treatment of assets during the planning period. These requirements will be incorporated into the Vendor Registration Program requirements and be integral to contractor participation in EnergizeNC.

EnergizeNC will also design a quality assurance/site inspection component during the planning period, which will entail on-site visits to inspect installed systems for quality control purposes and to investigate consumer complaints. The Coalition will also consider developing standards for equipment packages for the purposes of compliance with Solar for All requirements, compatibility with monitoring systems, and recycling. Upon receiving a complaint or concern through one of the consumer feedback channels, the program implementer will follow Coalition procedures to determine which complaints should be forwarded to a Coalition partner or partners to further investigate and determine any additional actions needed.

To ensure that contractors can properly protect and handle consumer data, a Risk Assessment and Vendor Capability (RAVC) tool will be used for vetting. The RAVC will assign points for questions about the contractors' capabilities and potential risks related to working with consumers. Contractors must score a certain point value before being able to work with consumers' data. In addition, desk reviews to ensure compliance with federal and state requirements will be conducted as Coalition partners and contractors/vendors submit payment requests and requisitions to NCDEQ.

Contractors/vendors receiving these funds may also receive more detailed financial desk monitoring. All contractors/vendors that deal directly with consumer data will be subject to these reviews to ensure effective consumer protection in the program and will be selected randomly to receive the detailed financial desk monitoring when deemed necessary by any member of the Coalition. Detailed financial desk monitoring will require the subrecipient to provide information such as:

- Procurement regulations;
- Financial management/accounting regulations;
- Invoicing and payment system regulations and data;
- Consumer protection policies;
- Vendor financial monitoring procedures;
- Flow down provisions.

Once the contractors/vendors receive detailed financial desk monitoring, NCDEQ and Coalition partners will conduct on-site monitoring visits to a subset of homes in the program based on procedures to be established during planning. On-site and desk monitoring may be conducted randomly or for specific reasons, such as addressing discrepancies, subrecipient requests for programmatic or financial compliance assistance, or failure to submit proper monthly reports or associated data. In addition to financial consumer protections, NCDEQ and the Coalition will ensure compliance with the terms and conditions of the grant and ensure consumer protection for participants in the program through document reviews, bill reviews, consumer feedback, consistent installer communications, and other related activities. During the planning period, consumer protection requirements as well as contractor participation requirements and monitoring details will be finalized.

NCDEQ and the Coalition will also develop customer feedback channels that will comply with all relevant state laws regarding consumer rights and data protection; and all feedback channels will meet Americans with Disabilities Act accessibility standards.  Feedback channels will include a webform, consumer hotline, email and paper form.  NCDEQ and the Coalition, in collaboration with the program implementer, will further develop a response protocol for addressing customer feedback.  Included in this protocol will be a dedicated procedure for responding to consumer complaints that will assign urgency levels based on the severity of the complaint and any applicable state and federal laws.  For example, complaints that pertain to health and safety, faulty installation, or malfunctioning equipment will be assigned the highest urgency.

The program implementer will also regularly review general customer feedback from all the channels and classify the feedback by categories, such as application issues or service issues.  The implementer will report regularly to NCDEQ and the Coalition on emerging trends in the consumer feedback.  NCDEQ and the Coalition will inform affected contractors, vendors, and other entity representatives of the feedback and potential implications for their continued participation in the program.

**Section 4:  Timeline and Milestones**

*Pre-award and conditional drawdown period activities (May 2024-Dec 2024):*

During this time, EnergizeNC will submit the SFA detailed workplan and budget for approval, update EPA required documents, and amend the coalition scope and budget. A 90-day legislative review hold on grant funds received is also reflected in this time period.

*Program planning activities (Jan 2025-Dec 2025):*
During the 12-month planning period, the Coalition will engage in activities to ensure that the program is poised for success once implementation begins. Among these activities are program development, community outreach, contractor outreach, and quality assurance development. The planning period will culminate in the submission of a revised workplan and budget in late 2025.

*Implementation period (Jan 2026-Dec 2029):*
During the implementation period, EnergizeNC will carry out all programs discussed in the sections above. The timeline is currently very broad and will be further refined during the planning period.

Reporting and compliance activities will be completed throughout the project period to meet all federal and state requirements. Additional reporting will take place after the conclusion of the project, as required.

**Section 5:  Reporting Requirements**

Reporting is essential to maintaining transparency, accountability, and oversight while tracking and measuring progress in achieving expected environmental outputs and outcomes. The reports will also be used in the prevention of fraud, waste, and abuse of funds. In compliance with EPA's guidance, NCDEQ will submit timely and accurate reports on this grant and the subsequent subawards under it. The information collected in the reports will be submitted to EPA per the established program performance reporting requirements and be consistent with 2 CFR 200.329 in the terms and conditions of the grant award.

Coalition partners and subrecipients will comply with monthly reporting requirements as well as other reporting requirements that may be required by the Grant Agreement. Monthly financial and programmatic reports are due to the SEO by the agreed-upon date of each month following the date of execution of the Grant Agreement. Failure to submit the required information accurately, completely, and by the reporting deadline will be considered a violation of the Grant Agreement and may result in funds being frozen until reports are submitted. In addition to financial and general programmatic reports, subrecipients are expected to report on an ongoing basis, the underlying methodologies, technologies, data sources, inputs, assumptions, and other significant analytical choices used to calculate or estimate outputs or outcomes. These outputs and outcomes will include program-level data and key assumptions to translate program-level data into outcomes. This data and analysis may be subjected to third-party verification, audits, and/or assurances.

Monthly programmatic and financial reports will be provided from Coalition partners and contractors to NCDEQ for compliance with desktop reviews. Ongoing reports on methodologies, technologies, data sources, inputs, assumptions, and other significant analytical choices must be submitted in compliance with EPA guidance. In addition to monthly desktop reviews and detailed financial desk monitoring, program partners and subrecipients of funds will receive on-site

monitoring visits. The visits will monitor programs to assist with tracking and measuring progress in achieving the expected outputs and outcomes. Visits will be used to ensure that subrecipients have proper systems in place for consumer protection as well. Technical assistance visits and reports will also be provided in person, virtually, by email, by phone, and by correspondence as required and requested. Finally, the reporting plan will integrate a program evaluation of the activities in this plan, including assessing the effectiveness and efficiency in achieving the outputs and outcomes. The Coalition partners will conduct the program evaluations annually and deliver a formal report at the end of the program that will be made public.

Building on the work of the Department of Commerce's work on Clean Energy Scenarios Modeling, the Coalition will collaborate with academic partners to develop an assessment plan for the workforce development aspects of EnergizeNC. The focus will be on establishing a shared set of methods and metrics that can be applied to various energy transition-related workforce development programs. This will involve tracking information such as who participates in training programs, the impact of training on the economic outcomes of program participants, and how training affects local and regional economic development.

1. Performance Reports
*Semi-Annual Report*
The Coalition will submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report will cover activities from the preceding two quarters.

*Final Report*
The Coalition will submit a final report in a format conducive for immediate public consumption. The final report will contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the Coalition's implementation of its EPA-approved SFA Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the Coalition will detail its program strategy and plans for performance reporting under the Closeout Agreement. The Coalition will include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The Coalition agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

2. Transaction-Level and Project-Level Data

The Coalition will submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The Coalition agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports will cover transactions originated in the preceding two quarters.

## Section 6:  Budget Narrative

### 6.1 Project Budget

NCDEQ, through the SEO, will be the lead organization that will work with EnergizeNC partners to ensure the timely completion of program tasks outlined in this narrative. The project management team will assist the respective Coalition leads in program development activities, funding processes, federal requirements, guidance, and reporting to ensure interim deliverables are completed per the developed timeline to achieve program success. Each quarter, the team will assess the programs and identify risk areas for delays and how to adjust.

**<u>Personnel</u>**
**Category total: $2,183,334**

Salaries are budgeted for six full time employees (FTEs) for five years, with Y1 salaries pro-rated (50% of base salary) to accommodate expected hiring timelines:

- Environmental Program Manager I (NC22) – 1 FTE for five years to oversee the program, lead EnergizeNC Coalition meetings, and direct the work of the NCDEQ and SEO program staff. This position will spend 100% of time assigned to EnergizeNC. Total cost across budget period: $517,424.
- Info and Communications Specialist II (NC13) – 0.5 FTE for five years to plan and implement program outreach and provide program education. This position will spend 50% of time working on EnergizeNC. Total cost across budget period: $193,429.
- Environmental Program Consultant (EPC, NC18) - 1 FTE for five years to conduct site inspections to ensure program compliance, advancement, and completion. This position will spend 100% of time working on EnergizeNC. Total cost across budget period: $411,037.
- Budget Analyst II (NC16) – 0.5 FTE for five years to oversee contracts, grants, and fiscal reports, and develop fiscal reporting templates or mechanisms. This position will spend 50% of time focused on EnergizeNC. Total cost across budget period: $205,519.
- Program Analyst I (Grant Admin, NC 17) – 1FTE for five years to provide program guidance, develop program reporting templates, and ensure programs follow and document federal requirements. This position will spend 100% of time assigned to EnergizeNC. Total cost across budget period: $386,859.

- Quality Assurance Standards Manager (NC 21) – 1 FTE for five years to oversee quality assurance and conduct independent oversight of the EnergizeNC program. This position will spend 100% of time focused on EnergizeNC. Total cost across budget period: $469,066.

**Fringe Benefits**
**Category total: $984,438.23**

Fringe benefits in the budget spreadsheet include FICA, Retirement, Health based on annual rates set by the North Carolina General Assembly. The annual fringe benefit calculation is as follows: YEAR 1 — FICA: 7.65% + Retirement: 25.02% + Health: $7,557 per FTE; YEAR 2 — FICA: 7.65% + Retirement: 24.04% + Health: $8,095 per FTE; YEAR 3 — FICA: 7.65% + Retirement: 25.72% + Health: $8,475 per FTE; YEAR 4 — FICA: 7.65% + Retirement: 27.52% + Health: $8,874 per FTE; YEAR 5 — FICA: 7.65% + Retirement: 29.45% + Health: $9,291 per FTE.

**Travel**
**Category total: $181,179**

Includes funding to send SEO staff to program-related EPA conferences or trainings twice per year, plus mileage for staff to travel to 10 outreach events per year, and for site visits by the EPC to determine program compliance, progress, and completion.

**Equipment**
No equipment costs.

**Supplies**
**Category total: $50,221**

Office and related supplies to support outreach meetings, training, etc. Includes laptop computers and IT support for new staff in year 1 and standard office supplies in years 2-5.

**Contractual**
**Category total: $6,143,993**

Contractual obligations include:
- Program Implementer for consumer protection, call center and other related tasks as determined by SEO and the rest of the Coalition. Proposed duration: Y1-4; Total cost: $6,000,000.
- 'Contracts with vendors for tech assistance, workforce development, community engagement, reporting/eval, contractor reviews, financial incentives, and other related tasks as determined by the SEO to supplement SEO and Coalition staff as needed. Proposed duration: Y1-5; Total cost: $143,993.37

**Other**
**Category total: $153,359,366**

**Subawards: $118,503,916**
- NC Clean Energy Fund (Non-profit): $139,992,815 total subaward, with $117,090,000 in direct financial assistance and $22,902,815 in program financial assistance, including the online portal; leasing program; tariffed on-bill financing; grants; loan products; and credit enhancement. (Indirect: 18%)
- NCCETC (Non-profit): $5,463,862 to lead distributed solar market strategy activities, provide project deployment technical assistance, contractor training and certification process, provide education and outreach, and support overall program planning and design. (Indirect: 15% per State of NC agreement with the NC University System)
- Advanced Energy (Non-profit): $233,750 to support the rollout of the community solar subscription support program.

**Participant Support Costs: $44,000**
Participant support costs will include security and translation services at public meetings. These line items will encourage participant attendance at public meetings and expand program reach.
Total cost of security: $14,000
Total cost of translation services: $30,000

Other costs in this category include postage (total: $2,540), space rental for in-person community workshops (total: $15,000), printing and publication fees (total: $20,000), and registration and outreach/advertising expenses (total: $10,500).

**Additional Items**

**Indirect Charges**
State of North Carolina indirect rate: 18.2% x Personnel Costs. Total DEQ indirect costs: $479,725.29. Subaward indirect costs included in subaward totals above.

**Program Income**
 The financial assistance for the EnergizeNC programs and pilots will not be generating any income at this time. EnergizeNC plans to leverage capital and credit enhancement (including interest rate buydowns) from other SFA coalitions and other greenhouse gas reduction fund lenders. Any program income would therefore accrue to those external entities, not to EnergizeNC. We recognize that the possibility that partnerships of this nature may not meet the needs of the households that EnergizeNC seeks to serve. In that case, we will work with EPA to craft a compliant strategy to use financial assistance dollars from EnergizeNC to create revolving loans funds and ensure that any related program income will be managed accordingly. The specifics of EnergizeNC financial assistance will be finalized during the planning period.

# Exhibit 3



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

<u>**MEMORANDUM**</u>

**SUBJECT:** Termination of EPA Assistance Agreement 5H-84091701 under 2 CFR 200.340

**FROM:** Devon Brown, EPA Award Official

**TO:** D. Reid Wilson, Secretary
North Carolina Department Of Environmental Quality

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84091701 awarded to North Carolina Department Of Environmental Quality. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Brandon Pierce, EPA Grant Specialist
    Clarisa Romero, EPA Project Officer
    Julie Woosley, Grantee Program Manager

# Exhibit 4



JOSH STEIN
*Governor*

D. REID WILSON
*Secretary*

JULIE WOOSLEY
*Director*

**NORTH CAROLINA**
*Environmental Quality*

August 27, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gase Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington DC 20460

RE: Disagreement with Modification No. 2 to Grant Number (FAIN): 84091701, dated August 8, 2025

Dear Mr. Brown:

On August 7, 2025, the North Carolina Department of Environmental Quality ("NCDEQ") received a memorandum from you that purported to terminate EPA Assistance Agreement 5H-84091701 under 2 CFR 200.340 ("Termination Letter"). The Termination Letter outlined a Dispute process pursuant to 2 CFR 1500.15 with a Dispute deadline of 30 days. The Termination Letter also stated, "The EPA Grants Management Office will issue an amendment to the agreement to document the termination."

The next day, NCDEQ received a document titled "Assistance Amendment" dated August 8, 2025. That document states it is "Modification Number: 2" to Grant Number 84091701. Under its "Explanation of Changes" the document states that it requires NCDEQ to stop work, terminates the agreement, reduces performance period duration, curtails the scope of work, and adds administrative terms and conditions. In the "Notice of Award" section, it states that if the recipient disagrees with the terms and conditions specified, it must furnish a notice of disagreement within 21 days.

Please accept this letter as NCDEQ's notice of disagreement with Modification No. 2 dated August 8, 2025, issued under your signature as EPA Award Official. NCDEQ also disagrees with any suggestion in the Assistance Amendment that any attempt to draw down funds could function as a waiver of NCDEQ's dispute rights, which is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination



North Carolina Department of Environmental Quality | State Energy Office
217 West Jones Street | 4345 Mail Service Center | Raleigh, North Carolina 27699-4345
919.707.8778

per 2 CFR 200.305(b)(3) as well as the Termination Letter's specific statement that costs incurred prior to the termination date are allowable.

NCDEQ reserves the right to pursue legal remedies as necessary to enforce its rights under the grant agreement, including filing a Dispute of the Termination Letter. If NCDEQ decides to file a Dispute of Termination Letter, it will do so in a separate communication to the Dispute Decision Official within the 30-day Dispute deadline.

Please acknowledge receipt of this notice of disagreement and contact NCDEQ via the below-signed designee to discuss resolution of this disagreement as soon as possible.

Julie Woosley
Director, North Carolina State Energy Office
North Carolina Department of Environmental Quality

# Exhibit 5

JOSH STEIN
*Governor*
D. REID WILSON
*Secretary*
JULIE WOOSLEY
*Director*



**NORTH CAROLINA**
*Environmental Quality*

To: Michael Molina
EPA Disputes Decision Official
Environmental Protection Agency
Office of Mission Support
Washington, D.C. 20460

Date: September 5, 2025

Re: Wrongful Termination of EPA Assistance Agreement 5H-84091701 under 2 CFR 200.340
(AMENDED)

Dear Mr. Molina:

Pursuant to 2 CFR 1500.15, we are writing to notify you, as the designated EPA Dispute
Decision Official, that we disagree with EPA's attempt to terminate North Carolina's Solar for All
award, grant number 5H-84091701, which was awarded to the North Carolina Department of
Environmental Quality (DEQ) State Energy Office on December 18, 2024. This notice of dispute
is an amended version of DEQ's original notice, filed September 4, 2025, and replaces that notice.

The Memorandum from EPA Award Official Devon Brown dated August 7, 2025 and the amended
assistance award from Phillip Schindel dated August 8, 2025 ("Termination Notice"): (1) violate
the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded
only unobligated balances from the Greenhouse Gas Reduction Fund and preserved funds already
awarded to grantees; (2) violate EPA's legal obligation under 2 C.F.R. 200.340 and the legally
binding assistance agreement issued by EPA to DEQ on December 18, 2024, and any attempts to
liquidate the remaining funds in DEQ's ASAP account would violate due process; (3) provide no
other valid reason for termination pursuant to 2 C.F.R. 200.341; and (4) violate the Constitution's
Separation of Powers. This termination is contrary to law, arbitrary and capricious, and is a breach
of the assistance agreement. DEQ requests that EPA rescind the termination and make all obligated
funds that were removed from DEQ's ASAP account on August 11, 2025 (after the Memorandum
and Termination Notice were issued) available to DEQ again.

The August 7, 2025, Memorandum indicates that EPA is terminating DEQ's award because EPA's
cost appropriations and the "grant appropriations" were rescinded, so "the Agency no longer
possesses either the substantive legal authority or the financial appropriations needed to continue
implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for
All," and continued administration of the program is no longer legally permissible. Based on this
legal conclusion, EPA determined it would end the Solar for All program and all existing grants.



North Carolina Department of Environmental Quality | State Energy Office
217 West Jones Street | 4345 Mail Service Center | Raleigh, North Carolina 27699-4345
919.707.8778

Respectfully, the rescission of unobligated funds and repeal of granting authority under 42 U.S.C. 7434 do not give EPA the authority to terminate all legally binding Solar for All grant agreements unilaterally under 2 CFR 200.340. Doing so is contrary to law and arbitrary and capricious. We therefore ask that the termination of DEQ's award be reconsidered via an administrative appeals process. As such, please accept this letter as a request to initiate an administrative dispute under 2 C.F.R. 1500 Subpart E.

(1) **EPA's asserted grounds for termination violate the plain language of OBBBA Section 60002, which rescinded unobligated balances but preserved funds already awarded to grantees.**

EPA's conclusion that OBBBA rescinded the grant appropriations for Solar for All is incorrect and contrary to law. By its plain language, Section 60002 only authorized rescission of the unobligated balance in the appropriations account established by 42 U.S.C. 7434:

> SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

Where the plain language of a statute is unambiguous, no further analysis is required. *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (". . . when the meaning of the statute's terms is plain, our job is at an end."). Indeed, after OBBBA passed Congress, the Department of Justice wrote to the court presiding over *Climate United Fund v. Citibank, N.A.* to inform it that new legislation, if signed, would "rescind all unobligated funds appropriated for it." (Letter dated July 3, 2025, to the Clerk of the Court from Yaakov Roth, DOJ.).

By its plain language, the OBBBA only rescinded funds that were unobligated on the date the OBBBA was enacted. And there is no basis to conclude that Congress expressly or impliedly intended to de-obligate or claw back funds that were properly and timely obligated pursuant to 42 U.S.C. § 7434(a)(1). Funds awarded to Solar for All grantees, including DEQ under the subject award, were obligated upon award and subject to a legally binding agreement which "create[d] a legal liability or definite commitment on the part of [EPA], or create[d] a legal duty that could mature into a legal liability by virtue of an action that is beyond the control of the government."[1] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[2] In other words, the Solar for All grant funds were obligated upon award, and remained obligated when OBBBA was passed. The OBBBA did not change this and could not have legally rescinded these obligated funding awards.

---

[1] United States Government Accountability Office, Office of the General Counsel, Principles of Federal Appropriations Law, Third Edition, Volume II, at 7-2, available at https://www.gao.gov/assets/gao-06-382sp.pdf

[2] Grants Policy Issuance- 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds at https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf



Additionally, this termination did not automatically de-obligate DEQ's funds because termination of an award cannot automatically or retroactively de-obligate funds. But even if termination of an award could result in the de-obligation of funds, DEQ's Solar for All grant was not terminated until August 7, 2025, well after OBBBA became law on July 4, 2025, and contrary to the direction of that statute. At the time the OBBBA was enacted, DEQ's Solar for All funds remained obligated so they were not impacted by Section 60002 of the OBBBA.

EPA also cannot avoid administering the entire Solar for All program merely because OBBBA rescinded other unobligated funds. For the reasons stated above, DEQ's grant funds remain obligated, so EPA has a legal duty and obligation to fulfill its part of the agreement by administering the funds.

### (2) EPA's termination of DEQ's grant violates EPA's legal obligation under 2 C.F.R. 200.340 and the signed grant agreement, and any attempts to liquidate the remaining funds in DEQ's ASAP account would violate due process.

EPA has offered a laundry list of potential and contradictory grounds on which it might have based the termination of DEQ's award, but no indication or substantiation of the actual reason. Regardless, there is no merit to any of the numerous potential grounds suggested by EPA. As an initial matter, EPA's failure to make DEQ aware of the specific grounds for its termination is a violation of 2 C.F.R. § 200.341(a), which requires that a written notice of termination should include the reasons for termination.

In the August 7th Memorandum, EPA indicated that federal spending legislation was the basis for the termination. The August 8th Termination Notice, however, said that the termination was instead based on a list of entirely different and unspecified reasons, purportedly any of the possible reasons included in EPA's General Terms and Conditions and 2 CFR 200.340, which govern DEQ's award. The uniform grant regulations at 2 C.F.R. 200.340(a) provide the circumstances under which the government may terminate a grant agreement, which include: (1) failure to comply with the grant terms and conditions; (2) with consent of the grantee; (3) by request of the grantee; or (4) otherwise pursuant to the terms and conditions of the grant, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities. In certain circumstances, an award may also be terminated on the grounds provided in 2 CFR 200.339 (those being where the recipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award).

Between the Memorandum and Termination Notice, EPA has offered at least six potential - and different - reasons why a federal award could in theory be terminated. But EPA has not offered a single valid reason why this specific grant agreement with DEQ was terminated, providing no reasoned basis for termination or any individualized assessment of DEQ's grant agreement. Nor did EPA preserve all available regulatory grounds for termination in this case, so not all of the options presented in EPA's long list are actually available to it. *See* 2 C.F.R. 200.340(b) ("The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.").

Consistent with 2 C.F.R. 200.340(a), EPA is bound by the termination provisions specified in the terms and conditions of the Solar for All award. The terms and conditions applicable to this grant



do not allow for unilateral termination absent a recipient's failure to comply with the terms and conditions of the grant. Any subsequent changes to the grounds for unilateral termination of an assistance agreement must be agreed to by both EPA and the grantee. We have not, and unequivocally do not, agree to any attempts to terminate this grant award based on an erroneous, bad faith interpretation of OBBBA Section 60002. Congress intended for DEQ's obligated funds to continue to support our legally binding award and these funds cannot be unilaterally terminated by the executive branch in this way. Doing so is contrary to law.

In addition, EPA has taken further action that unlawfully pulled back funding that was still legally obligated to DEQ. Prior to the Memorandum and Termination Notice and the August 11 removal of funds in ASAP, DEQ's ASAP account available balance was $154,360,079.09, which represents the cumulative authorized amount of the EPA Award $156,120,000 minus funds drawn down by DEQ for authorized work prior to that date. On August 11, 2025, DEQ's ASAP account access changed to a "liquidated" status and a small portion of the awarded funds appeared to be available to draw down. However, the "available balance" on the account had been substantially reduced from $154,360,079.09 to $10,805,205.54 (a $143,554,873.55 reduction), and the performance period end date had been changed from April 30, 2029, to August 8, 2025.

This adjustment to DEQ's account balance, which was done prior to the expiration the 30-day dispute period detailed at 2 CFR 1500 Subpart E and prior to any actions from DEQ to close out the award[3] violates DEQ's right to due process and ignores its reliance interests. DEQ reasonably relied on this funding to hire two staff members, with hiring planned for 5 additional staff in preparation for program launch, DEQ had issued two grants to Energize NC Coalition members for program development and implementation: a grant for $7,229,119 to the North to North Carolina State University's Clean Energy Technology Center that included technical and contractor support including 8.7 FTEs, and a grant for $139,640,565 to the North Carolina Clean Energy Fund, which included $117,090,000 in program rebates for households and pilot programs and $22,550,565 in personnel and contractual costs including up to 15.75 FTEs. The Clean Energy fund had also issued multiple contracts for specific program tasks and the Coalition was in the process of hiring a program implementer. Without this funding, DEQ will be unable to fulfill these grant obligations and DEQ and the other Coalition members will have to lay off or transfer staff dedicated to the program and will be unable to move forward on its commitments to fund solar deployments and workforce development.

### (3) The Memorandum and Termination Notice provide no other valid grounds for termination.

Neither the August 2025 Termination Notice nor the Memorandum give any other reason for termination, and the other conditions for termination are inapplicable here. Termination for noncompliance is only possible under this grant's terms when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination." Neither case exists here. EPA has neither identified any non-compliance nor requested that DEQ take action to cure any deficiencies in its agreement

---

[3] To be clear, because DEQ disputes the termination of its Solar for All funding, the agency is not taking any steps to close out the award.


North Carolina Department of Environmental Quality | State Energy Office
217 West Jones Street | 4345 Mail Service Center | Raleigh, North Carolina 27699-4345
919.707.8778

performance. Moreover, it bears noting that all competitive grants were awarded per 2 CFR 200.205, which requires a merit review before awarding funding; nothing that the Agency has stated in our termination letter raises concerns about the meritorious nature of our organization or the projects that we are undertaking with our federal funds.

Furthermore, DEQ has not failed to comply with the terms or conditions of this award. EPA has not claimed that the grant will not accomplish the purposes for which it was made, which include enabling the rapid deployment of distributed solar and associated storage benefits to over 12,500 households in low-income and disadvantaged communities across the state; fostering and developing a trained workforce to deploy solar; and providing technical assistance support to local governments to address soft-cost barriers to solar deployment, such as permitting processes and zoning rules. And EPA has not raised any concerns specific to DEQ's administration of its award relative to fraud, waste or duplication.

Assuming, *arguendo*, that DEQ did fail to comply with the terms and conditions of the award, EPA has failed to provide DEQ with a reasonable opportunity to remedy the noncompliance as required by the December 18, 2024 Solar for All award agreement. Section III(P) of the Solar for All Programmatic Terms and Conditions to the award agreement provides that:

> Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America, or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

The award agreement goes on to say that if EPA determines that noncompliance cannot be remedied by imposing additional conditions, EPA may [only then] seek remedies under 2 CFR 200.339 up to and including termination. *Id.* EPA's failure to provide DEQ with its procedural due process rights as provided for in the award agreement renders EPA's termination decision unlawful and arbitrary.

Given that no valid grounds for this termination exist, and EPA does not point to any in the Termination Notice or Memorandum or provide any other valid justification, such termination is arbitrary and capricious and contrary to law. EPA must follow the law, rescind this unlawful termination, and restore DEQ's access to our obligated funds to complete crucial solar deployment projects in underserved communities to add energy to the grid and significantly lower household energy prices for low-and-middle-income North Carolinians.

### (4) EPA's Withdrawal of DEQ's Duly Appropriated and Obligated Solar for All Assistance Agreement Violates the Constitution's Separation of Powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[4] The Executive's powers are limited to those specifically

---

[4] U.S. Const. art. I, § 1.



North Carolina Department of Environmental Quality | State Energy Office
217 West Jones Street | 4345 Mail Service Center | Raleigh, North Carolina 27699-4345
919.707.8778

conferred by "an act of Congress or from the Constitution itself."[5] The Executive has no power "to enact, to amend or to repeal statutes."[6] Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

*Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[7] U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive— "shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[8] The Termination Notice, the Memorandum and their implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[9] For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of DEQ's funding agreement.

*Take Care Clause*

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[10] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[11] Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine. EPA terminated the Solar for All program and DEQ's award on the grounds that Section 60002 "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the program's administration. . .is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind DEQ's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[12] EPA's Termination of DEQ's award contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to DEQ well before the day before OBBBA's enactment. EPA violated constitutional separation-of-powers constraints because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

---

[5] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

[6] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

[7] *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

[8] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); NFIB v. Sebelius, 567 U.S. 519, 583-84 (2012).

[9] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

[10] U.S. Const. art. II, § 3.

[11] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

[12] OBBBA Section 60002.



North Carolina Department of Environmental Quality | State Energy Office
217 West Jones Street | 4345 Mail Service Center | Raleigh, North Carolina 27699-4345
919.707.8778

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[13] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[14] Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[15] For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[16] When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating DEQ's Solar for All award. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[17] When actions by the federal government come in the form of "threats to terminate. . .significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[18] EPA's termination of DEQ's Solar for All award altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the award. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Notice, the Memorandum, and subsequent termination of DEQ's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind DEQ's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

**(5) Relief Requested**

---

[13] U.S. Const. Art. I, § 9, cl. 7.

[14] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

[15] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

[16] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

[17] U.S. Const. amend. X.

[18] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

DEQ seeks rescission of the termination of this award and the full and immediate reinstatement of the $143,554,873.55[19] that was removed from DEQ's ASAP account on August 11, 2025 (after the Memorandum and Termination Notice were issued).

Until our dispute with EPA has been resolved, we will also object to any claims of noncompliance under 2 C.F.R. 200.344(i).

We would be happy to answer any questions you may have about this letter or our program. Please contact me at the contact info below or contact the Program Manager, Matt Schuneman, at Matt.Schuneman@deq.nc.gov or 919-316-8048.

Sincerely,

Julie Woosley, Director
State Energy Office
Department of Environmental Quality
1613 Mail Service Center
Raleigh, NC 27699-1613
Julie.Woosley@deq.nc.gov
919-707-8374

CC:
Devon Brown, EPA Award Official
Clarisa Romero, EPA Project Officer
Brandon E Pierce, EPA Grant Specialist

---

[19] This dollar amount represents the cumulative authorized amount of the EPA Award $156,120,000 minus funds drawn down by DEQ for authorized work prior to the August 2025 Memorandum and Termination Notice.

# Exhibit 6

| | |
|---|---|
| **From:** | SFA |
| **To:** | SFA |
| **Subject:** | [External] Solar for All Grant Closeout Instructions |
| **Date:** | Wednesday, October 1, 2025 4:21:18 PM |

**CAUTION:** External email. Do not click links or open attachments unless verified. Report suspicious emails with the Report Message button located on your Outlook menu bar on the Home tab.

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425)
**Submission Instructions**:
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out

your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

- ○ If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance <u>during the entire performance period</u> (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - ○ In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - ○ Progress towards objectives on program key performance metrics during the performance period.
  - ○ Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.

- Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
- Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
- *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.

- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# Exhibit 7



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

October 23, 2025

**MEMORANDUM**

**SUBJECT:**    Update on Dispute of EPA Assistance Agreement 5H-84091701 under 2 CFR 200.340

**FROM:**    Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**    Julie Woosley, Director, State Energy Office
North Carolina Department of Environmental Quality

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84091701. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 27, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.24
17:03:33 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# Exhibit 8



**JOSH STEIN**
*Governor*

**D. REID WILSON**
*Secretary*

**JULIE WOOSLEY**
*Director*

NORTH CAROLINA
*Environmental Quality*

From: Julie Woosley, Director
5HState Energy Office
NC Department of Environmental Quality
1613 Mail Service Center
Raleigh, NC 27699-1613

To: Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC  20460

CC: Michael Molina

Date: November 7, 2025

Re:    Objection to Closeout of EPA Assistance Agreement #5H-84091701


Dear Mr. Brown:

On September 4 and amended on September 5, the North Carolina Department of Environmental Quality (NCDEQ) submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement #5H-84091701 pursuant to 2 C.F.R. § 1500.15. Despite that timely dispute, on October 1, 2025, NCDEQ received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that NCDEQ complete closeout within 120 calendar days of "the date of termination that is listed in your award amendment." NCDEQ has now received EPA's October 23, 2025 letter purporting to declare moot NCDEQ's "dispute regarding the termination of Assistance Agreement #5H-84091701." The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that NCDEQ close out Assistance Agreement #5H-84091701.

NCDEQ disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending.  EPA cites no authority for this



North Carolina Department of Environmental Quality  |  State Energy Office
217 West Jones Street  |  4345 Mail Service Center  |  Raleigh, North Carolina 27699-4345
919.707.8778

proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation. We request that EPA reverse its mootness determination and allow the administrative dispute to proceed. At a minimum, EPA should stay the administrative dispute until the conclusion of NCDEQ's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of NCDEQ's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, NCDEQ has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require NCDEQ to close out while litigation is pending that directly concerns EPA's termination of this grant. *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." NCDEQ has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated $143,554,873.55 from the NCDEQ Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for the 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, NCDEQ has not been able to complete the work required under Assistance Agreement #5H-84091701. Accordingly, EPA necessarily cannot "determine that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

NCDEQ does not agree to close out Assistance Agreement #5H-84091701 while litigation relating to this grant is pending. We seek an extension for our closeout date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence closeout procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00pm on November 5, 2025.