# EXHIBIT 1

5H - 84087801 - 0     Page 1

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Grant Agreement

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 84087801 | |
| **MODIFICATION NUMBER:** 0 | **DATE OF AWARD** 07/09/2024 |
| **PROGRAM CODE:** 5H | |
| **TYPE OF ACTION** New | **MAILING DATE** 07/12/2024 |
| **PAYMENT METHOD:** ASAP | **ACH#** 60618 |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| ENERGY MINERALS & NATURAL RESOURCES DEPARTMENT | ENERGY MINERALS & NATURAL RESOURCES DEPARTMENT |
| 1220 S SAINT FRANCIS DR | 1220 S Saint Francis Drive |
| SANTA FE, NM 87505-4225 | Santa Fe, NM 87504 |
| EIN: 85-6000565 | |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Trevor Leuzinger | Bridget Kelly | ThuyT Nguyen |
| ENERGY MINERALS & NATURAL RESOURCES DEPARTMENT | 1300 Pennsylvania Ave., NW, 1101R | 1200 Pennsylvania Ave, NW 3903R |
| 1220 S. Saint Francis Dr | Washington, DC 20460 | Washington, DC 20460 |
| Santa Fe, NM 87505 | **Email:** kelly.bridget@epa.gov | **Email:** Nguyen.ThuyT@epa.gov |
| **Email:** trevor.leuzinger@emnrd.nm.gov | **Phone:** 202-566-0718 | **Phone:** 202-564-5312 |
| **Phone:** 505-460-7706 | | |

| **PROJECT TITLE AND DESCRIPTION** |
|---|
| Solar Deployment for Low Income New Mexicans Statewide. Note: A special payment condition applies to this award. |
| See Attachment 1 for project description. |

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 0.00 | **TOTAL PROJECT PERIOD COST** $ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division | Environmental Protection Agency, OGGRF |
| 1200 Pennsylvania Ave, NW Mail code 3903R | OA - Office of the Administrator |
| Washington, DC 20460 | 1200 Pennsylvania Ave., NW |
| | Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official for** Barbara Proctor - Associate Award Official | **DATE** |
| **by** Barbara Proctor - Award Official Delegate | 07/09/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41044 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. PROGRAMMATIC TERM AND CONDITIONS

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

## 1. Performance Reports

### *Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

   Progress towards objectives on key performance metrics over the entire period of performance,

   Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

   Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

   Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

   Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

## 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

### 1. Leveraging
The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

***The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.


## II.  ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

### B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b) (1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees <u>General Term and Condition</u>, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent

auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

### 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to

these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

### a. Include DBRA Requirements in All Subawards (including Loans):
Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

### b. Provide Oversight to Ensure Compliance with DBRA Provisions:
Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply

with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Health and Safety Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

    3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

    4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

    5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal

funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

## 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.\

## 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary

relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue

claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

### 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

### 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e.,

governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement

nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

    1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities;

coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide

standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

### B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

**Greenhouse Gas Reduction Fund**
**Solar for All**
**New Mexico Solar for All**
**Work Plan**
**Project Period: 5/1/24 – 4/30/29**
**[Submitted 1/10/25]**

**Project Title:** New Mexico Solar for All (SFA)
**Grant Number:** 84087801
**Organization Name:** State of New Mexico, Energy, Minerals and Natural Resources Department (EMNRD)
**Geography:** The state of New Mexico
**Definition of LIDAC:** Households meeting the LIDAC definition will either be located in CEJST-Identified Disadvantaged Communities or be identified as Geographically Dispersed Low-Income Households[1].

**Section 1:  Program Summary**

Overview

Any Solar for All (SFA) funds invested in New Mexico will have an outsized impact. New Mexico endures a poverty rate of 18.4%, much higher than the national average, and comprises numerous rural communities and a diverse, historically underserved population that will benefit greatly from solar. New Mexico, with a statewide average solar irradiance value of 6.49 (kWh/m2/day) and a large land area, has significant technical potential for solar resource development. To help overcome existing barriers to widespread adoption of distributed solar generation, the State of New Mexico, Energy, Minerals and Natural Resources Department (EMNRD) and its coalition partners (Project Team) have the following goals for a statewide SFA program:

1. Expand access to shared solar beyond the confines of the existing state statutorily defined community solar (CS) program, while also supporting CS projects.
2. Bring the most isolated and off-grid residents (e.g., unelectrified homes) online and support grid resilience with on-site solar plus storage or shared solar plus storage options as are feasible.
3. Meet low-income and disadvantaged communities (LIDAC), both owners and renters, where they are with direct grants and financing options for solar projects

---

[1] Geographically dispersed means, low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development. Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget.

1

that decrease energy burden through household annual electric bill savings of at least 20%.

New Mexico's SFA program will deliver on the Greenhouse Gas Reduction Fund goals by capitalizing on economies of scale through shared solar projects and leveraging Investment Tax Credits (ITC), Low-Income Housing Tax Credits (LIHTC), the U.S. Department of Energy's (DOE) weatherization assistance program (WAP) funding, other state funds, investments from solar and storage owners, and other public and private sources as much as legally possible. To maximize the reach and impact of the program, the Project Team will leverage New Mexico's existing programs that serve LIDAC households and will partner with: (1) weatherization and utility assistance implementers; (2) workforce development providers; and (3) community-based organizations and local and state government partners that understand and represent New Mexico's diverse, majority-minority population.

**Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**
Environmental Results - Outputs and Outcomes:
The Project Team will collaborate with any other SFA, NCIF, or CCIA recipients operating within New Mexico to extend the reach of the program and ensure there is no double counting of outputs or outcomes.

**Work Plan Priorities:**
Outputs
Households served: 24,000
New generation capacity rooftop residential: 40MW served by $45,000,000 in financial assistance funding, with an additional $3,000,000 available for enabling upgrades.
New generation capacity residential-serving shared solar: 38MW served by $65,076,473 in financial assistance funding, with an additional $6,000,000 available for enabling upgrades.
New generation capacity residential-serving community solar[2]: 50MW served by $18,000,000 in financial assistance funding for enabling upgrades.

Outcomes
Estimated GHG emissions reduced and avoided: 121,293
Estimated household savings (per household): $722 annually
Workforce development: SFA will require apprentices to be used for 15% of total labor hours for all solar installations over one MW to satisfy Davis Bacon requirements

---

[2] For the purposes of this program, the term shared solar is used to distinguish from the existing New Mexico Community Solar Program that is administered by the PRC in investor-owned utility territories. Shared solar projects developed with assistance from the Solar for All program will be on tribal lands or in a municipal utility or rural electric cooperative utility territory. Community solar refers to projects managed by a subscriber organization in investor-owned utility territory.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.

- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

**Meaningful Benefit Plan**
**Household Savings**
For each subprogram (single family, multifamily, and shared solar), the NM SFA program will determine average electricity costs based on electricity provider, and projects will be required to show at least 20% savings for participants, inclusive of costs of program participation, compared to the relevant model. For master-metered multifamily buildings, projects will be required to demonstrate how benefits will be shared with tenants, either through rent reductions or other means. For shared solar projects the Program Team will engage with utilities and potential project developers to determine the most effective method of savings attribution. A 10% sample of household savings will be audited annually to ensure that the savings goals are being met, and if the goals are not being met, the Program Team will adjust the model. If the savings goals are being met the audit rate will be decreased to 1%, unless issues are discovered, in which case it will return to 10%.

**Equitable Access to Solar**
New Mexico's SFA program will be built with low-income end-users in mind throughout every stage of development and execution. For more detail, see the Equitable Access and Meaningful Involvement Section.

**Resilience Benefits**
LIDAC households in New Mexico, notably those living on tribal lands or in tribal communities, in rural communities, and the state's sparsely electrified immigrant settlement areas, called Colonias, are highly vulnerable to energy emergencies and disruptions.

While installing solar through the SFA Program, the Project Team, will integrate allowable Energy Storage System (ESS) infrastructure[3] with certain residential and shared solar

---

[3] Energy storage systems for shared solar projects means, battery storage that enhances grid stability and enables the integration of the solar generation resource. Each solar project will be analyzed in terms of its renewable generation capacity and its intermittency. The Project Team will assess the excess energy generated during high production periods and determine the required energy storage capacity to store and utilize the surplus energy during low production/high demand periods. Energy storage systems for individual household projects means, battery storage that serves as back-up power for resiliency of grid-connected meters; or serves as the primary energy resource during non-generation hours of the day for households that are not grid connected. Storage projects will be determined on a case-by-case basis per the funding allocation criteria established during the planning year.

3

systems to enhance energy resiliency for LIDAC households either directly or indirectly. This is especially vital for rural areas. Preliminary modeling shows that SFA may be able to support 8.0 MWh of household on-site storage and up to 39 MWh of utility-scale storage, depending on market conditions and pipeline readiness at the time of procurement. The Project Team will measure success in improving energy resiliency by tracking the frequency and duration of power disruptions in LIDAC communities served by SFA before and after the implementation of the ESS through analysis of available data on energy disruptions.

SFA will also increase grid resiliency by subsidizing necessary upgrades to electric distribution infrastructure to enable the interconnection of specific LIDAC-serving projects. Grid upgrades will only be funded in cases where behind the meter solutions are not available, and capital upgrades to homes such as roof repairs will only be funded if necessary for qualified participants to benefit from the SFA program. The SFA Program will also ensure a more diverse energy supply within LIDAC communities. The presence of more small generation and storage capacity in local communities – especially peak-shaving ESS installations – will enhance the resiliency of both the larger grid and those local communities. All ESS systems receiving financial assistance will be connected to an eligible SFA solar project. ESS will be deployed through the SFA program where it will provide the greatest impact on resiliency in areas most underserved, with a priority being deployment in areas where it will most increase resiliency.

**Community Ownership Models**
The SFA Program will support the following number of community ownership model types:
- 5 projects where a municipality or tribe owns the solar or ESS for the benefit of the community both to reduce costs for their LIDAC residents and as an economic development asset.
- 5 projects where a rural electric cooperative owns the solar or ESS for the benefit of their LIDAC membership. As a nonprofit community-based utility, these co-ops will need to demonstrate how their ownership of the asset will have positive impacts on their rural locality[4]. For community solar owned by a utility, the program will require that at least 50% of the benefits derived from the project will be delivered to residential customers within the same utility territory as the facility.
- 10,000-12,000 individual low-income household-owned projects with and without ESS, funded with a mix of grants and loans.

The Project Team will support low-income households and communities in building equity through alternative utility ownership models, beyond the rural electric cooperative utility model. For residential projects, the Project Team intends for the household to own the

---

[4] Eligible cooperative-owned projects must be able to confirm that at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system will be delivered to residential customers within the same utility territory as the facility.

solar system. New Mexico law limits the increase in valuation of a residential property due to the installation of a solar energy system.[5] The Project Team will limit risk where ownership pathways are involved as part of the operations and maintenance strategy.

**Workforce Development and Entrepreneurship**

New Mexico will leverage its SFA program to attract, train, and retain the skilled and diverse local workforce required to expand access to solar, while promoting sustainable economic development in disadvantaged communities, including those impacted by the energy transition. The Project Team will collaborate with the State of New Mexico, Department of Workforce Solutions (NMDWS) to identify gaps and develop a framework for New Mexico-specific clean energy career pathways and a strategy for ensuring direct interaction of workforce development activities with projects funded through the SFA program. For more information on the training strategy, see the Workforce Development and Training Strategy section below.

The SFA program will have direct workforce impacts. First, SFA will require apprentices to be used for 15% of total labor hours for all solar installations over one MW to satisfy Davis Bacon requirements. Contractors working on projects secured through SFA funding will also be required to meet state and federal apprenticeship and prevailing wage requirements. NMDWS is charged with implementing rules for an apprenticeship program for displaced workers and communities, as described in New Mexico's Energy Transition Act (ETA). According to the ETA, NMDWS "shall develop a displaced worker development plan to assist displaced workers in an affected community that shall provide for the disbursement of money in the energy transition displaced worker assistance fund." This effort includes job training and apprenticeship programs for displaced workers or for programs designed to promote economic development in affected communities and includes a directive to employ apprentices. Although the Community Solar Act and potential SFA program were not in effect at the time of the drafting of this provision, NMDWS has determined that developers of Community Solar projects, as well as power generation built by utilities and non-utilities selling to utilities under a PPA, are subject to state apprenticeship requirements. The Project Team will use local trade publications, supplier councils, and local building associations in sourcing contractors from the LIDAC communities benefiting from projects when possible. The Project Team will use local trade publications, supplier councils, and local building associations in sourcing contractors from the communities benefiting from projects when possible. EMNRD and NMDWS will coordinate with worker's rights stakeholders, including unions, to use their input and invaluable expertise, to ensure worker's rights are a key part of the overall workforce development programming.

To the extent allowable under this funding opportunity, the Project Team will follow New Mexico preferences for minority firms, women-owned businesses, Native American resident businesses, resident veteran businesses, small business enterprises, and

---

[5] See NMSA 1978 § 7-36-21.2.

disadvantaged business enterprises. Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

The Project Team is keenly focused on ensuring that the spirit and directive of the federal Justice40 initiative are met. The Project Team will leverage their active partnerships to recruit LIDAC residents who would benefit from training and apprenticeships. The Project Team will ensure prevailing wages are used for all projects and contractors are well-versed in Davis-Bacon Act requirements. EMNRD is already engaged with NMDWS to help with compliance and recruitment on other projects.

The Project Team is fully committed to advancing DEIA across the SFA program and within each project. The Project Team will facilitate an inclusive programmatic culture where all staff feel respected, valued, and can actively participate in decision-making processes.

**Financial Assistance Strategy**
**Financial Assistance**
As of August 2024, New Mexico's SFA Project Team has begun the procurement process to find entities (e.g., banks, credit unions, green banks, etc.) to partner with that will provide the grants, loans, and other financial subsidy products to the project owners/beneficiaries of the program. Through these partnerships, the Project Team will refine the financial subsidy models with input from selected partners and industry stakeholders, as well as guidance from the SFA Stakeholder Advisory Committee.

To maximize the impact of SFA dollars, the Project Team proposes to use economies of scale by channeling the majority of funding toward shared solar projects. For the purposes of this program, the term shared solar is used to distinguish from the existing New Mexico Community Solar Program that is administered by the PRC in investor-owned utility territories. Shared solar projects developed with assistance from the Solar for All program will be on tribal lands or in a municipal utility or rural electric cooperative utility territory. Community solar refers to projects managed by a subscriber organization in investor-owned utility territory. All shared and community solar projects that receive financial assistance through SFA will comply with the program requirements. At a minimum, these projects must be less than 5 MW and deliver at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system to residential customers within the same utility territory as the facility.

To maximize utility bill savings for LIDAC households, the Project Team will offer the majority of the SFA funds as grants (non-debt financing), while leveraging additional private capital, tax credits (e.g., 10% adder for projects on tribal lands and 20% bonus ITC for multifamily affordable housing properties willing to share 50% of the benefits with their tenants), and other programs to facilitate CS and on-site projects. The financial assistance

strategy includes affordable debt products to facilitate additional projects, but the Project Team is committed to limiting the amount of debt that LIDAC households must consider taking on to participate. To this end, a portion of the funding will be set aside to capitalize a revolving loan fund. The type of financial assistance is described relative to the funding channel below.

1. **FA for Direct Project Support (Grants)**:
   a. $32,538,236 in SFA direct funding to provide financial assistance for implementation of shared solar without ESS projects administered through EMNRD by financial services providers.
      i. The financial product will be provided as a contract to financial assistance providers (e.g., banks, credit unions, green banks, etc.)
      ii. The financial assistance provider will provide grants to Nonprofits, rural electric cooperative utilities, tribes, or developers as the transaction counterparty to implement shared solar without ESS projects.
      iii. Counterparties will be contractually required as part of their grant to deliver at least 50% of their project benefits to households in the same utility territory, and guaranteeing participating households receive at least 20% bill savings. Because a range of counterparties and utility structures may participate in this structure, the benefits may accrue to households as bill credits or distribution of electricity at $0. This process will be refined alongside the selected financial service providers, including the accountability and contract the counterparty will sign to ensure that benefits do reach the households.
      iv. Estimated size is 5MW and $6,000,000 per project
   b. $32,538,237 in SFA direct funding to provide financial assistance for implementation of shared solar and ESS projects administered through EMNRD by financial services providers.
      i. The financial product will be provided as a contract to financial assistance providers (e.g., banks, credit unions, green banks, etc.)
      ii. The financial assistance provider will provide grants to Nonprofits, rural electric cooperative utilities, tribes, or developers as the transaction counterparty to implement shared solar without ESS projects.
      iii. Counterparties will be contractually required as part of their grant to deliver at least 50% of their project benefits to households in the same utility territory, and guaranteeing participating households receive at least 20% bill savings. Because a range of counterparties and utility structures may participate in this structure, the benefits may accrue to households as bill credits or distribution of electricity at $0. This process will be refined alongside the selected financial service providers, including the accountability and contract the

counterparty will sign to ensure that benefits do reach the households.

    iv. Estimated size is 5MW and 8,000,000 per project

  c. $15,000,000 in SFA direct funding for on-site residential solar and ESS projects (for off-grid systems) administered through EMNRD by financial services providers.

    i. The financial product will be provided as a contract to financial assistance providers (e.g., banks, credit unions, green banks, etc.)

    ii. The financial assistance provider will provide grants to households or developers as the transaction counterparty.

    iii. The household will receive ownership of the solar system and systems will be sized to ensure at least 20% household bill savings. As discussed elsewhere, risk management strategies will be incorporated into the operations and maintenance strategy.

    iv. Estimated size is 2kW and $12,000 per project

  d. $9,000,000 in SFA direct funding for enabling upgrades for shared solar and on-site residential solar projects.

    i. The financial product will be provided as a contract to financial assistance providers (e.g., banks, credit unions, green banks, etc.)

    ii. The financial assistance provider will provide grants to Nonprofits, rural electric cooperative utilities, tribes, households or developers as the transaction counterparty when enabling upgrades are necessary to implement a solar project receiving SFA funding.

    iii. Counterparties will be subject to the grant terms for the solar project in order to also receive a grant for enabling upgrades.

2. **FA for Enabling Upgrades (Grants):**

  a. $18,000,000 in SFA direct funding to support Community Solar projects taking part in Solar for All, including known distribution infrastructure upgrades needed to guarantee development of Community Solar projects through the state program in IOU territory. Examples can include upgraded transformers, reclosers, inverters, and reconductored distribution lines. The Project Team will select the most competitive and appropriate projects, The financial product will be provided as a contract to financial assistance providers (e.g., banks, credit unions, green banks, etc.)

  b. The financial assistance provider will provide grants to utilities as the transaction counterparty to implement necessary enabling upgrades for community solar projects participating in the SFA program.

  c. The community solar projects participating will be contractually required as part of the grant to deliver at least 50% of their project benefits to households in the same utility territory, and guaranteeing participating households receive at least 20% bill savings via bill credits. Solar providers will be accountable for ensuring that benefits reach intended households, as outlined in their contracts. Estimated size is $1,000,000 per project

3. **FA for Financing Services (Grants plus loans)**: $30,000,000 to be leveraged with grants as low-cost debt financing through chosen financial services providers for rooftop residential solar.
   a. The financial product will be provided as a contract to financial assistance providers (e.g., banks, credit unions, green banks, etc.)
   b. The financial assistance provider will provide loans to households as the transaction counterparty.
   c. Program beneficiary will receive financial assistance as a loan with low interest, with a payback period of 12 years. The household will receive ownership of the solar system and systems will be sized to ensure at least 20% household bill savings. Risk management strategies will be aligned and incorporated into the operations and maintenance strategy.
   d. Estimated size is 2kW and $10,000 per project. A portion may be provided as a grant or forgivable loan.
   e. This element will be the Revolving Loan Fund to extend the impact of the Solar for All Program, as such it will generate program income which we estimate to total $6,986,250 during the project performance period. The program income will be used to generate future low-cost loans and may also function as a loan-loss reserve.

The financial assistance described here amounts to 87.8% of the total SFA award to the Project Team, equaling $137,076,473.

The Project Team will leverage and complement the following programs:
1. DOE: Home Efficiency Rebates, Home Electrification and Appliance Rebates, Loan Programs Office funding (on combined energy efficiency Solar SF and MF projects), and WAP funding.
2. United States Department of Housing and Urban Development (HUD): Green and Resilient Retrofit Program (on MF projects).
3. EPA: Greenhouse Gas Reduction Fund National Clean Investment Fund and Clean Communities Investment Accelerator, Environmental and Climate Justice Block Grants, and Climate Pollution Reduction Grants.
4. Utility rebate program funding.
5. U.S. Department of Agriculture (USDA) Rural Electric Services: Powering Clean Energy Program (PACE) and Empowering Rural America (New ERA), (for CS Projects in rural communities).
6. NM's Indian Affairs Department (IAD) funding dedicated to providing cost share for tribal energy and grant projects.
7. Community Reinvestment Act funding from banks for grants or low-cost financing.
8. LIHTC for MFAH developments.
9. Low-interest financing (loans and leases) from various sources including Community Development Financial Institutions (CDFIs), green banks, credit unions, etc.
10. New Mexico CEED program which will provide funding for l households to receive energy efficiency upgrades.

9

11. Federal Energy Efficiency Community Block Grant, which is the federal analog to CEED.

The Project Team and its chosen financial partner will also utilize innovative financing products and services. Tools such as Property Assessed Clean Energy (PACE), energy performance contracts, and energy-as-a-Service (EaaS), will allow for increased implementation of solar projects.

**Revolving Loan Funds**
The Project Team understands that all loans provided to program participants will be subject to the Terms and Conditions regarding program income.  The financing partner may choose to apply financing to shared solar, CS and household on-site projects as determined by the market need. Per IAD, debt-financing will not be offered to tribal communities as those communities prefer direct funding.

The Project Team will provide partial grants plus loans to certain households where our household savings model  shows a sufficient grant  (likely around $4,000 per household), in coordination with reasonable loan term assumptions (e.g., loan amount of $2,585 with 3.5% interest rate and a payback period of 12 years), will ensure average monthly payments for 12,500 households would be 20% less than the current household electricity bill throughout the lifespan of the solar project.

**Enabling Upgrades**
New Mexico's SFA has a unique opportunity to multiply the impact of its grant. The state's existing Community Solar (CS) program has already selected and planned for 45 projects across the state. Support paying the interconnection upgrades, which SFA can provide, will dramatically multiply the number of households NM SFA will reach. Enabling upgrades will only be funded in conjunction with solar investment projects, not as independent initiatives.

For context, New Mexico's established Community Solar program places strong emphasis on serving low-income utility customers, with a statutorily set minimum commitment that at least 30 percent of the energy produced by the distributed solar generation facilities be delivered to low-income households or entities that provide services (including multi-family housing, community service organizations, or local government agencies). Community solar projects that receive assistance for enabling upgrades through SFA will be required to provide 50 percent of the benefits to low-income households. Customers may subscribe for projects for up to their total annual energy consumption.

The request for funding for enabling upgrades in utility distribution facilities is - as required by the Solar for All program - necessary to deploy several of these Community Solar projects to maximize the benefits for low-income customers who will subscribe to them, while providing resiliency benefits to the local grid.

Projects receiving the funding will be chosen via a further evaluation of maximizing impact for LI community members, and ability to abide by all the requirements of the Solar for All program, including: be less than 5 MW, deliver at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system to low-income households within the same utility territory as the facility, and result in 20% savings for households. In this case, funds will be directed to the host utility to "buy down" the costs of necessary electric system upgrades, rather than a direct subsidy to the project developers.

Successfully interconnecting to the utility grid has proven to be a significant challenge for these projects because of the high costs of circuit and system upgrades required by the utilities after undergoing interconnection studies, particularly related to the utility perception that distributed generation poses safety and reliability risks to reliability of the distribution network. The speed of the energy transition, coupled with an aging distribution system, has resulted in large areas of certain utility territories being declared "off limits" to new DG interconnections, which is adversely impacting low-income households' ability to access solar through community solar projects.

For example, the largest utility in the state, Public Service Company of New Mexico (PNM) has 19 feeder lines that it considers "saturated." Additionally, a recent PRC-directed study of 30 representative feeders shows that virtually any interconnection of a Community Solar-sized project would trigger extensive upgrade needs by PNM. Even residential customers seeking interconnection of rooftop solar PV are told that not only can they not be accommodated because of cost, but that the utility has no plans to upgrade the grid at their locations.

Other investor-owned utilities' systems pose equally daunting challenges, because of strict transmission-border concerns or simply due to aged infrastructure not designed to accommodate distributed generation or direct access to residential customers. These barriers are especially prevalent in communities with high levels of low-income households, which are the primary customers for Community Solar.

Because the utilities claim not just capacity constraints on circuits but in many cases thermal constraints at the network level, any DG interconnection for a Community Solar project (up to 5 MW of capacity) may well incur a cost for utility network upgrades that run from several hundreds of thousands of dollars to as much as $12 million per project. However, with assistance under this grant, many, if not most, of the 45 selected and future Community Solar projects will come to fruition, resulting in guaranteed opportunities for low-income customers to access the promised benefits.

 The Project Team will ensure that funds will be applied only where necessary to deploy or maximize the benefits of a residential-serving Community Solar project.
*Types of Upgrades Required*

11

In responses to NMPRC data requests about the upgrades that utilities have declared as necessary for interconnection, the utilities identified these facilities and components for most of the projects:

- Overhead feeder extensions
- Reconductoring circuits to handle the increased power flows
- Capacitor banks
- Reclosers
- Relays settings
- Intellirupters
- Substation transformers
- Switchgear
- Voltage protections

Separately, the Project Team has budgeted $9,000,000 for enabling upgrades for shared solar projects outside of IOU territory as well as for residential projects that require roof or electrical panel upgrades to be able to benefit from a solar project. Combined with the $18,000,000 for enabling upgrades for community solar projects, the share of financial assistance for enabling upgrades will not exceed 20 percent of the financial assistance.

**Residential-Serving Shared Solar**
In the case of financial assistance to offset shared solar without ESS, the Project Team is planning to provide grants for LIDAC-dedicated shared solar projects that are owned by local governments, tribes, and communities, or rural electric cooperatives. All residential-serving shared solar will meet SFA eligibility – less than 5 MW, delivers at least 50% of the financial benefits derived from the power generated by the community solar system to residential customers, including single-and multi-family owners and renters, within the same utility territory as the facility. Based on our initial modeling, our plan will result in up to 50% annual savings for households. Projects will be five MW or less to capitalize on enhanced ITC benefits.

Grants for low-income dedicated shared solar projects with storage are planned to primarily be installed in electric coop territories, including those serving tribal members, where grid balancing is needed. Projects will serve greater than 50% LIDAC homes, including single- and multi-family owners and renters. A small lease payment will be leveraged to cover O&M costs while ensuring average monthly payments are 20% less than current electricity bills throughout the lifespan of the solar project, and annual household savings will be up to 50%. The Project Team estimates that this will include 35.2 MW of solar and 66.2 MWh of storage, split between six to seven projects depending on size, and these projects will be less than or equal to five MW to capitalize on enhanced ITC benefits, including for projects sited in tribal territories.  Per data shared by PRC, the per project interconnection costs will average $1,000,000, due to market conditions and pipeline readiness at that time.

**Housing affordability**

The Project Team will consider unintended consequences that may result from this program throughout the technical and financial assistance implementation, including changes in housing affordability, rent, and tax liability for low-income households.

**Long-Term Asset Operations**

The Program Team will address important life-cycle aspects of project assets, including operations, management, decommissioning, and recycling as part of the overall technical assistance strategy.

**Project-Deployment Technical Assistance Strategy**

New Mexico will set aside 7% of the total award for technical assistance. This includes contractual services for education and outreach and the following elements. It also includes the workforce development activities funded through a subaward to DWS. New Mexico's SFA Program will provide technical assistance to communities through one or more Program Technical Assistance Manager(s) (PTAM). The PTAM(s), under the direction of the Project Team, will be responsible for TA for the program overall and will focus on the following core areas:

1. **Education and Outreach:** the PTAM(s) will deploy a marketing and outreach strategy as well as materials for educating LIDAC households/MF owners/utility partners about the benefits of solar, ESS, and energy efficiency beyond utility cost savings. Educational materials will also inform customers about financing options and how to evaluate the return on investment (ROI) for their solar and ESS project. Outreach to and engagement of specific communities, including tribes, will be a key portion of this TA.

2. **Project Assessment:** The Project Team will evaluate financial and technical viability of each project for its cost-effectiveness, ROI, and utility cost savings potential. A preliminary project scope of work (SOW) and pro forma will be developed for each project to determine project viability.

3. **Project Development:** The PTAM will provide assistance to the solar (and ESS) asset owners during project development to help facility owners develop a comprehensive SOW.

4. **Support in Accessing Incentives and Financing:** The PTAM and financial services provider will facilitate access to the universe of appropriate financial and technical resources for program beneficiaries, including rebates and retrofit programs administered by EMNRD. Resources will be stacked with SFA financial assistance to increase the benefits for program participants.

5. **Contractor Selection, Oversight, and Inspections**: The PTAM will ensure that the installation meets the approved project design and is a quality install. For projects larger than one MW, the TA team will also ensure the project meets the prevailing wages and apprenticeship requirements, by the Internal Revenue Service, for accessing the higher ITC. The PTAM will provide guidance to asset owners on factors to consider when selecting a solar contractor using criteria such as: experience; fair and reasonable pricing; crew skill set(s); health and safety

13

procedures and record; permits and licensing; ability and record to meet timelines and emergency calls, and post-install maintenance. The PTAM will assist solar contractors in the state to understand the program requirements in order for them to participate in the program efficiently. This will include training contractors on consumer protection and best practices on consumer interaction, as well as best practices and industry standards for quality installation.

6. **O&M Training:** The PTAM will train the asset owners or their designated staff on how to operate and maintain their solar (and ESS) assets. They will provide guidance on hiring an O&M firm to ensure their assets are well-maintained and functioning properly to provide expected benefits.

7. **Facilitating Workforce Development Activities**: The PTAM and DWS will lead the engagement efforts with workforce development agencies and providers

8. **Coordinating with Program Stakeholders**: The PTAM will coordinate with other state energy programs to co-deliver services, as well as coordinate with community-based organizations (CBOs), tribes, municipalities, advocates, and utilities to ensure an equitable deployment of leveraged funding throughout the state, and to create efficiencies for program deployment and project siting.

9. **Assisting in Community Inclusion Processes**: The PTAM will assist in program implementation activities. This includes helping to shape needed public comment and request for information sessions.

10. **Coordinating  Zoning & Land Use Initiatives**: Core elements of project site selection that require technical assistance include:  considering land use planning and zoning requirements that impact siting strategy; incorporating climate hazards (e.g., flood zones, wildfire risks) into siting strategy; protecting critical pollinator habitats, greenspace, wetlands, and productive farmland; adopting agrivoltaics in siting strategy if relevant; using remediated brownfields for project siting; and managing permitting processes and challenges.

**Workforce Development and Training Strategy**

As discussed above, the Project team will work with the New Mexico DWS to lay out a relevant workforce framework and strategy. The Project Team and NMDWS will partner to collect workforce data to understand the specific and cumulative impacts of clean energy funding coming into the state on workforce development. Through a subaward to DWS, SFA funding will be used to build on existing educational and training opportunities for solar technicians and other solar project-related careers (e.g., electricians, home energy auditors). Activities will include on-the-job training, pre-apprenticeship programs, apprenticeships, and business development/entrepreneurship training, with the goal of supporting good jobs with high road labor accommodations, including providing family-sustaining benefits, predictable work schedules, retirement contributions, safe working conditions, and the free and fair choice to join a union.

The Project Team will pay special attention to how SFA can be leveraged to sustain an empowering workforce ecosystem.  The Project Team will identify LIDAC businesses, educational institutions, and training organizations that serve workers who face barriers to

14

accessing quality jobs. EMNRD and its partner NMDWS already have strong relationships with unions, community colleges, tribal technical colleges, and trade associations that provide training/retraining, scholarships, and apprentice programs, as well as wrap-around services for students and employees, and a history of working with these partners on workforce development related to renewable energy and other green careers.

**Resilient Assets**
Resiliency will be addressed at two different scales. First, SFA will increase electric grid resiliency by subsidizing necessary upgrades to electric distribution infrastructure to enable the interconnection of specific LIDAC-serving projects. A reliable, resilient grid and energy supply is a key ingredient for future economic development in rural areas. Further, utility partners will be engaged to strategically place ESS for large-scale projects to support grid reliability. All ESS systems receiving financial assistance will be connected to an eligible SFA solar project. The amount of ESS deployed will be allocated with input from utilities and the Stakeholder Advisory Committee to prioritize e storage in areas where it will most increase resiliency.

Second, the Project Team will consider resiliency at the asset level. the Project Team will pull from industry standards and best practices and draw on input from utilities and industry representatives.  The Project Team will also draw on other state efforts to assess and mitigate threats posed by climate change on infrastructure including wildfire, flooding and damaging winds (e.g., the New Mexico Climate Resilience and Adaptation Plan, the New Mexico State Energy Security Plan, FEMA-CISA Regional Resiliency Assessment recommendations and insights from the DOE-Funded Grid Resilience Analysis and Climate Impacts project).

The Project Team will partner with utilities to ensure efficient siting, interconnection, and resilient assets.

The Project Team will also collaborate with state and local permitting partners, who have begun to explore apps and other tools that use AI to make permitting faster and smoother. The Project Team will encourage the adoption of free permitting tools such as SolarApp+.

**Community Benefit Agreements**
Ensuring community benefits is a main priority for New Mexico's SFA program. As such, the Project Team will incorporate community needs and desires, including community benefit agreements (CBAs) and workforce development agreements (WDAs) into program implementation.  CBO partners, tribal partners, and the Stakeholder Advisory Committee will advise on the most appropriate and effective formalized structures for community involvement in shaping the program and for providing iterative feedback, and when CBAs and WDAs should be used.

**Equitable Access and Meaningful Involvement Plan**
**Communities Served**

15

The Project Team will ensure the benefits of the Solar for All program to accrue to low-income households and disadvantaged communities across the state The Project team is using the CEJST-Identified Disadvantaged Communities and Geographically Dispersed Low-Income Households with incomes not more than 80% AMI or 200% FPL to define LIDAC households for the program. Areas of particular interest include tribal and rural areas, and the state's sparsely electrified immigrant settlement areas, called Colonias. The Solar for All Stakeholder Advisory Committee (SFA SAC) will assist in determining how best to maximize the benefits of SFA to benefit LIDAC communities across the state.

**Customer Acquisition**

The Project Team is committed to maximizing the breadth and diversity of New Mexico communities reached by the SFA Program, while ensuring equitable access for all, particularly historically underserved households and communities, such as Tribal communities and populations dispersed across rural areas.

As indicated above, New Mexico's SFA program will primarily apply the geographic approach – using the CEJST – to identifying LIDAC communities, with particular attention to communities that already face high energy burdens. In this case, the zip code of the perspective customer would be compared to the map using a modified GIS developed in-house. By also using the Geographically Dispersed definition of LIDAC, the Project Team will ensure that the program increases access for low-income households. The Project Team intends for the SFA SAC to provide guidance to ensure benefits accrue to LIDAC communities.

While there are few communities outside of the CEJST DAC designation in New Mexico, LIDAC households can also be deemed eligible for SFA funding by already qualifying for the following programs: Medicaid, SNAP, LIHEAP, first-time homeowner programs and housing rehabilitation programs, living in a low-income/affordable housing facility, and state and federal income tax credit programs. Additionally, the WAP serving multi-family housing is a national pioneer in using categorical eligibility for LI housing programs including HUD public housing, Section 8 Vouchers, USDA housing, LI housing tax credit subsides and more. Our DOE HEAR program is the same, and has built an online application portal, which will be available to SFA, that includes pathways for categorical eligibility.  New Mexico's SFA will use these existing "onramps," and ensure that participation in any other program used to verify eligibility will comply with the SFA low-income definition. The Project Team will leverage its influence with these existing stakeholders to conduct outreach and education and reach their program participants. The Project Team will meet with these stakeholders, and other community-serving organizations, to determine the most effective method of reaching these eligible households.

Part of the technical assistance related to outreach and education will be clear, multilingual and culturally appropriate communication around savings, enrollment requirements, and program participation. The program will ensure that information, flyers,

16

websites, and events where possible, are offered in multiple languages (e.g. Spanish, Navajo, Tewa, etc.)

**Participatory Governance**

Participatory governance is a key component of program design and implementation structure. This l includes the Stakeholder Advisory Committee composed of stakeholders representing New Mexico's diverse industry, geography, languages, races, cultures, and incomes. The Stakeholder Advisory Committee will review and guide program implementation. The Stakeholder Advisory Committee will be made up of 15-20 diverse stakeholders. The SFA SAC will be heavily involved in the first year of the program launch. Representatives from CBOs, advocacy organizations, tribes, local LIDAC-serving nonprofits, utilities, labor, and the solar industry will be recruited to participate in the advisory committee, and selection will be based on participants reflecting the diverse communities that the SFA program will serve. The SFASAC will meet at least monthly during the initial program launch year. After the first year, the SFASAC will continue to meet at least quarterly to provide and review feedback to continue improving implementation processes over the course of the program.

The Project Team will align all efforts with the Justice40 initiative, ensuring that benefits flow to LIDAC communities. LIDAC communities will be able to provide formal input and feedback through a variety of means:

- The Project Team will hold public meetings to receive community input (concerns, needs, etc.) on program design.
- The Project Team will develop CBA and WDAs as appropriate to ensure that any agreements made prioritize community members' inputs and needs.
- The advisory committee will include local community members and stakeholders to facilitate their input regarding LIDAC communities' needs.
- IAD has strong partnerships with tribes and will actively solicit their members' input in the development, execution, and outreach conducted to implement programming; and
- The Project Team will leverage existing partnerships with CBOs and other stakeholders to solicit input on SFA programmatic development and execution, allowing for community input. Some of these partnerships may be formalized via contracts for implementation.

**Education and Outreach**

As discussed in other sections of this plan, education and outreach are key components of New Mexico's SFA technical assistance plan. Gaps and needs for education about solar and ESS will be incorporated into the education and outreach strategy, as well as tailored to specific communities. At the same time, inputs from community outreach will be a key component of program design.

17

The Project Team will research data points such as: (1) eligible homes and communities, including those already associated with WAP, LIHEAP and EMNRD-administered building retrofit programs; (2) energy consumption and costs; and (3) income statistics and other relevant demographic data. Through additional financial assistance TA, and DOE-co-funded "energy coaches," the goal will be to help households stack and braid as many opportunities as possible.

When it comes to developing and siting specific projects, the Project Team will incorporate outreach with local government entities, CBOs and LIDAC households into the preparation, installation, and follow-up phases of the project., including group listening sessions as well as one-on-one meetings. These face-to-face meetings will be crucial to understanding potential barriers to community solar adoption and equitable customer acquisition. The Project Team will also use lessons learned and feedback gathered from the development and launch of its current CS program.

Modes of outreach and gathering input will be through diverse channels, including collaborations with CBO and trusted community partners, feedback from organizations managing other state programs, developer survey responses, listening sessions and interviews, clear contractual relationships, social media campaigns, and a centralized website with clear and transparent information.

**Fiscal Stewardship Plan**
**Stewardship**
Through the State of New Mexico's established procurement processes, EMNRD and subgrantees will be subject to auditing and monitoring to ensure funds are used only for authorized purposes under the grant agreement specified by the Code of Federal Regulations. EMNRD's funds are audited annually by external auditors to ensure compliance with state and requirements. Audit reports are completed annually by December 15 as required by state law. The New Mexico SFA program will follow the State and EMNRD's policies regarding fraud, waste, abuse, and conflicts of interest by employing our existing subrecipient and contractor monitoring guidance and instruments.

**Subawards**
EMNRD staff will use state-developed contracting and fiscal documents and processes for encumbering project funds, tracking contracts and expenditures, and monitoring compliance with state and federal financial accountability requirements. EMNRD program support staff will monitor recipients' incremental drawdown of grant funds throughout the grant project period to ensure that only actual earned amounts are drawn. EMNRD program support staff will use the federal ASAP payment management system and the state Statewide Human Resources Accounting Reporting system, which have established risk thresholds and are designed to mitigate the risk of loss due to fraud or improper federal funds management and are designed to mitigate the risk of loss due to fraud or improper federal funds management. Invoices will be processed according to state procedures, with EMNRD staff ensuring information is accurate, reimbursement request

invoices match budgets, and accountability is established through staff review and signature. The Project Team will implement policies to reduce fraud, waste, and abuse including formal policies for program oversight, confidential reporting (e.g., whistleblower protections), and managing conflicts of interest.

**Consumer Financial Protections**

New Mexico has two main laws governing consumer protection in this case: the Distributed Generation Disclosure Act (NMSA 1978, Sections 57-31-2 through 57-31-5) and the Unfair Practices Act (NMSA 1978, Sections 57-12-1 through 26). The Project Team will work closely with the State Office of the Attorney General to monitor compliance and identify non-compliance for enforcement of these two laws.

The Distributed Generation Disclosure Act, NMSA 1978, Sections 57-31-1 et seq., requires that any agreement accompanying the financing, sale or lease of a distributed energy system, or the sale of power to a power purchaser, be accompanied by a disclosure form. The form shall include items such as a description of system design and assumptions as well as a description of performance guarantees, details of the purchase price, a description of one-time and recurring fees, and, if financing or leasing, the total amount financed and total number of payments. The Project Team will require that this form will be executed by customers and developers for all projects funded through the SFA Program.

The Unfair Trade Practices Act, NMSA 1978, Sections 57-12-1 et seq., makes unlawful any false or misleading information knowingly made in connection with the sale, lease, rental or loan of goods and services provided by licensed professionals, including during the door-to-door sale of a solar system. The primary impact of this law will be legal recourse for any entity that knowingly provides false information about SFA to prospective beneficiaries.

The program will also comply with federal consumer protection and consumer financial laws, such as laws prohibiting unfair, deceptive, and abusive practices. The Project Team will uphold program standards and processes for consumer protection. Program partners and entities such as solar contractors associated with the program will be required to abide by the standards and will receive trainings in best practices on consumer interactions.

**Timeline & Milestones**

Q4 2024 (Planning Period)
- RFP & Procurement of PTAM & FPM
- Hire 2 SFA Program Coordinators at EMNRD
- Coordinate with PRC on Community Solar Strategy (continues through Q2 of 2025)
- Stakeholder Advisory Committee (SFA SAC) Formation

- Finalize Workplan, exit planning period

Q1 2025 (Program Launch Year)
- SFA SAC Meets Monthly
- Continuous meetings with key implementation partners and other low-income and clean energy programs
- Establish Data QA & Reporting Systems with PTAM & FPM, submit QMP/QAPP
- FA Activities:
  - Integrate Household Savings Model into program implementation (continues through July 2025)
  - Integrate Financial Assistance Model into program implementation (continues through July 2025)
  - Integrate Credit Enhancements & Revolving Loan Fund into program implementation (continues through July 2025)
  - Review & revise financial accountability processes (continues through July 2025)
- TA Activities:
  - Leverage DOE Technical Assistance (continues through 2025)
  - Engage partners in program launch process (continues throughout implementation)
  - Education & Outreach begins (continues through implementation)
  - Coordinate inter-agency & program collaboration on stacking low-income/clean energy programs (continues throughout implementation)
  - Integrate Energy Storage System Strategy into program implementation (continues through Q3 2025)
  - Community Benefit Agreements (continues through Q3 2025)
  - Housing Affordability integrated into program implementation (continues through Q3 2025)
  - Resilient Assets strategy integrated into program implementation (continues through Q3 2025)

Q2 2025 (Program Launch Year)
- SFA SAC Meets Monthly
- FA Activities:
  - Community ownership strategies (continues through Q3 2025)
- TA Activities:
  - Public & community meetings (continues for rest of 2025)
  - Operations & Maintenance (continues through Q3 2025)
  - Website/online platform development (continues through Q3 2025)
  - Facilitate workforce development initiatives (continues throughout implementation)
- Q3 2025 (Program Launch Year)
- SFA SAC Meets Monthly
- FA Activities:
  - Program application open to public

- TA Activities:
  - Program application open to public

Q4 2025 (Program Launch Year)
- SFA SAC Meets Monthly
- FA Activities:
  - Coordination with Energy Coaches (continues throughout implementation)
- TA Activities:
  - Customer trainings & guidance (continues throughout implementation)
  - Solar installations & Interconnection Projects begin

2026-2029 (Program Implementation Period)
- Review, Assess, Award financial program offerings
- Complete all required reporting
- Annual program review & revisions as needed


**Reporting Requirements**

In developing this application, the Project Team enlisted the support of Rocky Mountain Institute (RMI) to capture current assumptions and model expected outputs reported in the program narrative. In partnership with PTAM, the Project Team will further calibrate assumptions, establish an appropriate baseline, and determine metrics and milestones for tracking progress. The Project Team will enlist the TA offered through the DOE for this program. EMNRD will leverage its membership in the Clean Energy States Alliance, the National Association of State Energy Officials (NASEO), and the DOE National Community Solar Partnership for technical support as available. The Project Team will engage a third-party consultant to conduct annual program evaluation activities.

<u>Performance Reports</u>

1. Semi-Annual Report

The Project Team will submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report covers activities from the preceding two quarters.

2. Final Report

At the close of NM SFA, the Project Team will submit a final report in a format conducive for immediate public consumption. The final report will contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the Project Team will detail its program strategy and plans for performance reporting under the

Closeout Agreement to include following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The Project Team will submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

3. Transaction-Level and Project-Level Data

The Project Team will submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The Project Team will submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports will cover transactions originated in the preceding two quarters.

**Budget Narrative**
**Personnel**
EMNRD has budgeted for three staff (a program manager ($85,426/year) and two program coordinators ($76,025/year) to administer the SFA Program internally with support from coalition members and contracted suppliers as indicated below. Salaries are calculated based on FY24 State Personnel Office job classification salaries, with a built-in annual cost-of-living increase of 3%, based on recent actions of the New Mexico Legislature. Total salary cost for budget period is $1,260,794.

**Fringe Benefits**
EMNRD applied an average fringe benefit rate of 32.00% to all state personnel working on SFA, for the portion of the salary that is allocable to this EPA grant. The State of New Mexico uses the approved General Services Department rates for employee benefits. The rates are determined prior to the grant period and submitted with the operating budget request to the New Mexico Legislature for approval. Fringe benefits include group

insurance, which varies based on individual coverage of employee, retirement calculated at .02%, FICA at .076% and retiree health care at .1699%. For state personnel taking leave, it will be charged based on the portion of salary allocable to the EPA grant. Total cost for budget period is $403,453.

**Travel**
Site visits and inspections
The travel budget includes in-state travel for the three staff budgeted to the program to do site visits to meet with stakeholders, conduct outreach, and to verify and monitor solar installation projects. In-state travel costs are based on six trips per month, with no more than six nights of lodging per month, six days of per diem, and 2250 miles per month. EMNRD follows the State of New Mexico's Department of Finance and Administration (DFA) Rule 2.42.2 NMAC, Regulations Governing the Per Diem and Mileage Act, NMSA 1978, Sections 10-8-1 *et seq.,* as implemented by the EMNRD Travel Policy (*OFS-112, Travel Reimbursement*).

These equate to:
Mileage: 375 miles per trip at $0.47/mile
Lodging: $150 per night based on New Mexico averages
Per diem: $60 per day based on EMNRD Travel policy
This is $2317.50 per month, or $27,810 annually, for $139,050 over the five years of the program.

Travel for national conferences and trainings
The budget also includes funding for three staff to attend technical assistance workshops, trainings, or national conferences out-of-state, but in the United States, one time per year. These workshops will have clear applicability to the program, providing training and capacity expansion for staff through focus on solar program implementation, LIDAC service, EPA grant management, etc. Specific conferences have yet to be identified. These trips are budgeted at $1,790 per trip, $5,370 annually, and $26,850 for the full budget period.

These are estimated based on:
Airfare: $800 roundtrip based on historical averages
Lodging: $250 per night with three nights per trip based on historical averages
Per diem: $60 for four days per trip based on EMNRD Travel policy

The total travel costs for the budget period are $165,900.

**Supplies**
Supplies include computers and workstations for three staff. These new computers and workstations include laptops and peripherals including monitors, keyboards, and mice for the three new staff. These are necessary to ensure compliance with IT policies and so

employees have the tools to complete their work and ensure the grant goals are met. Costs average $3,000 per workstation for $9,000 total.

Supplies also includes materials associated with outreach and education such as flyers and printouts. These printed materials will be used to facilitate outreach and engagement efforts to improve communication, take notes, and for written materials for participants to take with them. These supplies will be purchased in accordance state procurement requirements and 2 CFR 200 and will only be used for SFA grant activities. Total cost is $50,000.

Light meals and refreshments will be provided at listening sessions and for SFA SAC meetings. The project team estimates providing light meals and refreshments at ten events per year, $500 per event. The types of refreshments may include coffee, other non-alcoholic beverages, fruit, pastries or sandwiches for morning to afternoon sessions. The listening sessions include outreach activities and technical education specific to the SFA program. Attendees will be stakeholders whose understanding of the program is necessary for successful completion of grant activities, such as solar developers and DAC-serving organizations. Light refreshments and beverages will be provided during the events to encourage attendees to stay and participate. Locations will be throughout New Mexico so that stakeholders are engaged in the program in their local community. Similarly, for SFA SAC meetings light meals and refreshments may be provided so that for long sessions of feedback and program implementation, the group is focused and able to advise on the program. If meals are provided for SFA SAC sessions, the per diem that SFA SAC members receive will be reduced to reflect grant funds being used for the meal. No evening events will involve refreshments, and all refreshments will be provided during the events. These will be purchased in accordance with state procurement requirements and UGG Procurement Standards. Total cost for budget period is $25,000.


**Contractual**

Program Technical Assistance Managers and Contractors providing outreach services: these entities will be contracted with for the length of the program to provide:

1. **Education and Outreach:** The PTAM(s) will implement a marketing and outreach strategy as well as distribute materials for educating LIDAC households/MF owners/utility partners about the benefits of solar, ESS, and energy efficiency beyond utility cost savings. Educational materials will also inform customers about financing options and how to evaluate the return on investment (ROI) for their solar and ESS project. Outreach to and engagement of specific communities, including tribes, will be a key portion of this TA.
2. **Project Assessment:** The Project Team will evaluate financial and technical viability of each project for its cost-effectiveness, ROI, and utility cost savings potential. A preliminary project scope of work (SOW) and pro forma will be developed for each project to determine project viability.

3. **Project Development:** The PTAM will provide assistance to the solar (and ESS) asset owners during project development to help facility owners develop a comprehensive SOW.

4. **Support in Accessing Incentives and Financing:** The PTAM and financial services provider will facilitate access to the universe of appropriate financial and technical resources for program beneficiaries, including rebates and retrofit programs administered by EMNRD. Resources will be stacked with SFA financial assistance to increase the benefits for program participants.

5. **Contractor Selection, Oversight, and Inspections**: The PTAM will ensure that the installation meets the approved project design and is a quality install. For projects larger than one MW, the TA team will also ensure the project meets the prevailing wages and apprenticeship requirements, by the Internal Revenue Service, for accessing the higher ITC.  The PTAM will provide guidance to asset owners on factors to consider when selecting a solar contractor using criteria such as: experience; fair and reasonable pricing; crew skill set(s); health and safety procedures and record; permits and licensing; ability and record to meet timelines and emergency calls, and post-install maintenance. The PTAM will assist solar contractors in the state to understand the program requirements in order for them to participate in the program efficiently. This will include training contractors on consumer protection and best practices on consumer interaction, as well as best practices and industry standards for quality installation.

6. **O&M Training:** The PTAM will train the asset owners or their designated staff on how to operate and maintain their solar (and ESS) assets. They will provide guidance on hiring an O&M firm to ensure their assets are well-maintained and functioning properly to provide expected benefits.

7. **Facilitating Workforce Development Activities**: The PTAM and DWS will lead the engagement efforts with workforce development agencies and providers and will adjust program offerings based on the capacity and gaps within the state.

8. **Coordinating with Program Stakeholders**: The PTAM will coordinate with other state energy programs to co-deliver services, as well as coordinate with community-based organizations (CBOs), tribes, municipalities, advocates, and utilities to ensure an equitable deployment of leveraged funding throughout the state, and to create efficiencies for program deployment and project siting.

9. **Assisting in Implementation Process**: The PTAM will assist in program design and implementation activities. This includes helping to shape needed public comment and request for information sessions. Core elements of the implementation process that TA providers will need to work into program deployment include: considering land use planning and zoning requirements that impact siting strategy; incorporating climate hazards (e.g., flood zones, wildfire risks) into siting strategy; protecting critical pollinator habitats, greenspace, wetlands, and productive farmland; adopting agrivoltaics in siting strategy if relevant; using remediated brownfields for project siting; and managing permitting processes and challenges.

The Program Technical Assistance Managers contracted will have significant experience administering and implementing solar energy programs for states in order to efficiently and effectively provide these services to the SFA program.

Outreach and education contractors: These entities will be contracted with for the length of the program to develop a marketing and outreach strategy as well as materials for educating LIDAC households/MF owners/utility partners about the benefits of solar, ESS, and energy efficiency beyond utility cost savings. Educational materials will also inform customers about financing options and how to evaluate the return on investment (ROI) for their solar and ESS project. Marketing and outreach costs will only be for the SFA program. Outreach to and engagement of specific communities, including tribes, will be a key portion of this TA. The entities contracted for this will have experience delivering effective education and outreach campaigns, as well as established trust with LIDAC communities in New Mexico.

Program Technical Assistance Manager - program implementation, program administration services, technical assistance - contractor TBD - $6,975,760 across five years.

Website Development and advertising – RTS - $400,000 across five years.

Outreach services for advertising, education and translation services - contractor TBD - $1,686,000 across five years.

Outreach services for advertising, education and translation services - contractor TBD - $530,000 across five years.

Outreach services for advertising, education and translation services - contractor TBD - $377,000 across five years.

Outreach services for advertising, education and translation services - contractor TBD - $1,300,000 across five years.

For the PTAM, website development, and outreach and education contractors we anticipate contracting with six entities. Some of these contractors' tasks have a similar focus. The Project Team intends for the SFA Program to serve the diverse geographies and demographics within New Mexico, and each contractor selected will have a history of delivering benefits to different LIDAC communities in the state. Each will provide a specific area of expertise in outreach and/or technical assistance that is necessary for the successful completion of the grant activities. While they will have similar scopes of work, their tactics and designated focuses will differ and be unique to the geographies and communities they are serving. All will have demonstrated ability to complete the tasks they are expected to complete for this program and will demonstrate ability to comply with all

program requirements. All will be procured through a competitive procurement process in accordance with New Mexico procurement requirements.

Program evaluation services: $160,000 to provide program evaluation and potentially third-party quality assurance. This will be necessary to help the program continue to iterate and improve during the course of the grant. They will be procured once the program is fully up and running. The entity contracted for this will have significant experience evaluating large state solar or other energy programs.

Amplifund grant management software: $175,000 in total that will be used by the program to increase ease and efficiency of grant management by Program Staff.

Financial assistance provider: $18,000,000 to support Community Solar projects taking part in Solar for All, including enabling upgrades of known distribution infrastructure upgrades needed to guarantee development of Community Solar projects through the state program in IOU territory. The entity contracted for this will have capability and experience handling and distributing large grants.

Financial assistance provider: $71,076,473 to provide financial assistance to shared solar with or without ESS, and for enabling upgrades for those projects. This entity will develop a grant management process that fairly and efficiently determines eligibility for customers to apply for grant funding through the SFA program. They will create the financial eligibility documents and manage the application review process, then distribute grant funds to customers through contracts and other formal mechanisms, following all EPA and New Mexico laws and rules. They will provide documentation and reporting of grant funds and outputs and outcomes. The entity contracted for this will have capability and experience handling and distributing large grants, providing green loans, and providing service to LIDAC customers.

Financial assistance provider: $18,000,000 to provide financial assistance to on-site residential solar with or without ESS projects (for off-grid systems); and for enabling upgrades for those projects. This entity will develop a grant management process that fairly and efficiently determines eligibility for customers to apply for grant funding through the SFA program. They will create the financial eligibility documents and manage the application review process, then distribute grant funds to customers through contracts and other formal mechanisms, following all EPA and New Mexico laws and rules. They will provide documentation and reporting of grant funds and outputs and outcomes. The entity contracted for this will have capability and experience handling and distributing large grants, providing green loans, and providing service to LIDAC customers.

Financial assistance provider: $30,000,000 to provide financial assistance for a Revolving Loan Fund and/or other financial mechanisms. This entity will develop a financial management process that fairly and efficiently determines eligibility for customers to apply for financing through the SFA program. They will create the financial eligibility documents

and manage the application review process, then distribute funds to customers through contracts and other formal mechanisms, following all EPA and New Mexico laws and rules. They will provide documentation and reporting of grant funds and outputs and outcomes. Further, they will provide low-interest loans to LIDAC customers to guarantee at least 20 percent utility savings for the customers. The entity contracted for this will have capability and experience handling and distributing large grants, providing green loans, and providing service to LIDAC customers. This contract will result in a Revolving Loan Fund that will follow the Subawards as Part of Revolving Loan Funds term and condition. This element will be the Revolving Loan Fund to extend the impact of the Solar for All Program, as such it will generate program income which we estimate to total $6,986,250 during the project performance period. The program income will be used to generate future low-cost loans and may also function as a loan-loss reserve. Other credit enhancements are also included in these financial services.

It is not intended to award any of these contracts to consultants. All will be procured competitively in accordance with New Mexico's procurement policies, and the Project Team will follow the same procurement statutes, policies, and procedures for Federal financial assistance funds as they do for state funds.

### Other – Subawards

Subaward to the state of New Mexico's Department of Workforce Solutions: $4,500,000 to support workforce development activities and technical assistance. State law classifies interagency agreements as subawards. Through a subaward to DWS, SFA funding will be used to build on existing educational and training opportunities for solar technicians and other solar project-related careers (e.g., electricians, home energy auditors). Technical Assistance activities will include on-the-job training, pre-apprenticeship programs, apprenticeships, and business development/entrepreneurship training, with the goal of supporting good jobs with high road labor accommodations, including providing family-sustaining benefits, predictable work schedules, retirement contributions, safe working conditions, and the free and fair choice to join a union. Duration will be for the length of the grant period. The Project Team has adequate systems in place for complying with 1) 2 CFR 200.331, the subrecipient eligibility provisions of EPA's National Term and Condition for Subawards, and any program specific restrictions on subrecipient eligibility. 2) 2 CFR 200.332, Requirements for pass-through entities, as described in EPA's National Term and Condition for Subawards.

All contracts, whether for-profit or non-profit entities, will be procured according to New Mexico state requirements and be eligible subrecipients in accordance with the EPA's Subaward Policy. If a for-profit entity, they will meet the "subawards to for-profit entities" term and conditions.

### Other - Participant Support Costs

Participant support costs include stipends for participants in listening sessions and travel and participation stipends for members of the SFA SAC. The Stakeholder Advisory Committee is being formed solely to advise on the New Mexico Solar for All program.

Membership will be made up of diverse stakeholders to take part in the first-year launch process and advise on program implementation, outreach strategy, and fair process for selecting which households benefit from funding. CBOs, advocacy organizations, tribes, and local LIDAC-serving nonprofits will be recruited to participate in the advisory committee.

The goal of the Stakeholder Advisory Committee (SFA SAC) is to advise New Mexico's Solar for All (SFA) Program Team on program design, outreach strategy, and fair processes for selecting households to benefit from the program. Twenty to twenty-two stakeholders will make up the SFA SAC, meeting monthly. They will receive a stipend for their participation in the SFA SAC of $200 per meeting. Meetings will be held in various locations in New Mexico, and the stipend is for travel and participation. No equipment will be purchased with these participant support costs. Total cost for budget period is $250,000.

**Indirect Costs**
The indirect cost rate of 22.57% was approved by the U.S. Department of the Interior for salary and fringe benefits, effective July 01, 2024. EMNRD's indirect cost rate is negotiated every year. If the indirect cost rate remains the same, the estimated total indirect cost for the duration of the 5-year award is $375,620.

| Questions | Responses |
|---|---|
| Does this scope of work include conducting conferences or workshops? | No |
| Who is initiating the conference/workshop/meeting? | n/a |
| How is the conference/workshop/meeting being advertised? | n/a |
| Whose logo will be on the agenda and conference/workshop/meeting materials? | n/a |

| | |
|---|---|
| What is the percentage distribution of persons attending (I.e. % federal govt, public participants, state and local)? | n/a |
| Will there be proceedings or analysis and will the information be disseminated back to the appropriate (state/local/scientific) community? | n/a |
| Do you anticipate program income being generated from this conference/workshop/meeting including registration fees? | n/a |
| Are costs for light refreshments, meals or beverages included in the workplan or budget? | Yes |
| Will the assistance award result in the development of any copyrighted software or written materials? | No |
| Could an invention result from this project? (If yes, provide disposition instructions) | No |
| Does the project involve animal subjects? | No |
| Does the project involve collecting identical information from 10 or more people? | Yes |
| Any work outside the US included in the grant? | No |
| Does the grant involve or relate to geospatial information? Includes info identifying geographic location, or application/tools associated with such information – GPS, mapping or statistical data | Yes |

# EXHIBIT 4



## OFFICE OF MISSION SUPPORT
### WASHINGTON, D.C. 20460

August 7, 2025

<u>**MEMORANDUM**</u>

**SUBJECT:** Termination of EPA Assistance Agreement 5H-84087801 under 2 CFR 200.340

**FROM:** Devon Brown, EPA Award Official

**TO:** Benjamin Shelton, Deputy Cabinet Secretary
Energy Minerals & Natural Resources Department

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84087801 awarded to Energy Minerals & Natural Resources Department. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Zachary Lane, EPA Grant Specialist
    Bridget Kelly, EPA Project Officer
    Trevor Leuzinger, Grantee Program Manager

2

# EXHIBIT 5

State of New Mexico
## Energy, Minerals and Natural Resources Department

**Michelle Lujan Grisham**
Governor

**Melanie A. Kenderdine**
Cabinet Secretary

**Ben Shelton**
Deputy Secretary

**Erin Taylor**
Deputy Secretary

**Office of the Secretary**



From: Benjamin Shelton
Deputy Secretary
New Mexico Energy, Minerals, and Natural Resources Department
1220 South Saint Francis Drive
Santa Fe, NM 87505

To: Devon Brown, EPA Award Official
Environmental Protection Agency, OGGRFOA - Office of the Administrator
1200 Pennsylvania Ave., NW
Washington, DC 20460
Brown.Devon@epa.gov

Date: August 26, 2025 [<u>**SENT VIA EMAIL ONLY**</u>]

**Re: Wrongful Termination of EPA Assistance Agreement 5H-84087801 under 2 CFR 200.340**

Mr. Brown:

Pursuant to 2 C.F.R. 1500.15, I am writing to officially notify you that EMNRD disagrees with the attempt to terminate the subject award, as outlined in the EPA Action Official's Memorandum dated August 7, 2025.  The termination notice: (1) violates the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, rescinding unobligated balances and preserving funds already awarded to grantees; (2) violates the legally binding grant agreement awarded on July 9, 2024; (3) is entirely self-contradictory and violates federal regulations pursuant to definitions at 2 CFR 200.1; (4) provides no other valid reason for termination pursuant to 2 C.F.R. 200.341; and (5) causes irreparable harm to Americans in New Mexico.

The EPA Action Official's letter dated August 7, 2025, indicates that this termination is due to the determination that:

> *Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, **and rescinds unobligated amounts** to carry out Section 134 … As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial*

Page 2

*appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients.*

Pursuant to the definitions of "financial obligations" and "unobligated balance" at 2 CFR 200.1, this attempted termination is facially self-contradictory. Additionally, pursuant to the termination requirements at 2 CFR 200.340 (a) and the plain language of the OBBBA, the EPA may not unilaterally terminate the grant contrary to what is authorized by law – this termination is contrary to what is authorized by law, specifically the OBBBA.

The rescission of unobligated funds and repeal of granting authority under 42 U.S.C. 7434 do not give EPA the authority to terminate all legally binding Solar for All grant agreements unilaterally, nor does it allow EPA to rescind clearly obligated funds, by its own rules. Accordingly, we ask that the termination be promptly reversed and that our grant be immediately reinstated. All of the $156,120,000 of New Mexico's Solar for All grant has been fully obligated, and so this rescission should be a rescission of exactly nothing.

**We reserve the right to take any and all necessary action to pursue all remedies available to protect our legal rights in this matter**. Until our dispute with EPA has been resolved, we will also object to any claims of noncompliance under 2 C.F.R. 200.344(i).

We will take the course of action necessary to prevent irreparable and continuing harm to our employees, contractors, subrecipients, program beneficiaries, and the communities we serve. We would be happy to answer any questions you may have about this letter or our program. The point of contact for our agency, Trevor Leuzinger, can be contacted at 505-460-7706 and trevor.leuzinger@emnrd.nm.gov.

Regards,

Benjamin Shelton
Deputy Secretary, EMNRD

CC:
Zachary Lane, EPA Grant Specialist, Lane.Zachary@epa.gov
Bridget Kelly, EPA Project Officer, Kelly.Bridget@epa.gov
Phillip Schindel, Acting Director, EPA Grants Management and Business Operations Division, Schindel.Phillip@epa.gov

# EXHIBIT 6

State of New Mexico
## Energy, Minerals and Natural Resources Department

**Michelle Lujan Grisham**
Governor

**Melanie A. Kenderdine**
Cabinet Secretary

**Ben Shelton**
Deputy Secretary

**Erin Taylor**
Deputy Secretary

**Office of the Secretary**



From: Benjamin Shelton
Deputy Secretary
New Mexico Energy, Minerals, and Natural Resources Department
1220 South Saint Francis Drive
Santa Fe, NM 87505

To: Michael Molina, Disputes Decision Official
Environmental Protection Agency, OGGRFOA - Office of the Administrator
1200 Pennsylvania Ave., NW
Washington, DC 20460
molina.michael@epa.gov

Date: Sept. 4, 2025 [<u>**SENT VIA EMAIL ONLY**</u>]

**Re: Wrongful Termination of EPA Assistance Agreement 5H-84087801 under 2 CFR 200.340**

Mr. Molina:

Pursuant to 2 C.F.R. 1500.15, I am writing to officially notify you, the EPA Dispute Decision Official (DDO), that the New Mexico Energy, Minerals and Natural Resources Department (EMNRD) is submitting an official Dispute of the attempted termination of the subject award, as outlined in the EPA Action Official's Memorandum dated August 7, 2025, and the Assistance Amendment No. 5H-84087801-2, dated the same day. The termination notice and amendment: (1) violate the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, rescinding unobligated balances and preserving funds already awarded to grantees; (2) are entirely self-contradictory and violate federal regulations pursuant to what constitutes financial obligations and unobligated balances at 2 CFR 200.1; (3) violate the legally binding grant agreement awarded on July 9, 2024; (4) provide no valid reason for termination pursuant to 2 C.F.R. 200.341; and (5) cause irreparable harm to Americans in New Mexico.

This termination is arbitrary, capricious and contrary to law. EMNRD respectfully requests that EPA rescind the termination and make all obligated funds that were available in EMNRD's ASAP account as of August 6, 2025 (the day before the termination notice) available to EMNRD as expeditiously as possible.

The EPA Action Official's letter dated August 7, 2025, indicates that this termination is due to the determination that:

> *Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, **and rescinds unobligated amounts** to carry out Section 134 … As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients.*

Clearly, the rescission of unobligated funds and repeal of granting authority under 42 U.S.C. 7434 do not give EPA the authority to terminate all legally binding Solar for All grant agreements unilaterally. **Accordingly, this letter serves as EMNRD's official submission of its Dispute of this Agency Decision pursuant to 2 C.F.R. 1500 Subpart E.**

**(1) EPA's asserted grounds for termination are contrary to OBBBA 60002, rescinding unobligated balances and preserving funds already awarded to grantees.**

According to the termination memorandum, EPA terminated the Assistance Agreement under 2 CFR 200.340 because:

> *"As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All."*

However, OBBBA did not rescind the grant appropriations for Solar for All. Section 60002 authorized rescission of only the unobligated balance in the appropriations account established by 42 U.S.C. 7434:

> *SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.*

Where the plain language of a statute is unambiguous, no further analysis is required. *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (". . . when the meaning of the statute's terms is plain, our job is at an end."). Indeed, after OBBBA passed Congress, the Department of Justice wrote to the court presiding over *Climate United Fund v. Citibank, N.A.* to inform it that new legislation, if signed, would "rescind all unobligated funds appropriated for it." (Letter dated July 3, 2025, to the Clerk of the Court from Yaakov Roth, DOJ.)

Funds awarded to Solar for All grantees were obligated upon award and subject to a legally binding agreement whereby the EPA "promise[d] to spend the money, either immediately or in the future, as work under the obligation is completed."[1] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the

---

[1] "Obligation," EPA Superfund Glossary, at
https://sor.epa.gov/sor_internet/registry/termreg/searchandretrieve/glossariesandkeywordlists/search.do?details=&vocabName=Superfund%20Glossary&filterTerm=obligat&checkedAcronym=false&checkedTerm=false&hasDefinitions=false&filterTerm=obligat&filterMatchCriteria=Contains

Page 3

appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[2] In other words, the Solar for All grant funds were obligated upon award, and remained obligated when OBBBA was passed.  The OBBBA did not change this and could not have legally rescinded these obligated funding awards. To the extent that OBBBA did rescind funds set aside for EPA to administer the program, EPA has the legal flexibility to draw from other available unrestricted funds to carry out mandatory oversight.[3]

**(2) EPA's termination of EMNRD's grant violates its legal obligation under 2 C.F.R. 200.340 and the signed grant agreement, and any attempts to liquidate the remaining funds in EMNRD's ASAP account would violate our due process rights to review required by the regulations.**

The uniform grant regulations at 2 C.F.R. 200.340(a) provide the only circumstances under which the government may terminate a grant agreement, which include (a) failure to comply with the grant terms and conditions; (b) with consent of the grantee; (c) by request of the grantee; or (d) otherwise pursuant to the terms and conditions of the grant, to the extent authorized by law.

Consistent with the revised termination provision, EPA clearly and unambiguously specified all termination provisions in the terms and conditions of applicable awards, and does not allow for unilateral termination unless such provision is specifically stated in the grant terms and conditions. Our terms and conditions DO NOT allow for unilateral termination. Accordingly, any subsequent changes to the grounds for unilateral termination of an assistance agreement **must be agreed to by both EPA and the grantee.  We have not, and unequivocally DO NOT, agree to any attempts to terminate this grant award based on an erroneous, bad faith interpretation of OBBBA Section 60002. We believe that Congress intended for these funds to flow in our legally mandated award and cannot be unilaterally terminated by the executive branch.**

Further, as noted above, the plain language of the OBBBA makes it clear that this termination clearly oversteps "the extent authorized by law."

We also understand that EPA may have unlawfully pulled back funding that was still legally obligated to EMNRD. Prior to the termination notice, EMNRD's ASAP account displayed the entire obligated amount of EMNRD's award, minus EMNRD's costs through Q2 2025. On August 8th, however, I learned that EMNRD's SFA Grant had been removed from the ASAP account and no longer appeared visible. On August 18, EMNRD's SFA program had reappeared in EMNRD's ASAP account, now displaying account access as "liquidated" status, and funds appear to be available to draw down. However, the "available balance" on the account has been substantially reduced from $155,631,650.79 to $10,778,513.42. Per 2 CFR 200.344, federal agencies "must make all necessary adjustments to the Federal share of costs after closeout reports are received (for example, to reflect the disallowance of any costs or the deobligation of an unliquidated balance)" More pointedly, EPA's Notice of Termination itself references EMNRD's option to file an administrative dispute within 30 days, consistent with the due process guarantee at 2 CFR 200.342 and as detailed at 2 CFR 1500 Subpart E. <u>Liquidating our legally obligated funds without giving us the opportunity to object to this unlawful termination is not only contrary to law, but also upends decades of agency practice.</u>

This adjustment to EMNRD's account balance, which was done prior to the expiration of the 30-day dispute period detailed at 2 CFR 1500 Subpart E and prior to any actions from EMNRD to

---

[2] Grants Policy Issuance- 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds at https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf
[3] 42 U.S.C. 7434(a) provided $30,000,000 in administrative set-aside funds "[i]n addition to amounts otherwise available."

close out the award[4] violates EMNRD's right to due process and ignores its reliance interests. EMNRD reasonably relied on this funding to hire three full-time staff members. Additionally, four significant contracts to deploy funds have been completed, three more are nearing completion, and EMNRD is entering into an intergovernmental Memorandum of Agreement with the New Mexico Department of Workforce Solutions to provide workforce development for the SFA program. Without this funding, EMNRD will have to lay off or reassign staff dedicated to the program, further draining the Agency's funds for other programs, and will be unable to move forward on its commitments to fund solar deployments and workforce development – and those vendors may also in turn have to lay off numerous workers hired in anticipation of this grant.

### (3) The attempted termination undermines American energy dominance and causes irreparable harm to Americans in New Mexico

EMNRD's award continues to produce key deliverables of value to the Trump Administration and to the U.S. more generally, including this Administration's stated priorities of supporting energy independence, reducing energy costs, and protecting clean air and water, thereby reducing the cost of living.

Retail electricity prices have risen 13% since 2022, outpacing inflation,[5] and rising temperatures, extreme weather, and expanding data centers will continue to drive higher demand. The U.S. cannot meet such demand through fossil fuels alone; solar energy and battery storage is a critical piece of the American energy independence puzzle. Our Solar for All award will deploy solar and storage technology to add energy to the grid, build grid resilience, and drastically lower household energy prices for low-and-middle-income Americans in New Mexico.

Any further delays in reinstating or processing of our award will result in direct harm to residents in the Southwest, where New Mexico is uniquely situated at the nexus of three regional energy transmission grids – eg able to share its energy abundance with the rest of the country.

As noted above, EMNRD has already hired full-time staff and completed contracts worth over $143 million. Between the various programs EMNRD intends to offer using SFA funding, the Agency is expecting to serve 24,000 low-income households, reducing electrical bills by 20% for participants; install 40 megawatts (MW) of new residential solar generation capacity; and install 38 MW of new Community Solar generation capacity. With the loss of SFA funding, EMNRD will no longer be able to offer grants for shared solar projects, grants to offset interconnection upgrade costs for Community Solar projects, no-cost solar installations for low-income households, storage to increase resilience, upgrades for roof replacement and/or electrical work, or no-interest loans to install solar and energy storage.

A premature end of SFA funding would also harm EMNRD and the State of New Mexico as an employer. EMNRD used SFA funding to hire three staff, signed four contracts with vendors, and is in negotiations with another three vendors. Without this funding, EMNRD will have to reroute funding and move staff to other projects, may have to lay off staff, and will have to reduce or terminate contracts with vendors who also had hired staff.

Perhaps especially galling, this move to terminate SFA directly reverses the State's efforts to be the best fiscal steward of federal taxpayer monies possible. To stretch SFA dollars, EMNRD is planning to combine the SFA grants with other financial instruments, such as interest rate buydowns, loan loss reserves, and forgivable loans, thus initiating and developing a clean energy

---

[4] To be clear, because EMNRD disputes the termination of its Solar for All funding, the agency is not taking any steps to close out the award.
[5] U.S. Energy Information Administration, "U.S. electricity prices continue steady increase," May 14, 2025, at https://www.eia.gov/todayinenergy/detail.php?id=65284.

finance ecosystem much needed by the state, one of the poorest in the nation. That ecosystem, kicked off by SFA, will go on to have outsize impact on the state, unleashing our energy future with further "stacking and braiding" and unlocking business opportunities. Thus these "partner" programs will also be harmed by this termination:

    a. **United States Department of Energy** (DOE) Home Efficiency Rebates and Home Electrification and Appliance Rebates,

    b. **United States Department of Energy** Loan Programs Office funding (on combined energy efficiency Solar Single-Family and Multi-Family projects)

    c. **United States Department of Energy** Weatherization Assistance Program funding.

    d. **United States Department of Housing and Urban Development** (HUD): Green and Resilient Retrofit Program (on Multi-Family projects).

    e. **United States Environmental Protection Agency** (EPA): Greenhouse Gas Reduction Fund National Clean Investment Fund and Clean Communities Investment Accelerator, Environmental and Climate Justice Block Grants, and Climate Pollution Reduction Grants.

    f. **Electric utility** rebate program funding.

    g. **United States Department of Agriculture** (USDA) Rural Electric Services: Powering Clean Energy Program (PACE) and Empowering Rural America (New ERA), (for Community Solar projects in rural communities).

    h. **New Mexico Indian Affairs Department** (IAD) funding dedicated to providing cost share for tribal energy and grant projects.

    i. **Community Reinvestment Act funding** from banks for grants or low-cost financing.

    j. **Low-Income Housing Tax Credit** for Multi-Family Affordable Housing developments.

    k. Low-interest financing (loans and leases) from various sources including **Community Development Financial Institutions (CDFIs), green banks, credit unions**, etc.

    l. **New Mexico's Community Energy Efficiency Development** (CEED) program which provides funding for low-income households to receive energy efficiency upgrades.

    m. **United States Department of Energy** Energy Efficiency Community Block Grant, which is the federal analog to CEED.

EMNRD has complied with all grant terms and conditions and were achieving all the deliverables and activities within the agreed-upon scope of work, working to unleash American energy in the Southwest United States.

Given that no valid grounds for this termination exist, and EPA does not point to any in the Termination Notice or Memorandum or provide any other valid justification, such termination is arbitrary and capricious and contrary to law. EPA must follow the law, rescind this unlawful termination, and restore EMNRD's access to our obligated funds to complete crucial solar and storage deployment projects in underserved communities to add energy to the grid and significantly lower household energy prices for low-and-middle-income New Mexicans.

The rescission of unobligated funds and repeal of granting authority under 42 U.S.C. 7434 do not give EPA the authority to terminate all legally binding Solar for All grant agreements unilaterally, nor does it allow EPA to rescind clearly obligated funds. Accordingly, we ask that the termination be promptly reversed and that our grant be immediately reinstated.

**We reserve the right to take any and all necessary action to pursue all remedies available to protect our legal rights in this matter and to prevent irreparable and continuing harm to our employees, contractors, program beneficiaries and the communities and people we**

**serve**. Until our dispute with EPA has been resolved, we will also object to any claims of noncompliance under 2 C.F.R. 200.344(i).

We would be happy to answer any questions you may have about this letter or our program. EMNRD's designated point of contact for this Dispute is Trevor Leuzinger, who can be contacted at 505-460-7706 and trevor.leuzinger@emnrd.nm.gov.

Regards,

Benjamin Shelton
Deputy Secretary, EMNRD

**CC:**
Devon Brown, EPA Award Official, Brown.Devon@epa.gov
Zachary Lane, EPA Grant Specialist, Lane.Zachary@epa.gov
Bridget Kelly, EPA Project Officer, Kelly.Bridget@epa.gov
Phillip Schindel, Acting Director, EPA Grants Management and Business Operations Division, Schindel.Phillip@epa.gov

# EXHIBIT 7

| From: | SFA |
|---|---|
| To: | SFA |
| Subject: | [EXTERNAL] Solar for All Grant Closeout Instructions |
| Date: | Wednesday, October 1, 2025 2:21:17 PM |

> CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425)

**Submission Instructions**:

- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:

- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of

the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

- ○ If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance during the entire performance period (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - ○ In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - ○ Progress towards objectives on program key performance metrics during the performance period.
  - ○ Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - ○ Geographic coverage of financial assistance and project-deployment technical

assistance deployed during the performance period.
  ○ Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  ○ *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 8



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 28, 2025

**MEMORANDUM**

**SUBJECT:**     Update on Dispute of EPA Assistance Agreement 5H-84087801 under 2 CFR 200.340

**FROM:**     Michael D. Molina, Principal Deputy Assistant Administrator
        Grants Dispute Decision Official

**TO:**     Trevor Leuzinger, Solar for All Program Manager
        New Mexico EMNRD

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84087801. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 26, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency