EXHIBIT 1
*Initial Assistance Agreement*
(July 9, 2024)

5H - 84088901 - 0    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | **GRANT NUMBER (FAIN):** 84088901<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5H | **DATE OF AWARD**<br>07/09/2024 |
|---|---|---|---|
| | | **TYPE OF ACTION**<br>New | **MAILING DATE**<br>07/12/2024 |
| | | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>20007 |

| **RECIPIENT TYPE:**<br>State | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| NEW YORK STATE ENERGY RESEARCH & DEVELOPMENT AUTHORITY<br>17 COLUMBIA CIRCLE<br>ALBANY, NY 12203-6399<br>EIN:  14-1731395 | NEW YORK STATE ENERGY RESEARCH & DEVELOPMENT AUTHORITY<br>17 COLUMBIA CIRCLE<br>ALBANY, NY 12203-6399 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Max Joel<br>17 COLUMBIA CIRCLE<br>ALBANY, NY 12203<br>**Email:** max.joel@nyserda.ny.gov<br>**Phone:** 917-539-4405 | Kelley Moore<br>1200 Pennsylvania Ave NW, 1101R<br>Washington, DC 20460<br>**Email:** Moore.Kelley@epa.gov<br>**Phone:** 212-637-3265 | Robin Holder<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>**Email:** Holder.Robin@epa.gov<br>**Phone:** 202-564-1532 |

**PROJECT TITLE AND DESCRIPTION**

New York State EPA Solar for All Application: " Note a special payment condition applies to this award."

See Attachment 1 for project description.

| **BUDGET PERIOD**<br>09/01/2024 - 08/31/2029 | **PROJECT PERIOD**<br>09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 0.00 | **TOTAL PROJECT PERIOD COST**<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 249,800,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,800,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY ||
|---|---|
| Digital signature applied by EPA Award Official for LaShaun Phillips - Associate Award Official<br>by LaShaun Phillips - Award Official Delegate | **DATE**<br>07/09/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 249,400,000 | $ 249,400,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 249,800,000 | $ 249,800,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41024 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 249,400,000 |
| | | | | | | | | | $ 249,400,000 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ____0.00 % Federal ____0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 249,800,000 |
| 15. Total EPA Amount Awarded To Date | $ 249,800,000 |

## Attachment 1 - Project Description

"Note: A special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

#### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

<u>B. Cybersecurity Condition</u>

<u>*The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition*</u>:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

#### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

#### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

<u>2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs</u>

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See <u>EPA Guidance on Participant Support Costs</u>

**K. Labor and Equitable Workforce Development Requirements**

<u>1. Davis-Bacon and Related Acts (DBRA)</u>

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

> **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

> **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

### 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the [EPA Build America, Buy America General Term and Condition](), which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** [EPA's Final Financial Assistance Conflict of Interest Policy](#) **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

**with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).**

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

### 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

### 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.
This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

### 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

### 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

**AA. Compliant URL Links**

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

**AB. Flow-Down Requirements**

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

#### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

#### 2. Governance Requirements

#### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

EXHIBIT 2
*Assistance Agreement, Modification 1*
(December 4, 2024)

5H - 84088901 - 1    Page 1

| ![EPA Logo] U.S. ENVIRONMENTAL PROTECTION AGENCY  Assistance Amendment | GRANT NUMBER (FAIN): 84088901  MODIFICATION NUMBER: 1  PROGRAM CODE: 5H | DATE OF AWARD 12/04/2024 |
|---|---|---|
| | TYPE OF ACTION No Cost Amendment | MAILING DATE 12/04/2024 |
| | PAYMENT METHOD: ASAP | ACH# 20007 |

| RECIPIENT TYPE: State | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT: | PAYEE: |
| NEW YORK STATE ENERGY RESEARCH & DEVELOPMENT AUTHORITY 17 COLUMBIA CIRCLE ALBANY, NY 12203-6399 EIN: 14-1731395 | NEW YORK STATE ENERGY RESEARCH & DEVELOPMENT AUTHORITY 17 COLUMBIA CIRCLE ALBANY, NY 12203-6399 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Max Joel 17 COLUMBIA CIRCLE ALBANY, NY 12203 Email: max.joel@nyserda.ny.gov Phone: 917-539-4405 | Kelley Moore 1200 Pennsylvania Ave NW, 1101R Washington, DC 20460 Email: Moore.Kelley@epa.gov Phone: 212-637-3265 | ThuyT Nguyen 1200 Pennsylvania Ave, NW 3903R Washington, DC 20460 Email: Nguyen.ThuyT@epa.gov Phone: 202-564-5312 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

New York State EPA Solar for All

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD 09/01/2024 - 08/31/2029 | PROJECT PERIOD 09/01/2024 - 08/31/2029 | TOTAL BUDGET PERIOD COST $ 249,800,000.00 | TOTAL PROJECT PERIOD COST $ 249,800,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,800,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official LaShaun Phillips - Associate Award Official | DATE 12/04/2024 |

5H - 84088901 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 249,400,000 | $ 0 | $ 249,400,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 249,800,000 | $ 0 | $ 249,800,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I) <br><br> Clean Air Act: Sec. 134(a)(1) <br><br> 2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84088901 - 1     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 4,935,408 |
| 2. Fringe Benefits | $ 3,398,030 |
| 3. Travel | $ 10,000 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 160,165,780 |
| 7. Construction | $ 0 |
| 8. Other | $ 74,172,500 |
| 9. Total Direct Charges | $ 242,681,718 |
| 10. Indirect Costs: 51.97 % Base MTDC | $ 7,118,282 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 249,800,000 |
| 12. Total Approved Assistance Amount | $ 249,800,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 249,800,000 |

## Administrative Conditions

## A. GENERAL TERMS AND CONDITIONS

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. CORRESPONDENCE CONDTION

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. INTERGOVERNMENTAL REVIEW PERIOD

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. PRE-AWARD COSTS

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. NEW RECIPIENT TRAINING REQUIREMENT

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/032024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or

requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such

Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not

"profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in

the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as

determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the [EPA Build America, Buy America General Term and Condition](#), which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

> 1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

> 2. Privately-owned commercial buildings when they meet the "public function" test;

> 3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply [EPA's Final Financial Assistance Conflict of Interest Policy](#) to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

EXHIBIT 3
*Work Plan*

**Greenhouse Gas Reduction Fund**

**Solar for All**

**New York State Solar for All Program Work Plan**

*Project Period: 9/1/2024-8/31/2029*

**Project Title: New York State Solar for All**

**Grant Number:** 84088901

**Organization Name: New York State Energy Research and Development Authority (NYSERDA)**

**Geography: The State of New York**

## Table of Contents

Description ......................................................................................................................................... 3

Linkage to U.S. EPA's Strategic Goals: .......................................................................................... 3

Outputs and Outcomes ...................................................................................................................... 3

Definition of Low-Income and Disadvantaged Communities ........................................................ 4

Work Plan Activities .......................................................................................................................... 4

    **Section 1: NYSERDA Administered Programs**: .......................................................................... 4

        1.    NYSERDA Residential-Serving Community Solar Financial Assistance ........................... 4

        1.1.    Energy Assistance Program (EAP) + Community Solar .......................................... 4

        1.2.    Inclusive Community Solar ....................................................................................... 7

        2.    NYSERDA Single-Family Residential Financial Assistance and Financing Solutions ..................... 9

        3.    Technical Assistance to Housing Agencies and Providers .......................................... 11

        4.    Financial Assistance for NYC Affordable Housing ..................................................... 12

        5.    On-The-Job Training .................................................................................................. 15

    **Section 2: Subrecipients Administered Programs** .................................................................. 17

        1.    City of New York (NYC) Subgrant: Public Solar NYC ................................................ 17

        2.    New York State Homes and Community Renewal (HCR) Subrecipient ..................... 24

Strategy to Increase Resiliency and Grid Benefits Utilizing Energy Storage ............................... 28

Project-Deployment Technical Assistance Strategy ...................................................................... 29

Equitable Access and Meaningful Involvement Plan .................................................................... 30

Fiscal Stewardship Plan .................................................................................................................. 32

Budget Narrative .............................................................................................................................. 34

    Personnel ...................................................................................................................................... 34

    Fringe Benefits ............................................................................................................................. 35

    Travel ........................................................................................................................................... 36

    Equipment .................................................................................................................................... 36

    Supplies ........................................................................................................................................ 36

    Contractual ................................................................................................................................... 37

    Other ............................................................................................................................................ 40

    Additional Items ........................................................................................................................... 41

Timeline and Milestones ................................................................................................................. 42

# Description

The New York State Energy Research & Development Authority (NYSERDA) will utilize the United States Environmental Protection Agency (EPA) Solar for All award to enhance New York State's existing portfolio of highly successful and effective solar deployment, technical assistance, and workforce development programs for the benefit of over 6.8 million residents that live in low-income and disadvantaged communities (LIDACs). Subgrantee agencies "New York State Housing Finance Agency ("HFA"), a public benefit corporation under the umbrella of New York State Homes and Community Renewal ("HCR"), HFA and HCR will collectively be referred to as HCR, and New York City Department of Environmental Protection (DEP), and partner agency New York City Housing Preservation & Development (HPD), will also implement new programs that target specific barriers to solar deployment for this population.

## Linkage to U.S. EPA's Strategic Goals

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
Goal 1: Tackle the Climate Crisis
    Objective 1.1: Reduce Emissions that Cause Climate Change

## Outputs and Outcomes

The table below summarizes the budgets, outputs, and outcomes of activities to be supported by New York's EPA Solar for All award:

| Program | SFA Budget ($ million) | % of Total Budget | MW Solar Deployment | Households Served | Lifetime Household Benefits ($ million) | Annual Avoided CO2 Emissions (Tons)^ | Jobs Created* |
|---|---|---|---|---|---|---|---|
| NYSERDA Resident-Serving Community Solar Incentives | $107.7 | 43.1% | 242.4 | 48,473 | $142.6 | 197,480 | 2,554 |
| NYSERDA Single-Family Residential Solar Incentives** | $15.0 | 6.0% | 8.9 | 1,182 | $16.8 | 4,250 | 304 |
| NYSERDA Multifamily Affordable Housing Solar Incentive** | $18.8 | 7.5% | 3.1 | 5,000 | $18.2 | 1,580 | 77 |
| Technical Assistance to Housing Agencies and Providers, Workforce Development and Administrative | $34.5 | 13.8% | N/A | N/A | N/A | N/A | N/A |
| New York City Mayor's Office of Climate Equity and Justice (MOCEJ) - Public Solar NYC (subgrant)*** | $37.5 | 15.0% | 8.0 | 3,950 | 21 | 4,060 | 197 |
| New York State Division of Housing and Community Renewal (HCR) - Affordable Housing (subgrant)*** | $36.3 | 14.5% | 7.6 | 12,091 | $25.0 | 3,890 | 188 |
| **Total** | **$249.8** | **100.0%** | **270.0** | **70,696** | **$223.3** | **211,260** | **3,320** |
| Total Enabling Upgrade Funding | $15.0 | 6.0% | | | | | |
| Total Financial Assistance | $210.7 | 84.4% | | | | | |
| ^ Estimated using EPA's AVERT tool. | | | | | | | |
| * Estimated using NREL Jobs and Economic Development Impact (JEDI) Model for photovoltaics. | | | | | | | |
| ** Includes enabling upgrade funding. | | | | | | | |
| *** Includes non-project funding (tech assistance/admin/outreach). | | | | | | | |

## Definition of Low-Income and Disadvantaged Communities

As described in the Work Plan Activities section below, NYSERDA will use each of the four definitions of low-income and disadvantaged communities (LIDACs) included in the EPA Solar for All Notice of Funding Opportunity:

1. CEJST-Identified Disadvantaged Communities
2. EJScreen-Identified Disadvantaged Communities
3. Geographically Dispersed Low-Income Households
4. Properties Providing Affordable Housing

Different program activities may utilize one or more of these definitions for purposes of participant eligibility, and for some activities NYSERDA may focus on the subset of LIDAC definitions 1 and 2 (geographically-defined LIDACs) that also correspond with New York's designated Disadvantaged Communities ( see www.nyserda.ny.gov/ny/Disadvantaged-Communities).

Where EPA-funded activities use participation in another program as the basis to verify income (e.g. WAP, LIHEAP), the program will conform with the 'Low-income' definition in the Solar for All terms and conditions.

## Work Plan Activities

### Section 1: NYSERDA Administered Programs:

1. NYSERDA Residential-Serving Community Solar Financial Assistance

- **Definition of Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW nameplate capacity, that delivers at least 50% of the power generated from the system to multiple residential customers within the same utility territory as the facility.

**Budget: $122.4 million**

#### 1.1. Energy Assistance Program (EAP) + Community Solar

- **Implementation Activity or Planning Activity:** Implementation
- **Activity Type:** Financial Assistance for Residential-Serving Community Solar
- **Definition(s) of LIDAC Used:**
    - Geographically Dispersed Low-Income Households

**Description:**

NYSERDA will implement Energy Assistance Program (EAP) + Community Solar as a modified version of the successful "Expanded Solar for All" program that is currently providing utility bill credits to approximately 168,000 low-income households in Upstate New York.  EAP + Community Solar provides community solar and associated guaranteed bill savings to all customers participating in a utility's Energy Affordability Program, which is a utility bill discount program for low-income (Low Income Home Energy Assistance Program (LIHEAP)-eligible) households that is administered by each of New York's

utilities. EPA Solar for All funds will be used to fund additional projects with deeper household savings than would otherwise be possible.

Individual community solar projects will enroll in the program through a standard offer process, and enrolled projects will commit to dedicating their entire solar generation, and the associated community solar credits, to the program. The utility administers the program, compensating project owners and then directly distributing the community solar credits to all customers enrolled in the EAP program. The community solar project owners are not responsible for any acquisition or management of participating customers, which significantly reduces program costs and maximizes household energy cost savings to low-income participants over the full 25-year life of the project. As more projects enroll and are constructed over time, the total monthly cost savings delivered to each participating household will continue to grow.

In May 2024, New York's Public Service Commission authorized the expansion of the program to all of the State's investor-owned utilities, with the "Statewide Solar for All" program anticipated to provide regular monthly bill credits to approximately 800,000 low-income households. (Note: while the "Solar for All" name has been used to describe this program model in New York since 2017, to avoid confusion in this Work Plan this program model will be referred to as EAP + Community Solar.)

With EPA Solar for All funds:

- NYSERDA will present a standard offer contract to qualified solar developers who have been approved via the existing NY-Sun Participating Contractor Program Opportunity Notice procurement process. These incentives are set based on NYSERDA's analysis of the additional project funding needed for a project to be constructed and deliver the required benefits. This analysis includes projections of capital expenses, such as interconnection and equipment costs, ongoing operations and maintenance costs, revenue from the generation of electricity, and other factors.

- The incentive will be offered on a "per Watt" basis, paid to the project developer upon project completion and enrollment in the applicable utility's EAP + Community Solar program.

- Projects will be eligible to secure an incentive contract after reaching project development maturity requirements, and before entering commercial operation.

- To secure the incentive, a project must contractually commit to:

  - Enrollment in the applicable utility's EAP + Community Solar program upon completion.

  - Dedication of all of the project's generated electricity for 25 years to the EAP + Community Solar program.

  - For projects receiving EPA Solar for All funding, a minimum of 20% of the monetary value of the generation going to the program's customer savings pool.

- The monetary value contributed to the customer savings pool will be distributed by the utility to participating LIDAC households in the form of monthly electricity bill credits.

- The project developer (or ownership entity) will be responsible for the operations and maintenance of the project over its full lifecycle, with the 25-year Value Stack tariff compensation based on continued electricity generation. At the end of the project lifecycle, the owner will be responsible for repowering, decommissioning, and/or recycling system components as applicable.

**References:**

- Statewide Solar for All Public Service Commission Order: https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={D02B828F-0000-C01A-8E42-33080180CDA9}

**Meaningful Benefits:**

The minimum 20% household savings requirement will be calculated using the existing EAP + Community Solar program rules and method as described above (i.e., a minimum of 20% of the monetary value of all generation from each incentivized project will go to the customer savings pool), which also complies with the federal Low Income Communities Bonus Tax Credit Category 4 methodology. For clarity, this means that 20% of the monetary value of *100%* of all generation from each project will be dedicated to household savings, yielding twice the total household savings compared to the minimum Solar for All requirement (i.e., based on 50% of generation).

The process for the calculation and distribution of benefits from EAP + Community Solar is detailed in the Statewide Solar for All Public Service Commission Order and associated program documents and utility tariffs. It is summarized below, with the term "Customer Share" maintained from the Order and indicating household savings:

1) Projects participating in the program will inject their generation into utility service territory's systems;

2) The utility will calculate the Value Stack credits associated with a participating project's generation using its existing Value Stack tariff;

3) The Value Stack credits will be split into three portions:

   a) a Customer Share to be used for participating customers' benefit, based on that project's compensation level. For projects receiving Solar for All funds the Customer Share will be no less than 20% of the project's compensation level;

   b) a Utility Administrative Fee; and

   c) the remainder, which will be paid directly to the project owner.

**Reporting:**

- The "Statewide Solar for All" Public Service Commission Order establishes a process for projects and utilities to report total electric generation, total monetary value contributed to the customer pool, and total number of eligible households participating in the program. NYSERDA will utilize these data sources for grant reporting.

**Education and Outreach:**

NYSERDA will partner with the utility administrators of the EAP program for education and outreach to eligible customers. These activities will not be funded by the EPA Solar for All grant.

### 1.2. Inclusive Community Solar

- **Implementation Activity or Planning Activity:** Implementation
- **Activity Type:** Financial Assistance for Residential-Serving Community Solar
- **Definition(s) of LIDAC Used:**
  - CEJST-Identified Disadvantaged Communities
  - EJScreen-Identified Disadvantaged Communities
  - Geographically Dispersed Low-Income Households
  - Properties Providing Affordable Housing

**Description:**

- The Inclusive Community Solar program will be implemented as a modified version of NYSERDA's existing Inclusive Community Solar Adder using the existing NY-Sun program implementation infrastructure.
- NYSERDA will present a standard offer incentive contract to qualified solar developers who have been approved via the existing NY-Sun Participating Contractor Program Opportunity Notice procurement process. These incentives are set based on NYSERDA's analysis of the additional project funding needed for a project to be constructed and deliver the required benefits. This analysis includes projections of capital expenses, such as interconnection and equipment costs, ongoing operations and maintenance costs, revenue from the generation of electricity, and other factors.
- The incentive will be offered on a "per Watt" basis, paid to the project developer in three annual payments beginning with project completion.
- Projects will be eligible to secure an incentive contract after reaching project development maturity requirements, and before entering commercial operation.
- The incentive payment amount will be adjusted based on the project's actual performance in serving LIDAC households with the minimum 20% household energy savings for a minimum of 50% of dedicated project capacity.
- Higher incentive rates will be offered to projects that meet the Community Benefits requirements, with the existing Inclusive Community Solar Adder Community Benefits criteria to be adjusted over time based on community stakeholder input.

- The project developer (or ownership entity) will be responsible for the operations and maintenance of the project over its full lifecycle, with the 25-year Value Stack tariff compensation based on continued electricity generation. At the end of the project lifecycle, the owner will be responsible for repowering, decommissioning, and/or recycling system components as applicable.

**References:**

Inclusive Community Solar Adder program website: https://www.nyserda.ny.gov/icsa

Summary of Community Solar crediting process under NY regulations: https://www.nyserda.ny.gov/All-Programs/NY-Sun/Contractors/Resources-for-Contractors/Community-Solar

**Meaningful Benefits:**

- Minimum 20% household savings for LIDAC households who enroll in community solar subscriptions with projects receiving incentive funds.

- NYSERDA will use the existing Inclusive Community Solar Adder methodology to calculate % household energy savings, which requires each community solar subscription to contractually guarantee a minimum 20% discount on the monetary value of the community solar credits placed on the household's utility bill per the process defined in New York's community distributed generation regulations, with total credit allocation sized to the household's annual net electricity costs.

    - For households billed through New York's net crediting mechanism, the household savings rate is the same as the net credit rate, which will be required to be set at no less than 20% for households served by projects receiving incentive funds.

For households that receive a separate bill from the community solar provider, the household savings rate is calculated by starting with the value of the community solar bill credits distributed to the household, subtracting all payments made by the household, and then dividing that difference by the value of the bill credits distributed to the household. This rate must be no less than than 20% for households served by projects receiving incentive funds.**Reporting:**

- Using the existing NY-Sun implementation infrastructure and Inclusive Community Solar Adder reporting process, each project receiving incentive funds will, upon completion and for two subsequent years, submit household-level reporting, verified by documentation provided by the utility (Utility Host Statements), documenting performance of the program requirements and savings delivered to LIDAC households.

**Education and Outreach:**

NYSERDA will apply the existing Inclusive Community Solar Adder marketing and education requirements, which may be modified in response to program experience and stakeholder feedback, to projects receiving funding. These include requirements for clear, accessible, and culturally appropriate materials.

2. NYSERDA Single-Family Residential Financial Assistance and Financing Solutions

- **Implementation Activity or Planning Activity:** Planning
- **Activity Type:** Financial Assistance for Rooftop Residential Solar
- **Budget:** $15,000,000 (Planning Period)
- **Definition(s) of LIDAC Used:**
    - CEJST-Identified Disadvantaged Communities
    - EJScreen-Identified Disadvantaged Communities
    - Geographically Dispersed Low-Income Households
    - Properties Providing Affordable Housing

**Description:**

During the planning period, NYSERDA will continue to explore and assess new financial assistance program options and financial solutions that can both address market gaps in serving LIDACs and be effectively administered within the Solar for All grant structure. These solutions may include:

Rooftop Residential Solar Incentive

- This program will provide incentives in the form of grant funding for LIDAC homeowners to install rooftop solar and, where necessary, implement enabling upgrades. The program will include a pre-qualification process for solar installers to ensure that participating installers will deliver 20% household energy savings and have effective marketing and customer acquisition strategies.
- This program will be coordinated with the NYSERDA-funded battery storage programs described in the "Strategy to Increase Resiliency and Grid Benefits Utilizing Energy Storage" section.

Revolving Loan Fund

- This program will provide affordable direct lending products targeting 1-4 family residential properties in LIDACs to create a revolving fund, mirroring aspects of New York's existing Green Jobs Green NY residential energy loan program in which loans are repaid out of household energy savings. Transaction sizes will be estimated during the planning period.

Loan Loss Reserve Fund (LLR)

- This program will provide credit enhancements to residential rooftop solar and residential-serving community solar investments, as well as community lending institutions (Community Development Financial Institutions, Credit Unions, regional and local banks and other specialized lenders) with solar financing products that serve LIDACs.
- Solar for All funding will be used as a reserve to provide partial portfolio loss coverage to lenders in case of a customer defaults on a loan, lease, or energy services agreement (ESA) for a specified period, as provided in the applicable loan, lease or ESA transaction documentation.
- As portfolio loans mature or are prepaid, the principal balance of the loan portfolio decreases which in turn frees up a portion of the LLR. This capital in the reserve could then be recycled, either into the same transaction which would effectively allow the lender to increase the size of its original loan portfolio, or to be utilized to support new loan portfolios from different lenders.

Tax Credit Transferability and Direct Pay Bridge Loan Fund

- This program will offer below-market interest rate bridge loans to eligible project developers and property owners, providing the necessary funding at the start of construction and until receipt of the purchase price under the tax credit transfer or direct pay agreement. It may include technical assistance for the transfer or direct pay of tax credits, and the development of credit transfer agreements.

**References:**

Green Jobs Green NY program website: https://www.nyserda.ny.gov/All-Programs/Green-Jobs-Green-New-York

**Meaningful Benefits:**

- Minimum 20% household savings for LIDAC households who install solar projects that utilize potential financial assistance and/or financing solutions.

**Reporting:**

- NYSERDA will develop specific metrics and procedures to collect and report required project-level data for any financial assistance programs/products developed.

**Education and Outreach:**

- NYSERDA will engage solar installers, potential financing partners and other stakeholders to identify program options, market gaps and assess potential financing solutions.

3. Technical Assistance to Housing Agencies and Providers

- **Implementation Activity or Planning Activity:** Implementation Activity
- **Activity Type:** Technical Assistance
- **Budget:** $6,375,750 (Subset of Technical Assistance, Workforce Development, and Administration budget in Outputs Table above)
- **Definition(s) of LIDAC Used:**
  - Properties Providing Affordable Housing

**Description:**

NYSERDA will competitively procure technical assistance to support the EPA-funded Solar for All activities to be undertaken by HCR and HPD, as described in the "Financial Assistance for NYC Affordable Housing" and "New York Homes and Community Renewal (HCE) Subgrant" Work Plan Activities detailed below. HCR and HPD will deploy EPA-funded financial assistance directly to their portfolios and pipelines of regulated affordable housing, adding solar to existing funding programs that construct and preserve affordable housing in New York.

In support of the deployment of these activities, NYSERDA will procure technical assistance provider(s) to work directly with HCR and HPD. The technical assistance provider(s) will provide services to HCR and HPD including:

- Direct Agency Technical Assistance – Assist with program design during the planning period, train agency staff, produce program materials, tools and public facing documents.
- Pipeline Building – Assist with identifying potential projects, conducting outreach, screening applications and making final project selections.
- Project Support – Providing selected projects with ongoing support through the design and installation of solar systems, including assistance with EPC selection and equipment selection.
- Reporting and Compliance – Assist with tracking key impact metrics and ensuring compliance with EPA terms and conditions.

**Meaningful Benefits:**

- The technical assistance provider(s) will support the delivery of the meaningful benefits outlined in "Financial Assistance for NYC Affordable Housing" and "New York Homes and Community Renewal (HCE) Subgrant" Work Plan Activities.

**Education and Outreach:**

- HPD and HCR will work with the technical assistance provider(s) to conduct trainings for internal staff and external partners to build awareness of the program opportunity and identify potential projects.

4. Financial Assistance for NYC Affordable Housing

- **Implementation Activity or Planning Activity:** Planning Activity
- **Activity Type:** Financial Assistance for Affordable Housing
- **Budget:** $18,771,750 (Anticipated over five years)
- **Definition(s) of LIDAC Used:**
    - Properties Providing Affordable Housing

**Description:**

HPD and NYSERDA will partner to deploy Solar for All programs directly to HPD's portfolios of regulated affordable housing, adding solar to existing funding programs that construct and preserve affordable housing across New York City. NYSERDA and HPD will deploy funds as incentive (grant) contracts to qualified solar installers through NYSERDA's existing NY-Sun program infrastructure.

NYSERDA and HPD will implement specific contract requirements and payment milestones to better serve the affordable housing market. Enabling upgrades for eligible measures, such as roof repairs and electrical panel upgrades needed to implement solar, will not exceed 20% of financial assistance.

NYSERDA and HPD will utilize the planning period to fully develop the "HPD Strategies" below and will conduct the following activities:

- Procure Technical Assistance provider(s) with NYSERDA (see related Activity 1.4 above).
- Conduct stakeholder engagement with housing agency staff and market participants.
- Develop and complete design of Solar for All financial assistance to affordable housing.
- Streamline the solar consent process for HPD asset managed properties.
- Begin screening portfolios of affordable housing for solar suitability and owner interest.

**HPD Strategies (to be assessed and refined during the planning period):**

Standalone/ Mid-Cycle Solar Projects: NYSERDA and HPD will deploy financial assistance, as well as the technical assistance described in Activity 1.3, to qualified HPD buildings that are not otherwise implementing capital upgrades, including hard-to-serve multifamily low-income cooperatives and non-profit rental buildings. Financial assistance will be sized to maximize the benefits to building residents where the cost of borrowing reduces the benefit, and to address the challenge of securing loans for affordable housing.

1-4 Family Projects: HPD's HomeFix Program serves low income 1-4 family homes, primarily located in Disadvantaged Communities. These projects will be screened for solar suitability, and if deemed eligible for Solar For All, will be designed to be "solar ready" such that they can install solar through Solar For All.

Multifamily Development Pipelines: HPD and NYSERDA will deploy Solar for All financial assistance to affordable housing projects moving through the agency's existing federally-funded development pipelines that meet Solar for All program requirements.

**References:**

- Development Pipelines: HPD and NYSERDA will deliver support in a similar fashion to the REDi: EB program: http://www.nyc.gov/site/hpd/services-and-information/redi.page
- HPD's Solar Where Feasible model: https://www.nyc.gov/site/hpd/services-and-information/solar-where-feasible.page
- NYSERDA's NY-Sun Solar Program: https://www.nyserda.ny.gov/All-Programs/NY-Sun
- Low-Income Communities Bonus Credit Program: https://www.energy.gov/justice/low-income-communities-bonus-credit-program

**Meaningful Benefits:**

<u>Minimum 20% Household Savings</u>

Through Solar for All, NYSERDA and HPD will serve a wide variety of regulated affordable housing types and ownership structures, which require a targeted approach to delivering household savings. HPD will deploy strategies based on housing type (single versus multifamily), ownership structure (co-op versus rental), and metering structure (tenant versus master metered). HPD will deploy approaches that maximize benefits, ensure housing affordability and resident savings.

HPD and NYSERDA will fully develop the meaningful benefits plan during the planning phase, but anticipate the following strategies to be deployed during program implementation:

- For all projects, HPD will require that building owners sign benefits agreements. HPD will reserve the right to audit owners to ensure that the benefits agreement is being carried out.

- Direct benefits to residents: For 1-4 buildings that have individual metering of electricity for each units, the solar project may be directly metered to onsite loads using net metering, and a minimum 20% household savings provided through direct ownership, power purchase agreement, or other arrangement.

- Indirect benefits to residents: For multifamily master metered buildings and multifamily tenant metered buildings, the solar project may be connected to the common area or owner's unit, with the owner received the direct financial benefits. Owners will be required to deliver no less than 50% of the net benefits to residents and indirect and "non-financial benefits" to resident, as calculated using the methodology for Category 3 of the Low-Income Communities Bonus Credit Program and associated IRS and HUD guidance.

- Indirect benefits to owner-occupants: For low-income cooperatives (i.e., owned by the low-income residents), solar projects may be net-metered to the building's common areas, with no less than 20% savings on the common electric load achieving the minimum household savings requirement. As an owner-occupied building, reducing the common area electrical costs provides community ownership benefits as well as a direct financial benefit to low-income residents in reduced maintenance charges from the common electricity costs.

- Community solar: For some housing types, New York's community solar mechanism may be used to distribute benefits from rooftop installations to individually-metered residents. Projects

13

will be required, if a sufficiently large rooftop system can be installed, to dedicate at least half of their generation to community solar subscriptions that provide at least 20% household savings to residents under this arrangement (see Activity 1.2 for a detailed description of community solar subscription savings calculations). If a sufficiently large rooftop system cannot be installed (for example, due to the space constraints on tall multifamily buildings in New York City), subscriptions may be sized smaller than the households' current electric load, while still maintaining a 20% discount rate on the community solar credits provided.

**Reporting:**

- HPD, with the support of its Technical Assistance Provider, will track impact metrics and report them to NYSERDA to support the larger Solar for All reporting requirements and deadlines.

**Education and Outreach:**

- NYSERDA and HPD will work with its technical assistance provider(s) to conduct broad reaching trainings to educate its internal staff and external partners on Solar for All programming to assist in identifying and deploying qualified projects.

- NYSERDA and HPD will work with its technical assistance provider(s) to conduct external trainings for its networks to advertise opportunities to the buildings in HPD's portfolio and pipeline.

- NYSERDA and HPD will work with its technical provider(s) to identify potential projects, conducting outreach and maintaining a pipeline for each program area.

5. On-The-Job Training

- **Implementation Activity or Planning Activity:** Implementation
- **Activity Type:** Technical Assistance (Workforce Development)
- **Budget:** $5,000,000 (Subset of Technical Assistance, Workforce Development, and Administration budget in Outputs Table above)
- **Definition(s) of LIDAC Used:**
  - CEJST-Identified Disadvantaged Communities
  - EJScreen-Identified Disadvantaged Communities
  - Geographically Dispersed Low-Income Households

**Description:**

- NYSERDA will use $5 million of the EPA Solar for All grant over five years to add funding to an existing on-the-job training (OJT) program, providing wage subsidies to solar developers and design and installation companies to hire workers from low-income and disadvantaged communities and to support training and certification costs for these new hires.
  - This funding will reduce the risk for businesses when hiring and taking the time to support new workers in gaining skills they need to succeed in new solar jobs.
  - Businesses receiving funds through the OJT program must remain in good standing regarding all New York State labor law and federal law for the protection of workers, which include paying the prevailing rate of wage and supplements (fringe benefits) to all workers under a public work contract.
  - In line with the Good Job Principles, the NYSERDA OJT program includes a NYS Department of Labor due diligence review of all participating employers to ensure that those employers do not have compliance issues with NYSDOL's Public Works, Labor Standards and/or Safety and Health Divisions, Workers' Compensation Insurance and Disability Insurance coverage, and Active Trade Adjustment Assistance (TAA) petitions. Additionally, the program incentivizes businesses to recruit and hire individuals from disadvantaged communities and priority populations through increased funding and direct program requirements. Funding provided to employers through the OJT program supports training and skills advancement of new employees. The payment structure is designed to encourage employee retention resulting from employers providing favorable working conditions and compensation that promotes economic security. Additionally, New York State law ensures workers a free and fair choice to join a union.
- For eligible workers hired through the program, NYSERDA will pay a percentage of that new hire's hourly wage for the eligible OJT period as a reimbursement to the business. Solar businesses are only subsidized if they hire workers from LIDACs.
  - With the Solar for All grant funding, NYSERDA will increase the wage subsidy to 75% for all eligible solar developers and design and installation companies that hire workers from the targeted populations that have historically had barriers to employment.
  - With an estimated average hourly wage of $32 per hour, NYSERDA's average subsidy will be approximately $23,000 per worker for OJT over a 6-month training period.
- Additionally, NYSERDA use EPA Solar for All funding to reduce the cost of training contractor employees participating in the OJT program through subsidized training, testing, and

15

certifications costs. NYSERDA will provide employers with an additional incentive (anticipated to be approximately $1,000) payment per new hire who completes their OJT training period and who earns an eligible industry recognized solar certification, such as North American Board of Certified Energy Practitioners (NABCEP) certification.

**References:**

NYSERDA's existing On-The-Job Training for Energy Efficiency and Clean Technology Program: https://www.nyserda.ny.gov/All-Programs/On-the-Job-Training-Program

**Outputs and Outcomes/Meaningful Benefits:**

- Approximately 200 new workers will be supported in prevailing wage positions for a total of $4.7 million in wage subsidies.

**Reporting:**

- Using NYSERDA's existing OJT program reporting processes, NYSERDA will track the status and terms of employment for each worker receiving wage subsidies for the duration of their On-the-Job Training Period. NYSERDA will also track and report on industry-recognized certifications the new workers earn during their training period.

**Education and Outreach:**

- NYSERDA will work closely with the New York State Department of Labor (NYSDOL) to deliver the OJT program, including education and outreach to workers and businesses:
  - Without using EPA Solar for All funds, NYSDOL will assist participating businesses with developing OJT training plans as well as assessing necessary skills and identifying available workers that match those skills.
  - Without using EPA Solar for All funds, NYSDOL also administers One Stop Career Centers and an online Virtual Career Center to connect job seekers with jobs in the solar industry.

## Section 2: Subrecipients Administered Programs

1.  City of New York (NYC) Subgrant: Public Solar NYC
    - **Implementation Activity or Planning Activity:** Implementation
    - **Activity Type:**
    - **Budget: $37,5000,000**
    - **Definition(s) of LIDAC Used:**
        - CEJST-Identified Disadvantaged Communities
        - EJScreen-Identified Disadvantaged Communities
        - Geographically Dispersed Low-Income Households
        - Properties Providing Affordable Housing

Where EPA-funded activities use participation in another program as the basis to verify income (e.g. WAP, LIHEAP), the program will conform with the 'Low-income' definition in the Solar for All terms and conditions. If a household is not enrolled in public benefits programs but still qualifies, the City of New York will require additional documentation to verify income. Enabling upgrades for eligible measures, such as roof repairs and electrical panel upgrades needed to implement solar, will not exceed 20% of financial assistance.

**Description:**

This workplan activity focuses on the City of New York subaward for the **Public Solar New York City (PSNYC)** initiative, which will provide significant solar benefits in New York City. PSNYC is designed to have three major components:

(1)     A residential rooftop program to lease solar panels to owners of one-to-four-unit residential homes;

(2)     A residential-serving community solar program for projects sited on multifamily and/or commercial buildings;

(3)     A grant program for solar-enabling building upgrades.

These three program components are crafted to accelerate the deployment and access to solar for low-income households and residents of disadvantaged communities. Each component is accompanied by a coordinated outreach strategy. The purpose and core relationships of each program are summarized below (Figure 1).

**Figure 1: Overview of the Three PSNYC Program Components**

| Programs | 1. Public Leasing Program for Homeowners of 1-4 Unit Residential Buildings | 2. Community Solar Sited on Multifamily and/or Commercial Buildings | 3. Program for Solar-Enabling Upgrades |
|---|---|---|---|
| Description | PSNYC subsidizes solar installation and offers affordable **leases** of solar equipment to qualified 1-4 family homeowners. | PSNYC creates or supplements and administrates operation of a residential-serving **community solar** program using rooftops on identified buildings. | PSNYC provides **grants** up to $20,000 to qualified residential buildings participating in PSNYC programs for solar-enabling upgrades, namely roof repairs, so the building is |

| | | | ready for solar installation. The Solar-Enabling Upgrades is an add-on to the other programs, primarily for Program 1. Public Leasing Program for 1-4 Unit Residential Buildings. |
|---|---|---|---|
| **Benefit to Participant** | Able to install solar without upfront costs and benefits from 20% household net savings post-installation with a below-market rate lease payment. | Eligible residents receive credit towards their electricity bill, reducing the participant's electricity costs by 20%.<br><br>Building owners will receive roof lease fees. | Able to perform retrofits to the building to prepare for solar installation. The Solar-Enabling Upgrades is an add-on to the other programs, primarily for Program 1. |
| **Financial Flow** | *PSNYC to homeowner:*<br>• Subsidizes all upfront solar installation<br>• Provides affordable lease<br>*Homeowner to PSNYC:*<br>• Pays monthly lease, resulting in 20% net savings on utilities | *PSNYC to participant:*<br>• Creates or supplements and manages a community solar program<br>*Participant to PSNYC:*<br>• Pays community solar subscription fee | *PSNYC to participant:*<br>• Provides grant & construction management of solar-enabling upgrades<br>*Participant to PSNYC:*<br>• None |
| **Purpose of Financial Product** | Implementation | Implementation | Implementation |
| **Expected award type (Note: To be confirmed during planning period)** | Equipment lease | Subaward to PSNYC for direct ownership of the installation<br><br>Building owner: lease of roof with attendant documents<br><br>Off-taker: standard community solar contract | Participant support cost |
| **Nature of Financial Product** | The financial product will be a low-cost loan with a fixed payment. Leases will not be forgivable but will have a buy-out option with a declining price after the tax credit compliance period. Leases do not have interest outside of default interest / late fees.<br>Consumer protection guidance will be in place for the development of this product. | N/A – transaction is a direct ownership of the installation | Grant – exact legal form TBD |
| **Transaction Counterparty** | Homeowner | N/A – transaction is a direct ownership of the installation | Homeowner or building owner |

| | | Roof lease: private building owner

Off-taker: Retail electric customers (primarily residential, some common / master meter for residential host buildings) | |
|---|---|---|---|
| **Program Beneficiary** | Homeowner | Tenants | Homeowner |
| **Estimated Size per Project/ Transaction** | $27,900 | $95,000 | $20,000 |

Key Components of the Program:

1. **Leveraging Existing Initiatives:** The program builds on the success of initiatives like the NY-Sun program and incorporates the PSNYC initiative's strategies. This includes a focus on public leasing for 1–4-unit residential homes, community solar for multifamily and/or commercial buildings, and grants for solar-enabling upgrades. These components are designed to address the unique challenges faced by NYC residents, particularly in dense urban environments.

2. **Comprehensive Financial Support:** Financial assistance mechanisms will include grants, loans, and innovative financing models. These models are tailored to overcome barriers specific to LIDAC households in NYC, such as creditworthiness and the need for building upgrades. The financial strategy also reflects the reduced funding PSNYC received compared to initial requests, with a focus on ensuring long-term sustainability through revenue generation from solar leasing.

3. **Alignment with Statewide Goals:** The program aligns with New York State's broader climate and clean energy objectives, ensuring that at least 35% of the benefits from clean energy investments are directed to disadvantaged communities. The Climate Leadership and Community Protection Act (CLCPA) and the EPA's Greenhouse Gas Reduction Fund (GGRF) mandate these allocations. The PSNYC program is designed to maximize these benefits within the constraints of the awarded funds.

4. **Program Income:** PSNYC will generate income through a mix of lease revenue for 1-4 family solar leases, subscription revenue for community solar, and direct pay from Investment Tax Credits. Revenue will be revolved back into the fund to pay for installations and operating expenses. Expenses include installation costs (including enabling upgrades for qualifying households) and operating expenses including administrative costs, marketing, panel maintenance, and roof lease payments to building owners participating in the community solar program. In the first 5 years, PSNYC is projected to generate $28M in revenue while spending $55M on installations and $10.5M on operating expenses for a net cash outflow of $37.5M over 5 years which will be funded by SFA funding. After the first 5 years, the program is expected to generate $3.5M in lease revenue per year while spending $1.2M per year on operations, meaning PSNYC will have enough ongoing revenue to support maintenance for the duration of the useful life of the installed panels installed in the first 5 years funded by the SFA funds.

5. **Long-Term Asset Operation:** PSNYC will competitively procure an asset management provider that will be responsible for monitoring and maintaining the assets through their useful lives. The

asset management provider will also be responsible for managing lease payments. Once the useful life of a solar panel has been reached (estimated 15-20 years), the asset management provider can assist the customer with the following options: (i) replacing the solar panel and renewing a contract with the solar provider, (ii) purchasing and replacing the solar panels, transitioning to a solar ownership model, or (iii) removing the solar panels. This is the standard model for the leased solar industry.

Meaningful Benefits:

Public Solar NYC will enhance NYSERDA's ability to provide a minimum of 20% energy bill savings specifically in NYC for **3,000 LIDAC households.**

Household Savings

- **Guaranteed Energy Savings:** Participating LIDAC households will receive a minimum of 20% savings on their energy bills, with savings monitored and enforced through the program's financial structures.
- Calculation of 20% household benefits: The cost of solar will be set based on the current energy cost of each individual household and the amount of solar power generated. The solar lease or subscription payment plus the cost of non-solar energy used, minus the tax benefits will be set at 20% less than the current energy cost of the household, on average. This will be achieved by changing the cost of the solar lease or subscription as needed. Final structure and type of product to be defined during the planning period.
- Calculation of Household savings throughout the 5-year program: Household savings during the program would be calculated by first calculating the current electricity payments for the household to understand the baseline energy costs. Next, the solar energy generated would be deducted from the household's total energy to get the total solar and non-solar energy used. The cost of the solar lease payment or community solar subscription would be added to the cost of any electricity usage not replaced by solar to get the total cost of energy. Subtracting the new total cost of energy from the baseline results in direct energy savings. Finally, the value of the City tax benefit and State tax credits would be added to the direct energy savings to get total savings. Total savings would be divided by the baseline to get the percentage savings each year. Ensuring 20% household savings is delivered net of program costs: The household will not be paying for any of the upfront program costs and therefore savings will be based solely on current household energy spending compared to energy costs with PSNYC.
- Strategy for Ensuring Households without individual meters receive benefits: This strategy will be defined during the planning period.

Equitable Access to Solar

- **Overcoming Barriers to Solar Adoption:** The PSNYC program is designed to address the significant barriers that LIDAC households in New York City face when adopting solar energy. These barriers include the need for roof repairs and electrical system upgrades that are often necessary before solar panels can be installed. The program provides financial support in the form of grants up to $20,000 for these essential solar-enabling upgrades, helping to prepare buildings for solar installations.

20

- **Community Solar and Financial Support:** The program will install community solar on smaller rental buildings, facilitating public or non-profit ownership, and providing LIDAC residents with solar credits at a 20% discount. Building owners will receive roof lease fees.
- **Target Population:** The main target customer for this solar adoption component is low-income 1-4 family homeowners. This is the main audience that PSNYC must reach, inform, and coordinate with to complete solar installations.

Community Ownership
- **Facilitating Direct Ownership:** The program will backstop term and bridge loans by providing sliding scale incentives for LIDAC households, offering credit enhancements, and delivering grants for make-ready improvements such as roof repairs, electrical upgrades, and quality assurance.
- **Enabling Community Solar Roof Leases:** Installing community solar on various building typologies in NYC, facilitating public or non-profit ownership that catalyzes elective pay or tax credit for LIDAC tenant subscribers; meanwhile, paying a roof lease fee to building owners and selling credits to LIDAC tenants at a 20% discount from the credit rate.
  - Community solar programs represent a key opportunity to extend the benefits of solar power to renters or others who pay electricity bills but may not be able to direct solar installations to their own rooftops. To this point, community solar deployment in NYC has been limited due to several obstacles including energy density to available space ratios, economics of implementation, and coordination across many partners.
  - PSNYC aims to overcome these by focusing on under-utilized areas in the city and partnering with existing successful programs, exploring community solar on City owned land, and including community partners in the PSNYC operating team.
  - Additional detail regarding end-of-life for the panel and strategies to limit risk to the communities will be addressed during the planning period.

Workforce Development and Entrepreneurship
- **Equitable Workforce Development:** The PSNYC initiative emphasizes the creation of job opportunities within the solar industry, specifically for residents of disadvantaged communities. This focus aligns with broader citywide goals to develop a green economy that is inclusive and accessible to all New Yorkers.
- **Integration with Existing Programs:** PSNYC plans to build upon existing workforce development initiatives in the city. For example, the program will collaborate with entities like the NYC Mayor's Office of Workforce Development and other local workforce training organizations that are already engaged in solar and green economy projects. This collaboration ensures that the PSNYC program benefits from established training and employment pathways.
- **On-the-Job Training and Workforce Initiatives:** The PSNYC program includes provisions for on-the-job training and other workforce initiatives that will be critical in preparing workers from disadvantaged communities for roles in the solar industry. This training is designed to provide participants with hands-on experience and the technical skills necessary to succeed in this growing sector.

**Reporting:**

21

As a sub-awardee, the City of New York will work with NYSERDA to ensure compliance with federal regulations for reporting in accordance with 2 CFR 200.329 and 2 CFR 200.337 and EPA specific grants reporting guidelines. To guarantee proper fiscal management, City of New York will ensure that each report includes its own expenditures and that of any other subrecipients, contractors, and program beneficiaries. Per the terms and conditions of the grant, City of New York will engage in the following performance reporting: (1) performance reports and (2) transaction-level and project-level data.

**Outreach and Education:**

Effective and efficient outreach and customer acquisition is key to understanding the targeted customer profiles and the influencers or decision makers in each step. These include requirements for clear, accessible, and culturally appropriate educational materials. Specifically, PSNYC will utilize the marketing campaign as a mechanism for providing much needed educational services to the surrounding community.

In pursuit of this goal, PSNYC will seek to increase interest in PSNYC and acquire potential customers for the 1-4 Public Leasing program and Community Solar programs. In addition, the implementation entity will be responsible for providing support to interested participants on navigating the program, educating them on the benefits and overall process of participating in PSNYC, and acting as the intermediary between the interested participant and other PSNYC staff.  PSNYC will provide technical assistance to potential PSNYC customers by assessing their need for additional financial assistance beyond the 1-4 Public Leasing program, conducting an initial assessment of the homeowner's building history, and assessing the building's roof conditions to determine eligibility for the program.

Even though PSNYC should be seen as a citywide initiative, targeted outreach strategies to smaller geographies (e.g., neighborhoods) have proven to be more effective and can support a more effective launch of PSNYC. Information from each target customer profile is used to inform the subsequent customer journey maps (as shown in Figure 2 ) for the 1-4 Public Leasing and Community Solar programs.

FIGURE **2**: CUSTOMER JOURNEY MAP IN RELATION TO PSNYC OPERATIONAL TASKS



Because outreach will be a continuous and significant effort throughout PSNYC operations, it is listed as "Step 0: Target Customer Outreach" and includes details on methods and messaging to accomplish the most effective outreach (indicated by the number of completed installations in a given timeframe).

City of New York initiates targeted outreach efforts to engage low income 1-4 family homeowners, coordinating efforts with local energy outreach entities. Initial efforts will be clustered in specific geographic areas, piloting PSNYC efforts on smaller scales first before expanding program offerings citywide, as the program was intended. The implementation team vendors for PSNYC will include partners that will assist in achieving outreach and education goals.

PSNYC has already conducted interviews with small residential homeowners with solar to inform the existing outreach and education plan. At a high level, PSNYC will continue to engage low-income communities where relevant to inform outreach methods. The details will be finalized during the planning period.

The City team will build upon several existing and prior community engagement strategies. These include:

1. Climate Strong Communities which is a City run program that involves community members in resilience and climate mitigation strategies in high priority areas;
2. Technical working groups from long term planning for reports such as PowerUp NYC and PlaNYC: Getting Sustainability Done;
3. Existing community partnerships through work with the NYC Accelerator, the Environmental Justice Advisory Board, community partners for PowerUp NYC, and others.

**Outreach methods**

The following outreach methods will be used connect with LIDAC customers:

- Online presence
  - Host an official website with PSNYC description and benefits, and a contact form. This contact form should connect directly with the PSNYC for follow up, initiating the customer journey.
  - Social media pages and targeted ads; possibly in collaboration with the Mayor's Office and other solar organization accounts.
- Connections with existing energy outreach entities and community based trusted institutions
  - Train organizations to understand and speak about PSNYC to residents.
  - Joining outreach events hosted by local homeowner support organizations: tabling, educational workshops, webinars, etc.

2.  New York State Homes and Community Renewal (HCR) Subrecipient

- **Implementation Activity or Planning Activity:** Planning Activity & Implementation Activities
- **Activity Type:** Financial Assistance for Affordable Housing
- **Budget:** $36,302,500
- **Definition(s) of LIDAC Used:**
  - o  CEJST-Identified Disadvantaged Communities
  - o  EJScreen-Identified Disadvantaged Communities
  - o  Geographically Dispersed Low-Income Households
  - o  Properties Providing Affordable Housing

**Description:**

Through subgrants from NYSERDA, HCR will deploy Solar for All programs directly to its pipelines of regulated and subsidized affordable housing, adding solar funding sources and technical support to existing State funding programs that construct and preserve affordable housing across New York. HCR will deploy unique strategies for each housing type to maximize energy savings and solar benefits for the residents and owners.

The HCR subgrant will be structured in the same way as the existing New York Clean Energy Initiative, through which HCR has successfully administered State clean energy funding for affordable housing as a NYSERDA subgrantee since 2020. NYSERDA and HCR will use the same program mechanics to deploy Solar for All funds, which consist of the following:

- NYSERDA and HCR agree on program terms and conditions;
- On a regular basis, HCR forecasts their pipeline of projects and funding needs based on program requirements;
- HCR requests payment of the projected funding needs from NYSERDA in advance of loan closings;
- HCR deploys funds to selected projects (as Participant Support Costs), per agreed upon terms, at time of closing.

During the planning period, to fully realize the concepts below, HCR will conduct the following activities:

- Hire staff dedicated to administering solar programs
- Procure technical assistance providers
- Conduct stakeholder engagement
- Develop and complete product design
- Draft and finalize term sheets and program guidelines
- Develop internal processes and procedures
- Develop program materials
- Conduct trainings
- Begin portfolio screenings and outreach in advance of program launch

**HCR Concepts:**

(Implementation Activity) Multifamily Development Pipelines: HCR will deploy solar funds to projects moving through the agency's existing multifamily development pipelines that meet Solar for All program

requirements. HCR will deliver solar subsidy for rooftop residential solar projects to affordable housing development projects alongside other state subsidy and Federal Housing Tax Credit programs to fill the funding gap for solar solutions and key enabling upgrades. HCR will size the solar subsidy on a $/watt basis to fill the gap left by existing incentive programs, such as the Solar Investment Tax Credit (ITC). HCR will publish a solar term sheet outlining key Solar for All terms and conditions to offer developers a predictable source of funding for solar. Solar for All funds will be delivered at the same time as other Housing Agency funds, for utilization as a source of funding during construction.

- <u>LIDAC Eligibility:</u> All selected development projects will meet the EPA's definition of "properties providing affordable housing."

- <u>Enabling Upgrades:</u> HCR does not anticipate a significant portion of enabling upgrades funding to be spent on this pipeline. Generally, roof conditions and other enabling upgrades will be addressed in the development scope of work. However, if a project requires additional funding for enabling upgrades in order to make solar feasible, HCR will spend enabling upgrades funds.

(Planning Activity) Asset Managed Pipelines: HCR will deploy funds for rooftop residential solar projects to regulated multifamily affordable housing owners that are overseen by HCR's Office of Asset Management or that comply with Department of Energy's Weatherization Assistance Program. In qualifying housing projects, more than 50% of the units are rented to households at or below 60% AMI and/or the development is located in LIDAC. Eligible projects in this concept will not be pursuing a recapitalization with HCR at the time of Solar funding. HCR will provide Solar for All grants or subsidy to fund solar and enabling upgrades, sizing awards on a $/watt basis to fill the gap left after a project also accounts for other available solar incentives. HCR anticipates selecting projects based on one of two criteria 1) particularly hard to develop sites with very limited cash flow and poor roof condition, and 2) those undergoing complementary mid-cycle renovation work where solar can be particularly additive.

- <u>LIDAC Eligibility:</u> Projects will either already be in HCR's asset managed pipeline and have a regulatory agreement and rents that meet the definition of "properties providing affordable housing" or will be participating in a proxy program, such as the Weatherization Assistance (WAP), which follows DOE WPN 22-5.

- <u>Enabling Upgrades:</u> HCR will evaluate the need for enabling upgrades on a project-by-project basis. HCR will prioritize enabling upgrades funding to projects that are well suited for solar, but infeasible due to eligible enabling upgrades opportunities. HCR will not exceed 20% of its financial assistance budget on enabling upgrades.

(Planning Activity) Single Family Home Ownership Programs:

HCR fund rooftop residential solar by leveraging existing pipelines from programs that serve single family homeowners to implement solar ownership programs for LMI homeowners in NY. HCR will explore multiple approaches, weighing the pros and cons of each, including a package of grant/loan, grants, or power purchase agreements. If HCR determines the best approach to include a package of grants/loan, HCR anticipates program income to be generated, the exact amount and timing to be determined during the planning period. During the planning period HCR will also explore competitively procuring an implementation partner to deploy program funds on behalf of HCR. The sizing of the loan and grant will consider the homeowner's ability to monetize the solar ITC, when applicable, and offer

flexible repayment approaches. Grant funds to complete critical enabling upgrades will be provided alongside direct solar funding. Homeowners will realize at least 50% net savings after debt is repaid.

- <u>LIDAC Eligibility:</u> HCR will first utilize its own program eligibility as a proxy for Solar for All eligibility. If homeowners are ineligible by using HCR's program eligibility as a proxy, HCR will attempt to qualify homeowners using CEJST or EJScreen methods, and lastly using geographically disbursed LMI household methods.

- <u>Enabling Upgrades:</u> HCR will evaluate the need for enabling upgrades on a project-by-project basis. HCR will prioritize enabling upgrades funding to projects that are well suited for solar, but infeasible due to eligible enabling upgrades. HCR will not exceed 20% of its financial assistance budget on enabling upgrades

**References:**

HCR will structure its Solar for All programming similarly to its [Clean Energy Initiative](#) program and anticipates creating term sheets for the various approaches above.

**Meaningful Benefits:**

<u>Household Savings:</u>

HCR oversees a wide variety of regulated affordable housing types and ownership structures, each of which requires a unique approach to delivering household savings. HCR will deploy strategies based on housing type (single versus multifamily), and metering structure (direct metered to tenant versus master metered). HCR will deploy approaches that align with industry best practices published by HUD as well as the IRS's ITC Category 3 bonus program.

In order to verify that the expected savings is being generated, HCR will require participants to sign a benefits agreement prior to receiving Solar for All funding. This agreement will include:

- Amount and flow of savings to participants;
- Requirements for ongoing monitoring and reporting;
- Provision that HCR reserves the right to audit savings if necessary.

HCR will deploy these strategies as they apply to the multifamily development pipeline during the implementation period and will further refine strategies for the pipelines in the planning period. HCR broadly anticipates implementing the following strategies:

<u>Single Family Projects:</u> For single-family rentals and single-family ownership solar, solar installations will be directly metered to power onsite loads using net metering. HCR will allow for the implementation of direct ownership of solar and power purchase agreements that provide at least 20% reduction in electricity bills for the end-user.

<u>2-4 Unit Projects:</u> For 2-4 unit buildings that have individually-metered electricity for each unit, HCR will allow for three options:

- <u>Option 1</u>: Multiple Interconnections

Allow the building owner to split the solar power between multiple electrical meters, directly connecting the power to each of the building's units. The owner of the building can provide a discount on the solar power to each tenant, resulting in a net 20% savings.

- Option 2: One Array to Multiple Connections

   Allow the building owner to utilize technologies that split solar electricity between multiple meters without the need for multiple utility interconnections.

- Option 3: Indirect Benefits

   Allow the owner to net-meter and supply power to the common area or owner's unit. Then allow the owners to provide indirect and "non-financial benefits" to residents. Reference guidance established by the IRS Guidance for its Solar ITC Category 3 Bonus program, which allows owners to keep 50% of the savings and requires the remaining 50% to be distributed to tenants equitably through a list of approved methods.

Multifamily Master Metered Projects: For multifamily properties that are master-metered for 100% of their power, require solar systems to be net-metered to offset as much of the property's electrical load as possible. Allow owners to provide indirect and "non-financial benefits" to residents. Reference guidance provided by HUD outlining the approved methods for providing non-financial benefits to residents. See link above.

Multifamily Tenant Metered Projects: For multifamily properties that have individual metering of electricity for each unit (direct tenant meter), allow solar projects that are net-meter and supply solar power to common areas. Then allow the owners to provide indirect and "non-financial benefits" to residents. Reference guidance established by the IRS Guidance for its Solar ITC Category 3 Bonus program, which allows owners to keep 50% of the savings and requires the remaining 50% to be distributed to tenants equitably through a list of approved methods.

Multifamily Co-Ops: For multifamily buildings owned by a co-op formed by the residents of the building that are individually metered, allow for two options:

- Option 1: Allow solar projects that are net-metered to supply solar power to common areas. As an owner-occupied building, providing a minimum of 20% savings on the common area electrical load provides community ownership benefits as well as a reduction in annual maintenance costs equivalent to the solar savings to the co-op shareholders.

- Option 2: Allow the development of community solar on top of HCR properties. Allow the building owner to install solar, connect to the utility via virtual net metering, allocate 50% of the system to the building common area, and then subscribe the remaining 50% to the tenants, either by:

   o Sizing subscriptions to provide at least 20% savings to resident bills and distribute on first-come-first-served basis until fully subscribed; or

   o Considering the size limitations of each system, projects may not be able to provide 20% to all the residents of a building. As such, distribute as much power as possible equally among tenants.

Equitable Access to Solar:

The New York State Homes and Community Renewal (HCR) agency's mission is to build, preserve, and protect affordable housing, increase homeownership, and invest in communities. All of HCR's Solar for All programming will be focused on increasing solar access to LMI communities. HCR's goal is to ensure that low- and moderate-income New Yorkers have access to financing to buy homes, and to improve housing conditions, accessibility, and energy efficiency. HCR also works to support small businesses and create sustainable communities.

Resiliency:

During the planning period HCR will explore extending funding for battery storage alongside solar funding.

Workforce Development:

HCR will follow Davis Bacon Act requirements and support prevailing wage for construction activities related to solar installation and enabling upgrades to support solar.

**Reporting:**

HCR, with the support of its Technical Assistance Provider, will track impact metrics and report them to NYSERDA to support the larger Solar for All reporting requirements and deadlines.

**Education and Outreach:**

- HCR will conduct broad reaching trainings to educate its internal staff on Solar for All programming to assist in identifying qualified projects

- HCR will also conduct external trainings for its networks to advertise its solar program opportunities to the public

- Selected TA providers will also assist in identifying potential projects, conducting outreach and maintaining a pipeline for each program area

- Selected TA providers will assist with development of public facing program awareness materials, including training materials, FAQs, and fact sheets

# Strategy to Increase Resiliency and Grid Benefits Utilizing Energy Storage

On-site energy storage, when paired with distributed solar, can maximize the value of solar generation and provide resilient, clean power during periods of grid outages. This is especially beneficial for communities residing in regions of the state most vulnerable to extreme weather and grid reliability events, including New York City, Long Island, and Western New York. Currently, NYSERDA offers an incentive of $400/kWh to support residential storage paired with solar PV for qualifying low-and-moderate income households on Long Island.

In June 2024, the New York Public Service Commission authorized $775 million in NYSERDA program funding to support the deployment of 200 MW of Residential energy storage and 1,500 MW of

distributed non-residential ("Retail") storage statewide, implemented via standard offer, fixed-rate, dollar per kilowatt-hour ($/kWh) of installed capacity incentive programs. As proposed by NYSERDA in its Implementation Plans for these programs, the Residential program will allocate 40% of total program capacity, or 80 MW, toward the Residential Inclusive Storage Incentive, at an initial rate of $450/kWh, to support the deployment of storage for eligible low-to-moderate income and disadvantaged community households statewide. Similarly, the Retail program will initially allocate 60 MW of program capacity, toward the Retail Inclusive Storage Incentive, at an initial rate of $350/kWh, to support storage sited at eligible critical facilities located in disadvantaged community census tracts, such as affordable housing units, food banks, medical facilities, and community cooling centers. In both cases, most, if not all, storage systems supported through these programs are expected to be paired with solar PV.

These programs, expected to launch in 2025, will meaningfully increase resiliency and grid benefits by creating capacity that can deliver power to New York households and/or critical facilities during a grid outage. While their initial focus would be to deliver solar integration and resiliency benefits to vulnerable households, NYSERDA anticipates that forthcoming utility tariff structures, pay-for-performance programs, and Virtual Power Plant (VPP) models will enable the aggregation of residential storage towards providing critically important grid services during times of peak demand, both at the distribution and transmission level. For clarity, battery storage projects funded through these programs will not be directly funded by the Solar for All program.

## Project-Deployment Technical Assistance Strategy

In addition to the activities directly funded by the EPA Solar for All program, NYSERDA will continue to address key barriers to the implementation of solar and energy storage projects for low-income households and disadvantaged communities. At the center of New York's Solar Energy Equity Framework (SEEF) is the Affordable Solar and Storage Predevelopment and Technical Assistance Program (Predevelopment Program), which provides technical assistance funding for the early-stage development of solar and/or storage projects that will benefit low-income households, affordable housing and disadvantaged communities. The early-stage initiatives have helped build a pipeline of solar installations eligible for direct project-level grants through the NY-Sun incentive program and NYSERDA expects this dynamic to continue through the EPA Solar for All program period.

A key part of the Predevelopment Program involves ongoing outreach to potential applicants through presentations to affordable housing groups, a quarterly webinar series, and regular communication with a range of community-based organizations and technical service providers. In particular, the Predevelopment Program webinars are an opportunity to share updates to the program design, to share best practices from grantees, and to provide a platform for feedback from potential applicants.

With the support of Predevelopment Program grants, several organizations have successfully built a large portfolio of solar developments. Predevelopment Program grants will continue to provide support to community-led solar and storage projects through 2030.

Technical Assistance for Overcoming Interconnection Challenges

The following technical resources exist in New York for addressing challenges and barriers relating to distributed solar and storage interconnection:

- NYSERDA, DPS, and each of New York's investor-owned utilities maintain on staff a dedicated Interconnection Ombudsperson, who is tasked with providing guidance on aspects of New York's standardized interconnection process and coordinating with solar developers on individual interconnection applications.
- New York's long-running Interconnection Policy Working Group (IPWG) and Interconnection Technical Working Group (ITWG) also serve as a forum for stakeholders to raise concerns and address challenges related to distributed energy resource (DER) interconnection.
- New York's investor-owned utilities have developed and maintain interactive Hosting Capacity maps as a developer resource to help identify lowest-cost interconnection locations for distributed generation.

Additionally, in 2020, New York passed the Accelerated Renewable Energy Growth and Community Benefit Act (AREGCBA), which initiated a regulatory proceeding to identify investments in distribution and local and bulk transmission necessary to meet the State's requirements under the Climate Act. As an outcome of that proceeding, the New York Public Service Commission approved the state's first Coordinated Grid Planning Process (CGPP), a comprehensive, multi-year process to determine necessary investments in distribution and transmission infrastructure toward realizing New York's Climate Act mandates. From the perspective of distributed solar and storage, this development is particularly noteworthy, given the risk of faster-than-anticipated distribution hosting capacity saturation that could result in a significant uptick in interconnection costs and slow deployment. NYSERDA is a member of the Energy Policy Planning Advisory Council (EPPAC) stakeholder group set up to inform the CGPP, and NYSERDA's DER program includes a full-time Distribution Grid Policy Advisor staff member to inform NYSERDA's involvement in this process. This role ensures that NYSERDA's involvement in the CGPP is cognizant of distribution-level hosting capacity expansion needs and facilitating cost-effective interconnection and continued deployment of community solar and associated storage serving disadvantaged communities, especially those located in rural areas where interconnection upgrade costs can be prohibitively expensive.

Technical Assistance for Siting and Permitting

NYSERDA offers resources and direct technical assistance to help local governments manage distributed solar, energy storage and other clean energy development in their communities. These resources include clean energy guidebooks with tools and step-by-step instructions to assist local governments with preparing their communities for clean energy, one on one technical assistance to help implement the policies and practices, and workshops for local governments to receive training on a variety of clean energy topics. The available guidance materials include, but are not limited to: technology overviews, permitting processes, local zoning laws, navigating the State Environmental Quality Review (SEQR), navigating the Office of Renewable Energy Siting's state level permitting process for large scale renewables, and fire safety/fire code considerations. This team works to build relationships with local governments and act as a resource for information to empower local officials to make the right choices for their communities. NYSERDA is supportive of local permitting agencies using technical tools such as SolarApp, but does not plan for direct deployment of these tools through Solar for All.

# Equitable Access and Meaningful Involvement Plan

Breadth and Diversity Maximization

NYSERDA commits to maximizing the breadth and diversity of communities served by the program. New York State has a wide diversity of community types, from the nation's largest city to small rural hamlets, and including eight federally recognized tribal nations. New York's solar regulations, the existing SEEF administered by NYSERDA, and the new and expanded program activities to be implemented under this grant are designed to serve all types of communities, along with the very different housing and ownership structures found across the state. New York has implemented residential rooftop solar and residential-serving community solar programs and policies that make solar accessible to all residents, regardless of whether they rent or own their homes, are able to pay any upfront costs, live in rural or urban communities, or need technical assistance at the community level to support solar and storage deployment.

Participatory Governance Plan

NYSERDA is working to address the challenges historically marginalized communities have faced in accessing programs and using their lived experience to inform solutions that support an inclusive clean energy transition. NYSERDA is integrating equity into internal operations through our Diversity Equity and Inclusion Strategic Plan which is focused on building a diverse, equitable and inclusive culture within the organization. With the creation of an Energy & Climate Equity team, NYSERDA is working to conduct more equitable, meaningful, and diverse community engagement. This will ensure historically marginalized communities are at the front and center of the decisions that impact their everyday lives.

A component of this is the development of Regional Clean Energy Hubs, designed to help New Yorkers access and navigate information they need to connect to the clean economy. Hubs provide a team of trusted, knowledgeable, community-based organizations in and from 12 regions of the State. They have experience with clean energy, energy efficiency, workforce and economic development, education, health, and housing. Hubs help and provide information to individuals, small businesses, and affordable housing owners about the benefits of the clean energy economy, ways to reduce energy use and costs, and how to make more informed energy decisions.

The Co-design of Community-Led Solar is a forthcoming initiative for community-anchored organizations to participate in a co-design process to develop an incentive program that supports community-led solar while limiting risks to communities from ownership. The intent of the co-design effort is to determine the most self-sustaining program design to support historically underserved communities in owning community solar projects and the development of community-led, rather than developer-led, solar. This may include the use of community benefits agreements. NYSERDA will take the findings from the co-design process and integrate them into the State's residential-supporting community solar programs (described in detail in the Financial Assistance Strategy section) to support community-owned and community-developed solar projects for low-income households and disadvantaged communities. The Community-Led Solar Co-Design process will take place during the planning period.

Stakeholder Engagement

The Energy Equity Collaborative was established with a Founding Steering Committee in 2023.The Collaborative provides a coordinated forum for NYSERDA and community-based organizations and stakeholders that are representative of, or principally serve, disadvantaged communities to work together to address energy equity and climate justice issues and develop equitable programs. With NYSERDA's support, the Collaborative will host public meetings and create working groups for sector-

specific issues. The Collaborative will host a network of organizations that help ensure the experiences and needs of under-resourced and historically marginalized communities are front and center in decision-making and program planning. The Collaborative includes participation from other New York State agencies, including members of the interagency Low-Income Energy Task Force, with which NYSERDA will coordinate on issues and opportunities raised.

NYSERDA has established a Disadvantaged Community Stakeholder Services Pool via a Request for Qualifications (RFQ) for qualified CBOs that represent New York State's disadvantaged communities. The pool of CBOs includes grassroots advocacy organizations, faith-based groups, environmental and climate justice organizations, as well as individual nonprofits, coalitions, and for-profit firms based in and with a substantial connection to those residing in New York State's disadvantaged communities. Organizations qualified under this RFQ are available to work with NYSERDA staff through a variety of paid services. CBOs will assist NYSERDA address barriers to participation and inform how disadvantaged communities can receive a greater share of the benefits from clean energy investments and programs. This includes providing advice and input on programs and policies, facilitating community outreach and engagement, and participating in working groups organized by NYSERDA around various issues and program areas. These could include, but are not limited to, solar energy, workforce development, affordable housing decarbonization, clean transportation, and large-scale renewable deployment. Assistance may also be requested to design new programs or improve Authority-wide initiatives.

<u>Consumer Outreach and Protection</u>

The Solar for All programs will involve a range of customer education, acquisition, and management tools and partners. NYSERDA provides funding (separate from EPA funds) to a wide range of community-based organizations for activities including outreach and education in their communities. In many cases, customer acquisition and management are handled by private solar companies, subject to the strict oversight described below.

New York has established robust consumer protection, especially during the customer acquisition process, as foundational to an equitable solar market. The Uniform Business Practices for Distributed Energy Resources (UBP-DERs) sets mandatory requirements for consumer marketing and acquisition practices, including standard customer disclosure forms for both rooftop residential and residential-serving community solar. The New York State DPS, with support from NYSERDA, enforces these rules and manages a customer complaint resolution process.

NYSERDA extends further protections and accessibility requirements through the SEEF programs. Residential-serving community solar providers participating in the Inclusive Community Solar program must submit a marketing plan describing how they will acquire customers, including non-English speakers, and contractors are screened for their ability and commitment to acquire and manage customers in a fair and appropriate way. NYSERDA has extended these requirements to the Affordable Solar incentive program for low-income rooftop residential customers.)

# Fiscal Stewardship Plan

NYSERDA has established certain general procedures for federal financial awards that are applicable when NYSERDA is the Prime Applicant, Co-Applicant, or providing any Letters of Support.

NYSERDA project management staff, Finance Department staff, and Counsel's Office will carefully review the EPA grant to ensure that NYSERDA will be able to comply with all the requirements of the award, including any conditions that affect the project itself. Any resultant contracts or subawards NYSERDA then makes based upon the Federal Funding will flow down the terms of the funding to any resultant contracts. NYSERDA maintains full compliance with requirements of 2CFR §200.303 and 2 CFR §200.332(b) and (d) via internal controls enforced through the finance and legal counsel staff.

NYSERDA's accounting system meets government standards for recording and collecting costs in accordance with 2 CFR 200.302(b)(1). NYSERDA is committed to ensuring reduction in waste, fraud and abuse, including compliance with New York State Private Sector Whistleblower Labor Law, which prohibits an employer from taking retaliatory personnel action against employees because the employee made a complaint of employer violations. The NYSERDA Conflict of Interest Policy, available at https://www.nyserda.ny.gov/-/media/Project/Nyserda/Files/About/Board-Governance/NYSERDA-Code-of-Conduct.pdf, is intended to supplement, but not replace, any applicable state and federal laws governing conflicts of interest applicable to Authority employees.

New York already has in place a comprehensive set of consumer protection requirements and enforcement processes for residential rooftop and residential-serving community solar, as well as processes for verifying eligibility, including income-eligibility, of program participants. This process includes referrals, as necessary, to other State and federal agencies to ensure that consumer protection and consumer financial laws, such as laws prohibiting unfair, deceptive, and abusive practices, are applied.

NYSERDA's contracting and procurement policies and agreements meet the requirements of 2 CFR 200.332(a) is available at Appendix D of EPA's Subaward Policy (GPI-16-01).

NYSERDA's Standards and Quality Assurance (SQA) department conducts onsite inspections of a representative sample of projects to ensure compliance, and installers demonstrating consistently high build quality receive the NY-Sun Quality Solar Installer designation.

# Budget Narrative

## Personnel

| CATEGORY | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|
| **Personnel** | | | | | | |
| .75 FTE 1 Vice President @ $201,711/yr | $30,257 | $31,164 | $32,099 | $33,062 | $34,054 | $160,636 |
| 2.5 FTE 1 Director @ $201,711/yr | $100,856 | $103,881 | $106,998 | $110,208 | $113,514 | $535,457 |
| 2.5 FTE 1 Assistant Director @ $185,851/yr | $92,926 | $95,713 | $98,585 | $101,542 | $104,588 | $493,354 |
| .2 FTE 1 Program Manager @ $161,674/yr | $6,467 | $6,661 | $6,861 | $7,067 | $7,279 | $34,335 |
| 12.7 FTE 7 Sr Project Managers @ $137,319/yr | $348,790 | $359,254 | $370,032 | $381,133 | $392,567 | $1,851,776 |
| 9.4 FTE 7 Project Managers @ $123,761/yr | $289,601 | $298,289 | $307,237 | $316,455 | $325,948 | $1,537,530 |
| 3.5 FTE 2 Assistant Project Managers @ $86,730/yr | $60,710 | $62,531 | $64,407 | $66,341 | $68,331 | $322,320 |
| **TOTAL PERSONNEL** | $929,607 | $957,493 | $986,219 | $1,015,808 | $1,046,281 | $4,935,408 |

| Title | Role in Solar for All Program |
|---|---|
| Vice President | Leads Distributed Energy Resources portfolio, provides executive management of Solar for All. |
| Director | Leads NY-Sun program and provides overall management of Solar for All. |

| Assistant Director | Supports overall management and implementation of Solar for All. |
|---|---|
| Program Manager | Oversees Solar for All evaluation, reporting and program compliance activities. |
| Senior Project Manager | Supervises implementation of Solar for All program activities, including direct engagement with contractors and projects, approval of documentation and reporting, and support of evaluation and program development activities. |
| Project Manager | Responsible for day-to-day implementation of Solar for All program activities, including direct engagement with contractors and projects, review of documentation and reporting, and support of evaluation and program development activities. |
| Assistant Project Manager | Support day-to-day implementation of Solar for All program activities, |

## Fringe Benefits

| Fringe Benefits | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|
| Vice Presidents @68.85% of salary | $20,832 | $21,456 | $22,100 | $22,763 | $23,446 | $110,598 |
| Directors @ 68.85% of salary | $69,439 | $71,522 | $73,668 | $75,878 | $78,154 | $368,662 |
| Assistant Directors @ 68.85% of salary | $63,980 | $65,898 | $67,876 | $69,912 | $72,009 | $339,674 |
| Program Managers @ 68.85% of salary | $4,453 | $4,586 | $4,724 | $4,866 | $5,012 | $23,640 |
| Sr Project Managers @ 68.85% of salary | $240,142 | $247,346 | $254,767 | $262,410 | $270,282 | $1,274,948 |
| Project Managers @ 68.85% of salary | $199,390 | $205,372 | $211,533 | $217,879 | $224,415 | $1,058,589 |
| Assistant Project Managers @ 68.85% of salary | $41,799 | $43,053 | $44,344 | $45,676 | $47,046 | $221,917 |
| TOTAL FRINGE BENEFITS | $640,034 | $659,234 | $679,012 | $699,384 | $720,364 | $3,398,028 |

35

**List of Fringe Benefit categories:**

| Account | Description |
|---------|-------------|
| 4100 | Social Security |
| 4101 | Medicare Tax |
| 4103 | MCTM Tax |
| 4105 | Health Insurance |
| 4106 | Health Insurance - PEP |
| 4107 | Health Insurance Buyout |
| 4110 | Dental Plan |
| 4125 | Vision Care Plan |
| 4130 | Dependent Care Plan |
| 4135 | LT Disability Plan |
| 4140 | Workers Compensation |
| 4145 | Unemployment |
| 4150 | Pension |
| 4155 | VDC Employer Contribution |
| 4160 | GASB 75 OPEB expense (prev 45) |
| 4165 | Tuition Reimbursement |
| 4175 | ST Disability Plan |
| 4190 | Other Employee Benefits |
| 4195 | Compensated Absences Adjustmt |

## Travel

Travel Budget estimates based on established USGSA per diem rates. Actual travel costs will also adhere to USGSA rates and policies, and will not exceed budgeted amount. Anticipated travel costs include mileage costs, tolls, hotels, meals, and airfare. An estimated 5-10 trips will be taken annually for Solar for All program-related conferences, site visits, meetings, and/or outreach events.

| | | | | | | |
|---|---|---|---|---|---|---|
| *Travel within mainly New York State, but also in the United States in support of the program* | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $10,000 |
| TOTAL TRAVEL | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $10,000 |

## Equipment

NYSERDA will not purchase equipment with EPA funds.

## Supplies

NYSERDA will not purchase supplies with EPA funds.

## Contractual

### Evaluation ($2,000,000)

NYSERDA has a dedicated evaluation team, which includes internal NYSERDA staff and external, independent evaluation contractors, who are selected through a competitive procurement process. Evaluation activities include development of program theories and logics, market characterization and assessment, and impact and process evaluations.

Market characterization studies document empirical evidence of market transformation and identify any barriers that impede market transformation from occurring as expected. In parallel, NYSERDA conducts impact assessments to verify that energy production is meeting expectations and to serve as a benchmark to support the ongoing performance measurement of new and emerging solar and energy storage deployment strategies. NYSERDA also conducts process evaluations to assess and improve program efficiency and effectiveness, gathering input from participants, non-participants and other stakeholders.

NYSERDA competitively selects evaluation providers across multiple technology and program areas (i.e., an evaluation contractor may provide services for activities receiving EPA funding and for activities only receiving funding from other NYSERDA-administered sources). NYSERDA will carefully track evaluation contract costs associated with Solar for All activities. NYSERDA's accounting system meets government standards for recording and collecting costs in accordance with 2 CFR 200.302(b)(1), and is capable of segregating costs to allocate the costs properly across a number of funding sources.

### NYSERDA Standards and Quality Assurance Inspection Program ($1,650,000)

The Quality Assurance/Quality Control (QA/QC) process for the NY-Sun program provides guidance and oversight for projects that receive NY- Sun incentives (including from SEEF programs) to ensure that projects meet applicable code requirements and high safety and performance standards. The overall goal is to ensure that partners can consistently provide customers with properly installed, safe, reliable solar projects that produce the projected amount of energy over their expected life cycle.

As part of this ongoing process, for projects receiving EPA Solar for All funds, NYSERDA will select a representative sample of completed projects for either onsite field inspections or as-built photo evaluation based upon the solar installer's demonstrated quality performance and production volume. Competitively selected third-party technical experts, under contract with NYSERDA, will perform field inspections, photo review services and provide any technical assistance, if needed. NYSERDA competitively selects QA inspection providers across multiple technology and program areas (i.e., a QA provider may conduct inspections for projects receiving EPA funding and for projects only receiving funding from other NYSERDA-administered sources). NYSERDA will carefully track QA/QC inspection contract costs associated with EPA-funded projects. NYSERDA's accounting system meets government standards for recording and collecting costs in accordance with 2 CFR 200.302(b)(1), and is capable of segregating costs to allocate the costs properly across a number of funding sources.

Solar installers will receive detailed reports designed to provide clear direction on any deficiencies found as well as any corrective action that must be taken. Performance reports are shared with the solar

installers to facilitate continuous improvement. Customers are also able to request a Quality Assurance field inspection at no cost.

*Program Implementation Support ($750,000)*

NYSERDA is engaging, through competitive procurement, a consultant(s) to provide technical assistance, program implementation, and project management support to NYSERDA and state and local affordable housing agencies, including but not limited to HCR and HPD (Housing Agencies), for the purpose of advancing clean energy and sustainability initiatives, inclusive of Solar for All, and build institutional capacity to assess and incorporate clean energy and sustainability into programming, processes, regulatory functions and funding plans of those organizations. Consultant(s) may be competitively selected for services across a technology or market sector, including services that are not directly funded by Solar for All (i.e., a consultant may be selected for expertise on affordable housing program design and provide services related to activities funded by other NYSERDA-administered programs as well as Solar for All). The competitively selected consultant(s) will carefully track time and activity dedicated to Solar for All. NYSERDA's accounting system meets government standards for recording and collecting costs in accordance with 2 CFR 200.302(b)(1), and is capable of segregating costs to allocate the costs properly across a number of funding sources.

*Shared Administrative Services ($1,750,000)*

NYSERDA competitively selects "shared" administrative services providers with the expertise and experience to bring consistency of operations to NYSERDA's programs and processes. The shared administrative services provider(s) will undertake high-volume, low-complexity tasks such as application intake and review for compliance with rules and procedures, including eligibility of participants, service providers, projects, and measures; completeness of applications; and the compliance with the overall requirements requested with written program rules; payment processing; and routine data collection and analysis.

NYSERDA competitively selects shared administrative services providers across multiple technology and program areas (i.e., an administrative services provider may review applications for projects receiving EPA funding and for projects only receiving funding from other NYSERDA-administered sources). NYSERDA will carefully track administrative services contract costs associated with EPA-funded projects. NYSERDA's accounting system meets government standards for recording and collecting costs in accordance with 2 CFR 200.302(b)(1), and is capable of segregating costs to allocate the costs properly across a number of funding sources.

*Technical Assistance to Housing Agencies and Providers ($7,375,750)*

As described in Work Plan Activity 1.3,NYSERDA will competitively procure technical assistance to support the EPA-funded Solar for All activities to be undertaken by HCR and HPD, as described in the "Financial Assistance for NYC Affordable Housing" and "New York Homes and Community Renewal (HCE) Subgrant" Work Plan Activities detailed below. HCR and HPD will deploy EPA-funded financial assistance directly to their portfolios and pipelines of regulated affordable housing, adding solar to existing funding programs that construct and preserve affordable housing in New York.

In support of the deployment of these activities, NYSERDA will procure technical assistance provider(s) to work directly with HCR and HPD. The technical assistance provider(s) will provide four buckets of services to HCR and HPD including:

- Direct Agency TA – Assist with program design during the planning period, train agency staff, produce program materials, tools and public facing documents;
- Pipeline Building – Assist with identifying potential projects, conducting outreach, screening applications and making final project selections;
- Project Support – Providing selected projects with ongoing support through the design and installation of solar systems, including assistance with EPC selection and equipment selection;
- Reporting and Compliance – Assist with tracking key impact metrics and ensuring compliance with EPA terms and conditions.

*Compliance Tool(s)/Platform(s) ($150,000)*

NYSERDA will competitively select a tool(s)/platform(s) to facilitate compliance with the DBRA requirements of the Solar for All terms and conditions, including cloud-based tool(s) to collect, verify, and manage compliance data as well as certified payroll report data from awardees, contractors, and subcontractors.

*Financial Assistance: Residential-Serving Community Solar Incentive ($107,718,281)*

As detailed in Workplan Activity 1.1-1.2, NYSERDA will implement two residential-serving community solar incentive programs:

- NYSERDA will implement Energy Assistance Program (EAP) + Community Solar as a modified version of the successful "Expanded Solar for All" program that is currently providing utility bill credits to approximately 168,000 low-income households in Upstate New York. EAP + Community Solar provides community solar and associated guaranteed bill savings to all customers participating in a utility's Energy Affordability Program, which is a utility bill discount program for low-income (Low Income Home Energy Assistance Program (LIHEAP)-eligible) households that is administered by each of New York's utilities. EPA Solar for All funds will be used to fund additional projects with deeper household savings than would otherwise be possible.
- NYSERDA will implement Inclusive Community Solar as a modified version of NYSERDA's existing Inclusive Community Solar Adder using the existing NY-Sun program implementation infrastructure.
- NYSERDA will present a standard offer incentive contract to qualified solar developers who have been approved via the existing NY-Sun Participating Contractor Program Opportunity Notice procurement process.

*Financial Assistance: Single-Family Residential Financial Assistance and Financing Solutions ($15,000,000)*

As detailed in Workplan Activity 1.2, during the planning period, NYSERDA will continue to explore and assess new financial assistance program options and financial solutions that can both address market gaps in serving LIDACs and be effectively administered within the Solar for All grant structure. NYSERDA will present a standard offer incentive contract to qualified solar developers who have been approved via the existing NY-Sun Participating Contractor Program Opportunity Notice procurement process, and/or use another competitive selection (Request for Proposals/Qualifications) process.

*Financial Assistance: Financial Assistance for NYC Affordable Housing ($18,771,750)*

As detailed in Workplan Activity 1.4, NYSERDA and New York City Housing Preservation and Development (HPD) will partner to deploy Solar for All programs directly to HPD's portfolios of regulated affordable housing, adding solar to existing funding programs that construct and preserve affordable housing across New York City. NYSERDA and HPD will deploy funds as incentive (grant) contracts to qualified solar installers through NYSERDA's existing NY-Sun incentive program infrastructure.

NYSERDA and HPD will implement specific contract requirements and payment milestones to better serve the affordable housing market. NYSERDA will present a standard offer incentive contract to qualified solar developers who have been approved via the existing NY-Sun Participating Contractor Program Opportunity Notice procurement process.

 Enabling upgrades for eligible measures, such as roof repairs and electrical panel upgrades needed to implement solar, will not exceed 20% of financial assistance.

*Financial Assistance: Workforce Development On-the-Job Training and Certifications ($5,000,000)*

As detailed in Work Plan Activity 1.5, NYSERDA will use $5 million of the EPA Solar for All grant over five years to add funding to an existing on-the-job training (OJT) program, providing wage subsidies to solar developers and design and installation companies to hire workers from low-income and disadvantaged communities and to support training and certification costs for these new hires

## Other

| OTHER | | | | | | |
|---|---|---|---|---|---|---|
| *Subgrant - City of New York (Public Solar NYC)* | $4,996,000 | $7,494,000 | $7,494,000 | $8,430,750 | $9,055,250 | $37,470,000 |
| *Subgrant - HCR* | $3,630,250 | $5,445,375 | $7,260,500 | $9,075,625 | $10,890,750 | $36,302,500 |
| **Subtotal Subgrants** | $8,626,250 | $12,939,375 | $14,754,500 | $17,506,375 | $19,946,000 | $73,772,500 |
| *DOE in-kind assistance* | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $400,000 |
| **TOTAL OTHER** | $8,706,250 | $13,019,375 | $14,834,500 | $17,586,375 | $20,026,000 | $74,172,500 |

*Subgrant: City of New York (Public Solar NYC) ($37,470,000)*

As detailed in Workplan Activity 2.1, the City of New York will implement the Public Solar New York City (PSNYC) initiative, which will provide significant solar benefits in New York City. PSNYC is designed to have three major components: A residential rooftop program to lease solar panels to owners of one-to-four-unit residential homes; a residential-serving community solar program for projects sited on multifamily and/or commercial buildings; and, a grant program for solar-enabling building upgrades.

These three program components are crafted to accelerate the deployment and access to solar for low-income households and residents of disadvantaged communities. Each component is accompanied by a coordinated outreach strategy.

- Entity Type: Governmental
- Duration of Subaward: Year 1 – Year 5

*Subgrant: New York State Homes and Community Renewal ($36,302,500)*

As detailed in Workplan Activity 2.2, New York State Homes and Community Renewal (HCR) will deploy Solar for All programs directly to its pipelines of regulated and subsidized affordable housing, adding solar funding sources and technical support to existing State funding programs that construct and preserve affordable housing across New York. HCR will deploy unique strategies for each housing type to maximize energy savings and solar benefits for the residents and owners.

- Entity Type: Governmental
- Duration of Subaward: Year 1 – Year 5

## Additional Items

***Indirect Charges:*** *The base of the Labor Overhead and G&A Expense is Total Direct Labor Dollars, exclusive of Market Engagement Activities. The base for NY Shared Services Cost Recovery Fee is Total Direct and Indirect Expenses, excluding Capital Projects.*

| Indirect Costs | | | | | | |
|---|---|---|---|---|---|---|
| *Labor Overhead 41.65% of Total Direct Labor dollars* | *$387,181* | *$398,796* | *$410,760* | *$423,084* | *$435,776* | *$2,055,597* |
| *G&A Expense 51.97% of G&A Expense* | *$483,117* | *$497,609* | *$512,538* | *$527,915* | *$543,752* | *$2,564,931* |
| *NY Shared Services Cost Recovery Fee 1.01% of Total Direct & Indirect Expenses, excluding Capital Projects* | *$281,075* | *$480,433* | *$654,584* | *$605,634* | *$476,027* | *$2,497,754* |
| **TOTAL INDIRECT** | *$1,151,373* | *$1,376,838* | *$1,577,882* | *$1,556,634* | *$1,455,555* | *$7,118,282* |

***Conferences and Workshops***

NYSERDA will not conduct any conferences or workshops using EPA funds.

***Meals and Refreshments***

NYSERDA will not purchase meals and/or refreshments using EPA funds.

***Program Income***

NYSERDA and/or its subgrantees may generate program income from lease payments and/or loan repayment as described in the Work Plan, with all program income intended to be "recycled" into

41

additional financial assistance. Program income details will be defined during the program planning period.

*Geospatial Information*

NYSERDA will collect information identifying the geographic location of projects receiving Solar for All funding.

## Timeline and Milestones

(see attachment)

EXHIBIT 4
*Termination Letter*
(August 7, 2025)



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**  Termination of EPA Assistance Agreement 5H-84088901 under 2 CFR 200.340

**FROM:**  Devon Brown, EPA Award Official

**TO:**  Pam Poisson, Chief Financial Officer
New York State Energy Research & Development Authority

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84088901 awarded to New York State Energy Research & Development Authority. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program— that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Matthew Forte, EPA Grant Specialist
    Kathryn Moffitt, EPA Project Officer
    Max Joel, Grantee Program Manager

EXHIBIT 5
*Notice of Disagreement*
(August 28, 2025)



KATHY HOCHUL
*Governor*

CHARLES BELL
*Acting Chair*

DOREEN M. HARRIS
*President and CEO*

August 28, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington DC 20460
Via Electronic Mail: brown.devon@epa.gov

Re: Modification #2 Amending EPA Assistance Agreement 5H-84088901

Dear Devon Brown:

This letter serves as the New York State Energy Research and Development Authority's (NYSERDA) notice of disagreement with the termination of the award and the terms and conditions specified in the above referenced modification.

NYSERDA disagrees with the legality of the U.S. Environmental Protection Agency's (EPA) decision to terminate the award; there is no valid statutory basis, nor any asserted regulatory or contractual basis, supporting EPA's arbitrary decision. Nevertheless, NYSERDA is complying with the terms of EPA's stop work instructions pending a resolution of this disagreement. Neither NYSERDA's compliance with the stop work instruction nor any other conduct by NYSERDA, including the drawdown of funds at any time for expenses lawfully incurred, shall be construed as NYSERDA's acceptance of the termination or the terms and conditions set forth in the above modification and should not be deemed as such. NYSERDA maintains the legal ability to obtain reimbursement for its costs at any time, unfettered by additional appended implications. See 2 C.F.R 200.343.

NYSERDA is submitting this notice of disagreement within twenty-one days of receipt as referenced in the above referenced modification, but notes that this deadline is unsupported in regulation or statute. NYSERDA intends to submit a detailed dispute of the U.S. Environmental Protection Agency's decision to terminate Assistance Agreement No. 5H-84088901 pursuant to the timelines set forth in 2 C.F.R. § 1500.15.

Sincerely,

Peter J. Costello
**General Counsel & Secretary**

**New York State Energy Research and Development Authority**

**Albany**
17 Columbia Circle, Albany, NY 12203-6399
**(P)** 1-866-NYSERDA  |  **(F)** 518-862-1091

nyserda.ny.gov  |  info@nyserda.ny.gov

**Buffalo**
726 Exchange Street
Suite 821
Buffalo, NY
14210-1484
**(P)** 716-842-1522
**(F)** 716-842-0156

**New York City**
1359 Broadway
19th Floor
New York, NY
10018-7842
**(P)** 212-971-5342
**(F)** 518-862-1091

**West Valley Site
Management Program**
9030-B Route 219
West Valley, NY
14171-9500
**(P)** 716-942-9960
**(F)** 716-942-9961

EXHIBIT 6
*Dispute of Termination*
(September 5, 2025)



KATHY HOCHUL
*Governor*
CHARLES BELL
*Acting Chair*
DOREEN M. HARRIS
*President and CEO*

September 5, 2025

Michael Molina
Disputes Decision Official
Office of Mission Support
U.S. Environmental Protection Agency
By electronic mail: Molina.Michael@epa.gov

Re: Termination of EPA Assistance Agreement 5H-84088901

Dear Michael Molina:

Pursuant to 2 C.F.R. § 1500.15, the New York State Energy Research and Development Authority (NYSERDA) hereby formally disputes the U.S. Environmental Protection Agency's (EPA) decision to terminate Assistance Agreement No. 5H-84088901 between EPA and NYSERDA (Assistance Agreement). EPA has purported to terminate the Assistance Agreement by either or both of an August 7, 2025 letter and an August 8, 2025 contract amendment, each providing different and conflicting alleged reasons for the termination. EPA's unilateral decision to terminate is not in accordance with law, is arbitrary, and is a breach of the Assistance Agreement.

Specifically, and as discussed below, EPA's unilateral termination of the Assistance Agreement:[1] (a) was not directed by Section 60002 of Pub. L. No. 119-21[2] which did not direct the deobligation of obligated funds or the termination of the Assistance Agreement; (b) violates 2 C.F.R. § 200.340(a) and the termination provisions of the Assistance Agreement, as no specific reason for termination was given (indeed, many contradictory reasons were instead provided) and it was not issued pursuant to any of the regulatory or contractual grounds upon which the Assistance Agreement may lawfully be terminated; and (c) breaches the Assistance Agreement. Accordingly, NYSERDA disputes the termination decision, asks that the decision be promptly reversed, and that its Solar for All grant be immediately reinstated without any additional conditions.

---

[1] It is not clear which document EPA believes terminated the Assistance Agreement. For the purposes of this dispute, NYSERDA collectively refers to both documents when referencing EPA's termination decision, unless otherwise indicated.

[2] Section 60002 is entitled "the Repeal of the Greenhouse Gas Reduction Fund". NYSERDA refers to that statute and the larger bill it was a part of as the "federal spending legislation".

**New York State Energy Research and Development Authority**

Albany
17 Columbia Circle, Albany, NY 12203-6399
**(P)** 1-866-NYSERDA  |  **(F)** 518-862-1091

nyserda.ny.gov  |  info@nyserda.ny.gov

Buffalo
726 Exchange Street
Suite 821
Buffalo, NY
14210-1484
**(P)** 716-842-1522
**(F)** 716-842-0156

New York City
1359 Broadway
19th Floor
New York, NY
10018-7842
**(P)** 212-971-5342
**(F)** 518-862-1091

West Valley Site
Management Program
9030-B Route 219
West Valley, NY
14171-9500
**(P)** 716-942-9960
**(F)** 716-942-9961

**BACKGROUND**

**The Solar for All Program**

The Inflation Reduction Act of 2022 amended the Clean Air Act to authorize and appropriate to EPA $7 billion to make competitive grants to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies. Public Law 117-169, Sec. 60103, 136 Stat. 2065-66 (codified at 42 U.S.C. § 7434). Using this funding, EPA launched the Solar for All program. On June 28, 2023, EPA published its Notice of Funding Opportunity (NOFO), EPA-R-HQ-SFA-23-01, outlining application requirements for the Solar for All program. The NOFO indicated that, pursuant to the Inflation Reduction Act and the Clean Air Act, EPA would award up to 60 grants to States, territories, Tribal governments, municipalities, and eligible nonprofits to expand the number of low-income and disadvantaged communities that have access to affordable, resilient, and clean solar energy programs.

On October 5, 2023, NYSERDA applied to the Solar for All program under the NOFO. On July 9, 2024, EPA awarded NYSERDA a Solar for All award in the amount of $249,800,000.00. On July 12, 2024, EPA transmitted an Assistance Agreement to NYSERDA, attached hereto as **Exhibit 1**. The Assistance Agreement was fully executed on December 4, 2024, when, through Modification 1, New York's allocation of $249,800,000.00 was fully obligated. NYSERDA's Assistance Agreement, Modification 1 is attached hereto as **Exhibit 2**. Pursuant to the Assistance Agreement, EPA obligated the entire $249,800,000.00 balance of NYSERDA's Solar for All award as of the date of the modified Agreement. The funds were accessible shortly thereafter in NYSERDA's Automated Standard Application Payments (ASAP) accounts with EPA accounts.

Following the date of its Solar for All award, NYSERDA negotiated its work plan and budget with EPA. On October 22, 2024, NYSERDA submitted its final Solar for All Work Plan to EPA. The Work Plan outlined NYSERDA's plan for planning, designing, and implementing New York's Solar for All program. NYSERDA's Work Plan is attached hereto as **Exhibit 3**. Following approval of its Work Plan, NYSERDA expended significant resources, including staff time, to design and ready for implementation its Solar for All program. NYSERDA staff engaged in frequent and productive communications with EPA's assigned Project Officer(s) for this grant, who never notified NYSERDA of any fatal concerns with NYSERDA's administration of the grant. Indeed, NYSERDA and EPA staff held the last of such conversations on August 6, the day before EPA abruptly terminated NYSERDA's award. EPA's Project Officer made no statements during that meeting to indicate concerns with, or an intention to terminate, NYSERDA's Assistance Agreement.

**EPA Publicly Announces the Termination of the Solar for All program before informing NYSERDA**

At 2:07pm on August 7, 2025, EPA announced the decision to terminate the Solar for All program nationwide through an X post from EPA Administrator Zeldin. The post is reproduced below.



## The August 7 Termination Letter and Subsequent Contract Modification

At 9:25pm on August 7, 2025, NYSERDA received an email from EPA that said simply "Attached is your Termination Notification," as though this was expected, which it was not. EPA attached a document styled as a Termination Notice from an individual named Devon Brown, bearing the title of "EPA Award Official" on letterhead from the EPA "Office of Mission Support" stating that it was terminating NYSERDA's Solar for All grant. The Termination Notice is attached hereto as **Exhibit 4**. The Termination Notice stated that Section 60002 of Pub. L. No. 119-21 had repealed the underlying authority for the Solar for All program and rescinded unobligated amounts to carry out the program. The Termination Notice asserted that the law had "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and that the agency "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the Solar for All program. The Termination Letter also noted that recipients could continue to request payment from the ASAP system for allowable costs incurred up to the date of the termination notice. Notwithstanding this statement, EPA promptly locked NYSERDA out of its ASAP account, prohibiting it from requesting any further reimbursements.

On August 8, 2025, NYSERDA received Modification Number 2 (see **Exhibit 5**) (the "Agreement Modification") to the Assistance Agreement, which purported to be an amendment of the Assistance Agreement "to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements." The Agreement Modification purported to cite yet other grounds for termination of the award, but cited to and offered support for no specific provision; the Agreement Modification cited generally "2 CFR

3

200.340 and the Termination General Terms and Conditions of this agreement." It is not clear which document EPA believes terminated the Assistance Agreement. For the purposes of this dispute, NYSERDA collectively refers to both documents when referencing EPA's termination decision, unless otherwise indicated.

## EPA's Unilateral Liquidation of NYSERDA's ASAP Account

Prior to the Termination Notice, NYSERDA's ASAP account contained the amount of $248,682,519.67 as the amount available to draw down, which was the entire obligated balance of NYSERDA's Solar for All award minus NYSERDA's drawdowns to date. As of August 8, 2025, NYSERDA's ASAP account for the Solar for All program had been suspended entirely. As of August 17, NYSERDA's ASAP account access changed to a "liquidated" status and funds appeared to be available to draw down. However, during the time identified in both letters for NYSERDA to disagree or dispute the termination, NYSERDA's "available balance" listed on the account was substantially reduced, from $248,682,519.67 to $17,256,813.26, and the performance period end dates had been changed from August 31, 2029 and December 31, 2029 to August 15, 2025 and December 8, 2025, respectively.

## Litigation Backdrop

At the time of EPA's across-the-board termination of all Solar for All awards, EPA was, and at the time of this filing remains, subject to a District Court preliminary injunction prohibiting EPA from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on … any … memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress." State of New York et al v. Trump et al (D. RI, Index No. 25-cv-00039), Memorandum and Order (Mar. 6, 2025) at 44.

## Timeliness of this Dispute Submission

The Termination Notice stated that NYSERDA may dispute the termination decision no later than 30 calendar days from the date the Termination Notice was electronically sent to NYSERDA. This is consistent with 2 CFR §1500.15(a), which provides that a dispute to an EPA decision must be received by EPA no later than 30 calendar days from the date the decision is electronically sent to the affected entity. NYSERDA is submitting this dispute on September 5, 2025, which is within the 30-day period required by the Termination Notice and 2 CFR § 1500.15(a). Accordingly, this dispute is timely.

Separately, the Agreement Modification stated that, if NYSERDA disagrees with the terms and conditions specified in the Agreement Modification, it must submit a notice of disagreement to EPA within 21 days after the Agreement Modification mailing date. While the 21 days stipulated by the Agreement Modification has no support under statute or the Assistance Agreement, NYSERDA nevertheless submitted a Notice of Disagreement to EPA on August 28, 2025, which was within the 21-day period stated by the Agreement Modification. Accordingly, NYSERDA's Notice of Disagreement was also timely.

**ARGUMENT**

EPA's termination of the Assistance Agreement is not in accordance with law, is arbitrary, and is a breach of the Assistance Agreement for the reasons outlined below.

## I.    THE TERMINATION DECISION IS NOT IN ACCORDANCE WITH LAW

A.    EPA Misinterpreted and Misapplied Federal Law in Making the Termination Decision

In the Termination Notice, EPA cited Section 60002 of Pub. L. No. 119-21 as the basis for terminating the Assistance Agreement and, consequently, NYSERDA's Solar for All award. Specifically, EPA stated that Section 60002 had repealed the underlying authority for the Solar for All program and rescinded unobligated amounts to carry out the program and its administrative cost appropriation. EPA, therefore, concluded that it "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the Solar for All program. This is false.

To the extent that EPA relied on the federal spending legislation to terminate the Assistance Agreement, EPA is incorrect and its termination decision was not lawfully rendered in accordance with the statutory language. An agency action is not in accordance with law when it conflicts with the language of the statute the agency has relied upon. *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 94 (2d Cir. 2020).

By asserting that the federal spending legislation terminated all appropriations related to Solar for All, EPA misinterpreted the plain language of Section 60002, which provides that: "[s]ection 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and **the unobligated balances** of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded." (Emphasis added)

It is settled that when the words of a statute are unambiguous, judicial inquiry is complete. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). As is obvious from the plain language of the federal budget bill, only the **unobligated balances of amounts** made available to carry out the Solar for All program were rescinded. (Emphasis added) In terminating NYSERDA's Solar for All grant, EPA ignored the plain, unambiguous language of Section 60002 and erroneously proceeded as if that law directed the de-obligation of amounts that were already obligated. It did not. While the statute rescinds unobligated balances, it does not rescind amounts that were already obligated.

In the instant case, by entering into the Assistance Agreement on December 4, 2024, EPA committed to pay NYSERDA the entire $249,800,000.00 Solar for All grant amount. The $249,800,000.00 Solar for All award amount was fully obligated as of December 4, 2024, before the enactment of the federal spending legislation cited in the Termination Notice, and it continued to remain fully obligated after the enactment of the federal spending legislation. The federal spending legislation did not rescind and, indeed, had no effect on these obligated funds, such that EPA did not validly terminate the award pursuant to Section 60002.

5

EPA recognizes that funds are obligated upon award and a binding agreement with the recipient. Specifically, in a recent EPA Grants Policy Issuance, it defines an obligation as "creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[3]

To the extent that EPA also based the termination on the purported rescission of its administrative cost appropriation, such argument is also unavailing. This is because Section 60002 of the federal spending legislation rescinds unobligated balances. If Congress had intended to rescind obligated balances or intended the deobligation of obligated balances, it would not have explicitly limited the rescission to "unobligated balances." There is a presumption "that a legislature says in a statute what it means and means in a statute what it says there." *Germain*, at 254.

Accordingly, by entering into the Assistance Agreement on December 4, 2024, EPA obligated the entire $249,800,000.00 balance of NYSERDA's Solar for All award, and EPA cannot rely on Section 60002 of Pub. L. No. 119-21 to terminate NYSERDA's access to its already obligated funds.

## II.    THE TERMINATION DECISION IS ARBITRARY

### A.    EPA Has Not Offered Clear or Valid Grounds for Termination

EPA has offered a laundry list of potential and contradictory grounds on which it might have based the termination of NYSERDA's award, but no indication or substantiation of what that reason actually was. Regardless, there is no merit to any of the numerous potential grounds suggested by EPA.[4]

As an initial matter, EPA's failure to make NYSERDA aware of the specific grounds for its termination is a violation of 2 C.F.R. § 200.341(a), which requires that a written notice of termination should include the reasons for termination. EPA was required to provide detailed valid reason(s) for its termination decision. *Neeta Thakur v. Trump*, No. 25-cv-04737-RFL, 2025 U.S. Dist. LEXIS 118980, at *46 (N.D. Cal. June 23, 2025), citing *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 689 (9th Cir. 2007).

Initially, EPA sent a letter indicating that

(1) the federal spending legislation was the reason for the termination.

But then, the next day, EPA sent the Agreement Modification that said that the termination was <u>actually</u> based on a list of entirely different and unspecified reasons, purportedly any of those found in federal regulations and/or in the Termination General Terms and Conditions of this agreement itself. That list includes:

---

[3] <u>See</u> Grants Policy Issuance- 12-0, available at https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf

[4] Moreover, Administrator Zeldin's public pronouncement that EPA was "ending Solar for All for good" (see X post above) indicates that EPA may have sent all awardees the same or similar termination notices, demonstrating that it arbitrarily acted on a broad basis without specificity to actual grants.

(2) if the recipient or subrecipient fails to comply with the terms and conditions of the federal award;

(3) if the recipient or subrecipient consents to terminate the federal award;

(4) if the recipient or subrecipient of the federal award so requests; or

(5) pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

(6) The grounds provided in 2 CFR 200.339 (those being where the recipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award).

(7) The grounds listed in the version of 2 CFR 200.340 effective as of October 1, 2024 (discussed above) when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is
   a. Materially Impaired or
   b. there is adequate evidence of Waste, Fraud, or Abuse, or
   c. material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339.

All in all, between its Termination Letter and subsequent agreement modification, EPA has offered at least seven potential – and different - reasons why a federal award could in theory be terminated, but no valid reasons why this specific Assistance Agreement with NYSERDA was terminated. Nor did EPA preserve all available regulatory grounds for termination in this case, so not all of the options presented in EPA's long list are actually available to it. See 2 C.F.R. 200.340(b) ("The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."). Even if EPA had met its obligation to provide specificity in its reasoning, not one cited ground for termination finds support on this record. We address EPA's list one by one.

(1) **The argument that federal spending legislation required this termination fails for the reasons articulated in Point I.** This argument has been discussed above; for the reasons discussed in Point I (the statute does not direct or authorize termination of NYSERDA's agreement or de-obligation of federal funds), termination based on this argument is arbitrary. The Termination Letter did not cite any additional grounds for termination, indicating only one reason for EPA's decision. The contract amendment issued the next day is inconsistent with, and conflicts with, the Termination Letter, rendering EPA in violation of 2 C.F.R. 200.340(b).

(2) **The argument that the list of termination provisions in federal regulations justified termination of the Assistance Agreement fails for a number of reasons.** As an initial matter, EPA is not entitled to rely on every ground enumerated in the regulations. EPA has waived its right to rely on any termination provision afforded to it by federal regulations where EPA did not "clearly and unambiguously specify" it in the NYSERDA award agreement. 2 C.F.R. 200.340(b). Similarly, EPA chose to narrow the arguments available to it pursuant to 2 C.F.R. 200.340 by allowing termination under 2 C.F.R. 200.340(a)(1), noncompliance with the agreement, only "when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate

7

evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339." <u>See</u> Assistance Agreement, pp36-37 of Modification #1.  EPA has provided no such evident here, and therefore lacks the ability to rely on the entirety of 2 C.F.R. 200.340, as it asserts in the Agreement Modification.

We address and refute each of these regulatory provisions in turn.

2 C.F.R. 200.340(a)(1): The argument that NYSERDA may have failed to comply with the terms and conditions of the federal award fails because NYSERDA <u>has</u> complied with all terms and conditions of the award, and EPA has never raised with NYSERDA any allegations of noncompliance. Indeed, NYSERDA has maintained very good working relationships with EPA staff throughout the administration of this award, up until the day prior to termination. At that August 6 meeting, EPA staff raised <u>no indication</u> of NYSERDA wrongdoing, and discussions instead focused on NYSERDA's upcoming revised work plan submission to move the grant forward. Additionally, EPA did not raise this issue in its August 7 termination letter as the reason it was terminating the grant. Further, even if this was the ground on which EPA's termination decision rested, EPA failed to offer NYSERDA its right to remedy pursuant to the Agreement (see also Point B below) and the termination is therefore invalid.

2 C.F.R. 200.340(a)(2): The argument that NYSERDA consented to terminate the federal award fails because NYSERDA never consented, and does not consent, to the termination of the federal award. Additionally, EPA did not raise this issue in its August 7 termination letter as the reason it was terminating the grant. To the extent EPA may seek to deem NYSERDA's drawdown of funding as consent to the termination, this argument is unavailing. NYSERDA has the legal right to obtain reimbursement for its costs at any time, unfettered by additional appended implications. See 2 C.F.R 200.343.

2 C.F.R. 200.340(a)(3): The argument that NYSERDA has requested this termination fails because NYSERDA did not request this termination. The termination action was wholly a unilateral EPA construct.  The record is entirely devoid of any statement or action to indicate otherwise. Additionally, EPA did not raise this issue in its August 7 termination letter as the reason it was terminating the grant.

2 C.F.R. 200.340(a)(4): The idea that, pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, the award no longer effectuates the program goals or agency priorities fails because EPA has waived its ability to cite this regulatory provision in drafting the Assistance Agreement without including it.[5] And because it did not explicitly state this reason in its agreement with NYSERDA, EPA is not afforded the ability to rely on this provision of 2 C.F.R 200.340. Additionally, EPA did not raise this issue in its August 7 termination letter as the reason it was terminating the grant.

---

[5] To the extent that EPA may argue that its April 3, 2025 amendment to EPA's Terms and Conditions included this clause, that argument fails. The April 3, 2025, amendment to the EPA's General Terms and Conditions, by its own terms applies only to "new awards and funding amendments ... made on or after April 3, 2025". This amendment to the EPA's General Terms and Conditions is therefore inapplicable to awards made prior to April 2025, including this Assistance Agreement.

(3) **Termination provisions listed in the agreement:**

The argument that, under 2 CFR 200.339, NYSERDA has failed to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award fails because NYSERDA has fully complied with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, and EPA never asserted that it has not. EPA has never raised with NYSERDA any allegations of noncompliance with any provision of the Constitution, any law or regulation, or the Assistance Agreement. Additionally, EPA did not raise this issue in its August 7 termination letter as the reason it was terminating the grant. Even if this was the ground on which EPA's termination decision rested, EPA failed to offer NYSERDA its right to remedy and the termination is therefore invalid.

The argument that NYSERDA 2 CFR 200.339 justifies this termination fails because NYSERDA has not "failed to comply with the terms and conditions of the federal award in such a manner that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status," and EPA never asserted that it did. Not only has EPA failed to ever allege any NYSERDA noncompliance <u>at all</u>, it has certainly never alleged, or provided any evidence to support the allegation, that any such noncompliance rendered the agreement materially impaired, nor has EPA ever offered any allegation or evidence that NYSERDA has committed waste, fraud, and abuse, or that NYSERDA has made material misrepresentations of its eligibility status. Indeed, prior to its unlawful unilateral termination, EPA took no adverse action against NYSERDA of any kind, and had approved all milestones and payment requests, indicating that NYSERDA was in good standing under the award. Even if this was the ground on which EPA's termination decision rested, EPA failed to offer NYSERDA its right to remedy and the termination is therefore invalid. Additionally, EPA did not raise this issue in its August 7 termination letter as the reason it was terminating the grant.

B.  <u>EPA Has Unlawfully Deprived NYSERDA of its Rights to Remedy and Therefore Its Procedural Due Process</u>

Assuming *arguendo* that NYSERDA had failed to comply with the terms and conditions of the Assistance Agreement, EPA was contractually obligated to provide NYSERDA with a reasonable opportunity to remedy the noncompliance, which EPA did not provide. Specifically, Section III(P) of the Solar For All Programmatic Terms and Conditions to the Assistance Agreement provides that:

….Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy

under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

The Assistance Agreement goes on to say that if the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may [only then] seek remedies under 2 CFR 200.339 up to and including termination. *Id.*

EPA's failure to provide NYSERDA with its procedural due process rights as provided for in the Assistance Agreement renders EPA's termination decision unlawful and arbitrary.

### III. EPA HAS BREACHED ITS AGREEMENT WITH NYSERDA

For all of the reasons discussed in Points I and II above, EPA has breached the Agreement.

**REMEDY OR RELIEF**

NYSERDA seeks that the EPA:

a) resolve this dispute in its favor;
b) promptly reverse the termination of the Assistance Agreement without imposing any additional conditions; and
c) promptly reinstate its Solar for All grant, including its obligated balances into NYSERDA's ASAP Account, without imposing any additional conditions.

**DESIGNATED POINT OF CONTACT FOR THE DISPUTE**

Janice Dean
Senior Deputy General Counsel
NYSERDA
17 Columbia Circle
Albany, NY 12203-6399
(518) 817-7877
Janice.Dean@nyserda.ny.gov

**CONCLUSION**

The decision to terminate Assistance Agreement is not in accordance with law, is arbitrary, and is a breach of EPA's Assistance Agreement with NYSERDA. Accordingly, NYSERDA requests that EPA grant all the relief sought.

Sincerely,

Peter Costello
General Counsel and Secretary

10

cc:  Devon Brown, EPA Award Official (via electronic mail: brown.devon@epa.gov)

EXHIBIT 7

*Email from EPA re: "Solar for All Grant Closeout Instructions"*

(October 1, 2025)

**From:** SFA <SFA@epa.gov>
**Sent:** Wednesday, October 1, 2025 4:21:09 PM
**To:** SFA <SFA@epa.gov>
**Subject:** Solar for All Grant Closeout Instructions

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425)
**Submission Instructions**:
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

- o If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance during the entire performance period (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - o In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - o Progress towards objectives on program key performance metrics during the performance period.
  - o Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - o Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - o Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - o *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential

business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

EXHIBIT 8

*Letter from EPA re "Update on Dispute of EPA Assistance*
*Agreement 5H-84088901 under 2 CFR 200.340"*
(October 28, 2025)



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 28, 2025

**MEMORANDUM**

**SUBJECT:**     Update on Dispute of EPA Assistance Agreement 5H-84088901 under 2 CFR 200.340

**FROM:**     Michael D. Molina, Principal Deputy Assistant Administrator
                Grants Dispute Decision Official

**TO:**     Janice Dean, Senior Deputy General Counsel
                New York State Energy Research and Development Authority

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84088901. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.28
16:38:10 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

EXHIBIT 9

*Letter from NYSERDA re: "Objection to Closeout of EPA Assistance Agreement 5H-84088901"*
(November 3, 2025)



**KATHY HOCHUL**
Governor

**CHARLES BELL**
Acting Chair

**DOREEN M. HARRIS**
President and CEO

November 3, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC 20460
*Via electronic mail*: brown.devon@epa.gov

      Re:    Objection to Closeout of EPA Assistance Agreement 5H-84088901

Dear Devon Brown:

On September 5, 2025, the New York State Energy Research and Development Authority (NYSERDA) submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 5H-84088901 pursuant to 2 C.F.R. § 1500.15. Despite that timely dispute, on October 1, 2025, NYSERDA received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that NYSERDA complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." NYSERDA has now received EPA's October 28, 2025, memorandum purporting to declare moot NYSERDA's "dispute regarding the termination of Assistance Agreement 5H-84088901." The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that NYSERDA close out Assistance Agreement 5H-84088901.

As an initial matter, clarification is needed because EPA's October 28, 2025, memorandum references "your dispute . . . submitted on August 28, 2025." But NYSERDA did not submit its Part 1500 dispute on August 28, 2025. Rather, August 28, 2025, is the date that NYSERDA submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025, Assistance Amendment. Thus, it is unclear exactly what "EPA has rendered" moot.

Further, NYSERDA disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending. EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome

**New York State Energy Research and Development Authority**

**Albany**
17 Columbia Circle, Albany, NY 12203-6399
**(P)** 1-866-NYSERDA  |  **(F)** 518-862-1091

nyserda.ny.gov  |  info@nyserda.ny.gov

**Buffalo**
726 Exchange Street
Suite 821
Buffalo, NY
14210-1484
**(P)** 716-842-1522
**(F)** 716-842-0156

**New York City**
1359 Broadway
19th Floor
New York, NY
10018-7842
**(P)** 212-971-5342
**(F)** 518-862-1091

**West Valley Site
Management Program**
9030-B Route 219
West Valley, NY
14171-9500
**(P)** 716-942-9960
**(F)** 716-942-9961

litigation. We request that EPA reverse its mootness determination and allow the administrative dispute to proceed. At a minimum, EPA should stay the administrative dispute until the conclusion of NYSERDA's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of NYSERDA's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, NYSERDA has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require NYSERDA to close out while litigation is pending that directly concerns EPA's termination of this grant. Cf. 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." NYSERDA has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated $231,345,119.68 from NYSERDA's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for the 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, NYSERDA has not been able to complete the work required under Assistance Agreement 5H-84088901. Accordingly, EPA necessarily cannot "determine[] that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

NYSERDA does not agree to close out Assistance Agreement 5H-84088901 while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00pm on November 7, 2025.

Sincerely,

*Janice A. Dean*

Janice A. Dean
Senior Deputy General Counsel

CC:    Michael D. Molina, Grants Dispute Decision Official
       *Via electronic mail*: Molina.Michael@epa.gov