# EXHIBIT 1

5H - 84092901 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY  Grant Agreement | **GRANT NUMBER (FAIN):** 84092901  **MODIFICATION NUMBER:** 0  **PROGRAM CODE:** 5H | | **DATE OF AWARD** 07/08/2024 |
|---|---|---|---|
| | **TYPE OF ACTION** New | | **MAILING DATE** 07/11/2024 |
| | **PAYMENT METHOD:** ASAP | | **ACH#** PEND |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| OREGON DEPARTMENT OF ENERGY  550 CAPITOL ST NE # 1  SALEM, OR 97301  EIN: 93-0643773 | OREGON DEPARTMENT OF ENERGY  550 Capitol ST NE 1st Floor  Salem, OR 97301-2567 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Robert Del Mar  550 Capitol ST. NE  Salem, OR 97301  **Email:** Robert.DelMar@energy.oregon.gov  **Phone:** 503-302-7027 | Christine Clark  77 West Jackson Boulevard  Chicago, IL 60604  **Email:** Clark.Christine@epa.gov  **Phone:** 312-886-9749 | Shana Etheridge  1200 Pennsylvania Ave NW, 3903R  Washington, DC 20460  **Email:** Etheridge.Shana@epa.gov  **Phone:** 202-564-9777 |

**PROJECT TITLE AND DESCRIPTION**

Oregon Solar For All Coalition application "Note: A Special payment condition applies to this award."

See Attachment 1 for project description.

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 0.00 | **TOTAL PROJECT PERIOD COST** $ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 86,600,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 86,600,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division  1200 Pennsylvania Ave, NW Mail code 3903R  Washington, DC 20460 | Environmental Protection Agency, Grants and Interagency Agreement Management Division  OA - Office of the Administrator  1200 Pennsylvania Ave, NW Mail code 3903R  Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Acting Chief, Grants Management Branch | **DATE** 07/08/2024 |

5H - 84092901 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 86,200,000 | $ 86,200,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 86,600,000 | $ 86,600,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41062 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 86,200,000 |
|  |  |  |  |  |  |  |  |  | $ 86,200,000 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 86,600,000 |
| 15. Total EPA Amount Awarded To Date | $ 86,600,000 |

# Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

## Administrative Conditions

### A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

### D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. Programmatic Terms and Conditions

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

## 1. Performance Reports

### *Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

## 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

## 1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

***The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

### Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

## A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during

the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

### 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on

behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

#### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

> **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

> **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

> **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

> **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Health and Safety Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its

financial risk management policies and procedures.\

<u>3. Additional Requirements</u>

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** <u>EPA's Final Financial Assistance Conflict of Interest Policy</u> **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

<u>National Historic Preservation Act (NHPA)</u>

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*__The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:__*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made

available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

### 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

### 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and **Emily Salmeri** (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry

out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards  unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to

execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

## B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a

personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

EXHIBIT 2

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Oregon Solar for All**
**Work Plan**
**Project Period: 5/1/24 – 4/30/29**
**[10/18/2024]**

**Project Title: Oregon Solar for All Coalition (OSFAC)**
**Grant Number:** #84092901
**Organization Name:** Oregon Department of Energy
**Geography:** State of Oregon

During the planning year the Oregon Solar for All Coalition may review which definitions of low-income and disadvantaged communities are used for each pathway.

1. CEJST-Identified Disadvantaged Communities:

All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

2. EJScreen-Identified Disadvantaged Communities:

All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

3. Geographically Dispersed Low-Income Households:

Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development. Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using the U.S. Department of Housing Development's Family Size Adjustment factor.

1

4. Properties Providing Affordable Housing: Properties providing affordable housing that fall within either of the following two categories:
    a. multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs:
        i. Low-Income Housing Tax credit;
        ii. A housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program;
        iii. Housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or
        iv. A housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)) or
    b. naturally occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

**Introduction**

**Section 1:  Project Description**

**1.1 Overview**

The Oregon Solar for All Coalition (OSFAC) will leverage existing solar technology incentives and support platforms through a coordinated program delivery system, designed specifically to meet the needs of low-income households and residents of disadvantaged communities in Oregon. The OSFAC membership includes Oregon Department of Energy (ODOE), Energy Trust of Oregon (ETO), and Bonneville Environmental Foundation (BEF). Together, OSFAC members will deliver on the program objectives of the Greenhouse Gas Reduction Fund through the provision of financial and technical assistance across five distinct pathways:

1. Enable solar installations at single-family households with little to no upfront customer cost;
2. Point of sale rebates for multifamily buildings that provide tangible benefits to low-income residents;
3. Financial and technical assistance to develop community solar projects under the Oregon Community Solar Program (OCSP), a program regulated by the Oregon Public Utility (OPUC) Commission;
4. Financial and technical assistance to develop Consumer-owned Utility Territories' Community Solar (COUTCS) projects in areas outside of OCSP coverage; and
5. Workforce development activities. This diversified approach will maximize use of existing resources and the breadth and diversity of households served throughout the state.

**1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**

**Environmental Results - Outputs and Outcomes:**

Outputs and outcomes demonstrated in the following two tables are attributed solely to Solar for All funding under grant number #84092901.

| Anticipated Outputs and Outcomes of the OSFAC | Total |
|---|---|
| Total number of households projected to benefit from the solar program | 8,363 |
| Award funding requested per household | $10,307 |
| Megawatts of residential solar capacity deployed | 16.9 MW DC |
| Megawatts of residential-serving community solar capacity deployed | 20.5 MW DC* |
| Award funding per megawatts of solar capacity | $2.3 million |
| Award funding per megawatt hour of storage capacity across dedicated storage funds | $1.7 million |
| Award funding per megawatt hour of storage across total funding requested | $ 45.4 million |
| Award funding per Tons of CO2 avoided | TBD** |
| Award funding per $ household savings | $16.27 |
| Businesses provided business development and mentoring services | 12-16 |

* Denotes that the figure includes solar capacity deployed in IOU community solar that is dedicated to low-income households only.

**Awaiting EPA guidance on the methodology required for the Solar for All program to calculate carbon dioxide avoided.

| Anticipated Outputs and Outcomes of the OSFAC | 2026 | 2027 | 2028 | 2029 | Total over performance period |
|---|---|---|---|---|---|
| Megawatt hours of solar production (MWh) | 544 | 8,176 | 29,092 | 15,406 | 53,218 |
| Megawatt hours of storage capacity deployed | 0 | 0.5 | 1.4 | 1.9 | 1.9 |
| Tons of CO2 avoided | TBD** | TBD** | TBD** | TBD** | TBD** |
| Household savings | $67,000 | $931,000 | $2,848,000 | $1,453,000 | $5,299,000 |

**Awaiting EPA guidance on the methodology required for the Solar for All program to calculate carbon dioxide avoided.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

**Section 2:  Project Design Plan**

**2.1 Activities to be Conducted**

OSFAC will be conducting planning activities during the first year of program funding. All activities will be in support of the Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals. Planning activities will be completed in each of the five program pathways (single-family, multifamily, IOU community solar, COU community solar and workforce development) as well as overarching activities that support all program areas such as community engagement and quality assurance planning.

**Activities for all Pathways**

Each OSFAC member will hire and train staff and develop a plan detailing how program partners and entities receiving Solar for All Funds will interact, transact, or contract with consumers. This plan will cover education and outreach, sales and marketing of solar products or services, consumer purchasing, and leasing and financing materials.

1. **Initiate subrecipient awards (Jan 1 - Mar 31)**
   a. Develop subaward contracts with Energy Trust of Oregon and Bonneville Environmental Foundation to complete the tasks described in section 2.1 of the Work Plan.
2. **Develop quality assurance measures (Jan 1 – Apr 30)**
   a. Coordinate with Coalition members to develop a Quality Management Plan in accordance with EPA requirements (due 90 days after final award).
   b. Upon EPA Approval of the Quality Management Plan, coordinate with Coalition members to develop the Quality Assurance Project Plan.
   c. Establish regularly scheduled meetings with coalition members during the planning period.
3. **Develop program compliance and oversight (Jan 1 - July 31)**
   a. Review all program policies and procedures for compliance with EPA guidance
   b. Procure the services of a third-party firm to conduct compliance related risk assessments and/or various compliance-based reviews.

    c. Evaluate low-income and disadvantaged communities' eligibility requirements including adoption of definitions for low-income and disadvantaged communities.

4. **Engage with stakeholders, including tribal partners, to inform program design (Jan 1-Dec 30)**
   a. Develop and implement participatory governance structures.
5. **Community outreach and education (Jan 1 – Dec 30)**
   a. Conduct meetings with at least 10 community-based organizations in Oregon to develop overarching program outreach and delivery strategies.
   b. Develop educational materials in multiple languages highlighting Solar for All offerings across all programs.
   c. Develop public facing webpage and other materials to support consumer protection and describe project timelines and activities.
6. **Submit revised work plan (Oct 30)**

**<u>Single-family Residential</u>**

Oregon Department of Energy will utilize the planning year to develop a program to deliver the target outcomes and outputs associated with single-family households participating in Solar for All. This will include outreach and engagement with community partners to support program design and integration with existing energy related services offered in disadvantaged communities. Milestones will include development of a new statewide incentive program for low-income households, a consumer protection plan to ensure installation integrity, evaluation of additional funding strategies, and quality assurance plans that ensure acceptable data collection and reporting to EPA. The planning year will include development of a revised workplan detailing program activities in years 2 – 5 of Solar for All funding.

1. **Outreach and engagement with community partners: (Jan 1 – Dec 30)**
   a. Coordinate with community organizations to develop program design and delivery options.
   b. Establish guidelines to support community partners in compliance with state and federal requirements.
   c. Establish criteria for community partner participation.
   d. Verify eligibility to receive federal funding.
   e. Identify capacity constraints, technical assistance needs and other support for community partners.

2. **Develop Contracts with Community Partners (Jun 1 – Dec 30)**
   a. Follow state and federal procurement requirements for contract development.
   b. Initiate contracts with community partners.

3. **Develop Consumer Protection Measures (Mar 1 – Sep 30)**
   a. Proactive marketing to counter "free solar" offers.
   b. Develop approved contractor list.
   c. Develop system warranty requirements.

    d. Develop installation quality control and dispute resolution plan.
    e. Develop follow up surveys with program participants.
    f. Cost controls including competitive bidding.

**4. Develop Alternate Financing Strategies (Mar 1 – Dec 30)**
    a. Explore four options (described in the program narrative) to reduce per-household Solar for All spending in the single-family market and increases the number of homes served.
    b. Explore options to capitalize tax credits using a pass-through with non-profit community partners.
    c. Explore options to capitalize tax credits using third party ownership models.
    d. Explore additional grant funding sources from program partners. This may include funds specifically targeted to energy storage or other companion technologies that provide additional benefits.
    e. Evaluate system financing options.

**5. Program design (Jan 1 – Dec 1)**
    a. Evaluate historical data from residential solar programs to inform program design.
    b. Coordinate with community partners to develop strategies to identify and serve the most overburdened and lowest income households.
    c. Develop a customer experience path.
    d. Develop a solar contractor experience path.
    e. Develop integration strategy with existing solar incentive programs in Oregon (PowerClerk).
    f. Develop referral strategy with community partners.
    g. Develop contractor bid and selection process including federal contracting requirements.
    h. Develop special considerations for wide geographic distribution in rural communities.
    i. Adopt consumer protection parameters described above.
    j. Establish technical requirements for solar and storage installations.
    k. Develop contractor materials for compliance with federal requirements such as Davis Bacon.
    l. Establish incentive rates for solar and storage projects.

**6. Deliver Project financial assistance for pilot projects (Oct 1 – Dec 30)**
**7. Launch standard offer incentive program (Dec 1)**

**<u>Multifamily Residential</u>**

Oregon Department of Energy will utilize the planning year to develop a program to deliver the target outcomes and outputs associated with multifamily households participating in Solar for All. This will include outreach and engagement with community partners and development of a new statewide incentive program for low-income households in family developments. The planning year will include development of a revised workplan detailing program activities in years 2 – 5 of Solar for All funding.

1. **Outreach and Engagement with Community Partners (Jan 1 – Dec 30)**
   a. Coordinate with community organizations to develop program design and delivery options.
   b. Coordinate with solar industry representatives and multifamily housing developers to develop program design and delivery options.
   c. Identify community partners.
   d. Present program information to community and industry partners through face-to-face visits and presentations at conferences or other regional events.

2. **Coordination with Program Partners (Jan 1 – June 30)**
   a. Develop criteria for prioritizing storage funding for projects with highest needs.
   b. Integrate the new multifamily incentive program into the existing state funded Oregon Solar + Storage Rebate Program.
   c. Coordinate with Energy Trust of Oregon's multifamily incentives programs
   d. Coordinate with households, electric utilities, solar industry partners and multifamily project developers to ensure 20% meaningful benefits are realized by participating households.

3. **Program Design (Mar 1 – Dec 1)**
   a. Evaluate existing solar programs in Oregon to identify underserved regions.
   b. Coordinate with community partners to develop strategies to identify and serve the most overburdened and lowest income households.
   c. Develop a customer experience path.
   d. Develop a solar contractor experience path.
   e. Develop integration strategy with existing solar incentive programs in Oregon (PowerClerk).
   f. Identify industry partners.
   g. Establish technical requirements for solar and storage installations.
   h. Develop contractor materials for compliance with federal requirements such as Davis Bacon.
   i. Establish incentive rates for solar and storage projects.

4. **Deliver Project financial assistance for pilot projects (Oct 1 – Dec 30)**
5. **Launch new multifamily incentive offering (Dec 1)**

**Workforce Development**

ODOE will use the planning year to engage with industry leaders and worker representatives, and design program offerings. The planning year will include development of a revised workplan detailing program activities in years 2 – 5 of Solar for All funding.

1. **Convene Industry Leaders (Mar 1 – Sep 30)**
   a. Identify existing coalitions and venues where relevant parties have been convened already, identify parties who need to be added to program design and outreach discussions to ensure robust discussion and connections to industry and potential trainers and trainees.
   b. Convene industry leaders and worker representatives to discuss methods to ensure workforce development efforts create opportunities for graduates of training program.

2. **Develop Solar Workforce Training Grants (Jan 1 – Sep 30)**
   a. Design opportunity announcement and application for solar workforce training grants: consult with Workforce Advisory Group and stakeholders including training providers, employers, and solar industry association on criteria and priorities for awarding grants.
   b. Design program for awarding solar workforce training grants, including timeline and program processes.

3. **Develop Solar Business Accelerator Contract: (Jan 1 – Nov 30)**
   a. Design request for proposals for solar business accelerator contract: research and consult with comparable programs in the U.S., Oregon stakeholders.
   b. Work with internal administrative staff to draft and review RFP to ensure the document and all processes comport with Department and State contracting requirements.
   c. Publicize request for proposals, including presenting information at the Solar + Storage Industry Conference in fall 2025

**Oregon Community Solar Program for Customers of Investor-Owned Utilities**

Energy Trust of Oregon intends to utilize the partial planning year to define and document a program framework specific to Solar for All deployment of Oregon's existing Community Solar Program in investor-owned utility (IOU) territories. This will include development of an incentive and technical assistance plan to support projects and customer enrollment, development of a plan for collaborating with community-based organizations on outreach efforts, and development of a plan for ensuring compliance with federal requirements such as Davis-Bacon. Community based organizations (CBOs) and other stakeholders may be engaged in development of incentive and outreach plans. The program framework and community input will be utilized to develop a full plan for SFA implementation in years 2 – 5.

1. **Program development (Apr 1 – Dec 1)**
   a. Develop financial assistance offers appropriate both for private sector-led and community-led community solar project models.
   b. Convene working meetings with OCSP program leaders and stakeholders to identify potential program strategies to incorporate storage into program rules.

8

    c. Convene other potential in-state funders of community solar projects to coordinate and identify opportunities to co-fund projects.

    d. Deliver financial assistance to pilot projects.

2. **Compliance and administration planning (Apr 1 – Dec 1)**

    a. Develop systems for ensuring projects comply with federal requirements.

    b. Develop education materials for community solar developers.

    c. Review existing OCSP program operational procedures, confirm that existing processes ensure compliance with SFA household energy savings targets, and identify barriers to scaling operational processes.

    d. Identify any needed changes to program administration and procedures for project developers.

    e. Work with OCSP-designated Low-Income Facilitator to adapt existing community solar income verification processes to also verify SFA income eligibility factors, to ensure necessary share of customers residing in CEJST-identified communities, and to provide any necessary reporting.

3. **Technical assistance planning (Jan 1 – July 1)**

    a. Develop an inventory of technical assistance needs for community solar developers.

    b. Identify elements of and delivery mechanism for technical assistance effort for private sector-led and community-led community solar project models.

    c. Evaluate community solar-specific interconnection barriers and identify implementation strategy.

4. **Outreach and engagement with community partners (Jan 1 – Dec 30)**

    a. Develop plan for engaging community-based organizations in investor-owned utility territory.

    b. Engage stakeholders on specific incentive structures for OCSP projects of varying sizes and ownership.

    c. Develop tools for determining and verifying customer eligibility.

    d. Develop plan for assisting community-based organizations in developing community solar projects.

5. **Launch technical assistance program (July 1)**

6. **Launch SFA IOU community solar incentive program (Dec 1)**

**Oregon Community Solar Programs for Customers of Consumer-Owned Utilities**

**Planning Year**

Bonneville Environmental Foundation (BEF) intends to utilize the partial planning year to define and document a program framework specific to Solar for All deployment of community solar to consumer-owned utilities (COU). This will include outreach to all COUs in Oregon and engagement of those utilities that are responsive to our requests for input in the programmatic planning process. Community based organizations (CBOs) may be engaged in support of stakeholder outreach to COUs and their customers. If determined feasible, BEF will partner with one or two utilities to initiate planning and potential implementation of a pilot community solar project. The program framework and community input will be utilized to develop a full plan for SFA implementation in years 2 – 5. The potential pilot project will inform refinement of the framework and considerations for future SFA community solar projects.

1. **Design COU-specific program framework (Jan 1 – Sept 30)**

   a.  Evaluate and incorporate best practices from existing community solar projects.
   b.  Research and incorporate utility partner perspectives and barriers.
   c.  Incorporate Davis-Bacon and Build America, Buy America compliance and administration requirements and systems in parallel with broader OSFAC program.
   d.  Coordinate with and incorporate relevant IOU OCSP design considerations and complimentary incentive programs.
   e.  Leverage technical assistance and legal consultation to support items 1b-1d.

**2.  Outreach to Consumer-owned Utilities (Jan 1 – Dec 30)**
   a.  Identify and communicate with COUs throughout Oregon.
   b.  Leverage potential community-based organization subawards to support COU stakeholder outreach.
   c.  Engage related stakeholders with programmatic education and feedback mechanisms to support program framework design and technical assistance needs.
   d.  Leverage development and technical assistance to support prospective solar installation and/or upgrade project planning.

**3.  Initiate Pilot COU Community Solar Project (potential) (Jun 1 – Dec 30)**
   a.  If feasible based on item 2d, engage in detailed project planning for prospective pilot project with one to two COUs.
   b.  Leverage project development assistance, along with enabling upgrades and solar installation financial assistance, to initiate pilot project implementation based on items 2d and 3a.

**4.  Define COU Community Solar implementation plan for years 2 – 5 (Jun 1 – Dec 30)**
   a.  Document a COU community solar workplan and complete timeline for remaining years in the SFA program.
   b.  Items 1 – 3 above will inform the workplan and timeline.

**5.  Launch SFA COU Community Solar Program (Dec 1)**

**Oregon Community Solar Programs for Customers of Consumer-Owned Utilities**
   1.  COU Community Solar Specific Program Framework Definition
      a.  Documented framework in alignment with federal requirements and Oregon specific considerations will be developed in year 1.
      b.  Framework will be adjusted in subsequent years to incorporate continuous improvements based on learning from pilot and subsequent community solar projects in years 2 – 5.
   2.  COU Outreach Protocol Definition
      a.  Documented outreach protocols will be developed in year 1
      b.  Protocols will be adjusted in subsequent years to incorporate continuous improvements based on engagement and learning in years 2 - 5
      c.  Utility responses to engagement will inform project feasibility and planning efforts for years 2 – 5 implementations
   3.  COU Community Solar SFA Workplan
      a.  Documented workplan and associated timeline will be developed in year 1 to fully expend the awarded funds in delivery of the meaningful benefits intended by the program

**Meaningful Benefit Plan**

10

Solar

OSFAC will develop a plan to ensure that all participating households experience a minimum household savings of 20 percent, or a direct non-financial benefit equivalent. After engagement with stakeholders is conducted during the planning phase, OSFAC members will implement detailed criteria to ensure minimum household savings are achieved. OSFAC will use utility data available through U.S. Energy Information Administration (EIA) or in-state sources to determine required household savings levels and will ensure that households supported by the program receive at least 20 percent household energy savings on either a utility-average or building-specific basis. The OSFAC members have preliminary concepts to ensure these households savings are experienced across the four pathways:

**Single-Family:** During the planning phase ODOE will identify criteria, based on historical data to the extent practical, that demonstrate the proposed system is expected to return a minimum savings of 20 percent based on the average utility bill in that utility's territory or on the unique household data. ODOE will use these criteria to create standardized requirements of all projects receiving financial assistance. OSFAC's objective is to fully fund, or nearly-fully fund, single- family systems by leveraging existing resources and supplementing with Solar for All funds.

**Multifamily:** The objective is to fund a significant portion of onsite solar and storage on affordable multifamily properties. This will be accomplished by leveraging existing in-state funding sources managed by ODOE and ETO. The OSFAC anticipates some low-income households residing in affordable multifamily buildings will be unable to directly benefit financially from a project due to the typical metering arrangements of these buildings in the state. During the planning stage, ODOE will develop specific program design criteria required for an affordable housing provider to receive an onsite solar system and share direct or indirect financial benefits with residents.  Prior ETO multifamily solar incentives and the low- income subscription mechanisms of the OCSP allow affordable housing property managers to provide an annual, off-bill payment to their residents that is equal to an agreed-upon portion of the benefit from the solar project, and this benefit model could be utilized here. In some instances, the size of a solar installation that can be accommodated at a multifamily site may not be large enough to provide 20% saving to all households within the development. Battery storage systems will provide additional indirect benefits on a limited number of multifamily projects. ODOE will consider existing models and other options for indirect benefits indicated by HUD guidance in designing program requirements.

**OCSP:** The existing OCSP program rules are conducive to providing 20 percent household savings at the building level. Low-income participants in OCSP may be charged no more than 60 percent of the value of the bill credits they receive (which are valued based on retail energy rates). To avoid excess generation in a year with abnormally low energy consumption, the program's subscription sizing guidance suggests meeting 80 percent of a customer's energy needs with community solar. Accounting also for fixed utility service charges that OCSP bill credit rates are not designed to offset, a low-income OCSP participant will naturally experience roughly 25 percent household energy savings based on the current program design.

ETO has the responsibility to suggest or verify the subscription size of each low-income customer, leveraging utility customer billing data that ETO has access to. Because of these existing processes, ETO would have the ability to ensure that low-income OCSP participants supported by Solar for All experience 20 percent household energy savings on a building-specific basis, and to monitor these

11

savings levels over time. Lastly, customers that do not pay their own electric bill can participate in OCSP. In this scenario, the entity that pays the electric bill for a low-income household, which is typically the housing provider, can participate in the program on behalf the low-income household(s). This entity must submit annual documentation to the OCSP administrator demonstrating that at least 87.5 percent of the net financial benefits received have been shared directly with the resident household. During the program planning phase, the ETO team will engage the Oregon Public Utility Commission (OPUC) and OCSP program administration partners to identify and address any challenges associated with scaling this existing program feature to meet SFA eligibility and reporting needs and to achieve greater scale.

**Consumer-Owned Utility Territories' Community Solar:** Community solar within COU territories does not have a statewide program or standards that make savings easy to estimate. To ensure the minimum savings are achieved, calculations will be done by utilizing existing publicly available tools such as the Community Solar Business Case Tool, the Community Solar Scenario Tool, or customized tools developed to address the specific project or community conditions. By accurately forecasting the critical inputs – such as capital expenditures, applicable subsidies, value of energy, inflation/escalation, system efficiency, operations and maintenance costs, and financing terms – the program will be able to ensure that a minimum of 20 percent savings will be realized by the COUTCS participants. These models and review processes will ensure that all potential costs are included, such as lease payments, subscription costs, taxes, or utility allowances, and that the projected and realized savings are a calculated net of these potential costs to ensure that the program and products do no harm to the participating households. With quick annual calculations of reported information from projects, BEF can assess if the projections of savings are being realized by looking at production, bill credit value, and factoring in any participant costs.

ODOE will randomly sample completed projects to verify savings achieved for households annually across the four project-based pathways above. If this evaluation indicates that the necessary savings levels are not being achieved, programmatic adjustments will be made within six months of completion of random samplings to ensure compliance with grant requirements.

<u>Energy Storage</u>

The program will deliver energy resilience and grid benefits through carefully constructing criteria during the planning phase to determine where storage may be cost effective to pair with a solar system. In an ideal scenario, all solar would be paired with storage, but there are practical market realities governing not only the cost of such projects, but also challenges to the supply chain and electrical grid. During the planning phase, OSFAC members will determine specific installation scenarios that warrant storage under this program. Possible considerations include facilities that are at the end of distribution lines and therefore vulnerable to outages, residents who reside in Public Safety Power Shutoff areas, residents with critical medical needs for resilient power, and in certain scenarios where more than just the resilience value can be accrued, such as participation in a utility's demand side management program.

**Single-Family:** Storage for single family projects is not planned or budgeted in the SFA program. SFA storage funds will be reserved for multifamily and some community solar projects where a higher benefit to cost ratio can be achieved. In some cases, storage for single family projects may be pursued if alternate funding sources can be found. ODOE will consider the conditions in which storage in a single-family residence is a cost-effective investment. ODOE will not widely deploy storage on single-family residences but may evaluate whether this funding should be made available

12

for residents living in Public Safety Power Shutoff areas, who are most vulnerable to grid outages, or those with medical conditions that are exacerbated by a grid outage. Storage rebates provided under this program may also leverage a $2,500 rebate offered through the Oregon Solar + Storage Rebate Program (OSSRP) and ETO's newly launched battery storage incentive offer of up to $10,000 for storage installations for income-qualified households.

**Multifamily:** ODOE intends to prioritize storage in multifamily settings where resilience benefits will be available to all residents. Resilience benefits will be identified and measured for each specific project. To the extent practicable, this will be in alignment with the U.S. Department of Housing and Urban Development guidance.

**OCSP:** Storage cannot currently be accommodated in OCSP projects. However, there may be an opportunity to work with OPUC to revise program rules to allow such investments, particularly on project sites that serve critical community infrastructure in low-income households and disadvantaged communities (DACs). OSFAC will engage OPUC, utilities, and program stakeholders to explore whether such programmatic changes are possible and practical within Oregon's regulatory framework. If rule changes are deemed appropriate, ETO would coordinate with OCSP program staff in revising program rules in the next available annual update to the OCSP Program Implementation Manual and would revise the OCSP project funding strategy to include storage. However, these changes are not necessary for OCSP to deliver the benefits contemplated in this proposal.

All OCSP projects are installed 'in front of the meter' and interconnected directly to the electric utility grid. The OCSP program rules do not explicitly prohibit storage, but there is no established pathway for community-led projects to install a solar and storage project for resilience. During the planning year, ETO will engage the OPUC and explore what rulemaking or technical feasibility workarounds may be required to allow for smaller, community-led projects to include solar and storage in the installation process. This would allow for OCSP projects on critical community facilities to remain powered off-grid in an outage and provide deeper benefit to low-income and DAC community members.

**COUTCS:** Some COUTCS projects may be located at a residential building site, such as affordable housing. If the solar is then interconnected to the facility, whether common areas or households, battery storage could be added and support the facility operation during a grid outage. The potential deployment of storage on COUTCS project sites will be examined by BEF on a case-by-case basis, based on the unique benefits and detriments that would be experienced based on the project design.

<u>Household and Community Ownership</u>

The OSFAC program will also maximize household and community ownership models and support low-income and disadvantaged households and communities to build equity across the four project-based pathways as described below:

**Single-Family:** Participating households are likely to build equity in their homes because the solar is attached to the home and the incentives will cover most of the cost of a system installation. To the maximum extent possible, ODOE is seeking to minimize the role of any financing products needed to support the installation and equipment costs on residential solar. OSFAC is prioritizing this approach to prevent low-income households and DACs from becoming straddled with long-lasting insurmountable debt. Pathways for household ownership of solar installations will be determined

during the planning year.

**Multifamily:** ODOE is committed to exploring methods of promoting community ownership or building equity of residents in a multifamily setting during the planning phase but recognizes there may be various legal hurdles in a multifamily setting that OSFAC may not be able to overcome in all contexts.

**OCSP:** Models for community ownership already exist in Oregon and can be leveraged by this program. In OCSP, currently operational projects include a participant-owned project, a cooperatively owned project, and several nonprofit-managed projects.

ETO anticipates providing deep support to community-based organizations that intend to pursue community ownership models and will hire dedicated staff to advise these projects through the development process. This will include guidance and technical assistance on a range of factors including monetizing federal tax credits through new Elective Pay mechanisms (which could enable asset ownership by nonprofit entities), partnering with lenders to obtain low-cost financing through tools, and funding sources such as U.S. DOE's Community Power Accelerator platform and EPA's National Clean Investment Fund opportunity. ETO anticipates supporting community ownership models structured through both cooperative and nonprofit organizations.

**COUTCS:** Community solar projects owned by COUs provide an indirect means of community ownership. Several COUs in Oregon have developed community solar projects that are directly or indirectly controlled by utility customers. In Ashland, Oregon, for example, a cooperative was formed by community members who came together to advance more distributed generation. Communities across Oregon can replicate these and other models to sustain COUTCS projects far beyond the performance period.

<u>Workforce Development</u>

ODOE proposes a three-part plan to invest in jobs and businesses in low-income and DACs. The three part-plan includes:

> 1. The creation of a solar business accelerator to provide business growth coaching and mentorship.

> 2. Financial support programs that provide career exposure, pre-apprenticeship, education and training programs, and transitions to employment related to the solar industry.

> 3. The convening of industry leaders and worker representatives to discuss methods for ensuring that ODOE's workforce development efforts create opportunities for graduates of pre-apprenticeship and other training programs.

Under the first part of this plan, ODOE will establish an Oregon Solar Business Accelerator (OSBA) to offer business development and mentoring to businesses associated with the deployment of solar technology. The contracted OSBA will, to the extent practical, prioritize services to: disadvantaged business enterprises; other businesses that are certified under Oregon's Certification Office for Business Inclusion and Diversity; businesses located or serving customers in historically underutilized business zones; or businesses that operate east of the Cascade Mountain range or in coastal communities where there are fewer contractors offering solar installations. Program activities may include workshops on topics such as: 1) industry best practices; 2) business growth strategies; or 3) business mentorship. This intensive model is anticipated to serve two cohorts of six to eight businesses each. This will benefit solar deployment in regions of the state that have limited

to no solar contractors. ODOE is committed to following the practices and principles outlined in the "Six Good Faith Efforts" to ensure that disadvantaged business enterprises eligible to bid for contracts to offer training and solar contractors eligible to receive training are aware of and have opportunities to apply for and participate in the benefits of the OSBA program.

In the second part of the plan, the OSFAC is committed to expanding opportunities for workers from underserved communities by providing skills and certifications leading to high quality jobs. To fulfill this commitment, ODOE will offer a competitive grant program to support a variety of workforce development programs related to the solar industry. Projects of interest include but are not limited to: career awareness and exposure programs, development and expansion of pre-apprenticeship programs, short-term training programs (to benefit both participants and instructors), tuition assistance, and workplace experiences such as internships, on-the-job training, and mentoring for newly employed individuals. The program will also offer wraparound supportive services, requiring at least $217,000 to be deployed as wraparound supportive services by grantees. Dedicated wraparound support services will enable participants, particularly those from low-income or DACs, to enroll and stay enrolled in education, training, and initial periods of employment in occupations that support the solar industry. The dedication of funds for wraparound supportive services will be detailed during the planning phase and will comply with *EPA's participant support costs policy*. ODOE is committed to following the practices and principles outlined in the "Six Good Faith Efforts" to ensure that disadvantaged business enterprises eligible to compete for workforce development subgrants are aware of and have opportunities to apply for and receive subgrant awards under the Solar for All program in Oregon.

In the third part of the plan, ODOE will convene discussions about methods to connect graduates of training and certificate programs to employment opportunities. ODOE will leverage a new Clean Energy Workforce Advisory Group as part of ODOE's new workforce development legislative directive. The Clean Energy Workforce Advisory Group will allow for the facilitation of workforce conversations with industry leaders, workers and their representatives, and organized labor representatives to request feedback on plans, policies, procedures, and concrete goals to work with labor unions, developers, contractors, and other partners as such items evolve throughout the planning phase. Where appropriate, ODOE will coordinate with other workforce efforts in the state for additional feedback and advice, including an energy workforce coalition, convened in 2022 to coordinate outreach among Oregon-based + sharing a common interest in attracting the next generation of energy sector workers.

During the planning phase, the OSFAC is committed to working with industry leaders and worker representatives, including organized labor, to explore methods such as community workforce agreements or labor standards to ensure that workforce development efforts result in quality jobs reflecting "high road" labor practices, including providing family-sustaining benefits, predictable work schedules, retirement contributions, safe working conditions, and the free and fair choice to join a union. OSFAC members are committed to supporting good jobs in local communities to the extent practicable, recognizing that in rural areas in particular, project laborers may need to be trained and sourced from urban locations to meet performance period requirements under the award and that regional differences in wages, available workforce, and training resources may require regional adjustments to any community agreements or labor standards considered.

As described above, ODOE's dedication of program funds for grants to new and existing workforce

development programs will be open to potential investments in pre-apprenticeship programs, which will prepare candidates for Registered Apprenticeships. ODOE commits to providing funding opportunities that may support a variety of training pathways, including pre-apprenticeship programs, short-term training, and tuition assistance. These will help ensure workers a free and fair choice to collectively bargain and join a union as they progress through their career.

During the planning phase, OSFAC members will explore concepts like requiring all contractors to commit to remaining neutral in union organizing and operations, as well as project labor agreements or community workforce agreements, or standards that promote similar worker benefits on projects of a significant size. As stated above, this desire to create good jobs in local communities will also be balanced against the need to avoid potential implementation delays given the limited period of performance. The Clean Energy Workforce Advisory Group may be consulted on such considerations during the planning phase.

**Financial Assistance Strategy**

The financial assistance strategy will use the following estimated types and sizes of financial assistance. The final determination of financial assistance values under each pathway will be determined during the planning year and will include industry and other stakeholder input.

**Single-Family:** ODOE will provide rebates to support solar adoption in low-income single-family residences and DACs. Rebates provided under this program will be stacked with existing state and utility-funded financial incentive programs to fund a high percentage of, or potentially all, project capital costs to enable low-income and DACs to participate in the program with little to no amounts financed. ODOE will allow a maximum payment of $18,000 for a rooftop solar installation per single-family household with Solar for All funds. The OSFAC anticipates serving a minimum of 2,176 single-family households. During the planning phase, ODOE will evaluate precise tiers and qualifications methods, and consult with stakeholders to develop detailed qualifications and maximize the number of households served under this program.

| Single-Family Projections | Annual in IOU | Annual in COU | **Annual Totals** | **4 Year Totals** |
|---|---|---|---|---|
| Number of SF Households | 444 | 100 | 544 | **2,176** |
| Solar For All Incentives | $5,504,236 | $1,745,764 | $7,250,000 | **$29,000,000** |
| Average Incentive | $12,400 | $17,400 | $13,322 | **$13,322** |

To determine this rebate amount, OSFAC members first established the cost of a typical 5 kW rooftop solar system as $20,000, based on historical data. Next, OSFAC members compared maximum rebates currently available in both IOU and COU territories. In IOU territory the projected funding gap is $10,000 and in COU territories, the projected funding gap is $15,000. ODOE then examined the underlying assumption that the existing incentives have no limit – and that is not true. ODOE anticipates the OSSRP is only capable of providing about 500 rebates annually to households that qualify for Solar for All, so additional funds are required to fully leverage the existing ETO incentive. ODOE increased the average incentive cost by $2,400 to offset the limitations of OSSRP.

This initial plan is also premised on the assumption that OSSRP will be re-funded by the Oregon Legislature each biennium. OSSRP is currently only funded through June 30, 2025. The Oregon legislature has continuously funded the program since its inception over the course of three biennial cycles; however, this is not guaranteed to continue. If the state legislature does not continue funding of state incentives, the total number of projects that OFSAC can support will be reduced.

| Single-Family Projections, No State Funding | Annual in IOU | Annual in COU | Annual Totals | 4 Year Totals |
|---|---|---|---|---|
| Number of SF Households | 367 | 87 | 454 | 1,817 |
| Average Incentive | $15,000 | $20,000 | $15,961 | $15,961 |

Lastly, ODOE is aware of federal tax credits that may be available to homeowners. However, because the OSFAC intends to prioritize low-income households, who may have little to no federal tax liability, ODOE is not depending on the tax credit to be available as part of the funding stack for single-family households. In addition, the initial investigation of the residential tax credit applicability shows that a highly subsidized project may have its tax credit basis reduced to the point of minimal tax credit value to the homeowner. However, ODOE is committed to exploring strategies during the planning phase, which includes methods to monetize federal tax credits. If successful, these strategies will reduce the cost per participating household and expand the offerings to a greater number of households.

ODOE will seek to develop strategies to stretch federal, state, and utility program funds to increase volume in the low-income program and facilitate benefits that extend beyond the period of performance.

**Multifamily:** ODOE will provide rebates to multifamily projects that qualify for this program. ODOE proposes a stacked incentive strategy to incentivize property owners to install solar systems on multifamily properties and share benefits with tenants, particularly those who are low-income or reside in a DAC. Solar For All funds will be used in coordination with existing state- and utility-funded financial incentive programs to reduce capital costs. State funds in the incentive stack are dependent on legislative approval. ODOE estimates a Solar for All solar installation rebate of $1 per watt in multifamily projects. ODOE anticipates an average per-project grant of $180,000 in IOU territory and $210,000 in COU territory (assuming a 40-unit complex). In addition, some multifamily projects will also be eligible for storage rebates up to $80,000 per project. This multifamily approach is anticipated to serve 2,000 households in 48 projects, 24 of which are anticipated to include storage.

| Multifamily Projections | IOU Territories | COU Territories | Annual Totals | 4 Year Totals |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Number of Solar Projects | 10 | 2 | 12 | **48** |
| Number of Storage Projects | 4 | 2 | 6 | **24** |
| Fed Incentive Budget Solar | $1,819,355 | $530,645 | $2,350,000 | **$9,400,000** |
| Fed Incentive Budget Storage | $255,500 | $109,500 | $365,000 | **$1,460,000** |
| Total Incentives Budget | $2,074,855 | $640,145 | $2,715,000 | $10,860,000 |
| Number of Households | 400 | 100 | 500 | **2,000** |

If the state legislature does not continue funding of state incentives, the total number of projects that OFSAC can support will be reduced.

| Multifamily Projections if State Funding is not Approved | IOU Territories | COU Territories | Annual Totals | 4 Year Totals |
|---|---|---|---|---|
| Number of Solar Projects | 9 | 2 | 11 | **44** |
| Number of Storage Projects | 3 | 1 | 5 | **19** |
| Number of Households | 348 | 87 | 434 | **1738** |

ODOE does not expect that multifamily incentives will need to cover the full system cost for the funding to be successfully deployed. Instead, the incentive only needs to be great enough to entice multifamily owners to make these additions on their buildings.

ODOE will provide financial support for the installation of battery storage systems on select multifamily projects. Low-income households and DACs are disproportionately vulnerable to extended power outages. Deploying storage on multifamily residences is a cost-effective method of delivering resiliency benefits. To receive storage rebates, multifamily projects will be required to demonstrate how battery storage will benefit the residents in a meaningful way, such as backup power for shared refrigerators and common gathering spaces with air conditioning and filtration.

**Community Solar in IOU Territory:** ETO's approach to supporting OCSP projects is built around leveraging the existing program infrastructure and project developers of the OCSP. To maximize benefits and access for customers, the first strategy focuses on financial assistance for private sector-led projects that can quickly scale and maximize the number of low-income households served. A second strategy provides deeper financial and technical assistance to community-led projects that provide deeper benefits to low-income and disadvantaged customers. The existing OCSP program infrastructure provides a safe and efficient mechanism for community solar projects to receive on-bill subscription payments from subscribers, including low-income subscribers, while allowing participants to retain significant net savings. The program's bill credit was designed by OPUC to be set at a level that would allow a 2-3 MW project to be financially sustainable solely

18

through subscriber revenues and the monetization of federal tax credits and depreciation, while meeting the program's minimum requirements of 10 percent low-income participation. Currently, OCSP projects that would meet the additional 50 percent low-income participation requirement for both Solar for All and the OCSP carve-out are generally not financially viable without additional funding support because program rules require projects to provide 40 percent bill credit savings to all low-income participants. Because of these existing program dynamics and the traditional financing sources available to community solar developers, it is not necessary for ETO to fully fund OCSP projects. Instead, ETO's intended financial assistance strategy is based in meeting the revenue shortfall that a typical 1.5-3 MW-AC OCSP project would experience by increasing the share of project capacity provided to low-income customers from 10 to 50 percent of project capacity. Project incentive levels would be calculated primarily to compensate projects for the lower amount of subscription revenue they are permitted to collect from these low-income participants (providing an upfront incentive equivalent to the lifetime incremental change in subscription revenue), with additional funding provided to offset expected cost increases related to paying prevailing wages during project construction and other program requirements.

This strategy will make use of the base financing mechanics of OCSP and will also leverage subscription payments (both from low-income and non-low-income customers) to finance most of a project's capital costs. The value of the upfront payment needed to incentivize private-sector developers to increase low-income capacity can be directly calculated from OCSP bill credit values and average system production values — and is roughly $0.50/watt of total project capacity, assuming projects use incentives to increase low-income capacity from 10 to 50 percent of project capacity.

ETO also intends to reserve additional financial assistance to support smaller-scale community-led projects. Supporting these projects is critical to achieving specific outcomes related to community control and ownership of community solar projects, and to providing a pathway for low-income and DACs to realize their own goals and objectives related to community solar. However, these projects require deeper financial support because they are typically smaller and lack economies of scale and other efficiencies of larger projects, and the community organizations developing them need to cover their administrative costs as they build the technical capacity to develop and manage these projects. ETO also expects that community-led projects may be able to accommodate even larger percentages of low-income customers but will require additional financial support to do so. Based on ETO's incentive offers to community-led OCSP projects to date, a total incentive necessary to overcome these barriers and offer substantial household energy savings to an increased portion of program participants could be as high as $1.44/watt. ETO intends to fine-tune these estimates, as well as any eligibility criteria that go beyond a low-income capacity requirement, and that relate to community control of projects through a small-scale OCSP incentive offer that ETO plans to issue in early 2024. ETO expects community-led projects that take advantage of this additional incentive offer amount to a small share of the OCSP project capacity and financial assistance that is deployed through Solar for All, but for this to represent roughly half of the incentivized OCSP project count and to command the greatest amount of technical assistance.

This two-pronged approach to supporting OCSP strikes a balance between cost-effectively supporting large amounts of low-income households participating in OCSP and receiving substantial

household energy savings, while also prioritizing and resourcing community-led initiatives that satisfy program objectives related to community leadership, control, and potentially ownership.

The table below demonstrates the total planned incentivized program capacity, capacity subscribed by low-income customers, the expected funding required, and the expected number of households served. Note that, while OCSP program capacity is managed in terms of MW-AC, budget and impact numbers shown in the table and elsewhere are displayed in expected MW-DC to align with other OSFAC program components.

| Project Size | Large, Private Sector Led | Small, Community Led | Total |
|---|---|---|---|
| Targeted Total Project Capacity (MW-DC) | 22.6 | 2.5 | 25.2 |
| Expected Low Income % | 50% | 65% | NA |
| Total Low-Income Capacity (MW-DC) | 11.3 | 1.6 | 12.9 |
| Project Incentive $/W | $.49 | $1.44 | NA |
| Total Project Incentive Budget ($MM) | $11.02 | $3.62 | $14.64 |
| Expected Avg. Project Size (MW-DC) | 1.7 | .2 | NA |
| Expected Project Count | 14 | 11 | 25 |
| Expected Low-Income Households Served | 2,450 | 231 | 2,681 |

**Community Solar in COU Territory:** BEF will provide rebates, grants, and/or forgivable loans, ranging from 40-60 percent of a project's cost depending on the incentives available to the project. No program income will be generated. The average system size is projected to be 500 kW, and the total amount of low-income COUTCS capacity to be 7.5 MW DC. BEF anticipates supporting up to 15 COUTCS projects during the performance period. By assuming that a 5-kW subscription is needed to reduce household costs by 20 percent, the COUTCS projects could serve 1,506 low-income households at $9,668 per household during the program term.

COUTCS will likely occur at multifamily and offsite locations. The ability of associated storage to serve residences in each scenario varies and can be directly serving residences when sited on a multifamily facility. When sited as a standalone offsite community solar project, the ability of the project and associated storage may be less clear or applicable. In addition, the capacity and duration of the storage may or may not be able to serve an entire distribution circuit during a grid outage. Up to 20% of COUTCS financial assistance budget is allocated to enabling upgrades (specifically required to support CS installation) and storage. Any installed storage would be in conjunction and connected to the SFA COUTCS; utilization and siting of storage will be considered as part of overall project review. The criteria to determine when storage is a justified expense will be developed during the planning period and will include stakeholder input as well as advisory committee approval as to the priorities and budget allocations.

| Financial Assistance | Amounts | $/watt | Additional Incentives | Project Capacity (kW DC) | Avg. Subscription Size (kW) | Households Served |
|---|---|---|---|---|---|---|

| Solar Installation Rebates/Subsidies | $8,584,000 | $1.90 | $40% | 7,530 | 5 | 1,506 |
|---|---|---|---|---|---|---|
| Enabling Upgrades Rebates/Subsidies | $1,836,800 | | | | | |
| Project Development Assistance | $600,000 | | | | | |
| Totals | $11,020,800 | | | | | |

**Workforce Development Participant Support Costs:** ODOE will dedicate $2.17 million for grants for workforce training, of which at least $217,000 will be used by grantees for participant support costs. During the planning phase, ODOE will determine appropriate funding ratios to support participants in different workforce training activities eligible for funding under these grant opportunities, along with precise types of participant support costs under this grant program. This process will be informed by reviews of existing workforce programs that offer similar participant support costs within the state.

Financial Assistance Development and Design Considerations
Approximately 74 percent of Oregon's population resides within IOU territory. ETO projects that 2,618 low-income customers will be able to benefit from OCSP within these boundaries. This is a relatively high number of beneficiaries for the award amounts and represents only a small portion of the potentially eligible population within IOU territories.

The OSFAC will use the planning phase to further evaluate existing resources to ensure the financial assistance strategy complements, and does not unnecessarily duplicate, existing sources of capital and financial assistance. ODOE will accomplish this by ensuring that single-family and multifamily incentives are aligned closely with other available resources within the state. The OSFAC is working closely with other state agencies including those who provide funding statewide through Low-income Weatherization Assistance Program (WAP) services and the Low- income Heating Assistance Program (LIHEAP). During the planning phase, ODOE will work closely with stakeholders to develop a coordinated approach to customer acquisition and financial assistance delivery.

During the planning phase, the OSFAC will seek opportunities to braid newly available financial resources into the financial assistance strategy. This will include exploring how renewable energy credits, tax credits, debt financing, leases, power purchase agreements, other third-party ownership options, revolving loan programs, green bonds, guarantees, or other financing products made available from sources such as the National Clean Investment Fund and the Clean Communities Investment Accelerator may be integrated into long-term efforts.

Additionally, ODOE and ETO have engaged with a regional Clean Development Financing Institution (CDFI) and have begun researching strategies for tax credit monetization for single-family installations at low-income households. This research will continue into the planning phase so

projects, particularly those developed by community-based organizations, can receive expert technical assistance on project financing options. ODOE's strategy for deploying onsite solar at single-family homes is to combine Solar for All funding with existing in-state funding to provide systems at little to no cost for households. However, ODOE is committed to fully exploring options for strategies that would enable tax credits to be leveraged, which would allow Solar for All dollars to serve additional households.

During the planning stage, ODOE will explore four potential options that would allow reductions to the per-household Solar for All spending in the single-family market and allow increases to the number of homes served and also to support energy storage or enabling upgrades at a greater share of households. These options are:

| Strategy to Explore | Potential Result |
|---|---|
| Traditional Third-Party Ownership | If ODOE determines that TPOs are an appropriate strategy based on structures developed by other states, an incentive to third-party developers may enable more households to be served within existing budget. |
| Alignment with other funding resources | ODOE will identify additional funding sources that have potential for alignment with Solar for All rules, and where practicable, may be leveraged to support common objectives. This has the potential to increase the number of households that may be served within existing budget. |
| Low-Income Financing | Many stakeholder groups, including representatives of low-income households and DACs, have discouraged the use of financing for solar installations, however on bill financing for energy efficiency is currently deployed in Oregon effectively. During the planning phase, ODOE will explore whether a financing program, such as an on-bill payment system would be appropriate for low-income households, which hold the potential to deploy resources to more households. |
| Non-Profit Direct-Pay Partnerships | Non-profit entities may be able to serve as TPOs for low-income solar installations and monetize federal tax credits through Elective Pay. If ODOE determines that a private sector approach to TPO is not desirable for customer service or customer protection reasons, we may explore a potential strategy of partnering with one or multiple local or regional non-profits to provide such a service. |

The OSFAC will evaluate options to provide financial assistance for storage. SFA financial assistance for storage is expected to be deployed in a multifamily setting. However, during the planning phase, ODOE will conduct stakeholder outreach and engagement to determine appropriate criteria for deployment of storage in a single-family setting. At this time, ODOE is interested in exploring scenarios that may include facilities that are at the end of distribution lines and extra vulnerable to outages, residents who reside in Public Safety Power Shutoff areas, residents with critical medical needs for resilient power, and in certain scenarios where more than just the resilience value can be accrued, such as participation in a utilities demand side management program.

During the application development, the OSFAC learned of various resources throughout the state that can support enabling upgrades. BEF's COUTCS efforts will evaluate upgrades such as: interconnection costs, line upgrades, and substation upgrades. Opportunities to leverage ITC and other subsidies will be evaluated. Before committing to capital grid upgrades a cost comparison will be conducted to see if alternative approaches are more economically viable such as integrating battery storage, decreasing export capacity, or other non-wires alternatives. This funding will not exceed 20 percent of all financial assistance, in accordance with program requirements.

ETO does not anticipate funding for enabling upgrades for OCSP projects in IOU territory and will prioritize project developments in locations and on commercial structures that do not require upgrades. If during the planning year it is discovered that there is an insufficient inventory of locations that do not require enabling upgrades, ETO will explore alternatives to reduce the need for upgrades and non-SFA funding sources to cover these needs. If these are not feasible, ETO will explore the use of SFA funds and will not exceed 20 percent of all financial assistance, in accordance with program requirements.

Enabling upgrades for single family projects are not planned or budgeted in the SFA program because of the high costs. The program will work with community partners to identify households that do not require, or have recently completed, enabling upgrades. In some cases, enabling upgrades may be pursued if alternate funding sources can be found. As part of the development of the enabling upgrade strategy, ODOE will consider other sources of capital including other assistance programs at the federal, state, and local level, as well as a plan to receive referrals from DOE's Weatherization Assistance Program (WAP), or other local, state, and federal programs for energy efficiency financial assistance. This will ensure households participating in the Solar for All program are aware of additional energy saving measures. ODOE identified several possible avenues for coordination with the state agency that provides WAP and LIHEAP funding throughout Oregon. These avenues for coordination include identifying single-family households that are enrolled in, or have recently been served by, a community partner program delivering energy related services. Other avenues for coordination in the multifamily space include providing financial offerings to multifamily developers to integrate solar and potentially storage into new developments. Oregon has set ambitious housing development goals in Governor Kotek's Executive Order 23-04 set a target of developing 36,000 new homes a year. This goal represents a nearly 80 percent increase in housing development from the existing baseline. Within this context, many new housing projects, including affordable multifamily developments, are expected over the next five years. The share of financial assistance expended on enabling upgrades will not exceed 20% of the financial assistance (not total budget) over the lifetime of the program.

ODOE will provide valuable long-term resources to low-income and disadvantaged communities. ODOE will adopt policies cautiously so that low-income households are not placed in financially precarious positions due to their participation in Solar for All. ODOE commits to coordinating closely with other state agencies, the governor's office, and others charged with addressing Oregon's housing issues so that efforts are aligned.

ODOE will explore the four strategies outlined above to assist with the long- term/lifetime operations, maintenance, and recycling of the assets funded under the program. The single-family and multifamily assets are anticipated to have lifespans of 25 years or longer; however, ODOE

23

recognizes grant funds will only be available for a five-year period of performance. For that reason, ODOE will continue to explore each of the four strategies to create long-lasting resources that support solar technologies within Oregon.

During the period of performance, ODOE and ETO will conduct onsite audits of assets to ensure operations and maintenance is performed correctly, building on the processes and practices of current in-state programs. For example, ETO regularly contracts with professional service providers for onsite verification of appropriate installation practices for incentivized systems prior to payment and has budgeted to support installation verification for projects receiving Solar for All Funding that also receive ETO incentives. In the OSSRP, ODOE selects a random sampling of completed projects for inspection throughout the year. These onsite inspections benefit the contractors and the customers by providing quality control and assisting with ensuring corrective measures are taken when problems are identified. Successful installation and operations of projects will also be monitored as part of the programmatic evaluation to validate the household's savings calculations.

**Project-Deployment Technical Assistance Strategy**

By leveraging the soon-to-be-established Clean Energy Workforce Advisory Group, ODOE will work with a broad array of stakeholders in this area, including the existing public workforce system, community-based organizations, organized labor, private industry, and industry associations that are leading efforts to create training programs within solar and associated occupations. To the extent practicable, ODOE will coordinate with similar workforce funding delivered through the workforce system, including other state agencies, which oversees the state's allocation of Workforce Innovation and Opportunity Act funding, and registered apprenticeships.

With the expert advice provided from the Clean Energy Workforce Advisory Group and in consultation with other workforce programs operated by state agencies, ODOE will provide grant funding opportunities to support local workforce programs that present a plan to train and place workers in high-quality, long-term careers. ODOE is particularly interested in prioritizing applications that promote high road, worker-centered workforce training models, including one or more Registered Apprenticeship programs, pre-apprenticeship (apprenticeship readiness) programs affiliated with Registered Apprenticeship programs, Labor-Management Training Partnerships or other union-affiliated training programs, and training programs in partnership with local community colleges or institutions that serve students from LIDACs. ODOE will provide dedicated funding to support training in occupations needed to implement the OSFAC's four pathways to deploy solar technology. This dedicated funding will offer $2.17 million in competitive grant opportunities to Oregon based employers, local governments and special districts, and non-profit organizations to grow the solar workforce. Additionally, participants in these training programs will be supported with wrap-around supportive services (e.g., childcare, transportation), case management, and on-the-job support and mentorship tailored to different communities dispersed through the state. ODOE intends to dedicate at least $217,000 for the provision of wraparound supportive services.

A major component of OSFAC's project deployment technical assistance strategy includes the opportunities for businesses to access services provided by the OSBA, which will prioritize select

24

businesses for services of the OSBA that are most aligned with the goals of the OSFAC. Solar developers may be included as possible recipients of support under the OSBA. ODOE will select a contractor to operate the OSBA consistent with Oregon's procurement requirements.

ETO and BEF will make efforts to provide solar developers and communities with technical assistance to address interconnection challenges. In Oregon, interconnection issues vary based on whether the project is in IOU or COU territory and the size of the project seeking interconnection. Technical support related to interconnection will focus on community solar projects, as interconnection is not a barrier for single-family and multifamily projects.

In IOU territories, ETO will utilize the program planning period to hire dedicated staff to help projects navigate project development and the interconnection process and will develop a specific technical assistance program design that addresses known historic barriers.

Additionally, OCSP projects interconnect through their utility's Small Generator Interconnection Procedures (SGIP) procedures, which were designed for larger projects that are considerably more complex than the procedures for onsite connections that many contractors in the state are used to navigating. Most OCSP projects, including those managed by professional solar developers, have encountered substantial delays in project development due to interconnection challenges and setbacks. As part of the OCSP Program Administration team, ETO staff have recently begun joining utility-developer coordination calls to support projects in navigating these processes.

Finally, project developers often have difficulty working with utility staff to identify lower- cost alternatives to potential engineering solutions, because developers lack the expertise to understand and propose alternative solutions that satisfy detailed utility interconnection requirements. In the past, ETO has been successful in supporting MW-scale renewable energy projects through interconnection processes by funding independent engineering experts to support project developers in their utility engagements. ETO plans to hire at least one full-time employee to provide technical assistance to community-led projects. ETO staff also will engage OCSP administration partners, including OPUC, utilities, and project development stakeholders, to identify opportunities for more direct engagement in the interconnection and development process for community-led projects.

If ETO determines that community stakeholders are interested in supporting community solar projects but are not equipped to identify project sites and pursue project development, ETO is prepared to play a more direct role in community solar project development. One potential concept that ETO may develop during the planning phase is to serve as a "matchmaker" by offering a series of competitive procurements to identify and select: 1) project sites that are suitable for community solar development; 2) current ETO trade ally contractors capable of developing community solar projects at these sites; 3) a suitable entity to own and manage the resulting community solar projects; 4) an interconnection engineering resource that can take direct responsibility for submitting and managing OCSP interconnection requests; and 5) community- based organizations representing DACs that are able to conduct outreach to and recruit low-income community members to participate in the program. ETO would work with local lenders to provide the necessary project financing to enable this concept, with subscription revenues providing the necessary long-term project revenues.

25

In COUTCS projects, BEF will be able to address interconnection challenges by providing financial support to utilities or for contracted interconnection studies. However, in some cases grid limitations may limit the capacity and siting of COUTCS projects. BEF will work with contractors to provide specific technical and financial assistance to approved projects wishing to explore COU interconnection studies.

In addition to technical assistance related to interconnection, all OSFAC members intend to expand capacity for community-based outreach, provide direct management of existing programs, deliver customer service, and provide quality assurance across the OSFAC's various contractor groups, including ETO's network of trade ally contracts that install low-income solar projects.

ETO and BEF will ensure community solar projects funded under the program are efficiently deployed and resilient by providing solar developers and communities with technical assistance across a wide variety of issues. At a minimum, this technical assistance will cover issues related to project siting, land-use, permitting, building codes, inspection, and quality control. Local jurisdictional processes will be considered with support from community partners with relevant expertise and as needed, leveraging SFA budget within the project development assistance category. Findings will be documented to support future project siting. Furthermore, community benefits agreements will be evaluated and adoption encouraged during the project siting process. ETO and BEF will be able to access resources previously developed within Oregon to assist developers in this process. These resources include the Oregon Renewable Energy Siting Assessment (ORESA) tool, launched by ODOE in 2022. The ORESA tool is a collection of information about locations for current and future renewable energy and transmission development, designed to build an understanding of the opportunities and constraints that come with specific locations. Developers and other interested parties can now use the report and mapping tool developed under ORESA to understand the opportunities and constraints related to renewable energy growth and economic development. Oregon's land use laws have long included comprehensive land use requirements. These land use considerations, such as zoning requirements, climate hazards, and various agricultural and ecological considerations, are included as data layers in the ORESA tool, specifically developed for Oregon. This tool also includes limited information about military uses of Oregon's land, sea, and air space, sufficient to alert a renewable energy developer of a potential conflicting use, along with a military contact for more information pertaining to a particular site.

During the program planning period, ETO and BEF will incorporate feedback and recommendations from the solar industry, housing providers, and solar developers to determine what types of technical assistance will be most valuable in various sectors to better meet the needs of communities. The Technical Assistance strategy will highlight resources that are publicly available such as NREL's Multifamily Affordable Housing Screening report, SolarAPP+, and REopt. The DOE SolSmart program can assist local governments in siting and permitting new solar projects. These existing tools will help in providing baseline information and assistance to new and existing solar developers, and when more tailored assistance is required, ETO and/or BEF will customize support for community solar projects. This support will enable projects to evolve beyond the conceptual phase into a financially viable project with key risks mitigated. For COUs, this will be particularly important as they span a wide geography with varying land use constraints and widely varying permitting environments, and some have little to no solar experience to date. The OSFAC members

may also leverage efforts under the Resilient and Efficient Codes Implementation grant award to update and educate building officials on energy related building codes and to ensure that post-construction inspection and quality control processes are robust to protect consumers.

The OSFAC will deploy specific technical assistance resources across the pathways, customized for the needs of the financial assistance delivery method.

**Single-Family and Multifamily**: ODOE and ETO will collaborate in providing technical assistance to customers and developers engaged in single-family and multifamily solar projects funded by Solar for All. ETO will leverage its existing trade ally network infrastructure to ensure a consistent level of quality and customer standard of care across sites in this area. Trade Ally status is a requirement for a project to receive ratepayer-funded incentives through ETO that may be paired with Solar for All financial assistance. Any solar contractor may become an ETO trade ally, but they must agree to certain customer service and solar installation standards, among other requirements. Furthermore, Energy Trust's Solar Within Reach incentive for low-and-moderate income customers is only available to trade allies that perform highly across a set of objective quality metrics to ensure a positive experience and quality installation for vulnerable customers. ETO will leverage this existing program infrastructure to expand availability of technical assistance to trade ally contractors, and to ensure quality installations for participating households.

**OCSP:** ETO's technical assistance will be deployed through a mix of in-house, sub- awarded, and procured expertise. First, ETO will hire at least one FTE focused on providing technical assistance to community solar projects (described above). In addition to providing focused support on interconnection issues, this internal resource will help projects navigate issues such as site selection, land use issues, IRS elective pay, and other shared issues. Second, ETO will substantially scale its existing Community Solar Development Assistance (CSDA) offer. CSDA currently offers between $5,000 and $20,000 to OCSP projects, based on project size and prioritizing small community-led projects, to fund early-stage project development activities such as siting, feasibility assessments, project planning activities, and other early-stage project development activities undertaken either by internal staff or third-party experts. This early-stage funding has been a critical initial support for every community-led project that has submitted an OCSP project application to date. With additional funding, ETO can dramatically scale the support offered to community-led projects in early stages, providing grants or forgivable loans that mitigate risks in early-stage project development activities for community-led projects. ETO won't have income associated with SFA Program. Explorations of loans would be made by other institutions. Third, ETO will scale its community-based program implementation efforts by sub-awarding to and partnering with community-based organizations, consistent with EPA Subaward Policy, to support community outreach and education in DACs, and to also build capacity to pursue and develop OCSP projects.

**COUTCS:** Projects in Oregon's 38 COU territories will require individualized technical assistance and project-by-project evaluations to ensure project designs will deliver the minimum benefits required under this program. BEF's individualized approach is necessary because utility specific characteristics will result in different energy values, incentives available, and type of customers enrolled in the program.

BEF will procure a dedicated technical assistance provider to support both the program administration team and individual COUTCS projects. This provider will assist with preparing a projection of low-income savings or equivalent non-financial benefits. Depending on the subscription breakdown, the low-income subscriber portion could be fully subsidized, with no upfront cost, with the other project participants shouldering some of the low-income costs. This model has been successfully deployed in many COUTCS projects and creates a diverse and robust subscriber pool to ensure the outcomes of a program are met.

BEF will expand on the strong foundation of collaboration built formally and informally with COUs, which includes more than 20 COUs over the past year alone – and many of these collaborations have been focused on solar technology. Specifically, BEF will provide technical assistance such as financial modeling, tax credit analysis, grant writing support, outreach services, and deployment support. Under the OSFAC program, COUTCS projects will be able to access tailored support to overcome barriers such as lack of capacity, lack of expertise, financial barriers, challenges with billing system integration, and project siting. BEF can engage with the managers of COUs at regular utility meetings at the same time and solicit input and feedback on how to best structure a COUTCS program in their communities.

All projects may be subject to random inspections by the OSFAC after completion as part of the compliance effort to ensure that projects are built to match the description and confirm with all applicable licensing, permitting, and safety standards.

**Equitable Access and Meaningful Involvement Plan**

The OSFAC plans will maximize access to the program for low-income and DACs. The OSFAC is strategically structured with members that currently serve the entirety of Oregon in the five identified pathways proposed. This coalition-style approach allows each of the members to provide customized support within their regions and areas of expertise. This approach is both diverse and inclusive of numerous communities and voices from around our state. While OSFAC recognizes there is significant work that will need to be performed during the planning phase to ensure equitable access and meaningful involvement from communities, we have secured support from environmental justice and community-based organizations that will be instrumental in advising our approach and guiding us as we seek to better understand the barriers low-income households and DACs face in accessing the benefits of solar technologies.

The OSFAC will maximize the breadth and diversity of the communities served throughout Oregon, while still prioritizing low-income and DACs. All financial assistance distributed in pursuit of installing solar technologies for single-family residences, multifamily residences, OCSP, or COUTCS projects will be focused primarily on serving low-income households, though members of DACs that are not low-income may be served in specific program components. This will include coordination with community partners to develop strategies to identify and serve the most overburdened and lowest income households. However, some aspects of the OSFAC program design will provide benefits to all Oregonians seeking to benefit from solar technologies. For example, OSFAC efforts to provide consumer education or workforce training is done so to support OSFAC objectives — but benefits will accrue to a broader base of Oregonians.

28

Oregon has many dimensions of diversity, and this program will serve all types of communities and households. These include rural, suburban, and urban communities; communities with limited English proficiency; as well as households who do not own their property, including owners of manufactured homes on leased sites and households who do not have space for residential rooftop solar.

Oregon's two large mountain ranges divide the state into three distinct regions. Portions of Oregon's coasts receive significant rain and are classified as rainforests. Crossing the coastal mountain range are inland valleys. Approximately 2/3rds of Oregon's population resides in the Willamette Valley. Across the eastern Cascade Mountain range, Oregon's landscape changes dramatically into high desert, plains, and buttes. This diverse landscape poses challenges that may be unique to certain regions. Oregonians also speak diverse languages. When appropriate, OSFAC members will translate program materials and customer outreach and educational materials for the intended audience base, and all coalition members have budgeted appropriately for translation services.

OSFAC also intends to serve families that live in diverse housing arrangements. The five- pathway approach is strategically intended to be flexible enough to meet the needs of low-income households and DACs where they are. Pragmatically, OSFAC members acknowledge that not every house is a candidate for an individual solar installation. Some homes cannot support a rooftop installation, others may be shaded all or most of the day by numerous trees or large buildings. Fortunately, multifamily projects, OCSP and COUTCS projects can be designed to service these households where a rooftop solar installation is inappropriate.

Oregon is home to nine federally recognized Tribes. In the process of preparing this application, ODOE sent a government-to-government letter to the chairs of the nine Tribes, inviting formal collaboration on this program. This effort to engage and serve Tribal communities will continue into the planning phase of the project, if awarded. To the extent practical, the OSFAC members intend to develop funding priorities to support deployment of solar technology in low- income households and Oregon's nine federally recognized Tribes. The OSFAC members will further explore methods of prioritization methods during the planning phase, in tribal consultation, to develop models that will provide benefits to Oregon's nine federally recognized Tribes.

Workforce availability also varies by geography. Workforce training facilities and instructional expertise focused on renewable energy are largely located in the more densely populated Interstate-5 corridor. Through conversations with stakeholders, the OSFAC identified the need to expand workforce development opportunities in rural areas of the state to support solar deployment.

Throughout the life of the program, ODOE will continue to meaningfully engage with stakeholders and offer opportunities for participatory governance, where interested parties can weigh in on the design of the program. This participatory governance structure will be developed in the first three months of the planning phase and will be robustly implemented during the subsequent nine months of the planning phase. Periodic opportunities for additional participatory governance will occur in the three months following the release of the annual programmatic evaluation.

ODOE may elect during the planning phase to provide modest and prudent participant support costs

to individuals or provide sub-awards to community-based organizations who support this work on behalf of the community interests they represent, based on the level of involvement sought under this participatory governance structure. This includes considerations for effective engagement with Tribes and/or other environmental justice organizations, who operate on limited budgets and staff capacity. This would be in addition to the sub-awards provided to community partners envisioned as part of the community solar technical assistance described above.

The OSFAC members will use different methods to provide education, outreach, and community engagement on programmatic offerings. ODOE will develop unified educational materials designed for general usage among the OSFAC members. However, specialized materials will be developed by different members to engage diverse audiences. These materials may be web- based, paper materials, audio-visual materials, or education offered through in-person meetings and conversations. Where appropriate, ETO and BEF intend to offer contracts or subawards to trusted, community-based organizations to facilitate outreach and engagement with certain populations, including those with limited English proficiency. This approach will be carefully crafted during the planning phase, so that agreements are compliant with 2 C.F.R. Part 200.331 and the *EPA's Subaward policy*, as well as *EPA's Guidance on Participant Support Costs*.

The OSFAC will implement a robust strategy for customer acquisition and retention for the program. All OSFAC members acknowledge that existing programs do not serve low- income households and DACs to a satisfactory extent. Therefore, OSFAC members have started strategizing about tactics to support a strong customer acquisition strategy, so the benefits of solar technologies can be brought to scale for low-income and DACs. Programs will only serve participants that meet the low-income and DAC definitions in the terms and conditions. Further measures will be developed where appropriate to ensure benefits from funded projects continue to serve eligible households even if the original beneficiary moves or leaves the program. Described below are initial concepts that will evolve during the planning year:

**Single-Family:** ODOE will work with other state agencies to identify households that received roof upgrades or repairs within the last five years. ODOE plans to use partnerships to identify customers and plans to coordinate with existing need-based federal, state, Tribal, or utility assistance programs (e.g., WAP, SNAP, TANF, Lifeline, LIHEAP). Households identified through these programs may be candidates for a single-family solar installation and this could assist with the initial customer base to launch the program. The program will also leverage ETO's existing customer care and call center infrastructure to support participants in learning about and understanding the program's offers. ETO will also hire an additional FTE on its customer care team partially funded by SFA specifically to ensure quality customer care by trade ally contractors and that any issues or disputes that may arise when serving vulnerable populations are speedily and appropriately addressed.

**Multifamily:** In addition to coordinating with the existing OSSRP applications, ODOE intends to work with state agencies which support the development of new affordable housing projects. By leveraging other programs, developers of new affordable housing projects can be rapidly identified for potential multifamily projects.

**OCSP:** ETO will leverage the existing infrastructure of the program to acquire and manage customers. The OCSP funds a low-income facilitator (LIF), which is a designated community- based

organization charged by OPUC with recruiting low-income participants on behalf of participating projects. The LIF's current outreach approach focuses on engaging non-English speaking households and other underrepresented groups to participate in the program. The OSFAC team has engaged the OCSP LIF and confirmed its ability to support expanded low-income recruitment in OCSP and to align recruitment with EPA customer eligibility requirements using existing program funding, without the need for EPA funding to support these efforts. ETO does plan to further support the enrollment of low-income and DAC members through the community partner funding model described above, wherein roughly five community organizations would receive funding to hire a staff person dedicated to outreach and education to targeted populations, as well as to directly pursue community solar project development. All subawards will be made in accordance with EPA's subaward policy.

**COUTCS:** BEF will leverage their extensive partnership network and collaborative relationships with COUs to identify potential projects that could be realized with the provision of financial and technical assistance. These identified projects will be offered various support to both identify customers and manage projects.

**Workforce Development:** ODOE intends to replicate similar models for grant making used by other state agencies after the 2022 legislative passage of Oregon's Future Ready funding. Future Ready provided $200 million primarily designed to be dispersed as grant funds to support and expand on existing workforce development programs in the state. ODOE will seek lessons learned from other state agencies to identify recipients who can rapidly and successfully deploy workforce programs to foster growth of the solar industry.

Also cognizant of the Justice40 initiative, all OSFAC participant recruitment efforts, including any provision of contracts or subawards to organizations to assist with recruitment, will be conducted in a manner that is mindful of the Justice40 Initiative. When appropriate, priority will be given to entities that demonstrate strong ties to DACs identified by the Climate and Economic Justice Screening Tool (CEJST) or EJ Screen's Supplemental Indexes.

To reduce waste from fraud and abuse, the OSFAC members will use different methods, including categorical eligibility or other tools that minimize burdens on households.

**Single-Family**: Currently, ODOE's existing OSSRP model permits two methods by which a household may become income-qualified to participate. The first option is to provide documentation that shows household eligibility for LIHEAP, the Oregon Energy Assistance Program, WAP, SNAP, Medicaid, or CHIP. The second method is for the household to provide a tax transcript from either the IRS or Oregon Department of Revenue from one of the previous two tax years. ODOE anticipates deploying a similar model for Solar for All and will develop procedures during that planning year that ensure that program participants meet the low-income and DAC definitions in the terms and conditions.

**Multifamily:** The incentives currently available for multifamily low-income service providers are determined eligible if they are eligible for public assistance. The OSFAC will consider similar requirements during the planning phase.

**OCSP:** Within the OCSP, participants can self-attest to income levels in a manner approved by OPUC. During the OCSP program design process, it was determined that alternatives to self-attestation would be unduly restrictive and counter to the objective of forming an easily- accessible program for low-income households. However, the role of the OCSP LIF in managing the program's income verification process is designed to minimize the risks of improper enrollment. The nature of income verification is not made public by the program, and as part of the enrollment process, the LIF collects income information through an intake phone call with the customer, which builds trust and minimizes the risk of fraud. Project managers are not permitted to provide their own records of income eligibility self-attestation in lieu of the program-controlled process. The OCSP also accepts categorical eligibility, such as a household residing within an affordable housing property. These existing OCSP program resources will be used to enroll participants in projects supported by Solar for All, and ETO will engage OCSP program implementation partners to adapt customer intake and verification processes to ensure that customers enrolled in these projects satisfy both OCSP and SFA household eligibility requirements.

Oregon's administrative rules and OCSP implementation manual (approved by the OPUC) allows income self-reporting in OCSP. During Oregon's public comment and rulemaking process for the OCSP, agencies that serve people with low incomes and PUC staff concluded that requiring income documentation proved to be costly and time-consuming. Stakeholders and the PUC agreed that income verification and documentation proved inefficient and not feasible if the program were to achieve its per-project low-income requirement.

As the program currently allows for self-reported income, the LIF will continue to carefully screen and qualify households by income, as well as other categorical definitions of low-income and DAC. ETO will work with the LIF during the planning year to adapt the current screening process to limit improper enrollment, as well as develop a screening tool that prioritizes categorical SFA LI definitions that may allow the LIF to selectively assign those subscribers to SFA-funded projects.

Lastly, the OCSP program rules require that all LI subscribers face no upfront costs, no termination fees, discounts on subscription, and guaranteed energy bill savings. These program rules will safeguard any LI OCSP beneficiaries from the risk of penalty should the LI subscriber ever move. They also allow a framework for the subscriber to transfer their subscription within the same utility territory if the subscriber moves needed. The program's composition and delivery team include a Low-Income Facilitator (LIF) that will educate and screen LI subscribers upfront, thereby allowing for better costumer education and subscriber retention.

**COUTCS:** Income-qualification methods will be similar to the above methods when operating within COUTCS projects. Many of the same dynamics and programmatic services are offered across utility territories except for the self-attestation method currently in operation by the OCSP. The distinction within COUTCS projects is the strong overlay with DACs defined by the CEJST tool, and the ability of the OSFAC to utilize this specific geography in eligibility criteria. BEF will strive to acquire community solar participants that are categorically eligible, have provided income verification, or, when infeasible, reside with the defined DACs and self-attest to their income eligibility.

**Section 3:  Fiscal Stewardship Plan**

ODOE will provide the policies and controls for program oversight. As a state agency, ODOE has existing policies and procedures in place to reduce waste, fraud, and abuse, including policies and controls for program oversight. ODOE's internal auditor will review plans, evaluate risks and conduct internal program audits. ODOE will also procure services of a third-party firm to conduct compliance related risk assessments and/or various compliance-based reviews to assist the agency in ensuring strong internal controls, proper administration, and minimizing the risk of waste, fraud and abuse. Current practices include risk assessments of all subrecipients and appropriate controls respective to the risk determination for each subrecipient, which may include financial and onsite monitoring in accordance with the requirements for providing oversight of pass-through funds under 2 C.F.R. Part 200.302 and 2 C.F.R. Part 200.332. ODOE employs practices such as monthly budget-to-actual grant reporting and supports transparent performance tracking and strong procurement practices to provide for strong internal controls. State-specific policies that align with federal requirements for grant compliance can be found in Chapter 30 of the Oregon Accounting Manual. Oregon also protects confidential whistleblowers through a reporting hotline directly available on the homepage of the Oregon Secretary of State's office. This site clarifies that the office investigates both state agencies and reports of other entities who receive either state or federal funds from the state and provides information to potential reporters about whistleblower protections.

ODOE will ensure that all subrecipients comply with the US EPA's policy on conflict of interest through incorporating all necessary requirements into performance. The OSFAC members will also ensure that procurement, conflict of interest, and appropriate financial management and reporting are incorporated into project monitoring on all funded projects. ODOE budgeted sufficient staff time and resources to conduct samplings for site specific compliance, as well as subrecipient monitoring on an annual basis to monitor oversight of grant progress and compliance. The OSFAC is also committed to investing in policies and practices that support consumer protection. Given the purpose of these funds is to serve low-income and DACs, the OSFAC is mindful of the importance for strong consumer protection standards that will be necessary for successful project deployment. The OSFAC is acutely aware that historically DACs may be distrusting of programs such as Solar for All. Strong consumer protections will help build trust and demonstrate that participants experience direct benefits from the program.

Each OSFAC member will develop a plan detailing how program partners and entities receiving Solar for All Funds will interact, transact, or contract with consumers. This plan will cover education and outreach, sales and marketing of solar products or services, consumer purchasing, and leasing and financing materials. All aspects of services will be required to comply with applicable consumer protection laws, including laws prohibiting unfair, deceptive, and abusive practices, the Consumer Protection Act, Fair Debt Collection Practices Act, and Regulation Z.

To that end, each OSFAC member will carefully screen entities expected to directly interact, transact, or contract with consumers in the program. This will include requirements for contractors to participate in the program. If a particular contractor is found to be in violation of the program standards, they will be removed from further participation in the program. To support consumer protection, ODOE will test random samples of transactions and sites will be selected for physical inspections to confirm that: customers are not charged illegal upfront or cancellation fees; customers experience transparent and verifiable subscription payments, where applicable, and billing processes; and have accessibility if they have limited English proficiency. ODOE will use a

judgmental auditing method at least annually. These transaction tests will also ensure that consumers are not exposed to predatory lending programs under the Solar for All program. Loan products will be limited to only those products that the program develops. Where appropriate, ODOE will consider methods to support consumer education campaigns about solar technology and available programs, as well as warnings about predatory practices that may exist within the state. ODOE will implement appropriate guardrails to ensure household savings materialize for program beneficiaries by performing audits or spot-checks of bills. For the duration of the grant, random samplings will not only be done to recently completed projects, but to a reasonable extent, a sampling will be pulled from projects completed at least a year prior.

The program will also undergo annual programmatic evaluations to determine programmatic strengths and weaknesses. This evaluation will evaluate the progress of the grant, as well as effectiveness in serving different customers, including customers living DACs, rural communities, tribal communities, and customers who speak a language other than English.

**Section 4:  Timeline and Milestones**



36

**Activities for all Pathways**

| Activity Title | Start Date | End Date |
|---|---|---|
| **Initiate subrecipient awards** | **01/01/25** | **03/31/25** |
| Develop subaward contracts with coalition members | 01/01/25 | 03/31/25 |
| **Develop quality assurance measures** | **01/01/25** | **04/30/25** |
| Develop Quality Management Plan | 01/01/25 | 03/31/25 |
| Review Quality Management Plan | 01/01/26 | 03/31/26 |
| Review Quality Management Plan | 01/01/27 | 03/31/27 |
| Review Quality Management Plan | 01/01/28 | 03/31/28 |
| Review Quality Management Plan | 01/01/29 | 03/31/29 |
| Develop Quality Assurance Project Plan | 01/01/25 | 03/31/25 |
| Review Quality Assurance Project Plan | 01/01/26 | 03/31/26 |
| Review Quality Assurance Project Plan | 01/01/27 | 03/31/27 |
| Review Quality Assurance Project Plan | 01/01/28 | 03/31/28 |
| Review Quality Assurance Project Plan | 01/01/29 | 03/31/29 |
| Establish regularly scheduled meetings with coalition | 01/01/25 | 04/30/25 |
| **Develop program compliance and oversight** | **01/01/25** | **07/31/25** |
| Review policies & procedures for compliance | 01/01/25 | 04/30/25 |
| Engage third-party firm in compliance activities | 04/30/25 | 07/31/25 |
| Evaluate LIDAC eligibility requirements | 01/01/25 | 06/30/25 |
| **Engage with stakeholders to inform program design** | **01/01/25** | **12/31/25** |
| Develop and implement participatory governance structures | 01/01/25 | 12/31/25 |
| **Community outreach and education** | **01/01/25** | **12/31/25** |
| Engage 10+ local CBOs to develop outreach & delivery strategies | 01/01/25 | 12/31/25 |
| Develop educational materials | 04/01/25 | 12/31/25 |
| Develop public-facing webpage & other materials | 01/01/25 | 04/01/25 |
| **Submit revised work plan** | **10/30/25** | **10/30/25** |
| **Program review cycle** | **01/01/26** | **08/31/28** |
| Periodic review of program | 06/01/26 | 08/31/26 |
| Periodic review of program | 06/01/27 | 08/31/27 |

37

| | | | |
|---|---|---|---|
| Periodic review of program | | 06/01/28 | 08/31/28 |

**Single-family Residential**

| Activity Title | Start Date | End Date |
|---|---|---|
| **Outreach and engagement with community partners** | **01/01/25** | **12/31/25** |
| Develop program design & delivery with community orgs | 01/01/25 | 12/31/25 |
| Establish guidelines to support community partners | 03/01/25 | 12/31/25 |
| Establish criteria for community partner participation. | 03/01/25 | 12/31/25 |
| Verify eligibility to receive federal funding | 04/01/25 | 12/31/25 |
| Identify support needs for community partners | 01/01/25 | 12/31/25 |
| **Develop Contracts with Community Partners** | **06/01/25** | **12/31/25** |
| Develop and submit guidelines to US EPA for subawards | 06/01/25 | 09/30/25 |
| Follow procurement requirements for contract development | 06/01/25 | 09/30/25 |
| Initiate contracts with community partners | 10/01/25 | 12/31/25 |
| **Develop Consumer Protection Measures** | **03/01/25** | **09/30/25** |
| Proactive marketing to counter "free solar" offers. | 03/01/25 | 09/30/25 |
| Develop approved contractor list | 06/01/25 | 09/30/25 |
| Develop system warranty requirements | 06/01/25 | 09/30/25 |
| Develop installation quality control plan | 03/01/25 | 07/31/25 |
| Develop follow up surveys with program participants | 06/01/25 | 09/30/25 |
| Cost controls including competitive bidding | 03/01/25 | 09/30/25 |
| **Develop Alternate Financing Strategies** | **03/01/25** | **12/31/25** |
| Explore options to reduce per-household spending & increase homes served | 03/01/25 | 12/31/25 |
| Explore options for tax credits using a pass-through with non-profit community partners. | 03/01/25 | 12/31/25 |
| Explore options for tax credits using third party ownership models | 03/01/25 | 12/31/25 |
| Explore additional grant funding sources from program partners | 03/01/25 | 12/31/25 |
| Evaluate system financing options | 03/01/25 | 12/31/25 |
| **Program design** | **01/01/25** | **12/01/25** |
| Evaluate historical data from residential solar programs | 01/01/25 | 03/31/25 |

38

| | | |
|---|---|---|
| Develop strategies to identify & serve the most overburdened & lowest income households | 03/01/25 | 11/28/25 |
| Develop a customer experience path. | 03/01/25 | 09/30/25 |
| Develop a solar contractor experience path | 03/01/25 | 09/30/25 |
| Develop PowerClerk integration strategy | 03/01/25 | 12/01/25 |
| Develop referral strategy with community partners | 03/01/25 | 12/01/25 |
| Develop contractor bid and selection process | 03/01/25 | 12/01/25 |
| Develop geographic distribution considerations | 03/01/25 | 12/01/25 |
| Adopt consumer protection parameters | 03/01/25 | 09/30/25 |
| Establish technical requirements for solar & storage installations | 03/01/25 | 09/30/25 |
| Develop Davis Bacon materials for contractors | 03/01/25 | 09/30/25 |
| Establish incentive rates for solar & storage projects | 03/01/25 | 09/30/25 |
| **Deliver Project financial assistance for pilot projects** | **10/01/25** | **12/31/25** |
| **Launch standard offer incentive program** | **12/01/25** | **12/01/25** |
| **Implementation of pathway** | **12/02/25** | **04/30/29** |

### Multifamily Residential

| Activity Title | Start Date | End Date |
|---|---|---|
| **Outreach and Engagement with Community Partners** | **01/01/25** | **12/31/25** |
| Coordinate with community organizations to develop program design and delivery options. | 01/01/25 | 12/31/25 |
| Coordinate with solar industry representatives and multifamily housing developers to develop program design and delivery options | 01/01/25 | 12/31/25 |
| Identify community partners | 03/01/25 | 12/31/25 |
| Present program information to community and industry partners | 06/01/25 | 12/31/25 |
| **Coordination with Program Partners** | **01/01/25** | **06/30/25** |
| Develop criteria for prioritizing storage funding for projects | 01/01/25 | 06/30/25 |
| Integrate the new incentives into the existing state funded program | 03/01/25 | 06/30/25 |
| Coordinate with ETO's multifamily incentives programs | 01/01/25 | 06/30/25 |
| Ensure 20% meaningful benefits are realized by participating households. | 01/01/25 | 06/30/25 |

| | | |
|---|---|---|
| **Program Design** | **03/01/25** | **12/01/25** |
| Evaluate existing solar programs in Oregon to identify underserved regions. | 03/01/25 | 06/30/25 |
| Develop strategies to identify and serve the most overburdened and lowest income households. | 03/01/25 | 11/28/25 |
| Develop a customer experience path. | 03/01/25 | 09/30/25 |
| Develop a solar contractor experience path | 03/01/25 | 09/30/25 |
| Develop PowerClerk integration strategy | 03/01/25 | 12/01/25 |
| Identify Industry Partners | 03/01/25 | 12/01/25 |
| Establish technical requirements for solar and storage installations | 03/01/25 | 09/30/25 |
| Develop Davis Bacon materials for contractors | 03/01/25 | 09/30/25 |
| Establish incentive rates for solar and storage projects | 03/01/25 | 09/30/25 |
| **Deliver Project financial assistance for pilot projects** | **10/01/25** | **12/31/25** |
| **Launch new multifamily incentive offering** | **12/01/25** | **12/01/25** |
| **Implementation of pathway** | **12/02/25** | **04/30/29** |

## Workforce Development

| Activity Title | Start Date | End Date |
|---|---|---|
| **Convene Industry Leaders** | **03/01/25** | **09/30/25** |
| Identify participants for program design and outreach discussions | 03/01/25 | 09/30/25 |
| Identify and convene participants for discussions about connecting trainees to jobs | 03/01/25 | 09/30/25 |
| **Develop Solar Workforce Training Grants** | **01/01/25** | **09/30/25** |
| Design opportunity announcement for solar workforce training grants | 01/01/25 | 07/31/25 |
| Develop and submit guidelines to US EPA for subawards | 01/01/25 | 07/31/25 |
| Design workforce training grants program | 01/01/25 | 09/30/25 |
| **Develop Solar Business Accelerator Contract** | **01/01/25** | **11/30/25** |
| Design RFPs for solar business accelerator contract | 01/01/25 | 11/30/25 |
| Work through Department and State contracting process | 01/01/25 | 11/30/25 |
| Publicize RFPs | 01/01/25 | 11/30/25 |
| **Implementation of pathway** | **12/02/25** | **04/30/29** |

**Oregon Community Solar Program for Customers of Investor-Owned Utilities**

| Activity Title | Start Date | End Date |
|---|---|---|
| **Program development** | **04/01/25** | **12/01/25** |
| Develop financial assistance for private-sector-led and community-led community solar | 04/01/25 | 11/28/25 |
| With OCSP, identify strategies to incorporate storage into program rules | 04/01/25 | 11/28/25 |
| Explore co-funding with other potential in-state funders | 04/01/25 | 11/28/25 |
| Deliver financial assistance to pilot projects | 07/01/25 | 11/28/25 |
| **Compliance and administration planning** | **04/01/25** | **12/01/25** |
| Develop systems for ensuring projects comply with federal requirements | 04/01/25 | 11/28/25 |
| Develop education materials for community solar developers | 04/01/25 | 11/28/25 |
| Review existing OCSP program operational procedures, confirm that existing processes ensure compliance with SFA household energy savings targets, and identify barriers to scaling operational processes. | 04/01/25 | 11/28/25 |
| Identify any needed changes to program administration and procedures for project developers | 04/01/25 | 11/28/25 |
| Work with OCSP-designated Low-Income Facilitator to adapt existing community solar income verification processes to also verify SFA income eligibility factors, to ensure necessary share of customers residing in CEJST-identified communities, and to provide any necessary reporting. | 04/01/25 | 11/28/25 |
| **Technical assistance planning** | **01/01/25** | **07/01/25** |
| Develop an inventory of technical assistance needs for community solar developers | 01/01/25 | 06/30/25 |
| Identify elements of and delivery mechanism for technical assistance effort for private-sector-led and community-led community solar project models | 01/01/25 | 06/30/25 |
| Evaluate community solar-specific interconnection barriers and identify implementation strategy | 01/01/25 | 06/30/25 |
| **Outreach and engagement with community partners** | **01/01/25** | **12/31/25** |
| Develop plan for engaging community-based organizations in investor-owned utility territory | 01/01/25 | 12/31/25 |

| | | |
|---|---|---|
| Engage stakeholders on specific incentive structures for OCSP projects of varying sizes and ownership | 01/01/25 | 12/31/25 |
| Develop tools for determining and verifying customer eligibility | 01/01/25 | 12/31/25 |
| Develop plan for assisting community-based organizations in developing community solar projects | 01/01/25 | 12/31/25 |
| **Launch technical assistance program** | **07/01/25** | **07/01/25** |
| **Launch SFA IOU community solar incentive program** | **12/01/25** | **12/01/25** |
| **Implementation of pathway** | **12/02/25** | **04/30/29** |

### Oregon Community Solar Programs for Customers of Consumer-owned Utilities

| Activity Title | Start Date | End Date |
|---|---|---|
| **Design COU specific program framework** | **01/01/25** | **09/30/25** |
| Evaluate and incorporate best practices from existing community solar projects | 01/01/25 | 09/30/25 |
| Research and incorporate utility partner perspectives and barriers | 01/01/25 | 09/30/25 |
| Incorporate systems to comply with all Federal compliance requirements w OSFAC | 01/01/25 | 09/30/25 |
| Incorporate relevant IOU CS design considerations & complimentary incentive programs | 01/01/25 | 09/30/25 |
| Leverage technical assistance and legal consultation to support program framework | 01/01/25 | 09/30/25 |
| **Outreach to Consumer-owned Utilities** | **01/01/25** | **12/31/25** |
| Identify and communicate with COUs throughout Oregon | 01/01/25 | 12/31/25 |
| Document outreach protocols and best practices | 04/01/25 | 12/31/25 |
| Leverage community-based organization subaward for COU outreach | 01/01/25 | 12/31/25 |
| Engage stakeholders in program design and technical assistance needs | 01/01/25 | 12/31/25 |
| Leverage financial assistance to support solar project planning | 01/01/25 | 12/31/25 |
| **Initiate Pilot COU Community Solar Project (potential)** | **06/01/25** | **12/31/25** |
| If feasible, engage in detailed pilot project planning with one to two COUs | 06/01/25 | 12/31/25 |
| Leverage financial assistance budget for implementation of pilot project(s) | 06/01/25 | 12/31/25 |
| **Define COU Community Solar implementation plan for years 2 – 5** | **06/01/25** | **12/31/25** |
| Document a COU workplan and complete timeline for remaining years in the SFA program | 06/01/25 | 12/31/25 |
| **Launch SFA COU Community Solar Program** | **12/01/25** | **12/01/25** |

| Implementation of pathway | 12/02/25 | 04/30/29 |
|---|---|---|
| Refine COU framework to incorporate continuous improvements in years 2 - 5 | 12/02/25 | 04/30/29 |
| Adjust outreach protocols to incorporate continuous improvements in years 2 - 5 | 12/02/25 | 04/30/29 |
| Incorporate utility feedback into project feasibility and planning in years 2 - 5 | 12/02/25 | 04/30/29 |
| Execute solar installation & related upgrades in alignment with COU workplan | 12/02/25 | 04/30/29 |

**Section 5:  Reporting Requirements**

**Reporting Plan:**  ODOE will report collective results based on the outputs and outcomes included in the logic model, shown below:



ODOE will build program capacity to perform evaluation activities and detail a plan to publish data, evidence, and evaluation reports publicly during the program lifetime. This includes conducting an annual evaluation, which will assess programmatic performance and validate realization of household savings.

Additionally, ODOE will leverage systems for financial management, performance reporting, and federal compliance expertise within the agency. Coalition members ETO and BEF are also applicants under other federal competitive grants and may be able to leverage common systems used by their organizations, if selected for awards. During the planning phase, all OSFAC members will construct robust reporting systems to comply with the requirements of Section VI.C of the Request for Application, Order 1000.33, as well as any requirements specific to the grant terms and conditions.

1. Performance Reports

Semi-Annual Report
The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

Final Report

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.


2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.


**Section 6:  Budget Narrative**

**6.1 Project Budget**

45

| Category | Amounts | |
|---|---|---|
| Personnel | $2,083,281 | |
| Fringe Benefits 51.9% | $1,081,222 | |
| Travel | $155,585 | |
| Supplies | $1,000 | |
| Contractual | $1,863,998 | |
| Other | | |
|     Printing Costs | $7,000 | |
|     Participant Support Costs | $39,860.000 | |
|     Sub-awards | $39,881,480 | |
|     In-Kind | $400,000 | |
| Indirect Cost 40.02% | $1,266,434 | |
| **Total** | **$86,600,000** | |

## Personnel

The following ODOE personnel will support Solar for All program activities:

| Job Title | Average Salary Y1-Y5 | # Personnel | Time Assigned Y2-Y5 | Cost BPY1 | Cost BPY2 | Cost BPY3 | Cost BPY4 | Cost BPY5 |
|---|---|---|---|---|---|---|---|---|
| Division Administrator | $159,716 | 1 | .20 | $38,942 | $32,141 | $32,141 | $32,141 | $32,141 |
| Manager | $119,804 | 1 | .50 | $13,223 | $57,252 | $60,126 | $63,072 | $66,168 |
| Grant Program Analyst | $94,727 | 1 | 1.00 | $20,936 | $90,684 | $95,016 | $99,708 | $104,484 |
| Operations and Policy Analyst | $99,352 | 1 | 1.00 | $21,974 | $95,016 | $99,708 | $104,484 | $109,656 |
| Solar Rebate Assistant | $61,867 | 1 | 1.00 | N/A | $59,280, | $62,004 | $64,956 | $68,280 |
| Senior Policy Analyst | $131,976 | 1 | .20 | $40,866 | $26,558 | $26,558 | $0 | $0 |
| Energy Policy Analyst | $119,607 | 1 | .20 | $35,713 | $24,142 | $24,142 | $0 | $0 |
| Incentives Analyst | $101,524 | 1 | .20 | $4,663 | $20,180 | $0 | $0 | $0 |
| Community Equity Analyst | $115,616 | 1 | .10 | $31,400 | $11,320 | $11,880 | $12,071 | $12,071 |
| QA Officer | $99,351 | 1 | .56 | $49,221 | $53,209 | $55,836 | $58,511 | $61,407 |

Note: please see calculations details in excel Budget table

ODOE's employees receive increase of salaries according to approved COLA and seniority levels

| Position | Main Roles/Responsibilities |
|---|---|
| Division Administrator | Oversees the project |
| Manager | Lead the program team |

| Grant Program Analyst | Collaborate with Grants Officer on grants administration |
| Operations and Policy Analyst | Analyze regulations and standards, establish operational procedures |
| Solar Rebate Assistant | Works directly with Sub-awardees and end users |
| Senior Policy Analyst | Oversee, implement processes between Sub-awardee and ODOE |
| Energy Policy Analyst | Create, recommend, implement program design. Research analyze data |
| Incentives Analyst | Collaborate with the team to collect and analyze data from end users |
| Community Equity Analyst | Collaborate with the team to ensure equality and justice are fulfilled. |
| QA Officer | Risk management, compliance, high standards on deliverables |

This award will support 4.96 FTE at ODOE after grant-specific staff are hired. Different FTE levels from existing employees will provide support during the planning and early implementation phases, some existing employees will transition away from the project after grant-specific staff are onboarded and appropriately trained. This best practice allows for rapid implementation.

Once the grant is implemented, we expect to have 10 staff working at different levels of capacity. The most crucial staff are Grant Program Analyst, Operations and Policy Analyst for the first year. This staff is leading the team. Following the early implementation phases, the Incentives Analyst will transition away starting the 3rd year, and the Senior Policy Analyst and Energy Policy Analyst in the 4th year. ODOE is hiring a QA Officer to perform quality management duties and provide oversight of ODOE's quality assurance and control documents and activities. This strategy will improve and guarantee performance and efficiency with the goal of using the grant resources in an efficient manner.

Increases for each position are based on an assumed increase of 5% on January 1, 2025, in alignment with recently announced increases for state employees — and thereafter, structured annual step progressions as required by the state. ODOE employees positively time keep for federal grants using project cost account codes on a monthly basis. This method ensures accurate reporting and grant expenditures. At the end of each month, ODOE allocates each employee's paid leave to each project cost account code, proportionate to time worked. This provides an equitable basis for distribution of paid leave across various grants. Paid leave is considered wages within Oregon's system, and correspondingly fringe benefits are distributed under the same proportions.

**Fringe Benefits**

ODOE does not have a federally approved Fringe Rate, however, fringe benefits are a component examined in the agency's negotiated indirect cost rate. The agency uses the biennial agencywide average fringe rate from the agency's budget for budgeting purposes only, which during the 2023-2025 biennium is 51.9% (Salaries and wages/OPE). Actual costs for fringe benefits, based on individual employee costs incurred each month, are charged to each individual funding source based on the employee's time charged to each fund source.

The Fringe Benefits are comprised of the following class of costs:

| Type of Benefit | Percentage/$ | Basis of Computation |
| Employee Relations Board | $2.19 | Per month |
| PERS | 17.92% | Of wages |

| | | |
|---|---|---|
| Pension Obligation Bonds | 4.75% | Based on salary |
| Social Security | 7.65% | Based on Salary |
| Workers Compensation | $1.91 | Per month |
| Medical/Vision | $1,650 | Per month |
| Paid Family Medical Leave | .4% | Based on Salary |

**Travel**-
The following travel is anticipated in the program budget:

### A) Compliance Inspections

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 2 days | Ground Transport | Cost per trip | # Trips per year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1 | TBD | 2 | $284 | $276 | $168 | $728 | 10 | $7,280 |
| 2-5 | TBD | 2 | $284 | $276 | $168 | $728 | 20 | $14,560 |

### B) Outreach events

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 3 days | Ground Transport | Cost per trip | # Trips per year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1-5 | Medford, OR | 1 | $196 | $162 | $197 | $555 | 12 | $6,660 |

### C) Sub-recipient monitoring

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 3 days | Ground Transport | Cost per trip | # Trips per year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1-5 | TBD | 2 | $284 | $276 | $168 | $728 | 10 | $7,280 |

### D) OSFAC Meeting Participation

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 1 day | Ground Transport | Cost per trip | # Trips/year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1-5 | Portland, OR | 2 | | $112 | $59 | $171 | 3 | $513 |

### E) Professional Development

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 3 days | Airfare/Ground Transport | Cost per trip | # Trips/year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1-5 | Washington, DC | 2 | $1,032 | $396 | $2,132 | $171 | 1 | $3,560 |

ODOE anticipates 10 Compliance Inspection Trips in Year 1, and 20 Compliance Inspection Trips for each year following. All other travel types are expected to be evenly divided across the five-year period. ODOE anticipates 12 outreach trips, 10 subrecipient monitoring trips, and 3 OSFAC meetings to occur annually, requiring in-state travel.

ODOE's estimated travel costs are based on current state travel requirements contained in the Oregon Accounting Manual, which primarily uses GSA rates. Because precise locations of projects sites are unknown at this time, ODOE selected 10 cities across Oregon and averaged travel costs across these locations to arrive at trip averages. ODOE employees are also expected to access the state motor pool vehicles, which is often more cost effective than a GSA mileage payment on a cost-per-mile basis. State motor pool rates were used for mileage costs cited above based on 10 cities across Oregon.

48

ODOE anticipates staff attending one national conference per year for professional development. While precise conferences have not been identified, for estimating purposes, ODOE based estimates on conferences occurring in Washington. D.C. ODOE will follow standard GSA payments for travel as required by the Oregon accounting manual.

**Equipment**-
No equipment will be purchased by the prime applicant under this award.

**Supplies** -
ODOE anticipates personal protective equipment, such as hard hats, vests, and other materials may be needed for some site inspections and estimates an annual cost of $200 for such items.

Procedures/Procurement method: ODOE will follow state and federal procurement guidelines when procuring supplies.

**Contractual** -
The following contract activities are anticipated in the Solar for All program.

| Contract Activity | Scope of Work/Services | Duration | Procurement Method |
|---|---|---|---|
| 1. Legal Services-DOJ | Sub-awards reviews | 5 years | Non-competitive |
| 2.Davis Bacon Software | Certified payroll reports | 5 years | Competitive |
| 3.Consulting | Common application portal | 5 years | Existing Contract |
| 4.Software Subscription | Online application software | 4 years | Existing Contract |
| 5.Business Accelerator | Business development/mentoring | 4 years | Competitive |
| 6.Program Promotion | Program advertisement | 4 years | Competitive |
| 7.Translation Services | End user program learning | 5 years | Competitive |
| 8.Compliance Reviews | Program audit | 4 years | Competitive |

As a state agency, ODOE will comply with state procurement requirements, as required by 2 C.F.R. Part 200.317. ODOE anticipates conducting procurements during the planning year to secure contractors and develop software and resources necessary to implement the program.

1. Legal Services-from Oregon Department of Justice. ODOE anticipates reviews of sub-awards, procurements, and general consultations with the legal counsel, with the Oregon DOJ, as required under state law. ODOE-DOJ don't have an intergovernmental/interagency agreement; DOJ is the state's attorney, and ODOE is required to receive counsel from them under state law. Estimates are based on the current attorney rate of $293 per hour, which is subject to adjustment. DOJ will provide legal services for reviews of sub-awards, procurements, and general consultations.
2. ODOE anticipates the need for Davis-Bacon tracking software, which ODOE will administer for the OSFAC.
3. ODOE anticipates the need to enhance current rebate processing systems to meet grant specific terms and streamline rebate applications.
4. Ongoing costs for the existing rebate processing subscriptions are also projected based on current rates.

49

5. ODOE intends to procure a contractor to establish and operate an Oregon Solar Business Accelerator to help solar businesses grow and expand.
6. To supplement outreach efforts, ODOE also expects the need for program promotions through media such as internet, radio, or tv, as well as
7. Translation or interpretation services.
8. ODOE also intends to secure services from a third-party CPA firm to assist with compliance-related reviews. Estimates are based on a rate of $200 per hour for 500 hours a year in years 2-5.

Procurement method follow for existing contracts: ODOE follows the ODOE Purchasing Internal Policies and Procedures PUR-06

- For contracts exceeding $150K a competitive process was conducted according to DAS and DOJ procurement rules based on the agency's mission and DOJ legal sufficiency requirements under OAR 137-046 and Competitive Procurement Regulations under OAR 125-246-0110.

**<u>Construction (if applicable)</u>** -
No construction costs are planned by the prime applicant under this award.

**<u>Other - Printing</u>**
ODOE also anticipates printing costs for each year. ODOE estimates printing costs of .10 cents per page, with the largest printing volume to occur in the first two years as the program launches.

**<u>Other – Subaward activities</u>**

| Entity | Main activities |
|---|---|
| Energy Trust of Oregon - $22,817,732 | • Develop and manage financial incentive program for community solar projects in investor-owned utility service territories. <br>• Support ODOE in development and management of single family program. <br>• Support ODOE in development and management of multifamily program. <br>• Support community partner engagement. <br>• Support development of alternate financing strategies to leverage federal tax credits in single family projects. <br>• Provide technical assistance to developers <br>• Support participant outreach and education. <br>• Support community-based organizations that intend to pursue community ownership models <br>• Provide financial and technical assistance to support smaller-scale community-led projects. |

| | |
|---|---|
| | • Additional detail in section 2.1: Oregon Community Solar Program for Customers of Investor-Owned Utilities |
| Bonneville Environmental Foundation -$14,559,822 | • Develop and manage financial incentive program for community solar projects in consumer-owned utility service territories.<br>• Provide technical assistance to developers.<br>• Evaluate upgrades necessary to facilitate interconnection of community solar projects.<br>• Develop strategies to leverage federal tax credits.<br>• Develop financial assistance for storage paired with community solar projects.<br>Additional detail in section 2.1: Oregon Community Solar Programs for Customers of Consumer-Owned Utilities |
| Workforce Development (TBD) -$2,170,000 | • Convene industry leaders and worker representatives to discuss methods to ensure workforce development efforts create opportunities for graduates of training program<br>• Design opportunity announcement and application for solar workforce training grants<br>• Develop Solar workforce training grants program<br>• Design and publicize request for proposals for solar business accelerator contract |
| Community Partner (TBD) - $333,926 | • Add solar site assessments to existing home energy audits.<br>• Provide referrals to single family program when on-site rooftop solar is appropriate.<br>• Provide referrals to multifamily program when on-site rooftop solar is appropriate.<br>• Provide referral to community solar programs when on-site rooftop solar is not appropriate.<br>• Support prioritization strategy for storage projects in multifamily housing developments.<br>• Identify and report issues and challenges end users are facing.<br>• Serve as first contact point for customer service. |

**Participant Support Costs**

Participant support costs will consist of rebates provided by ODOE to contractors for the installation of solar through the single-family pathway and solar and storage through the multifamily pathway. The participants shall select the contractor and sign the contract. Other funds to participants shall be delivered by the recipients of subawards. The dedication of funds for participant support costs will be detailed during the planning phase and will comply with *EPA's participant support costs policy*.

51

**Subawards**

Energy Trust of Oregon and Bonneville Environmental Foundation are both 501(c) 3 non-profit entities. Sub-recipient activities are described in section 2.

**In Kind-Technical Assistance**

OSFAC will coordinate with EPA, The National Renewable Energy Laboratory, Pacific Northwest National Laboratory, and/or other federal technical resources to develop detailed technical assistance requests. Technical assistance funding may be coordinated with other states and organizations (such as the Clean Energy States Alliance) to maximize the value of the funding. Topics under consideration for technical assistance include:

- Evaluate and develop compliance support tools for the Build America Buy America program requirements. Request would include development of detailed eligible product lists for solar and storage related equipment in single family, multifamily and community solar applications.
- Work with stakeholders to identify key interconnection barriers for community solar projects and make policy and procedure recommendations to address them.
- Aid community solar projects in reducing barriers to interconnection, including equipment selection and design, engineering support, and third-party interconnection study review.
- Collect and analyze market data relating to projected solar workforce needs in Oregon.
- Evaluate third party ownership models and develop best practices for states who wish to recruit third party owners.

**Additional Items**

**Indirect Charges**
ODOE negotiates a federally approved indirect rate on a fixed rate with a carry-forward basis, every two years, aligned with the agency's biennial budget. The current provision rate request spanning from July 1, 2023, to June 30, 2025, is currently under review with the U.S. Department of Energy's Richland Field Office, ODOE's cognizant agency. The provisional rate is 40.02. ODOE's indirect rate uses Personnel and Fringe Benefits as a base on which the rate is applied across all funding streams.

**Conferences and Workshops:**

The OSFAC will coordinate with organizations and community partners to identify conferences and workshops relating to Solar for All activities. In some cases, ODOE, Energy Trust of Oregon and / or Bonneville Environmental Foundation may choose to sponsor events and will be recognized with a logo on conference materials. No federal funds will be used for conference related expenses and EPA's logo will not be used without prior discussion and approval from EPA. The only currently planned event is the annual Oregon Solar Plus Storage Conference hosted by the Oregon Solar and Storage Industries Association. The OSSC is targeted primarily to solar and storage contractors. OSFAC anticipates annual presentations at the OSSC relating to Solar for All to disseminate program information to industry partners. Additional conferences and workshops may be identified

throughout the 5-year program period. No program income will be generated from conferences or workshops.

Under the first part of this plan, ODOE will establish an Oregon Solar Business Accelerator (OSBA) to offer business development and mentoring to businesses associated with the deployment of solar technology. The OSBA will, to the extent practical, prioritize services to: disadvantaged business enterprises; other businesses that are certified under Oregon's Certification Office for Business Inclusion and Diversity; businesses located or serving customers in historically underutilized business zones; or businesses that operate east of the Cascade Mountain range or in coastal communities where there are fewer contractors offering solar installations. Program activities may include workshops on topics such as: 1) industry best practices; 2) business growth strategies; or 3) business mentorship. This intensive model is anticipated to serve two cohorts of six to eight businesses each. This will benefit solar deployment in regions of the state that have limited to no solar contractors.

No federal staff are anticipated to be present at conferences or workshops.

**Meals and Refreshments:**
Federal funds will not be used to provide meals or refreshments.

**Program Income**
No program income is anticipated to be generated from federal funds.

**Conferences and workshops questions:**

| Question | Answer |
|---|---|
| Does this scope of work include conducting conferences or workshops? | Yes, in Y1 |
| Who is initiating the conference/workshop/meeting? | OSFAC, ETO, BEF, ODOE |
| How is the conference/workshop/meeting being advertised? | Will be advertised on ETO, BEF, ODOE websites |
| Whose logo will be on the agenda and conference/workshop/meeting materials? | ETO, BEF, ODOE. EPA'S logo won't be used without prior authorization |
| What is the percentage distribution of persons attending (I.e. % federal govt, public participants, state and local)? | Not available |
| Will there be proceedings or analyses and will the information be disseminated back to the appropriate (state/local/scientific) community? | Yes |
| Do you anticipate program income being generated from this conference/workshop/meeting including registration fees? | No |

**Final Questionnaire**

| Question | Answer |
|---|---|
| Will the assistance award result in the development of any copyrighted software or written materials? | No |
| Could an invention result from this project? (If yes, provide disposition instructions) | No |
| Does the project involve animal subjects? | No |
| Does the project involve collecting identical information from 10 or more people? | Yes |
| Any work outside the US included in the grant? | No |
| Does the grant involve or relate to geospatial information? Includes info identifying geographic location, or application/tools associated with such information – GPS, mapping or statistical data | Yes |

# EXHIBIT 3

5H - 84092901 - 1    Page 1

| | | GRANT NUMBER (FAIN): 84092901 | |
|---|---|---|---|
| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | MODIFICATION NUMBER:    1 PROGRAM CODE:    5H | **DATE OF AWARD** 01/08/2025 |
| | | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 01/08/2025 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** PEND |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** OREGON DEPARTMENT OF ENERGY 550 CAPITOL ST NE 1ST FLOOR SALEM, OR 97301-2567 EIN:  93-0643773 | **PAYEE:** OREGON DEPARTMENT OF ENERGY 550 CAPITOL ST NE 1 FLOOR SALEM, OR 97301-2567 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Robert Del Mar 550 Capitol ST NE 1st Floor Salem, OR 97301-2567 **Email:** Robert.DelMar@energy.oregon.gov **Phone:** 503-302-7027 | Vineet Pandharpurkar 1200 Pennsylvania Ave. NW, 4410C Washington, DC 20460 **Email:**  Pandharpurkar.Vineet@epa.gov **Phone:** 202-564-5211 | Caitlyn Chandler 1200 Pennsylvania Ave. NW 3903R Washington, DC 20460 **Email:**  Chandler.Caitlyn@epa.gov **Phone:** 202-564-0592 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Oregon Solar For All Coalition application

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 86,600,000.00 | **TOTAL PROJECT PERIOD COST** $ 86,600,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 86,600,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave. NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Phillip Schindel - Chief, Business Operations Branch | **DATE** 01/08/2025 |

5H - 84092901 - 1     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 86,200,000 | $ 0 | $ 86,200,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 86,600,000 | $ 0 | $ 86,600,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328) <br> Clean Air Act: Sec. 134(a)(1) <br> National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84092901 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,083,281 |
| 2. Fringe Benefits | $ 1,081,222 |
| 3. Travel | $ 155,585 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 1,000 |
| 6. Contractual | $ 1,863,998 |
| 7. Construction | $ 0 |
| 8. Other | $ 80,148,480 |
| 9. Total Direct Charges | $ 85,333,566 |
| 10. Indirect Costs: 40.02 % Base SW+FB | $ 1,266,434 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 86,600,000 |
| 12. Total Approved Assistance Amount | $ 86,600,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 86,600,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity. Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition*. If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or

requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such

Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not

"profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in

the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as

determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

_**The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:**_

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

EXHIBIT 4



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**    Termination of EPA Assistance Agreement 5H-84092901 under 2 CFR 200.340

**FROM:**    Devon Brown, EPA Award Official

**TO:**    Jennifer Senner, Grants Officer
Oregon Department Of Energy

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84092901 awarded to Oregon Department Of Energy. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.


cc: Brandon Pierce, EPA Grant Specialist
    Vineet Pandharpurkar, EPA Project Officer
    Robert Del Mar, Grantee Program Manager

EXHIBIT 5



Tina Kotek, Governor



550 Capitol St. NE
Salem, OR 97301
Phone: 503-378-4040
Toll Free: 1-800-221-8035
FAX: 503-373-7806
www.oregon.gov/energy

August 28, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gase Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington DC 20460

RE:  Disagreement with Modification No. 2 to Grant Number (FAIN): 84089501, dated August 8, 2025

Dear Mr. Brown:

On August 7, 2025, the Oregon Department of Energy ("ODOE") received a memorandum from you that purported to terminate EPA Assistance Agreement 5H-84092901 under 2 CFR 200.340 ("Termination Letter").  The Termination Letter outlined a Dispute process pursuant to 2 CFR 1500.15 with a Dispute deadline of 30 days.  The Termination Letter also stated, "The EPA Grants Management Office will issue an amendment to the agreement to document the termination."

The next day, ODOE received a document titled "Assistance Amendment" dated August 8, 2025. That document states it is "Modification Number: 2" to Grant Number 84092901.  Under its "Explanation of Changes" the document states that it requires ODOE to stop work, terminates the agreement, reduces performance period duration, curtails the scope of work, and adds administrative terms and conditions.  In the "Notice of Award" section, it states that if the recipient disagrees with the terms and conditions specified, it must furnish a notice of disagreement within 21 days.

Please accept this letter as ODOE's notice of disagreement with Modification No. 2 dated August 8, 2025, issued under your signature as EPA Award Official.  ODOE also disagrees with any suggestion in the Assistance Amendment that any attempt to draw down funds could function as a waiver of ODOE's dispute rights, which is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination per 2 CFR 200.305(b)(3) as well as the Termination Letter's specific statement that costs incurred prior to the termination date are allowable.

ODOE will be filing a Dispute of the Termination Letter in a separate letter to the Dispute Decision Official within the 30 days provided in the Termination Letter.

Please acknowledge receipt of this notice of disagreement and contact ODOE via the below-signed designee to discuss resolution of this disagreement as soon as possible.

Sincerely,

Janine Benner, Director
Oregon Department of Energy

EXHIBIT 6



Tina Kotek, Governor



550 Capitol St. NE
Salem, OR 97301
Phone: 503-378-4040
Toll Free: 1-800-221-8035
FAX: 503-373-7806
www.oregon.gov/energy

September 5, 2025

VIA Email

To:     Michael Molina
        Environmental Protection Agency
        Disputes Decision Official
        molina.michael@epa.gov

Re:     Wrongful Termination of EPA Assistance Agreement 5H-84092901 under 2 CFR
        200.340

Dear Mr. Molina,

Pursuant to 2 CFR 1500.15, I am writing on behalf of the Oregon Department of Energy
(ODOE) to notify you, as the Environmental Protection Agency (EPA) Dispute Decision
Official, that we dispute EPA's attempt to terminate its Solar for All (SFA) award, grant number
5H-84092901, which was awarded to ODOE on July 8, 2024 (the "Assistance Agreement").

EPA has purported to terminate the SFA award through an August 7, 2025 Memorandum and an
August 8, 2025 contract amendment. EPA's termination: (1) violates the plain language of the
One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only unobligated
balances from the Greenhouse Gas Reduction Fund and preserved funds already awarded to
grantees; (2) violates the legally binding Assistance Agreement dated July 8, 2024; (3) provides
no valid reason for termination pursuant to 2 C.F.R. 200.341, (4) is arbitrary, capricious, and not
supported by substantial evidence; (5) violates constitutional boundaries; and (6) causes
irreparable harm to Oregonians.

ODOE requests that EPA rescind the termination and make all obligated funds that were
available in ODOE's ASAP account as of August 6, 2025 (the day before the termination notice)
available to ODOE again. Therefore, please accept this letter as a request to initiate an
administrative dispute under 2 C.F.R. 1500 Subpart E.

Following is a more detailed statement of the specific legal and factual grounds for this Dispute.

## A.     Factual Grounds

On July 8, 2024, EPA awarded ODOE a Solar for All award in the amount of $ 86,600,000.00. On July 11, 2024, EPA transmitted an Assistance Agreement to the Oregon Department of Energy. (See **Exhibit 1**).  Pursuant to the Assistance Agreement, EPA obligated the entire $86.6 million balance of the Oregon Department of Energy's SFA award as of the date of the Agreement. Of this, $400,000 was for Technical Assistance provided by EPA. The funds appeared shortly thereafter in the Oregon Department of Energy's ASAP accounts.

Following the date of its award, ODOE negotiated its work plan and budget with EPA. On November 8, 2024, ODOE submitted its final Work Plan to EPA. The Work Plan outlined the Oregon Department of Energy's plan for planning, designing, and implementing its SFA program. A copy of the Work Plan is attached as **Exhibit 2**.

The Oregon Department of Energy's Work Plan proposed to deliver on the program objectives of Solar for All through the provision of financial and technical assistance across five distinct pathways:  1. Enable solar installations at single-family households with little to no upfront customer cost; 2. Point of sale rebates for multifamily buildings that provide tangible benefits to low-income residents; 3. Financial and technical assistance to develop community solar projects under the Oregon Community Solar Program, a program regulated by the Oregon Public Utility Commission; 4. Financial and technical assistance to develop community solar projects in Consumer-owned Utility Territories; and 5. Workforce development activities.

Pursuant to its approved Work Plan, the Oregon Department of Energy elected to take a full Program Planning Year to design and get ready for implementation of its SFA program.

While ODOE was in the Program Planning Year, EPA limited the amount ODOE could draw down from its ASAP account to 2% of the total obligated award, to ensure that ODOE could effectively carry out "the significant scale, complexity, and novelty" of its SFA program. *See* Exhibit 1 at Programmatic Conditions, Part II(B). After its Work Plan was approved, the funding restriction was removed, and EPA incorporated the budget and Work Plan into the Agreement with the Oregon Department of Energy on January 8, 2025. See the 01/08/2025 Assistance Amendment, attached as **Exhibit 3**.

On August 7, 2025 the Oregon Department of Energy received a Memorandum from EPA terminating the Oregon Department of Energy's SFA grant. A copy of that Memorandum is attached hereto as **Exhibit 4**. The August 7, 2025 Memorandum states that the One Big Beautiful Bill Act (OBBBA) had repealed the underlying authority for the SFA program and rescinded unobligated amounts to carry out the program. It indicates that EPA is terminating ODOE's award because EPA's cost appropriations and the "grant appropriations" were rescinded, so "the Agency

no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All," and continued administration of the program is no longer legally permissible. Based on this legal conclusion, EPA determined it would end the Solar for All program and all existing grants. The next day, August 8, 2025, EPA sent an Assistance Amendment (**Exhibit 5**), which states the termination was actually based on a list of entirely different and unspecified reasons, purportedly any of those found in 2 CFR 200.340 and/or in the Termination General Terms and Conditions of the Assistance Agreement itself. That list includes:

- if the recipient or subrecipient fails to comply with the terms and conditions of the federal award;
- if the recipient or subrecipient consents to terminate the federal award;
- if the recipient or subrecipient of the federal award so requests; or
- pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities;
- The grounds provided in 2 CFR 200.339 (those being where the recipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award).
- The grounds listed in the version of 2 CFR 200.340 effective as of October 1, 2024 when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is
  a. Materially Impaired or
  b. there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339.

EPA did not specify which of these reasons the termination is supposedly based upon nor provide any explanation or support for why one of these reasons might be present.

Prior to the termination notice, the Oregon Department of Energy's ASAP account contained the available balance of $85,840,484.87 and the status was listed as "Open." On August 11th, ODOE learned its ASAP account for the SFA program had been suspended and the account was showing as unavailable, "No accounts found matching criteria." On August 18th, the Oregon Department of Energy's ASAP account for the SFA program access changed to a "liquidated" status and funds appeared to be available to draw down. However, the "available balance" on the account has been substantially reduced from $85,840,484.87 to $6,005,029.38 and the performance period end dates were changed from April 30, 2029, and August 30, 2029, to August 15, 2025, and December 8, 2025.

B.    **Legal Grounds**

1.    **EPA's asserted grounds for termination violate the plain language of OBBBA 60002, which rescinded unobligated balances while preserving funds already awarded to grantees.**

EPA's conclusion that the OBBBA rescinded the grant appropriations for Solar for All is incorrect and contrary to law. By its plain language, Section 60002 only authorized rescission of the unobligated balance in the appropriations account established by 42 U.S.C. 7434:

> *SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.*

ODOE's funds were all obligated many months before OBBBA and were, therefore, not rescinded by Section 60002.

Funds awarded to Solar for All grantees were obligated upon award and subject to a legally binding Assistance Agreement whereby EPA "promise[d] to spend the money, either immediately or in the future, as work under the obligation is completed."[1]  EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[2]   In other words, the Solar for All funds were obligated at the time OBBBA was passed.  OBBBA did not change this and could not have legally rescinded these obligated funding awards.

Where the plain language of a statute is unambiguous, no further analysis is required.[3]  Here, the plain language of OBBBA is clear that obligated funds are not affected by Section 60002.  EPA's action in terminating ODOE's Solar for All Assistance Agreement is therefore contrary to the plain language of OBBBA.

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.[4]  Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent

---

[1] *See* https://www.usaspending.gov/explorer?glossary=obligation
[2] *See* https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf.
[3] *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (". . . when the meaning of the statute's terms is plain, our job is at an end.").
[4] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).

with the statute's text, structure, and purpose.  Congress did not direct or otherwise authorize EPA to terminate the Solar for All program.  EPA is acting beyond its authority because it defies Congress's express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All appropriations are rescinded.

Additionally, this termination did not automatically de-obligate ODOE's funds because termination of an award cannot automatically or retroactively de-obligate funds. But even if termination of an award could result in the de-obligation of funds, ODOE's Solar for All grant was not terminated until August 7, 2025, well after OBBBA became law on July 4, 2025, and contrary to the direction of that statute. At the time the OBBBA was enacted, ODOE's Solar for All funds remained obligated so they were not impacted by Section 60002 of the OBBBA.

EPA also cannot avoid administering the entire Solar for All program merely because OBBBA rescinded other unobligated funds. Because the OBBBA rescinded only unobligated funds, Congress provided EPA with statutory authority in OBBBA to continue administering obligated funds.  This is the only reading of the OBBBA that harmonizes the repeal of Section 134 with the rescission of only unobligated funds.  Congress left EPA with the authority to administer obligated funds. (See exhibit 6, the Congressional Budget Office Score for the OBBBA, which assumes savings only associated with rescinding unobligated funds.)  Moreover, EPA has other statutory authorities that it can rely upon to continue administering the obligated funds.  For the reasons stated above, ODOE's grant funds remain obligated, so EPA has a legal duty and obligation to fulfill its part of the agreement by administering the funds.

## 2. EPA's termination of ODOE's grant violates EPA's legal obligation under the Assistance Agreement.

Per the July 8, 2024 Assistance Agreement, EPA maintained the right to terminate the agreement "only as specified in 2 CFR 200.340. . ."[5] Similarly, the Termination provision in the January 8, 2025 Assistance Amendment states "EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340 . . [6].The uniform grant regulations at 2 C.F.R. 200.340(a) provide the circumstances under which the government may terminate a grant agreement, which include: (1) failure to comply with the grant terms and conditions; (2) with consent of the grantee; (3) by request of the grantee; or (4) otherwise pursuant to the terms and conditions of the grant, including, to the extent authorized by law if an award no longer effectuates the program goals or agency priorities.  2 C.F.R. § 200.340 does not authorize EPA to terminate an assistance agreement when EPA believes that it "no longer possess either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring" of a Federal program.  Nor does it authorize EPA to terminate an

---

[5] Exhibit 1, Page 30.
[6] Exhibit 3, Pages 36-27.

assistance agreement when Congress rescinds EPA's "administrative cost appropriation" as EPA alleges.  Indeed, EPA has not identified any provision of 2 C.F.R. § 200.340 which authorizes termination of ODOE's Solar for All Assistance Agreement.

The terms and conditions of the Assistance Agreement do not allow for termination under the circumstances described by EPA. ODOE has not, and unequivocally does not, agree to any attempts to terminate the Agreement based on EPA's erroneous, bad faith interpretation of OBBBA Section 60002.  Congress intended for these funds to benefit the public by providing efficient and sustainable energy options to meet the country's growing energy needs.  ODOE complied with the Assistance Agreement's terms and conditions, and does not consent to the Assistance Agreement being terminated.

EPA has identified no bases for unilateral termination of ODOE's Solar for All Agreement.  Termination for noncompliance is only possible when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."[7] Neither condition exists.  Indeed, EPA has not identified any noncompliance, has provided no evidence of waste, fraud, or abuse, nor has it requested that ODOE take action to cure any deficiencies in its performance.

2 C.F.R. § 200.340(a)(4)'s language allowing termination "if an award no longer effectuates the program goals or agency priorities" does not apply either.  When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget ("OMB") confirmed that the termination language relating to agency priorities did not allow agencies to implement arbitrary cancellations.[8] In 2024, OMB completed another round of revisions to this provision.[9]  After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that may form a ground for termination, but only if "the language is included in the terms and conditions of the award."[10] The agency must "clearly and unambiguously" include (a)(4) in the Assistance Agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4).[11]

Here, because the Assistance Agreement does not include the "agency priorities" provision of (a)(4) as a ground for potential termination in its terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the Agreement.  EPA acted contrary to the governing

---

[7] Ex. 3 at Pages 36-37.
[8] Guidance for Grants and Agreements 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).
[9] Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024).
[10] *Id.* at 30,089.
[11] *Id.*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

regulations.[12] ODOE's award must be immediately restored to its full amount.[13]  ODOE requests no more or less than for EPA to follow the law and rescind this unlawful termination.

### 3. EPA's Decision to Terminate ODOE's Solar for All Assistance Agreement is Arbitrary and Capricious.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[14]  In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[15]

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[16] Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process."[17] Agency action taken on pretextual grounds violates the requirement of reasoned agency decision-making.

EPA's decision to terminate ODOE's Solar for All Assistance Agreement is arbitrary and capricious because: (1) EPA provided no reasoned basis for the termination, (2) EPA failed to undertake any individual assessments of ODOE's Solar for All Assistance Agreement, (3) EPA failed to provide ODOE notice and an opportunity to cure, and (4) EPA ignored ODOE's substantial reliance interests and the harmful impact of an abrupt and complete termination of the Solar for All Agreement.

EPA's sole stated rationale for the termination —that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 award recipients"—is a contrived, irrational, and insufficient explanation and thus not a reasoned basis for that action.  EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that Congress appropriated to EPA in March to pay for "Environmental Programs and Management."

---

[12] 2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30,089.

[13] 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.

[14] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[15] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[16] *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

[17] *Id.*

EPA likewise failed to engage in reasoned consideration of ODOE's Solar for All Assistance Agreement before categorically terminating the Solar for All program.  EPA has identified no facts that would support the termination.  EPA's public statements[18] demonstrate that its stated rationale was pretextual.

Also arbitrary was EPA's failure to give notice to ODOE so ODOE could address any alleged failures.  2 C.F.R. 200.208 requires EPA to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to satisfy the conditions.[19]  It is only after a grantee fails to meet the conditions imposed that an agreement can be terminated.[20]  EPA's actions are contrary to these procedures.  EPA terminated the Assistance Agreement without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure.[21]  Contrary to Section 200.208's notice-and-cure requirements, EPA operated in secret to withdraw access to ODOE's accounts.  The lack of notice was arbitrary, capricious, and deprived ODOE of due process.

### 4.  EPA's Withdrawal of ODOE's Duly Appropriated and Obligated Solar for All Assistance Agreement Violates the Constitution's Separation of Powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[22]  The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[23]  The Executive has no power "to enact, to amend or to repeal statutes."[24]  Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority.  And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

*Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[25]  U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the

---

[18] Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025, 11:07 AM), https://x.com/epaleezeldin/status/1953518426602803684; *see also* https://www.youtube.com/watch?v=CfU3bYKmBOA (referring to Solar for All as a grift).
[19] 2 C.F.R. § 200.208(d)-(e).
[20] 2 C.F.R. § 200.339(a) & (c) (authorizing a temporary hold on payments, suspension or termination unless or until the recipient takes corrective action).
[21] 2 C.F.R. § 200.208.
[22] U.S. Const. art. I, § 1.
[23] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).
[24] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).
[25] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[26]

The Termination Memorandum and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[27] For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of ODOE's funding agreement.

*Take Care Clause*

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[28] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[29] Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and ODOE's individual Assistance Agreement on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind ODOE's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[30] EPA's termination of ODOE's Assistance Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to ODOE prior to September 30, 2024. EPA violated constitutional separation-of-powers constraints because EPA's termination overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

---

[26] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).
[27] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).
[28] U.S. Const. art. II, § 3.
[29] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").
[30] OBBBA Section 60002.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[31]  The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[32]  Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[33]  For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[34]  When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers.  EPA cannot usurp the will of Congress by unilaterally terminating Commerce's Solar for All Assistance Agreement.  For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[35]  When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[36]  EPA's termination of ODOE's Solar for All Assistance Agreement altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Agreement.  For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

---

[31] U.S. Const. Art. I, § 9, cl. 7.

[32] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).

[33] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

[34] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

[35] U.S. Const. amend. X.

[36] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

*Ultra Vires*

The Termination Memorandum and subsequent termination of ODOE's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind Commerce's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

> 5. **The termination of ODOE's Solar for All Assistance Agreement will cause irreparable harm to Oregonians.**

ODOE reasonably relied on the Solar For All funding to hire and train two staff members to work on the SFA program and develop financial and technical assistance programs across five distinct pathways described in Section A above.

At the time EPA terminated the funding, ODOE was actively working on designing and preparing the aforementioned SFA programming, with an anticipated launch date in early December 2025. Between the various programs ODOE intended to offer using SFA funding, ODOE was expecting to serve 7742 low-income households, resulting in household savings of $83,617,099. With the loss of SFA funding, ODOE will no longer be able to offer solar installations at single-family households with little to no upfront customer cost; point of sale rebates for multifamily buildings that provide tangible benefits to low-income residents; financial and technical assistance to develop community solar projects under the Oregon Community Solar Program; or financial and technical assistance to develop community solar in Consumer-owned Utility Territories. Nor will ODOE be able to move forward on its commitments to fund workforce development. Further, the two staff hired in this program lost their Solar for All positions at ODOE and a planned hiring of a third staff person will not happen.

## C.    Relief Requested and Designated Point of Contact

ODOE seeks rescission of the termination of this award and the full and immediate reinstatement of the $85,840,484.87[37] that was available in ODOE's ASAP account as of August 6, 2025 (the day before the termination notice).

Until our dispute with EPA has been resolved, we will also object to any claims of noncompliance under 2 C.F.R. 200.344(i).

---

[37] As noted above, this dollar amount represents the cumulative authorized amount of the EPA Award minus funds drawn down by ODOE for authorized work prior to the August 7, 2025 termination notice.

We would be happy to answer any questions you may have about this letter or our program. I will be ODOE's designated contact; I can be contacted at:

Oregon Department of Energy
Janine Benner, Director
550 Capitol St. NE | Salem, OR 97301
Email: Janine.Benner@energy.oregon.gov
P: 503-378-4040

Very truly yours,

Janine Benner, Director
Oregon Department of Energy

CC:
Devon Brown, EPA
brown.devon@epa.gov

Attachments.

Exhibit 1
Assistance Agreement

Exhibit 1
Assistance Agreement

5H - 84092901 - 0    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN): 84092901<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5H | DATE OF AWARD<br>07/08/2024 |
|---|---|---|---|
| | | TYPE OF ACTION<br>New | MAILING DATE<br>07/11/2024 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:<br>OREGON DEPARTMENT OF ENERGY<br>550 CAPITOL ST NE # 1<br>SALEM, OR 97301<br>EIN: 93-0643773 | PAYEE:<br>OREGON DEPARTMENT OF ENERGY<br>550 Capitol St NE 1st Floor<br>Salem, OR 97301-2567 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Robert Del Mar<br>550 Capitol ST. NE<br>Salem, OR 97301<br>**Email:** Robert.DelMar@energy.oregon.gov<br>**Phone:** 503-302-7027 | Christine Clark<br>77 West Jackson Boulevard<br>Chicago, IL 60604<br>**Email:** Clark.Christine@epa.gov<br>**Phone:** 312-886-9749 | Shana Etheridge<br>1200 Pennsylvania Ave NW, 3903R<br>Washington, DC 20460<br>**Email:** Etheridge.Shana@epa.gov<br>**Phone:** 202-564-9777 |

**PROJECT TITLE AND DESCRIPTION**

Oregon Solar For All Coalition application "Note: A Special payment condition applies to this award."

See Attachment 1 for project description.

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 0.00 | TOTAL PROJECT PERIOD COST<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 86,600,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 86,600,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Acting Chief, Grants Management Branch | DATE<br>07/08/2024 |

5H - 84092901 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 86,200,000 | $ 86,200,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 86,600,000 | $ 86,600,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41062 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 86,200,000 |
| | | | | | | | | | $ 86,200,000 |

5H - 84092901 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00__ % Federal ___0.00__ %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 86,600,000 |
| 15. Total EPA Amount Awarded To Date | $ 86,600,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. Programmatic Terms and Conditions

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

## 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

<u>Final Report</u>

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

## 1. Leveraging
The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

***The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

### Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

### B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during

the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements.* The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on

behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

   **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

   **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

   **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

   **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Health and Safety Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its

financial risk management policies and procedures.\

## 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made

available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and **Emily Salmeri** (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry

out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards  unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to

execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

## B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a

personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

Exhibit 2
Oregon Solar for All Work Plan

Exhibit 2
Oregon Solar for All Work Plan

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Oregon Solar for All**
**Work Plan**
**Project Period: 5/1/24 – 4/30/29**
**[10/18/2024]**

**Project Title: Oregon Solar for All Coalition (OSFAC)**
**Grant Number:** #84092901
**Organization Name:** Oregon Department of Energy
**Geography:** State of Oregon

During the planning year the Oregon Solar for All Coalition may review which definitions of low-income and disadvantaged communities are used for each pathway.

1. CEJST-Identified Disadvantaged Communities:

All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

2. EJScreen-Identified Disadvantaged Communities:

All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

3. Geographically Dispersed Low-Income Households:

Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development. Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using the U.S. Department of Housing Development's Family Size Adjustment factor.

1

4. Properties Providing Affordable Housing: Properties providing affordable housing that fall within either of the following two categories:
   a. multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs:
      i. Low-Income Housing Tax credit;
      ii. A housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program;
      iii. Housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or
      iv. A housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)) or
   b. naturally occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

**Introduction**

**Section 1:  Project Description**

1.1 **Overview**

The Oregon Solar for All Coalition (OSFAC) will leverage existing solar technology incentives and support platforms through a coordinated program delivery system, designed specifically to meet the needs of low-income households and residents of disadvantaged communities in Oregon. The OSFAC membership includes Oregon Department of Energy (ODOE), Energy Trust of Oregon (ETO), and Bonneville Environmental Foundation (BEF). Together, OSFAC members will deliver on the program objectives of the Greenhouse Gas Reduction Fund through the provision of financial and technical assistance across five distinct pathways:

1. Enable solar installations at single-family households with little to no upfront customer cost;
2. Point of sale rebates for multifamily buildings that provide tangible benefits to low-income residents;
3. Financial and technical assistance to develop community solar projects under the Oregon Community Solar Program (OCSP), a program regulated by the Oregon Public Utility (OPUC) Commission;
4. Financial and technical assistance to develop Consumer-owned Utility Territories' Community Solar (COUTCS) projects in areas outside of OCSP coverage; and
5. Workforce development activities. This diversified approach will maximize use of existing resources and the breadth and diversity of households served throughout the state.

1.2 **Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**

**Environmental Results - Outputs and Outcomes:**

Outputs and outcomes demonstrated in the following two tables are attributed solely to Solar for All funding under grant number #84092901.

| Anticipated Outputs and Outcomes of the OSFAC | Total |
|---|---|
| Total number of households projected to benefit from the solar program | 8,363 |
| Award funding requested per household | $10,307 |
| Megawatts of residential solar capacity deployed | 16.9 MW DC |
| Megawatts of residential-serving community solar capacity deployed | 20.5 MW DC* |
| Award funding per megawatts of solar capacity | $2.3 million |
| Award funding per megawatt hour of storage capacity across dedicated storage funds | $1.7 million |
| Award funding per megawatt hour of storage across total funding requested | $ 45.4 million |
| Award funding per Tons of CO2 avoided | TBD** |
| Award funding per $ household savings | $16.27 |
| Businesses provided business development and mentoring services | 12-16 |

* Denotes that the figure includes solar capacity deployed in IOU community solar that is dedicated to low-income households only.

**Awaiting EPA guidance on the methodology required for the Solar for All program to calculate carbon dioxide avoided.

| Anticipated Outputs and Outcomes of the OSFAC | 2026 | 2027 | 2028 | 2029 | Total over performance period |
|---|---|---|---|---|---|
| Megawatt hours of solar production (MWh) | 544 | 8,176 | 29,092 | 15,406 | 53,218 |
| Megawatt hours of storage capacity deployed | 0 | 0.5 | 1.4 | 1.9 | 1.9 |
| Tons of CO2 avoided | TBD** | TBD** | TBD** | TBD** | TBD** |
| Household savings | $67,000 | $931,000 | $2,848,000 | $1,453,000 | $5,299,000 |

**Awaiting EPA guidance on the methodology required for the Solar for All program to calculate carbon dioxide avoided.

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

**Section 2:  Project Design Plan**

**2.1 Activities to be Conducted**

OSFAC will be conducting planning activities during the first year of program funding. All activities will be in support of the Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals. Planning activities will be completed in each of the five program pathways (single-family, multifamily, IOU community solar, COU community solar and workforce development) as well as overarching activities that support all program areas such as community engagement and quality assurance planning.

**Activities for all Pathways**

Each OSFAC member will hire and train staff and develop a plan detailing how program partners and entities receiving Solar for All Funds will interact, transact, or contract with consumers. This plan will cover education and outreach, sales and marketing of solar products or services, consumer purchasing, and leasing and financing materials.

1. **Initiate subrecipient awards (Jan 1 - Mar 31)**
   a. Develop subaward contracts with Energy Trust of Oregon and Bonneville Environmental Foundation to complete the tasks described in section 2.1 of the Work Plan.
2. **Develop quality assurance measures (Jan 1 – Apr 30)**
   a. Coordinate with Coalition members to develop a Quality Management Plan in accordance with EPA requirements (due 90 days after final award).
   b. Upon EPA Approval of the Quality Management Plan, coordinate with Coalition members to develop the Quality Assurance Project Plan.
   c. Establish regularly scheduled meetings with coalition members during the planning period.
3. **Develop program compliance and oversight (Jan 1 - July 31)**
   a. Review all program policies and procedures for compliance with EPA guidance
   b. Procure the services of a third-party firm to conduct compliance related risk assessments and/or various compliance-based reviews.

     c.  Evaluate low-income and disadvantaged communities' eligibility requirements including adoption of definitions for low-income and disadvantaged communities.

4. **Engage with stakeholders, including tribal partners, to inform program design (Jan 1-Dec 30)**
   a. Develop and implement participatory governance structures.
5. **Community outreach and education (Jan 1 – Dec 30)**
   a. Conduct meetings with at least 10 community-based organizations in Oregon to develop overarching program outreach and delivery strategies.
   b. Develop educational materials in multiple languages highlighting Solar for All offerings across all programs.
   c. Develop public facing webpage and other materials to support consumer protection and describe project timelines and activities.
6. **Submit revised work plan (Oct 30)**


**<u>Single-family Residential</u>**

Oregon Department of Energy will utilize the planning year to develop a program to deliver the target outcomes and outputs associated with single-family households participating in Solar for All. This will include outreach and engagement with community partners to support program design and integration with existing energy related services offered in disadvantaged communities. Milestones will include development of a new statewide incentive program for low-income households, a consumer protection plan to ensure installation integrity, evaluation of additional funding strategies, and quality assurance plans that ensure acceptable data collection and reporting to EPA. The planning year will include development of a revised workplan detailing program activities in years 2 – 5 of Solar for All funding.


1. **Outreach and engagement with community partners: (Jan 1 – Dec 30)**
   a. Coordinate with community organizations to develop program design and delivery options.
   b. Establish guidelines to support community partners in compliance with state and federal requirements.
   c. Establish criteria for community partner participation.
   d. Verify eligibility to receive federal funding.
   e. Identify capacity constraints, technical assistance needs and other support for community partners.

2. **Develop Contracts with Community Partners (Jun 1 – Dec 30)**
   a. Follow state and federal procurement requirements for contract development.
   b. Initiate contracts with community partners.

3. **Develop Consumer Protection Measures (Mar 1 – Sep 30)**
   a. Proactive marketing to counter "free solar" offers.
   b. Develop approved contractor list.
   c. Develop system warranty requirements.

    d.  Develop installation quality control and dispute resolution plan.
    e.  Develop follow up surveys with program participants.
    f.  Cost controls including competitive bidding.

4. **Develop Alternate Financing Strategies (Mar 1 – Dec 30)**
   a. Explore four options (described in the program narrative) to reduce per-household Solar for All spending in the single-family market and increases the number of homes served.
   b. Explore options to capitalize tax credits using a pass-through with non-profit community partners.
   c. Explore options to capitalize tax credits using third party ownership models.
   d. Explore additional grant funding sources from program partners. This may include funds specifically targeted to energy storage or other companion technologies that provide additional benefits.
   e. Evaluate system financing options.

5. **Program design (Jan 1 – Dec 1)**
   a. Evaluate historical data from residential solar programs to inform program design.
   b. Coordinate with community partners to develop strategies to identify and serve the most overburdened and lowest income households.
   c. Develop a customer experience path.
   d. Develop a solar contractor experience path.
   e. Develop integration strategy with existing solar incentive programs in Oregon (PowerClerk).
   f. Develop referral strategy with community partners.
   g. Develop contractor bid and selection process including federal contracting requirements.
   h. Develop special considerations for wide geographic distribution in rural communities.
   i. Adopt consumer protection parameters described above.
   j. Establish technical requirements for solar and storage installations.
   k. Develop contractor materials for compliance with federal requirements such as Davis Bacon.
   l. Establish incentive rates for solar and storage projects.

6. **Deliver Project financial assistance for pilot projects (Oct 1 – Dec 30)**
7. **Launch standard offer incentive program (Dec 1)**

**<u>Multifamily Residential</u>**

Oregon Department of Energy will utilize the planning year to develop a program to deliver the target outcomes and outputs associated with multifamily households participating in Solar for All. This will include outreach and engagement with community partners and development of a new statewide incentive program for low-income households in family developments. The planning year will include development of a revised workplan detailing program activities in years 2 – 5 of Solar for All funding.

6

1. **Outreach and Engagement with Community Partners (Jan 1 – Dec 30)**
   a. Coordinate with community organizations to develop program design and delivery options.
   b. Coordinate with solar industry representatives and multifamily housing developers to develop program design and delivery options.
   c. Identify community partners.
   d. Present program information to community and industry partners through face-to-face visits and presentations at conferences or other regional events.

2. **Coordination with Program Partners (Jan 1 – June 30)**
   a. Develop criteria for prioritizing storage funding for projects with highest needs.
   b. Integrate the new multifamily incentive program into the existing state funded Oregon Solar + Storage Rebate Program.
   c. Coordinate with Energy Trust of Oregon's multifamily incentives programs
   d. Coordinate with households, electric utilities, solar industry partners and multifamily project developers to ensure 20% meaningful benefits are realized by participating households.

3. **Program Design (Mar 1 – Dec 1)**
   a. Evaluate existing solar programs in Oregon to identify underserved regions.
   b. Coordinate with community partners to develop strategies to identify and serve the most overburdened and lowest income households.
   c. Develop a customer experience path.
   d. Develop a solar contractor experience path.
   e. Develop integration strategy with existing solar incentive programs in Oregon (PowerClerk).
   f. Identify industry partners.
   g. Establish technical requirements for solar and storage installations.
   h. Develop contractor materials for compliance with federal requirements such as Davis Bacon.
   i. Establish incentive rates for solar and storage projects.

4. **Deliver Project financial assistance for pilot projects (Oct 1 – Dec 30)**
5. **Launch new multifamily incentive offering (Dec 1)**

**Workforce Development**

ODOE will use the planning year to engage with industry leaders and worker representatives, and design program offerings. The planning year will include development of a revised workplan detailing program activities in years 2 – 5 of Solar for All funding.

1. **Convene Industry Leaders (Mar 1 – Sep 30)**
   a. Identify existing coalitions and venues where relevant parties have been convened already, identify parties who need to be added to program design and outreach discussions to ensure robust discussion and connections to industry and potential trainers and trainees.
   b. Convene industry leaders and worker representatives to discuss methods to ensure workforce development efforts create opportunities for graduates of training program.

2. **Develop Solar Workforce Training Grants (Jan 1 – Sep 30)**
   a. Design opportunity announcement and application for solar workforce training grants: consult with Workforce Advisory Group and stakeholders including training providers, employers, and solar industry association on criteria and priorities for awarding grants.
   b. Design program for awarding solar workforce training grants, including timeline and program processes.

3. **Develop Solar Business Accelerator Contract: (Jan 1 – Nov 30)**
   a. Design request for proposals for solar business accelerator contract: research and consult with comparable programs in the U.S., Oregon stakeholders.
   b. Work with internal administrative staff to draft and review RFP to ensure the document and all processes comport with Department and State contracting requirements.
   c. Publicize request for proposals, including presenting information at the Solar + Storage Industry Conference in fall 2025

## Oregon Community Solar Program for Customers of Investor-Owned Utilities

Energy Trust of Oregon intends to utilize the partial planning year to define and document a program framework specific to Solar for All deployment of Oregon's existing Community Solar Program in investor-owned utility (IOU) territories. This will include development of an incentive and technical assistance plan to support projects and customer enrollment, development of a plan for collaborating with community-based organizations on outreach efforts, and development of a plan for ensuring compliance with federal requirements such as Davis-Bacon. Community based organizations (CBOs) and other stakeholders may be engaged in development of incentive and outreach plans. The program framework and community input will be utilized to develop a full plan for SFA implementation in years 2 – 5.

1. **Program development (Apr 1 – Dec 1)**
   a. Develop financial assistance offers appropriate both for private sector-led and community-led community solar project models.
   b. Convene working meetings with OCSP program leaders and stakeholders to identify potential program strategies to incorporate storage into program rules.

    c. Convene other potential in-state funders of community solar projects to coordinate and identify opportunities to co-fund projects.

    d. Deliver financial assistance to pilot projects.

2. **Compliance and administration planning (Apr 1 – Dec 1)**

    a. Develop systems for ensuring projects comply with federal requirements.

    b. Develop education materials for community solar developers.

    c. Review existing OCSP program operational procedures, confirm that existing processes ensure compliance with SFA household energy savings targets, and identify barriers to scaling operational processes.

    d. Identify any needed changes to program administration and procedures for project developers.

    e. Work with OCSP-designated Low-Income Facilitator to adapt existing community solar income verification processes to also verify SFA income eligibility factors, to ensure necessary share of customers residing in CEJST-identified communities, and to provide any necessary reporting.

3. **Technical assistance planning (Jan 1 – July 1)**

    a. Develop an inventory of technical assistance needs for community solar developers.

    b. Identify elements of and delivery mechanism for technical assistance effort for private sector-led and community-led community solar project models.

    c. Evaluate community solar-specific interconnection barriers and identify implementation strategy.

4. **Outreach and engagement with community partners (Jan 1 – Dec 30)**

    a. Develop plan for engaging community-based organizations in investor-owned utility territory.

    b. Engage stakeholders on specific incentive structures for OCSP projects of varying sizes and ownership.

    c. Develop tools for determining and verifying customer eligibility.

    d. Develop plan for assisting community-based organizations in developing community solar projects.

5. **Launch technical assistance program (July 1)**

6. **Launch SFA IOU community solar incentive program (Dec 1)**


**Oregon Community Solar Programs for Customers of Consumer-Owned Utilities**

**Planning Year**

Bonneville Environmental Foundation (BEF) intends to utilize the partial planning year to define and document a program framework specific to Solar for All deployment of community solar to consumer-owned utilities (COU). This will include outreach to all COUs in Oregon and engagement of those utilities that are responsive to our requests for input in the programmatic planning process. Community based organizations (CBOs) may be engaged in support of stakeholder outreach to COUs and their customers. If determined feasible, BEF will partner with one or two utilities to initiate planning and potential implementation of a pilot community solar project. The program framework and community input will be utilized to develop a full plan for SFA implementation in years 2 – 5. The potential pilot project will inform refinement of the framework and considerations for future SFA community solar projects.

1. **Design COU-specific program framework (Jan 1 – Sept 30)**

     a. Evaluate and incorporate best practices from existing community solar projects.
     b. Research and incorporate utility partner perspectives and barriers.
     c. Incorporate Davis-Bacon and Build America, Buy America compliance and administration requirements and systems in parallel with broader OSFAC program.
     d. Coordinate with and incorporate relevant IOU OCSP design considerations and complimentary incentive programs.
     e. Leverage technical assistance and legal consultation to support items 1b-1d.

**2. Outreach to Consumer-owned Utilities (Jan 1 – Dec 30)**
     a. Identify and communicate with COUs throughout Oregon.
     b. Leverage potential community-based organization subawards to support COU stakeholder outreach.
     c. Engage related stakeholders with programmatic education and feedback mechanisms to support program framework design and technical assistance needs.
     d. Leverage development and technical assistance to support prospective solar installation and/or upgrade project planning.

**3. Initiate Pilot COU Community Solar Project (potential) (Jun 1 – Dec 30)**
     a. If feasible based on item 2d, engage in detailed project planning for prospective pilot project with one to two COUs.
     b. Leverage project development assistance, along with enabling upgrades and solar installation financial assistance, to initiate pilot project implementation based on items 2d and 3a.

**4. Define COU Community Solar implementation plan for years 2 – 5 (Jun 1 – Dec 30)**
     a. Document a COU community solar workplan and complete timeline for remaining years in the SFA program.
     b. Items 1 – 3 above will inform the workplan and timeline.

**5. Launch SFA COU Community Solar Program (Dec 1)**

**Oregon Community Solar Programs for Customers of Consumer-Owned Utilities**
1. COU Community Solar Specific Program Framework Definition
     a. Documented framework in alignment with federal requirements and Oregon specific considerations will be developed in year 1.
     b. Framework will be adjusted in subsequent years to incorporate continuous improvements based on learning from pilot and subsequent community solar projects in years 2 – 5.
2. COU Outreach Protocol Definition
     a. Documented outreach protocols will be developed in year 1
     b. Protocols will be adjusted in subsequent years to incorporate continuous improvements based on engagement and learning in years 2 - 5
     c. Utility responses to engagement will inform project feasibility and planning efforts for years 2 – 5 implementations
3. COU Community Solar SFA Workplan
     a. Documented workplan and associated timeline will be developed in year 1 to fully expend the awarded funds in delivery of the meaningful benefits intended by the program

**Meaningful Benefit Plan**

Solar

OSFAC will develop a plan to ensure that all participating households experience a minimum household savings of 20 percent, or a direct non-financial benefit equivalent. After engagement with stakeholders is conducted during the planning phase, OSFAC members will implement detailed criteria to ensure minimum household savings are achieved. OSFAC will use utility data available through U.S. Energy Information Administration (EIA) or in-state sources to determine required household savings levels and will ensure that households supported by the program receive at least 20 percent household energy savings on either a utility-average or building-specific basis. The OSFAC members have preliminary concepts to ensure these households savings are experienced across the four pathways:

**Single-Family:** During the planning phase ODOE will identify criteria, based on historical data to the extent practical, that demonstrate the proposed system is expected to return a minimum savings of 20 percent based on the average utility bill in that utility's territory or on the unique household data. ODOE will use these criteria to create standardized requirements of all projects receiving financial assistance. OSFAC's objective is to fully fund, or nearly-fully fund, single- family systems by leveraging existing resources and supplementing with Solar for All funds.

**Multifamily:** The objective is to fund a significant portion of onsite solar and storage on affordable multifamily properties. This will be accomplished by leveraging existing in-state funding sources managed by ODOE and ETO. The OSFAC anticipates some low-income households residing in affordable multifamily buildings will be unable to directly benefit financially from a project due to the typical metering arrangements of these buildings in the state. During the planning stage, ODOE will develop specific program design criteria required for an affordable housing provider to receive an onsite solar system and share direct or indirect financial benefits with residents.  Prior ETO multifamily solar incentives and the low- income subscription mechanisms of the OCSP allow affordable housing property managers to provide an annual, off-bill payment to their residents that is equal to an agreed-upon portion of the benefit from the solar project, and this benefit model could be utilized here. In some instances, the size of a solar installation that can be accommodated at a multifamily site may not be large enough to provide 20% saving to all households within the development. Battery storage systems will provide additional indirect benefits on a limited number of multifamily projects. ODOE will consider existing models and other options for indirect benefits indicated by HUD guidance in designing program requirements.

**OCSP:** The existing OCSP program rules are conducive to providing 20 percent household savings at the building level. Low-income participants in OCSP may be charged no more than 60 percent of the value of the bill credits they receive (which are valued based on retail energy rates). To avoid excess generation in a year with abnormally low energy consumption, the program's subscription sizing guidance suggests meeting 80 percent of a customer's energy needs with community solar. Accounting also for fixed utility service charges that OCSP bill credit rates are not designed to offset, a low-income OCSP participant will naturally experience roughly 25 percent household energy savings based on the current program design.

ETO has the responsibility to suggest or verify the subscription size of each low-income customer, leveraging utility customer billing data that ETO has access to. Because of these existing processes, ETO would have the ability to ensure that low-income OCSP participants supported by Solar for All experience 20 percent household energy savings on a building-specific basis, and to monitor these

11

savings levels over time. Lastly, customers that do not pay their own electric bill can participate in OCSP. In this scenario, the entity that pays the electric bill for a low-income household, which is typically the housing provider, can participate in the program on behalf the low-income household(s). This entity must submit annual documentation to the OCSP administrator demonstrating that at least 87.5 percent of the net financial benefits received have been shared directly with the resident household. During the program planning phase, the ETO team will engage the Oregon Public Utility Commission (OPUC) and OCSP program administration partners to identify and address any challenges associated with scaling this existing program feature to meet SFA eligibility and reporting needs and to achieve greater scale.

**Consumer-Owned Utility Territories' Community Solar:** Community solar within COU territories does not have a statewide program or standards that make savings easy to estimate. To ensure the minimum savings are achieved, calculations will be done by utilizing existing publicly available tools such as the Community Solar Business Case Tool, the Community Solar Scenario Tool, or customized tools developed to address the specific project or community conditions. By accurately forecasting the critical inputs – such as capital expenditures, applicable subsidies, value of energy, inflation/escalation, system efficiency, operations and maintenance costs, and financing terms – the program will be able to ensure that a minimum of 20 percent savings will be realized by the COUTCS participants. These models and review processes will ensure that all potential costs are included, such as lease payments, subscription costs, taxes, or utility allowances, and that the projected and realized savings are a calculated net of these potential costs to ensure that the program and products do no harm to the participating households. With quick annual calculations of reported information from projects, BEF can assess if the projections of savings are being realized by looking at production, bill credit value, and factoring in any participant costs.

ODOE will randomly sample completed projects to verify savings achieved for households annually across the four project-based pathways above. If this evaluation indicates that the necessary savings levels are not being achieved, programmatic adjustments will be made within six months of completion of random samplings to ensure compliance with grant requirements.

Energy Storage

The program will deliver energy resilience and grid benefits through carefully constructing criteria during the planning phase to determine where storage may be cost effective to pair with a solar system. In an ideal scenario, all solar would be paired with storage, but there are practical market realities governing not only the cost of such projects, but also challenges to the supply chain and electrical grid. During the planning phase, OSFAC members will determine specific installation scenarios that warrant storage under this program. Possible considerations include facilities that are at the end of distribution lines and therefore vulnerable to outages, residents who reside in Public Safety Power Shutoff areas, residents with critical medical needs for resilient power, and in certain scenarios where more than just the resilience value can be accrued, such as participation in a utility's demand side management program.

**Single-Family:** Storage for single family projects is not planned or budgeted in the SFA program. SFA storage funds will be reserved for multifamily and some community solar projects where a higher benefit to cost ratio can be achieved. In some cases, storage for single family projects may be pursued if alternate funding sources can be found. ODOE will consider the conditions in which storage in a single-family residence is a cost-effective investment. ODOE will not widely deploy storage on single-family residences but may evaluate whether this funding should be made available

for residents living in Public Safety Power Shutoff areas, who are most vulnerable to grid outages, or those with medical conditions that are exacerbated by a grid outage. Storage rebates provided under this program may also leverage a $2,500 rebate offered through the Oregon Solar + Storage Rebate Program (OSSRP) and ETO's newly launched battery storage incentive offer of up to $10,000 for storage installations for income-qualified households.

**Multifamily:** ODOE intends to prioritize storage in multifamily settings where resilience benefits will be available to all residents. Resilience benefits will be identified and measured for each specific project. To the extent practicable, this will be in alignment with the U.S. Department of Housing and Urban Development guidance.

**OCSP:** Storage cannot currently be accommodated in OCSP projects. However, there may be an opportunity to work with OPUC to revise program rules to allow such investments, particularly on project sites that serve critical community infrastructure in low-income households and disadvantaged communities (DACs). OSFAC will engage OPUC, utilities, and program stakeholders to explore whether such programmatic changes are possible and practical within Oregon's regulatory framework. If rule changes are deemed appropriate, ETO would coordinate with OCSP program staff in revising program rules in the next available annual update to the OCSP Program Implementation Manual and would revise the OCSP project funding strategy to include storage. However, these changes are not necessary for OCSP to deliver the benefits contemplated in this proposal.

All OCSP projects are installed 'in front of the meter' and interconnected directly to the electric utility grid. The OCSP program rules do not explicitly prohibit storage, but there is no established pathway for community-led projects to install a solar and storage project for resilience. During the planning year, ETO will engage the OPUC and explore what rulemaking or technical feasibility workarounds may be required to allow for smaller, community-led projects to include solar and storage in the installation process. This would allow for OCSP projects on critical community facilities to remain powered off-grid in an outage and provide deeper benefit to low-income and DAC community members.

**COUTCS:** Some COUTCS projects may be located at a residential building site, such as affordable housing. If the solar is then interconnected to the facility, whether common areas or households, battery storage could be added and support the facility operation during a grid outage. The potential deployment of storage on COUTCS project sites will be examined by BEF on a case-by-case basis, based on the unique benefits and detriments that would be experienced based on the project design.

Household and Community Ownership

The OSFAC program will also maximize household and community ownership models and support low-income and disadvantaged households and communities to build equity across the four project-based pathways as described below:

**Single-Family:** Participating households are likely to build equity in their homes because the solar is attached to the home and the incentives will cover most of the cost of a system installation. To the maximum extent possible, ODOE is seeking to minimize the role of any financing products needed to support the installation and equipment costs on residential solar. OSFAC is prioritizing this approach to prevent low-income households and DACs from becoming straddled with long-lasting insurmountable debt. Pathways for household ownership of solar installations will be determined

13

during the planning year.

**Multifamily:** ODOE is committed to exploring methods of promoting community ownership or building equity of residents in a multifamily setting during the planning phase but recognizes there may be various legal hurdles in a multifamily setting that OSFAC may not be able to overcome in all contexts.

**OCSP:** Models for community ownership already exist in Oregon and can be leveraged by this program. In OCSP, currently operational projects include a participant-owned project, a cooperatively owned project, and several nonprofit-managed projects.

ETO anticipates providing deep support to community-based organizations that intend to pursue community ownership models and will hire dedicated staff to advise these projects through the development process. This will include guidance and technical assistance on a range of factors including monetizing federal tax credits through new Elective Pay mechanisms (which could enable asset ownership by nonprofit entities), partnering with lenders to obtain low-cost financing through tools, and funding sources such as U.S. DOE's Community Power Accelerator platform and EPA's National Clean Investment Fund opportunity. ETO anticipates supporting community ownership models structured through both cooperative and nonprofit organizations.

**COUTCS:** Community solar projects owned by COUs provide an indirect means of community ownership. Several COUs in Oregon have developed community solar projects that are directly or indirectly controlled by utility customers. In Ashland, Oregon, for example, a cooperative was formed by community members who came together to advance more distributed generation. Communities across Oregon can replicate these and other models to sustain COUTCS projects far beyond the performance period.

<u>Workforce Development</u>

ODOE proposes a three-part plan to invest in jobs and businesses in low-income and DACs. The three part-plan includes:

> 1. The creation of a solar business accelerator to provide business growth coaching and mentorship.

> 2. Financial support programs that provide career exposure, pre-apprenticeship, education and training programs, and transitions to employment related to the solar industry.

> 3. The convening of industry leaders and worker representatives to discuss methods for ensuring that ODOE's workforce development efforts create opportunities for graduates of pre-apprenticeship and other training programs.

Under the first part of this plan, ODOE will establish an Oregon Solar Business Accelerator (OSBA) to offer business development and mentoring to businesses associated with the deployment of solar technology. The contracted OSBA will, to the extent practical, prioritize services to: disadvantaged business enterprises; other businesses that are certified under Oregon's Certification Office for Business Inclusion and Diversity; businesses located or serving customers in historically underutilized business zones; or businesses that operate east of the Cascade Mountain range or in coastal communities where there are fewer contractors offering solar installations. Program activities may include workshops on topics such as: 1) industry best practices; 2) business growth strategies; or 3) business mentorship. This intensive model is anticipated to serve two cohorts of six to eight businesses each. This will benefit solar deployment in regions of the state that have limited

to no solar contractors. ODOE is committed to following the practices and principles outlined in the "Six Good Faith Efforts" to ensure that disadvantaged business enterprises eligible to bid for contracts to offer training and solar contractors eligible to receive training are aware of and have opportunities to apply for and participate in the benefits of the OSBA program.

In the second part of the plan, the OSFAC is committed to expanding opportunities for workers from underserved communities by providing skills and certifications leading to high quality jobs. To fulfill this commitment, ODOE will offer a competitive grant program to support a variety of workforce development programs related to the solar industry. Projects of interest include but are not limited to: career awareness and exposure programs, development and expansion of pre-apprenticeship programs, short-term training programs (to benefit both participants and instructors), tuition assistance, and workplace experiences such as internships, on-the-job training, and mentoring for newly employed individuals. The program will also offer wraparound supportive services, requiring at least $217,000 to be deployed as wraparound supportive services by grantees. Dedicated wraparound support services will enable participants, particularly those from low-income or DACs, to enroll and stay enrolled in education, training, and initial periods of employment in occupations that support the solar industry. The dedication of funds for wraparound supportive services will be detailed during the planning phase and will comply with *EPA's participant support costs policy*. ODOE is committed to following the practices and principles outlined in the "Six Good Faith Efforts" to ensure that disadvantaged business enterprises eligible to compete for workforce development subgrants are aware of and have opportunities to apply for and receive subgrant awards under the Solar for All program in Oregon.

In the third part of the plan, ODOE will convene discussions about methods to connect graduates of training and certificate programs to employment opportunities. ODOE will leverage a new Clean Energy Workforce Advisory Group as part of ODOE's new workforce development legislative directive. The Clean Energy Workforce Advisory Group will allow for the facilitation of workforce conversations with industry leaders, workers and their representatives, and organized labor representatives to request feedback on plans, policies, procedures, and concrete goals to work with labor unions, developers, contractors, and other partners as such items evolve throughout the planning phase. Where appropriate, ODOE will coordinate with other workforce efforts in the state for additional feedback and advice, including an energy workforce coalition, convened in 2022 to coordinate outreach among Oregon-based + sharing a common interest in attracting the next generation of energy sector workers.

During the planning phase, the OSFAC is committed to working with industry leaders and worker representatives, including organized labor, to explore methods such as community workforce agreements or labor standards to ensure that workforce development efforts result in quality jobs reflecting "high road" labor practices, including providing family-sustaining benefits, predictable work schedules, retirement contributions, safe working conditions, and the free and fair choice to join a union. OSFAC members are committed to supporting good jobs in local communities to the extent practicable, recognizing that in rural areas in particular, project laborers may need to be trained and sourced from urban locations to meet performance period requirements under the award and that regional differences in wages, available workforce, and training resources may require regional adjustments to any community agreements or labor standards considered.

As described above, ODOE's dedication of program funds for grants to new and existing workforce

development programs will be open to potential investments in pre-apprenticeship programs, which will prepare candidates for Registered Apprenticeships. ODOE commits to providing funding opportunities that may support a variety of training pathways, including pre-apprenticeship programs, short-term training, and tuition assistance. These will help ensure workers a free and fair choice to collectively bargain and join a union as they progress through their career.

During the planning phase, OSFAC members will explore concepts like requiring all contractors to commit to remaining neutral in union organizing and operations, as well as project labor agreements or community workforce agreements, or standards that promote similar worker benefits on projects of a significant size. As stated above, this desire to create good jobs in local communities will also be balanced against the need to avoid potential implementation delays given the limited period of performance. The Clean Energy Workforce Advisory Group may be consulted on such considerations during the planning phase.

**Financial Assistance Strategy**

The financial assistance strategy will use the following estimated types and sizes of financial assistance. The final determination of financial assistance values under each pathway will be determined during the planning year and will include industry and other stakeholder input.

**Single-Family:** ODOE will provide rebates to support solar adoption in low-income single-family residences and DACs. Rebates provided under this program will be stacked with existing state and utility-funded financial incentive programs to fund a high percentage of, or potentially all, project capital costs to enable low-income and DACs to participate in the program with little to no amounts financed. ODOE will allow a maximum payment of $18,000 for a rooftop solar installation per single-family household with Solar for All funds. The OSFAC anticipates serving a minimum of 2,176 single-family households. During the planning phase, ODOE will evaluate precise tiers and qualifications methods, and consult with stakeholders to develop detailed qualifications and maximize the number of households served under this program.

| Single-Family Projections | Annual in IOU | Annual in COU | Annual Totals | 4 Year Totals |
|---|---|---|---|---|
| Number of SF Households | 444 | 100 | 544 | **2,176** |
| Solar For All Incentives | $5,504,236 | $1,745,764 | $7,250,000 | **$29,000,000** |
| Average Incentive | $12,400 | $17,400 | $13,322 | **$13,322** |

To determine this rebate amount, OSFAC members first established the cost of a typical 5 kW rooftop solar system as $20,000, based on historical data. Next, OSFAC members compared maximum rebates currently available in both IOU and COU territories. In IOU territory the projected funding gap is $10,000 and in COU territories, the projected funding gap is $15,000. ODOE then examined the underlying assumption that the existing incentives have no limit – and that is not true. ODOE anticipates the OSSRP is only capable of providing about 500 rebates annually to households that qualify for Solar for All, so additional funds are required to fully leverage the existing ETO incentive. ODOE increased the average incentive cost by $2,400 to offset the limitations of OSSRP.

16

This initial plan is also premised on the assumption that OSSRP will be re-funded by the Oregon Legislature each biennium. OSSRP is currently only funded through June 30, 2025. The Oregon legislature has continuously funded the program since its inception over the course of three biennial cycles; however, this is not guaranteed to continue. If the state legislature does not continue funding of state incentives, the total number of projects that OFSAC can support will be reduced.

| Single-Family Projections, No State Funding | Annual in IOU | Annual in COU | Annual Totals | 4 Year Totals |
|---|---|---|---|---|
| Number of SF Households | 367 | 87 | 454 | 1,817 |
| Average Incentive | $15,000 | $20,000 | $15,961 | $15,961 |

Lastly, ODOE is aware of federal tax credits that may be available to homeowners. However, because the OSFAC intends to prioritize low-income households, who may have little to no federal tax liability, ODOE is not depending on the tax credit to be available as part of the funding stack for single-family households. In addition, the initial investigation of the residential tax credit applicability shows that a highly subsidized project may have its tax credit basis reduced to the point of minimal tax credit value to the homeowner. However, ODOE is committed to exploring strategies during the planning phase, which includes methods to monetize federal tax credits. If successful, these strategies will reduce the cost per participating household and expand the offerings to a greater number of households.

ODOE will seek to develop strategies to stretch federal, state, and utility program funds to increase volume in the low-income program and facilitate benefits that extend beyond the period of performance.

**Multifamily:** ODOE will provide rebates to multifamily projects that qualify for this program. ODOE proposes a stacked incentive strategy to incentivize property owners to install solar systems on multifamily properties and share benefits with tenants, particularly those who are low-income or reside in a DAC. Solar For All funds will be used in coordination with existing state- and utility-funded financial incentive programs to reduce capital costs. State funds in the incentive stack are dependent on legislative approval. ODOE estimates a Solar for All solar installation rebate of $1 per watt in multifamily projects. ODOE anticipates an average per-project grant of $180,000 in IOU territory and $210,000 in COU territory (assuming a 40-unit complex). In addition, some multifamily projects will also be eligible for storage rebates up to $80,000 per project. This multifamily approach is anticipated to serve 2,000 households in 48 projects, 24 of which are anticipated to include storage.

| Multifamily Projections | IOU Territories | COU Territories | Annual Totals | 4 Year Totals |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Number of Solar Projects | 10 | 2 | 12 | **48** |
| Number of Storage Projects | 4 | 2 | 6 | **24** |
| Fed Incentive Budget Solar | $1,819,355 | $530,645 | $2,350,000 | **$9,400,000** |
| Fed Incentive Budget Storage | $255,500 | $109,500 | $365,000 | **$1,460,000** |
| Total Incentives Budget | $2,074,855 | $640,145 | $2,715,000 | $10,860,000 |
| Number of Households | 400 | 100 | 500 | **2,000** |

If the state legislature does not continue funding of state incentives, the total number of projects that OFSAC can support will be reduced.

| Multifamily Projections if State Funding is not Approved | IOU Territories | COU Territories | **Annual Totals** | **4 Year Totals** |
|---|---|---|---|---|
| Number of Solar Projects | 9 | 2 | 11 | **44** |
| Number of Storage Projects | 3 | 1 | 5 | **19** |
| Number of Households | 348 | 87 | 434 | **1738** |

ODOE does not expect that multifamily incentives will need to cover the full system cost for the funding to be successfully deployed. Instead, the incentive only needs to be great enough to entice multifamily owners to make these additions on their buildings.

ODOE will provide financial support for the installation of battery storage systems on select multifamily projects. Low-income households and DACs are disproportionately vulnerable to extended power outages. Deploying storage on multifamily residences is a cost-effective method of delivering resiliency benefits. To receive storage rebates, multifamily projects will be required to demonstrate how battery storage will benefit the residents in a meaningful way, such as backup power for shared refrigerators and common gathering spaces with air conditioning and filtration.

**Community Solar in IOU Territory:** ETO's approach to supporting OCSP projects is built around leveraging the existing program infrastructure and project developers of the OCSP. To maximize benefits and access for customers, the first strategy focuses on financial assistance for private sector-led projects that can quickly scale and maximize the number of low-income households served. A second strategy provides deeper financial and technical assistance to community-led projects that provide deeper benefits to low-income and disadvantaged customers. The existing OCSP program infrastructure provides a safe and efficient mechanism for community solar projects to receive on-bill subscription payments from subscribers, including low-income subscribers, while allowing participants to retain significant net savings. The program's bill credit was designed by OPUC to be set at a level that would allow a 2-3 MW project to be financially sustainable solely

through subscriber revenues and the monetization of federal tax credits and depreciation, while meeting the program's minimum requirements of 10 percent low-income participation. Currently, OCSP projects that would meet the additional 50 percent low-income participation requirement for both Solar for All and the OCSP carve-out are generally not financially viable without additional funding support because program rules require projects to provide 40 percent bill credit savings to all low-income participants. Because of these existing program dynamics and the traditional financing sources available to community solar developers, it is not necessary for ETO to fully fund OCSP projects. Instead, ETO's intended financial assistance strategy is based in meeting the revenue shortfall that a typical 1.5-3 MW-AC OCSP project would experience by increasing the share of project capacity provided to low-income customers from 10 to 50 percent of project capacity. Project incentive levels would be calculated primarily to compensate projects for the lower amount of subscription revenue they are permitted to collect from these low-income participants (providing an upfront incentive equivalent to the lifetime incremental change in subscription revenue), with additional funding provided to offset expected cost increases related to paying prevailing wages during project construction and other program requirements.

This strategy will make use of the base financing mechanics of OCSP and will also leverage subscription payments (both from low-income and non-low-income customers) to finance most of a project's capital costs. The value of the upfront payment needed to incentivize private-sector developers to increase low-income capacity can be directly calculated from OCSP bill credit values and average system production values — and is roughly $0.50/watt of total project capacity, assuming projects use incentives to increase low-income capacity from 10 to 50 percent of project capacity.

ETO also intends to reserve additional financial assistance to support smaller-scale community-led projects. Supporting these projects is critical to achieving specific outcomes related to community control and ownership of community solar projects, and to providing a pathway for low-income and DACs to realize their own goals and objectives related to community solar. However, these projects require deeper financial support because they are typically smaller and lack economies of scale and other efficiencies of larger projects, and the community organizations developing them need to cover their administrative costs as they build the technical capacity to develop and manage these projects. ETO also expects that community-led projects may be able to accommodate even larger percentages of low-income customers but will require additional financial support to do so. Based on ETO's incentive offers to community-led OCSP projects to date, a total incentive necessary to overcome these barriers and offer substantial household energy savings to an increased portion of program participants could be as high as $1.44/watt. ETO intends to fine-tune these estimates, as well as any eligibility criteria that go beyond a low-income capacity requirement, and that relate to community control of projects through a small-scale OCSP incentive offer that ETO plans to issue in early 2024. ETO expects community-led projects that take advantage of this additional incentive offer amount to a small share of the OCSP project capacity and financial assistance that is deployed through Solar for All, but for this to represent roughly half of the incentivized OCSP project count and to command the greatest amount of technical assistance.

This two-pronged approach to supporting OCSP strikes a balance between cost-effectively supporting large amounts of low-income households participating in OCSP and receiving substantial

household energy savings, while also prioritizing and resourcing community-led initiatives that satisfy program objectives related to community leadership, control, and potentially ownership.

The table below demonstrates the total planned incentivized program capacity, capacity subscribed by low-income customers, the expected funding required, and the expected number of households served. Note that, while OCSP program capacity is managed in terms of MW-AC, budget and impact numbers shown in the table and elsewhere are displayed in expected MW-DC to align with other OSFAC program components.

| Project Size | Large, Private Sector Led | Small, Community Led | Total |
|---|---|---|---|
| Targeted Total Project Capacity (MW-DC) | 22.6 | 2.5 | 25.2 |
| Expected Low Income % | 50% | 65% | NA |
| Total Low-Income Capacity (MW-DC) | 11.3 | 1.6 | 12.9 |
| Project Incentive $/W | $.49 | $1.44 | NA |
| Total Project Incentive Budget ($MM) | $11.02 | $3.62 | $14.64 |
| Expected Avg. Project Size (MW-DC) | 1.7 | .2 | NA |
| Expected Project Count | 14 | 11 | 25 |
| Expected Low-Income Households Served | 2,450 | 231 | 2,681 |

**Community Solar in COU Territory:** BEF will provide rebates, grants, and/or forgivable loans, ranging from 40-60 percent of a project's cost depending on the incentives available to the project. No program income will be generated. The average system size is projected to be 500 kW, and the total amount of low-income COUTCS capacity to be 7.5 MW DC. BEF anticipates supporting up to 15 COUTCS projects during the performance period. By assuming that a 5-kW subscription is needed to reduce household costs by 20 percent, the COUTCS projects could serve 1,506 low-income households at $9,668 per household during the program term.

COUTCS will likely occur at multifamily and offsite locations. The ability of associated storage to serve residences in each scenario varies and can be directly serving residences when sited on a multifamily facility. When sited as a standalone offsite community solar project, the ability of the project and associated storage may be less clear or applicable. In addition, the capacity and duration of the storage may or may not be able to serve an entire distribution circuit during a grid outage. Up to 20% of COUTCS financial assistance budget is allocated to enabling upgrades (specifically required to support CS installation) and storage. Any installed storage would be in conjunction and connected to the SFA COUTCS; utilization and siting of storage will be considered as part of overall project review. The criteria to determine when storage is a justified expense will be developed during the planning period and will include stakeholder input as well as advisory committee approval as to the priorities and budget allocations.

| Financial Assistance | Amounts | $/watt | Additional Incentives | Project Capacity (kW DC) | Avg. Subscription Size (kW) | Households Served |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Solar Installation Rebates/Subsidies | $8,584,000 | $1.90 | $40% | 7,530 | 5 | 1,506 |
| Enabling Upgrades Rebates/Subsidies | $1,836,800 | | | | | |
| Project Development Assistance | $600,000 | | | | | |
| Totals | $11,020,800 | | | | | |

**Workforce Development Participant Support Costs:** ODOE will dedicate $2.17 million for grants for workforce training, of which at least $217,000 will be used by grantees for participant support costs. During the planning phase, ODOE will determine appropriate funding ratios to support participants in different workforce training activities eligible for funding under these grant opportunities, along with precise types of participant support costs under this grant program. This process will be informed by reviews of existing workforce programs that offer similar participant support costs within the state.

<u>Financial Assistance Development and Design Considerations</u>
Approximately 74 percent of Oregon's population resides within IOU territory. ETO projects that 2,618 low-income customers will be able to benefit from OCSP within these boundaries. This is a relatively high number of beneficiaries for the award amounts and represents only a small portion of the potentially eligible population within IOU territories.

The OSFAC will use the planning phase to further evaluate existing resources to ensure the financial assistance strategy complements, and does not unnecessarily duplicate, existing sources of capital and financial assistance. ODOE will accomplish this by ensuring that single-family and multifamily incentives are aligned closely with other available resources within the state. The OSFAC is working closely with other state agencies including those who provide funding statewide through Low-income Weatherization Assistance Program (WAP) services and the Low- income Heating Assistance Program (LIHEAP). During the planning phase, ODOE will work closely with stakeholders to develop a coordinated approach to customer acquisition and financial assistance delivery.

During the planning phase, the OSFAC will seek opportunities to braid newly available financial resources into the financial assistance strategy. This will include exploring how renewable energy credits, tax credits, debt financing, leases, power purchase agreements, other third-party ownership options, revolving loan programs, green bonds, guarantees, or other financing products made available from sources such as the National Clean Investment Fund and the Clean Communities Investment Accelerator may be integrated into long-term efforts.

Additionally, ODOE and ETO have engaged with a regional Clean Development Financing Institution (CDFI) and have begun researching strategies for tax credit monetization for single-family installations at low-income households. This research will continue into the planning phase so

projects, particularly those developed by community-based organizations, can receive expert technical assistance on project financing options. ODOE's strategy for deploying onsite solar at single-family homes is to combine Solar for All funding with existing in-state funding to provide systems at little to no cost for households. However, ODOE is committed to fully exploring options for strategies that would enable tax credits to be leveraged, which would allow Solar for All dollars to serve additional households.

During the planning stage, ODOE will explore four potential options that would allow reductions to the per-household Solar for All spending in the single-family market and allow increases to the number of homes served and also to support energy storage or enabling upgrades at a greater share of households. These options are:

| Strategy to Explore | Potential Result |
|---|---|
| Traditional Third-Party Ownership | If ODOE determines that TPOs are an appropriate strategy based on structures developed by other states, an incentive to third-party developers may enable more households to be served within existing budget. |
| Alignment with other funding resources | ODOE will identify additional funding sources that have potential for alignment with Solar for All rules, and where practicable, may be leveraged to support common objectives. This has the potential to increase the number of households that may be served within existing budget. |
| Low-Income Financing | Many stakeholder groups, including representatives of low-income households and DACs, have discouraged the use of financing for solar installations, however on bill financing for energy efficiency is currently deployed in Oregon effectively. During the planning phase, ODOE will explore whether a financing program, such as an on-bill payment system would be appropriate for low-income households, which hold the potential to deploy resources to more households. |
| Non-Profit Direct-Pay Partnerships | Non-profit entities may be able to serve as TPOs for low-income solar installations and monetize federal tax credits through Elective Pay. If ODOE determines that a private sector approach to TPO is not desirable for customer service or customer protection reasons, we may explore a potential strategy of partnering with one or multiple local or regional non-profits to provide such a service. |

The OSFAC will evaluate options to provide financial assistance for storage. SFA financial assistance for storage is expected to be deployed in a multifamily setting. However, during the planning phase, ODOE will conduct stakeholder outreach and engagement to determine appropriate criteria for deployment of storage in a single-family setting. At this time, ODOE is interested in exploring scenarios that may include facilities that are at the end of distribution lines and extra vulnerable to outages, residents who reside in Public Safety Power Shutoff areas, residents with critical medical needs for resilient power, and in certain scenarios where more than just the resilience value can be accrued, such as participation in a utilities demand side management program.

During the application development, the OSFAC learned of various resources throughout the state that can support enabling upgrades. BEF's COUTCS efforts will evaluate upgrades such as: interconnection costs, line upgrades, and substation upgrades. Opportunities to leverage ITC and other subsidies will be evaluated. Before committing to capital grid upgrades a cost comparison will be conducted to see if alternative approaches are more economically viable such as integrating battery storage, decreasing export capacity, or other non-wires alternatives. This funding will not exceed 20 percent of all financial assistance, in accordance with program requirements.

ETO does not anticipate funding for enabling upgrades for OCSP projects in IOU territory and will prioritize project developments in locations and on commercial structures that do not require upgrades. If during the planning year it is discovered that there is an insufficient inventory of locations that do not require enabling upgrades, ETO will explore alternatives to reduce the need for upgrades and non-SFA funding sources to cover these needs. If these are not feasible, ETO will explore the use of SFA funds and will not exceed 20 percent of all financial assistance, in accordance with program requirements.

Enabling upgrades for single family projects are not planned or budgeted in the SFA program because of the high costs. The program will work with community partners to identify households that do not require, or have recently completed, enabling upgrades. In some cases, enabling upgrades may be pursued if alternate funding sources can be found. As part of the development of the enabling upgrade strategy, ODOE will consider other sources of capital including other assistance programs at the federal, state, and local level, as well as a plan to receive referrals from DOE's Weatherization Assistance Program (WAP), or other local, state, and federal programs for energy efficiency financial assistance. This will ensure households participating in the Solar for All program are aware of additional energy saving measures. ODOE identified several possible avenues for coordination with the state agency that provides WAP and LIHEAP funding throughout Oregon. These avenues for coordination include identifying single-family households that are enrolled in, or have recently been served by, a community partner program delivering energy related services. Other avenues for coordination in the multifamily space include providing financial offerings to multifamily developers to integrate solar and potentially storage into new developments. Oregon has set ambitious housing development goals in Governor Kotek's Executive Order 23-04 set a target of developing 36,000 new homes a year. This goal represents a nearly 80 percent increase in housing development from the existing baseline. Within this context, many new housing projects, including affordable multifamily developments, are expected over the next five years. The share of financial assistance expended on enabling upgrades will not exceed 20% of the financial assistance (not total budget) over the lifetime of the program.

ODOE will provide valuable long-term resources to low-income and disadvantaged communities. ODOE will adopt policies cautiously so that low-income households are not placed in financially precarious positions due to their participation in Solar for All. ODOE commits to coordinating closely with other state agencies, the governor's office, and others charged with addressing Oregon's housing issues so that efforts are aligned.

ODOE will explore the four strategies outlined above to assist with the long- term/lifetime operations, maintenance, and recycling of the assets funded under the program. The single-family and multifamily assets are anticipated to have lifespans of 25 years or longer; however, ODOE

recognizes grant funds will only be available for a five-year period of performance. For that reason, ODOE will continue to explore each of the four strategies to create long-lasting resources that support solar technologies within Oregon.

During the period of performance, ODOE and ETO will conduct onsite audits of assets to ensure operations and maintenance is performed correctly, building on the processes and practices of current in-state programs. For example, ETO regularly contracts with professional service providers for onsite verification of appropriate installation practices for incentivized systems prior to payment and has budgeted to support installation verification for projects receiving Solar for All Funding that also receive ETO incentives. In the OSSRP, ODOE selects a random sampling of completed projects for inspection throughout the year. These onsite inspections benefit the contractors and the customers by providing quality control and assisting with ensuring corrective measures are taken when problems are identified. Successful installation and operations of projects will also be monitored as part of the programmatic evaluation to validate the household's savings calculations.

**Project-Deployment Technical Assistance Strategy**

By leveraging the soon-to-be-established Clean Energy Workforce Advisory Group, ODOE will work with a broad array of stakeholders in this area, including the existing public workforce system, community-based organizations, organized labor, private industry, and industry associations that are leading efforts to create training programs within solar and associated occupations. To the extent practicable, ODOE will coordinate with similar workforce funding delivered through the workforce system, including other state agencies, which oversees the state's allocation of Workforce Innovation and Opportunity Act funding, and registered apprenticeships.

With the expert advice provided from the Clean Energy Workforce Advisory Group and in consultation with other workforce programs operated by state agencies, ODOE will provide grant funding opportunities to support local workforce programs that present a plan to train and place workers in high-quality, long-term careers. ODOE is particularly interested in prioritizing applications that promote high road, worker-centered workforce training models, including one or more Registered Apprenticeship programs, pre-apprenticeship (apprenticeship readiness) programs affiliated with Registered Apprenticeship programs, Labor-Management Training Partnerships or other union-affiliated training programs, and training programs in partnership with local community colleges or institutions that serve students from LIDACs. ODOE will provide dedicated funding to support training in occupations needed to implement the OSFAC's four pathways to deploy solar technology. This dedicated funding will offer $2.17 million in competitive grant opportunities to Oregon based employers, local governments and special districts, and non-profit organizations to grow the solar workforce. Additionally, participants in these training programs will be supported with wrap-around supportive services (e.g., childcare, transportation), case management, and on-the-job support and mentorship tailored to different communities dispersed through the state. ODOE intends to dedicate at least $217,000 for the provision of wraparound supportive services.

A major component of OSFAC's project deployment technical assistance strategy includes the opportunities for businesses to access services provided by the OSBA, which will prioritize select

businesses for services of the OSBA that are most aligned with the goals of the OSFAC. Solar developers may be included as possible recipients of support under the OSBA. ODOE will select a contractor to operate the OSBA consistent with Oregon's procurement requirements.

ETO and BEF will make efforts to provide solar developers and communities with technical assistance to address interconnection challenges. In Oregon, interconnection issues vary based on whether the project is in IOU or COU territory and the size of the project seeking interconnection. Technical support related to interconnection will focus on community solar projects, as interconnection is not a barrier for single-family and multifamily projects.

In IOU territories, ETO will utilize the program planning period to hire dedicated staff to help projects navigate project development and the interconnection process and will develop a specific technical assistance program design that addresses known historic barriers.

Additionally, OCSP projects interconnect through their utility's Small Generator Interconnection Procedures (SGIP) procedures, which were designed for larger projects that are considerably more complex than the procedures for onsite connections that many contractors in the state are used to navigating. Most OCSP projects, including those managed by professional solar developers, have encountered substantial delays in project development due to interconnection challenges and setbacks. As part of the OCSP Program Administration team, ETO staff have recently begun joining utility-developer coordination calls to support projects in navigating these processes.

Finally, project developers often have difficulty working with utility staff to identify lower- cost alternatives to potential engineering solutions, because developers lack the expertise to understand and propose alternative solutions that satisfy detailed utility interconnection requirements. In the past, ETO has been successful in supporting MW-scale renewable energy projects through interconnection processes by funding independent engineering experts to support project developers in their utility engagements. ETO plans to hire at least one full-time employee to provide technical assistance to community-led projects. ETO staff also will engage OCSP administration partners, including OPUC, utilities, and project development stakeholders, to identify opportunities for more direct engagement in the interconnection and development process for community-led projects.

If ETO determines that community stakeholders are interested in supporting community solar projects but are not equipped to identify project sites and pursue project development, ETO is prepared to play a more direct role in community solar project development. One potential concept that ETO may develop during the planning phase is to serve as a "matchmaker" by offering a series of competitive procurements to identify and select: 1) project sites that are suitable for community solar development; 2) current ETO trade ally contractors capable of developing community solar projects at these sites; 3) a suitable entity to own and manage the resulting community solar projects; 4) an interconnection engineering resource that can take direct responsibility for submitting and managing OCSP interconnection requests; and 5) community- based organizations representing DACs that are able to conduct outreach to and recruit low-income community members to participate in the program. ETO would work with local lenders to provide the necessary project financing to enable this concept, with subscription revenues providing the necessary long-term project revenues.

25

In COUTCS projects, BEF will be able to address interconnection challenges by providing financial support to utilities or for contracted interconnection studies. However, in some cases grid limitations may limit the capacity and siting of COUTCS projects. BEF will work with contractors to provide specific technical and financial assistance to approved projects wishing to explore COU interconnection studies.

In addition to technical assistance related to interconnection, all OSFAC members intend to expand capacity for community-based outreach, provide direct management of existing programs, deliver customer service, and provide quality assurance across the OSFAC's various contractor groups, including ETO's network of trade ally contracts that install low-income solar projects.

ETO and BEF will ensure community solar projects funded under the program are efficiently deployed and resilient by providing solar developers and communities with technical assistance across a wide variety of issues. At a minimum, this technical assistance will cover issues related to project siting, land-use, permitting, building codes, inspection, and quality control. Local jurisdictional processes will be considered with support from community partners with relevant expertise and as needed, leveraging SFA budget within the project development assistance category. Findings will be documented to support future project siting. Furthermore, community benefits agreements will be evaluated and adoption encouraged during the project siting process. ETO and BEF will be able to access resources previously developed within Oregon to assist developers in this process. These resources include the Oregon Renewable Energy Siting Assessment (ORESA) tool, launched by ODOE in 2022. The ORESA tool is a collection of information about locations for current and future renewable energy and transmission development, designed to build an understanding of the opportunities and constraints that come with specific locations. Developers and other interested parties can now use the report and mapping tool developed under ORESA to understand the opportunities and constraints related to renewable energy growth and economic development. Oregon's land use laws have long included comprehensive land use requirements. These land use considerations, such as zoning requirements, climate hazards, and various agricultural and ecological considerations, are included as data layers in the ORESA tool, specifically developed for Oregon. This tool also includes limited information about military uses of Oregon's land, sea, and air space, sufficient to alert a renewable energy developer of a potential conflicting use, along with a military contact for more information pertaining to a particular site.

During the program planning period, ETO and BEF will incorporate feedback and recommendations from the solar industry, housing providers, and solar developers to determine what types of technical assistance will be most valuable in various sectors to better meet the needs of communities. The Technical Assistance strategy will highlight resources that are publicly available such as NREL's Multifamily Affordable Housing Screening report, SolarAPP+, and REopt. The DOE SolSmart program can assist local governments in siting and permitting new solar projects. These existing tools will help in providing baseline information and assistance to new and existing solar developers, and when more tailored assistance is required, ETO and/or BEF will customize support for community solar projects. This support will enable projects to evolve beyond the conceptual phase into a financially viable project with key risks mitigated. For COUs, this will be particularly important as they span a wide geography with varying land use constraints and widely varying permitting environments, and some have little to no solar experience to date. The OSFAC members

may also leverage efforts under the Resilient and Efficient Codes Implementation grant award to update and educate building officials on energy related building codes and to ensure that post-construction inspection and quality control processes are robust to protect consumers.

The OSFAC will deploy specific technical assistance resources across the pathways, customized for the needs of the financial assistance delivery method.

**Single-Family and Multifamily**: ODOE and ETO will collaborate in providing technical assistance to customers and developers engaged in single-family and multifamily solar projects funded by Solar for All. ETO will leverage its existing trade ally network infrastructure to ensure a consistent level of quality and customer standard of care across sites in this area. Trade Ally status is a requirement for a project to receive ratepayer-funded incentives through ETO that may be paired with Solar for All financial assistance. Any solar contractor may become an ETO trade ally, but they must agree to certain customer service and solar installation standards, among other requirements. Furthermore, Energy Trust's Solar Within Reach incentive for low-and-moderate income customers is only available to trade allies that perform highly across a set of objective quality metrics to ensure a positive experience and quality installation for vulnerable customers. ETO will leverage this existing program infrastructure to expand availability of technical assistance to trade ally contractors, and to ensure quality installations for participating households.

**OCSP:** ETO's technical assistance will be deployed through a mix of in-house, sub- awarded, and procured expertise. First, ETO will hire at least one FTE focused on providing technical assistance to community solar projects (described above). In addition to providing focused support on interconnection issues, this internal resource will help projects navigate issues such as site selection, land use issues, IRS elective pay, and other shared issues. Second, ETO will substantially scale its existing Community Solar Development Assistance (CSDA) offer. CSDA currently offers between $5,000 and $20,000 to OCSP projects, based on project size and prioritizing small community-led projects, to fund early-stage project development activities such as siting, feasibility assessments, project planning activities, and other early-stage project development activities undertaken either by internal staff or third-party experts. This early-stage funding has been a critical initial support for every community-led project that has submitted an OCSP project application to date. With additional funding, ETO can dramatically scale the support offered to community-led projects in early stages, providing grants or forgivable loans that mitigate risks in early-stage project development activities for community-led projects. ETO won't have income associated with SFA Program. Explorations of loans would be made by other institutions. Third, ETO will scale its community-based program implementation efforts by sub-awarding to and partnering with community-based organizations, consistent with EPA Subaward Policy, to support community outreach and education in DACs, and to also build capacity to pursue and develop OCSP projects.

**COUTCS:** Projects in Oregon's 38 COU territories will require individualized technical assistance and project-by-project evaluations to ensure project designs will deliver the minimum benefits required under this program. BEF's individualized approach is necessary because utility specific characteristics will result in different energy values, incentives available, and type of customers enrolled in the program.

BEF will procure a dedicated technical assistance provider to support both the program administration team and individual COUTCS projects. This provider will assist with preparing a projection of low-income savings or equivalent non-financial benefits. Depending on the subscription breakdown, the low-income subscriber portion could be fully subsidized, with no upfront cost, with the other project participants shouldering some of the low-income costs. This model has been successfully deployed in many COUTCS projects and creates a diverse and robust subscriber pool to ensure the outcomes of a program are met.

BEF will expand on the strong foundation of collaboration built formally and informally with COUs, which includes more than 20 COUs over the past year alone – and many of these collaborations have been focused on solar technology. Specifically, BEF will provide technical assistance such as financial modeling, tax credit analysis, grant writing support, outreach services, and deployment support. Under the OSFAC program, COUTCS projects will be able to access tailored support to overcome barriers such as lack of capacity, lack of expertise, financial barriers, challenges with billing system integration, and project siting. BEF can engage with the managers of COUs at regular utility meetings at the same time and solicit input and feedback on how to best structure a COUTCS program in their communities.

All projects may be subject to random inspections by the OSFAC after completion as part of the compliance effort to ensure that projects are built to match the description and confirm with all applicable licensing, permitting, and safety standards.

**Equitable Access and Meaningful Involvement Plan**

The OSFAC plans will maximize access to the program for low-income and DACs. The OSFAC is strategically structured with members that currently serve the entirety of Oregon in the five identified pathways proposed. This coalition-style approach allows each of the members to provide customized support within their regions and areas of expertise. This approach is both diverse and inclusive of numerous communities and voices from around our state. While OSFAC recognizes there is significant work that will need to be performed during the planning phase to ensure equitable access and meaningful involvement from communities, we have secured support from environmental justice and community-based organizations that will be instrumental in advising our approach and guiding us as we seek to better understand the barriers low-income households and DACs face in accessing the benefits of solar technologies.

The OSFAC will maximize the breadth and diversity of the communities served throughout Oregon, while still prioritizing low-income and DACs. All financial assistance distributed in pursuit of installing solar technologies for single-family residences, multifamily residences, OCSP, or COUTCS projects will be focused primarily on serving low-income households, though members of DACs that are not low-income may be served in specific program components. This will include coordination with community partners to develop strategies to identify and serve the most overburdened and lowest income households. However, some aspects of the OSFAC program design will provide benefits to all Oregonians seeking to benefit from solar technologies. For example, OSFAC efforts to provide consumer education or workforce training is done so to support OSFAC objectives — but benefits will accrue to a broader base of Oregonians.

Oregon has many dimensions of diversity, and this program will serve all types of communities and households. These include rural, suburban, and urban communities; communities with limited English proficiency; as well as households who do not own their property, including owners of manufactured homes on leased sites and households who do not have space for residential rooftop solar.

Oregon's two large mountain ranges divide the state into three distinct regions. Portions of Oregon's coasts receive significant rain and are classified as rainforests. Crossing the coastal mountain range are inland valleys. Approximately 2/3rds of Oregon's population resides in the Willamette Valley. Across the eastern Cascade Mountain range, Oregon's landscape changes dramatically into high desert, plains, and buttes. This diverse landscape poses challenges that may be unique to certain regions. Oregonians also speak diverse languages. When appropriate, OSFAC members will translate program materials and customer outreach and educational materials for the intended audience base, and all coalition members have budgeted appropriately for translation services.

OSFAC also intends to serve families that live in diverse housing arrangements. The five- pathway approach is strategically intended to be flexible enough to meet the needs of low-income households and DACs where they are. Pragmatically, OSFAC members acknowledge that not every house is a candidate for an individual solar installation. Some homes cannot support a rooftop installation, others may be shaded all or most of the day by numerous trees or large buildings. Fortunately, multifamily projects, OCSP and COUTCS projects can be designed to service these households where a rooftop solar installation is inappropriate.

Oregon is home to nine federally recognized Tribes. In the process of preparing this application, ODOE sent a government-to-government letter to the chairs of the nine Tribes, inviting formal collaboration on this program. This effort to engage and serve Tribal communities will continue into the planning phase of the project, if awarded. To the extent practical, the OSFAC members intend to develop funding priorities to support deployment of solar technology in low- income households and Oregon's nine federally recognized Tribes. The OSFAC members will further explore methods of prioritization methods during the planning phase, in tribal consultation, to develop models that will provide benefits to Oregon's nine federally recognized Tribes.

Workforce availability also varies by geography. Workforce training facilities and instructional expertise focused on renewable energy are largely located in the more densely populated Interstate-5 corridor. Through conversations with stakeholders, the OSFAC identified the need to expand workforce development opportunities in rural areas of the state to support solar deployment.

Throughout the life of the program, ODOE will continue to meaningfully engage with stakeholders and offer opportunities for participatory governance, where interested parties can weigh in on the design of the program. This participatory governance structure will be developed in the first three months of the planning phase and will be robustly implemented during the subsequent nine months of the planning phase. Periodic opportunities for additional participatory governance will occur in the three months following the release of the annual programmatic evaluation.

ODOE may elect during the planning phase to provide modest and prudent participant support costs

to individuals or provide sub-awards to community-based organizations who support this work on behalf of the community interests they represent, based on the level of involvement sought under this participatory governance structure. This includes considerations for effective engagement with Tribes and/or other environmental justice organizations, who operate on limited budgets and staff capacity. This would be in addition to the sub-awards provided to community partners envisioned as part of the community solar technical assistance described above.

The OSFAC members will use different methods to provide education, outreach, and community engagement on programmatic offerings. ODOE will develop unified educational materials designed for general usage among the OSFAC members. However, specialized materials will be developed by different members to engage diverse audiences. These materials may be web- based, paper materials, audio-visual materials, or education offered through in-person meetings and conversations. Where appropriate, ETO and BEF intend to offer contracts or subawards to trusted, community-based organizations to facilitate outreach and engagement with certain populations, including those with limited English proficiency. This approach will be carefully crafted during the planning phase, so that agreements are compliant with 2 C.F.R. Part 200.331 and the *EPA's Subaward policy*, as well as *EPA's Guidance on Participant Support Costs*.

The OSFAC will implement a robust strategy for customer acquisition and retention for the program. All OSFAC members acknowledge that existing programs do not serve low- income households and DACs to a satisfactory extent. Therefore, OSFAC members have started strategizing about tactics to support a strong customer acquisition strategy, so the benefits of solar technologies can be brought to scale for low-income and DACs. Programs will only serve participants that meet the low-income and DAC definitions in the terms and conditions. Further measures will be developed where appropriate to ensure benefits from funded projects continue to serve eligible households even if the original beneficiary moves or leaves the program. Described below are initial concepts that will evolve during the planning year:

**Single-Family:** ODOE will work with other state agencies to identify households that received roof upgrades or repairs within the last five years. ODOE plans to use partnerships to identify customers and plans to coordinate with existing need-based federal, state, Tribal, or utility assistance programs (e.g., WAP, SNAP, TANF, Lifeline, LIHEAP). Households identified through these programs may be candidates for a single-family solar installation and this could assist with the initial customer base to launch the program. The program will also leverage ETO's existing customer care and call center infrastructure to support participants in learning about and understanding the program's offers. ETO will also hire an additional FTE on its customer care team partially funded by SFA specifically to ensure quality customer care by trade ally contractors and that any issues or disputes that may arise when serving vulnerable populations are speedily and appropriately addressed.

**Multifamily:** In addition to coordinating with the existing OSSRP applications, ODOE intends to work with state agencies which support the development of new affordable housing projects. By leveraging other programs, developers of new affordable housing projects can be rapidly identified for potential multifamily projects.

**OCSP:** ETO will leverage the existing infrastructure of the program to acquire and manage customers. The OCSP funds a low-income facilitator (LIF), which is a designated community- based

30

organization charged by OPUC with recruiting low-income participants on behalf of participating projects. The LIF's current outreach approach focuses on engaging non-English speaking households and other underrepresented groups to participate in the program. The OSFAC team has engaged the OCSP LIF and confirmed its ability to support expanded low-income recruitment in OCSP and to align recruitment with EPA customer eligibility requirements using existing program funding, without the need for EPA funding to support these efforts. ETO does plan to further support the enrollment of low-income and DAC members through the community partner funding model described above, wherein roughly five community organizations would receive funding to hire a staff person dedicated to outreach and education to targeted populations, as well as to directly pursue community solar project development. All subawards will be made in accordance with EPA's subaward policy.

**COUTCS:** BEF will leverage their extensive partnership network and collaborative relationships with COUs to identify potential projects that could be realized with the provision of financial and technical assistance. These identified projects will be offered various support to both identify customers and manage projects.

**Workforce Development:** ODOE intends to replicate similar models for grant making used by other state agencies after the 2022 legislative passage of Oregon's Future Ready funding. Future Ready provided $200 million primarily designed to be dispersed as grant funds to support and expand on existing workforce development programs in the state. ODOE will seek lessons learned from other state agencies to identify recipients who can rapidly and successfully deploy workforce programs to foster growth of the solar industry.

Also cognizant of the Justice40 initiative, all OSFAC participant recruitment efforts, including any provision of contracts or subawards to organizations to assist with recruitment, will be conducted in a manner that is mindful of the Justice40 Initiative. When appropriate, priority will be given to entities that demonstrate strong ties to DACs identified by the Climate and Economic Justice Screening Tool (CEJST) or EJ Screen's Supplemental Indexes.

To reduce waste from fraud and abuse, the OSFAC members will use different methods, including categorical eligibility or other tools that minimize burdens on households.

**Single-Family**: Currently, ODOE's existing OSSRP model permits two methods by which a household may become income-qualified to participate. The first option is to provide documentation that shows household eligibility for LIHEAP, the Oregon Energy Assistance Program, WAP, SNAP, Medicaid, or CHIP. The second method is for the household to provide a tax transcript from either the IRS or Oregon Department of Revenue from one of the previous two tax years. ODOE anticipates deploying a similar model for Solar for All and will develop procedures during that planning year that ensure that program participants meet the low-income and DAC definitions in the terms and conditions.

**Multifamily:** The incentives currently available for multifamily low-income service providers are determined eligible if they are eligible for public assistance. The OSFAC will consider similar requirements during the planning phase.

31

**OCSP:** Within the OCSP, participants can self-attest to income levels in a manner approved by OPUC. During the OCSP program design process, it was determined that alternatives to self-attestation would be unduly restrictive and counter to the objective of forming an easily- accessible program for low-income households. However, the role of the OCSP LIF in managing the program's income verification process is designed to minimize the risks of improper enrollment. The nature of income verification is not made public by the program, and as part of the enrollment process, the LIF collects income information through an intake phone call with the customer, which builds trust and minimizes the risk of fraud. Project managers are not permitted to provide their own records of income eligibility self-attestation in lieu of the program-controlled process. The OCSP also accepts categorical eligibility, such as a household residing within an affordable housing property. These existing OCSP program resources will be used to enroll participants in projects supported by Solar for All, and ETO will engage OCSP program implementation partners to adapt customer intake and verification processes to ensure that customers enrolled in these projects satisfy both OCSP and SFA household eligibility requirements.

Oregon's administrative rules and OCSP implementation manual (approved by the OPUC) allows income self-reporting in OCSP. During Oregon's public comment and rulemaking process for the OCSP, agencies that serve people with low incomes and PUC staff concluded that requiring income documentation proved to be costly and time-consuming. Stakeholders and the PUC agreed that income verification and documentation proved inefficient and not feasible if the program were to achieve its per-project low-income requirement.

As the program currently allows for self-reported income, the LIF will continue to carefully screen and qualify households by income, as well as other categorical definitions of low-income and DAC. ETO will work with the LIF during the planning year to adapt the current screening process to limit improper enrollment, as well as develop a screening tool that prioritizes categorical SFA LI definitions that may allow the LIF to selectively assign those subscribers to SFA-funded projects.

Lastly, the OCSP program rules require that all LI subscribers face no upfront costs, no termination fees, discounts on subscription, and guaranteed energy bill savings. These program rules will safeguard any LI OCSP beneficiaries from the risk of penalty should the LI subscriber ever move. They also allow a framework for the subscriber to transfer their subscription within the same utility territory if the subscriber moves needed. The program's composition and delivery team include a Low-Income Facilitator (LIF) that will educate and screen LI subscribers upfront, thereby allowing for better costumer education and subscriber retention.

**COUTCS:** Income-qualification methods will be similar to the above methods when operating within COUTCS projects. Many of the same dynamics and programmatic services are offered across utility territories except for the self-attestation method currently in operation by the OCSP. The distinction within COUTCS projects is the strong overlay with DACs defined by the CEJST tool, and the ability of the OSFAC to utilize this specific geography in eligibility criteria. BEF will strive to acquire community solar participants that are categorically eligible, have provided income verification, or, when infeasible, reside with the defined DACs <u>and</u> self-attest to their income eligibility.

**Section 3: Fiscal Stewardship Plan**

ODOE will provide the policies and controls for program oversight. As a state agency, ODOE has existing policies and procedures in place to reduce waste, fraud, and abuse, including policies and controls for program oversight. ODOE's internal auditor will review plans, evaluate risks and conduct internal program audits. ODOE will also procure services of a third-party firm to conduct compliance related risk assessments and/or various compliance-based reviews to assist the agency in ensuring strong internal controls, proper administration, and minimizing the risk of waste, fraud and abuse. Current practices include risk assessments of all subrecipients and appropriate controls respective to the risk determination for each subrecipient, which may include financial and onsite monitoring in accordance with the requirements for providing oversight of pass-through funds under 2 C.F.R. Part 200.302 and 2 C.F.R. Part 200.332. ODOE employs practices such as monthly budget-to-actual grant reporting and supports transparent performance tracking and strong procurement practices to provide for strong internal controls. State-specific policies that align with federal requirements for grant compliance can be found in Chapter 30 of the Oregon Accounting Manual. Oregon also protects confidential whistleblowers through a reporting hotline directly available on the homepage of the Oregon Secretary of State's office. This site clarifies that the office investigates both state agencies and reports of other entities who receive either state or federal funds from the state and provides information to potential reporters about whistleblower protections.

ODOE will ensure that all subrecipients comply with the US EPA's policy on conflict of interest through incorporating all necessary requirements into performance. The OSFAC members will also ensure that procurement, conflict of interest, and appropriate financial management and reporting are incorporated into project monitoring on all funded projects. ODOE budgeted sufficient staff time and resources to conduct samplings for site specific compliance, as well as subrecipient monitoring on an annual basis to monitor oversight of grant progress and compliance. The OSFAC is also committed to investing in policies and practices that support consumer protection. Given the purpose of these funds is to serve low-income and DACs, the OSFAC is mindful of the importance for strong consumer protection standards that will be necessary for successful project deployment. The OSFAC is acutely aware that historically DACs may be distrusting of programs such as Solar for All. Strong consumer protections will help build trust and demonstrate that participants experience direct benefits from the program.

Each OSFAC member will develop a plan detailing how program partners and entities receiving Solar for All Funds will interact, transact, or contract with consumers. This plan will cover education and outreach, sales and marketing of solar products or services, consumer purchasing, and leasing and financing materials. All aspects of services will be required to comply with applicable consumer protection laws, including laws prohibiting unfair, deceptive, and abusive practices, the Consumer Protection Act, Fair Debt Collection Practices Act, and Regulation Z.

To that end, each OSFAC member will carefully screen entities expected to directly interact, transact, or contract with consumers in the program. This will include requirements for contractors to participate in the program. If a particular contractor is found to be in violation of the program standards, they will be removed from further participation in the program. To support consumer protection, ODOE will test random samples of transactions and sites will be selected for physical inspections to confirm that: customers are not charged illegal upfront or cancellation fees; customers experience transparent and verifiable subscription payments, where applicable, and billing processes; and have accessibility if they have limited English proficiency. ODOE will use a

33

judgmental auditing method at least annually. These transaction tests will also ensure that consumers are not exposed to predatory lending programs under the Solar for All program. Loan products will be limited to only those products that the program develops. Where appropriate, ODOE will consider methods to support consumer education campaigns about solar technology and available programs, as well as warnings about predatory practices that may exist within the state. ODOE will implement appropriate guardrails to ensure household savings materialize for program beneficiaries by performing audits or spot-checks of bills. For the duration of the grant, random samplings will not only be done to recently completed projects, but to a reasonable extent, a sampling will be pulled from projects completed at least a year prior.

The program will also undergo annual programmatic evaluations to determine programmatic strengths and weaknesses. This evaluation will evaluate the progress of the grant, as well as effectiveness in serving different customers, including customers living DACs, rural communities, tribal communities, and customers who speak a language other than English.

**Section 4:  Timeline and Milestones**



36

**Activities for all Pathways**

| Activity Title | Start Date | End Date |
|---|---|---|
| **Initiate subrecipient awards** | **01/01/25** | **03/31/25** |
| Develop subaward contracts with coalition members | 01/01/25 | 03/31/25 |
| **Develop quality assurance measures** | **01/01/25** | **04/30/25** |
| Develop Quality Management Plan | 01/01/25 | 03/31/25 |
| Review Quality Management Plan | 01/01/26 | 03/31/26 |
| Review Quality Management Plan | 01/01/27 | 03/31/27 |
| Review Quality Management Plan | 01/01/28 | 03/31/28 |
| Review Quality Management Plan | 01/01/29 | 03/31/29 |
| Develop Quality Assurance Project Plan | 01/01/25 | 03/31/25 |
| Review Quality Assurance Project Plan | 01/01/26 | 03/31/26 |
| Review Quality Assurance Project Plan | 01/01/27 | 03/31/27 |
| Review Quality Assurance Project Plan | 01/01/28 | 03/31/28 |
| Review Quality Assurance Project Plan | 01/01/29 | 03/31/29 |
| Establish regularly scheduled meetings with coalition | 01/01/25 | 04/30/25 |
| **Develop program compliance and oversight** | **01/01/25** | **07/31/25** |
| Review policies & procedures for compliance | 01/01/25 | 04/30/25 |
| Engage third-party firm in compliance activities | 04/30/25 | 07/31/25 |
| Evaluate LIDAC eligibility requirements | 01/01/25 | 06/30/25 |
| **Engage with stakeholders to inform program design** | **01/01/25** | **12/31/25** |
| Develop and implement participatory governance structures | 01/01/25 | 12/31/25 |
| **Community outreach and education** | **01/01/25** | **12/31/25** |
| Engage 10+ local CBOs to develop outreach & delivery strategies | 01/01/25 | 12/31/25 |
| Develop educational materials | 04/01/25 | 12/31/25 |
| Develop public-facing webpage & other materials | 01/01/25 | 04/01/25 |
| **Submit revised work plan** | **10/30/25** | **10/30/25** |
| **Program review cycle** | **01/01/26** | **08/31/28** |
| Periodic review of program | 06/01/26 | 08/31/26 |
| Periodic review of program | 06/01/27 | 08/31/27 |

| | 06/01/28 | 08/31/28 |
|---|---|---|
| Periodic review of program | | |

**Single-family Residential**

| Activity Title | Start Date | End Date |
|---|---|---|
| **Outreach and engagement with community partners** | **01/01/25** | **12/31/25** |
| Develop program design & delivery with community orgs | 01/01/25 | 12/31/25 |
| Establish guidelines to support community partners | 03/01/25 | 12/31/25 |
| Establish criteria for community partner participation. | 03/01/25 | 12/31/25 |
| Verify eligibility to receive federal funding | 04/01/25 | 12/31/25 |
| Identify support needs for community partners | 01/01/25 | 12/31/25 |
| **Develop Contracts with Community Partners** | **06/01/25** | **12/31/25** |
| Develop and submit guidelines to US EPA for subawards | 06/01/25 | 09/30/25 |
| Follow procurement requirements for contract development | 06/01/25 | 09/30/25 |
| Initiate contracts with community partners | 10/01/25 | 12/31/25 |
| **Develop Consumer Protection Measures** | **03/01/25** | **09/30/25** |
| Proactive marketing to counter "free solar" offers. | 03/01/25 | 09/30/25 |
| Develop approved contractor list | 06/01/25 | 09/30/25 |
| Develop system warranty requirements | 06/01/25 | 09/30/25 |
| Develop installation quality control plan | 03/01/25 | 07/31/25 |
| Develop follow up surveys with program participants | 06/01/25 | 09/30/25 |
| Cost controls including competitive bidding | 03/01/25 | 09/30/25 |
| **Develop Alternate Financing Strategies** | **03/01/25** | **12/31/25** |
| Explore options to reduce per-household spending & increase homes served | 03/01/25 | 12/31/25 |
| Explore options for tax credits using a pass-through with non-profit community partners. | 03/01/25 | 12/31/25 |
| Explore options for tax credits using third party ownership models | 03/01/25 | 12/31/25 |
| Explore additional grant funding sources from program partners | 03/01/25 | 12/31/25 |
| Evaluate system financing options | 03/01/25 | 12/31/25 |
| **Program design** | **01/01/25** | **12/01/25** |
| Evaluate historical data from residential solar programs | 01/01/25 | 03/31/25 |

| | | |
|---|---|---|
| Develop strategies to identify & serve the most overburdened & lowest income households | 03/01/25 | 11/28/25 |
| Develop a customer experience path. | 03/01/25 | 09/30/25 |
| Develop a solar contractor experience path | 03/01/25 | 09/30/25 |
| Develop PowerClerk integration strategy | 03/01/25 | 12/01/25 |
| Develop referral strategy with community partners | 03/01/25 | 12/01/25 |
| Develop contractor bid and selection process | 03/01/25 | 12/01/25 |
| Develop geographic distribution considerations | 03/01/25 | 12/01/25 |
| Adopt consumer protection parameters | 03/01/25 | 09/30/25 |
| Establish technical requirements for solar & storage installations | 03/01/25 | 09/30/25 |
| Develop Davis Bacon materials for contractors | 03/01/25 | 09/30/25 |
| Establish incentive rates for solar & storage projects | 03/01/25 | 09/30/25 |
| **Deliver Project financial assistance for pilot projects** | **10/01/25** | **12/31/25** |
| **Launch standard offer incentive program** | **12/01/25** | **12/01/25** |
| **Implementation of pathway** | **12/02/25** | **04/30/29** |

## Multifamily Residential

| Activity Title | Start Date | End Date |
|---|---|---|
| **Outreach and Engagement with Community Partners** | **01/01/25** | **12/31/25** |
| Coordinate with community organizations to develop program design and delivery options. | 01/01/25 | 12/31/25 |
| Coordinate with solar industry representatives and multifamily housing developers to develop program design and delivery options | 01/01/25 | 12/31/25 |
| Identify community partners | 03/01/25 | 12/31/25 |
| Present program information to community and industry partners | 06/01/25 | 12/31/25 |
| **Coordination with Program Partners** | **01/01/25** | **06/30/25** |
| Develop criteria for prioritizing storage funding for projects | 01/01/25 | 06/30/25 |
| Integrate the new incentives into the existing state funded program | 03/01/25 | 06/30/25 |
| Coordinate with ETO's multifamily incentives programs | 01/01/25 | 06/30/25 |
| Ensure 20% meaningful benefits are realized by participating households. | 01/01/25 | 06/30/25 |

| Program Design | 03/01/25 | 12/01/25 |
|---|---|---|
| Evaluate existing solar programs in Oregon to identify underserved regions. | 03/01/25 | 06/30/25 |
| Develop strategies to identify and serve the most overburdened and lowest income households. | 03/01/25 | 11/28/25 |
| Develop a customer experience path. | 03/01/25 | 09/30/25 |
| Develop a solar contractor experience path | 03/01/25 | 09/30/25 |
| Develop PowerClerk integration strategy | 03/01/25 | 12/01/25 |
| Identify Industry Partners | 03/01/25 | 12/01/25 |
| Establish technical requirements for solar and storage installations | 03/01/25 | 09/30/25 |
| Develop Davis Bacon materials for contractors | 03/01/25 | 09/30/25 |
| Establish incentive rates for solar and storage projects | 03/01/25 | 09/30/25 |
| **Deliver Project financial assistance for pilot projects** | 10/01/25 | 12/31/25 |
| **Launch new multifamily incentive offering** | 12/01/25 | 12/01/25 |
| **Implementation of pathway** | 12/02/25 | 04/30/29 |

## Workforce Development

| Activity Title | Start Date | End Date |
|---|---|---|
| **Convene Industry Leaders** | 03/01/25 | 09/30/25 |
| Identify participants for program design and outreach discussions | 03/01/25 | 09/30/25 |
| Identify and convene participants for discussions about connecting trainees to jobs | 03/01/25 | 09/30/25 |
| **Develop Solar Workforce Training Grants** | 01/01/25 | 09/30/25 |
| Design opportunity announcement for solar workforce training grants | 01/01/25 | 07/31/25 |
| Develop and submit guidelines to US EPA for subawards | 01/01/25 | 07/31/25 |
| Design workforce training grants program | 01/01/25 | 09/30/25 |
| **Develop Solar Business Accelerator Contract** | 01/01/25 | 11/30/25 |
| Design RFPs for solar business accelerator contract | 01/01/25 | 11/30/25 |
| Work through Department and State contracting process | 01/01/25 | 11/30/25 |
| Publicize RFPs | 01/01/25 | 11/30/25 |
| **Implementation of pathway** | 12/02/25 | 04/30/29 |

**Oregon Community Solar Program for Customers of Investor-Owned Utilities**

| Activity Title | Start Date | End Date |
|---|---|---|
| **Program development** | **04/01/25** | **12/01/25** |
| Develop financial assistance for private-sector-led and community-led community solar | 04/01/25 | 11/28/25 |
| With OCSP, identify strategies to incorporate storage into program rules | 04/01/25 | 11/28/25 |
| Explore co-funding with other potential in-state funders | 04/01/25 | 11/28/25 |
| Deliver financial assistance to pilot projects | 07/01/25 | 11/28/25 |
| **Compliance and administration planning** | **04/01/25** | **12/01/25** |
| Develop systems for ensuring projects comply with federal requirements | 04/01/25 | 11/28/25 |
| Develop education materials for community solar developers | 04/01/25 | 11/28/25 |
| Review existing OCSP program operational procedures, confirm that existing processes ensure compliance with SFA household energy savings targets, and identify barriers to scaling operational processes. | 04/01/25 | 11/28/25 |
| Identify any needed changes to program administration and procedures for project developers | 04/01/25 | 11/28/25 |
| Work with OCSP-designated Low-Income Facilitator to adapt existing community solar income verification processes to also verify SFA income eligibility factors, to ensure necessary share of customers residing in CEJST-identified communities, and to provide any necessary reporting. | 04/01/25 | 11/28/25 |
| **Technical assistance planning** | **01/01/25** | **07/01/25** |
| Develop an inventory of technical assistance needs for community solar developers | 01/01/25 | 06/30/25 |
| Identify elements of and delivery mechanism for technical assistance effort for private-sector-led and community-led community solar project models | 01/01/25 | 06/30/25 |
| Evaluate community solar-specific interconnection barriers and identify implementation strategy | 01/01/25 | 06/30/25 |
| **Outreach and engagement with community partners** | **01/01/25** | **12/31/25** |
| Develop plan for engaging community-based organizations in investor-owned utility territory | 01/01/25 | 12/31/25 |

| | | |
|---|---|---|
| Engage stakeholders on specific incentive structures for OCSP projects of varying sizes and ownership | 01/01/25 | 12/31/25 |
| Develop tools for determining and verifying customer eligibility | 01/01/25 | 12/31/25 |
| Develop plan for assisting community-based organizations in developing community solar projects | 01/01/25 | 12/31/25 |
| **Launch technical assistance program** | **07/01/25** | **07/01/25** |
| **Launch SFA IOU community solar incentive program** | **12/01/25** | **12/01/25** |
| **Implementation of pathway** | **12/02/25** | **04/30/29** |

### Oregon Community Solar Programs for Customers of Consumer-owned Utilities

| Activity Title | Start Date | End Date |
|---|---|---|
| **Design COU specific program framework** | **01/01/25** | **09/30/25** |
| Evaluate and incorporate best practices from existing community solar projects | 01/01/25 | 09/30/25 |
| Research and incorporate utility partner perspectives and barriers | 01/01/25 | 09/30/25 |
| Incorporate systems to comply with all Federal compliance requirements w OSFAC | 01/01/25 | 09/30/25 |
| Incorporate relevant IOU CS design considerations & complimentary incentive programs | 01/01/25 | 09/30/25 |
| Leverage technical assistance and legal consultation to support program framework | 01/01/25 | 09/30/25 |
| **Outreach to Consumer-owned Utilities** | **01/01/25** | **12/31/25** |
| Identify and communicate with COUs throughout Oregon | 01/01/25 | 12/31/25 |
| Document outreach protocols and best practices | 04/01/25 | 12/31/25 |
| Leverage community-based organization subaward for COU outreach | 01/01/25 | 12/31/25 |
| Engage stakeholders in program design and technical assistance needs | 01/01/25 | 12/31/25 |
| Leverage financial assistance to support solar project planning | 01/01/25 | 12/31/25 |
| **Initiate Pilot COU Community Solar Project (potential)** | **06/01/25** | **12/31/25** |
| If feasible, engage in detailed pilot project planning with one to two COUs | 06/01/25 | 12/31/25 |
| Leverage financial assistance budget for implementation of pilot project(s) | 06/01/25 | 12/31/25 |
| **Define COU Community Solar implementation plan for years 2 – 5** | **06/01/25** | **12/31/25** |
| Document a COU workplan and complete timeline for remaining years in the SFA program | 06/01/25 | 12/31/25 |
| **Launch SFA COU Community Solar Program** | **12/01/25** | **12/01/25** |

| Implementation of pathway | 12/02/25 | 04/30/29 |
|---|---|---|
| Refine COU framework to incorporate continuous improvements in years 2 - 5 | 12/02/25 | 04/30/29 |
| Adjust outreach protocols to incorporate continuous improvements in years 2 - 5 | 12/02/25 | 04/30/29 |
| Incorporate utility feedback into project feasibility and planning in years 2 - 5 | 12/02/25 | 04/30/29 |
| Execute solar installation & related upgrades in alignment with COU workplan | 12/02/25 | 04/30/29 |

**Section 5: Reporting Requirements**

**Reporting Plan:** ODOE will report collective results based on the outputs and outcomes included in the logic model, shown below:



ODOE will build program capacity to perform evaluation activities and detail a plan to publish data, evidence, and evaluation reports publicly during the program lifetime. This includes conducting an annual evaluation, which will assess programmatic performance and validate realization of household savings.

Additionally, ODOE will leverage systems for financial management, performance reporting, and federal compliance expertise within the agency. Coalition members ETO and BEF are also applicants under other federal competitive grants and may be able to leverage common systems used by their organizations, if selected for awards. During the planning phase, all OSFAC members will construct robust reporting systems to comply with the requirements of Section VI.C of the Request for Application, Order 1000.33, as well as any requirements specific to the grant terms and conditions.

1. Performance Reports

Semi-Annual Report
The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

Final Report

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.


2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.


**Section 6:  Budget Narrative**

**6.1 Project Budget**

| Category | Amounts | |
|---|---|---|
| Personnel | $2,083,281 | |
| Fringe Benefits 51.9% | $1,081,222 | |
| Travel | $155,585 | |
| Supplies | $1,000 | |
| Contractual | $1,863,998 | |
| Other | | |
|     Printing Costs | $7,000 | |
|     Participant Support Costs | $39,860.000 | |
|     Sub-awards | $39,881,480 | |
|     In-Kind | $400,000 | |
| Indirect Cost 40.02% | $1,266,434 | |
| **Total** | **$86,600,000** | |

## Personnel

The following ODOE personnel will support Solar for All program activities:

| Job Title | Average Salary Y1-Y5 | # Personnel | Time Assigned Y2-Y5 | Cost BPY1 | Cost BPY2 | Cost BPY3 | Cost BPY4 | Cost BPY5 |
|---|---|---|---|---|---|---|---|---|
| Division Administrator | $159,716 | 1 | .20 | $38,942 | $32,141 | $32,141 | $32,141 | $32,141 |
| Manager | $119,804 | 1 | .50 | $13,223 | $57,252 | $60,126 | $63,072 | $66,168 |
| Grant Program Analyst | $94,727 | 1 | 1.00 | $20,936 | $90,684 | $95,016 | $99,708 | $104,484 |
| Operations and Policy Analyst | $99,352 | 1 | 1.00 | $21,974 | $95,016 | $99,708 | $104,484 | $109,656 |
| Solar Rebate Assistant | $61,867 | 1 | 1.00 | N/A | $59,280, | $62,004 | $64,956 | $68,280 |
| Senior Policy Analyst | $131,976 | 1 | .20 | $40,866 | $26,558 | $26,558 | $0 | $0 |
| Energy Policy Analyst | $119,607 | 1 | .20 | $35,713 | $24,142 | $24,142 | $0 | $0 |
| Incentives Analyst | $101,524 | 1 | .20 | $4,663 | $20,180 | $0 | $0 | $0 |
| Community Equity Analyst | $115,616 | 1 | .10 | $31,400 | $11,320 | $11,880 | $12,071 | $12,071 |
| QA Officer | $99,351 | 1 | .56 | $49,221 | $53,209 | $55,836 | $58,511 | $61,407 |

Note: please see calculations details in excel Budget table

ODOE's employees receive increase of salaries according to approved COLA and seniority levels

| Position | Main Roles/Responsibilities |
|---|---|
| Division Administrator | Oversees the project |
| Manager | Lead the program team |

| Grant Program Analyst | Collaborate with Grants Officer on grants administration |
| Operations and Policy Analyst | Analyze regulations and standards, establish operational procedures |
| Solar Rebate Assistant | Works directly with Sub-awardees and end users |
| Senior Policy Analyst | Oversee, implement processes between Sub-awardee and ODOE |
| Energy Policy Analyst | Create, recommend, implement program design. Research analyze data |
| Incentives Analyst | Collaborate with the team to collect and analyze data from end users |
| Community Equity Analyst | Collaborate with the team to ensure equality and justice are fulfilled. |
| QA Officer | Risk management, compliance, high standards on deliverables |

This award will support 4.96 FTE at ODOE after grant-specific staff are hired.  Different FTE levels from existing employees will provide support during the planning and early implementation phases, some existing employees will transition away from the project after grant-specific staff are onboarded and appropriately trained. This best practice allows for rapid implementation.

Once the grant is implemented, we expect to have 10 staff working at different levels of capacity. The most crucial staff are Grant Program Analyst, Operations and Policy Analyst for the first year. This staff is leading the team. Following the early implementation phases, the Incentives Analyst will transition away starting the 3rd year, and the Senior Policy Analyst and Energy Policy Analyst in the 4th year.  ODOE is hiring a QA Officer to perform quality management duties and provide oversight of ODOE's quality assurance and control documents and activities. This strategy will improve and guarantee performance and efficiency with the goal of using the grant resources in an efficient manner.

Increases for each position are based on an assumed increase of 5% on January 1, 2025, in alignment with recently announced increases for state employees — and thereafter, structured annual step progressions as required by the state. ODOE employees positively time keep for federal grants using project cost account codes on a monthly basis. This method ensures accurate reporting and grant expenditures. At the end of each month, ODOE allocates each employee's paid leave to each project cost account code, proportionate to time worked. This provides an equitable basis for distribution of paid leave across various grants. Paid leave is considered wages within Oregon's system, and correspondingly fringe benefits are distributed under the same proportions.

**Fringe Benefits**

ODOE does not have a federally approved Fringe Rate, however, fringe benefits are a component examined in the agency's negotiated indirect cost rate. The agency uses the biennial agencywide average fringe rate from the agency's budget for budgeting purposes only, which during the 2023-2025 biennium is 51.9% (Salaries and wages/OPE). Actual costs for fringe benefits, based on individual employee costs incurred each month, are charged to each individual funding source based on the employee's time charged to each fund source.

The Fringe Benefits are comprised of the following class of costs:

| Type of Benefit | Percentage/$ | Basis of Computation |
|---|---|---|
| Employee Relations Board | $2.19 | Per month |
| PERS | 17.92% | Of wages |

| Pension Obligation Bonds | 4.75% | Based on salary |
|---|---|---|
| Social Security | 7.65% | Based on Salary |
| Workers Compensation | $1.91 | Per month |
| Medical/Vision | $1,650 | Per month |
| Paid Family Medical Leave | .4% | Based on Salary |

**Travel**-

The following travel is anticipated in the program budget:

### A) Compliance Inspections

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 2 days | Ground Transport | Cost per trip | # Trips per year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1 | TBD | 2 | $284 | $276 | $168 | $728 | 10 | $7,280 |
| 2-5 | TBD | 2 | $284 | $276 | $168 | $728 | 20 | $14,560 |

### B) Outreach events

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 3 days | Ground Transport | Cost per trip | # Trips per year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1-5 | Medford, OR | 1 | $196 | $162 | $197 | $555 | 12 | $6,660 |

### C) Sub-recipient monitoring

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 3 days | Ground Transport | Cost per trip | # Trips per year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1-5 | TBD | 2 | $284 | $276 | $168 | $728 | 10 | $7,280 |

### D) OSFAC Meeting Participation

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 1 day | Ground Transport | Cost per trip | # Trips/year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1-5 | Portland, OR | 2 | | $112 | $59 | $171 | 3 | $513 |

### E) Professional Development

| Year | Destination | Travelers | Lodging 2 nights | Per-diem X 3 days | Airfare/Ground Transport | Cost per trip | # Trips/year | Cost per year |
|---|---|---|---|---|---|---|---|---|
| 1-5 | Washington, DC | 2 | $1,032 | $396 | $2,132 | $171 | 1 | $3,560 |

ODOE anticipates 10 Compliance Inspection Trips in Year 1, and 20 Compliance Inspection Trips for each year following. All other travel types are expected to be evenly divided across the five-year period. ODOE anticipates 12 outreach trips, 10 subrecipient monitoring trips, and 3 OSFAC meetings to occur annually, requiring in-state travel.

ODOE's estimated travel costs are based on current state travel requirements contained in the Oregon Accounting Manual, which primarily uses GSA rates. Because precise locations of projects sites are unknown at this time, ODOE selected 10 cities across Oregon and averaged travel costs across these locations to arrive at trip averages. ODOE employees are also expected to access the state motor pool vehicles, which is often more cost effective than a GSA mileage payment on a cost-per-mile basis. State motor pool rates were used for mileage costs cited above based on 10 cities across Oregon.

ODOE anticipates staff attending one national conference per year for professional development. While precise conferences have not been identified, for estimating purposes, ODOE based estimates on conferences occurring in Washington. D.C. ODOE will follow standard GSA payments for travel as required by the Oregon accounting manual.

**Equipment**-
No equipment will be purchased by the prime applicant under this award.

**Supplies** -
ODOE anticipates personal protective equipment, such as hard hats, vests, and other materials may be needed for some site inspections and estimates an annual cost of $200 for such items.

Procedures/Procurement method: ODOE will follow state and federal procurement guidelines when procuring supplies.

**Contractual** -
The following contract activities are anticipated in the Solar for All program.

| Contract Activity | Scope of Work/Services | Duration | Procurement Method |
|---|---|---|---|
| 1. Legal Services-DOJ | Sub-awards reviews | 5 years | Non-competitive |
| 2.Davis Bacon Software | Certified payroll reports | 5 years | Competitive |
| 3.Consulting | Common application portal | 5 years | Existing Contract |
| 4.Software Subscription | Online application software | 4 years | Existing Contract |
| 5.Business Accelerator | Business development/mentoring | 4 years | Competitive |
| 6.Program Promotion | Program advertisement | 4 years | Competitive |
| 7.Translation Services | End user program learning | 5 years | Competitive |
| 8.Compliance Reviews | Program audit | 4 years | Competitive |

As a state agency, ODOE will comply with state procurement requirements, as required by 2 C.F.R. Part 200.317. ODOE anticipates conducting procurements during the planning year to secure contractors and develop software and resources necessary to implement the program.

1. Legal Services-from Oregon Department of Justice. ODOE anticipates reviews of sub-awards, procurements, and general consultations with the legal counsel, with the Oregon DOJ, as required under state law. ODOE-DOJ don't have an intergovernmental/interagency agreement; DOJ is the state's attorney, and ODOE is required to receive counsel from them under state law. Estimates are based on the current attorney rate of $293 per hour, which is subject to adjustment. DOJ will provide legal services for reviews of sub-awards, procurements, and general consultations.
2. ODOE anticipates the need for Davis-Bacon tracking software, which ODOE will administer for the OSFAC.
3. ODOE anticipates the need to enhance current rebate processing systems to meet grant specific terms and streamline rebate applications.
4. Ongoing costs for the existing rebate processing subscriptions are also projected based on current rates.

49

5. ODOE intends to procure a contractor to establish and operate an Oregon Solar Business Accelerator to help solar businesses grow and expand.
6. To supplement outreach efforts, ODOE also expects the need for program promotions through media such as internet, radio, or tv, as well as
7. Translation or interpretation services.
8. ODOE also intends to secure services from a third-party CPA firm to assist with compliance-related reviews. Estimates are based on a rate of $200 per hour for 500 hours a year in years 2-5.

Procurement method follow for existing contracts: ODOE follows the ODOE Purchasing Internal Policies and Procedures PUR-06

- For contracts exceeding $150K a competitive process was conducted according to DAS and DOJ procurement rules based on the agency's mission and DOJ legal sufficiency requirements under OAR 137-046 and Competitive Procurement Regulations under OAR 125-246-0110.

**Construction (if applicable)** -
No construction costs are planned by the prime applicant under this award.

**Other - Printing**
ODOE also anticipates printing costs for each year. ODOE estimates printing costs of .10 cents per page, with the largest printing volume to occur in the first two years as the program launches.

**Other – Subaward activities**

| Entity | Main activities |
|---|---|
| Energy Trust of Oregon - $22,817,732 | • Develop and manage financial incentive program for community solar projects in investor-owned utility service territories. <br> • Support ODOE in development and management of single family program. <br> • Support ODOE in development and management of multifamily program. <br> • Support community partner engagement. <br> • Support development of alternate financing strategies to leverage federal tax credits in single family projects. <br> • Provide technical assistance to developers <br> • Support participant outreach and education. <br> • Support community-based organizations that intend to pursue community ownership models <br> • Provide financial and technical assistance to support smaller-scale community-led projects. |

50

| | • Additional detail in section 2.1: Oregon Community Solar Program for Customers of Investor-Owned Utilities |
|---|---|
| Bonneville Environmental Foundation -$14,559,822 | • Develop and manage financial incentive program for community solar projects in consumer-owned utility service territories.<br>• Provide technical assistance to developers.<br>• Evaluate upgrades necessary to facilitate interconnection of community solar projects.<br>• Develop strategies to leverage federal tax credits.<br>• Develop financial assistance for storage paired with community solar projects.<br>Additional detail in section 2.1: Oregon Community Solar Programs for Customers of Consumer-Owned Utilities |
| Workforce Development (TBD) -$2,170,000 | • Convene industry leaders and worker representatives to discuss methods to ensure workforce development efforts create opportunities for graduates of training program<br>• Design opportunity announcement and application for solar workforce training grants<br>• Develop Solar workforce training grants program<br>• Design and publicize request for proposals for solar business accelerator contract |
| Community Partner (TBD) - $333,926 | • Add solar site assessments to existing home energy audits.<br>• Provide referrals to single family program when on-site rooftop solar is appropriate.<br>• Provide referrals to multifamily program when on-site rooftop solar is appropriate.<br>• Provide referral to community solar programs when on-site rooftop solar is not appropriate.<br>• Support prioritization strategy for storage projects in multifamily housing developments.<br>• Identify and report issues and challenges end users are facing.<br>• Serve as first contact point for customer service. |

**Participant Support Costs**

Participant support costs will consist of rebates provided by ODOE to contractors for the installation of solar through the single-family pathway and solar and storage through the multifamily pathway. The participants shall select the contractor and sign the contract. Other funds to participants shall be delivered by the recipients of subawards. The dedication of funds for participant support costs will be detailed during the planning phase and will comply with *EPA's participant support costs policy*.

51

**Subawards**

Energy Trust of Oregon and Bonneville Environmental Foundation are both 501(c) 3 non-profit entities. Sub-recipient activities are described in section 2.

**In Kind-Technical Assistance**

OSFAC will coordinate with EPA, The National Renewable Energy Laboratory, Pacific Northwest National Laboratory, and/or other federal technical resources to develop detailed technical assistance requests. Technical assistance funding may be coordinated with other states and organizations (such as the Clean Energy States Alliance) to maximize the value of the funding. Topics under consideration for technical assistance include:

- Evaluate and develop compliance support tools for the Build America Buy America program requirements. Request would include development of detailed eligible product lists for solar and storage related equipment in single family, multifamily and community solar applications.
- Work with stakeholders to identify key interconnection barriers for community solar projects and make policy and procedure recommendations to address them.
- Aid community solar projects in reducing barriers to interconnection, including equipment selection and design, engineering support, and third-party interconnection study review.
- Collect and analyze market data relating to projected solar workforce needs in Oregon.
- Evaluate third party ownership models and develop best practices for states who wish to recruit third party owners.

**Additional Items**

**Indirect Charges**
ODOE negotiates a federally approved indirect rate on a fixed rate with a carry-forward basis, every two years, aligned with the agency's biennial budget. The current provision rate request spanning from July 1, 2023, to June 30, 2025, is currently under review with the U.S. Department of Energy's Richland Field Office, ODOE's cognizant agency. The provisional rate is 40.02. ODOE's indirect rate uses Personnel and Fringe Benefits as a base on which the rate is applied across all funding streams.

**Conferences and Workshops:**

The OSFAC will coordinate with organizations and community partners to identify conferences and workshops relating to Solar for All activities. In some cases, ODOE, Energy Trust of Oregon and / or Bonneville Environmental Foundation may choose to sponsor events and will be recognized with a logo on conference materials. No federal funds will be used for conference related expenses and EPA's logo will not be used without prior discussion and approval from EPA. The only currently planned event is the annual Oregon Solar Plus Storage Conference hosted by the Oregon Solar and Storage Industries Association. The OSSC is targeted primarily to solar and storage contractors. OSFAC anticipates annual presentations at the OSSC relating to Solar for All to disseminate program information to industry partners. Additional conferences and workshops may be identified

throughout the 5-year program period. No program income will be generated from conferences or workshops.

Under the first part of this plan, ODOE will establish an Oregon Solar Business Accelerator (OSBA) to offer business development and mentoring to businesses associated with the deployment of solar technology. The OSBA will, to the extent practical, prioritize services to: disadvantaged business enterprises; other businesses that are certified under Oregon's Certification Office for Business Inclusion and Diversity; businesses located or serving customers in historically underutilized business zones; or businesses that operate east of the Cascade Mountain range or in coastal communities where there are fewer contractors offering solar installations. Program activities may include workshops on topics such as: 1) industry best practices; 2) business growth strategies; or 3) business mentorship. This intensive model is anticipated to serve two cohorts of six to eight businesses each. This will benefit solar deployment in regions of the state that have limited to no solar contractors.

No federal staff are anticipated to be present at conferences or workshops.

**Meals and Refreshments:**
Federal funds will not be used to provide meals or refreshments.

**Program Income**
No program income is anticipated to be generated from federal funds.

**Conferences and workshops questions:**

| Question | Answer |
|---|---|
| Does this scope of work include conducting conferences or workshops? | Yes, in Y1 |
| Who is initiating the conference/workshop/meeting? | OSFAC, ETO, BEF, ODOE |
| How is the conference/workshop/meeting being advertised? | Will be advertised on ETO, BEF, ODOE websites |
| Whose logo will be on the agenda and conference/workshop/meeting materials? | ETO, BEF, ODOE. EPA'S logo won't be used without prior authorization |
| What is the percentage distribution of persons attending (I.e. % federal govt, public participants, state and local)? | Not available |
| Will there be proceedings or analyses and will the information be disseminated back to the appropriate (state/local/scientific) community? | Yes |
| Do you anticipate program income being generated from this conference/workshop/meeting including registration fees? | No |

**Final Questionnaire**

| Question | Answer |
|---|---|
| Will the assistance award result in the development of any copyrighted software or written materials? | No |
| Could an invention result from this project? (If yes, provide disposition instructions) | No |
| Does the project involve animal subjects? | No |
| Does the project involve collecting identical information from 10 or more people? | Yes |
| Any work outside the US included in the grant? | No |
| Does the grant involve or relate to geospatial information? Includes info identifying geographic location, or application/tools associated with such information – GPS, mapping or statistical data | Yes |

Exhibit 3
1/8/2025 Assistance Amendment

Exhibit 3
1/8/2025 Assistance Amendment

5H - 84092901 - 1    Page 1

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Assistance Amendment

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 84092901 | |
| **MODIFICATION NUMBER:** 1 | **DATE OF AWARD** 01/08/2025 |
| **PROGRAM CODE:** 5H | |
| **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 01/08/2025 |
| **PAYMENT METHOD:** ASAP | **ACH#** PEND |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| RECIPIENT: | PAYEE: |
|---|---|
| OREGON DEPARTMENT OF ENERGY<br>550 CAPITOL ST NE 1ST FLOOR<br>SALEM, OR 97301-2567<br>EIN:  93-0643773 | OREGON DEPARTMENT OF ENERGY<br>550 CAPITOL ST NE 1 FLOOR<br>SALEM, OR 97301-2567 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Robert Del Mar<br>550 Capitol ST NE 1st Floor<br>Salem, OR 97301-2567<br>**Email:** Robert.DelMar@energy.oregon.gov<br>**Phone:** 503-302-7027 | Vineet Pandharpurkar<br>1200 Pennsylvania Ave. NW, 4410C<br>Washington, DC 20460<br>**Email:**  Pandharpurkar.Vineet@epa.gov<br>**Phone:** 202-564-5211 | Caitlyn Chandler<br>1200 Pennsylvania Ave. NW 3903R<br>Washington, DC 20460<br>**Email:**  Chandler.Caitlyn@epa.gov<br>**Phone:** 202-564-0592 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Oregon Solar For All Coalition application

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 05/01/2024 - 04/30/2029 | 05/01/2024 - 04/30/2029 | $ 86,600,000.00 | $ 86,600,000.00 |

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 86,600,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave. NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Phillip Schindel - Chief, Business Operations Branch | **DATE** 01/08/2025 |

5H - 84092901 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 86,200,000 | $ 0 | $ 86,200,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 86,600,000 | $ 0 | $ 86,600,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,083,281 |
| 2. Fringe Benefits | $ 1,081,222 |
| 3. Travel | $ 155,585 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 1,000 |
| 6. Contractual | $ 1,863,998 |
| 7. Construction | $ 0 |
| 8. Other | $ 80,148,480 |
| 9. Total Direct Charges | $ 85,333,566 |
| 10. Indirect Costs: 40.02 % Base SW+FB | $ 1,266,434 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 86,600,000 |
| 12. Total Approved Assistance Amount | $ 86,600,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 86,600,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

## 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

### K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or

requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such

Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not

"profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in

the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as

determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

a. Solicitation and Contract Requirements:

i. Include the Correct Wage Determinations in Bid Solicitations and Contracts: "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

ii. Include DBRA Requirements in All Contracts: Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

b. After Award of Contract:

i. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

Exhibit 4
Memorandum

Exhibit 4
Memorandum



## OFFICE OF MISSION SUPPORT
### WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**   Termination of EPA Assistance Agreement 5H-84092901 under 2 CFR 200.340

**FROM:**   Devon Brown, EPA Award Official

**TO:**   Jennifer Senner, Grants Officer
Oregon Department Of Energy

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84092901 awarded to Oregon Department Of Energy. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Brandon Pierce, EPA Grant Specialist
    Vineet Pandharpurkar, EPA Project Officer
    Robert Del Mar, Grantee Program Manager

Exhibit 5
8/8/2025 Assistance Amendment

Exhibit 5
8/8/2025 Assistance Amendment

5H - 84092901 - 2    Page 1

<table>
<tr><td rowspan="3"><strong>U.S. ENVIRONMENTAL PROTECTION AGENCY</strong><br><br>Assistance Amendment</td><td><strong>GRANT NUMBER (FAIN):</strong> 84092901<br><strong>MODIFICATION NUMBER:</strong> 2<br><strong>PROGRAM CODE:</strong> 5H</td><td><strong>DATE OF AWARD</strong><br>08/08/2025</td></tr>
<tr><td><strong>TYPE OF ACTION</strong><br>No Cost Amendment</td><td><strong>MAILING DATE</strong><br>08/08/2025</td></tr>
<tr><td><strong>PAYMENT METHOD:</strong><br>ASAP</td><td><strong>ACH#</strong><br>PEND</td></tr>
</table>

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| OREGON DEPARTMENT OF ENERGY<br>550 CAPITOL ST NE 1ST FLOOR<br>SALEM, OR 97301-2567<br>EIN:  93-0643773 | OREGON DEPARTMENT OF ENERGY<br>550 CAPITOL ST NE 1 FLOOR<br>SALEM, OR 97301-2567 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Robert Del Mar<br>550 Capitol ST NE 1st Floor<br>Salem, OR 97301-2567<br>**Email:** Robert.DelMar@energy.oregon.gov<br>**Phone:** 503-302-7027 | Vineet Pandharpurkar<br>1200 Pennsylvania Ave. NW, 4410C<br>Washington, DC 20460<br>**Email:**  Pandharpurkar.Vineet@epa.gov<br>**Phone:** 202-564-5211 | Savannah Acosta<br>OGD - GMBOD, 3901M<br>Washington, DC 20460-0001<br>**Email:**  acosta.savannah@epa.gov<br>**Phone:** 202-564-8525 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Oregon Solar For All Coalition application

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| **BUDGET PERIOD**<br>05/01/2024 - 08/08/2025 | **PROJECT PERIOD**<br>05/01/2024 - 08/08/2025 | **TOTAL BUDGET PERIOD COST**<br>$ 86,600,000.00 | **TOTAL PROJECT PERIOD COST**<br>$ 86,600,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 86,600,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave. NW<br>Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** ||
|---|---|
| **Digital signature applied by EPA Award Official** Devon Brown - Branch Chief, GMB | **DATE**<br>08/08/2025 |

5H - 84092901 - 2    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| **EPA Amount This Action** | $ 86,200,000 | $ 0 | $ 86,200,000 |
| **EPA In-Kind Amount** | $ 400,000 | $ 0 | $ 400,000 |
| **Unexpended Prior Year Balance** | $ 0 | $ 0 | $ 0 |
| **Other Federal Funds** | $ 0 | $ 0 | $ 0 |
| **Recipient Contribution** | $ 0 | $ 0 | $ 0 |
| **State Contribution** | $ 0 | $ 0 | $ 0 |
| **Local Contribution** | $ 0 | $ 0 | $ 0 |
| **Other Contribution** | $ 0 | $ 0 | $ 0 |
| **Allowable Project Cost** | $ 86,600,000 | $ 0 | $ 86,600,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,083,281 |
| 2. Fringe Benefits | $ 1,081,222 |
| 3. Travel | $ 155,585 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 1,000 |
| 6. Contractual | $ 1,863,998 |
| 7. Construction | $ 0 |
| 8. Other | $ 80,148,480 |
| 9. Total Direct Charges | $ 85,333,566 |
| 10. Indirect Costs: 40.02 % Base SW+FB | $ 1,266,434 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 86,600,000 |
| 12. Total Approved Assistance Amount | $ 86,600,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 86,600,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

    a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

    b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

    c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect. The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

    a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

    b. Explanations on why established outputs/outcomes were not met; and

    c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

    a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

    b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

## Programmatic Conditions

All Programmatic Conditions Remain the Same.

Exhibit 6
Congressional Budget Office Score

Exhibit 6 Congressional Budget Office



**Congressional Budget Office**
Cost Estimate

June 4, 2025

**Summary**

**Estimated Budgetary Effects of H.R. 1, the One Big Beautiful Bill Act**

**As passed by the House of Representatives on May 22, 2025**

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2025-2029 | 2025-2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **By Fiscal Year, Millions of Dollars** | | | | | | | |
| | | | | | **Increases or Decreases (-) in Direct Spending Outlays, Revenues, and Deficits** | | | | | | | |
| **Title I. Committee on Agriculture** | | | | | | | | | | | | |
| Estimated Outlays | 453 | -12,597 | -16,168 | -30,026 | -30,058 | -29,094 | -28,121 | -30,535 | -30,874 | -31,065 | -88,396 | -238,085 |
| Estimated Revenues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Effect on the Deficit | 453 | -12,597 | -16,168 | -30,026 | -30,058 | -29,094 | -28,121 | -30,535 | -30,874 | -31,065 | -88,396 | -238,085 |
| **Title II. Committee on Armed Services** | | | | | | | | | | | | |
| Estimated Outlays | 1,957 | 40,299 | 42,019 | 23,548 | 16,779 | 9,367 | 4,878 | 2,889 | 1,514 | 742 | 124,602 | 143,992 |
| Estimated Revenues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Effect on the Deficit | 1,957 | 40,299 | 42,019 | 23,548 | 16,779 | 9,367 | 4,878 | 2,889 | 1,514 | 742 | 124,602 | 143,992 |
| **Title III. Committee on Education and Workforce** | | | | | | | | | | | | |
| Estimated Outlays | -197,940 | -14,271 | -12,706 | -12,649 | -15,714 | -18,455 | -19,118 | -19,236 | -19,422 | -19,591 | -253,280 | -349,102 |
| Estimated Revenues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Effect on the Deficit | -197,940 | -14,271 | -12,706 | -12,649 | -15,714 | -18,455 | -19,118 | -19,236 | -19,422 | -19,591 | -253,280 | -349,102 |
| **Title IV. Committee on Energy and Commerce** | | | | | | | | | | | | |
| Estimated Outlays | -1,145 | -28,487 | -66,042 | -95,483 | -111,573 | -128,936 | -146,869 | -153,462 | -149,810 | -145,436 | -302,730 | -1,027,243 |
| Estimated Revenues | -26 | -231 | 4,045 | 6,441 | 8,640 | 9,942 | 12,025 | 13,220 | 4,120 | 171 | 18,869 | 58,347 |
| Net Effect on the Deficit | -1,119 | -28,256 | -70,087 | -101,924 | -120,213 | -138,878 | -158,894 | -166,682 | -153,930 | -145,607 | -321,599 | -1,085,590 |
| *On-Budget Deficit* | *-1,126* | *-28,509* | *-70,701* | *-102,952* | *-121,294* | *-139,990* | *-160,050* | *-167,908* | *-155,221* | *-146,962* | *-324,582* | *-1,094,713* |
| *Off-Budget Deficit* | *7* | *253* | *614* | *1,028* | *1,081* | *1,112* | *1,156* | *1,226* | *1,291* | *1,355* | *2,983* | *9,123* |
| **Title V. Committee on Financial Services** | | | | | | | | | | | | |
| Estimated Outlays | -16 | -352 | -800 | -926 | -948 | -973 | -1,013 | -1,090 | -1,160 | -1,200 | -3,042 | -8,478 |
| Estimated Revenues | 0 | -473 | -724 | -720 | -752 | 1,081 | -410 | -427 | -443 | -455 | -2,669 | -3,323 |
| Net Effect on the Deficit | -16 | 121 | -76 | -206 | -196 | -2,054 | -603 | -663 | -717 | -745 | -373 | -5,155 |
| **Title VI. Committee on Homeland Security** | | | | | | | | | | | | |
| Estimated Outlays | * | 2,488 | 9,218 | 14,008 | 13,995 | 13,623 | 11,145 | 7,984 | 4,556 | 2,130 | 39,709 | 79,147 |
| Estimated Revenues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Effect on the Deficit | * | 2,488 | 9,218 | 14,008 | 13,995 | 13,623 | 11,145 | 7,984 | 4,556 | 2,130 | 39,709 | 79,147 |
| **Title VII. Committee on the Judiciary** | | | | | | | | | | | | |
| Estimated Outlays | * | 6,426 | 10,277 | 15,080 | 18,795 | 13,657 | 8,207 | 2,625 | -530 | -1,122 | 50,578 | 73,415 |
| Estimated Revenues | 0 | 2,394 | 5,916 | 6,193 | 6,990 | 8,004 | 8,397 | 8,635 | 8,872 | 9,008 | 21,493 | 64,409 |
| Net Effect on the Deficit | * | 4,032 | 4,361 | 8,887 | 11,805 | 5,653 | -190 | -6,010 | -9,402 | -10,130 | 29,085 | 9,006 |
| **Title VIII. Committee on Natural Resources** | | | | | | | | | | | | |
| Estimated Outlays | -122 | -321 | -499 | -1,269 | -1,300 | -1,930 | -2,129 | -2,480 | -3,227 | -3,866 | -3,511 | -17,143 |
| Estimated Revenues | 0 | 65 | 130 | 130 | 135 | 140 | 140 | 145 | 150 | 150 | 460 | 1,185 |
| Net Effect on the Deficit | -122 | -386 | -629 | -1,399 | -1,435 | -2,070 | -2,269 | -2,625 | -3,377 | -4,016 | -3,971 | -18,328 |
| **Title IX. Committee on Oversight and Government Reform** | | | | | | | | | | | | |
| Estimated Outlays | 0 | 40 | -6 | -223 | -597 | -965 | -1,296 | -1,545 | -1,742 | -1,899 | -786 | -8,233 |
| Estimated Revenues | 8 | 64 | 160 | 258 | 359 | 459 | 563 | 668 | 775 | 887 | 849 | 4,201 |
| Net Effect on the Deficit | -8 | -24 | -166 | -481 | -956 | -1,424 | -1,859 | -2,213 | -2,517 | -2,786 | -1,635 | -12,434 |
| *On-Budget Deficit* | *-8* | *-21* | *-169* | *-481* | *-956* | *-1,424* | *-1,859* | *-2,213* | *-2,517* | *-2,786* | *-1,635* | *-12,434* |
| *Off-Budget Deficit* | *0* | *-3* | *3* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* |
| **Title X. Committee on Transportation and Infrastructure** | | | | | | | | | | | | |
| Estimated Outlays | -612 | 536 | 1,642 | 3,809 | 5,060 | 4,388 | 3,924 | 3,674 | 3,354 | 1,974 | 10,435 | 27,749 |
| Estimated Revenues | 0 | 423 | 1,742 | 3,405 | 5,230 | 7,064 | 8,815 | 10,660 | 12,556 | 14,414 | 10,800 | 64,309 |
| Net Effect on the Deficit | -612 | 113 | -100 | 404 | -170 | -2,676 | -4,891 | -6,986 | -9,202 | -12,440 | -365 | -36,560 |
| **Title XI. Committee on Ways and Means** | | | | | | | | | | | | |
| Estimated Outlays | 593 | 7,650 | 12,927 | 7,581 | 1,153 | -6,785 | -6,720 | -7,764 | -9,089 | -10,152 | 29,907 | -10,602 |
| Estimated Revenues | -89,234 | -483,642 | -557,949 | -551,520 | -470,310 | -298,373 | -241,385 | -294,641 | -375,516 | -402,413 | -2,152,662 | -3,764,990 |
| Net Effect on the Deficit | 89,827 | 491,292 | 570,876 | 559,101 | 471,463 | 291,588 | 234,665 | 286,877 | 366,427 | 392,261 | 2,182,569 | 3,754,388 |
| *On-Budget Deficit* | *89,827* | *491,109* | *570,448* | *558,409* | *470,578* | *290,616* | *233,629* | *285,781* | *365,267* | *391,030* | *2,180,377* | *3,746,702* |
| *Off-Budget Deficit* | *0* | *183* | *428* | *692* | *885* | *972* | *1,036* | *1,096* | *1,160* | *1,231* | *2,192* | *7,686* |

Exhibit 6 Congressional Budget Office Score


**Congressional Budget Office**
Cost Estimate

June 4, 2025

**Summary**

**Estimated Budgetary Effects of H.R. 1, the One Big Beautiful Bill Act**

**As passed by the House of Representatives on May 22, 2025**

| | By Fiscal Year, Millions of Dollars | | | | | | | | | | 2025-2029 | 2025-2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | | |
| | **Increases or Decreases (-) in Direct Spending Outlays, Revenues, and Deficits** | | | | | | | | | | | |
| **Interactions Among Titles** | | | | | | | | | | | | |
| Estimated Outlays | 0 | 1,649 | 4,736 | 7,614 | 9,544 | 11,355 | 13,111 | 15,981 | 10,063 | 6,925 | 23,543 | 80,978 |
| Estimated Revenues | 0 | -75 | -4,968 | -9,106 | -12,208 | -14,505 | -16,998 | -18,782 | -10,253 | -7,077 | -26,357 | -93,972 |
| Net Effect on the Deficit | 0 | 1,724 | 9,704 | 16,720 | 21,752 | 25,860 | 30,109 | 34,763 | 20,316 | 14,002 | 49,900 | 174,950 |
| **Total Changes** | | | | | | | | | | | | |
| Estimated Outlays | -196,832 | 3,060 | -15,402 | -68,936 | -94,864 | -134,748 | -164,001 | -182,959 | -196,367 | -202,560 | -372,971 | -1,253,605 |
| Estimated Revenues | -89,252 | -481,475 | -551,648 | -544,919 | -461,916 | -286,188 | -228,853 | -280,522 | -359,739 | -385,315 | -2,129,217 | -3,669,834 |
| Net Effect on the Deficit | -107,580 | 484,535 | 536,246 | 475,983 | 367,052 | 151,440 | 64,852 | 97,563 | 163,372 | 182,755 | 1,756,246 | 2,416,229 |
| *On-Budget Deficit* | *-107,587* | *484,102* | *535,201* | *474,263* | *365,086* | *149,356* | *62,660* | *95,241* | *160,921* | *180,169* | *1,751,071* | *2,399,420* |
| *Off-Budget Deficit* | *7* | *433* | *1,045* | *1,720* | *1,966* | *2,084* | *2,192* | *2,322* | *2,451* | *2,586* | *5,175* | *16,809* |

Components may not sum to totals because of rounding.
* = between zero and $500,000.

Sources: Congressional Budget Office; staff of the Joint Committee on Taxation.

In keeping with reconciliation instructions from the House Committee on the Budget, this estimate reflects CBO's January 2025 baseline projections updated to reflect enacted legislation and administrative and judicial actions. It includes budgetary effects through fiscal year 2034.

This estimate incorporates interactions among provisions within each title. (Budgetary effects of interactions among titles are shown on the "Interactions Among Titles" tab.)

Because of the magnitude of its estimated budgetary effects, H.R. 1 is considered major legislation as defined in House Rule XIII(8). That rule requires cost estimates, to the extent practicable, to account for the budgetary implications of certain bills' macroeconomic effects. CBO has not yet completed an analysis of the macroeconomic effects of H.R. 1 or their additional budgetary effects.

The revenues and outlays of the Social Security trust funds and the net cash flow of the Postal Service are classified as off-budget.

The Congressional Budget Act of 1974, as amended, stipulates that revenue estimates provided by the staff of the Joint Committee on Taxation (JCT) will be the official estimates for all tax legislation considered by the Congress. As such, CBO incorporates those estimates into its cost estimates of the effects of legislation. The estimates for the revenue provisions of some sections of the legislation were provided by JCT.

CBO estimates that enacting H.R. 1 would increase by 10.9 million the number of people without health insurance in 2034. That total includes an estimated 1.4 million people without verified citizenship, nationality, or satisfactory immigration status who would no longer be covered in state-only funded programs in 2034.

CBO estimates that enacting H.R. 1 would lower gross benchmark premiums, on average, in marketplace plans established by the Affordable Care Act by an estimated 12.2 percent in 2034. (That is, the premiums for the plans used to determine premium tax credits, but before those credits are accounted for.)

# EXHIBIT 7

| From: | SFA |
|---|---|
| To: | SFA |
| Subject: | Solar for All Grant Closeout Instructions |
| Date: | Wednesday, October 1, 2025 1:21:18 PM |

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425)
**Submission Instructions**:
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.
  - If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

<u>Final Technical Report</u>
**Submission Instructions**:
- Like previous performance reporting, please use the <u>White House Office of Management and Budget (OMB)-approved information collection templates</u>, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and <u>ggrf@epa.gov</u>.

**Details**:
- The final technical report should provide a detailed narrative of your program's performance <u>during the entire performance period</u> (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - In accordance with <u>2 CFR 200.329</u>, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - Progress towards objectives on program key performance metrics during the performance period.
  - Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA

website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 8



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 23, 2025

**MEMORANDUM**

**SUBJECT:**    Update on Dispute of EPA Assistance Agreement 5H-84092901 under 2 CFR 200.340

**FROM:**    Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**    Janine Benner, Director
Oregon Department of Energy

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84092901. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.24
17:08:05 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

EXHIBIT 9



Tina Kotek, Governor



550 Capitol St. NE
Salem, OR 97301
Phone: 503-378-4040
Toll Free: 1-800-221-8035
FAX: 503-373-7806
www.oregon.gov/energy

November 6, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC 20460

Re:     Objection to Closeout of EPA Assistance Agreement 5H-84092901

Dear Mr. Brown:

On September 5, 2025, the Oregon Department of Energy submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 5H-84092901 pursuant to 2 C.F.R. § 1500.15. Despite that timely dispute, on October 1, 2025, the Oregon Department of Energy received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that the Oregon Department of Energy complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." The Oregon Department of Energy has now received EPA's October 23, 2025, letter purporting to declare moot the Oregon Department of Energy's "dispute regarding the termination of Assistance Agreement 5H-84092901." The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that Oregon Department of Energy close out Assistance Agreement 5H-84092901.

As an initial matter, clarification is needed because EPA's October 23, 2025, letter references "your dispute was submitted on August 28, 2025." But the Oregon Department of Energy did not submit its Part 1500 dispute on August 28, 2025. Rather, August 28, 2025, is the date that the Oregon Department of Energy submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025, Assistance Amendment. On September 5, 2025, the Oregon Department of Energy submitted a dispute pursuant to 2 CFR 1500.15, notifying EPA that we dispute EPA's attempt to terminate our Solar for All award. Thus, it is unclear which of Oregon Department of Energy's disputes "EPA has rendered" moot. The Oregon Department of Energy disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending. EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation. At a minimum, EPA should stay the administrative dispute until the conclusion of Oregon Department of Energy's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of Oregon Department of Energy's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, the Oregon Department of Energy has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require the Oregon Department of Energy to close out while litigation is pending that directly concerns EPA's termination of this grant. *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if— (1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." The Oregon Department of Energy has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally de-obligated $79,835,455.49 from the Oregon Department of Energy's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, the Oregon Department of Energy has not been able to complete the work required under Assistance Agreement 5H-84092901. Accordingly, EPA necessarily cannot "determine[] that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

The Oregon Department of Energy does <u>not</u> agree to close out Assistance Agreement 5H-84092901 while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00pm on November 6, 2025.

Sincerely,

Janine Benner, Director
Oregon Department of Energy


CC: Michael Molina