# <u>EXHIBIT 1</u>

5H - 84089101 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Grant Agreement | | GRANT NUMBER (FAIN): 84089101<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5H | DATE OF AWARD<br>07/11/2024 |
|---|---|---|---|
| | | TYPE OF ACTION<br>New | MAILING DATE<br>07/16/2024 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**<br>ENERGY DEVELOPMENT AUTHORITY<br>400 MARKET ST<br>HARRISBURG, PA 17101-2301<br>EIN:  93-2613093 | **PAYEE:**<br>ENERGY DEVELOPMENT AUTHORITY<br>400 Market Street<br>Harrisburg, PA 17101-2301 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Geoffrey Bristow<br>400 Market St<br>Harrisburg, PA 17101-2301<br>**Email:** gbristow@pa.gov<br>**Phone:** 814-332-6681 | Lydia Kidane<br>1200 Pennsylvania Ave NW, 1101R<br>Washington, DC 20460<br>**Email:**  Kidane.Lydia@epa.gov<br>**Phone:** 202-564-0506 | Robin Holder<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>**Email:** Holder.Robin@epa.gov<br>**Phone:** 202-564-1532 |

**PROJECT TITLE AND DESCRIPTION**

Pennsylvania Solar for All Program: " Note:   A special payment condition applies to this award."

See Attachment 1 for project description.

| BUDGET PERIOD<br>09/01/2024 - 08/31/2029 | PROJECT PERIOD<br>09/01/2024 - 08/31/2029 | TOTAL BUDGET PERIOD COST<br>$ 0.00 | TOTAL PROJECT PERIOD COST<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/06/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS**<br>Environmental Protection Agency, Grants and Interagency Agreement<br>Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | **ORGANIZATION / ADDRESS**<br>Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature applied by EPA Award Official for LaShaun Phillips - Associate Award Official<br>by LaShaun Phillips - Award Official Delegate | DATE<br>07/11/2024 |
|---|---|

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41015 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

## Attachment 1 - Project Description

"Note: A special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

### 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

### B. Cybersecurity Condition

_The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition_:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

*__The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:__*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

*__The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:__*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

II. Additional Programmatic Terms and Conditions

A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

### C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

K. Labor and Equitable Workforce Development Requirements

1. Davis-Bacon and Related Acts (DBRA)

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

<u>4. Indirect Cost Rate</u>

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

<u>5. Sufficient Progress</u>

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping
In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.
Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

AA. Compliant URL Links

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

AB. Flow-Down Requirements

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

5H - 84089101 - 1    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN): 84089101<br>MODIFICATION NUMBER: 1<br>PROGRAM CODE: 5H | DATE OF AWARD<br>12/19/2024 |
|---|---|---|
| | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>12/19/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:<br>ENERGY DEVELOPMENT AUTHORITY<br>400 Market St<br>Harrisburg, PA 17101-2301<br>EIN: 93-2613093 | PAYEE:<br>ENERGY DEVELOPMENT AUTHORITY<br>400 Market St<br>Harrisburg, PA 17101-2301 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Gregory Smith<br>400 Market St<br>Harrisburg, PA 17101-2301<br>**Email:** smitgreg@pa.gov<br>**Phone:** 717-772-5842 | Lydia Kidane<br>1200 Pennsylvania Ave NW, 1101R<br>Washington, DC 20460<br>**Email:** Kidane.Lydia@epa.gov<br>**Phone:** 202-564-0506 | Matthew Forte<br>1200 Pennsylvania Ave. NW, 3903R<br>Washingont, DC 20460<br>**Email:** Forte.Matthew@epa.gov<br>**Phone:** 202-564-2245 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Pennsylvania Solar for All Program

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD<br>09/01/2024 - 08/31/2029 | PROJECT PERIOD<br>09/01/2024 - 08/31/2029 | TOTAL BUDGET PERIOD COST<br>$ 156,120,000.00 | TOTAL PROJECT PERIOD COST<br>$ 156,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/06/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, The Office of Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official LaShaun Phillips - Associate Award Official | DATE<br>12/19/2024 |

5H - 84089101 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 155,720,000 | $ 0 | $ 155,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,367,838 |
| 2. Fringe Benefits | $ 1,701,292 |
| 3. Travel | $ 98,110 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 55,535 |
| 6. Contractual | $ 75,251,082 |
| 7. Construction | $ 0 |
| 8. Other | $ 75,507,600 |
| 9. Total Direct Charges | $ 154,981,457 |
| 10. Indirect Costs: 27.98 % Base SW + FB | $ 1,138,543 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 8,059,566 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/032024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

> "[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:
>
> **a. Solicitation and Contract Requirements:**
>
>> **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
>>
>> **ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
>
> **b. After Award of Contract:**
>
>> **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
>>
>> **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

> 1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;
>
> 2. Privately-owned commercial buildings when they meet the "public function" test;
>
> 3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

1. Single family homes;

2. Privately-owned, non-mixed-use, multi-family housing properties;

3. Privately-owned residential portions of mixed-use properties;

4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities**. As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement.* EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

<u>B. Board Independence</u>

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

<u>C. Board Policies and Procedures</u>

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

<u>3. Legal Counsel</u>

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

<u>AB. Amendments to Award Agreement</u>

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

<u>AC. Preservation of Guidance and Data</u>

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# **EXHIBIT 3**

**Greenhouse Gas Reduction Fund**
**Solar for All**
Pennsylvania Solar for All (PA SFA) Program
**Work Plan**
*Project Period: 09/01/2024-08/31/2029*
*Submitted 10/29/24*

**Project Title:** Pennsylvania Solar for All (PA SFA) Program
**Grant Number:** 84089101
**Organization Name:** Pennsylvania Energy Development Authority (PEDA)
**Geography:** Commonwealth of Pennsylvania
**Definition of LIDAC:** From a statewide perspective, 12% of PA's 3,219 census tracts qualify as Areas of Persistent Poverty, defined by the Bipartisan Infrastructure Law (formally, the Infrastructure Investment and Jobs Act (Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021)) (BIL/IIJA) as census tracts in which there is a poverty rate of at least 20% as measured by the 2014-2018 five-year data series available from the American Community Survey of the Bureau of the Census. According to the Climate and Economic Justice Screening Tool (CEJST), of PA's 3,219 census tracts, 586, or 18%, qualify as disadvantaged communities, or DACs. 5,086,568 Pennsylvanians meet the definition of low & moderate income (LMI) per HUD and 3,060,720 live in CEJST census tracts. The PA SFA Coalition will serve LIDAC communities as defined by CEJST or EJScreen's supplemental indices as defined in the NOFO; geographically dispersed households who earn less than the greater of 80% AMI and/or 200% of the Federal Poverty Level; and potentially properties providing affordable housing.

**Introduction**

**Section 1:  Project Description**

**Overview**

The PA SFA Program will deploy and enable deployment of residential serving solar, storage, and enabling upgrades in low-income and disadvantaged communities (LIDACs) across Pennsylvania. The PA SFA Program will deliver meaningful benefits, such as household savings, quality jobs, and community ownership to rural, urban, and suburban LIDACs; energy communities; and persistent poverty counties in Pennsylvania. The PA SFA Program will stimulate deployment of new solar generation by strengthening the overall market for residential serving solar through an intentional balance of financial subsidies, program design, and project deployment services, such as community outreach and workforce development.

1

Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

**Environmental Results - Outputs and Outcomes**

**Through extensive modeling, the PA SFA Coalition anticipates the following outputs:**

| PA SFA Program: Key Stats, Outputs & Outcomes | |
|---|---|
| Total Award Amount | $156,120,000 |
| Total Households Going Solar | 12,555 |
| Total Households Receiving Enabling Upgrades | 5,020 |
| Total Households Benefiting from Storage | 480 |
| Total New Solar MW Installed | 63 |
| Total Savings for Households from Solar | $101,782,698 |
| Graduates of Green Energy Related Training Programs | 1,000 |
| Percent for Financial Assistance | 76.6% |
| Percent for Technical Assistance | 23.4% |

<u>Number of households served</u>
- **12,555 households receiving financial assistance to go solar.**
- PEDA, with its subaward recipient, Philadelphia Green Capital Corp (PGCC), will serve LIDAC households and, through accessible financial products, utilize SFA funding to subsidize solar systems, battery storage, and enabling upgrades for LIDAC households.
- **Measurement:** PEDA, and PGCC, will ensure that program administrators and contractors are collecting and reporting required data on solar system installations, including geographic location, LIDAC eligibility, system size, system cost and financial assistance applied to each project. PGCC intends to do this tracking with their affiliate, the Philadelphia Energy Authority, through a robust Salesforce data management system and regular data reconciliation with installers. This data tracking and reporting will follow the Solarize Philly model and be expanded to meet SFA federal reporting requirements. Project level and financial expenditures will be provided to PEDA for required semiannual reporting to EPA. See Appendix A for a summary of the target annual savings per utility territory.  PEDA will procure a program administrator to build out project tracking and measurement systems that mirror what PGCC already has in place.

<u>New generation capacity broken down by residential solar (MW)</u>
- **63 new MW of residential solar.** Over the 5-year Solar for All performance period the Pennsylvania Energy Development Authority will support the installation of 63 MW of solar capacity. This will be realized through SFA financial assistance for LIDAC household access to solar leases and solar loan products.

2

- **Measurement:** PEDA, in conjunction with a program administrator will measure the solar capacity of subsidized solar systems installed over the 5-year performance period. Installers will submit final contracts for all systems installed. Installers may also provide access to system production monitoring platforms or submit bi-annual system production reports to the financing provider.

### Estimated GHG emissions reduced and avoided (CO2; CO2e if available)

- **Outputs:**
  - Within the 5-year performance period we anticipate avoiding 92,601 metric tons (102,075 short tons) $CO_2$ emissions through the installation of SFA subsidized solar systems
- **Outcomes:**
  - Over a conservatively estimated 20-year system lifetime we anticipate 1,450,055 short tons of $CO_2$ avoided due to installations of solar systems
- **Measurement:** PEDA will measure the GHG reductions of SFA subsided solar array installations based on the AVERT tool metric of 1100 metric tons of $CO_2$ avoided per MW of distributed solar generation in the mid-Atlantic region, converted to short tons by multiplying by 1.10231.

### Estimated household savings per household ($/household)

**Average Savings Per Household**
**Annual target:** $375

| Solar Program Model Savings Overview | |
|---|---|
| Number of homes | 12,555 |
| Average system size (kw) | 5 |
| Average system cost ($) | $15,000 |
| Average SFA Program subsidy ($) | $7,219 |
| Average household 20-year Savings ($) | $8,021 |

**Measurement:**

- PEDA intends to implement a third-party owned product, such as a solar lease, and solar loan product as part of the SFA program. The solar lease would be subsidized to ensure that the LIDAC household receives a 20% saving including the monthly lease payment. Financial partners offering the lease will be procured through a process compliant with 2CFR 200 for PGCC or a state-compliant process for PEDA.
- See table, Appendix A, for average savings targets by utility territory. The savings per household will be determined by the household historical usage and system size incorporated into the lease, which PEDA will subsidize with SFA funding. Measuring savings over the performance period will be accomplished by comparing the solar lease cost per kWh to the household's current utility rate.

3

**Outcome Related to Workforce Development:**

      PA has a very strong network of existing statewide workforce development programs to support the goals of the SFA application. Rather than propose new programs under the PA SFA Program, PEDA and PGCC intend to fund and leverage the existing programs that are led by state and local government entities, schools and nonprofit organizations. PEDA and PGCC's existing programs place a strong emphasis on workforce training models that will prepare and directly connect individuals from LIDACs to middle class career pathways in the clean energy sector. These programs reflect Good Jobs Challenge principles which include but are not limited to the following: all workers are paid a stable and predictable living wage, family-sustaining benefits that promote economic security and mobility, the choice to form and join a union, and safe and healthy working conditions.

      **Outcome:** PEDA and PGCC anticipate supporting 1000 individuals to participate in green energy related training programs.

      **Measurement: PEDA, through a subaward to PGCC, and anticipated subawards to other workforce development partners that would act as** workforce development program administrator(s), will collect information on training program enrollment, program completion data, and utilize follow-up communication to track employment, as part of their normal operations.


**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.

1. Goal 1: Tackle the Climate Crisis
   a. Objective 1.1: Reduce Emissions that Cause Climate Change
      i. The PA SFA program aims to enable the deployment of at least 63 new MW of distributed solar generation during the performance period which would offset approximately 1.45 million short tons of $CO_2$ over a 20-year timeframe according to AVERT calculations.


**Project Design Plan**

**Activities to be Conducted**

**Project Deployment Activities Narrative (Implementation Activities):**

**Launch the Third-Party Owned Solar Product (referred to as Solar Lease throughout workplan)**

The backbone of the PA SFA Program will be building upon the existing Solarize Philly Program, which has already helped over 3,500 homes to go solar. PEDA's subawardee and coalition partner, the Philadelphia Green Capital Corp, will expand the Solarize Philly Program to the 5-county Southeastern PA region. Concurrently, PEDA will establish a solarize program across the remaining 62 counties in PA tailored to the specific needs of those communities. The first phase of PA Solar

for All deployment will support the expansion of the Philadelphia Solarize Program and subsidized third-party owned solar products, such as solar leases, for LIDAC households through the subaward to PGCC.

Solarize Philadelphia Program Background: Solarize Philly is consistent with, and its development was supported by, the Clean Energy States Alliance's (CESA) solar program model, which includes initiatives to scale up solar for under-resourced communities (including single-family homes, manufactured homes, and multifamily affordable housing) and efforts to connect states and communities in partnerships to promote solar for LIDAC. In addition, Solarize Philly pairs with well-established workforce development programs targeting the same LIDACs. The Solarize Philly program (administered by PGCC's affiliate, the Philadelphia Energy Authority (PEA)) manages a request for proposals (RFP) process to vet installers for the program, then engages in market education, community outreach, and manages a Salesforce platform to track leads and projects from inquiry through commencing operations. As a non-profit corporation formed as a green bank affiliate of the PEA, PGCC partners with PEA on the Solarize Philly program by providing the financial subsidies for low-to-moderate-income (LMI) households in the program. Through their subaward, PGCC will utilize SFA grant monies to expand the operations of the Solarize Philly program to the Greater Philadelphia area in the five counties in the southeastern PA region (Bucks, Chester, Delaware, Montgomery and Philadelphia Counties). SFA funding will support this work and PGCC will provide financial assistance to LIDAC households through a subsidized solar third-party owned product such as a solar lease.

For PEDA to develop and launch the statewide program to offer a solar lease product, activities related to that work will be in implementation phase as soon as the workplan is approved. Additionally, in order for PGCC to quickly and effectively deploy SFA capital through the solarize program, the entirety of the subaward to PGCC and activities therein will be in implementation. Activities related to this work are listed below and included in the attached timeline.

To meet Solar for All workforce development goals, as well as the goals of the Commonwealth Workforce Transformation Program (CWTP), PGCC's activities related to workforce development will also be in the implementation phase. Further description of those workforce development programs is detailed in the Project – Deployment Technical Assistance Plan.

**Solar Loan Product Development**
As stated previously, the first phase of the PA Solar for All program will involve launching a subsidized third-party owned product to the broader market.

As a second phase, the program intends to develop and launch a complimentary subsidized solar loan product.  The overall goal will be to eventually offer LIDAC households a choice of multiple subsidized solar financing options that deliver at least 20% savings versus their current utility bills.  While the program anticipates most households will opt for a lease, some homeowners may have the tax liability to benefit from the solar tax credits and would prefer to own the system.

PEDA issued a request for information during application development to gauge financial institutions' interest in a solar loan product.  Several credit unions and CDFIs responded that they would be open to exploring the type of loan product needed.   PEDA will issue a request for

proposals to bring on financial institutions and then work to standardize product features, application processes, and develop installer training.  This product will be explained in more detail in the Financial Assistance Section.

There is also an opportunity to work with financial institutions to launch a solar loan aimed at the broader PA residential solar market outside of Solar for All.  Higher income households (who are more likely to benefit from the tax credits associated with direct solar ownership) tend to purchase solar outright or take out a loan to benefit from tax credits.  This product would not be subsidized with SFA funds.  However, offering a competitively priced solar loan could help financial institutions become more comfortable with lending to solar projects and add credit quality balance to their portfolios.  An effective solar loan product could help to grow the overall residential market which would benefit local installers and create more jobs thus supporting the workforce development goals of the PA SFA program.

**Workforce Development**
 PEDA envisions subawards for workforce training programs to expand capacity and support students through wraparound social services provided as participant support costs from subawardees.  PEDA will obtain EPA approval of subaward guidelines and, if necessary, approval for each subaward, and will follow requirements as laid out in EPA Subaward Policy. PEDA will engage with community and technical colleges, non-profits, and regional workforce development coalitions to better understand solar training programs across the state and where gaps exist. Additionally, PEDA will gather feedback from solar installers as to their workforce needs and what elements of a training program will best prepare students to be hired in the industry.  Further details, including potential workforce partner organizations/subawardees, are identified in the Project-Deployment Technical Assistance Strategy section.

**Planning Period Activities Narrative:**

**Multifamily Housing**
While PA's lack of virtual net metering is a significant challenge in deploying solar for tenants of multifamily buildings, there are still opportunities to develop solar on low-income and affordable multifamily housing.  The initial focus will likely be on master metered buildings where PEDA can work with property owners to develop structures to distribute solar benefits to tenants.

The multifamily strategy will attempt to leverage the Home Efficiency Rebates and Home Electrification Appliance Rebate programs currently being developed and implemented by the state's Energy Programs Office.  There are further opportunities to coordinate with multifamily efficiency and weatherization programs run by the Pennsylvania Department of Community and Economic Development (DCED).

PEDA has begun to engage multifamily housing organizations across PA to lay out the technical challenges and gather feedback about approaches to Solar for All projects.  PEDA also sees an opportunity to leverage a relationship with the Pennsylvania Housing Finance Agency (PHFA) to identify opportunities in their project development pipeline.  The recent changes to renewable energy tax credits under the IRA allow public entities, such as public housing authorities, to capture the value of tax credits through the direct pay feature.  Many areas of PA also have a

strong overlap with Energy Communities.  There is potential to layer multiple tax credits to bring the cost of a solar project down.

Overall, the main challenge to an effective multifamily program is developing structures to distribute the benefits of a solar array to building tenants in an equitable and verifiable manner.  Guidance issued by the US Department of Housing and Urban Development in August of 2023 lists some alternative means of reimbursing tenants of master metered public housing buildings in the absence of line-item virtual net metering utility bill credits.  Some incentive structures include offering residents reduced rate internet service, financial or health counseling, or stipends for job training.  The program will seek to identify property owners and developers interested in taking a creative approach to ensuring tenants benefit from a solar installation without true virtual net metering.

**Community Solar**
Should community solar become broadly authorized in PA, the program would support pilot projects with community stakeholders.  These projects would be structured so that at least 50% of the array benefits would flow to low-income subscribers through virtual net metering credits.  There may be an option for a municipal utility to develop their own solar array and distribute the benefits to their members.

**Rural Electric Cooperatives**
Approximately 5% of PA's population are members of a rural electric cooperative.  Thirteen rural cooperatives serve around one third of the geographic area of the Commonwealth.   Installing solar in these cooperatives is much less financially viable than investor-owned utilities for many reasons.  Allegheny Electric Cooperative supplies the other rural cooperatives with low-cost electricity sourced from nuclear and hydro power. Furthermore, individual electric cooperatives typically compensate net solar generation at a wholesale rate versus full retail price and impose additional policies on system owners such as maintaining $1,000,000 of insurance coverage on PV systems.  Projects in these areas may need to look different than the single-family home program proposed in the investor-owned utility areas of the state.  Pairing energy storage with single family home systems in these areas could potentially aid in delivering more economic value.   But without one-to-one net metering, delivering a household at least 20% savings over their current electric bills is difficult.

Rural cooperatives are not regulated by the Public Utilities Commission and could potentially create their own community solar programs.  But many of these cooperatives are not eager to own generation assets.   Pairing solar with storage may offer the cooperatives additional grid resiliency benefits to make such a community like solar project more attractive.

PEDA has begun to engage with the PA Rural Electric Association to learn more about the challenges the co-ops face and if there is an opportunity for collaboration. The state's Energy Programs Office recently announced 15 million dollars in grants to 7 rural electric cooperatives for grid reliability upgrades.  There may be opportunities to expand collaboration with the co-ops regarding solar project development by leveraging the increased grid capacity these grants should provide.

7

**Policy limitations**

Pennsylvania benefits from some foundational solar policies such as net metering, the Alternative Energy Portfolio Standard, and third-party ownership which has resulted in a growing distributed generation market. However, community solar in the traditional sense - i.e., a shared solar resource to which individuals can subscribe - is not statutorily authorized in PA. While there has been some legislative movement regarding community solar, there is no guarantee that this policy will be enacted during the SFA performance period.

Given there is not an effective virtual net metering policy, splitting the benefits from larger arrays and ensuring these benefits flow down to low-income residents is particularly challenging. Since a community solar market does not exist in PA, the corresponding network of support services to educate, enroll, and bill customers is also not present.

Due to these policy limitations, community and multi-family solar projects do not fit into neat program design boxes in Pennsylvania, and our current quantitative workplan outcomes do not include households served or dollars of financial assistance to these types of projects. We intend to use a partial program planning year for these sub-categories of projects to engage with relevant stakeholders and explore alternative program designs.

**Meaningful Benefit Plan**

<u>Household Savings:</u> See Appendix A for background information on electricity costs for households in each of the 11 electric distribution companies (EDCs) in PA as of April 2023.

The PA SFA Program will use financial assistance methods specifically calibrated to ensure a minimum of 20% savings on electric utility bills (or equivalent savings for participating households without electric bills). We anticipate that the 20% savings minimum will be calculated based solely on the solar measures being installed and financed, and any savings achieved from storage or enabling upgrades will be considered additional to the baseline 20% savings achieved by solar. Specifically:

- The single family residential solar lease product to be implemented will be priced for the consumer so they receive at least 20% savings on the total cost of the lease payments plus the remaining utility bill cost compared to their pre-solar utility bill. The lease price will need to provide ample savings to offset not only the variable costs (generation), but also a portion of the fixed costs (distribution, etc.) from the pre-solar utility bill. PEDA and PGCC plan to refine the methodology for 20% savings calculations with financial partners contracted through a state or federally-compliant procurement process for provider(s) of a solar lease product (state process for PEDA, federal process for PGCC). We anticipate, barring undue administrative burden, utilizing a method to track savings over time by monitoring the output of subsided systems, to ensure that the system is producing the baseline kWhs in the solar lease contract. Therefore, continuously meeting the average usage needs of the LIDAC household. PEDA and PGCC will employ best practices for calculating and tracking savings in forthcoming Household Savings Guidance from the EPA.

**Single Family Residential Solar Savings through the Solar Lease Product:**

Much like in the private sector, the PA SFA Program anticipates that residential solar is a customized solution designed to fit a home's available roof space, energy needs, and client goals. We suggest that calculating required savings on an individual household basis is a better method to account for the variety in building stock and electric usage than to compare to a utility territory average.

Methodology to calculate savings for the single-family lease program:

- Interested homeowners would apply directly to the program, be referred through a community organization or supporting program, or be referred by a qualified and vetted installer or financing partner.

- The program administrator would screen the client to ensure they meet eligibility requirements. The administrator may also ask additional questions to the client about whether they were anticipating adding any major electrical loads or changes to the number of individuals living in the home in the next year.

- A qualified and vetted installer would collect the client's electric usage history for the past year. This would include the total kWh of electricity used over the past 12 months, at minimum.

- For suitable sites, installer partners would prepare initial system designs and PV production estimates. The program would work with installers to set minimum system production targets (kWh per kW) to ensure it is not subsidizing systems that won't generate enough energy to deliver tangible savings. Using a minimum total solar resource fraction (TSRF) measure can also help ensure homes have enough productive solar potential.

- From the initial system design, the installer would work with and utilize tools from the financial provider to determine a lease price to deliver at least 20% savings in dollars in relation to the homeowner's current electric bills.  SFA funding would be deployed to subsidize the lease in an upfront payment to the lessor or financial partner owning the solar asset.

- The upfront payment to the lessor would include a direct subsidy or 'buy down' of the lease price, as well as an SREC prepurchase for the first 7 years of the lease term wherever possible. Exact SREC prepurchase terms will be established with financing partners through the procurement and contracting process.  Further discussion of the SREC purchase can be found in the Financial Assistance Strategy. This savings calculation would consider the lease payment and any remaining electric bill post solar versus the client's initial average monthly bill.  The program views 20% savings as a floor.  The goal will be to provide deeper savings wherever possible.

- Installers would be required to include production monitoring with all SFA PV systems. With most modern inverters, installers can share monitoring platform access with third parties to view system production data.  Otherwise, barring undue administrative burden,

installers would be required to submit bi-annual production reports for any SFA systems installed.

- Using this production data, the program would monitor and determine if the installed systems generated the expected amount of energy compared to the initial projections. A method to track savings over time would be to compare the effective solar rate per kWh from the lease product to the current cost of electricity from the client's utility for each year of the performance period:

$$\frac{total\ of\ lease\ payments\ for\ the\ last\ year\ (\$)}{annual\ PV\ system\ production\ (kWh)} = solar\ rate\ per\ kWh$$

- We can then compare the solar rate per kWh to the current cost of electricity from the client's utility and calculate the percentage difference. This way, we can answer whether the system is delivering at least 20% savings compared to the client's pre-solar electric bills and current electric rate.

**Tracking household usage** past the initial solar installation is difficult. The utility company is unlikely to share customer data due to privacy regulations. Additionally, the program cannot control whether clients significantly increase their electric usage post solar installation. The program administrator would ask homeowners to optionally share an electric bill for each year of the performance period. That would provide additional usage data to refine savings calculations and prompt follow-up to homeowners whose usage has significantly increased.

Connecting SFA homeowners with energy efficiency services and education is a critical component to ensure they enjoy long-term financial benefits from their solar system. The program will stay in touch with clients throughout the performance period and work to connect homeowners with existing and upcoming efficiency programs. Some strategies include identifying clients from the Weatherization Assistance Program (WAP) and informing SFA clients as the Home Electrification and Appliance Rebate (HEAR) Program rolls out.

- The solar debt product will be priced so the customer receives at least 20% savings on the total cost of the debt service payments plus the remaining utility bill cost compared to their pre-solar utility bill. The PA SFA Program anticipates providing low-cost loan capital and leveraging additional private sector capital to provide a low blended-interest-rate loan. The PA SFA Program may also leverage funding from other Greenhouse Gas Reduction Fund (GGRF) sources for this purpose, including IRA tax credits and funds received from the National Clean Investment Fund and Clean Communities Investment Accelerator. To ensure the household achieves at least 20% savings, the PA SFA Program will likely need to provide upfront payments to the financing partners to reduce the amount of solar that needs to be financed. The PA SFA Program anticipates providing a loan loss reserve, maintenance reserve, and operations and maintenance (O&M) service to the projects for households using debt financing to ensure proper borrower protections. The household savings calculation method will be the same as that for the lease, except PEDA will use total loan payments in the numerator of the above formula instead of total lease payments.

10

- The cost of storage and enabling upgrades are considered to be 100% grants (net of the investment tax credit) under the PA SFA Program, which allows the savings associated with those measures to accrue directly to the homeowner.

PA benefits from a net metering policy and an unsubsidized SREC market but there are no statewide solar incentives, and no state funded low-income focused solar programs. While PA had a small residential solar incentive that operated 10 years ago, that program ran out of funds in approximately 2013 – 2014 and there has not been a successor program launched since then. This is to say PA does not have a robust policy landscape to support low income solar. The PA SFA program will fill that gap.

The PA SFA Program will complement, not duplicate, existing strategies, subsidies and tax credits in the following ways:

- Solar Lease: This financing product will provide access to renewable solar energy for low-income households at no upfront cost, especially households that may not have the tax liability to utilize the ITC when purchasing a solar array. The lease also allows for third party owners to flow-down the ITC adders that are not available to single family households such as energy communities or domestic content bonus. Monetizing these tax incentives lowers the overall cost of the project, resulting in greater savings for households and allows for greater program impact by reaching more homes. Additionally, most solar installers in PA do not have access to an affordable solar lease product. By expanding access to an LMI focused lease product these installers will be able to reach customers that previously could not afford to go solar.

- Solar Loan: The solar loan will offer low interest rates through subsidized solar financing which doesn't exist in the PA market. The high-interest rate environment from the past few years has made borrowing costs unsustainable for low-income homeowners to fund major home renovation projects. By providing loan loss reserves and blended capital the PA SFA program intends to attract additional private capital from PA based banks and credit unions. An additional goal of the program is to help these financial institutions become more comfortable lending to residential solar projects to support further market growth and job creation.

PEDA and PGCC will run procurement processes in accordance with applicable federal and state requirements to determine the financing partners. Final subsidy amounts and loan structures will depend on the results of those processes and will be refined through contracting. PEDA and PGCC expect to continue to monitor and revise the savings calculations as needed to ensure households are saving at least 20% through the program.

Competitively procured financing partners are considered contractual relationships, and 2 CFR 200 procurement requirements do not "flow down" to the financing partners' relationships with solar installers. As part of the financing provider RFP, PEDA and PGCC will require financing partners to work with a pool of vetted installers who will be determined through an RFQ process that is not subject to CFR requirements, as PEDA and PGCC do not hold the engineering, procurement, and

11

construction (EPC) contractual relationship with the installers and will not provide SFA funds to installers directly. Requiring financing partners to work with vetted installers is an essential consumer protection aspect of the program.

Equitable Access to Solar: The PA SFA Program will provide a diversity of consumer outreach and education, technical assistance, project delivery, and financing options to promote equitable outcomes for LIDAC households across PA, including a LIDAC accessible solar lease product and solar loan product.

Community Ownership: The first phase of the PA SFA program will primarily focus on single family home residential solar deployment.  As further described in the financial assistance strategy section, the proposed financial products (lease and loan) will provide options for LIDAC households to eventually own their systems.  The lease product will include a buy-out provision that will activate after a certain period of time.  The amount of the lease buyout provision will decrease each year of the lease and will be determined by collaborative product development with competitively procured lessors. For both financial products, funds will be set aside for operations and maintenance to keep systems operating over the next twenty plus years.   Additionally, the program will engage community organizations and solar industry partners to expand homeowner education around PV system ownership considerations such as monitoring system production, understanding workmanship and manufacturer warranties, and considerations when selling a home with a PV system.

In the planning period, the PA SFA Program intends to investigate and leverage allowable solutions that can lead to community ownership and enhance efficient deployment of solar. Options will be evaluated for viability and possible inclusion in the PA SFA Program. Possible options include: 1) Community Choice Aggregation – taking advantage of the opportunity for PA municipalities to serve as "municipal aggregators" to procure lower cost renewable energy for participating residents; 2) Use of Power Purchase Agreements (PPAs) by wholesale energy generations suppliers (EGSs) to supply a residential customer base, possibly with new solar arrays built to supply the power; and 3) Installation of on-site solar for master-metered multi-family buildings, possibly associated with public housing authorities.

Resilience Benefits: To maximize the cost and benefit of solar photovoltaics plus battery storage, the PA SFA Program will prioritize its financial assistance for deployments that achieve one or more of the following:
- Resilience for Individuals with Medical Conditions: For medically vulnerable populations that rely on equipment such as oxygen tanks, ventilators, refrigerated medications, and wheelchairs for mobility and who may not have the mobility or health to move to a new location, even short-term power outages can lead to a potentially life-threatening situation. Very few individuals who have a reliance on electric-powered equipment have an alternative source of power to use in the event of an outage. Clean, reliable battery power provides the added benefit of avoiding the use of fossil fuel-generated backup power that worsens air quality, exacerbating other medical conditions like asthma.
- Community Resilience Hubs, Virtual Power Plants, and Localized Resiliency: Community solar can be paired with storage and efficiency in a community-serving facility to offer a low-income community solar subscription model during normal operations, and resilience

to the community in instances of grid outages. By centralizing solar generation and battery storage, a community is more resilient in the wake of extended power outages or natural disasters. Given the absence of statutory authorization for community solar in PA, the PA SFA Program will explore options to deliver the same benefits under a legally permissible framework during the planning period. Options may include partnering with a rural electric cooperative or municipal utility to develop these types of projects.

In addition to prioritizing the above deployments, the PA SFA Program will leverage PA's statewide Whole-Home Repairs Program (created by Act 54 of 2022, codified at 72 P.S. § 135-C) (WHR) and PEA's Built to Last (BTL) program, among other state, local, and utility programs, to deliver energy efficiency and electrify homes whenever possible to maximize resilience benefits and ensure efficient capital deployment.

Workforce Development and Entrepreneurship: The PA SFA Program is dedicated to placing individuals from LIDAC in good jobs, in alignment with the U.S. Department of Labor's eight-principle framework. PEDA and PGCC will work with strategic partners statewide to leverage existing workforce training programs to (1) produce local, skilled, diverse graduates eligible for employment, (2) foster relationships with employers in need of new hires and allowing for their expansion, (3) use on-the-job training opportunities on PA SFA Program projects, including Registered Apprenticeships, and (4) provide wraparound services to ensure that job placement and employment experiences are positive for both employee and employer alike. Greater detail can be found in the Project Deployment Technical Assistance Strategy section of the workplan.

To prioritize equity and diversity in workforce development efforts, the PA SFA Program will prioritize contracting with Disadvantaged Businesses post-award and will prioritize local hire requirements into its installer RFQ processes, meaning a portion of the workforce is hired from the community to ensure jobs benefit the communities in which they are built. This will also include efforts by PEDA and PGCC to work with trusted organizations to ensure that businesses and individuals are connected to the contracting and work opportunities that arise under SFA. Solarize Philly has reflected these objectives in its latest RFP for solar and battery storage installation vendors.

**Financial Assistance Strategy**

| PA SFA Program Percentage for Financial Assistance | |
|---|---|
| Percent for Financial Assistance | 76.6% |
| Percent for Technical Assistance | 23.4% |

**Overview of the PA SFA Program Financial Assistance Strategy:** The PA SFA Program will offer a variety of financial assistance models to support solar access, enabling upgrades, and energy storage projects for LIDAC households across the state. The goal is to maximize solar deployment by leveraging funds to the greatest extent, including federal, state, and local resources, as well as private and philanthropic capital. The program will examine successful local and national models

as a base. Leveraging additional funds ensures a thriving program that promotes and provides access to solar for all communities, especially LIDAC households, beyond the program's performance period.

The PA SFA Program will run competitive procurement processes to determine the final pricing and structure of each financial assistance model. Each financial structure will be developed to consider the tax owner of the projects and the related benefits of such ownership (i.e., the ITC), as well as the potential to leverage other private capital to create a sustained and robust solar economy in PA. The figures included in this section are estimates to the best of PEDA and PGCC's knowledge as of the time of submission of this workplan. Given the building stock, utility rates, and regulatory structure in PA, the program expects to focus primarily on single family households. Many of the financial assistance structures described in this section refer to the Solarize Philly program as an example of successful implementation. Though Solarize Philly is an industry-standard solar program for single-family households and commercial (including multifamily) buildings, the PA SFA Program will evaluate the best practices of the Solarize Philly Program and the opportunities for expansion to ensure that a variety of delivery and financing models are available to meet the specific preferences and financial needs of households and communities that want solar across the Commonwealth.

**Anticipated Financial Assistance Models**

| Financial Assistance Summary by Project Type | Households Served* | PA SFA Financial Assistance |
|---|---|---|
| Solar | 12,555 | $90,639,620 |
| Enabling Upgrades | 5,020 | $23,909,905 |
| Energy Storage | 480 | $5,000,000 |
| **Total** | **12,555** | **$119,549,525** |

*Solar:* The program contemplates four structures for LIDAC solar access: 1) Third-party owned product such as a lease subsidized via SREC purchase agreements, lease buydown payments, and reserves; 2) Loan subsidized via low-cost debt and subsidy payments, which may be offered via a revolving loan and/or supported by a loan loss reserve fund that attracts private lenders to the program; 3) Public housing authorities offering loans specifically for multifamily projects; and 4) Strategies to support effective community solar. Due to current policy limitations, estimates of households served and $ of financial assistance for 3) and 4) are not included in the table above.

*Third-Party Owned Product:* (*Implementation Activity*): The PA SFA Program will explore creative financing structures that would allow a third-party owner to capture and aggregate ITCs from multiple projects. The owner could either be a for-profit entity or a nonprofit entity using the elective pay provision. The third-party owner can then pass on a greater percentage of the ITC value to the participant (via reduced lease prices) than a low-income household would be able to access in an ownership model, given that tax credit adders, like energy communities, are only available to commercially owned installations, and that many low-income households do not have the tax liability to take full advantage of the 30% residential ITC.

14

The PA SFA Program intends to offer a solar lease product and, via a federally compliant RFP process, will seek products with the following attributes:

- No upfront payment is required
- Projected to result in a minimum of 20% savings for customers starting in year one (through a combination of the lease rate and subsidies)
- Lease price escalator of no more than the local utility's average annual escalation rate
- System insurance (insurance held by the third-party owner to cover the cost of damage or issues that are not at the fault of the customer and are not included in the scope of the installer or equipment warranties)
- Warranty management, ongoing maintenance support, and performance guarantees
- Simple assignability/transferability provisions
- Contains a purchase option consistent with IRS rules on ITC recapture
- No collateral required beyond the solar PV system
- Uses alternative underwriting (i.e., not reliant on FICO scores) to include households that are likely to make on-time payments
- Lessor will provide education and support to homeowners as to their options when selling their homes

The PA SFA Coalition may seek to add additional requirements to the RFP to ensure that PA SFA participants have access to a lease that provides fair terms and robust consumer protections. To the extent that the lease price is not able to achieve at least 20% savings for the participating household, PA SFA plans to offer the following forms of financial assistance:

- *Lease Subsidy:* Considered a Contract. To achieve the 20% savings for the customer on day one, the PA SFA Program anticipates making upfront payments to the solar lessors to decrease the monthly $/kwh lease price, so it falls below the utility's price to compare. The lease buydown calculations and structure will be finalized through the procurement process when PGCC and PEDA are contracting with financial partners. Currently, the program anticipates two tiers of lease subsidies, which have been calculated based on the cost of an average electricity bill across all utility territories. We plan to refine the general subsidy amount(s) needed in each utility territory in consultation with the PUC and via the pricing structures received in an RFP process. First, we are budgeting ~$5,000/system to bring the lease price to 20% of the utility price. This subsidy includes a lease buy down payment to the contracted financial provider and an upfront SREC purchase described below. This $5,000 subsidy is expected to be applicable to the moderate income households that qualify as LIDAC and will be negotiated with the lease providers who respond to the RFP. Second, we are budgeting ~$9,500/system to bring the lease price to between $0-40 per month. This option will be available for the lowest income households in the program.

- *Solar Renewable Energy Credit (SREC) Purchase Commitment:* Considered a Contract. To provide more value to LIDAC lessors, and to give financing partners stable projections of future SREC revenue, the PA SFA Program will offer an SREC Purchase Commitment that will guarantee the purchase of the system's SRECs at a set price for a set period of time.

15

PGCC currently uses this approach to support LMI homes going solar through the Solarize Philly program.

- How this works: PGCC purchases the SRECs at $40/SREC for the first seven years of a system's operations. PGCC has a contract with the City of Philadelphia for the sale of these SRECs at $50/SREC for four consecutive automatically renewing one-year contracts. The City purchases SRECs to meet its own renewable energy goals. Once PGCC's contract with the City expires, PGCC will enter into a new contract either with the City or one of several corporations and institutions with a footprint in Southeastern PA with an interest in purchasing SRECs to support solar access and their own renewable energy procurement goals. We expect to apply the same SREC revolving fund concept to the PA SFA Program, as a highly efficient use of capital. The average cost to support a Solarize Philly household with the SREC revolving fund is $1,480. For SFA, PGCC plans to pre-purchase 7 years of SRECs as part of the upfront payment to the financing provider, and will require the financing provider to transfer the SRECs to PGCC to sell on to the City of Philadelphia or other partners as they are minted, generating sale proceeds to support future SREC purchase commitments.

- PEDA's approach to SREC purchases will mirror PGCC's, or, will be refined to expand PGCC's role in the SREC purchases outside of the southeastern PA region.  Ideally PGCC will be able to offer this option to all SFA households.  However, that depends on being able to find SREC buyers willing to pay above market rate.   If that does not materialize prior to program launch, then the procured lessor would own the SRECs.

- *Solar Lease Reserves:* Following feedback from trusted consumer protection groups, the PA SFA Coalition plans to use a portion of the SFA funds to set aside a Lease Loss Reserve (currently estimated at 5%) and an Excess O&M Reserve (currently estimated at 1.5%). These two reserves are budgeted at approximately ~$300-$450 per home.

Estimated subsidy, SREC purchase, and reserve amounts are subject to change following procurement of contracted financial providers and market conditions.

*Debt (implementation activity):* The PA SFA Program also anticipates offering a low-cost, consumer-friendly solar loan option to participants. There are several potential strategies that can be leveraged to reduce the cost of financing for these installations and address the specific challenges that have prevented LIDAC households from financing their own solar projects, including:

- Partner with mission-aligned financial institutions to offer low blended interest rates
- Leverage standard loan contracts
- Limit loan collateral to the solar PV system
- Enable longer loan terms (15-20 years) to allow savings to cover debt service payments
- Address low credit scores via alternative underwriting such as utility bill payment history
- Include a loan loss reserve that reduces the perceived risk that private lenders may have when lending to LIDAC solar projects

16

- o Include a maintenance reserve to protect borrowers from unexpected expenses related to the solar system during the loan term
- o Include biannual operations and maintenance (O&M) visits to ensure the financed projects continue to operate as expected during the loan term

Financial partners will be procured via a subsequent competitive state-approved acquisition process (as appropriate), thus the loan is considered a contract. PEDA currently anticipates structuring the loan product as follows:

- o Using SFA funding as loan capital in combination with private lenders to create a low blended interest rate and attract responsible lenders to the LIDAC solar lending space. PEDA anticipates providing financing at a 0% interest rate for 50% of the loan capital; assuming the financial provider has an 8% interest rate, this will blend down the rate to 4% for borrowers. Given a 15-year term, average utility rates, and the requirement to provide 20% household savings on the total bill, PEDA estimates the average loan size would be ~$4,500, with PEDA providing 50% of this amount.
- o Using SFA funding to provide an upfront subsidy to buydown the principal amount (similar to the Lease Buydown described above) to ensure that monthly debt payments are low enough to achieve 20% savings. Given an average system cost of $15,000, a 30% ITC, and a loan amount of ~$4,500, PEDA anticipates providing roughly $7,000 in a principal subsidy per project to ensure monthly debt payments plus the remaining utility bill do not result in less than 20% savings.
- o Using SFA funding to create a Loan Loss Reserve Fund (LLRF) to increase market access and enhance the terms of capital lending for solar products with private and not-for-profit financial lending institutions. A LLRF can provide additional credit support and protection against the risk of payment defaults by individuals or entities seeking capital for solar projects. PEDA estimates its LLRF at 5% of the total loan amount.
- o Using SFA funding to procure a contracted O&M provider to oversee a maintenance reserve to protect borrowers from unexpected expenses, budgeted at $3,200 per system.

PEDA recognizes the average subsidy required for loan products is significantly higher than the average subsidy for lease products and as a result is only providing 10% of its overall solar financial assistance in the form of loans instead of leases.

Further refining the details of the solar loan product will be a task in accordance with the attached timeline, followed by product launch. Estimated loan & subsidy amounts are subject to change following procurement of contracted financial providers and market conditions.

- ● *Enabling Upgrades: (implementation activity):* Considered a Contract. PA SFA plans to provide enabling upgrades on over 1/3 of households in the program, serving roughly 5,000 homes. The SFA funds are expected to fully subsidize the costs of enabling upgrades while leveraging additional funding for complementary home repairs. Enabling upgrades will

17

only be funded in conjunction with a solar investment; will only be investments in energy or building infrastructure; and will be necessary to deploy or maximize the benefits of the residential rooftop solar. The PA SFA Coalition may set limits on the dollar amount of enabling upgrades per house to ensure benefits flow to the largest number of households and to encourage additional sources of funding for repairs. To prioritize SFA dollars for enabling upgrades that could not be funded otherwise, the PA SFA Coalition plans to coordinate with other income-qualified programs providing building & energy upgrades to homeowners (more details on these programs are in the Customer Acquisition section below). For example, the PA SFA Coalition plans to use homes that have already gone through a Whole Home Repairs Program, a Weatherization Assistance Program, and/or the Built to Last Program as pipeline for SFA solar; other sources of funds will likely have already covered the majority of necessary upgrades and SFA will endeavor to fill the gap. However, the Whole Home Repairs program, a Pennsylvania-funded program, did not receive any additional funds in the latest state budget, and in Philadelphia County alone there are 1,548 income-eligible households on the waitlist for these essential repairs as of August 2024 for whom there is no available funding. SFA dollars will be prioritized to fund eligible enabling upgrades for these income-qualified homes that plan to go solar but do not have access to sufficient funds to perform necessary improvements.

- *Energy Storage: (implementation activity)* Considered a Contract. The program plans to serve approximately 480 households through pairing storage with solar, utilizing a budget of $5M for the storage component.  An average 10kwh system is expected to cost roughly $15K, so the program expects to subsidize $10,417 per system after monetizing the 30% ITC. The storage will be fully subsidized for homeowners. PEDA and PGCC will provide subsidized storage in conjunction with both solar loans and solar leases.

- Public Financing for Multifamily Solar: (*planning year activity*) The PA SFA Program has already started engaging the PA Housing Finance Agency in discussions on pairing solar with its LIDAC-focused programming. These programs can potentially be leveraged to offer solar products, possibly with the inclusion of battery storage, through the PA SFA Program.

Leveraging Other Federal Funds

The PA SFA Coalition will apply directly for competitive grant applications to complement program efforts, where appropriate; encourage state and local government partners to collaborate with this program's goals in their applications; and connect community-based organizations to technical assistance to identify and apply to competitions that support the goals of Solar for All. As of the date of submission, the PA SFA Coalition has identified the following opportunities for potential complementarity to the PA SFA Program:
- *Other Greenhouse Gas Reduction Fund Programs*. In addition to SFA, PA intends to leverage funding from other GGRF programs, including the Clean Communities Investment Accelerator (CCIA) and National Clean Investment Fund (NCIF), to partner with local lenders, including banking institutions, community development financial institutions, and credit unions working in LIDACs to develop financial products to deploy clean technology projects.

18

- *Home Efficiency Rebates (HER) and Home Electrification Appliance Rebates (HEAR).* This funding should be deployed in consideration with the PA SFA Program funding, when possible. The HER and HEAR program are being developed by the Energy Programs Office. PEDA is staffed by members of the Energy Programs Office and has close coordination with the program managers for HER and HEAR.
- *U.S. Department of Agriculture's Rural Utilities Service (RUS) Programs.* RUS has several grant, loan and loan guarantee programs. In particular, the Electric Infrastructure and Loan program and newly created Rural Powering Affordable Clean Energy (PACE) program may provide additional funding for rural solar projects.
- *HUD Community Development Block Grants (CDBG).* HUD CDBG grants are focused primarily on developing viable urban communities via housing and expanded economic opportunities, principally for LMI persons. Pairing CDBG funds with SFA funding will similarly impact LIDAC households across PA.
- *U.S. Department of Agriculture's Rural Energy for America Program (REAP)*. With the passage of the Inflation Reduction Act, REAP has been provided over $2 billion for renewable energy systems and energy efficiency improvement grants for agricultural producers and rural small business owners through 2031.

Housing Affordability and Tax Considerations

As outlined in this section, the PA SFA Coalition envisions solar financial products that will utilize financial assistance dollars to provide a subsidy directly to a financing company to buy down a lease or loan. Since this financial assistance is not being directly transferred to a homeowner, we do not anticipate the financial assistance being considered personal income which could trigger income tax or Federal program eligibility considerations.

Our model and real-world data from solar companies operating in Pennsylvania suggest that the majority of LMI homeowners will opt for a solar lease instead of a solar loan. Solar leases should not increase property taxes as the system is owned by a third party.

In Pennsylvania, property taxes are assessed at the county level and the implementation of property tax assessments varies widely for different municipalities. Furthermore, Pennsylvania does not have a solar property tax abatement law. It is possible that a homeowner who chooses a solar loan in which they will eventually own the system outright could see an increase in property taxes. To address this possibility the PA SFA coalition will provide educational materials to homeowners and installers so each client can choose the best financial product for their situation and goals. The coalition may advocate for the adoption of a solar property tax abatement law to address this issue more broadly.

The first phase of the PA SFA program is focused on single family homes where the owner lives at the property as their principal residence. The current program design only serves homeowners, not renters, so improvements would not lead to rapid rent increases.

Reducing household energy burden lowers the operating cost of a home which maintains the affordability of existing housing stock. SFA financial products will be priced to offer immediate

savings as compared to homeowners' current electric bills. Additionally, enabling upgrades for solar, such as roof repairs, would be delivered free of charge to the homeowner. The end result should be a more affordable and stable utility payment which can help clients be able to stay in their homes. The program will partner with energy efficiency providers, affordable housing advocates, and the Weatherization Assistance Program to identify clients that can or already have benefitted from energy efficiency improvements to further drive value from adding a solar array.

**Project-Deployment Technical Assistance Strategy**

The PA SFA Program will leverage the best practices of Solarize Philly to demystify and streamline the process for consumers through technical assistance and advocating for market and regulatory conditions that support the scale and growth of the program statewide and in each utility territory.

| Category | Total | % |
|---|---|---|
| Solar Financial Assistance | $90,639,620 | 58.1% |
| Enabling Upgrades | $23,909,905 | 15.3% |
| Energy Storage | $5,000,000 | 3.2% |
| Workforce Development | $8,445,576 | 5.4% |
| Technical Assistance | $6,603,447 | 4.2% |
| In-Kind Technical Assistance | $400,000 | 0.3% |
| Other Admin Costs | $21,121,452 | 13.5% |
| **Total** | **$156,120,000** | **100.00%** |

Project-Related Technical Assistance

*Consumer Protection:* Consumer protection is core to the Solarize Philly program and will be a cornerstone of the PA SFA Program. As administrator of the Solarize Philly program, PEA evaluates all contractors' previous performance by contacting the customer references provided and conducting on-site Quality Assurance Assessments. PEA holds contractors to a high standard of customer service and expects contractors to resolve customer issues quickly. Similar measures will be incorporated into the PA SFA Program.

As part of implementation activities, PEDA and PGCC will be running state or federally compliant RFP processes to vet and qualify financial partners and will vet a pool of solar installers through RFQs that financing providers may select from (financing providers, as contractual partners, are not subject to "flow down" federal procurement requirements for their contracts with installers). As part of this process PEDA and PGCC will memorialize the Solarize Philly consumer protection model to scale across the commonwealth.

20

*Project Templates:* The PA SFA Program will design a solar project template that can help developers standardize customer communication and maximize efficiency. This template will contain the basics of any solar projects, including but not limited to 1) Estimated annual production, 2) Details on the panels (number of panels being installed, model of panel), 3) Inverters (models, quantity), 4) Information on return on investment, 5) Project schedule, and 6) Fee summary.

*Existing Technical Assistance Programs:* The PA SFA Program will also leverage existing standalone technical assistance programs to ensure that consumers, installers, and enforcement bodies alike are employing best practices and refining the program model to ensure maximum benefit to LIDACs statewide. PEDA and PGCC will connect the SFA ecosystem to these existing programs.

<u>Workforce Development Assistance</u>

The PA SFA Coalition intends to support workforce development programs as an implementation activity, specifically PGCC will implement workforce development activities through their subaward. Alternatively, PEDA will plan workforce development initiatives with possible partners during the planning period. PA has a very strong network of existing statewide workforce development programs to support the goals of the SFA application. Rather than propose new programs under the PA SFA Program, PEDA and PGCC intend to fund and leverage the existing programs that are led by state and local government entities. These programs reflect Good Jobs Challenge principles which include but are not limited to the following: all workers are paid a stable and predictable living wage, family-sustaining benefits that promote economic security and mobility, the choice to form and join a union, and safe and healthy working conditions. These programs also aim to expand workforce opportunities for underserved communities that often face disproportionate barriers to training and employment. Wraparound services are also prioritized to ensure that unserved communities are successful from training through job placement by removing barriers and helping to support soft skill development.

With existing program structures and SFA funding, the PA SFA Program expects to support training and/or placement of 1,000 clean energy jobs over the five-year performance period.

<u>Training Plans & Workforce Training Models</u>

*Commonwealth Workforce Transformation Program (CWTP):* Created by an executive order in 2023, the program is intended to leverage existing workforce development infrastructure as well as the local workforce development boards, workforce development non-profit organizations, and unions to develop a pipeline and connect workers to it. Additionally, the CWTP office (housed within the PA Department of Labor and Industry) will work with the PA DEP to coordinate with local advocacy groups, local workforce development boards, unions, and local workforce organizations to hire local talent, particularly in the neighborhoods where the solar is being installed, wherever possible. This not only empowers residents by building up their own community, but it also creates another means of hiring underserved populations given that SFA will be deployed in LIDACs.

*Good Jobs Challenge (GJC): Southeastern PA:* PGCC's affiliate, PEA, is a subrecipient on Southeastern PA's successful Good Jobs Challenge to create the Coordinated Southeastern PA Workforce Development System. This effort will run concurrently with the PA SFA Program and will help to build a supported network of local, diverse, well-trained professionals that will help support solar and battery storage installation as well as enabling upgrades.

*Bright Solar Futures (BSF):* In a concerted effort to build a well-trained, diverse workforce in Philadelphia, the BSF program run by PGCC's affiliate PEA trains high school students and young adults to become solar installers. BSF, funded in part by DOE's Solar Energy Technologies Office, ensures access to solar careers for young Philadelphians, preparing them to either enter the workforce or continue onto higher education. The three-year curriculum including lesson plans and syllabi is available via a free download to help educators, school administrators, and training professionals start a BSF program at their school or training facility, making it easily scalable across PA and nationwide.   A goal of the program will be to share this curriculum more broadly around PA and develop partnerships with high schools.  By introducing clean energy workforce topics earlier, students can become aware of potential career paths and post-secondary technical education opportunities.

*Bright Solar Futures Opportunity Youth (BSF OppY) in partnership with PowerCorpsPHL:* BSF OppY engages un- and under-employed 18-to-30-year-olds in an immersive, paid 4-to-24-month experience that results in connection to living wage jobs in clean energy, green infrastructure, and community-based careers.

*Green Retrofit Immersive Training Program (GRIT):* Working in tandem with the Built to Last (BTL) program, the GRIT program, run by PGCC's affiliate PEA, seeks to support the market demand for a trained clean energy workforce. GRIT consists of three core, paid components: an 18-week training that includes classroom learning, hands-on labs, and on-the-job training with employers. The program supports placement into living wage jobs with contractors performing green home retrofits. BTL contractors are a natural fit for GRIT graduates as they are expanding their businesses through the program's growth and need local, diverse, and well-trained green construction professionals. GRIT also prepares its graduates to pass the tests required to be accepted into union apprenticeship programs and provides the relevant on-the-job experience that makes graduates particularly attractive to building trades unions.

*The Pennsylvania College of Technology (Penn College):*
Penn College is one of the oldest vocational training organizations in the state and has been providing career technical education since the 1920s. Based out of Williamsport PA in the state's north central region, Penn College operates the Clean Energy Center which is a leading provider of energy workforce training and technical assistance.  The Clean Energy Center has been the primary trainer for the state's Weatherization Assistance Program (WAP) since 1985.

Penn College has recently expanded their clean energy training centers to include locations in Harrisburg and Latrobe in Western Pennsylvania. In partnership with Pittsburgh Gateways Corp, plans have been announced for a new clean energy workforce training center in Pittsburgh expected to open in 2025. Penn College's history and track record of technical education,

22

leadership in weatherization training, and geographic reach make them a natural partner for the PA SFA coalition to support and expand solar workforce training across the state.

The Clean Energy Center takes an integrated approach by providing education on energy efficiency, home electrification, and solar. There is an opportunity to leverage workforce development funds from the HER and HEAR IRA programs currently under development by the state's Energy Programs Office. PEDA has already begun conversations with Penn College staff to understand their solar training curriculum and discuss ways of supporting students and programs.

*Community College of Allegheny County (CCAC):* CCAC has been in operation since 1966 and offers 130 programs of study through multiple campuses in Western Pennsylvania. CCAC has developed a five-week PV technician training course that can lead to NABCEP certification.

*Solar Industry Involvement: The* PA SFA program will continually engage the state's solar industry to understand their staffing needs and connect job trainees with companies. The program will facilitate dialogue between workforce training groups, solar companies, and trainees to see where offerings can be improved. An additional goal will be to promote and raise awareness of other career paths available in the industry such as sales, operations, and customer support.


Resilient Assets

As an implementation activity, the PA SFA Coalition has plans to attain project inspection contractors to ensure quality control of assets funded by the program. As part of an RFP and RFQ process, PEDA and PGCC intend to contract with solar installers and financial partners after thorough vetting through the procurement process. Contracted partners will be required to adhere to strict business and consumer protection standards and use approved equipment.

Home Assessments: PEDA and PGCC will contract with a pool of competitively procured third-party assessors who may determine or review the necessity or cost reasonableness of enabling upgrades, which may include energy audits, as part of a Solar for All project scope of work. These assessments can serve as a cost reasonableness measure on the scope of enabling upgrades as well as an opportunity to perform energy audits to allow better layering of weatherization and anticipated energy efficiency rebate programs.

The PA SFA program will contract with third party inspection services to conduct randomized inspections of Solar for All projects. Installers will need to address any cited issues from these inspections and submit corrective action reports to show that any needed fixes were completed. Continued patterns of improper installation, poor workmanship quality, or unresponsiveness will be grounds for dismissal from the program.

The program can model inspection processes off the success of similar efforts with the Mass Solar Loan and Smart-E loan program in Connecticut. Anonymized summaries of inspection results will be shared with solar contractors to promote industry best practices. Additionally, installers will be required to coordinate any manufacturer's warranty claims. The program will create a plan to coordinate system maintenance and service in case an original installer goes out of business.

The majority of the single-family systems installed will be leased from a third-party owner. Lessors will be invested in keeping the systems operating for the duration of the lease, and the program will connect lessors with installers and inspectors to coordinate maintenance requests. The PA SFA program plans to set aside a small excess O&M reserve for leases, following feedback from community organizations to provide additional financial safeguards to homeowners. For the solar loan product, a portion of funds will be set aside to support operations and maintenance.

*Siting, Permitting, and Interconnection:* The PA SFA Program will set up and maintain throughout the entire program period regular convenings of its implementation partners with PA PUC, utilities, and local government officials to ensure that interconnection processes, resilient project siting, land-use, permitting, building codes, inspection, and quality control technical assistance issues encountered in program implementation are identified and addressed. The PA SFA Program will leverage best practices from partners including SolSmart and will build off progress already made in PA to streamline permitting and interconnection. For example, in 2020, the City of Philadelphia's Department of Licenses and Inspections (L+I) implemented a new online application submission portal that makes it possible for contractors to secure permits online, eliminating the need to wait in-person. The program will also engage with authorities having jurisdiction around the state to make them aware of SolarAPP+ as a free tool to streamline solar permitting.

The program administrator will track permitting data and installer reported project milestones to determine if projects are taking longer to complete in certain jurisdictions or if permits are being denied at a high rate. Should those trends appear the PA SFA program would seek to better understand underlying causes, consult with utility partners, gain installer feedback, and offer potential solutions to municipalities.

The program is proposing small scale (<20kW) residential solar which will be predominantly roof mounted. Some rural residential systems may be ground mounted, but these systems would take up a fraction of space on privately owned land. We do not anticipate these residential scale projects having any impact on farmland, wetlands, pollinators, or greenspace.

Since many houses are unsuitable for solar due to shading or available roof space, program guidelines will encourage siting systems on roofs with good solar potential. Examples could include requiring a certain estimate of kWh production per kW of PV installed, or using a measure such as a minimum total solar resource fraction to ensure SFA systems can produce the required energy to provide tangible homeowner savings.

Generally, damage to PV systems from weather events is not covered by manufacturer's warranties or installer workmanship guarantees. The program anticipates the majority of residential systems will be third party owned. The lessor will be responsible for carrying insurance to protect against weather risks and would coordinate repairs with the approved installer network to address any weather-related system damage.

For homeowners who choose to own their system through a loan, they should add the system to their homeowner's insurance policy to cover against potential weather-related damage. The PA SFA program will provide educational materials to homeowners and installers to make them aware

24

of this consideration. The program will also set aside funds for each loan project for operations and maintenance, so homeowners have a reserve to draw from in case their system is damaged.

**Equitable Access and Meaningful Involvement Plan**

The PA SFA Program will rely on a combination of industry best practices and PGCC's on-the-ground experience and refinement of the Philadelphia-based Solarize Program, as well as offerings in partnership with frontline CBOs across PA to set the basis of program structure, including delivery models, financing options, and workforce development. The PA SFA Program intends to build on best practices from Solarize Philly in specifying the roles and responsibilities of program partners, while also using SFA funding to address the gaps that currently exist in making education, outreach, and technical assistance for solar accessible and appropriate for all PA residents. The PA SFA Program will leverage every program partner to ensure that the goal of equitable access to solar for LIDACs is met statewide.

<u>Customer Acquisition</u>

*Role of Solar Installers*: The PA SFA Program will equip its solar installers with the expectations and supportive materials that align with the statewide program goals and reflect the on-the-ground conditions in which they are working. Installer partners will be given guidance on how to define LIDACs in alignment with the PA SFA Program to focus their recruitment efforts and help with verifying eligibility for financial assistance offerings. Under Solarize Philly, the program's installers have been the main generators of leads for the program.

*Customer Accessibility:* The PA SFA Program will include a robust strategy for customer acquisition that will ensure that installers and other community partners are equipped to reach the most disadvantaged members of the community across a breadth of stakeholders with a broad range of strategies, including:
- Advertising the program using trusted local media outlets, especially rural areas.
- Producing multilingual materials, offer presentations at meetings in languages other than English, and provide translation services, where appropriate.
- If policy allows, providing clear options for delivery models such as effective community solar that are broadly accessible, especially for households that do not own their property, including renters, owners of manufactured homes on leased sites, and households who do not have space for rooftop, ground-mounted, or pole-mounted solar.
- Providing strategies and support to overcome financial barriers to entry and for non-financial barriers to entry.
- Using easy-to-understand language and lead with relatable examples of the benefits of solar and battery storage, e.g., bill savings, resilience during outages.
- Reducing the amount of paperwork that people need to submit upfront and use categorical eligibility, when possible, to reduce the burden of providing verification documentation.
- Provide in-person, telephone, and email support to customers that encounter challenges with navigating these systems.

*Income-Eligible Programs as Opportunities for Leveraging Capital and Building Project Pipeline:* The PA SFA Program will coordinate with existing income-eligible programs to reach LIDACs and leverage complementary funding sources to maximize the impact of the PA SFA funding:

- Whole-Home Repair (WHR) Program: County-level providers that are performing home repair and weatherization services can refer income-qualified homes (both owner-occupied and rentals via small landlords) to the PA SFA Program and support the growth of PA's clean energy economy through their workforce development programs. The Whole Home Repairs program caps income at 80% AMI, in line with SFA requirements, though counties design their own rules within state guidelines and are allowed to set lower income thresholds: for example, Philadelphia caps participation at 60% AMI.
- Built to Last (BTL) Program: BTL already refers income-qualified homes (60% AMI) to the Solarize Philly program for deeply discounted solar leases. BTL can be a pipeline for both the solar and workforce development components of the PA SFA Program.
- Act 129 of 2008:  this law includes a provision (codified at 66 Pa.C.S. § 2806.1) requiring PA's large EDCs to help PA reduce its energy consumption and peak electric demand through PA PUC-approved energy efficiency and conservation plans that feature consumer- and business-facing energy efficiency programs and rebates. These programs include carve-outs for low-income people, defined as income at or below 150% of the federal poverty level (FPL), which is more restrictive than SFA's definition of 200% of the FPL. The vast majority of PA is covered under these programs. The PA SFA Program will encourage the deployment of these rebates in anticipation of solar and/or battery installation to reduce electricity loads and increase the solar savings for an individual household.
- The PA SFA Program will also coordinate with existing need-based federal, state, and utility assistance programs (including but not limited to SNAP (130% FPL), LIHEAP (150% FPL), Weatherization Assistance Program (WAP) (200% FPL), Temporary Assistance for Needy Families (TANF)) to leverage complementary resources and reach potential Program participants. The PA SFA Coalition will confirm the income eligibility guidelines of each program conform to the SFA definition of low-income before using participation in the program as categorical eligibility.
- For households outside of LIDAC geography the PA SFA Program will endeavor to work with partner organizations to create a pipeline of income eligible beneficiaries that could be qualified through a recent approval in federal assistance programs deemed allowable for qualification by EPA.
  - Whenever possible, PEDA and PGCC will use categorical eligibility to minimize burdens on households by requiring financial providers or a program administrator to collect award letters within the last 12 months for income-qualified programs such as those listed above.

  - For households that cannot meet categorical eligibility and do not have award letters indicating previous income verification, the financing provider or program administrator will collect documents that could include paystubs, tax returns, pension statements, or other records listed as accepted income verification documents in the PA0253 Verification Checklist.

  - PEDA would work closely with the entity collecting income verification documents to ensure procedures are in place to protect non-public personal information

(NPPI).  Additionally, PEDA would seek to develop procedures to have any NPPI deleted or destroyed after a certain period of record retention as required by the program in consultation with EPA.

- o  Income verification policies would be further developed in conjunction with financial partners and a program administrator once those entities are procured through a compliant request for proposal process.

Customer Moves: The PA SFA Coalition recognizes that ensuring low-income homeowners can sell their homes without undue complication from solar loans or leases is a critical piece of consumer protection and building trust in the program. The solar lease may include options at the moment of sale such as the ability to transfer the lease; prepay the lease; remove the system; and/or purchase the system after a set number of years in line with IRS rules on ITC recapture. The solar loan product will seek to include a transferability provision and no pre-payment penalties.

Experience from private sector solar finance providers suggest confusion can arise when selling a home with solar panels.  Some of these scenarios include:

- ● Real estate agents who are unfamiliar with solar systems and how to talk about their value to prospective buyers.

- ● Confusion over how a solar system was financed through a lease or a loan, whether it is owned by a third party, and if it's possible to transfer the financing agreement to the buyer.

- ● Sellers not building the fair market price of a solar system into the asking price for a home (assuming the system is not third party owned).

- ● Lenders encountering solar equipment liens during title searches.

- ● Not discussing the solar system and its value with a prospective buyer until late in the home sale process.

The PA SFA Coalition will work to educate homeowners, provide support during the sales process, and engage the realtor community to expand solar knowledge.
These strategies may include:

- ● Providing fact sheets to homeowners as to considerations when selling their home tailored to the financial product they choose.

- ● Engaging real estate agent professional organizations to raise awareness of the SFA program, home solar systems in general, and questions to ask when selling a home with solar.

- ● Requiring financial partners and a program administrator to provide customer support to homeowners during a home sale process.

27

- Coordinating with the program administrator to stay in touch with homeowners throughout the performance period to offer additional tips and guidance when considering selling their home.

*Outreach and Marketing:* The PA SFA Program will complement installer-driven recruitment efforts by using earned media coverage, social media, webinars, paid digital and traditional media advertising ads, and engagement with local government, utilities, CBOs, and local chambers of commerce and other business associations, as well as attending community events to promote solar options directly with community members. The PA SFA Program intends to utilize culturally responsive practices that will ensure that all solar marketing and outreach efforts are mindful of the cultural and demographic diversity across the Commonwealth. Some of these practices may include being mindful management of gender stereotyping and gendered language, eliminating slang terms and idioms with complicated or offensive origins, ensuring that visuals are representatively accurate given the region's demographic makeup, and consideration of communication channels preferred by different demographic groups. The PA SFA Program will rely heavily on CBOs and other trusted local partners to review and share information on the program in alignment with all of the aforementioned best practices.

*Community Engagement:* When designing engagement strategies for urban, suburban, and rural communities, the PA SFA Program will consider dynamics and factors that influence different communities' levels of access. For example, when designing in-person gatherings such as listening sessions, town hall meetings, and open forums, program leaders will consider each community's relative access to public transportation and the accessibility of gathering locations. When designing engagement strategies for communities with limited English proficiency (LEP), the PA SFA Program will consider hiring bilingual staff members who will be on call for community events, engage native speakers and highly skilled translators to translate printed and online marketing materials and communications, and prioritize the engagement of bilingual technical assistance staff who can easily translate technical information with a high level of cultural competency.

*Community Involvement:* PEDA and PGCC have led and will continue to lead stakeholder sessions to obtain feedback and establish open lines of communication and set expectations of the flexibility that is being built into deployment to ensure meaningful and ongoing feedback opportunities by stakeholders statewide. The PA SFA Program will seek feedback from stakeholders, including LIDACs, to inform program design and operations, especially around the aspects of the program that will be a focus of the one-year development period, including a Solarize program that reaches beyond Southeastern PA and off-site solar and battery storage project structures and financial assistance. The PA SFA Program will consider how stipends can be made available to the LIDAC-supporting organizations and individuals that help support program design and deployment. The PA SFA Program will also seek guidance from key stakeholder communities to develop appropriate formal input and feedback to inform program design, including participatory governance structures and regular meaningful engagement with CBOs and residents that may include forums, listening sessions, and town hall meetings. Recognizing that government-affiliated entities like PEDA and PGCC may not be trusted by every community throughout PA, the PA SFA Coalition will engage partners or contractors that can help devise a robust plan for participatory governance that incorporates direct stakeholder feedback.

*Communities Served*: The PA SFA Program will serve households in disadvantaged and low-income households identified in the following ways

1. LIDAC communities indicated in the Climate and Economic Justice Screening Tool (CEJST)
2. LIDAC communities indicated as census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indices when compared to the nation or state
3. Geographically dispersed low-income household at or below 80% area median income and/or 200% Federal poverty level
4. Individuals or households approved for a list of named Federal assistance programs with a letter in the last 12 months
5. Properties providing affordable housing (as defined in the NOFO), if the planning period results in a scalable program design model that can address the multi-family sector.

For geographically qualified homeowners identified by CEJST or EJScreen, the PA SFA Coalition plans to additionally require an income attestation to prioritize SFA funding to households under the greater of 80% AMI or 200% of the FPL.

*Participatory Governance*: Because PEDA and PGCC will be scaling the strong work of the Solarize Philly program, which, in its eighth year, has strong partnerships with community-based organizations, consumer protection organizations and volunteer-lead regional solarize programs, the PA SFA Coalition intend to incorporate these partners into program design and refinement. The PA SFA Coalition is committed to incorporating feedback from communities and intends to lead strong stakeholder engagement. This stakeholder engagement will include the formation of an advisory group of community-based organizations and community members who are environmental justice leaders that will help to design the customer outreach and acquisition strategy.

The program intends to leverage the community connections and environmental justice resources of the PA Department of Environmental Protection to build out a participatory governance structure. The PA DEP has six regional offices serving the entire state, and each has an associated environmental community relations specialist.   These relations specialists have knowledge of their region's community organizations and can suggest organizations who may be a good fit for an advisory group.  Furthermore, the state's Energy Programs Office has deep connections with many groups across the Commonwealth from implementing various energy related programs and grants.

PEDA and PGCC have begun to engage community organizations such as affordable housing providers, non-profits, regional climate coalitions, and workforce groups about Solar for All goals and planning. The final structure and role of the advisory group, including any stipends/participant support costs provided to members, will be determined in accordance with the attached timeline.

**Fiscal Stewardship Plan**

*Approach to Ensuring Compliance:* As an established organization with a substantial operational history, PEDA complies with the requirements set forth in 2 CFR § 200.303 – Internal Controls.

29

Individual entities that receive funding from PEDA as subrecipients must also properly manage and account for funding received. A complete spending record for all expenditures will be required, including invoice receipts, logs of record, and other properly certified documents. The funding must be spent in accordance with the spending plan included in the application and with federal requirements set forth in 2 CFR § 200.332 – Requirements for Pass-Through Entities. The subrecipient process will be administered by PEDA utilizing administrative, procurement, legal, and other services of the PA DEP, which are required by state law to be provided by PA DEP to PEDA. The process for identifying and securing the subrecipient organizations needed to implement all of the elements of the PA SFA Program will ultimately be determined during the program development and design phase. A number of options exist that could include a grant award process or other competitive process following state and federal guidelines for contracting and procurement. Regardless of the eventual process, all contracts and agreements will include standard Commonwealth terms and conditions, including fiscal responsibility, to the extent that state provisions do not conflict with federal requirements. PEDA will ensure that the terms and conditions of the EPA SFA grant agreement will flow down to PGCC and any future subawardees.

*Risk Management Policies:* PA DEP has a robust set of grants management and fiscal management policies as well as standard procurement contract language to prevent fraud, waste, abuse, and to properly manage grant funds. An internal audit process is in place for quality assurance / quality control. During the program design phase, PEDA will develop a strategy that will ensure that any PA SFA program income will be re-allocated to the PA SFA program component where it is needed most or is most impactful based on continuing program evaluation and adaptive management.

*Consumer Protection Measures:* As program design progresses, PEDA will incorporate consumer protections building upon the experiences that PGCC has had operating the Solarize Philly program, as well as incorporating the strategies outlined in the NOFO (p. 80).

Administration of the PEDA program will be accomplished by hiring in-house staff and an outside firm to carry out that function using a state-approved procurement process.  The Program Administrator will work with the fiscal analyst on PEDA's staff to audit and monitor the selected and funded program components to ensure fiscal stewardship. The Administrator will also conduct audits to ensure compliance with federal requirements.

Consumer protection is core to the Solarize Philly program and will be a cornerstone of the PA SFA Program. As administrator of the Solarize Philly program, the Philadelphia Energy Authority (PEA) evaluates all contractors' previous performance by contacting the customer references provided and conducting on-site Quality Assurance Assessments. PEA also conducts random Quality Assurance Assessments of completed installations to ensure quality and best industry practices. Contractors are expected to correct any issues identified in these assessments and must offer a 10-year minimum workmanship warranty. PEA pre-approval is required for all financing options (i.e., loans, PPAs and leases), as well as for modules, inverters, and racking utilized for Solarize Philly projects. PEA has established standards for customer communication, including but not limited to the timeframe of contractors' responses to customer inquiries, a standard cover sheet to be included with customer proposals/contracts, and required contract terms. PEA holds

contractors to a high standard of customer service and expects contractors to resolve customer issues quickly. Similar measures will be incorporated into the PA SFA Program.

*Subaward*: Per PEDA's subaward agreement with PA SFA Coalition partner, the Philadelphia Green Capital Corp will be required to report in accordance with PEDA and PA DEP current policies and procedures. When final, the subaward agreement will detail reporting metrics, such as number of projects completed, financial assistance expended, and documentation to support administrative costs. All subawardees will also be required to report on project level data and program level data on a semiannual basis, concurrent with the EPA's semiannual reporting schedule.

## Timeline and Milestones

Year 1:
Implementation Activities:
- Develop Solar Lease Product, including subsidies for Enabling Upgrades and Battery Storage
- Begin PGCC Subaward Activities
- Develop Workforce Development Subawards

Planning:
- Explore Community Solar and Rural Electric Cooperative Projects
- Develop Multifamily Housing Strategy
- Submit revised workplan by 12/19/25

Year 2:
- Launch Solar Lease Product
- Launch Solar Loan Product
- Explore Multifamily Expansion
- Expand Workforce Development Partnerships & provide additional subawards

Year 3:
- Program Refinement
- Explore Community Solar Viability (Dependent on Enabling Legislation in PA)

Year 4:
- Continued Program Refinement

Year 5:
- SFA Grant Close Out

For the complete timeline of activities, see Attachment Appendix B.

## Reporting Requirements

Adherence to Reporting Requirements: The PA SFA Program Administrator will monitor program components via inspections, periodic reports, and review of fiscal records during the period of performance. A progress report must be submitted to PEDA at regular intervals. The subrecipients must submit additional information as requested. A final report detailing project successes, problems, failures and measurable energy and environmental benefits will be required.

31

Additionally, subrecipients will be required to submit follow-up status reports, including methodologies, technology, data sources, inputs and assumptions used to estimate outputs and outcomes listed in the NOFO (pp. 65-69). PEDA will work with EPA to incorporate the AVERT tool for greenhouse gas reduction estimations and to standardize reporting requirements. The PA SFA Program Administrator will publish an annual report including the outputs and outcomes of the PA SFA program, including recommendations for continuous program improvement. In addition, PEDA will summarize the results within the annual report to the PA Governor and legislature that is required by state law. The PA SFA Program has already identified the process for tracking and calculating the metrics for outputs and outcomes the EPA listed in the NOFO on pages 21-23 and the program performance reporting requirements on pp. 65-69. This information will be collected by the program administrator(s) to collect in the course of normal operations, via the AVERT tool, and through other various publicly available sources.

Publishing Outcomes: PA DEP, which provides support to PEDA pursuant to state law, is committed to maximizing transparency and improving efficiency across all of its programs. PA DEP currently provides easy access to dozens of online reports and key data that is publicly available regarding the many programs the agency administers. PEDA is focused on continuing this transparent approach to reporting for the SFA program. PEDA expects to make PA SFA program reporting publicly available, including online through the PA DEP website, consistent with PA DEP's practice and state law.

1. Performance Reports

Semi-Annual Report
The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

Final Report
The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its final report:
- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

32

- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions that originated in the preceding two quarters, i.e. the report due January 30 for reporting period July 1-December 31 covers the period of April 1-September 30.

---

**Budget Narrative**

**Project Budget**

**Personnel -**

| Position | Annual Salary | % of FTE to the project | Cost |
|---|---|---|---|
| Executive Director | $130,000 | 30% | $202,958 |
| Chief Financial Officer | $115,000 | 50% | $299,232 |
| Energy Program Specialist | $90,000 | 100% | $468,364 |
| Energy Program Specialist | $90,000 | 100% | $468,364 |
| Community Outreach Coordinator | $90,000 | 100% | $468,364 |
| Fiscal Management Analyst | $90,000 | 80% | $374,691 |
| Administrative Support | $55,000 | 30% | $85,867 |
| **Total Personnel** | | | **$2,367,838** |

PEDA envisions a ramp up hiring process during the first year of the program implementation.  At present this is our best estimation of the staff needs to implement the Solar for All program.   After

33

the first year these staffing needs will be re-assessed and any changes would be communicated in the updated workplan to be submitted at the end of the partial planning period.

Positions hired for or contributing to implementing Solar for All will be civil service positions. Salaries for these positions are subject to Commonwealth rules, policies, and negotiated state contracts that include cost of living increases. Salary increases for these civil service positions equate to 2% per year over the performance period and this is reflected in the budget table.

**Executive Director (1 position and 30% FTE on SFA):** This position will develop, direct, and implement the overarching strategic approach to achieving PEDA's mission as a clean energy financing authority. This position will work with and advise the DEP Executive Staff, the Energy Programs Office Director, the Governor's Office, and the PEDA Board of Directors on the development and deployment of equitable financial assistance programs to be offered under the PEDA Energy Accelerator Program (EAP), including the Solar for All program.

**Chief Financial Officer (1 position and 50% FTE on SFA):** The position will work with PEDA's technical staff, legal staff, contracted financial consultants, and contracted program administrators to contribute overall program financial analysis and strategies to ensure optimal financial performance of the PEDA Green Bank (Energy Accelerator Program) financing programs, including the Solar for All program. The CFO will pursue strategic partnerships with financial institutions and multi state SFA coalitions to bring additional capital into the program wherever possible to increase program reach. Additionally, this position will oversee financial audits of PEDA, SFA grant recipients, or sub-recipients, and ensure compliance with related policies, regulations, and fiscal controls.

**Energy Program Specialists (2 positions and 100% of FTE on SFA)**: These positions are responsible for developing and implementing major elements of the SFA program focusing on assisting in the near-term development of program plans and launch of a single-family home residential leasing program, the second-year launch of a solar loan, andtaking a lead role on developing next-phase elements of the program during the partial planning year. Program specialists will develop requests for proposals to compliantly bring on a program administrator and financial partners. Additionally, the specialists will collaborate with a program administrator to implement and refine client eligibility screening, project tracking, consumer protection measures and raise awareness of the SFA program. Specialists will utilize program feedback from installers, financial partners, community organizations, and clients to improve SFA processes. These positions will also take the lead in meeting EPA reporting requirements.

**Community Outreach Coordinator (1 position and 100% of FTE on SFA):** This position will develop and maintain relationships with community organizations, non-profits, affordable housing organizations, utilities, and solar industry partners. This position will coordinate outreach, stakeholder feedback sessions, gather program feedback, and communicate these findings to PEDA staff to refine program design elements. The outreach coordinator will work to raise awareness of the SFA program across all regions of the state and coordinate response and corrective action to consumer complaints.

**Fiscal Management Analyst (1 position and 80% of FTE on SFA):**  This position will be responsible for developing and enforcing fiscal controls related to the flow of funds in the Solar for All Program.  The position will work with PA's Bureau of Accounting & Financial Management and the Department of Environmental Protection to implement sound financial tracking and planning to ensure compliance with requirements of PEDA's funding sources including federal and other providers.   This position will assist PEDA management to monitor and track financial performance of Solar for All funds obtained from federal and other sources for the purpose of audits and reporting in accordance with funding source requirements.  The position will provide assistance to ensure compliance with Federal grant program goals and requirements, when applicable, including Build America Buy America, Davis-Bacon, SHPO, NEPA and Justice40.

**Administrative Support (1 position and 30% of FTE on SFA):**   This position provides administrative support for PEDA staff working on the SFA grant.   The position will work with the PEDA Executive Director and CFO to coordinate the development of all meeting materials, financial, technical, or otherwise, for all PEDA Board Meetings.  The administrator will support PEDA staff in coordinating and accounting for administrative expenses as required for grant reporting.

**Fringe Benefits -**
Fringe benefits are estimated at 71.85% of total salary.  This is based on benefits available to Pennsylvania state employees.  Benefits include health insurance, life insurance, workers compensation, contributions to the Pennsylvania State Employees' Retirement System (SERS), and a 401(a)-investment plan.  The total is **$1,701,292**.

**Travel -**
We are budgeting **$98,110** for travel for all PEDA employees across the five-year performance period.  These meetings would be in-state.

**Travel purpose:**  PEDA staff would meet with community partners, conduct in person trainings for solar installers, visit workforce development partners, and hold stakeholder feedback sessions.  These meetings will help raise awareness of the Solar for All program in its opening phases, offer installer and community partners training on program guidance, and create a forum to receive public comment and feedback.   Effectively implementing the Solar for All program across PA will require strong local partnerships and adapting the program to fit regional needs.  Having a regular cadence of in person meetings with important partner organizations will help to develop trust and enable collaboration to effectively implement the program.

All of the proposed travel will be domestic travel within the United States and the vast majority of trips will be within Pennsylvania.

**Cost Assumptions:** Per diem rates for lodging, meals, and incidental expenses (M&IE) were obtained from the General Services Administration website.

**Standard Daily Lodging Rate for PA: $110**

**Standard Rate for meals and incidental expenses for PA: $68 per day**

**Standard Mileage Reimbursement Rate: $0.67 per mile**

**Other Vehicle Available Mileage Reimbursement Rate: $0.21 per mile**

It is estimated that staff will use a state vehicle half the time and their personal vehicle for the other half of the travel.  We estimate mileage reimbursement as the average of the standard and other vehicle rate as listed above for a **blended reimbursement rate of $0.44 cents per mile.**

We envision PEDA staff traveling to six regions of Pennsylvania from the central office in Harrisburg.  Each of these regions has an office for the Department of Environmental Protection.  The location of these offices provides a good approximation of the travel distance from the home office in Harrisburg to reach each regional area of Pennsylvania.

| DEP Regional Office Location | Mileage one way from Harrisburg | Roundtrip mileage from Harrisburg to the region |
|---|---|---|
| Wilkes Barre (Northeast) | 104 | 208 |
| Williamsport (Northcentral) | 100 | 200 |
| Meadville (Northwest) | 280 | 560 |
| Norristown (Southeast) | 91 | 182 |
| Harrisburg Region (Southcentral) | 25 | 50 |
| Pittsburgh (Southwest) | 205 | 410 |
| Total | 810 miles | 1610 miles |

**Community Outreach Coordinator (one position)**

Purpose:  The community outreach coordinator will engage in the most travel by having a regular cadence of visits to Solar for All partners across the state to develop, deepen, and maintain relationships.

This role assumes visits to each of the 6 regions of PA once per quarter and assumes travel from the Harrisburg area.  This equates to 24 regional trips per year.

Mileage: Assuming roundtrip mileage to each region once per quarter.  This should be approximately 1610 miles per quarter and 6440 miles for the year.

| Destination | Frequency | Lodging Days | Meals | Mileage | Total per year |
|---|---|---|---|---|---|
| Visit with SFA partners in each of the six | Once per quarter | 24 days | 48 days | 6,440 | $8737.00 |

| | | | | | |
|---|---|---|---|---|---|
| regions of the state | | | | | |

For those trips we are assuming 24 days of overnight travel and 48 days of meal reimbursement.

Calculation for one year:   Lodging (24*110) + Meals (48*68) + Mileage (6440*0.44) = $8,737 per year. Rates are escalated at 2%/year to account for inflation

**Total for performance period** is $41,402, assuming the coordinator will conduct only 12 visits in the first year of the performance period to account for the time to hire and train this individual.


**Energy Program Specialists (2 positions)**

Purpose: The two Energy Program Specialists are directly involved in implementing and overseeing the deployment of Solar for All program design.   Program Specialists will be working with the contracted program administrator, financial partners, installers, and community organizations. Additionally, these positions will also be responsible for exploring how the SFA program can reach other sectors such as multi-family housing and potentially community solar.

Specialists will travel to each of the state's 6 regions twice per year to conduct stakeholder feedback sessions and have a better sense of how Solar for All is being implemented on the ground in that specific region.

| Destination | Frequency | Travelers | Lodging Days | Meals | Mileage | Total per year |
|---|---|---|---|---|---|---|
| Visit with SFA partners in each of the six regions of the state | Twice per year | 2 people | 12 days per person | 24 days per person | 3220 per person | $4368 per person |

Calculation for one year:   Lodging (12*110) + Meals (24*68) + Mileage (3220*0.44) = $4368 per person in year 1. Rates are escalated at 2% to account for inflation.

**Total for performance period** = $**45,471**

 **Other PEDA Staff and Attendance at Conferences**

The other PEDA staff partially involved in implementing the Solar for All program such as the Executive Director, Chief Financial Officer, and Fiscal Analyst are not expected to maintain a regular travel schedule in relation to the program.  However, these staff may require attendance at regional conferences in PA to promote the program and develop additional strategic

partnerships with regional networks and capital providers to further program goals.   Generally regional conferences in PA are located in the Philadelphia or Pittsburgh regions so mileage will be calculated based on the average of travel from Harrisburg to the regional DEP offices located in SW and SE PA

| Destination | Travelers | Frequency | Lodging Days | Meals | Mileage | Total for one year |
|---|---|---|---|---|---|---|
| Regional conferences | 4 | Once per year | 2 days per person | 3 days per person | 296 per person | $554 per person |

Calculation for one year:   Lodging (2*110) + Meals (3*68) + Mileage (296*0.44) = $554 per year per person. Rates are escalated at 2%/year to account for inflation.

**Total for the performance period:  $11,537**

**Total Travel Budget Roll Up:**

1.) Community Outreach Coordinator = **$41,102**

2.) Energy Program Specialists = **$45,471**

3.) Other PEDA Staff and Conference Attendance = **$11,537**

**Total = $98,110**

**Equipment -**
We have not identified any tangible property/equipment needed to administer this grant.

**Supplies** -

First year costs will include the purchase of a laptop and monitors.  Ongoing supply costs will include software licenses and miscellaneous office supplies as described by the table below.  The ongoing supply costs will reflect a 2% cost escalator to account for inflation in the budget table. The overall total including the escalator is **$55,535.**

| Item or Service | Number of Employees | Cost | Frequency | Cost for Performance Period |
|---|---|---|---|---|
| Laptop | 5 | $1700 per computer | One time cost | $8,500 |
| Monitors (2) | 5 | $150 per and $300 total | One time cost | $1,500 |
| Adobe Pro Subscription | 7 | $100 per year | Yearly | $3,500 |

| | | | | |
|---|---|---|---|---|
| Solar Project and Grants Management Software Subscriptions | 7 | $1000 per year | Yearly | $35,000 |
| General Office Supplies | 7 | $150 per year | Yearly | $5,250 |
| **Total** | | | | **$53,750** |

At this point it is difficult to assign an exact number for solar project management and grant management software subscriptions.  PEDA will undertake a competitive RFP process to procure a program administrator who may bring their own software solutions.  PEDA may need to procure additional software to complement the administrator's capabilities to fulfill reporting requirements or essential program functions.

Supplies are acquired in accordance with Commonwealth procurement policies.  The Commonwealth has large scale pre-negotiated contracts with suppliers that we are obligated to use for items such as laptops and monitors.

Staff will use laptops to create SFA related documents, requests for proposals, email communication to partners, and meeting reporting requirements.  To accomplish these grant related tasks staff will have a subscription to the Microsoft Office suite.  We anticipate the need for additional software subscriptions such as a Customer Relationship Management platform (CRM) to track SFA projects.  Staff may require a subscription to Davis Bacon related compliance software and a fiscal management software platform.

General office supplies such as notebooks, pens, headsets, and computer peripherals will be used to carry out daily grant project activities.

**Contractual** -

**Program Administrator**                                      **Budget: $3,903,030**

A program administrator would be procured competitively, and the contract would run for the performance period. The PA SFA program is focused on installing solar on single family homes in the initial phase and these types of projects require many touch points and steps. The administrator would run client eligibility screening, collect needed verification documents, and would also provide a customer service function.  The administrator would bring their own CRM software or subcontract that function out to track project stages and customer information. Other functions include organizing maintenance requests, keeping clients updated as to project status, and coordinating system inspections.  Since the program anticipates thousands of single-family home installations the administrative burden associated with these projects is high.

The contractor would be selected via an RFP process, so it is difficult to pinpoint the exact cost of these services but given the broad scope of work the administrator would be responsible for this accounts for a significant portion of administration costs.

**Financial Assistance:**                                      **Budget: $65,739,266**

39

As described in this workplan, the majority of financial assistance dollars will be used to subsidize and buy down solar leases and loans. This assistance will allow LMI households and residents of LIDAC communities to affordably access solar and realize utility bill savings.

Financial partners (solar lease and loan providers) will be competitively procured following the Commonwealth of Pennsylvania's request for proposal process. Once procured, it is anticipated these contractual partners would remain for the duration of the grant performance period (barring breaches of contract).

Financial assistance will be set aside to fund loan loss, and lease loss reserves as well as an SREC purchase program. Financial assistance will also be used to fund an operations and maintenance reserve for each single-family home solar project. These reserves de-risk projects for financial partners and help ensure systems remain operational so homeowners can realize energy savings over the long term.

Enabling upgrades which include roof repairs and electrical panel upgrades would also be funded through financial assistance dollars. These upgrades would only be funded in conjunction with a solar installation and the upgrades would be necessary to deploy or maximize the benefit of the installation.

Finally, financial assistance will also fund battery storage systems in conjunction with solar.

**Compliance and Reporting**                    **Budget: $884,687**

Current EPA guidance has suggested SFA awardees will need to procure software to manage Davis Bacon compliance to ensure workers meet Department of Labor DBA wage standards on SFA projects. Solar installers will need to submit certified payrolls for SFA projects and will also require training on these requirements since DBA has not applied to single family homes in the past.

Software would be procured competitively following Pennsylvania's request for proposal or invitation to qualify process. Once procured it is assumed the contract would last for the duration of the performance period assuming the software is meeting the needs of the program.

At present it is unclear what options exist for this type of software and what the overall cost may be. There is another factor of the labor needed to review and approve payrolls which may be accomplished by a program administrator.

**Third Party Inspection Services**                    **Budget: $289,678**

Inspectors would be procured competitively for the duration of the grant period to inspect a portion of SFA projects (estimated at 10%) across the state, prepare inspection reports, and review installer corrective action reports. These costs are estimated at $400 per home. These inspections are necessary to ensure quality installations and that installers are following electrical and local code requirements.

40

**Third Party Home Assessments**                    **Budget: $2,896,785**

Contract with a pool of competitively procured third-party assessors who may determine or review the necessity or cost reasonableness of enabling upgrades, which may include energy audits, as part of a Solar for All project scope of work. Estimated at $400 per home.

**Other Consulting Services**                    **Budget: $544,285**

The PA SFA program has budgeted $544,285 for consulting services other than the designated program administrator.  Consultants could be brought on to review PEDA's financial and reporting controls, offer program design guidance, and help to refine client eligibility verification processes. These consultants would likely be procured competitively through the PA State Invitation to Qualify (ITQ) list.  ITQ is the name given to certain multiple award contracts issued by the Commonwealth of Pennsylvania pursuant to Section 517 of the Procurement Code. ITQ contracts may be solicited by an invitation for bids or a request for proposals.

At this point in the program development, it is difficult to further break down this number into subcategories as we do not know what areas of program design or implementation where we may require additional assistance in the future.  The purpose is to have some budget set aside to access additional consulting services when and if needed by the program.  The results of the program administrator RFP and initial launch phase will give PEDA a sense of where gaps may exist in program management capabilities where consultants could assist.

**Legal and Auditing Services**                    **Budget: $884,687**

The PA SFA program is budgeting this amount split between legal and auditing services.  These services would support the reporting and fiscal management requirements of the grant and be procured through the PA ITQ list as described above.

**Marketing**                    **Budget: $108,664**

PEDA is budgeting this amount for marketing activities such as websites, ads, social media content, producing language accessible resources, educational materials that will be included in the PA Solar for All Program.

**Construction (if applicable) -**
There are no planned construction contracts.

**Other** -

**In-Kind Technical Assistance**                    **Budget: $400,000**

This is technical assistance provided by the Department of Energy to SFA awardees to refine program design considerations.

**Community Events & Outreach**                    **Budget: $300,000**

41

Beginning in year 1, PEDA will determine the best approach for community outreach for Solar for All program engagement, this may include solar installer and community partner trainings, door-to-door outreach campaigns, in person gatherings such as listening sessions, town hall meetings, and open forums. PEDA will determine the scope of these events including advertising, logos, attendees. Finally, PEDA may host events and or conferences and will determine any food or beverage plans and will work with our project officer to approve such plans.

**Participant Support Costs**                                    **Budget: $50,000**

PEDA anticipates potentially using participant support costs to support citizen advisory councils and providing stipends for individuals to attend SFA trainings, conferences, or job fairs.

**Subawards**
**1. Philadelphia Green Capital Corp (PGCC) Subaward**
> A description of the types of activities to be supported: As mentioned throughout the workplan, the purpose of this subaward is to support the expansion of the Solarize Philly Program to a regional program. This subaward will enable PEDA to quickly deploy SFA funds through PGCC and PEA, which have been administering a successful solarize program now in its eighth year. Furthermore, PGCC aims to serve up to 45% of the households to receive solar financial assistance through the PA SFA Program. PGCC will provide financial assistance to competitively procured financial provider(s) for third-party owned systems: a partial lease subsidy, an SREC prepurchase, a lease loss reserve, and an excess O&M reserve. PGCC will also deploy funds for technical assistance, workforce development activities, and admin expenses, including through further subawards.
>
> Please see Appendix B, the attached Workplan Timeline foran exhaustive list of subaward activities.
>
> Amount of Subaward: $70,074,000
> Subawardee entity type: PGCC is a 501(c) 3 Non-Profit Organization
> The subaward will not be provided as part of a revolving loan fund
> Duration of subaward (e.g. Y1-5): Years 1- 5, the entirety of the performance period

PEDA intends to provide PGCC, a 501(c) 3 nonprofit entity with an award of $70,074,000. This is up to 45% of the EPA's total award to PEDA. Complete details of the award will be established by a subgrant agreement between PEDA and PGCC consistent with Appendix D of EPA's Subaward Policy and applicable federal statutes and regulations.

**2. Workforce Development Organizations**                    **Budget: $4,683,600**

PEDA will subawards to non-profit workforce development organizations in order to implement the program's solar workforce goals. These subawardees will provide workforce development training as well as participant support costs to participants to cover expenses such as transportation and childcare while they attend training. The established clean energy workforce training programs in the state have the systems and reporting in place to better serve their

students and trainees.  PEDA will be submitting subaward guidelines for these unnamed subawardees to the EPA Project Officer for approval.

**Additional Items**

**Indirect Charges:**                                                 **Budget: $1,138,543**

PEDA will use the negotiated rate agreement between the EPA and the Pennsylvania Department of Environmental Protection at a rate of 27.98%.   According to the agreement, the base is calculated as Personnel Direct Salary Costs and Fringe Benefits, where:
Indirect Cost Charges = Indirect Rate * Personnel Salary & Fringe Benefits Costs.

A copy of this rate agreement will be included with the workplan submission.


**Program Income:**

Program income will be generated in three ways: through the sale of SRECs for solar leases; through principal & interest payments on solar loans; and through interest income earned on cash reserve accounts.

Sale of SRECs: The PA SFA Coalition will scale PGCC's design for the purchase and recycling of funds through SREC pre-purchases. Program income will be generated through the purchase of SRECs from Lessors, or formally procured financial partners, who will own the solar arrays provided through the Solar Lease Program. SRECs will be purchased from the lessor for a predetermined period at a predetermined price. PGCC and/or PEDA will then sell the SRECs on the open market or to local municipal partners interested in meeting their renewable energy goals. The gross SREC sales income is considered program income and is estimated at $7,736,451 over the 5-year performance period.

Solar loans: Principal repayments on solar loans are estimated at $323,115 during the 5-year performance period. While interest payments on loans are also considered program income, currently PEDA anticipates providing 0% interest financing and is not including interest income in the estimated program income. If PEDA did charge an interest rate the interest income would be considered program income.   Any solar loan program income would be recycled back to issue additional solar loans or fund other allowable costs.

Interest income on reserve accounts: The PA SFA Coalition intends to create four cash reserve accounts: 1) a lease loss reserve 2) an excess O&M reserve for leases 3) a loan loss reserve and 4) a maintenance reserve for loans. Each reserve will be placed in a separate escrow account following EPA rules in section AC of the Terms & Conditions regarding cash reserves. The interest earned on the balances of these reserve accounts is considered program income. Due to the uncertainty of bank account interest rates, no estimate has been provided for this type of program income, but as it is earned it will be reported to the EPA.
**Total estimated program income: $8,059,566**

# Appendix

**Appendix A.**

| Electric Utility Provider | Current Average Utility Bill | Savings Target (%) | Savings Target ($) | New Utility Bill Target ($) | Target Annual Savings / Household |
|---|---|---|---|---|---|
| | *Monthly* | *Monthly* | *Monthly* | *Monthly* | *Annual* |
| *Citizen's Electric* | $162.59 | 20.0% | $32.52 | $130.07 | $390.22 |
| *Duquesne Light* | $134.46 | 20.0% | $26.89 | $107.57 | $322.70 |
| *Met Ed* | $164.20 | 20.0% | $32.84 | $131.36 | $394.08 |
| *PECO* | $130.56 | 20.0% | $26.11 | $104.45 | $313.34 |
| *Penelec* | $138.86 | 20.0% | $27.77 | $111.09 | $333.26 |
| *Penn Power* | $161.79 | 20.0% | $32.36 | $129.43 | $388.30 |
| *PPL* | $199.85 | 20.0% | $39.97 | $159.88 | $479.64 |
| *UGI* | $190.43 | 20.0% | $38.09 | $152.34 | $457.03 |
| *Wellsboro Electric* | $145.98 | 20.0% | $29.20 | $116.78 | $350.35 |
| *West Penn Power* | $133.75 | 20.0% | $26.75 | $107.00 | $321.00 |
| *Pike County Light and Power* | $157.87 | 20.0% | $31.57 | $126.30 | $378.89 |
| **Average** | **$156.39** | | **$31.28** | **$125.12** | **$375.35** |

**Appendix B.**

See Attached Workplan Timeline

**Detailed Budget Table**
*PA SFA Program*

| BUDGET BY YEAR | | | | | | | |
|---|---|---|---|---|---|---|---|
| COST-TYPE | CATEGORY | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
| Direct Costs | Personnel | | | | | | |
| | Executive Director (30%) | $39,000 | $39,780 | $40,576 | $41,387 | $42,215 | $202,958 |
| | Finance Director (50%) | $57,500 | $58,650 | $59,823 | $61,019 | $62,240 | $299,232 |
| | Energy Program Specialist (100%) | $90,000 | $91,800 | $93,636 | $95,509 | $97,419 | $468,364 |
| | Energy Program Specialist (100%) | $90,000 | $91,800 | $93,636 | $95,509 | $97,419 | $468,364 |
| | Community Outreach and Environmental Justice Coordinator (100%) | $90,000 | $91,800 | $93,636 | $95,509 | $97,419 | $468,364 |
| | Fiscal Management Analyst (80%) | $72,000 | $73,440 | $74,909 | $76,407 | $77,935 | $374,691 |
| | Administrative Staff (30%) | $16,500 | $16,830 | $17,167 | $17,510 | $17,860 | $85,867 |
| | TOTAL PERSONNEL | $455,000 | $464,100 | $473,382 | $482,850 | $492,507 | $2,367,838 |
| | Fringe Benefits | | | | | | |
| | Executive Director | $28,022 | $28,582 | $29,154 | $29,737 | $30,331 | $145,825 |
| | Finance Director | $41,314 | $42,140 | $42,983 | $43,842 | $44,719 | $214,998 |
| | Energy Program Specialist | $64,665 | $65,958 | $67,277 | $68,623 | $69,995 | $336,519 |
| | Energy Program Specialist | $64,665 | $65,958 | $67,277 | $68,623 | $69,995 | $336,519 |
| | Community Outreach and Environmental Justice Coordinator | $64,665 | $65,958 | $67,277 | $68,623 | $69,995 | $336,519 |
| | Fiscal Management Analyst | $51,732 | $52,767 | $53,822 | $54,898 | $55,996 | $269,215 |
| | Administrative Staff | $11,855 | $12,092 | $12,334 | $12,581 | $12,833 | $61,695 |
| | TOTAL FRINGE BENEFITS | $326,918 | $333,456 | $340,125 | $346,927 | $353,866 | $1,701,292 |
| | Travel | | | | | | |
| | Community Engagement Coordinator | $4,369 | $8,912 | $9,091 | $9,272 | $9,458 | $41,102 |
| | Energy Program Specialist | $8,738 | $8,912 | $9,091 | $9,272 | $9,458 | $45,471 |
| | Other PEDA Staff | $2,217 | $2,261 | $2,307 | $2,353 | $2,400 | $11,537 |
| | TOTAL TRAVEL | $15,323 | $20,086 | $20,488 | $20,897 | $21,315 | $98,110 |
| | Equipment | | | | | | |
| | [NONE] | – | – | – | – | – | – |
| | TOTAL EQUIPMENT | – | – | – | – | – | – |
| | Supplies | | | | | | |
| | Office supplies | $1,050 | $1,071 | $1,092 | $1,114 | $1,137 | $5,464 |
| | Laptops | $8,500 | – | – | – | – | $8,500 |
| | Monitors | $1,500 | – | – | – | – | $1,500 |
| | Project & Grants Management Software Subscription | $7,000 | $7,140 | $7,283 | $7,428 | $7,577 | $36,428 |
| | Adobe Pro Subscriptions | $700 | $714 | $728 | $743 | $758 | $3,643 |
| | TOTAL SUPPLIES | $18,750 | $8,925 | $9,104 | $9,286 | $9,471 | $55,535 |
| | Contractual | | | | | | |
| | Reporting and compliance | $170,000 | $173,400 | $176,868 | $180,405 | $184,013 | $884,687 |
| | Accounting | | | | | | |
| | Audits | $85,000 | $86,700 | $88,434 | $90,203 | $92,007 | $442,343 |
| | Legal | $85,000 | $86,700 | $88,434 | $90,203 | $92,007 | $442,343 |
| | PEDA Program Design Consultant and General Advisory Consulting | $359,285 | $185,000 | – | – | – | $544,285 |
| | PEDA Program Administrator | $750,000 | $765,000 | $780,300 | $795,906 | $811,824 | $3,903,030 |
| | Technical Assistance | | | | | | |
| | Utility Coordinating | – | – | – | – | – | – |
| | Permitting Coordinating | – | – | – | – | – | – |
| | National Lab Support | – | – | – | – | – | – |
| | Producing language-accessible resources | | | | | | |
| | Online marketing materials (website(s), ads, social media content, etc.) | $50,000 | $25,000 | $11,000 | $11,220 | $11,444 | $108,664 |
| | Direct customer interfacing | – | – | – | – | – | – |
| | Door-to-door outreach campaigns | – | – | – | – | – | – |
| | Home Assessments | $248,604 | $422,626 | $718,188 | $746,640 | $760,727 | $2,896,785 |
| | Quality control system inspections | $24,860 | $42,263 | $71,819 | $74,664 | $76,073 | $289,678 |
| | To be administered by PEDA Program Administrator: | | | | | | |
| | Solar financial assistance | $4,062,576 | $7,476,310 | $12,460,517 | $12,921,333 | $12,921,333 | $49,842,070 |
| | Enabling upgrades grants | $1,253,358 | $1,917,638 | $3,259,985 | $3,325,184 | $3,391,688 | $13,147,853 |
| | Energy storage grants | $247,441 | $412,401 | $687,336 | $701,082 | $701,082 | $2,749,343 |
| | TOTAL CONTRACTUAL | $1,772,749 | $1,786,689 | $1,935,043 | $1,989,240 | $2,028,095 | $75,251,082 |
| | OTHER | | | | | | |
| | Subgrant to PGCC | $7,167,260 | $10,877,980 | $16,950,959 | $17,476,036 | $17,601,765 | $70,074,000 |
| | Subaward(s) - Workforce Development - Program & Admin Costs | $446,478 | $683,111 | $1,161,290 | $1,184,515 | $1,208,206 | $4,683,600 |
| | In-Kind Technical Assistance | $400,000 | – | – | – | – | $400,000 |
| | Participant Support Costs | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $50,000 |
| | Technical Assistance | | | | | | |
| | Community events | $75,000 | $75,000 | $50,000 | $50,000 | $50,000 | $300,000 |
| | Publishing articles and op-eds in local community newspapers | – | – | – | – | – | – |
| | In-person gatherings such as listening sessions, town hall meetings, and open foru | – | – | – | – | – | – |
| | Media coverage, webinars, paid digital and traditional media advertising ads | – | – | – | – | – | – |
| | TOTAL OTHER | $8,098,738 | $11,646,092 | $18,172,248 | $18,720,551 | $18,869,971 | $75,507,600 |
| | TOTAL DIRECT | $10,687,478 | $14,259,347 | $20,950,389 | $21,569,751 | $21,775,225 | $154,981,457 |
| Indirect Costs | Indirect Costs | | | | | | |
| | Indirect costs on direct costs | $218,781 | $223,156 | $227,619 | $232,172 | $236,815 | $1,138,543 |
| | TOTAL INDIRECT | $218,781 | $223,156 | $227,619 | $232,172 | $236,815 | $1,138,543 |
| TOTAL FUNDING | | $10,906,259 | $14,482,503 | $21,178,009 | $21,801,923 | $22,012,040 | $156,120,000 |
| Share of funding by activity | | | | | | | |

# PEDA Solar for All Program Timeline

Planning Period Type Used: **Partial**

Planning Period: **12 Months**

Period of Performance: **9/01/2024- 8/31/2029**

Activity Type

| |
|---|
| **Pre-Award and Conditional Drawdown Period Activities** |
| Submit SFA detailed workplan and budget for approval within 90 days of award |
| Finalize subaward agreement with PGCC |
| **Program Planning Activities** |
| Draft QMP and submit to EPA for Approval (within 90 days of the first amendment) |
| Draft QAPP and submit to EPA for Approval (within 90 days of the first amendment) |
| Explore multi-family program design through stakeholder engagement with public housing agencies, developers, nonprofits, and clean energy policy organizations |
| Investigate potential for virtual power plants |
| Develop a program design and deployment plan in the event community solar is legislatively authorized in PA |
| Engage rural electric cooperatives and municipal utilities on SFA program structure  Gauge |
| Submit Revised Workplan and Budget at end of Planning Period |
| **PEDA Project Deployment Period** |
| Create and hold sessions with consumer protection working group |
| Create workforce development working group to refine proposed activities |
| Develop participatory governance structure and reach out to potential member organizations |
| Engage with banks, credit unions, and CDFIs to gather product feedback and assess interest in participating in a solar loan RFP |
| Develop plan for community events - structure, frequency, and audiences |
| Develop more structure around how to utilize participant support costs with feedback from workforce organizations |
| Refine energy storage deployment strategy |
| Draft program administrator RFP |
| Post program administrator RFP, move through the PA state procurement process to select a contractor, and finalize contract with selected contractor |
| Work with program administrator to finalize client intake, project tracking, and reporting systems |
| Draft solar lessor RFP |
| Post solar lessor RFP,  move through the PA state procurement process to select contractors, and finalize contracts with selected contractors |
| PEDA launches and implements solar lease product more broadly across PA |
| Develop and draft solar loan RFP |

| |
|---|
| Post solar loan RFP, move through the PA state procurement process to select contractors, and finalize contract with selected contractors |
| Finalize solar loan product design with selected financial institutions |
| Launch and implement SFA solar loan product across PA |
| Develop SFA marketing plan and materials |
| Create SFA resource website utilizing state resources, in conjunction with a program administrator, or procure a web designer through the state's Invitation to Qualify (ITQ) process |
| Launch and implement SFA marketing and education plan in conjunction with community organizations and regional PA DEP environmental justice coordinators |
| Engage solar installers on program design considerations and qualifications to participate in the program |
| Launch installer recruitment and vetting process outside of SE PA |
| Plan and deploy technical assistance to installers regarding Davis Bacon requirements |
| Conduct installer training sessions on program guidelines virtually and in person |
| Draft program manual and guidelines |
| Engage quarterly with utility representatives and interconnection teams |
| Plan and deploy solar permitting technical assistance to municipalities |
| Refine workforce development support activities with input from training organizations |
| Develop and issue subawards to workforce development groups |
| Issue RFQ / RFP for third party inspectors and bring on selected contractors |
| Implement system inspection plan |
| Support workforce development organizations and work collaboratively to track participant outcomes |
| Survey program clients, installers, workforce trainees and community partners for feedback |
| Meet with SFA governance group bi monthly to share outcomes and gather feedback |
| Post SFA job positions, interview candidates, and hire additional PEDA staff |
| |
| PGCC Project Deployment Period |
| 1. PEDA Commits Subaward to PGCC |
| 1.2 PGCC Solar Lease Program |
| 1.2.1 PGCC refine SFA lease program design with workgroup |
| 1.2.2 PGCC form SFA Program Stakeholder Advisory Committee |
| 1.2.3 PGCC SFA Stakeholder Engagement in LIDAC areas |
| 1.2.4 PGCC develop and launch website for SFA program access |
| 1.2.5 PGCC develop resource, marketing, outreach kits for various audiences |
| 1.2.6 PGCC develop and run RFP for financial Partners |
| 1.2.7 PGCC develop and run RFQ for solar installers & contractors |
| 1.2.8 PGCC Contract with Financial Partners & Installers |
| 1.2.9 PGCC Launch SFA program with final design in SEPA |
| 1.2.10 PGCC draft Consumer Protections Guide |
| 1.2.11 PGCC conduct Salesforce discovery |

| |
|---|
| 1.2.12 PGCC Undertake Salesforce system upgrades and/or develop SFA reporting system |
| 1.2.13 PGCC memorialize 20% savings methodology (to be informed by Fin Partner RFP) |
| 1.2.14 PGCC develop tracking, monitoring, & project inspections requirements |
| 1.2.15 PGCC create SFA program manual and support Solarize greater philadelphia program |
| 1.2.16 PGCC Provide subaward to PEA for WFD and TA and/or program administration once |
| 1.2.17 PGCC Oversee PEA SFA activities |
| 1.2.18 PGCC refine workforce development outputs and outcomes |
| 1.2.19 PGCC Hire SFA program manager & coordinator |
| |
| **Reporting** |
| Draft QMP and submit to EPA for Approval |
| Draft QAPP and submit to EPA for Approval |
| MBE/WBE Reporting: EPA Form 5700-52A Annual Report Submitted (when the combined |
| Submit Interim Federal Financial Report (SF425) annually |
| Submit Final Federal Financial Report |
| July 1-December 31 2024 Semi-annual performance report and semi-annual transaction-level |
| January 1-June 30 2025 Semi-annual performance report and semi-annual transaction-level |
| July 1-December 31 2025 Semi-annual performance report and semi-annual transaction-level |
| January 1-June 30 2026 Semi-annual performance report and semi-annual transaction-level |
| July 1-December 31 2026 Semi-annual performance report and semi-annual transaction-level |
| January 1-June 30 2027 Semi-annual performance report and semi-annual transaction-level |
| July 1-December 31 2027 Semi-annual performance report and semi-annual transaction-level |
| January 1-June 30 2028 Semi-annual performance report and semi-annual transaction-level |
| July 1-December 31 2028 Semi-annual performance report and semi-annual transaction-level |
| January 1-June 30 2029 Semi-annual performance report and semi-annual transaction-level |
| July 1-December 31 2029 Semi-annual performance report and semi-annual transaction-level |
| Post-closeout program strategy Submitted Prior to Program Closeout |
| Final Report submitted |
| January 1-June 30 2030 Semi-annual performance report submitted |
| July 1-December 31 2030 Semi-annual performance report  submitted |
| January 1-June 30 2031 Semi-annual performance report submitted |
| July 1-December 31 2031 Semi-annual performance report  submitted |
| Review approved QMP annually |
| Review approved QAPP annually |
| |

| | | 1-Sep-24 | 1-Oct | 1-Nov-24 | 1-Dec | 1-Jan |
|---|---|---|---|---|---|---|
| | | **Pre-award and conditional drawdown peri** | | | | **Program P** |
| | | *Period of Performance and Budget Year 1* | | | | |
| **Anticipated Start Date** | **Anticipated Completion Date** | **Month 1** | **Month 2** | **Month 3** | **Month 4** | **Month 5** |
| 9/1/2024 | Award date + 90 days | | | | | |
| 9/1/2024 | 2/1/2025 | | | | | |
| | | **Month 1** | **Month 2** | **Month 3** | **Month 4** | **Month 5** |
| 1/1/2025 | 3/30/2025 | | | | | |
| 1/1/2025 | 3/30/2025 | | | | | |
| 9/1/2024 | 12/31/2025 | | | | | |
| 1/1/2025 | 12/31/2025 | | | | | |
| 1/1/2025 | 12/31/2025 | | | | | |
| 1/1/2025 | 12/31/2025 | | | | | |
| | 12/19/2025 | | | | | |
| | | **Month 1** | **Month 2** | **Month 3** | **Month 4** | **Month 5** |
| 12/1/2024 | 2/28/2026 | | | | | |
| 12/1/2024 | 2/28/2026 | | | | | |
| 12/1/2024 | 2/28/2026 | | | | | |
| 1/1/2025 | 3/31/2026 | | | | | |
| 7/1/2025 | 2/1/2026 | | | | | |
| 7/1/2025 | 5/1/2026 | | | | | |
| 5/1/2025 | 12/31/2025 | | | | | |
| 3/1/2025 | 6/30/2025 | | | | | |
| 8/1/2025 | 3/31/2026 | | | | | |
| 4/1/2026 | 7/31/2026 | | | | | |
| 7/1/2025 | 9/30/2025 | | | | | |
| 10/1/2025 | 3/31/2026 | | | | | |
| 6/1/2026 | 8/31/2029 | | | | | |
| 8/1/2025 | 11/30/2025 | | | | | |

| Start | End | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
|---|---|---|---|---|---|---|
| 12/1/2025 | 5/31/2026 | | | | | |
| 6/1/2026 | 8/31/2026 | | | | | |
| 10/1/2026 | 8/31/2029 | | | | | |
| 3/1/2025 | 9/30/2025 | | | | | |
| 10/1/2025 | 6/1/2026 | | | | | |
| 7/1/2025 | 8/31/2029 | | | | | |
| 2/1/2025 | 10/31/2025 | | | | | |
| 12/1/2025 | 5/31/2026 | | | | | |
| 1/1/2026 | 8/30/2026 | | | | | |
| 6/1/2025 | 8/31/2029 | | | | | |
| 4/1/2025 | 10/31/2025 | | | | | |
| 10/1/2024 | 8/31/2029 | | ▓ | | | ▓ |
| 3/1/2026 | 8/31/2029 | | | | | |
| 9/1/2024 | 12/31/2025 | ▓ | ▓ | ▓ | ▓ | ▓ |
| 8/1/2025 | 12/31/2026 | | | | | |
| 10/1/2025 | 2/29/2026 | | | | | |
| 3/1/2026 | 8/31/2029 | | | | | |
| 6/1/2025 | 8/31/2029 | | | | | |
| 10/1/2025 | 8/31/2029 | | | | | |
| 2/1/2026 | 8/31/2029 | | | | | |
| 9/1/2024 | 6/30/2026 | ▓ | ▓ | ▓ | ▓ | ▓ |
| | | **Month 1** | **Month 2** | **Month 3** | **Month 4** | **Month 5** |
| 9/1/2024 | 2/1/2026 | ▓ | ▓ | ▓ | ▓ | ▓ |
| | | ▓ | ▓ | ▓ | ▓ | ▓ |
| 9/1/2024 | 4/1/2026 | ▓ | ▓ | ▓ | ▓ | ▓ |
| 9/1/2024 | 12/1/2025 | ▓ | ▓ | ▓ | ▓ | ▓ |
| 9/1/2024 | 8/31/2029 | ▓ | ▓ | ▓ | ▓ | ▓ |
| 9/1/2025 | 4/1/2026 | | | | | |
| 9/1/2024 | 4/1/2026 | ▓ | ▓ | ▓ | ▓ | ▓ |
| 09/01/24 | 1/1/2026 | ▓ | ▓ | ▓ | | |
| 11/1/2024 | 2/1/2026 | | | ▓ | ▓ | ▓ |
| 1/1/2026 | 4/1/2026 | | | | | |
| | 5/1/2026 | | | | | |
| 1/1/2026 | 4/1/2026 | | | | | |
| 9/1/2024 | 12/30/2024 | ▓ | ▓ | ▓ | | |

| | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
|---|---|---|---|---|---|---|
| 10/1/2025 | 9/1/2026 | | | | | |
| 9/1/2025 | 4/1/2026 | | | | | |
| 10/1/2025 | 4/1/2026 | | | | | |
| 7/1/2025 | 4/1/2026 | | | | | |
| 6/1/2025 | 2/28/2026 | | | | | |
| 2/28/2026 | 8/31/2029 | | | | | |
| 9/1/2024 | 5/1/2026 | | | | | |
| 9/1/2024 | 9/1/2024 | | | | | |
| | | | | | | |
| | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
| 1/1/2025 | 3/30/2025 | | | | | |
| 1/1/2025 | 3/30/2025 | | | | | |
| | 10/30/2024, 10/30/2025, | | | | | |
| 4/1/2025 | 10/31/2029 | | | | | |
| 8/31/2029 | 12/29/2029 | | | | | |
| 12/31/2024 | 1/30/2025 | | | | | |
| 6/30/2025 | 7/30/2025 | | | | | |
| 12/31/2025 | 1/30/2026 | | | | | |
| 6/30/2026 | 7/30/2026 | | | | | |
| 12/31/2026 | 1/30/2027 | | | | | |
| 6/30/2027 | 7/30/2027 | | | | | |
| 12/31/2027 | 1/30/2028 | | | | | |
| 6/30/2028 | 7/30/2028 | | | | | |
| 12/31/2028 | 1/30/2029 | | | | | |
| 6/30/2029 | 7/30/2029 | | | | | |
| 12/31/2029 | 1/30/2030 | | | | | |
| 6/1/2029 | 8/31/2029 | | | | | |
| 8/31/2029 | 12/29/2029 | | | | | |
| 6/30/2030 | 7/30/2030 | | | | | |
| 12/31/2030 | 1/30/2031 | | | | | |
| 6/30/2031 | 7/30/2031 | | | | | |
| 12/31/2031 | 1/30/2032 | | | | | |
| 4/1/2025 | 4/1/2029 | | | | | |
| 4/1/2025 | 4/1/2029 | | | | | |
| | | | | | | |

| 1-Feb-25 | 1-Mar | 1-Apr-25 | 1-May | 1-Jun-25 | 1-Jul | 1-Aug-25 | 1-Sep | 1-Oct-25 |
|---|---|---|---|---|---|---|---|---|

**lanning (# Months)**

| | | | | | | *Period of Performance* |
|---|---|---|---|---|---|---|

| Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
| **Month 6** | **Month 7** | **Month 8** | **Month 9** | **Month 10** | **Month 11** | **Month 12** | **Month 1** | **Month 2** |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
| **Month 6** | **Month 7** | **Month 8** | **Month 9** | **Month 10** | **Month 11** | **Month 12** | **Month 1** | **Month 2** |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

| Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 |
|---------|---------|---------|---------|----------|----------|----------|---------|---------|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| 1-Nov | 1-Dec-25 | 1-Jan | 1-Feb-26 | 1-Mar | 1-Apr-26 | 1-May | 1-Jun-26 | 1-Jul |
|---|---|---|---|---|---|---|---|---|
| **Project Deployment Period** | | | | | | | | |
| *...nd Budget Year 2* | | | | | | | | |
| **Month 3** | **Month 4** | **Month 5** | **Month 6** | **Month 7** | **Month 8** | **Month 9** | **Month 10** | **Month 11** |
| | | | | | | | | |
| | | | | | | | | |
| **Month 3** | **Month 4** | **Month 5** | **Month 6** | **Month 7** | **Month 8** | **Month 9** | **Month 10** | **Month 11** |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **Month 3** | **Month 4** | **Month 5** | **Month 6** | **Month 7** | **Month 8** | **Month 9** | **Month 10** | **Month 11** |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 |
|---------|---------|---------|---------|---------|---------|---------|----------|----------|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| 1-Aug-26 | 1-Sep | 1-Oct-26 | 1-Nov | 1-Dec-26 | 1-Jan | 1-Feb-27 | 1-Mar | 1-Apr-27 | 1-May |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| *Period of Performance and Budget Year 3* | | | | | | | | | |
| Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 |
| | | | | | | | | | |
| Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

| 1-Jun-27 | 1-Jul | 1-Aug-27 | 1-Sep | 1-Oct-27 | 1-Nov | 1-Dec-27 | 1-Jan | 1-Feb-28 | 1-Mar |
|---|---|---|---|---|---|---|---|---|---|

| | | *Period of Performance and Budget Year 4* | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 |
| | | | | | | | | | |
| | | | | | | | | | |
| Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| 1-Apr-28 | 1-May | 1-Jun-28 | 1-Jul | 1-Aug-28 | 1-Sep | 1-Oct-28 | 1-Nov | 1-Dec-28 | 1-Jan |
|---|---|---|---|---|---|---|---|---|---|

| | | | | | Period of Performance and Budget Year 5 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
| | | | | | | | | | |
| | | | | | | | | | |
| Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
|---------|---------|----------|----------|----------|---------|---------|---------|---------|---------|
|         |         |          |          |          |         |         |         |         |         |
|         |         |          |          |          |         |         |         |         |         |
|         |         |          |          |          |         |         |         |         |         |
|         |         |          |          |          |         |         |         |         |         |
|         |         |          |          |          |         |         |         |         |         |
|         |         |          |          |          |         |         |         |         |         |
|         |         |          |          |          |         |         |         |         |         |
|         |         |          |          |          |         |         |         |         |         |
|         |         |          |          |          |         |         |         |         |         |
|         |         |          |          |          |         |         |         |         |         |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| 1-Feb-29 | 1-Mar | 1-Apr-29 | 1-May | 1-Jun-29 | 1-Jul | 1-Aug-29 | | 1-Sep | 1-Oct-29 | 1-Nov |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

1-Dec-29



# EXHIBIT 4

5H - 84089101 - 2    Page 1

| | | GRANT NUMBER (FAIN): | 84089101 | |
|---|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | | MODIFICATION NUMBER: | 2 | **DATE OF AWARD** 08/07/2025 |
| | | PROGRAM CODE: | 5H | |
| | | **TYPE OF ACTION** No Cost Amendment | | **MAILING DATE** 08/07/2025 |
| | | **PAYMENT METHOD:** ASAP | | **ACH#** PEND |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| ENERGY DEVELOPMENT AUTHORITY | ENERGY DEVELOPMENT AUTHORITY |
| 400 Market St | 400 Market St |
| Harrisburg, PA 17101-2301 | Harrisburg, PA 17101-2301 |
| EIN:  93-2613093 | |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Gregory Smith | Lydia Kidane | Alison Hanlon |
| 400 Market St | 1200 Pennsylvania Ave NW, 1101R | 3903R |
| Harrisburg, PA 17101-2301 | Washington, DC 20460 | 1200 Pennsylvania Ave, NW, 3903R |
| **Email:** smitgreg@pa.gov | **Email:** Kidane.Lydia@epa.gov | Washington DC, DC 20460-0000 |
| **Phone:** 717-772-5842 | **Phone:** 202-564-0506 | **Email:** Hanlon.Alison@epa.gov |
| | | **Phone:** 202-564-0244 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Pennsylvania Solar for All Program

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| **BUDGET PERIOD** | **PROJECT PERIOD** | **TOTAL BUDGET PERIOD COST** | **TOTAL PROJECT PERIOD COST** |
|---|---|---|---|
| 09/01/2024 - 08/07/2025 | 09/01/2024 - 08/07/2025 | $ 156,120,000.00 | $ 156,120,000.00 |

## NOTICE OF AWARD

Based on your Application dated 10/06/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division | Environmental Protection Agency, The Office of Greenhouse Gas Reduction Fund |
| 1200 Pennsylvania Ave, NW Mail code 3903R | OA - Office of the Administrator |
| Washington, DC 20460 | 1200 Pennsylvania Ave NW |
| | Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** Phillip Schindel - Acting Director, Grants Mgmt. and Business Operations Division | **DATE** 08/07/2025 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 155,720,000 | $ 0 | $ 155,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84089101 - 2     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,367,838 |
| 2. Fringe Benefits | $ 1,701,292 |
| 3. Travel | $ 98,110 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 55,535 |
| 6. Contractual | $ 75,251,082 |
| 7. Construction | $ 0 |
| 8. Other | $ 75,507,600 |
| 9. Total Direct Charges | $ 154,981,457 |
| 10. Indirect Costs: 27.98 % Base SW + FB | $ 1,138,543 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 8,059,566 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

    a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

    b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

    c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect. The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

    a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

    b. Explanations on why established outputs/outcomes were not met; and

    c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

    a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

    b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

# Programmatic Conditions

All Programmatic Conditions Remain the Same

# EXHIBIT 5



## OFFICE OF MISSION SUPPORT
### WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**    Termination of EPA Assistance Agreement 5H-84089101 under 2 CFR 200.340

**FROM:**    Devon Brown, EPA Award Official

**TO:**    Jennifer Brandt, Senior Fiscal Management Specialist for Federal Grants and Audits
Energy Development Authority

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84089101 awarded to Energy Development Authority. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Alison Hanlon, EPA Grant Specialist
    Lydia Kidane, EPA Project Officer
    Gregory Smith, Grantee Program Manager

# **EXHIBIT 6**



August 28, 2025

**VIA EMAIL:** Schindel.Phillip@epa.gov
Phillip Schindel, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue, NW
Washington, DC 20460

RE:    Notice of Disagreement with Purported Termination of Solar for All Grant No. 84089101

Dear Mr. Schindel:

On August 7, 2025, the Pennsylvania Energy Development Authority ("PEDA") received two documents from the U.S. Environmental Protection Agency ("EPA") purporting to terminate PEDA's Solar for All ("SFA") grant. As a preliminary matter, let me emphasize that PEDA's SFA grant, No. 84089101, is subject to a legally binding award agreement dated July 11, 2024, as amended on December 19, 2024. EPA does not have the authority to unilaterally terminate the agreement, despite the enactment of Section 60002 of the federal reconciliation bill commonly referred to as the One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025).

The first document, a Memorandum with the subject line "Termination of EPA Assistance Agreement 5H-84089101 under 2 CFR 200.340," was sent by a different EPA Award Official, Devon Brown. The Memorandum states that the EPA terminates PEDA's SFA grant agreement and "will issue an amendment to the agreement to document the termination." It states that, if PEDA wishes to dispute the termination decision, it must file a Dispute with the Disputes Decision Official, Michael Molina, within 30 days.

The second document, titled "Assistance Amendment," purports to be "Modification Number: 2." Under the "Explanation of Changes" section on the first page, the document states that the EPA terminates PEDA's SFA grant agreement, orders PEDA to stop work under the agreement, reduces the duration of the performance period, curtails the scope of work, and adds administrative terms and conditions. The "Notice of Award" section on the same page states that, if PEDA disagrees with the terms and conditions specified in the document, it must furnish a notice of disagreement to the EPA Award Official within 21 days. You are listed as the EPA Award Official on the bottom of the same page.

1

Please accept this letter as PEDA's notice of disagreement with Modification No. 2 dated August 7, 2025, issued under your signature as EPA Award Official.  PEDA also disagrees with any suggestion in the Assistance Amendment that any attempt to draw down funds could function as a waiver of its dispute rights, which is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination, as well as the Memorandum's specific statement that costs incurred prior to the termination date are allowable.

PEDA will also be filing a Dispute in a separate filing with the Dispute Decision Official by the 30-day deadline.

Please acknowledge receipt of this notice of disagreement and contact me to discuss resolution of this disagreement as soon as possible.

If you have additional questions, feel free to contact me by e-mail at jesshirley@pa.gov or by phone at (717) 787-2814.

Sincerely,

*Jessica L. Shirley*

Jessica L. Shirley
Secretary, Pennsylvania Department of Environmental Protection
Chair, Pennsylvania Energy Development Authority


cc:    Devon Brown, EPA Award Official, brown.devon@epa.gov
       Michael Molina, EPA Disputes Decision Official, molina.michael@epa.gov
       Lydia Kidane, EPA Project Officer, Kidane.Lydia@epa.gov
       Alison Hanlon, EPA Grant Specialist, Hanlon.Alison@epa.gov
       Sean Donahue, EPA General Counsel, donahue.sean@epa.gov
       Nathaniel Tisa, EPA Deputy General Counsel, tisa.nathaniel@epa.gov
       James Payne, EPA Deputy General Counsel for Environmental Media & Regional Law Offices, payne.james@epa.gov
       Wendel Askew, EPA Deputy Associate General Counsel for Assistance Law, Askew.Wendel@epa.gov
       Daniel Coogan, EPA Deputy Assistant Administrator for Infrastructure & Extramural Resources, Coogan.Daniel@epa.gov
       Melissa Wise, EPA Director, Office of Grants & Debarment, wise.melissa@epa.gov

# **EXHIBIT 7**



September 5, 2025

**VIA EMAIL: molina.michael@epa.gov**
Michael Molina
EPA Disputes Decision Official
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

RE:    Dispute of the Purported Termination of Solar for All Grant No. 84089101

Dear Mr. Molina:

On August 7, 2025, the Pennsylvania Energy Development Authority ("PEDA") received two documents from the U.S. Environmental Protection Agency ("EPA") purporting to terminate PEDA's Solar for All ("SFA") grant, No. 84089101.

The first document, titled "Assistance Amendment," dated August 7, 2025, purports to be "Modification Number: 2."  A copy of the Assistance Amendment is attached.  Under the "Explanation of Changes" section on the first page, the document states that the EPA terminates PEDA's SFA grant agreement, orders PEDA to stop work under the agreement, reduces the duration of the performance period, curtails the scope of work, and adds administrative terms and conditions.  The "Notice of Award" section on the same page states that, if PEDA disagrees with the terms and conditions specified in the document, it must furnish a notice of disagreement to Phillip Schindel, EPA Award Official, within 21 days.

The second document, a Memorandum with the subject line "Termination of EPA Assistance Agreement 5H-84089101 under 2 CFR 200.340" ("Termination Notice"), dated August 7, 2025, was sent to PEDA by Devon Brown, a different EPA Award Official.  A copy of the Termination Notice is attached.  The Memorandum states that the EPA terminates PEDA's SFA grant agreement and references the Assistance Amendment, asserting that the EPA "will issue an amendment to the agreement to document the termination."  It also states that, if PEDA wishes to dispute the termination decision, it must file a Dispute with you, as the Disputes Decision Official, within 30 days.

The Termination Notice further states that the EPA terminated the Assistance Agreement under 2 C.F.R. § 200.340 because:

As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or

monitoring for waste, fraud, or abuse of these grants or of Solar for All.  Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients.

PEDA's SFA grant is subject to a legally binding award agreement dated July 11, 2024, as amended on December 19, 2024 (copies attached).  The EPA does not have the authority to unilaterally terminate the agreement.  Accordingly, on August 28, 2025, PEDA submitted its notice of disagreement with Modification No. 2 to Mr. Schindel.  In addition to disagreeing with the purported termination of the SFA grant, PEDA disagreed with any suggestion in the Assistance Amendment that any attempt to draw down funds could function as a waiver of its dispute rights. Such a suggestion is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination, as well as the Memorandum's specific statement that costs incurred prior to the termination date are allowable.  PEDA also informed the EPA that it would be filing a Dispute to the Termination Notice in a separate filing with the Dispute Decision Official by the 30-day deadline.  This document constitutes the Dispute to the Termination Notice.

Please note that, while PEDA has temporarily paused work and spending pursuant to the EPA's stop-work order in the Assistance Amendment, PEDA does not agree to or accept the purported EPA grant termination.  As such, PEDA has submitted the required semi-annual report to the EPA's Project Officer, but PEDA has not been able to move forward on our milestones since August 7, 2025.  If the purported termination is reversed and funding becomes accessible, PEDA is prepared to restart implementation and achieve project goals consistent with the law and our coalition's workplan.

**Pursuant to 2 C.F.R. § 1500.15, PEDA disputes the purported grant termination in the Termination Notice.**  PEDA is disputing the purported termination because it: (1) is contrary to Section 60002 of the federal reconciliation bill, which rescinded only unobligated balances and preserved funds already awarded to grantees; (2) is contrary to the legally binding award agreement dated July 11, 2024, as amended on December 19, 2024; (3) provides no other reason for termination pursuant to 2 C.F.R. § 200.341; and (4) undermines the energy independence and economic security of taxpayers and families in the Commonwealth of Pennsylvania.

> **(1) The EPA's asserted grounds for termination are contrary to Section 60002, which rescinded only unobligated balances and preserved funds already awarded to grantees.**

Initially, the rescission of unobligated funds and repeal of granting authority under 42 U.S.C. § 7434 do not give the EPA the authority to terminate all legally binding SFA award agreements unilaterally.  Accordingly, we ask that the purported termination be promptly reversed and that our grant be immediately reinstated.

2

The federal reconciliation bill did not rescind the funding already awarded to PEDA for SFA.  Rather, Section 60002 authorized rescission of only the <u>unobligated</u> balance in the appropriations account established by 42 U.S.C. § 7434.  In all, that section states:

> SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. [§] 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

Where the plain language of a statute is unambiguous, no further analysis is required.  *See, e.g., Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("[The U.S. Supreme] Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end.").  Indeed, after Congress passed the reconciliation bill, the U.S. Department of Justice wrote to the federal court presiding over *Climate United Fund v. Citibank, N.A.* to inform it that new legislation, if signed, would "rescind all <u>unobligated funds</u> appropriated for it." *See* Letter to the Clerk of the Court, U.S. Court of Appeals for the D.C. Circuit, from Yaakov M. Roth, U.S. Department of Justice (July 3, 2025) (emphasis added).

Funds awarded to Solar for All grantees were <u>obligated</u> upon award and subject to legally binding agreements whereby the EPA promised to disburse the money, either immediately or in the future, as work under the obligation is completed.[1]  EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. [§] 1501(a)(5)."[2]  In other words, PEDA's SFA grant funds were obligated upon their award on July 11, 2024, remained obligated when the reconciliation bill was passed, and remain obligated to this day.  The reconciliation bill did not change the obligation of the funds and could not have legally rescinded the obligated funding award to PEDA.

Despite the limited scope of the federal reconciliation bill's text, the EPA has effectively attempted to rescind funds that were already obligated to PEDA.  The effect of the Assistance Amendment and the Termination Notice is that funding that Congress appropriated through Section 134 of the Clear Air Act and that was already obligated to PEDA has been purportedly rescinded despite the explicit contrary instruction in Section 60002.

---

[1] *See* U.S. Government Accountability Office, *A Glossary of Terms Used in the Federal Budget Process*, at 70 (Sept. 2005) (defining "obligation" for purposes of the federal budget as "[a] definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States.  Payment may be made immediately or in the future.  An agency incurs an obligation, for example, when it places an order, signs a contract, awards a grant, purchases a service, or takes other actions that require the government to make payments to the public or from one government account to the other.").

[2] *Grants Policy Issuance- 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds*, at https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf (effective Dec. 4, 2024).

Finally, even if the reconciliation bill rescinded funds set aside for the EPA to administer the program, the EPA has the legal flexibility to draw from other available unrestricted funds to carry out mandatory duties, including oversight and paying out obligated grant funds.[3]

**(2) The EPA's purported termination of PEDA's grant is contrary to 2 C.F.R. § 200.340 and the signed award agreement, and the liquidation of funds in PEDA's ASAP account violates PEDA's due process rights to review required by the regulations.**

The federal government's uniform grant regulations at 2 C.F.R. § 200.340(a) specify the limited circumstances when the government may terminate an award agreement, which include (a) failure of the grantee to comply with the grant terms and conditions; (b) consent of the grantee; (c) request of the grantee; or (d) otherwise pursuant to the terms and conditions of the grant, to the extent authorized by law.

The terms and conditions of PEDA's award agreement do not allow for unilateral termination. Any subsequent changes to the grounds for unilateral termination of an award agreement must be agreed to by both the EPA and the grantee. PEDA has not, and unequivocally does not, agree to any attempts to terminate this grant award. PEDA certainly has not, and unequivocally does not, request the termination of this grant award.

We also understand that the EPA unlawfully pulled back funding that was still legally obligated to PEDA. On or about August 8, 2025, PEDA's ASAP account status was changed to "liquidated," and the available balance on the grant was reduced to $10,900,400. Per 2 C.F.R. § 200.344, federal agencies "must make all necessary adjustments to the Federal share of costs after closeout reports are received (for example, to reflect the disallowance of any costs or the deobligation of an unliquidated balance)." More pointedly, the EPA's Notice of Termination itself references PEDA's option to file an administrative dispute within 30 days, consistent with the due process guarantee at 2 C.F.R. § 200.342 and as detailed at 2 C.F.R. 1500 Subpart E. Liquidating PEDA's legally obligated funds without giving PEDA the opportunity to object to this unlawful termination is contrary to law, violates due process rights, and upends decades of agency practice.

PEDA insists that the EPA refrain from taking any action to liquidate its funds during the appeals process. Under 2 C.F.R. § 200.344, federal agencies may not deobligate or liquidate until closeout has taken place.

**(3) The Termination Notice provides no other grounds for the purported termination.**

The Termination Notice does not give any other reason for the purported termination. The other conditions for termination are similarly inapplicable here. The language of PEDA's award agreement clearly states that termination for noncompliance is only possible "when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2

---

[3] *See, e.g.,* 42 U.S.C. § 7434(a) (providing $30 million in administrative set-aside funds "[i]n addition to amounts otherwise available").

[C.F.R. §] 200.339, through either a partial or full termination."[4]  The EPA has neither alleged any noncompliance nor requested that PEDA take action to cure any deficiencies in its agreement performance.

Furthermore, PEDA has not failed to comply with the terms or conditions of this award; there has been no claim made that the grant will not accomplish the purposes for which it was made; and there has been no finding or concern of impairment, waste, fraud, abuse, misrepresentation, or duplication regarding the award.  PEDA has complied with all grant terms and conditions and has been achieving all of the deliverables and activities within the agreed upon scope of work.

### (4) The purported termination of PEDA's Solar for All grant is arbitrary and will undermine energy independence and economic security for Americans in Pennsylvania.

Federal agencies may not engage in action that is arbitrary and capricious.  An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The purported termination violates these foundational principles of administrative law because, as described above, the stated rationale for terminating the grant has no basis in law.

Beyond that, the EPA failed to engage in any reasoned decision-making.  Pennsylvania's SFA grant will produce key deliverables of value to the Trump administration and the United States more generally, including the administration's stated priorities of supporting energy independence and protecting clean air and water, thereby reducing the cost of living.

Retail electricity prices have risen 13% since 2022, outpacing inflation,[5] and rising temperatures, extreme weather, and expanding data centers will continue to drive higher demand.  The United States cannot meet such demand without tapping into all sources of energy; solar energy is therefore an essential piece of the American energy independence puzzle.  PEDA's SFA award would deploy solar technology to add energy to the grid at a moment of unprecedented demand and drastically lower household energy prices for low-and-middle-income Americans in Pennsylvania.  Any further delays in reinstating or processing of our award will result in direct harm to Pennsylvanians.  The EPA's purported termination failed to consider these important elements of its decision.

**For the foregoing reasons, we respectfully request the following specific relief:** that the EPA follow the law, fully and immediately rescind the purported termination of PEDA's Solar for All grant, and allow all funds from the grant to flow to complete crucial energy projects across Pennsylvania.

---

[4] Assistance Amendment, Grant No. (FAIN) 84089101-1, pp. 36-37 (Dec. 19, 2024).

[5] U.S. Energy Information Administration, "U.S. electricity prices continue steady increase," May 14, 2025, at https://www.eia.gov/todayinenergy/detail.php?id=65284.

If the EPA is able to make a legitimate claim that it no longer possesses the requisite personnel or administrative funding required to oversee and administer the award, PEDA respectfully proposes the appointment of an independent third party to administer and oversee the award, subject to the EPA's reasonable oversight and supervision. With the EPA's permission, and with an explicit understanding that this would not trigger adherence to terms and conditions in effect as of April 3, 2025, PEDA would submit an amendment to the program budget to include an allocation of EPA funding to be used to pay for such independent third-party administrator for the period of performance of the award.

**Please accept this letter as a request to initiate an administrative dispute under 2 C.F.R. 1500 Subpart E.** Pursuant to 2 C.F.R. § 200.344(a), PEDA will not complete any administrative actions necessary to close out the grant; we will also object to any claims of noncompliance under 2 C.F.R. 200.344(i).

Please acknowledge receipt of this Dispute. As required by 2 C.F.R. § 1500.15(c)(4), PEDA's designated point of contact for this Dispute is:

Robert F. Teplitz, Special Counsel
Pennsylvania Energy Development Authority
400 Market Street, 9th floor
Harrisburg, Pennsylvania 17101-2301
(717) 772-5858
rteplitz@pa.gov

If you have additional questions, feel free to contact me by e-mail at jesshirley@pa.gov or by phone at (717) 787-2814.

Sincerely,

*Jessica L. Shirley*

Jessica L. Shirley
Secretary, Pennsylvania Department of Environmental Protection
Chair, Pennsylvania Energy Development Authority

Attachments

cc:    Phillip Schindel, Acting Director, EPA Grants Management & Business Operations Division, Schindel.Phillip@epa.gov
Devon Brown, EPA Award Official, brown.devon@epa.gov
Lydia Kidane, EPA Project Officer, Kidane.Lydia@epa.gov
Alison Hanlon, EPA Grant Specialist, Hanlon.Alison@epa.gov
Sean Donahue, EPA General Counsel, donahue.sean@epa.gov
Nathaniel Tisa, EPA Deputy General Counsel, tisa.nathaniel@epa.gov
James Payne, EPA Deputy General Counsel for Environmental Media & Regional Law Offices, payne.james@epa.gov

Wendel Askew, EPA Deputy Associate General Counsel for Assistance Law, Askew.Wendel@epa.gov

Daniel Coogan, EPA Deputy Assistant Administrator for Infrastructure & Extramural Resources, Coogan.Daniel@epa.gov

Melissa Wise, EPA Director, Office of Grants & Debarment, wise.melissa@epa.gov

Robert F. Teplitz, Special Counsel, PEDA

Gregory Smith, Project Manager, PEDA



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**   Termination of EPA Assistance Agreement 5H-84089101 under 2 CFR 200.340

**FROM:**   Devon Brown, EPA Award Official

**TO:**   Jennifer Brandt, Senior Fiscal Management Specialist for Federal Grants and Audits
Energy Development Authority

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84089101 awarded to Energy Development Authority. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Alison Hanlon, EPA Grant Specialist
    Lydia Kidane, EPA Project Officer
    Gregory Smith, Grantee Program Manager

5H - 84089101 - 2    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN): 84089101 | | |
|---|---|---|---|---|
| | | MODIFICATION NUMBER: 2 | DATE OF AWARD |
| | | PROGRAM CODE: 5H | 08/07/2025 |
| | | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>08/07/2025 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| RECIPIENT: | PAYEE: |
|---|---|
| ENERGY DEVELOPMENT AUTHORITY | ENERGY DEVELOPMENT AUTHORITY |
| 400 Market St | 400 Market St |
| Harrisburg, PA 17101-2301 | Harrisburg, PA 17101-2301 |
| EIN: 93-2613093 | |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Gregory Smith | Lydia Kidane | Alison Hanlon |
| 400 Market St | 1200 Pennsylvania Ave NW, 1101R | 3903R |
| Harrisburg, PA 17101-2301 | Washington, DC 20460 | 1200 Pennsylvania Ave, NW, 3903R |
| **Email:** smitgreg@pa.gov | **Email:** Kidane.Lydia@epa.gov | Washington DC, DC 20460-0000 |
| **Phone:** 717-772-5842 | **Phone:** 202-564-0506 | **Email:** Hanlon.Alison@epa.gov |
| | | **Phone:** 202-564-0244 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Pennsylvania Solar for All Program

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 09/01/2024 - 08/07/2025 | 09/01/2024 - 08/07/2025 | $ 156,120,000.00 | $ 156,120,000.00 |

## NOTICE OF AWARD

Based on your Application dated 10/06/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division | Environmental Protection Agency, The Office of Greenhouse Gas Reduction Fund |
| 1200 Pennsylvania Ave, NW Mail code 3903R | OA - Office of the Administrator |
| Washington, DC 20460 | 1200 Pennsylvania Ave NW |
| | Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Phillip Schindel - Acting Director, Grants Mgmt. and Business Operations Division | DATE<br>08/07/2025 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 155,720,000 | $ 0 | $ 155,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,367,838 |
| 2. Fringe Benefits | $ 1,701,292 |
| 3. Travel | $ 98,110 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 55,535 |
| 6. Contractual | $ 75,251,082 |
| 7. Construction | $ 0 |
| 8. Other | $ 75,507,600 |
| 9. Total Direct Charges | $ 154,981,457 |
| 10. Indirect Costs: 27.98 % Base SW + FB | $ 1,138,543 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 8,059,566 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

## Administrative Conditions

UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

    a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

    b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

    c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect. The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

    a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

    b. Explanations on why established outputs/outcomes were not met; and

    c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

    a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

    b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

# Programmatic Conditions

All Programmatic Conditions Remain the Same

5H - 84089101 - 0    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN): 84089101<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5H | DATE OF AWARD<br>07/11/2024 |
|---|---|---|---|
| | | TYPE OF ACTION<br>New | MAILING DATE<br>07/16/2024 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| ENERGY DEVELOPMENT AUTHORITY<br>400 MARKET ST<br>HARRISBURG, PA 17101-2301<br>EIN:  93-2613093 | ENERGY DEVELOPMENT AUTHORITY<br>400 Market Street<br>Harrisburg, PA 17101-2301 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Geoffrey Bristow<br>400 Market St<br>Harrisburg, PA 17101-2301<br>**Email:** gbristow@pa.gov<br>**Phone:** 814-332-6681 | Lydia Kidane<br>1200 Pennsylvania Ave NW, 1101R<br>Washington, DC 20460<br>**Email:** Kidane.Lydia@epa.gov<br>**Phone:** 202-564-0506 | Robin Holder<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>**Email:** Holder.Robin@epa.gov<br>**Phone:** 202-564-1532 |

**PROJECT TITLE AND DESCRIPTION**

Pennsylvania Solar for All Program: " Note:   A special payment condition applies to this award."

See Attachment 1 for project description.

| BUDGET PERIOD<br>09/01/2024 - 08/31/2029 | PROJECT PERIOD<br>09/01/2024 - 08/31/2029 | TOTAL BUDGET PERIOD COST<br>$ 0.00 | TOTAL PROJECT PERIOD COST<br>$ 0.00 |
|---|---|---|---|

# NOTICE OF AWARD

Based on your Application dated 10/06/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official for LaShaun Phillips - Associate Award Official<br>by LaShaun Phillips - Award Official Delegate | DATE<br>07/11/2024 |

5H - 84089101 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41015 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

5H - 84089101 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

## Attachment 1 - Project Description

"Note: A special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

## Administrative Conditions

### A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

   Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

   MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

   All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

   Payment requests (if applicable): EPA Project Officer

   Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

### D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer

within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

  Progress towards objectives on key performance metrics over the entire period of performance,

  Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

  Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

  Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

  Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be

published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**_The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:_**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**_The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:_**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity

requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure

compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

#### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

#### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined

in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

II. Additional Programmatic Terms and Conditions

A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable

expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental,

non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

### J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program

participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

K. Labor and Equitable Workforce Development Requirements

1. Davis-Bacon and Related Acts (DBRA)

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

ii. **Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

b. **After Award of Contract**:

i. **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

ii. **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

D. **Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

E. **Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

a. **Solicitation and Contract Requirements:**

i. **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

ii. **Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

### 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the [EPA Build America, Buy America General Term and Condition](), which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by

recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistoric, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient

must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance**

**with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).**

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they

do not "profit" from the transaction.

#### 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

#### 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official

that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031,

the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

<u>3. Low-Income and Disadvantaged Communities Expenditure Requirements</u>

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

<u>4. Cash Management Requirements</u>

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

<u>5. Remedies for Non-Compliance</u>

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

<u>6. Suspension and Debarment</u>

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin,

sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet

Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

AA. Compliant URL Links

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

AB. Flow-Down Requirements

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

**For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and**

condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

5H - 84089101 - 1    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN):  84089101<br>MODIFICATION NUMBER:  1<br>PROGRAM CODE:  5H | | DATE OF AWARD<br>12/19/2024 |
|---|---|---|---|
| | TYPE OF ACTION<br>No Cost Amendment | | MAILING DATE<br>12/19/2024 |
| | PAYMENT METHOD:<br>ASAP | | ACH#<br>PEND |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| ENERGY DEVELOPMENT AUTHORITY<br>400 Market St<br>Harrisburg, PA 17101-2301<br>EIN:  93-2613093 | ENERGY DEVELOPMENT AUTHORITY<br>400 Market St<br>Harrisburg, PA 17101-2301 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Gregory Smith<br>400 Market St<br>Harrisburg, PA 17101-2301<br>**Email:** smitgreg@pa.gov<br>**Phone:** 717-772-5842 | Lydia Kidane<br>1200 Pennsylvania Ave NW, 1101R<br>Washington, DC 20460<br>**Email:** Kidane.Lydia@epa.gov<br>**Phone:** 202-564-0506 | Matthew Forte<br>1200 Pennsylvania Ave. NW, 3903R<br>Washingont, DC 20460<br>**Email:** Forte.Matthew@epa.gov<br>**Phone:** 202-564-2245 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Pennsylvania Solar for All Program

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD<br>09/01/2024 - 08/31/2029 | PROJECT PERIOD<br>09/01/2024 - 08/31/2029 | TOTAL BUDGET PERIOD COST<br>$ 156,120,000.00 | TOTAL PROJECT PERIOD COST<br>$ 156,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/06/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, The Office of Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official LaShaun Phillips - Associate Award Official | DATE<br>12/19/2024 |

5H - 84089101 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 155,720,000 | $ 0 | $ 155,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,367,838 |
| 2. Fringe Benefits | $ 1,701,292 |
| 3. Travel | $ 98,110 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 55,535 |
| 6. Contractual | $ 75,251,082 |
| 7. Construction | $ 0 |
| 8. Other | $ 75,507,600 |
| 9. Total Direct Charges | $ 154,981,457 |
| 10. Indirect Costs: 27.98 % Base SW + FB | $ 1,138,543 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 8,059,566 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/032024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Case 2:25-cv-02015-TMC     Document 85-1     Filed 11/14/25     Page 236 of 284

5H - 84089101 - 1     Page 9

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### Semi-Annual Report

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### Final Report

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

### 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

### 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

### 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

### U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

### V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

<u>B. Board Independence</u>

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

<u>C. Board Policies and Procedures</u>

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

<u>3. Legal Counsel</u>

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

<u>AB. Amendments to Award Agreement</u>

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

<u>AC. Preservation of Guidance and Data</u>

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT 8

| | |
|---|---|
| **From:** | SFA |
| **To:** | SFA |
| **Subject:** | [External] Solar for All Grant Closeout Instructions |
| **Date:** | Wednesday, October 1, 2025 4:21:18 PM |

***ATTENTION:*** *This email message is from an external sender. Do not open links or attachments from unknown senders. To report suspicious email, use the* Report Phishing button in Outlook.

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425)
**Submission Instructions:**
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details:**
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your

grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

- ○ If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.


Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance during the entire performance period (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - ○ In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - ○ Progress towards objectives on program key performance metrics during the performance period.
  - ○ Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - ○ Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.

- o Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
- o *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:
- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 9

| | |
|---|---|
| **From:** | Nguyen, Tiana on behalf of Molina, Michael |
| **To:** | Brandt, Jennifer; mitgreg@pa.gov; Teplitz, Robert |
| **Cc:** | Wise, Melissa; Schindel, Phillip; Molina, Michael |
| **Subject:** | [External] EPA Dispute Decision for 5H 84089101 - Pennsylvania Energy Development Authority |
| **Date:** | Monday, October 27, 2025 6:19:23 PM |
| **Attachments:** | MM - 5H 84089101 Pennsylvania Energy Development Authority DDO Decision.pdf |

---

*ATTENTION: This email message is from an external sender. Do not open links or attachments from unknown senders. To report suspicious email, use the Report Phishing button in Outlook.*

Good afternoon,

Please see attached memorandum.

Best,

*Michael D. Molina*
Principal Deputy Assistant Administrator
Office of Mission Support



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 23, 2025

**MEMORANDUM**

**SUBJECT:**     Update on Dispute of EPA Assistance Agreement 5H-84089101 under 2 CFR 200.340

**FROM:**     Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**     Jennifer Brandt, Senior Fiscal Management Specialist for Federal Grants & Audits
Pennsylvania Energy Development Authority

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84089101. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# EXHIBIT 10



November 4, 2025

**VIA EMAIL: brown.devon@epa.gov**
Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC  20460

RE:    Objection to Closeout of Solar for All Assistance Agreement 5H-84089101

Dear Mr. Brown:

On September 5, 2025, the Pennsylvania Energy Development Authority (PEDA) submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of the purported termination of Solar for All Assistance Agreement 5H-84089101 pursuant to 2 C.F.R. § 1500.15. Despite that timely submission, PEDA received email correspondence from SFA@epa.gov on October 1, 2025, containing "Solar for All Grant Closeout Instructions" and demanding that PEDA complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment."  PEDA has now received EPA's memorandum dated October 23, 2025, purporting to declare moot PEDA's "dispute regarding the termination of Assistance Agreement 5H-84089101."  The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

I write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that PEDA close out Assistance Agreement 5H-84089101.

As an initial matter, clarification is needed because EPA's memorandum dated October 23, 2025, references "your dispute...submitted on August 28, 2025."  However, PEDA did not submit its Part 1500 dispute on August 28, 2025.  Rather, August 28, 2025 is the date on which PEDA submitted its 21-day Notice of Disagreement in accordance with EPA's Assistance Amendment dated August 7, 2025.  Therefore, it is unclear which of PEDA's disputes "EPA has rendered" moot. PEDA disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending.  EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation.  We request that EPA reverse its mootness determination and allow the administrative dispute to proceed.  At a minimum, EPA should stay the administrative dispute until the conclusion of PEDA's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of PEDA's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, PEDA has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, docketed at No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require PEDA to close out while litigation is pending that directly concerns EPA's termination of this grant. *Cf.* 48 C.F.R. § 4.804-1(c)(1) (for procurement contracts, "[a] contract file shall not be closed if...[t]he contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." PEDA has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated $144,819,600 from PEDA's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for the 30-day deadline to file a Part 1500 dispute to expire. Because PEDA has not been able to complete the work required under Assistance Agreement 5H-84089101, EPA necessarily cannot "determine[] that all administrative actions and required work of the Federal award have been completed," as would be required to close out.

**PEDA does <u>not</u> agree to close out Assistance Agreement 5H-84089101 while litigation relating to this grant is pending.** We request an extension for our closeout date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of EPA to commence closeout procedures without our express and informed consent and without our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00 p.m. Eastern Standard Time on November 5, 2025. I can be reached by e-mail at jesshirley@pa.gov or by phone at (717) 787-2814.

Sincerely,

Jessica L. Shirley

Jessica L. Shirley
Secretary, Pennsylvania Department of Environmental Protection
Chair, Pennsylvania Energy Development Authority

cc:    Phillip Schindel, Acting Director, EPA Grants Management & Business Operations Division, Schindel.Phillip@epa.gov

Michael Molina, EPA Disputes Decision Official, molina.michael@epa.gov

Julie Zavala, EPA Acting Director, Office of the Greenhouse Gas Reduction Fund, Zavala.Julie@epa.gov

Lydia Kidane, EPA Project Officer, Kidane.Lydia@epa.gov

Alison Hanlon, EPA Grant Specialist, Hanlon.Alison@epa.gov

Sean Donahue, EPA General Counsel, donahue.sean@epa.gov

Nathaniel Tisa, EPA Deputy General Counsel, tisa.nathaniel@epa.gov

James Payne, EPA Deputy General Counsel for Environmental Media & Regional Law Offices, payne.james@epa.gov

Wendel Askew, EPA Deputy Associate General Counsel for Assistance Law, Askew.Wendel@epa.gov

Daniel Coogan, EPA Deputy Assistant Administrator for Infrastructure & Extramural Resources, Coogan.Daniel@epa.gov

Melissa Wise, EPA Director, Office of Grants & Debarment, wise.melissa@epa.gov

Tiana Nguyen, EPA, Nguyen.Tiana@epa.gov

Robert F. Teplitz, Special Counsel, PEDA

Gregory Smith, Project Manager, PEDA

Jennifer L. Brandt, Senior Fiscal Management Specialist, Pennsylvania Department of Environmental Protection