# Exhibit 1

5H - 84091001 - 0    Page 1

# U.S. ENVIRONMENTAL PROTECTION AGENCY

Grant Agreement

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 84091001 | |
| **MODIFICATION NUMBER:** 0 | **DATE OF AWARD** 07/09/2024 |
| **PROGRAM CODE:** 5H | |
| **TYPE OF ACTION** New | **MAILING DATE** 07/12/2024 |
| **PAYMENT METHOD:** ASAP | **ACH#** PEND |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS 1 CAPITOL HILL 4th Floor Providence, RI 02908-5850 EIN: 05-6000522 | STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS 1 CAPITOL HILL 4th Floor Providence, RI 02908-5850 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Shauna Beland One Capitol Hill Providence, RI 02908-5850 **Email:** shauna.beland@energy.ri.gov **Phone:** 401-574-9100 | Kelley Moore 290 Broadway, WD/DWMIB New York, NY 10007 **Email:** Moore.Kelley@epa.gov **Phone:** 212-637-3265 | Shana Etheridge OGD-GMB, 3903R 1200 Pennsylvania Ave NW Washington, VA 20460-0001 **Email:** Etheridge.Shana@epa.gov **Phone:** 202-564-9777 |

**PROJECT TITLE AND DESCRIPTION**

Rhode Island Solar for All- "Note: A Special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.
Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.
No subawards are included in this assistance agreement.

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 0.00 | **TOTAL PROJECT PERIOD COST** $ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 49,330,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 49,330,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund OA - Office of the Administrator 1300 Pennsylvania Avenue NW Washington, DC 20004 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** ||
|---|---|
| **Digital signature applied by EPA Award Official** LaShaun Phillips - Associate Award Official | **DATE** 07/09/2024 |

5H - 84091001 - 0     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 48,930,000 | $ 48,930,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 49,330,000 | $ 49,330,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41020 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 48,930,000 |
| | | | | | | | | | $ 48,930,000 |

5H - 84091001 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
| --- | --- |
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 49,330,000 |
| 15. Total EPA Amount Awarded To Date | $ 49,330,000 |

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once,

and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>2. Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

<u>*The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition*</u>:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient

to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

#### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1)

must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

II. Additional Programmatic Terms and Conditions

A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

**C. Solar for All Workplan**

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate

program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to

a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements.* The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

<u>2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs</u>

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

<u>K. Labor and Equitable Workforce Development Requirements</u>

<u>1. Davis-Bacon and Related Acts (DBRA)</u>

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant

construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

**B. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

> **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

> **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for

Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract**:

    **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

    **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

    a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

    b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

    c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

    "[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

## a. Solicitation and Contract Requirements:

    **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

    **ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

## b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the

performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims**

Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

<u>5. Sufficient Progress</u>

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient

agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

<u>4. Cash Management Requirements</u>

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

<u>5. Remedies for Non-Compliance</u>

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

<u>6. Suspension and Debarment</u>

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the

Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at

any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that

the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

### AA. Compliant URL Links

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

### AB. Flow-Down Requirements

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form

of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

#### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

#### 2. Governance Requirements

#### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient

agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

### B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

Exhibit 2

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Rhode Island Equitable Access to Solar Energy (EASE) Programs Work Plan**
**Project Period: 5/1/24 – 4/30/29**
**Date of Submittal: December 4, 2024**

**Project Title: Rhode Island Equitable Access to Solar Energy (EASE) Programs**
**Grant Number:** 84091001
**Organization Name:** Rhode Island Office of Energy Resources (Lead for Coalition)
**Geography:** State of Rhode Island
**Definition of LIDAC:** The RI Coalition will use the Climate and Economic Justice Screening Tool (CEJST) to identify disadvantaged communities (DACs). The State of Rhode Island used GGRF's definition of "geographically dispersed low-income households" from the competition terminology. For metropolitan areas, this includes individuals and households with incomes at or below 80% of the Area Median Income (AMI), or 200% of the Federal Poverty Level, whichever is greater. For non-metropolitan areas, it includes those with incomes at or below 80% of the AMI, 80% of the Statewide Non-Metropolitan Area AMI, or 200% of the Federal Poverty Level.

Programs in Rhode Island that meet these criteria include:

1. Low Income Home Energy Assistance Program (LIHEAP)
   - Eligibility: Households with income at or below 60% of the state median income.

2. Supplemental Nutrition Assistance Program (SNAP)
   - Eligibility: Households with an older adult or someone with a disability may qualify if their income is less than 200% of the Federal Poverty Level (FPL).

Therefore, both LIHEAP and SNAP are capable of verifying and qualifying income eligibility of individuals seeking assistance from SFA programs.

The Rhode Island Coalition will continue to explore additional federal programs that can verify categorical eligibility as avenues for income verification during the 1-year program planning period and will update this section as needed.

**Introduction**

**Section 1: Project Description**

**1.1 Overview**

The Rhode Island coalition of applicants is proposing the launch and expansion of a comprehensive suite of six financial assistance programs and twelve project deployment technical assistance initiatives designed to equitably address barriers to solar adoption in Rhode Island's low-income and disadvantaged communities. All financial assistance programs are tailored to defray specific

1

and longstanding financial barriers to solar adoption while addressing the needs of low-income renters and homeowners. Financial assistance programs proposed specifically deliver meaningful benefits of reliable solar power directly to RI's most historically underserved communities through low-income and DAC-specific eligibility requirements. The following programs are numbered in the below summary table.

NOTE: Program 1 received approval from EPA to be removed from the application. Programs 2 through 7 were NOT renumbered to account for this change. There is no longer a "program 1" in this workplan.

| Rhode Island Financial Assistance Programs | | Residential Solar Program Type |
|---|---|---|
| Program 2 | Low-Income Residential Solar Direct Ownership Adder | Rooftop single family |
| Program 3 | Low-Income & DAC Roof and Electrical System Adder | Enabling upgrades |
| Program 4 | Low-Income/DAC Residential Energy Storage Adder | Associated Storage |
| Program 5 | Affordable Housing Solar Supplemental Program (AHSSP) | Multifamily |
| Program 6 | Community Remote Net Metering (CRNM) | Community Solar |
| Program 7 | Community Solar on Preferred Sites | Community Solar |

*REF "Adder" Expansions (Programs 2, 3, and 4)*: Delivers upfront grants for rooftop solar direct ownership, enabling upgrades, and associated storage. Programs 2 and 4 double existing adders for LIDAC residents, while Program 3 is an entirely new adder supporting enabling upgrades by mitigating longstanding barriers to solar adoption in RI's oldest homes. These adders can all be paired with each other and applied directly to total project costs, reducing the burden of upfront investment. Upfront grants that directly reduce total project costs enable LIDAC households to own their own system and build wealth in communities that have historically been underserved by RI's ratepayer funded grant programs.

*Affordable Housing Solar Supplemental Program (Program 5)*: a milestone-based grant program that delivers meaningful solar benefits to energy efficient multifamily housing for low-income tenants and homeowners. Projects can include new construction as well as deep retrofitted housing.

*Community Remote Net Metering (Program 6):* a milestone-based grant program that will facilitate the ~20MW statutory expansion of RI's community solar program to a total of 50MW, reducing ratepayer costs for the implementation of CRNM. Meaningful benefits will be delivered to over 2,658 additional customers through low-commitment subscription models.

*Community Solar on Preferred Sites (Program 7)*: A milestone-based grant program which will further enable funding options for community solar on public "preferred sites", while emphasizing the importance of energy resilience for DAC-serving critical facilities.

**1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**

**Environmental Results - Outputs and Outcomes:**

**The following outputs/outcomes are based ONLY on new solar generation.**

| Table 1: Rhode Island's Output and Outcome Targets for Financial Assistance Programs | | | | | |
|---|---|---|---|---|---|
| Program name | Capacity Deployed | Households Served | Absolute Household Savings | Federal Funding per household | $CO_2$ Emissions avoided |
| Low-Income Direct Ownership Adder | 1.54 MW | 271 | $13,223,851 | $3,688 | 32,000 |
| Roof and Electrical System Adder | N/A | 1,478 | N/A | $2,500-$20,000 | N/A |
| Low-income Energy Storage Adder | 2.69 MWh | 125 | $1,292,156 | $2,000 | 4,200 |
| AHSSP (Multifamily) | 1.7 MW | 693 | $9,993,047 | $5,339 | 35,250 |
| CRNM | 24.25 MW | 2,658 | $23,968,299 | $11,286 | 435,077 |
| **TOTAL** | 27.49 MW, 2.69 MWh | 5,225 | $48,477,353 | | 506,527 |

**Outcomes related to workforce development are detailed on page 10.**

**Linkage to U.S. EPA's Strategic Goals:**
This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

**Section 2:  Project Design Plan**

**2.1 Activities to be Conducted.**

**Meaningful Benefit Plan**

Low–Income Direct Purchase Adder (Program 2):
Program 2 will provide energy savings, access, and ownership through upfront grant payments. This will enable the adoption of on-site solar for households who wish to procure their own power and offset as much of their electric load as possible. Once installed, behind-the-meter solar adequately sized to historic usage will offset close to 100% of electric demand, resulting in significant bill reductions far beyond the 20% household savings target.

Program 2 Activities to be Completed for the Meaningful Benefits Plan:

1. Activities needed to guarantee 20% savings:
   a. Activities necessary to achieve 20% bill savings are outlined in the financial assistance strategy section on page 12 as guaranteeing minimum savings is a program design and implementation parameter to be finalized during the 1-year program planning period. Once the program is launched, behind-the-meter solar adequately sized to historic usage will offset close to 100% of electric demand, resulting in significant bill reductions far beyond the 20% household savings target.
2. Activities to increase LIDAC Access:
   a. Activities to increase LIDAC access to program 2 are detailed in the Equitable Access and Meaningful Involvement Plan section on page 25.
3. Activities that increase household or grid resilience:
   a. Creation of outreach materials that encourage the braiding of REF adders: namely, promoting program 4 for energy storage in tandem with program 2, as Program 4 can only be utilized with solar plus energy storage installations.
   b. Additional activities that increase household resilience are outlined in the educational and outreach strategies detailed in the Equitable Access and Meaningful Involvement Plan section of this document on page 25.
   c. Launch Program 2 (also listed in FA section): program implementation improves household resilience as BTM solar protects from energy price volatility via net metering direct ownership models.
4. Facilitate ownership models that support wealth building / community ownership.
   a. REF's Minimum Technical Requirements already include robust quality assurance measures through mandatory inspections for systems that receive a grant. Quality assurance inspections help build wealth in communities by raising property values and reducing opportunity for costly maintenance or repairs.
   b. Launch program 2 (also listed in FA section): Directly facilitate wealth building ownership models via program launch.

Roof and Electrical Systems Adder (Program 3):
Program 3 will expand access to solar through upfront grant payments by enabling the adoption of on-site solar for households that cannot afford the upfront costs of roof or electrical panel replacements. When adequately sized to historic usage, low-income direct ownership of PV will offset close to 100% of electric demand, resulting in significant bill reductions far beyond the 20% household savings target.

Program 3 Activities to be Completed for the Meaningful Benefits Plan:
1. Activities needed to guarantee 20% savings: -- N/A
   a. As a program geared specifically towards enabling upgrades, this criterion is not applicable because this program is an "adder" which MUST be paired with the REF direct ownership adder and can be paired with all adders simultaneously. This adder MUST be paired with the direct purchase of a solar system, where the 20% savings are experienced. There is a trade-off between Enabling upgrades serving as

4

a necessary component to achieve 20% bill savings. This program enables those savings to be achieved via all other REF programs (1-4).

2. Activities to increase LIDAC Access:
   a. Activities to increase LIDAC access to program 3 are detailed in the Equitable Access and Meaningful Involvement Plan section on page 25 as community engagement work accomplishes this deliverable.

3. Activities that increase household or grid resilience:
   a. Activities necessary to increase household and grid resilience are outlined in the financial assistance strategy section on page 12 as increased resiliency is an outcome resulting from program design and implementation parameters, which will be finalized during the 1-year program planning period.
   b. Quality Assurance Activities: Please cross reference activities pertaining to quality assurance inspections in the Equitable Access and Meaningful Involvement Plan section on page 32 as quality assurance (QA) can play a crucial role in building household resilience by ensuring that products, services, and systems are reliable, safe, and effective.
   c. Launch Program 3 (also listed in FA strategy): Electrical component improves household safety and resilience.

4. Facilitate ownership models that support wealth building.
   a. Launch Program 3 (also listed in FA strategy): Program implementation directly facilitates wealth building.
      i. See additional activities pertaining to program launch in the financial assistance strategy on page 12.
   b. REF's Minimum Technical Requirements already include robust quality assurance measures through mandatory inspections for systems that receive a grant. Quality assurance inspections help build wealth in communities by raising property values and reducing opportunity for costly maintenance or repairs.

Low-Income/DAC Energy Storage Adder Expansion (Program 4):
Program 4 will enable the adoption of energy storage paired with on-site solar. By offering energy storage paired with solar to communities with frequent history of outages, the grid resilience benefits delivered directly to disadvantaged households can directly improve the reliability of electric service during major storm events.

Per the REF rules and regulations, the energy storage adder funded through this program MUST be deployed in conjunction with and connected to an eligible residential-serving solar project receiving financial assistance from the program. This is because it is an "adder" program. The storage must be sited on residential LIDAC property in conjunction with the solar system. The specific siting of these resources will be determined as applications are submitted to the REF for PV-paired projects.

Program 4 Activities to be Completed for the Meaningful Benefits Plan:
1. Activities needed to guarantee 20% savings:

      a. Develop strategy for reporting plan to calculate household savings for PV paired storage and methodology to quantify resiliency benefits.

      b. Additional Activities necessary to achieve 20% bill savings are outlined in the financial assistance strategy section on page 12 as guaranteeing minimum savings is a program design and implementation parameter that will be finalized during the 1-year program planning period.

2. Activities to increase LIDAC Access:

      a. Activities to increase LIDAC access for program 4 are detailed in the Equitable Access and Meaningful Involvement Plan section on page 25. Community engagement work accomplishes this deliverable.

3. Activities that increase household or grid resilience:

      a. Explore the feasibility of RI Energy's Connected Solutions Demand Response Program as an alternative revenue source for DACs facing most frequent history of outages.

      b. Meet with Energy Hub (administrators of RI Energy's Demand Response Program, Connected Solutions)

      c. Conduct educational Energy Storage and Resilience 101 listening sessions in census tracts in RI facing most frequent history of outages.

4. Facilitate ownership models that support wealth building / community ownership.

      a. Launch Program 4 (also in FA section): Program implementation directly facilitates wealth building.

            i. See additional activities pertaining to program launch in the financial assistance strategy on page 12.

      b. REF's Minimum Technical Requirements already include robust quality assurance measures through mandatory inspections for systems that receive a grant. Quality assurance inspections help build wealth in communities by raising property values and reducing opportunity for costly maintenance or repairs.

How the program intends to limit risk to communities when ownership pathways are offered:
All 3 REF programs directly support ownership pathways for LIDAC community members. These grant programs limit risk to communities in the following ways:

- Grants and Subsidies: Providing upfront grants, rebates, or subsidies can reduce the financial burden for low-income households, limiting their financial exposure and making it easier to afford solar installations by limiting the risk associated with taking the financial leap for a direct purchase system.

- Financial Literacy and Energy Education: The education and outreach strategy articulated in the Equitable Access and Meaningful Involvement Plan can include education on financial planning, energy savings, and the long-term benefits and responsibilities of solar ownership, helping participants make informed decisions.

- Consumer Protections: Enforcing clear, fair, and transparent contracts, along with dispute resolution mechanisms, can protect low-income consumers from predatory practices.

- Option to Purchase: Participants can be given the option to purchase the system at a reduced cost after a certain period. All of the adder programs with the REF are designed to be for customers who own the solar system.

6

Affordable Housing Supplemental Solar Program (AHSSP):

At least 50% of the net value of the net metered credits achieved with the addition of solar to affordable housing will be required to benefit low-income tenants. These approaches will include direct reduction or rebates of tenant rents; establishment of increased operating or replacement reserves of the property; provision of free or reduced-cost high-speed internet access for the residents; provision of social service programs, such as job training or financial literacy programs, to the tenants; installation of additional energy-savings programs for the property, and other similar initiatives. Will require developers to identify the benefits they intend to utilize to meet these requirements. This program will be designed during the 1-year program planning period. Additional activities related to program design are included in the Financial Assistance Strategy. These additional activities will also include recognition of unintended consequences such as increased costs to tenants and ensuring that tenants benefit from electricity savings that the building might realize through solar adoption. It will also include ways to provide landlord encouragement to undertake energy efficiency measures before installing solar on the property.

Program 5 Activities to be Completed for the Meaningful Benefits Plan:
1. Activities needed to guarantee 20% savings during 1-year program planning period:
    a. Develop and refine 20% household savings calculation, after EPA releases savings guidance, for tenants who receive financial benefit.
    b. Develop and refine 20% household savings guidance and calculations for "non-financial benefit" tenants, for 20% household savings during the 1-year program planning period.
2. Activities to increase LIDAC Access:
    a. Activities to increase LIDAC access for Program 5 are detailed in the equitable Access and Meaningful Involvement Plan section on page 25.
    b. Additional activities related to program design and implementation can be found in the financial assistance strategy section on page 14.
3. Activities that increase household or grid resilience during 1-year planning period:
    a. Protection from energy price volatility via net metering direct ownership models
    b. Explore the inclusion of CRNM subscriptions for tenants that pay their own electricity bills.
    c. Explore leveraging energy storage programs into AHSSP program design.
    d. OER will explore additional activities necessary to increase household and grid resilience in AHSSP program design.

Community Remote Net Metering (CRNM – Program 6):

Program 6 will require and guarantee that community solar facilities structure their subscription models such that the annual direct bill savings resulting from a subscription is equal to or greater than 20% of the household's electric bill. These subscription models will include no sign-up fees, no cancellation fees, no credit checks, and equitable verification and sign-up processes. Program design for CRNM will take place during the 1-year program planning period, and additional activities related to program design are included in the Financial Assistance Strategy.

Program 6 Activities to be Completed for the Meaningful Benefits Plan:

1. Activities needed to guarantee 20% savings **during 1-year program planning period:**
   a. Incorporate household savings into CRNM program design.
   b. Meet with Rhode Island Energy about CRNM program design.
   c. Develop plan to include LIHEAP funds for community solar in CRNM program design.
2. Activities to increase LIDAC Access **during 1-year program planning period:**
   a. File CRNM docket with public utilities commission and participate in regulatory process.
   b. Facilitate public meetings about community solar education and CRNM Program Design
   c. facilitate educational workshops for low-income customers about regulatory process.
   d. Develop stakeholder plan with Center for Justice for CRNM regulatory proceedings.
   e. Meeting with community solar developers and subscriber management companies about CRNM regulatory filing, current subscription offerings and contract terms
   f. Meeting with DOE Clean Energy Connector team to assess viability of participating as pilot state.
   g. Sign Clean Energy Connector Partnership agreement and submit to DOE.
   h. Formally join DOE on connector project as a pilot state
   i. Facilitate regular meetings with LIHEAP to coordinate RI Participation in connector.
3. Activities that increase household or grid resilience: N/A: since the residential-serving community solar project is not owned or located the property of a LIDAC electric customer, this criterion is non-applicable.

Rhode Island Infrastructure Bank (RIIB) Funding Preferred Sites (Program 7):
Projects funded through RIIB's DAC-focused grant program for Community Solar on Preferred Sites would be a part of the total 20MW expansion of the low-income-focused CRNM program as described above. Via subscription models, meaningful benefits deliver a minimum of 20% household savings threshold by requiring that participating community solar facilities structure their subscription models such that the annual direct bill savings resulting from a subscription is equal to or greater than 20% of the household's electric bill prior to accounting for CRNM bill credits. Funding will be sub awarded to RIIB, who will manage the program and provide technical assistance as discussed in the Project Deployment TA section below) necessary to implement the community solar project. To design the program, the Bank is engaging its financial advisory and underwriting firms to establish program terms and consulting its technical advisors to establish program parameters for energy cost savings. The Bank's activities to establish a grant program will span four months and the Bank estimates the timespan to review applications and make project awards will span eight weeks.

Program 7 Activities to be Completed for the Meaningful Benefits Plan:
1. Activities needed to guarantee 20% savings:
   a. Determine baseline energy cost burden averages with OER and the utility.
   b. Development of Project Summary Form: which will allow applicants to conduct a cost savings analysis with the Bank's technical partner. The Bank's technical partner,

8

      in partnership with the utility, will review two years' worth of utility bills to establish baseline energy data from which the savings analysis will be performed.

2. Activities to increase LIDAC Access:
   a. Develop framework for prioritizing applicants located 100% within or that serve 100% of Low Income and Disadvantaged Communities
   b. Facilitate two community information sessions per project with program participants.
   c. RIIB will collect information from program participants tallying community outreach and LIDAC enrollment.
   d. RIIB plans to report continual benefits from program participants including cost savings, number of households located within LIDACs impacted, and annual emissions avoided.
3. Activities that increase household or grid resilience:
   a. RIIB will require participating communities to participate in resilience-focused workshops provided by the Bank at no cost to develop and implement grid and infrastructure resiliency plans.
4. Other activities:
   a. OER will meet with RIIB and their legal team to determine whether RIIB rules and regulations need to be updated to include new technical assistance/grant program.

Investing in Quality Jobs and Businesses (meaningful benefits criteria 5):
The Rhode Island AFL-CIO will leverage their members' expertise and existing partnerships with the Rhode Island Department of Labor and Training (DLT) to identify and establish equitable pathways to the kinds of family-sustaining good-paying clean energy careers illustrated in this application for disadvantaged communities. The Rhode Island AFL-CIO will dedicate staff time and resources to provide technical assistance towards workforce development best practices through registered pre-apprenticeship and apprenticeship utilization, community benefits agreements, project labor agreements, career readiness curriculum, and intake. OER will work with the Rhode Island AFL-CIO to create a work plan and hold regular check-in meetings with staff and stakeholders.

OER will coordinate with RI DLT's Real Jobs Rhode Island (RJRI) platform team to determine which communities will be the primary focus of programming and will then assess which of the members of the CBO advisory committee provide services within those areas.

OER will leverage the longstanding partnership with Building Futures Rhode Island to recruit low-income members of affected communities to participate in training. RJRI and Building Futures will create a pathway to a registered apprenticeship as an electrician for between 150-200 individuals from DACs. It is expected that the specific budget identified, and work proposed by RI DLT through Solar for All will result in 75-100 new electricians.

OER commits to adhering to the US Department of Labor and Commerce Good Job Principles. During the planning year, OER will work with workforce stakeholders on program details and reporting criteria to ensure that the Building Futures RI program, funded through SFA, will interact with the projects funded by SFA. Additionally, OER will work with the REF, RI Housing and RIIB to

ensure the Good Job Principals are included in program design. Adherence to the principles will ensure that Building Futures graduates are able to pursue to high-quality jobs in SFA programs.

Workforce Development Milestones to be Completed for the Meaningful Benefits Plan **During 1-year Planning Period:**

  a. Milestone 1: DLT to create workforce participation plan through Real Jobs RI. The design will include how DLT plans to ensure that the RJRI program will align with SFA funded programs and how RJRI program participants will receive high quality jobs at the conclusion of their participation.
  b. Milestone 2: OER to develop cadence of meetings with DLT, the RJRI platform team, RIIB, REF, and RI Housing to discuss inclusion of the US Department of Labor and Commerce Good Jobs Principals, develop a plan for tracking workforce participation in SFA funded programs, and design reporting criteria.
  c. Milestone 3: OER will coordinate with the RJRI team to determine which communities will be the primary focus of programming, ensure that all identified areas are in the SFA specified locations, and will then assess which of the members of the CBO advisory committee provide services within those areas specific to SFA.
  d. Milestone 4: OER/AFL-CIO development of workplan for workforce development for SFA Program Period
  e. Milestone 5: OER to complete 2024 Clean Energy Jobs Report
  f. Milestone 6: Meet with workforce development partners to discuss timeline and action items for implementation.

**Financial Assistance Strategy**

**The percent of award used for financial assistance is 88% as indicated in the budget. Accounting for the $400,000 of EPA Technical Assistance, the percentage of award goes down to 87%.**

**Expansion of Renewable Energy Fund (REF) Residential Programs to include LIDAC "Adders" for Solar Direct Purchase, Energy Storage, and Enabling Upgrades:**

Commerce RI's Renewable Energy Fund (REF) exists to help expand the role of renewable energy throughout Rhode Island. REF has two long standing grant programs (small and commercial-scale grant programs) which support the installation of net-metered solar on residential and commercial buildings. The REF also has existing adders for energy storage-paired systems and carport solar projects. The **addition of new adders to REF's Residential Programs will be administered by REF, via subawards.**

REF is funded using ratepayer dollars, alternative compliance payments, and RGGI, meaning that grant payments are not given directly to the end user. Installers apply to REF on behalf of a customer, the grant is awarded to the installer, and the installer will then leverage the grant awards to directly reduce the cost of a solar project. The REF requires copies of all contracts between the customer and installer, ensuring that the grant amount is passed through to the customer. **The consumer protections for this process are incorporated into the Minimum Technical Requirements that applicants must follow in order to receive a grant.**

**Once sub awarded, REF** will expand their existing adder offerings to include three new LIDAC-specific adders, specifically designed to be added onto the existing market-rate base incentive of .65 cents/watt, up to 7.69kW or $5,000 max incentive amount for non-LIDAC customers. While the base incentive amount may change over the course of the five-year SFA program, the existing REF programs are expected to continue until 2029.  The addition of the three adders below will improve opportunities for wealth building by reducing upfront project cost in the following ways:

- Program 2: Adder to the small-scale program for direct ownership for low-income homeowners, providing additional funding to support the upfront cost of a customer owned PV system. While a market rate customer can receive up to $5,000 for a residential project, a LIDAC customer could receive up to $10,000 in reduced project cost for the same solar project.
- Program 3: Adder to the small-scale programs for roof and electrical system upgrades for low-income homeowners and multifamily housing projects
- Program 4: Expansion of the small-scale energy storage adder for low-income solar customers and the commercial scale energy storage adder for multifamily housing. While a market rate customer can receive $2,000 for a residential project, a LIDAC customer could receive an additional $2,000 in funding, totaling $4,000 in reduced project cost for a solar project paired with storage.

**Residential Solar Low Income Direct Ownership Adder (program 2):**
The adder will double the small-scale incentive for qualifying LI customers by creating an adder of .65/watt for eligible small scale direct purchase customers. Customers will be able to receive a maximum grant amount of $10,000 for system sizes 7.69kW and higher. This adder will help reduce the upfront cost of the solar system, reducing the remaining cost that may be financed. Will cap financing fees for projects utilizing the adder at a fixed percentage that will be determined based on stakeholder input.  Will work to streamline the reporting of this data and will not allow a project to utilize this adder if the fee percentage is greater than the final determined financing percentage of the total project cost. Examples of tiered incentive structure provided in the original application are provided in Table 3:

| Table 3: Sample System Size Ranges | | | |
|---|---|---|---|
| System Size | Base Incentive | LI Adder | Total |
| 4kW | $  2,600.00 | $  2,600.00 | $  5,200.00 |
| 6kW | $  3,900.00 | $  3,900.00 | $  7,800.00 |
| 7.5kW | $  4,875.00 | $  4,875.00 | $  9,750.00 |
| 8kW | $  5,000.00 | $  5,000.00 | $ 10,000.00 |

**Roof and Electrical System Adder (program 3):**
REF will provide adders to the Residential and LIDAC multifamily housing program (specifically, programs 2, 4, and 5 in the application) for knob and tube wiring replacement, electrical panel upgrades, structural upgrades and roof replacement. The current share of financial assistance for enabling upgrades is 13.5%, which is well within the 20% threshold for the lifetime of the program. OER has done due diligence to explore other sources of funding but enabling upgrades and pre-weatherization barriers have been a longstanding challenge for locating sources of funding to

address non-generational assets that are not tied directly to energy savings calculations. OER staff have spoken with program directors, OER's CFO, and other state agencies to explore financial avenues for this funding, and OER believes the opportunity to fund enabling upgrades would not exist without this federal funding. OER remains committed to exploring opportunities to braid funding for enabling upgrades with the funding received from the Inflation Reduction Act's Home Energy Rebate Programs, when awarded. While the timelines for each program are still incongruent, this will be addressed during the 1-year program planning period. The adders may be bundled in any combination if a home needs to address multiple issues. To qualify for any of these adders, a quote from a licensed electrician and/or roofing company must be submitted with the REF solar application. These adders will be a capped if the cost for any of the upgrades is less than the max adder amount.  REF will require several application and completion components to ensure the adder funds are appropriately dispersed and to prevent fraud.

Examples of incentive structure provided in the original application are provided below:

| Table 4: Roof and Electrical Upgrade Adder, Type vs. Amount | |
|---|---|
| Enabling Upgrade Adder | Maximum Amount |
| Knob and tube wiring replacement, single family | $     15,000.00 |
| Knob and tube wiring replacement, triple decker | $     45,000.00 |
| Electrical Panel upgrade | $      2,500.00 |
| Structural upgrades and roof replacement | $     20,000.00 |

**Expansion of Energy Storage Adder (program 4):**
Program 4 will provide funding to continue the small-scale energy storage adder for systems paired with solar. REF will offer an additional $2,000 flat rate adder to qualifying low-income customers who wish to pair an energy storage system with either a leased or direct purchase PV system. This will bring the total energy storage incentive for a residential low-income customer to $4,000. The average cost of a battery system that went through the REF in 2023 was $22,036 and it is expected that the additional incentive will reduce the cost of an average RI battery storage system by 18.15%.

REF Small Scale energy storage adders work in conjunction with the Rhode Island Energy (RIE) Connected Solutions program, run through the utility's energy efficiency program. Income-eligible Customers utilizing the low-income energy storage adder will be encouraged to apply through Connected Solutions and utilize the 0% Heat Loan to receive no interest financing, allowing customers to pay back the cost of the battery on their monthly electricity bill.  Please reference page 17 under the Energy Storage Incentive Analysis section for additional information on recent changes to the Connected Solutions program.

REF "ADDER" PROGRAM FA ACTIVITIES TO BE COMPLETED FOR PROGRAMS 2, 3 AND 4 (design incentive structure and launch program):

1. Facilitating launch of REF application portal prior to adding programmatic funding
    a. Finalize beta testing for existing REF program "test users."
    b. Meet with REF vendor to discuss changes to portal for the SFA programs.
    c. REF Vendor to make changes to the portal for Programs 2, 3, and 4

      d. REF Vendor to beta test new programs in the portal with "test users"
      e. Finalize portal for new REF programs.

2. Develop and release survey to solar and battery storage RI market participants to gain feedback on rightsizing incentives.
3. Develop REF Adder application forms and integrating application forms into portal design.
4. Determine list of required attachments to be submitted with program applications for programs 2, 3 and 4.
5. Develop REF Adder completion documents and integrate application forms into portal design.
6. Release REF Adder application documents and completion documents for public comment for stakeholder feedback
7. Present program design to solar stakeholders for review and comment
8. Update REF application portal to include capabilities for new SFA "adder" programs.
9. Subaward to REF to launch program 2: LIDAC Direct Ownership Adder
10. Subaward to REF to launch program 3: Roof and Electrical Systems Upgrade Adder
11. Subaward to REF to launch program 4: LIDAC Energy Storage Adder
12. Subaward to REF to update their website with existing program materials and links for new "adder" programs' launch.
13. Incorporate Solar for All funding into REF Annual Report
14. Coordinate with REF to implement program design of Roof and Electrical System Adder Program (program 3)
15. Coordinate with REF to hire a full-time employee responsible for SFA program management.
16. Create internal REF program process for adder intake and completion processing.
17. Develop OER/REF reporting framework to monitor adder funds awarded and expended.
18. Update the REF completion documents and review process for Commerce Accounting and Legal teams.
19. Update REF small scale program guidance document
20. Create new flyers that encourage the braiding of REF Adder programs for best return on investment.
21. Update REF website with new, final program documents and process guide
22. Statutorily extend the expiration date of the REF beyond 2029
23. Update the REF Rules and Regulations

**Affordable Housing Solar Supplemental Program (AHSSP – program 5):**
OER will provide grant funding through RI Housing to eligible affordable housing developments to offset the cost of net metered solar as well as battery storage systems. Several partners work with RI Housing (including OER, RIE, and their vendor for energy efficiency zero energy programs) which provides funding for the design and construction of net zero housing affordable to low-income tenants and homeowners. Projects can include new construction as well as deep retrofitted housing. To expand the opportunity for more affordable housing to get closer to net zero RI Housing will create this new supplemental solar grant program (the AHSSP), which will be specifically designed to close those financing gaps for installing solar systems on affordable developments. Eligible projects must meet required criteria.

13

RI Housing worked with the National Housing Trust to develop a report on "Advancing Renewable Energy in Rhode Island Affordable Housing", which was published in March 2024. The report details several policy and programmatic activities RI Housing should consider adopting over the next few years. It also identifies barriers to the utilization of renewable energy in affordable housing, best practices to advance solar adoption, and a robust recommendations section. OER and RI Housing have met multiple times in the last few months to discuss the recommendations in the report and more technical assistance is needed to address the barriers outlined in the report. One of the notable findings from the report was that most stakeholders indicated that a lack of technical assistance and access to information created barriers to deploying renewable energy at affordable housing sites. Specifically, developers identified three technical assistance and education needs:

1. Finding easily accessible information about Rhode Island's renewable energy incentives, including help understanding net metering options.
2. Access to information about Inflation Reduction Act (IRA) resources and support in understanding how resources, especially clean energy tax credits, can be incorporated into project financing.
3. Assistance in designing and deploying solar facilities, including identifying reputable contractors (with experience in the affordable and multifamily sectors).

It will be important for OER and RI Housing to identify a path forward to address these needs and other barriers addressed in the report during the program planning year for development of the AHSSP program.

ASSHP ACTIVITIES TO BE COMPLETED FOR THE FINANCIAL ASSISTANCE STRATEGY During 1-year program planning period (design incentive structure and launch program):
1. Coordinate with RI Housing to finalize and implement program design of AHSSP (program 5)
2. Explore possibility to incorporate technical assistance offerings in ASSHP for solar installations on affordable housing.
3. Explore technical assistance recommendations in HUD Tenant guidance.
4. Determine methodology to braid RI Housing funds with RGGI and SFA funding necessary to implement full scope of ZEOS program redesign.
5. Plan to refine any subsidies with input from industry:
   a. OER and RI Housing to issue Request for Information (RFI) to gain input from industry on tiered incentive structure.
   b. Explore options beyond ZEOS offerings for new construction AND existing building modifications/rehab.
   c. Establish file management system with RI Housing to ensure seamless communication for program design, implementation and reporting.

Community Remote Net Metering (CRNM):

OER will create a milestone-based grant program to community solar projects to reduce ratepayer costs for the implementation of CRNM. On June 24, 2023, SB-684A[1] was signed into law by Governor McKee. This new law, among other provisions, requires the OER to redesign the Community Remote Net Metering (CRNM) program, and mandates that at least 50% of the output from a CRNM project must be allocated to low-income residents or residents living in a disadvantaged or environmental justice community. The redesigned CRNM program would be structured as a 20 MW, program and would cap any new CRNM project to 5MWs or less. CRNM projects, per the law, may only be developed in Rhode Island Energy's distribution network, which covers approximately 98% of Rhode Island electricity customers.

Per the new law, OER must file a program proposal and associated benefit cost analysis with the Rhode Island Public Utilities Commission (PUC), which would then issue a ruling either approving, approving with modifications, or denying the program proposal based in part on the findings of such benefit-cost analysis. More stakeholder input, especially from low-income constituents, will be sought prior to this docket being filed. Low-income participation through participatory governance is an activity to be funded under this grant and was included in the original amount budgeted for community engagement. Please reference the participatory governance section of the Project Deployment Technical Assistance Strategy on page 29 for additional detail about our coalition partner, Center for Justice, and their involvement in LIDAC regulatory inclusion.

OER has experience with low income and CBO stakeholder engagement specific to community solar from prior attempts to expand the CRNM program. Notably, OER was a recipient of technical assistance from the first round of the National Community Solar Partnership. However, that was several years ago and there are likely new stakeholders and CBOs we will need to engage. Many stakeholders do not have experience with the regulatory process, and it will be critical to ensure that they have a voice, both before and during the docket proceeding.

One other important stakeholder group that OER will need to engage are community solar developers and subscriber management companies. Since the existing CRNM program reached capacity four years ago, most, if not all, have left the RI market and are not engaged. A serious effort will be needed to ensure that once additional community solar capacity is available, that developers will be interested in building projects.

Lastly, it is expected that more CRNM projects will be built on existing infrastructure, such as roofs and parking lots rather than greenfield spaces. Municipalities may also be interested in hosting a community solar project on behalf of their residents. OER and other program partners will need to engage buildings owners and municipalities to help identify suitable locations for projects.

It is expected that the CRNM program would function under a subscription-based community solar model, with a third party owning the solar facilities, and recruiting the relevant subscribers. This structure allows for direct bill credit savings that meet or exceed the 20% SFA threshold target based upon the delta between what customers would pay in subscription fees to the CRNM project owner and the retail cost of electric service without a CRNM subscription. When municipalities express interest in hosting a CRNM project on municipal owned property, OER and

---

[1] S0684A.pdf (rilegislature.gov)

RIIB will provide technical assistance to help them navigate the complexities of the program as well as assistance exploring how to take advantage of Direct Pay opportunities.

CRNM and DOE's Clean Energy Connector: Rhode Island is close to finalizing a partnership with the US Department of Energy (DOE) and National Renewable Energy Laboratories (NREL) as a pilot state for the Clean Energy Connector tool, which allows LIHEAP customers to be connected directly with community solar subscription fees. DOE and NREL are able to take on no more than 5 pilot states in 2025 and OER has been ambitious to sign on as a pilot state.  This tool ensures strong consumer protections for community solar from enrollment through the life of the program, safeguarding consumer data, and providing customers with comprehensive and clear communication and disclosures about community solar. The Clean Energy Connector mandates a minimum 20% savings requirement for subscribed households and reduces the burden of income verification through LIHEAP. RI's involvement with the connector will help strengthen the case for LIDAC inclusion and engagement with community solar during the CRNM docket filing and will play an important role in the design of LIDAC inclusion in the CRNM program design. Currently, LIDAC community solar subscribers in RI make up only 5% of the total subscribers in the state utilizing community solar. The enabling legislation that expanded community solar mandates a minimum of 50% LIDAC uptake. The connector serves as a valuable nexus in closing the gap between community solar protections, education, and 20% bill savings.

Rhode Island has only one investor-owned  utility that the CRNM law applies to.  As a result, any new or existing community solar customers participating in the CRNM program will be able to move almost anywhere in the state, in Rhode Island Energy's territory, and be able to move their subscription with them.  As OER continues to work with DOE on the Clean Energy Connector, the process with Rhode Island Energy for moving a CRNM subscription to a different electricity account will be created and published on the Community Solar Marketplace Website.  The process for moving will also take into account any LIHEAP or other income eligible discounts the customer may receive at the time they move.

CRNM ACTIVITIES TO BE COMPLETED FOR THE FINANCIAL ASSISTANCE STRATEGY (design incentive structure and launch program):
1. Review program design parameters from neighboring states with enabling legislation to learn best practices for program design.
2. Design milestone-based incentive structure for CRNM
3. Go out for public comment on first draft of CRNM program.
4. Explore avenues to gain input from developer industry on attracting community solar installers back to RI.
5. Engage developers on benefits of DOE Clean Energy Connector
6. File CRNM docket with the PUC and participate in the regulatory process.
   a. Activity 1: Meet with RIE about CRNM program design.
   b. Activity 2: Develop stakeholder plan with Center for Justice for CRNM Regulatory Proceedings
   c. Activity 3: Hold 3 meetings with community solar developers and subscriber management companies about CRNM regulatory filing.

Funding Publicly Owned Community Solar Projects on Preferred Sites (Program 7):
Program 7 will establish a milestone-based grant program managed by the Rhode Island Infrastructure Bank (RIIB) for public entities to install host-owned residential-serving community solar projects on preferred sites. The law defines preferred sites as a location for a renewable energy system that has had prior development, including, but not limited to, landfills, gravel pits and quarries, highway and major road median strips, brownfields, superfund sites, parking lots or sites that are designated appropriate for carports, and all rooftops including, but not limited to, residential, commercial, industrial, and municipal buildings. This is a grant program for public entities supplemented by technical assistance. The sites for these projects may be owned by municipalities and quasi-public agencies.

RIIB will incorporate community buy-in during the siting process since siting community solar projects in underserved urban landscapes may be difficult. To promote this community component wherever possible, RIIB will prioritize community solar projects sited in DACs.

RIIB ACTIVITIES TO BE COMPLETED FOR THE FINANCIAL ASSISTANCE STRATEGY:
1. RIIB will refine planned grant subsidies with a project and solicitation scope, inclusion of technical assistance, and projected disbursement schedules. Additionally, the bank will dedicate staff resources for federal reporting requirements. To compensate for a smaller allocation to the program, the Bank will examine internal unallocated revenues to provide additional financial relief.

**Project-Deployment Technical Assistance Strategy**

**Energy Storage Incentive Analysis:**
On June 26th Governor McKee signed the 2024 Energy Storage Act (S-2499A)[2] into law, which created an energy storage target in the state for the first time. The goals are 90 MWs by 2026, 195 MWs by 2028 and 600 MWs by 2033. The law requires OER to work with one of our SFA program partners, RIIB, to develop programs to facilitate energy storage adoption, in addition to the current programs already offered. It also requires the PUC to engage stakeholders to adopt frameworks for both an energy storage tariff and an interconnection tariff for distribution system interconnection battery storage projects.

In 2024, Rhode Island Energy has made progress on educating stakeholders about battery storage interconnection processes including stand-alone batteries and solar with energy storage. In April 2024, OER invited Rhode Island Energy to present at a solar stakeholder meeting to provide education and information about the interconnection process to the RI solar industry. In July 2024, OER began public reporting on the number and location of energy storage projects in RIE's territory.[3] More work will be needed on energy storage reporting in the next six months, including: adding progress towards the goals, adding in additional data from other utilities, and the creation of a more refined definition for small, commercial, and utility scale battery projects.

---

[2] S2499A.pdf (rilegislature.gov)
[3] https://energy.ri.gov/renewable-energy/ris-clean-energy-portfolio

17

Earlier this year, RIE removed the Connected Solutions program from the energy efficiency program and included it is its own separate PUC filing under a System Reliability Procurement (SRP) for electric demand response.[4] The Connected Solutions Program offered a generous demand response incentive for customers who installed energy storage batteries and participated in peak load reduction events during the summer months. The proposal reduced the incentive from $400/kW for five years to $225kW for at least three years and $200/kW after five years. Since this was approved by the PUC in June 2024, it will be important for OER and its partners to be responsive to stakeholders about the impacts these changes will do to the current residential battery storage market.

To get a sense of the market's response to these changes, OER and the REF released a survey to residential battery storage installers to determine whether changes needed to be made to the REF's energy storage incentive currently offered to customers installing energy storage and solar projects. Currently the program does not provide incentives for stand-alone energy storage systems not tied with solar PV. There were eleven responses to the survey and all eleven indicated that because the SRP Connected Solutions changes were approved, the REF market rate energy storage incentive would need to increase. The survey also indicated strong support for a stand-alone battery incentive. While SFA funds will not be used to fund a stand-alone battery storage program, it will be important to work on addressing this industry identified need.

Program 4 focuses on the expansion of the existing REF energy storage adder and increasing the incentive amount to LIDAC residential customers. In order for program design to begin, OER and the REF need to undertake an analysis of the current battery storage market in Rhode Island. The analysis will provide three outcomes. The first will help inform OER on changes needed to the current REF energy storage adder incentive and right sizing the SFA energy storage adder. The second outcome will be to help design an energy storage incentive for affordable housing. Lastly, the third outcome is to determine what programmatic and policy changes OER and the REF should make to enhance or add to the existing energy storage program to help achieve the new energy storage goals.

Program 4 will also help with meeting the new energy storage goal included in the recently passed energy storage law. OER met with RIE utility planners at the end of September to discuss the plan for engaging with the PUC on the new energy storage tariff which was opened by the PUC on August 30, 2024.[5] OER also has a consultant (not funded through SFA) for assistance with the new energy storage docket. OER, our consultant, and RIE will work closely together over the next year while this docket is underway to ensure there is a clear path forward for energy storage projects to move forward in the state. The result of the docket process should be a clear and easy to understand process for interconnecting small scale, large scale, and utility scale batteries to the RIE distribution system.

OER will procure a consultant to perform an evaluation of the residential scale energy storage market to determine an appropriate incentive for a battery system paired with solar located on multifamily housing, community resiliency hubs, or public critical facility locations.

---

[4] https://ripuc.ri.gov/Docket-24-06-EE

[5] https://ripuc.ri.gov/Docket%20No.%202024-34-EL

ACTIVITIES TO BE CONDUCTED TO SUPPORT ENERGY STORGE INCENTIVE ANALYSIS:

1. Work with RIIB and the REF teams to develop a scope of work for the energy storage analysis.
2. OER will procure the energy storage analysis vendor through a competitive solicitation.
3. Complete procurement process and execute contract with the selected vendor.
4. Hold kickoff meeting with energy storage analysis vendor.
5. Complete scope of work with vendor to redesign the existing REF battery storage adder and design the SFA battery storage adder.
6. Conduct stakeholder review and comment opportunity on proposed on draft of final report.
7. Publish final report.
8. Meet with Rhode Island Energy to discuss streamlining the battery storage interconnection process.
9. Attend meetings and participate in the PUC-led stakeholder process to create the interconnection tariff for battery storage projects.
10. Attend meetings and participate in the PUC-led stakeholder process to create an energy storage incentive tariff.
11. Attend energy-storage focused conferences to learn from other states with more advanced energy storage policies.
12. Continue to update the energy storage tracker towards the state goal.

**Updates to the RI Community Solar Marketplace:**

OER maintains the RI Community Solar Marketplace website which serves as a critical forum for community solar education and stakeholder engagement. There are several updates that must be completed to prepare for the upcoming docket filing, additional stakeholder engagement, development of new FAQs, and updated metrics. The SFA funding will be used to provide the backend site design work and changes to the layout and metrics sections to ensure ease of public accessibility. Funds will also be used to translate sections of the website into other languages as well as training for staff members to make edits such as code changes, layout and formatting as well as content updates.

ACTIVITIES TO BE CONDUCTED TO SUPPORT MARKETPLACE UPDATES:

1. Renewal of contract with website vendor
2. Training full-time staff on back end of website
3. Regular meetings with renewable team staff to formulate website updates.
4. Coordination with developers doing business in the state to update current listings, using list of developers.
5. Update Low- and Moderate-Income (LMI) Customer Inclusion in the CRNM Program Plan section of the marketplace website,
6. Add a new section to the website focused on upcoming docket filing and additional stakeholder engagement.
7. Add section to the website to include community serving solar tour information.

**REF portal upgrades for new programs:**

REF is currently designing its new software platform funded, in part, through DOE's Scaling up Solar Initiative.  This new software platform will significantly improve the efficiency of program management efficiencies, communication between solar installers and REF. Including new adders in the REF's current suite of programs will require portal design and functionality that is not included in the current portal design. SFA funds will be used specifically for the support required to launch all the new REF-related programs proposed in this application.

ACTIVITIES TO BE CONDUCTED TO SUPPORT REF PORTAL UPGRADES during 1-year program planning period:
1. Conduct beta testing portal for functionality and quality control
2. REF to update application portal for new programs.
3. Additional activities related to supporting the launch of the REF portal upgrades is discussed in the financial assistance strategy section on page 12.

**REF Income Verification Consultant (5 years):**
OER will subaward funding to REF to procure a vendor to provide income verification services. Income verification is necessary to meet the geographic and income threshold requirements for SFA program participation.  All vendors that contract with the REF must receive Commerce Rhode Island Board approval. OER will leverage state assistance programs such as LIHEAP and SNAP wherever possible to ensure the reasonableness of costs associated with income verification.

ACTIVITIES TO BE CONDUCTED TO SUPPORT INCOME VERIFICATION CONSULTANT:
1. OER and REF teams to read Income Verification Strategies for Income-Based Solar Programs report published by LBNL (July 2024)
2. Create a list of vendors that do similar work.
3. Draft RFP for income verification consultant
4. Publish the RFP for income verification consultant.
5. Present selected vendor to Commerce Rhode Island Board
6. Contract with vendor and hold kick off meeting.
7. Develop and publish process and procedure for income verification for stakeholder awareness.

**Workforce Development:**
Climate Jobs Rhode Island (CJRI) is a coalition of more than 30 environmental organizations, labor unions, registered pre-apprenticeship and apprenticeship organizations, career readiness organizations, and community organizations that was established in 2021. While leveraging the expertise of its coalition partners, CJRI has been working with the DLT to forecast the needs of the clean energy workforce of the future and establishing pathways for people from frontline, disadvantaged communities to access family sustaining careers with good wages and benefits in the clean energy workforce. CJRI's collaboration with the DLT and other state agencies includes connecting the policy mechanisms with the right pathways to ensure that decarbonization projects enable the appropriate career pathways for people from disadvantaged communities.  CJRI currently has two staff members whose experience and knowledge include an ability to shape climate and workforce policy and programs in ways that ensure program implementation benefits working class people and people from disadvantaged communities. CJRI's coalition members provide expertise that enhance these skills, and the organization will soon add two additional staff

members in the beginning of 2024. SFA funds will NOT be used to support CJRI's administrative costs, including these two additional staff members. One staff person has been hired and the other will be hired in early 2025. The following activities will be funded by and conducted under this grant, with the exception of Activity 3 below:

ACTIVITIES TO BE CONDUCTED TO SUPPORT WORKFORCE DEVELOPMENT:
   a. Activity 1: RIDLT to create workforce participation plan through Real Jobs RI
   b. Activity 2: OER/AFL-CIO development of workplan for workforce development for SFA Program Period
   c. Activity 3: OER to complete 2024 Clean Energy Jobs Report, which will not be funded through SFA.
   d. Activity 4: Meet with workforce development partners to determine activities to be completed during 1-year planning period.
   e. Engage apprentices and journey workers from environmental justice communities, construction industry stakeholders, and representatives of community organizations.

**Translation Services (written and in-person):**
OER will procure a vendor to assist with translation services for both written materials and for in-person meetings. This vendor will need to provide staff to provide verbal translation services for languages identified by the community for in-person meetings, which may include stakeholder meetings related to community solar, solar 101s and other educational meetings, public meetings and docket proceedings. The vendor will also need to be able to provide translation of written materials which may include content from the Community Solar Marketplace website, marketing material, sample contracts and disclosures, and other material as needed.

ACTIVITIES TO BE CONDUCTED TO SUPPORT TRANSLATION SERVICES:
1. Post Language Translation RFP to state purchasing website.
2. Complete procurement process with vendor and enter into contract.
3. Kick-off meeting with translation services vendor to identify which events, print publication and digital marketing material will require real-time translation services.
4. **During 1-year planning period:**
   a. Identify contract manager on OER team.
   b. Hold check in meetings with vendor on a regular cadence.
   c. Develop contract management plan to cover entire scope of translation services across federal and non-federal funding sources.
   d. Determine how technical assistance offerings are incorporated into activities associated with chosen vendor.

**Renewable Ready Technical Assistance:**
OER, RIIB and RIDEM will collaborate on an initiative for municipalities and developers which may include, but is not limited to, the identification of locations subject to determined set of criteria, property owner information, estimates of renewable energy production capacity at the locations, and an estimate and impact study of any utility interconnection costs which may be required to connect the project. RIIB will manage a fund to provide financial assistance to reduce the site preparation and interconnection costs for renewable energy development projects on these

locations. In June 2024, the Rhode Island General Assembly passed SB-2293Aaa[6] which established the Renewable Ready Fund. The Fund, co-managed by OER and RIIB, will provide financial assistance to cover the costs of connecting a renewable energy generation project to the electric distribution system on eligible sites within LIDACs. The activities covered by this Fund include but are not limited to (1) installation of transformers and substations; (2) transmission facilitation; and (3) grid flexibility.

Partnership with Rhode Island Energy

The Renewable Ready law requires close coordination between OER, OER's consultant (not funded through SFA), and Rhode Island Energy on two projects related to siting:

1. The first is the identification of eligible sites. OER has been tasked with the creation of a list of locations in the state that:
    a. Is a current or former contaminated site as determined by the Department of Environmental Protection Management
    b. Is a property or a facility owned and/or managed by the State
    c. Is a rooftop of a public, municipal, or state-owned building
    d. Is a state property adjacent to a highway or major road
    e. Is owned by the electric distribution company and subject to the environmental response fund.

    In addition to the list of locations, OER must also include:
    a. A reasonable estimate of the renewable energy production capacity of the location
    b. Identify the current owner of the property and provide their contact information
    c. Include a reasonable estimate of any utility interconnection costs that would be required to interconnect the project to the existing electricity transmission and distribution system.

    The Renewable Ready fund shall be used to cover the costs of connecting a renewable energy generation project to the electric distribution systems on sites identified by OER and DEM and published on the list of eligible sites, and shall include but not limited to, the following activities:
    a. Installation of transformers and substations;
    b. Transmission facilitation;
    c. Grid flexibility; and
    d. Electrification planning for sites and facilities

Funds shall not be used to conduct any interconnection study or other preliminary work as may be required by the electric distribution company or the public utilities commission.

RIE will determine and, if necessary, ISO-NE for anything over a MW, what upgrades to the distribution system are needed for the project to be interconnected as part of an interconnection feasibility study or an interconnection study. The Renewable Ready Fund will be designed to assist with the costs, identified by RIE through the interconnection study process, of equipment needed to facilitate the project. In the case of SFA projects, the Renewable Ready Fund (funded with SFA funds), will support the necessary upgrades needed to construct the project. Examples may include a transformer upgrade in a LIDAC neighborhood that is already saturated with rooftop

---

[6] S2293Aaa.pdf (rilegislature.gov)

solar or undergrounding of lines in a LIDAC in order to comply with a municipal solar ordinance requirement for a community solar project.

At this time, the Renewable Ready fund program design has not started and site identification has not begun. Both will be completed during the program planning year. As a result, proposed costs for grid updates are not known at this time. The $450,000 in SFA funding will comprise only a part of the Renewable Ready Fund. Other sources of funding may be added to the fund to support non-SFA projects.

2. The second project is to provide financial assistance to eligible entities to reduce the site preparation and interconnection costs for the renewable energy development project on current or formerly contaminated sites.

Both of these projects will require close coordination with Rhode Island Energy for project site identification, costs related to interconnection and site work associated with project development and permitting with municipalities.

One other project that will require close coordination with Rhode Island Energy includes a recent technical assistance award from DOE to support OER's work related to integrated grid planning (IGP). On August 26, 2024, OER was notified of our deep dive application award to US DOE's State Technical Assistance Program. We are in the project scoping phase with the Regulatory Assistance Project (RAP). This work will continue OER's existing work on integrated grid planning with RAP and Lawrence Berkley National Laboratory (LBNL) on a pilot project with the town of Johnston and Rhode Island Energy. OER notified the distribution planning team at RIE of the award at the end of August and they are interested in continuing our collaboration on IGP work. OER also plans on engaging Rhode Island Statewide Planning in the next phase of IGP as well. IGP is a key component of Rhode Island's SEP IRA funding from DOE, and members of the renewables team at OER will be working on this initiative during the SFA timeframe. The scope of work for the technical assistance is still being developed, however, it is expected that a LIDAC will be included in the next round of IGP and the SFA team will be working closely with the selected Town Planner and RIE's utility distribution planning team on implementation.

Finally, two more projects OER is working with RIE on relate to energy storage. OER is working with the utility on the revised Connected Solutions program design, which is mentioned above in the Meaningful Benefits plan related to battery storage. The other is the recently opened energy storage docket which is mentioned above in the Project Deployment Technical Assistance Strategy under the Energy Storage Analysis vendor section.

ACTIVITIES TO BE CONDUCTED TO SUPPORT RENEWABLE READY TA:
1. Track solar for all's impact on the state's Renewable Portfolio Standard
2. Work with RAP and LBNL to identify a LIDAC that will participate in the next round of IGP.
3. RI general assembly passes renewable energy legislation.
4. During 1-year program planning period, OER/RIIB Design Renewable Ready Program
   a. Engage with RIIB on Renewable Ready program design.

   b. Identification of sites qualifying for the Renewable Ready program in LIDACs. Only the sites and projects identified will qualify for SFA funding in the Renewable Ready program.
   c. Identify and engage with stakeholders via public meetings to be conducted for program design and feedback.
   d. Upon program launch, conduct series of outreach events geared towards Renewable Ready Stakeholder feedback and education.
   e. Explore sources of TA from 400k allocation versus external sources (e.g., DOE, SEIN, NCSP, etc.)
   f. Establish file management system with RIIB to ensure seamless communication for program design, implementation and reporting.

**Community Solar Technical Assistance:**

RIIB, working with OER, will design a technical assistance program during the program planning year for municipalities and quasi-public agencies to develop community solar projects on municipally owned property. RIIB will utilize SFA funding to provide municipalities technical assistance by paying for a competitively procured vendor to offer siting development, layout drawings, electrical line diagrams, energy forecast estimates, site assessments and visits, economic analysis and other activities as requested.

As part of the technical assistance program design, OER and RIIB will factor in the recently passed solar siting law which limits greenfield solar development and encourages solar adoption on previously disturbed surfaces (rooftops, parking lots, brownfields, etc.). All new ground mounted projects in the state must comply with DEM's new siting guidelines.[7] All new ground mounted CRNM projects will have to comply with the DEM Core Forest Guidance. Additionally, RIIB and OER will encourage CRNM projects to include best practices related to designing topological pathways for well drained sites, avoidance of projects in wetlands, encouragement of including plantings for pollinators, raising fencing for small animals, and utilizing native species plantings and trees whenever possible.

RIIB and their contractor will aid with development of RFPs and provide proposal evaluation assistance. Economic analysis will also be included through tools such as the National Renewable Energy Laboratory's System Advisor Model (SAM) to ensure that municipalities understand the overall project economics and risk profile, including capital costs, principal and interest payments, incentives such as the newly introduced direct pay provision and available state incentives. Part of a vendor's work may include utilizing RIE's System Data Portal and Heat Maps to determine interconnection feasibility, submit feasibility studies to RIE on behalf of municipalities and assist with study results interpretation for municipalities to make decisions about a particular site's interconnection feasibility.

To promote resilient project plans to DAC-serving critical facilities or resilience hubs, RIIBs technical assistance will include solar plus energy storage proposals to bolster the importance of system reliability during weather events, enabling projects that receive technical assistance to

---

[7] https://dem.ri.gov/natural-resources-bureau/agriculture-and-forest-environment/forest-environment/core-forest

reach a greater volume of RI's disadvantaged populace by seeking refuge at these facilities. Only solar paired storage projects will be funded with SFA funding, as stand-alone storage is not an allowable use of SFA funds.

To qualify for TA, municipalities must reach directly out to RIIB via email with a specific request to review one or more preferred sites within the municipality for community solar potential. RIIB will evaluate the requests for completeness and approve requests for TA until funding is exhausted. Upon approval, RIIB will serve as the nexus between municipalities and available technical assistance opportunities.

ACTIVITIES TO BE CONDUCTED TO SUPPORT RIIB TECHINCAL ASSISTANCE:
1. Develop Technical Assistance Application for municipalities.
2. Develop outreach strategy for establishing connections with eligible DACs.
3. Develop strategy for Direct Pay technical assistance.
4. Explore Clean Energy Tax Navigator tools by L4GG as a tool to enhance Direct Pay TA offerings.
5. Work with consultant to develop Economic analysis framework, including tools such as the National Renewable Energy Laboratory's System Advisor Model (SAM)
6. Develop strategy for identifying and engaging with communities experiencing frequent history of outages.
7. Review feedback from TA providers and municipal participants to further refine scope of assistance to meet and address specific community needs
8. Create summary of findings from TA workshops that lead to project financing and implementation.

**Project Deployment Regulatory Assistance (Center for Justice PDTA):**
OER will need to work closely with stakeholders as well as the Public Utilities Commission in order for the CRNM program to move forward. One of the most important stakeholders include LIDAC community members who were not provided an opportunity to voice their opinion in the first CRNM program. These important stakeholders often do not have the funds or ability to participate in the regulatory process as a lawyer is required to intervene. The Center for Justice will provide LIDAC representation at the PUC for the CRNM regulatory process. CIFJ was not identified as a sub awardee in the original application but were factored into the community engagement costs. Additional detail regarding participatory governance is included on page 29 of the Equitable Access and Meaningful Involvement Plan.

ACTIVITIES TO BE CONDUCTED TO SUPPORT REGULATORY ASSISTANCE:
1. Facilitate meeting between OER/Center for Justice to Identify exact funding needed to sub award Center for Justice through SFA. This activity will take place early in the program planning year.
2. See Participatory Governance Activities for additional items.

**Equitable Access and Meaningful Involvement Plan**

In-kind Technical Assistance Awards

In 2024, OER applied for several technical assistance opportunities through various agencies and groups. Two of our applications, with specific activities related to the SFA workplan, were recently awarded.

Solar Energy Innovation Network (SEIN) Solar Community Assistance for Local Equity (SCALE) Project.[8] Innovation at SCALE is funded by the U.S. Department of Energy and led by the National Renewable Energy Laboratory (NREL) is designed to help communities and institutions find their path to solar in a just and equitable way. Through SCALE, DOE and NREL offers targeted technical and analytical assistance to help communities overcome barriers to solar adoption. NREL requested project applications that could take between three to six months to implement. OER applied in order to be better prepared for the solar public engagement work needed to make significant progress in the SFA program planning year. OER was notified of their selection on July 1, 2024.

OER's proposal was specific to community engagement challenges. Two barriers were identified. The first is getting the attention of the public and community-based organizations. Often their knowledge or background on energy subject matter is limited or nonexistent. There is competition for their time, and we are often fighting for the public's attention. Also, OER needs assistance in answering the question of "why?". The question is twofold, why should people pay attention to the proposed education and marketing campaigns we will be deploying and why should they care about participating. OER anticipates two deliverables from SCALE assistance:

- Deliverable 1 – a schedule of meetings with experts and facilitation assistance for a specific number of public meetings.
- Deliverable 2 – a playbook of lessons learned and action items that can be replicated in Rhode Island for OER to deploy in advance of deploying federal funding.

SEIN SCALE ACTIVITIES TO BE COMPLETED:

Some of the SEIN activities might intersect and overlap with public stakeholder meetings listed below, however specific topics, cadence of meetings, audience and other factors will be determined during future meetings with NREL and during program planning year.

1. OER will receive a Scope of Work from NREL
2. Schedule series of meetings between OER/NREL and other staff assigned to this project and determine which topics should be covered at each meeting.
3. Hold public education meetings referenced in deliverable one with NREL or other assigned professional facilitators.
4. Work with NREL staff to develop playbook referenced in deliverable 2 and determine whether it should be a public facing document or for internal OER use.
5. Finalize and/or publish playbook.

The Just and Clean Energy Future – State Implementation Accelerator Project

---

[8] https://www.nrel.gov/solar/market-research-analysis/solar-community-assistance.html

The Accelerator program is designed to support states that have been awarded IRA, BIL/IIJA and Justice 40 covered programs that incorporate equity analysis and implementation strategies specifically for LIDACs. The program is led by the Communities First Fund which helps transform how federal, state and local governments invest public dollars in Black, Indigenous, People of Color, and low wealth communities by implementing a relationships-first approach to community driven solutions that centers frontline communities' leadership, innovation and priorities.  The project will help stack and leverage key federal programs that invest in a just and clean energy future across various sectors.  Rhode Island was selected as part of the accelerator cohort on July 31, 2024.[9]  While some of the activities may overlap and intersect with the SEIN SCOPE program, OER plans to keep the deliverables separate and distinct as possible as the Communities First Fund is technical assistance for all federally funded program, of which SFA is one.

JUST AND CLEAN ENERGY FUTURE PROGRAM ACTIVITIES TO BE COMPLETED

1. OER to attend kick off meeting in DC (September 16-17, 2024)
2. Develop a scope of work with the Communities First Fund for activities to be conducted during the project program period.
3. OER to attend regular meetings.
4. Host an in-state meeting with CBOs and program partners on implementation strategies.
5. Implement scope of work

**Community Based Organizations (CBOs):**

Inclusive and authentic community engagement is vital to creating trust with LIDACs and OER has dedicated a significant amount of time over the past several years to building a reliable network of CBOs including neighborhood associations, environmental advocacy groups, social service providers, and other charitable organizations.  This network informs our policy and program work. OER is committed to a process where CBOs define and drive outcomes in order for benefits to flow to the community.

To expand this network, OER will leverage existing relationships with CBOs to introduce new CBOs to the CBO network.  OER will also leverage working relationships with municipal sustainability offices, Rhode Island's philanthropic community, and other governmental partners to tap their CBO networks for introductions.  This work will result in the development of a robust network of CBOs that can be called into action for their communities.

OER will implement multiple education and outreach methods when engaging with our CBO network including in-person and virtual meetings, mailings, and door-door contact.  RI-EASE program partners will assist in these education and outreach efforts.

In addition to working with CBOs, other stakeholders will be consulted during the program planning year and at other times throughout the Solar for All program life. These include solar stakeholders. OER maintains a solar stakeholder email list with approximately 650 unique email addresses. Approximately three to four emails per month are sent to this list with various program

---

[9] https://communitiesfirst.us/accelerator1/

and policy updates. Additionally, OER and the REF host between three to four solar stakeholder meetings per year. We anticipate the cadence of meetings to increase during Solar for All. OER will solicit industry feedback on program design during the program planning year.

For other stakeholders, in addition to the CBOs and solar industry, OER will attempt to reach a diverse set of stakeholders that include other state agencies, boards and councils, trade associations, workforce groups, colleges and universities, and energy efficiency groups.

OER will hold quarterly calls with CBOs to educate and provide opportunities for feedback and to ensure that program design prioritizes applicants within LIDACs. OER will work with CBOs to develop a framework during the program planning year for prioritization as well as ensuring benefits to tenants and 20% bill savings. The low-commitment savings guarantee offered through community solar subscription models will be promoted via Rhode Island's community focused email listservs. RI Program partners will provide CBOs with appropriate translations for their listservs. Program partners will also distribute hard-copy outreach materials by mail to CEJST identified census tracts with a return address that can be verified by residents. The inclusion of return addresses from state agencies will help to establish trust that the distributor of hard-copy materials is not a scam and can be verified by similar online material.

CBO ACTIVITES TO BE CONDUCTED:

1. Expand upon OER's existing list of CBOs to develop new working relationships.
2. Expand upon OER's existing list of neighborhood associations to develop new working relationships with association staff.
3. Coordinate with environmental non-profits on solar, energy storage, community solar education
4. Engage with municipal sustainability offices on solar, energy storage, community solar education.
5. Coordinate with environmental non-profits on scope of programmatic offerings and CBO engagement
6. Engage with municipal sustainability offices on scope of programmatic offerings.
7. Engage with local neighborhood associations in eligible communities to coordinate educational presentations to community members.
8. Engage with local neighborhood associations in eligible communities to coordinate programmatic presentations to community members.
9. Scheduling a cadence of meetings with community-based organizations on programmatic and technical assistance offerings made available through SFA.
10. Creation of a list of digital content (e.g., webpages, videos, 1-pagers) to be distributed to various CBO and community-focused email listservs.
11. Creation of digital content (e.g., webpages, videos, 1-pagers) to be distributed to various CBO and community-focused email listservs.
12. Develop hard-copy outreach materials for distribution to CBOs, public libraries, and community centers.
13. Explore opportunities with local utilities to include inserts for Income Eligible customers in utility bills for programmatic offerings.

28

14. Engage with Rhode Island Foundation and present on programmatic offerings.
15. Explore feasibility to develop a SFA campaign strategy for canvassing eligible neighborhoods.
16. Community Action Agency engagement: Host events in eligible communities
17. Meet with DOE staff on low-income clean energy connector and explore eligibility to partner as a pilot state.
18. Conduct regular cadence of meetings with DHS to implement Clean Energy Connector partnership as a pilot state.
19. Engage with DOE connector staff to get a Clean Energy Connector Fellow placed at OER to assist with LIHEAP and DHS engagement to pilot Connector in Rhode Island
20. Onboarding DOE Connector Fellow
21. Engage and empower LIDAC communities to develop an understanding of the link between climate justice and economic justice.

**Multilingual Education and Workshops:**

OER will provide Solar 101 educational resources and workshops such as one-pagers, tri-fold flyers, educational videos about solar energy (that can be QR coded on one-pagers and distributed), or in-person workshops held after work hours that residents can attend and learn about the benefits of solar energy and how to get involved. Translation services will be offered at in-person workshops. Wrap-around services will be provided, recognizing childcare, transportation vouchers, and compensation for time spent at an event is equally as important. As part of the one-year program planning period, program partners will work with CBOs and other RI agencies currently offering wrap-around services to determine adequate offerings for the communities that are being targeted through these initiatives.

Program partners will focus outreach and educational efforts in RI's most energy burdened census tracts. DAC-focused educational initiative is oriented around how solar can provide meaningful benefits while changing the energy landscape for underserved residents, from both a health and financial perspective. These materials will be made available in multiple languages using translation services.

MULTILINGUAL EDUCATION AND WORKSHOP ACTIVITIES:

1. Create Solar 101 educational resources that can be posted to OER's website, the RI Solar Marketplace, and hard copy. QR coded hard-copy materials to simplify access.
2. Creation of educational videos that can be used on OER website to broadly educate about the benefits solar and the nexus of solar with energy efficiency and electrification.
3. Work with translation services vendor to translate digital content for CBOs (see CBO section above) into culturally appropriate language for eligible communities.
4. Work with translation vendor to translate all materials for distribution into culturally appropriate language necessary to reach target audience.
5. Develop resource pages on OER website and RI Solar Marketplace for educational content.
6. Engage with CBOs to determine adequate offerings for wrap-around services.

7. Engage with CBOs to identify local community meetings that OER can attend and give educational presentations, which include Solar 101 written materials and videos.
8. Work with community libraries in eligible communities to disseminate educational materials.
9. Work with the members of the Rhode Island Community Action Association to disseminate educational materials.

**Community-Serving Solar Tours:**

Program Partners will hold solar siting conversations in tandem with education about the meaningful benefits of solar. Part of this outreach will include drawing attention to the availability of solar tours offered in the surrounding area. The RI Solar Marketplace website will also be updated to include information about where and when tours are available, with the potential to send email invites to subscribers to that specific project. Community solar tours will be a requirement for any projects funded through SFA.

Community Serving Solar Tour Activities to be completed during 1 year planning period:

1. Create community solar developer and project management company outreach plan aimed at identifying points of contact and establishing meaningful connections with installer industry to engage.
2. Work with communications team to create an event proposal for a series of solar tours. Recognizing the speaking portion will vary based on audience, OER.
3. Create outreach strategy for solar tours.
4. Engage with local school districts to assess opportunity for tours geared towards students, with emphasis on communities that may use CRNM program to install rooftop installations.
5. Engage with Project Green Schools.
6. Engage with Movement Education Outdoors.
7. Engage with environmental non-profits in RI who have experience conducting solar tours, exploring the opportunity to join efforts on prospective tours and learn best practices for administration.
8. Explore electronic tools and resources to provide translation services during solar tours (e.g., Headphones, AI, etc.)
9. Work with translation services providers ahead of solar tours to debrief on appropriate jargon, recognizing highly technical industry language can still pose barriers to understanding without proper preparation.
10. Identify rooftop sites suitable for visitation.

**Tribal engagement:**

Rhode Island is home to the Narragansett Tribe, the only federally recognized tribe in the state. Over the past few years, OER has made several attempts to contact and engage with the Narragansett Tribe, but the response has been tepid. OER will continue attempting to make meaningful connections with the Narragansett Tribe and ensure inclusivity on our educational and outreach plan if they show such interest. Our strategy will involve using our established networks with CBOs, non-profits, state agencies, and academic institutions to engage with the Narragansett

30

Tribe on the programs available through the RI-EASE initiative. This strategy will be integrated into the outreach strategy during the one-year program planning period.

Tribal Engagement Activities:

1. Locate new points of contact with Tribal council using our existing network of CBOs.
2. Engage with known tribal representatives and Climate Jobs RI.
3. Engage with leadership at the University of Rhode Island to connect with students enrolled in the Narragansett Undergraduate Scholarship Program, which was established for members of the Narragansett Tribe. OER will seek to engage with students interested in environmental or energy-related fields.
4. Explore possibility of co-hosting public engagement event with the Tomaquag Museum, which is operated by a member of the Narragansett Tribe.

**Public Stakeholder Meetings:**

An engaged stakeholder community will be necessary for the long-term sustainability of the RI-EASE initiative. Stakeholder engagement and regular communication leads to committed community members who support the development of initiatives. OER will develop a robust public engagement strategy to provide opportunities for public comment to inform detailed program design and incorporate feedback on draft program plans.

A key element of OER's strategy will be to embark on a statewide road show where OER staff will hold meetings in public venues to educate and inform stakeholders about the RI-EASE initiative. OER's community engagement team will also leverage relationships with federal and state elected officials to cohost road show events.

Further, OER will take a holistic approach to public engagement collaborating with stakeholders by being inclusive, providing wraparound services such as childcare assistance and transportation vouchers.

STAKEHOLDER MEETING ACTIVITIES:

1. Expand upon OER's existing list of venues to conduct stakeholder meetings, recognizing conference rooms in buildings housed by state agencies is not effective at reaching target audience. OER staff will conduct in-person visits to potential sites while establishing stronger connections with building staff.
   a. Identify venues that are child-care friendly to hold public meetings.
2. Create list of neighborhood associations and points of contact for regular communication and scheduling
3. Develop a robust outreach plan for a SFA "Road Show" across RI, holding meetings at town halls, senior centers, community centers,
4. Explore opportunities to partner with neighborhood associations, CBOs, and with elected officials from the RI General Assembly for Road Show tour.
5. Engage with RI Lt. Governor Sabina Matos on community outreach and engagement efforts, including:
   a. Monthly events in senior centers

      b. Spanish radio station segments – i.e., Poder FM111.0

6. WRAP AROUND SERVICES

      a. Explore possibilities for compensating community members for their time if they attend meetings, such as gift cards, vouchers, etc.

      b. Engage with Rhode Island Public Transportation Authority to buy bus vouchers in bulk.

      c. Go out to bid for childcare services vendor and/or Identify opportunities to partner with organizations that already offer childcare services.

**Participatory Governance in Regulatory Proceedings:**

R.I. Center for Justice (RICJ) is a non-profit public interest law center that partners with community groups to strengthen existing advocacy and service provision with legal representation and strategy. Through working with existing grassroots organizations as a trusted partner, RICJ will continue to advance the goals of the SFA coalition by representing low-income consumers directly in PUC proceedings and any directly relevant court proceedings. Their assistance will be needed during the CRNM regulatory process.

Participatory Governance Activities during the one-year planning period:

1. Set up kick-off call with Center for Justice
2. Identify stakeholders RICJ will represent during CRNM regulatory process and determine how and when to report out to represented stakeholders.
3. Set up regular cadence of calls with RICJ as OER prepares for CRNM regulatory filing.
4. Coordinate debriefing call with Public Utilities Commission on participatory governance efforts for CRNM filing.

**Community Solar Marketplace website:**

The RI Solar Marketplace website is Rhode Island's principal platform for community solar education and outreach and will also be used for communications on all initiatives undertaken by RI on community solar and customer inclusion. This website already includes a "Low- and Moderate-Income Customer Inclusion in the CRNM Program Plan" page, which will be significantly expanded upon throughout the one-year program planning period. The website will also be the primary way community solar project details are available to the public, including low-income customers, to learn where projects are located, who the installers is, and if the project is actively seeking new subscribers. Customers can link directly to projects that may be looking to subscribe customers to learn more and sign up. Additional activities to be included are numerated in the Project Deployment Technical Assistance Strategy.

Community Solar Marketplace Activities:

1. Train additional OER staff on backend of CS marketplace website
2. Create tutorial during 1-year program planning period of how to use the Community Solar Marketplace Website.

3. Explore possibility of using translation services to translate webpage into other languages for non-English speakers.
4. Add definitions on marketplace website for different community solar programs.
5. Add a glossary of terms to the marketplace website
6. Update the "what is community solar?" page.
7. Add educational "Solar 101" videos to RI Solar Marketplace website.
8. After the second program year, add additional community stories as projects are developed and interconnected.
9. Publish a community story on community solar consumer protection.
10. Publish the community solar consumer protection form on the marketplace website.
11. Once the plan for community serving solar tours is developed, create subpage on marketplace website to provide information about purpose of tours and opportunities to participate.

Consumer Protection:

OER and the REF have several consumer protection requirements in place including the REF's Minimum Technical Requirements (MTR) which identifies specific codes projects must be built to, safety parameters, and site requirements that projects must met to qualify for incentives. The MTR is periodically updated as Rhode Island updates electrical and building codes relevant to solar and energy storage as well as industry best practices related to installation. The MTR also includes a total solar resource fraction (TSRF) of .8 or greater in order for a project to receive funding. TSRF is a measure of the actual expected irradiance divided by the total irradiance available to a system with optimal siting characteristics (tilt, azimuth, etc.) Shading losses are incorporated into the TSRF and a low TRSF can be the result of shading, non-ideal orientation, or both. All REF Small and Commercial Scale projects that do not meet the MTR are not eligible to receive funding. The REF and OER will require all SFA funding projects, in association with the Small and Commercial Scale programs and adders, to adhere to the MTR.

The REF currently requires a 100% inspection for all projects that receive funding. Most of these inspections are self-inspections and/or self-verification of compliance. New installers participating with the REF's programs for the first time, delinquent installers, or those not performing well are subject to field inspections. The inspection requirement will continue to be enforced for all REF programs included in SFA. The REF will provide inspection services for projects utilizing the adders funded through SFA.

Program design is still underway for CRNM and AHSSP, however OER plans on requiring inspections for SFA funded projects that go through both programs as well as adherence to MTRs. More detail regarding this will be developed during the program planning year.

The REF currently requires a minimum of a three-year workmanship warranty. In addition, the REF requires submission of the turnkey contract which provides detailed warranty information as well as the expected output of the project during the anticipated lifetime of the project. During the program planning year, OER will work to develop warranty requirements for the CRNM and AHSSP programs in accordance with EPA's General Terms and Conditions.

For the past few years, the RI General Assembly has proposed legislation regarding PV recycling. One example is H5525 from 2021, which required developers to create a stewardship plan to recycle panels at the end of their expected life.[10] Since then, DEM and OER collaborated on the recently passed Solar Decommissioning law which was signed by the Governor on May 26, 2024. This law requires that developers of ground-mounted solar systems submit a plan for decommissioning to be held on file by the municipality and requires DEM, with OER to make publicly available model decommissioning plans.[11] All ground mounted projects using SFA funds must adhere to the solar decommissioning law. Work associated with implementation of the law is currently underway and expected to be in effect by January 1, 2025.

On August 7, 2024, Governor McKee signed the Solar Consumer Protection and Homeowners Bill of Rights Act, which will require solar retailers to register their business and have a roster of all representatives soliciting sales, conduct criminal background checks for all sales representatives, and follow municipal restrictions on door-to-door sales and telemarketing rules. It gives the Department of Business Regulation (DBR) the authority to investigate complaints and impose any administrative penalties. The law also requires OER to develop and implement solar consumer protection disclosure forms. While the REF and REG programs already require these forms, the new law ensures that all residential solar PV customers will use the new forms, regardless of which incentive program is utilized (net metering or REG). The law goes into effect on March 1, 2025.[12] All residential SFA projects will adhere to the new law and utilize the net metering consumer protection disclosure form.

On August 30, 2024, OER submitted a technical assistance application to the National Community Solar Partnership (NCSP) for assistance with developing consumer protections for community solar customers. The Solar Consumer Protection and Homeowners Bill of Rights Act does not cover community solar customers so it will be important to have a plan for consumer protection before OER makes its filing to the PUC to expand the CRNM program. The application to NCSP requested assistance for four specific deliverables:

- Research on community solar disclosure form best practices and lessons learned on states that have implemented them.
- Assistance with developing a community solar consumer protection form.
- Leading a public comment process and facilitating one public meeting on the draft form
- Developing a reporting process for OER to ensure CRNM customers receive a 20% bill savings or equivalent in order to meet both SFA and the NCSP goals.

OER commits to implementing a community solar consumer protection form for all CRNM customers that utilize SFA funding, whether technical assistance is awarded or not.

OER commits to working with the Attorney General's office and all program partners to track all customer complaints related to projects that are funded through SFA. This will include developing

---

[10] https://legiscan.com/RI/text/H5525/id/2291764/Rhode_Island-2021-H5525-Introduced.pdf
https://legiscan.com/RI/text/S2808/2024
[12] 2024-S 2801A

a new procedure for tracking customer complaints, include a shared drive accounting system of all customer complaints by program.

Consumer Protection Activities/Notes to be Included In Workplan Shell:

1.  Continue meeting with DBR and the AG's office on the implementation of the Solar Consumer Protection and Homeowners Bill of Rights Act
2. Develop the consumer protection disclosure forms.
3. Solicit stakeholder feedback on the draft disclosure forms.
4. If awarded, work with NCSP to complete the following deliverables by Q2 2025:
   a. Research on community solar disclosure form best practices and lessons learned on states that have implemented them.
   b. Assistance with developing a community solar consumer protection form.
   c. Leading a public comment process and facilitating one public meeting on the draft form
   d. Developing a reporting process for OER to ensure CRNM customers receive a 20% bill savings or equivalent in order to meet both SFA and the NCSP goals.
5. Work with DBR on the development of the solar business registration system and promulgating rules and regulations specific to the Solar Consumer Protection and Homeowners Bill of Rights Act
6. Develop a protocol with DBR and the REF to ensure that only solar companies in good standing can participate in REF programs.
7. OER and program partners will develop a process and procedure for tracking customer complaints.
8. OER will develop a solar consumer protections webpage including links to existing videos and resources about the importance of solar consumer protection.
9. OER will update the existing Rhode Island Residential Guide to Going Solar to include community solar, energy storage, the new consumer protection disclosure forms and other updates related to SFA.

## Section 3:  Fiscal Stewardship Plan

All Program Partners commits to reducing waste, fraud, and abuse both internally among our agencies by creating plans for audits. This includes including audit fees in the budget which are charged to each federal grant by the RI Office of Auditor General for the allocable costs of performing the State's single audit.

OER, REF and RIIB currently use SharePoint with a multifactor authentication requirement. SharePoint has been in place for all three agencies for the past few years. In fact, collaboration on SFA documents, including this workplan, have been done via SharePoint. Only designated users are allowed to share links to documents. This results in a targeted number of people to have access to documents or specific folders within SharePoint, rather than the entire database. Such measures and the use of SharePoint will continue to take place between OER and our subawardees for reporting. For those subawardees who do not utilize SharePoint themselves, OER

35

will make a folder on our SharePoint site available for reporting with a limited number of authorized users.

Rhode Island also has a grants management software system which will be the platform used for management of subawards. Use of this system will ensure OER can maintain oversight of subawardees and ensure that funds will be used for authorized purposes only.

OER also attempts to limit staff access to personal identification information. When receiving confidential information from RIE, the information comes via email as a password protected, encrypted file.

All State employees are subject to the State's code of ethics.[13] Periodic mandatory training for State employees is required. Additionally, all State employees are subject to the Procurement Statutes and Regulations, which includes a Code of Ethics and Professional Behavior regulation (220-RICR-30-00-3)[14]. These regulations help manage conflicts of interest in the procurement process.

OER and the REF have several consumer protection requirements in place including the REF's Minimum Technical Requirements (MTR) which identifies specific codes projects must be built to, safety parameters, and site requirements that projects must met to qualify for incentives. The MTR is periodically updated as Rhode Island updates electrical and building codes relevant to solar and energy storage.  All REF Small and Commercial Scale projects that do not meet the MTR are not eligible to receive funding. The REF/OER will require all SFA funding projects, in association with the Small and Commercial Scale programs and adders, to adhere to the MTG.

The REF currently requires a 100% inspection for all projects that receive funding.  Most of these inspections are self-inspections and/or self-verification of compliance. New installers participating with the REF's programs for the first time, delinquent installers, or those not performing well are subject to field inspections. The inspection requirement will continue to be enforced for all REF programs included in SFA. The REF will provide inspection services for projects utilizing the adders funded through SFA.

On August 7, 2024, Governor McKee signed the Solar Consumer Protection and Homeowners Bill of Rights Act, which will require solar retailers to register their business and have a roster of all representatives soliciting sales, conduct criminal background checks for all sales representatives, and follow municipal restrictions on door-to-door sales and telemarketing rules.  It gives the Department of Business Regulation (DBR) the authority to investigate complaints and impose any administrative penalties.  The law also requires OER to develop and implement solar consumer protection disclosure forms.  While the REF and REG programs already require these forms, the new law ensures that all residential solar PV customers will use the new forms, regardless of which incentive program is utilized (net metering or REG). The law goes into effect on March 1, 2025.[15]

---

[13] https://ethics.ri.gov/media/166/download?language=en
[14] https://rules.sos.ri.gov/regulations/part/220-30-00-3
[15] 2024-S 2801A

All residential SFA projects will adhere to the new law and utilize the net metering consumer protection disclosure form.

On August 30, 2024, OER submitted a technical assistance application to the National Community Solar Partnership (NCSP) for assistance with developing consumer protections for community solar customers. The Solar Consumer Protection and Homeowners Bill of Rights Act does not cover community solar customers so it will be important to have a plan for consumer protection before OER makes its filing to the PUC to expand the CRNM program. The application to NCSP requested assistance for our specific deliverables:

- Research on community solar disclosure form best practices and lessons learned on states that have implemented them.
- Assistance with developing a community solar consumer protection form.
- Leading a public comment process and facilitating one public meeting on the draft form
- Developing a reporting process for OER to ensure CRNM customers receive a 20% bill savings or equivalent in order to meet both SFA and the NCSP goals.

OER commits to implementing a community solar consumer protection form for all CRNM customers that utilize SFA funding, whether technical assistance is awarded or not.

OER commits to working with the AG's office and all program partners to track all customer complaints related to projects that are funded through SFA. This will include developing a new procedure for tracking customer complaints, include a shared drive accounting system of all customer complaints by program.


**Section 4:  Timeline and Milestones**

The detailed timeline for RI's 5-year workplan is included as an attachment, **with start and end dates for over 200 tasks**. Each of the activities and associated milestones are listed in their respective sections of this document; namely, the Meaningful Benefits Plan, the Financial Assistance Strategy, the Project-Deployment Technical Assistance Strategy, and the Equitable Access and Meaningful Involvement Plan. Duplicating all of those activities in this section of the document would make it increasingly challenging to edit future iterations of the timeline, as start and end dates for activities may be revised during the 1-year program planning period. OER remains committed to tracking the tasks listed in the detailed timeline and will continue to add tasks as necessary during the planning year.


**Section 5:  Reporting Requirements**

As the lead applicant, RI OER is dedicated to tracking and measuring progress towards achieving outputs and outcomes. All Program Partners are aware of reporting requirements and are committed to ensuring timely and accurate reporting. OER has experience with creating dashboards and infographics that intuitively and visually display program data. REF will ensure to report on all funding sources for all projects leveraging SFA and ensure that projects do not dip

into multiple programs erroneously. Program Partners have ample experience in analyzing and publicizing program success, data, and evidence.

OER already provide metrics to the National Community Solar Partnership and will continue to update the number and capacity of community solar projects in the state, community solar off. takers, including breakout by rate code to track the low-income participants, and will. include household savings in the future. OER will also include community solar and energy storage metrics in OER's Renewable Energy Portfolio, which reports on quarterly renewable interconnection data at the state-level.

1. Performance Reports
Semi-Annual Report
The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024. The semi-annual performance report should cover activities from the preceding two quarters.

Final Report
The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions. and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

2. Transaction-Level and Project-Level Data
The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA

38

ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

## Section 6:  Budget Narrative

### 6.1 Project Budget

**Personnel**
- 100%: 1 FTE for Office of Energy Resources, Programming Services Officer (PSO) = $389,931 (over five years)
    - The Full Time Employee supporting the OER RI Office of Energy Resources will support the Renewable Energy team to implement and administer the Rhode Island Solar for All Program. This position is for a five year period.  Some of these responsibilities include facilitation of weekly Solar for All (SFA) team meetings, ensuring the team meets all deliverable deadlines in the workplan, managing all SFA reporting requirements from the Environmental Protection Agency (EPA), including Davis-Bacon and Build America, Buy America. They are Responsible for OER's development of and compliance with EPA's Quality Management Plan for SFA.
    - Limited budget has been allocated for salary adjustments for this FTE. Any salary adjustments through increases with a salary step increase or non-union staff increases in excess of the budgeted amount will be paid by OER.

**Fringe Benefits**
- Office of Energy Resources FTE Fringe = $228,982
- Fringe Rates are calculated on direct salaries as follows:
    - Assessed Fringe Benefit - 3.95%,
    - Payroll Accrual - 0.4%,
    - Retirement - 29.54%,
    - Retiree Health Insurance - 3.94 %,
    - FICA - 7.65 %.
    - Medical, Dental and Vision weighted cost $18,073 per employee.

The fringe percentage for the OER SFA FTE is 63.43%. The fringe benefit rate is total for 5 years. The annual two week leave for the SFA PSO is included in the salary budget line item.

**Travel**
- Travel for 2 OER staff to attend SFA program-related workshops/conferences.  These are expected to be out of state conferences which include airfare and hotel = $5,200
- OER SFA staff person mileage, 100 mi/mo @ .655/ mi x 12 mo = $3,930
    - this is ONLY for the OER SFA staff person in state travel to Rhode Island based meetings and does not include any other OER staff travel expenses or milage. Milage will only be used for SFA program-related events and meetings.

39

**Equipment** - N/A

**Supplies** -
- Laptop for OER FTE = $1,500 – Cooperative agreement with NASPO
  - **Type of procedure to be used to purchase supplies:** NASPO - National Association of State Procurement Officials - the cooperative purchasing division of the National Association of State Procurement Officials (NASPO), facilitating cooperative public procurement solicitations using a Lead State Model™. NASPO aggregates the demand of all 50 states, the District of Columbia, the US territories, their political subdivisions, and other eligible entities, spurring best value, innovation, and competition in the marketplace. NASPO delivers high-value, reliable, and competitively sourced cooperative contracts - offering public entities outstanding prices, favorable terms and conditions, and value-added services.
- Printing for solar marketing material = $1,000 – Master Price Agreement (MPA) list or in-house (depending on volume)
  - **Type of procedure to be used to purchase supplies:** MPA is the acronym for Master Price Agreement. MPAs cover requirements for universal need for goods or services for a specified contract period on a state-wide basis. They are solicited as Requests for Proposals or Requests for Quotes and may have cap limits for pricing and cap limits for project cost. MPAs provide agencies with access to qualified vendors, expedited process, and opportunity for mini-bid. State and Quasi-Public Agencies order their requirements for these items individually, as the need arises. There are approximately 200 MPAs in the portfolio and they are diverse in the goods and services provided. For example, road salt, office supplies, milk, small appliance repairs, automotive parts and batteries, energy efficiency services and stenographic services are all contracted as MPAs.
- General office supplies = $500 – selected via competitive solicitation for MPA

The dollar amount for supplies is for the 5-year duration of the grant.

**Contractual** -

**No individual consultants will be procured with SFA funding. All consultants have or will be procured through a competitive process.**

- Energy Storage Analysis Vendor = $80,000
  Duration: June 2025-December 2026
  - OER will procure a consultant to perform an evaluation of the residential scale energy storage market to determine an appropriate incentive for a battery system paired with solar located on multifamily housing, community resiliency hubs, or public critical facility locations. SFA funds will be used to continue funding the small-scale energy storage incentive program.
  - OER has not gone out to bid for this vendor. The scope of work and hourly rate will be shared when known.

- REF Application Portal Updates vendor = $50,000

40

Duration: Current-December 2029

- o The REF is currently designing its new software platform funded, in part, through DOE's Scaling up Solar Initiative. Phase I of the portal design is covered with a combination of REF and DOE funding, not utilizing SFA funds. This new software platform will significantly improve the efficiency of program management efficiencies, communication between solar installers and REF. It is not expected to be available for beta testing until early 2024. However, including new adders in the REF's current suite of programs will require portal design and functionality that is not included in the current portal design. Phase II of the portal design will specifically cover the cost of portal functionality, document management, and reporting for the REF adders (programs 2-4) that Phase I does not cover. Phase II of the portal will be funded through SFA. The vendor will need to be under contract for the duration of the SFA program.

- OER Translation Services Vendor = $150,000
  Duration: November 2024-December 2029
  - o OER is currently in the process to procure a vendor to assist with translation services for both written materials and for in-person meetings. This vendor will need to provide staff to provide verbal translation services for languages identified by the community for in-person meetings, which may include stakeholder meetings related to community solar, solar 101s and other educational meetings, public meetings and docket proceedings. The vendor will also need to be able to provide translation of written materials which may include content from the Community Solar Marketplace website, marketing material, sample contracts and disclosures, and other material as needed.
  - o As of October 3rd (when the RFP was due), OER received nine proposals. A vendor has not yet been selected. The vendor and hourly rate will be shared when known.

- OER Updates to Community Solar Marketplace = $63,000
  Duration: Current –December 2029
  - o OER maintains the RI Community Solar Marketplace website which serves as a critical forum for community solar education and stakeholder engagement. There are several updates that must be completed to prepare for the upcoming docket filing, additional stakeholder engagement, development of new FAQs, and updated metrics. Backend site design work will be needed as well as training for staff members to make edits such as code changes, layout and formatting as well as content updates. The vendor will need to be under contract for the duration of the SFA program or until the CRNM funds are expended in order to make updates to the backend software, as needed.

- RIIB Technical Services Consultant = $125,000
  Duration: Current-December 2027
  - o OER and RIIB will procure a technical services consultant to help cities and public agencies meet their energy goals. RIIB will offer free consulting and energy audits to create action plans for each participant. They'll also provide affordable for energy efficiency and renewable energy projects, while OER will decide which projects get priority. This partnership will make it easier for participants to get the help and funding and "technical assistance" as needed.

- o OER/RIIB have not gone out to bid for this vendor. The scope of work and hourly rate will be shared when known.

- OER Solar for All Consultant = $58,412
  - o OER currently does not have an FTE for the Programming Services Officer position available. Funding for the position was submitted to the Governor's office for the FY26 budget on September 27th. While it is anticipated that a FTE may be hired in 2025, OER hired a contract employee to fill this role until the FTE is approved and hired. Hiring of this contract employee was conducted utilizing MPA 569, Temporary Employment Services, Statewide. The dates associated with this MPA are Jun 19, 2019-September 8, 2026. OER posted a contract employee position at the Program Manager I rate of $59.91.[16]

- OER CRNM Grant Program - Program 6 = $30,100,004
  - o The redesigned, low-income-focused CRNM program would meet the 20% household savings threshold by requiring and guaranteeing that community solar facilities structure their subscription models such that the annual direct bill savings resulting from a subscription are equal to or greater than 20% of the household's electric bill.
  - o The CRNM program will be designed during the program planning year and will be subject to regulatory approval. At this time, it is unknown whether OER or the REF will provide the funds. Regardless of who deploys the funding, SFA funds will be either provided directly to community solar installers or subscriber management companies as a pass-through cost or directly to the subscriber. It is expected that participation in DOE's Clean Energy Connector pilot program will also help assist with program design. Regardless of program design details, LMI community solar subscribers will benefit from the program and will receive at least 20% electricity bill savings.

- OER Renewable Ready Technical Assistance Program = $450,000
  - o In June 2024, the Rhode Island General Assembly passed SB-2293Aa which established the Renewable Ready Fund. The Fund, co-managed by OER and RIIB, will provide financial assistance to cover the costs of connecting a renewable energy generation project to the electric distribution system on eligible sites within LIDACs. This fund will provide financial assistance to reduce the site preparation and interconnection costs for renewable energy development projects on these locations.
  - o The Renewable Ready Program has not yet been designed. OER will review the recently passed legislation with RIIB and work together during the program planning year on program design. SFA funding through this program will benefit projects, specifically community solar and on multifamily housing. By reducing the interconnection and other siting costs, all program participants will benefit as the project should cost less to build and interconnect.

**Construction (if applicable) - N/A**

---

[16]https://webprocure.proactiscloud.com/maincontractboard/contractviewdoc.do?docid=17102&eboid=46&&mimeType=application/pdf/docName=RIMSP_Rate_Card%2001-22-24.pdf&docUniqueName=RIMSP_Rate_Card%2001-22-24.pdf&contract=9835

**Other** -

**Participant Support Costs:**

Participant support costs will be further defined in the program planning year.  Activities that will take place during Included in the program planning year include:

    Activity 1: Written guidelines will be developed to deploying participant support costs

    Activity 2: Program design for the Community Engagement programs will detail who the funding will be awarded to and how the funding will be provided. (See lines 202 & 203)

- OER Community Engagement = $2,000,000
  - OER and its partners recognize how critical it is for the community to hear from the state regarding the design of programs designed to serve them. Their participation is critical to the success of the programs outlined in this application. The state needs to make it as easy as possible for community members and CBOs to participate in stakeholder meetings, either virtual or in person. To ensure maximum participation, OER plans to develop and deploy a robust plan which includes holding public meetings during evening hours with childcare and transportation assistance (gas reimbursement, bus fare, parking costs, etc.) included. Additionally, underserved communities and its residents have a difficult time engaging in the regulatory process, where some rulings directly impact their electricity bills. OER has included the RI Center for Justice as a program partner to address this problem with the upcoming CRNM docket. The Center will represent low-income customers in the docket filing. Details on each of these initiatives are further elaborated upon in the Equitable Access and Meaningful Involvement Plan.
  - Wrap around services will be made available for community members attending public meetings. The cost per participant (including the amount of travel assistance) will be determined during the 1-year program planning period in tandem with the full scope of wrap around services offered at public meetings conducted by the RI Coalition.  Some of the wrap around services that may be provided, depending on venue, include but are not limited to childcare and transportation/parking vouchers.
  - Participant benefits from wrap around services will go directly to the participant, following EPA/DOE guidelines regarding payment via gift card or other approved method.  These may include stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants.

- OER Auditing fees (0.05% of the total awarded funds) = $24,462
  - Single Audit fees are assessed at 0.05% for all federal funding. The Auditor General's Office charges the allocable cost to perform the State of Rhode Island's annual single audit. OER will comply with RI rules related to auditing fees.

**Subawards**

**Descriptions and specific lists of activities to be supported via subawards are included in the Financial Assistance Strategy and Project Deployment Technical Assistance Strategy sections of this workplan and have been included in the detailed timeline.**

REF: Rhode Island Commerce's Renewable Energy Fund (REF) is a **quasi-state agency** that provides grants for projects that generate sustainable electricity and stimulate job growth in green technology and energy sectors. Funded by the "system benefit charge" on electric bills alternative compliance payments from electricity suppliers, and RGGI. the REF supports Small Scale solar, Commercial Scale, and Community Renewables projects. Rhode Island Commerce has adequate systems in place to meet the requirements in the terms and conditions.

- Subgrant to the REF for the Low-Income Residential Direct Ownership Adder - Program 2 = $1,000,000
  REF Administrative Costs for Program 2 = $160,827
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- Subgrant to the REF for the Low-Income/DAC Roof and Electrical System Adder - Program 3 = $6,670,414
  REF Administrative Costs for Program 3 = $160,827
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- Subgrant to the REF for the Low-Income/DAC Residential Energy Storage Adder - Program 4 = $250,000
  REF Administrative Costs for Program 4 = $160,827
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- All subgrants will last for a duration of five years.

REF Income Verification Vendor = $75,000 – to be subawarded to the REF for this vendor
  Duration: March 2025-December 2029
  - The REF will procure a vendor to provide income verification services to ensure applicants meet the AMI requirements for eligibility and the geographical parameters for program participation. The REF does not, nor would they prefer to, receive confidential customer information including but not limited to social security numbers, employment records or medical program enrollment information. A third-party vendor, with comprehensive cybersecurity policies and procedures in place, would be better equipped to handle this type of documentation.
  - The REF has not gone out to bid for this vendor.  The scope of work and hourly rate will be shared when known.

RIIB: Rhode Island Infrastructure Bank is a **quasi-state agency** that is a central hub for grants and financing of infrastructure projects in Rhode Island, serving municipalities, businesses, and homeowners. It offers innovative financing from a revolving fund for various projects that enhance infrastructure, create jobs, stimulate economic growth, and improve the environment.

- Subgrant to RIIB for Community Solar on Preferred Sites - Program 7 = $1,320,185

44

*Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- Subgrant to RIIB for Community Solar Technical Assistance = $500,000
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- All subgrants will last for a duration of five years.

Rhode Island Housing (RI Housing): RI Housing is a **quasi-state agency** dedicated to providing affordable housing options and financing solutions for residents of Rhode Island. It aims to ensure that all Rhode Islanders have access to safe, healthy, and affordable homes. The organization offers a variety of programs, including mortgage loans for homebuyers, rental assistance, and funding for the development and preservation of affordable housing. RI Housing works in collaboration with public and private partners to address the state's housing needs and support community development.
- Subgrant to RI Housing for the Affordable Housing Solar Supplemental Program (AHSSP) - Program 5 = $3,700,000
  RI Housing Administrative Costs for Program 5 = $200,000
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- All subgrants will last for a duration of five years.

DLT: The Department of Labor and Training (DLT) in Rhode Island is a **state agency** responsible for administering workforce development, labor market information, and unemployment insurance programs. It provides employment services, job training, and career development resources to residents, helping them gain the skills needed for employment. The DLT also enforces labor laws, ensuring fair labor practices and workplace safety. Additionally, it offers support to employers through recruitment assistance, labor market data, and various workforce programs aimed at enhancing the state's economic stability and growth.
- Subgrant to DLT for Workforce Development = $1,000,000
  *Details: Activities related to program design and implementation are detailed in the Technical Assistance Strategy and Meaningful Benefits Plan sections.*

**Additional Items**

**Indirect Charges - N/A**

**Conferences and Workshops:**

No additional workshop or conferences are planned at this time.

**Meals and Refreshments:**
Details for specific events (including cost, location, timing, etc.) are to be determined during the one-year planning period and are not yet known. Therefore, the use of light refreshments/meals at public events as tools to encourage increased attendance, ease the burden of participation for attendees,

and to help foster a positive and diverse atmosphere will be determined during that process. The anticipated expenses would then be added to the plan and subject to EPA approval.

**Program Income – N/A**

**Other**

Does the grant involve or relate to geospatial information? Includes info identifying geographic location or application/tools associated with such information – GPS, mapping or statistical data.

- The definition of LIDAC communities as discussed on the first page of the workplan involves CEJST-identified census tracts, which technically utilizes geospatial information for categorical eligibility. The RI Coalition does not plan to develop applications or tools associated with such information, beyond eligibility criteria as defined in the NOFO.

Exhibit 3



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**  Termination of EPA Assistance Agreement 5H-84091001 under 2 CFR 200.340

**FROM:**  Devon Brown, EPA Award Official

**TO:**  Terri Brooks, Assistance Director, Financial & Contract Management
State Of Rhode Island & Providence Plantations

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84091001 awarded to State Of Rhode Island & Providence Plantations. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Brandon Pierce, EPA Grant Specialist
    April Nowak, EPA Project Officer
    Shauna Beland, Grantee Program Manager

Exhibit 4



**STATE OF RHODE ISLAND**
**OFFICE OF**
**ENERGY RESOURCES**

August 28, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gase Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington DC 20460

RE: Disagreement with Modification No. 2 to Grant Number (FAIN): 84091001, dated August 8, 2025

Dear Mr. Brown:

On August 7, 2025, Rhode Island Office of Energy Resources ("OER") received a memorandum from you that purported to terminate EPA Assistance Agreement 5H-84091001 under 2 CFR 200.340 ("Termination Letter"). The Termination Letter outlined a Dispute process pursuant to 2 CFR 1500.15 with a Dispute deadline of 30 days. The Termination Letter also stated, "The EPA Grants Management Office will issue an amendment to the agreement to document the termination."

The next day, OER received a document titled "Assistance Amendment" dated August 8, 2025. That document states it is "Modification Number: 2" to Grant Number 84091001. Under its "Explanation of Changes" the document states that it requires OER to stop work, terminates the agreement, reduces performance period duration, curtails the scope of work, and adds administrative terms and conditions. In the "Notice of Award" section, it states that if the recipient disagrees with the terms and conditions specified, it must furnish a notice of disagreement within 21 days.

Please accept this letter as OER notice of disagreement with Modification No. 2 dated August 8, 2025, issued under your signature as EPA Award Official. OER also disagrees with any suggestion in the Assistance Amendment that any attempt to draw down funds could function as a waiver of OER dispute rights, which is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination per 2 CFR 200.305(b)(3) as well as the Termination Letter's specific statement that costs incurred prior to the termination date are allowable.

OER will be filing a Dispute of the Termination Letter in a separate letter to the Dispute Decision Official within the 30 days provided in the Termination Letter.

Please acknowledge receipt of this notice of disagreement and contact OER via the below-signed designee to discuss resolution of this disagreement as soon as possible.


*Terri L. Brooks*

Terri Brooks
Rhode Island Office of Energy Resources
Assistant Director, Financial & Contract Management

Exhibit 5



**STATE OF RHODE ISLAND**
**OFFICE OF**
**ENERGY RESOURCES**

September 5, 2025

Michael Molina, EPA Dispute Decision Official
U.S. Environmental Protection Agency
molina.michael@epa.gov
Office of Mission Support
1200 Pennsylvania Avenue NW
Washington DC 20460

RE: Dispute of Termination of EPA Assistance Agreement 5H-840891001 dated August 7, 2025

Dear Mr. Molina:

Please accept this letter as the State of Rhode Island and Office of Energy Resources' ("OER") dispute with the termination notice issued by the Environmental Protection Agency ("EPA") on August 7, 2025, purporting to terminate EPA Assistance Agreement 5H-840891001 under 2 CFR 200.340 ("Termination Letter").[1] The next day, OER received a document titled "Assistance Amendment" dated August 8, 2025,[2] which OER previously responded to on August 28, 2025. Now, OER timely files this letter in accordance with 2 C.F.R. § 1500.15 and all other relevant parts of 2 C.F.R. . § 1500 Part E, disputing the August 7, 2025 Termination Letter.

Pursuant to 2 CFR 1500.15, we are writing to notify you as the EPA Dispute Decision Official that OER disagrees with the attempt to terminate the Assistance Agreement. The termination notice: (1) violates the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only unobligated balances and preserved funds already awarded to grantees; (2) violates the legally binding assistance agreement dated July 9, 2024; (3) provides no valid reason for termination pursuant to 2 C.F.R. 200.341; (4) is arbitrary, capricious, and not supported by substantial evidence; (5) violates constitutional boundaries; and (6) causes irreparable harm to Rhode Islanders.

The following is a more detailed statement of the specific legal and factual grounds for this notice of disagreement:

**FACTUAL GROUNDS**

---

[1] Ex. 1 (attached).
[2] Ex. 2 (attached).

On October 12, 2023, OER submitted an application under EPA's Solar for All[3] Notice of Funding Opportunity EPA-R-HQ-SFA-23-01. In developing its application, OER consulted with over twenty unique stakeholder organizations, including Rhode Island Energy, the state's only investment owned utility, the Rhode Island congressional delegation, the Rhode Island League of Cities and Towns, the Board of Directors of Rhode Island Commerce, The Rhode Island Center for Justice, community-based organizations, labor organizations, solar installers and developers, and non-profit organizations. Twelve of the organizations provided letters supporting the program proposal. On April 22, 2024, EPA announced that it had selected 60 applicants to receive Solar for All awards, including "states, territories, Tribal governments, municipalities, and nonprofits."[4] EPA announced that it obligated these funds as part of the larger Greenhouse Gas Reduction Fund.[5] As one of the recipients of the obligated funds, OER received an Assistance Agreement for $49,330,000 dated July 9, 2024.[6]

Relying on the Assistance Agreement, OER negotiated its Work Plan and budget with EPA.[7] OER's Work Plan proposed to invest $43 million in financial assistance for residential-serving solar and storage programs. Financial assistance activities were to span six key programmatic areas:

- $1 million to support a direct-ownership grant program for single family low-income homes, reducing the upfront cost of solar
- $6.6 million to support the deployment of structural and electrical upgrades necessary to make single family homes solar-ready
- $250,000 to support the deployment of energy storage installed simultaneously with solar for single-family homes, offering resiliency benefits to communities historically faced with more frequent outages
- $3.7 million to support the deployment of solar for multifamily buildings that would directly benefit all of a building's residents.
- $30 million to support the expansion of RI's community solar program, offering solar savings to thousands of renters and other low-income residents who cannot take advantage of direct ownership solar programs
- $1.3 million to support municipal development of community solar projects on preferred sites such as landfills, gravel pits and quarries, highway and major road median strips, brownfields, superfund sites, parking lots or sites that are designated as appropriate for carports, and rooftops.

---

[3] *Greenhouse Gas Reduction Fund,* U.S. EPA, https://www.epa.gov/greenhouse-gas-reduction-fund; https://www.epa.gov/system/files/documents/2023-04/GGRF%20Implementation%20Framework_730am.pdf at pp. 41-52.

[4] *See* https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.

[5] *See* https://www.epa.gov/newsreleases/epa-awards-27b-greenhouse-gas-reduction-fund-grants-accelerate-clean-energy-solutions.

[6] Ex. 3 (attached).

[7] Ex. 4 a and b (attached).

OER received an Assistance Amendment from EPA on December 18, 2024 that removed a 2% funding restriction and incorporated the Work Plan documentation.[8] Beyond financial assistance, OER's Solar for All effort planned to provide technical assistance for community solar project siting and pre-development, interconnection design, economic analyses, community engagement, as well as administrative support for subrecipient coalition partners. OER also signed on as a pilot state to participate in the Energy Connector, a Department of Energy Program, which connects LIHEAP customers with community solar subscriptions. OER took steps to launch a solar and energy literacy initiative that would have supported OER's local neighborhood associations and community-based organizations' efforts to increase residents' understanding of their solar options and potential bill savings. OER has also been in the process of designing community solar consumer protection forms. Funds were also specifically dedicated to workforce development.

OER met regularly with program partners to advance Solar for All planning up until the termination letter was received. All programs and initiatives included in the Work Plan received approval from EPA to fully exit the planning period, with funding restrictions fully removed, prior to receiving the termination letter. As a result of the Work Plan being in full effect, momentum with coalition partners was picking up speed at the time the termination letter was received. At Rhode Island Commerce's Renewable Energy Fund ("REF"), discussions focused on three of the six SFA programs, as REF's programs would be the first to launch in 2025. REF had also been in the process of designing an application portal. With Rhode Island Housing ("RIH"), OER collaborated on programs impacting multi-family residents, with conversations focused on how to allocate EPA's in-kind technical assistance offerings to key parameters of multifamily program implementation. Meetings with the Rhode Island Infrastructure Bank ("RIIB") centered on designing the Renewable Ready Program and technical assistance offerings for community solar on preferred sites. In addition, OER updated its program website with new details, participated in public meetings, events and conferences to share financing and program plans, and gathered feedback from potential adopters. OER also joined working groups with other SFA award recipients to refine program goals and reporting based on best practices.

OER was officially approved by EPA to exit the Planning Period on March 12, 2025. Since that time, OER further developed program plans with REF's staff to implement the adder programs associated with residential solar offerings and was slated to launch those programs by the end of 2025. Similarly, OER was in the process of finalizing subaward agreements with REF when it received the Termination Letter stating the program efforts must end.

The Termination Letter states that OBBBA repealed the underlying authority for the Solar for All program and rescinded unobligated amounts to carry out the program. EPA's opinion is that OBBBA "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and that EPA "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the Solar for All program. The letter also noted that recipients could continue to request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of the Termination Letter.

---

[8] Ex. 5 (attached).

3

The subject line of the Termination Letter states that the termination is under 2 C.F.R. § 200.340, and the Letter states that OER should follow the closeout process outlined in 2 C.F.R. § 200.344. However, the Letter does not state the grounds EPA relied upon to require the closeout process. To be clear, OBBBA did not eliminate EPA's entire administrative budget. To the contrary, on March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" in fiscal year 2025.[9] Further, OER has complied with all Agreement terms and conditions and was achieving all the deliverables and activities within the agreed upon scope of work.

Prior to the Termination Letter, OER's ASAP account contained $48,930,000.00 of OER's Solar for All award. On August 8, OER learned that its ASAP account for the Solar for All program had been suspended and that the grant amount was reduced to $3.4M; OER's ASAP account for the Solar for All program was no longer visible on the ASAP site. On August 11, the ASAP account reappeared. As of August 21, OER's Finance Director noted the ASAP account access displayed a "liquidated" status and funds are available to draw down. However, the "available balance" on the account was substantially reduced from $48,841,181.50 to $3,411,862.45, and the performance period end dates were changed from April 30, 2029 and August 30, 2029 to August 15, 2025 and December 8, 2025 per Assistance Amendment 5H-84091001-2.

## LEGAL GROUNDS

1. **EPA's Termination of OER's Solar for All Assistance Agreement Exceeds and Contradicts OBBBA's Language, Which Rescinded Unobligated Balances and Preserved Funds Already Awarded to Recipients.**

EPA's Termination Letter states that the Assistance Agreement is terminated because it is required by OBBBA. Section 60002 of OBBBA provides:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

OER's funds were all obligated many months before OBBBA and were, therefore, not rescinded by Section 60002.[10]

Funds awarded to Solar for All grantees were obligated upon award and subject to a legally binding Assistance Agreement whereby EPA "promise[d] to spend the money, either immediately

---

[9] Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

[10] On August 11, 2025, three members of Congress wrote to Administrator Zeldin that he had "falsely claimed that passage and enactment of H.R.1 . . . gives [him] the authority to take back obligated funds." Contrary to this claim, "grant funding awarded before [H.R. 1] was enacted . . . does not constitute unobligated funds subject to OBBBA. *See* https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/august-11-epa-letter-re-ggrf-ejcj-and-hr1.pdf.

4

or in the future, as work under the obligation is completed."[11] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[12] In other words, the Solar for All funds were obligated at the time OBBBA was passed. OBBBA did not change this and could not have legally rescinded these obligated funding awards.[13]

Where the plain language of a statute is unambiguous, no further analysis is required.[14] Here, the plain language of OBBBA is clear that obligated funds are not affected by Section 60002. EPA's action in terminating OER's Solar for All Assistance Agreement is therefore contrary to the plain language of OBBBA.

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.[15] Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. Congress did not direct or otherwise authorize EPA to terminate the Solar for All program. EPA is acting beyond its authority because it defies Congress's express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All appropriations are rescinded. EPA should therefore reinstate OER's Solar for All Assistance Agreement.

## 2. EPA's Decision to Terminate OER's Solar for All Assistance Agreement Lacks Any Legal Basis.

The Termination Letter does not give any reason for termination other than its alleged reliance on OBBBA. The uniform grant regulations at 2 C.F.R. § 200.340(a) provide the circumstances under which the government may terminate an award agreement, which include (1) failure to comply with the agreement's terms and conditions; (2) with consent of the recipient; (3) by request of the recipient; or (4) otherwise pursuant to the terms and conditions of the agreement, to the extent authorized by law.

2 C.F.R. § 200.340 does not authorize EPA to terminate an assistance agreement when EPA believes that it "no longer possess either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring" of a Federal program.

---

[11] *See* https://www.usaspending.gov/explorer?glossary=obligation.

[12] *See* https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining _state_grant_and_expediting_outlays.pdf.

[13] On August 14, 2025, 32 senators wrote to Administrator Zeldin to inform him that his interpretation of OBBBA was incorrect. *See* https://www.epw.senate.gov/public/_cache/files/7/f/7fc428d4-aafa-4991-a25e-655d295fc0e2/D93F6E6E26805AFA241C4D39073BED3B75A6F496F4350B82CC4D782AAE 9BC35C.8.14.25-letter-to-epa-re-solar-for-all.pdf.

[14] *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end.").

[15] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).

5

Nor does it authorize EPA to terminate an assistance agreement when Congress rescinds EPA's "administrative cost appropriation" as the Termination Letter alleges. Indeed, EPA has not identified any provision of 2 C.F.R. § 200.340 which authorizes termination of OER's Solar for All Assistance Agreement.

The terms and conditions of the Assistance Agreement do not allow for termination under the circumstances described in the Termination Letter. OER has not, and unequivocally does not, agree to any attempts to terminate the Agreement based on EPA's erroneous, bad faith interpretation of OBBBA Section 60002. Congress intended for these funds to benefit the public by providing efficient and sustainable energy options to meet the country's growing energy needs. OER complied with the Assistance Agreement's terms and conditions and does not consent to the Assistance Agreement being terminated.

EPA has identified no bases for unilateral termination of OER's Solar for All Agreement. Termination for noncompliance is only possible when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."[16] Neither condition exists. Indeed, EPA has not identified any noncompliance, has provided no evidence of waste, fraud, or abuse, nor has it requested that OER take action to cure any deficiencies in its performance.

2 C.F.R. § 200.340(a)(4)'s language allowing termination "if an award no longer effectuates the program goals or agency priorities" does not apply either. When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget ("OMB") confirmed that the termination language relating to agency priorities did not allow agencies to implement arbitrary cancellations.[17] In 2024, OMB completed another round of revisions to this provision.[18] After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that may form a ground for termination, but only if "the language is included in the terms and conditions of the award."[19] The agency must "clearly and unambiguously" include (a)(4) in the Assistance Agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4).[20]

Here, because the Assistance Agreement does not include the "agency priorities" provision of (a)(4) as a ground for potential termination in its terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the Agreement. EPA acted contrary to the governing

---

[16] Ex. 3 at p. 30; Ex. 5 at p. 25.

[17] Guidance for Grants and Agreements 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).

[18] Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024).

[19] *Id.* at 30,089.

[20] *Id.*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

regulations.[21] OER's award must be immediately restored to its full amount.[22] OER requests no more or less than for EPA to follow the law and rescind this unlawful termination.

### 3. EPA's Decision to Terminate OER's Solar for All Assistance Agreement is Arbitrary and Capricious.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[23] In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[24]

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[25] Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decision making process."[26] Agency action taken on pretextual grounds violates the requirement of reasoned agency decision-making.

EPA's decision to terminate OER's Solar for All Assistance Agreement is arbitrary and capricious because: (1) EPA provided no reasoned basis for the termination, (2) EPA failed to undertake any individual assessments of OER's Solar for All Assistance Agreement, (3) EPA failed to provide OER notice and an opportunity to cure, and (4) EPA ignored OER's substantial reliance interests and the harmful impact of an abrupt and complete termination of the Solar for All Agreement.

EPA's sole stated rationale for the Termination Letter—that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 award recipients"—is a contrived, irrational, and insufficient explanation and thus not a reasoned basis for that action. EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that Congress appropriated to EPA in March to pay for "Environmental Programs and Management."

EPA likewise failed to engage in reasoned consideration of OER's Solar for All Assistance Agreement before categorically terminating the Solar for All program. EPA has identified no facts

---

[21] 2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30,089.

[22] 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.

[23] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[24] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[25] *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

[26] *Id.*

that would support the termination. EPA's public statements[27] demonstrate that its stated rationale was pretextual.

Also arbitrary was EPA's failure to give notice to OER so OER could address any alleged failures. 2 C.F.R. 200.208 requires EPA to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to satisfy the conditions.[28] It is only after a grantee fails to meet the conditions imposed that an agreement can be terminated.[29] EPA's actions are contrary to these procedures. EPA terminated the Assistance Agreement without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure.[30] Contrary to Section 200.208's notice-and-cure requirements, EPA operated in secret to withdraw access to OER's accounts. The lack of notice was arbitrary, capricious, and deprived OER of due process.

### 4. EPA's Withdrawal of OER's Duly Appropriated and Obligated Solar for All Assistance Agreement Violates the Constitution's Separation of Powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[31] The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[32] The Executive has no power "to enact, to amend or to repeal statutes."[33] Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

*Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[34] U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[35]

---

[27] Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025, 11:07 AM), https://x.com/epaleezeldin/status/1953518426602803684; *see also* https://www.youtube.com/watch?v=CfU3bYKmBOA (referring to Solar for All as a grift).
[28] 2 C.F.R. § 200.208(d)-(e).
[29] 2 C.F.R. § 200.339(a) & (c) (authorizing a temporary hold on payments, suspension or termination unless or until the recipient takes corrective action).
[30] 2 C.F.R. § 200.208.
[31] U.S. Const. art. I, § 1.
[32] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).
[33] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).
[34] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).
[35] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).

8

The Termination Letter and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[36] For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of OER's funding agreement.

*Take Care Clause*

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed."[37] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[38] Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and OER individual Assistance Agreement on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration... is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind OER's funds, which were obligated prior months prior to "the day before the date of enactment of [the] Act."[39] EPA's Termination of OER's Assistance Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to OER prior to September 30, 2024. EPA violated constitutional separation-of-powers constraints because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[40] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[41] Consistent with these principles, the Executive

---

[36] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

[37] U.S. Const. art. II, § 3.

[38] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

[39] OBBBA Section 60002.

[40] U.S. Const. Art. I, § 9, cl. 7.

[41] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).

9

acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[42] For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[43] When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating OER's Solar for All Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[44] When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[45] EPA's termination of OER's Solar for All Assistance Agreement altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Letter and subsequent termination of OER's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind OER's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

> **5. The Termination of OER's Solar for All Assistance Agreement Will Cause Irreparable Harm to Rhode Islanders.**

---

[42] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).
[43] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").
[44] U.S. Const. amend. X.
[45] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

OER's Solar for All Assistance Agreement supports energy independence, reducing energy costs, and protecting clean air and water, thereby reducing the cost of living. Rhode Island's retail electricity prices have risen approximately 38% since 2022, outpacing inflation, and rising temperatures, extreme weather, and expanding data centers will continue to drive higher demand.

Between the various programs OER intended to offer using Solar for All funding, OER was expecting to serve 5,225 low-income households, reducing electrical bills by 20% for each participating household. With the loss of Solar for All funding, Rhode Island is no longer able to offer solar grants specific to low-income residents. Additionally, OER will no longer have access to funding for providing low-income carveouts to its existing programs that would sufficiently drive low-income program participation. It will no longer be able to offer any programs that can support the enabling structural and electrical upgrades that make a home solar-ready. These upgrades would have helped build wealth for these homeowners and increased home safety. It will no longer be able to offer funding for solar installations to serve affordable housing properties that serve low-income Rhode Island renters. OER will face significant challenges in supporting the regulatory expansion of the Community Remote Net Metering program as allowed by statute under § 39-26.4-3. OER would no longer be able to offer any financial or technical assistance programs for municipalities to install community solar on preferred sites.

In addition, Solar for All funding was expected to invest $1 million in job training opportunities for Rhode Island's solar industry. OER had partnered with Rhode Island Department of Labor and Training, Real Jobs Rhode Island and Building Futures RI to recruit 150–200 participants from disadvantaged communities into electrician apprenticeships, resulting in 75–100 new licensed electricians. This investment would have ensured that training programs adhered to the U.S. Department of Labor and Commerce Good Jobs Principles and connected graduates with high-quality careers in Solar for All projects. Projects would have advanced contracts with local installers, construction workers, and electricians. This compounds all harm already caused to the solar industry by the early end of federal tax credits for distributed solar.

The premature end of Solar for All funding also harms OER as an employer. OER had used Solar for All funding to support a full-time employee. This employee has been essential in managing progress on the detailed Work Plan, timeline, and budget through project management software. They have also led administrative processes for memoranda of understanding with subrecipients and coalition partners, while ensuring accurate reporting on program goals. Their work has kept both Solar for All objectives and broader OER goals on track. Without this funding, staff will forgo these partnerships and will have to shift to other projects, eating into other programmatic funds and depleting those funds far more quickly than anticipated. Rhode Island is simply unable to make up for this loss of funds to advance residential serving solar work.

More generally, loss of Solar for All funding and the loss of federal support for solar energy will harm Rhode Island and its residents. At a time of expanding electrical demand, solar and wind represent the least expensive and climate resilient way to add domestic electrical supply in Rhode Island. Rising energy prices and reduced economic growth will hit low- and moderate-income residents the most—exactly the population that Solar for All seeks to help. That does not even account for the public health savings that come from the fact that, compared with other means of generating electricity, solar energy is pollution-free.

11

Moreover, OER acted in reasonable reliance on its fully obligated Solar for All funding continuing to be available. Since December 2024, OER expended more than 404 employee hours on Solar for All programming. In so doing, OER had to forgo other funding opportunities, program structures, and scaling of other solar deployment opportunities. These hours reflect actual staff participation across all engagements tracked in project management software and represent the extensive effort required to ensure program readiness and compliance with the Solar for All Terms and Conditions. This does not include any of the time spent on writing and submitting the SFA application, or any of the activities completed in the 14-month period between submitting the application and submitting the final revision to OER's approved Work Plan. There is no way to recover this lost time or effort. OER cannot simply backfill the loss of funding with state funds to keep its Solar for All offerings available. The same is true for OER and Rhode Island Housing's multifamily efforts. Rhode Island has invested funds in net zero multifamily housing over the past five years, but those efforts will be limited with the loss of technical assistance to help overcome regulatory and programmatic barriers. The Solar for All program also allowed Rhode Island to work closely with EPA in developing its Work Plan and with the National Renewable Energy Lab in scoping technical assistance needs, including work on multifamily housing. The loss of these collaborations and programmatic support cannot be remedied.

## REMEDY OR RELIEF SOUGHT

If EPA claims that it no longer possesses the requisite personnel or administrative funding required to oversee and administer the Award, OER respectfully proposes the appointment of an independent third party to administer and oversee the Award, subject to EPA's reasonable oversight and supervision.

Until OER's dispute with EPA has been resolved, it objects to any claims of noncompliance under 2 C.F.R. 200.344(i).

OER will take the course of action necessary to prevent irreparable and continuing harm to our employees, contractors, subrecipients, program beneficiaries, and the communities we serve.

The specific remedy or relief sought here is rescission of the termination of this Assistance Agreement, reinstatement of the Assistance Agreement for the originally awarded amount, scope of work, and performance period, and reinstatement of the notice to proceed. In furtherance of this Dispute, please find attached:
- A copy of the disputed Agency Decision; and
- Copies of supporting documents (Exhibits 1-5).

The name and contact information, including email address, of OER's designated point of contact for this notice of disagreement is: Terri Brooks, Assistance Director, Financial & Contract Management, One Capitol Hill, 4th Floor, Providence, RI 02908. terri.brooks@energy.ri.gov. 401-574-9107.

12

Please acknowledge receipt of this Dispute and contact me to discuss resolution of this Dispute as soon as possible.

Very truly yours,

*Terri L. Brooks*

Terri Brooks
Assistant Director, Financial & Contract Management
Rhode Island Office of Energy Resources

CC: Devon Brown, EPA Award Official *via email* (brown.devon@epa.gov)
   April Nowak, EPA Program Officer *via email* (april.nowak@epa.gov)

13

Exhibit 7



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 23, 2025

**MEMORANDUM**

**SUBJECT:**    Update on Dispute of EPA Assistance Agreement 5H-84091001 under 2 CFR 200.340

**FROM:**    Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**    Terri Brooks, Assistant Director, Financial & Contract
Management Rhode Island Office of Energy Resources

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84091001. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.24
17:02:11 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# Exhibit 8



STATE OF RHODE ISLAND
# OFFICE OF
# ENERGY RESOURCES

*One Capitol Hill, 4th Floor*
*Providence, RI 02908*
*www.energy.ri.gov*

November 6, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC 20460


Re:     Objection to Closeout of EPA Assistance Agreement 5-H84091001


Dear Mr. Brown:

On September 5, 2025, the State of Rhode Island and Office of Energy Resources submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 5H-840891001 pursuant to 2 C.F.R. § 1500.15. Despite that timely dispute, on October 1, 2025, the Office of Energy Resources received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that the State of Rhode Island complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment." The Office of Energy Resources has now received EPA's October 23, 2025 letter purporting to declare moot the State of Rhode Island's "dispute regarding the termination of Assistance Agreement 5H-840891001." The sole basis for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that the State of Rhode Island close out Assistance Agreement 5H-840891001.

As an initial matter, clarification is needed because EPA's October 23, 2025 letter references "your dispute submitted on August 28, 2025." But the State of Rhode Island and Office of Energy Resources did not submit its Part 1500 dispute on August 28, 2025. Rather, August 28, 2025 is the date that the State of Rhode Island and Office of Energy Resources submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025 Assistance Amendment. Thus, it is unclear which termination dispute "EPA has rendered" moot.



**STATE OF RHODE ISLAND**
**OFFICE OF**
**ENERGY RESOURCES**

*One Capitol Hill, 4th Floor*
*Providence, RI 02908*
*www.energy.ri.gov*

The State of Rhode Island disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending. EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation. At a minimum, EPA should stay the administrative dispute until the conclusion of the State of Rhode Island's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation).

More importantly, and regardless of any determination regarding the status of the State of Rhode Island and Office of Energy Resources' administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, the State of Rhode Island has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require the State of Rhode Island to close out while litigation is pending that directly concerns EPA's termination of this grant. *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." The State of Rhode Island has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated $45,429,319.05 from the State of Rhode Island's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, the State of Rhode Island has not been able to complete the work required under Assistance Agreement 5H-840891001. Accordingly, EPA necessarily cannot "determine that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

The State of Rhode Island does <u>not</u> agree to close out Assistance Agreement [5H-840891001] while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

Please confirm receipt of this correspondence no later than 5:00pm on November 10, 2025.



STATE OF RHODE ISLAND
**OFFICE OF**
**ENERGY RESOURCES**

*One Capitol Hill, 4ᵗʰ Floor*
*Providence, RI 02908*
*www.energy.ri.gov*

Sincerely,

*Terri L. Brooks*

Terri Brooks
Assistant Director, Financial & Contract Management
Rhode Island Office of Energy Resources

CC: Michael Molina, Principal Deputy Assistant Administrator *via email*
(molina.michael@epa.gov)