# EXHIBIT 1

5H - 84089901 - 1    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY — Assistance Amendment | | |
|---|---|---|
| **GRANT NUMBER (FAIN):** 84089901 **MODIFICATION NUMBER:** 1 **PROGRAM CODE:** 5H | | **DATE OF AWARD** 12/18/2024 |
| **TYPE OF ACTION** No Cost Amendment | | **MAILING DATE** 12/18/2024 |
| **PAYMENT METHOD:** ASAP | | **ACH#** 6097 |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| STATE OF VERMONT PUBLIC SERVICE DEPARTMENT 112 STATE ST MONTPELIER, VT 05620-2601 EIN: 03-6000264 | STATE OF VERMONT PUBLIC SERVICE DEPARTMENT |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Christopher Heine 112 State Street MONTPELIER, VT 05620-2601 **Email:** christopher.heine@vermont.gov **Phone:** 802-522-7554 | Kelley Moore WD/DWMIB **Email:** Moore.Kelley@epa.gov **Phone:** 212-637-3265 | Caitlyn Chandler OGD-GMBOD, 3903R 1200 Pennsylvania Ave NW Washington, DC 20460 **Email:** Chandler.Caitlyn@epa.gov **Phone:** 202-564-0592 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Vermont Solar programs (1) Community Solar; (2) Multi-Family Residential Solar; and (3) Single Family Residential Solar

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD** 09/01/2024 - 08/31/2029 | **PROJECT PERIOD** 09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST** $ 62,450,000.00 | **TOTAL PROJECT PERIOD COST** $ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA - Office of the Administrator 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** Barbara Proctor - Associate Award Official | **DATE** 12/18/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| **EPA Amount This Action** | $ 62,050,000 | $ 0 | $ 62,050,000 |
| **EPA In-Kind Amount** | $ 400,000 | $ 0 | $ 400,000 |
| **Unexpended Prior Year Balance** | $ 0 | $ 0 | $ 0 |
| **Other Federal Funds** | $ 0 | $ 0 | $ 0 |
| **Recipient Contribution** | $ 0 | $ 0 | $ 0 |
| **State Contribution** | $ 0 | $ 0 | $ 0 |
| **Local Contribution** | $ 0 | $ 0 | $ 0 |
| **Other Contribution** | $ 8,196,428 | $ 0 | $ 8,196,428 |
| **Allowable Project Cost** | $ 70,646,428 | $ 0 | $ 70,646,428 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 1,399,780 |
| 2. Fringe Benefits | $ 1,004,687 |
| 3. Travel | $ 13,791 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 38,800 |
| 6. Contractual | $ 16,369,200 |
| 7. Construction | $ 0 |
| 8. Other | $ 43,253,220 |
| 9. Total Direct Charges | $ 62,079,478 |
| 10. Indirect Costs: 26.47 % Base Personnel Only | $ 370,522 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and chandler.caitlyn@epa.gov.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and chandler.caitlyn@epa.gov.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: moore.kelley@epa.gov and chandler.caitlyn@epa.gov

Payment requests (if applicable): moore.kelley@epa.gov

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: moore.kelley@epa.gov

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa. gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States: Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

## 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the [EPA Build America, Buy America General Term and Condition](#), which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

   1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

   2. Privately-owned commercial buildings when they meet the "public function" test;

   3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT 2

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Solar for All Vermont**
**DRAFT Work Plan**
**Project Period: 9/1/24 – 8/31/29**
**[Note: 11/15/2024 Submittal]**

**Project Title:**         Solar for All Vermont
**Grant Number:**      84089901
**Organization Name:** Vermont Public Service Department (PSD)
**Geography:**          Entire state of Vermont
**Definition of LIDAC:** Categorical eligibility for recipients of benefits from LIHEAP, 3 SquaresVT, Fuel Assistance, Reach Up, WIC, other programs; residents of disadvantaged communities as defined by the Climate & Economic Justice Tool; properties providing affordable housing; and VT electric utility customers with household incomes not exceeding 80% AMI or 200% of FPL (whichever is highest) percentage. This LIDAC definition will be used for all three of Vermont's Solar For All programs.

**Introduction**

**Section 1:  Project Description**

   **Overview**

Solar for All Vermont's (SAV) mission is to lower participants' overall electricity cost burden through the provision of the benefits of ownership of solar arrays to low-income and disadvantaged Vermonters across the state while maximizing greenhouse gas (GHG) emission reductions and solar market development. SAV will provide the incentives, organizational structures, and program policies needed to install thousands of solar systems on the roofs of low-income and disadvantaged homeowners, on the roofs and sites of managed permanently affordable apartment buildings, and as large community arrays that will provide meaningful benefits to the participating homeowners, affordable housing residents, and renters.

The megawatts of solar capacity installed through SAV will provide direct GHG savings by offsetting fossil fuel generation of electricity, especially during peak power demand events during summer months. Additionally, GHG savings will be realized with the installation of battery storage systems that will allow homeowners to displace fossil-fueled back-up generators. SAV will provide meaningful benefits to its participants through electric bill savings of over 20% for the life of the solar systems. SAV will also provide community benefits of emission-free power that will provide lasting local solar and construction workforce and solar market development. SAV will have long-term impact by stimulating additional solar development beyond its initial period of performance by building a

stronger solar market and establishing financing programs that will leverage private capital and other GHG reduction programs in Vermont that will continue to stimulate the growth of the solar market in Vermont beyond the period of performance for the SAV award.

**Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**
This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
Goal 1: Take proactive steps to address the Climate Crisis
Objective 1.1: Reduce Emissions that Cause Climate Change

**Environmental Results - Outputs and Outcomes**

**Impact Targets**

The PSD estimates that their SAV proposal can equitably reach the following seven beneficial impacts targets by the end of the program period (see Table 1 below):

1. Number of households projected to benefit: 8,302
2. Megawatts of new solar capacity deployed over first five years
    a) Residential: 5.12
    b) Residential-serving community arrays: 16.34
3. Megawatt hours of storage capacity deployed: 2,210
4. Annual short tons of annual carbon dioxide ($CO_2$) emissions reduced: 19,490
5. Annual average household savings realized: $472
6. Workforce development
    a) Number or solar laborers completing training: 200
    b) Number of electrician apprentices completed: 100
    c) Overall number of solar jobs in VT: 2,500

The impact targets for the SAV will be further refined during the Planning Period as each part of the SAV program goes through a community engagement and stakeholder process and more detailed data on costs are developed.  Finalized impact targets will be provided before the end of the Planning Period.

**Table 1: Impact Metrics Table**

| | Market Segment Programs | | | |
|---|---|---|---|---|
| *Impact Metrics* | *RAISE* | *MASH* | *ACRE* | *Totals or Averages* |
| *Number of households served by solar projects* | 1,024 | 3,016 | 4,262 | 8,302 |
| *Solar Capacity to be Installed* (*MW AC*) | 5.12 | 7.99 | 8.35 | 21.47 |

| | | | | |
|---|---|---|---|---|
| *Capacity of Storage to be Installed* (kWh) | 1,950 | 260 | 0 | 2,210 |
| *CO₂ Emissions avoided* (short tons) | 4,250 | 7,210 | 8,030 | 19,490 |
| *Annual Household Savings* ($) | $453 | $672 | $336 | $472 |
| *Monthly Percent Household Electric Bill Savings* | 32.9% | 48.7% | 24.3% | 34.2% |

This proposal's three program segments focus on expanding the PSD's ACRE community-scale program, coupled with new programs for affordable housing occupants (MASH), and individual residential homes for rooftop installations (RAISE). Approximately 8,300 Vermont households are expected to be served across the suite of programs. The program will facilitate just over 21 megawatts (MW) of solar between the more than 8.3MW of community solar through the ACRE Program, just under 5 MW of distributed roof-top solar projects in the RAISE Program and an additional 8 MW installed through the MASH Program, as well as an estimated additional 2,200 kWh of storage, providing access for customers to technology that improves their resilience.

This additional energy generation capacity is expected to reduce and avoid approximately 19,400 tons of carbon dioxide ($CO_2$) emissions from being released into the atmosphere over the coming years. The ACRE Program is expected to displace approximately 8,000 tons, RAISE 4,200 and the MASH is expected to displace approximately 7,200.

With a weighted average savings of $472 per household per year across all three programs, the RAISE program is estimated to provide $453 and the ACRE Program is expected to deliver $336 of annual savings. The MASH Program is expected to deliver an average of $672 per year per household served. All the savings estimated calculations will be further verified and finalized during the Planning Period.

Workforce outcomes:
Vermont's solar workforce has shown signs of decline between its 2017 peak of 2,379 jobs down to 1,771 in 2023. Solar For All funding will offer an opportunity for the reinvigoration of the solar workforce and will leverage other funds available for workforce development being deployed in Vermont including the Vermont Department of Labor's existing Certified Apprentice program for electricians and solar laborers, the Serve, Learn, and Earn program, the Vermont Works for Women program, and other programs that may be developed during the Planning Period. The SAV program will catalyze a substantial, and sustained uptrend, in well-paying solar jobs in Vermont with a target of increasing the total number of solar jobs in Vermont to 2,500 by the end 2029.

Alignment with GGRF Program Objectives:

The SAV program supports the following objectives of the GGRF directly with programs that will be used to build solar systems and the solar workforce in Vermont.

1. Reducing air emissions of $CO_2$ and Criteria Air Pollutants in Vermont and the New England region by increasing the amount of solar energy being used on-site and fed into the electrical grid that will reduce emissions from fossil-fueled generation.

2. Provide benefits to disadvantaged communities and households with low incomes through direct reductions in electric utility bills for those that pay for electricity and other reduced living-expenses for those tenants in managed affordable housing that don't have electric bills. SAV will also benefit these communities indirectly with increases in jobs and economic activity in the clean energy sector in Vermont.

3. Improve the solar energy market/economic sector in Vermont through specific solar workforce development efforts as the program increases the number of solar installations of all sizes and across the State via its three innovative programs.


## Section 2:  Project Design Plan

### Activities to be Conducted

Meaningful Benefit Plan:

Vermont's SAV consists of three separate programs. The details, including the meaningful benefit plans of all three programs, will be finalized during the award's Planning Period. The benefits of SAV's different solar market sector programs will be similar, but each of the three programs are intended to reach a different sector of Vermont's low-income population and disadvantaged communities (DACs) as follows:

1) The Residential Assistance in Solar Energy (RAISE) program will provide incentives and support for those living in DACs and/or that are low-income Vermonters that own their own single-family home to install solar systems on their roofs. The solar systems will make use of Vermont's net-metering program to provide streamlined permitting and meaningful reductions in the participating household's annual electric costs.

2) The Managed Affordable Solar Housing (MASH) program will provide incentives and technical support for the owners of permanently designated affordable housing to install solar on their buildings as well as providing opportunities for the tenants to participate in community solar projects.

   a) Many of the particulars of the MASH program will be developed during the Planning Period. There are many legal and regulatory issues in the affordable housing market sector that require more planning.  Looking at how the benefits of solar arrays can benefit tenants that don't pay an electric bill will be one such topic for the Planning Period.  Another will be how best to make solar benefits available to non-profit owned manufactured home communities.

3) The Affordable Community Renewable Energy (ACRE) program will support the installation of MW-scale community solar arrays of which membership shares will be offered to low-income Vermonters, with a focus on renters that don't have access to solar though the other two programs or homeowners whose homes aren't suitable for the solar arrays installed through the RAISE

program. The details of the ACRE program will be further refined during the Planning Period to design a program that has the community solar membership shares providing the maximum annual benefit on participants' electric bills and be transferrable, thus proving a tangible asset to the participants.

The three-program approach will provide multiple avenues for eligible Vermont households to access solar, meeting them where they are at and engaging them in SAV participation in the way that is most beneficial for them.

While the three programs will be finalized in the Planning Period the current program designs include the following benefits:
1) Increase access to roof-top and community distributed solar generation for households with low-income and those living in DACs that deliver the value of solar asset ownership, including via:
    a) Small solar arrays (e.g., 5 kW) with permitting and compensation through Vermont's net metering program. Eligible single-family homeowners will be able to have solar system installed on their roofs through a lease-to-own structure.
    b) Solar arrays located on-site of managed affordable housing, providing benefits for their permanently affordable rental property tenants and possibly (to be determined in the Planning Period) on manufactured homes in communities that are cooperatively owned by the tenants or by non-profit organizations. Financing incentives will help to build and leverage the existing, but very limited, solar financing options in Vermont. The SAV programs will have a long-term benefit on the solar financial market in Vermont by creating systems that allow non-profit financial organizations to cost effectively provide financing to low-income and disadvantaged Vermonters interested in capturing the benefits of solar energy, either on their own home or through a community array.
    c) Large community solar arrays that low-income and disadvantaged renters can participate in with memberships leading to direct on-bill savings at no cost to the participants.
2) Provide a minimum of 20% household savings on the average electric bill of a program participant's electric utility. Household savings will be calculated based on the average residential electric bill of each electrical distribution utility. The expected benefit of participation in the program through residential-serving community solar will be based on the statewide average residential electric bill as the community solar arrays will be offered to eligible customers state-wide. During the Planning Period the benefit calculations will be examined to determine if community solar benefits can be tailored to each participating household or to each participating distribution utility.
    a) During the Planning Period SAV will look to develop the programs to cost effectively increase electricity resilience to low-income and/or disadvantaged households that are dependent on electric medical equipment through the installation of battery storage, allowing customers to ride through power outages. The number of households that receive battery storage systems might reduce the number of households that receive solar PV systems. This Planning Period activity will determine how existing state programs to provide residential battery storage system can be integrated in the SAV program. Battery storage systems included in SAV will be targeted to participants in single-family homes receiving a solar array where they have electric powered medical equipment and where the frequency and duration of power outages have been above the Vermont average. Best practices of SFA programs will be followed in making

program eligibility determinations for solar storage system. Through existing programs homes that receive incentives for back-up battery systems will also receive technical support on operating the battery systems and how to make their homes more energy efficient to further lower energy costs and to extend the time the back-up batteries can provide power to the home. These battery systems will leverage and participate in utility storage and electrical panel upgrade programs where available to lower costs of the systems and increase the critical resiliency benefits for these participants.

   b) SAV will issue a contract in support of increased workforce development in the Vermont solar and storage sector.
   c) The program's goal is to provide approximately 10% of the participating single-family homes with a battery storage systems or other solar related upgrade, such as roof repair or tree trimming to increase solar production.

3) SAV participating homes could also receive SAV funds for an electric panel upgrade, tree trimming or roof repair as necessary to enable the solar and/or battery storage system to be installed. Program projections for these enabling measures are that approximately 10% of the participating single-family homes will be provided with upgrades, however, SAV will ensure that no more than 20% of the financial assistance be used for enabling system costs. Upgrades on a home will only be eligible in conjunction with a solar investment commitment for that home.

4) The program will help to create high-quality and long-lasting jobs in the solar industry and with electrical, battery storage, and solar contractors. The solar and battery systems installed through the program will help to build a trained workforce for the solar and battery storage sector. The SAV program will be able to leverage other workforce development efforts happening in Vermont for licensed electricians. There are other different workforce development programs/efforts happening in Vermont that pair well with SAV workforce development goals – such as for weatherization and other energy efficiency work in residential buildings. SAV will work with the solar companies and other aligned trades to support building their workforce by creating good-paying local jobs and careers in the solar and related industries. The SAV program will work with the Department of Labor to create workforce goals and metrics to demonstrate the impact of the SFA funding on workforce programs that will be used to for a competitively selected contract with a workforce development contractor. There will be a strong focus to ensure that the existing workforce development programs are coordinated with SAV's workforce development efforts.

In addition to the above, meaningful public benefits are addressed by Vermont's existing generation facilities permit law, Section 248. This law requires utilities and companies to obtain approval from the Public Utilities Commission in the form of a Certificate of Public Good for projects including electric generation from solar arrays that are interconnected to the electrical grid.  During this permit process all projects are evaluated for potential impacts and benefits on the environment, public health, and the local community. This includes considerations of aesthetics, historic sites, air and water purity, the natural environment, public safety and economics. The Vermont Agency of Natural Resources has developed best practices to provide guidance and recommendations that can be applied to Section 248 such as creating and maintaining pollinator friendly habitats around solar arrays. All solar generation projects funded through the three SAV programs will require a Certificate of Public Good.

Residential Assistance In Solar Energy (RAISE) Program Benefits

Avenues for direct ownership will be investigated during the Planning Period. SAV is currently looking at offering ownership through a lease to own, or shared ownership model.

A lease-to-own financial structure offered through one or more competitively selected Vermont financial institutions that can utilize the federal investment tax credits for solar will lower the cost of the solar array installed on the participating single-family homes. The financial institution(s) would co-own the solar system with the homeowner for the first five or six years (depending on IRS rules) and then would transfer full ownership of the solar array to the homeowner. The homeowner's portion of the costs could be covered by a subsidized lease that would not require any up-front costs and could be paid off by the end of the lease term. The homeowner will obtain ownership of the array without having to come up with extra dollars at the end of the lease period. If homeowner funds are needed at the end of the lease to obtain ownership there would be an option for a loan from our financial institution contractor that would have a payment low enough to maintain the annualized 20% savings on their monthly electric bill.

SAV will also include incentives for a limited number of back-up battery systems.  If storage systems are included, it will support the homeowner's resiliency during power outages and potentially reduce the strain on emergency services during outage events. The batteries can also provide demand response value for the utility, reducing the overall cost of service paid by all ratepayers.

SAV will determine during the Planning Period how the program will ensure that participants receive the required electric bill savings. Verification of saving will be through audit mechanisms such as review of utility bill and/or participant's electric meter's AMI data and interviews and surveys.

Managed Affordable Solar Housing (MASH) Program Benefits

The affordable housing market will be served by the Vermont Housing Finance Agency (VHFA) which will administer subaward funding as grants or loans for solar on, or for the benefit of, new or existing subsidized affordable housing alongside other housing funding resources. VHFA will coordinate with existing compliance systems for housing resources to ensure that the financial benefits of solar arrays are received by income eligible tenants, homeowners, and resident communities.

Affordable multifamily housing projects subsidized by and managed under state and federal housing programs will receive grants, possibly loans and/or bridge financing for tax equity for solar installations providing electric bill savings to tenants – or commensurate savings for tenants that do not pay an electric bill. Non-utility bill savings will follow HUD guidance on treatment of solar benefits for residents in master-metered buildings. All applications for solar funding by affordable housing developers will be required to be accompanied by calculations of the required dollar amount of benefits per tenant (or a plan to do so, for buildings that are not completed) and a plan for how these benefits will be delivered. Benefits will depend on the type of housing and the overall needs of the residents. Benefits could include facility upgrades that improve quality of life, such as energy efficiency upgrades or the development of on-site community gardens or playgrounds. Alternatively, or additionally, services such as free or reduced cost high-speed internet or shuttle programs that

supports accessibility and independence could also be conveyed to residents in lieu of on-bill utility savings. Benefits could be delivered to all residents of an eligible building.

Solar project types will include on-site roof-top or ground-mounted arrays serving new construction, and existing affordable housing buildings that have the space for solar arrays. Larger off-site community solar installations will serve the tenants of affordable housing properties that don't have space for solar arrays.

Vermont's affordable housing project types include multifamily affordable rental housing developed through programs such as the Low-Income Housing Tax Credit (LIHTC) and the Vermont Affordable Housing State Tax Credit, administered by VHFA. Additional sources include state appropriations, federal HOME, NHTF and CDBG funds. VHFA also funds subsidized single-family homes developed for purchase by low- and moderate-income homebuyers.

Also included in the Managed Affordable Solar Housing program are new manufactured homes that receive subsidies through housing development programs. SAV grants and/or possibly credit enhancements would be awarded by VHFA to housing developers to subsidize rooftop solar equipment, enabling upgrades, and some battery back-up systems, which would be installed on solar ready, highly efficient manufactured models. These systems will either be included in the sale to an eligible household, or the eligible nonprofit housing developer will rent the unit to an-income eligible tenant within the non-profit owned manufactured home community (MHC).

The MASH program design phase includes plans to assess the feasibility of offering grants or loans to non-profit or cooperatively owned MHCs for community-serving solar arrays located on-site. VHFA has existing relationships with Vermont's MHCs and has previously provided the communities with low-interest loans and grants to support community-serving infrastructure needs. MASH will explore a similar approach to finance solar infrastructure. These communities are often located in rural areas with significant potential for community solar or ground-mounted solar and battery storage to improve resiliency. These projects would need to be designed with a method of passing the required financial benefits to all residents, potentially with a decrease in community fees or lot rent if there is not an electric bill for each homeowner where the value of the solar generation can be added.

In cases where roof-top and on-site arrays are ideal and eligible for Vermont's net metering program, that program will be leveraged to provide on-bill benefits. Larger off-site solar arrays would provide bill credits via specially designed utility tariffs for the MASH program similar to the tariffs designed in the ACRE program.

In situations where there is a concern that offering savings on electric bills would be considered income that could negatively impact a tenant's eligibility for their affordable housing benefit, the value of solar will flow to those tenants in other meaningful ways such as reduced rent, free internet, or other free/reduced cost services. Depending on the housing subsidy, program partners will be required to ensure that property owners can pass on solar created benefits while working within the housing program restrictions on base rent and utility allowances that work in tandem.  During the Planning Period, the SAV will develop plans to mitigate any increase in taxes if needed.

The program will allow owners of master-metered multifamily properties to select permissible benefits from the list provided by U.S. Department of Housing and Urban Development. The program administrator will need to ensure that ongoing services or one-time investments would be calculated to match the lifetime benefit of the solar equipment and are 'but-for' benefits that would not otherwise be delivered without SAV funding.

During the Planning Period the MASH program will determine the best way to support manufactured homes in cooperatively owned parks to obtain solar for all electric bill savings.

<u>Affordable Community Renewable Energy (ACRE) Program Benefits</u>
The ACRE program is an existing initiative between the PSD and the electric utilities to install large solar arrays to provide lasting electric bill savings for low-income customers. The SAV ACRE program will provide membership shares in community solar arrays to renters and others that do not own a roof where solar can be installed. Benefits will accrue to participants through specialized utility tariff, creating a path to the benefits of ownership of a portion of the community arrays.

The PSD will issue a subaward to VEPP Inc. which will work with distribution utilities to enter into power-purchase agreements (PPAs) with solar developers for the SAV solar projects. The solar projects will range from 2-5MW in size to take advantage of the economies of scale that can be realized with systems of this size. These systems will be required to deliver at least 50% of the electricity generated from the system to SAV-eligible residential customers.  In most cases, a SAV array will serve participants from the same service territory of the array but, in some cases, it will serve participants from other service territories when those service providers are not be able to site a MW-sized solar project within its territory.

Benefits will be delivered to participants through a specialized to-be-designed tariff that would discount the cost of power for a selected block of energy – projected to be 150-300kWh per monthly billing cycle. Energy from the community solar projects will be delivered or banked for participants so that the benefit would be dependable, being spread out throughout the year so that each participant's electric bill will have at least a 20% reduction on average due to the solar energy from the solar array membership that they benefit from. To verify that participants receive benefits, subscription agreements could clearly outline the amount of benefit and how that benefit will be delivered. Program reports obtained from community solar program administrator, VEPP Inc., could include detailed breakdowns of credit allocation confirming that the benefits have been delivered. If the participant moves out of their utility's service territory or decides that they no longer want to participate in the program, they will have the option to transfer their membership on to an income-qualified family member, friend or neighbor who has an account within that DU's service territory.

**Financial Assistance Strategy:**

In total $46,931,018 will be provided as financial assistance to households to acquire the benefits of solar systems.  Most of the funds ($34.5 million) will support renters and tenants of permanently

affordable multi-family buildings via community solar arrays. The remaining financial assistance ($12.3 million) will go towards rooftop residential systems for single-family homes.

<u>Single-Family Homeowners</u>
During the Planning Period SAV will design and develop the RAISE program to provide financial assistance to owner-occupied single-family homes for rooftop solar installations that complements and leverages existing financial assistance and support deployment that would not have occurred otherwise. In addition, robust income verification processes beyond self-attestation shall be developed during the Planning Period. The income verification process will conform with the with the definition as stated in the terms and conditions.

The RAISE program will combine the following four financial assistance strategies for homeowners to leverage private funds and non-Solar for All incentives, to install solar on their roofs:
1. Flat up-front capital incentives to lower the cost of the solar systems installed;
2. Competitive selection of one or more financial institutions that would use the federal solar tax credits to co-own the solar arrays with the homeowner in a lease structure that allows the financial institution to capture the full value of the tax credits and provides for the maintenance and operations of the solar arrays for the first five or six years[1];
3. Fully utilize Vermont's net metering system for both its incentivized compensation system through electric bill credits and its registration system for small-scale solar that allows for a simpler permitting and interconnection process; and
4. Technical assistance on maximizing the value of federal solar tax credits and navigating the permitting, financing, and other incentives available to the homeowner that could be taken at the same time, for example for weatherization services, that will lower the homeowner's total energy costs.

In addition, the RAISE program will require the participating solar contractors to sell/install only 5kW AC systems with a set price structure that will lower costs through more efficient system design and customer interface and could help the solar contractors to have more accurate estimates on the amount of solar modules and balance of system components to add to their inventory in preparation for the RAISE program increase in system installations.

The RAISE program will include two contracts. One contract will be for a program administration contractor in support of the program. This contract will support the PSD in the day-to-day implementation of the RAISE program which will include participant and solar contractor acquisition and communications, income verification services, and administrative approval of incentive payment for the solar installation

The second contract in the RAISE program will be a financial services contract that will also include financial assistance payments to beneficiaries. The contract will be awarded to a licensed financial institution that will provide financing services to the program participants receiving RAISE financial

---

[1] The length of the lease to be determined in the planning year based on IRS rules for the investment tax credit.

assistance for a solar array on their home.  The contract will pay the financial institution to create and administer the financial lease instrument and tax credit structure and processes that will be used to finance each installation in the RAISE program.

<u>Managed Affordable Solar Housing</u>
The framework that the MASH Program will be based upon is described below. Further details of the MASH program will be designed in the Planning Period

The affordable housing work envisioned will be managed by Vermont Housing Finance Authority (VHFA), which, in turn, will issue grants or loans to developers or owners of subsidized affordable housing, including multifamily housing, permanently affordable homeownership housing, and manufactured housing. VHFA would source solar projects from within existing pipelines of housing projects in development or existing housing projects, through housing funding partners across the state.

During the Planning Period, the SAV program will collaborate closely with VHFA to incorporate housing affordability into its operations. This includes policies to maintain affordability, prevent rapid price increases, and avoid displacement.

The State of Vermont has made perpetual affordability a priority in housing funding policy. Since the early 2000s, Vermont State Housing Tax Credits have required perpetual affordability in statute, and VHFA has required it for federal 9% Low Income Housing Tax Credits (LIHTC) awards. The result is that 32% of Vermont's existing subsidized multifamily housing stock is already perpetually affordable, and most multifamily new construction or new rehabilitation projects that are developed through VHFA each year are protected. Permanent affordability is ensured through restrictive property covenants reviewed at the time of loan closings, as well as VHFA's long-term compliance monitoring. These covenants ensure that units will always be rented to eligible low-income households at specified affordable rent levels. Residents will never lose the affordability of their homes, even if the property is sold to another owner.

As VHFA intends to make most MASH awards to existing or newly developed affordable housing properties already protected by permanent affordability tied to other funding sources, affordability policies would automatically be applied to these projects.  For the small number of projects that could potentially receive SAV incentives that are not already covered by perpetually affordability requirements, including manufactured home replacements and middle-income rental and middle-income homeownership development projects in LIDACs, VHFA will work with the Vermont Public Service Department to ensure that SAV-supported projects are tied with appropriate long-term affordability policies and anti-displacement measures.

SAV program funding subawards will be tied into affordable housing funding awards, including the Low-Income Housing Tax Credit (LIHTC) and Vermont state housing funding. Projects requesting SAV resources as part of a new affordable housing project would make those requests when the project is submitted for housing resources. VHFA currently allows developers to apply for housing tax credits and loans during annual funding rounds, or on a rolling basis, depending on the funding source.

Underwriters will review the project for program compliance and for competitiveness under a Qualified Allocation Plan, or other funding guidance. As part of the planning year, VHFA staff will determine which housing projects can be considered for SFA with other housing funds, and which will need a separate funding period or rolling period to apply for SFA.  VHFA will ensure that SAV funds will enhance rather than duplicate tax credits and other subsidies ensuring SAV funds advance the installation of solar projects where they otherwise would not have been.

SFA funding for MASH will be awarded alongside new construction or rehabilitation housing projects that have already applied for Low Income Housing Tax Credits (LIHTC) but are not yet completed, or projects that submit new housing funding applications during the program. Every subsequent year of the SFA program would include a funding round for SFA assistance as part of LIHTC application period for new housing projects, as long as funding remains available.

During the planning year, VHFA will create separate models for on-site solar on existing affordable housing, non-LIHTC housing projects that receive Vermont housing funding, and community solar proposals. These projects will receive SFA awards in future program years, with designated funding rounds or rolling funding periods for these project types.

To facilitate program participation, VHFA will create and publish clear funding criteria and application instructions. All projects will be brought before the VHFA Board of Commissioners for review and approval, with the same rigorous assessment that all other applications for housing funding receive. To the degree that VHFA can coordinate SAV funding within housing funding processes, they will do so as much as possible, and that coordination will help reduce the administrative burden for housing developers, as well as leveraging the extensive project review process already in place.

VHFA will award funding as grants and loans, with interest rates expected to be capped at no more than 3% and may include 0% financing or forgivable loans. Loans might be awarded as revolving loans. Funding could be subawarded in the form of bridge loans to allow housing developers to cover the up-front costs of solar projects until they can transfer investment tax credits or take advantage of the elective pay option.  Roughly 90% of Vermont's housing projects in most years are developed by nonprofit affordable housing developers. While new housing tax credit buildings are developed within the framework of a tax credit partnership that will not qualify for direct pay under IRS guidelines, these nonprofit developers may leverage direct pay for future non-housing tax credit projects or housing developer-owned community solar. The Planning Period will assess the demand for bridge loans and develop a funding model to determine the amount of funding necessary to facilitate each type of planned projects.

<u>Renters & Community Solar</u>
Vermont's current ACRE program operates as a utility assistance program, providing participants with reduced energy rates. With SAV funding the reduced energy rate will vary between electric distribution utilities (DUs) but will result in the participants seeing a reduction in their utility bill that will be equivalent to, or greater than, 20% of the average utility bill in their DU's service territory. Participation in the program will not require the participant to pay membership or any other fees, with the only

barrier to their participation being the income-verification process or living in a DAC. The income verification process will conform with the low-income definition as stated in the Terms and Conditions. While participants will be required to income-qualify prior to their participation in the program, their participation in the program will be perpetual, lasting for the useful life of the generation plant that they receive benefit from, so long as they remain in the DU service territory. If the participant leaves that service territory, they could then pass along their place in the program to another income-qualified electric customer in that service territory. If the participant cannot find an individual the DU would then fill that spot with the next prospective participant in the queue for the program.

Reduced energy rates coming from participation in the ACRE program are reflective of the participant receiving energy at the cost of delivery – the embedded transmission and distribution costs as well as administrative costs. The value received is the energy rate being offset by the projects that are developed through the ACRE Program. A participant would be delivered the first 100-300kWh block of energy at this reduced rate or could receive the dollar value of this block of solar kWh on their bill as a Solar for All Vermont credit[2].

<u>Solar Asset Operations & Maintenance and End-of-Life</u>
During the Planning Period, the SAV program will develop a plan to inspect projects to ensure quality control of assets funded under the program. The plan will consider requiring an operations and maintenance (O&M) contract in place prior to becoming operational. O&M reports would confirm systems are up and running and performing as expected.

Solar PV panels have a life expectancy of about 25 years and other associated equipment that make up the balance of system (BOS), including inverters, monitoring devices, racking materials and hardware have a life expectancy of 10-25 years. All these materials will eventually need to be appropriately disposed of and recycled to the extent possible at the end of their useful life. Plans for an appropriate waste management plan will be determined during the Planning Period.

**Project-Deployment Technical Assistance Strategy**

The SAV program will contract with an entity with solar, financial, and incentive program expertise to provide technical assistance to both the beneficiaries and solar developer participants in the program. Technical assistance in this context will be focus on the incentive program process by supporting Vermonters and solar developers to participate in the program in the most efficient and beneficial way. This technical assistance could also include a variety of support services including but not limited to best practice solar design and installation guidance, financial planning assistance for participants, and regulatory compliance training. These technical assistance services will promote the adoption of best practices and industry standards for quality installation and ease of participation for the beneficiaries.

Vermont has established a robust and mature solar installation marketplace over the last 20 years. Most solar installers are well versed in siting tools and Green Mountain Power (Vermont's largest

---

[2] Whether the program utilities a kWh credit or a $ credit on participant's bills will be determined during the planning period.

utility, serving over 75% of all customers in Vermont) has recently created a solar map that informs customers where solar is being sited and how it ties into the grid. Existing tools such as SolarAPP+ provide a web-based platform that supports receiving and processing permit information could also serve as a viable tool for this program.  Additional details will be addressed in the Planning Period, and equity and inclusion in program design and implementation will be central.

The SAV program will work with the utilities to ensure efficient siting, interconnection and resilient assets formally through Vermont's Section 248 permitting process. As mentioned above, Section 248 requires utilities and companies to obtain a Certificate of Public Good (CPG) from the Public Utility Commission (PUC) before beginning site preparation or construction of electric generation and transmission facilities. This process involves collaboration with utilities, Regional Planning Commissions, The Vermont Agency of Natural Resources, and the Agency of Agriculture, Food and Markets, to ensure that projects meet the necessary criteria for public good, including not only electric system stability, reliability, but also orderly development of the region, economic benefit to the state, and appropriate use of natural resources and the natural environment. The encouragement of community benefits agreements will be part of this Section 248 process

Residential Assistance in Solar Energy (RAISE)
During the Planning Period the RAISE program will develop technical assistance (TA) strategies that will include step-by-step project coordination to assist participants overcome obstacles to participating in the RAISE program. TA will also be available for the participating solar installers to understand all the requirements of the SAV program. The TA developed will leverage experienced industry partners and reputable community-based organizations to market, educate, and recruit participants. Recruiting and education will build on community engagement and shared governance methods and include trusted community partners working in the low-income and disadvantaged communities, such as Vermont's Community Action Agencies. TA will include walking participants though contractor selection, program requirements, permitting, and the possible variations in ownership models to maximize the financial benefits to the household. Direct and indirect TA will be delivered in easy-to-understand terms and be easily accessible and readily available.

Managed Affordable Solar Housing (MASH)
VHFA will utilize the Planning Year in collaboration with its partners with expertise in financial aspects of affordable housing development and operation to refine the MASH program's technical assistance strategies. VHFA's partners' experience includes housing tax equity partnerships, shared ownership consortiums (for example, credit unions and other non-profit financial institutions), manufactured home communities (including resident-owned cooperatives).

During the Planning Period, VHFA will hold outreach sessions with other housing funders, housing developers, housing advocates, solar developers, and other interested parties to assess the needs for solar resources and design the programs. VHFA is experienced in seeking and incorporating public feedback in other recent programs it has developed with state and federal funds.

During the design process for any project, the MASH program will also require housing developers to the greatest extent possible to engage with their residents to understand concerns and interests with obtaining power from solar PV. This may vary in some instances, for example, new construction projects in development will not yet have tenants available to consult. Obtaining resident input will help provide opportunities for addressing concerns in project development.

While most housing organizations have previous experience incorporating solar onto their facilities, there are some non-profit and for-profit housing organizations with limited or no exposure to solar. To address this gap, TA will be provided to help these property owners work through the solar development process. This will include, but not be limited to site selection and permitting processes, contracting with solar developers, community engagement, interconnection and regulatory compliance, tax credit planning, financing and grant proposal development, compliance with federal requirements, and program reporting.

Affordable Community Renewable Energy (ACRE)
SAV does not see a need for TA for the distribution utility participants as they already are installing solar arrays and/or are negotiating to purchase power from local arrays. Therefore, the needs are relatively limited given this experience. The ACRE program's technical assistance will consist of partnering with distribution utilities for recruitment, marketing, and financial management of the program to eligible Vermonters. Utilities will be encouraged to follow best practices such as confirming community benefits agreements during the project siting, early in the process. Community benefit agreements are an important tool for ensuring that projects provide tangible benefits to local residents. Additionally, TA may include a consumer guide, fact sheets, case studies, customer testimonials, and virtual and in-person educational workshops.

Workforce and Apprenticeships
All activities will entail working with the state's workforce development office and others working to build employment opportunities in the solar and electrical trades.  SAV will build on  pre-existing certified apprenticeship programs that help qualify the next generation of employees in the solar and related sectors. The workforce development efforts will follow the U.S. Departments of Commerce and Labor's good job principles. These eight principles will guide SAV's work in creating a framework for quality jobs. Currently, some of the larger solar developers in the state offer apprenticeship programs to train new workers in the electrical and mechanical sides of solar installations and solar site preparations.  Vermont is currently developing a workforce training center funded under the IIJA focusing on weatherization; a new program focused on contractor training to be funded under the IIJA is also under development. Resources from these programs will be offered to eligible workforce development organizations or directly to participating solar companies that have certified apprenticeship programs to grow the solar employee workforce. This work will be integrated into the existing and proposed workforce development programs to foster overall coordination toward meeting unmet employment needs and drawing in workers from underserved, disadvantaged communities. Working in conjunction with these existing programs, the SAV program will develop metrics and create a detailed workplan with the apprenticeship program during the Planning Period. Pulling from best practices, training opportunities will be accessible to create an expanded solar workforce.

SAV will work with Vermont's Registered Apprenticeship Program, which is the Vermont's Department of Labor's (DOL) occupational training program. Additionally, SAV will investigate, together with Vermont DOL, during the planning period whether the program should provide financial support to the individuals and solar businesses participating in apprenticeship programs to make use of apprenticeship software that facilitates successful tracking and completion of apprenticeship program requirements.

**Equitable Access and Meaningful Involvement Plan**

Participant Acquisition
PSD will leverage the networks made available by our partners to broadcast the availability of the SAV Program. Many of our partners are focused exclusively on working directly with the intended recipients of the benefits that will come from the SAV Program. Other partners have broader networks throughout the state while also having experience in directing resources to those communities that the Program is intended for. Potential partners have already been engaged in conversation about the SAV Program.  During the Planning Period, we will identify partners through a stakeholder mapping process and engage them through a variety of approaches including virtual and in-person meetings to solicit feedback on key aspects of program design including equitable access to incentives and financing. We will continue developing relationships and expand the breadth of our outreach through public engagement and education through a variety of platforms and forums during the program implementation phase.

Implementation Partners
PSD will develop programs with organizations who have built trusted relationships with communities that have low-income or are disadvantaged. PSD will also engage directly with those communities through outreach and marketing to create opportunities for education and engagement as well as meaningful participation in the development of the programs that will be funded with SAV funding. This active engagement during the planning period will allow implementation partners to provide feedback on financial assistance assumptions and the impact of the financial subsidies.

The organizations and divisions of Vermont State government listed below are among the organizations engaged as possible implementation partners:

*Vermont Department for Children and Families:* PSD is working with multiple divisions within the Vermont Department for Children and Families (DCF), leveraging their established relationships with low-income households around the state to develop plans for participant acquisition in the roof-top and community-solar features of Vermont's SAV Program. DCF's Office of Economic Opportunity (OEO) and Economic Services Division (ESD) administer programs that reach Vermont's most vulnerable residents through direct financial assistance and delivery of services.

*Vermont Office of Economic Opportunity (OEO):* OEO administers the state's Weatherization Assistance Program (WAP) through the state's regional Community Action Agencies (CAAs) to deploy weatherization services and energy-efficiency retrofits in income-qualified households. PSD will work

with OEO to develop materials to share with homeowners that are receiving WAP services to increase awareness of the availability of SAV.

*Vermont Economic Services Division (ESD):* ESD administers assistance programs to meet the basic needs of Vermont's most vulnerable. ESD operates programs like Reach Up and SNAP and acts as the state's LIHEAP Office. ESD currently works with two of Vermont's largest utilities—Green Mountain Power and Vermont Gas Systems—offering income-eligibility verification services for their Energy Assistance Programs (EAP). ESD will also be working with electric distribution utilities to perform income verification services for the ACRE program. PSD is collaborating with ESD to not only provide income verification services for Vermont's SAV Program, but also to help increase awareness of its availability to its clients who seek assistance from other programs it administers. The SAV program will ensure that this income verification process conforms with the low-income definition as stated in the Terms and Conditions.

*Vermont Department of Labor (DOL):* Vermont's DOL operates the Registered Apprenticeship Program that includes obtaining an electrical license and a newly developed solar constructure laborer certificate.  SAV will work with DOL's existing programs available to the solar industry that the SAV program can leverage to provide individuals with hands-on experience and on-the-job training in the solar and electrical professions.

*Electric Distribution Utilities:* Vermonters are served by 17 different electric distribution utilities, including one investor-owned utility, two rural cooperatives and 14 municipal electric providers. Vermont's electric utilities pride themselves on providing innovative programs that drive the renewable energy transition and are committed to being active and interested partners in ensuring the success of the SAV program.

*Non-profit Community Financial Institutions -* Vermont's non-profit financial institutions have a long record of working with Vermont families to help finance energy-related products and services. The following entities bring expertise with financing for residential projects:

*Community Action Agencies:* Vermont's five Community Action Agencies offer financial and energy coaching to income qualified Vermonters. Through the Green Saving Smart program, coaches offer clients assistance in developing budgets and exploring opportunities for savings including through reduced energy usage.

*Vermont Housing Finance Agency (VHFA):* VHFA is Vermont's federally designated statewide affordable housing finance entity and has a 49-year history of outreach and marketing with the state's affordable housing stakeholders. VHFA works closely with state agencies awarding other housing resources to build out a shared multi-year pipeline of all affordable housing development in the state. VHFA communicates regularly with housing funders, developers, advocates, and the Legislature to help address the state's housing needs. VHFA has an established network of housing developers across its statewide service area, many of whom VHFA has worked with for decades. Historically, over 90% of VHFA's housing resources have been awarded to mission driven non-profit developers that are deeply embedded in their communities and committed to the broader statewide goal of deep and perpetual

affordability for housing investments. In addition to partnering with other organizations to address housing affordability issues, VHFA employs several strategies to ensure that existing housing stock remains affordable including housing preservations that ensure homes remain safe and affordable and administering tax credit programs to promote maintaining and improving properties.

Education and Engagement
PSD will engage the public with educational opportunities and events that will allow for input from disadvantaged communities and community organizations that advocate for those communities in the final program design. PSD will be developing a community engagement plan for SAV that will comply with the state's Environmental Justice Law (EJ Law). The PSD has gained experience with directly relevant public engagement on Vermonter's electric supply procurement priorities that it will use in developing a meaningful community engagement plan for SAV.

Outreach and Marketing in a Culturally Appropriate Manner
Using experience gained from past community engagement efforts, the PSD will utilize a variety of proven methods of outreach to reach different communities. Engagement with community-based organizations will be critical to reach different communities, as they have existing relationships with potential eligible beneficiaries. These networks of relationships can be leveraged to ensure that SAV can reach different communities through online and in-person events, meeting communities where they are at and with appropriate language and accessibility services.

Meeting Accessibility
PSD will develop marketing materials and host engagement events that meet participants where they are. This includes making conversation around what can be expected from their participation in SAV programs using terminology that is accessible and less technical, building from simple concepts, up to more sophisticated ideas as needed.

Meaningful Involvement in Program Design
The PSD has a statutory responsibility to "provide for the meaningful participation of all" in decisions about the development and implementation of the SAV Program. During the Planning Period, a Community Engagement Plan will be developed that will be implemented during the Planning Period and into the Planning Period. The community engagement plan will provide an opportunity to include groups representing landlords, tenants, apartment complexes and neighborhood associations as an example, creating space for feedback on financial subsidies. Community partners and program participants to be included in program design will be identified through a stakeholder mapping exercise prior to development of the community engagement plan.

Native American/American Indian Communities
While Vermont has no federally recognized tribes in the geography being served, the State of Vermont has four state-recognized American Indian communities. Those are the Elnu Abenaki Tribe, the Nulhegan Abenaki Tribe, the Kaosek Traditional Band of the Koas Abenaki Nation, and the Abenaki Nation at Missisquoi. These tribes are regularly involved in state land use policy and the PSD sees this as an opportunity to work with this communities to ensure that development of the projects funded

through the SAV program not only offer benefits of the program to the members of these communities, but also that these projects are developed without impacting culturally sensitive lands.

**Section 3:  Fiscal Stewardship Plan**

PSD will adhere to its official Granting Plan which it updates annually. The Granting Plan details the PSD's procedures governing awards to subrecipients, including comprehensive policies to ensure risk management; prevent waste, fraud, and abuse, and prudently manage grant funds. The Granting Plan establishes internal controls to maintain compliance with applicable laws, evaluates risk of noncompliance, and sets out monitoring and accountability procedures for all subrecipients. The Granting Plan requires that grant agreements made by the PSD outline requirements of the award including services to be rendered, authorized amount, payment provisions, reporting requirements, performance measures, Federal regulations, and any other requirement necessitated by accepting the grant. All programmatic, performance, and financial reporting requirements will also be described in the grant agreement. The Granting Plan also address confidential reporting and managing conflicts of interest. The plan includes provisions for confidential reporting to ensure that any concerns or issues can be reported without fear of retaliation. The plan includes guidelines to prevent the appearance of conflicts and ensure that all grant-related decisions are made impartially. The Conflict of Interest Policy specifically establishes standards to ensure that the design, conduct, and reporting of projects are free from bias due to financial conflicts. The State of Vermont also requires that all grant recipients comply with all applicable federal and state laws, regulations, and policies, including but not limited to those related to nondiscrimination, diversity, environmental and consumer protections, and labor standards.

For all grant awards greater than $750,000, the PSD will apply the highest level of routine scrutiny to recipients to ensure that funds are expended only for their intended and authorized uses. This includes Desk and On-site Monitoring. Desk monitoring requires grantees to issue periodic reports to the PSD. Reporting will include updates on progress towards programmatic and impact metrics, such as program/project successes; workshops/meetings held; energy cost savings; and renewable energy capacity built. Grantees will be required to submit a final report. PSD grant managers and division directors may conduct on-site visits as a concluding phase of the monitoring process. These on-site visits are guided by the PSD's on-site monitoring checklist, serving as a structured tool to document observations and any follow-up actions needed to ensure grantee compliance and the successful execution of the funded projects.

If the PSD identifies non-compliance with state or federal regulations, the terms and conditions of the agreement, performance benchmarks, or auditing prerequisites, or detects any suspicion of fraudulent activities or improper fund utilization, or if the grantee fails to address audit findings adequately, PSD retains the authority to impose sanctions against the grantee. These sanctions will be selected with a clear intent to promote compliance or reduce potential risks to the State. The array of possible sanctions encompasses but is not limited to:
• Delaying disbursements or partially withholding payments.
• Transitioning to a reimbursement-based payment structure.

- Imposing additional reporting obligations on the grant, as permitted by the terms of the grant agreement.
- Disallowing incurred costs and/or requesting repayment in cases where funds have been previously advanced.
- Initiating or facilitating an audit.
- Rescinding the grant award.
- Designating the grantee as a "high-risk" entity and withholding future grant awards.

<u>Consumer Protection Plan</u>
PSD will mandate that participating solar companies interfacing with consumers under any of the SAV programs adhere to the following consumer protection guidelines. These requirements go above and beyond state law, addressing transparent disclosures, contract terms, fee structures, and accountability measures.

Solar companies contracting with a consumer to build a project using SAV funding through any program must provide to consumers:
- A plain language disclosure, specifying pricing terms over the contract's lifetime, given as either a flat monthly rate or on a per kilowatt-hour basis, and notification of any charge increases and the advance notice to be provided.
- A copy of the calculations for estimated energy output, monthly payments, interest, assumptions about utility rate increases, and net financial savings including tax credits.
- Clear terms regarding how a subscription can be transferred or terminated, and any associated costs.
- A disclosure of all one-time and recurring charges and any other fees or charges that could be incurred.
- A clear statement outlining the contract's length, including rollover provisions if applicable.
- A description of all procedures and penalties associated with early termination, including both the process and any associated costs for unsubscribing.
- A description of any compensation for underperformance or non-performance must be included.
- Terms under which both the subscriber and the solar company can terminate the contract early, including fees and notice periods.
- A description of the procedures for contract renewal, if applicable.
- Up-to-date contact information for both customer service and complaint handling.
- Clear terms outlining options and obligations if a solarized property changes ownership during the contract term.

Program Administration Procedures for Consumer Protection:
- The PSD will establish a clear arbitration or grievance redressal mechanism for consumers to avail themselves of, should there be a conflict with the solar provider.
- Solar companies using SAV funding must submit regular reports to PSD for compliance verification and will include a review of customer complaints and resolutions.

**Section 4:  Activities Timeline**

Through the remainder of 2025, the PSD will be responding to EPA's comments and questions on this submitted workplan and budget. The PSD will also begin to scope out the activities we are proposing to complete in the Planning Period including preparing the subawards. The PSD will also begin the hiring process for the SAV positions in the budget so that when the workplan and budget are approved we can get to work on the Planning Period tasks quickly.

Please see the attached SAV Activities Timeline worksheet that provides a list of tasks and when over the five-year award period we are expecting to complete the tasks.  During the Planning Period we will develop the steps and milestones to show how we will implement the strategies and plans described in the Workplan.

**Section 5:  Reporting Requirements**

PSD will report on each element of Vermont's SAV program. Reporting will also address resulting environmental benefits through avoided greenhouse gas emissions (and describe underlying assumptions). The reporting plan focuses on data categories that are relevant to program objectives, are useful for measuring program performance, and can be reliably reported by the subrecipients and the PSD. The PSD is prepared to modify or add reporting metrics as required by EPA. The notation in brackets below indicates proposed quarterly [Q] or annual [A] reporting.

**Table 3: Reporting Plan Elements**

| Category | Planned Reporting Metric - Outputs | Planned Reporting Topic - Outcomes |
|---|---|---|
| Performance | <ul><li>Capacity (MW) deployed by project type and technology (e.g., solar, storage) [Q]</li><li>Unit price ($/watt) deployed and change over time [Q]</li><li>Count of participants (households) [Q]</li><li>Count of physical projects by utility territory and type of project (rooftop, community solar, etc.) [Q]</li><li>Amount of household savings delivered by utility and type of project [A]</li><li>Count of workers trained by geography and starting wage/benefit [A]</li><li>Investments in or in partnership with disadvantaged business enterprises by geography and relationship type ($ and count) [A]</li><li>Financial assistance deployed by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, lease, loan), type of project, type of technology [A]</li><li>Number of community-based organizations engaged by SAV services [A]</li></ul> | <ul><li>MWh generated [A]</li><li>Count of participants/ with resiliency improvements [A]</li><li>Count of jobs created [A]</li><li>Reduced disparities in energy burden between low-income and non-low-income households [A]</li></ul> |
| Program & Financial | <ul><li>Grant funds deployed by type of cost, such as financial assistance, technical assistance, program administration, by type of project, technology, and geography [Q]</li><li>Private sector financing mobilized alongside projects funded directly by SAV by geography, type of project [A]</li></ul> | <ul><li>Award funding per participant (household) by type of project</li><li>Cost of GHG emissions reductions ($/short ton of $CO_2$) [A]</li><li>Total participant savings [A]</li><li>Household savings ratio [A]</li><li>Percent household savings [A]</li></ul> |

| Environmental | • Environmental assumptions (emissions per kWh intensity, capacity factor) [A] | • Avoided GHG emissions (statewide and accounting for utility power portfolios) [A]<br>• Other avoided air pollutants [A]<br>• Fossil fuel power generation displacement (GWh) [A] |
|---|---|---|
| Qualitative | • Reports on program feedback from all stakeholders participating in the program [A] | • Findings from evidence building activities on program operations, impact, outcomes including but not limited to program evaluation reports [A] |

Performance Reports

Semi-Annual Report

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024. The semi-annual performance report should cover activities from the preceding two quarters.

Final Report

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

<u>Transaction-Level and Project-Level Data</u>

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

# EXHIBIT 3



## OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**    Termination of EPA Assistance Agreement 5H-84089901 under 2 CFR 200.340

**FROM:**    Devon Brown, EPA Award Official

**TO:**    Carol Flint, Administration Division Director
State Of Vermont Public Service Department

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84089901 awarded to State Of Vermont Public Service Department. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.


cc: Zachary Lane, EPA Grant Specialist
    April Nowak, EPA Project Officer
    Andrew Perchlik, Grantee Program Manager

2

EXHIBIT 4

Docusign Envelope ID: 2E9BEDF7-3399-4865-888B-26710600ACF6

 VERMONT

State of Vermont
Department of Public Service
112 State Street                                    [phone]  802-828-2811
Montpelier, VT 05620-2601                           [fax]    802-828-2342
vvww.publicservice.vermont.gov

August 28, 2025

Via Email

Devon Brown, Award Official
U.S. Environmental Protection Agency
brown.devon@epa.gov

Re: Notice of Disagreement Unlawful Termination of EPA Assistance Agreement No.
5H-84089901

Dear Mr. Brown:

The Vermont Department of Public Service ("PSD" or the "Department") is in receipt of
an Assistance Amendment dated August 8, 2025, relating to the above-referenced EPA Solar for
All program award. That Assistance Amendment purports to, among other things, "terminate the
[award] agreement; reduce performance period duration; [and] curtail scope of work." It further
provides that "[i]fthe recipient disagrees with the terms and conditions specified in this award,
the authorized representative of the recipient must furnish a notice of disagreement to the EPA
Award Official within 21 days after the EPA award or amendment mailing date."

PSD does not understand the "notice of disagreement" language in the Assistance
Amendment to alter or preempt the formal dispute process governing award terminations set
forth in 2 C.F.R. 1500.15 and described in your August 7, 2025 Memorandum notifying the
Department of the termination of the award. The Department reserves all rights in that regard,
including the right to file a formal dispute with the Dispute Decision Official.

Nonetheless, out of an abundance of caution, the Department submits this Notice of
Disagreement with the terms and conditions in Assistance Amendment, including the termination
of the award. The Department also intends to submit a formal dispute in accordance with 2
C.F.R. 1500.15 within the 30-day deadline referenced in the August 7, 2025 Memorandum.

Kind regards,

Signed by:
Kerrick Johnson
263C56C985A9481
Kerrick Johnson

Commissioner

EXHIBIT 5



**State of Vermont**
**Department of Public Service**
112 State Street
Montpelier, VT 05620-2601
**http://public service.vermont.gov**

[phone]    802-828-2811
[fax]    802-828-2342
[tdd]    800-734-8390

September 5, 2025

*Via Email*

Michael Molina, EPA Disputes Decision Official
U.S. Environmental Protection Agency
Office of Mission Support
1200 Pennsylvania Avenue NW
Washington, DC 20460
molina.michael@epa.gov

**Re:    Administrative Dispute**
**Termination of EPA Assistance Agreement No. 5H-84089901**

Dear Mr. Molina:

Please accept this letter as the Vermont Department of Public Service's ("PSD" or the "Department") dispute of the August 7, 2025, notice issued by the EPA purporting to terminate the above-referenced EPA assistance agreement (the "Termination Memorandum," copy attached as **Exhibit 1**). The Department also received a document titled "Assistance Amendment" dated August 8, 2025 (copy attached as **Exhibit 2**), which the Department responded to on August 28, 2025.

Pursuant to 2 C.F.R. § 1500.15, we write to notify you as the EPA Disputes Decision Official that the Department disputes with the attempt to terminate the Assistance Agreement. As discussed below, the termination notice: (1) violates the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only unobligated balances and preserved funds already awarded to grantees; (2) violates the legally binding grant agreement dated July 10, 2024, and amended on December 18, 2024; (3) provides no other reason for termination under 2 C.F.R. § 200.341; (4) is arbitrary and capricious and unsupported by substantial evidence; (5) violates constitutional boundaries; and (5) undermines the energy independence and economic security of Americans in Vermont.

## Background

On October 11, 2023, the Department applied for funding under EPA's Solar for All Notice of Funding Opportunity EPA-R-HQ-SFA-32-01. In developing its application, the Department consulted with and collected input from numerous stakeholders, including electric distribution utilities, community-based organizations, workforce development representatives, solar installation companies, housing developers, financial agencies, non-profit housing and clean energy organizations, and Vermont residents.

On April 22, 2024, EPA announced that it had selected 60 applicants to receive Solar for All awards, including "states, territories, Tribal governments, municipalities, and nonprofits."[1] As one of the recipients of the obligated funds, the Department received an Assistance Agreement for $62,450,000.00 dated July 10, 2024 (copy attached as **Exhibit 3**).

Relying on the Assistance Agreement, the Department negotiated its Work Plan and budget with EPA. It submitted the Work Plan on November 15, 2024 (copy attached as **Exhibit 4**). The Work Plan outlined Vermont's roadmap for planning, designing, and implementing its Solar for All program. It proposed three distinct subprograms for making zero-emission, electric power technologies available to low-income and disadvantaged Vermont communities. Among the various programs, Vermont expected to serve 8,300 low-income households, reducing electricity bills by at least 20%, and creating at least 300 new jobs. On December 18, 2024, EPA issued an Assistance Amendment (copy attached as **Exhibit 5**) that incorporated the Work Plan documentation and removed a 2% funding restriction.

Pursuant to its approved Work Plan, Vermont elected to take a full Program Planning Year to design and prepare its program for implementation. For example, it hired a Financial Administrator and a Grant Program Manager, and began developing its quality assurance and reporting processes, which were submitted to EPA in early 2025. The Department also adopted and purchased licensing for cloud-based management systems to manage project workload and timelines, established financial protocols, and conducted weekly meetings to discuss compliance, procedure, progress, and planning topics. During this time, Department staff attended dozens of training sessions and webinars hosted by EPA. In addition, on May 1, 2025, the Department signed a $22.3 million grant agreement with the Vermont Housing Financing Agency to design and administer a Solar for All program to lower costs for low-income tenants of affordable multi-family housing thorough solar projects.

Vermont also went to great lengths to involve the public in the process. Department staff created a public email distribution list, attended community events to promote awareness of the program, and drafted and implemented a community engagement plan. In 2025 alone, the Department held over a dozen outreach meetings with stakeholders including electric distribution utilities, community-based organizations, workforce development agencies, affordable housing developers, and state partner agencies. It collected the feedback received through all these efforts in a comprehensive report that was in the process of being finalized when the program was abruptly terminated.

---

[1] https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.

Docusign Envelope ID: 2F2032D4-733D-4943-AFE0-036A4E97G8D4

Then, on August 7, 2025, the Department received the Termination Memorandum. The Memorandum indicates that the termination of the above-referenced grant is due to a determination that:

> As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients.

Ex. 1. The next day, the Department received the Assistance Amendment documenting the termination of the award. Ex. 2.

Prior to the termination, Vermont's ASAP account[2] contained $61,863,350.63 of Vermont's $62,050,000.00 Solar for All award. On August 13, 2025, however, Vermont's ASAP account for the Solar for All program was suspended and draw-down funds were not available. On August 19, 2025, Vermont's ASAP account changed to a "liquidated" status and funds appeared to be available to draw down, but the "available balance" on the account was reduced from $61,863,350.63 to $4,299,242.30, and the performance period date was changed from August 30, 2029 to December 8, 2025. As of today, EPA has not provided the Department with any explanation as to why the ASAP account was reduced, how the new balance was determined, or why the performance period end date was changed.

## Grounds for the Dispute

Respectfully, the rescission of unobligated funds and repeal of granting authority under 42 U.S.C. § 7434 do not give EPA the unilateral authority to terminate all legally binding Solar for All grant agreements. Accordingly, we ask that the termination be promptly reversed and that Vermont's grant be reinstated. Please accept this letter as a request to initiate an administrative dispute under 2 C.F.R. Part 1500 Subpart F.

## I.    The termination is not supported by OBBBA.

First, the grounds for termination asserted in the August 7 Memorandum are contrary to law. The OBBBA did not, as the Memorandum asserts, rescind grant appropriations for the Solar for All program. Section 60002 rescinded only *unobligated* balances in the appropriations account established by 42 U.S.C. § 7434. *See* OBBBA, Pub. L. No. 119-21, § 60002 (rescinding "the *unobligated balances* of amounts made available to carry out [42 U.S.C. § 7434]").

---

[2] ASAP is the Automated Standard Application for Payments system, an electronic system that federal agencies use to quickly and securely transfer money to recipient organizations.

Docusign Envelope ID: 2F2032D4-733D-4943-AFE0-036A4E97G8D4    Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 83 of 220

PSD, Administrative Dispute Letter
Page 4 of 9

Funds awarded to Solar for All grantees were obligated upon award and subject to a legally binding agreement under which EPA committed to spend the money. The OBBBA did not purport to change the status of those obligated funds. And to the extent the OBBBA rescinded funds set aside for EPA to administer the program, EPA has the flexibility to draw from other available unrestricted funds to carry out its mandatory oversight. The August 7 Memorandum does not explain why EPA has chosen not to do that.

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024). Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, or purpose. Congress did not direct or otherwise authorize EPA to terminate the Solar for All program. EPA is acting beyond its authority because the termination defies Congress' express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All program appropriations are rescinded.

## II.    The termination violates 2 C.F.R. § 200.340 and the grant agreement.

Federal grant regulations provide that the government may terminate grants only: (1) where a recipient or subrecipient has failed to comply with the terms and conditions of the award; (2) with the consent of the recipient; (3) at the request of the recipient; or (4) pursuant to clear and unambiguous terms and conditions in the award. 2 C.F.R. § 200.340(a)-(b).

The terms and conditions of the above-referenced grant do not allow for unilateral termination. The Department has not agreed to terminate the award—on the contrary, it has been working diligently to implement the terms of the award. And the August 7 Memorandum does not give any other reason for termination. Thus, EPA has not established any valid basis for termination of the award under 2 C.F.R. § 200.340(a) or the grant terms and conditions. EPA should rescind the termination for that reason.

## III.    The termination is arbitrary and capricious.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). That is, agency action is arbitrary and capricious where it is not "reasonable or reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by the courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on "contrived" explanations or those that are "incongruent with what the record reveals about the agency's priorities and decision-making process." *Id.* Agency action taken on pretextual grounds violates the requirement of reasoned Agency decision making.

Docusign Envelope ID: 2F2032D4-733D-4943-AFE0-636A4E97G8D4    Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 84 of 220

PSD, Administrative Dispute Letter
Page 5 of 9

EPA's decision to terminate Vermont's Solar for All grant agreement is arbitrary and capricious because the agency: (1) provided no reasoned basis for its decision; (2) failed to undertake any individualized assessment of the Department's agreement; (3) failed to provide the Department with notice and an opportunity to cure; and (4) ignored the Department's substantial reliance interests and the harmful impact of an abrupt and complete termination of the agreement.

EPA's sole stated rationale for the Termination Memorandum—that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 award recipients"—is a contrived, irrational, and insufficient explanation and thus not a reasoned basis for that action. EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that Congress appropriated to the EPA in March to pay for "Environmental Programs and Management" to cover the cost.

EPA likewise failed to engage in reasoned consideration of the Department's Assistance Agreement before categorically terminating the program. EPA has identified no facts that would support the termination. EPA's public statements demonstrate that its stated rationale was pretextual. *See* Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025, 11:07 am), https://x.com/epaleezeldin/status/1953518426602803684; *see also* https://www.youtube.com/watch?v=CfU3bYKmBOA (referring to Solar for All as a grift).

Also arbitrary was EPA's failure to give notice to the Department so the Department could address any alleged failures. 2 C.F.R. § 200.208 requires EPA to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to satisfy the conditions. It is only after a grantee fails to meet the conditions imposed that an agreement can be terminated. EPA's actions are contrary to these procedures. EPA terminated the Assistance Agreement without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure. Contrary to Part 200.208's notice-and-cure requirements, EPA operated in secret to withdraw access to the Department's accounts. The lack of notice was arbitrary and capricious, and deprived the Department of due process.

## IV.    The termination violates the Constitution.

### Separation of Powers

Article I, Section I of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I, § 1. The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

**Spending Clause**

The Constitution "exclusively grants the power of the purse to Congress, not the President." *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). The Spending Clause, U.S. Const. art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them. *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).

The Termination Memorandum and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987). For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of the Department's funding agreement.

**Take Care Clause**

The Constitution also provides that the Executive must "take Care that the laws be faithfully executed." U.S. Const. art. II, § 3. The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care Clause "implies a power to forbid their execution"). Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and the Department's individual Assistance Agreement on the grounds that Section 60002 "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind the Department's funds, which were obligated months prior to "the day before the date of enactment of [the] Act." OBBBA Section 60002. EPA's termination of the Department's Assistance Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to the Department on July 10, 2024. EPA violated constitutional separation-of-powers constraints because EPA's Termination Memorandum overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

### Appropriations Clause

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds. *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring). For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

### Legislative Vesting Clause

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating Commerce's Solar for All Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

### Tenth Amendment

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012). EPA's termination of the Department's Solar for All Assistance Agreement altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

### Ultra Vires

The Termination Memorandum and subsequent termination of the Department's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind the Department's obligated funds or otherwise terminate the Solar for All program.

Docusign Envelope ID: 2F2032D4-733D-4943-AFE0-036A4E97G8D4    Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 87 of 220

PSD, Administrative Dispute Letter
Page 8 of 9

For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

## V.      The termination will cause irreparable harm to Vermonters.

The Department's Solar for All Assistance Agreement supports the Trump Administration's stated priorities of supporting energy independence, reducing energy costs, and protecting clean air and water, thereby reducing the cost of living.  Retail electricity prices have risen 13% since 2022, outpacing inflation; rising temperatures, extreme weather, and expanding data centers will continue to drive higher demand.

Between the various programs the Department intended to offer using Solar for All funding, the Department was expecting to serve 8,300 low-income households, reducing electrical bills by at least 20% for each participating household, and creating 300 new jobs. With the loss of funding, Vermont will no longer be able to offer these Solar-for-All related services, such as low or no-cost solar installations for low-income households, upgrades for roof replacement and/or electrical work,  access to community solar memberships and their benefits, or financial incentives for solar systems to lower electric costs for tenants in managed affordable housing.

The loss of Solar for All will harm the affordable housing market as investors are now faced with absorbing new construction costs caused by the disappearance of Solar for All funds. This is going to make affordable housing projects more expensive and more challenging to manage for investors and will result in much less solar being installed on affordable housing projects for the next few years without federal tax credits and Solar for All funds.  That is very concerning because most of Vermont's housing developers are pursuing all electric or nearly all-electric building designs and offsetting electric costs with solar generation is one of the best strategies for keeping operating costs manageable. Both demand and the cost of electricity are expected to increase over the coming years, especially as Vermont experiences greater urgency in providing summer cooling to residents, including vulnerable seniors.

The premature end of Solar for All funding also harms Vermont as an employer. Vermont had used the funding to support three full-time positions and to partially fund three others. The state signed a grant agreement with the Vermont Housing & Finance Agency (VHFA) on May 1, 2025, for $22.3 million to manage one of the Solar for All programs.  VHFA assigned two staff members to the program and recently issued a Request for Proposals for additional consulting services.  Vermont also issued a Request for Proposal for another program implementation in June 2025 and had notified a contractor of their selection for the award of a contract worth $1.2 million. Without the Solar for All funding, it is extremely unlikely Vermont will be able to fund any of these obligations. State employees will need to be terminated, and subrecipients likely will need to lay off employees.

Finally, the abrupt termination has left many stakeholders, including the Department, with little to show for the many hours of work they put into the program, and will greatly increase the cost for Vermont to meet its legislatively required renewable energy goals and efforts to lower energy burdens on low-income households.

Docusign Envelope ID: 2F2032D4-733D-4943-AFE0-636A4E97G8D4    Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 88 of 220

PSD, Administrative Dispute Letter
Page 9 of 9

**REMEDY OR RELIEF SOUGHT**

If EPA claims that it no longer possesses the requisite personnel or administrative funding required to oversee and administer the Award, the Department respectfully proposes the appointment of an independent third party to administer and oversee the Award, subject to EPA's reasonable oversight and supervision.

Until the Department's dispute with EPA has been resolved, it objects to any claims of noncompliance under 2 C.F.R. 200.344(i).

The specific remedy or relief sought here is rescission of the termination of this Assistance Agreement, reinstatement of the Assistance Agreement for the originally awarded amount, scope of work, and performance period, and reinstatement of the notice to proceed.  In furtherance of this Dispute, please find attached:
•   A copy of the disputed Agency Decision (Exhibit 1); and
•   Copies of supporting documents (Exhibits 2-5).

The name and contact information, including email address, of the Department's designated point of contact for this notice of disagreement is: Brittney L. Wilson, Deputy Commissioner, Brittney.Wilson@vermont.gov.

Please acknowledge receipt of this Dispute and contact the Department to discuss resolution of this Dispute.

Sincerely,

Signed by:

*Kerrick Johnson*

263C50C995A9481...

Kerrick Johnson
Commissioner
Vermont Department of Public Service

Cc:     Devon Brown, EPA Award Official (via email: brown.devon@epa.gov).



**State of Vermont**
**Department of Public Service**
112 State Street
Montpelier, VT 05620-2601
**www.publicservice.vermont.gov**

[phone]   802-828-2811
[fax]       802-828-2342

August 28, 2025

*Via Email*

Devon Brown, Award Official
U.S. Environmental Protection Agency
brown.devon@epa.gov

**Re:    Notice of Disagreement**
**Unlawful Termination of EPA Assistance Agreement No. 5H-84089901**

Dear Mr. Brown:

The Vermont Department of Public Service ("PSD" or the "Department") is in receipt of an Assistance Amendment dated August 8, 2025, relating to the above-referenced EPA Solar for All program award. That Assistance Amendment purports to, among other things, "terminate the [award] agreement; reduce performance period duration; [and] curtail scope of work." It further provides that "[i]f the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date."

PSD does not understand the "notice of disagreement" language in the Assistance Amendment to alter or preempt the formal dispute process governing award terminations set forth in 2 C.F.R. § 1500.15 and described in your August 7, 2025 Memorandum notifying the Department of the termination of the award. The Department reserves all rights in that regard, including the right to file a formal dispute with the Dispute Decision Official.

Nonetheless, out of an abundance of caution, the Department submits this Notice of Disagreement with the terms and conditions in Assistance Amendment, including the termination of the award. The Department also intends to submit a formal dispute in accordance with 2 C.F.R. § 1500.15 within the 30-day deadline referenced in the August 7, 2025 Memorandum.

Kind regards,

Kerrick Johnson
Commissioner



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**  Termination of EPA Assistance Agreement 5H-84089901 under 2 CFR 200.340

**FROM:**  Devon Brown, EPA Award Official

**TO:**  Carol Flint, Administration Division Director
State Of Vermont Public Service Department

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84089901 awarded to State Of Vermont Public Service Department. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Zachary Lane, EPA Grant Specialist
   April Nowak, EPA Project Officer
   Andrew Perchlik, Grantee Program Manager

5H - 84089901 - 3    Page 1

| | | GRANT NUMBER (FAIN): 84089901 | |
|---|---|---|---|
| | | MODIFICATION NUMBER: 3 | DATE OF AWARD |
| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | PROGRAM CODE: 5H | 08/08/2025 |
| | | TYPE OF ACTION No Cost Amendment | MAILING DATE 08/08/2025 |
| | | PAYMENT METHOD: ASAP | ACH# 6097 |

| RECIPIENT TYPE: State | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** STATE OF VERMONT PUBLIC SERVICE DEPARTMENT 112 STATE ST MONTPELIER, VT 05620-2601 EIN: 03-6000264 | **PAYEE:** STATE OF VERMONT PUBLIC SERVICE DEPARTMENT 112 STATE ST MONTPELIER, VT 05620-2601 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Andrew Perchlik 112 State Street Floor 3 MONTPELIER, VT 05602-2710 **Email:** andrew.perchlik@vermont.gov **Phone:** 802-828-4017 | April Nowak 1300 Pennsylvania Ave NW, 1101R Washington, DC 20460 **Email:** Nowak.April@epa.gov **Phone:** 303-312-6181 | Zachary Lane 1200 Pennsylvania Ave NW Washington, DC 20460 **Email:** Lane.Zachary@epa.gov **Phone:** 202-564-3397 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Vermont Solar programs (1) Community Solar; (2) Multi-Family Residential Solar; and (3) Single Family Residential Solar

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD 09/01/2024 - 08/08/2025 | PROJECT PERIOD 09/01/2024 - 08/08/2025 | TOTAL BUDGET PERIOD COST $ 62,450,000.00 | TOTAL PROJECT PERIOD COST $ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA – Office of the Administrator 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature applied by EPA Award Official for Devon Brown – Branch Chief, GMB by Keva Lloyd – Award Official Delegate | DATE 08/08/2025 |
|---|---|

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 – Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84089901 - 3    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 1,399,780 |
| 2. Fringe Benefits | $ 1,004,687 |
| 3. Travel | $ 13,791 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 38,800 |
| 6. Contractual | $ 16,369,200 |
| 7. Construction | $ 0 |
| 8. Other | $ 43,253,220 |
| 9. Total Direct Charges | $ 62,079,478 |
| 10. Indirect Costs: 26.47 % Base Personnel Only | $ 370,522 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

   a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

   b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

   c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect.  The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

   a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

   b. Explanations on why established outputs/outcomes were not met; and

   c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

   a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

   b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

## Programmatic Conditions

All programmatic conditions remain the same.

5H - 84089901 - 0    Page 1

| | | GRANT NUMBER (FAIN): 84089901 | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** Grant Agreement | | MODIFICATION NUMBER: 0 | **DATE OF AWARD** 07/10/2024 |
| | | PROGRAM CODE: 5H | |
| | | **TYPE OF ACTION** New | **MAILING DATE** 07/15/2024 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** 6097 |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** STATE OF VERMONT PUBLIC SERVICE DEPARTMENT 112 STATE ST MONTPELIER, VT 05620-2601 EIN: 03-6000274 | **PAYEE:** STATE OF VERMONT PUBLIC SERVICE DEPARTMENT 112 STATE ST MONTPELIER, VT 05620-2601 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Christopher Heine 112 State Street MONTPELIER, VT 05620-2601 **Email:** christopher.heine@vermont.gov **Phone:** 802-522-7554 | Kelley Moore WD/DWMIB **Email:** Moore.Kelley@epa.gov **Phone:** 212-637-3265 | Caitlyn Chandler OGD-GMBOD, 3903R 1200 Pennsylvania Ave NW Washington, DC 20460 **Email:** Chandler.Caitlyn@epa.gov **Phone:** 202-564-0592 |

**PROJECT TITLE AND DESCRIPTION**

Vermont Solar programs (1) Community Solar; (2) Multi-Family Residential Solar; and (3) Single Family Residential Solar. Note: A special payment condition applies to this award.

See Attachment 1 for project description.

| **BUDGET PERIOD** 09/01/2024 - 08/31/2029 | **PROJECT PERIOD** 09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST** $ 0.00 | **TOTAL PROJECT PERIOD COST** $ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 62,450,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA - Office of the Administrator 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Barbara Proctor - Associate Award Official | **DATE** 07/10/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 62,050,000 | $ 62,050,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 8,196,428 | $ 8,196,428 |
| Allowable Project Cost | $ 0 | $ 70,646,428 | $ 70,646,428 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 – Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328) Clean Air Act: Sec. 134(a)(1) National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41022 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 62,050,000 |
| | | | | | | | | | $ 62,050,000 |

5H - 84089901 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 62,450,000 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. Programmatic Terms and Conditions

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

## 1. Performance Reports

### *Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

> Progress towards objectives on key performance metrics over the entire period of performance,

> Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

> Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

> Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

> Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

Docusign Envelope ID: 2E2032D4-733D-4943-AFE0-G36A4E97G8D4
Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 107 of 220

5H - 84089901 - 0    Page 11

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

## 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

## 1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

***The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

### Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

### B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during

the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

Docusign Envelope ID: 2E2032D4-733D-4943-AFE0-C36A4E97E8D4
Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 115 of 220

5H - 84089901 - 0    Page 19

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on

behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1, EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

#### B. Davis-Bacon and Related Acts

[Davis-Bacon and Related Acts (DBRA)](#) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants,"

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

### a. Include DBRA Requirements in All Subawards (including Loans): Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients,"

### b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Health and Safety Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its

Docusign Envelope ID: 2E2032D4733D-4942-AFE0-G36A4E97F8D4
Case 2.25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 122 of 220

5H - 84089901 - 0    Page 26

financial risk management policies and procedures.\

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

Docusign Envelope ID: 2E2032D4-733D-4943-AFE0-G36A4E97G8D4
Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 123 of 220

5H - 84089901 - 0    Page 27

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, Reporting Subaward and Executive Compensation.

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

### 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made

available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

> Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

> Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

> National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

> Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

> Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

> Endangered Species Act, as specified in 50 CFR Part 402;

> Federal Funding Accountability and Transparency Act;

> Farmland Protection Policy Act; and

> Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Carol Flint (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry

out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards  unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves**. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to

execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

### B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a

personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Solar for All Vermont**
**DRAFT Work Plan**
**Project Period: 9/1/24 – 8/31/29**
**[Note: 11/15/2024 Submittal]**

**Project Title:**        Solar for All Vermont
**Grant Number:**        84089901
**Organization Name:**  Vermont Public Service Department (PSD)
**Geography:**          Entire state of Vermont
**Definition of LIDAC:** Categorical eligibility for recipients of benefits from LIHEAP, 3 SquaresVT, Fuel Assistance, Reach Up, WIC, other programs; residents of disadvantaged communities as defined by the Climate & Economic Justice Tool; properties providing affordable housing; and VT electric utility customers with household incomes not exceeding 80% AMI or 200% of FPL (whichever is highest) percentage. This LIDAC definition will be used for all three of Vermont's Solar For All programs.

**Introduction**

**Section 1:  Project Description**

   **Overview**

Solar for All Vermont's (SAV) mission is to lower participants' overall electricity cost burden through the provision of the benefits of ownership of solar arrays to low-income and disadvantaged Vermonters across the state while maximizing greenhouse gas (GHG) emission reductions and solar market development. SAV will provide the incentives, organizational structures, and program policies needed to install thousands of solar systems on the roofs of low-income and disadvantaged homeowners, on the roofs and sites of managed permanently affordable apartment buildings, and as large community arrays that will provide meaningful benefits to the participating homeowners, affordable housing residents, and renters.

The megawatts of solar capacity installed through SAV will provide direct GHG savings by offsetting fossil fuel generation of electricity, especially during peak power demand events during summer months. Additionally, GHG savings will be realized with the installation of battery storage systems that will allow homeowners to displace fossil-fueled back-up generators. SAV will provide meaningful benefits to its participants through electric bill savings of over 20% for the life of the solar systems. SAV will also provide community benefits of emission-free power that will provide lasting local solar and construction workforce and solar market development. SAV will have long-term impact by stimulating additional solar development beyond its initial period of performance by building a

stronger solar market and establishing financing programs that will leverage private capital and other GHG reduction programs in Vermont that will continue to stimulate the growth of the solar market in Vermont beyond the period of performance for the SAV award.

**Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**
This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
> Goal 1: Take proactive steps to address the Climate Crisis
> Objective 1.1: Reduce Emissions that Cause Climate Change

**Environmental Results - Outputs and Outcomes**

**Impact Targets**

The PSD estimates that their SAV proposal can equitably reach the following seven beneficial impacts targets by the end of the program period (see Table 1 below):

1. Number of households projected to benefit: 8,302
2. Megawatts of new solar capacity deployed over first five years
    a) Residential: 5.12
    b) Residential-serving community arrays: 16.34
3. Megawatt hours of storage capacity deployed: 2,210
4. Annual short tons of annual carbon dioxide ($CO_2$) emissions reduced: 19,490
5. Annual average household savings realized: $472
6. Workforce development
    a) Number or solar laborers completing training: 200
    b) Number of electrician apprentices completed: 100
    c) Overall number of solar jobs in VT: 2,500

The impact targets for the SAV will be further refined during the Planning Period as each part of the SAV program goes through a community engagement and stakeholder process and more detailed data on costs are developed. Finalized impact targets will be provided before the end of the Planning Period.

**Table 1: Impact Metrics Table**

| Impact Metrics | Market Segment Programs | | | |
|---|---|---|---|---|
| | *RAISE* | *MASH* | *ACRE* | *Totals or Averages* |
| *Number of households served by solar projects* | 1,024 | 3,016 | 4,262 | 8,302 |
| *Solar Capacity to be Installed* (MW AC) | 5.12 | 7.99 | 8.35 | 21.47 |

| | | | | |
|---|---|---|---|---|
| **Capacity of Storage to be Installed** *(kWh)* | 1,950 | 260 | 0 | 2,210 |
| **CO₂ Emissions avoided** *(short tons)* | 4,250 | 7,210 | 8,030 | 19,490 |
| **Annual Household Savings** *($)* | $453 | $672 | $336 | $472 |
| **Monthly Percent Household Electric Bill Savings** | 32.9% | 48.7% | 24.3% | 34.2% |

This proposal's three program segments focus on expanding the PSD's ACRE community-scale program, coupled with new programs for affordable housing occupants (MASH), and individual residential homes for rooftop installations (RAISE). Approximately 8,300 Vermont households are expected to be served across the suite of programs. The program will facilitate just over 21 megawatts (MW) of solar between the more than 8.3MW of community solar through the ACRE Program, just under 5 MW of distributed roof-top solar projects in the RAISE Program and an additional 8 MW installed through the MASH Program, as well as an estimated additional 2,200 kWh of storage, providing access for customers to technology that improves their resilience.

This additional energy generation capacity is expected to reduce and avoid approximately 19,400 tons of carbon dioxide ($CO_2$) emissions from being released into the atmosphere over the coming years. The ACRE Program is expected to displace approximately 8,000 tons, RAISE 4,200 and the MASH is expected to displace approximately 7,200.

With a weighted average savings of $472 per household per year across all three programs, the RAISE program is estimated to provide $453 and the ACRE Program is expected to deliver $336 of annual savings. The MASH Program is expected to deliver an average of $672 per year per household served. All the savings estimated calculations will be further verified and finalized during the Planning Period.

Workforce outcomes:
Vermont's solar workforce has shown signs of decline between its 2017 peak of 2,379 jobs down to 1,771 in 2023. Solar For All funding will offer an opportunity for the reinvigoration of the solar workforce and will leverage other funds available for workforce development being deployed in Vermont including the Vermont Department of Labor's existing Certified Apprentice program for electricians and solar laborers, the Serve, Learn, and Earn program, the Vermont Works for Women program, and other programs that may be developed during the Planning Period.  The SAV program will catalyze a substantial, and sustained uptrend, in well-paying solar jobs in Vermont with a target of increasing the total number of solar jobs in Vermont to 2,500 by the end 2029.

Alignment with GGRF Program Objectives:

The SAV program supports the following objectives of the GGRF directly with programs that will be used to build solar systems and the solar workforce in Vermont.

1. Reducing air emissions of $CO_2$ and Criteria Air Pollutants in Vermont and the New England region by increasing the amount of solar energy being used on-site and fed into the electrical grid that will reduce emissions from fossil-fueled generation.

2. Provide benefits to disadvantaged communities and households with low incomes through direct reductions in electric utility bills for those that pay for electricity and other reduced living-expenses for those tenants in managed affordable housing that don't have electric bills. SAV will also benefit these communities indirectly with increases in jobs and economic activity in the clean energy sector in Vermont.

3. Improve the solar energy market/economic sector in Vermont through specific solar workforce development efforts as the program increases the number of solar installations of all sizes and across the State via its three innovative programs.

## Section 2:  Project Design Plan

### Activities to be Conducted

Meaningful Benefit Plan:

Vermont's SAV consists of three separate programs. The details, including the meaningful benefit plans of all three programs, will be finalized during the award's Planning Period. The benefits of SAV's different solar market sector programs will be similar, but each of the three programs are intended to reach a different sector of Vermont's low-income population and disadvantaged communities (DACs) as folllows:

1) The Residential Assistance in Solar Energy (RAISE) program will provide incentives and support for those living in DACs and/or that are low-income Vermonters that own their own single-family home to install solar systems on their roofs. The solar systems will make use of Vermont's net-metering program to provide streamlined permitting and meaningful reductions in the participating household's annual electric costs.

2) The Managed Affordable Solar Housing (MASH) program will provide incentives and technical support for the owners of permanently designated affordable housing to install solar on their buildings as well as providing opportunities for the tenants to participate in community solar projects.

   a) Many of the particulars of the MASH program will be developed during the Planning Period. There are many legal and regulatory issues in the affordable housing market sector that require more planning.  Looking at how the benefits of solar arrays can benefit tenants that don't pay an electric bill will be one such topic for the Planning Period.  Another will be how best to make solar benefits available to non-profit owned manufactured home communities.

3) The Affordable Community Renewable Energy (ACRE) program will support the installation of MW-scale community solar arrays of which membership shares will be offered to low-income Vermonters, with a focus on renters that don't have access to solar though the other two programs or homeowners whose homes aren't suitable for the solar arrays installed through the RAISE

program. The details of the ACRE program will be further refined during the Planning Period to design a program that has the community solar membership shares providing the maximum annual benefit on participants' electric bills and be transferrable, thus proving a tangible asset to the participants.

The three-program approach will provide multiple avenues for eligible Vermont households to access solar, meeting them where they are at and engaging them in SAV participation in the way that is most beneficial for them.

While the three programs will be finalized in the Planning Period the current program designs include the following benefits:

1) Increase access to roof-top and community distributed solar generation for households with low-income and those living in DACs that deliver the value of solar asset ownership, including via:
   a) Small solar arrays (e.g., 5 kW) with permitting and compensation through Vermont's net metering program. Eligible single-family homeowners will be able to have solar system installed on their roofs through a lease-to-own structure.
   b) Solar arrays located on-site of managed affordable housing, providing benefits for their permanently affordable rental property tenants and possibly (to be determined in the Planning Period) on manufactured homes in communities that are cooperatively owned by the tenants or by non-profit organizations. Financing incentives will help to build and leverage the existing, but very limited, solar financing options in Vermont. The SAV programs will have a long-term benefit on the solar financial market in Vermont by creating systems that allow non-profit financial organizations to cost effectively provide financing to low-income and disadvantaged Vermonters interested in capturing the benefits of solar energy, either on their own home or through a community array.
   c) Large community solar arrays that low-income and disadvantaged renters can participate in with memberships leading to direct on-bill savings at no cost to the participants.

2) Provide a minimum of 20% household savings on the average electric bill of a program participant's electric utility. Household savings will be calculated based on the average residential electric bill of each electrical distribution utility. The expected benefit of participation in the program through residential-serving community solar will be based on the statewide average residential electric bill as the community solar arrays will be offered to eligible customers state-wide. During the Planning Period the benefit calculations will be examined to determine if community solar benefits can be tailored to each participating household or to each participating distribution utility.
   a) During the Planning Period SAV will look to develop the programs to cost effectively increase electricity resilience to low-income and/or disadvantaged households that are dependent on electric medical equipment through the installation of battery storage, allowing customers to ride through power outages. The number of households that receive battery storage systems might reduce the number of households that receive solar PV systems. This Planning Period activity will determine how existing state programs to provide residential battery storage system can be integrated in the SAV program. Battery storage systems included in SAV will be targeted to participants in single-family homes receiving a solar array where they have electric powered medical equipment and where the frequency and duration of power outages have been above the Vermont average. Best practices of SFA programs will be followed in making

program eligibility determinations for solar storage system. Through existing programs homes that receive incentives for back-up battery systems will also receive technical support on operating the battery systems and how to make their homes more energy efficient to further lower energy costs and to extend the time the back-up batteries can provide power to the home. These battery systems will leverage and participate in utility storage and electrical panel upgrade programs where available to lower costs of the systems and increase the critical resiliency benefits for these participants.

    b) SAV will issue a contract in support of increased workforce development in the Vermont solar and storage sector.

    c) The program's goal is to provide approximately 10% of the participating single-family homes with a battery storage systems or other solar related upgrade, such as roof repair or tree trimming to increase solar production.

3) SAV participating homes could also receive SAV funds for an electric panel upgrade, tree trimming or roof repair as necessary to enable the solar and/or battery storage system to be installed. Program projections for these enabling measures are that approximately 10% of the participating single-family homes will be provided with upgrades, however, SAV will ensure that no more than 20% of the financial assistance be used for enabling system costs. Upgrades on a home will only be eligible in conjunction with a solar investment commitment for that home.

4) The program will help to create high-quality and long-lasting jobs in the solar industry and with electrical, battery storage, and solar contractors. The solar and battery systems installed through the program will help to build a trained workforce for the solar and battery storage sector. The SAV program will be able to leverage other workforce development efforts happening in Vermont for licensed electricians. There are other different workforce development programs/efforts happening in Vermont that pair well with SAV workforce development goals – such as for weatherization and other energy efficiency work in residential buildings. SAV will work with the solar companies and other aligned trades to support building their workforce by creating good-paying local jobs and careers in the solar and related industries. The SAV program will work with the Department of Labor to create workforce goals and metrics to demonstrate the impact of the SFA funding on workforce programs that will be used to for a competitively selected contract with a workforce development contractor. There will be a strong focus to ensure that the existing workforce development programs are coordinated with SAV's workforce development efforts.

In addition to the above, meaningful public benefits are addressed by Vermont's existing generation facilities permit law, Section 248. This law requires utilities and companies to obtain approval from the Public Utilities Commission in the form of a Certificate of Public Good for projects including electric generation from solar arrays that are interconnected to the electrical grid.  During this permit process all projects are evaluated for potential impacts and benefits on the environment, public health, and the local community. This includes considerations of aesthetics, historic sites, air and water purity, the natural environment, public safety and economics. The Vermont Agency of Natural Resources has developed best practices to provide guidance and recommendations that can be applied to Section 248 such as creating and maintaining pollinator friendly habitats around solar arrays. All solar generation projects funded through the three SAV programs will require a Certificate of Public Good.

<u>Residential Assistance In Solar Energy (RAISE) Program Benefits</u>
Avenues for direct ownership will be investigated during the Planning Period. SAV is currently looking at offering ownership through a lease to own, or shared ownership model.

A lease-to-own financial structure offered through one or more competitively selected Vermont financial institutions that can utilize the federal investment tax credits for solar will lower the cost of the solar array installed on the participating single-family homes. The financial institution(s) would co-own the solar system with the homeowner for the first five or six years (depending on IRS rules) and then would transfer full ownership of the solar array to the homeowner. The homeowner's portion of the costs could be covered by a subsidized lease that would not require any up-front costs and could be paid off by the end of the lease term. The homeowner will obtain ownership of the array without having to come up with extra dollars at the end of the lease period. If homeowner funds are needed at the end of the lease to obtain ownership there would be an option for a loan from our financial institution contractor that would have a payment low enough to maintain the annualized 20% savings on their monthly electric bill.

SAV will also include incentives for a limited number of back-up battery systems.  If storage systems are included, it will support the homeowner's resiliency during power outages and potentially reduce the strain on emergency services during outage events. The batteries can also provide demand response value for the utility, reducing the overall cost of service paid by all ratepayers.

SAV will determine during the Planning Period how the program will ensure that participants receive the required electric bill savings. Verification of saving will be through audit mechanisms such as review of utility bill and/or participant's electric meter's AMI data and interviews and surveys.

<u>Managed Affordable Solar Housing (MASH) Program Benefits</u>
The affordable housing market will be served by the Vermont Housing Finance Agency (VHFA) which will administer subaward funding as grants or loans for solar on, or for the benefit of, new or existing subsidized affordable housing alongside other housing funding resources. VHFA will coordinate with existing compliance systems for housing resources to ensure that the financial benefits of solar arrays are received by income eligible tenants, homeowners, and resident communities.

Affordable multifamily housing projects subsidized by and managed under state and federal housing programs will receive grants, possibly loans and/or bridge financing for tax equity for solar installations providing electric bill savings to tenants – or commensurate savings for tenants that do not pay an electric bill. Non-utility bill savings will follow HUD guidance on treatment of solar benefits for residents in master-metered buildings. All applications for solar funding by affordable housing developers will be required to be accompanied by calculations of the required dollar amount of benefits per tenant (or a plan to do so, for buildings that are not completed) and a plan for how these benefits will be delivered. Benefits will depend on the type of housing and the overall needs of the residents. Benefits could include facility upgrades that improve quality of life, such as energy efficiency upgrades or the development of on-site community gardens or playgrounds. Alternatively, or additionally, services such as free or reduced cost high-speed internet or shuttle programs that

supports accessibility and independence could also be conveyed to residents in lieu of on-bill utility savings. Benefits could be delivered to all residents of an eligible building.

Solar project types will include on-site roof-top or ground-mounted arrays serving new construction, and existing affordable housing buildings that have the space for solar arrays. Larger off-site community solar installations will serve the tenants of affordable housing properties that don't have space for solar arrays.

Vermont's affordable housing project types include multifamily affordable rental housing developed through programs such as the Low-Income Housing Tax Credit (LIHTC) and the Vermont Affordable Housing State Tax Credit, administered by VHFA. Additional sources include state appropriations, federal HOME, NHTF and CDBG funds. VHFA also funds subsidized single-family homes developed for purchase by low- and moderate-income homebuyers.

Also included in the Managed Affordable Solar Housing program are new manufactured homes that receive subsidies through housing development programs. SAV grants and/or possibly credit enhancements would be awarded by VHFA to housing developers to subsidize rooftop solar equipment, enabling upgrades, and some battery back-up systems, which would be installed on solar ready, highly efficient manufactured models. These systems will either be included in the sale to an eligible household, or the eligible nonprofit housing developer will rent the unit to an-income eligible tenant within the non-profit owned manufactured home community (MHC).

The MASH program design phase includes plans to assess the feasibility of offering grants or loans to non-profit or cooperatively owned MHCs for community-serving solar arrays located on-site. VHFA has existing relationships with Vermont's MHCs and has previously provided the communities with low-interest loans and grants to support community-serving infrastructure needs. MASH will explore a similar approach to finance solar infrastructure. These communities are often located in rural areas with significant potential for community solar or ground-mounted solar and battery storage to improve resiliency. These projects would need to be designed with a method of passing the required financial benefits to all residents, potentially with a decrease in community fees or lot rent if there is not an electric bill for each homeowner where the value of the solar generation can be added.

In cases where roof-top and on-site arrays are ideal and eligible for Vermont's net metering program, that program will be leveraged to provide on-bill benefits. Larger off-site solar arrays would provide bill credits via specially designed utility tariffs for the MASH program similar to the tariffs designed in the ACRE program.

In situations where there is a concern that offering savings on electric bills would be considered income that could negatively impact a tenant's eligibility for their affordable housing benefit, the value of solar will flow to those tenants in other meaningful ways such as reduced rent, free internet, or other free/reduced cost services. Depending on the housing subsidy, program partners will be required to ensure that property owners can pass on solar created benefits while working within the housing program restrictions on base rent and utility allowances that work in tandem.  During the Planning Period, the SAV will develop plans to mitigate any increase in taxes if needed.

The program will allow owners of master-metered multifamily properties to select permissible benefits from the list provided by U.S. Department of Housing and Urban Development. The program administrator will need to ensure that ongoing services or one-time investments would be calculated to match the lifetime benefit of the solar equipment and are 'but-for' benefits that would not otherwise be delivered without SAV funding.

During the Planning Period the MASH program will determine the best way to support manufactured homes in cooperatively owned parks to obtain solar for all electric bill savings.

<u>Affordable Community Renewable Energy (ACRE) Program Benefits</u>
The ACRE program is an existing initiative between the PSD and the electric utilities to install large solar arrays to provide lasting electric bill savings for low-income customers. The SAV ACRE program will provide membership shares in community solar arrays to renters and others that do not own a roof where solar can be installed. Benefits will accrue to participants through specialized utility tariff, creating a path to the benefits of ownership of a portion of the community arrays.

The PSD will issue a subaward to VEPP Inc. which will work with distribution utilities to enter into power-purchase agreements (PPAs) with solar developers for the SAV solar projects. The solar projects will range from 2-5MW in size to take advantage of the economies of scale that can be realized with systems of this size. These systems will be required to deliver at least 50% of the electricity generated from the system to SAV-eligible residential customers.  In most cases, a SAV array will serve participants from the same service territory of the array but, in some cases, it will serve participants from other service territories when those service providers are not be able to site a MW-sized solar project within its territory.

Benefits will be delivered to participants through a specialized to-be-designed tariff that would discount the cost of power for a selected block of energy – projected to be 150-300kWh per monthly billing cycle. Energy from the community solar projects will be delivered or banked for participants so that the benefit would be dependable, being spread out throughout the year so that each participant's electric bill will have at least a 20% reduction on average due to the solar energy from the solar array membership that they benefit from. To verify that participants receive benefits, subscription agreements could clearly outline the amount of benefit and how that benefit will be delivered. Program reports obtained from community solar program administrator, VEPP Inc., could include detailed breakdowns of credit allocation confirming that the benefits have been delivered. If the participant moves out of their utility's service territory or decides that they no longer want to participate in the program, they will have the option to transfer their membership on to an income-qualified family member, friend or neighbor who has an account within that DU's service territory.


**Financial Assistance Strategy:**

In total $46,931,018 will be provided as financial assistance to households to acquire the benefits of solar systems.  Most of the funds ($34.5 million) will support renters and tenants of permanently

affordable multi-family buildings via community solar arrays.  The remaining financial assistance ($12.3 million) will go towards rooftop residential systems for single-family homes.


Single-Family Homeowners
During the Planning Period SAV will design and develop the RAISE program to provide financial assistance to owner-occupied single-family homes for rooftop solar installations that complements and leverages existing financial assistance and support deployment that would not have occurred otherwise.  In addition, robust income verification processes beyond self-attestation shall be developed during the Planning Period.  The income verification process will conform with the with the definition as stated in the terms and conditions.

The RAISE program will combine the following four financial assistance strategies for homeowners to leverage private funds and non-Solar for All incentives, to install solar on their roofs:
1. Flat up-front capital incentives to lower the cost of the solar systems installed;
2. Competitive selection of one or more financial institutions that would use the federal solar tax credits to co-own the solar arrays with the homeowner in a lease structure that allows the financial institution to capture the full value of the tax credits and provides for the maintenance and operations of the solar arrays for the first five or six years[1];
3. Fully utilize Vermont's net metering system for both its incentivized compensation system through electric bill credits and its registration system for small-scale solar that allows for a simpler permitting and interconnection process; and
4. Technical assistance on maximizing the value of federal solar tax credits and navigating the permitting, financing, and other incentives available to the homeowner that could be taken at the same time, for example for weatherization services, that will lower the homeowner's total energy costs.

In addition, the RAISE program will require the participating solar contractors to sell/install only 5kW AC systems with a set price structure that will lower costs through more efficient system design and customer interface and could help the solar contractors to have more accurate estimates on the amount of solar modules and balance of system components to add to their inventory in preparation for the RAISE program increase in system installations.

The RAISE program will include two contracts. One contract will be for a program administration contractor in support of the program. This contract will support the PSD in the day-to-day implementation of the RAISE program which will include participant and solar contractor acquisition and communications, income verification services, and administrative approval of incentive payment for the solar installation

The second contract in the RAISE program will be a financial services contract that will also include financial assistance payments to beneficiaries. The contract will be awarded to a licensed financial institution that will provide financing services to the program participants receiving RAISE financial

---

[1] The length of the lease to be determined in the planning year based on IRS rules for the investment tax credit.

Docusign Envelope ID: 2E2032D4-733D-4942-AFE0-C36A4E97E8D4

assistance for a solar array on their home.  The contract will pay the financial institution to create and administer the financial lease instrument and tax credit structure and processes that will be used to finance each installation in the RAISE program.

<u>Managed Affordable Solar Housing</u>
The framework that the MASH Program will be based upon is described below. Further details of the MASH program will be designed in the Planning Period

The affordable housing work envisioned will be managed by Vermont Housing Finance Authority (VHFA), which, in turn, will issue grants or loans to developers or owners of subsidized affordable housing, including multifamily housing, permanently affordable homeownership housing, and manufactured housing. VHFA would source solar projects from within existing pipelines of housing projects in development or existing housing projects, through housing funding partners across the state.

During the Planning Period, the SAV program will collaborate closely with VHFA to incorporate housing affordability into its operations. This includes policies to maintain affordability, prevent rapid price increases, and avoid displacement.

The State of Vermont has made perpetual affordability a priority in housing funding policy. Since the early 2000s, Vermont State Housing Tax Credits have required perpetual affordability in statute, and VHFA has required it for federal 9% Low Income Housing Tax Credits (LIHTC) awards. The result is that 32% of Vermont's existing subsidized multifamily housing stock is already perpetually affordable, and most multifamily new construction or new rehabilitation projects that are developed through VHFA each year are protected. Permanent affordability is ensured through restrictive property covenants reviewed at the time of loan closings, as well as VHFA's long-term compliance monitoring. These covenants ensure that units will always be rented to eligible low-income households at specified affordable rent levels. Residents will never lose the affordability of their homes, even if the property is sold to another owner.

As VHFA intends to make most MASH awards to existing or newly developed affordable housing properties already protected by permanent affordability tied to other funding sources, affordability policies would automatically be applied to these projects.  For the small number of projects that could potentially receive SAV incentives that are not already covered by perpetually affordability requirements, including manufactured home replacements and middle-income rental and middle-income homeownership development projects in LIDACs, VHFA will work with the Vermont Public Service Department to ensure that SAV-supported projects are tied with appropriate long-term affordability policies and anti-displacement measures.

SAV program funding subawards will be tied into affordable housing funding awards, including the Low-Income Housing Tax Credit (LIHTC) and Vermont state housing funding. Projects requesting SAV resources as part of a new affordable housing project would make those requests when the project is submitted for housing resources. VHFA currently allows developers to apply for housing tax credits and loans during annual funding rounds, or on a rolling basis, depending on the funding source.

Underwriters will review the project for program compliance and for competitiveness under a Qualified Allocation Plan, or other funding guidance. As part of the planning year, VHFA staff will determine which housing projects can be considered for SFA with other housing funds, and which will need a separate funding period or rolling period to apply for SFA. VHFA will ensure that SAV funds will enhance rather than duplicate tax credits and other subsidies ensuring SAV funds advance the installation of solar projects where they otherwise would not have been.

SFA funding for MASH will be awarded alongside new construction or rehabilitation housing projects that have already applied for Low Income Housing Tax Credits (LIHTC) but are not yet completed, or projects that submit new housing funding applications during the program. Every subsequent year of the SFA program would include a funding round for SFA assistance as part of LIHTC application period for new housing projects, as long as funding remains available.

During the planning year, VHFA will create separate models for on-site solar on existing affordable housing, non-LIHTC housing projects that receive Vermont housing funding, and community solar proposals. These projects will receive SFA awards in future program years, with designated funding rounds or rolling funding periods for these project types.

To facilitate program participation, VHFA will create and publish clear funding criteria and application instructions. All projects will be brought before the VHFA Board of Commissioners for review and approval, with the same rigorous assessment that all other applications for housing funding receive. To the degree that VHFA can coordinate SAV funding within housing funding processes, they will do so as much as possible, and that coordination will help reduce the administrative burden for housing developers, as well as leveraging the extensive project review process already in place.

VHFA will award funding as grants and loans, with interest rates expected to be capped at no more than 3% and may include 0% financing or forgivable loans. Loans might be awarded as revolving loans. Funding could be subawarded in the form of bridge loans to allow housing developers to cover the up-front costs of solar projects until they can transfer investment tax credits or take advantage of the elective pay option. Roughly 90% of Vermont's housing projects in most years are developed by nonprofit affordable housing developers. While new housing tax credit buildings are developed within the framework of a tax credit partnership that will not qualify for direct pay under IRS guidelines, these nonprofit developers may leverage direct pay for future non-housing tax credit projects or housing developer-owned community solar. The Planning Period will assess the demand for bridge loans and develop a funding model to determine the amount of funding necessary to facilitate each type of planned projects.

<u>Renters & Community Solar</u>
Vermont's current ACRE program operates as a utility assistance program, providing participants with reduced energy rates. With SAV funding the reduced energy rate will vary between electric distribution utilities (DUs) but will result in the participants seeing a reduction in their utility bill that will be equivalent to, or greater than, 20% of the average utility bill in their DU's service territory. Participation in the program will not require the participant to pay membership or any other fees, with the only

barrier to their participation being the income-verification process or living in a DAC. The income verification process will conform with the low-income definition as stated in the Terms and Conditions. While participants will be required to income-qualify prior to their participation in the program, their participation in the program will be perpetual, lasting for the useful life of the generation plant that they receive benefit from, so long as they remain in the DU service territory. If the participant leaves that service territory, they could then pass along their place in the program to another income-qualified electric customer in that service territory. If the participant cannot find an individual the DU would then fill that spot with the next prospective participant in the queue for the program.

Reduced energy rates coming from participation in the ACRE program are reflective of the participant receiving energy at the cost of delivery – the embedded transmission and distribution costs as well as administrative costs. The value received is the energy rate being offset by the projects that are developed through the ACRE Program. A participant would be delivered the first 100-300kWh block of energy at this reduced rate or could receive the dollar value of this block of solar kWh on their bill as a Solar for All Vermont credit[2].

<u>Solar Asset Operations & Maintenance and End-of-Life</u>
During the Planning Period, the SAV program will develop a plan to inspect projects to ensure quality control of assets funded under the program.  The plan will consider requiring an operations and maintenance (O&M) contract in place prior to becoming operational. O&M reports would confirm systems are up and running and performing as expected.

Solar PV panels have a life expectancy of about 25 years and other associated equipment that make up the balance of system (BOS), including inverters, monitoring devices, racking materials and hardware have a life expectancy of 10-25 years.  All these materials will eventually need to be appropriately disposed of and recycled to the extent possible at the end of their useful life. Plans for an appropriate waste management plan will be determined during the Planning Period.

**Project-Deployment Technical Assistance Strategy**

The SAV program will contract with an entity with solar, financial, and incentive program expertise to provide technical assistance to both the beneficiaries and solar developer participants in the program. Technical assistance in this context will be focus on the incentive program process by supporting Vermonters and solar developers to participate in the program in the most efficient and beneficial way. This technical assistance could also include a variety of support services including but not limited to best practice solar design and installation guidance, financial planning assistance for participants, and regulatory compliance training. These technical assistance services will promote the adoption of best practices and industry standards for quality installation and ease of participation for the beneficiaries.

Vermont has established a robust and mature solar installation marketplace over the last 20 years. Most solar installers are well versed in siting tools and Green Mountain Power (Vermont's largest

---

[2] Whether the program utilities a kWh credit or a $ credit on participant's bills will be determined during the planning period.

utility, serving over 75% of all customers in Vermont) has recently created a solar map that informs customers where solar is being sited and how it ties into the grid. Existing tools such as SolarAPP+ provide a web-based platform that supports receiving and processing permit information could also serve as a viable tool for this program.  Additional details will be addressed in the Planning Period, and equity and inclusion in program design and implementation will be central.

The SAV program will work with the utilities to ensure efficient siting, interconnection and resilient assets formally through Vermont's Section 248 permitting process. As mentioned above, Section 248 requires utilities and companies to obtain a Certificate of Public Good (CPG) from the Public Utility Commission (PUC) before beginning site preparation or construction of electric generation and transmission facilities. This process involves collaboration with utilities, Regional Planning Commissions, The Vermont Agency of Natural Resources, and the Agency of Agriculture, Food and Markets, to ensure that projects meet the necessary criteria for public good, including not only electric system stability, reliability, but also orderly development of the region, economic benefit to the state, and appropriate use of natural resources and the natural environment. The encouragement of community benefits agreements will be part of this Section 248 process

Residential Assistance in Solar Energy (RAISE)
During the Planning Period the RAISE program will develop technical assistance (TA) strategies that will include step-by-step project coordination to assist participants overcome obstacles to participating in the RAISE program. TA will also be available for the participating solar installers to understand all the requirements of the SAV program. The TA developed will leverage experienced industry partners and reputable community-based organizations to market, educate, and recruit participants. Recruiting and education will build on community engagement and shared governance methods and include trusted community partners working in the low-income and disadvantaged communities, such as Vermont's Community Action Agencies. TA will include walking participants though contractor selection, program requirements, permitting, and the possible variations in ownership models to maximize the financial benefits to the household. Direct and indirect TA will be delivered in easy-to-understand terms and be easily accessible and readily available.

Managed Affordable Solar Housing (MASH)
VHFA will utilize the Planning Year in collaboration with its partners with expertise in financial aspects of affordable housing development and operation to refine the MASH program's technical assistance strategies. VHFA's partners' experience includes housing tax equity partnerships, shared ownership consortiums (for example, credit unions and other non-profit financial institutions), manufactured home communities (including resident-owned cooperatives).

During the Planning Period, VHFA will hold outreach sessions with other housing funders, housing developers, housing advocates, solar developers, and other interested parties to assess the needs for solar resources and design the programs. VHFA is experienced in seeking and incorporating public feedback in other recent programs it has developed with state and federal funds.

During the design process for any project, the MASH program will also require housing developers to the greatest extent possible to engage with their residents to understand concerns and interests with obtaining power from solar PV. This may vary in some instances, for example, new construction projects in development will not yet have tenants available to consult. Obtaining resident input will help provide opportunities for addressing concerns in project development.

While most housing organizations have previous experience incorporating solar onto their facilities, there are some non-profit and for-profit housing organizations with limited or no exposure to solar. To address this gap, TA will be provided to help these property owners work through the solar development process. This will include, but not be limited to site selection and permitting processes, contracting with solar developers, community engagement, interconnection and regulatory compliance, tax credit planning, financing and grant proposal development, compliance with federal requirements, and program reporting.

Affordable Community Renewable Energy (ACRE)
SAV does not see a need for TA for the distribution utility participants as they already are installing solar arrays and/or are negotiating to purchase power from local arrays. Therefore, the needs are relatively limited given this experience. The ACRE program's technical assistance will consist of partnering with distribution utilities for recruitment, marketing, and financial management of the program to eligible Vermonters. Utilities will be encouraged to follow best practices such as confirming community benefits agreements during the project siting, early in the process. Community benefit agreements are an important tool for ensuring that projects provide tangible benefits to local residents. Additionally, TA may include a consumer guide, fact sheets, case studies, customer testimonials, and virtual and in-person educational workshops.

Workforce and Apprenticeships
All activities will entail working with the state's workforce development office and others working to build employment opportunities in the solar and electrical trades.  SAV will build on  pre-existing certified apprenticeship programs that help qualify the next generation of employees in the solar and related sectors. The workforce development efforts will follow the U.S. Departments of Commerce and Labor's good job principles. These eight principles will guide SAV's work in creating a framework for quality jobs. Currently, some of the larger solar developers in the state offer apprenticeship programs to train new workers in the electrical and mechanical sides of solar installations and solar site preparations.  Vermont is currently developing a workforce training center funded under the IIJA focusing on weatherization; a new program focused on contractor training to be funded under the IIJA is also under development. Resources from these programs will be offered to eligible workforce development organizations or directly to participating solar companies that have certified apprenticeship programs to grow the solar employee workforce. This work will be integrated into the existing and proposed workforce development programs to foster overall coordination toward meeting unmet employment needs and drawing in workers from underserved, disadvantaged communities. Working in conjunction with these existing programs, the SAV program will develop metrics and create a detailed workplan with the apprenticeship program during the Planning Period. Pulling from best practices, training opportunities will be accessible to create an expanded solar workforce.

SAV will work with Vermont's Registered Apprenticeship Program, which is the Vermont's Department of Labor's (DOL) occupational training program. Additionally, SAV will investigate, together with Vermont DOL, during the planning period whether the program should provide financial support to the individuals and solar businesses participating in apprenticeship programs to make use of apprenticeship software that facilitates successful tracking and completion of apprenticeship program requirements.

### Equitable Access and Meaningful Involvement Plan

Participant Acquisition

PSD will leverage the networks made available by our partners to broadcast the availability of the SAV Program. Many of our partners are focused exclusively on working directly with the intended recipients of the benefits that will come from the SAV Program. Other partners have broader networks throughout the state while also having experience in directing resources to those communities that the Program is intended for. Potential partners have already been engaged in conversation about the SAV Program. During the Planning Period, we will identify partners through a stakeholder mapping process and engage them through a variety of approaches including virtual and in-person meetings to solicit feedback on key aspects of program design including equitable access to incentives and financing. We will continue developing relationships and expand the breadth of our outreach through public engagement and education through a variety of platforms and forums during the program implementation phase.

Implementation Partners

PSD will develop programs with organizations who have built trusted relationships with communities that have low-income or are disadvantaged. PSD will also engage directly with those communities through outreach and marketing to create opportunities for education and engagement as well as meaningful participation in the development of the programs that will be funded with SAV funding. This active engagement during the planning period will allow implementation partners to provide feedback on financial assistance assumptions and the impact of the financial subsidies.

The organizations and divisions of Vermont State government listed below are among the organizations engaged as possible implementation partners:

*Vermont Department for Children and Families:* PSD is working with multiple divisions within the Vermont Department for Children and Families (DCF), leveraging their established relationships with low-income households around the state to develop plans for participant acquisition in the roof-top and community-solar features of Vermont's SAV Program. DCF's Office of Economic Opportunity (OEO) and Economic Services Division (ESD) administer programs that reach Vermont's most vulnerable residents through direct financial assistance and delivery of services.

*Vermont Office of Economic Opportunity (OEO):* OEO administers the state's Weatherization Assistance Program (WAP) through the state's regional Community Action Agencies (CAAs) to deploy weatherization services and energy-efficiency retrofits in income-qualified households. PSD will work

with OEO to develop materials to share with homeowners that are receiving WAP services to increase awareness of the availability of SAV.

*Vermont Economic Services Division (ESD):* ESD administers assistance programs to meet the basic needs of Vermont's most vulnerable. ESD operates programs like Reach Up and SNAP and acts as the state's LIHEAP Office. ESD currently works with two of Vermont's largest utilities—Green Mountain Power and Vermont Gas Systems—offering income-eligibility verification services for their Energy Assistance Programs (EAP). ESD will also be working with electric distribution utilities to perform income verification services for the ACRE program. PSD is collaborating with ESD to not only provide income verification services for Vermont's SAV Program, but also to help increase awareness of its availability to its clients who seek assistance from other programs it administers. The SAV program will ensure that this income verification process conforms with the low-income definition as stated in the Terms and Conditions.

*Vermont Department of Labor (DOL):* Vermont's DOL operates the Registered Apprenticeship Program that includes obtaining an electrical license and a newly developed solar constructure laborer certificate.  SAV will work with DOL's existing programs available to the solar industry that the SAV program can leverage to provide individuals with hands-on experience and on-the-job training in the solar and electrical professions.

*Electric Distribution Utilities:* Vermonters are served by 17 different electric distribution utilities, including one investor-owned utility, two rural cooperatives and 14 municipal electric providers. Vermont's electric utilities pride themselves on providing innovative programs that drive the renewable energy transition and are committed to being active and interested partners in ensuring the success of the SAV program.

*Non-profit Community Financial Institutions -* Vermont's non-profit financial institutions have a long record of working with Vermont families to help finance energy-related products and services. The following entities bring expertise with financing for residential projects:

*Community Action Agencies:* Vermont's five Community Action Agencies offer financial and energy coaching to income qualified Vermonters. Through the Green Saving Smart program, coaches offer clients assistance in developing budgets and exploring opportunities for savings including through reduced energy usage.

*Vermont Housing Finance Agency (VHFA):* VHFA is Vermont's federally designated statewide affordable housing finance entity and has a 49-year history of outreach and marketing with the state's affordable housing stakeholders. VHFA works closely with state agencies awarding other housing resources to build out a shared multi-year pipeline of all affordable housing development in the state. VHFA communicates regularly with housing funders, developers, advocates, and the Legislature to help address the state's housing needs. VHFA has an established network of housing developers across its statewide service area, many of whom VHFA has worked with for decades. Historically, over 90% of VHFA's housing resources have been awarded to mission driven non-profit developers that are deeply embedded in their communities and committed to the broader statewide goal of deep and perpetual

affordability for housing investments. In addition to partnering with other organizations to address housing affordability issues, VHFA employs several strategies to ensure that existing housing stock remains affordable including housing preservations that ensure homes remain safe and affordable and administering tax credit programs to promote maintaining and improving properties.

Education and Engagement
PSD will engage the public with educational opportunities and events that will allow for input from disadvantaged communities and community organizations that advocate for those communities in the final program design. PSD will be developing a community engagement plan for SAV that will comply with the state's Environmental Justice Law (EJ Law). The PSD has gained experience with directly relevant public engagement on Vermonter's electric supply procurement priorities that it will use in developing a meaningful community engagement plan for SAV.

Outreach and Marketing in a Culturally Appropriate Manner
Using experience gained from past community engagement efforts, the PSD will utilize a variety of proven methods of outreach to reach different communities. Engagement with community-based organizations will be critical to reach different communities, as they have existing relationships with potential eligible beneficiaries. These networks of relationships can be leveraged to ensure that SAV can reach different communities through online and in-person events, meeting communities where they are at and with appropriate language and accessibility services.

Meeting Accessibility
PSD will develop marketing materials and host engagement events that meet participants where they are. This includes making conversation around what can be expected from their participation in SAV programs using terminology that is accessible and less technical, building from simple concepts, up to more sophisticated ideas as needed.

Meaningful Involvement in Program Design
The PSD has a statutory responsibility to "provide for the meaningful participation of all" in decisions about the development and implementation of the SAV Program. During the Planning Period, a Community Engagement Plan will be developed that will be implemented during the Planning Period and into the Planning Period. The community engagement plan will provide an opportunity to include groups representing landlords, tenants, apartment complexes and neighborhood associations as an example, creating space for feedback on financial subsidies.  Community partners and program participants to be included in program design will be identified through a stakeholder mapping exercise prior to development of the community engagement plan.

Native American/American Indian Communities
While Vermont has no federally recognized tribes in the geography being served, the State of Vermont has four state-recognized American Indian communities. Those are the Elnu Abenaki Tribe, the Nulhegan Abenaki Tribe, the Kaosek Traditional Band of the Koas Abenaki Nation, and the Abenaki Nation at Missisquoi. These tribes are regularly involved in state land use policy and the PSD sees this as an opportunity to work with this communities to ensure that development of the projects funded

through the SAV program not only offer benefits of the program to the members of these communities, but also that these projects are developed without impacting culturally sensitive lands.

**Section 3:  Fiscal Stewardship Plan**

PSD will adhere to its official Granting Plan which it updates annually. The Granting Plan details the PSD's procedures governing awards to subrecipients, including comprehensive policies to ensure risk management; prevent waste, fraud, and abuse, and prudently manage grant funds. The Granting Plan establishes internal controls to maintain compliance with applicable laws, evaluates risk of noncompliance, and sets out monitoring and accountability procedures for all subrecipients. The Granting Plan requires that grant agreements made by the PSD outline requirements of the award including services to be rendered, authorized amount, payment provisions, reporting requirements, performance measures, Federal regulations, and any other requirement necessitated by accepting the grant. All programmatic, performance, and financial reporting requirements will also be described in the grant agreement. The Granting Plan also address confidential reporting and managing conflicts of interest. The plan includes provisions for confidential reporting to ensure that any concerns or issues can be reported without fear of retaliation. The plan includes guidelines to prevent the appearance of conflicts and ensure that all grant-related decisions are made impartially. The Conflict of Interest Policy specifically establishes standards to ensure that the design, conduct, and reporting of projects are free from bias due to financial conflicts. The State of Vermont also requires that all grant recipients comply with all applicable federal and state laws, regulations, and policies, including but not limited to those related to nondiscrimination, diversity, environmental and consumer protections, and labor standards.

For all grant awards greater than $750,000, the PSD will apply the highest level of routine scrutiny to recipients to ensure that funds are expended only for their intended and authorized uses. This includes Desk and On-site Monitoring. Desk monitoring requires grantees to issue periodic reports to the PSD. Reporting will include updates on progress towards programmatic and impact metrics, such as program/project successes; workshops/meetings held; energy cost savings; and renewable energy capacity built. Grantees will be required to submit a final report. PSD grant managers and division directors may conduct on-site visits as a concluding phase of the monitoring process. These on-site visits are guided by the PSD's on-site monitoring checklist, serving as a structured tool to document observations and any follow-up actions needed to ensure grantee compliance and the successful execution of the funded projects.

If the PSD identifies non-compliance with state or federal regulations, the terms and conditions of the agreement, performance benchmarks, or auditing prerequisites, or detects any suspicion of fraudulent activities or improper fund utilization, or if the grantee fails to address audit findings adequately, PSD retains the authority to impose sanctions against the grantee. These sanctions will be selected with a clear intent to promote compliance or reduce potential risks to the State. The array of possible sanctions encompasses but is not limited to:
• Delaying disbursements or partially withholding payments.
• Transitioning to a reimbursement-based payment structure.

• Imposing additional reporting obligations on the grant, as permitted by the terms of the grant agreement.
• Disallowing incurred costs and/or requesting repayment in cases where funds have been previously advanced.
• Initiating or facilitating an audit.
• Rescinding the grant award.
• Designating the grantee as a "high-risk" entity and withholding future grant awards.

<u>Consumer Protection Plan</u>
PSD will mandate that participating solar companies interfacing with consumers under any of the SAV programs adhere to the following consumer protection guidelines. These requirements go above and beyond state law, addressing transparent disclosures, contract terms, fee structures, and accountability measures.

Solar companies contracting with a consumer to build a project using SAV funding through any program must provide to consumers:
• A plain language disclosure, specifying pricing terms over the contract's lifetime, given as either a flat monthly rate or on a per kilowatt-hour basis, and notification of any charge increases and the advance notice to be provided.
• A copy of the calculations for estimated energy output, monthly payments, interest, assumptions about utility rate increases, and net financial savings including tax credits.
• Clear terms regarding how a subscription can be transferred or terminated, and any associated costs.
• A disclosure of all one-time and recurring charges and any other fees or charges that could be incurred.
• A clear statement outlining the contract's length, including rollover provisions if applicable.
• A description of all procedures and penalties associated with early termination, including both the process and any associated costs for unsubscribing.
• A description of any compensation for underperformance or non-performance must be included.
• Terms under which both the subscriber and the solar company can terminate the contract early, including fees and notice periods.
• A description of the procedures for contract renewal, if applicable.
• Up-to-date contact information for both customer service and complaint handling.
• Clear terms outlining options and obligations if a solarized property changes ownership during the contract term.

Program Administration Procedures for Consumer Protection:
• The PSD will establish a clear arbitration or grievance redressal mechanism for consumers to avail themselves of, should there be a conflict with the solar provider.
• Solar companies using SAV funding must submit regular reports to PSD for compliance verification and will include a review of customer complaints and resolutions.

**Section 4:  Activities Timeline**

Through the remainder of 2025, the PSD will be responding to EPA's comments and questions on this submitted workplan and budget. The PSD will also begin to scope out the activities we are proposing to complete in the Planning Period including preparing the subawards. The PSD will also begin the hiring process for the SAV positions in the budget so that when the workplan and budget are approved we can get to work on the Planning Period tasks quickly.

Please see the attached SAV Activities Timeline worksheet that provides a list of tasks and when over the five-year award period we are expecting to complete the tasks.  During the Planning Period we will develop the steps and milestones to show how we will implement the strategies and plans described in the Workplan.


**Section 5:  Reporting Requirements**

PSD will report on each element of Vermont's SAV program. Reporting will also address resulting environmental benefits through avoided greenhouse gas emissions (and describe underlying assumptions). The reporting plan focuses on data categories that are relevant to program objectives, are useful for measuring program performance, and can be reliably reported by the subrecipients and the PSD. The PSD is prepared to modify or add reporting metrics as required by EPA. The notation in brackets below indicates proposed quarterly [Q] or annual [A] reporting.

**Table 3: Reporting Plan Elements**

| Category | Planned Reporting Metric - Outputs | Planned Reporting Topic - Outcomes |
|---|---|---|
| Performance | • Capacity (MW) deployed by project type and technology (e.g., solar, storage) [Q]<br>• Unit price ($/watt) deployed and change over time [Q]<br>• Count of participants (households) [Q]<br>• Count of physical projects by utility territory and type of project (rooftop, community solar, etc.) [Q]<br>• Amount of household savings delivered by utility and type of project [A]<br>• Count of workers trained by geography and starting wage/benefit [A]<br>• Investments in or in partnership with disadvantaged business enterprises by geography and relationship type ($ and count) [A]<br>• Financial assistance deployed by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, lease, loan), type of project, type of technology [A]<br>• Number of community-based organizations engaged by SAV services [A] | • MWh generated [A]<br>• Count of participants/ with resiliency improvements [A]<br>• Count of jobs created [A]<br>• Reduced disparities in energy burden between low-income and non-low-income households [A] |
| Program & Financial | • Grant funds deployed by type of cost, such as financial assistance, technical assistance, program administration, by type of project, technology, and geography [Q]<br>• Private sector financing mobilized alongside projects funded directly by SAV by geography, type of project [A] | • Award funding per participant (household) by type of project<br><br>• Cost of GHG emissions reductions ($/short ton of CO2) [A]<br>• Total participant savings [A]<br>• Household savings ratio [A]<br>• Percent household savings [A] |

| Environmental | • Environmental assumptions (emissions per kWh intensity, capacity factor) [A] | • Avoided GHG emissions (statewide and accounting for utility power portfolios) [A]<br>• Other avoided air pollutants [A]<br>• Fossil fuel power generation displacement (GWh) [A] |
|---|---|---|
| Qualitative | • Reports on program feedback from all stakeholders participating in the program [A] | • Findings from evidence building activities on program operations, impact, outcomes including but not limited to program evaluation reports [A] |

Performance Reports

Semi-Annual Report

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024. The semi-annual performance report should cover activities from the preceding two quarters.

Final Report

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.


**Section 6: Budget Narrative**

**6.1 Project Budget**

PSD has developed an overall Program Budget of $62,450,00 to align with the EPA's grant award amount and as reflected in the attached budget table and as reflected in the attached SF-424 and SF-424A. This Program Budget total is based on a direct scaling down of sixty-two percent from PSD's original application's budget amount.

While the overall program was directly scaled down by the sixty-two percent, slight adjustments to the program categories were made. However, none of the programs' budgets changed more than plus/minus ten percent from the baseline sixty-two percent of the budgeted amounts in the original application.

With $46,931,018 of PSD's proposed budget allocated to delivering direct financial benefits to program participants, the budget provides just over seventy-five percent of the award funds for financial assistance.

Personnel

The PSD's budget includes the hiring of three new staff members: one Program Manager, one Grant Manager, and one Financial Administrator. These three staff will work full-time on the SAV program. The hourly wages are established by the state position titles. The SAV program will also assign thirty percent of an existing PSD director's time to the SAV program for supervising, managerial and oversight roles. In addition to the new staff the PSD will assign 30% of an FTE of an existing Program Director to the SAV project.

The Program Manager position oversees, and monitors work performed by Subawardees, grantees, and/or contractors, including defining the scope of work, negotiating contracts, and evaluating work products. The Grant Manager will provide overall project oversight on behalf of the PSD and monitor

and evaluate progress and results, and may supervise, train or mentor other staff. The Program Manager will be responsible for all EPA reporting.

The Grant Manager position will manage the day-to-day operational aspects of SAV project. This position will schedule, attend, and evaluate grantee compliance; provide written reports of grantee compliance with federal, state and local laws and regulations; tracks and report SAV staff hours and expenses; manages the SAV budget; ensures timely and accurate project reporting; conducts review of final program reports, interim and final audits, and other closeout data. This position will also provide compliance management and technical assistance to all grantees in the conduct of all program activities.

The Financial Administrator will be responsible for the ASAP draws and all the accounts payable accounting and payment processing related to the SAV program. This position will assist with audit compliance and timesheet/payroll requirements.

The Program Director will provide program guidance, employee supervision, risk management, and compliance oversight for the SAV program.

The total personnel costs listed below are for the full five years of the program.  First year personnel costs are reduced by 50% for the three new positions as the positions will not start until the second or third quarter of the program year.

Wages are budgeted to increase by three percent per-year over the five-year program period.

| Personnel (% of FTE assigned to SFA and hourly wage) | 5 Year Total |
|---|---|
| *One Energy Program Manager (100%), $98,883* | *$500,264* |
| *One Grant Program Manager (100%), $84,490* | *$427,444* |
| *One Financial Administrator (100%), $54,662* | *$287,477* |
| *One Program Director (30%), $115,898* | *$184,595* |
| | |
| TOTAL PERSONNEL | *$1,399,780* |

<u>Fringe Benefits</u>
Fringe benefits vary by position classification in the State of Vermont employment systems.  The rates for the positions that will work on the SAV program range from 56.48% to 72.16%. The benefits included in Vermont's fringe rates are FICA, retirement, health insurance, and worker's compensation. The fringe benefits do not include the cost of leave time.  The cost of leave time is accounted for in the salary payments for each position.

The fringe rates used are based on the salary paid and will be thirty to fifty percent lower in the first year due to employees paid with SAV funds not being hired until the first or second quarter of the first program year.

| Fringe Benefits | 5 Year Total |
|---|---|
| *Energy Program Manager (72.16% for FICA, Retirement, Health Insurance, Worker's Compensation)* | *$360,990* |
| *Grant Program Manager (56.48% for FICA, Retirement, Health Insurance, Worker's Compensation)* | *$241,421* |
| *Financial Administrator (73.34% for FICA, Retirement, Health Insurance, Worker's Compensation)* | *$298,017* |
| *Program Director (56.48% for FICA, Retirement, Insurance, Worker's Comp.)* | *$104,259* |
| | |
| TOTAL FRINGE BENEFITS | *$1,004,687* |

Travel

Travel costs in the budget are for two SAV staff member to travel to EPA or DOE SAV related conferences or workshops in two of the five program years. The destinations of these trips are not known at the time this budget was submitted.  Costs are included for airfare, per diems, and hotel stays of three nights for each of the two staff.

Also included in the travel budget is milage costs for staff members vehicle travel inside Vermont to attend meetings, conduct community engagement events, participate in site visits, and other needed local travel for the SAV program. The milage costs are calculated at $0.67 per mile and the milage is estimated to be 200 miles a month for all five program years.

| Travel | 5 Year Total |
|---|---|
| *Travel for 2 staff to attend DOE or EPA SFA workshops* | |
| *Airfare: 2 @ $700 round trip* | *$2,600* |
| *Per Diem: 2 staff X 4 days @ $60/day* | *$960* |
| *Hotel: 2 staff X 3 nights @ $250/night* | *$3,00* |
| *Local Mileage: Outreach Travel, 200 mi/mo. @ $.67/mi x 12 months.* | *$7,231* |
| TOTAL TRAVEL | *$13,791* |

Equipment

The PSD's SAV budget does not include any costs for equipment.

| Equipment | *5 Year Total* |
|---|---|
| *NA* | |
| TOTAL EQUIPMENT | *$0* |

Supplies

The supply costs for the PSD's budget includes the purchase of supplies for meetings and community engagement events during the five program years, and office supplies needed by the three new staff members hired by the PSD to work on the SFA programs.

The office supplies for meetings and community engagement include printed materials to hand out (the cost of printing these materials is the majority of the expenditures in the Supplies category), meeting facilitation supplies such as markers, pens, sticky pads, sign-up sheets, printed surveys, easels, and easel paper. The Supplies budget also includes office supplies needed by the PSD's SFA staff.  Items such as phones and computers for the new SFA staff in the first and fourth program year of the award are the items that will be purchased with these funds

| Supplies | 5 Year Total |
|---|---|
| *Office supplies for meetings and community engagement events.* | *$24,400* |
| *3 Phones for new staff @ $900/each* | *$5,400* |
| *3 Computers for new staff @ $1,500/each* | *$9,000* |
| | |
| TOTAL SUPPLIES | *$38,800* |

Contractual

The PSD has budgeted for four contracts. Two contracts will include financial assistance payments for the program beneficiaries and the other two will be service contracts to support the SAV programs. The four contracts will be:

- One for translation services for community engagement meetings and printed materials.
- One for workforce development of the solar sector. The contract will support solar business and new employees to participate in and complete Vermont's existing certified apprenticeship program for licensed electricians. In addition, this contract will develop a new apprenticeship program for solar construction workers that become certified by the Vermont Department of Labor.
- One for the customer/beneficiary facing administration/implementation of the RAISE program. This contract will include authorization of financial assistance payments to be made for the benefit of the participating homeowners.
- One for financial services to provide leases to the participating homeowners for the solar installed on their roof. This contracted financial services provider will also monetize the tax credits available to lower the cost of the solar systems and be responsible for the operational and maintenance of the solar systems.

All four contracts will be procured through competitive bid. The contracts are budgeted to have some expenditures during all five program years, but the bulk of the work will be done in the first three years.

The RAISE implementation contract will be for a program administration contractor in support of the RAISE program. This contract will support the PSD in the day-to-day implementation of the RAISE program which will include participant and solar contractor acquisition and communications, income verification services, and administrative approval of incentive payment for the solar installation

The financial services contract will also include assistance payments. The contract will be awarded to a licensed financial institution that will provide financing services to the program participants receiving RAISE financial assistance for a solar array on their home.  The contract will pay the financial institution to create and administer the financial lease instrument and tax credit structure and processes that will be used to finance each installation in the RAISE program.

| Contractual | 5 Year Total | FINANCIAL ASSISTANCE $ Amounts |
|---|---|---|
| Translation services for community meetings | $41,400 | |
| Workforce development training program | $1,400,000 | |
| RAISE Program Contract to a Financial Institution for Financing Single-family Home Arrays | $7,527,800 | $6,097,518 |
| RAISE Program Implementation Services Separate from Financial Services Contract & Financial Assistance Payments for Single-family Home Arrays | $7,400,000 | $6,250,000 |
| | | |
| TOTAL CONTRACTUAL | $16,369,200 | $12,347,518 |

### Other

Costs in the "other" category include the technical assistance services expected from the Department of Energy (DOE), printing of materials used in community engagement and public outreach efforts, and two subawards for the MASH and ACRE programs. DOE's in-kind assistance will be provided as technical support that will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach activities.

| Other | 5 Year Total | Financial Assistance $ Amounts |
|---|---|---|
| *Program planning technical assistance - DOE in-kind technical assistance* | $400,000 | |
| *Printing and publication services* | $8,220 | |
| ***Subawards*** | | |
| *MASH Program Subaward to Vermont Housing Financing Agency* | $22,345,000 | $17,876,000 |
| *ACRE Program Subaward(s) to VEPP Inc. or Distribution Utility Entity for Large-scale Community Arrays* | $20,500,000 | $16,707,500 |
| *Total of Subawards* | $42,845,000 | |
| TOTAL OTHER | $43,253,220 | $34,583,500 |

| TOTAL DIRECT | | $62,079,478 | |
|---|---|---|---|

Participant Support Costs

The PSD's budget does not include participant support costs. The PSD will be supporting participants with the financial assistance in accessing solar systems and will not be providing support to participants such as registration fees, training materials, travel assistance, or stipends of any kind.

Subawards

The SAV program will issue two subawards. The first subaward will be to the Vermont Housing Finance Agency (VHFA) in the amount of $22,345,000. This subaward will be to design and implement the MASH program and will include at least $17,876,000 in direct financial assistance to eligible beneficiaries.

VHFA is a non-profit instrumentality of the State of Vermont but is not a Vermont governmental entity. The MASH program activities are explained in the sections above and the details on the activities of the MASH subaward will be developed during the Planning Period. During the Planning Period VHFA and the PSD will determine if the MASH subaward will include using SFA funds for loans and if that would include a revolving loan fund and/or loan or credit enhancements. The MASH subaward will extend through all five program years of the SFA award.

The MASH subaward will be made to the Vermont Housing Financing Agency (VHFA). VHFA was established in 1974 to finance and promote affordable, safe and decent housing opportunities for low- and moderate-income Vermonters. VHFA awards federal low-income housing tax credits to developers of permanently affordable housing in Vermont.

Through the subaward VHFA will perform all activities needed to operate a successful MASH program, including:

- Issue an RFP for a contractor to assist with a financing model that determine appropriate award amounts to projects, and to assist VHFA in developing compliance and reporting system.
- Conduct public outreach sessions among affordable housing developers and other members of the public.
- Establish criteria for competitive MASH awards to affordable housing projects, to be made available to affordable housing developers.
- Design application materials for developers to apply for MASH funds.
- Establish open award periods for affordable housing developers to apply for MASH grants and/or loans to specified affordable housing projects.

The second subaward will be for a total of $20,500,000 with at least $16,707,500 of the total being for participant financial assistance. This subaward will be issued to VEPP Inc. or a special purpose entity created under a cooperative agreement by the Vermont's electricity distribution utilities (DUs) and through community engagement processes. The current plan is for the subaward to be issued to VEPP

Inc.[3], a not-for-profit Vermont corporation that administers two of Vermont's Renewable Energy Programs under contract with the Vermont Public Utility Commission (PUC). VEPP Inc. would solicit proposals for community solar arrays that through up-front SAV incentive payments will provide monthly electric bill credits to eligible participant.  This is similar work they do for the Vermont PUC and the DUs. This ACRE subaward would be created collaboratively with independent power producers, Vermont's DUs, and other stakeholders, including community members, to distribute the generation and attributes from the SAV solar energy projects amongst DUs in Vermont. The DUs would then distribute that generation to eligible participants in SAV.

Through its subaward VEPP Inc. will be responsible for the implementation of the ACRE program. The design and implementation of the Program will require the collaboration of Vermont DUs so that the program can provide access to eligible Vermonters across the state with affordably developed solar energy. VEPP Inc. is well positioned to orchestrate this collaboration as they have acted as the administrator of similar functions for Vermont's Standard Offer Program. In that role VEPP Inc. assisted in the reverse auctions for renewable energy plants, and then upon commissioning became responsible for the accounting for and distribution of the attributes that came from projects selected for the program. Program activities to be implemented by VEPP Inc. for the ACRE program include:
- Issuing requests for proposals for program compliant solar generation plants
- Engaging with communities where the projects may potentially be sited as part of the selection process
- Creating and executing an operational agreement with the DUs
- Working with the DUs develop tariffs as needed
- Developing appropriate community benefits plans for communities where projects will be sited in concert with the DUs
- Accounting for the distribution of the energy generation and other attributes generated by the solar generation plants developed under the program

Of Vermont's seventeen DUs two are cooperatives[4], one is a for-profit investor-owned company[5], and the remaining are non-profit municipal entities three of which who operate independently[6] and the remaining 11[7] are community owned while also collaborating through membership to the Vermont Public Power Supply Authority (VPPSA). If SAV is not able to negotiate a subaward with VEPP Inc. the program would work with the DUs to create a special purpose non-profit entity to complete the role and ACRE program activities listed above.

The PSD has adequate systems in place to comply with 2 CFR 200.331 and the requirements of 2 CFR 200.332.

---

[3] https://vermontstandardoffer.com/
[4] Vermont Electric Cooperative and Washington Electric Cooperative
[5] Green Mountain Power Corporation
[6] Burlington Electric Department; Hyde Park Electric Department; Stowe Electric Department
[7] Barton Village, Inc.; Village of Enosburg Falls Inc.; Town of Hardwick Electric Department; Village of Jacksonville; Village of Johnson Inc.; Village of Ludlow Electric Light Department; Lyndon Electric Department; Village of Morrisville Water & Light Department; Town of Northfield Electric Department; Incorporated Village of Orleans; Swanton Village, Inc.

Additional Items
Indirect Charges
The PSD's indirect rate is 26.47 percent and is the rate approved by the U.S. Department of Energy as per the Cost Negotiation Agreement of 04/17/2024. The rate is approved through 06/30/2025.

| Indirect Costs (@26.47%) | 5 Year Total |
|---|---|
| *Indirect costs on personnel only* | $370,522 |
| TOTAL INDIRECT | $370,522 |

Conferences and Workshops
The PSD is not planning on the SAV program having any conference or workshop expenses.

Meals and Refreshments
The PSD is not planning on the SAV program having any meal or refreshment expenses.

Program Income
The PSD is not planning on the SAV program having any program income. There is the possibility that during the MASH program development during the Planning Period that a revolving loan fund could be determined to be a preferred support tool for solar systems that are supporting affordable housing tenants. If that turns out to be the determination the proposed award amendment at the end of the Planning Period for the MASH program will include the required details and discussion regarding program income.

5H - 84089901 - 1    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY — Assistance Amendment | GRANT NUMBER (FAIN): 84089901 | | |
|---|---|---|---|
| | MODIFICATION NUMBER: 1 | | DATE OF AWARD |
| | PROGRAM CODE: 5H | | 12/18/2024 |
| | TYPE OF ACTION | | MAILING DATE |
| | No Cost Amendment | | 12/18/2024 |
| | PAYMENT METHOD: | | ACH# |
| | ASAP | | 6097 |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| RECIPIENT: | PAYEE: |
|---|---|
| STATE OF VERMONT PUBLIC SERVICE DEPARTMENT<br>112 STATE ST<br>MONTPELIER, VT 05620-2601<br>EIN: 03-6000264 | STATE OF VERMONT PUBLIC SERVICE DEPARTMENT |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Christopher Heine<br>112 State Street<br>MONTPELIER, VT 05620-2601<br>**Email:** christopher.heine@vermont.gov<br>**Phone:** 802-522-7554 | Kelley Moore<br>WD/DWMIB<br>**Email:** Moore.Kelley@epa.gov<br>**Phone:** 212-637-3265 | Caitlyn Chandler<br>OGD-GMBOD, 3903R<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460<br>**Email:** Chandler.Caitlyn@epa.gov<br>**Phone:** 202-564-0592 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Vermont Solar programs (1) Community Solar; (2) Multi-Family Residential Solar; and (3) Single Family Residential Solar

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 09/01/2024 – 08/31/2029 | 09/01/2024 – 08/31/2029 | $ 62,450,000.00 | $ 62,450,000.00 |

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this award and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Barbara Proctor - Associate Award Official | DATE<br>12/18/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| **EPA Amount This Action** | $ 62,050,000 | $ 0 | $ 62,050,000 |
| **EPA In-Kind Amount** | $ 400,000 | $ 0 | $ 400,000 |
| **Unexpended Prior Year Balance** | $ 0 | $ 0 | $ 0 |
| **Other Federal Funds** | $ 0 | $ 0 | $ 0 |
| **Recipient Contribution** | $ 0 | $ 0 | $ 0 |
| **State Contribution** | $ 0 | $ 0 | $ 0 |
| **Local Contribution** | $ 0 | $ 0 | $ 0 |
| **Other Contribution** | $ 8,196,428 | $ 0 | $ 8,196,428 |
| **Allowable Project Cost** | $ 70,646,428 | $ 0 | $ 70,646,428 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 – Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328) <br> Clean Air Act: Sec. 134(a)(1) <br> National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84089901 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 1,399,780 |
| 2. Fringe Benefits | $ 1,004,687 |
| 3. Travel | $ 13,791 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 38,800 |
| 6. Contractual | $ 16,369,200 |
| 7. Construction | $ 0 |
| 8. Other | $ 43,253,220 |
| 9. Total Direct Charges | $ 62,079,478 |
| 10. Indirect Costs: 26.47 % Base Personnel Only | $ 370,522 |
| 11. Total (Share: Recipient ___0.00___ % Federal __100.00__ %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and chandler.caitlyn@epa.gov.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and chandler.caitlyn@epa.gov.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: moore.kelley@epa.gov and chandler.caitlyn@epa.gov

Payment requests (if applicable): moore.kelley@epa.gov

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: moore.kelley@epa.gov

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

## Programmatic Conditions

### Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

### I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa. gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

**Freely Associated States:** *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a)** the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity. Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the [EPA Guidance on Selected Items of Cost for Recipients](#)). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

Docusign Envelope ID: 2E2032D4-733D-4942-AFE0-G36A4E97G8D4　　Case 2:25-cv-02015-TMC　　Document 87-1　　Filed 11/14/25　　Page 178 of 220

5H - 84089901 - 1　　Page 13

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

2E2032D4-733D-4943-AFE0-G36A4E97F8D4

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition*:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Docusign Envelope ID: 2E2032D4-733D-4943-A5E0-C36A44E97E8D4
Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 183 of 220

5H - 84089901 - 1    Page 18

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1, EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Docusign Envelope ID: 2E2032D4-733D-4942-AFE0-G36A44E97E8D4
Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 194 of 220

5H - 84089901 - 1    Page 29

**Beneficiaries**

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

> "[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:
>
> **a. Solicitation and Contract Requirements:**
>
> > **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
> >
> > **ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants,"
>
> **b. After Award of Contract:**
>
> > **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
> >
> > **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

    1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

    2. Privately-owned commercial buildings when they meet the "public function" test;

    3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

Docusign Envelope ID: 2E2032D4-733D-4941-AFE0-G36A44E97E8D4
Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 198 of 220

5H - 84089901 - 1    Page 33

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

## Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

    1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

    2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

    3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

    4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

    5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Docusign Envelope ID: 2E2032D4-733D-4942-AFE0-G36A4E97E8D4
Case 2:25-cv-02015-TMC    Document 87-1    Filed 11/14/25    Page 208 of 220

5H - 84089901 - 1    Page 43

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

EXHIBIT 6

**From:** SFA <SFA@epa.gov>
**Sent:** Wednesday, October 1, 2025 4:21 PM
**To:** SFA <SFA@epa.gov>
**Subject:** Solar for All Grant Closeout Instructions

**EXTERNAL SENDER: Do not open attachments or click on links unless you recognize and trust the sender.**

Hello,

EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.

The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:

Final Federal Financial Report (SF-425)
**Submission Instructions**:
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details**:
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.
- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.

- o If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance <u>during the entire performance period</u> (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - o In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - o Progress towards objectives on program key performance metrics during the performance period.
  - o Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - o Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - o Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - o *[If applicable]* Plans for key activities, including anonymized current transaction and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.
- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:

- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews.

Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,
Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 7



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 28, 2025

**MEMORANDUM**

**SUBJECT:**   Update on Dispute of EPA Assistance Agreement 5H-84089901 under 2 CFR 200.340

**FROM:**   Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**   Kerrick Johnson, Commissioner
Vermont Department of Public Service

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84089901. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by
MICHAEL MOLINA
Date: 2025.10.28
16:41:06 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

# EXHIBIT 8



**State of Vermont**
**Department of Public Service**
112 State Street
Montpelier, VT 05620-2601
**http://public service.vermont.gov**

[phone]   802-828-2811
[fax]        802-828-2342
[tdd]       800-734-8390

November 7, 2025


Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC  20460

**RE:      Objection to Closeout of EPA Assistance Agreement #84089901**

Dear Mr. Brown:

On September 5, 2025, the Vermont Department of Public Service (Vermont) submitted to the U.S. Environmental Protection Agency (EPA) a Dispute of Termination of EPA Assistance Agreement 84089901 pursuant to 2 C.F.R. § 1500.15.  Despite that timely dispute, on October 1, 2025, Vermont received email correspondence from SFA@epa.gov containing "Solar for All Grant Closeout Instructions" and demanding that Vermont complete closeout within 120 calendar days of the "the date of termination that is listed in your award amendment."

Vermont has now received EPA's October 28, 2025, letter purporting to declare moot Vermont's "dispute regarding the termination of Assistance Agreement 84089901." The sole basis provided for EPA's mootness determination is that "there is a current lawsuit in place regarding the validity of the termination of your assistance agreement." We write to obtain clarification regarding EPA's mootness determination and to formally object to EPA's demand that Vermont closeout Assistance Agreement 84089901.

As an initial matter, clarification is needed because EPA's October 28, 2025, letter states "your dispute was submitted on August 28, 2025." But Vermont did not submit its Part 1500 dispute on August 28, 2025. Rather, August 28, 2025, is the date that Vermont submitted its 21-day Notice of Disagreement in accordance with EPA's August 8, 2025, Assistance Amendment. Vermont submitted its Part 1500 dispute on September 5, 2025.

Thus, it is unclear which of Vermont's disputes EPA has rendered moot.  Vermont disagrees with EPA's apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot proceed if related litigation is pending.  EPA cites no authority for this proposition, and we are aware of no authority that would prohibit EPA from correcting its unlawful termination decision through a streamlined administrative dispute, rather than through cumbersome litigation.

**Objection to Closeout of EPA Assistance Agreement #84089901**
**November 7, 2025**
**Page 2 of 2**

We therefore respectfully request that EPA reverse its mootness determination and allow the administrative dispute to proceed. At a minimum, EPA should stay the administrative dispute until the conclusion of Vermont's lawsuit challenging EPA's termination of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015 (the District Court litigation). More importantly, and regardless of any determination regarding the status of Vermont's administrative challenges to the termination, closeout is improper at this time.

As you are aware, in addition to the District Court litigation, Vermont has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS. It would be inappropriate and prejudicial to require Vermont to effect a closeout while litigation is pending that directly concerns EPA's termination of this grant. Cf. 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if (1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may closeout a grant only after it "determines that all administrative actions and required work of the Federal award have been completed."  Vermont has complied—and continues to comply—with the terms and conditions of the Solar for All program.  EPA unilaterally terminated these grants and illegally deobligated $57,564,108.30 from Vermont's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire.  As a result of EPA's unlawful actions, Vermont has not been able to complete the work required under Assistance Agreement 84089901. Accordingly, EPA necessarily cannot "determine that all administrative actions and required work of the Federal award have been completed" as would be required to effect a timely and complete closeout.

Vermont does not agree to closeout Assistance Agreement 84089901 while litigation relating to this grant is pending. We seek an extension for our closeout date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral action on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)(c).

Please confirm receipt of this correspondence no later than 5:00 pm on November 12, 2025.

Sincerely,

Signed by:

*Kerrick Johnson*

282C50C995A9481...

Kerrick Johnson
Commissioner

Cc: Michael Molina